# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:21-cv-01997 |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, CHRIS GONZALEZ, | § | |
| PAM GOODSON, KAREN PECK, JOSEF D. | § | |
| KLAM, MINDA CAESAR, CHRIS | § | |
| EARNEST, J. CARTER BREED, in their | § | |
| official capacity as members of the Board of | § | |
| Trustees of Spring Branch ISD. | § | |
| | § | |
| *Defendants.* | § | |

---

## PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

---

Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6601
(713) 228-6605 (fax)
barry.abrams@blankrome.com

Martin Golando
Texas Bar No. 24059153
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 West Magnolia
San Antonio, Texas 78201
(210) 471-1185
martin.golando@gmail.com

# **Table of Contents**

Table of Authorities ............................................................................................................... iii

I.   Introduction ....................................................................................................................... 1

II.  Background Facts .............................................................................................................. 2

   A. General Facts About SBISD. ........................................................................................ 2

   B. Spring Branch Community History and Racial and Ethnic Change. ........................... 4

   C. Jurisdictional Facts for Plaintiff. ................................................................................ 7

III.    Argument ........................................................................................................................ 7

   A. Violation of the Right to Vote Plainly Constitutes Irreparable Harm. ........................ 7

   B. Elizondo is substantially likely to succeed on the merits of her claim that SBISD's at-large election scheme violates Section 2 of VRA. ................................................... 8

      1.   The Legal Framework of the VRA. ......................................................................... 8

      2.   Gingles preconditions and Senate Factors. ........................................................... 9

      3.   Hispanics are sufficiently large in number and geographically compact to constitute a majority in at least one Single Member District in SBISD. ................ 11

      4.   Hispanics in SBISD are politically cohesive, and their preferred candidates are usually defeated by White bloc voting. ................................................................. 12

      5.   Under the Totality of the Circumstances, SBISD At-Large System Violates the Voting Rights Act…………………………………………………………………………....16

      a.   Whether minority group members have been elected to office in SBISD and whether voting is racially polarized................................................................... 16

      b. Whether a history of discrimination against Hispanics exists. ......................... 17

      c.   Use of a staggered election system enhances the dilutive effect of the at-large election system. 19

      d.   SBISD Hispanics bear the effects of discrimination in education, employment and health that impair their ability to participate in the political process. ......... 20

      e.   Whether elections involving Hispanic candidates have involved racial and ethnic appeals....... 23

   C. The balance of equities tips in Plaintiff's favor. ....................................................... 25

   D. The injunction is in the public interest. ..................................................................... 26

   E. The Court should issue a Preliminary Injunction enjoining SBISD from Conducting the May 2022 Election Under an At-Large System. ................................................... 27

IV.    Conclusion & Prayer ..................................................................................................... 27

CERTIFICATE OF SERVICE ............................................................................................. 28

CERTIFICATE OF CONFERENCE ................................................................................... 28

## Table of Authorities

Cases

*Benavidez v. Irving Indep. Sch. Dist., Texas*, 690 F. Supp. 2d 451 .............................................11

*Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469 ...........................................................20

*Cisneros v. Pasadena Indep. Sch. Dist.*, .................................................................................13

*City of Rome v. United States*, 446 U.S. 156 ...........................................................................20

*Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393 ..........................................................................13

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 .................................................25

*Goosby v. Town Bd. of Hempstead*, 180 F.3d 476 ...................................................................17

*Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 ..............................................26

*Janvey v. Alguire*, 647 F.3d 585...............................................................................................25

*Johnson v. DeGrandy*, 512 U.S. 997 ........................................................................................9

*League of Women Voters of Florida v. Browning* .....................................................................26

*NAACP v. City of Niagara Falls*, 65 F.3d 1002 ......................................................................16

*Neal v. Coleburn*, 689 F. Supp. 1426 ......................................................................................27

*Neal v. Harris*, 837 F.2d 632 ..................................................................................................27

*Patino v. City of Pasadena*, 229 F. Supp. 3d 582 .....................................................................8

*Reyes v. City of Farmers Branch, Texas* .....................................................................................9

*Reynolds v. Sims*, 377 U.S. 533 .................................................................................................7

*Teague v. Attala County*, 92 F.3d 283......................................................................................23

*Thornburg v. Gingles*, 478 U.S. 30 ...........................................................................................9

*United States v. Osceola County* ..............................................................................................8

*Veasey v. Abbott*, 830 F.3d 216 .................................................................................................8

*Wesberry v. Sanders*, 376 U.S. 1 .............................................................................................26

*Williams v. Rhodes*, 393 U.S. 23 .............................................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 ...................................................................7

Statutes

52 U.S.C. § 10101 .......................................................................................................................7

52 U.S.C. § 10301 .......................................................................................................................8

52 U.S.C. §10301 ........................................................................................................................1

## Other Authorities

S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28...........................................................................10

## I.      Introduction

Plaintiff Virginia Elizondo respectfully moves the Court for a preliminary injunction prohibiting Spring Branch Independent School District ("SBISD") from conducting school board trustee elections currently scheduled for May 7, 2022. Absent an injunction, trustee elections improperly will go forward utilizing the current "at-large" method of electing school board members, which unlawfully dilutes Latino voting strength in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. §10301 ("VRA").

As discussed in greater detail below, Plaintiff is entitled to the injunctive relief sought because:

(1) **Plaintiff is likely to succeed on the merits** since: (a) Hispanics are sufficiently large in number and geographically compact to constitute a majority in at least one Single Member District in SBISD; (b) Hispanics in SBISD are politically cohesive, and their preferred candidates are usually defeated by White bloc voting; and (c) under the totality of the circumstances, the SBISD at-large electoral system violates the Voting Rights Act, since: (i) SBISD's schools and residential populations are starkly segregated by race and ethnicity; (ii) SBISD has a historical pattern and practice of impairing the voting rights of its minority voters by, among other things, discriminatory placement of early voting locations solely in majority white portions of the district and failing to comply with State voter registration laws which would increase minority voter participation; (iii) as a result of historical discrimination against Hispanics in Texas, Houston and Spring Branch, their ability to participate effectively in the political process remains impaired; and (iv) a single-member plan for SBISD would likely strongly improve bilingual and other educational outcomes critical for Hispanic students and increase the responsiveness of school board trustees to minority and low-income students, minority voters and minority educators.

(2) **Plaintiff and other minority voters in SBISD are likely to suffer irreparable harm absent preliminary relief**, since impairment of their right to a meaningful vote and the full and effective participation in the political process is in and of itself irreparable harm.

(3) **The balance of equities tips in Plaintiff's favor**, since the threatened and ongoing injury to the rights of Plaintiff and other minority SBISD voters outweighs any potential harm that an injunction might cause Defendants. Voting is a fundamental right and no adequate remedy at law exists for a vote cast in an election scheme that violates federal law. No harm will befall SBISD if the May 2022 at-large trustee election is enjoined pending implementation of single-member district election plan that will preserve the rights of Hispanic and other minority voters throughout the school district.

(4) **An injunction is in the public interest**, since enjoining the challenged illegal election system would ensure the vindication of constitutional rights and the enforcement of a federal statute which, by definition, serves the public interest.

Plaintiff supports her Application with: (1) the Report of Robert M. Stein, Ph.D., attached as **Exhibit A**; (2) the Report of Andres Tijerina, Ph.D., attached as **Exhibit B**; (3) the Depositions of the SBISD Corporate Representatives (Christine Porter, Kristin Craft, and Karen Heeth), attached as **Exhibits C, D and E;** and (4) the Declaration of Virginia Elizondo, attached as **Exhibit F**.

## II.    Background Facts

This is a Section 2 challenge to the "at-large" method of electing members of the SBISD Board of Trustees. No minority candidate has ever been elected to serve on the SBISD board even though more than 55% of the SBISD voting population is non-Anglo. Plaintiff is a Hispanic registered voter in SBISD. Defendants are responsible for conducting elections for members of the SBISD board of trustees.

### A.  General Facts About SBISD.

SBISD is an independent school district that elects its seven-member school board "at-large" meaning that the trustees are elected by all voters within the jurisdiction rather than from single-member districts. The trustees are elected to three-year terms and by place. Trustee elections are held each May. In 2022, elections for place 5, 6, and 7 will be held. Candidate filing began on January 19, 2002 and will conclude on February 18, 2022.

Between 2015 and 2021, SBISD conducted ten trustee elections. Four of the ten contests were uncontested (i.e., only one candidate stood for election). In four elections, a Hispanic candidate ran and was defeated by an Anglo candidate. Virginia Elizondo ran in 2015 and 2021. Noel Lezama ran in 2018. David Lopez ran in 2019.

According to the 2020 Census, SBISD contains a total population of 183,364. If SBISD were divided into a seven member districting plan, then each district would contain approximately 26,194 people. SBISD's population is 40.7% Hispanic, 41.7% White, 10.2% Asian, and 6.6% African American.

**SBISD Total Population[1] – 2020 US Census**

| District | Total | Anglo | Non-Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|---|---|
| Total Population | 183,364 | 76,444 | 106,920 | 18,756 | 12,190 | 74,701 |
| Voting Age Population | 136,493 | 60,978 | 75,515 | 14,122 | 8,759 | 51,384 |

| District | % Anglo | %Non-Anglo | % Asian | % Black | % Hispanic |
|---|---|---|---|---|---|
| Total Population | 41.7 | 58.3 | 10.2 | 6.6 | 40.7 |
| Voting Age Population | 44.7 | 55.3 | 10.3 | 6.4 | 37.6 |

According to the 2015-2019 American Community Survey, the Citizen Voting Age Population (CVAP) of SBISD is 24.8% Hispanic, 59.7% White, 6.2% African American, and 7.6% Asian. Spanish Surname Voter Registration (SSVR) measures the amount and percentage of registered voters with Hispanic surnames. The SSVR for SBISD for the 2020 election was 17.26%.

SBISD has seven election precincts, which are based upon the SBISD middle school enrollment zones: Spring Forest, Spring Oaks, Northbrook, Spring Woods, Landrum, Spring Branch, and Memorial. Four of the election precincts and middle school enrollment zones lie north of Interstate Highway 10 ("I-10") and are overwhelmingly populated by Hispanic students; three of the precincts and middle school enrollment zones lie south of I-10, apart from portions north of I-10 largely falling within the boundaries of two heavily racially and segregated incorporated villages (Spring Valley Village and Hilshire Village). The majority student population of the enrollment districts south of I-10 are Anglo, or White.

---

[1] The percentage numbers may not add up to 100% because of rounding.

3

**Spring Branch ISD Enrollment Zones/Voting Precincts**



**B.  Spring Branch Community History and Racial and Ethnic Change.**

The Spring Branch community was settled in the late 1840s as an early wagon road constructed along the trail from Stephen F. Austin's colony in 1830, now located in Spring Branch in the west side of present-day Houston, Texas. An early settlement, Piney Point Village, developed along the south side of Buffalo Bayou, along with Hunters Creek Village, while other villages developed north of Buffalo Bayou in the region that came to be known as Spring Branch. The other villages included Hedwig Village, Bunker Hill Village, Hilshire Village, and Spring Valley Village. Collectively, the villages are often called the "Memorial Villages." The original settlers were German immigrants and Anglo Americans, many of whom brought enslaved African Americans to the settlement.

When the U.S. Supreme Court ruled racially discriminatory schools to be unconstitutional in *Brown v. Board of Education* (1954), Houston city leaders railed against the ruling. During this time a group of "prominent Houstonians" organized a Citizens League against desegregation of "white and Negro pupils" in the Houston public school system. Chaired by attorney Fred W. Moore, the Citizens League raised "substantial financial aid," and launched a series of legal challenges and proposals in opposition to integration.

Contemporaneously, the Memorial Villages incorporated with strict zoning ordinances. The larger Spring Branch area was annexed by the city of Houston in 1957, excluding the Memorial villages. By 1973 the Spring Branch Independent School District represented the Memorial Villages and the city of Houston, and had 40,200 students and 2,276 teachers. The exclusive Memorial Villages developed an affluent character, and their school district reflected a similar success rate with over 80% of the Spring Branch ISD graduates continuing into college by the 1980s.

The 1980s saw a major downturn in the Texas oil economy, and the effects of over-building in real estate. The real estate market decline left large apartment complexes vacant, and by 1990 a major influx of low-income families had moved into the apartments in the West Houston and Spring Branch area. Many of the new residents were recent immigrants from Central America as well as members of a sizeable Korean population. The result was that the Spring Branch Independent School District suddenly included low-income ethnic immigrants, mostly Hispanic or Latino, in addition to residents of the exclusive Memorial Villages, located primarily south of I-10. This demographic change resulted in a stark contrast by almost any standard demographic or social criterion between the north and south sides of I-10.

The Memorial Villages were (and are) exclusive Anglo enclaves, surrounded by the City of Houston, and adjacent to their new fellow Hispanic and Latino school district residents. The

websites of the Memorial Villages reported that according to the 2010 U. S. Census, their populations consisted of 67% to 94.4% Anglos, with very small populations of Asians, Latinos, or African Americans. Hunters Creek Village, for example, reported only 2.7% Latinos and a Black population of 0.4%.

The significant contrast between the demographic characteristics of the Memorial Villages and the north side of I-10 in SBISD is second only to the population increases occurring after 1980. The rapid and significant change in population in Spring Branch is reflected in the national census records. This surge was exacerbated even more by the racial and cultural differences between the resident population and the new immigrants. Texas led the nation in population increase, and its cities led all other cities in the nation. For example in the decade before 2010, Houston, Atlanta, and Dallas-Fort Worth (26.1 percent, 24.0 percent, and 23.4 percent, respectively) were the fastest-growing metro areas in the Nation. The Houston and Dallas-Fort Worth metro areas alone accounted for almost one-half (49.0 percent) of the Texas population and over one-half (56.9 percent) of the state's population growth. Two counties, Harris County and Dallas County, accounted for over one-quarter (25.7 percent) of the population of the nation's second largest state and 19.6 percent of its growth. The Houston-Sugar Land-Baytown Metro area grew by 1,231,393 or 26.1 percent between 2000 and 2010—and that was a smaller increase than its growth between 1990 and 2000. From its population of 1,430,000 in 1960, Houston had already grown by 39.8% to 1,999,000 in 1970. This was matched by the Dallas – Ft. Worth Metroplex, which grew by 36.8% from 1,738,000 in1960 to 2,378,000 by1970.

The increase in Houston's population before 2010 exceeded the rapid growth after 2000, and the rate of increase in its Latino population exceeded the growth rate for Houston's overall population. The increase of its Mexican population alone, for example, distinguished Houston as one of the top three growing MSA's in the United States, with its Mexican population nearly tripling in the years between 1990 and 2000. The Mexican population of Houston increased by

75% in 2000 (from 576,937 in 1990 to 1,010,721). In 2010, it increased another 55% (to 1,567,286). That represented a 172% increase in the Mexican population of Houston from 1990 to 2010, excluding Latinos of other national origins. The Spring Branch census statistics also reflect the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicate that by 2019, the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only 13.1% White.

### C.  Jurisdictional Facts for Plaintiff.

Plaintiff Elizondo is a registered voter in SBISD. She resides in District 1 of an HCVAP majority district in a proposed single-member district plan for SBISD. (**Exhibit F** – Declaration of Plaintiff Virginia Elizondo). She has voted and will vote in upcoming SBISD elections. *Id.*

### III.  Argument

To obtain a preliminary injunction, a plaintiff must show "[1] that [s]he is likely to succeed on the merits, [2] that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [her] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Elizondo can satisfy each of those elements. Granting  a preliminary injunction is particularly appropriate here, because  federal law requires that voting rights cases "be in every way expedited." 52 U.S.C. § 10101 (g).

### A.  Violation of the Right to Vote Plainly Constitutes Irreparable Harm.

No question exists that violation of the right to vote constitutes irreparable harm. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process therefore is in and of itself a claim of irreparable harm.

7

Holding an election under an unlawful plan with discriminatory effects results in a serious and irreparable injury. *Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) (en banc) ("It would be untenable to permit a law with a discriminatory effect to remain in operation for th[e] election."); *cf. Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."). A court should be "should be extremely reluctant to have an election take place under a law … under [an election scheme] … is discriminatory." *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 589 (S.D. Tex. 2017)(Rosenthal, C.J). Denial of equal electoral access also discourages future participation by similarly situated voters. *See, e.g., United States v. Osceola County*, No. 6:05- cv-1053, 2006 WL 2989268, at *11 n.30 (M.D. Fla. Oct. 18, 2006) ("[T]here is a sense of futility that often leads Hispanics to not participate in contests where there does not appear to be a reasonable opportunity for their preferred candidate to win.") (finding Section 2 violation in Florida county's at-large system of election).

**B. Elizondo is substantially likely to succeed on the merits of her claim that SBISD's at-large election scheme violates Section 2 of VRA.**

**1.     The Legal Framework of the VRA.**

Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301, reads:

(a) No voting qualification or pre-requisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered; provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

8

No dispute exists that SBISD's at-large system for electing its Board of Trustees is an electoral practice or procedure that is subject to challenge under the VRA.

### 2. *Gingles* preconditions and Senate Factors.

The Supreme Court construed the VRA in its amended version for the first time in an action challenging a multi-member at-large districting scheme. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). In *Gingles*, 478 U.S. at 34, the Supreme Court set out three "preconditions" that must be met for a challenge under Section 2 of the Voting Rights Act to be successful:

1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district;

2) the minority group must be politically cohesive and vote as a bloc; and

3) the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate.

No specific showing of discriminatory intent is required to prove a Section 2 violation. *See id.* at 70-73 (Brennan, J. plurality op.).

An analysis of the three *Gingles* factors and whether each has been proven by a preponderance of the evidence is the first step in a two-part analysis of a vote dilution claim on behalf of minority voters. The Supreme Court has held that satisfying the three *Gingles* preconditions alone does not suffice to prevail on a Section 2 vote dilution claim. *See Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). Accordingly, in addition to confirming that Plaintiff has, in fact, satisfied three *Gingles* factors, this Court also must consider whether the Plaintiff has "demonstrate[d] that, under the totality of the circumstances, 'its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Reyes v. City of Farmers Branch, Texas*, 2008 U.S. Dist. LEXIS 89599, 2008 WL 4791498, at *2 (N.D. Tex. Nov. 4, 2008) (citation omitted).

Judicial assessment of the totality of the circumstances requires a "searching practical evaluation of the past and present reality." *Gingles*, 478 U.S. at 45. The key to this inquiry is an

examination of the seven principal factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act, the so called "Senate factors." *See* S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982) (the "Senate Report"). The additional factors listed in the Senate Report are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

> 6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

In addition, the Senate Report adds two other considerations that may have probative value in vote dilution cases, specifically: (1) whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group; and (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The list of Senate factors is "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. Plaintiff need not prove a majority of these factors, nor even any particular number of them in order to sustain their claims. "Multimember districts and at-large election schemes . . . are not *per*

*se* violative of minority voters' rights. Minority voters who contend that the multimember form of districting violates § 2[] must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates." *Benavidez v. Irving Indep. Sch. Dist., Texas*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010) ("*Benavidez II*") (citing *Gingles*, 478 U.S. at 48).

As documented in the report of Rice University Professor Robert M. Stein, a well-recognized national expert in elections, voting behavior, election sciences and public policy (the "Stein Report"), the at-large procedure SBISD utilizes to elect its school board trustees has precisely that improper effect: it operates to preclude the ability of minority SBISD voters to elect their preferred candidates. *See* **Exhibit A**.

### 3. Hispanics are sufficiently large in number and geographically compact to constitute a majority in at least one Single Member District in SBISD.

Plaintiff Elizondo has established the first *Gingles* precondition and the District admits this fact. Hispanics in SBISD are "sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50. *See* **Exhibit C**, Deposition of SBISD Corporate Representative Christine Porter ("SBISD Porter Deposition"), at pp. 34/8 – 35/13; **Exhibit A**, Stein Report at p. 3, 7-8. Professor Stein has drawn an illustrative single-member district plan under which SBISD would maintain the same number of Trustees, but elected by district rather than at large. (*See* **Exhibit A**, Stein Report at p. 8). Based on the 2020 Census and the 2015-2019 American Community Survey, Hispanics constitute a 72% majority of the voting age population and a 52.8% majority of the citizen voting age population of District 1 in the illustrative plan. The illustrative district plan complies with one person, one vote principles and each district is reasonably compact. (*Id.*) This plan satisfies the first *Gingles* precondition.

**Demonstrative Spring Branch ISD Single-Member District**



**Table 1**
**Citizen Voting Age Population by SBSID Voting District**

| District | Total Population | Voting Age Population | Citizen Voting Age Population | % Hispanic Citizen Voting Age Population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

**4. Hispanics in SBISD are politically cohesive, and their preferred candidates are usually defeated by White bloc voting.**

Plaintiff Elizondo also satisfies the second and third *Gingles* preconditions: Hispanic voters

vote cohesively and their candidates of choice are usually defeated by white bloc voting. *See*

12

*Gingles*, 478 U.S. at 50-51. The second and third *Gingles* preconditions assess whether voting is racially polarized. There is no mathematical or numerical threshold for determining the existence of polarized or bloc voting for purposes of Section 2. Instead, legally significant racial polarization exists "where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes' . . . or to put it differently, where '[minority] voters and white voters vote differently.'" *Id.* at 53 n.21.

The most relevant elections for purposes of assessing racial and ethnic polarization are generally endogenous elections, i.e., elections for the particular office at issue. *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 U.S. Dist. LEXIS 58278 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014)(Ellison, J.); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996). Here, endogenous elections are SBISD trustee elections. Professor Stein analyzed the extent to which voting behavior in SBISD trustee elections is racially polarized. (*See* **Exhibit A**, Stein Report, pp. 3, 5-7). Professor has analyzed each of the ten SBISD elections from 2015 to 2021 and found a strong pattern of racial and ethnic voter polarization.

Racially polarized voting is established when the direction of the relationships between the race or ethnicity of voters and candidates are "signed" in opposite directions. *Id.* A second condition for polarized voting is when the White majority vote against a minority preferred candidate i.e., Hispanic candidate, is significant and positive. *Id.* That is, the share of vote the Hispanic received increases significantly as the proportion of voters in each voting district increases. Racially polarized voting is observed in every election in SBISD studied by Prof. Stein. *Id.* at 5. White and Hispanic voters diverge in their support for each candidate on the ballot, including uncontested contests, where under votes are treated as a second candidate. *Id.*

13

*Fig 1: The proportion of vote cast for white candidate and Share of vote White*



*Fig 2: The proportion of vote cast for white candidate and Share of vote Hispanic*

*Fig 3: The proportion of vote cast for Hispanic candidate and Share of vote White*



*Fig 4: The proportion of vote cast for Hispanic candidate and Share of vote Hispanic*



As the foregoing graphs indicate, whites and Hispanics had opposite preferences for candidates in all SBISD elections from 2015 to 2020. The Hispanic preferred candidate has lost in every trustee election in SBISD. At the same time, the White majority preferred different candidates and won every election in the time period examined.

Having met the three *Gingles* preconditions, Plaintiff is presumptively entitled to relief: "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but have still failed to establish a violation of § 2 under a totality of the circumstances." *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1020 (2d Cir. 1995).

## 5. Under the Totality of the Circumstances, SBISD At-Large System Violates the Voting Rights Act.

### a. Whether minority group members have been elected to office in SBISD and whether voting is racially polarized.

In *Gingles*, the Supreme Court emphasized that the two most important Senate factors are (1) the "extent to which minority group members have been elected to public office in the jurisdiction" and (2) the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 48 n.15. If those factors are present, the other factors "are supportive of, but not essential to, a minority voter's claim." *Id*. These two Senate factors (factors # 2 and # 7) are without doubt met here.

- The election results discussed above leave no room to debate the fact that voting in SBISD trustee elections is polarized along ethnic lines (Senate factor # 2). *See* **Exhibit A,** Stein Report, Figures 1-4.

- No Hispanic candidate or any other minority candidate has ever been elected to public office in SBISD (Senate factor # 7). *See* **Exhibit C**, SBISD Porter Deposition at pp. 29-30. The lack of Hispanic representation is not for want of trying. There have been, at least, three Hispanics who have run for Trustee for SBISD, the Plaintiff, Noel Lezama and David Lopez. All were defeated by Anglo candidates. Lezama ran for election as a SBISD trustee in 2018. Plaintiff, Elizondo, ran for election as a SBISD trustee on two occasions, in 2015 and again in 2021. David Lopez ran for election as a SBISD trustee in 2019. Plaintiff Elizondo therefore has conclusively established Senate Factor #7.

16

Having met the *Gingles* preconditions, and satisfied the two most important Senate factors, Plaintiff need not show more. "[N]o specified number of factors need be proved, and . . . it is not necessary for a majority of the factors to favor one position or another." *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 492 (2d Cir. 1999). Yet there can be no legitimate dispute that the Plaintiff is substantially likely to succeed in proving its case with respect to several additional Senate factors.

### b. Whether a history of discrimination against Hispanics exists.

There is a longstanding history of official discrimination against Hispanics in Harris County, including in SBISD (Senate factor # 1). Professor Andres Tijerina, a historian and expert witness retained by the Plaintiffs who specializes in the history of discrimination Tejanos and Hispanics in Texas, has submitted a report detailing the extensive history of discrimination against Hispanics in Texas, Harris County, and SBISD. *See* **Exhibit B**, Report of Andres Tijerina, Ph.D., ("Tijerina Report").  Until the very recent past, Texas had a segregated school system in which Latinos and Anglo school children were taught at separate schools. *Id*. at p. 22-3. "The 'Mexican School' became a widespread phenomenon in Texas education. The various school districts segregated their Latino students, but they provided significantly poorer facilities for them." *Id*. at p. 22. In one study, "[t]he Latino schools had 48 students per room compared to 23 Anglo students per room. The school funding revealed similar contrast, as the school board spent $24.50 for each Latino student compared to $35.96 average spending per Anglo pupil." *Id*. at p. 24. "Gerrymandering of attendance zones within a district became widespread by the late 1940s." *Id*.

SBISD has experienced a dramatic influx of Latino students over the past thirty years. "The Spring Branch census statistics . . .  showed the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicated that the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only

13.1% White by 2019." *Id*. at p. 34. The rapid statistical transition in Spring Branch is also starkly reflected the social, cultural, and economic changes within SBISD.

SBISD admits that in the past twenty years the racial and ethnic composition of the population in the district has changed significantly. *See* **Exhibit C**, SBISD Porter Deposition at p. 23. SBISD, the district admits, is now a majority minority district. *Id*. at 24.What once was a district in which the majority of the voters and students were white is now a district where the Hispanic population is greater than the white population and the percentage of Hispanic students is more than twice the percentage of White students. *Id*. at 23. Moreover, a substantial majority of its students are economically disadvantaged, and a greater proportion of its minority students are economically disadvantaged than are its White students. *Id.* at 25-26. SBISD also admits that in the four election precincts and middle school enrollment districts located north of I-10, the student population is overwhelmingly comprised of Hispanic students, averaging approximately 87 percent of the student population in those areas. *Id.* at 45. In the remaining three election and middle school enrollment districts located primarily south of I-19, the student bodies are between 42 and 52 percent White. *Id*.

At some point the growing cultural differences between the affluent Anglo American Spring Branch residents and their northern Latino and minority neighbors began to manifest itself in suspicion, conflict, and outright fear. *See* **Exhibit B**, Tijerina Report at pp. 35-36. These differences were most visible in the legislative proposals advanced by the then State Representative for the area. In 2005, that Representative proposed a bill for public health agencies to enforce vending regulations on the popular Latino taco trucks, or *taquerías* "in the same manner [they enforce] other health and safety regulations relating to food service." Latinos complained that it this was just a "smoke screen" to disguise racial prejudice. But in a very real operation "health and law enforcement officers swept down on 27 taco trucks in Spring Branch" and shut down thirteen. Latinos complained that an "onslaught of squad cars" to enforce a health and safety

regulation was needlessly intimidating. *Id*. at p. 35. In another campaign, the State Representative promoted a bill to allow local law enforcement authorities to challenge Latinos, and deport them if they lacked legal status in the U.S. The Representative not only campaigned publicly on these and other similar issues, but he also reportedly boasted his rigid stance in public meetings and civic club meetings. According to one Latino candidate for the SBISD Board of Trustees, the Representative established a reputation among Spring Branch Latinos as "insensitive" to their needs. Indeed, Latinos quietly articulated their fear of retaliation from their State Representative. *Id*. at p. 36.

More recently, SBISD has evidenced its discrimination toward Hispanic voters by: (1) its placement of every early voting location solely within majority White communities and its failure to designate any early voting locations within any of the portions of the district where a majority of its Hispanic residents and voters live *See* **Exhibit C**, SBISD Porter Deposition at pp. 11/22 – 13/3, 60/5 – 65/1; and (2) by its violation of Texas law regarding the requirement that its high school principals or their designees facilitate voter registration for students who are 18 or who will be 18 years of age or older. *See* **Exhibit E,** SBISD Heeth Deposition at pp. 40/14 – 43/15. The failure to locate early voting locations within the portions of the district where the majority of its Hispanic voters reside (and the location of all such early polling places only within the portions of the district where a majority of its White residents live) and the violation of state law intended to enhance voter participation by students 18 or older, given that the majority of its students are Hispanic, are two recent examples of official actions by SBISD which have had a discriminatory impact on Hispanic voters.

        c.      <u>Use of a staggered election system enhances the dilutive effect of the at-large election system</u>.

SBISD's staggered election system also enhances the dilutive effect of its at-large system (Senate factor # 3). The Supreme Court has held that staggered terms enhance the discriminatory

effect of at-large voting systems. *See City of Rome v. United States*, 446 U.S. 156, 185 n.21 (1980). "[S]taggered terms promote the dilution of minority voting strength because they limit the number of seats, create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting. . . . The discriminatory effect of staggered terms was specifically considered by Congress in the enactment of § 2." *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986). There can be no dispute that SBISD elects its Trustees at-large in staggered elections, in which multiple positions are open at a time. Plaintiff Elizondo therefore is substantially likely to prevail on this point as well.

        d.    <u>SBISD Hispanics bear the effects of discrimination in education, employment and health that impair their ability to participate in the political process</u>.

SBISD's Hispanics bear the effects of discrimination in education, employment, and health that hinder their ability to participate in the political process (Senate factor # 5). Professor Tijerina notes that "a 1977 report issued by the U.S. Commission on Civil Rights reported that 19% of the Latinos over age 25 in Texas were illiterate. Latinos had twice the Anglo unemployment rate, and 15% of them still lived in overcrowded housing with inadequate plumbing as compared to the Anglo 1.7%." **Exhibit B**, Tijerina Report at p. 40). A clear holdover to the Texas 'Mexican town' was the 70% of Latinos in Texas who still lived in barrios. *Id*. In 1981, Judge William Wayne Justice found the state bilingual plan inadequate, and that measures had not been taken to fully "remove the disabling vestiges of past de jure discrimination." *Id*. He ordered corrections to train teachers, identify students in Limited English Proficiency (LEP), and to expand the program. *Id*. And in 1980, the Southwest Voter Registration and Education Project (SVREP) found that Latinos were underrepresented on school boards in 92% of the 361 Texas school districts where Latinos make up over 20% of the school population. *Id*. In many other comparisons, Texas educational

statistics show evidence of past discrimination. A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas, the majority of Latino students are still in "inferior and highly segregated schools." *Id*. They are "disproportionally enrolled in remedial English classes." *Id*. Texas Latino students still have an unacceptably "high dropout" rate, and receive poor preparation for college. *Id*.

The vestiges of this history racial and ethnic discrimination remain present in SBISD. The contrast between a Hispanic or Latino SBISD school and a school with a majority white student population is starkly illustrated by the Accountability Rating and ethnic composition between Hollibrook Elementary School, located north of I-10 (and in the proposed Hispanic single member district) and Hunters Creek Elementary in a Memorial Village, located south of I-10 (School Year 2018-2019). Hunters Creek had 56.9% Anglo students with 20.2% Economically Disadvantaged while Hollibrook had 98.4% Hispanic students, with 98.6% disadvantaged. Hunters Creek has only 18.9% Hispanic students, while Hollibrook Elementary had only .4% Anglo students. *Id*. at p. 36.

**Spring Branch ISD: School Year 2018 – 2019**

| School | Total Students | Hunters Creek | Hollibrook Elem. |
|---|---|---|---|
| Accountability rating | | A | B |
| Total Students | 35,136 | 613 | 764 |
| Hispanic: | 59.3% | 18.9% | 98.4% |
| Anglo: | 26.6% | 60.2% | .4% |
| At-risk students: | 56.9 % | 24.6 | 94.2% |
| Economically disadvantaged: | 59.4 % | 20.2% | 98.6% |
| Limited English proficiency: | 36.7 % | 16.3% | 91.2% |

(Texas Tribune, "Spring Branch ISD" 2021] https://schools.texastribune.org/districts/spring-branch-isd/)

In four of SBISD's seven voting precincts and middle school enrollment zones 78% or more of the students are Hispanic. **Exhibit A**, Stein Report, pp. 9 - 10. In the remaining three voting precincts and middle school enrollment zones 42% to 52% of the students are White. *Id*. Strong evidence exists that the racial and ethnic makeup of SBISD schools and enrollment districts is highly segregated. *Id*. at p. 9. Researchers have identified dissimilarity index scores below .3 as

21

indicating low levels of segregation, .3 to .6 as moderate levels of segregation and .6 and above as high levels of segregation. *Id*. SBISD's dissimilarity index score at the school level is .694 and .596 at the enrollment zone level. *Id*. These scores suggest that well over half of the Hispanic students enrolled in SBISD schools would have to move to another school if one desired to achieve an integrated distribution of students within the district by ethnicity. *Id*.

**Table 2 Percent Enrollment by Race/Ethnicity**

| Enrollment Zone | % White | % Hispanic |
| --- | --- | --- |
| Northbrook Middle | 0.02 | 0.96 |
| Spring Woods Middle | 0.05 | 0.88 |
| Spring Oaks Middle | 0.07 | 0.85 |
| Landrum Middle | 0.13 | 0.78 |
| Spring Forest Middle | 0.42 | 0.36 |
| Spring Branch Middle | 0.47 | 0.36 |
| Memorial Middle | 0.52 | 0.25 |

Another indicator of the contrast in conditions within SBISD schools for Hispanic and other minority students is the Differential Discipline index. The Coalition of Advocates for Restorative Education (CARE) gathered and reported statistics with figures from the Center for Justice Research, Texas Southern University (the "TSU Center"). The CARE report cited the TSU Center's report on "Racial Disparity in SBISD Disciplinary Programs." Its basic finding was that SBISD's disciplinary practices disproportionately impacted minority youth. The report found that while Hispanic American students were only 58.3% of the district's school's population census report, they comprised 86% of the Disciplinary Alternative Education Program (DAEP) referrals in 2016 - 2017. African American students comprise only 4.7% of the district's student population, but represented 15% of DAEP referrals. The report also observed that many of the disciplinary policies and punitive operations employed by the SBISD have no empirical or scientific support. *Id*. at p. 34-5.

The rapid demographic transition in Spring Branch also starkly reflected the social, cultural, and economic changes occurring in the district. One early indication was the condition of the apartments that the Latino immigrants were moving into during the late 1980s and early 1990s.

Residents in nearby neighborhoods complained that the community north of I-10 was overburdened with apartment complexes. Indeed, one apartment complex was so dilapidated that one Houston City Council person led an effort to demolish a 250-unit apartment complex because the City had declared the buildings to be dangerous to other residents. An estimated 8,000 primarily Hispanic residents lived in the five apartment communities surrounding the complex at the time. The effort to purchase and demolish the dilapidated complex failed as well as an effort, but the complex was eventually sold and removed." *Id*. at p. 35.

"Where plaintiffs show disproportionate educational, employment, income level and living conditions . . . and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socioeconomic status and the depressed level of political participation." *Teague v. Attala County*, 92 F.3d 283, 294 (5th Cir. 1996) (quoting S. Rep. No. 417 at 29 n.114). Plaintiff Elizondo is likely to succeed on her claim that SBISD Hispanics and Latinos bear the effects of discrimination in education, employment, and health which hinder their ability to participate in the political process.

e. <u>Whether elections involving Hispanic candidates have involved racial and ethnic appeals.</u>

SBISD elections involving Hispanic candidates have involved racial and ethnic appeals (Senate factor # 6). While SBISD Hispanic and Latino parents complained about inadequate facilities and insensitive State Representatives and School Board members, Anglo parents organized their efforts into committees with names like the Pine Shadows Concerned Citizens or the Parents for Fair Full Funding. *Id*. at p. 38. The Anglo parents couched their complaints in statistics and pedagogical terms, but they openly revealed that their demands had a strong racial appeal as well. *Id*. In 1990, reportedly "Hundreds of Spring Branch parents banded together in opposition to construction of new Pine Shadows Elementary School. *Id*. They say boundary expansion and "increased size of the campus will reduce the quality of education" by adding 700

23

additional students. But the opponents also observed that the proposed enrollment would result from "a large group coming from low-income apartments primarily occupied by minorities," according to Wayne Schaper, then executive director of SBISD administration. *Id*. Bill Ray, then chairman of the Pine Shadows Concerned Citizens, said the concern was about increased size of the campus, "not a racial issue," but his group member Kathleen Drinnan said "racial balance" is the issue. *Id*. She added quite candidly, "We don't want them (the minorities) all in our neighborhood. The associated social problems are documented in schools that are largely minority." *Id*.

In another meeting to protest the mixing of students across the "Mason-Dixon Line" [I-10] one Anglo parent styled her complaint as a social class conflict. *Id*. Germaine Sitomer admitted that she was sending her own child to a private school. *Id*.  She said "'For sale' signs are coming up in Spring Valley. . . We would like to go to Hunters Creek. . . We think that moving a piece of the population of upper middle-class people to an upper middle-class school is the best solution." *Id*. Carlee Klam, president of the Valley Oaks PTA denied "racism, but admitted there has been 'white flight' for the past six years or so as the apartment buildings have added minority children to the school." *Id.* at p. 39. Spring Branch ISD Board President Jerry Mischon said that racism "has been a part of community discussions" at the least "and bigotry at the most." *Id.*

Note that "moving a piece of the population of upper middle-class people to an upper middle class school" is precisely what SBISD has done with respect to districting White residents in Spring Valley Village and Hilshire Villages to schools located south of I-10. **See** Exhibit C, SBISD Porter Deposition at pp. 47/25 – 55/2 and Exhibits 5, 6 and 7, which depict areas north of I-10 comprised largely of White residents and students zoned to schools south of I-10 with majority White enrolments. The fact that the vast majority of the students and voters that SBISD has moved from the north side of I-10 to the south side are White students from White households is "purely coincidental." *Id.*

24

One of the major issues emerging in the 1980s and early 1990 was the passing of a school $48 million bond to build new schools north of the Interstate. *Id*. Spring Branch ISD Superintendent Hal Guthrie told Spring Branch Education Association that Spring Branch added 2,500 elementary students. Several of his elementary schools had enrollments of 900, using 90 portable buildings. *Id*. He conceded that many of the district's parents were circulating opposition flyers against the bonds. Indeed, a Spring Branch parents group called the Pine Shadows Concerned Citizens collected 1,000 signatures to organize a political action committee in opposition to the bond issue. *Id*. The group walked out of Superintendent Guthrie's speech in opposition to building new elementary school and expanding boundaries of an existing school. *Id*. Guthrie admitted that it was the first time the district's parents opposed a bond issue, but he persisted, and eventually passed the bond for the new schools. *Id*.

Plaintiff Elizondo is likely to succeed that there have been racial appeals in SBISD elections.

**C. The balance of equities tips in Plaintiff's favor.**

The threatened and ongoing injury to Plaintiff and other minority voters outweighs any potential harm that an injunction might cause Defendants. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir. Unit B 1981). Voting is a fundamental right that is essential to preserve all democratic rights and it "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Sims*, 377 U.S. at 555, 561. No adequate remedy at law exists should the May 2022 election be allowed to proceed under the existing at-large system, because a vote cast in an election under an election scheme that violates federal law cannot be remedied. Harm is, therefore, irreparable. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

The harm Plaintiff and other Hispanic and minority voters face is not merely speculative, but inevitable were they to be forced to cast their ballots in an unconstitutional election scheme.

*Sims*, 377 U.S. at 565 ("[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. . . . [T]he Constitution demands, no less.").

No harm would befall SBISD by enjoining the May 2022 trustee election until a single-member district plan can be implemented that will preserve the rights of Hispanic and Latino voters throughout the district. No government is entitled to violate federal law. Therefore there is no harm to the Defendants by enjoining the current at-large election scheme. At the same time, Plaintiff and other voters will sustain a tremendous injury if forced to participate in an election that violates Section 2 of the VRA. Because Defendants cannot show that a countervailing interest exists, much less a "powerful" harm to their interests, the balance of equities favors Plaintiff's request for injunctive relief.

### D.  The injunction is in the public interest.

The public interest is best served by allowing voters to cast their ballots in an election that does not violate federal law. Granting a preliminary injunction therefore will serve the public interest. Enjoining the challenged election system would ensure "[t]he vindication of constitutional rights and the enforcement of a federal statute," an achievement which "serve[s] the public interest almost by definition." *League of Women Voters of Florida v. Browning*, 2012 WL 1957793, at *11. Indeed, the Supreme Court has "often reiterated that voting is of the most fundamental significance under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); s*ee also Williams v. Rhodes*, 393 U.S. 23, 31 (1968) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964))). A preliminary injunction therefore should issue.

**E.   The Court should issue a Preliminary Injunction enjoining SBISD from Conducting the May 2022 Election Under an At-Large System.**

The standard remedy for a Section 2 violation involving an at-large election is to require the locality to implement a district plan. *See Goosby*, 180 F.3d at 498 ("We think that the six-district plan is an entirely appropriate remedy under the circumstances."); *Osceola County*, 2006 WL 2989268, at *13 (county at-large system violated Section 2 and county must submit remedial plan within thirty days). At this stage, SBISD should be enjoined from proceeding with the May 2022 election for two Trustee positions under an at-large system, but it may conduct the election provided that it implements a district plan that complies with the Voting Rights Act. An at-large election may be set aside and a new election ordered. *See, e.g., Neal v. Harris*, 837 F.2d 632 (4th Cir. 1987) (affirming district court order of special election); *Neal v. Coleburn*, 689 F. Supp. 1426, 1439 (E.D. Va. 1988) (ordering special election).

**IV.   Conclusion & Prayer**

For the foregoing reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer and that the Court take the following actions:

A)   grant appropriate preliminary injunctive relief enjoining the "at-large" election system for SBISD; and,

B)   adopt a single-member district plan for use in the upcoming 2022 election cycle.

**DATED**: February 1, 2022                                Respectfully,

By: /s/ Barry Abrams
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6601
(713) 228-6605 (fax)
barry.abrams@blankrome.com

Martin Golando
Texas Bar No. 24059153
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 West Magnolia
San Antonio, Texas 78201
(210) 471-1185
Martin.Golando@gmail.com

## CERTIFICATE OF SERVICE

I certify that on February 1, 2022, in accordance with the Federal Rules of Civil Procedure, a true and correct copy of the foregoing document was served, via ECF, to the following counsel:

Charles J. Crawford
ccrawford@abernathy-law.com
Lucas Henry
lhenry@abernathy-law.com
ABERNATHY ROEDER BOYD HULLETT,LLP
1700 N. Redbud Blvd. Ste. 300
McKinney, Texas 75069

Christopher B. Gilbert
cgilbert@thompsonhorton.com
Stephanie A. Hamm
shamm@thompsonhorton.com
THOMPSON & HORTON LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027

*/s/ Barry Abrams*
Barry Abrams

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 1, 2022, in accordance with the Federal Rules of Civil Procedure, I conferred with Defendants' counsel via email, concerning the relief sought in the Application for Preliminary Injunction and counsel advised that Defendants oppose the relief requested.

*/s/ Barry Abrams*
Barry Abrams