# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:21-cv-01997 |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, CHRIS GONZALEZ, | § | |
| PAM GOODSON, KAREN PECK, JOSEF D. | § | |
| KLAM, MINDA CAESAR, CHRIS | § | |
| EARNEST, J. CARTER BREED, in their | § | |
| official capacity as members of the Board of | § | |
| Trustees of Spring Branch ISD. | § | |
| | § | |
| *Defendants.* | § | |

---

### APPENDIX IN SUPPORT OF
### PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

---

**Exhibit A**:    Report of Robert M. Stein, Ph.D.

**Exhibit B**:    Report of Andres Tijerina, Ph.D.

**Exhibit C**:    Deposition of SBISD Corporate Representative, Christine Porter

**Exhibit D**:    Deposition of SBISD Corporate Representative, Kristin Craft

**Exhibit E**:    Deposition of SBISD Corporate Representative, Karen Heeth

**Exhibit F**:    Declaration of Virginia Elizondo

**DATED**: February 1, 2022                Respectfully,

By: */s/ Barry Abrams*
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6601
(713) 228-6605 (fax)
barry.abrams@blankrome.com

Martin Golando
Texas Bar No. 24059153
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 West Magnolia
San Antonio, Texas 78201
(210) 471-1185
Martin.Golando@gmail.com

## CERTIFICATE OF SERVICE

I certify that on this, the 1st day of February, 2022 in accordance with the Federal Rules of Civil Procedure, a true and correct copy of the foregoing document was served, via ECF, to the following counsel:

Charles J. Crawford
ccrawford@abernathy-law.com
Lucas Henry
lhenry@abernathy-law.com
ABERNATHY ROEDER BOYD HULLETT,LLP
1700 N. Redbud Blvd. Ste. 300
McKinney, Texas 75069

Christopher B. Gilbert
cgilbert@thompsonhorton.com
Stephanie A. Hamm
shamm@thompsonhorton.com
THOMPSON & HORTON LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027

*/s/ Barry Abrams*
Barry Abrams

# <u>Exhibit A</u>

**EXHIBITS TO**
**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIRGINIA ELIZONDO

Plaintiff,

v.

SPRING BRANCH INDEPENT SCHOOL DISTRICT, CHRIS GONZALEZ, PAM
GOODSON, KAREN PECK, JOSEF D. KLAM, MINDA CAESAR, CHRIS EARNEST, J.
CARTER BREED, in their official capacity as member of the Board of Trustee of Spring
Branch ISD

Defendants

EXPERT REPORT
OF
Robert M. Stein, Ph.D.

January 20, 2022

1

## I.        Background and Qualifications

I am the Lena Gohlman Fox Professor of Political Science and a fellow in urban politics at the Baker Institute at Rice University.  A copy of my curriculum vitae is attached as Appendix A.  I am being compensated at $250 per hour.

My current research focuses on alternative modes of elections and voting procedures, voting behavior and public policy in the United States.  I teach classes on voting behavior, election sciences, public policy and survey research.

My work has been supported by the National Science Foundation, the City of Houston's Office of Public Safety and Homeland Security and the Pew Charitable Trusts, among others. Some of my select publications include "Reducing the Undervote with Vote by Mail" (published in *American Politics Research*), "Election Administration during National Disasters and Emergencies: Hurricane Sandy and the 2012 Election" (published in *Election Law Journal*), "Voting for Minority Candidates in Multi-Racial/Ethnic Communities," (published in *Urban Affairs Review*) and "The Effect of Election Day Vote Centers on Voter Participation" (published in *Election Law Journal*).  In addition, I have written extensively on federal spending, 'pork barrel politics' and the electoral connection between single member district representatives, spending policies and incumbent reelection (published in *American Journal of Political Science* and *Journal of Politics*).  I am co-author of *Perpetuating the Pork Barrel* (*Cambridge University Press*).  A complete list of my publications is included in my attached curriculum vitae.

Since 2010, I have been an expert witness in several cases involving election administration and voting.  I have consulted for several jurisdictions in the design, implementation and evaluation of alternative voting systems including early voting, Election Day vote centers, mail-assisted voting and in-person polling locations. In these jurisdictions, I have worked closely with election administrators and elected officials to fulfill their obligation to conduct elections.  These jurisdictions include: Collin, Harris and Lubbock Counties, Texas, 64 Colorado counties that make up the Colorado County Clerks Association, and Albuquerque, New Mexico.  I have also designed voting districts for municipal governments and school districts in Texas.  I am currently designing election districts for Lancaster ISD, Goose Creek ISD and the City of Baytown.

I have been retained by counsel for Virginia Elizondo to provide expert testimony on:

- Whether voting in SBISD school board elections is racially polarized.
- Whether Latinos or Hispanics are politically cohesive in SBISD school board trustee elections and vote as a block for Latino-preferred candidate.
- Whether the Latino or Hispanic voting age population in SBISD is sufficiently large and geographically compact to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan.

- Whether White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.
- Whether single member district elections or at-large elections enhances the proportional representation of minority-preferred candidates on elected legislatives bodies.
- Whether taxing and spending practices differ significantly between governments with single member district and at-large elections.
- Whether legislative bodies are more responsive to the preferences of minority and non-minority voters in at-large or single member district elections.

## II.      Summary of Opinions

- There is statistically significant evidence of racial polarized voting in the Spring Branch Independent District's Board of Trustees elections for the period 2015-2021.
- White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.
- The geographic concentration of Hispanics in the Spring Branch Independent School District is sufficient to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan.
- There is strong evidence in the scholarly literature to conclude that:
  - o   Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.
  - o   Single member district representation increases the likelihood that minority candidates will contest elections for position on legislative bodies.
  - o   Single member district representation will produce policies more responsive to the preference of minority voters.
- SBISD should adopt a single member district plan for the election of the district's seven trustees.

## III.     Materials Reviewed

To establish an expert opinion in this case, I reviewed a variety of materials from academic, governmental, legal and media sources.  Building on my existing knowledge, expertise and experience, I consulted the scholarly (peer reviewed) research on:

- Minority representation in local governments and school districts with single member and at-large representation.
- Spending and taxing practices of local governments and school districts with single member and at-large representation.
- The responsiveness of policies in local governments and school districts with single member and at-large forms of government.

I have relied on election results provided by the SBISD for trustee elections, data from the U.S. Bureau of the Census and Harris County's Election Administrator Office for my analysis of racially polarized voting in SBISD's trustee elections.

3

**IV.      Racially polarized voting in Spring Branch Independent School District**

I used a definition of racially polarized voting as outlined in *Thronburg v. Gingles* to assess whether this condition existed in the Spring Branch School District trustee elections between 2017-2021.  I further sought to determine whether the extent of racially polarized voting in SBISD trustee elections was of sufficient magnitude to dilute the votes of minority voters and prevent them from electing a candidate of their choice.  Finally, I assessed the likelihood that single member district elections would remedy the effect of racially polarized voting in SBISD trustee elections.

Racially polarized voting is defined as when the relevant minority group "is politically cohesive and that the white majority voters sufficiently as a bloc to enable it… usually to defeat the minority's preferred candidate (Thornburg v Gingles 478 U.S. 30, 49 (1986)."

In assessing the degree of racially polarized voting in SBISD trustee elections I obtained the following information:

- A list of all persons eligible to vote in SBISD trustee elections for the years in which trustee elections were held between 2015 and 2021.
- The residential location and voting precinct (i.e., latitude and longitude) of all eligible SBISD voters
- The voting histories of each eligible SBISD voter in the 2015, 2017, 2019 and 2021 SBISD trustee elections from data provide by SBISD and Harris County.
- The racial and ethnicity of each eligible SBISD voter using Imai and Khana (2016) ecological inference software.  These estimates of racial and ethnicity are obtained by using the Center for Disease Control's list of common racial and ethnic surnames along with information about the racial and ethnic makeup of the voter's residential location i.e., census block or block group.  Estimates at or above 90% were used to assigning voters to one racial and/or ethnic group including: Non-Hispanic White, Non-Hispanic Black, Non-Hispanic Asian, Non-Hispanic other and Hispanic.

I aggregated the proportion of voters by race and ethnicity by SBISD's voting precincts (N=7) by election (N=5) to identify majority-minority and majority White precincts.  I further calculated the proportion of vote cast for each trustee candidate by voting precinct.

Ten trustee contests were held between 2015 and 2021 in seven to eight election precincts per election.  Four of the ten contests were uncontested (i.e., only one candidate stood for election).  We can identify the share of vote cast for one or more trustee candidates and the share of voters in each precinct that are Non-Hispanic White, Non-Hispanic Black, Non-Hispanic Asian, Non-Hispanic other and Hispanic in 73 precinct election contests.

The dominant races and ethnicities among SBISD voters are White (majority) and Hispanic (minority).  Asian and African-American SBISD voters rarely exceed 10% of the district voting population in any election year.

4

To measure the degree to which there is racially polarized voting in SBISD Trustee elections I regressed[1] the proportion of persons White and Hispanic in each voting district on the proportion of votes cast for each candidate. Racially polarized voting is established when the direction of these relationships are signed in opposite directions.  A second condition for polarized voting is when the White majority vote against a minority preferred candidate i.e., Hispanic candidate is significant and positive. That is, the share of vote the Hispanic received increases significantly as the proportion of voters in each voting district increases.

Racially polarized voting is observed in every election studied. White and Hispanic voters diverge in their support for each candidate on the ballot, including uncontested contests where we report under vote as the second candidate.

Figures 1-4 report the proportion of vote cast for the White candidate, minority-preferred candidate (i.e., Hispanic surname candidate), and the proportion of vote Hispanic and White in each precinct in all elections. Hispanic surname candidates are identified as the minority-preferred candidate. A minority-preferred candidate appeared on the ballot in seven of ten contests.   The findings confirm significant (p<.05) racially polarized voting for White and Hispanic voters.

*Fig 1: The proportion of vote cast for white candidate and Share of vote White*



---

*Fig 2: The proportion of vote cast for white candidate and Share of vote Hispanic*



*Fig 3: The proportion of vote cast for Hispanic candidate and Share of vote White*

*Fig 4: The proportion of vote cast for Hispanic candidate and Share of vote Hispanic*



## V.    Compactness of Hispanic citizen voting age persons in SBISD

Table 1 reports the number and proportion of citizen voting age by race and ethnicity for the seven proposed voting districts in SBISD.  These data are from the 2020 U.S. Census and the American Community Survey 2015-2019 and best approximate that the likelihood that at least one or more majority Hispanic trustee districts can be constructed. More than half (52.8%) of the citizen voting age population in proposed district 1 is sufficient to enable Hispanic voters to elect a candidate of their choice i.e., an Hispanic.

Table 1
Citizen Voting Age Population by SBSID Voting District

| District | Total Population | Voting Age Population | Citizen Voting Age Population | % Hispanic Citizen Voting Age Population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

Under the proposed configuration of voting districts in SBSID there is sufficient evidence to show that at least one single member majority Hispanic trustee district can be created.  There may be other configurations of voting districts that could yield more than one majority Hispanic trustee districts.

Demonstrative Spring Branch ISD Single-Member District



## VI.     Racial and ethnic segregation in SBISD

The ethnic makeup of the district's seven election/enrollment districts is heavily skewed.  Four districts (i.e., Landrum, Northbrook, Spring Oaks and Spring Woods) are overwhelmingly comprised of Hispanic students, with an average of 87% of students in these election/enrollment districts Hispanic.  In the remaining three election/enrollment districts (Memorial, Spring Branch and Spring Forest) between 42% and 52% of the student are white.

I have measured segregation of SBISD students using the index of dissimilarity between whites and Hispanics at the school and enrollment zone level.  The index is equal to:

$$\frac{1}{2} \sum_{i=1}^{N} \left| \frac{w_i}{W} - \frac{l_i}{L} \right|,$$

where $w_i$ and $l_i$  represent the number of whites and Latinos in school I respectively, W and L represent the total number of whites and Latinos in the district, respectively and N represents the total number of schools (enrollment zones) in the district.  Information on the racial and ethnic makeup of SBISD schools comes from National Center for Education Statistics[2].

The dissimilarity index captures how proportional Hispanics and whites are distributed across schools and enrollment zones.  For example, SBISD is comprised of 26.7% white students 59.2% Hispanic students.[3]  Given these district-wide distributions, one would expect every school and/or enrollment zone would have the same proportion of students Hispanic and white if the district was not segregated or was fully integrated.  Another way to think about the dissimilarity index is the proportion of Hispanic (white) students who would have to move to a different school or enrollment zone in order for the composition of each school or enrollment zone to be identical to the composition of the district as a whole.

Researchers (Abbott and Magazinnik 2020;Massey and Denton 1993; Ananat 2011; Collins and Margo 2000; Cutler and Glaeser 1997; Cutler, Glaeser and Vigdor 1999) identify dissimilarity index scores below .3 as indicating low levels of segregation, .3 to .6 as moderate levels of segregation and .6 and above as high levels of segregation.  SBISD's dissimilarity index score at the school level is .694 and .596 at the enrollment zone level.  These scores suggest that well over half of the Hispanic students enrolled in SBISD schools would have to move to another school in order to achieve an integrated distribution of students by ethnicity.

Table 2 reports the proportion of students by enrollment zone in SBISD by race and ethnicity.  In four of the districts seven enrollment zones 78% or more of the students are Hispanic.   In the

---

[2] Source: https://nces.ed.gov/ccd/schoolsearch/school_list.asp?Search=1&DistrictID=4841100
[3] The remaining proportion of the SBISD students at Asian (5.9%), Black (4.8%), and two or more races (2.3%).

remaining three enrollment zones 42% to 52% of the students are White. There is strong evidence that the racial and ethnic makeup of SBISD schools and enrollment districts is high segregated

Table 2 Percent Enrollment by Race/Ethnicity

| Enrollment Zone | % White | % Hispanic |
|---|---|---|
| Northbrook Middle | 0.02 | 0.96 |
| Spring Woods Middle | 0.05 | 0.88 |
| Spring Oaks Middle | 0.07 | 0.85 |
| Landrum Middle | 0.13 | 0.78 |
| Spring Forest Middle | 0.42 | 0.36 |
| Spring Branch Middle | 0.47 | 0.36 |
| Memorial Middle | 0.52 | 0.25 |

## VII.    Recommendations

The degree of racial segregation and voter polarization in SBISD supports the plaintiff's request that future SBISD trustee elections be held with a single member district plan of representation. The district currently has seven board members and elections are conducted in seven precincts corresponding to the district's enrollment districts. Using a single member district plan to elect trustees will most likely result in the election of at least one school board trustee reflecting the preferences of SBISD's Hispanic voters, and likely more.

## VIII.   Minority representation in at-large and single member systems

How we elect our legislative representatives has long been a prominent subject of study. A core research question in this field of study is whether the method of election discriminates against representation of non-majority populations including racial and ethnic minorities. In the United States, the two most popular ways for electing our representatives are single member district and at-large elections. In at-large elections, voters across an entire jurisdiction (e.g., city, county, school district) have the opportunity to select from among contesting candidates for every available seat in the governing body. Alternatively, single member district representation divides the jurisdiction into separate precincts/wards each with its own seat in the legislative/governing body.

Opponents of at-large representation claim that majority interests, voting in a bloc, dilute minority votes. When minorities are concentrated in particular areas such that they comprise a majority, switching to single member district representation can afford minorities representation in the legislative body. Properly configured, single member district representation can produce representation for minorities proportionate to their representation in the jurisdiction. For example, if a minority group comprises 20% of the adult voting age population in a school district, it is more likely that 20% of the legislative body will be comprised of members preferred by the minority group with single member district elections than at-large elections.

Though the vast majority of empirical research demonstrates that single district representation results in greater and more proportional representation for Black and Hispanic voters (Davidson

and Grofman 1994; Davidson and Korbel 2981; Engstrom and McDonald 1981; Karnig and Welch 1982; Leal, Martinez-Ebers and Meier 2004; Marschall, Ruhil, and Shah 2010; Meier et al 2005; Molina Jr and Meier 2018; Moncrief and Thompson 1992; Polinard 1994; Robinson and England 1981; Stewart, England and Meier 1989; Trounstine and Valdini 2008; Abbot and Magazinnik 2020), several studies, have reported null findings (Bullock and MacManus 1987; Cole 1974; MacManus 1978; Welch 1990; Leal, Martinez-Ebers and Meier 2004[4]).  Two studies have reported a negative relationship between single member district elections and minority representation (Meier and Rutherford 2014; Welch and Karnig 1978).

Two factors explain the lack of unanimity in the scholarly literature on the effect of single member district representation on minority representation.  The first is the contingent nature of electoral reform on minority representation and the second is the challenge researchers face in making reliable and valid casual inferences and estimates of this effect.  Single member district elections can succeed in electing minority-preferred candidates when the minority population is sufficiently large and geographically concentrated such that it constitutes a majority in the area they occupy, as is the case in SBISD.  Most studies compare the representation of minority populations among single member and at-large systems of representation without consideration of how and why these different forms of representations were first adopted, thus omitting unobserved differences between jurisdictions with long histories of at-large representation.

Abott and Magazinnik (2020) identify two contingencies which condition the positive effect of single member district representation has on minority representation.  "[T]he voting population be segregated enough for the minority group to constitute a local majority in at least one ward, and that the political boundaries be drawn accordingly (2020:719)."  A second condition is that the district must be of sufficient size to attract candidates to run for office.

Studies by Abott and Magazinnik (2020), Marschall, Ruhil and Shah 2010) and Trounstine and Valdini (2008) all employ contingent effects of minority group size and segregation when estimating the effects of changing from at-large to single member district representation on minority representation.  These scholars all report significant gains in minority representation, albeit for different genders, races and ethnicities in city councils and school districts with single member district representation and where the same changed from at-large to single member district representation.

To date, the strongest empirical evidence supports the thesis that the likelihood of proportional representation of racial and ethnic minorities on legislative bodies is greater with single member districts than at-large elections when district size is large and minority group size is sufficiently large and segregated.  Abott and Magazinnik note "When all of these conditions are met, the positive impact of reform is striking, exceeding one additional officeholder for every three available seats (730)."  When these conditions are not met, however, moving from an at-large to single member system of representation was found to have a null or even negative effect on

---

[4] The authors qualify their null findings by noting that Hispanics "may be able to profit from at-large districting when they are a majority of the population (2004:1241)."  In non-majority Hispanic settings, Hispanic representation does not benefit from at-large districting.

minority representation, accounting for "why a large and active academic literature …has produced so many conflicting findings (731)."

The scholarly literature supports the following conclusions:

- o Single member district representation increases the likelihood that minority candidates will contest elections for positions on legislative bodies.
- o Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.
- o Single member district representation will produce policies more responsive to the preference of minority voters.

## IX.   The taxing and spending policies of governments with at-large and single member district representation

A purported advantage of at-large over single member district elections is that elected single member district representatives trade off the virtues of public goods against the attractiveness of spending on particularistic goods ('pork') benefitting voters in their home or single member districts. In at-large systems, representatives are thought to voice the preferences of the average (median) resident throughout the entire jurisdiction. In single member systems, the representative better expresses the preferences of the average resident within a specific geography. Assuming preferences vary by geography, at-large systems work to pull the tails of the preference distributions inward, reducing the representation of diverse preferences. A potential consequence of this presumed effect of at-large representation is to under represent (and under value) non-majority voters' preferences.

At the federal level Mayhew's seminal work (1974) established the logic underlying higher spending and taxing in governments with single member district representation. Mayhew and subsequently Sheplse, Weingast and Johnson (1981) argued that representatives elected from single member districts had a strong incentive to extract distributive[5] spending benefits for their constituents to enhance their re-election. A system of log rolling in which single member district representatives agreed to support each other's district specific spending priorities produced an inefficient level of spending and taxing i.e., produce more taxing and spending than might occur with an at-large system of representation. By implication, the level of spending and taxing was assumed lower in legislative bodies with at-large representation, where the electoral benefits of distributive taxes and concentrated spending are not available.

Empirical support for a significant and positive relationship between spending and the electoral fortunes of single member district representatives has been mixed, modest and conditional. Most research has been unsuccessful in corroborating a significant relationship between spending allocations to single member district congressional representatives (Bickers and Stein 2000). The prevailing finding is the electoral connection is conditional on incumbent's electoral vulnerability,

---

[5] Distributive spending refers to outlays concentrated to specific rather than generalized recipients, often defined by geography and which is funded by taxes levied on all persons inside and more importantly outside the area in which the spending benefits are located. An example of distributive spending is infrastructure projects located in specific areas of a jurisdiction and not readily accessible to persons not living in the immediate area.

a rare condition and related to grant awards, not the amount of money flowing to the district (Stein and Bickers 1994).

Research on the spending and taxing policies of subnational governments does not demonstrate significant differences between jurisdictions with at-large and single member representation (Morgan and Pelissero 1980; Lineberry and Fowler 1967; Langbein, Crewson and Brasher 1997; Farnham 1990). In a few instances, (Zax 1990; Deno and Mehay 1987) researchers have found that cities with at-large elections spend more on municipal employees than cities with single member district representation. The few studies that did find significantly higher spending in cities with single member representation (Southwick 1997; Dalenberg and Duffy-Deno 1991) used weaker cross sectional research designs with limited controls for factors that shape municipal taxing and spending policies, including state laws,[6] the range of goods and services provided [7] and most importantly citizens' preferences for spending. These studies fail to take into account that the adoption of at-large or single member district systems is related to the same factors shaping spending and taxing decisions.

The research on spending and taxing among governments with different modes of representation presumes that the higher levels of spending governments in jurisdictions with single member district representation is both inefficient and non-representative of the preferences of the full community. Though spending and taxing may be higher in single member district governments this finding does not suggest anything other than that citizens in these jurisdictions prefer higher spending. In the next section of my report I turn to this question asking whether single member or at-large modes of representation better represent the interest of citizens, both majority and minority citizens.

## X.     The representation of policy preferences among jurisdictions with different modes of representation

Tausanovitch and Warshaw's research (2014) ask whether different modes of representation provide for better representation of public preferences. Using a unique database that measured public preferences for spending and tax policies among every U.S. city and town over 20,000 in population (N=1,600) the authors estimate whether the taxing and spending policies of these communities match citizen preferences by mode of representation.[8]

Drawing upon previously discussed explanations for spending and taxing among at-large and single member district systems of representation the authors hypothesized that *cities with at-large districts are more responsive to citizens' policy preferences than cities with single-member districts.* The authors' design was sufficiently rigorous to correct many of the deficiencies in previous research that produced mixed findings about the relationship between spending and

---

[6] Many states mandate minimum spending and service content for the goods and services their municipalities provide their citizens, independently influencing spending. Tax limits imposed by states on cities and school districts further shape spending.

[7] Cities differ significantly on the number and scope of goods and services they provide their constituents (Peterson 1991). The repertoire of goods and services is itself a function of the constituent preferences, constituents' ability to pay for these goods and services as well as how these goods and services are produced (Stein 1991).

[8] The authors constructed a measure of public preferences for taxing and spending across a large number public policies e.g., public employee pensions, recycling, health care and bans on smoking in bars and restaurants.

alternative modes of representation. The authors conclude: "our findings provide no support …. that at-large districts lead to better representation (2014: 621)."

A great number of minority school board members, in either at-large or single member districts elections, should produce policies favored by minorities. Multiple studies suggest greater minority representation on school boards translates into outcomes that are more positive for minority students (Meier, Stewart and England 1989; Reyes, Scribner and Schribner 1999; Spring 2000; Leal and Hess 2000; Rocha and Wrinke 2011; Theobold 2007; Leal, Martinez-Ebers and Meier 2004). Robinson (2016), however, finds that a great proportion of Hispanic board members leads to *less* support for bilingual policies, popular among Hispanic voters. Flink and Molina (2016) find the level of Hispanic representation has a positive effect on bilingual education spending only when the proportion of bilingual population in the district is relatively small. Is the relationship between minority representation and policies preferred by minorities stronger under single member district or at-large elections?

Leal et al (2004) asked whether greater Latino representation on school boards with single member rather than at-large elections nets great Latino representation among the district's teachers and administrators. They find that "at-large elections negatively influence Latino educational representation, which produces a ripple effect that ultimately reduces the share of Latino teachers (2004:1224)."

> "Latino representation on school boards is significantly associated with increases in the percentage of Latino administrators, and the percentage of Latinos in administration is the most important variable determining the presence of Latino teachers. As we know the Latino community wants more Latinos teaching their children, greater Latino school board representation is therefore more likely to lead to education policies congruent with community wishes (2004:1242)."

Leal et al (2004) also uncover an important condition governing the link between single member district election, proportional minority representation on school boards and minority supported educational policies. "…[W]hen Latinos are a minority in the population, the population-representation relationship is non-linear, with larger percentages getting significantly more representation than smaller percentages (2004: 1234)." This finding suggests the etiology pro-minority policies under single member district elections with proportional minority representation is conditional on the size of the minority population

McBrayer (2020) builds on Leal et al findings and suggests descriptive representation (i.e., minority board members) does not always lead to substantive policy representation. Instead McBrayer hypothesizes that this relationship is conditioned on the mode of representation i.e., single member versus at-large. She specifically looks at the provision of bilingual education services among at-large and single member district school districts in Texas school districts. McBrayer finds that different modes of representation are better at translating minority representation into substantive policies when demand for these policies varies. Specifically McBrayer finds:

- Hispanic representatives have a positive effect on bilingual funding allocation when the entire board serves single-member districts, suggesting that this specific electoral arrangement strengthens the relationship between descriptive and substantive representation.

- Hispanic representatives in at-large electoral systems allocate more bilingual funding proportion only when there are small portions of qualifying students.

- Hispanic representatives in at-large systems have a negative effect on bilingual allocation when there are large portions of qualifying students.

  "This suggests that schools with the least demand for bilingual funding are best represented by minority officials in at-large systems, yet schools with the most demand are underrepresented by minority officials. Thus, in both electoral scenarios, Hispanic representatives substantively represent campuses with low demand for bilingual programming, which is congruent with Flink and Molina's (2016) findings. Only Hispanic officials in single-member districts substantively represent campuses with high demand for bilingual programming, congruent with theoretical expectations (McBrayer 2020:1689-1690)."

The extant literature on the representation of minority policy preferences shows that descriptive representation (i.e., proportional minority representation on school boards) is a necessary but not sufficient condition for fulfilling the policy preferences of minority constituents. This policy connection for minority interests is significantly enhanced with single member district elections rather than at-large elections.

A single-member plan for SBISD would likely strongly improve bilingual and other educational outcomes critical for Hispanic students. In addition, a single-member districting plan for SBISD will increase the responsiveness of school board trustees to minority and low-income students, minority voters and minority educators.

I state under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2022.

*robert stein*

_____

Robert M. Stein

*Bibliography*

Abbot, Carolyn and Asya Magazinnik. 2021. "At-Large Elections and Minority Representation in Local Government," *American Journal of Political Science*. 64:717-773. Xx:219-233

Ananat, E.O. 2011. "The wrong side(s) of the tracks: The causal effects of racial segregation on urban poverty," *American Economic Journal: Applied Econometrics*. 3:34-66.

Barrreto, Matthew, Michael Cohen, Loren Collingwood, Chard W. Dunn and Sonni Waknin. 2022. "A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding." *New York University Review of Law and Social Change*. 46: 1-28.

Brockington, D., Donovan, T., Bowler, S., & Brischetto, R. (1998). Minority Representation under Cumulative and Limited Voting. *The Journal of Politics*, *60*(4), 1108–1125. https://doi.org/10.2307/2647733

Bullock, Charles S., and Susan A. MacManus. 1990. "Structural Features of Municipalities and the Incidence of Hispanic Councilmembers." *Social Science Quarterly* 71(4):665-81.

Cole, Leonard A. 1974. "Electing Blacks to Municipal Office: Structural and Social Determinants." *Urban Affairs Review* JO(l): 17-39.

Collingwood, L., & Long, S. (2021). Can States Promote Minority Representation? Assessing the Effects of the California Voting Rights Act. *Urban Affairs* Review. 57(3), 731–762. https://doi.org/10.1177/1078087419896854

Collins, William J., and Robert A. Margo. 2000. "Residential Segregation and Socioeconomic Outcomes: When Did Ghettos Go Bad?" *Economics Letters* 69(2): 239-43.

Cutler, David M., and  Edward L. Glaeser. 1997. "Are Ghettos Good or Bad?" *Quarterly Journal of Economics* 23:827-72.

Cutler, David M., Edward L.Glaeser and Jacob L. Vigdor. 1999. "The Rise and Decline of the American Ghetto." *Journal of Political Economy* 107(3): 455-506

Dalenberg, D. and K. Duffy-Deno, "At-Large versus Ward Elections: Implications for Public Infrastructure," *Public Choice*, 70(3), June 1991, 335-342

Davidson, Chandler, and Bernard Grofman, eds. 1994. *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990*. Princeton, NJ: Princeton University Press.

Davidson, C., & Korbel, G. (1981). At-Large Elections and Minority-Group Representation: A Re-Examination of Historical and Contemporary Evidence. *The Journal of Politics*, *43*(4), 982–1005. https://doi.org/10.2307/2130184

Engstrom, Richard L., and Michael D. McDonald. 1981. "The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship." *American Political Science Review* 75(2): 344-54.

Fiva, Joh H. and Askill H. Halse. 2016. "Local Favoritism in at-large proportional representation systems." *Journal of Public Economics* 143:15-26.

16

Flink, Carla M. and Angel Luis Molina. 2016. "Politics or Professionalism? Budgeting for Bilingual Education," *Urban Affairs Review* 53:1064-1087.

Hicks, W. D., Klarner, C. E., McKee, S. C., & Smith, D. A. (2018). Revisiting Majority-Minority Districts and Black Representation. *Political Research Quarterly*, *71*(2), 408–423. https://doi.org/10.1177/1065912917738574

Karnig, Albert K., and Susan Welch. 1982. "Electoral Structure and Black Representation on City Councils." *Social Science Quarterly* 63*:*99-114.

Langbein, Laura I., Philip Crewson and Charles Niel Brasher. 1996. "Rethinking ward and at-large elections in cities. Total spending, the number of locations of selected city services and policy types." *Public Choice* 88:275-293.

Leal, David, and Frederick M. Hess. 2000. "The Politics of Bilingual Education Expenditures in Urban School Districts." *Social Science Quarterly* 8:1064–72.

Leal, David, Valerie Martinez-Ebers, and Kenneth J. Meier. 2004. "The Politics of Latino Education: The Biases of At-large Elections." *Journal of Politics* 66:1224–44.

Leal, D. L., Martinez-Ebers, V., & Meier, K. J. (2004). The Politics of Latino Education: The Biases of At-Large Elections. *The Journal of Politics*, *66*(4), 1224–1244. https://doi.org/10.1111/j.0022-3816.2004.00297.x

Lineberry, Robert and Edmund P. Fowler 1967. "Reformism and Public Policies in American Cities." *American Political Science Review* 61:701-716.

MacManus, Susan A. 1978. "City Council Election Procedures and Minority Representation: Are They Related?" *Social Science Quarterly* 59: 153–61.

Marschall, M. J., Ruhil, A. V. S., & Shah, P. R. (2010). The New Racial Calculus: Electoral Institutions and Black Representation in Local Legislatures. *American Journal of Political Science*, 54*:*107–124. https://doi.org/10.1111/j.1540-5907.2009.00421.x

Massey, Douglas S., and Nancy A. Denton. 1993. *American Apartheid: Segregation and the Making of the Underclass.* Cambridge, MA: Harvard University Press.

Mayhew, David. 1974. *The Electoral Connection.* New Haven: Yale University Press

McBrayer, M. (2020). Translating Descriptive Representation into Substantive Representation: The Role of Electoral Institutions in Urban School Districts in Texas. *Urban Affairs Review* 56: 1687–1714. https://doi.org/10.1177/1078087419844028

Meier, Kenneth J. 1993. "Latinos and Representative Bureaucracy: Testing the Thompson and Henderson Hypotheses." *Journal of Public Administration Research and Theory* 3: 393–414.

Meier, Kenneth J., Eric Gonzalez Juenke, Robert D. Wrinkle, and J. L. Polinard. 2005. "Structural Choices and Representational Biases: The Post-election Color of Representation." *American Journal of Political Science* 49: 758–68.

17

Meier, Kenneth J., Robert D. Wrinkle, and Jerry L. Polinard. 1999. "Representative Bureaucracy and Distributional Equity: Addressing the Hard Question." *Journal of Politics* 61: 1025–39.

Meier, Kenneth J., Joseph Stewart and Robert E. England. l991. "The Politics of Bureaucratic Discretion: Educational Access as an Urban Service." *American Journal of Political Science* 35: 155-77.

Meier, Kenneth J. and A. Rutherford. 2014. Partisanship, Structure, and Representation: The Puzzle of African American Education Politics. *The American Political Science Review*, 108: 265–280. https://doi.org/10.1017/S0003055414000148

Molina, A. L., & Meier, K. J. (2018). "Demographic dreams, institutional realities: election design and Latino representation in American education." *Politics, Groups & Identities*, 6: 77–94. https://doi.org/10.1080/21565503.2016.1182931

Moncrief, Gary F. and Thompson, Joel A. 1992. "Electoral Structure and State Legislative Representation: A Research Note". *Journal of Politics,* 54: 246-254.

Morgan, David R. and John P. Pelissero, "Urban Policy: Does Political Structure Matter?" *The American Political Science Review* 74: 999-1006.

Polinard, Jerry L., ed. 1994. *Electoral Structure and Urban Policy: The Impact on Mexican American Communities: Bureaucracies, Public Administration and Public Policy*. Armonk, NY: M.E. Sharpe.

Reyes, Pedro, Jay D. Scribner and Alicia Paredes Schribner eds. 1999. *Lessons from High-Performing Hispanic Schools*. New York: Teachers College Press.

Robinson, Ted, and Robert E. England. 1981. "Black Repre- sentation on Central City School Boards Revisited." *Social Science Quarterly* 62(3): 495-502.

Rocha, Rene R., and Robert D. Wrinkle. 2011. "Gender, Ethnicity, and Support for Bilingual Education: Will Just Any Woman or Latino Do? A Contingent 'No.'" *Policy Studies Journal* 39: 309–28.

Smith, John, S., , H., & Zack, E. (2018). The alternative vote: Do changes in single-member voting systems affect descriptive representation of women and minorities? *Electoral Studies*, *54*, 90–102. https://doi.org/10.1016/j.electstud.2018.05.009

Spicer, Z., McGregor, M., & Alcantara, C. (2017). Political opportunity structures and the representation of women and visible minorities in municipal elections. *Electoral Studies*, *48*, 10–18. https://doi.org/10.1016/j.electstud.2017.01.002

Spring, Joe.  2000. *American Education,* 9th Ed. Boston: McGraw-Hill.

Tausanovitch, Chris and Christopher Warshaw. 2014. "Representation in Municipal Government." *American Political Science Review* 108:605-641

Theobald, Nick A. 2007. "¡Mue'streme el Dinero! Assessing the Linkage Between Latino School Superintendents and English-Language Learner Program Resources." *In Latino Politics*:

*Identity, Mobilization, and Representation*, edited by Rodolfo Espino, David L. Leal, and Kenneth J. Meier, 249–64. Charlottesville: Univ. of Virginia Press

Trebbi, F., Aghion, P., & Alesina, A. (2008). Electoral Rules and Minority Representation in U.S. Cities. *The Quarterly Journal of Economics*, 123*:* 325–357. https://doi.org/10.1162/qjec.2008.123.1.325

Trounstine, J., & Valdini, M. E. (2008). The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity. *American Journal of Political Science*, 52*:* 554–569. https://doi.org/10.1111/j.1540-5907.2008.00329.x

Southwick, Lawrence, Jr. 1997. "Local government spending and at-large versus district representation: Do wards results in more "Pork"?" *Economics and Politics*. 9:173-203

Stewart, Joseph, Jr., Robert E. England, and Kenneth J. Meier. 1989. "Black Representation in Urban School Districts: From School Board to Office to Classroom." *Western Political Quarterly* 42 (2): 287–305.

Welch, S. (1990). The Impact of At-Large Elections on the Representation of Blacks and Hispanics. *The Journal of Politics*, *52*(4), 1050–1076. https://doi.org/10.2307/2131682

Welch, Susan, and Albert Karnig. 1979. "The Impact of Black Elected Officials on Urban Social Expenditures." *Policy Studies Journal* Summer: 707-14.

CURRICULUM VITAE
January, 2021

ROBERT M. STEIN
Lena Gohlman Fox Professor of Political Science
Rice University
Houston, Texas 77251
713-348-2795
Email: Stein@rice.edu

Place of birth: New York, NY

Married, two children

## Education

B.A., Ohio Wesleyan University, Delaware, Ohio, 1972.

M.A., University of Wisconsin-Milwaukee, Milwaukee, WI, 1974

Ph.D., University of Wisconsin-Milwaukee, Milwaukee, WI, 1977

## Fields of Specialization

Elections and election administration, Federalism and intergovernmental relations, state and local government, urban politics and public policy.

## Teaching Positions

Lena Gohlman Fox Professor of Political Science, 1996

Fellow, James A. Baker III Institute for Public Policy, 2006

Professor, Department of Political Science, Rice University, 1989-1996

Visiting Associate Professor and research scientist, Workshop in Political Theory-Public Policy and Department of Political Science, Indiana University, 1987-1988

Associate Professor, Department of Political Science, Rice University, 1983-1989

Assistant Professor, Department of Political Science, Rice University, 1979-1983

Assistant Professor, University of Georgia, 1977-1978

**Administrative positions**

Faculty Director, Center for Civic Engagement, Rice University 2007-2021

Dean, School of Social Sciences, Rice University, 1996- 2006

Interim Dean, School of Social Sciences, Rice University, 1995-1996

Chair, Department of Political Science, Rice University, 1994-1995

Director, Policy Studies Program (undergraduate major), Rice University, 1987-1995

Director, Graduate Studies, Department of Political Science, Rice University, 1987
Chair, Department of Political Science, Rice University, 1984-1986

Director, Rice Institute of Policy Analysis Public Opinion Poll, 1983-present

Political analyst, KHOU-TV, Houston, TX, 1983-present

**Fellowships, awards, and offices**

Outstanding reviewer award, *Political Research Quarterly,* 2010.

Best paper award on Federalism and Intergovernmental Relations for "Inter-Local Cooperation and the Distribution of Federal Grants," by the section on Federalism and Intergovernmental Relations, American Political Science Association, 2004 (with Kenneth Bickers).

President, Urban Politics Subsection, American Political Science Association, 1999-2000.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1998.

President, Southwestern Political Science Association, 1998.

Recipient, Outstanding Mentor of Women in Political Science Award, Women's Caucus for Political Science, American Political Science Association, 1996.

Special book award from the Urban Politics and Policy Section of the American Political Science Association for *Urban Alternatives: Private and Public Markets in the Provision of Local Services*, 1991.

Research fellowship, Indiana University, Workshop in Political Theory and Public Policy, 1987-1988.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1987.

Fellowship, U.S. Advisory Commission on Intergovernmental Relations, 1978-1979.

**Research Grants and Contracts**

Measuring and improving the impact of using stadiums and arenas for voting. Funded by New Venture Fund. 8/1/2021-2/28/2022. Co-PI, $125,350.

The integrity of mail-in voting in the 2020 Election.  Funded by the National Science Foundation (2105671), 12/1/2020-11/30/2020. PI, $120,283.

Optimizing vote-by-mail implementations on consumer grade equipment. Funded by the National Science Foundation (2033923), 7/1/2020-6/30/2021. Co-PI, $200,000.

Making voting safe for voters and poll workers: Meeting the challenge of the COVID-19 Virus. Funded by Rice University, COVID-19 Initiative, 5/1/2020-12/31/2020. PI, $45,300.

Election Day Vote Centers in Harris County, Texas. Funded by the Arnold Foundation, May 2019-December 2020, $100,000.

Hurricane Harvey: Longitudinal Survey. Funded by the National Science Foundation, January 2018 – December 2021 (SBER1760292). Co-PI, $200,000.

Urban Flooding: Identifying where it floods and evaluating remedies.  May 2018-September 2019.  Funded by the Kinder Institute, Ken Kennedy Institute and Office of Research, Rice University. Co-PI, $74,450.

2016 City of Houston Citizen Survey, September 2016-January 2017. Funded by the City of Houston, $23,500.

Vote by mail, September 2014-September 2015. Funded by The Pew Charitable Trusts, $48,000.

Saturday Run-off Election Exit Poll Survey, City of Houston, October-November, 2013. $4,000.

Prioritizing and selecting bridge management actions for heightened truck loads and natural hazards in light of funding allocation patterns. Funded by the National Science Foundation, September 2012-August, 2015. Co-PI, $1.2 million.

Phase 2, Development and enhancement of online storm risk calculator tool for public usage, City of Houston, Office of Public Safety and Homeland Security, November, 2012-June 2013. Co-PI, $189,000.

NetSE: Large Urban-Scale Polymorphic Wireless Networks: Community-Driven Assessment, Design and Access. Funded by the National Science Foundation, September 2010-2013. Co-PI, $1.9 million.

Development and enhancement of online storm risk calculator tool for public usage, City of Houston, Office of Public Safety and Homeland Security, January, 2011-June 2011. Co-PI, $309,000.

Increasing turnout among the less engaged: A study of Election Day vote centers. Funded by The Pew Charitable Trusts, September, 2007-May, 2009. PI, $260,000.

Independent Response of Complex Urban Infrastructures Subjected to Multiple Hazards, National Science Foundation, October 2007–October 2010. Co-PI, $20,000.

Program evaluation, City of Houston, SAFEclear, traffic incident management program, July 2006-January 2008. PI, $20,000.

Program evaluation, City of Houston, SAFEclear, traffic incident management program, February 2005-December 2005. PI, $20,000.

Program Utilization Among Households Eligible for Head Start Enrollment, funded by the Harris County Department of Education, June, 2001. PI, $15,000.

The Changing Structure of Federal Aid and the Politics of the Electoral Connection.  Funded by the National Science Foundation, 2001-2002 (SES0095997). January 2001-January 2003. PI, $230,000.

Greater Harris County 9-1-1 Emergency Network Data Archive and Analysis, January 2000-January 2001. PI, $15,000.

Evaluation of Greater Harris County Emergency Network: Round II. Funded by the Greater Harris County Emergency Network, September, 1993-January, 1994. PI, $5,000.

22

Evaluation of Greater Harris County 9-1-1 Emergency Network. Funded by the Greater Harris County Emergency Network, January 1992-July 1993. PI, $5,000.

Selective Universalization of Domestic Public Policy. Funded by the National Science Foundation (SES8921109) 1990-1992. PI, $185,000.

Contracting for Municipal Services. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1986-1990. PI.

The Fiscal Austerity and Urban Innovation Project.  Funded by the U.S. Department of Housing and Urban Development. 1983-1985. PI.

Research Associate, Field Network Evaluation Study of the Reagan Domestic Program.  Princeton Urban and Regional Center, Princeton University. Funded by the Ford Foundation. 1982-1984. PI.

Research Associate, Field Network Evaluation Study of the Community Development Block Grant: Round 8. Funded by the U.S. Department of Housing and Urban Development. Summer 1982. PI.

The Structural Character of Federal Grants-in-Aid. Funded by the U.S. Department of Housing and Urban Development. 1982-83. PI.

The Allocation of Federal Grants-in-Aid. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1979-1981. PI.

The Allocation of State-Local Aid: An Examination of Within State Variation. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1979-1981. PI.

**Editorial Positions**

Editorial board member, *Journal of Election Technology and Systems*, 2013-2016

Editorial board member, *American Political Science Review*, 2001- 2007

Executive Committee, American Politics, *American Political Science Review*, 2004-2007

Editorial board member, *American Journal of Political Science*, 1994-1998

Editorial board member, *Journal of Politics*, 1994-1998

Editorial board member, *Social Science Quarterly*, 1993-present

Editorial board member, *State and Local Government Review*, 1987-1992

Editorial board member, *Urban Affairs Review* (formerly *Urban Affairs Quarterly*), 1996- 2000

Referee, *American Political Science Review, American Politics Quarterly,  Journal of Urban Affairs, Urban Affairs Quarterly, Publius,* National Science Foundation

**Books**

*Perpetuating the Pork Barrel: Policy Subsystems and American Democracy*, Cambridge University Press, 1995, with Kenneth N. Bickers.

23

*Federal Domestic Outlays, 1983-1990*. 1991. M.E. Sharp, with Kenneth N. Bickers

*Urban Alternatives: Public and Private Markets in the Provision of Local Services*. 1990  Pittsburgh Press.

## Articles

"Recruiting Persons to Work the Polls," 2021. *Election Law Journal*, 30:315-326. With Colin Jones. https://www.liebertpub.com/doi/10.1089/elj.2020.0701.

"How to Measure and Assess the Turnout Effects of Election Reforms." 2020. *Journal of Political Institutions and Policy Economy,* 1:1-28.  With Andrew Menger. http://dx.doi.org/10.1561/113.00000009

"How Human Factors Can Help Preserve Democracy in the Age of Pandemics." 2020. *Human Factors*, 62(4):1077-1086. With Philip Kortum, Claudia Zeigler Aceyman, Elizabeth Vann and Dan Wallach. http://DOI: 10. 1177/ 0018 7208 20946896

"Choosing the less convenient way to vote: An anomaly in vote by mail elections." 2020. *Political Research Quarterly*, 73:196-207. With Andrew Menger. https://journals.sagepub.com/doi/full/10.1177/1065912919898900009

"Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study." 2019. *Political Research Quarterly*, 73:439-453. With Charles Stewart, Christopher Mann and others. https://journals.sagepub.com/doi/full/10.1177/1065912919832374

"This Way Out." 2018. *Scientific American*, October 18, pp. 76-79. With Leonardo Dueñas-Osorio and Devika Subramanian.

"Pedagogical Value of Polling-Place Observation by Students." 2018 *PS: Political Science & Politics*. 51:831-837. With Christopher B. Mann, , Gayle A. Alberda, Nathaniel A. Birkhead, Yu Ouyang, Chloe Singer, Charles Stewart, Michael C. Herron, et al. https://doi.org/10.1017/S1049096518000550.

"Reducing the undervote with vote by mail." 2018. *American Politics Research,* 46(6):1039-1064. With Andrew Menger and Greg Vonnahme. https://doi.org/10.1177/1532673X17737059

"Enlisting the public in facilitating election administration: A field experiment." 2018. *Public Administration Review*, 78(6):892-903. With Andrew Menger. https://doi.org/10.1111/puar.12833

 "Survey Experiments with Google Consumer Surveys: Promise and Pitfalls for Academic Research in Social Science." 2016.  *Political Analysis,* 24(3):256-373. With Philip Santaso and Randolph Stevenson. https://doi.org/10.1093/pan/mpw016

"Election Administration During National Disasters and Emergencies: Hurricane Sandy and the 2012 Election." 2016. *Election Law Journal*, 14:1-8. http://doi.org/10.1089/elj.2014.0271

"The social and private benefits of preparing for natural disasters." 2014. *International Journal of Mass Emergencies and Disasters,* 32:459-483. With Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, and Devika Subramanian. http://www.ijmed.org/articles/664/download/

"Building and validating geographically refined hurricane wind risk models for residential structures." 2014. *Natural Hazards Review*, 15(3):1-10. With Devika Subramanian, Leonardo Dueñas-Osorio, and Josue Salazar. https://doi.org/10.1061/(ASCE)NH.1527-6996.0000131

"How risk perceptions influence evacuations from hurricanes and compliance with government directives." 2013. *Policy Studies Journal*. 41(2):319-341. With Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian, and David Kahle.  https://doi.org/10.1111/psj.12019

"Early voting and campaign news coverage." 2013. *Political Communication*, 30:278-396. With Johanna Dunaway. https://doi.org/10.1080/10584609.2012.737420

"The effect of election day vote centers on voter participation." 2012. *Election Law Journal,* 11(4):291-301. With Greg Vonnahme.

"Where, when and how we vote: Does it matter?" 2012. *Social Science Quarterly,* 93(3):693-712. With Greg Vonnahme.

"Prospectus for the Future Administration of Elections." 2012. *Baker Center Journal of Applied Public Policy,* 4(1):45-57.

"Engineering-based hurricane risk estimates and comparison to perceived risks in storm-prone areas."  2012. *Natural Hazards Review,* 13(1):1-12. With Leonardo Dueñas-Osorio, Devika Subramanian and Birnur Buzcu-Guven.

"Voting at non-precinct polling places: A review and research agenda." 2011. *Election Law Journal,* 10:307-11.  With Greg Vonnahme.

"Interface network models for complex urban infrastructure systems." 2011. *Journal of Infrastructure Systems*, 17(4): 138-150. With James Winkler, Leonardo Dueñas-Osorio, Robert Stein, and Devika Subramanian.

"Performance assessment of topological diverse power systems subjected to hurricane events." 2010. *Reliability Engineering and System Safety*, 95:323-336. With James Winkler, Leonardo Dueñas-Osorio and Devika Subramanian.

"Who evacuates when hurricanes approach? The role of risk, information and location." 2010. *Social Science Quarterly,* 91:816-834. With Leonardo Dueñas-Osorio and Devika Subramanian.

"Crunching collisions." 2009. *Roads and Bridges*, 13:2. With Robert Dahnke, Ben Stevenson, and Tim Lomax.

"Voting technology, election administration and voter performance" 2008. *Election Law Journal,* 7:123-135. With Greg Vonnahme, Michael Byrne and Daniel Wallach.

"Engaging the unengaged voter: Voter centers and voter turnout." 2008. *Journal of Politics,* 70:487-497. With Greg Vonnahme.

"Assessing the Micro-Foundations of the Tiebout Model." *Urban Affairs Review*, 42:57-80. With Kenneth Bickers and Lapo Salucci.

"Who is Held Responsible When Disaster Strikes? The Attribution of Responsibility for a Natural Disaster in an Urban Election." 2006. *Journal of Urban Affairs*, 28:43-54. With Kevin Arceneaux.

"Voting for Minority Candidates in Multi-Racial/Ethnic Communities." 2005. *Urban Affairs Review*, 41:157-181. With Stacy Ulbig and Stephanie Post.

"Inter-Local Cooperation and the Distribution of Federal Grant Awards." 2004. *Journal of Politics*, 66:800-22. With Kenneth Bickers.

"Language Choice, Residential Stability, and Voting among Latino-Americans." 2003. *Social Science Quarterly*, 84:412-24. With Martin Johnson and Robert Wrinkle.

"Public Support for Term Limits: Another Look at Conventional Thinking." 2002. *Legislative Studies Quarterly*, 27:459-480. With Martin Johnson and Stephanie Shirley Post.

"Contextual Data and the Study of Elections and Voting Behavior: Connecting Individuals to Environments." 2002. *Electoral Studies,* 21:63-77. With Martin Johnson, W. Phillips Shively.  Also appearing in *The Future of Electoral Studies.* Mark N. Franklin and Christopher Wlezien, eds. Oxford: Elsevier Press (2003).
"The Congressional Pork Barrel in a Republican Era." 2000. *Journal of Politics*, 62:1070-1086. With Kenneth Bickers.

"State Economies, Regional Governance, and Urban-Suburban Economic Dependence." 2000. *Urban Affairs Review*, 36:46-60. With Stephanie Shirley Post.

"Reconciling Context and Contact Effects on Racial Attitudes." 2000. *Political Research Quarterly*, 53:285-303. With Stephanie Shirley Post and Allison Rinden.

"The Micro Foundations of the Tiebout Model." 1998. *Urban Affairs Review,* 34:76-93. With Kenneth Bickers.

"Early Voting." 1998. *Public Opinion Quarterly*, 62:57-70.

"Voting Early, But Not Often." 1997. *Social Science Quarterly,* 78:657-677. With Patricia Garcia-Monet.

"Building Majority Coalitions for Sub-Majority Benefit Distributions." 1997. *Public Choice*, 91:229-249. With Kenneth Bickers.

"The Electoral Dynamics of the Federal Pork Barrel." 1996. *American Journal of Political Science*, 40:1300-1326. With Kenneth Bickers.

"Privatization and the Arrangement of City Services." 1996. *Estudios De Economia*, 23:323.

"A Portfolio Theory of Policy Subsystems." 1994. *Administration and Society*, 26:158-184. With Kenneth Bickers.

"Congressional Elections and the Pork Barrel." 1994. *Journal of Politics*, 56:377-399.

"Explaining State Aid Allocations: Targeting Within Universalism." 1994. *Social Science Quarterly*, 75:524-540. With Keith E. Hamm.

"Universalism and the Electoral Connection:  A Test and Some Doubts." 1994. *Political Research Quarterly*, 47:295-318. With Kenneth N. Bickers.

"Response to Weingast's 'Reflections on Distributive Politics and Universalism.'" *Political Research Quarterly*, 47:329-334. With Kenneth N. Bickers.

"Arranging City Services." 1993. *Journal of Public Administration: Research and Theory,* 3:66-93.

"Alternative Means of Delivering Municipal Services: 1982-1988." 1993.  *Intergovernmental Perspective,* 19:27-30.

"A Federalist Explanation of Municipal Elections." *The Midsouth Political Science Journal*, 13:211-229. With Cheryl Young.

"The Budgetary Effects of Municipal Service Contracting: A Principal-Agent Explanation." 1990. *American Journal of Political Science*, 34:471-502.

"Economic Voting for Governor and U.S. Senator:  The Electoral Consequences of Federalism." 1990. *Journal of Politics*, 52:29-54.

"Market Maximization of Individual Preferences and Metropolitan Municipal Service Responsibility." *Urban Affairs Quarterly*, 24:86-116.

"A Comparative Analysis of the Targeting Capacity of State and Federal Intergovernmental Aid Allocations: 1977-1982." *Social Science Quarterly*, 68:447-466.  With Keith Hamm.

"Tiebout's Sorting Hypothesis." 1987. *Urban Affairs Quarterly,* 22:199-225.

"Federal Aid and The Mobilization of Black Political Influence." 1986. *Research in Urban Policy,* 2:97-117. With Keith Hamm.

"The Fiscal Impact of U.S. Military Assistance Programs, 1967-1976." 1985.  *The Western Political Quarterly,* 38:27-43. With R. Stoll and M. Ishimatsu.

"Municipal Public Employment:  An Examination of Intergovernmental Influences." 1984. *American Journal of Political Science,* 28:636-653.

"State Regulation and the Political Consequences of Municipal Fiscal Stress." 1984. *Publius,* 14:41-54.

"Implementation of Federal Policy: An Extension of the 'Differentiated Theory of Federalism.'" 1984. *Research in Urban Policy*, 3:341-348.

"The Structural Character of Federal Aid: An Examination of Fiscal Impact." 1984. *Research in Urban Economics,* 4:167-186.

"Trends and Prospects in State and Local Finance." 1983. *Journal of Urban Economics,* 14:224-241. With P. Mieszkowski.

"An Analysis of  Support for Tax Limitation Referenda." 1983. *Public Choice,* 40:187-194. With K. Hamm and P. Freeman.

"The Political Economy of Municipal Functional Responsibility." 1982. *Social Science Quarterly*, 63:530-549.

"The Effects of Reagan Domestic Budget Cuts: The Case of Houston." 1982. *Texas Business Review*, 13:11-18.  With S.A. MacManus.

"The Targeting of State Aid: A Comparison of Grant Delivery Mechanisms." 1981. *Urban Interest*, 2:47-59.

"The Allocation of Federal Aid Monies: The Synthesis of Demand-Side and Supply-Side Explanations." 1981. *American Political Science Review*, 75:334-343.

"Functional Integration at the Substate Level:  A Policy Perspective." 1980. *Urban Affairs Quarterly,* 16:211-233.

"Federally Mandated Substate Regional Government: The Maintenance of Governmental Structures*."* 1980. *Urban Interest,* 1:74-82.

"Federal Categorical Aid:  Equalization and the Application Process." 1979. *Western Political Quarterly*, 32: 396-408.

"The Electability of Women Candidates: The Effects of Sex Role Stereotyping." 1979. *Journal of Politics*, 41:513-524. With R. Hedlund, K. Hamm, and P. Freeman.

"Regional Planning Assistance:  Its Distribution to Local Governments and its Relationship to Local Grant Getting." 1977. *The Journal of the American Institute of Planners*, 43:871-891. With B. Hawkins.

## Chapters in edited volumes

"Polling Place Quality," in *The Future of Election Administration,* Kathleen Hale and Bridgett A. King, eds., Palgrave.  2019: 83-100.

"Help America Vote Act of 2002" in *Voting and Political Representation in America: Issues and Trends,* Mark P. Jones, ed. Forthcoming, 2019. Santa Barbara, CA: ABC-CLIO

"Convenience modes of voting" in *Voting and Political Representation in America: Issues and Trends,* Edited by Mark P. Jones. Forthcoming, 2019. Santa Barbara, CA: ABC-CLIO

"Polling Place Practices," in *Electoral Performance,* Charles Stewart, III, and Barry Burden, eds. Cambridge University Press, 2014:166-187. With Greg Vonnahme.

"Early, Absentee, and Mail-in Voting," in *Handbook of American Elections and Political Behavior*, Jan Leighley, ed., Oxford University Press. 2010:182-199. With Greg Vonnahme.

"The Political Market for Intergovernmental Cooperation," in *Self-Organizing Federalism: Collaborative Mechanisms to Mitigate Institutional Collective Action Dilemmas,* Richard C. Feiock and John T. Scholz, eds. Cambridge University Press.  2010:161-178. With Kenneth N. Bickers and Stephanie Post.

"Local Services, Provision and Production," in *Encyclopedia of Public Administration and Public Policy*. Marcel Dekker, New York. 2003:734-748.

"The Politics of Revenue and Spending Policies," in *Cities, Politics, and Policy*. John Pelissero, ed., Washington, D.C., CQ Press. 2002:217-236.

 "Implications for Citizen Participation," in *Choosing a President The Electoral College and Beyond,* Paul Schumacher and Burdette Loomis eds. New York, Catham House. 2002:125-142. With Paul Johnson, Daron Shaw and Robert Weissberg.

"Devolution and the Challenge for Local Governance," in *Change and Continuity in American State and Local Politics,* Ronald E. Weber and Paul Brace, eds. New York, Catham House. 2000:21-33.

"Contracting for Municipal Services," in *Privatization of the Justice System,* P. Seidenstat, S. Hakim and G. Bowman, eds. McFarland and Co. Publishers. 1992:82-107. With Delores Martin.

"Urban Public Policy Under Fiscal Stress:  A Comparison of Spending and Employment Decisions," in *Cities Under Fiscal Stress*, Mark Gottdiner, ed. Sage. 1986:111-144. With M. Neiman and E. Sinclair.

"The Texas Response to Reagan's New Federalism Programs:  The Early Years," in *Managing the New Federalism*, L. Bender and J. Stever, eds. Denver: Westview Press, 1986:124-159. With S.A. MacManus.

"Implementation of federal policy: An extension of the 'differentiated theory of federalism,'" in *Research in Urban Policy,* Terry Nichols Clark, ed. Chicago: JAI Press. 1985:341-348.

"Policy Implementation in the Federal Aid System:  The Case of Grant Policy,"  in *Public Policy Implementation,* G. Edwards, ed. , JAI Press. 1984:125-155.

"The Allocation of State Aid to Local Governments:  An Examination of Interstate Variations," pp. 202-225. in *The Federal Influence on State and Local Roles in the Federal System*, U.S. Advisory Commission on Intergovernmental Relations, U.S. Government Printing Office. 1982:202-225

"The Impact of Federal Grant Programs on Municipal Functions: An Empirical Analysis," in *The Federal Influence on State and Local Roles in the Federal System*, U.S. Advisory Commission on Intergovernmental Relations. U.S. Government Printing Office. 1981:65-122.

"The Impact of Socio-Economic Environment on Revenue Policies," in *The Politics of Raising State and Local Revenues*, R. Bingham, B. Hawkins, and F. Hebert, eds. Praeger, 1978:133-172. With R. Bingham, B. Hawkins, and R. Robertson.

"Grant Seeking and the Allocation of Federal Grant-in-Aid Monies:  The Case of Southeastern Wisconsin," in *Milwaukee's Economy:  Federal Programs, Local Resources and Community Action*, John P. Blair and Ronald S. Edari, eds. Federal Reserve Bank of Chicago. 1978:199-219,

"Substate Regionalism:  Another View From the States," in *Substate Regionalism in the United States: Perspectives and Issues,* Charles Tyer, ed. University of South Carolina Press. 1978:69-102.


**Recent papers, completed manuscripts, conference papers and invited presentations**

"Choosing the less convenient way to vote: An anomaly in vote by mail elections," presented at Election Science Meeting, University of Pennsylvania, Philadelphia, PA. June 2019.

"Compositional effects of vote by mail elections," presented at VBMcon: A conference to discuss vote by mail election reform, Washington, D.C. June 20, 2019.

"Vote fraud and errant voting," invited presentation at the Department of Political Science, University of Nebraska, Lincoln, NE. April 25, 2013.

"Polling place practices," prepared for presentation at the Measure of Elections Conference, Massachusetts Institute of Technology, Boston, MA. June 18-19, 2012.

"Where, when and how we vote: Does it matter?" Presented at the Scottish National Election Commission, Strathclyde University, Glasgow, Scotland. November 12-15, 2010.

"The future of elections," presented at the Future of Governance Conference, Howard Baker Institute of Government, University of Tennessee, Knoxville, TN. October 14-15, 2010.

"Cost of elections," presented at the 2010 Meeting of the Midwest Political Science Association, Chicago, IL April 3-5, 2000. With Greg Vonnahme.

"Early voting and campaign news coverage," presented at the 2010 Meeting of the American Political Science Association, Washington, D.C. September 1-3, 2010.

"The cost of elections," prepared for The Pew Charitable Trusts. 2009. With Greg Vonnahme.

"The effects of early voting on congressional campaign expenditures." Presented at the 2009 Meeting of the Midwest Political Science Association, Chicago, IL. April 13-15, 2009. With Marvin McNeese.

"The effects of Election Day vote centers on voter experiences," presented at the 2008 Meeting of the Midwest Political Science Association, Chicago, IL. April 3-5, 2008. With Greg Vonnahme.


**Professional Associations**

President, Urban Subsection, American Political Science Association, 1999-2000
President, Southwest Political Science Association, 1997-1998
Chair, Nominations Committee, Southern Political Science Association, 1995

Nomination committee, Southern Political Science Association, 1993-1994
Executive Council, Southwest Political Science Association, 1992-1994
Chair, Nominations Committee, Southwest Political Science Association, 1993-1994
Section Head, State and Local Government, Southern Political Science Association Meetings, 1993
Section Head, State and Intergovernmental Relations, Midwest Political Science Association, 1992
Executive Board, Urban Politics Section, American Political Science Association, 1990-1992
Executive Board, Southwestern Political Science Association, 1985-1991, 1993-1994
Program Chair, Southwestern Political Science Association Annual Meetings, 1983
Section Head, Intergovernmental Relations, Southern Political Science Association Meetings, 1983

**Ph.D. Thesis advisees**

Albert Ellis, Ph.D. 1989. Associate Professor, University of Texas, Corpus Christi (deceased)
Stephanie Post, Ph.D. 1998. Director, Center for Civic Engagement, Rice University
Martin Johnson, Ph.D. 2002. Professor and Dean, Louisiana State University (deceased)
Gavin Dillingham, Ph.D. 2004. Research Scientist, Houston Advanced Research Center
Johanna Dunaway, Ph.D. 2006. Associate Professor, Texas A&M University
Gregory Vonnahme, Ph.D. 2009. Assistant Professor, University of Missouri-Kansas City
Marvin McNeese, Ph.D. 2015, Christian Bible University, Houston, TX
Andrew Menger, Ph.D. 2017. Vanderbilt University, Nashville, TN
Matthew Lamb, Ph.D. 2020. Austin Community College, Austin, TX

## <u>Teaching</u>

Urban Politics (undergraduate)
Public Policy (graduate and undergraduate)
Bureaucracy and Public Policy
Policy Implementation
Federalism
Political Behavior

## <u>Recent expert testimony</u>

Expert Report in *The League of Women Voters of Arkansas and Arkansas United et al v John Thurston in his official capacity as the Secretary of State of Arkansas, et al*, CASE NO. 60CV-21-3138 [Voting rights case in the state of Arkansas] December, 2021-January, 2022.

Expert Report in *Mark Wandering Medicine et al. v. Linda McCulloch et al.,* No. CV 12-135-BLG-DWM, 2014 WL 12588302 (D. Mont. Mar. 26, 2014), [voting rights case in the state of Montana] February-June, 2014

Expert Report in *Thomas Poor Bear, et al. vs. The County of Jackson, South Dakota*, 2014 WL 4702282 [voting rights case in the state of South Dakota] June-November, 2015.

Expert Report in the case of *Martin Cowen, et al. vs Brian P. Kemp*, No. 1:17-CV-04660-LMM, 2018 WL 8141305 (N.D. Ga. Jan. 25, 2018) [ballot access case, challenge to state's candidate and party ballot access requirements] January-May, 2018.

Expert Report in *Jayla Allen et al. v. Waller County, Texas et al.*, 472 F. Supp. 3d 351 (S.D. Tex. 2020) [challenge to the operation of early voting] September 2019-September 2020.
Expert Report in *Donald J. Trump et al. v. Kathy Boockvar et al.* 141 S. Ct. 1044, 208 L. Ed. 2d 517 (2021) [challenge to Pennsylvania's new no-excuse voting procedures] August, 2020.

30

Consultant on election administration to: Harris County, Texas; Albuquerque, New Mexico; Colorado County Clerks Association; The Pew Charitable Trusts; Arnold Foundation; Collin County, Texas; Lubbock County, Texas

# **Exhibit B**

**EXHIBITS TO**
**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

1

REPORT of Dr. Andrés Tijerina

Spring Branch Independent School District,
Houston, Harris County, Texas

January 20, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VIRGINIA ELIZONDO, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| vs. | § Civil Action No. 4:21-cv-01997 |
| | § |
| SPRING BRANCH INDEPENDENT | § |
| SCHOOL DISTRICT, CHRIS GONZALEZ, | § |
| PAM GOODSON, KAREN PECK, JOSEF D. | § |
| KLAM, MINDA CAESAR, CHRIS | § |
| EARNEST, J. CARTER BREED, in their | § |
| official capacity as members of the Board of | § |
| Trustees of Spring Branch ISD | § |
| | § |
| *Defendants*. | § |

2

REPORT of Dr. Andrés Tijerina
Spring Branch Independent School District
Houston, Harris County, Texas
January 20, 2022

     1. I submit this report on the history of the violation of civil rights of Latinos in Texas with emphasis on the electoral process. In writing this report, I have relied on my extensive knowledge and readings of archives and bibliography. I am a member and fellow of the Texas State Historical Association, a member of the American Historical Association, and president of the Texas Institute of Letters. I regularly attend professional conferences where I present formal papers for peer review and where I exchange the latest information on historical sources, methods, and data. I draw my conclusions in the present report based on my extensive knowledge of Texas History and Latino History and from the readings and archival research that I have conducted for the better part of four decades. From my broad professional experience, I have been able to use accepted methods of analysis to compare the Latino experience in Texas with other groups in history. My conclusion is that they have a legacy of exploitation and abuse by Anglo-Americans who have used government, financial, and technological advantages to appropriate Latino lands, labor, and resources, and that Latinos in Texas today bear the effects of this discrimination which hinders their ability to participate effectively in the democratic process. I testified in as an expert witness in *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) vacated and remanded, 133 S. Ct. 2886, 186 L. Ed. 2d 930 (2013) and *Perez v. Perry*, Civil Action No. 5:11-cv-360 (W.D.TX 2011). I am compensated at the rate of $350.00 per hour.

     2. I have utilized my research and writing skills to produce new information and interpretations to critical areas of Texas history. My Ph.D. is in U.S. History. Indeed, I was the first Latino to receive a Ph.D. in U.S. History from the University of Texas at Austin in 1977. My specialty is Tejano or Latino history in Texas. I have written four books on Latino history, two of them published by a major university press. One of my books won the three most prestigious awards in Texas History, and two national awards. I am a Professor of history at Austin Community College, and I have taught at the University of Texas at Austin, the University of Texas at San Antonio, and Texas Tech University. I have edited and published four books by other writers in order to spread knowledge of Tejano history. My most widely read work is the publication of my combat memoirs as a USAF pilot with over 100 combat missions in the *Time/Life Books* series on the Vietnam War. I have practical experience as a former military commander, a former corporate executive with Motorola, Inc., and as a former state agency executive director with the Texas state government. As the only Latino state agency director at the time, the position gave me a rare glimpse into the workings of state agency administration.

     3. The facts and data that I considered to form my conclusions came from the materials in my bibliography. These include documents in the categories of newspaper clippings from the Texas and Houston newspapers, federal and state government documents, archival documents

3

from the libraries of the University of Texas, the University of Houston, and the State Archives of Texas.  I have conducted years of research in the Spanish and Mexican archives, as well as in newspaper collections, personal collections, and government depositories of those libraries and archives as well as the Briscoe Center for American History and the Benson Latin American Collection, which also houses one of the most extensive Mexican-American collections in the United States.  I have also conducted extensive research in online databases and in numerous county land records across Texas, as well as at the University of California at San Diego, the U.S.  National Archives, the Library of Congress, the State Archives of Coahuila, and the National Archives of Mexico.

4.  I have been a consultant to historical museums across Texas such as the Witte Art Museum of San Antonio, writing the text, and reviewing the accuracy of their displays.  I also once consulted a major federal archeological project in Texas.  I am a regular speaker and curriculum consultant to civic groups, universities, and independent school districts.  I have delivered keynote addresses to federal agencies in Washington, D.C. and in every major city in Texas, the largest of which was at Texas A&M University to over 3,000 in a special events center and a worldwide satellite TV audience.

5.  My expertise as a U.S. historian is in the social, cultural, economic, and political interaction of various groups in Texas history.  My specialty historical period is the nineteenth century and early twentieth century.  I have used traditional historical archival documents like period newspapers, court records, city council minutes, state legislative committee proceedings, government documents, eighteenth century Spanish documents, nineteenth century Mexican archives, and personal collections.  I have been named as Series Editor for the Spencer Series of Texas A&M University Press for their history books on Texas and the Southwest.  Under my direction, the Spencer Series has won several book prizes for books for introducing new historical methods to access the unwritten historical transcripts of non-literate societies by referring to inter-disciplinary methods in archeology and anthropology.  I recently received the national Equity Award from the American Historical Association for my role in promoting diverse perspectives and minority historians in the field of American history.

6.  The summary of my findings of discrimination against Latinos in Texas is that discrimination has been a pervasive and constant phenomenon since 1836, when Anglo-Americans took control of Texas government.  Anglo-American government control was expanded by the defeat of Mexico in the U.S.-Mexico War of 1846-1848, which ended in the taking of present-day South Texas as well.  The traumatic manner in which those Mexicans became U.S. citizens through defeat placed them at a great disadvantage in knowledge and access to the laws, economic power, and government.  Another theme in my conclusion is that racist and discriminatory treatment has been a major characteristic and a consistent thread in the relationship between Latinos and Anglo-Americans especially in Texas.  Another theme is that Anglo-Americans have consistently been able to use Texas government agencies, police agencies, and laws to appropriate lands, labor, and cultural heritage from Latinos.  This phenomenon of domination has manifested itself since 1836 after which the bulk of the lands

4

throughout Texas were taken along with government control.  It was reinforced in South Texas when Anglo-Americans established large commercial farming estates which have used violence and labor controls to appropriate Latino labor until the mid-20th century.  During the period between 1900 and 1920 the state government established Anglo-controlled legislative districts and a statewide subtractive school system as major obstacles to Latino education and equal access to the democratic process.  The subtractive schooling of Texas has made Latinos vulnerable in turn to another complete sphere of domination through political devices that are designed to disfranchise citizens with limited education, English-language skills, and literacy.  The state government has consistently and aggressively exploited these weaknesses to deprive Latinos of their voter and citizenship rights.  Although Latinos have challenged the political, economic, and educational subordination, they have done so at tremendous disadvantage, which is manifested in the persistent racism and their current subordinate status.

7.   My findings in this case are that Latinos in Houston, Harris County, Texas have experienced many of the same violations of civil rights cited in the above paragraph.  The political leadership of Houston, the educational leaders, and employers have employed many of the same discriminatory devices such as racial segregation, police intimidation, voter dilution, slating, restrictive covenants, and job discrimination to restrict the equal access of Latinos to fair treatment before the law, economic opportunity, and open democratic processes.  These abuses have been particularly detrimental to recently-arrived Latino immigrants in the latter part of the twentieth century.   Documents cited in this report provide direct quotes in which employers and city officials openly admit that they systematically practiced dual-wage employment, discriminatory hiring, and ostracism of Latino fellow citizens and workers.  The lucrative economic incentives have attracted a major Latino population to the work sites in Houston and the Spring Branch Independent School District ("Spring Branch"), and they have asserted their demands for fair treatment and equal access to the electoral process, but Latinos continue to lag behind politically and economically in the face of persistent racial prejudice and a structure of discrimination.

**Historical Background** The Spanish and Mexican pioneer ancestors of modern Latinos were the founders of Texas under a European type of government.  These original Latino settlers are called Tejanos, which is simply the Spanish word for Texan.  Tejanos had come initially under the flag of Spain, as Mexicans after Mexican independence, and they continued to settle in Texas under the Republic of Texas.  They claimed lands under the various land grant programs of the successive governments of Texas, and they were citizens of the successive republics. They established large ranches, and several towns such as San Antonio, Victoria, Laredo, Nacogdoches, and Corpus Christi.  Over 2,000 Tejanos claimed headrights or land grants in Texas along with Sam Houston and Mirabeau B. Lamar as a reward for defending Texas from the Mexican government of President Santa Anna.  Even though thousands fought for Texas, incoming Anglo-Americans made no distinction between the Tejanos who were citizens of the Republic of Texas, and the Mexicans who fought against Texas.  As an example, Juan N.  Seguin

5

of San Antonio, had fought for Texas Independence.  He is the only Texan who fought against Mexican General Santa Anna at both the Alamo and at the Battle of San Jacinto.  Immediately after the Texan victory at San Jacinto, Seguin was the victim of several threats on his life in San Antonio by Anglo-Americans because they made no distinction except their concept of the Mexican "race." (Williams and Barker 1943, IV, pp.  63, 64; Friend 1969, pp.  66, 73) Tejanos had established the legitimate government of Texas under Spain and Mexico, but they quickly found themselves isolated by the Anglo-American wave of settlers who greatly outnumbered them.  As Anglo-Americans entered Texas, they took a dominant position, isolating the Tejanos from any viable role in government and the economy.

An anti-Mexican sentiment spread after the Texas Revolution as other prominent Tejano leaders like Juan N.  Seguin, Carlos de la Garza, and Vicente Cordova were eventually forced to defend themselves against raids and attacks by Anglo Texans.  Tejano families began an evacuation of Texas.  Hundreds of Tejano families fled to Tamaulipas and Nuevo Leon, Mexico while others fled into Louisiana.  During these years, the Texas government played a direct role in dispossessing Tejanos from their lands.  In many cases, the Texas Army had actually ordered loyal Tejanos off their lands, ostensibly to preclude collusion with the enemy.  In 1842, Col. Clark L. Owen declared martial law in the Goliad-Victoria area, and ordered "all Mexicans" to move south of the Nueces.  Prominent and loyal Tejano families lost their ranches and lands as they left many of their settlements in what was called a "virtual state of abandonment." (O'Connor 1966, pp.  10, 126, 253; Huson 1953, I, 471**;** Hammett, 1971, pp.  83-84) As the 1840s progressed, Anglo and European immigrants flooded in and took many of the ranches, the livestock, and indeed the livelihood of many of the old Tejanos around Bexar, Goliad, and Nacogdoches.  By 1845, for example, 40 of the 45 Goliad Tejano ranches had passed into Anglo hands for a pittance of their value.  Many of these *emigré* Tejanos returned years later to reclaim their lands after the revolution—some successfully, and some not.  (Goliad County, Deed Records). After the U.S.-Mexico War, the Treaty of Guadalupe Hidalgo in 1848 incorporated the land south of the Nueces into Texas, and guaranteed full citizenship to the Tejanos as Latinos. Historians like David Montejano and Walter Prescott Webb have suggested that South Texas counties like Nueces, Kleberg, Cameron, and Hidalgo experienced an economically-driven pattern of Tejano land dispossession, which characterized the transfer of lands as one-way and irreversible.  These basic books of Texas history state that Tejanos lost their lands through "fictitious suits," sheriff's auctions, and dubious transfers of title.  Anglo newcomers like Stephen Powers, Charles Stillman, Richard King, and Mifflin Kenedy remained after the U.S.-Mexico War, and, to use Webb's expression, "bamboozled" or deceived the Mexicans in South Texas.  Webb added that "The old landholding Mexican families found their titles in jeopardy and if they did not lose in the courts they lost to their American lawyers." (Montejano 1987, 74; Webb 1991, pp.  175-76)

Many historians have indicated the major role played by the racism of the incoming Anglo Texans during and after the Texas Revolution.  Anglo-Texans often cited a distorted version of Texas history to rationalize their economic claims against Tejanos.  For example,

6

during the Texas Revolution, Edward Dwyer, an Irish merchant in San Antonio encouraged Texas Army Gen.  Thomas Jefferson Green to expedite the army into Bexar.  ".  .  .the people [of San Antonio de Bexar] .  .  .  are not sufficiently scared to make an advantigius [sic] sale of their Lands.  In case two or three hundred of our troops should be stationed there, I have no doubt but a man could make some good speculations with Gold and Silver.  Bank notes will not do to purchase Land from Mexicans," he added.  And in Victoria, John Linn described a similar situation during that same period in which "Fernando de Leon was subsequently persecuted by the presentation of unjust claims against him, and, owing to the prejudice then existing against the Mexicans, many illegal and unfair judgements were rendered against him." De Leon, the largest landowner in Victoria County, lost about half of his lands to those judgements.  And, during the U.S.-Mexico War, a U.S. Army officer, General William North boasted "our Anglo-Saxon race [have] been land stealers from time immemorial, and why shouldn't they [be]?" (Crisp 1976, 343; Foley 1997, 21; Crimm 2003, 170) Thus racism was an openly avowed motive and a justification for land theft.

   In the mid- to late-1840s, however, incoming Anglo squatters openly began to use brutal atrocities against many Tejano families.  One specific case in 1843, was recorded in Karnes County, where according to the *The Kennedy Times*, the Carlos Martinez ranches were raided by "companies of white people, who came to the rancho from the Guadalupe and Colorado rivers, and killed the people at the rancho and stole their stock." The newspaper added that no arrests were made as the murderers moved into the ranches.  Another murder on the nearby Becerra land grant also drove the Tejano families off their lands.  The Tejano families fled to Goliad after their livestock were killed and their barns burned by mounted Anglo marauders.  Tejanos lost many relatives in the killings, and they lost their legitimate claims to the lands.  (Crimm 2003, 141; Kenedy, Texas 1963, Sect.  1; Rubio 1986, 136)

      The counties west of Karnes saw Anglo city and county officials begin a coordinated campaign to drive Latino citizen and Mexican immigrant settlers out of the counties from Austin to San Antonio.  The campaign took the form of vigilante raids incited by newspaper rhetoric and conducted by the town's most "excellent citizens." In 1850, the Austin City Council established "city watch" authorizing a Vigilante Committee "to inflict punishments without resorting to trials.  .  ." on Negro slaves for violating the curfew or for associating with Mexican immigrants and Latino citizen residents.  Blaming the Latinos for inciting runaway slaves by associating on an equal basis with them, local newspapers developed a rationale for not only persecuting the recalcitrant slaves, but also for punishing the Latino citizens in Austin.  The *State Gazette* referred to "the local Mexican residents who were permanent citizens" of Austin as "half-negro, half Indian greasers" and called for "exertion in clearing our country of rascally peons." The newspaper rationalized that this "clearing" of the city was justified because Mexicans were peons "incapable of acquiring the rights of citizenship." The City Council and the newspapers agreed that the Vigilante Committee should be comprised of Anglo-Saxon "excellent citizens" in order to legitimize the "clearing" campaign as had been done in Seguin County and eight other neighboring counties.  As a result, the Austin committee included elected

officials, Democratic Party officials, veterans of the Texas Revolution, and members of the nativist Know Nothing Party.  The Austin Vigilante Committee was led by the well-known Texas Ranger and Mayor of Austin, John S. "Rip" Ford, a Chief Justice, a city alderman, the city marshal, and the county sheriff.  After a few years of persecution, Austin had burned out all settlements of Mexican immigrants and local Latino citizens.  By the 1860 census, only 20 Spanish-surnamed residents were left in Travis County, and *State Gazette* rationalized the raids because Mexicans were "a bad element of society . . .  [that] sooner or later would be extinguished." The newspaper boasted that Mexicans had also been driven out by vigilante raids in Uvalde, Bexar, Austin, Colorado, Matagorda, and Guadalupe Counties.  (Lack 1981, pp.  2 – 19)

According to historian David Montejano, native Tejanos eventually established a "Peace Structure" with incoming Anglo-Texans in order to escape the violence.  In the "Peace Structure," Anglos were allowed to dominate the government and economy, while Tejanos collaborated with them in exchange for protection from land theft and violence. In many cases, these incoming Anglo-American and European immigrants nevertheless used the anti-Mexican sentiment to acquire Tejano lands.  Following the 1850s, in Hidalgo County, Judge Thaddeus Rhodes, Sheriff John Closner, and land lawyer Jim Wells began to press sheriff's auctions on Tejano land grants.  The judge targeted the fertile lands of Spanish Porcion #69 land grant, owned by descendants of Juan Jose Hinojosa along the Rio Grande.  In May of 1878, the sheriff sold over 7,000 acres of the grant for $17.75 to Anglo-Texans.  Also in 1878, Judge Rhodes personally bought 30 acres of Porcion #69, and then held a sheriff's auction on an additional 668 acres of the land grant.  (Mexico 1875, pp.  30 - 32; Hidalgo County, A:149; Crimm 2003, 175; Rubel 1966, 36)

The period after Reconstruction and around the turn of the century also saw an attack on the Tejano landownership and socio-economic status, as Anglo-American commercial farmers from Midwestern states swept into South Texas.  The incoming Anglo-American squatters launched large-scale vigilante raids against legitimate and prominent Tejano land grantees during the Reconstruction period after the Civil War. One raid in 1874 swept from Victoria down to Refugio and another in the next year, the Peñascal Raid, swept from Corpus Christi down to present-day Raymondville.  The Victoria-Refugio region had also been the scene of racial and economic conflict between Anglo ranchers and Tejano landholders for years.  The conflict culminated in a vigilante raid in 1874 after a heinous crime against an Anglo rancher and his wife.  According to land lawyer and historian Hobart Huson, "several hundred ranchmen and cowboys from Refugio and Goliad Counties met on Rosilla Prairie with the view of exterminating all Mexicans in the section, commencing at Goliad." To begin with, they shot prominent Tejanos Marcelo and Antonio Moya, and slit the throat of their father, the Moya family patriarch.  In the dispossession, Huson reported a mass exodus of the surviving Tejano widows and children to Mexico after the incident, saying "the roads were lined with oxcarts and wagons headed west." Goliad County Sheriff Phil Fulcrod, judges, and other militia and government officials were directly involved in the above mentioned raids. The perpetrator of the

8

initial murder was later identified and hanged, but the vigilantes admitted that they still "were desperate for revenge." When they later heard another rumor that Mexicans had committed a murder a few miles south on the Nueces River, they rode overnight the sixty miles to Corpus Christi to enroll in that posse.  (Dobie 1929, pp.  73 – 80, 125; Huson 1953, I p.  471, II p.  214; U.S.  Congress 1876, p.  xviii)

In Corpus Christi a vigilante committee of about one hundred Anglos set out ostensibly to drive off the "Mexicans" on large land grants south of Corpus Christi.  For several months prior to the raids, famous rancher Richard King had stirred passions against several large neighboring Tejano ranches around the Peñascal Ranch, located about sixty miles south of Corpus Christi.  These ranches were home to about five hundred Tejano men, women, and children described by Texas Ranger N.A.  Jennings, as "peaceful Mexican farmers and stockmen who had lived all their lives in Texas." King instructed the vigilante posse to elect leaders— about twenty men—who should go first to Brownsville to be deputized.  With their instructions, and acting under color of law, the vigilantes then masked and painted themselves, and systematically killed all of the Tejano patriarchs and "every adult male that was present." As the raiders burned one ranch after another, the women and children fled into the chaparral and hid throughout  the night.  Many of the men's bodies were never found, and were presumed to have been "dumped in the bay." When Texas Ranger Captain L.  H. McNelly arrived to investigate the raids, he wrote back to Austin, "The acts committed by Americans are horrible to relate; many ranches have been plundered and burned, and the people murdered or driven away; one of these parties confessed to me in Corpus Christi as having killed eleven men on their last raid."

Many of the Tejano lands involved in the Peñascal Raid were incorporated into the King and Kenedy ranch empires, as the women and children and other Tejano rancheros fled across the border to Mexico.  According to one account: "They departed taking their money and personal possessions with them, and often they were found dead along the way with their money missing." (Taylor 1934, 57; Cheeseman 1998, 88; Mexico 1875, pp.  105, 106, 176; Hidalgo County, A, 149; Dunn 1932, pp.  9, 63; Villareal 1972, pp.  16-19) In the Refugio raid and in the Corpus Christi raid, the Anglo vigilantes included law officers, and were acting under color of law.  The marauders were deputized before conducting the Peñascal raid, and some even claimed to be Texas Rangers.  In neither case, however, were there any arrests of the perpetrators. (Cheeseman 1998, 88). In his book, *The Texas Rangers*, Walter Prescott Webb stated that the "reign of terror" reached its peak at the turn of the century, when between 500 and 5,000 Tejanos died, "many of them innocent, at the hands of the local posses, peace officers, and Texas Rangers." (Webb 1991, 176n.)

After the Revolution and even after the U.S.-Mexico War, the state government continued to undermine Tejano land title claims.  The legislature passed Texas Land Relinquishment Law of 1852, for example, requiring that all unarchived lands granted before 1835 be surveyed and filed with the Texas General Land Office by 1853 or be declared null and void.  Later, the Texas Constitutions of 1869 and 1876 included the same requirements, placing the burden of proof on the Tejano title holders.  The state legislature imposed restrictions on

Tejano rights to testify.  When Tejano appellants came to Austin to plead their land cases, they were told that a committee rule required that in order for Tejanos or other non-whites to testify, "their character for truth and veracity had to be established by the testimony of two white men." (Rubio 1986, 114; Texas, *State Gazette,* Vol.  II, No.  6.)

One of the most questionable government actions in the administering of Tejano lands was known as the Bourland-Miller Commission of 1850.  As Anglo-American capitalists and land speculators stimulated a growing demand for Tejano lands, the state legislature sent two commissioners across the Tejano ranching frontier to verify and record the titles to as many Tejano lands as possible.  The state's interest was clearly to facilitate land transfers from the old Tejano land-holding families into Anglo hands.  After the commissioners collected the titles, and loaded them for sea transport from Brownsville to Austin through the Gulf of Mexico, the Steamship *Anson* caught fire and sank off the coast of Matagorda, destroying all the Tejano land titles.  (Greaser and de la Teja 1992, pp.  455, 457n.) The most questionable role of the state government was not so much in the coincidental fire, but in actively promoting the sale of the lands of a targeted class of citizens through legislation and a special commission.

In summary, the actual cases recorded in county and state land records verify the historical interpretations that the violence waged against Tejanos during Reconstruction was primarily used by Anglos in an effort to usurp their landholdings.  It cannot be characterized— and it cannot be trivialized—as one short period of unfortunate but legal transfer of title from unwitting victims.  It involved mass murder of whole families, of whole ranch settlements, and of titled patriarchs of landholding families who were citizens of Texas.  In its various forms, the violence was perpetrated by the Army of the Republic of Texas, it was condoned by the Confederate State of Texas, it was actively promoted by the State of Texas, and it was knowingly permitted, contrived, and facilitated by the local governments.  And, when the sheriffs' auctions, and the vigilante raids, and the legal trials covered up the atrocities, the theft of Hispanic lands was legitimized and shielded under the sanctity of the courts and the Texas General Land Office. (Tijerina, 2012, p.  322)

The end of the 19th century would find the Tejanos inundated not only by continuing Anglo-American immigration from the United States, but by a wave of emigrant Mexicans fleeing the violence of the Mexican Revolution.  Incoming Anglo-Americans continued to acquire Tejano lands in South Texas, which they called "The Rio Grande Valley." As immigrants themselves, the Anglo Americans ironically made little distinction between the native Tejano citizens of Texas and the flood of immigrant Mexican nationals.  By taking control of the county government, Midwestern Anglo-American commercial farmers re-structured the county taxes, budgets, road and bridge construction, and education to suit the farmer at the expense of ranchers and the Mexican-American population.  Landless Tejanos and Mexican immigrants were all categorized by Anglo-Americans as "Mexicans" and seen as cheap labor with no distinction as to social status, education, or citizenship.  Just as they re-structured the county government to suit themselves, Anglo Americans re-structured Texas history and culture to rationalize their disfranchisement of the Latino as a laboring class with limited educational or

political freedom.  In the period of 1900 to 1920, the Anglo- American commercial farmers began to claim economic and political power from Anglo ranchers and Latinos alike.  Political power presupposed an attack and a control of Latino citizenship and voting rights.

**20th Century**  Throughout the twentieth century, the racialization of politics and the economy had continued to the point that Texas had what amounted to a caste stratification with Anglo-Americans in dominant positions and Latinos generally in subordinate positions.  One 1965 study of Texas racial relations stated that "Anglos have always been on top… and the Latinos isolated on the bottom." (U.S. Commission on Civil Rights: Latino Education, 11). The distorted historical transcript had been developed by 1900 that depicted the Anglo-American as the liberator of Texas from a heathen Mexican population.  The historical narrative was articulated by policy leaders and the public in order to rationalize the political and economic subordination of Latinos.  As an example, in a 1911 state vote on prohibition, state leader Thomas Ball in Brownsville said he opposed "…the Mexican vote, which Texas in 1836 declared unfit to govern this country." (Anders 1982,, 101) Even a poor Anglo cotton picker used history to elevate himself above Latinos, saying "the study of the Alamo helps to make more hatred toward the Mexicans… if a man …slaughters your kinsman…I am in favor of not letting Mexicans come over and take a white man's labor." (Montejano 1987, 224)

**Progressive Era**  During the 1900 and the 1920s Progressive Era, Anglo-Americans began to refine their political control over the Latinos.  In Texas, "Progressive" meant anti-Mexican.  The term represented a new development in political philosophy.  By using a salutary term that implied positive progress, the Progressive politicians appropriated the mantle of reform.  Texas Progressives adopted a rhetoric of reform, naming their organizations with innocuous or benevolent names such as the Good Government League or the Ballot Purification League.  But their effect was to disfranchise and dilute minority voting power by political device and by intimidation and violence.  By the turn of the century, Latinos sought refuge under the protection of political bosses.  The political bosses protected them from Texas Ranger violence and Anglo-American raids, and then controlled their voting for complicit state and federal politicians, who gave tacit consent.  The Progressives were middle-class Anglos.  As one authority said, "most came from the ranks of the Anglo, Protestant majority and looked with contempt upon the social standing, life-styles, religion, and moral values of the Hispanic population." In order to strip the political bosses of their power, then, middle-class Anglo-American professionals blamed the Latino victims of the system, and made a concerted effort to disfranchise the Latinos.  One of the most powerful political bosses was Archie Parr.  In 1908, Parr took a seat on Duval County Commissioner's Court after political assassinations eliminated his opposition.  Once in power, he used the County Treasury as "slush fund" and gave his constituents short-term work on road and bridge projects.  Then, he simply deducted their poll tax fees from their wages, and directed their voting.  Parr and other bosses like Jim Wells used a device called "corraling voters" to deliver their minions by the "wagonloads." One political boss

11

could amass enough votes to elect state and federal officials.  The political machines under Parr, Jim Wells, and Robert Kleberg worked in close cooperation with state and federal officials who benefitted from their control of the South Texas votes such as Col. Edward M.  House, Lyndon B.  Johnson, and John Nance Garner.  As presidential advisor to Woodrow Wilson, Col. House gave Jim Wells "a near monopoly over the distribution of state patronage" in the Valley, according to one historian.  (Anders 1982, pp.  13, 103, 176). These slating and corralling devices were used by political bosses in many other cities of Texas as well.  As an example, San Antonio had the Callaghan political machine which reportedly paid the poll tax for Latinos, and instructed them on voting.  More blatantly, the Good Government League of post-World War II San Antonio regularly slated the city council candidates.  Although it usually slated a middle-class Latino as a token, it limited the Latino representation to that one token position, which was far below their percentage of the electorate.  (Garcia 1981, 157; Rosales, 2000, 5 & 13.)

Gerrymandering developed as an alternate method used by Texas policy makers at the highest levels to dilute and manipulate Latino voter groups. This method was later used to segregate Mexican-American laborers and public school students as well.  In order to secure their Latino voting blocks, political bosses used gerrymandering of electoral districts and created whole counties in order to control Latino voters.  Indeed, thirteen South Texas counties were created by these bosses for that purpose.  Some counties were created by Progressive politicians to counter the political bosses.  As an example, Ed C. Lasater took Brooks County from "Mexican" Starr County in order to secure Brooks for his "thrifty and industrious farmers from Iowa, Kansas, Texas, Nebraska, Indiana." Likewise, D.W.  Glasscock broke Jim Hogg County from Zapata County in order "to get out from under the domination of the Mexican vote." Meanwhile, Parr and other bosses made other efforts to carve Duval, Nueces, Jim Wells, Kleberg counties to concentrate their Latino voting blocs.  Within a few years, Counties in South Texas had increased from 7 to 13.  As an example, at the turn of the century, U.S. Congressman John N. Garner was a member of the House Committee on Congressional Districts and "the subcommittee that drafted the initial version of the reappointment bill…the House measure confirmed exactly to Garner's and Wells' specifications …created a district that included Uvalde and the Trans-Nueces but excluded San Antonio." (Anders, *Boss*, 110; Montejano 1987, 131) By the end of the century, gerrymandering of Latinos had proven to be an effective and accepted practice by Anglo American policy makers at all levels of Texas government.

Throughout the Progressive Era, Anglo ideologues and politicians explicitly articulated their rationale of disfranchising what University of Texas professor called the "dangerous" Mexican vote.  During the 1914 gubernatorial race, the *San Antonio Daily Express* quoted prohibitionist candidate Thomas Ball as supporting reforms to disfranchise Latinos.  He publicly predicted that "liquor and Mexicans" would both "rest together forever in death." In the 1918 general election for Texas Senator, candidate D.W.  Glasscock stated that his campaign was "to get the Anglo Saxon on top." (*San Antonio Express*, 1914, p.  4B; Montejano 1987, pp.131, 145-7)

12

The poll tax was one of the main devices created specifically to disfranchise Latinos in Texas.  The 1903 Terrell Election Law required payment of the poll tax between October and February on the assumption that Latinos were too poor or forgetful to comply.  The state reformer, Terrell, himself said the law was intended to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes." His proponents said Latinos could not afford the poll tax, would lose receipts, or not pay so far in advance.  Using community organizations called the "Good Government League," the Progressive reformers articulated their intent.  In 1913, for example, State Rep. Joseph O. Boehmer of Eagle Pass established the Ballot Purification League, and submitted a bill admitting his intent was "to disqualify the Mexicans of the Western and Lower Rio Grande Counties." Historian Evan Anders has argued that "the practical effect of most of these proposals would be to curtail the voting of impoverished, illiterate blacks and Latinos." (Dallas Morning News, 1913, p.  10; Anders 1982, 102; Montejano, 1987 , 143)

The Progressives also used restrictive laws, such as the 1918 state law to eliminate interpreters at the polls.  They used the "White Man's Primary" to exclude Latino voting in the Democratic Primary elections, which in a one-party state, pre-empted the general election.  In establishing the White Man's Primary Association (WMPA) in 1904, the State Democratic Executive Committee required an oath, declaring "I am a white person and a Democrat." The Dimmit Co.  WMPA was so effective that *Carrizo Springs Javelin* in June 12, 1914 said it "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards." The newspaper added that it was for labor and "race control" to protect the "purity of Anglo women." (Montejano, 1987, pp.  143-4)

 In many cases, violence was used by Anglo-American mobs and state and local officials against Latino voters.  The Texas Rangers had traditionally intimidated Latinos, and were used specifically to discourage their voting after 1900.  As an example, Progressive Gov.  Wm. Hobby in 1918 created the "Loyalty Ranger Force" of 1,000 special rangers, and 3 rangers in each county to supplement Texas Rangers.  The Rangers gave "armed support" to Democrat machines in "partisan" conflicts.  In the senatorial race that year, Texas Ranger William Hanson (former U.S. Marshall, and organizer of Loyalty Rangers) and several rangers discouraged Latino voters in Corpus Christi, "prior to the primary both there [Kingsville] and at Corpus Christi, giving out that word and calling at the homes of these Mexicans and telling them if they couldn't read and write they would be sent to the penitentiary if they voted." Hanson then sent several rangers to Duval County for "management of the primary election." One official reported that "only about sixty-odd Mexicans" voted in Nueces County elections as a result.  A South Texas lawyer, Marshall Hicks, testified in *Glasscock v.  Parr* (1919) in the minutes of the *Texas Senate Journal* that his opponent, D.W.  Glasscock had the Texas Rangers selectively "investigate" Latino voters, and spread "a spirit of terrorism among those Mexican people." The sworn testimony was that Glascock had a committee of henchmen who "tried in every legitimate way they could to keep the Mexicans out of the polls" using circulars in which "the Mexican

13

race was very bitterly denounced" as "Greasy Mexicans." Or as Evan Anders said in his study, "the mere presence of armed Rangers at the polling stations had an intimidating effect on the Hispanic population" in Cameron, Duval, Nueces, Hidalgo, and Starr Counties.  (*Glascock v Parr*, 1919, pp.  551-552; Montejano 1987, 145-7; Anders, 1982, pp.  252, 257, 263)

In 1916, during the turmoil of the Mexican Revolution immigration, Anglo political leaders in the Valley held meetings, and stirred Anglo fears of Latino uprisings.  But, according to Anders, "the Anglos' suffering and hardships paled beside the horrors that they inflicted upon the Hispanic population." Anglos used vigilante action, and "a bloodbath that claimed from two hundred to three hundred Hispanic lives ensued." In widespread lynchings, Anglo gangs burning Latino houses, ranches, and hanged 15 in San Benito.  Local officials participated in lynchings. "The most blatant abusers of police power were the Texas Rangers." according to a legislative committee report in 1919.  The Texas Rangers "confiscated the arms of Hispanic residents" in Cameron County, violating their Bill of Rights, and leaving them defenseless.  In one small town, the Rangers dragged 15 Latinos from their homes, and executed them in front of their families.  They reportedly killed 102 Latinos in "cold-blooded murder."

A few years later, a momentous incident occurred called the "Hidalgo County Rebellion." In this incident, crowds of Anglo reformers demonstrated and rioted against Latino voters at elections to supplement the Texas Ranger brutality.  In 1928, the Weslaco barrio election box was assailed by the Republican "Good Government League" which led the "Rebellion" cited in a U.S. Congressional investigation.  According to the federal report, a crowd of 3,000 to 4,000 Anglos at the polling place shouted, "Don't let those Mexicans in to vote.  Throw them out" while men with shotguns protected the crowd.  An estimated 200 to 300 regular Latino voters "did not show up at all." One former Texas Ranger, Hidalgo County Sheriff A.Y. Baker, became the Democrat boss of the county, and was reputed to have committed election fraud and large-scale graft.  When State Rep. J.T. Canales protested the violence and the use of Loyalty Rangers in the 1919 legislature, he was given a death threat by Ranger Frank Hamer as he walked up to the capitol building in Austin.  In the legislature, Rep. Canales pressed his demands, accusing the Rangers of covering up their atrocities. (Anders, Boss, pp.  224-6, 239, 269; Montejano 1987, 147)

Years later, scholars and organization leaders would blame these widespread events for a disaffected Latino electorate.  Many years after the Progressive Era, Latinos continued to live under the systematic discrimination established in Texas by the Progressive politicians.  The segregated schools, the poll tax and voting intimidation, and the job discrimination continued as the status quo in Texas from the 1920s through the 1960s.  The only major changes during the Depression Era were the federal programs of President Franklin D.  Roosevelt's New Deal. Ironically, even though the New Deal provided for jobs, farm price re-stabilization, and old-age pensions, the New Deal programs tended to exclude the Latinos.  For example, the Civilian Conservation Corps often neglected Latino young men, the Agricultural Adjustment Act displaced the Latino sharecroppers by making it more profitable for land owners to leave their land fallow rather than employing sharecroppers, and the Social Security Act gave a guaranteed

retirement to all Americans except agricultural labor and domestic workers, most of whom, in Texas, were Latinos.

**Labor Controls** Early in the twentieth century, Texas state and local officials began to relate labor control over the Latino population to social and political control. One South Texas superintendent explicitly stated that the state officials condoned minimal education of "the lower element" [Latinos] specifically to control them in the labor force. "We don't need skilled or white-collared Mexicans…There isn't a concerted effort against them but the white-collar man is not a common laborer." Another school official said he complied with local growers to keep the Latino population out of school, saying "it is up to the white population to keep the Mexican on his knees…This does not mix very well with education." (Montejano 1987, pp. 192-3)

As Anglo-American businessmen and government officials sought to maximize their profits in using the Latinos as a labor force, they developed a systematic web of formal and informal labor control devices. Recruitment of foreign nationals and domestic workers helped to build a labor surplus to drive wages downward and to displace the risk factor of production onto the labor force itself. As an example six major labor recruiting agencies working on the Texas-Mexico border in 1907-8 recruited 16,479 Mexicans for railroad construction alone. Other agencies recruited Mexican and Latino workers for the cotton industry and mining in West Texas. The railroads and agribusinesses made no distinction between citizen and foreign national. Both classes of Latino were subjected to the same state and local labor controls. (Foley 1997, 44; Daniel, FEPC, 128). Other labor controls included vagrancy laws, indebtedness, and county passes. By 1927, Willacy County was implementing Vagrancy Laws enforced by the county sheriff, the Justice of the Peace, and the County Attorney. They systematically arrested Latino laborers traveling in search of higher wages for not having the approved "county passes" signed by an Anglo employer or county official. The Latino workers were convicted, and paroled as "convict labor" to Anglo-American growers. When asked about the legality of these controls, a U.S. Dept. of Justice agent rationalized it, saying it was necessary at harvest time.



**COUNTY PASS: Hidalgo County, 1915**

To support the growers, the state government coordinated the labor control devices with them and the South Texas chambers of commerce.  In 1927, the state legislators pressed the Texas State Employment Division to assist the growers.  The legislature passed the Emigrant Labor Agency Laws to keep the Latino labor force from being recruited by out-of-state recruiters.  The state controls included requirements that out-of-state recruiters pay prohibitive bonds, fees, and taxes.  In 1934, the Texas Farm Placement Service began to maintain check points on highways in order to direct Latino labor to farmers.  In so doing, the state government helped to create local labor surpluses to drive wages down, and ostensibly to prevent migrants from "aimless wandering" in search of higher wages.  (Montejano 1987, pp.  205, 210-12)

South Texas agri-businessmen began to use Taylorism and professional management in their control of labor.  In South Texas, Taylorism meant control of the Latino labor force.  By 1930, Corpus Christi led the nation in cotton production and profits mainly through the complete control of the large Latino labor force.  These commercial farmers established a system of controls that included racial stratification of labor, company towns, and armed guards.  In 1929, for example the Chapman Ranch had 18,000 acres in Nueces County.  It gave Anglo-American farmers 160-acre plots to be worked by Latino workers, who comprised 97% of the labor force, but received no land plots.  Chapman divided his workers by race, providing one Anglo school and one "Mexican School" for his Latino workers, separate churches, a hardware store, a grocery store, and a dry goods store where workers were required to pay with his company scrip as a condition of the oral employment agreement.  Latino laborers were issued coupons which they had to use in ranch store, ostensibly for "salary advance," but in reality to keep them in debt as a further control device.

Even larger was the Taft Ranch near Corpus Christi.  Around 1900, near Corpus, the 200,000-acre Taft Ranch comprised 39% of the San Patricio County population.  Like the Chapman Ranch, owner Charles Phelps Taft kept his Latino laborers separate from Anglos, who were also given 160-acre farms.  His workers were also kept in company towns, provided housing, grocery stores, dry good stores, separate schools, and separate churches.  The Taft Ranch hired only Latinos with a wife and children in order to maintain more stable workers.  The Latino workers lived on the Taft Ranch under a shadow of armed intimidation.  The Ranch sponsored "rifle clubs" consisting of its Anglo-American farmers and overseers.  It also admittedly had a machine gun, and issued the Anglos .30-.30s and .38 caliber pistols.  The Anglo overseers held target practice on the ranch ostensibly to preclude any possibility of an "an uprising of some sort" among Latino workers.  Charles Phelps Taft, the owner, was President William Howard Taft's brother.  He kept his Latino workers in debt.  He periodically "rounded up" his Latino and black workers and voted them for President Taft, and other selected candidates.  (Foley 1997, pp.  81, 119, 121-7, 132-3) The Chapman Ranch and Taft Ranch developed models of labor control that were replicated in varying forms across the state.  In 1916, for example, the Commission on Industrial Relations reported that Latino agricultural workers were chained and guarded by armed men with shotguns.  One grower told the

commission that Latinos were better labor because "you can treat them in any manner and not be bothered with lawsuits." Other industries also implemented a dual wage system for its Anglo and Latino workers as late as 1942 when the War Production Board reported that "the differentials between Mexican and American white workers is as high as $1 per shift." (Foley 1997, 49; Daniel, FEPC, 77)

In labor controls as in political control, the Texas Rangers played a prominent role by intimidating the Latino workers to preclude organization or protest. In 1913, for example, Texas Rangers broke a strike in El Paso where Latinos made up 60% of the work force. The 650 smelter workers went on a strike, which was broken by Texas Rangers using violence and hired company henchmen. Likewise, in 1966, when national civil rights leader Cesar Chavez came to the Rio Grande Valley to support a Latino farmworker strike, the Texas Rangers used intimidation, arrests, and violence to harass the strikers. (Gomez-Quinonez 1994, 79, 255; Daniel, FEPC, 128). Throughout this period, government investigations continually reported discriminatory practices against Latino workers. Even in World War II, the Fair Employment Practices Commission found a dual wage system in the Texas oil industry.

Even after the war, as Latinos took 10,000 of the 35,000 jobs at Kelly A.F.B. in San Antonio, the U.S. Commission of Civil Rights reported that they "continued to be concentrated in the lower pay scales" through a network of discriminatory devices. Typically, an Anglo manager would "Pass-Over" a Latino worker for an Anglo on hiring and promotions. The personnel evaluation system was found to use a "Dummy Profile" for promoting and hiring pre-selected Anglos. Many of the Latino workers were performing skilled jobs at lower rate of pay. (U.S. Com. Civ. Rts., Employment, 3; Montejano 1987, 269). In agriculture, the farm ownership patterns had seen a replacement of the family farm by corporate agribusiness. Likewise the Latino agricultural force changed to a migrant force. The Latino farm labor force became an interstate migrant labor force which increased "from 95,000 in 1963 to 129,000 in 1966." One study of the migrant force of 350,000 in the Lubbock area in 1939 was 85% Latino. According to a recent study, conditions for Mexican American migrant workers have not improved significantly. The Texas Office of Rural Health reported recently that their work is still "the highest of all industries in work-related deaths, with a rate of 52 deaths per 1,000,000 workers." (Montejano 1987, 273; Tijerina 1979, 38; Richardson 1999, 33).

**Mexican Towns/Barrios** Another device promoted by business and local governments to keep Latino workers separate was the formation of an exclusively Latino town or neighborhood. As Anglo-American farmers migrated into the Rio Grande Valley from Midwestern states in the 1890s, they used race as a device to segregate not only their workers but whole towns. They were attracted by land promoters with promises of low labor wages and cheap agricultural lands, but they rejected the local Latino culture and population. According to a study of the Valley counties, "racially segregated schools and residential patterns emerged" at the turn of the century. Many of these segregated or exclusively Latino towns were planned and developed by powerful growers specifically to isolate their labor force. In 1910, for example, the Taft Ranch

built Taft and Sinton on ranch land specifically to separate its Latino workers from its Anglos. Likewise, other South Texas towns were developed by growers. Asherton was built as a "Mexican Town" by a banker named Richardson. Kingsville was segregated by the Kleberg Town & Improvement Company. Weslaco was built as a segregated town in 1921 by municipal ordinance using the Missouri Pacific Railroad tracks. McAllen was segregated by the formal policies of the Real Estate Board and the Delta Development Company. (Anders 1982, 142; Montejano 1987, 167)

In the larger cities of the state, Mexican immigrants and native Latino citizens alike were simply not allowed to settle within the city limits. Segregated into *barrios*, they were commonly denied access to business, to neighborhoods, to education, and to city services. As the new Texas cities grew, they took the shape of a segregated community. When Latinos returned to Austin after the 1859 vigilante raids, for example, they were allowed to remain primarily as a disfranchised labor force living in the county dump. Those in Dallas, Lubbock, and Houston settled across the railroad tracks near the railroad depots or stockyards. In this racially and politically segregated *barrio*, the Latino citizenry of Texas developed an unequal status which lingers to the present day as a result of the decades of denial. In general, the Texas *barrios* were described as deplorable, isolated from city services, and lacking political representation.

The Dallas *barrio*, for example, developed along Mill Creek across the Trinity River from downtown Dallas after the Civil War. Mexican immigrants were housed near the railroad depot and Latino citizens moved into the *barrio* called "Cement City" because of the cement works. It was described as having dilapidated houses with "No sewage—no sanitation. . . worse conditions." A newspaper report said in 1944 that "every such congested, overcrowded, unhealthful center is like a canker or eating sore on our fair city." It added that the substandard housing was "little improved" through the decades of the twentieth century, and were "hardly fit for housing livestock on a farm." Indeed "Little Mexico," as the Dallas *barrio* was later called, ranked first in tuberculosis deaths, pellagra deaths, and overall death rate for the city. As stated above, these conditions would leave a lingering effect on the Latino community. A report, U.S. Census Tract X of Dallas in 1970 showed that the *barrio* had the lowest education and income levels, and the highest infant mortality rate in Dallas as late as 1970. (Achor 1978, pp. 34, 35, & 63)

Through the decades, Dallas continued to develop a "sharp division between the Anglo and non-White population," the highest of thirty-five southwestern U.S. cities according to a report in 1960. After urban renewal and school desegregation in the 1970s, statistics revealed that "Dallas has still maintained separate patterns of settlement." As a result of the economic and racial segregation, one study reported in 1972 that "Minority access to political power is severely limited—in fact, it was almost nonexistent for many years." The study indicated that from 1931 to the early 1970s, an informal council of Anglo political leaders called the Dallas Citizens Council used its political arm, the Citizens Charter Association (CCA) to influence local elections. In so doing, the CCA denied Latino access to equitable representation in local elections, and virtually prohibited broader representation in state and federal legislation. The

18

CCA typically slated pro-business Anglo candidates for all elections and never had a single Hispanic in any of the eighteen Texas legislative districts, three state senatorial districts, or six U.S. congressional districts in Dallas County.

The Latino community of Dallas began to organize for democratic activities, and was "radicalized" by a singularly revealing incident in 1972.  *Barrio* residents had long complained of police brutality, but little evidence could be found to verify it until a Dallas policeman shot a Latino child in an interrogation.  The police officer, Darrel Cain, used his .357 magnum revolver to force a confession from 12- year-old Santos Rodriguez (later found to be innocent) in a deadly game of Russian roulette.  The gruesome incident agitated Latinos across the state, although it had no impact on the segregation or political representation for the Dallas *barrio*. (Ibid., pp.  50, 59.  60, 148). Indeed, Latino children were still attending segregated schools in Dallas in the 1950s.  Not only were they restricted to four segregated elementary schools, their only high school until 1960 was Crozier Tech, a vocational school.  A turbulent desegregation of schools in the 1960s seemed to exacerbate matters by leading to a massive "White Flight" out of the inner city schools.  The Dallas Planning Department reported that 100,000 whites had fled Dallas to the suburbs between 1968 and 1973, leaving Dallas Independent School District about 50% African American and 20% Latino.  With the "White Flight" went the tax base as businesses followed the Anglos to Arlington, Plano, and Irving.  Later developments have tended to transform the inner city area through gentrification, but none of the newer trends substantially increased Latino representation.  (Phillips 2006, pp.  127 & 167)

Like Dallas, the first Mexican immigrants and Latino citizens in Houston moved in with the railroads in a segregated neighborhood called "El Crisol." By 1910 another barrio emerged near the railroad depot of the Southern Pacific called El Segundo Barrio.  The Houston *barrio*, like other Texas *barrios*, was described as late as World War II as having "dismally poor housing conditions" with most residents living in "two, three room houses, very cheaply constructed of unpainted lumber." The *barrio* reportedly had little running water or heat, and many of its residents living in boxcars with no bedding.  The Houston school district established Rusk Elementary School as the single segregated elementary school for Latinos.  Rusk was known as the "Mexican School." By the late 1920s and 1930s, new *barrios* grew up in Houston's Second Ward with the largest *barrio*, Magnolia, near the Houston ship channel.  All of these barrios had segregated schools, which although lacking in physical and curriculum advantages, stressed Americanization and corporeal punishment for speaking Spanish. (Rosales 1981, pp. 224 – 248)

By 1875 when the Latino population of Austin began to recover from the vigilante raids, they were allowed to settle only at the edge of town.  The Austin *barrio* was in the city dump where the city garbage was dumped over the bluff into the Colorado River, presently located at the Congress Avenue bridge downtown.  As the Latino population increased, only a few lived outside of the city dump grounds, some along the upper reaches of Waller Creek at present-day 25th Street.  An analysis of segregation in Austin between 1875 and 1910 indicated that although other ethnic groups—even the Irish—had integrated into the city, "Not so the Mexicans who

19

continued to live… in other physically and socially marginal pockets." (Manaster 1986, 99). Nor were they allowed burial in the city cemetery, but outside the cemetery instead, in the pauper's burial ground labeled as the "Strangers' Ground." (Austin Oakwood Cemetery, Book I) Conditions in the city dump were described in a complaint by former city Alderman A.J. Zilker in 1899. Zilker reported that city dump had collected 10,000 loads of trash in the last 15 months alone, including dead animals and vegetable matter that created an "unbearable" stench for "a large number of people live near the dump. . ." (*Austin Daily Tribune* 1899, p. 4) A university sociologist, William B. Hamilton, conducted a social survey of Austin in 1913, in which he described the Mexican-American neighborhood in the city dump as living "in the 'Dark Ages' of civic sanitation." The Mexican-American residents lived in "small huts, one and two families in a one-room shanty, and little children are forced to play out in the dusty street on the filthy, dirty creek or river bank where their homes are located." (Hamilton 1913, 9)

By the late 1920s, Austin policy makers had begun to realize that they had inadvertently forced the Latinos to settle an area that became prime real estate on Congress Avenue at the river. Their response was to conduct a model of urban planning that not only created the first city-planned Texas *barrio*, but to invent the modern American model of a housing project. They hired a consulting agency which proposed to move the Latinos and African Americans out of the city dump and out of the Clarksville neighborhood, both along the north bank of the river. Specifically, it proposed moving them out of the now "desirable" area for construction of a proposed Waller Creek Driveway and a broad new Congress Avenue. The report recognized that the property was "at present occupied by very unsightly and unsanitary shacks inhabited by negroes. With these buildings removed for the trafficway, most of the remaining property will be of substantial and more desirable type." Stating that the property "will increase its value many times," the report used coded language to indicate that the Mexican-American "blighted district" was the reason for current low value, but "if the reason is removed, the value will increase." The consultants advised the city planners to avoid "unconstitutional" attempts like the vigilante raids previously used. It suggested that they simply create "a negro district, as an incentive to draw the negro population to this area" in East Austin to avoid duplication of segregated parks, schools, and facilities. It also included a suggested removal of the Latino neighborhood along with the Negro population. (Austin 1928, pp. 46 - 57).

The City of Austin adopted the consultant report as a "Master Plan" in 1929 "as official city policy the goal of concentrating Blacks in East Austin." It segregated municipal services, and in coordination with the city planners, "the school system promoted the City policy by building all segregated schools." To provide for tacit enforcement of the removal, property restrictions in the private sector "prohibited Blacks, and in some cases Mexican-Americans from buying or renting…outside East Austin." (Austin Human Relations Commission 1979) Meanwhile, in order to entice the minorities to move into the East Austin *barrio*, Honorable U.S. Congressman Lyndon B. Johnson introduced a bill authorizing the U.S. Housing Authority to fund housing projects "enhance the value not only of the surrounding property but of all property in Austin." (U.S. Congress 1933). With the federal funds appropriated by Congressman

20

Johnson, Austin boasted the "Nation's First Completed [Housing] Project" with three sites selected for "separate projects for white families, Mexican families, and negro families." By 1940 and 1950, Austin had become the most segregated major city in Texas based on Index of Dissimilarity.  (Austin 1979, pp.  1-15; Austin Housing Authority 1948, p.  12) As the twentieth century progressed, Austin segregation became even more pronounced.  Even after WWII, when the returning veterans, Latino veterans included, the city continued forced segregation.  Texas Land Commissioner Bascom Giles developed two housing sub-divisions in north Austin which he promoted as the Duplex Nation and the Wilshire Historic District near the Austin Mueller Airport. Giles developed the sub-divisions specifically for the returning WWII veterans, but he included "restrictive covenant which prohibited non-whites from owning or residing in the neighborhood." Thus, even returning Latino veterans were restricted to the same barrio and excluded from the modern housing provided for Anglo American residents of Austin.  (Texas 2006, pp.  15 & 16).

 Although segregated from the earliest days of the *barrio*, Austin's Latinos apparently always voted, though in significantly smaller percentages than Anglo-Americans or even European immigrants.  The 1867 voter registration records of Travis County indicate the 128 Latinos registered among the total 4,838 other voters, mostly Anglo-American, but many listed as immigrants from Germany, Prussia, England, Bavaria, Africa, Ireland, some of these listed as "Naturalized." Latinos voted in small numbers, but perhaps the most deleterious effect was caused by the implementation of the poll tax.  A case study of voting in 1933 Austin election illustrates the negative impact of the poll tax on Latino voting. Latinos show significant decline in registration and even more decline in voting.  Charts and tables in this study show less than 3% Latinos voted after implementation of the poll tax.  Analysis also shows that at the same time, according to the report that "whites augment their strength… solely at the expense of the Mexican element." (Martin 1933, p.  929). After the poll tax was repealed, Austin eligible voter numbers went up from 42,300 to 71,300.  The 1967 election was first election since the repeal, and according to the newspaper reports, "The turnout was the biggest ever for a city election— 32,892," although it still reflected a low percentage of eligible voters of only 46%.  (*Austin American-Statesman* 1967, p.  A-15). Latinos had begun to actively campaign for only-Anglo candidates with a Latino advertising in the newspaper promoting their Anglo candidate, but after repeal of the poll tax they began to run their own candidates like S.J. "Buddy" Ruiz, the first local Latino candidate for an Austin elected post.  (*Austin American-Statesman* 1969).

 In order to achieve the residential segregation, many other Texas cities used restrictive covenants and deed restrictions, specifically directed at the Latino population.  In 1977, one study reported that "real estate covenants along racial and ethnic lines continue to have substantial effect on housing patterns" in Corpus Christi and San Antonio.  (U.S.  Commission on Civil Rights: Latino Education, 11). In 1947, later Congressman Henry B.  Gonzalez organized the Pan American Progressive Association (PAPA) to document restrictive housing in San Antonio.  He reported restrictive covenants in home mortgages which effectively prohibited Latino moving into the more affluent neighborhoods of the city. Many other cities created a

segregated Latino section or "*barrio*" using subtle tactics like smaller lot sizes, lower home costs, and square footage covenants. These patterns quickly established a pattern that racist practices would later enforce.  In 1920, for example, the Lockhart school superintendent said "If a Mexican bought a lot among the whites they would burn him out." Many towns openly posted signs that read "No lots sold to Mexicans" and "No Mexicans admitted." The practice of segregation led to congestion and social problems such as infant mortality and disease.  As an example, San Antonio, had the highest rate of tuberculosis in the U.S. in the 1930s.  The denigration of the Latino as a second-class citizen in Texas eventually led to social practices and attitudes that were articulated and implemented socially.  As an example, the distinguished lawyer and State Rep. J.T. Canales was publicly referred to as the "greaser from Brownsville" in 1910 legislative session.  Across the state, Latinos were denied service in restaurants, swimming pools, barber shops, and in public.  Even after World War II in 1946, two Latino veterans were refused service in Helotes, near San Antonio.  The Anglo merchant stated that their veteran status had no effect on the discriminatory practice.  Contemporary newspapers indicated that such treatment against Latino was common "throughout the entire state." (US Comsn.  Civ.  Rts., Unfinished, 185; San Miguel 1987, pp.  15, 68 115; Foley 1997, 42; Rosales 2000, 16).

## Official Education Policy

Education is one of the most vulnerable areas of democratic life to racial discrimination not only because it is subject to local prejudices, but also because it tends to perpetuate the racial polarization.  The political, economic, and social segregation in Texas during the twentieth century had strong ramifications in education as well.  Indeed, education was to a great extent the primary racial advantage in those other spheres of life. The destructive restrictions against Latinos in Texas began shortly after the government was taken over by Anglo-American power. In 1841, the Republic of Texas Legislature passed a Joint Resolution that suspended printing laws in Spanish. Ironically, only three years later, it chartered a foreign-language German university.  In 1856, a law was passed allowing Spanish in the courts of Texas only if the Justice of the Peace and the primary party could not speak English.

In an 1858 amendment to an 1856 school law, the state legislature made English the "Principle language" of instruction.  It strengthened this in 1870 by requiring English for instruction in all public schools.  In this racially divided social environment, Texas public education developed as an exclusive and segregated system at the state and local level.  The principle of racial segregation was formally established in the Texas, Constitution of 1876, which stated in Article 7 § 7 that "Separate schools shall be provided." Many schools interpreted this to apply to the Latino as well as the Negro.  Throughout the state, schools excluded Latinos until the 1890s. (Taylor 1934, p. 192). When they did provide education for Latino students, many cities across Texas began to segregate their Latino students into separate schools called "Mexican Schools." Houston, San Antonio, and El Paso had "Mexican Schools" by the turn of the century.  Latino attendance at these segregated schools became mandatory.  By 1921, the school board in Alice ordered that "all Latin Americans attend Nayer…Anglo Saxons attend

Hobbs-Strickland School." By the turn of century, Latino students were forced by school board policies to bypass neighboring Anglo schools to attend Latino segregated schools. And, many of these "Mexican Schools," offered schooling only to the 6th grade. (Garcia 1981, 110; Rangel 1972, pp. 315, 367)

By the 1920s, state officials began to issue statements of policy that singled out the Latino culture and students for special restrictions. One of these officials was Annie Webb Blanton, the state superintendent of public instruction. In the 1920s, she promoted a policy to make Texas schools teach "8," which was a euphemism for Anglo-conformity. In opposition to the Latino culture, she proclaimed "if you wish to preserve, in our state, the language and the custom of another land, you have no right to this." In response to her policy, E.E. Davis and C.T. Gray conducted "A Study of Rural Schools in Karnes County," which they published in the University of Texas Bulletin #2246 in December, 1922. In the report they stated "In general, it should be stated that separate schools are preferable for both the Mexican and the Americans." Their reason was that Americans "do not like to go to school with the dirty 'greaser' type of Mexican child." (Davis 1916, pp. 9, 10, 41-43 pp. 9, 10, 41-43). This was followed by a report by George A. Works, Texas Education Survey Reports, under the auspices of the Texas Educational Survey Commission in 1925. In this statewide survey, Works stated that "it is time to segregate, if it is done on educational grounds." (Works 1925, p. 213.). Thus segregation received endorsement not only from the Superintendent of Public Instruction and the state, but from University of Texas scholars as well.

School boards then began to follow a widespread practice of neglecting Latino student enrollment almost completely, condoned by Superintendent Blanton. By 1920, 70% of Latino school-age children in Texas were not enrolled as opposed to only 22% of the Anglo non-enrolled students, although mandatory school attendance had been required by law since the 1880s in Texas. In a classic study of education in Texas, University of Texas Professor H.T. Manuel in 1928 found that 40% of the Latino students were not enrolled at state level as compared to 9% of the Anglo students. Manuel found only 4% of the Latino students were attending junior high and high school as opposed to 60% of the Anglo students. During this time period, many South Texas school officials and principals in Nueces County and Dimmit County reported that they simply did not enforce Latino student enrollment or attendance. (San Miguel 1987, pp. 6-7; 24, 32, 49; Garcia 1981, 110; Rangel 1972, 315) Much of the educational neglect was due to excluding the Latino students, but much was due to segregation in the school district boundaries.

**Segregated Districts**

The "Mexican School" became a widespread phenomenon in Texas education. The various school districts segregated their Latino students, but they provided significantly poorer facilities for them. The "Mexican School" segregation spread rapidly across the state. In 1930, for example over 40 school districts had Mexican schools. A 1942 study by Wilson Little found 50% of the Latino students segregated through the 6th grade in 122 districts in "widely distributed

and representative counties" of the state.  Few Latino students went beyond the 6th grade.  A typical example of the racial stratification in housing, labor, and education was seen in Cotulla, where future President Lyndon B.  Johnson taught at the "Mexican School."  In 1928, he taught in Welhausen Elementary School for Latin Americans.  Across town, Amanda Burks Elementary was "limited to Anglo-Americans."  In a typical stratification, 80% of the population was Latino, and *barrio* segregated.  LBJ wrote about the racial situation, noting that his girlfriend in the neighboring town was in the Ku Klux Klan.  By the 1940s, whole sections of the state had segregated "Mexican School" belts of towns, many of these developed specifically by the growers to isolate the Latinos.  In the Lower Valley, Edinburg, Harlingen, and San Benito school systems were segregated, while on Hwy. 83, Mercedes, McAllen, Mission, Pharr, San Juan, Alamo, and Weslaco districts were completely segregated.  On the Gulf Coast in South Texas, Raymondville, Kingsville, Robstown, Kenedy, and Taft schools districts were segregated, while in the Winter Garden, Crystal City, Carrizo Springs, Asherton, and Frio Town were segregated towns with segregated schools.  (Montejano 1987, 168; Pycior 1997, 14; San Miguel 1987, 56; Civil Rts.  Study, 13)

In the larger cities, the school board policy was to segregate whole school districts, or to segregate the Latino students into predominantly Latino schools.  In 1900 Rusk Elementary was established as Houston's first Mexican school.  Later, the Houston school board built Lorenzo de Zavala, Hawthorne, Dow, Elysian Street, Jones, and Lubbock exclusively for Latinos.  These students were rarely encouraged to go beyond the 6th grade.  By 1940, however, Latinos began to enter high schools, when about 3% of the high school students were Latino.  (San Miguel 2001, pp.  12, 32) A report for the school year 1942-43 reported that there were 260,759 "Latin" or Latino students in Texas or 20% of the white.  Much of the segregation was, of course, due to the initial segregation of the housing and "Mexican Towns," but much of it was due to outright gerrymandering of the district boundaries within a city.  A survey of superintendents revealed that "While many claimed that there was no segregation in their schools, some admitted that the drawing-up of district boundary lines was deliberately made to enclose areas predominantly Latin."  (Kuhr 1971, 73) In the study by Wilson Little, he stated that many superintendents surveyed were asked why they segregated their Latin students.  He reported that, "In laying out the attendance areas within a given school district, therefore, it is not at all uncommon to find that one school is attended only by Spanish-speaking children and that another school in the same district is attended only by Anglo-American students." As a result, he found that "Separate housing for Spanish-speaking children is a fixed practice in many school systems in Texas." (Little 1994, 59)

After the 1920s, Latino students were put into "developmental" classes and vocational classes, ostensibly because they needed special attention.  Unfortunately, students were mixed with a variety of other students who were blind, spoke Spanish-only, were delinquents, or were bright students who simply did not like school.  The San Antonio schools were reported in 1934 to have similar segregation.  In that year, Alonso Perales and Eleuterio Escobar founded the Liga Pro-Defensa Escolar or School Improvement League in San Antonio.  In their study of Latino

schools, they reported statistics comparing West Side Mexican schools to the Anglo schools. The Latino schools had 12,334 students compared to 12,224 Anglo students. But the Latino students were in only 11 schools compared to 28 Anglo schools. The Latino schools had 23 acres of space compared to 82 acres for the Anglo school grounds. The Latino schools had 48 students per room compared to 23 Anglo students per room. The school funding revealed similar contrast, as the school board spent $24.50 for each Latino student compared to $35.96 average spending per Anglo pupil. Similar discriminatory funding was revealed in Nueces and Dimmit Counties. In 1934, noted historian Paul S. Taylor interviewed a Nueces County superintendent, who openly admitted that 100% of the $18,000 property tax revenue "goes on the white school." (San Miguel 2001, pp. 12, 32; San Miguel 1987, 54; Garcia 1989, 66).

Gerrymandering of attendance zones within a district became widespread by the late 1940s, Charles Ray Akin wrote his Master's thesis at the University of Texas at Austin in 1955 on "A Study of School Boundaries in East Austin, Texas" under the distinguished education scholar George I. Sanchez. Aiken compared the "Mexican School" Zavala and the Anglo school Metz in attendance. He stated that "there exists the possible basis for a charge of segregation, especially since Zavala is 100 percent composed of Latins, although some Anglos live nearer here than to Metz where they attend; [and] …since Metz and Zavala are located within three blocks of each other." (Aikin 1951, 28).

Later, in 1954, famed lawyer Gus Garcia led a group of Latino parents in a petition to Dr. J.W. Edgar, State Commissioner of Education on whether a "zone line" for the new Gillet Jr. High in Kingsville, Texas was legal. The line made the school 100% Latino in attendance. Although the Kingsville I.S.D. Supt. George W. Wier said "that the zoning boundaries were set up on the basis of student load and other factors" and that there was "no intention to segregate," Garcia argued otherwise. In a newspaper article, he stated that the line was "more crooked than a sick snake." ["*está mas chueca que una vívora enferma*"] In another article to the *Corpus Christi Caller*, Garcia accused the school of making the school "predominantly 'Mexican' either by virtue of gerrymandering or geographical location." (Garcia Papers, Box 1, Folders 1 & 10).

One of the most salient characteristics in discrimination of Latinos in Texas is the formal role played by government and school officials. There is ample evidence that the state "embraced" segregation as a formal concept in education of its Latino citizens. A Texas Education Agency survey in 1921 reported overcrowded Latino schools and half-day sessions for Latino students. The state agency made no comment or suggestion that the practice was inadequate. And throughout the first half of the 20th century, the state Attorney General systematically approved construction bonds submitted as required by the various independent school districts for his approval. The bond packages frequently called for construction of segregated "Mexican" Schools, but received customary approval with no mention or state sanctions for the segregated facilities. In 1920, Gov. William P. Hobby called a special session to pass education laws, including a 1922 law to make English the "medium of instruction" in public schools. Following the lead of the governor and attorney general, the Texas State Teachers Association (TSTA) at their 1922 convention, passed a resolution opposing any but the

English language in school.  The state's teachers proclaimed that "Respect for our Flag should carry with respect for our Language and loyalty to it." And in 1925, the legislature passed a law specifying that schools "shall use the English language exclusively" in public education.  With the formal policy equating English with loyalty, Texas schools began exclusively to teach Latino students hygiene, English, drawing, and music with the assumption that they needed to be clean and divest themselves of their Spanish accent and "all things Mexican." (Rangel 1972, pp. 318-19; San Miguel, 1987 pp. 25, 35, 45).

**Latino Challenge**

        As Latino parents and civic leaders began to perceive the official nature of discrimination in the mid-20th century, they initiated formal protests and legal challenges to the agencies and government.  Limited in resources, the Latino challengers were also limited in their success to end discrimination, but they established a legal foundation for many advancements.  The "first challenge" to segregated schools in Texas was in 1928 in Charlotte, Atascosa County.  The parents of Amanda Vela protested to the school superintendent that she did not live in the predominantly Latino district, and she did not speak any Spanish; therefore, they wanted her to attend the Anglo school.  The school board trustees resisted it, but the superintendent conceded that the Latinos should not be segregated.  The State School Board upheld the superintendent's decision to let her into the Anglo school, notwithstanding the trustee's resistance.  The case revealed early on the consistent pattern of recalcitrance that local school officials would show toward integrated schools.  This was evident in the school districts of Beeville, Sinton, Elgin, Bastrop, and Cotulla when attorney Gus Garcia told Atty. Gen. Price Daniel that Texas schools were using "a subterfuge to practice segregation" after the 1947 *Mendez v. Westminster* case. Gen. Daniel denied the subterfuge.

        Then in 1948, Garcia filed a case against the Bastrop I.S.D., and the judge found that the district was illegally segregating the Latino students.  In its decision, the court added a proviso, however, that segregation was acceptable in 1st grade "solely for instruction purposes." The Delgado "proviso" led to evasive tactics by many other school districts to segregate Latino students who had dubious need of segregation for instructional purposes.  In 1957, the League of United Latin American Citizens (LULAC) sued Driscoll I.S.D., which was using the Delgado proviso to evade the court's ruling.  In Driscoll, one little girl who was segregated for "instructional purposes" on the basis of language was found to be proficient only in English. Moreover, the school system had failed to provide any "instructional" programs for the segregated students.  By the mid-1950s, other schools across the state used freedom of choice plans, selected student transfer and transportation plans, and classification systems based on language or scholastic ability to maintain segregation.  These programs did not enhance the education of Latinos in any way, and served only to perpetuate and justify the segregation.

        After the frustrating legal challenges met only with evasion and subterfuge, Latino civic leaders began a different approach to improving their schools. One classic example was the development of an early school program called the "Little School of 400." This pre-school

program was funded personally by a Houston restauranteur, and president of LULAC, Felix Tijerina in 1955.  The Texas legislature later adopted Little School of 400 as Texas Pre-School Program, but by 1967, only 12% of eligible schools were offering it to their students.  In 1967 through 1970, Latino students took the initiative from their parents and civic leaders to conduct their own walk-outs and demonstrations to protest insensitive curriculum and discriminatory practices in high schools and colleges.  Latino students conducted school boycotts in Crystal City, Kingsville, and Edcouch-Elsa.  In Kingsville, the police arrested 110 Latino students, and the boycotts yielded minor concessions from the school boards, but the actions brought public attention to the segregation and discrimination.  Also, the boycotts spurred the federal government's Department of Health, Education, and Welfare (HEW) to take legal action against offending school districts.  By 1972, HEW gained compliance in many South Texas towns like Bishop, Lyford, Los Fresnos, Beeville, and Weslaco, and it put Del Rio under court order for compliance.  (San Miguel 1987, pp.  76, 120, 123, 134; Rangel 1972, 369).

**Latino Experience in Houston and Harris County**

In the Houston area, where Buffalo Bayou and Braes Bayou meet near Harrisburg and the site of the 1836 Battle of San Jacinto, incoming Anglo-Americans from the United States and European immigrants quickly developed "an intense anti-Mexican sentiment." Few original Tejanos lived in the Houston area before the Texas Revolution, and except for Texas Republic Vice President Lorenzo de Zavala, few lived in the area after 1836.  De Zavala was the Mexican government liberal who fled Mexico to come to Texas after General Antonio Lopez de Santa Anna ascended to the Mexican Presidency. De Zavala was a signer of the Texas Declaration of Independence whose land grant and family home were on Buffalo Bayou, near the famous battleground.  But the only other Mexicans in the area were a few of Santa Anna's captured Mexican soldiers who delayed their repatriation to work on local farms and public works in the area.  As a result, the Anglo and European immigrants accepted the image promoted by two newspapers, the Houston *Telegraph and Texas Register* and the Houston Morning Star, that Mexicans were a "mongrel race, inferior even to negroes." As communities began to form around Houston, they continued to look upon all Mexicans "with ridicule and scorn."

Present-day Pasadena is a vivid example of the role that racial prejudice affected labor, housing, and education in Harris County.  Pasadena was founded nearest to the San Jacinto Battleground, initially employing Mexican laborers on ranches or on strawberry farms.  Between 1875 and 1890, the railroad construction, cotton compresses began to attract larger numbers of Mexican immigrant laborers east of Houston in the area around Pasadena.  The Pasadena population accelerated after WWI and the 1920s with refineries along the Houston ship channel. The early residents were constantly reminded of the narrative that developed around the battleground that Mexicans were a defeated race, unprepared for self-rule. (Pomeroy 1993, pp. ix, 316-18; Kreneck 1989, pp.  19-22, 45).

As Pasadena grew and attracted a growing Latino population, the Anglo population continued to see them as Mexican immigrants, excluding them from access to city government.

Access to elected position was only by the traditional method of slating.  In the Pasadena ISD, which had never elected a Latino, the Citizens United for Better Schools "tapped" Carmen Orozco to run on the slate for the Board.  Orozco had garnered their attention when she publicly declared in a newspaper article and on the radio that while Pasadena schools had "been avalanched with criticism," she believed "Pasadena has been doing a very fine job of educating its children." Elevated to the School Board, she became the darling of the Anglo electorate. Celestino Perez, a Latino witness, testified in a sworn deposition that Orozco thereby became the only Latino member of the Citizens United for Better Schools.  "She had the backing.  She had the money, and she had the votes to be elected for the first time." (Pasadena Citizen, "One Parent Appreciates PISD" Sept.  10, 1984,Sec 1 Pg 1; *Perez vs Pasadena Independent School District*, Deposition).

The use of race also became pronounced in labor controls on the Texas Gulf Coast after the 1901 discovery at Spindletop.  Texas became "the world's largest concentration of petroleum refineries and chemical plants," from Beaumont/Port Arthur to New Orleans and down to Corpus Christi, and Pasadena, Texas was the center of that concentration.  As Shell, Sinclair and other petroleum companies moved into Pasadena, the city was beset by crude oil tanks, distillation columns, fractionating towers, catalytic "crackers" and refineries that produced 36 percent of national refining capacity by 1976. But as they attracted labor, the refineries hired Mexicans, Mexican-American citizens, and Anglo-Americans in unequal segregated classifications. Latinos, whether citizens or not, were hired only in construction around the refinery but not in the refinery maintenance.  Restricted to menial labor, Latinos even in the unions could expect no advancement.  Latinos were relegated to inferior wage schedules and segregated facilities. Following the practice of the local construction industry, the refineries established "independent unions" by 1937, usually with separate African-American auxiliaries.  The discriminatory practices were enforced informally by intimidation, spies, red smears, and "racist jeremiads." (Priest and Botson, 2012, pp.  100-110). Union members openly admitted that they, themselves, demanded segregated work spaces and a dual-wage system.  In an interview with a University of Texas researcher, the Secretary of Workers' International Union (OWIU) #243 in Beaumont stated, "This organization had to be formed separately from the whites because of racial feelings in Beaumont." (Labor Movement, Dabney Interview, Box 2E308, File 2).

Texas companies, like Humble, Sinclair, and Shell hired Latinos, though the unions like the CIO and other unions collaborated with the companies to establish the dual wage systems, segregated work areas, separate occupational categories, and restrictions of Latinos in skilled work.  John Crossland, an Anglo unionist with Shell Refinery Local 367 in Pasadena admitted about minorities, "A lot of white membership … didn't want them to have a line of progression." The Dallas office Director, Dr.  Carlos Castaneda, found that Texas mining and oil companies used token Latino workers "to avoid an open charge of discrimination." His conclusion, however, was that "Discrimination against the Latin-American worker has not been eliminated." (Zamora 1992, 327; Daniel, FEPC, 150; Priest and Botson 2012)

28

Pasadena experienced the same segregated growth in its neighborhood patterns, as other major Texas cities, but its population increase greatly exceeded other cities. Pasadena grew by 161% between 1950 and 1960, but in the following decades, the entire region experienced a radical ethnic shift. The Latino population of Harris County grew 50% to 1.7 million even as the number of Anglo Americans declined by 6%. Two out of three Pasadena residents were Latino by the end of the century. The change in ethnicity was exacerbated by the cultural change, from an Anglo community to a Latino community. Culturally, Pasadena had strong markers of a conservative blue-collar Anglo city. Its congressman in the McCarthyism of the 1950s was Martin Dies, Chairman of the House Unamerican Affairs Committee, and by the 1980s, Pasadena was the state headquarters of the Ku Klux Klan, with a KKK bookstore in the middle of town. Its union-member workers were "quite militant and radical" as they promoted conformity to an Anglo-American Protestant culture. The Chamber of Commerce sponsored "Loyalty Parades," the school board enforced dress codes, and the City Council hosted an "Obscenity Panel" to prohibit lewd movies at the theaters. The city had been incorporated with a city charter that complied with the state law that prescribed segregation and outlawed the teaching of Spanish, Bohemian, and German. This culture later clashed openly with the overwhelming Latino population that spoke Spanish, ate tacos, and danced at *quinceañera* debutante balls. (Houston Chronicle August 11, 1971 "Obscenity Panel;" Houston Post, May 1, 1955, p. 19 "Loyalty Week"; Jervis, Rick, "Hispanics Guide Huge Growth in Texas," *USA Today*, February 23, 2011).

Instead of changing to single-member districts, the city council simply maintained the same at-large district system, exploiting the incumbency of the established Anglo political structure. As the city rapidly grew in population, and as the Latino demographic exploded after the 1980s, Pasadena retained its old order. The 1942 city charter had incorporated segregation in its Article VIII, Section 4 "Segregation of Races," taking advantage of the state's allowance for legal segregation of the races. The Pasadena Chamber of Commerce boasted a projected population increase which literally doubled from 103,281 in 1970 to 203,756 in the year 2000. It hardly noted that the Latino population, which had been roughly 15% in 1970, would rapidly become the majority of the population. As Latinos met with city leaders and the school board for adjustments to the precinct boundaries, they were met with indifference. One group of Latinos, the Pasadena Citizens for Equitable Representation met with the city council in 1991 to ask for two Latino districts. As a sincere gesture, they drew up a map to illustrate graphically the boundaries that would provide 14,000 Latino citizens in each of the two new districts, but were denied as well. (Pasadena Citizens , MAP, 1991; Pasadena City Charter 1942, Article VIII, Section 4 "Segregation of Races; Texas Penal Code, Art. 288; Texas, General and Special Laws, 1927; Pasadena Chamber of Commerce, "Economic and Demographic Profile," n.p.").

In the area of education, many cultural and discriminatory practices were prevalent in the mid-twentieth century Pasadena, Texas. Pasadena was a legally segregated city that made minimal or no provisions for its minority students. African- American students had to go out of the city to attend school, and the Pasadena Independent School District (PISD) excluded the

hiring of minority teachers and administrators until mid-century.  The Findings of Fact in *U.S.  v.  Pasadena Independent School District* (1987) outlined a strong pattern of racial discrimination in the hiring practices of school teachers.  (U.S. v. Pasadena Independent School District, 1987).  When the school district finally began to hire minority teachers, it conflicted with the minority community in its curriculum and treatment of minority students and teachers.  Academic studies of Pasadena schools consistently revealed a strong culture of condescension on Latino students due to their "slow" performance or "mental ability" which supposedly hindered the Anglo students.  (Glasgow, 1931, p.  49; Davis, 1958).  Another federal case revealed that the Pasadena ISD was denying admission to the children of undocumented Latino immigrant residents of the city.  The court enjoined the school board "from refusing to permit any child .  .  to attend the public free schools" because of their status as immigrants.  It also enjoined the board from refusing "to admit free of tuition" those Latino children.  (U.S.  District Court, *In Re Alien*, 1980). Despite the one Latino on the school board, Carmen Orozco, the growing Latino community repeatedly protested student treatment, corporeal punishment, and treatment of Latino teachers.  In 1990, the School Board was challenged by a Latino petition, charging that Latino principal Graciela Barrera Kavulla had been fired for promoting Hispanic students at Jackson Elementary School.  The Latino dissatisfaction increased until they launched a lawsuit to reform the board elections to single-member districts.  (Kavulla Petition; Houston Chronicle April 18, 1992 "School Board Reform").

Along with the other patterns of alienation, police conflicts with Latino citizens emerged in the social and physical segregation in Pasadena, Texas.  By the mid-1980s, Latino *ad hoc* committees began to meet with the Pasadena Police Chief and city council to protest and discuss what they termed as police brutality and harassment of Latinos.  In a 1991 meeting with Pasadena Police Chief Floyd W.  Daigle, the "Hispanic and Other Concerned Citizens Committee" addressed specific cases of police treatment of Latinos. They also complained of the benign relationship between the Pasadena Police Department and the Ku Klux Klan which had its state headquarters and book store in Pasadena.  In KKK demonstrations, the newspaper regularly pictured the police and the KKK in close proximity.  The KKK had been known to have "penetrated the Houston Police Department," and Latinos complained of the same in Pasadena.  In 1986, the Federal Bureau of Investigation came into Pasadena to investigate the alleged beating of José Antonio Nuñez while in police custody.  In 1994, Latinos again protested the alleged suicide of Sirilo Delao by hanging himself with a telephone cord in the Pasadena City Jail.  Latinos complained that the police intimidated Latino citizens, and did not represent the city's ethnic make-up.  When asked to explain why there were only three Latino policemen on the force, Police Sgt. J.C. Lyde stated that Anglo police officers were "'enforcers' of 'the white man's law,' and often minority members find themselves ostracized if they decide to become policemen." The conflict between Latinos and police remained an accepted characteristic of the status quo in Pasadena.  (Greene, 1995, pp.  30, 41;Pasadena Citizen, Oct.  22, 1986 "FBI Investigates;" Nov.  26, 1994 "Inmate Hangs Himself;" May 17, 1980 "Minorities Missing;" April, 1980 "Klansmen, police 'stood up'").

**Spring Branch at the Western End of Harris County**

The Spring Branch community was settled in the late 1840s as an early wagon road constructed along the trail from Stephen F. Austin's colony in 1830, now located in Spring Branch in the west side of present-day Houston, Texas.  An early settlement, Piney Point Village, developed along the south side of Buffalo Bayou, along with Hunters Creek Village, while other villages developed north of Buffalo Bayou in the region that came to be known as Spring Branch.  The other villages included Hedwig Village, Bunker Hill Village, Hilshire Village, and Spring Valley Village.  The original settlers were German immigrants and Anglo Americans, many of whom brought enslaved African Americans to the settlement.(Worrall, "Five Harris County Historical Markers" (Harris County Historical Commission), np. harriscountyarchives.com).

When the U.S. Supreme Court ruled racially discriminatory schools to be unconstitutional in *Brown v. Board of Education* (1954), city leaders railed against the ruling.  It was during this time that a group of "prominent Houstonians" organized a Citizens League against desegregation of "white and Negro pupils" in the Houston public school system.  Chaired by Atty. Fred W. Moore, the Citizens League raised "substantial financial aid," and launched a series of legal challenges and proposals in opposition to integration.

During this transition period of school integration, many particularly southern state and local leaders formally resisted adjustments in the structure of their school districts and education.  Latino and other minority leaders complained that their families and students were being denied equitable treatment in school districts like those in Texas.  One such leader was Vilma S. Martinez, a Latina attorney and civic leader who testified in 1975 to a committee hearing in the U.S. Senate on grievances of Mexican Americans and other Latinos in Texas.  Although at that time, Mexican Americans constituted 18% of the Texas population, they held only 6.2% of the 4,770 elective offices in the state and local areas.  In one Texas county, Martinez stated that "Local officials . . have shown ingenuity and determination in depriving Mexican Americans of their right to vote."  She added that the school system in that Texas county "fires teachers who attempt to run for office . . . One of the most severe problems we face is the at-large election or the multi-member-district election.  Such an election effectively operates to cancel out minority voting strength where a Chicano, if running from a single-member district, might otherwise hope to win."  Martinez stated that local officials refused "to set up a polling place in a Chicano neighborhood . . where 75% of the district's population resided, thus forcing voters to travel seven miles in order to cast their ballots."  She lamented that many Texas school districts continued to resist or to challenge efforts to address minority voter rights.  (U.S. Congress, 94th Cong., 1st sess. on S. 407, S.903, S. 1297, and S. 1443.  Senate. Voting Rights Act Extension. Washington, 1975. p. 768)

Also during this time, the five villages incorporated themselves with strict zoning ordinances.  The larger Spring Branch area was annexed by the city of Houston in 1957, excluding the five villages.  By 1973 the Spring Branch Independent School District represented

the six communities, had 40,200 students and 2,276 teachers.  The exclusive villages developed an affluent character, and their school district reflected a similar success rate with over 80% of of the Spring Branch ISD graduates continuing into college by the 1980s. ("New League Fights School Integration" Houston Chronicle, 1955, pp. 1, 22)

      The 1980s saw a major downturn in the Texas oil economy, and by over-building in real estate.  The real estate market decline left large apartment complexes vacant, and by 1990 a major influx of low-income families had moved into the apartments in the West Houston and Spring Branch area.  Many of the new residents were recent immigrants from Central America as well as a sizeable Korean population.  The result was that the Spring Branch Independent School District suddenly included the low-income ethnic immigrants, mostly Latino, and the exclusive Memorial Villages, mostly south of Interstate 10.  The demographic change created a stark contrast by almost any standard demographic or social criterion between the north side of the Interstate and the south side. (TSHA Handbook:  "Spring Branch, Tx, www.tshaonline.org/handbook/entries/spring-branch-tx-harris-county)

      By their own proud online websites shown below, the Memorial Villages were exclusive Anglo enclaves, surrounded by the City of Houston, and adjacent to their new fellow Latino school district residents.  The websites of the Memorial Villages boasted a rate of 67% to 94.4% Anglo American by the Year 2010 U.S. Census, with very small populations of Asians, Latinos, or African Americans.  Hunters Creek Village, for example, had only 2.7% Latinos while Hunters Creek showed a Black population of 0.4%.

## Memorial Villages Anglo Percentage

| CITY | YEAR | PERCENT WHITE (Non-Hispanic) |
|------|------|------------------------------|
| Bunker Hill Village | 1954 | 94.4% Non-Hispanic/87.7% White |
| Hedwig Village | 1954 | 67.6% White (Non-Hispanic) |
| Hilshire Village | 1955 | 76.1 White (Non-Hispanic) |
| Hunters Creek Village | 1954 | 89.2% White (Non-Hispanic) |
| Piney Point Village | 1954 | 74% White (Non-Hispanic) |
| Spring Valley Village | 1955 | 81.9% White (Non-Hispanic) |

**"City of Bunker Hill Village" City Profile:  Other Memorial Villages [accessed 27 Nov 2021]**
**www.bunkerhilltx.gov/**1980s SURGE in Texas and its Latinos

The contrast between the Memorial Villages demographic characteristics and the north side of I-10 Spring Branch is second only to the increase in population after 1980.  The rapid change in population was significant in the national census records as well as in Spring Branch.  This surge was exacerbated even more by the racial and cultural differences between the resident population and the new immigrants.  Texas led the nation in population increase, and its cities led all other cities in the nation.  For example in the decade before 2010, Houston, Atlanta, and Dallas-Fort

32

Worth (26.1 percent, 24.0 percent, and 23.4 percent, respectively) were the fastest-growing metro areas in the Nation (Table 3).  Indeed, the Houston and Dallas-Fort Worth metro areas alone accounted for almost one-half (49.0 percent) of the Texas population and over one-half (56.9 percent) of the state's population growth.  These two counties, Harris County and Dallas County, accounted for over one-quarter (25.7 percent) of the population of the nation's second-largest state and 19.6 percent of its growth.  The Houston-Sugar Land-Baytown Metro area grew by 1,231,393 or 26.1 percent between 2000 and 2010—and that was a smaller increase than it grew between 1990 and 2000 (US Census Table 3 Population Change).  From its population of 1,430,000 in 1960, Houston had already grown by 39.8% to 1,999,000 in 1970.  This was matched by the Dallas – Ft. Worth metroplex, which grew by 36.8% from 1,738,000 in 1960 to 2,378,000 by 1970. (Paul Mackun & Steven Wilson, 2010 Census Brief, March 2011, p. 11; Table 3 pp. 6,9) https://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf)

Table 3.

### Population Change for the Ten Most Populous and Ten Fastest-Growing Metropolitan Statistical Areas: 2000 to 2010

(For information on confidentiality protection, nonsampling error, and definitions, see *www.census.gov/prod/cen2010/doc/pl94-171.pdf*)

| Metropolitan statistical area | Population | | Change | |
|---|---|---|---|---|
| | 2000 | 2010 | Number | Percent |
| **MOST POPULOUS** | | | | |
| New York-Northern New Jersey-Long Island, NY-NJ-PA | 18,323,002 | 18,897,109 | 574,107 | 3.1 |
| Los Angeles-Long Beach-Santa Ana, CA | 12,365,627 | 12,828,837 | 463,210 | 3.7 |
| Chicago-Joliet-Naperville, IL-IN-WI | 9,098,316 | 9,461,105 | 362,789 | 4.0 |
| Dallas-Fort Worth-Arlington, TX | 5,161,544 | 6,371,773 | 1,210,229 | 23.4 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 5,687,147 | 5,965,343 | 278,196 | 4.9 |
| Houston-Sugar Land-Baytown, TX | 4,715,407 | 5,946,800 | 1,231,393 | 26.1 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 4,796,183 | 5,582,170 | 785,987 | 16.4 |
| Miami-Fort Lauderdale-Pompano Beach, FL | 5,007,564 | 5,564,635 | 557,071 | 11.1 |
| Atlanta-Sandy Springs-Marietta, GA | 4,247,981 | 5,268,860 | 1,020,879 | 24.0 |
| Boston-Cambridge-Quincy, MA-NH | 4,391,344 | 4,552,402 | 161,058 | 3.7 |
| **FASTEST-GROWING** | | | | |
| Palm Coast, FL | 49,832 | 95,696 | 45,864 | 92.0 |
| St. George, UT | 90,354 | 138,115 | 47,761 | 52.9 |
| Las Vegas-Paradise, NV | 1,375,765 | 1,951,269 | 575,504 | 41.8 |
| Raleigh-Cary, NC | 797,071 | 1,130,490 | 333,419 | 41.8 |
| Cape Coral-Fort Myers, FL | 440,888 | 618,754 | 177,866 | 40.3 |
| Provo-Orem, UT | 376,774 | 526,810 | 150,036 | 39.8 |
| Greeley, CO | 180,926 | 252,825 | 71,899 | 39.7 |
| Austin-Round Rock-San Marcos, TX | 1,249,763 | 1,716,289 | 466,526 | 37.3 |
| Myrtle Beach-North Myrtle Beach-Conway, SC | 196,629 | 269,291 | 72,662 | 37.0 |
| Bend, OR | 115,367 | 157,733 | 42,366 | 36.7 |

Note: The full names of the metropolitan statistical areas are shown in this table; abbreviated versions of the names are shown in the text.
Source: U.S. Census Bureau, 2010 Census and Census 2000.

(U.S. Census.  Statistical Abstract of the United States: 1980, Population www.census.gov/library/publications/1980/compendia/statab/101ed/1980-02.pdf)

The national population increased by 9.7 percent from the 2000 census to the 2010 census, but the nation's Hispanic or Latino population increased by 43 percent in that same time period.  The large increase in Latino population caught the attention of the U.S. Census demographers, but they made an attempt to alert America to the major implications in that

33

change. (Ennis, The Hispanic Population:  2010 p. 13.
www.census.gov/content/dam/Census/library/publications/2011/dec/c2010br-04.pdf)

     The U.S. Census report for 2010 contained two explanatory notes that highlighted the significance of Latino population increase.  The notes were indicative of the rapidity of change in the population numbers as well as in cultural demography of the nation.  The first note addressed nomenclature, defining the terms "Hispanic" and "Latino."  This was significant, not only because it introduced new terms to the American demographers, but because it was indicative of the racial differences and nations of origin between different classes of Latinos.  The note stated:

> NOTE:  The 2010 Census defines "Hispanic or Latino" as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.  The terms "Hispanic or Latino" and "Hispanic" are used interchangeably.

     For the purposes of the discussion herein, "Hispanic or Latino" and "Hispanic" are used interchangeably, along with the newer term "Latinx."  Also for the purposes of the discussion herein, there is no significance in the different national origins of Latinos, unless explicitly noted.

     The second note in the above U.S. Census for 2010 highlighted the public policy implications of the rapid and diverse increase in the Hispanic population.  It stated:

> **Public Policy Implications:**  All levels of government need information on Hispanic origin to implement and evaluate programs, or enforce laws, such as the Civil Rights Act, Voting Rights Act, Fair Housing Act, Equal Employment Opportunity Act, and the 2010 Census Redistricting Data Program. Both public and private organizations use Hispanic origin information to find areas where groups may need special services and to plan and implement education, housing, health, and other programs that address these needs. For example, a school system might use this information to design cultural activities that reflect the diversity in their community. Or a business could use it to select the mix of merchandise it will sell in a new store. Census information also helps identify areas where residents might need services of particular importance to certain ethnic groups, such as screening for hypertension or diabetes.

     These notes have major application in the consideration of Houston's population growth after 1980, especially in the Spring Branch Independent School District. As mentioned above, the increase in Houston's population before 2010 exceeded the rapid growth after 2000, and the Latino population increase exceeded the rate for Houston's overall population.  The increase of its Mexican population alone, for example, distinguished Houston as one of the top three growing MSA's in the United States, with its Mexican population nearly tripling in the years between 1990 and 2000.  The Mexican population of Houston increased by 75% in 2000 (from 576,937 in 1990 to 1,010,721).  In 2010, it increased another 55% ( to 1,567,286).  That represented a 172% increase in the Mexican population of Houston from 1990 to 2010, excluding Latinos of other national origins. (McCasland, "Analysis of Impediments," 2020. Table 37 p. 9  www.houstontx.gov/housing/plans-reports/impediments/Draft-2020-AI-03172020.pdf; Haiwen Chu,  "The Mexican-Origin Population, 2013, pp. 8 & 9)
www.academicworks.cuny.edu/cgi/viewcontent.cgi?article=1043&context=clacls_pubs)

**Table 37: Population Growth 1980 -2010**

| 30-Year Time Period by Decennial Years | Total Population | Non-Hispanic White | Non-Hispanic Black | Hispanic or Latino | Non-Hispanic Asian* | Non-Hispanic Other Races** |
|---|---|---|---|---|---|---|
| 1980 | 1,595,138 | 834,061 | 436,392 | 281,331 | 34,259 | 9,095 |
| - | | 52.30% | 27.40% | 17.60% | 2% | 0.57% |
| 1990 | 1,631,766 | 662,766 | 448,148 | 450,556 | 66,993 | 3,303 |
| - | | 40.62% | 27.46% | 27.61% | 4.11% | 0.20% |
| 2000 | 1,953,631 | 601,851 | 487,851 | 730,865 | 106,620 | 26,444 |
| - | | 30.81% | 24.97% | 37.41% | 5.46% | 1.35% |
| 2010 | 2,099,451 | 537,901 | 485,956 | 919,668 | 129,098 | 26,828 |
| - | | 25.62% | 23.15% | 43.81% | 6.15% | 1.28% |
| Net Change 1980-2010 | 504,313 | -296,160 | 49,564 | 638,337 | 94,839 | 17,733 |
| | 31.62% | -35.51% | 11.36% | 226.90% | 276.83% | 194.98% |
| *Note: Asian includes American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander populations | | | | | | |
| **Note: Other Races include Two or More Races and Some Other Race | | | | | | |
| Source: 1980-2000, 2010 PL94-171 Data, US Census Bureau | | | | | | |

(U.S. Census:  Table 37:  Population Growth 1980 – 2010).

The Spring Branch census statistics also showed the results of the rapid Hispanic population growth after 1990 and 2000.  The City of Houston Neighborhood Data website indicated that the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only 13.1% White by 2019. (City-Data.com, "Spring Branch" n.d.  www.city-data.com/neighborhood/Spring-Branch-Houston-TX.html).

Spring Branch residents, leaders, and public policy makers commented on the policy implications occasioned by the ethnic and cultural aspects Spring Branch growth.  Ricardo Barnes, Executive Director of the Spring Branch Family Development Center, said that Spring Branch was converted overnight from a White community to a Latino enclave.   He said the Latino lower-income immigrants came in early to mid-1980s when oil was failing in the Houston economy, attracted to the empty apartments on Pitner Road on the north side of I-10.  After that, he said he noticed a decline in student performance in the school's Texas Assessment skills tests and a commensurate change in Spring Branch ISD services.  Barnes said he noticed  that the school free lunch program, STEM, tutoring, after-school curriculums, quality sports programs were not being provided north of freeway. (Tijerina, Zoom Interview of Ricardo Barnes, 2021.)

Similar observations were offered by Spring Branch ISD Superintendent Hal Guthrie upon his retirement in 2001.  Guthrie guided the district through a difficult transition from a middle-class suburban district to a largely minority urban district as the city grew and its neighborhoods changed.  Spring Branch had evolved into a district of economic contrasts, where students attending schools south of Interstate 10 were mostly white and middle- to upper-income while those in schools north of I-10 are mostly Hispanic and middle- to lower-income.

Noting that the percentage of economically disadvantaged students has nearly doubled during his tenure, Guthrie said, "this community doesn't look like it did when I came here."  He also noted that Spring Branch's increasingly Hispanic schools did not do well when the state first rated their performance on the Texas Assessment of Academic Skills in the early 1990s.  Guthrie claimed credit for leaving the district with greatly improved overall TAAS rating, but other

residents like Ricardo Barnes noted that the improved ratings were more the result of averaging in the higher statistics from the affluent Anglo Five Villages south of the Interstate rather than improvements in the Latino neighborhood school ratings on the north side. (Markley, "Leaving the helm at Spring Branch ISD, , 2001)  www.chron.com/news/houston-texas/article/Leaving-the-helm-at-Spring-Branch-ISD-Guthrie-2073787.php)

The rapid statistical transition in Spring Branch also starkly reflected the social, cultural, and economic changes.  One of the early indications was the condition of the apartments that the Latino immigrants were moving into during the late 1980s and early 1990s.   Residents in nearby neighborhoods were complaining that the community north of I-10 was overburdened with apartment complexes.  Indeed, one apartment complex was so dilapidated that then Houston City Councilwomen Helen Huey led an effort to demolish a 250-unit apartment complex on the tract, owned by a real estate investor Alfred J. Antonini because the city had declared the buildings to be dangerous to other residents.  An estimated 8,000 primarily Hispanic residents lived in the five apartment communities surrounding the complex at the time.  The effort to purchase and demolish the dilapidated complex failed as well as an effort by the Pitner Road Affordable Housing Ltd., but the complex was eventually sold and removed.  Meanwhile, the entire neighborhood developed an unsavory reputation.  Ricardo Barnes and another civic leader, Victor Alvarez, Member of Spring Branch Management District Board of Directors, said that the section was not only unsightly, but frequented by drug dealers and crimes against persons and property.  Barnes said that the Houston police referred to the location as "Pitner Pits." (Tijerina, Zoom Interview of Ricardo Barnes, 2021; Tijerina, Zoom Interview of Victor Alvarez, 2021; Jackson,. " Changes in store for Pitner Road, 2006)

At some point in the growing cultural differences between the Spring Branch affluent Anglo American residents and their northern Latino and minority neighbors began to manifest suspicion, political conflict, and outright fear.  The large Latino population spoke Spanish, rarely visited with their southern neighbors, and manifested starkly different political views regarding property ownership, taxation, and immigrant rights.  Generally, the traditional southern neighbors were more conservative, conflicting with the Latino lifestyle.  These political differences were most visible in the legislative proposals articulated by their Republican State Representative, Dwayne Bohac.  In 2005, Bohac proposed a bill for public health agencies to enforce vending regulations on the popular Latino taco trucks, or *taquerías* "in the same manner [they enforce] other health and safety regulations relating to food service."  Latinos complained that it is just a "smoke screen" to disguise racial prejudice.  But in a very real operation "health and law enforcement officers swept down on 27 taco trucks in Spring Branch" and shut down thirteen of them.  Latinos complained that an "onslaught of squad cars" was needlessly intimidating.  The *Houston Chronicle* editorial conceded that all food service establishments warranted oversight, but implied that Bohac's political pressure might have targeted the Latino merchants unfairly, noting that "Whereas cases of food poisoning are common in restaurants, the taco stands have a clean record." (*Houston Chronicle*, Editorial (Sunday, May 14, 2005), p. B8.)

In another political campaign, Bohac supported a bill to allow local law enforcement authorities to challenge Latinos, and deport them if they lacked legal status in the U.S.  Bohac

36

not only campaigned publicly on these and other conservative issues, but he also reportedly boasted his rigid stance in public meetings and civic club meetings.  According to the Latino candidate for Spring Branch School Board, Bohac established his reputation among Spring Branch Latinos as "insensitive" to their needs.  Indeed, Latinos quietly articulated their fear of retaliation from their State Representative. (Tijerina, Zoom Interview of Noel Lezama, 2021.

Ironically, even U.S. citizen Latinos expressed fear and distrust of Rep. Bohac and his political adherents.  One such student named Mario, was interviewed by the local daily newspaper which reported that the Spring Branch High School senior worked construction and spent his weekends as a volunteer in the community, hoping to become a biomedical engineer.  As a DACA student, Mario said he was hesitant to proceed with the paperwork to legalize his status for fear of being deported.  The newspaper reported that "Thousands (estimated 600,000) of immigrant students across the Houston region" were shaken by the political rhetoric against Mexicans in the U.S.  It specifically identified Spring Branch, saying, "They fear that Immigration and Customs Enforcement agents will raid their schools in Spring Branch.  Schools reported drops in student attendance, after-school programs, free lunch, and parent involvement in school events.  Even citizen students fear that their parents will be deported and leave them alone in the U.S."   Brenda Flores, a representative of the Spring Branch League of United Latin American Citizens on July 21, 1992 issued a public statement that Hispanics and other minorities were being "shortchanged educationally and denied adequate representation in the white-controlled Spring Branch Independent School District." ("Blanket of Fear," 2017, pp. 1 & 12; "Spring Branch Parent Claims Discrimination," *Houston Post* (22 July 1992).https://texashistory.unt.edu/)

The public schools of Spring Branch also began to reveal the stark differences between the traditional Five Villages south of the Interstate and those Latino schools north.  One of the most obvious differences was the rapidly growing problem of rapid overcrowding in the Latino schools compared to those south of the Interstate.  The problems had been developing since the 1980, but by the school year of 2018, the contrast was starkly shown in the Accountability Rating and ethnic composition between Hollibrook Elementary School north of I-10 and Hunters Creek Elementary in that Village south of the Interstate (School Year 2018-2019).  The following table shows that Hunters Creek had 18.9% Hispanic students while Hollibrook Elementary north of I-10 had only .4% Anglo students.  Hunters Creek had 56.9% Anglos with 20.2% Economically Disadvantaged while Hollibrook was 98.4% Hispanic, with 98.6% disadvantaged.

Another indicator of the contrast in schools was the Differential Discipline index.  The Coalition of Advocates for Restorative Education (CARE) gathered and reported statistics with figures from the Center for Justice Research, Texas Southern University.  The report cited "Racial Disparity in SBISD Disciplinary Programs."  Its general finding was that the Spring Branch Independent School District's (SBISD) disciplinary practices disproportionately impacted minority youth.  It found that while Hispanic American students were only 58.3% of the district's school's population census report, they comprised 86% of the Disciplinary Alternative Education Program (DAEP) referrals in 2016 - 2017.  African American students were only 4.7% of the district's student population, but represented 15% of DAEP referrals.  They also complained that

many of the disciplinary policies and punitive operations employed by the SBISD have no empirical or scientific support. (Coalition of Advocates for Restorative Education, "Report on Discipline and the Disciplinary" (2020). https://oncelostnowfound.org/)

# SPRING BRANCH ELEMENTARY SCHOOLS

The following elementary school statistics were provided by the Spring Branch Independent School District. An asterisk next to the name of the school denotes a "target" school. The April 21 enrollment was the most recent figure available; free lunch percentage was based on the number of free lunches served at the school last week. The rest of the figures are from the district's 1985-86 Annual Performance report; district officials did not have similar figures available for the 1986-87 school year. Free lunches are served to low-income students. Achievement test scores are the school's mean percentile for the composite Survey of Basic Skills. Teacher experience is in years.

| Elementary school | April 21 enrollment | Percent free lunches | 1985-86 Enrollment | Percent white | Grade 5 Achievement test score | Students per teacher | Expenditure per student | Average teacher experience |
|---|---|---|---|---|---|---|---|---|
| **North of I-10** | | | | | | | | |
| (illegible) | | | 406 | 55.6 | 48 | 15.2 | $2,170 | 9.1 |
| Hollibrook* | 758 | 81.8 | 740 | 18.9 | 41 | 20.9 | $1,763 | 7.1 |
| (illegible) | | | 777 | 35.6 | 45 | 17.0 | $1,908 | 8.3 |
| Pine Shadows | 360 | 30.6 | 352 | 68.8 | 77 | 14.7 | $2,256 | 10.4 |
| (illegible) | | | 1,030 | 24.5 | 32 | 18.7 | $1,516 | 4.9 |
| Shadow Oaks* | 574 | 53.1 | 489 | 42.5 | 55 | 16.7 | $2,009 | 10.3 |
| (illegible) | | | 380 | 39.2 | 57 | 17.2 | $2,002 | 11.2 |
| Spring Branch* | 635 | 41.3 | 621 | 53.9 | 60 | 19.2 | $1,688 | 9.0 |
| (illegible) | | | 786 | 62.9 | 54 | 15.7 | $2,012 | 9.2 |
| Terrace | 383 | 9.4 | 400 | 71.0 | 78 | 17.9 | $1,788 | 8.3 |
| (illegible) | 827 | 75.6 | 772 | 31.2 | 45 | 18.1 | $1,630 | 6.8 |
| Westwood* | 462 | 48.1 | 452 | 57.1 | 52 | 16.7 | $2,149 | 11.1 |
| (illegible) | 500 | 43.1 | 422 | 52.8 | 59 | 13.0 | $2,509 | 10.8 |
| **North average** | 583 | 47.7 | 587 | 49.5 | 54 | 17 | $1,960 | 9.1 |
| **District average** | 497 | 39.7 | 499 | 60.3 | 64 | 16.9 | $2,048 | 10.2 |
| **South average** | 373 | 10.7 | 371 | 75.8 | 80 | 16.7 | $2,176 | 11.8 |
| **South of I-10** | | | | | | | | |
| (illegible) Hill | 416 | 18.1 | 425 | 80.0 | 79 | 17.9 | $1,959 | 11.2 |
| Frostwood | 377 | 0.3 | 357 | 82.1 | 87 | 18.5 | $2,112 | 17.1 |
| (illegible) Creek | 245 | 4.5 | 274 | 82.5 | 63 | 13.2 | $2,597 | 11.7 |
| Meadow Wood | 430 | 22.6 | 427 | 67.7 | 79 | 17.3 | $1,920 | 10.1 |
| (illegible) Drive | 320 | 3.4 | 308 | 88.0 | 68 | 16.9 | $2,154 | 11.6 |
| Nottingham | 432 | 19.2 | 413 | 73.4 | 74 | 18.0 | $1,874 | 9.7 |
| (illegible) Creek | 415 | 10.1 | 408 | 80.4 | 80 | 17.0 | $2,462 | 10.5 |
| Thornwood | 406 | 12.8 | 449 | 56.1 | 65 | 17.7 | $2,120 | 12.2 |
| (illegible) | 315 | 5.4 | 276 | 82.5 | 81 | 13.9 | $2,387 | 11.9 |

( McGrath, "Spring Branch Elementary Schools", Section 1, pp. 1, 14.)

## Spring Branch ISD:  School Year 2018 – 2019

| School | Total Students | Hunters Creek | Hollibrook Elem. |
|---|---|---|---|
| Accountability rating | | A | B |
| Total Students | 35,136 | 613 | 764 |
| Hispanic: | 59.3% | 18.9% | 98.4% |
| Anglo: | 26.6% | 60.2% | .4% |
| At-risk students: | 56.9 % | 24.6 | 94.2% |
| Economically disadvantaged: | 59.4 % | 20.2% | 98.6% |
| Limited English proficiency: | 36.7 % | 16.3% | 91.2% |

(Texas Tribune, "Spring Branch ISD" 2021) https://schools.texastribune.org/districts/spring-branch-isd/)

38

While Latino parents complained about inadequate facilities and insensitive State Representatives and School Board members, Anglo parents organized their efforts into committees with names like the Pine Shadows Concerned Citizens or the Parents for Fair Full Funding. The Anglo parents couched their complaints in statistics and pedagogical terms, but they openly revealed that their political demands had a strong racial appeal as well. In 1990, reportedly "Hundreds of Spring Branch parents banded together in opposition to construction of new Pine Shadows Elementary School. They say boundary expansion and "increased size of the campus will reduce the quality of education" by adding 700 additional students. But they added that it would come "with a large group coming from low-income apartments primarily occupied by minorities," according to Wayne Schaper, executive director of SBISD administration. Bill Ray, chairman of the Pine Shadows Concerned Citizens, said it was about increased size of the campus, "not a racial issue," but his group member Kathleen Drinnan said "racial balance" is the issue. She added quite candidly, "We don't want them (the minorities) all in our neighborhood. The associated social problems are documented in schools that are largely minority." (Asin, "Spring Branch parents fight expansion of school campus," 1990, p. 1, 10A.)

In another meeting to protest the mixing of students across the "Mason-Dixon Line" [Interstate 10] one Anglo parent styled her complaint as a social class conflict. Germaine Sitomer admitted that she was sending her own child to a private school. She said "'For sale' signs are coming up in Spring Valley. . . We would like to go to Hunters Creek. . . We think that moving a piece of the population of upper middle-class people to an upper middle-class school is the best solution."



**Poster in Spring Branch neighborhood, protesting "slow children" in the Spring Branch ISD.**

Carlee Klam, president of the Valley Oaks PTA denied "racism, but admitted there has been 'white flight' for the past six years or so as the apartment buildings have added minority children to the school." Spring Branch ISD Board President Jerry Mischon said that racism "has been a part of community discussions" at the least "and bigotry at the most." (McGrath, "Spring Branch parents call it a district divided," 1987, Section 1, pp. 1, 14.)

One of the major issues emerging in the 1980s and early 1990 was the passing of a school $48 million bond to build new schools north of the Interstate. Spring Branch ISD Superintendent Hal Guthrie told Spring Branch Education Association that Spring Branch added 2,500 elementary students. Several of his elementary schools had enrollments of 900, using 90 portable buildings. He conceded that many of the district's parents were circulating opposition flyers against the bonds. Indeed, a Spring Branch parents group called the Pine Shadows Concerned Citizens collected 1,000 signatures to organize a political action committee in opposition to the bond issue. (Asin, "Spring Branch parents fight expansion of school campus," 1990, p. 1, 10A.) The group walked out of Superintendent Guthrie's speech in opposition to building new elementary school and expanding boundaries of an existing school. Guthrie admitted that it was the first time the district's parents opposed a bond issue, but he persisted, and eventually passed the bond for the new schools. Guthrie had successfully passed three bond issues before. He also successfully sued the state after the attorney general's office refused to authorize a bond sale, arguing the district's tax rate was already higher than the law allowed. The district prevailed when a judge ruled that voters in 1953 had authorized a "grandfathered" $2 tax cap rather than the $1.50 tax cap set by a more recent law. (Markley. " Leaving the helm at Spring Branch ISD," 2001) www.chron.com/news/houston-texas/article/Leaving-the-helm-at-Spring-Branch-ISD-Guthrie-2073787.php)

**Legacy of Segregation**

The legacy of 150 years of multi-faceted government-condoned discrimination against Latinos in Texas is a state educational system that maintains a high dropout rate and is still characterized by widespread segregation. One of the vestiges of the years of "Mexican Schools" is the continued formation, construction, and maintenance of schools and school districts that are imbalanced compared to the number of Latino students in the community or district. Many Texas cities now have whole segregated districts that have replaced the old "Mexican Schools." In Nueces County, for example, a 1968 federal agency study found racially separated contiguous districts. The predominantly Latino school district in Robstown, which was established by Robert Kleberg as a segregated town for his Latino agricultural labor force, is adjoining the Callalen I.S.D., which is predominantly Anglo. In Val Verde County, the predominantly Latino San Felipe I.S.D. is adjacent to the all-white Del Rio I.S.D., and in Bexar County, the predominantly Latino districts of Edgewood and Harlandale are adjoining Anglo districts in San Antonio. By the 1960s, 50% or more of Latino students in Texas were segregated. Worse, not only students but even Latino teachers were also segregated or neglected. In 1968, the Anglo/Latino teacher ratio was reported to be 17:1. Latino teachers comprised only 4.9% of the teachers in Texas. And in the Rio Grande Valley, where Latinos comprised 64% of the student

40

enrollment, only 7% of the teachers were Latino.  Likewise, Latino principals comprised only 3.4% of Texas principals.  These low statistics were found to be similar for Latino school board members and school administrative staff, with Latinos overrepresented in the custodial staff numbers.  The latest studies reveal that even in the 1990s, the percentage of Latino high school administrators was only 65% for schools that were over 90% Latino in enrollment.  (Civil Rts. Study, 1971, pp.  21, 23, 30, 42; Richardson 1999, 132).

The social and academic vestiges of systematic discrimination and segregation of Latinos also continue to yield statistics that place Texas in an unenviable position among other states.  A 1977 report issued by the U.S.  Commission on Civil Rights reported that 19% of the Latinos over age 25 in Texas were illiterate. Latinos had twice the Anglo unemployment rate, and 15% of them still lived in overcrowded housing with inadequate plumbing as compared to the Anglo 1.7%.  A clear holdover to the Texas "Mexican town" was the 70% of Latinos in Texas who still lived in barrios.  In San Antonio, for example, a 1980 study concluded that the limited residential access of middle-class Latinos to the three affluent northern census tracts tended also to limit their educational access.  (US Comsn. Civ.  Rts., 1977, p.  184; Rosales 2001, 12). In 1981, Judge William Wayne Justice found the state bilingual plan inadequate, and that measures had not been taken to fully "remove the disabling vestiges of past de jure discrimination." He ordered corrections to train teachers, identify students in Limited English Proficiency (LEP), and to expand the program.  And in 1980, the Southwest Voter Registration and Education Project (SVREP) found that Latinos were underrepresented on school boards in 92% of the 361 Texas school districts where Latinos make up over 20% of the school population. In many other comparisons, Texas educational statistics show evidence  of past discrimination.  A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas, the majority of Latino students are still in "inferior and highly segregated schools." (Gomez- Quinones 1994, pp.  155, 166, 172). They are "extremely overage" and "disproportionally enrolled in remedial English classes." Texas Latino students still have an unacceptably "high dropout" rate, and receive poor preparation for college.

**Legacy of Disfranchisement**

Just as segregation has hindered Latino education, so has the history of disfranchisement reduced Latino voter participation.  Texas has been cited as having a distinct pattern of disfranchisement of minorities, including Latinos by a variety of devices—all intended to dilute or reduce voting strength.  A report by the U.S.  House of Representatives in 1975 stated that "Texas has a long history of discriminating" against minorities using "myriad forms of discrimination." The background of the report stated that "The cultural and language impediment conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Latinos access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary." An example of the state's tenacious attack on minority voting rights is clearly demonstrated by its use of the White Primary.  As stated above, the White Primary was established in 1914, specifically to exclude the

41

Latino voters.  When the Texas White Primary Law was struck down by the courts in 1926, the state legislature responded by passing a law that authorized state political parties to set their own voter credentials.  The state Democratic Party then ruled that only whites could vote in the primary, which was struck down in 1923.  The Democratic Party immediately restricted party membership to whites only, which was struck down in 1944.  These party exclusions were followed up by the poll tax until it was struck down.  (TSHA Handbook, "White Primary").

The Congressional Report added that most destructive was the fact that the state discriminatory laws combined with local governments and local officials to "frighten, discourage, frustrate, and otherwise inhibit" Latino voters.  (U.S. Congress, 1975, p. 17).  The report cited several Texas cities such as Corpus Christi, Waco, and Lufkin in which a variety of "legal devices" were used to discourage Latino voting.  In some cases precinct or election districts have been re-drawn to dilute Latino voting populations; in other cases the lines have been drawn to concentrate an entire Latino community into a single district combined with at-large elections to limit their representation on elective boards and commissions.  Until the 1980s, 179 of the 214 large cities in Texas had at-large electoral systems, or 83%.  In general, the at-large non-partisan electoral system combined with the poll tax and other obstacles to hinder voter participation of Latinos throughout most the twentieth century.  (San Miguel 1987, pp. xv, 201; Montejano 1987, 292; Rosales, 2000, 13; U.S. Commission on Civil Rights, Texas, 1980, p. 47).  The Congressional Report stated that the same legal devices that hindered minority voting also hindered their running for office.  In Texas, for example, Latinos were found to hold 2.5 percent of elective positions, substantially lower than their percentage of the state's population.  It concluded that this was "because of discrimination and economic dependence, and the fear that these have created." Scholar Juan Gomez- Quiñones has stated that the absence of Latinos at all levels of appointed positions before 1970 is major indicator of their exclusion from the democratic process in Texas.  And even though Latino voting had increased, Willie Velasquez of San Antonio, the founder of the Southwest Voter Registration Education Project (SVREP) stated that "Clearly, past discriminatory practices have hindered voting." Velasquez began in 1974 to register Latino voters.  He found that he had to file several law suits in order to seek enforcement of the Voting Rights Act, and to restructure local voting districts which had been gerrymandered.  (Gomez-Quinones 1994, pp. 155, 166, 172).  This mirrored the comments by the Congressional Report that "In view of this overwhelming evidence of voting discrimination against language minorities, it is not surprising that the registration and voting statistics of language minorities are significantly below those of the Anglo majority.  In 1972, for example, only 44.4 percent of persons of Spanish origin were registered compared to 73.4 percent for Anglos." The 1974 percentages indicated similar disparity of 34.9 percent for Latinos to 63.5 percent registered Anglos.  As a result, the Latino voting rate was half of the voting rate for Anglos in 1974.  (U.S. Congress, 1975, p. 22).

The 1975 Congressional Report by the U.S. House of Representatives was particularly clear in stating not only that Texas has an exceptionally strong record of abuses, but that the long train of abuses has left a legacy of voter alienation among its minority, especially Latino, voters.

42

The report added specifically stated that "In 1973, the Supreme Court upheld a lower court finding which noted that the Latino population in Texas has "historically suffered from, and continues to suffer from the results and effect of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others." The report stated that Texas has "a history pock-marked by a pattern of racial discrimination that has stunted the electoral and economic participation of the black and brown communities in the life of the state." An example of the persistent pressure put on Texas minority voters was the "voter purge" in 1975.  At that time, the Department of Justice wrote Texas Secretary of State Mark White to interpose an objection to the Texas voter purge.  Federal investigation revealed that the total purge could have a discriminatory effect on their voting rights "on the heels of registration difficulties in the past." The investigation indicated that the purge could confuse a substantial number of minority voters and leave them unable to comply with the statutory registration requirements in the new Texas law.  (U.S.  Attorney General, 1975). The Congressional Report found that such legal devices and "the practice of conducting registration and voting only in English does impede the political participation of voters whose usual language is not English." State and local election districts failure to provide adequate bilingual materials "effectively excludes otherwise qualified voters from participating in elections."

All of the legal devices and discriminatory principles cited above are exemplified in the case of Crockett County, Texas as documented in a 1980 study by the United States Commission on Civil Rights.  Dr.  Charles Cotrell, a member of the Texas Advisory Committee, prepared the report in conjunction with members and documentation provided by attorneys and the staff of the U.S.  Department of Justice. The case involves a study of electoral practices to disfranchise Latino citizens in the town of Ozona, Texas, a typically segregated town with Latinos at a distinct disadvantage in population, income level, education, and political power.  The study reveals that the Anglo minority were so accustomed to overt discrimination in employment, social interaction, and elections that their election officials were hardly aware that they were violating basic election laws and procedures.  For example, the Anglo election officials either gerrymandered the Mexican-American neighborhoods by diluting them into Anglo districts, or they gerrymandered them into one massive voter district.  Anglo non-residents then registered illegally to vote in that exclusively Mexican-American district to defeat the only Mexican-American candidate. The exclusively-Anglo Crockett County officials color coded the ballots to distinguish the Mexican-American ballots.  At the end of the Election Day, the wife of the Anglo candidate went to the Mexican-American district polls to collect the color-coded ballots. She and the Anglo County Clerk then discarded the color-coded Mexican-American ballots.  The County Clerk did not hesitate to reveal the system to federal investigators, nor to admit that she systematically challenged only the Latino voters who came in to vote legally in their own district.  Investigators asked her about the color of the Anglo ballots, saying "What do you mean by 'the white ones?'" She replied, "Well, the white people." She then added "American, not the Latins, the Americans." (U.S.  Commission on Civil Rights, Vol.  1 "Participation": 1980, p. 231).

43

The inherent legacy of these discriminatory practices is that the entire community of the state lives under the shadow of decades of unescapable social discrimination.  The Congressional Report underscored this by adding that the dynamic in racial abuses was "the economic dependence of these minorities upon the Anglo power structure. People whose jobs, credit, or housing depend on someone who wishes to keep them politically powerless are not likely to risk retaliation." And the report did document a variety of cases of such retaliation.  In one case, for example, "a loan officer at the bank went to each Latino who had loans with the bank and told them he expected their votes.".  Another report indicated that Latinos in Uvalde, Texas "are afraid their welfare checks will be reduced because of their political activity.".  I concluded the statement of legacy by stating the years of discriminatory abuses cannot be dismissed simply because "The people in charge are frequently the same ones who so recently excluded minorities from the political process." (U.S.  Congress, Voting Rights Act 1975, pp.  18-22). As a result of the historical discrimination against Latinos in Texas, Latinos in Spring Branch and Houston, Texas, still bear the effects of this discrimination which hinders their ability to participate effectively in the political process.

I state under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2022.

_____

Andres Tijerina

44

BIBLIOGRAPHY

"Blanket of Fear" *Houston Chronicle* Vol. 117, No. 71 (Dec. 23, 2017), pp. 1 & 12;

"City of Bunker Hill Village" City Profile: Other Memorial Villages [accessed 27 Nov 2021] **www.bunkerhilltx.gov/**

"New League Fights School Integration" *Houston Chronicle* (November 27, 1955) pp. 1, 22.

"Spring Branch Parent Claims Discrimination," Houston Post (22 July 1992). https://texashistory.unt.edu/

*Houston Chronicle* August 11, 1971 "Obscenity Panel;" April 18, 1992 "School Board Reform." *Houston Post*, May 1, 1955, p. 19 "Loyalty Week."

Achor, Shirley. *Mexican Americans in a Dallas Barrio.* Tucson: University of Arizona Press, 1978.

Akin, Charles Ray. "A Study of School Boundaries in East Austin, Texas" (Unpublished M.A. Thesis, University of Texas at Austin, 1951).

Anders, Evan. *Boss Rule in South Texas: The Progressive Era*. Austin: University of Texas, 1982.

Asin, Sefanie. "Spring Branch parents fight expansion of school campus," *Houston Chronicle*, May 31, 1990, p. 1, 10A.

*Austin American-Statesman.* (Sunday, April 9, 1967), p. A-15.

*Austin American-Statesman.* "Adelante," (February 11, 1969).

*Austin Daily Tribune* (Thursday, Sept. 1899, p. 4; Camacho Family Papers (Box 10, Folder 4) Austin History Center.

Austin Housing Authority. "Annual Reports, 1938-39," 1948. Austin History Center.

Austin Human Relations Commission. "Austin Housing Patterns Study" Summary, 1979. Civil Rights Folder. Austin History Center, Austin Public Library.

Austin. City Plan for Austin. Koch and Fowler, 1928. Austin History Center, Austin Public Library.

Austin. Oakwood Cemetery. Original Cemetery Record Book I. Austin History Center, Austin Public Library.

*Balli Heirs v. Gilbert Kerlin, North Central Oil Corporation, et. al.* filed in the 107th Judicial District, Cameron County, Texas.

Casstevens, Mary Anna. "The Institution of the Spanish-Mexican Ranch and Its Culture in South Texas." Unpublished M.A. Thesis. Texas A&M University-Kingsville, 1997.

Cheeseman, Bruce S. "Richard King: Pioneering Market Capitalism on the Frontier," in Joe S. Graham, ed. *Proceedings of "Ranching in South Texas: A Symposium."* Kingsville: Texas A&M University, Kingsville, 1994.

City-Data.com, "Spring Branch neighborhood in Houston, Texas (TX), 77041 detailed profile" www.city-data.com/neighborhood/Spring-Branch-Houston-TX.html [accessed 16 Nov. 2021].

Coalition of Advocates for Restorative Education (CARE), "Report on Discipline and the Disciplinary Alternative Education Program in the Spring Branch ISD" (2020). https://oncelostnowfound.org/

Crimm, Ana Carolina Castillo. *De León: A Tejano Family History*. Austin: University of Texas Press, 2003.

Crisp, James Ernest. "Anglo-Texan Attitudes toward the Mexican, 1821-1845." Unpublished Ph.D. dissertation. Yale University, 1976.

45

*Dallas Morning News*, 9 March 1913.

Daniel, Clete. *Chicano Workers and the Politics of Fairness: the FEPC in the Southwest, 1941-1945*. Austin: University of Texas, 1991.

Davis, E. E., "A Study of Rural Schools in Travis County, Texas" *Bulletin of The University of Texas* No. 67 (December 1, 1916).

Davis, Peggy Jean, "A Study of Non-Promotion in the Pasadena, Texas Elementary Schools," (M.Ed.Thesis, University of Texas, 1958.

De Leon, Arnoldo. *They Called them Greasers: Anglo Attitudes Toward Mexicans in Texas, 1821-1900*. Austin: University of Texas Press, 1983.

Dobie, J. Frank. *A Vaquero of the Brush Country: Partly from the Reminiscences of John Young*. Dallas: The Southwest Press, 1929.

Dunn, J. B. (Red). *Perilous Trails of Texas.* ed. by Lilith Lorraine. Dallas: Southwest Press, 1932.

Ennis, Sharon R., Merarys Ríos-Vargas, and Nora G. Albert. The Hispanic Population: 2010. "2010 Census Briefs" (May, 2011), Report Number C2010BR-04. p. 13. www.census.gov/content/dam/Census/library/publications/2011/dec/c2010br-04.pdf

Foley, Neil. *The White Scourge: Mexicans, Blacks, and Poor Whites in Texas Cotton Culture*. Berkeley: University of California Press, 1997.

Friend, Llerena. *Sam Houston: Great Designer.* Austin: University of Texas Press, 1969.

Gammel, H.P.N. *The Laws of Texas, 1822-1897*. 4 Vols. Austin: The Gammel Book Company, 1898.

Garcia Papers, Mexican American Library, University of Texas at Austin.

Garcia, Mario T. *Desert Immigrants: The Mexicans of El Paso, 1880-1920*. New Haven: Yale University Press, 1981.

Garcia, Mario T. *Mexican Americans: Leadership, Ideology, & Identity, 1930-1960*. New Haven: Yale University Press, 1989.

Glasgow, Roy Arthur, "A financial study of the Pasadena, Texas, Independent School District," M.A.Thesis, University of Texas, 1931.

Goliad County, County Clerk. Deed Records.

Gomez-Quinones, Juan. *Chicano Politics: Reality and Promise, 1940-1990*. Albuquerque: University of New Mexico Press, 1990.

Gomez-Quinones, Juan. *Mexican American Labor, 1790-1990*. Albuquerque: University of New Mexico Press, 1994.

Greaser, Galen D. and Jesús de la Teja. "Quieting Title to Spanish and Mexican Land Grants in the Trans-Nueces: The Bourland and Miller Commission, 1850-1852." *Southwestern Historical Quarterly* 95, no. 4 (Apr., 1992).

Greene, Casey Edward, "Apostles of Hate: The Ku Klux Klan in and Near Houston, Texas, 1920-1982" MA Thesis, University of Houston, 1995.

Haiwen, Chu. "The Mexican-Origin Population in Metropolitan Statistical Areas Across the United States, 1990-2010" Latino Data Project, Report 51. CLACLS, City University of New York. (September 2013), (pp. 8 & 9) https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1043&context=clacls_pubs [Nov. 2010].

Hamilton, William B. "A Social Survey of Austin" *Bulletin of The University of Texas* No. 273 (No. 15, March 15, 1913).

46

Hammett, A.B.J. *The Empresario Don Martín de Leon*. Kerville, Tex.: Braswell Printing Co., 1971.

Hidalgo County. Court Record Book A.

Hill, Kate Adele. *Lon C. Hill, 1862-1935: Lower Rio Grande Valley Pioneer*. San Antonio: The Naylor Company, 1900.

Hinojosa, Gilberto Miguel. *A Borderlands Town in Transition: Laredo, 1755-1870*.  College Station: Texas A&M university Press, 1983.

*Houston Chronicle*, Editorial (Sunday, May 14, 2005), p. B8.

Huson, Hobart. *Refugio: A Comprehensive History of Refugio County from Aboriginal Times to 1953*. 2 vols. Woodsboro: The Rooke Foundation, Inc., 1953.

Jackson, Kim.  " Changes in store for Pitner Road:A pocket park, church project, are in the works for the area," *Houston Chronicle*, NEIGHBORHOODS//MEMORIAL NEWS, (Nov. 15, 2006). www.chron.com/neighborhood/memorial-news/article/Changes-in-store-for-Pitner-Road-1870300.php

Jervis, Rick, "Hispanics Guide Huge Growth in Texas," *USA Today*, February 23, 2011.  Kavulla Petition, PISD.

Kenedy, Texas. *The Kennedy Times* (October 31, 1963), Sect. 1.

Kreneck, Thomas H., *Del Pueblo: A History of Houston's Hispanic Community* (Houston: Houston International University, 1989.

Kuhr, Nancy. "Segregated Public Schools in Texas, 1876-1940" M.A. Thesis, University of Texas at Austin, 1971.

Labor Movement in Texas, Collection, 1845-1954, Briscoe Center for American History, Manuscripts, Box 2E308, File 2, Dabney Interview)

Lack, Paul D. "Slavery and Vigilantism in Austin, Texas, 1840-1860." *Southwestern Historical Quarterly* 85 (July 1981).

Lea, Tom. *The King Ranch*. Austin: University of Texas Press, 1973.

Little, Wilson.  *Spanish-Speaking Children in Texas*.  Austin: University of Texas Press, 1944.

Mackun, Paul & Steven Wilson.  *2010 Census Brief: Population Distribution and Change: 2000 to 2010*, U.S. Census Bureau (March 2011, p. 11) (Table 3:  Population Change for the Ten Most Populous and Ten Fastest-Growing Metropolitan Statistical Areas: 2000 to 2010") (p. 6,9) https://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf

Manaster, Jane. "The Ethnic Geography of Austin, Texas: 1875-1910." Unpublished M.A. Thesis, University of Texas at Austin, 1986.

Markley, Melanie. " Leaving the helm at Spring Branch ISD, Guthrie praised for 'cutting-edge' reform," Houston Chronicle (Dec. 19, 2001)  www.chron.com/news/houston-texas/article/Leaving-the-helm-at-Spring-Branch-ISD-Guthrie-2073787.php

Martin, Roscoe C. "The Municipal Electorate: A Case Study" *Southwestern Social Science Quarterly* XIV (December 1933), pp. 890-936.

McCallum, Jane Y.  Secretary of State, 1927) Texas Historical Commission. *Duplex Nation Historic District. Application for National Register of Historic Places*, Nov. 10, 2006.

McCasland, Tom.  "Analysis of Impediments to Fair Housing Choice"  *DRAFT* City of Houston, Housing and Community Development Department, 2020. Table 37:  Population Growth 2980 – 2010. (p. 98) https://houstontx.gov/housing/plans-reports/impediments/Draft-2020-AI-03172020.pdf

McCasland, Tom.  Center for Latin American, Caribbean, and Latino Studies:  Latino Data Project  2020 www.academicworks.cuny.edu/clacls_pubs/

McGrath, Stephanie A. *Houston Chronicle* "Spring Branch Elementary Schools". "Spring Branch parents call it a district divided," *Houston Chronicle*, April 26, 1987, Section 1, pp. 1, 14.

Mexico. *Reports of the Committee of Investigation Sent in 1873 by the Mexican Government to the Frontier of Texas*. Translated from the Official Edition Made in Mexico. New York: Baker & Godwin, Printers, 1875.

Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas, 1987.

Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1886.* Austin: University of Texas Press, 1987.

O'Connor, Kathryn Stoner. *Presidio La Bahia del Espiritu Santo de Zuniga, 1721 to 1846*. Austin: VonBoeckmann-Jones Co., 1966.

Pasadena Chamber of Commerce, "Economic and Demographic Profile," Booklet.

Pasadena Citizen. 1980 *passim.*

Phillips, Michael. White Metropolis: Race, Ethnicity, and Religion in Dallas, 1841- 2001. Austin: University of Texas Press, 2006.

Pomeroy, C. David, Jr., *Pasadena: The Early Years* (Pasadena, Tex.: Pomerosa Press, 1993).

Priest, Tyler and Michael Botson, "Bucking the Odds: Organized Labor in Gulf Coast Oil Refining" *Journal of American History* (2012) 99 (1): 100-110.

Pycior, Julie Leininger. *LBJ & Mexican Americans: The Paradox of Power*. Austin: University of Texas, 1997.

Rangel, Jorge C. and Carlos M. Alcala. "Project Report: De Jure Segregation of Chicanos in Texas Schools" *Harvard Civil Rights-Civil Liberties Law Review* 7:2 (March, 1972), pp. 307-91).

Richardson, Chad. *Batos, Bolillos, Pochos, & Pelados: Class & Culture on the South Texas Border*. Austin: University of Texas Press, 1999.

Rosales, F. Arturo. "Mexicans in Houston: The Struggle to Survive, 1908-1975" *The Houston Review: History and Culture of the Gulf Coast A Journal of the Houston Metropolitan Research Center*, Vol. III, No. 2 (Summer, 1981), pp. 224 – 248.

Rosales, Rodolfo. *The Illusion of Inclusion: The Untold Political Story of San Antonio*. Austin: University of Texas Press, 2000.

Rubel, Arthur J. *Across the Tracks: Mexican-Americans in a Texas City.* Austin: University of Texas Press, 1966, 36.

Rubio, Abel G. *Stolen Heritage: A Mexican-American's Rediscovery of His Family's Lost Land Grant*. Austin: Eakin Press, 1986.

*San Antonio Express*, July 12, 1914, p. 4B.

San Miguel, Guadalupe, Jr. *Brown not White: School Integration and the Chicano Movement in Houston*. Austin: University of Texas Press, 2001.

San Miguel, Guadalupe, Jr. *Let All of them Take Heed: Mexican Americans and the Campaign for Educational Equality in Texas, 1910-1981*. College Station: Texas A&M University Press, 1987.

Taylor, Paul Schuster. *An American-Mexican Frontier: Nueces County, Texas*. Chapel Hill: The University of North Carolina Press, 193.

Teja, Jesus F. de la. *A Revolution Remembered: The Memoirs and Selected Correspondence of Juan N. Seguin*. Austin: State House Press, 1991.

48

Texas Historical Commission. Wilshire Historic District. Application for National Register of Historic Places , Nov. 10, 2006.

Texas Senate. *D.W. Glasscock contestant vs. A. Parr contestee*, Supplement to the Senate Journal, 36th Legis., Reg. Sess., 1919.

Texas State Historical Association (TSHA). Handbook of Texas Online URL: http://www.tshaonline.org/handbook "White Primary." [Accessed June 5, 2012].

Texas Tribune, Statewide Data, "Spring Branch ISD" [accessed 28 NOV 2021]. www.schools.texastribune.org/districts/spring-branch-isd/

Texas. General Land Office. *Abstract of all Original Texas Land Titles comprising Grants and Locations to August 31, 1942.* 8 vols. Austin: State of Texas, 1942.

Texas, *General and Special Laws of the State of Texas Passed by the Fortieth Legislature at the Regular Session Convened at the City of Austin, January 11, 1927.*

Texas, *Penal Code of the State of Texas. Adopted at the Regular Session of the Thirty- Ninth Legislature*, 1925.

Texas, Secretary of State city charters and amendments. Archives and Information Services Division, Texas State Library and Archives Commission.

Texas, *State Gazette Appendix,* Vol. II (1854-55) in Camacho Papers, Box 2 "Mexican American History" folder. Austin History Center, Austin Public Library.

Tijerina, Andrés, "Foreigners in Their Native Land: The Violent Struggle between Anglos and Tejanos for Land Titles in South Texas during Reconstruction" Chapter 11 in Kenneth W. Howell, Ed., *Still the Arena of Civil War: Violence and Turmoil in Reconstruction Texas, 1865-1874* University of North Texas Press, 2012.

Tijerina, Andrés.  Zoom Interview of Noel Lezama, Spring Branch business owner and former candidate for Spring Branch ISD Board of Trustees, 23 Nov. 2021.

Tijerina, Andrés.  Zoom Interview of Ricardo Barnes, Executive Director of the Spring Branch Family Development Center, 19 Nov. 2021.

Tijerina, Andrés.  Zoom Interview of Victor Alvarez, Member of Spring Branch Management District Board of Directors, 19 Nov. 2021.

Tijerina, Andrés. *History of Mexican Americans in Lubbock*. Lubbock: Texas Tech University Press, 1979.

Travis County Voter Registration List, 1867, 1873, & 1892. Austin History Center.

TSHA Handbook: "Spring Branch, Tx (Harris County)" By: Diana J. Kleiner www.tshaonline.org/handbook/entries/spring-branch-tx-harris-county.

U.S. Census.  Statistical Abstract of the United States: 1980 (December, 1980) Part 2, Section 1, Population www.census.gov/library/publications/1980/compendia/statab/101ed/1980-02.pdf   [accessed 26 NOV 1021].

U.S. Commission on Civil Rights. "Mexican American Education Study" *Report 1: Ethnic Isolation of Mexican Americans in the Public Schools of the Southwest*, 1971.

U.S. Commission on Civil Rights. A Report of the Texas Advisory Committee to the U.S. Commission on Civil Rights. *Employment Practices at Kelly Air Force Base, San Antonio, Texas*. 1977.

U.S. Commission on Civil Rights. *Texas: The State of Civil Rights, Ten Years Later, 1968-1978*. Washington, D.C., 1980.

U.S. Commission on Civil Rights. *The Unfinished Business: Twenty Years Later*.  Washington, D.C., 1977.

49

U.S. Commission on Civil Rights. Vol. 1: *A Report on the Participation of Mexican- Americans, Blacks, and Females in the Political Institutions and Processes in Texas*. 1968-1878. Prepared by Charles Cotrell. Washington, D.C., 1980.

U.S. Congress, 44th Cong., 1st sess. House of Representatives. Report No. 343**,** Texas Frontier Troubles. Washington, 1876.

U.S. Congress, 94th Cong., 1st sess. House of Representatives. Report No. 94-196**,** Voting Rights Act Extension. Washington, 1975.

U.S. Congress, 94th Cong., 1st sess. on S. 407, S.903, S. 1297, and S. 1443.  Senate. Voting Rights Act Extension. Washington, 1975.

U.S. Congress. Hon. Lyndon B. Johnson, Radio Address. Congressional Record. 75 Cong., 3rd Sess., Jan. 23, 1933. 1-page reprint in HOUSING PROJECTS folder.  Austin History Center.

U.S. Department of Justice. J. Stanley Pottinger, Assistant U.S. Attorney General, to Mark White, Texas Secretary of State, 1975.

*U.S. v. Pasadena Independent School District*, 1987 U.S. District Court, Southern District of Texas, Houston Division , In Re Alien Children Education Litigation § Civil Action No. H-78-1862 , July 21, 1980.

Valenzuela, Angela. *Subtractive Schooling: U.S.-Mexican Youth and the Politics of* 43 *Caring*. New York: State University of New York Press, 1999.

Villareal, Roberto M. "The Mexican-American Vaqueros of the Kenedy Ranch: A Social History." Master's thesis, Texas A&I University, 1972.

Webb, Walter Prescott. *The Texas Rangers: A Century of Frontier Defense*. 2d ed.  Austin: University of Texasl, 1991.

Williams, Amelia W. and Eugene C. Barker, eds. *Writings of Sam Houston,1813-1863*.  Austin: University of Texas Press, 1943.

Works, George A. *Texas Education Survey Reports*, Vol. Viii (Austin: Texas Educational Survey Commission, 1925).

Worrall, D. M.   "Five Harris County Historical Markers That Comprise the Memorial Villages Heritage Trail," (Harris County Historical Commission), np. Memorial Villages Heritage Trail markers narrative.pdf (harriscountyarchives.com) [accessed 27 Nov 2021].

Zamora, Emilio. "The Failed Promise of Wartime Opportunity for Mexicans in the Texas Oil Industry" *Southwestern Historical Quarterly* 95 (January, 1992), pp. 323-350.

# **Exhibit C**

**EXHIBITS TO**
**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

IN THE UNITED STATES DISTRICT COURT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON DIVISION

VIRGINIA ELIZONDO,    |
   Plaintiff,        |
               |
V.                    |    Civil Action No. 4:21-CV-01997
               |
SPRING BRANCH         |
INDEPENDENT SCHOOL    |
DISTRICT, ET AL.,     |
   Defendants.       |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
CHRISTINE PORTER
DECEMBER 28, 2021
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL DEPOSITION of CHRISTINE PORTER, produced as
a witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on December 28, 2021, from 9:34 a.m. to
11:45 a.m., before Mendy A. Schneider, CSR, RPR, in
and for the State of Texas, recorded by machine
shorthand, at the offices of Spring Branch ISD
Athletic Center, 1050 Dairy Ashford, Houston, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

```
 1                   A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4         MR. BARRY ABRAMS
           BLANK ROME
 5         717 Texas Avenue, Suite 1400
           Houston, Texas 77002
 6         (713) 228-6601
           Babrams@blankrome.com
 7
 8    FOR THE DEFENDANTS:
 9         MR. CHARLES J. CRAWFORD
           ABERNATHY ROEDER BOYD HULLETT
10         1700 North Redbud Boulevard, Suite 300
           McKinney, Texas 75069
11         (214) 544-4000
           Ccrawford@abernathy-law.com
12
13    ALSO PRESENT:
           MS. AUDREY SHAKRA
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                      EXAMINATION INDEX
2    WITNESS:  CHRISTINE PORTER
3        EXAMINATION                                   PAGE
             BY MR. ABRAMS                               4
4
     SIGNATURE REQUESTED                                92
5
     REPORTER'S CERTIFICATION                           93
6
                       EXHIBIT INDEX
7
                                                       PAGE
8      SBISD EXHIBIT NO. 1                               6
           Notice of Deposition
9
       SBISD EXHIBIT NO. 2                              24
10         District Web Site Screenshot
11     SBISD EXHIBIT NO. 3                              30
           2010 to 2021 District List of Candidates
12
       SBISD EXHIBIT NO. 4                              39
13         Map
14     SBISD EXHIBIT NO. 5                              44
           Map
15
       SBISD EXHIBIT NO. 6                              50
16         Map
17     SBISD EXHIBIT NO. 7                              53
           Map
18
       SBISD EXHIBIT NO. 8                              65
19         Notice of Trustee Election
20     SBISD EXHIBIT NO. 9                              70
           Spring Branch ISD 10-Year Per Student
21     Cost General Fund
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                    CHRISTINE PORTER,
 2   having been first duly sworn, testified as follows:
 3                 E X A M I N A T I O N
 4   BY MR. ABRAMS:
 5       Q.   Good morning.
 6       A.   Good morning.
 7       Q.   Would you please state your name?
 8       A.   Christine Porter.
 9       Q.   Ms. Porter, my name is Barry Abrams.  I'm a
10   lawyer representing Virginia Elizondo in a lawsuit
11   against the Spring Branch Independent School District
12   and its board members in their official capacities.
13                 Do you understand that?
14       A.   Yes.
15       Q.   What do you do for a living?
16       A.   I am the chief financial officer for Spring
17   Branch ISD currently.  I've actually been in school
18   finance in a few different school districts for the
19   past 30 years.
20       Q.   And at Spring Branch, what does that entail?
21       A.   It entails primarily handling all financial
22   aspects of the district, the collection, the expending
23   of all dollars.
24                 And in that role, I oversee finance, tax
25   office, purchasing, child nutrition, and federal
```

```
 1    funds.  I also have the role of being the election
 2    official for the district.
 3         Q.   Do you understand that we're here today for
 4    you to provide sworn testimony that can be used in the
 5    lawsuit?
 6              The number is 4:21-CV-01997.  It's
 7    titled Virginia Elizondo versus spring Branch
 8    Independent School District and it's pending in the
 9    United States District Court for the Southern District
10    of Texas Houston Division.
11              Do you understand that's why we're here?
12         A.   Yes, I do.
13         Q.   If I refer to that proceeding as "the
14    lawsuit," will you know what I'm talking about?
15         A.   Yes.
16         Q.   What's your understanding about the basis for
17    the lawsuit?
18         A.   My understanding is that there is a feeling
19    by Virginia but I believe representing a group of
20    people who feel underrepresented specifically on the
21    board of trustees and within the dealings of the
22    school district.
23         Q.   Do you understand that the lawsuit is being
24    brought under what's called the Federal Voting Rights
25    Act?
```

1      A.   Yes.

2      Q.   Do you understand that the lawsuit contests

3  whether the district's system of electing its trustees

4  at large improperly dilutes the voting strength of

5  certain minorities in the district?

6      A.   That the lawsuit --

7      Q.   That claims that.

8      A.   Yes.  Uh-huh.

9      Q.   Let me hand you what's been marked as Exhibit

10  No. 1.  This is a copy of the deposition notice that

11  was originally issued for this to take place on

12  December the 20th.  We, by agreement with the

13  district's lawyer, reset it for today.

14             (Marked Porter Exhibit No. 1.)

15      Q.   (BY MR. ABRAMS)  Have you ever seen the

16  notice?

17      A.   Yes.

18      Q.   Do you understand that you're appearing today

19  as one of the representatives for the district that's

20  been designated to testify on the district's behalf

21  with regard to certain topics that are listed in the

22  notice?

23      A.   Yes, I do.

24      Q.   Who made the decision that you would appear

25  as a representative for the district?

```
 1        A.    I think -- I believe through conversations
 2   with the superintendent, our general counsel felt that
 3   I would be the one that could best answer certain of
 4   these questions.
 5        Q.    And who authorized you to appear today in the
 6   capacity as a representative for the district?
 7        A.    The superintendent.
 8        Q.    Who decided what topics you would be
 9   designated to testify about on behalf of the district?
10        A.    That was through discussion with our general
11   counsel.
12        Q.    What preparation have you made to appear
13   today as the corporate representative on the
14   district's behalf with respect to certain of the
15   topics that are listed in the notice?
16        A.    I read through the various topics and tried
17   to ensure that I understood what they meant, what was
18   being asked for, and then if I had certain documents
19   that I could review to make sure that -- or background
20   knowledge just to make sure I could have those facts
21   ready to talk about today.
22        Q.    Have you brought any documents with you here
23   today to assist you in testifying?
24        A.    No, I did not bring any documents.
25        Q.    Who did you speak with to prepare for your
```

1    deposition?

2        A.   Our general counsel.

3        Q.   **And beyond what you've described, have you**

4    **done anything else to prepare?**

5        A.   No.

6        Q.   **What documents did you review in preparation**

7    **for your deposition?**

8        A.   I reviewed legal -- our Spring Branch ISD's

9    legal policy.  I reviewed the election results for the

10   last 10 years.  I reviewed information concerning

11   early election sites as well as number of voters and

12   things that happen at them.

13            I reviewed the presentation that was

14   provided -- that was given by Thompson Horton back in

15   2020.  I didn't actually attend it, but I did review

16   the presentation as it's a public document.

17            I also just made sure I was

18   understanding what's happening with our current

19   election calendar to ensure that people were aware for

20   of the critical dates tied to this current year.

21            I also looked at financial information

22   because one of the topics is covering -- is asking

23   about some per student costs.  So I reviewed that.

24       Q.   **You mentioned a 2020 presentation by**

25   **Thompson & Horton.**

```
 1              Just for our record, Thompson & Horton
 2   is a law firm that has, for a number of years,
 3   represented the district, correct?
 4       A.   Correct.
 5       Q.   And in 2020, they made a presentation to the
 6   board about what that's relevant here?
 7       A.   They talked about the different types of
 8   electoral systems that are legal in the state of Texas
 9   for school districts and how if -- if the board of
10   trustees were considering making any changes, what
11   they would need to do in order to make those changes.
12       Q.   You also mentioned that you refreshed your
13   recollection about the critical dates for the 2022
14   board elections.
15              What are the critical dates for the 2022
16   board elections as you've defined the term "critical
17   dates"?
18       A.   Well, December 20 of 2021 was critical
19   because I had to post on our Web site information
20   about the upcoming election.
21              January 3 is when our office reopens and
22   people can pick up applications for -- to apply -- to
23   complete in order to run for the election.
24              They can start turning in those
25   applications on January 19 and they have until
```

1    5:00 p.m. on February 18 in order to turn in those.

2              Within that next week -- I don't have

3    the exact date for that off the top of my head --

4    they'll do the drawing for the order for the ballot

5    and as well as we have to get information -- we have

6    to tell the State that we are hosting an election.

7              So within about a week of that, we have

8    to let the State know that we're hosting the election.

9              Early elections start the last full week

10   in April with our election date being on April 7 --

11   excuse me -- May 7.  Sorry.

12       Q.   Thank you.

13            Who have you met with, other than

14   lawyers for the district, to prepare?

15       A.   I have -- I talked with the previous CFO just

16   to make sure I knew where files were like for the

17   previous election results.

18       Q.   Who was that person?

19       A.   That person is Karen Wilson.

20            I also talked -- we have a technology --

21   a person in technology who helps run the actual

22   equipment and so making sure, you know, my

23   understanding of what equipment is needed and that

24   type of thing, mainly in preparation for this next

25   election and then in response to some changes we're

1    going to make specifically on early election sites.

2        Q.   **What changes are anticipated on early**

3    **election sites?**

4        A.   We're adding an additional site up in the

5    northwest quadrant of the school district.

6    Previously, we actually had relatively low in

7    comparison to the entire election numbers of people

8    voting in the early election.

9              This last year, we actually had over

10   5,000 voters in the early election and feel that

11   another site is warranted to allow for that type of

12   count as well as ensuring that some of the -- some

13   concerns have been raised about whether or not we were

14   ensuring that everybody could get to all of the

15   locations easily enough.  And so we have a site now

16   that's on Gessner so it would allow for easy public

17   access.

18       Q.   **We'll touch on the early election sites that**

19   **the district historically has used a little later.**

20             **But is it fair to say that none of those**

21   **sites were located north of the northeast corner of**

22   **Hilshire Village?**

23       A.   Yes, that's correct.

24       Q.   **So none of the sites were located in the**

25   **election precinct that corresponds to the Northbrook**

1    election precinct, correct?

2        A.   Correct.

3        Q.   None of the sites were located within the

4    precinct that corresponds to the Landrum precinct,

5    correct?

6        A.   Correct.

7        Q.   None of the sites were located in the

8    precinct that corresponds to the Spring Woods election

9    precinct?

10       A.   I'm not for sure on their boundaries, but I

11   don't believe that's true.

12       Q.   You don't believe it's true or you do believe

13   it's true?

14       A.   I mean, I believe that's -- I believe it's a

15   true statement that it is not in the Spring Woods High

16   School.  I just don't know how far Spring Woods High

17   School...

18       Q.   Okay.  And is the same thing true with

19   respect to the Spring Oaks election precinct, that

20   there were no early voting sites located within the

21   Spring Oaks election precinct?

22       A.   Correct.

23       Q.   The only sites historically that Spring

24   Branch ISD has had for early voting in the recent past

25   and going back as far as I could see were located

1    within the Memorial Spring Branch and Spring Forest

2    election precincts, correct?

3         A.    That's correct.

4         Q.    Which of the lawyers for the district have

5    you met with in connection with preparation?

6         A.    I've met with -- oh, in preparation for the

7    deposition?

8         Q.    Yes, ma'am.

9         A.    Charles and Lucas and Audrey.

10        Q.    When did you meet with them?

11        A.    Yesterday as well as we had a conference call

12   last week.  And I met with Audrey in a -- probably a

13   few different times, I mean, you know, in the week

14   leading up to Christmas break.

15        Q.    All told, how much time have you devoted to

16   preparing to testify about the topics listed that

17   correspond to your testimony in the case?

18        A.    I would say about 20 hours.

19        Q.    To make this go as easily as possible, I

20   would like to have several agreements with you.  And

21   it's important that you understand the proceedings.

22              The lady who is seated to your left is

23   called a court reporter.  She is typing down word for

24   word my questions and your answers.  And my questions

25   and your answers will be typed up in a booklet called

1    a transcript and that testimony can be used in the

2    lawsuit.

3                    Do you understand that?

4        A.    Yes.

5        Q.    You've been doing a great job thus far, but

6    it's important that you continue to answer out loud

7    rather than relying on gestures such as nods of the

8    head or sounds like uh-huh or huh-uh, because those

9    are not things that can be easily taken down by the

10   court reporter.

11                   So will you continue to testify using

12   words and out loud?

13       A.    Yes.

14       Q.    As our court reporter mentioned before we

15   went on the record, it's very important that you and I

16   try to not talk over each other, that is, that we

17   speak one at a time, because it's very difficult for

18   the court reporter to untangle people talking over

19   each other.

20                   I promise you I will try very hard not

21   to cut you off when you're answering a question.  If I

22   do inadvertently, you just tell me and I'll stop.

23                   By the same token, I sometimes take a

24   while to get a question out.  So even if you think you

25   know where I'm going, if you'll give me the courtesy

1    of letting me finish my question before you start an

2    answer, our record will be more complete and our court

3    reporter will be much happier with us.

4                    Can you do that?

5        A.    Yes.

6        Q.    It's also very important that you understand

7    the questions that you're asked today because the

8    parties have a right to rely upon your testimony.

9                    And so I want you to tell me if I ask

10   you a question that I -- that you do not understand.

11   And I will promise you I will try to rephrase it in a

12   way that you do understand it.

13                   So will you tell me if you think you

14   don't understand a question?

15       A.    Yes, I will.

16       Q.    And may I fairly assume when you've answered

17   my questions that you understood them at the time?

18       A.    Yes.

19       Q.    We'll probably break at least once an hour.

20   But in any event, if you need a make at some other

21   time, if you'll simply let me know, I'll be happy to

22   accommodate you.  Okay?

23       A.    Okay.

24       Q.    We've already talked about the fact I'm going

25   to use the shorthand expression "lawsuit" to refer to

1    the legal proceeding.

2              I don't know that we'll refer very often

3    to the plaintiff, Virginia Elizondo.  But if so, if I

4    refer to "the plaintiff" or "Ms. Elizondo," will you

5    know who I'm talking about?

6         A.   Uh-huh.  Yes.

7         Q.   I will variously refer to the Spring Branch

8    Independent School District as "the district" or

9    "SBISD," and we'll know what we we're talking about,

10   your employer?

11        A.   Yes.  Yes.

12        Q.   Similarly, from time to time there will be

13   questions about the Spring Branch Independent School

14   District board of trustees.  I'll probably shorthand

15   that to refer to simply "the board."

16             If I refer to "the board," will you know

17   that I'm talking about the board of trustees?

18        A.   Yes.

19        Q.   I'm going to spend a moment or two just on

20   your personal background.

21             Where do you reside?

22        A.   I reside at -- in Spring Branch ISD at 1507

23   Shady Villa Manor, Houston, Texas 77055.

24        Q.   How long have you been a district resident?

25        A.   Five months.

1    Q.    Where did you live before that?

2    A.    I lived up in Spring for 21 years.

3    Q.    Where were you born and raised?

4    A.    I'm a military brat.  I was born in

5    California.  My dad was stationed out there.  Mainly

6    grew up, though, on the East Coast in Virginia, North

7    Carolina, and South Carolina.

8                Graduated high school in 1986, and then

9    we all moved to Texas.  Dad retired and went to SMU

10   and became -- got his master's of divinity and became

11   a Methodist minister in the Central Conference.

12               So we're all in Texas now, but I would

13   say pretty much I grew up on the East Coast.

14   Q.    You mentioned that you graduated from high

15   school in 1986.

16               What high school was that?

17   A.    Buford Academy in Buford, South Carolina.

18   Q.    After high school, did you then go on to

19   college?

20   A.    I did.  I went to Texas A&M University in

21   College Station, Texas.  Graduated in 1990 with a

22   degree in accounting.

23   Q.    Could you give me a horseback view of your

24   employment experience after graduating from A&M?

25   A.    Sure.  I started off as an internal auditor

```
1    at First Bank of Texas.  After doing that for about a

2    year and a half.  As they got taken over by the Feds

3    by the second time, I realized it was probably time to

4    move on.

5              I actually responded to -- you know,

6    back then, you can used to look at newspaper articles,

7    you know, the classifieds and circled.

8              So I responded to a job application at

9    955 Campbell Road, not really knowing what I was

10   applying for.

11             And it was Spring Branch ISD.  So I

12   started here -- I'll call myself a baby accountant.

13   And I was here for 5 years.

14             When I left, I was the budget manager.

15   I went to Tomball ISD.  Was the business manager there

16   for 3 years.

17             And then went to Spring ISD.  Started

18   off as the controller.  And when I left there, I was

19   the CFO.  And then came back to Spring Branch.  After

20   a little break came back to Spring Branch and was the

21   payroll manager, the tax assessor, and then the CFO a

22   year and a half ago.

23      Q.   Did any of the school districts you worked

24   for, before you came back to Spring Branch, elect any

25   of their trustees from single-member districts?
```

```
1        A.   No.
2        Q.   Do you have any personal experience working
3    for school districts where trustees have been elected
4    from single-member districts?
5        A.   No, I do not.
6        Q.   Have you ever personally been a party to a
7    lawsuit, that is, sued somebody or been sued?
8        A.   No.
9        Q.   You understand you're not a party to this
10   lawsuit?
11       A.   Yeah, I do.
12       Q.   You're here merely as a witness and you're
13   here merely as a witness on behalf of the district.
14       A.   I do.
15       Q.   Okay.
16       A.   I do.
17       Q.   Have you ever been through this process of
18   being deposed before?
19       A.   No.
20       Q.   Have you ever gone through the process of
21   testifying in some other setting before?
22       A.   Yes.
23       Q.   If you would, tell me about that prior
24   testifying experience.
25       A.   It was a -- a friend of mine had been accused
```

```
 1   of an improper relationship with a student, and so I
 2   was a character witness on his behalf.
 3        Q.   Are there any other occasions where you have
 4   testified other than that one instance?
 5        A.   No.
 6        Q.   Do you have any professional licenses or
 7   certifications?
 8        A.   I do.  I have a certified public accountancy
 9   certificate.
10        Q.   From the State of Texas?
11        A.   From the State of Texas, yes.
12        Q.   And when -- when did you obtain your
13   certification?
14        A.   1992 or '3.
15        Q.   Have you ever been charged and convicted of
16   any criminal offense?
17        A.   No.
18        Q.   Are you familiar with Ms. Elizondo?
19        A.   Yes.
20        Q.   How?
21        A.   She led a committee that I was a part of
22   during the -- let me get my years straight -- the
23   '20-'21 year, the visioning committee that focused on
24   what a Spring Branch ISD graduate would look like, and
25   not just an official graduate but as they move between
```

```
 1   elementary to middle and middle to high school.
 2               I also -- she also ran for the school
 3   board in 2021.
 4       Q.   Are you familiar with her educational
 5   background?
 6       A.   I believe she has lots of educational
 7   background.  I remember being familiar and have -- you
 8   know, seeing that on the application.  I believe she
 9   has at least a master's, if I'm remembering correctly.
10       Q.   And if I understood your prior testimony,
11   you're familiar with at least some of her involvement
12   in district activities because she headed a committee
13   that you participated in?
14       A.   Yes.
15       Q.   Do you recall the title of the committee or
16   whatever the topic was?
17       A.   I thought it was the visioning committee.
18       Q.   Does the district agree that Ms. Elizondo met
19   all the legal requirements to be eligible for election
20   to the district board when she ran?
21       A.   Yes.
22       Q.   Let's now turn to some of the issues in the
23   lawsuit for which you've been designated as a
24   representative.
25               Has the racial and ethnic composition of
```

1    the voters in the district changed over time?

2        A.   Yes.

3        Q.   How has it changed?

4        A.   I believe, without knowing exact numbers,

5    that the -- we've become a much more diverse school

6    district, and the population of the school district is

7    reflecting -- is reflected in that.  The minority

8    groups are larger than they've been, you know,

9    30 years ago.

10       Q.   Do you agree that when the district was

11   formed and for a number of years its population was

12   virtually all white?

13       A.   Yes.

14       Q.   And do you agree that in the -- let me back

15   up and say when I use the term "you," you're here in a

16   representative capacity.  So we're going to be talking

17   about the district.

18       A.   Right.

19       Q.   It will be a little less cumbersome if I can

20   still refer to you knowing you're speaking for the

21   district than always saying does the district agree.

22       A.   Okay.

23       Q.   Are you okay with that convention?

24       A.   Yes, as long as my response looks like I'm

25   responding on behalf of the district.

1       Q.    All right.  I mean, I can do it either way.

2       A.    No, it's fine.

3       Q.    Do you -- does the district agree that in the

4  past 20 years the racial and ethnic composition of the

5  population in the district has changed significantly?

6       A.    Yes.

7       Q.    Does the district agree that what was once a

8  district in which a majority of the voters and

9  students were white is a now a district where the

10  Hispanic population is greater than the white

11  population and the percentage of Hispanic students

12  more than twice the percentage of white students?

13      A.    Yes.

14      Q.    Does the district agree that it is now a

15  majority minority district in terms of the total

16  population in student population?

17      A.    I can attest to the student population as

18  yes.

19      Q.    With respect to the total population, does

20  the district agree that the total population of the

21  district is now majority minority?

22      A.    I just haven't seen numbers to that to know

23  that for sure.  I haven't seen recent census numbers,

24  but I know we -- we believe that and act in that

25  manner.

1    Q.   The district's position is without regard to

2    the specifics, it acknowledges its belief that it is a

3    majority minority district in terms of total

4    population at this point in time?

5    A.   Yes.

6    Q.   Let me hand you what's been marked as

7    Exhibit 2.  This is a screenshot from the district's

8    Web site.

9              (Marked Porter Exhibit No. 2.)

10   Q.   (BY MR. ABRAMS)  Are you familiar with --

11   A.   Yes.

12   Q.   -- this page from the district's Web site?

13   A.   (Nodding head.)

14   Q.   The district's Web site purports to break

15   down the demographics of its students.  And is it the

16   district's position that the little graph on the

17   right-hand side properly describes the racial and

18   ethnic composition of its student body --

19   A.   Yes.

20   Q.   -- as of 2021?

21   A.   Yes.

22   Q.   Exhibit 2 shows that 59 percent of the

23   district's students are Hispanic, 27 percent of its

24   students are white, 7 percent of its students are

25   Asian, and 5 percent of its students are

1    African-American, correct?

2        A.    Correct.

3        Q.    Exhibit 2 also reflects that 58 percent of

4    the district students are economically disadvantaged.

5                Is that correct?

6        A.    Correct.

7        Q.    What does that term mean in the way that the

8    district uses it on its Web site?

9        A.    It means that 58 percent of the students have

10   completed information concerning free and reduced

11   lunch applications and have been found to be -- to be

12   eligible for free or reduced meals through our lunch

13   program.

14       Q.    As a general proposition, what is the

15   standard financially that a some -- that a student

16   needs to meet to be eligible for the free and reduced

17   lunch program which qualifies it as an economically

18   disadvantaged student?

19       A.    You mean what's the level of income in the

20   family?

21       Q.    Yes, ma'am.

22       A.    I don't have that -- I don't know that number

23   off the top of my head.

24       Q.    I noticed that the infographic, Exhibit 2,

25   says that 59 percent of the students are Hispanic and

```
 1    58 percent of the total student body are economically
 2    disadvantaged.
 3                    Does the district know what the
 4    correlation is between the race and ethnicity of the
 5    economically disadvantaged students in that status?
 6         A.    That information can be pulled.  I don't know
 7    that.
 8         Q.    Does the district acknowledge that a greater
 9    proportion of its minority students are economically
10    disadvantaged than its white students?
11         A.    I -- I believe that's a trend that can be
12    deduced from the two graphs.
13         Q.    I'm not clear about your answer.
14                    Are you telling me that's something that
15    one could determine or that you think that that is the
16    case based upon the information available to you?
17         A.    I think based on seeing these percentages,
18    that's a fair assumption, but I would want to verify
19    that data.
20         Q.    We talked earlier about how the demographics
21    of the district changed over time.
22                    I want to now ask you:  Do you -- does
23    the district agree that in the past 20 years the
24    socioeconomic background of the district's residents
25    and students has likewise changed?
```

```
 1        A.    Yes.
 2        Q.    How has it changed?
 3        A.    I believe the percentage used to be less than
 4   50 percent and now it is over 50 percent.
 5        Q.    What percentage?
 6        A.    The percentage of economically disadvantaged
 7   students.
 8        Q.    What proportion of the students in the
 9   district now attend what are called Title I schools?
10        A.    I wish I would know that percentage off the
11   top of my head.  I would have to compare two different
12   lists, a list of students by campus and highlight the
13   Title I campuses.
14        Q.    What's your best estimate -- what's the
15   district's best estimate realizing that's subject to
16   mathematical verification?
17        A.    I would say at least 50 percent.
18        Q.    What is Title I?
19        A.    Title I is the short-term version of monies
20   we receive directly from -- or through -- through the
21   State of Texas, but from the federal government that
22   are based on the number of students at campuses that
23   are considered economically disadvantaged.
24              And so it's supplemental dollars we
25   receive that gets -- that is provided to campuses to
```

1    spend at their discretion to focus on the needs of
2    their campuses.
3         Q.   If I'm following you, then, Title I funds are
4    federal funds that are allocated through the State
5    then to the district and then to individual campuses.
6              Is that a correct generalization?
7         A.   It's more of a passthrough --
8         Q.   Okay.
9         A.   -- of the state.
10             They don't really allocate it.  The
11   federal government determines that a school district
12   gets X amount based on their number of students.
13        Q.   Does the district agree that all of the
14   current members of its board are white or -- or
15   Caucasian?
16        A.   Yes.
17        Q.   Does the district agree that it has no record
18   that any minority candidate has ever been elected to
19   serve on the Spring Branch Independent School District
20   board?
21        A.   Yes.
22        Q.   What investigation or search of district
23   records has been done to confirm that fact?
24        A.   I looked at the election results.  So I could
25   only base it on surnames, I mean, some recent

1    surnames, obviously Chris Gonzalez, if you saw that,
2    and didn't know otherwise.
3              But no other surnames indicated such.
4    While I didn't personally do it, I understand that a
5    review of pictures of the board has been done and
6    based on those review and on the pictures that could
7    be found, nobody of it -- nobody of color has been
8    elected.
9        Q.   Does the district agree that in every trustee
10   election for the past 10 years the candidate elected
11   was white?
12       A.   Yes.
13       Q.   And as we confirmed a moment ago, a hundred
14   percent of the current board members are white?
15       A.   Yes.
16       Q.   Does the district agree that no Hispanic or
17   other minority candidate has been elected to the board
18   in the past 10 years even though the percentage of
19   both the minority student and adult populations is
20   greater than the percentage of white population and
21   students in the district?
22       A.   Yes.
23       Q.   Does the district agree that every minority
24   candidate for the board during the period from 2010 to
25   2021 was defeated by a white candidate?

```
1        A.    Yes.
2                    (Marked Porter Exhibit No. 3.)
3        Q.    (BY MR. ABRAMS)   Let me hand you what's been
4   marked as Exhibit 3.   This is a document the district
5   has produced titled "2010 to 2021 List/Names of All
6   Candidates," correct?
7        A.    Correct.
8        Q.    Does the district acknowledge that in 2015
9   Virginia Elizondo was a minority candidate for the
10  board?
11       A.    Yes.
12       Q.    And in 2018, Noel Lezama was a minority
13  candidate for the board?
14       A.    Yes.
15       Q.    And in 2019, David Lopez was a minority
16  candidate for the board?
17       A.    Yes.
18       Q.    And, again, in 2021, Virginia Elizondo was a
19  minority candidate for the board?
20       A.    Yes.
21       Q.    And in each of the elections in which they
22  ran, the white candidate defeated the minority
23  candidate, correct?
24       A.    Yes.
25       Q.    Does the district agree that there is
```

```
1    statistically significant evidence of racially or
2    ethnically polarized voting in the district's board
3    elections for the period 2015 to 2021?
4         A.   Can you define "racial polarization"?
5         Q.   Yes.
6              By the term "racially polarized," I mean
7    that there's a consistent relationship between the
8    race or ethnicity of the voter and the way the voter
9    votes and that white and minority voters vote
10   differently.
11        A.   That is not data we obtain on our voters, so
12   I would expect that an expert might be able to get
13   that data.
14        Q.   In the lawsuit, the district filed an answer.
15             Do you understand that's part of the
16   procedure?
17        A.   Yes.
18        Q.   And in that answer, the district took the
19   position that as a matter of fact there is no such
20   evidence of racially polarized voting.
21             What investigation had the district
22   conducted before filing an answer in the lawsuit
23   denying that there's racially polarized voting in the
24   district's board elections for the past 6 years?
25        A.   The district itself didn't do any actual
```

1    investigation of it.  Again, because we don't track,

2    we don't obtain that data of the race or ethnicity of

3    the actual voters, that information would have come

4    through discussion with the experts.

5        Q.    Before the district filed a document with the

6    federal court denying that there is racially or

7    ethnically polarized voting in its board

8    investigations, what investigation had the district

9    conducted to corroborate that position?

10       A.    None.

11       Q.    Has the district ever investigated or does it

12   have any knowledge about whether or not racially or

13   ethnically polarized voting exists in the elections of

14   the municipal governments that make up the district?

15       A.    We're not aware of any.

16       Q.    Are you telling me you're not aware of any

17   investigation the district has ever undertaken to

18   determine whether or not the voting in the cities that

19   make up the district, which are Hunters Creek Village,

20   Piney Point Village, Bunker Hill Village, Spring

21   Valley Village, Hilshire Village, and the City of

22   Houston, involve racially polarized voting?

23       A.    We don't know anything about the data that's

24   been happening in those sites.

25       Q.    And the district has not conducted any

1   investigation to determine whether or not the voting

2   in any of those jurisdictions is racially polarized or

3   ethnically polarized, correct?

4       A.   Correct.

5       Q.   Given that the district had not conducted any

6   investigation about whether or not the voting in its

7   trustee elections was racially or ethnically polarized

8   when it denied that fact in the federal lawsuit, what

9   was the basis for making such a denial?

10      A.   We did not have evidence to the contrary.  We

11  had investigated it, but we had no evidence.

12      Q.   Does the district agree that white

13  non-Hispanics in the district vote sufficiently as a

14  block to enable them to defeat minority voters'

15  preferred candidates of choice in the various trustee

16  elections?

17      A.   I believe that's something that an expert can

18  look at the data.  And the district has never looked

19  at the voting population by race to be able to make

20  that deduction ourselves.

21      Q.   So does the district agree that when it filed

22  a document in the federal lawsuit denying that white

23  non-Hispanics in the district vote sufficiently as a

24  block to enable them to defeat minority voters'

25  preferred candidates, it had no evidence to support

```
 1   that denial?
 2        A.   Or evidence against that denial, but correct.
 3        Q.   And before making that denial in the federal
 4   lawsuit, the district did not undertake an
 5   investigation to determine whether or not the
 6   statement was true, correct?
 7        A.   Correct.
 8        Q.   Does the district agree that the geographic
 9   concentration of Hispanics in the district is large
10   enough to constitute a majority of the voting age
11   population in one or more single-member districts if
12   there was a seven-member election plan adopted or
13   ordered by the court?
14        A.   It's our understanding that that can happen,
15   that -- that they can make those single-member
16   districts.
17        Q.   What is the district's position about the
18   number of single-membered districts that could be
19   formed in which the geographic concentration of
20   Hispanics would constitute a majority of the voting
21   age population?
22        A.   I've heard that three, up to three could be
23   established.
24        Q.   Who has provided the factual information to
25   the district that as many as three single-membered
```

```
 1   districts could be drawn in which a majority of the
 2   voting age population would be Hispanic?
 3        A.   That was based on some meetings we had with
 4   legal counsel at the time.
 5        Q.   Does the district possess any written
 6   investigation or report confirming that the geographic
 7   concentration of Hispanics in the district is
 8   sufficient to constitute a majority of the voting age
 9   population in as many as three single-membered
10   districts if a seven-member plan were adopted?
11        A.   We don't maintain documents.  Those were
12   mainly talked about during discussions with our legal
13   counsel.
14        Q.   Setting aside communications with legal
15   counsel, which I presume and understand the district
16   will assert privilege over, are you aware of any other
17   sources of information confirming that as many as
18   three single-membered districts could be drawn in
19   Spring Branch in which the concentration of voting age
20   Hispanics would be a majority?
21        A.   No.
22        Q.   Does the district agree that single-member
23   district forms of representation can enhance the
24   proportional representation of minority candidates?
25        A.   The district understands that it is within --
```

```
1   it is legal within the electoral system to use that
2   and it does provide an opportunity for participation
3   in some areas of the district that have lower
4   participation.
5       Q.   Isn't the district's position that adoption
6   of a single-member district form of representation can
7   result in enhanced representation of the minority
8   community on its board?
9       A.   The board believes they represent the entire
10  district already, so it would be more a focus on
11  ensuring that they have participation from the areas
12  of those school districts, the area of the school
13  district.
14              MR. ABRAMS:   Object to the answer as
15  nonresponsive.
16      Q.   (BY MR. ABRAMS)  My question is whether or not
17  the district has a position on whether single member
18  district forms of representation can have the effect
19  of enhancing the representation of minority candidates
20  on the district's board?
21              MR. CRAWFORD:   Objection; form.
22      A.   I have not heard the board discuss anything
23  like that.
24      Q.   (BY MR. ABRAMS)  So as we sit here today, is
25  it fair to say the district has no position on whether
```

1    single-membered district forms of representation can,

2    in fact, enhance proportional representation of

3    minority candidates on the board?

4              MR. CRAWFORD:  Objection; form.

5         A.   They stand that they represent the entire

6    district as it is.  I know that's not answering your

7    question.

8         Q.   (BY MR. ABRAMS)  Has the district investigated

9    whether or not single-membered district forms of

10   representation can enhance proportional representation

11   of minority individuals on the board?

12        A.   To the extent that that is a legal way to

13   hold your electoral system, that investigation -- or

14   requests for information from legal counsel has

15   happened, which led to that presentation in January of

16   2020.

17        Q.   In connection with the lawsuit and the

18   district's answer that it filed in the lawsuit and

19   prior to filing that answer, had the district

20   investigated whether adopting a single member form of

21   representation could enhance the representation of

22   minority residents on the board?

23        A.   I'm not aware of any.

24        Q.   Does the district agree that single-membered

25   district representation can increase the likelihood

```
 1   that minority candidates will run for office on the
 2   board?
 3        A.   It can increase the likelihood that they will
 4   run for the board.
 5        Q.   Does the district agree that the
 6   single-member district representation can produce
 7   policies that are more responsive to the preferences
 8   of minority voters than at-large systems do?
 9                  MR. CRAWFORD:  Objection; form.
10        A.   I know the board feels that they represent
11   the entire district.
12                  MR. ABRAMS:  Objection to the answer as
13   nonresponsive.
14        Q.   (BY MR. ABRAMS)  My question does not concern
15   the district's current plan.  My question concerns
16   whether the district has a position on the issue of
17   single-member representation producing policies that
18   are even more responsive to the preferences of
19   minority voters than is the case under the current
20   at-large system.
21                  Does the district have a position on that?
22                  MR. CRAWFORD:  Objection; form.
23        A.   No, we don't have a position on that.
24        Q.   (BY MR. ABRAMS)  Does the district agree that
25   the racial and ethnic demographics in the so-called
```

1    Memorial Villages are substantially different than the

2    racial and ethnic composition of the areas outside the

3    villages located north of Interstate Highway 10?

4         A.   Yes.

5         Q.   I'm going to probably refer to Interstate

6    Highway 10 as "I-10" or the "Katy Freeway."

7                   If I use those expressions, will you

8    know what I'm talking about?

9         A.   Yes.

10        Q.   Probably I-10 is the more current version.  I

11   group up in an era where it was the Katy Freeway.  But

12   you know -- either use you'll know what I'm talking

13   about?

14        A.   Yes.

15        Q.   Okay.

16                   (Marked Porter Exhibit No. 4.)

17        Q.   (BY MR. ABRAMS)  Let me hand you what's been

18   marked as Exhibit 4.

19             Do you recognize that as a map depicting the

20   boundaries of what I call the so-called Memorial

21   Villages, which encompasses Bunker Hill Village, Piney

22   Point Village, Hunters Creek Village, Hedwig Village,

23   Spring Valley Village, and Hilshire Village?

24        A.   Yes.

25        Q.   And I'm not holding you to the standards of a

1    demographer, but do the boundaries appear to be --
2    correspond for what you understand and the district
3    understands the boundaries of those villages are?
4          A.    Yes.
5          Q.    Does the district acknowledge that the
6    non-Hispanic white populations in the Memorial
7    Villages range from 94 plus percent to 67 percent of
8    those populations?
9          A.    Can you repeat that question?
10         Q.    Yes, ma'am.
11               Does the district acknowledge that the
12   non-Hispanic white populations of the Memorial
13   Villages vary from 94 plus percent to 67 percent of
14   the total populations in those communities?
15         A.    Yes.
16         Q.    Does the district acknowledge that the
17   villages report very small Hispanic and black
18   populations?
19         A.    Yes.
20         Q.    Does the district acknowledge that the racial
21   and ethnic segregation in the villages corresponds to
22   the racial and ethnic segregation evident in the
23   student populations on the north and south sides of
24   the freeway?
25               MR. CRAWFORD:  Objection; form.

```
1        A.   I'm not sure about the word "segregation" and
2   the connotation with that.
3        Q.   (BY MR. ABRAMS)  Let me -- let me rephrase the
4   question.
5             Does the district acknowledge that the racial
6   and ethnic demographics in the villages correspond to
7   the racial and ethnic demographics evident in the
8   student populations in the district's north and
9   south-side schools?
10        A.   I'm going to try to reword the question.
11        Q.   Yes, ma'am.
12        A.   Tell me if I'm correct.
13        Q.   Yes, ma'am.
14        A.   You're asking if the racial breakdown of the
15   villages represents the entire school district?
16        Q.   No, ma'am.
17        A.   I'm sorry.
18        Q.   Let me -- let me take another crack at it.
19        A.   I'm sorry.
20        Q.   I think we're in agreement, and the district
21   acknowledges, that the population of the Memorial
22   Villages is largely white and nonminority, correct?
23        A.   Correct.
24        Q.   It is also the case, isn't it -- isn't it
25   that the populations of the schools on the south side
```

1    of I-10 are largely white and not minority?

2        A.    I believe that to be accurate, but I would

3    want to see the data to verify that.

4        Q.    While the district has maintained its current

5    at-large system for electing school board trustees,

6    has it ever investigated why residential demographics

7    of the Memorial Villages are what they are?

8        A.    No.

9        Q.    Has the district ever investigated how the

10   racial and ethnic demographics came about in the

11   district as evidenced by the demographics of the

12   Memorial Villages?

13       A.    No.

14       Q.    Has the district ever investigated how the

15   racial and ethnic demographics on the north side of

16   I-10 have come about over time?

17       A.    No.

18       Q.    Has the district ever investigated whether

19   the racial and ethnic demographics in the district has

20   negatively affected the delivery of educational

21   services to its students?

22       A.    Can -- will you repeat that?

23       Q.    Sure.  Has the district ever investigated

24   whether the racial and ethnic demographics in the

25   district, which I'll oversimplify to mean the

1   **south-side schools are largely white and many, if not**

2   **all of the north-side schools are largely minority,**

3   **how that demographic breakdown affects the delivery of**

4   **educational services to the students?**

5       A.   We focus more -- not based on racial.  We

6   focus more on economically disadvantaged and the needs

7   of specific students versus just whether or not

8   there's Hispanics in a campus or not.

9           Economically disadvantaged often brings

10  other opportunities for need for certain services,

11  additional services, and supports.  So that would be

12  more the focus on the educational delivery.

13      **Q.   If I'm following you, then, the district has**

14  **had a focus on the impact of socioeconomic factors on**

15  **the delivery of educational services to its students**

16  **rather than the impact of the racial and ethnic**

17  **demographics of the district.**

18              **Is that what you're saying?**

19      A.   We've seen the effect of that.  When you say

20  "investigation," we haven't -- I don't know the

21  right -- I apologize -- into why that is, we just

22  recognize that the students often need additional

23  services and support when they're lower socioeconomic.

24      **Q.   We're coming up on an hour.  Would you like a**

25  **break or you want to keep trucking?  I'm at your**

1    disposal.  I told you we would break around every hour

2    and it looks like we're close to an hour.  So if you

3    would like to take a short break, we can.  If you

4    don't, we'll keep trucking.

5        A.   Let's take a short break.  That would be

6    great.

7        Q.   Very good.

8        A.   Thanks.

9        Q.   Uh-huh.

10             (Break from 10:24 a.m. to 10:32 a.m.)

11        Q.   (BY MR. ABRAMS)  Ms. Porter, the ethnic and

12   racial makeup of the students in the District 7

13   election precincts is heavily segregated, right?

14        A.   Heavily diverse?  I just -- I apologize.

15        Q.   The racial and ethnic composition is

16   concentrated and varies among the districts?

17        A.   Correct.

18        Q.   Let me hand you what's been marked as

19   Exhibit 5.  That was produced by the district as SBISD

20   No. 1.

21             (Marked Porter Exhibit No. 5.)

22        Q.   (BY MR. ABRAMS)  Do you recognize that as a

23   map from the district's Web site that depicts both the

24   attendant zones for the middle schools in the district

25   and because those attendant zones are used as the

1   election precincts -- the election precincts for the

2   district?

3        A.   Yes.

4        Q.   Does the district agree that four of the

5   seven districts shown, namely the Landrum, Northbrook,

6   Spring Woods, and Spring Oaks Middle School areas and

7   precincts, are overwhelmingly comprised of Hispanic

8   students?

9        A.   Yes.

10       Q.   Based on my math, there's an average of

11  87 percent of the students in those election precincts

12  and enrollment districts are Hispanic.

13            Does that figure sound about right?

14       A.   Yes, that sounds about right.

15       Q.   In the remaining three election or enrollment

16  districts, the Memorial, Spring Branch, and Spring

17  Forest precincts, the student body is somewhere

18  between 42 percent and 52 percent white, correct?

19       A.   That sounds correct.

20       Q.   One of the topics that you've been designated

21  to testify about is the current ethnic and racial

22  background of the citizenship voting age population

23  voters in the district.

24            Do you agree that the ethnic and racial

25  background of the voting age population of the voters

1    in the district more or less tracks the ethnic and

2    racial background of its students?

3        A.    I have not seen recent -- any recent census

4    numbers, but I would believe that it follows the

5    breakdown of the students.

6        Q.    And -- and based upon the investigation

7    that's been conducted by the district to date, at

8    least three single-member districts could be drawn in

9    the district in which the Hispanic voting age

10   population would constitute a majority, correct?

11       A.    Yes.

12       Q.    How and when did the district draw the

13   current boundaries of its election precincts, which

14   happen to be at school enrollment districts?

15       A.    In 2011, I believe that was when the

16   Legislature passed a law stating that we, as a

17   district, host our own elections if we went into a

18   contract with either a county or a city, host our own

19   election in May.

20              Prior to that, 2011 and prior, we

21   actually had the precincts of our elementary schools.

22   So in -- when the law passed, we had discussions with

23   the county and the county said that they would be

24   willing to partner with us, but would only agree to do

25   elections every other year.

1    And I believe it would be the even years

2    in the sense that when they do their even year

3    elections in November, there's lots of runoffs that

4    happen in the spring that would make it too difficult

5    for them to host our elections separately.

6    So we -- instead we didn't want to -- at

7    the time didn't want to change our setup of our

8    staggered terms of every 3 years because we would have

9    had to switch to every 4 years for -- if we had gone

10   with the county.

11   So we were able to partner with Piney

12   Point, who we currently have a contract with, because

13   they used one of our far east elementary schools as a

14   site for their elections already prior to that.

15   And by taking over the election process

16   ourselves, we had to look at the administration and

17   financial implications of such.

18   And so having seven election sites would

19   be easier to handle both administratively and

20   financially because of the equipment and the people

21   involved than 26 sites of the elementary school.

22   So that was when that decision made

23   for -- and it occurred in the 2012 election the first

24   time.

25   **Q.   Do you agree that with the exception of the**

1    Spring Branch Middle School and the Spring Forest

2    Middle School election precincts and enrollment

3    boundaries, those areas are divided between schools

4    located on the north and south sides of I-10?

5         A.   Yes.

6         Q.   What's the rationale for having election

7    precincts and middle school boundaries that zone

8    voters and students from the north side of I-10 to the

9    south side of I-10 for the Spring Branch and Spring

10   Forest Middle Schools?

11        A.   Using them for election sites -- I mean, for

12   election precincts?

13        Q.   Yeah.  It's kind of intertwined.  The

14   district elected chose to use its middle school

15   enrollment districts --

16        A.   Uh-huh.

17        Q.   -- as its election districts?

18        A.   Yes.

19        Q.   And so I'm not trying to take you into the

20   school enrollment question, but since the district

21   chose to use its middle school enrollment districts as

22   its election precincts, my question is:  What's the

23   rationale for having precincts in -- for Spring Branch

24   and Spring Forest that span I-10?

25        A.   Those enrollment boundaries were set many

1   years ago.  So I don't know the rationale why there

2   was north and south, but primarily it has to do with

3   ensuring that you -- the schools could handle the

4   number of students.

5           I've seen in other districts' enrollment

6   boundaries change as a school may increase, not be

7   able to handle their growth.

8           So it's possible changes could be made.

9   But as we are pretty steady in our growth of students,

10  we haven't had to have any type of change to our

11  middle schools or any of our enrollment zones, for

12  that matter.

13      **Q.   When did the district adopt the middle school**

14  **enrollment zones that are shown on Exhibit 5?**

15      A.   When the last middle school was built, which

16  would have been -- I believe is Northbrook Middle.  So

17  I would say at least the mid-'80s.

18      **Q.   So the boundaries of the election precincts**

19  **and the boundaries of the middle school enrollment**

20  **zones have been in place since sometime in the 1980s,**

21  **correct?**

22      A.   The fact that they're the same, that didn't

23  happen until 2012, but yes.

24      **Q.   Let me clarify that.**

25          **In 2012, the district elect -- chose to**

1   use its middle school enrollment zones as its election
2   precincts, correct?
3        A.   Yes.
4        Q.   And the district's decision to set the
5   boundaries of its middle school enrollment zones dates
6   back to the 1980s?
7        A.   Yes.
8                   (Marked Porter Exhibit No. 6.)
9        Q.   (BY MR. ABRAMS)  Let me hand you what's been
10   marked as Exhibit 6.
11        You recognize this as the enrollment zones
12   from the district's Web site for its high schools?
13        A.   Yes.
14        Q.   It follows the same general layout as
15   Exhibit 5 except this map, Exhibit 6, depicts the high
16   school enrollments or attendance zones?
17        A.   Yes.
18        Q.   And the same pattern holds true for the high
19   schools as is true for the middle schools, and that is
20   there are two enrollment zones where students on the
21   north side go to the south side, the Memorial and the
22   Stratford enrollment zones, correct?
23        A.   Correct.
24        Q.   And that mirrors the pattern for middle
25   schools where students on the north side of I-10 go to

1    Spring Branch Middle and students on the north side of
2    I-10 go to Spring Forest Middle, correct?
3         A.   Yes.
4         Q.   What is the racial and ethnic composition of
5    the students from the north side of I-10 that are
6    zoned to the south side middle schools and high
7    schools?
8         A.   I don't know that.  I would have to dive into
9    street addresses.
10        Q.   We earlier looked at Exhibit 4.  Would you
11   pull that back out just so you can refer to it when
12   you look at Exhibit 5?
13              Exhibit 4 depicts the boundaries of the
14   Memorial Villages north of I-10.
15              Do you see that?
16        A.   Yes.
17        Q.   Spring Valley Village and Hilshire Village?
18        A.   Uh-huh.
19        Q.   Is that a "yes"?
20        A.   Yes.
21        Q.   Thank you.
22              Can you confirm that with reference to
23   Exhibit 5 the areas of Spring Valley Village and
24   Hilshire Village are among the areas zoned from north
25   to south?

1          **Their students go to Spring Branch**
2   **Middle rather than to one of the north-side middle**
3   **schools?**
4        A.   Let me just verify.  Yes.  It looks like
5   Spring Valley Village and Hilshire Village all attend
6   Spring Branch Middle.
7        Q.   **And we earlier confirmed that the racial and**
8   **ethnic composition of Spring Valley Village and**
9   **Hilshire Village is majority -- substantially majority**
10  **white, correct?**
11       A.   Correct.
12       Q.   **From that, does it follow that the students**
13  **that are sent from the north side from Spring Valley**
14  **Village and Hilshire Village to the south side middle**
15  **school, Spring Branch Middle, are substantially white**
16  **students?**
17       A.   Yes.
18       Q.   **Do you happen to know anything about the**
19  **demographics of the area north of I-10 where the**
20  **Spring Forest Middle School students go from north to**
21  **south?**
22       A.   No, I don't.
23       Q.   **Isn't it the case that the demographics of**
24  **that subdivision likewise are largely white, with**
25  **white students going from north to south?**

```
 1        A.   I don't know that.

 2        Q.   You're not denying it, you just don't know?

 3        A.   I don't know.

 4                  (Marked Porter Exhibit No. 7.)

 5        Q.   (BY MR. ABRAMS)  Let me hand you what's been

 6   marked as Exhibit 7.

 7             Do you recognize that as the map from the

 8   district's Web site akin to Exhibits 5 and 6?  This

 9   one, Exhibit 7, depicts the enrollment zones for the

10   district's elementary schools.

11        A.   Yes.

12        Q.   And can you confirm that the same pattern or

13   a similar pattern holds true with respect to the

14   elementary schools that, with the exception of a

15   couple of schools, school enrollment boundaries are

16   divided between schools located on the north and south

17   side of I-10?

18        A.   Yes.

19        Q.   What is the racial and ethnic composition of

20   the students zoned from the north side of I-10 to

21   south-side schools?

22        A.   I believe there's more minorities.

23        Q.   Pardon me?

24        A.   I believe that it's a higher minority in

25   that -- in the schools that are on the north side.
```

```
 1     Q.   Right.

 2               With respect to Hunters Creek Elementary

 3     on the right side of Exhibit 7, if I'm interpreting

 4     these colors correctly, it looks like the area between

 5     Wirt and not quite up to Antoine is zoned for north to

 6     south?

 7     A.   Yes.

 8     Q.   Can you confirm that the racial and ethnic

 9     composition of the students zoned from north to south

10     there is largely white?

11     A.   I don't know that.  It is outside of Hilshire

12     Village, however.

13     Q.   Does the district contend that it is purely

14     coincidental that the vast majority of the voters and

15     students zoned from the north side of I-10 to the

16     south side of I-10 are white students from white

17     households?  For example, Spring Branch Middle School

18     Spring Forest Middle School, Memorial High School,

19     Stratford High School, Hunters Creek Elementary, and

20     Thornwood?

21               MR. CRAWFORD:  Objection; form.

22     A.   Yeah.

23     Q.   (BY MR. ABRAMS)  Is that just a coincidence

24     that the vast majority of the students and voters that

25     are moved from the north side to the south side for
```

1    those schools are white?

2        A.   Yes.

3        Q.   Does the district advance the theory that it

4    is a proponent of neighborhood schools?

5        A.   Yes.

6        Q.   Why, if the district advances the theory of

7    neighborhood schools, are students placed in

8    enrollment districts that take them to schools that

9    are physically farther from their home than schools

10   nearby their home?

11            MR. CRAWFORD:   Objection; form.

12       A.   When an elementary school is built, they

13   consider having students its being built for.   And

14   schools aren't built in these perfectly middle of

15   squares and divided out among the school district.

16            And so that very well could be the case,

17   that a person -- that a household could be zoned to a

18   school that's actually further away from a school that

19   could literally be right across the street.

20       Q.   (BY MR. ABRAMS)   I'm looking at Exhibit 5, the

21   election precinct map which corresponds to the middle

22   school attendance zone map.

23            Do you have that?

24       A.   I do.

25       Q.   Has the district ever taken into account the

1    racial, ethnic, and socioeconomic characteristics of
2    each of these election precincts and school attendance
3    zones?
4         A.   In what regard?  I mean, taken into account
5    as election zones?
6         Q.   And/or school enrollment zones, the fact that
7    their school enrollment zones where there are white
8    students on the north side of I-10 that could readily
9    be zoned to a school a stone's throw away but
10   nevertheless they're zoned to a white school south of
11   I-10?
12        A.   When these boundaries were established, I
13   believe it was based on how many students a school
14   could hold.
15        Q.   Have the boundaries of any election precinct
16   or school enrollment zone been the subject of
17   discussion with any of the municipalities in the
18   district?
19        A.   Not that I'm aware of.
20        Q.   Had the boundaries of any election precinct
21   or school enrollment zone been the subject of
22   discussion with any developers or builders within the
23   district?
24        A.   Not that I'm aware of.  In knowing my history
25   of working with school districts, when a developer is

```
 1   making decisions on where to build, they want to know
 2   the facts about what schools they would go to so that
 3   that's what they can start tabbing as they're
 4   building.
 5              So it's information they need.  So I
 6   imagine those discussions have happened as different
 7   areas have been built up just to make sure that
 8   they're -- they know that.
 9        Q.   Have the boundaries of any election precinct
10   or school enrollment zone been the subject of
11   discussion with any homeowners associations or
12   subdivisions or neighborhood groups?
13        A.   Not that I'm aware of.
14        Q.   Has the district ever investigated the extent
15   to which the ethnic and racial demographics that
16   differ between the north and south sides of I-10 are
17   the result of restrictive zoning that was adopted in
18   the Memorial Villages when they were incorporated?
19        A.   No.  We've never investigated that, nor are
20   aware of anything like that.
21        Q.   We earlier discussed the fact that the racial
22   and ethnic demographics of the Memorial Villages vary
23   dramatically from the racial and ethnic demographics
24   of the north side of the district, right?
25        A.   Yes.
```

1    Q.    Yet the district's never looked into why

2  those patterns exist?

3    A.    Not in any way in the sense to educate the

4  students that show up.

5    Q.    So is it the district's position that it is

6  ignorant of the cause of the ethnic and racial

7  demographics that vary between the communities on the

8  north and south sides of I-10?

9              MR. CRAWFORD:  Objection; form.

10    A.    We're aware that there are differences, but

11  why it's happened, no, we don't know.

12    Q.    (BY MR. ABRAMS)  Has the district ever

13  investigated why the dramatically different

14  demographics exist between the north and south side

15  residential areas of the district?

16    A.    In the sense that we know that there's more a

17  lower socioeconomic level on the north side.  We also

18  have a lot more apartment complexes and such that

19  would lead to that potential.

20              More families leaving -- living in a

21  closer area and in lower cost housing indicates a

22  lower socioeconomic level.  And most of the homes on

23  the south side are more expensive, so that indicates a

24  higher level of socioeconomic, not necessarily deal

25  with race, though.

1    Q.   Has the ever investigated the fact that

2  multifamily housing is not permitted under the zoning

3  ordinances of the Memorial Villages, which translates

4  into there not being apartments?

5    A.   Wouldn't investigate it.  We know that

6  different villages have their own deed restriction,

7  yes.

8    Q.   Has the district ever looked at the history

9  of the incorporation of the Memorial Villages, which

10 was in 1954 and 1955, shortly after the United States

11 Supreme Court decision in Brown versus Board of

12 Education, which inte -- which required integration of

13 schools?

14   A.   No, has not investigated that.

15   Q.   Does the district acknowledge that the

16 Memorial Villages were incorporated in 1954 and 1955?

17   A.   Yes.

18   Q.   But the district knows nothing about the

19 history or rationale for their incorporation at that

20 time?

21   A.   No.

22   Q.   Is that correct?

23   A.   That's correct.

24   Q.   And the district does not claim to have any

25 understanding about the explanation for the racial and

1    ethnic demographics of the residential patterns that

2    vary between the north and south-side communities,

3    correct?

4        A.   Correct.

5        Q.   What process historically did the district

6    follow when designating early voting locations in the

7    district and what was the rationale for the number and

8    placement of those locations through 2021?

9        A.   2011 and prior, we actually only had one

10   early voting site.  It was essential administration

11   building.

12             When we made the change in 2012, it was

13   important to the board because we went from 26 sites

14   down to 7 on election day, to offer some additional

15   sites for early voting to offer the citizens an

16   opportunity.

17             And so they made the decision to choose

18   a location in the west side that would support the

19   west side and one that would support the east side.

20   And that's how this location was picked as well as the

21   one at that Holy Cross Lutheran Church.

22             We also, as part of the agreement with

23   Piney Point, agreed to -- that they would host an

24   early election site at their site, but that was just

25   part of the contract agreement and the very fact that

1    we have to have one with a city or county in order to

2    host those May elections.

3         **Q.   Did anyone ever discuss the irony of putting**

4    **a early election site at Piney Point's city hall given**

5    **that Piney Point city hall is not located in Piney**

6    **Point and that's why Piney Point has to have its**

7    **elections at a Spring Branch Independent School**

8    **District elementary school so it can actually conduct**

9    **its elections within its own city?**

10        A.   It was --

11             MR. CRAWFORD:  No objection other than

12   to note that that was a mouthful.

13             THE WITNESS:  Yes.

14        A.   I mean, that --

15             MR. ABRAMS:  Just an observation.

16        A.   It is, because they actually -- they host

17   meetings and such at our sites too.  But yeah.

18        **Q.   (BY MR. ABRAMS)  With reference to Exhibit 5,**

19   **the election precincts and middle school attendance**

20   **zones, the west side location you said for the**

21   **attendance zone was basically near where we are here**

22   **at the Don Coleman Center?**

23        A.   Yes.

24        **Q.   And looking at Exhibit 5, if we look at Dairy**

25   **Ashford, it's near -- it's between Memorial and I-10**

1    on Dairy Ashford, right?

2         A.   Correct.

3         Q.   And it's in the Spring Forest Middle School

4    zone south of the freeway?

5         A.   Yes.

6         Q.   Another location is the so-called ad

7    building, now properly known as the Wayne Schaper

8    Leadership Center.  And that is located south of I-10,

9    two-thirds of the way to the right, between Echo Lane

10   and Voss on this map.  It shows a letter C, I think.

11        A.   Yes.

12        Q.   So that location likewise is south of I-10,

13   correct?

14        A.   Correct.

15        Q.   The city of Piney Point Village location on

16   Woodway is not depicted, but it's in fairly -- the --

17   the fairly southernmost portion of the Spring Branch

18   Middle School zone, correct?

19        A.   Correct.

20        Q.   And then the Holy Cross Lutheran Church is on

21   Westview and it is on the easternmost portion of

22   Westview within Hilshire Village, essentially.

23             Can you pick a -- a landmark on

24   Exhibit 5 that will tell us roughly where the Holy

25   Cross early voting location was?

```
 1        A.    A little south and east of 115, the red
 2   circle for Valley Oaks.
 3        Q.    Okay.
 4        A.    So south and east of that is...
 5        Q.    And I believe we earlier talked about the
 6   fact that's within Hilshire Village, right?
 7        A.    Correct.
 8        Q.    So up until the -- and through the 2021
 9   election, none of the early voting locations were
10   located among the Landrum, Spring Woods, Northbrook,
11   Spring Oaks Middle School attendance zones and none
12   were located north of I-10 other than the one at
13   Hilshire Village?
14        A.    Correct.
15        Q.    You indicated there's an intention to put in
16   one more early voting location in 2022?
17        A.    Yes.
18        Q.    Has the board voted on that?
19        A.    No.   They'll vote on that in January.
20        Q.    When -- when and in what context have
21   discussions occurred about the potential of adding a
22   new early voting location?
23        A.    After the 2021 election, after analyzing how
24   many early votes we had, which was well over 5,000
25   votes, when normally it's less than a thousand votes
```

1    in early election and often around 400 or 500, as well
2    as we heard from, I would say a handful, maybe five
3    different people asking us to add an additional early
4    election site last year, which I couldn't at that
5    point because that decision has already been made
6    based on the historical occurrence of how voting fell,
7    we began to ponder where we would have another early
8    election site.
9              And actually John Knox Presbyterian, the
10   minister from that church that's at Hammerly and
11   Gessner reached out to us and offered their location
12   as a site for early election.
13             And so we went and looked at their room,
14   what they have, and feel that it will be a good fit
15   for us, mainly because I appreciate that it's on
16   Gessner, which would allow for some public
17   transportation, access to -- easier access to -- to
18   people on the northwest side, because that's who we
19   were hearing from, that they were having some
20   difficulties getting to the early election sites.
21        Q.   Did the reports from northwest residents
22   about difficulties with early voting sites occur
23   before or after the 2021 election?
24        A.   During.
25        Q.   During the election?

1      A.    (Nodding head.)

2      Q.    And what impact does the district acknowledge

3   limiting access to early voting locations may have on

4   the election?

5      A.    We don't believe it limited their access

6   because early elections are over eight different --

7   let me get my numbers right -- eight different days

8   which would -- with the weekends as an opportunity to

9   get to early elections as well as they would have

10   their neighborhood middle schools on the election day

11   to vote on.

12                  (Marked Porter Exhibit No. 8.)

13      Q.    (BY MR. ABRAMS)  What day of the week is the

14   regular election held?

15      A.    Saturday.

16      Q.    Let me hand you what's been marked as

17   Exhibit 8.

18             Do you recognize this as the notice for

19   the last trustee election --

20      A.    Yes.

21      Q.    -- indicating the various early voting

22   locations?

23      A.    Yes.

24      Q.    And those are the locations you indicated

25   were in place from 2012 to 2021?

```
 1        A.    Yes.
 2        Q.    And before that time, there was only one
 3   early voting location?
 4        A.    Correct.
 5        Q.    And that was at the Wayne Schaper Leadership
 6   Center or then the ad building --
 7        A.    Yes.
 8        Q.    -- administration building --
 9        A.    Uh-huh.
10        Q.    -- which is also located on the south side --
11        A.    Yes.
12        Q.    -- of I-10?
13        A.    (Nodding head.)
14        Q.    So before 2012, there were no early voting
15   locations on the north side of I-10, correct?
16        A.    Correct.
17        Q.    And after 2012, there's been one early voting
18   location, and that's on the northeast corner of
19   Hilshire Village?
20        A.    Correct.
21        Q.    Does the district have any knowledge to --
22   about the extent to which can district trustee
23   elections have involved formal or informal candidates
24   slating processes?
25        A.    Can you define "slating"?
```

1    Q.    Organized groups that endorse candidates and
2  provide slates of candidate to elect.
3    A.    We don't have any knowledge of that.  Is that
4  what the question was?  I'm sorry.
5    Q.    Right.
6              Has the district ever investigated the
7  extent to which in these school board trustee
8  elections there have been formal or informal candidate
9  slating processes where groups endorse candidates?
10   A.    We have not investigated it.
11   Q.    In the -- does the district have any
12 knowledge of the extent to which there has been
13 candidate slating either formally or informally during
14 trustee elections?
15   A.    We have no knowledge.
16   Q.    Is the district aware of the extent to which
17 during the period 2011 to 2021 any trustee election
18 has involved in the campaign process overt or subtle
19 racial or ethnic appeals?
20   A.    We're not aware of any.  I've heard in some
21 recent public comments, I believe it was Noel --
22   Q.    Referring to Mr. Lezama?
23   A.    Yes.
24   Q.    Thanks.
25   A.    Mr. Lezama.

1    Q.    Thank you.

2    A.    -- talked to some of that happening during

3    his campaign.

4              And I know he talked with a newspaper

5    reporter.  That's all I'm aware of.  I don't have any

6    documentation of that happening.

7              If things like that were brought to my

8    attention, we would always recommend that people

9    report that to the appropriate either Secretary of

10   State or Ethics Commission because they're the ones

11   that actually oversee the campaigning process of

12   elections.

13   Q.    Apart from the recent reports by Mr. Lezama

14   about racial or ethnic communications during his

15   campaign, does the district have any awareness of any

16   other campaigns in which similar communications were

17   distributed?

18   A.    No, not aware.

19   Q.    Does the district have access to the 2020

20   Census and American Community Survey information?

21   A.    I understand it's in the hands of our

22   demographer, but, no, we, ourselves, haven't seen any

23   reports from that census data.

24   Q.    Who is the district's demographer?

25   A.    Davis Templeton, I believe, is the name.  I

1    don't know if that's the completely -- there might be

2    another name on the title.  I know Ms. Templeton.

3         Q.   **Is Davis Templeton, independent of the**

4    **lawsuit, charged with any responsibilities to assist**

5    **the district on demographic matters?**

6         A.   They help us with enrollment projections,

7    mainly.  That's where we've -- where we've used their

8    data before, what they acknowledge -- you know,

9    they're able to track, you know, what developing --

10   developments are in play, like who has put in permits

11   and things like that, to let us know that homes are

12   being built or apartments are being built to prepare

13   us for influx of kids.

14        Q.   **What role, if any, do you understand Davis**

15   **Templeton is currently undertaking to analyze the 2020**

16   **Census or American Community Survey demographic**

17   **information for the district?**

18        A.   Primarily to help us with the enrollment

19   trends that are happening.  Because our information is

20   provided in the census, like racial breakdown, that

21   could give us some indication of some areas that are

22   starting to grow to ensure that we're prepared to

23   provide, you know, supports that don't necessarily

24   come with the race but might come with other things

25   tied to them, primarily socioeconomic needs.

```
 1        Q.    Does the district know what the current
 2   percentage of citizenship voting age population for
 3   voters in the district is by race and ethnic group?
 4        A.    No, we don't know that.
 5                   (Marked Porter Exhibit No. 9.)
 6        Q.    (BY MR. ABRAMS)  Let me hand you what's been
 7   marked as Exhibit 9.
 8              Exhibit 9 is a document the district produced
 9   with Bates No. SBISD 798 titled "Spring Branch ISD
10   10-Year Per Student Cost General Fund."
11              What does this document show?
12        A.    This takes the expenditures that happened out
13   of our -- specifically out of our general fund and
14   using the student enrollments at -- on each of those
15   years to determine a per student cost of actual
16   expenditures.
17              Out of that general fund, we've also
18   indicated by highlighting in each year what campuses
19   were considered Title I campuses.
20        Q.    Earlier in your testimony, I asked you about
21   Title I campuses.
22              And does Exhibit 9, by its highlighting,
23   tell us all which of the campuses are Title I
24   campuses?
25        A.    Yes.
```

1      Q.    And a Title I campus requires that what
2   percentage of the students are eligible for free and
3   reduced lunch?
4      A.    At least 45 percent and definitely over
5   50 percent.  A campus can fluctuate year to year.  And
6   so once they meet Title I standards or once they meet
7   the Title I threshold, they could drop a little bit,
8   you know, if one year just a few less kids fill out
9   the form and then, you know, come back up.
10              But I would say need at least 45 to
11   50 percent of free and reduced lunch.
12      Q.    I want to kind of go behind the numbers to
13   understand what differences in funding exist and how
14   general fund dollars are allocated that result in the
15   differences.
16      A.    Okay.
17      Q.    With reference to the 2019-2020 figures, for
18   example, I see different per student averages.
19              What factors can result in the
20   differential on per student expenditures among the
21   different schools because I assume that all the
22   Title I influences separate and apart from this sheet,
23   right?
24      A.    Correct.
25      Q.    So Exhibit 9 doesn't reflect any Title I

1    funding, which would flow through campus -- two

2    campuses that have economically disadvantaged

3    students, right?

4         A.    Correct.

5         Q.    What explanations are there for the per

6    student differentials reflected in Exhibit 9?

7         A.    There's several pieces of data that affect

8    that.

9               For one, the actual enrollment of

10   students.  When you consider a campus, every campus

11   has to have a principal, for instance.  And so more or

12   less students spreads out that cost per student.  So

13   definitely the enrollment of students as well as the

14   programs at those campuses.

15              For instance, if you look at an

16   elementary school, Bendwood School --

17        Q.    Yes.  Sure.

18        A.    -- that has very specialized special

19   education programs there.  Much, much lower

20   student-teacher ratios and things like that.

21              So they're going to have -- by nature of

22   their programatic happening specific to their campus

23   is going to, you know, produce more dollars there.

24              We also look at specific programs that

25   happen at each campus, CTE programs, for instance, as

well as specific special education programs.  Not

every campus hosts every program there.

 Another thing we do look at that free

and reduced lunch percentage.  And if you -- depending

on how many kids were reported with an approved free

and reduced lunch application, we then give additional

staffing and dollars for those -- at those campuses.

 So a campus with a higher free and

reduced lunch percentage by design would receive

additional dollars towards staffing or additional --

well, towards spending in programs and then additional

staffing allocations.

Q.   **And the factors that I've heard so far that**
**would be an explanation for why there are differential**
**per student expenditures start with enrollment.**

A.   Uh-huh.

Q.   **If you have fewer students, then the costs**
**are spread among fewer students.  That's one factor,**
**correct?**

A.   Uh-huh.

Q.   **A second -- is that a "yes"?**

A.   Yes.

Q.   **A second factor is there really are some**
**specialized campuses.  You used Bendwood as an**
**example, which is not akin to a traditional elementary**

1    school?

2         A.    Correct.

3         Q.    A third factor is there's some campuses where

4    there are specialized programs such as CTE or special

5    ed where the dollars are tracked to that campus, but

6    they correspond to a specialized program?

7         A.    Yes.

8         Q.    And then the fourth factor is some additional

9    amount allocated to campuses that exceed some

10   threshold for free and reduced lunch children?

11        A.    Correct.

12        Q.    Is there a per student stipend or per student

13   add-on that corresponds to this fourth factor, the

14   free and reduced lunch?

15        A.    Primarily, we see it in the staffing

16   allocations at the high schools where they're based on

17   their the counts.  And I -- may not be exact, but I

18   want to say, you know, for every 25 or 30 free and

19   reduced lunch kits, they get an additional staffing

20   unit.  Something along that line.

21        Q.    So there's some ratio --

22        A.    Yes.

23        Q.    -- that determines how much additional

24   funding goes to a campus based upon the number of free

25   and reduced lunch children?

1        A.    Primarily at the secondary campus, yes.

2        **Q.    Are there any other significant factors that**

3   **go into explaining the differential expenditures**

4   **reflected on Exhibit 9 on a per student basis out of**

5   **the general fund other than what you've told me?**

6        A.    We also have campuses that are considered

7   catalyst schools.  That's our definition of schools

8   that are struggling to meet the requirements by the

9   State to be considered -- passing might be the

10  terminology.

11              And so in some cases we've allocated an

12  additional position or supports at those campuses to

13  help them analyze data to help them ensure kids are

14  getting the specific support on the specific subject

15  that they need.

16       **Q.    Where within the system are these budgetary**

17  **and staffing decisions made to reallocate funds from**

18  **the districtwide average?**

19       A.    Probably with -- it starts at

20  administratively.  We look at the trends and the

21  needs.  We look to see what those costs would be.

22              Also, I would say in cohort with the

23  board defining their goals, that's actually -- we

24  watch what the needs are.  We look at the board goals.

25              And more than likely, they're often in

1   line in the sense that, for instance, numeracy and

2   literacy, superintendent goals, board goals, focus

3   needs to be made on that.

4                  So we've ensured -- you've heard people

5   talk about the federal dollars we've got in the ESSER

6   dollars.  Those specifically, quite a bit of it, are

7   very focussed on numerous needs at -- to help the

8   entire district.  And then those are assigned to

9   campuses that need that.

10                 So the decision, you know, we -- however

11  then have to analyze can we handle the budget costs.

12  That case we specifically had ESSER dollars.  In

13  another case, if we didn't have those types of

14  dollars, we would have to analyze our programs and

15  determine what programs aren't as supportive of what

16  we need.

17                 So I would say between the

18  administration and the board, the board ultimately

19  approves the budget.

20      Q.    Right.  I was going to say I know that as a

21  legal matter the board has to approve the budget, but

22  I also suspect as a practical matter administratively

23  you have to roll up to the board level --

24      A.    Absolutely.

25      Q.    -- with your line items.

```
1        A.    Yes.
2        Q.    And those begin with the -- with the
3   administrative staff?
4        A.    With the administrative staff down to, I
5   mean, campuses are given their allotments and
6   departments --
7        Q.    Okay.
8        A.    -- you know, have their requests and bring us
9   their budget.
10       Q.    During the period from 2011 to 2021, the last
11  decade, has the district either received or published
12  information about whether it should or shouldn't
13  change its method of elected trustees?
14       A.    I know in the recent year there's been
15  various e-mails.  I haven't seen them specifically.
16  I've just heard talk about e-mails that board members
17  have received, talking about whether or not -- from
18  both sides of the argument, whether or not we should
19  switch or not, especially tied to once the lawsuit was
20  filed, not really leading up to it.
21             I know, again, going back to that there
22  was a discussion in 2020, obviously with the board,
23  tied to -- I mean, at that time, you know, over that
24  previous year, several school districts in the north
25  side of Texas had been sued basically under this --
```

1   relatively same premise.

2              I know there's some different facts

3   there.  And the board recognized that the diversity of

4   our school district appears to not be literally

5   represented on the school board, and so just wanted to

6   see what the options were to ensure that we were

7   getting that participation.

8              So I know that type of discussion has

9   happened, but other than the more recent comments

10  really tied to the lawsuit, I'm not aware.

11       **Q.   Between the time of the 2020 presentation by**

12  **the district's lawyers until the lawsuit, did the**

13  **district undertake any other discussions or**

14  **investigations of whether or not it would consider**

15  **changing its electual [phonetic] system?**

16       A.   No.  They were waiting for the results from

17  the 2020 Census to determine if the need.

18       **Q.   Has the district made any attempt to collect**

19  **and produce the e-mail communications, which you**

20  **indicated it has received, concerning whether or not**

21  **it should change its method of elected trustees?**

22       A.   My understanding is there may have been some

23  public information requests that some of those e-mails

24  might have come a part of, but that's all I know.

25              I don't know of any specific collection

1   just for the purposes to see what -- you know, to

2   account for who was supportive or not supportive of

3   changing.

4       **Q.   Has the district requested from its trustees**

5   **copies of communications they have received in their**

6   **capacity as trustees concerning whether or not the**

7   **district should change its method of electing its**

8   **trustees?**

9       A.   I believe it's -- if it's been requested

10  through public information requests, then those

11  requests have been made; but I don't know, again, of

12  the specific requests.

13          **MR. ABRAMS:**  Charles, we'll talk

14  separately about it.  We made such a request and we

15  didn't get anything, and so I think there was a

16  suggestion that maybe we needed to define search

17  terms.

18          **MR. CRAWFORD:**  My understanding was --

19          **MR. ABRAMS:**  You and I can talk about

20  that separately.

21          **MR. CRAWFORD:**  Sure.  Yeah, that was my

22  understanding, is that Chris was waiting for some

23  search terms from you so that we could -- because

24  apparently there's a large volume of e-mails that

25  might come up.  So he was trying to narrow that down.

```
 1   That hadn't happened yet, and we're in the process.
 2              MR. ABRAMS:  That would be a subject for
 3   our discussion.
 4              MR. CRAWFORD:  Sounds great.
 5              MR. ABRAMS:  No need to trouble
 6   Ms. Porter with that.
 7        Q.   (BY MR. ABRAMS)  I'm now going to turn --
 8   actually, let me see.  We're almost at the hour mark.
 9   And I'm closing in on a series of questions that are
10   going to go back to the allegations in the lawsuit.
11              If you're ready, this might be a good time to
12   take another one of our short breaks and we might be
13   able to close this out after our next break.
14        A.   Sounds great.
15        Q.   Okay?
16        A.   Okay.
17              (Break from 11:23 a.m. to 11:31 a.m.)
18        Q.   (BY MR. ABRAMS)  Ms. Porter, I now want to
19   visit with you about topics in the notice of
20   deposition that concern some of the factual
21   allegations in the lawsuit and the district's stated
22   position when it answered, just to give you a
23   heads-up.
24              In the defendant's answer, it denied that its
25   election system violates the Voting Rights Act or
```

1    denies minority voters' rights.

2           My question is:  Before the district filed

3    that denial, what investigation and analysis did it

4    do?

5      A.   I don't know of a specific investigation or

6    analysis that we did.  It was just the belief that we

7    were not denying their rights.

8      Q.   Can you confirm that before filing that

9    denial the district did not conduct an investigation

10   into whether or not the allegations were true?

11          MR. CRAWFORD:  Objection; form.

12     A.   Can you word it again, because I just lost

13   how I would answer that?  I'm sorry.

14     Q.   (BY MR. ABRAMS)  Yes, ma'am.

15     A.   The proper word.

16     Q.   Yes, ma'am.  I'll ask you again.

17          Before the district denied that its

18   conduct violates the Voting Rights Act or denies

19   minority voters rights under that act, can you confirm

20   the district did not conduct any investigation or

21   analysis of that subject?

22          MR. CRAWFORD:  Objection; form.

23     A.   Yes, I can confirm that.

24     Q.   (BY MR. ABRAMS)  In Paragraph 8 of the

25   district's answer -- and by the term "district," now

1    I'm referring to the district and its trustees that

2    have been sued in their official capacity --

3        A.   Yes.

4        Q.   -- with the defendant's answer.

5              The defendants denied that its at-large

6    system was the reason that the plaintiff lost in the

7    most recent election.

8              Before making that denial, can you

9    confirm that the district did not conduct any

10   investigation or analysis of that allegation?

11           MR. CRAWFORD:  Objection; form.

12       A.   We did not do any investigation.

13       Q.   (BY MR. ABRAMS)  In the defendant's answer,

14   the district denied that its elections involve

15   racially polarized voting.

16       Can you confirm that before the district

17   denied that allegation it did not conduct any

18   investigation or analysis of the truth or falsity

19   of -- of that fact?

20           MR. CRAWFORD:  Objection; form.

21       A.   We did not do any investigation.

22       Q.   (BY MR. ABRAMS)  In Paragraph 48 of its

23   answer, the district denied that Spring Branch's

24   neighborhoods evidence a history of residential

25   segregation and racial conflict.

1           Before denying that, did the district conduct

2    any investigation or analysis of whether that fact is

3    true?

4                MR. CRAWFORD:  Objection; form.

5        A.   We had no history.  We -- we knew of no

6    history of that happening, so we did not do any

7    additional investigation.

8        Q.   (BY MR. ABRAMS)  Does the district know one

9    way or the other whether in the school board elections

10   during the 10-year period 2011 to 2021 involved a

11   majority of its white voters supporting different

12   candidates than did the majority of its Hispanic and

13   African-American voters?

14       A.   We did not know that.

15       Q.   Don't know one way or the other?

16       A.   Correct.

17       Q.   Maybe happened, maybe didn't happen?

18       A.   That's correct.

19       Q.   And the district's not investigated whether

20   or not that happened?

21       A.   Correct.

22       Q.   Has the district investigated whether or not

23   in the most recent school board trustee election in

24   2021 the majority of the white voters supported the

25   white candidates and that amount exceeded the number

1    of white voters who supported the plaintiff?

2        A.   We have --

3                MR. CRAWFORD:  Objection; form.

4        A.   We have not investigated that.

5        Q.   (BY MR. ABRAMS)  Might be true, might not be

6    true?  District doesn't know?

7        A.   We do not know.

8        Q.   In Paragraph 53 of the defendant's answer,

9    the defendants denied that district elections are

10   deeply racially polarized.

11               Before denying that allegation, had the

12   district conducted any investigation or analysis of

13   whether or not that allegation was true?

14               MR. CRAWFORD:  Objection; form.

15       A.   No.

16       Q.   (BY MR. ABRAMS)  In Paragraph 58 of the

17   defendant's answer, the defendants denied that the

18   district has enacted any barriers to voting.

19           Before making that denial, had the district

20   conducted any investigation or analysis of whether or

21   not that allegation is true?

22               MR. CRAWFORD:  Objection; form.

23       A.   No.

24       Q.   (BY MR. ABRAMS)  Does the district

25   acknowledge that the location of its early voting

1    sites provides an impediment to voters on the north

2    side of the district to vote -- early vote?

3        A.    Based on responses or comments I received

4    during this election, I realized I would be better

5    serving the voters of the district if I put another

6    one on the northwest side.  But going into the

7    election, we did not believe that was an impediment.

8        Q.    Does the district acknowledge that the

9    location of its early voting sites has an impact on

10   voter turnout?

11       A.    I don't know.

12       Q.    In Paragraph 75 of the defendant's answer,

13   the district made the statement that single-member

14   districts can promote balkanization of a school

15   district by electing trustees who are only focused on

16   the interest of the constituents of their smaller

17   single-member districts and not necessarily on the

18   overall good of the school district.

19            Before making that statement and its

20   answer, had the district investigated whether or not

21   the existing body of social science research

22   contradicts that statement?

23            MR. CRAWFORD:  Objection; form.

24       A.    Nothing scientific.  No scientific

25   investigation.  The -- there's fear -- an underlying

1  fear in all school districts that that potentially can

2  happen with single-member districts.

3      Q.   (BY MR. ABRAMS)  What analysis has the

4  district ever conducted to determine whether in school

5  districts with single-member districts that negative

6  effect has occurred?

7      A.   No investigation.

8      Q.   What, then, was the source of this fear that

9  the district voiced in its answer that single-member

10  districts might have negative impacts?

11          MR. CRAWFORD:  Objection; form.

12     A.   No specific source.  Just the belief that

13  they represent the entire district as the board stands

14  now at the at-large.

15          It was more a strong belief that the

16  at-large system can support and represent the entire

17  district.

18     Q.   (BY MR. ABRAMS)  In Paragraph 75 of its

19  answer, the defendants claim that there are, quote,

20  sound nonrace-based policy reasons for maintaining

21  at-large voting systems, close quote.

22          What are those sound nonbased -- nonrace-based

23  policy reasons?

24     A.   Can you repeat that question?

25     Q.   In Paragraph 75 of the defendant's answer, it

1    stated that --

2        A.   Is that -- I'm sorry, is that on this, so I

3    can read it as you say it?

4        Q.   Sure.  If you look at Topic 38, if I've

5    accurately created my notes.

6        A.   Yes.  I'm sorry.

7        Q.   Are you with me, Topic 38?

8        A.   Yes.

9        Q.   I'm asking you about the last part of that

10   topic, which is the assertion by the defendants that

11   there are, quote, sound nonrace-based policy reasons

12   for maintaining at-large voting systems.

13               What's the factual basis for the

14   district's position?

15       A.   That everybody who is a voting citizen has

16   the right to vote for whoever they want to and

17   regardless of race throughout the district at every

18   election.

19               That is not limited to only certain

20   elections.  And that's because we are an at-large

21   system.

22       Q.   Does the district acknowledge, in light of

23   its awareness of litigation involving other Texas

24   school districts, that the Voting Rights Act assures

25   that the voting strength of its minority voters is not

1    to be diluted by the majority?

2        A.   Yes, they understand that.

3        Q.   Does the district acknowledge that there are

4    sound policy reasons for adopting a single-member

5    district plan as has been the case in various other

6    Texas school districts?

7              MR. CRAWFORD:  Objection; form.

8        A.   Single-member districts would ensure that

9    specific minority groups have an opportunity to be

10   represented as required by the Texas voters' rights.

11       Q.   (BY MR. ABRAMS)  So the district acknowledges

12   that there are also sound policy reasons for adopting

13   a single-member plan just as there are some policy

14   reasons that support maintenance of an at-large plan?

15             MR. CRAWFORD:  Objection; form.

16       Q.   (BY MR. ABRAMS)  Correct?

17       A.   Correct.

18       Q.   And one of the policy reasons supporting the

19   adoption of single member plans is that those plans

20   may allow minority voters references to be better

21   reflected in the election results?

22             MR. CRAWFORD:  Objection; form.

23       A.   That's possible.  Correct.

24       Q.   (BY MR. ABRAMS)  In Paragraph 76 of the

25   defendant's answer, the defendants denied that its

1    system for electing trustees dilutes the voting

2    strength of racial or language minorities.

3              Before making that denial, what investigation

4    or analysis had the district conducted to determine

5    whether or not that allegation was true?

6                   MR. CRAWFORD:  Objection; form.

7         A.    No investigation.

8         Q.    (BY MR. ABRAMS)  In Paragraph 79 of the

9    defendant's answer, the district denied that it had

10   done anything which gave the Latino community or any

11   other minority citizens less of an opportunity to

12   participate in the political process, before making

13   that denial what investigation or analysis had the

14   district conducted of that allegation to determine

15   whether or not it's true?

16                  MR. CRAWFORD:  Objection; form.

17        A.    No specific investigation.

18        Q.    (BY MR. ABRAMS)  Do you believe you've

19   understood my questions here today except for when you

20   told me you didn't?

21        A.    Yes.

22        Q.    And when you told me you didn't, did I work

23   with you until I asked you a question that you did

24   understand?

25        A.    Yes.

1      **Q.   Are there any of your answers on behalf of**

2   **the district that you would like to change or correct**

3   **at this time?**

4      A.   Not at this time.

5      **Q.   Okay.**

6              **MR. ABRAMS:**  At this time I have no

7   further questions.

8              And I thank you for your courtesy.

9              THE WITNESS:  Thank you.

10             **MR. CRAWFORD:**  Thank you.  We -- we will

11   reserve our questions.

12             **MR. ABRAMS:**  Okay.

13             (The deposition concluded at 11:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1      WITNESS CORRECTIONS AND SIGNATURE.

2        Please indicate changes on this sheet of paper,

giving the change, page number, line number and reason

3   for the change.   Please sign each page of changes.

4   PAGE/LINE        CORRECTION        REASON FOR CHANGE

5   7/3     Certain ~~of these~~ questions - clarify.

6   17/17   ~~Buford~~ Beaufort     correct spelling

7   60/10   ~~esstentrtal~~ Central     correction:

8   69/2    ~~I know~~ Ms. Templeton   wasn't said

9   74/19   ~~Kits~~ Kids           correction :

10  74/17   their ~~the~~ counts     correction

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

                CHRISTINE PORTER

24  ┌─────────────────────────┐
    │  DIANE DICKENS           │     Diane Dickens
25  │     2400814              │     Diane Dickens, notary
    │ NOTARY PUBLIC, STATE OF TEXAS │  Feb. 7, 2024
    │  MY COMMISSION EXPIRES   │
    │   FEBRUARY 7, 2024       │
    └─────────────────────────┘

Page 92

```
 1           S I G N A T U R E   O F   W I T N E S S

 2

 3       I, CHRISTINE PORTER, solemnly swear or affirm

 4    under the pains and penalties of perjury that the

 5    foregoing pages contain a true and correct transcript

 6    of the testimony given by me at the time and place

 7    stated with the corrections, if any, and the reasons

 8    therefor noted on the foregoing correction page(s).

 9

10

11          CHRISTINE PORTER

12

13

14

15

16    Job 70024

17

18

19

20

21

22

23

24

25
```

DIANE DICKENS
2400814
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEBRUARY 7, 2024

*Diane Dickens*
Diane Dickens, notary
Feb. 7, 2024

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1
              IN THE UNITED STATES DISTRICT COURT
 2                   COURT FOR THE SOUTHERN
               DISTRICT OF TEXAS HOUSTON DIVISION
 3
 4    VIRGINIA ELIZONDO,   |
          Plaintiff,       |
 5                         |
      V.                   |   Civil Action No. 4:21-CV-01997
 6                         |
      SPRING BRANCH        |
 7    INDEPENDENT SCHOOL   |
      DISTRICT, ET AL.,    |
 8       Defendants.       |
 9              REPORTER'S CERTIFICATION
            ORAL DEPOSITION OF CHRISTINE PORTER
10                  DECEMBER 28, 2021
11        I, Mendy A. Schneider, a Certified Shorthand
12    Reporter in and for the State of Texas, hereby certify
13    to the following:
14        That the witness, CHRISTINE PORTER, was duly sworn
15    by the officer and that the transcript of the oral
16    deposition is a true record of the testimony given by
17    the witness;
18        That the deposition transcript was submitted on
19    _____, 2022, to the witness, or to the
20    attorney for the witness, for examination, signature,
21    and return to Worldwide Court Reporters, by
22    _____, 2022;
23        That the amount of time used by each party at the
24    deposition is as follows:
25            MR. ABRAMS - 01:19:22
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

1       That pursuant to information given to the
2   deposition officer at the time said testimony was
3   taken, the following includes counsel for all parties
4   of record:
5           MR. BARRY ABRAMS AND MR. MARTIN GOLANDO,
    Attorneys for Plaintiff.
6           MR. CHARLES J. CRAWFORD, Attorney for
    Defendants.

7

8       I further certify that I am neither counsel for,
9   related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13      Further certification requirements pursuant to
14  Rule 203 of TRCP will be certified to after they have
15  occurred.
16      Certified to by me this _____.
17
18
19
20  _____
    Mendy A. Schneider, CSR NO. 7761
21  Expiration Date:  1-31-2023
22
23
24
25

```
1          FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition was _____ was not _____
    returned to the deposition officer on _____,
3   2022.
4       If returned, the attached Corrections and
    Signature page contains any changes and the reasons
5   therefor;
6       If returned, the original deposition was delivered
    to MR. BARRY ABRAMS, Custodial Attorney;
7
        That $_____ is the deposition officer's charges
8   to the Attorney for Plaintiff, MR. BARRY ABRAMS, TBA#
    00822700, for preparing the original deposition
9   transcript and any copies of exhibits;
10      That the deposition was delivered in accordance
    with Rule 203.3, and that a copy of this certificate
11  was served on all parties shown herein and filed with
    the Clerk.
12
        Certified to by me this _____.
13
14
                        _____
15                      Mendy A. Schneider, CSR NO. 7761
                        Expiration Date:  1-31-2023
16
17
18
    JOB NO. 70024
19
20
21
22
23
24
25
```

**A**

**A&M** 17:20,24
**a.m** 1:16,16
44:10,10 80:17
80:17 90:13
**ABERNATHY**
2:9
**able** 31:12 33:19
47:11 49:7
69:9 80:13
**above-styled**
1:15
**Abrams** 2:4 3:3
4:4,9 6:15
24:10 30:3
36:14,16,24
37:8 38:12,14
38:24 39:17
41:3 44:11,22
50:9 53:5
54:23 55:20
58:12 61:15,18
65:13 70:6
79:13,19 80:2
80:5,7,18
81:14,24 82:13
82:22 83:8
84:5,16,24
86:3,18 88:11
88:16,24 89:8
89:18 90:6,12
93:25 94:5
95:6,8
**Absolutely**
76:24
**Academy** 17:17
**access** 11:17
64:17,17 65:3
65:5 68:19
**accommodate**
15:22
**account** 55:25
56:4 79:2
**accountancy**
20:8
**accountant**

18:12
**accounting**
17:22
**accurate** 42:2
**accurately** 87:5
**accused** 19:25
**acknowledge**
26:8 30:8 40:5
40:11,16,20
41:5 59:15
65:2 69:8
84:25 85:8
87:22 88:3
**acknowledged**
92:13
**acknowledges**
24:2 41:21
88:11
**act** 5:25 23:24
80:25 81:18,19
87:24
**action** 1:5 93:5
94:10,12
**activities** 21:12
**actual** 10:21
31:25 32:3
70:15 72:9
**ad** 62:6 66:6
**add** 64:3
**add-on** 74:13
**adding** 11:4
63:21
**additional** 11:4
43:11,22 60:14
64:3 73:6,10
73:10,11 74:8
74:19,23 75:12
83:7
**addresses** 51:9
**administration**
47:16 60:10
66:8 76:18
**administrative**
77:3,4
**administrativ...**
47:19 75:20
76:22

**adopt** 49:13
**adopted** 34:12
35:10 57:17
**adopting** 37:20
88:4,12
**adoption** 36:5
88:19
**adult** 29:19
**advance** 55:3
**advances** 55:6
**affect** 72:7
**affix** 92:1
**African-Amer...**
25:1 83:13
**age** 34:10,21
35:2,8,19
45:22,25 46:9
70:2
**ago** 18:22 22:9
29:13 49:1
**agree** 21:18
22:10,14,21
23:3,7,14,20
26:23 28:13,17
29:9,16,23
30:25 33:12,21
34:8 35:22
37:24 38:5,24
45:4,24 46:24
47:25
**agreed** 60:23
**agreement** 6:12
41:20 60:22,25
**agreements**
13:20
**akin** 53:8 73:25
**AL** 1:7 93:7
**allegation** 82:10
82:17 84:11,13
84:21 89:5,14
**allegations**
80:10,21 81:10
**allocate** 28:10
**allocated** 28:4
71:14 74:9
75:11
**allocations**

73:12 74:16
**allotments** 77:5
**allow** 11:11,16
64:16 88:20
**American** 68:20
69:16
**amount** 28:12
74:9 83:25
93:23
**analysis** 81:3,6
81:21 82:10,18
83:2 84:12,20
86:3 89:4,13
**analyze** 69:15
75:13 76:11,14
**analyzing** 63:23
**And/or** 56:6
**answer** 7:3 14:6
15:2 26:13
31:14,18,22
36:14 37:18,19
38:12 80:24
81:13,25 82:4
82:13,23 84:8
84:17 85:12,20
86:9,19,25
88:25 89:9
**answered** 15:16
80:22
**answering** 14:21
37:6
**answers** 13:24
13:25 90:1
**anticipated** 11:2
**Antoine** 54:5
**apart** 68:13
71:22
**apartment**
58:18
**apartments** 59:4
69:12
**apologize** 43:21
44:14
**apparently**
79:24
**appeals** 67:19
**appear** 6:24 7:5

7:12 40:1
**appeared** 92:11
**appearing** 6:18
**appears** 78:4
**application** 18:8
21:8 73:6
**applications**
9:22,25 25:11
**apply** 9:22
**applying** 18:10
**appreciate**
64:15
**appropriate**
68:9
**approve** 76:21
**approved** 73:5
**approves** 76:19
**April** 10:10,10
**area** 36:12 52:19
54:4 58:21
**areas** 36:3,11
39:2 45:6 48:3
51:23,24 57:7
58:15 69:21
**argument** 77:18
**articles** 18:6
**Ashford** 1:18
61:25 62:1
**Asian** 24:25
**aside** 35:14
**asked** 7:18 15:7
70:20 89:23
**asking** 8:22
41:14 64:3
87:9
**aspects** 4:22
**assert** 35:16
**assertion** 87:10
**assessor** 18:21
**assigned** 76:8
**assist** 7:23 69:4
**associations**
57:11
**assume** 15:16
71:21
**assumption**
26:18

assures 87:24
at-large 38:8,20
 42:5 82:5
 86:14,16,21
 87:12,20 88:14
Athletic 1:18
attached 1:19
 95:4
attempt 78:18
attend 8:15 27:9
 52:5
attendance
 50:16 55:22
 56:2 61:19,21
 63:11
attendant 44:24
 44:25
attention 68:8
attest 23:17
attorney 93:20
 94:6 95:6,8
attorneys 94:5
 94:10
auditor 17:25
Audrey 2:13
 13:9,12
authorized 7:5
available 26:16
Avenue 2:5
average 45:10
 75:18
averages 71:18
aware 8:19
 32:15,16 35:16
 37:23 56:19,24
 57:13,20 58:10
 67:16,20 68:5
 68:18 78:10
awareness 68:15
 87:23

　　　　B
Babrams@bla...
 2:6
baby 18:12
back 8:14 12:25
 18:6,19,20,24

22:14 50:6
51:11 71:9
77:21 80:10
background
 7:19 16:20
 21:5,7 26:24
 45:22,25 46:2
balkanization
 85:14
ballot 10:4
Bank 18:1
barriers 84:18
Barry 2:4 4:9
 94:5 95:6,8
base 28:25
based 26:16,17
 27:22 28:12
 29:6 35:3 43:5
 45:10 46:6
 56:13 64:6
 74:16,24 85:3
basically 61:21
 77:25
basis 5:16 33:9
 75:4 87:13
Bates 70:9
began 64:7
behalf 6:20 7:9
 7:14 19:13
 20:2 22:25
 90:1
belief 24:2 81:6
 86:12,15
believe 5:19 7:1
 12:11,12,12,14
 12:14 21:6,8
 22:4 23:24
 26:11 27:3
 33:17 42:2
 46:4,15 47:1
 49:16 53:22,24
 56:13 63:5
 65:5 67:21
 68:25 79:9
 85:7 89:18
believes 36:9
Bendwood

72:16 73:24
best 7:3 27:14
 27:15
better 85:4
 88:20
beyond 8:3
bit 71:7 76:6
black 40:17
BLANK 2:4
block 33:14,24
 9:6,9,14,16
 16:14,15,16,17
 21:3,20 28:14
 28:20 29:5,14
 29:17,24 30:10
 30:13,16,19
 31:2,24 32:7
 36:8,9,20,22
 37:3,11,22
 38:2,4,10 42:5
 59:11 60:13
 63:18 67:7
 75:23,24 76:2
 76:18,18,21,23
 77:16,22 78:3
 78:5 83:9,23
 86:13
body 24:18 26:1
 45:17 85:21
booklet 13:25
born 17:3,4
Boulevard 2:10
boundaries
 12:10 39:20
 40:1,3 46:13
 48:3,7,25 49:6
 49:18,19 50:5
 51:13 53:15
 56:12,15,20
 57:9
BOYD 2:9
Branch 1:6,17
 3:20 4:11,17
 4:20 5:7 8:8
 12:24 13:1
 16:7,13,22

18:11,19,20,24
20:24 28:19
35:19 45:16
48:1,9,23 51:1
52:1,6,15
54:17 61:7
62:17 70:9
93:6
Branch's 82:23
brat 17:4
break 13:14
 15:19 18:20
 24:14 43:25
 44:1,3,5,10
 80:13,17
breakdown
 41:14 43:3
 46:5 69:20
breaks 80:12
bring 7:24 77:8
brings 43:9
brought 5:24
 7:22 68:7
Brown 59:11
budget 18:14
 76:11,19,21
 77:9
budgetary 75:16
Buford 17:17,17
build 57:1
builders 56:22
building 57:4
 60:11 62:7
 66:6,8
built 49:15
 55:12,13,14
 57:7 69:12,12
Bunker 32:20
 39:21
business 18:15

　　　　C
C 2:1 62:10
calendar 8:19
California 17:5
call 13:11 18:12
 39:20

called 5:24
 13:23,25 27:9
campaign 67:18
 68:3,15
campaigning
 68:11
campaigns
 68:16
Campbell 18:9
campus 27:12
 43:8 71:1,5
 72:1,10,10,22
 72:25 73:2,8
 74:5,24 75:1
campuses 27:13
 27:22,25 28:2
 28:5 70:18,19
 70:21,23,24
 72:2,14 73:7
 73:24 74:3,9
 75:6,12 76:9
 77:5
candidate 28:18
 29:10,17,24,25
 30:9,13,16,19
 30:22,23 67:2
 67:8,13
candidates 3:11
 30:6 33:15,25
 35:24 36:19
 37:3 38:1
 66:23 67:1,9
 83:12,25
capacities 4:12
capacity 7:6
 22:16 79:6
 82:2
card 92:12
Carolina 17:7,7
 17:17
case 13:17 26:16
 38:19 41:24
 52:23 55:16
 76:12,13 88:5
cases 75:11
catalyst 75:7
Caucasian 28:15

cause 1:16 58:6
Ccrawford@a...
    2:11
census 23:23
    46:3 68:20,23
    69:16,20 78:17
Center 1:18
    61:22 62:8
    66:6
Central 17:11
certain 6:5,21
    7:3,14,18
    43:10 87:19
certificate 20:9
    95:10
certification 3:5
    20:13 93:9
    94:13 95:1
certifications
    20:7
certified 20:8
    93:11 94:14,16
    95:12
certify 93:12
    94:8
CFO 10:15
    18:19,21
change 47:7
    49:6,10 60:12
    77:13 78:21
    79:7 90:2 91:2
    91:3,4
changed 22:1,3
    23:5 26:21,25
    27:2
changes 9:10,11
    10:25 11:2
    49:8 91:2,3
    95:4
changing 78:15
    79:3
character 20:2
characteristics
    56:1
charged 20:15
    69:4
charges 95:7

Charles 2:9 13:9
    79:13 94:6
chief 4:16
child 4:25
children 74:10
    74:25
choice 33:15
choose 60:17
chose 48:14,21
    49:25
Chris 29:1 79:22
Christine 1:11
    1:14 3:2 4:1,8
    91:25 92:1,6
    92:11 93:9,14
Christmas 13:14
church 60:21
    62:20 64:10
circle 63:2
circled 18:7
cities 32:18
citizen 87:15
citizens 60:15
    89:11
citizenship
    45:22 70:2
city 32:21 46:18
    61:1,4,5,9
    62:15
Civil 1:5,18 93:5
claim 59:24
    86:19
claims 6:7
clarify 49:24
classifieds 18:7
clear 26:13
Clerk 95:11
close 44:2 80:13
    86:21
closer 58:21
closing 80:9
Coast 17:6,13
cohort 75:22
coincidence
    54:23
coincidental
    54:14

Coleman 61:22
collect 78:18
collection 4:22
    78:25
college 17:19,21
color 29:7
colors 54:4
come 32:3 42:16
    69:24,24 71:9
    78:24 79:25
coming 43:24
comments 67:21
    78:9 85:3
Commission
    68:10 92:20
committee 20:21
    20:23 21:12,15
    21:17
communicatio...
    35:14 68:14,16
    78:19 79:5
communities
    40:14 58:7
    60:2
community 36:8
    68:20 69:16
    89:10
compare 27:11
comparison 11:7
complete 9:23
    15:2
completed 25:10
completely 69:1
complexes 58:18
composition
    21:25 23:4
    24:18 39:2
    44:15 51:4
    52:8 53:19
    54:9
comprised 45:7
concentrated
    44:16
concentration
    34:9,19 35:7
    35:19
concern 38:14

80:20
concerning 8:10
    25:10 78:20
    79:6
concerns 11:13
    38:15
concluded 90:13
conduct 61:8
    81:9,18,20
    82:9,17 83:1
conducted 31:22
    32:9,25 33:5
    46:7 84:12,20
    86:4 89:4,14
conference
    13:11 17:11
confirm 28:23
    51:22 53:12
    54:8 81:8,19
    81:23 82:9,16
confirmed 29:13
    52:7
confirming 35:6
    35:17
conflict 82:25
connection 13:5
    37:17
connotation
    41:2
consider 55:13
    72:10 78:14
consideration
    92:14
considered
    27:23 70:19
    75:6,9
considering 9:10
consistent 31:7
constituents
    85:16
constitute 34:10
    34:20 35:8
    46:10
contains 95:4
contend 54:13
contests 6:2
context 63:20

continue 14:6,11
contract 46:18
    47:12 60:25
contradicts
    85:22
contrary 33:10
controller 18:18
convention
    22:23
conversations
    7:1
convicted 20:15
copies 79:5 95:9
copy 6:10 95:10
corner 11:21
    66:18
corporate 7:13
correct 9:3,4
    11:23 12:1,2,5
    12:6,22 13:2,3
    25:1,2,5,6 28:6
    30:6,7,23 33:3
    33:4 34:2,6,7
    41:12,22,23
    44:17 45:18,19
    46:10 49:21
    50:2,22,23
    51:2 52:10,11
    59:22,23 60:3
    60:4 62:2,13
    62:14,18,19
    63:7,14 66:4
    66:15,16,20
    71:24 72:4
    73:19 74:2,11
    83:16,18,21
    88:16,17,23
    90:2 92:2
CORRECTION
    91:4
Corrections
    91:1 95:4
correctly 21:9
    54:4
correlation 26:4
correspond
    13:17 40:2

41:6 74:6
**corresponds**
  11:25 12:4,8
  40:21 55:21
  74:13
**corroborate**
  32:9
**cost** 3:21 58:21
  70:10,15 72:12
**costs** 8:23 73:17
  75:21 76:11
**counsel** 7:2,11
  8:2 35:4,13,15
  37:14 94:3,8
**count** 11:12
**counts** 74:17
**county** 46:18,23
  46:23 47:10
  61:1 92:9
**couple** 53:15
**court** 1:1,1 5:9
  13:23 14:10,14
  14:18 15:2
  32:6 34:13
  59:11 93:1,2
  93:21
**courtesy** 14:25
  90:8
**covering** 8:22
**crack** 41:18
**CRAWFORD**
  2:9 36:21 37:4
  38:9,22 40:25
  54:21 55:11
  58:9 61:11
  79:18,21 80:4
  81:11,22 82:11
  82:20 83:4
  84:3,14,22
  85:23 86:11
  88:7,15,22
  89:6,16 90:10
  94:6
**created** 87:5
**Creek** 32:19
  39:22 54:2,19
**criminal** 20:16

**critical** 8:20
  9:13,15,16,18
**Cross** 60:21
  62:20,25
**CSR** 1:16 94:20
  95:15
**CTE** 72:25 74:4
**cumbersome**
  22:19
**current** 8:18,20
  28:14 29:14
  38:15,19 39:10
  42:4 45:21
  46:13 70:1
**currently** 4:17
  47:12 69:15
**Custodial** 95:6
**cut** 14:21

**D**
**dad** 17:5,9
**Dairy** 1:18 61:24
  62:1
**data** 26:19 31:11
  31:13 32:2,23
  33:18 42:3
  68:23 69:8
  72:7 75:13
**date** 10:3,10
  46:7 94:21
  95:15
**dates** 8:20 9:13
  9:15,17 50:5
**David** 30:15
**Davis** 68:25 69:3
  69:14
**day** 60:14 65:10
  65:13 92:11,15
**days** 65:7
**deal** 58:24
**dealings** 5:21
**decade** 77:11
**December** 1:12
  1:16 6:12 9:18
  93:10
**decided** 7:8
**decision** 6:24

47:22 50:4
  59:11 60:17
  64:5 76:10
**decisions** 57:1
  75:17
**deduced** 26:12
**deduction** 33:20
**deed** 59:6
**deeply** 84:10
**defeat** 33:14,24
**defeated** 29:25
  30:22
**defendant's**
  80:24 82:4,13
  84:8,17 85:12
  86:25 88:25
  89:9
**defendants** 1:7
  1:15 2:8 82:5
  84:9,17 86:19
  87:10 88:25
  93:8 94:6
**define** 31:4
  66:25 79:16
**defined** 9:16
**defining** 75:23
**definitely** 71:4
  72:13
**definition** 75:7
**degree** 17:22
**delivered** 95:6
  95:10
**delivery** 42:20
  43:3,12,15
**demographer**
  40:1 68:22,24
**demographic**
  43:3 69:5,16
**demographics**
  24:15 26:20
  38:25 41:6,7
  42:6,10,11,15
  42:19,24 43:17
  52:19,23 57:15
  57:22,23 58:7
  58:14 60:1
**denial** 33:9 34:1

34:2,3 81:3,9
  82:8 84:19
  89:3,13
**denied** 33:8
  80:24 81:17
  82:5,14,17,23
  84:9,17 88:25
  89:9
**denies** 81:1,18
**denying** 31:23
  32:6 33:22
  53:2 81:7 83:1
  84:11
**departments**
  77:6
**depending** 73:4
**depicted** 62:16
**depicting** 39:19
**depicts** 44:23
  50:15 51:13
  53:9
**deposed** 19:18
**deposition** 1:10
  1:14,19 3:8
  6:10 8:1,7 13:7
  80:20 90:13
  92:1 93:9,16
  93:18,24 94:2
  95:2,2,6,7,8,10
**described** 8:3
**describes** 24:17
**description**
  92:12
**design** 73:9
**designated** 6:20
  7:9 21:23
  45:20
**designating** 60:6
**determine** 26:15
  32:18 33:1
  34:5 70:15
  76:15 78:17
  86:4 89:4,14
**determines**
  28:11 74:23
**developer** 56:25
**developers**

56:22
**developing** 69:9
**developments**
  69:10
**devoted** 13:15
**differ** 57:16
**differences**
  58:10 71:13,15
**different** 4:18
  9:7 13:13
  27:11 39:1
  57:6 58:13
  59:6 64:3 65:6
  65:7 71:18,21
  78:2 83:11
**differential**
  71:20 73:14
  75:3
**differentials**
  72:6
**differently** 31:10
**difficult** 14:17
  47:4
**difficulties** 64:20
  64:22
**diluted** 88:1
**dilutes** 6:4 89:1
**directly** 27:20
**disadvantaged**
  25:4,18 26:2,5
  26:10 27:6,23
  43:6,9 72:2
**discretion** 28:1
**discuss** 36:22
  61:3
**discussed** 57:21
**discussion** 7:10
  32:4 56:17,22
  57:11 77:22
  78:8 80:3
**discussions**
  35:12 46:22
  57:6 63:21
  78:13
**disposal** 44:1
**distributed**
  68:17

**district** 1:1,2,7
3:10,11 4:11
4:22 5:2,8,9,9
5:22 6:5,19,25
7:6,9 9:3 10:14
11:5,19 13:4
16:8,8,14,24
19:13 21:12,18
21:20 22:1,6,6
22:10,17,21,21
22:25 23:3,5,7
23:8,9,14,15
23:20,21 24:3
25:4,8 26:3,8
26:21,23 27:9
28:5,11,13,17
28:19,22 29:9
29:16,21,23
30:4,8,25
31:14,18,21,25
32:5,8,11,14
32:17,19,25
33:5,12,13,18
33:21,23 34:4
34:8,9,25 35:5
35:7,15,22,23
35:25 36:3,6
36:10,13,17,18
36:25 37:1,6,8
37:9,19,24,25
38:5,6,11,16
38:21,24 40:2
40:5,11,16,20
41:5,15,20
42:4,9,11,14
42:18,19,23,25
43:13,17 44:12
44:19,24 45:2
45:4,23 46:1,7
46:9,12,17
48:14,20 49:13
49:25 54:13
55:3,6,15,25
56:18,23 57:14
57:24 58:12,15
59:8,15,18,24
60:5,7 61:8

65:2 66:21,22
67:6,11,16
68:15,19 69:5
69:17 70:1,3,8
76:8 77:11
78:4,13,18
79:4,7 81:2,9
81:17,20,25
82:1,9,14,16
82:23 83:1,8
83:22 84:6,9
84:12,18,19,24
85:2,5,8,13,15
85:18,20 86:4
86:9,13,17
87:17,22 88:3
88:5,11 89:4,9
89:14 90:2
93:1,2,7
**district's** 6:3,13
6:20 7:14 24:1
24:7,12,14,16
24:23 26:24
27:15 31:2,24
34:17 36:5,20
37:18 38:15
41:8 44:23
50:4,12 53:8
53:10 58:1,5
68:24 78:12
80:21 81:25
83:19 87:14
**districts** 4:18 9:9
18:23,25 19:3
19:4 34:11,16
34:18 35:1,10
35:18 36:12
44:16 45:5,12
45:16 46:8,14
48:15,17,21
55:8 56:25
77:24 85:14,17
86:1,2,5,5,10
87:24 88:6,8
**districts'** 49:5
**districtwide**
75:18

**dive** 51:8
**diverse** 22:5
44:14
**diversity** 78:3
**divided** 48:3
53:16 55:15
**divinity** 17:10
**Division** 1:2
5:10 93:2
**document** 8:16
30:4 32:5
33:22 70:8,11
92:12
**documentation**
68:6
**documents** 7:18
7:22,24 8:6
35:11
**doing** 14:5 18:1
**dollars** 4:23
27:24 71:14
72:23 73:7,10
74:5 76:5,6,12
76:14
**Don** 61:22
**dramatically**
57:23 58:13
**draw** 46:12
**drawing** 10:4
**drawn** 35:1,18
46:8
**drop** 71:7
**duly** 1:15 4:2
93:14

---

**E**

**E** 2:1,1 4:3 92:8
**e-mail** 78:19
**e-mails** 77:15,16
78:23 79:24
**earlier** 26:20
51:10 52:7
57:21 63:5
70:20
**early** 8:11 10:9
11:1,2,8,10,18
12:20,24 60:6

60:10,15,24
61:4 62:25
63:9,16,22,24
64:1,3,7,12,20
64:22 65:3,6,9
65:21 66:3,14
66:17 84:25
85:2,9
**easier** 47:19
64:17
**easily** 11:15
13:19 14:9
**east** 17:6,13
47:13 60:19
63:1,4
**easternmost**
62:21
**easy** 11:16
**Echo** 62:9
**economically**
25:4,17 26:1,5
26:9 27:6,23
43:6,9 72:2
**ed** 74:5
**educate** 58:3
**education** 59:12
72:19 73:1
**educational** 21:4
21:6 42:20
43:4,12,15
**effect** 36:18
43:19 86:6
**eight** 65:6,7
**either** 23:1
39:12 46:18
67:13 68:9
77:11
**elect** 18:24 49:25
67:2
**elected** 19:3
28:18 29:8,10
29:17 48:14
77:13 78:21
**electing** 6:3 42:5
79:7 85:15
89:1
**election** 3:19 5:1

8:9,11,19 9:20
9:23 10:6,8,10
10:17,25 11:1
11:3,7,8,10,18
11:25 12:1,8
12:19,21 13:2
21:19 28:24
29:10 34:12
44:13 45:1,1
45:11,15 46:13
46:19 47:15,18
47:23 48:2,6
48:11,12,17,22
49:18 50:1
55:21 56:2,5
56:15,20 57:9
60:14,24 61:4
61:19 63:9,23
64:1,4,8,12,20
64:23,25 65:4
65:10,14,19
67:17 80:25
82:7 83:23
85:4,7 87:18
88:21
**elections** 9:14,16
10:9 30:21
31:3,24 32:13
33:7,16 46:17
46:25 47:3,5
47:14 61:2,7,9
65:6,9 66:23
67:8,14 68:12
82:14 83:9
84:9 87:20
**electoral** 9:8
36:1 37:13
**electual** 78:15
**elementary** 21:1
46:21 47:13,21
53:10,14 54:2
54:19 55:12
61:8 72:16
73:25
**eligible** 21:19
25:12,16 71:2
**Elizondo** 1:3

4:10 5:7 16:3,4
20:18 21:18
30:9,18 93:4
**employed** 94:9
**employer** 16:10
**employment**
17:24
**enable** 33:14,24
**enacted** 84:18
**encompasses**
39:21
**endorse** 67:1,9
**enhance** 35:23
37:2,10,21
**enhanced** 36:7
**enhancing** 36:19
**enrollment**
45:12,15 46:14
48:2,15,20,21
48:25 49:5,11
49:14,19 50:1
50:5,11,20,22
53:9,15 55:8
56:6,7,16,21
57:10 69:6,18
72:9,13 73:15
**enrollments**
50:16 70:14
**ensure** 7:17 8:19
69:22 75:13
78:6 88:8
**ensured** 76:4
**ensuring** 11:12
11:14 36:11
49:3
**entail** 4:20
**entails** 4:21
**entire** 11:7 36:9
37:5 38:11
41:15 76:8
86:13,16
**equipment**
10:22,23 47:20
**era** 39:11
**especially** 77:19
**essential** 60:10
**essentially** 62:22

**ESSER** 76:5,12
**established**
34:23 56:12
**estimate** 27:14
27:15
**ET** 1:7 93:7
**Ethics** 68:10
**ethnic** 21:25
23:4 24:18
38:25 39:2
40:21,22 41:6
41:7 42:10,15
42:19,24 43:16
44:11,15 45:21
45:24 46:1
51:4 52:8
53:19 54:8
56:1 57:15,22
57:23 58:6
60:1 67:19
68:14 70:3
**ethnically** 31:2
32:7,13 33:3,7
**ethnicity** 26:4
31:8 32:2
**event** 15:20
**everybody** 11:14
87:15
**evidence** 31:1,20
33:10,11,25
34:2 82:24
**evidenced** 42:11
**evident** 40:22
41:7
**exact** 10:3 22:4
74:17
**examination** 3:1
3:3 93:20
**example** 54:17
71:18 73:25
**exceed** 74:9
**exceeded** 83:25
**exception** 47:25
53:14
**excuse** 10:11
**executed** 92:13
**Exhibit** 3:6,8,9

3:11,12,14,15
3:17,18,20 6:9
6:14 24:7,9,22
25:3,24 30:2,4
39:16,18 44:19
44:21 49:14
50:8,10,15,15
51:10,12,13,23
53:4,6,9 54:3
55:20 61:18,24
62:24 65:12,17
70:5,7,8,22
71:25 72:6
75:4
**exhibits** 53:8
95:9
**exist** 58:2,14
71:13
**existing** 85:21
**exists** 32:13
**expect** 31:12
**expending** 4:22
**expenditures**
70:12,16 71:20
73:15 75:3
**expensive** 58:23
**experience**
17:24 19:2,24
**expert** 31:12
33:17
**experts** 32:4
**Expiration**
94:21 95:15
**Expires** 92:20
**explaining** 75:3
**explanation**
59:25 73:14
**explanations**
72:5
**expressed** 92:14
**expression** 15:25
**expressions** 39:7
**extent** 37:12
57:14 66:22
67:7,12,16

_____ **F** _____

**fact** 15:24 28:23
31:19 33:8
37:2 49:22
56:6 57:21
59:1 60:25
63:6 82:19
83:2
**factor** 73:18,23
74:3,8,13
**factors** 43:14
71:19 73:13
75:2
**facts** 7:20 57:2
78:2
**factual** 34:24
80:20 87:13
**fair** 11:20 26:18
36:25
**fairly** 15:16
62:16,17
**falsity** 82:18
**familiar** 20:18
21:4,7,11
24:10
**families** 58:20
**family** 25:20
**far** 12:16,25
14:5 47:13
73:13
**farther** 55:9
**fear** 85:25 86:1
86:8
**February** 10:1
**federal** 4:25
5:24 27:21
28:4,11 32:6
33:8,22 34:3
76:5
**Feds** 18:2
**feel** 5:20 11:10
64:14
**feeling** 5:18
**feels** 38:10
**fell** 64:6
**felt** 7:2
**fewer** 73:17,18
**figure** 45:13

**figures** 71:17
**filed** 31:14 32:5
33:21 37:18
77:20 81:2
95:11
**files** 10:16
**filing** 31:22
37:19 81:8
**fill** 71:8
**finance** 4:18,24
**financial** 4:16,21
8:21 47:17
**financially** 25:15
47:20 94:11
**fine** 23:2
**finish** 15:1
**firm** 9:2
**first** 4:2 18:1
47:23
**fit** 64:14
**five** 16:25 64:2
**flow** 72:1
**fluctuate** 71:5
**focus** 28:1 36:10
43:5,6,12,14
76:2
**focused** 20:23
85:15
**focussed** 76:7
**follow** 52:12
60:6
**following** 28:3
43:13 93:13
94:3
**follows** 4:2 46:4
50:14 93:24
**foregoing** 92:1
92:13
**Forest** 13:1
45:17 48:1,10
48:24 51:2
52:20 54:18
62:3
**form** 36:6,21
37:4,20 38:9
38:22 40:25
54:21 55:11

58:9 71:9
81:11,22 82:11
82:20 83:4
84:3,14,22
85:23 86:11
88:7,15,22
89:6,16
**formal** 66:23
67:8
**formally** 67:13
**formed** 22:11
34:19
**forms** 35:23
36:18 37:1,9
**found** 25:11
29:7
**four** 45:4
**fourth** 74:8,13
**free** 25:10,12,16
71:2,11 73:3,5
73:8 74:10,14
74:18,24
**freeway** 39:6,11
40:24 62:4
**friend** 19:25
**full** 10:9
**fund** 3:21 70:10
70:13,17 71:14
75:5
**funding** 71:13
72:1 74:24
**funds** 5:1 28:3,4
75:17
**further** 55:18
90:7 94:8,11
94:13 95:1

**G**

**general** 3:21 7:2
7:10 8:2 25:14
50:14 70:10,13
70:17 71:14
75:5
**generalization**
28:6
**geographic** 34:8
34:19 35:6

**Gessner** 11:16
64:11,16
**gestures** 14:7
**getting** 64:20
75:14 78:7
**give** 14:25 17:23
69:21 73:6
80:22
**given** 8:14 33:5
61:4 77:5
92:15 93:16
94:1
**giving** 91:2
**go** 13:19 17:18
50:21,25 51:2
52:1,20 57:2
71:12 75:3
80:10
**goals** 75:23,24
76:2,2
**goes** 74:24
**going** 11:1 12:25
14:25 15:24
16:19 22:16
39:5 41:10
52:25 72:21,23
76:20 77:21
80:7,10 85:6
**GOLANDO**
94:5
**Gonzalez** 29:1
**good** 4:5,6 44:7
64:14 80:11
85:18
**government**
27:21 28:11
**governments**
32:14
**graduate** 20:24
20:25
**graduated** 17:8
17:14,21
**graduating**
17:24
**graph** 24:16
**graphs** 26:12
**great** 14:5 44:6

80:4,14
**greater** 23:10
26:8 29:20
**grew** 17:6,13
**group** 5:19
39:11 70:3
**groups** 22:8
57:12 67:1,9
88:9
**grow** 69:22
**growth** 49:7,9

**H**

**half** 18:2,22
**hall** 61:4,5
**Hammerly**
64:10
**hand** 6:9 24:6
30:3 39:17
44:18 50:9
53:5 65:16
70:6 92:15
**handful** 64:2
**handle** 47:19
49:3,7 76:11
**handling** 4:21
**hands** 68:21
**happen** 8:12
34:14 46:14
47:4 49:23
52:18 72:25
83:17 86:2
**happened** 37:15
57:6 58:11
70:12 78:9
80:1 83:17,20
**happening** 8:18
32:24 68:2,6
69:19 72:22
83:6
**happier** 15:3
**happy** 15:21
**hard** 14:20
**head** 10:3 14:8
24:13 25:23
27:11 65:1
66:13

**headed** 21:12
**heads-up** 80:23
**heard** 34:22
36:22 64:2
67:20 73:13
76:4 77:16
**hearing** 64:19
**heavily** 44:13,14
**Hedwig** 39:22
**held** 65:14
**help** 69:6,18
75:13,13 76:7
**helps** 10:21
**hereto** 1:19
**high** 12:15,16
17:8,14,16,18
21:1 50:12,15
50:18 51:6
54:18,19 74:16
**higher** 53:24
58:24 73:8
**highlight** 27:12
**highlighting**
70:18,22
**Highway** 39:3,6
**Hill** 32:20 39:21
**Hilshire** 11:22
32:21 39:23
51:17,24 52:5
52:9,14 54:11
62:22 63:6,13
66:19
**Hispanic** 23:10
23:11 24:23
25:25 29:16
35:2 40:17
45:7,12 46:9
83:12
**Hispanics** 34:9
34:20 35:7,20
43:8
**historical** 64:6
**historically**
11:19 12:23
60:5
**history** 56:24
59:8,19 82:24

83:5,6
**hold** 37:13 56:14
**holding** 39:25
**holds** 50:18
53:13
**Holy** 60:21
62:20,24
**home** 55:9,10
**homeowners**
57:11
**homes** 58:22
69:11
**horseback** 17:23
**Horton** 8:14,25
9:1
**host** 46:17,18
47:5 60:23
61:2,16
**hosting** 10:6,8
**hosts** 73:2
**hour** 15:19
43:24 44:1,2
80:8
**hours** 13:18
**household** 55:17
**households**
54:17
**housing** 58:21
59:2
**Houston** 1:2,18
2:5 5:10 16:23
32:22 93:2
**huh-uh** 14:8
**HULLETT** 2:9
**hundred** 29:13
**Hunters** 32:19
39:22 54:2,19

**I**

**I-10** 39:6,10
42:1,16 48:4,8
48:9,24 50:25
51:2,5,14
52:19 53:17,20
54:15,16 56:8
56:11 57:16
58:8 61:25

62:8,12 63:12
66:12,15
**identity** 92:12
**ignorant** 58:6
**imagine** 57:6
**impact** 43:14,16
65:2 85:9
**impacts** 86:10
**impediment**
85:1,7
**implications**
47:17
**important** 13:21
14:6,15 15:6
60:13
**improper** 20:1
**improperly** 6:4
**inadvertently**
14:22
**includes** 94:3
**income** 25:19
**incorporated**
57:18 59:16
**incorporation**
59:9,19
**increase** 37:25
38:3 49:6
**independent** 1:6
4:11 5:8 16:8
16:13 28:19
61:7 69:3 93:7
**INDEX** 3:1,6
**indicate** 91:2
**indicated** 29:3
63:15 65:24
70:18 78:20
**indicates** 58:21
58:23
**indicating** 65:21
**indication** 69:21
**individual** 28:5
**individuals**
37:11
**influences** 71:22
**influx** 69:13
**infographic**
25:24

**informal** 66:23
67:8
**informally** 67:13
**information**
8:10,21 9:19
10:5 25:10
26:6,16 32:3
34:24 35:17
37:14 57:5
68:20 69:17,19
77:12 78:23
79:10 94:1
**instance** 1:15
20:4 72:11,15
72:25 76:1
**instrument**
92:13
**inte** 59:12
**integration**
59:12
**intention** 63:15
**interest** 85:16
**interested** 94:12
**internal** 17:25
**interpreting**
54:3
**Interstate** 39:3,5
**intertwined**
48:13
**investigate** 59:5
**investigated**
32:11 33:11
37:8,20 42:6,9
42:14,18,23
57:14,19 58:13
59:1,14 67:6
67:10 83:19,22
84:4 85:20
**investigation**
28:22 31:21
32:1,8,17 33:1
33:6 34:5 35:6
37:13 43:20
46:6 81:3,5,9
81:20 82:10,12
82:18,21 83:2
83:7 84:12,20

85:25 86:7
89:3,7,13,17
**investigations**
32:8 78:14
**involve** 32:22
82:14
**involved** 47:21
66:23 67:18
83:10
**involvement**
21:11
**involving** 87:23
**irony** 61:3
**ISD** 1:17 3:20
4:17 12:24
16:22 18:11,15
18:17 20:24
70:9
**ISD's** 8:8
**issue** 38:16
**issued** 6:11
**issues** 21:22
**items** 76:25

---

**J**

**J** 2:9 94:6
**January** 9:21,25
37:15 63:19
**job** 14:5 18:8
92:25 95:18
**John** 64:9
**jurisdictions**
33:2

---

**K**

**Karen** 10:19
**Katy** 39:6,11
**keep** 43:25 44:4
**kids** 69:13 71:8
73:5 75:13
**kind** 48:13
71:12
**kits** 74:19
**knew** 10:16 83:5
**know** 5:14 10:8
10:22 12:16
13:13 14:25

15:21 16:2,5,9
16:16 18:5,7
21:8 22:8
23:22,24 25:22
26:3,6 27:10
29:2 32:23
37:6 38:10
39:8,12,12
43:20 49:1
51:8 52:18
53:1,2,3 54:11
57:1,8 58:11
58:16 59:5
68:4 69:1,2,8,9
69:11,23 70:1
70:4 71:8,9
72:23 74:18
76:10,20 77:8
77:14,21,23
78:2,8,24,25
79:1,11 81:5
83:8,14,15
84:6,7 85:11
**knowing** 18:9
22:4,20 56:24
**knowledge** 7:20
32:12 66:21
67:3,12,15
**known** 62:7
92:11
**knows** 59:18
**Knox** 64:9

---

**L**

**lady** 13:22
**landmark** 62:23
**Landrum** 12:4
45:5 63:10
**Lane** 62:9
**language** 89:2
**large** 6:4 34:9
79:24
**largely** 41:22
42:1 43:1,2
52:24 54:10
**larger** 22:8
**Latino** 89:10

**law** 9:2 46:16,22
**lawsuit** 4:10 5:5
5:14,17,23 6:2
6:6 14:2 15:25
19:7,10 21:23
31:14,22 33:8
33:22 34:4
37:17,18 69:4
77:19 78:10,12
80:10,21
**lawyer** 4:10 6:13
**lawyers** 10:14
13:4 78:12
**layout** 50:14
**lead** 58:19
**Leadership** 62:8
66:5
**leading** 13:14
77:20
**leaving** 58:20
**led** 20:21 37:15
**left** 13:22 18:14
18:18
**legal** 8:8,9 9:8
16:1 21:19
35:4,12,14
36:1 37:12,14
76:21
**Legislature**
46:16
**Let's** 21:22 44:5
**letter** 62:10
**letting** 15:1
**level** 25:19 58:17
58:22,24 76:23
**Lezama** 30:12
67:22,25 68:13
**licenses** 20:6
**light** 87:22
**likelihood** 37:25
38:3
**likewise** 26:25
52:24 62:12
**limited** 65:5
87:19
**limiting** 65:3
**line** 74:20 76:1

76:25 91:2
list 3:11 27:12
List/Names 30:5
listed 6:21 7:15
  13:16
lists 27:12
literacy 76:2
literally 55:19
  78:4
litigation 87:23
little 11:19 18:20
  22:19 24:16
  63:1 71:7
live 17:1
lived 17:2
living 4:15 58:20
located 11:21,24
  12:3,7,20,25
  39:3 48:4
  53:16 61:5
  62:8 63:10,12
  66:10
location 60:18
  60:20 61:20
  62:6,12,15,25
  63:16,22 64:11
  66:3,18 84:25
  85:9
locations 11:15
  60:6,8 63:9
  65:3,22,24
  66:15
long 16:24 22:24
look 18:6 20:24
  33:18 47:16
  51:12 61:24
  72:15,24 73:3
  75:20,21,24
  87:4
looked 8:21
  28:24 33:18
  51:10 58:1
  59:8 64:13
looking 55:20
  61:24
looks 22:24 44:2
  52:4 54:4

Lopez 30:15
lost 81:12 82:6
lot 58:18
lots 21:6 47:3
loud 14:6,12
low 11:6
lower 36:3 43:23
  58:17,21,22
  72:19
Lucas 13:9
lunch 25:11,12
  25:17 71:3,11
  73:4,6,9 74:10
  74:14,19,25
Lutheran 60:21
  62:20

M

M 4:3
ma'am 13:8
  25:21 40:10
  41:11,13,16
  81:14,16
machine 1:17
maintain 35:11
maintained 42:4
maintaining
  86:20 87:12
maintenance
  88:14
majority 23:8,15
  23:21 24:3
  34:10,20 35:1
  35:8,20 46:10
  52:9,9 54:14
  54:24 83:11,12
  83:24 88:1
makeup 44:12
making 9:10
  10:22 33:9
  34:3 57:1 82:8
  84:19 85:19
  89:3,12
manager 18:14
  18:15,21
manner 23:25
Manor 16:23

map 3:13,14,16
  3:17 39:19
  44:23 50:15
  53:7 55:21,22
  62:10
mark 80:8
marked 6:9,14
  24:6,9 30:2,4
  39:16,18 44:18
  44:21 50:8,10
  53:4,6 65:12
  65:16 70:5,7
MARTIN 94:5
master's 17:10
  21:9
math 45:10
mathematical
  27:16
matter 31:19
  49:12 76:21,22
matters 69:5
McKinney 2:10
meals 25:12
mean 12:14
  13:13 23:1
  25:7,19 28:25
  31:6 42:25
  48:11 56:4
  61:14 77:5,23
means 25:9
meant 7:17
meet 13:10
  25:16 71:6,6
  75:8
meetings 35:3
  61:17
member 36:17
  37:20 88:19
members 4:12
  28:14 29:14
  77:16
Memorial 13:1
  39:1,20 40:6
  40:12 41:21
  42:7,12 45:16
  50:21 51:14
  54:18 57:18,22

59:3,9,16
  61:25
Mendy 1:16
  93:11 94:20
  95:15
mentioned 8:24
  9:12 14:14
  17:14
merely 19:12,13
met 10:13 13:5,6
  13:12 21:18
method 77:13
  78:21 79:7
Methodist 17:11
mid-'80s 49:17
middle 21:1,1
  44:24 45:6
  48:1,2,7,10,14
  48:21 49:11,13
  49:15,16,19
  50:1,5,19,24
  51:1,2,6 52:2,2
  52:6,14,15,20
  54:17,18 55:14
  55:21 61:19
  62:3,18 63:11
  65:10
military 17:4
mine 19:25
minister 17:11
  64:10
minorities 6:5
  53:22 89:2
minority 22:7
  23:15,21 24:3
  26:9 28:18
  29:17,19,23
  30:9,12,15,19
  30:22 31:9
  33:14,24 35:24
  36:7,19 37:3
  37:11,22 38:1
  38:8,19 42:1
  43:2 53:24
  81:1,19 87:25
  88:9,20 89:11
mirrors 50:24

moment 16:19
  29:13
monies 27:19
months 16:25
morning 4:5,6
mouthful 61:12
move 18:4 20:25
moved 17:9
  54:25
multifamily 59:2
municipal 32:14
municipalities
  56:17

N

N 2:1 4:3,3
name 4:7,9
  68:25 69:2
  92:12
narrow 79:25
nature 72:21
near 61:21,25
nearby 55:10
necessarily
  58:24 69:23
  85:17
need 9:11 15:20
  43:10,22 57:5
  71:10 75:15
  76:9,16 78:17
  80:5
needed 10:23
  79:16
needs 25:16 28:1
  43:6 69:25
  75:21,24 76:3
  76:7
negative 86:5,10
negatively 42:20
neighborhood
  55:4,7 57:12
  65:10
neighborhoods
  82:24
neither 94:8
never 33:18
  57:19 58:1

nevertheless 56:10
new 63:22
newspaper 18:6 68:4
Nodding 24:13 65:1 66:13
nods 14:7
Noel 30:12 67:21
non-Hispanic 40:6,12
non-Hispanics 33:13,23
nonbased 86:22
nonminority 41:22
nonrace-based 86:20,22 87:11
nonresponsive 36:15 38:13
normally 63:25
north 2:10 11:21 17:6 39:3 40:23 41:8 42:15 48:4,8 49:2 50:21,25 51:1,5,14,24 52:13,19,20,25 53:16,20,25 54:5,9,15,25 56:8 57:16,24 58:8,14,17 60:2 63:12 66:15 77:24 85:1
north-side 43:2 52:2
Northbrook 11:25 45:5 49:16 63:10
northeast 11:21 66:18
northwest 11:5 64:18,21 85:6
notary 1:20 92:2 92:18
note 61:12

noted 92:2
notes 87:5
notice 3:8,19 6:10,16,22 7:15 65:18 80:19
noticed 25:24
November 47:3
number 5:6 8:11 9:2 22:11 25:22 27:22 28:12 34:18 49:4 60:7 74:24 83:25 91:2,2
numbered 1:15
numbers 11:7 22:4 23:22,23 46:4 65:7 71:12
numeracy 76:1
numerous 76:7
nutrition 4:25

**O**

O 4:3
Oaks 12:19,21 45:6 63:2,11
oath 92:11
Object 36:14
objection 36:21 37:4 38:9,12 38:22 40:25 54:21 55:11 58:9 61:11 81:11,22 82:11 82:20 83:4 84:3,14,22 85:23 86:11 88:7,15,22 89:6,16
observation 61:15
obtain 20:12 31:11 32:2
obviously 29:1 77:22

occasions 20:3
occur 64:22
occurred 47:23 63:21 86:6 94:15
occurrence 64:6
offense 20:16
offer 60:14,15
offered 64:11
office 4:25 9:21 38:1 92:15
officer 4:16 93:15 94:2 95:2
officer's 95:7
offices 1:17
official 4:12 5:2 20:25 82:2
oh 13:6
okay 12:18 15:22,23 19:15 22:22,23 28:8 39:15 63:3 71:16 77:7 80:15,16 90:5 90:12
once 15:19 23:7 71:6,6 77:19
ones 68:10
opportunities 43:10
opportunity 36:2 60:16 65:8 88:9 89:11
options 78:6
oral 1:10,14 93:9,15
order 9:11,23 10:1,4 61:1
ordered 34:13
ordinances 59:3
Organized 67:1
original 95:2,6,8
originally 6:11
outcome 94:12
outside 39:2

54:11
overall 85:18
oversee 4:24 68:11
oversimplify 42:25
overt 67:18
overwhelmingly 45:7

**P**

P 2:1,1
p.m 10:1
page 3:3,7 24:12 91:2,3 95:4
page(s) 92:2
PAGE/LINE 91:4
paper 91:2
Paragraph 81:24 82:22 84:8,16 85:12 86:18,25 88:24 89:8
Pardon 53:23
part 20:21 31:15 60:22,25 78:24 87:9
participate 89:12
participated 21:13
participation 36:2,4,11 78:7
parties 15:8 94:3 94:9 95:11
partner 46:24 47:11
party 19:6,9 93:23
passed 46:16,22
passing 75:9
passthrough 28:7
pattern 50:18,24 53:12,13
patterns 58:2

60:1
payroll 18:21
pending 5:8
people 5:20 8:19 9:22 11:7 14:18 47:20 64:3,18 68:8 76:4
percent 24:22,23 24:24,25 25:3 25:9,25 26:1 27:4,4,17 29:14 40:7,7 40:13,13 45:11 45:18,18 71:4 71:5,11
percentage 23:11,12 27:3 27:5,6,10 29:18,20 70:2 71:2 73:4,9
percentages 26:17
perfectly 55:14
period 29:24 31:3 67:17 77:10 83:10
permits 69:10
permitted 59:2
person 10:18,19 10:21 55:17 92:12
personal 16:20 19:2
personally 19:6 29:4 92:11
phonetic 78:15
physically 55:9
pick 9:22 62:23
picked 60:20
pictures 29:5,6
pieces 72:7
Piney 32:20 39:21 47:11 60:23 61:4,5,5 61:6 62:15
place 6:11 49:20

65:25
**placed** 55:7
**placement** 60:8
**plaintiff** 1:4 2:3
16:3,4 82:6
84:1 93:4 94:5
95:8
**plan** 34:12 35:10
38:15 88:5,13
88:14
**plans** 88:19,19
**play** 69:10
**please** 4:7 91:2,3
**plus** 40:7,13
**point** 24:4 32:20
39:22 47:12
60:23 61:5,6,6
62:15 64:5
**Point's** 61:4
**polarization**
31:4
**polarized** 31:2,6
31:20,23 32:7
32:13,22 33:2
33:3,7 82:15
84:10
**policies** 38:7,17
**policy** 8:9 86:20
86:23 87:11
88:4,12,13,18
**political** 89:12
**ponder** 64:7
**population** 22:6
22:11 23:5,10
23:11,16,16,17
23:19,20 24:4
29:20 33:19
34:11,21 35:2
35:9 41:21
45:22,25 46:10
70:2
**populations**
29:19 40:6,8
40:12,14,18,23
41:8,25
**Porter** 1:11,14
3:2 4:1,8,9

6:14 24:9 30:2
39:16 44:11,21
50:8 53:4
65:12 70:5
80:6,18 91:25
92:1,6,11 93:9
93:14
**portion** 62:17,21
**position** 24:1,16
31:19 32:9
34:17 36:5,17
36:25 38:16,21
38:23 58:5
75:12 80:22
87:14
**possess** 35:5
**possible** 13:19
49:8 88:23
**post** 9:19
**potential** 58:19
63:21
**potentially** 86:1
**practical** 76:22
**precinct** 11:25
12:1,4,4,8,9,19
12:21 55:21
56:15,20 57:9
**precincts** 13:2
44:13 45:1,1,7
45:11,17 46:13
46:21 48:2,7
48:12,22,23
49:18 50:2
56:2 61:19
**preferences** 38:7
38:18
**preferred** 33:15
33:25
**premise** 78:1
**preparation**
7:12 8:6 10:24
13:5,6
**prepare** 7:25 8:4
10:14 69:12
**prepared** 69:22
**preparing** 13:16
95:8

**Presbyterian**
64:9
**PRESENT** 2:13
**presentation**
8:13,16,24 9:5
37:15 78:11
**presume** 35:15
**pretty** 17:13
49:9
**previous** 10:15
10:17 77:24
92:2
**Previously** 11:6
**primarily** 4:21
49:2 69:18,25
74:15 75:1
**principal** 72:11
**prior** 19:23
21:10 37:19
46:20,20 47:14
60:9
**privilege** 35:16
**probably** 13:12
15:19 16:14
18:3 39:5,10
75:19
**procedure** 1:18
31:16
**proceeding** 5:13
16:1 94:10
**proceedings**
13:21
**process** 19:17,20
47:15 60:5
67:18 68:11
80:1 89:12
**processes** 66:24
67:9
**produce** 38:6
72:23 78:19
**produced** 1:14
30:5 44:19
70:8
**producing** 38:17
**professional**
20:6
**program** 25:13

25:17 73:2
74:6
**programatic**
72:22
**programs** 72:14
72:19,24,25
73:1,11 74:4
76:14,15
**projections** 69:6
**promise** 14:20
15:11
**promote** 85:14
**proper** 81:15
**properly** 24:17
62:7
**proponent** 55:4
**proportion** 26:9
27:8
**proportional**
35:24 37:2,10
**proposition**
25:14
**proved** 92:11
**provide** 5:4 36:2
67:2 69:23
**provided** 8:14
27:25 34:24
69:20
**provides** 85:1
**provisions** 1:19
**public** 1:20 8:16
11:16 20:8
64:16 67:21
78:23 79:10
92:3,18
**published** 77:11
**pull** 51:11
**pulled** 26:6
**purchasing** 4:25
**purely** 54:13
**purports** 24:14
**purposes** 79:1
92:14
**pursuant** 1:18
94:1,13
**put** 63:15 69:10
85:5

**putting** 61:3

**Q**

**quadrant** 11:5
**qualifies** 25:17
**question** 14:21
14:24 15:1,10
15:14 36:16
37:7 38:14,15
40:9 41:4,10
48:20,22 67:4
81:2 86:24
89:23
**questions** 7:4
13:24,24 15:7
15:17 16:13
80:9 89:19
90:7,11
**quite** 54:5 76:6
**quote** 86:19,21
87:11

**R**

**R** 2:1
**race** 26:4 31:8
32:2 33:19
58:25 69:24
70:3 87:17
**racial** 21:25 23:4
24:17 31:4
38:25 39:2
40:20,22 41:5
41:7,14 42:10
42:15,19,24
43:5,16 44:12
44:15 45:21,24
46:2 51:4 52:7
53:19 54:8
56:1 57:15,21
57:23 58:6
59:25 67:19
68:14 69:20
82:25 89:2
**racially** 31:1,6
31:20,23 32:6
32:12,22 33:2
33:7 82:15

84:10
raised 11:13
  17:3
ran 21:2,20
  30:22
range 40:7
ratio 74:21
rationale 48:6
  48:23 49:1
  59:19 60:7
ratios 72:20
reached 64:11
read 1:19 7:16
  87:3 92:1
readily 56:8
ready 7:21 80:11
realized 18:3
  85:4
realizing 27:15
reallocate 75:17
really 18:9 28:10
  73:23 77:20
  78:10
reason 82:6 91:2
  91:4
reasons 86:20,23
  87:11 88:4,12
  88:14,18 95:4
recall 21:15
receive 27:20,25
  73:9
received 77:11
  77:17 78:20
  79:5 85:3
recognize 39:19
  43:22 44:22
  50:11 53:7
  65:18
recognized 78:3
recollection 9:13
recommend
  68:8
record 1:19 9:1
  14:15 15:2
  28:17 93:16
  94:4
recorded 1:17

records 28:23
red 63:1
Redbud 2:10
reduced 25:10
  25:12,16 71:3
  71:11 73:4,6,9
  74:10,14,19,25
refer 5:13 15:25
  16:2,4,7,15,16
  22:20 39:5
  51:11
reference 51:22
  61:18 71:17
references 88:20
referring 67:22
  82:1
reflect 71:25
reflected 22:7
  72:6 75:4
  88:21
reflecting 22:7
reflects 25:3
refreshed 9:12
regard 6:21 24:1
  56:4
regardless 87:17
regular 65:14
related 94:9
relationship
  20:1 31:7
relatively 11:6
  78:1
relevant 9:6
rely 15:8
relying 14:7
remaining 45:15
remember 21:7
remembering
  21:9
reopens 9:21
repeat 40:9
  42:22 86:24
rephrase 15:11
  41:3
report 35:6
  40:17 68:9
reported 73:5

reporter 13:23
  14:10,14,18
  15:3 68:5
  93:12
REPORTER'S
  3:5 93:9
Reporters 93:21
reports 64:21
  68:13,23
represent 36:9
  37:5 38:10
  86:13,16
representation
  35:23,24 36:6
  36:7,18,19
  37:1,2,10,19
  37:21,21,25
  38:6,17
representative
  6:25 7:6,13
  21:24 22:16
representatives
  6:19
represented 9:3
  78:5 88:10
representing
  4:10 5:19
represents 41:15
request 79:14
requested 3:4
  79:4,9
requests 37:14
  77:8 78:23
  79:10,11,12
required 59:12
  88:10
requirements
  21:19 75:8
  94:13
requires 71:1
research 85:21
reserve 90:11
reset 6:13
reside 16:21,22
resident 16:24
residential 42:6
  58:15 60:1

82:24
residents 26:24
  37:22 64:21
respect 7:14
  12:19 23:19
  53:13 54:2
responded 18:5
  18:8
responding
  22:25
response 10:25
  22:24
responses 85:3
responsibilities
  69:4
responsive 38:7
  38:18
restriction 59:6
restrictive 57:17
result 36:7 57:17
  71:14,19
results 8:9 10:17
  28:24 78:16
  88:21
retired 17:9
return 93:21
returned 95:2,4
  95:6
review 7:19 8:6
  8:15 29:5,6
reviewed 8:8,9
  8:10,13,23
reword 41:10
right 15:8 22:18
  23:1 43:21
  44:13 45:13,14
  54:1,3 55:19
  57:24 62:1,9
  63:6 65:7 67:5
  71:23 72:3
  76:20 87:16
right-hand
  24:17
rights 5:24
  80:25 81:1,7
  81:18,19 87:24
  88:10

Road 18:9
ROEDER 2:9
role 4:24 5:1
  69:14
roll 76:23
ROME 2:4
room 64:13
roughly 62:24
RPR 1:16
Rule 94:14 95:1
  95:10
Rules 1:18
run 9:23 10:21
  38:1,4
runoffs 47:3

S
S 2:1 92:8
Saturday 65:15
saw 29:1
saying 22:21
  43:18
says 25:25
SBISD 3:8,9,11
  3:12,14,15,17
  3:18,20 16:9
  44:19 70:9
Schaper 62:7
  66:5
Schneider 1:16
  93:11 94:20
  95:15
school 1:6 4:11
  4:17,18 5:8,22
  9:9 11:5 12:16
  12:17 16:8,13
  17:8,15,16,18
  18:23 19:3
  21:1,2 22:5,6
  28:11,19 36:12
  36:12 41:15
  42:5 45:6
  46:14 47:21
  48:1,2,7,14,20
  48:21 49:6,13
  49:15,19 50:1
  50:5,16 52:15

52:20 53:15
54:17,18,18,19
55:12,15,18,18
55:22 56:2,6,7
56:9,10,13,16
56:21,25 57:10
61:7,8,19 62:3
62:18 63:11
67:7 72:16,16
74:1 77:24
78:4,5 83:9,23
85:14,18 86:1
86:4 87:24
88:6 93:7
**schools** 27:9
41:9,25 43:1,2
44:24 46:21
47:13 48:3,10
49:3,11 50:12
50:19,19,25
51:6,7 52:3
53:10,14,15,16
53:21,25 55:1
55:4,7,8,9,14
57:2 59:13
65:10 71:21
74:16 75:7,7
**science** 85:21
**scientific** 85:24
85:24
**screenshot** 3:10
24:7
**seal** 92:15
**search** 28:22
79:16,23
**seated** 13:22
**second** 18:3
73:21,23
**secondary** 75:1
**Secretary** 68:9
**see** 12:25 42:3
51:15 71:18
74:15 75:21
78:6 79:1 80:8
**seeing** 21:8
26:17
**seen** 6:15 23:22

23:23 43:19
46:3 49:5
68:22 77:15
**segregated**
44:13
**segregation**
40:21,22 41:1
82:25
**sense** 47:2 58:3
58:16 76:1
**sent** 52:13
**separate** 71:22
**separately** 47:5
79:14,20
**series** 80:9
**serve** 28:19
**served** 95:11
**services** 42:21
43:4,10,11,15
43:23
**serving** 85:5
**set** 48:25 50:4
**setting** 19:21
35:14
**setup** 47:7
**seven** 45:5 47:18
**seven-member**
34:12 35:10
**Shady** 16:23
**SHAKRA** 2:13
**sheet** 71:22 91:2
**short** 44:3,5
80:12
**short-term**
27:19
**shorthand** 1:17
15:25 16:14
93:11
**shortly** 59:10
**show** 58:4 70:11
**shown** 45:5
49:14 95:11
**shows** 24:22
62:10
**side** 24:17 41:25
42:15 48:8,9
50:21,21,25

51:1,5,6 52:13
52:14 53:17,20
53:25 54:3,15
54:16,25,25
56:8 57:24
58:14,17,23
60:18,19,19
61:20 64:18
66:10,15 77:25
85:2,6
**sides** 40:23 48:4
57:16 58:8
77:18
**sign** 91:3
**signature** 3:4
91:1 92:1
93:20 95:4
**signed** 1:19
**significant** 31:1
75:2
**significantly**
23:5
**signing** 92:2
**similar** 53:13
68:16
**Similarly** 16:12
**simply** 15:21
16:15
**single** 36:17
37:20 88:19
**single-member**
18:25 19:4
34:11,15 35:22
36:6 38:6,17
46:8 85:13,17
86:2,5,9 88:4,8
88:13
**single-membe...**
34:18,25 35:9
35:18 37:1,9
37:24
**sit** 36:24
**site** 3:10 9:19
11:4,11,15
24:8,12,14
25:8 44:23
47:14 50:12

53:8 60:10,24
60:24 61:4
64:4,8,12
**sites** 8:11 11:1,3
11:18,21,24
12:3,7,20,23
32:24 47:18,21
48:11 60:13,15
61:17 64:20,22
85:1,9
**slates** 67:2
**slating** 66:24,25
67:9,13
**small** 40:17
**smaller** 85:16
**SMU** 17:9
**so-called** 38:25
39:20 62:6
**social** 85:21
**socioeconomic**
26:24 43:14,23
56:1 58:17,22
58:24 69:25
**somebody** 19:7
**sorry** 10:11
41:17,19 67:4
81:13 87:2,6
88:4,12
**sounds** 14:8
45:14,19 80:4
80:14
**source** 86:8,12
**sources** 35:17
**south** 17:7,17
40:23 41:25
48:4,9 49:2
50:21 51:6,25
52:14,21,25
53:16 54:6,9
54:16,25 56:10
57:16 58:8,14
58:23 62:4,8
62:12 63:1,4
66:10
**south-side** 41:9

43:1 53:21
60:2
**Southern** 1:1
5:9 93:2
**southernmost**
62:17
**span** 48:24
**speak** 7:25 14:17
**speaking** 22:20
**special** 72:18
73:1 74:4
**specialized**
72:18 73:24
74:4,6
**specific** 43:7
72:22,24 73:1
75:14,14 78:25
79:12 81:5
86:12 88:9
89:17
**specifically** 5:20
11:1 70:13
76:6,12 77:15
**specifics** 24:2
**spend** 16:19
28:1
**spending** 73:11
**spread** 73:18
**spreads** 72:12
**spring** 1:6,17
3:20 4:11,16
4:20 5:7 8:8
12:8,15,16,19
12:21,23 13:1
13:1 16:7,13
16:22 17:2
18:11,17,19,20
18:24 20:24
28:19 32:20
35:19 39:23
45:6,6,16,16
47:4 48:1,1,9,9
48:23,24 51:1
51:2,17,23
52:1,5,6,8,13
52:15,20 54:17
54:18 61:7

62:3,17 63:10
63:11 70:9
82:23 93:6
**squares** 55:15
**staff** 77:3,4
**staffing** 73:7,10
  73:12 74:15,19
  75:17
**staggered** 47:8
**stand** 37:5
**standard** 25:15
**standards** 39:25
  71:6
**stands** 86:13
**start** 9:24 10:9
  15:1 57:3
  73:15
**started** 17:25
  18:12,17
**starting** 69:22
**starts** 75:19
**state** 1:17 4:7
  9:8 10:6,8
  20:10,11 27:21
  28:4,9 68:10
  75:9 92:8,19
  93:12
**stated** 1:19
  80:21 87:1
**statement** 12:15
  34:6 85:13,19
  85:22
**States** 1:1 5:9
  59:10 93:1
**stating** 46:16
**Station** 17:21
**stationed** 17:5
**statistically** 31:1
**status** 26:5
**steady** 49:9
**stipend** 74:12
**stone's** 56:9
**stop** 14:22
**straight** 20:22
**Stratford** 50:22
  54:19
**street** 51:9 55:19

**strength** 6:4
  87:25 89:2
**strong** 86:15
**struggling** 75:8
**student** 3:20
  8:23 20:1
  23:16,17 24:18
  25:15,18 26:1
  29:19 40:23
  41:8 45:17
  70:10,14,15
  71:18,20 72:6
  72:12 73:15
  74:12,12 75:4
**student-teacher**
  72:20
**students** 23:9,11
  23:12 24:15,23
  24:24,24,25
  25:4,9,25 26:5
  26:9,10,25
  27:7,8,12,22
  28:12 29:21
  42:21 43:4,7
  43:15,22 44:12
  45:8,11 46:2,5
  48:8 49:4,9
  50:20,25 51:1
  51:5 52:1,12
  52:16,20,25
  53:20 54:9,15
  54:16,24 55:7
  55:13 56:8,13
  58:4 71:2 72:3
  72:10,12,13
  73:17,18
**subdivision**
  52:24
**subdivisions**
  57:12
**subject** 27:15
  56:16,21 57:10
  75:14 80:2
  81:21
**submitted** 93:18
**subscribed**
  92:13

**substantially**
  39:1 52:9,15
**subtle** 67:18
**sued** 19:7,7
  77:25 82:2
**sufficient** 35:8
**sufficiently**
  33:13,23
**suggestion** 79:16
**Suite** 2:5,10
**superintendent**
  7:2,7 76:2
**supplemental**
  27:24
**support** 33:25
  43:23 60:18,19
  75:14 86:16
  88:14
**supported** 83:24
  84:1
**supporting**
  83:11 88:18
**supportive**
  76:15 79:2,2
**supports** 43:11
  69:23 75:12
**Supreme** 59:11
**sure** 7:19,20
  8:17 10:16,22
  12:10 17:25
  23:23 41:1
  42:23 57:7
  72:17 79:21
  87:4
**surnames** 28:25
  29:1,3
**Survey** 68:20
  69:16
**suspect** 76:22
**switch** 47:9
  77:19
**sworn** 1:15 4:2
  5:4 93:14
**system** 6:3 36:1
  37:13 38:20
  42:5 75:16
  78:15 80:25

82:6 86:16
87:21 89:1
**systems** 9:8 38:8
  86:21 87:12

---

**T**

**T** 4:3 92:8
**tabbing** 57:3
**take** 6:11 14:23
  41:18 44:3,5
  48:19 55:8
  80:12
**taken** 1:15 14:9
  18:2 55:25
  56:4 94:3,11
**takes** 70:12
**talk** 7:21 14:16
  76:5 77:16
  79:13,19
**talked** 9:7 10:15
  10:20 15:24
  26:20 35:12
  63:5 68:2,4
**talking** 5:14
  14:18 16:5,9
  16:17 22:16
  39:8,12 77:17
**tax** 4:24 18:21
**TBA** 95:8
**technology**
  10:20,21
**tell** 10:6 14:22
  15:9,13 19:23
  41:12 62:24
  70:23
**telling** 26:14
  32:16
**Templeton**
  68:25 69:2,3
  69:15
**term** 9:16 22:15
  25:7 31:6
  81:25
**terminology**
  75:10
**terms** 23:15 24:3
  47:8 79:17,23

**testified** 4:2 20:4
**testify** 6:20 7:9
  13:16 14:11
  45:21
**testifying** 7:23
  19:21,24
**testimony** 5:4
  13:17 14:1
  15:8 21:10
  70:20 93:16
  94:2
**Texas** 1:2,17,18
  1:18 2:5,5,10
  5:10 9:8 16:23
  17:9,12,20,21
  18:1 20:10,11
  27:21 77:25
  87:23 88:6,10
  92:19 93:2,12
**thank** 10:12
  51:21 68:1
  90:8,9,10
**Thanks** 44:8
  67:24
**theory** 55:3,6
**therefor** 95:5
**thing** 10:24
  12:18 73:3
**things** 8:12 14:9
  68:7 69:11,24
  72:20
**think** 7:1 14:24
  15:13 26:15,17
  41:20 62:10
  79:15
**third** 74:3
**Thompson** 8:14
  8:25 9:1
**Thornwood**
  54:20
**thought** 21:17
**thousand** 63:25
**three** 34:22,22
  34:25 35:9,18
  45:15 46:8
**threshold** 71:7
  74:10

| | | | | |
|---|---|---|---|---|
| **throw** 56:9 | 93:15,18 95:9 | **typed** 13:25 | 36:1 39:7,12 | 16:3 17:6 30:9 |
| **tied** 8:20 69:25 | **translates** 59:3 | **types** 9:7 76:13 | 48:14,21 50:1 | 30:18 93:4 |
| 77:19,23 78:10 | **transportation** | **typing** 13:23 | **uses** 25:8 | **virtually** 22:12 |
| **time** 13:15 14:17 | 64:17 | — | — | **visioning** 20:23 |
| 15:17,21 16:12 | **TRCP** 94:14 | **U** | **V** | 21:17 |
| 16:12 18:3,3 | 95:1 | **uh-huh** 6:8 14:8 | **V** 1:5 93:5 | **visit** 80:19 |
| 22:1 24:4 | **trend** 26:11 | 16:6 44:9 | **Valley** 32:21 | **voiced** 86:9 |
| 26:21 35:4 | **trends** 69:19 | 48:16 51:18 | 39:23 51:17,23 | **volume** 79:24 |
| 42:16 47:7,24 | 75:20 | 66:9 73:16,20 | 52:5,8,13 63:2 | **Voss** 62:10 |
| 59:20 66:2 | **tried** 7:16 | **ultimately** 76:18 | **varies** 44:16 | **vote** 31:9 33:13 |
| 77:23 78:11 | **trouble** 80:5 | **underlying** | **various** 7:16 | 33:23 63:19 |
| 80:11 90:3,4,6 | **trucking** 43:25 | 85:25 | 33:15 65:21 | 65:11 85:2,2 |
| 93:23 94:2 | 44:4 | **underreprese...** | 77:15 88:5 | 87:16 |
| **times** 13:13 | **true** 12:11,12,13 | 5:20 | **variously** 16:7 | **voted** 63:18 |
| **title** 21:15 27:9 | 12:15,18 34:6 | **understand** 4:13 | **vary** 40:13 57:22 | **voter** 31:8,8 |
| 27:13,18,19 | 50:18,19 53:13 | 5:3,11,23 6:2 | 58:7 60:2 | 85:10 |
| 28:3 69:2 | 81:10 83:3 | 6:18 13:21 | **vast** 54:14,24 | **voters** 8:11 |
| 70:19,21,23 | 84:5,6,13,21 | 14:3 15:6,10 | **verification** | 11:10 22:1 |
| 71:1,6,7,22,25 | 89:5,15 92:2 | 15:12,14 19:9 | 27:16 | 23:8 31:9,11 |
| **titled** 5:7 30:5 | 93:16 | 29:4 31:15 | **verify** 26:18 | 32:3 38:8,19 |
| 70:9 | **trustee** 3:19 29:9 | 35:15 40:2 | 42:3 52:4 | 45:23,25 48:8 |
| **today** 5:3 6:13 | 33:7,15 65:19 | 68:21 69:14 | **version** 27:19 | 54:14,24 70:3 |
| 6:18 7:5,13,21 | 66:22 67:7,14 | 71:13 88:2 | 39:10 | 81:19 83:11,13 |
| 7:23 15:7 | 67:17 83:23 | 89:24 | **versus** 5:7 43:7 | 83:24 84:1 |
| 36:24 89:19 | **trustees** 5:21 6:3 | **understanding** | 59:11 | 85:1,5 87:25 |
| **token** 14:23 | 9:10 16:14,17 | 5:16,18 8:18 | **view** 17:23 | 88:20 |
| **told** 13:15 44:1 | 18:25 19:3 | 10:23 34:14 | **Villa** 16:23 | **voters'** 33:14,24 |
| 75:5 89:20,22 | 42:5 77:13 | 59:25 78:22 | **Village** 11:22 | 81:1 88:10 |
| **Tomball** 18:15 | 78:21 79:4,6,8 | 79:18,22 | 32:19,20,20,21 | **votes** 31:9 63:24 |
| **top** 10:3 25:23 | 82:1 85:15 | **understands** | 32:21 39:21,22 | 63:25,25 |
| 27:11 | 89:1 | 35:25 40:3 | 39:22,22,23,23 | **voting** 5:24 6:4 |
| **topic** 21:16 87:4 | **truth** 82:18 | **understood** 7:17 | 51:17,17,23,24 | 11:8 12:20,24 |
| 87:7,10 | **try** 14:16,20 | 15:17 21:10 | 52:5,5,8,9,14 | 31:2,20,23 |
| **topics** 6:21 7:8 | 15:11 41:10 | 89:19 | 52:14 54:12 | 32:7,13,18,22 |
| 7:15,16 8:22 | **trying** 48:19 | **undertake** 34:4 | 62:15,22 63:6 | 33:1,6,19 |
| 13:16 45:20 | 79:25 | 78:13 | 63:13 66:19 | 34:10,20 35:2 |
| 80:19 | **turn** 10:1 21:22 | **undertaken** | **villages** 39:1,3 | 35:8,19 45:22 |
| **total** 23:15,19,20 | 80:7 | 32:17 | 39:21 40:3,7 | 45:25 46:9 |
| 24:3 26:1 | **turning** 9:24 | **undertaking** | 40:13,17,21 | 60:6,10,15 |
| 40:14 | **turnout** 85:10 | 69:15 | 41:6,15,22 | 62:25 63:9,16 |
| **touch** 11:18 | **twice** 23:12 | **unit** 74:20 | 42:7,12 51:14 | 63:22 64:6,22 |
| **track** 32:1 69:9 | **two** 16:19 26:12 | **United** 1:1 5:9 | 57:18,22 59:3 | 65:3,21 66:3 |
| **tracked** 74:5 | 27:11 50:20 | 59:10 93:1 | 59:6,9,16 | 66:14,17 70:2 |
| **tracks** 46:1 | 72:1 | **University** 17:20 | **violates** 80:25 | 80:25 81:18 |
| **traditional** | **two-thirds** 62:9 | **untangle** 14:18 | 81:18 | 82:15 84:18,25 |
| 73:25 | **type** 10:24 11:11 | **upcoming** 9:20 | **Virginia** 1:3 | 85:9 86:21 |
| **transcript** 14:1 | 49:10 78:8 | **use** 15:25 22:15 | 4:10 5:7,19 | 87:12,15,24,25 |

Page 111

89:1

**W**

waiting 78:16
79:22
want 15:9 26:18
26:22 42:3
43:25 47:6,7
57:1 71:12
74:18 80:18
87:16
wanted 78:5
warranted 11:11
watch 75:24
way 15:12 23:1
25:7 31:8
37:12 58:3
62:9 83:9,15
Wayne 62:7
66:5
we'll 11:18
15:19 16:2,9
44:4 79:13
we're 5:3,11
10:8,25 11:4
16:9 17:12
22:16 32:15
41:20 43:24
44:2 58:10
67:20 69:22
80:1,8
we've 15:24 22:5
43:19 57:19
69:7,7 70:17
75:11 76:4,5
Web 3:10 9:19
24:8,12,14
25:8 44:23
50:12 53:8
week 10:2,7,9
13:12,13 65:13
weekends 65:8
went 14:15 17:9
17:20 18:15,17
46:17 60:13
64:13
west 60:18,19

61:20
**Westview** 62:21
62:22
white 22:12 23:9
23:10,12 24:24
26:10 28:14
29:11,14,20,25
30:22 31:9
33:12,22 40:6
40:12 41:22
42:1 43:1
45:18 52:10,15
52:24,25 54:10
54:16,16 55:1
56:7,10 83:11
83:24,25 84:1
willing 46:24
**Wilson** 10:19
**Wirt** 54:5
wish 27:10
witness 1:15 3:2
19:12,13 20:2
61:13 90:9
91:1 93:14,17
93:19,20
**Woods** 12:8,15
12:16 45:6
63:10
**Woodway** 62:16
word 13:23,24
41:1 81:12,15
words 14:12
work 89:22
worked 18:23
working 19:2
56:25
**Worldwide**
93:21
**Wouldn't** 59:5
written 35:5

**X**

X 4:3 28:12 92:8

**Y**

yeah 19:11
48:13 54:22

61:17 79:21
year 8:20 11:9
18:2,22 20:23
46:25 47:2
64:4 70:18
71:5,5,8 77:14
77:24
years 4:19 8:10
9:2 17:2 18:13
18:16 20:22
22:9,11 23:4
26:23 29:10,18
31:24 47:1,8,9
49:1 70:15
**Yesterday** 13:11

**Z**

zone 48:7 55:22
56:16,21 57:10
61:21 62:4,18
zoned 51:6,24
53:20 54:5,9
54:15 55:17
56:9,10
zones 44:24,25
49:11,14,20
50:1,5,11,16
50:20,22 53:9
56:3,5,6,7
61:20 63:11
zoning 57:17
59:2

**0**

00822700 95:8
01:19:22 93:25

**1**

1 3:8 6:10,14
44:20
1-31-2023 94:21
95:15
10 8:10 29:10,18
39:3,6
10-year 3:20
70:10 83:10
10:24 44:10

10:32 44:10
1050 1:18
11:23 80:17
11:31 80:17
11:45 1:16 90:13
115 63:1
1400 2:5
1507 16:22
1700 2:10
18 10:1
19 9:25
1954 59:10,16
1955 59:10,16
1980s 49:20 50:6
1986 17:8,15
1990 17:21
1992 20:14

**2**

2 3:9 24:7,9,22
25:3,24
20 9:18 13:18
23:4 26:23
20-'21 20:23
2010 3:11 29:24
30:5
2011 46:15,20
60:9 67:17
77:10 83:10
2012 47:23
49:23,25 60:12
65:25 66:14,17
2015 30:8 31:3
2018 30:12
2019 30:15
2019-2020 71:17
2020 8:15,24 9:5
37:16 68:19
69:15 77:22
78:11,17
2021 1:12,16
3:11 9:18 21:3
24:20 29:25
30:5,18 31:3
60:8 63:8,23
64:23 65:25
67:17 77:10

83:10,24 93:10
2022 9:13,15
63:16 92:15
93:19,22 95:3
203 94:14 95:1
203.3 95:10
20th 6:12
21 17:2
214 2:11
228-6601 2:6
24 3:9
25 74:18
26 47:21 60:13
27 24:23
28 1:12,16 93:10

**3**

3 3:11 9:21
18:16 20:14
30:2,4 47:8
30 3:11 4:19
22:9 74:18
300 2:10
38 87:4,7
39 3:12

**4**

4 3:3,12 39:16
39:18 47:9
51:10,13
4:21-CV-01997
1:5 5:6 93:5
400 64:1
42 45:18
44 3:14
45 71:4,10
48 82:22

**5**

5 3:14 18:13
24:25 44:19,21
49:14 50:15
51:12,23 53:8
55:20 61:18,24
62:24
5,000 11:10
63:24

**5:00** 10:1
**50** 3:15 27:4,4
  27:17 71:5,11
**500** 64:1
**52** 45:18
**53** 3:17 84:8
**544-4000** 2:11
**58** 25:3,9 26:1
  84:16
**59** 24:22 25:25

**6**

**6** 3:8,15 31:24
  50:8,10,15
  53:8
**65** 3:18
**67** 40:7,13

**7**

**7** 3:17 10:10,11
  24:24 44:12
  53:4,6,9 54:3
  60:14
**70** 3:20
**70024** 92:25
  95:18
**713** 2:6
**717** 2:5
**75** 85:12 86:18
  86:25
**75069** 2:10
**76** 88:24
**77002** 2:5
**77055** 16:23
**7761** 94:20
  95:15
**79** 89:8
**798** 70:9

**8**

**8** 3:18 65:12,17
  81:24
**87** 45:11

**9**

**9** 3:20 70:5,7,8
  70:22 71:25

72:6 75:4
**9:34** 1:16
**92** 3:4
**93** 3:5
**94** 40:7,13
**955** 18:9

IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON
DIVISION

VIRGINIA ELIZONDO,                          §
        *Plaintiff*,                        §
                                            §
v.                                          §
                                            §        Civil Action No. 4:21-CV-01997
                                            §
SPRING BRANCH INDEPENDENT                   §
SCHOOL DISTRICT, *ET AL.*,                  §
                                            §
        *Defendants*.                       §
                                            §
                                            §

## NOTICE OF ORAL DEPOSITION

Pursuant to FED. R. CIV. P. 30(b)(6), Plaintiff will take the oral deposition of the corporate

representative(s) of Defendant Spring Branch Independent School District ("SBISD"), on

**Monday, December 20, 2021 at 9:00 a.m.**  The examination will continue from day-to-day until

completed at the offices of Thompson & Horton LLP, 3200 Southwest Freeway, Suite 200,

Houston, Texas 77027, or at Defendants' option, at the offices of Blank Rome LLP, 717 Texas

Avenue, Suite 1400, Houston, Texas 77002, and may cover the topics identified in Exhibit "A"

hereto.  SBISD must designate one or more officers, directors, or managing agents, or designate

other persons who consent to testify on its behalf; and it may set out the matters on which each

person designated will testify. The persons designated must testify about information known or

reasonably available to the organization. Counsel for Plaintiff is available to confer in good faith

about the matters for examination.

The deposition will be transcribed by a certified shorthand reporter and may be videotaped.

All parties are invited to attend and examine the witness as permitted by the Federal Rules of Civil

Procedure.

1



**EXHIBIT "A"**

**DEFINITIONS**

1.     "Person" means the plural as well as the singular and includes any natural person or business, legal or governmental entity or association.

2.     "Plaintiff" means Plaintiff Virginia Elizondo named in the document titled "Plaintiff's First Amended Complaint" (Dkt.#2 in the case styled *Elizondo v. Spring Branch Independent School District, et al.*), the party's abbreviated name, a pronoun referring to the party, and, where applicable, her employees, partners, or agents acting or purporting to act on her behalf with respect to any of the subjects identified in this Deposition Notice.

3.     "Defendants" means Spring Branch Independent School District, each of its Trustees in their official capacities, and all representatives, employees, agents, or officers of those designated in the caption of this cause acting or purporting to act on their behalf with respect to any matter inquired about in these Requests for Production.

4.     "You" or "your" or "yours" means Defendant SBISD and each of its Trustees in their official capacities, their members, attorneys, agents, representatives, and where applicable, SBISD officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates acting or purporting to act on their behalf with respect to any matter inquired about in the Requests for Production, or any person on their behalf.

5.     The term "Lawsuit" means the case styled *Elizondo v. SBISD, et al*, Cause No. 4:21-CV-01997, in the United States District Court for the Southern District of Texas, Houston Division.

6.     The term "Complaint" means the Plaintiff's First Amended Complaint, in the case styled the case styled *Elizondo v. SBISD, et al*, Cause No. 4:21-CV-01997, in the United States District Court for the Southern District of Texas, Houston Division.

7.     Any reference to an individual person, either singularly or as part of a defined group, includes, where applicable, that person's past and present agents, legal representatives, non-legal representatives, personal representatives, attorneys, employees, heirs, successors, and assigns, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of such individual person.

8.     The singular includes the plural and vice versa.

9.     The masculine gender includes the feminine and vice versa.

10.    All other terms are to be interpreted in accordance with their normal usage in the English language.

<u>**EXAMINATION TOPICS**</u>

1.      The claims and factual allegations in the Complaint and Defendants' Original Answer to Plaintiff's First Amended Complaint.

2.      Whether there is any past history of official discrimination in SBISD, the City of Houston, the Cities of Hunters Creek Village, Piney Point Village, Bunker Hill Village, Hedwig Village, the Spring Valley Village, Hilshire Village, Harris County, or the State of Texas, concerning the right of the members of a minority group to register, to vote, or otherwise participate in the democratic process, and any SBISD investigation into and knowledge about whether any such history exists. The term "past history of official discrimination" refers to any prior official customs, policies or practices of a government entity adversely affecting the rights of any minority group members.

3.      Whether past voting in the elections of SBISD, the City of Houston, the Cities of Hunters Creek Village, Piney Point Village, Bunker Hill Village, Hedwig Village, the City of Spring Valley Village, Hilshire Village, Harris County, or the State of Texas has been racially or ethnically polarized, and any SBISD investigation into and knowledge about whether any such polarization has existed. The term "racially polarized" means that there is a consistent relationship between the race or ethnicity of the voter and the way in which the voter votes and that white voters and minority voters vote differently.

4.      The process by which SBISD has chosen to use election precincts based upon middle school attendance zones during the period from 2011-2021, and the rationale for that decision.

5.      The process by which SBISD has chosen early voting locations and the rationale for those decisions during the period from 2011-2021.

6.      The extent to which SBISD trustee elections have involved formal or informal candidate slating processes during the period from 2011-2021 and any SBISD investigation into and knowledge about any such processes.

7.      The extent to which past SBISD trustee elections during the period from 2011-2021 have involved any overt or subtle racial or ethnic appeals, and any SBISD investigation into and knowledge about any such appeals. The term "overt or subtle racial or ethnic appeals" means communications that tend to disparage a political candidate on the basis of his or her membership in an identifiable racial or ethnic group.

8.      All investigations conducted by SBISD to determine whether any Hispanics, Latinos, or Mexican-Americans have ever been elected to public office in SBISD.

9.      All investigations by SBISD to determine whether any African Americans have ever been elected to public office in SBISD.

10.     All investigations by SBISD to determine whether any residents of Asian American heritage have ever been elected to public office in SBISD.

11.     The results of SBISD trustee elections from 2011-2021.

12.     The contents of demographic data from the 2020 Census and American Community Survey regarding the ethnicity and races of voters within SBISD and any SBISD investigation into and knowledge about that data.

13.     The current Citizenship Voting Age Population of voters in SBISD, the race and ethnicity of all such voters, and any SBISD investigation into and knowledge about that data.

2

14.     SBISD investigations into and knowledge about socio-economic disparities existing between Anglo and minority students in SBISD for the period 2011-2021.

15.     All complaints SBISD has received about alleged instances of  racial or ethnic discrimination affecting students, residents or employees within SBISD, and SBISD investigations into and knowledge about any such complaints of alleged racial or ethnic discrimination.

16.     The processes by which SBISD has developed and established its student school attendance zones, including the racial, ethnic and socio-economic characteristics of each such attendance zone and the rationale for each such zone.

17.     The most recent available State mandated academic assessment results on a per school basis for each SBISD campus.

18.     The most recent available data about SBISD expenditures on a per-student basis for Title I and non-Title I schools in SBISD, excluding Title I funds

19.     The racial and ethnic composition of the students on each SBISD campus during the period from 2011-2021.

20.     The racial and ethnic composition of the teachers, administrative staff and employees on each SBISD campus during the period from 2011-2021.

21.     The racial and ethnic composition of SBISD employees who are neither teachers nor administrators for SBISD during the period from 2011-2021.

22.     The racial and ethnic composition of all SBISD employees working at The Wayne F. Schaper, Sr., Leadership Center during the period from 2011-2021.

23.     The racial and ethnic composition of district-wide SBISD administrative staff during the period from 2011-2021.

24.     The racial and ethnic composition of certified peace officers in the SBISD police department during the period from 2011-2021.

25.     The provision and assessment of bilingual educational services to SBISD students during the period from 2011-2021, including any analyses of the success or lack of success of such programming.

26.     How and the extent to which SBISD has implemented the use of deputy student registrars allowed by TEX. ELEC. CODE §13.046 during the period from 2011-2021.

27.     All communications received by SBISD or published by SBISD during the period from 2011-2021 concerning whether or not SBISD should change its method of electing school board trustees.

28.     Any investigation that SBISD has conducted during the period from 2011-2021 concerning whether or not SBISD should change its method of electing school board trustees.

29.     All communications exchanged by, between, among, or sent by or received from a SBISD trustee with any other person concerning changing SBISD's method of electing school board trustees, during the period 2011-2021.

30.     The factual basis for the allegation in paragraph 3 of Defendants' answer (Dkt. #8) which states, "Defendants ... deny that the District's election system violates the Voting Rights Act or has denied minority voters any right protected by the Voting Rights Act," including any investigation and analysis that SBISD claims supports that allegation.

31.     The factual basis for the allegation in paragraph 8 of Defendants' answer (Dkt. #8) which states, "The Defendants deny that the at-large system was the reason for [Plaintiff's] losses..[in SBISD elections]," including any investigation or analysis that SBISD claims supports that allegation.

32.     The factual basis for the allegation in Defendants' answer (Dkt. #8) that voting in SBISD school board trustee elections has not involved a pattern of racially-polarized voting, including any investigation or analysis that SBISD claims supports that allegation.

33.     The factual basis for SBISD's allegation in paragraph 48 of its answer (Dkt. #8) which states, "the Defendants deny that SBISD's neighborhoods evidence a history of residential segregation and racial conflict," including any investigation or analysis that SBISD claims supports that allegation.

34.     Whether in SBISD school board trustee elections during the period 2011-2021 the majority of its Anglo voters supported different candidates than did the majority of its Hispanic and African-American voters.

35.     Whether in the most recent SBISD school board trustee election the majority of Anglo voters supporting the Anglo candidate and that amount exceeded the number of Anglo voters who supported Plaintiff.

36.     The factual basis for the allegation in paragraph 53 of Defendants' answer (Dkt. #8) which states, "the Defendants deny that elections in SBISD are deeply racially polarized," including any investigation or analysis that SBISD claims supports that allegation.

37.     The factual basis for the allegation in paragraph 58 of Defendants' answer (Dkt. #8) which states, "the Defendants affirmatively state that the District has not enacted any barriers to voting," including any investigation or analysis that SBISD claims supports that allegation.

38.     The factual basis for, investigation of and any analyses on which SBISD purports to rely in support of the allegations in paragraph 75 of Defendants' answer (Dkt. #8) which states, "single-member districts can promote the Balkanization of a school district, by electing trustees who are only focused on the interests of the constituents of their smaller single-member district, and not necessarily on the overall good of the school district. The Defendants assert that there are sound non-race-based policy reasons for maintaining at-large voting systems."

39.     The factual basis for, investigation of and any analyses on which SBISD purports to rely in support of the allegation in paragraph 76 of Defendants' answer (Dkt. #8) which states, "Defendants specifically deny that the District's electoral system dilutes the voting strength of racial or language minorities."

40.     The factual basis for, investigation of and any analyses on which SBISD purports to rely in support of the allegation in paragraph 79 of Defendants' answer (Dkt. #8) which states, "the Defendants specifically deny that anything the District has done gives the Latino community or any other minority citizens less of an opportunity to participate in the political process."

41.     Whether SBISD received or is aware of any citizen complaints concerning the manner in which it conducted school board trustee elections during the period from 2011-2021.

42.     Whether SBISD has received any complaints of disparate disciplinary treatment of minority students during the period from 2011-2021 and any investigations or analyses of the merits of any such complaints.



**Spring Branch Independent School District**
Inspiring minds. Shaping lives.

## There's so much to be proud of in SBISD!

**We believe a great school system:**

*Builds* on the strengths and gifts of Every Child;

*Provides* students from poverty the same opportunity for success after high school as students from non-poverty homes;

*Instills* in Every Child the belief that they can achieve more than they think possible; and,

*Ensures* that every adult in the system is committed to the successful completion of some form of higher education for Every Child.

**Learn more:**

## www.springbranchisd.com

955 Campbell Road, Houston, Texas 77024
713.464.1511

## Our Values



Every Child

### Every Child
**We put students at the heart of everything we do.**
- Every child. Every day. Every minute. Every way.
- What's Best for the Child Drives the Decision
- Infinite Possibilites Through Education



Collective Greatness

### Collective Greatness
**We, as a community, leverage our individual strengths to reach challenging goals.**
- Surpass Expectations
- Everyone's Work Matters
- Diversity Makes Us Stronger



Collaborative Spirit

### Collaborative Spirit
**We believe in each other and find joy in our work.**
- Each of Us is Committed to All of Us
- Together We're Better
- Assume the Best



Limitless Curiosity

### Limitless Curiosity
**We never stop learning and growing.**
- Empowered to Innovate
- Tenaciously Embrace Challenges
- Unleashed Potential

Moral Compass

### Moral Compass
**We are guided by strong character, ethics and integrity.**
- Personal Responsibility
- Kindness and Mutual Respect
- Trustworthiness

## Our Priorities
We're focusing on literacy, numeracy, social-emotional learning, career and technical education (CTE) and digital expansion.

## Our District







**33,536** Students enrolled

**47** Schools

**70+** Languages spoken

Diversity makes us stronger. #CollectiveGreatness
As of 10-12-21

## Our Students



- 1,694 Pre-K
- 13,979 Elementary
- 7,499 Middle
- 10,051 High

## Our **Bond**

We've had a strong start to the 2021-22 school year. We welcomed students back to two newly-rebuilt campuses, Hunters Creek Elementary School and Landrum Middle School. These projects and other rebuilds and facilities upgrades are possible because of voter support for our **$898 million** 2017 Bond program.

**springbranchisd.com/bond**

## Demographics

 **58%**  **37%**

**58%** Economically Disadvantaged

**37%** English Learners
As of PEIMS 2020-21



- 59% Hispanic
- 27% White
- 7% Asian
- 5% African American
- 2% Other

SBISD
2
28-Dec-2021
M. Schneider, CSR, RPR

2010 – 2021 List/Names of all Candidates

| Year | Trustee Position | Name of Candidate |
|---|---|---|
| 2010 | 5 | Bob Stevenson |
| | 6 | Pam Goodson |
| | | Susan Mathews |
| | 7 | Mike Falick |
| 2011 | 1 | Wayne F. Schaper, Sr. |
| | | Michael Hawkins |
| | 2 | Mary Grace Landrum |
| 2012 | 2 (2yrs. Unexpired term) | Kelly Tronzo |
| | | Chris Gonzalez |
| | 3 | Katherine L. Dawson |
| | | Kay Overly Peeples |
| | | Eric Charles Waligura |
| | 4 | Chris Vierra |
| 2013 | 5 | Bob Stevenson |
| | 6 | Pam Goodson |
| | 7 | John Buchanan |
| | | Karen Peck |
| 2014 | Election Cancelled | |
| 2015 | 3 | Katherine L. Dawson |
| | | Craig Adams |
| | 4 | Virginia Elizondo |
| | | Chris Vierra |
| 2016 | 5 | J. Carter Breed |
| | | Julie Jaehne |
| | 6 | Pam Goodson |
| | 7 | Karen Peck |
| 2017 | 1 | Josef D. Klam |
| | 2 | Mary Curry Mettenbrink |
| | | Chris Gonzalez |
| 2018 | 3 | Minda Caesar |
| | | Noel Lezama |
| | 4 | Chris Vierra |
| 2019 | 5 | David E. Lopez |
| | | J. Carter Breed |
| | 6 | Pam Goodson |
| | 7 | Karen Peck |
| 2020 | Election Cancelled | |
| 2021 | 3 | Minda Caesar |
| | 4 | Christopher Earnest |
| | | Virginia Elizondo |


SBISD
3
28-Dec-2021
M. Schneider, CSR, RPR



SBISD

4

28-Dec-2021
M. Schneider, CDP, RPR



SBISD000001





Key
012 Academy of Choice
131 Bear Blvd. School
101 Bendwood Campus
126 Buffalo Creek Elementary
102 Bunker Hill Elementary
124 Cedar Brook Elementary
048 Cornerstone Academy
DAEP District Alternative Education
ETC East Transition Campus
103 Edgewood Elementary
104 Frostwood Elementary
A Guthrie Center
105 Hollibrook Elementary
106 Housman Elementary
107 Hunters Creek Elementary
041 Landrum Middle
KIPP Courage @ LMS
130 Lion Lane School
108 Meadow Wood Elementary
109 Memorial Drive Elementary
042 Memorial Middle
001 Memorial High School
B Natatorium
047 Northbrook Middle
YES Prep @ NMS
005 Northbrook High School
YES Prep @ NHS
121 Nottingham Elementary
129 Panda Path School
110 Pine Shadows Elementary
111 Ridgecrest Elementary
112 Rummel Creek Elementary
C Schaper Leadership Center
113 Shadow Oaks Elementary
119 Sherwood Elementary
STC South Transition Campus
018 Spring Branch Academic Institute
988 Spring Branch Agricultural Facility
114 Spring Branch Elementary
043 Spring Branch Middle
045 Spring Forest Middle
046 Spring Oaks Middle
120 Spring Shadows Elementary
044 Spring Woods Middle
003 Spring Woods High School
006 Stratford High School
SBAI @ Stratford High School
D Technology Training Center
122 Terrace Elementary
123 Thornwood Elementary
SBAI @ Thornwood Elementary
132 Tiger Trail School
125 Treasure Forest Elementary
115 Valley Oaks Elementary
E Vines Science Center
F Warehouse Complex (Central Warehouse, Purchasing, Child Nutrition Services, Maintenance, SERS, Records Management, Textbook Services, Transportation)
G West Support Center
015 Westchester Academy for International Studies
116 Westwood Elementary
118 Wilchester Elementary
128 Wildcat Way School
117 Woodview Elementary
N
Attendance Option Spring Woods or Northbrook High School
Spring Woods High School
Northbrook High School
Stratford High School
Memorial High School
Addicks Reservoir
2007 Bond Program Transition Sites
Pre-K Centers
Elementary Schools
Middle Schools
High Schools
Charter Schools
District Facilities
Clay Road
Kempwood
Hammerly Blvd.
Long Point
Westview
Katy Freeway I-10
Memorial Drive
Hempstead
610 West Loop North
N. Post Oak
Gessner
Blalock
Campbell
Bunker Hill
Brittmoore
West Sam Houston Pkwy. N.
Police Command Station
Vines Science Center
Wayne F. Schaper, Sr. Leadership Center
1st Community Credit Union
SBISD Police Command Center
9009 Ruland Road
Tax Office
8880 Westview Drive
Don Coleman Coliseum
1050 Dairy Ashford
Tully Stadium
1050 Dairy Ashford
Grob Stadium
9000 Westview Drive
Wayne F. Schaper, Sr. Leadership Center
SBISD Administration Building
955 Campbell Road
Vines Science Center
8856 Westview Drive
Spring Branch Agricultural Facility
Revised 10-27-2021
Spring Branch Independent School District
SBISD
6
28-Dec-2021
M. Schneider, CSR, RPR

Key
012 Academy of Choice
131 Bear Blvd. School
101 Bendwood Campus
126 Buffalo Creek Elementary
102 Bunker Hill Elementary
124 Cedar Brook Elementary
048 Cornerstone Academy
DAEP District Alternative Education
ETC East Transition Campus
103 Edgewood Elementary
104 Frostwood Elementary
A Guthrie Center
105 Hollibrook Elementary
106 Housman Elementary
107 Hunters Creek Elementary
041 Landrum Middle
KIPP Courage @ LMS
130 Lion Lane School
108 Meadow Wood Elementary
109 Memorial Drive Elementary
042 Memorial Middle
001 Memorial High School
B Natatorium
047 Northbrook Middle
YES Prep @ NMS
005 Northbrook High School
YES Prep @ NHS
121 Nottingham Elementary
129 Panda Path School
110 Pine Shadows Elementary
111 Ridgecrest Elementary
112 Rummel Creek Elementary
C Schaper Leadership Center
113 Shadow Oaks Elementary
119 Sherwood Elementary
STC South Transition Campus
018 Spring Branch Academic Institute
988 Spring Branch Agricultural Facility
114 Spring Branch Elementary
043 Spring Branch Middle
045 Spring Forest Middle
046 Spring Oaks Middle
120 Spring Shadows Elementary
044 Spring Woods Middle
003 Spring Woods High School
006 Stratford High School
SBAI @ Stratford High School
D Technology Training Center
122 Terrace Elementary
123 Thornwood Elementary
SBAI @ Thornwood Elementary
132 Tiger Trail School
125 Treasure Forest Elementary
115 Valley Oaks Elementary
E Vines Science Center
F Warehouse Complex
(Central Warehouse, Purchasing, Child Nutrition Services, Maintenance, SERS, Records Management, Textbook Services, Transportation)
G West Support Center
015 Westchester Academy for International Studies
116 Westwood Elementary
118 Wilchester Elementary
128 Wildcat Way School
117 Woodview Elementary
N
2007 Bond Program Transition Sites
Pre-K Centers
Elementary Schools
Middle Schools
High Schools
Charter Schools
District Facilities
HBE
EWE
TCE
SSE
BCE
CBE
RCE
TFE
WWE
PSE
SBE
WVE
VOE
HME
SWE
SOE
TWE
NHE
WCE
BHE
MDE
HCE
MWE
RCE
FWE
Addicks Reservoir
Clay Road
Kempwood
Hammerly Blvd.
Long Point
Westview
Katy Freeway I-10
Memorial Drive
Hempstead
Police Command Station
Vines Science Center
Wayne F. Schaper, Sr. Leadership Center
1st Community Credit Union
610 West Loop North
SBISD Police Command Center
9009 Ruland Road
Tax Office
8880 Westview Drive
Don Coleman Coliseum
1050 Dairy Ashford
Tully Stadium
1050 Dairy Ashford
Grob Stadium
9000 Westview Drive
C Wayne F. Schaper, Sr. Leadership Center
SBISD Administration Building
955 Campbell Road
E Vines Science Center
8856 Westview Drive
988 Spring Branch Agricultural Facility
Spring Branch
Independent School District

Revised 10-27-2021

SBISD
7
28-Dec-2021
M. Schneider, CSR, RPR

**NOTICE OF SCHOOL TRUSTEE ELECTION**
**SPRING BRANCH INDEPENDENT SCHOOL DISTRICT**
**MAY 1, 2021**

A general election shall be held for and within the Spring Branch Independent School District on May 1, 2021, between 7:00 a.m. and 7:00 p.m. The General Election is for the purpose of electing two trustees to the Board for regular three-year terms in Position Nos. 3 and 4.  The person elected to each Trustee Position shall be that candidate for each Position who receives the highest number of the votes cast for that Position. On Election Day, May 1, 2021, voters must vote in the precinct in which they are registered to vote.  SBISD precincts correspond with middle school attendance zones. Information concerning your voting precinct may be accessed on the District's website at www.springbranchisd.com.  The Election on May 1, 2021, will be held jointly with the City of Piney Point Village.  The City of Piney Point Village has cancelled their election.

<u>Early Voting</u>

Early voting will begin on April 19, 2021 and continue through April 27, 2021, and will be held at the following locations and times:

## Early Voting Locations
## April 19 – April 27, 2021

| | | |
|---|---|---|
| Wayne F. Schaper, Sr. Leadership Center | April 19 - April 23 | 7:00 am – 7:00 pm |
| 955 Campbell Rd. - Board Room | Saturday, April 24 | 8:00 am – 12:00 pm |
| Houston, TX 77024 | April 26 – April 27 | 7:00 am – 7:00 pm |
| | | |
| Don Coleman Community Coliseum | April 19 - April 23 | 7:00 am – 7:00 pm |
| 1050 Dairy Ashford – Home Dressing Room | Saturday, April 24 | 8:00 am – 12:00 pm |
| Houston, TX 77079 | April 26 – April 27 | 7:00 am – 7:00 pm |
| | | |
| Holy Cross Lutheran Church | April 19 – April 23 | 7:00 am – 7:00 pm |
| 7901 Westview – Youth Room | Saturday, April 24 | 8:00 am – 12:00 pm |
| Houston, TX 77055 | April 26 – April 27 | 7:00 am – 7:00 pm |
| | | |
| City of Piney Point Village | April 19 – April 23 | 8:00 am – 4:00 pm |
| 7676 Woodway Suite #300 | April 26 – April 27 | 7:00 am – 7:00 pm |
| Houston, TX 77063 | **(no voting at this location on Saturday)** | |



Spring Branch ISD
10 Year per Student Cost
General Fund

Actual - Mid Year by Fund by Campus/Org
County-District Number: 101920 District Name: SPRING BRANCH ISD
Title I Campuses

| Campus/Org | 2010 - 2011 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | Unaudited 2020-2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101920001 - MEMORIAL H S | $ 5,117.40 | 4,785.86 | 5,048.33 | 4,997.42 | 5,065.56 | 5,166.02 | 5,193.13 | 5,055.04 | 5,316.65 | 5,530.47 | 5,670.37 |
| 101920003 - SPRING WOODS H S | $ 6,180.16 | 5,325.81 | 5,305.45 | 5,493.85 | 5,599.29 | 5,598.40 | 5,908.68 | 5,965.77 | 6,128.11 | 6,548.32 | 7,052.09 |
| 101920005 - NORTHBROOK H S | $ 5,715.27 | 5,357.61 | 5,278.65 | 5,644.66 | 5,531.33 | 5,563.36 | 6,281.96 | 6,503.79 | 6,662.48 | 8,402.79 | 8,026.28 |
| 101920006 - STRATFORD H S | $ 5,840.32 | 5,381.87 | 5,038.94 | 5,612.28 | 5,662.73 | 5,284.36 | 5,417.91 | 5,512.35 | 5,729.96 | 5,875.23 | 5,880.79 |
| 101920014 - WESTCHESTER ACADEMY FOR INTERNATIONAL STU | $ 6,788.86 | 6,118.55 | 6,573.65 | 6,617.14 | 6,620.94 | 6,432.24 | 6,538.09 | 6,378.12 | 6,644.58 | 7,061.81 | 7,486.97 |
| 101920016 - ACADEMY OF CHOICE | $  - | - | 108,160.00 | 11,228.92 | 16,864.51 | 15,528.08 | 12,809.71 | 12,542.87 | 15,675.34 | 17,670.94 |  |
| 101920018 - SPRING BRANCH ACADEMIC INSTITUTE | $  - | - | - | - | - | 10,171.10 | 10,818.55 | 10,368.89 | 9,767.48 | 9,515.74 | 10,761.91 |
| 101920041 - LANDRUM MIDDLE | $ 6,951.10 | 5,924.51 | 5,495.11 | 6,083.53 | 6,331.27 | 6,778.48 | 6,763.71 | 6,900.19 | 6,938.34 | 7,609.98 | 8,388.48 |
| 101920042 - MEMORIAL MIDDLE | $ 4,916.38 | 4,329.47 | 4,490.50 | 4,326.72 | 4,549.93 | 4,605.73 | 4,724.51 | 4,920.87 | 5,172.58 | 5,255.09 | 5,462.39 |
| 101920043 - SPRING BRANCH MIDDLE | $ 5,330.31 | 4,600.90 | 5,014.66 | 4,963.52 | 5,046.44 | 5,222.80 | 5,452.68 | 5,321.79 | 5,669.07 | 5,431.02 | 5,709.38 |
| 101920044 - SPRING WOODS MIDDLE | $ 5,337.24 | 5,758.85 | 5,458.48 | 5,295.10 | 5,055.34 | 5,401.74 | 5,688.42 | 6,458.84 | 6,559.59 | 6,748.32 | 7,012.84 |
| 101920045 - SPRING FOREST MIDDLE | $ 6,125.01 | 5,508.49 | 5,398.67 | 5,919.96 | 5,807.17 | 5,968.53 | 6,157.76 | 5,768.82 | 6,086.98 | 6,129.99 | 6,504.75 |
| 101920046 - SPRING OAKS MIDDLE | $ 6,829.24 | 5,789.21 | 5,919.54 | 5,719.77 | 6,261.41 | 6,318.65 | 6,609.80 | 6,848.80 | 6,952.38 | 7,486.86 | 8,094.74 |
| 101920047 - NORTHBROOK MIDDLE | $ 7,228.27 | 6,185.27 | 6,287.26 | 6,836.46 | 6,886.36 | 8,206.83 | 7,384.76 | 7,507.45 | 7,356.67 | 8,310.07 | 8,868.37 |
| 101920048 - CORNERSTONE ACADEMY | $ 5,326.01 | 5,149.38 | 5,104.23 | 5,435.31 | 5,749.28 | 5,636.44 | 5,840.49 | 5,819.27 | 6,349.14 | 6,408.09 | 6,901.63 |
| 101920101 - BENDWOOD SCHOOL | 24,977.10 | 38,481.80 | 34,140.38 | 39,003.69 | 36,035.77 | 31,005.47 | 38,188.41 | 36,236.35 | 35,503.68 | 38,842.39 | 57,491.85 |
| 101920102 - BUNKER HILL EL | $ 5,415.55 | 4,169.22 | 4,323.94 | 4,468.95 | 4,774.21 | 4,799.22 | 5,121.13 | 5,233.51 | 5,414.06 | 5,779.69 | 5,484.27 |
| 101920103 - EDGEWOOD EL | $ 5,328.58 | 4,583.34 | 5,378.57 | 5,806.63 | 5,951.96 | 6,416.70 | 6,160.05 | 6,075.58 | 5,773.12 | 6,193.81 | 6,912.96 |
| 101920104 - FROSTWOOD EL | $ 4,749.16 | 4,224.94 | 4,467.58 | 4,717.86 | 4,831.07 | 5,052.61 | 5,098.20 | 5,138.47 | 5,278.88 | 5,252.28 | 5,948.20 |
| 101920105 - HOLLIBROOK EL | $ 5,326.46 | 4,614.28 | 5,179.66 | 5,026.71 | 5,018.74 | 5,352.23 | 5,628.91 | 5,539.92 | 5,460.29 | 5,560.95 | 6,427.81 |
| 101920106 - HOUSMAN EL | $ 6,220.93 | 5,421.89 | 5,279.68 | 5,917.82 | 6,233.76 | 6,454.20 | 6,127.60 | 5,508.23 | 6,346.11 | 7,054.17 | 8,814.75 |
| 101920107 - HUNTERS CREEK EL | $ 5,271.82 | 4,513.90 | 4,703.69 | 4,766.66 | 4,654.06 | 4,835.48 | 5,005.50 | 4,991.59 | 5,319.03 | 5,708.55 | 6,238.67 |
| 101920108 - MEADOW WOOD EL | $ 6,438.52 | 5,959.98 | 5,670.29 | 5,786.39 | 5,878.04 | 6,029.93 | 6,228.65 | 5,975.32 | 5,484.88 | 6,461.56 | 6,405.36 |
| 101920109 - MEMORIAL DRIVE EL | $ 5,814.89 | 5,296.94 | 5,731.98 | 5,565.76 | 5,787.36 | 6,343.13 | 5,973.32 | 5,843.30 | 6,055.08 | 6,428.81 | 6,662.64 |
| 101920110 - PINE SHADOWS EL | $ 4,958.22 | 4,894.84 | 5,327.62 | 5,407.00 | 5,150.41 | 5,704.29 | 6,008.44 | 5,876.32 | 5,837.44 | 6,171.16 | 6,334.63 |
| 101920111 - RIDGECREST EL | $ 5,099.80 | 4,768.72 | 4,944.84 | 4,887.75 | 5,350.81 | 5,568.51 | 5,644.91 | 5,885.39 | 5,888.62 | 6,106.46 | 6,853.24 |
| 101920112 - RUMMEL CREEK EL | $ 5,222.31 | 4,892.04 | 5,155.41 | 5,378.68 | 5,532.26 | 5,564.50 | 5,474.76 | 5,362.85 | 5,484.07 | 6,071.39 | 5,847.54 |
| 101920113 - SHADOW OAKS EL | $ 5,403.71 | 5,285.50 | 5,539.05 | 5,311.74 | 5,592.00 | 5,792.25 | 5,594.62 | 6,017.96 | 6,163.65 | 6,666.33 | 7,541.82 |
| 101920114 - SPRING BRANCH EL | $ 5,869.86 | 4,923.51 | 5,179.25 | 5,332.77 | 5,513.45 | 5,844.53 | 5,829.41 | 6,184.99 | 6,051.40 | 6,394.26 | 8,270.06 |
| 101920115 - VALLEY OAKS EL | $ 5,188.79 | 4,955.41 | 5,329.11 | 6,023.23 | 6,214.55 | 6,176.98 | 5,551.05 | 5,276.20 | 5,421.68 | 5,794.85 | 6,394.14 |
| 101920116 - WESTWOOD EL | $ 5,460.35 | 5,763.93 | 5,322.87 | 5,235.88 | 5,543.51 | 5,822.45 | 6,093.42 | 6,349.09 | 5,998.99 | 7,250.73 | 7,597.88 |
| 101920117 - WOODVIEW EL | $ 5,993.36 | 5,228.05 | 5,175.88 | 5,249.32 | 5,377.52 | 5,706.30 | 5,782.71 | 5,919.53 | 6,889.21 | 6,956.33 | 7,953.90 |
| 101920118 - WILCHESTER EL | $ 4,997.25 | 4,608.66 | 4,872.05 | 4,903.51 | 5,239.42 | 5,235.93 | 5,245.96 | 5,172.10 | 5,074.47 | 5,352.33 | 5,577.96 |
| 101920119 - SHERWOOD EL | $ 5,687.55 | 6,002.22 | 5,777.37 | 5,753.84 | 6,151.88 | 6,175.27 | 5,965.34 | 5,567.46 | 6,870.99 | 7,856.42 | 7,499.74 |
| 101920120 - SPRING SHADOWS EL | $ 5,461.98 | 5,328.22 | 4,843.09 | 4,688.15 | 5,510.28 | 5,536.12 | 5,337.91 | 5,542.10 | 6,223.64 | 6,045.48 | 7,027.48 |
| 101920121 - NOTTINGHAM EL | $ 5,280.07 | 4,928.79 | 4,428.56 | 5,711.68 | 6,341.98 | 5,842.71 | 5,663.10 | 5,889.63 | 6,176.34 | 5,710.53 | 6,420.66 |
| 101920122 - TERRACE EL | $ 6,145.47 | 5,835.26 | 5,995.45 | 5,380.95 | 6,320.78 | 6,592.92 | 7,161.46 | 7,043.58 | 7,399.10 | 8,581.26 | 8,329.92 |
| 101920123 - THORNWOOD EL | $ 6,222.88 | 5,138.93 | 5,317.16 | 5,357.61 | 6,470.80 | 6,079.62 | 6,075.47 | 6,166.06 | 6,598.81 | 7,325.26 | 7,837.44 |
| 101920124 - CEDAR BROOK EL | $ 4,333.30 | 5,453.05 | 5,027.32 | 5,071.11 | 5,367.57 | 5,343.72 | 5,597.75 | 6,009.31 | 6,381.67 | 6,882.83 | 7,441.96 |
| 101920125 - TREASURE FOREST EL | $ 5,290.56 | 4,762.24 | 4,660.90 | 4,637.72 | 5,252.64 | 5,004.82 | 5,796.50 | 5,998.78 | 5,568.12 | 7,410.36 | 7,982.76 |
| 101920126 - BUFFALO CREEK EL | $ 5,907.90 | 5,304.79 | 5,711.69 | 5,412.78 | 5,832.35 | 6,022.01 | 6,515.00 | 6,436.82 | 7,097.39 | 7,404.12 | 8,314.78 |
| 101920128 - THE WILDCAT WAY SCHOOL | $ 3,143.24 | 4,415.08 | 5,015.83 | 5,276.55 | 5,793.11 | 6,086.26 | 7,075.46 | 6,585.75 | 6,906.36 | 7,853.56 | 8,574.20 |
| 101920129 - THE PANDA PATH SCHOOL | $ 1,514.03 | 6,292.55 | 5,581.44 | 6,141.13 | 7,650.26 | 7,602.14 | 11,059.82 | 5,472.89 | 6,493.61 | 7,084.06 | 9,775.55 |
| 101920130 - THE LION LANE SCHOOL | 508.28 | 3,413.43 | 4,119.45 | 4,493.16 | 4,780.42 | 5,554.22 | 5,854.35 | 5,100.54 | 4,983.46 | 5,844.36 | 7,662.56 |
| 101920131 - THE BEAR BLVD SCHOOL | 694.71 | 3,974.74 | 4,405.02 | 4,193.20 | 4,878.57 | 4,810.06 | 4,853.43 | 4,870.68 | 5,031.10 | 5,025.11 | 7,301.43 |
| 101920132 - THE TIGER TRAIL SCHOOL | 438.25 | 4,706.33 | 5,110.42 | 4,351.85 | 5,010.61 | 5,550.30 | 5,486.96 | 4,988.27 | 4,850.53 | 4,997.11 | 6,737.51 |



SBISD
9
28-Dec-2021
M. Schneider

SBISD000798

# **Exhibit D**

**EXHIBITS TO**
**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

IN THE UNITED STATES DISTRICT COURT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON DIVISION

VIRGINIA ELIZONDO,    |
   Plaintiff,         |
                   |
V.                    |    Civil Action No. 4:21-CV-01997
                   |
SPRING BRANCH         |
INDEPENDENT SCHOOL    |
DISTRICT, ET AL.,     |
   Defendants.        |

*********************************************************
ORAL DEPOSITION OF
KRISTIN CRAFT
DECEMBER 29, 2021
*********************************************************

     ORAL DEPOSITION of KRISTIN CRAFT, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on December 29, 2021, from 9:30 a.m. to
11:06 a.m., before Mendy A. Schneider, CSR, RPR, in
and for the State of Texas, recorded by machine
shorthand, at the offices of Spring Branch ISD
Athletic Center, 1050 Dairy Ashford, Houston, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

```
 1                    A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4          MR. BARRY ABRAMS

            BLANK ROME

 5          717 Texas Avenue, Suite 1400

            Houston, Texas 77002

 6          (713) 228-6601

            Babrams@blankrome.com

 7

 8     FOR THE DEFENDANTS:

 9          MR. CHARLES J. CRAWFORD

            ABERNATHY ROEDER BOYD HULLETT

10          1700 North Redbud Boulevard, Suite 300

            McKinney, Texas 75069

11          (214) 544-4000

            Ccrawford@abernathy-law.com

12

13     ALSO PRESENT:

             MS. AUDREY SHAKRA

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX
 2    WITNESS:  KRISTIN CRAFT
 3        EXAMINATION                              PAGE
          BY MR. ABRAMS                              4
 4
      SIGNATURE REQUESTED                            71
 5
      REPORTER'S CERTIFICATION                       72
 6
                        EXHIBIT INDEX
 7
                                                   PAGE
 8    SBISD EXHIBIT NO. 10                           24
          Fall Eco DisPercent and Membership for
 9    2021 for Spring Branch ISD for All Campuses
      for All Grades
10
      SBISD EXHIBIT NO. 11                           37
11        E-mail
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                      KRISTIN CRAFT,
 2    having been first duly sworn, testified as follows:
 3                    E X A M I N A T I O N
 4    BY MR. ABRAMS:
 5         Q.   Good morning.
 6         A.   Good morning.
 7         Q.   Would you please state your name?
 8         A.   Kristin Craft.
 9         Q.   Do you prefer to go by Dr. Craft, Ms. Craft,
10    Mrs. Craft, or something else?
11         A.   Kristin is fine.
12         Q.   Okay.  Well, I'm not going to be quite that
13    informal in the proceedings for procedural reasons.
14              But, Dr. Craft, my name is Barry Abrams.
15              Do you understand I'm a lawyer who is
16    representing Virginia Elizondo, who is the plaintiff
17    in a lawsuit against the Spring Branch Independent
18    School District and its board of trustees in their
19    official capacities and that case is pending in
20    federal court here in Houston?
21         A.   Yes, I'm aware.
22         Q.   I'm going to call that lawsuit "the
23    lawsuit" --
24         A.   Okay.
25         Q.   -- rather than rattling off all that stuff
```

1    today.

2              And if I call it "the lawsuit," you'll

3    know what I'm referring to, right?

4        A.   Uh-huh.

5        Q.   And as we go forward, it will be helpful if

6    we have several agreements to make this work better.

7    And we're going to jump to the agreements.

8              The woman who is seated to your left is

9    called a court reporter.  She's taking down word for

10   word my questions and your answers, and then she'll

11   type that up in a booklet.  It actually will look a

12   little bit like a script of a play.

13       A.   Okay.

14       Q.   But that will be the formal testimony.

15             To make her job easier and to make our

16   record clearer, it's important that you speak out loud

17   and use words rather than sounds or expressions or

18   gestures.  So uh-huh and huh-uh don't come out very

19   clearly and are subject to varying interpretation

20   later.

21             So I know that's not consistent with how

22   we all speak in conversation, but if you would try

23   really hard to answer with words rather than sounds.

24             Can we have that agreement?

25       A.   Yes.

1    Q.   Similarly, as good as our court reporter is,
2  she can only easily take down one of us at a time when
3  we're talking.
4              So I will try really hard not to talk
5  over you or cut you off when you're answering a
6  question.  And I will would appreciate it if you would
7  let me get my questions out all the way before you
8  start answering.
9              I have a tendency sometimes to pause and
10  think.  It's a occupational hazard of thinking when
11  I'm asking questions.
12             And so it's possible that I may pause.
13  If you'll try to accommodate me, I promise I'm not
14  intentionally going to ever cut you off.  And if I do,
15  you'll be allowed to continue your answer.
16             Can we have that agreement?
17    A.   Yes.
18    Q.   It's very important that you understand my
19  questions because the testimony you're giving here
20  today can be used in the legal proceeding and it's
21  every bit as solemn and important as it would be if
22  you were testifying in the courtroom.
23             So I if ask you a question and you don't
24  understand it, will you tell me so I can restate it in
25  a way you do understand it?

1     A.   Yes.

2     Q.   And may I fairly assume that when you've

3  answered my questions that you understood them at the

4  time?

5     A.   Yes.

6     Q.   We're probably going to break at least once

7  an hour.  I'm not sure we're going to go more than

8  hour, but we'll break at least once an hour.  If you

9  want to break before then, you just tell me and we'll

10  stop.  Okay?

11     A.   Okay.

12     Q.   On terminology today, same -- same thing.  I

13  would like to have some agreements.  We talked about

14  using the term "lawsuit" to refer to the proceed --

15  legal proceedings.

16          My client is Virginia Elizondo.  I may

17  refer to her as "plaintiff" or "Virginia Elizondo" or

18  "Mrs. Elizondo" interchangeably.

19          If I do so, will you know what I'm

20  talking about?

21     A.   Yes.

22     Q.   Rather than using the whole mouthful Spring

23  Branch Independent School District, I will probably

24  usually refer to the district as the district or

25  SBISD.

```
 1                    If I do so, will you know what I'm
 2    referring to?
 3        A.    Yes.
 4        Q.    Similarly, we may from time to time talk
 5    about the board of trustees of the Spring Branch
 6    Independent School District.  And I'll use the term
 7    "board" to refer to the Spring Branch Independent
 8    School District board of trustees for convenience.
 9                    Will you know what I'm talking about?
10        A.    Yes.
11        Q.    Thank you.
12                    What's your title and position?
13        A.    Associate superintendent for academics, also
14    considered the chief academic officer for the
15    district.
16        Q.    In layman's terms, what do you do?
17        A.    I am responsible for all of the teaching and
18    learning, assessment accountability, student support
19    services, and everything under those three unique
20    areas.
21                    I have three executive directors and
22    they all have directors over all of our academic
23    areas.
24        Q.    What is your understanding about the basis
25    for the lawsuit, why it's been brought?
```

1      A.   My understanding for the basis of the lawsuit

2  is that Virginia Elizondo ran for the board and she

3  did not win the election and so she has called into

4  question a possibility of student -- parents on the

5  north side earning a seat on the board.

6      **Q.   Do you have an understanding that the lawsuit**

7  **has been brought under what's called the Federal**

8  **Voting Rights Act and that it's challenging the**

9  **district's system of electing its board members at**

10 **large and asking the court to order that single-member**

11 **districts be used to elect members of the board?**

12     A.   I'm aware.

13     **Q.   Without regard to agreeing with the -- the**

14 **merits or demerits of the lawsuit, do you understand**

15 **that the rationale for the lawsuit is that at-large**

16 **districts dilute the opportunity for minority voters**

17 **to elect candidates that they prefer?**

18     A.   I'm aware.

19     **Q.   You're appearing today as a corporate**

20 **representative that's been designated to testify on**

21 **behalf of the district on certain of the topics in a**

22 **deposition notice.**

23          **Let me hand you what was earlier marked**

24 **as Exhibit 1.  It's a notice of oral deposition for**

25 **representatives of the district.**

1           Have you had an opportunity to see that?

2      A.   Yes.

3      Q.   The notice originally called for these

4  depositions to occur at an earlier time, but by

5  agreement of counsel we've rescheduled them.  But this

6  is the operative deposition notice.

7           Do you understand that?

8      A.   Yes.

9      Q.   Who made the decision that you would appear

10 today to testify about certain of the topics in the

11 notice?

12     A.   In coordination with Dr. Blaine and in

13 visiting with our attorney.

14     Q.   And Dr. Blaine is the superintendent of the

15 district, correct?

16     A.   Yes.

17     Q.   Jennifer Blaine?

18     A.   Yes.

19     Q.   Doing that simply for our record.

20           Who authorized you to appear as a

21 representative for the district?

22     A.   Dr. Blaine, the superintendent, our lawyers.

23     Q.   Who made the decision about which of the

24 topics you would be designated to testify about as

25 opposed to other people?

1      A.    Our attorneys.

2      Q.    And by referencing your attorneys, who are

3   you referring to?

4      A.    Audrey Shakra and Charles.

5           MR. CRAWFORD:  It is.  Thank you for

6   knowing.

7      Q.    (BY MR. ABRAMS)  What have you done to prepare

8   to testify today as a representative on behalf of the

9   district?

10     A.    So I have been reviewing reports.  Before

11  winter break started, I was meeting with our

12  accountability executive director to review kind of

13  history of the district and accountability reports

14  going back through, you know, reflecting on the word

15  I've led since being in the district since 2016.

16     Q.    Who is the person that serves as the

17  accountability director that you mentioned?

18     A.    Keith Haffey.

19     Q.    And describe, if you would, just very

20  generally what are these accountability reports that

21  you've indicated you've looked over?

22     A.    So our paper reports, the Texas

23  accountability or performance reports for school

24  districts.  One recently came out right before break.

25           Also looking at our results-driven

```
 1    accountability indicators, then just general, you
 2    know, reflecting on the work, you know, given the
 3    years of -- of the lawsuit in question.
 4        Q.   Who, other than Mr. Haffey and counsel for
 5    the district have you spoken with in preparation for
 6    your deposition?
 7        A.   Our attorneys, Charles and Lucas, Audrey
 8    Shakra, Christine Porter, and Karen Heeth.
 9        Q.   When did you speak with Ms. Porter and
10    Dr. Heeth?
11        A.   We -- we did some preparation on -- I forgot
12    the day -- Monday.  And Christine was here.  We also
13    did some preparation over Zoom that Karen was a part
14    of.
15        Q.   Have you reviewed documents other than the
16    accountability reports that you mentioned to prepare
17    for your deposition?
18        A.   I've referenced prior e-mails, really
19    thinking about looking at the EL performance.  We have
20    program evaluations for English language learners that
21    we've produced and the other documents that we've
22    produced.
23        Q.   Do you know whether the e-mails that you
24    reviewed have been among the materials produced in the
25    lawsuit to -- to my side?
```

1      A.   I am not aware.  Only after looking at the

2  questions and some preparation meetings did it kind of

3  jog my memory about a few other incidents that I was

4  involved in in my first couple of years with the

5  district.

6      **Q.   Did the e-mails that you reviewed refresh**

7  **your recollection about certain events in the past?**

8      A.   Yes.

9           **MR. ABRAMS:**  Through counsel, we -- we

10  are going to request and do request copies of the

11  e-mails that Dr. Craft has mentioned that she reviewed

12  in preparation for her deposition and which refreshed

13  her recollection about certain topics.

14           That's something for us, not for you to

15  concern yourself with.

16           THE WITNESS:  Sure.

17      **Q.   (BY MR. ABRAMS)  About how long have would you**

18  **say you've spent to prepare for your deposition?**

19      A.   Many hours.  I have not kept track of the

20  hours.  But since understanding that I would be the

21  one who would be deposed, I spent time with Audrey.

22  And -- so a good number of hours.

23      **Q.   I want to spend just a very few minutes on**

24  **your personal background before we jump back to the**

25  **topics that we'll cover under the notice.**

1          **Where do you currently reside?**

2          A.    501 Briar Knoll Drive, Houston, Texas 77079.

3          **Q.    And is that inside or outside the district?**

4          A.    Inside.

5          **Q.    Where were you born and raised?**

6          A.    Webster City, Iowa.

7          **Q.    And if you would, give me a thumbnail sketch**

8    **of your educational background beginning with high**

9    **school.**

10         A.    I graduated from high school up north.  Went

11   to the University of Northern Iowa and graduated in

12   '91.  Went there for 4 years.

13               My degree was in Spanish with a minor in

14   ESL.  I spent 6 months abroad when I was about 19 or

15   20.

16               Moved to Houston for my first teaching

17   job.  And I began in Aldine.  And I was there for

18   almost 19 years as teacher, assistant principal.

19               And all of my years of being a principal

20   were in Aldine, 11 years -- well, one of those in

21   Magnolia, but I came back to Aldine.

22               I've been a principal at every level

23   elementary, intermediate, and high school.  And then

24   about 2015, I went to HISD, Houston ISD, as a school

25   support officer.  And I supervised five high schools

 1    in HISD.

 2                    And then I was introduced to Spring

 3    Branch, and so I joined Spring Branch 2016.  And I

 4    joined here as one of the community superintendents.

 5    So I supervised a third of our schools.

 6                    I was in that role for 2 years before

 7    moving to chief academic officer.  I think this is my

 8    fourth year in that role.

 9         Q.    While serving as a community superintendent,

10    which schools were you overseeing?

11         A.    Would you like the name of every school?

12         Q.    Well, is there -- did they correspond to the

13    feeder patterns that still exist or are they --

14         A.    Not necessarily.

15         Q.    Okay.

16         A.    There were three of us.  It was a new role.

17    And we all had a selection of the schools.  So I

18    had -- you know, Panda Path was a pre-K center I

19    supervised.  I had a handful of elementary schools,

20    middle schools, and high schools.

21         Q.    Working backwards from the high schools,

22    which high schools were under your supervision?

23         A.    I had Stratford High School.  I also oversaw

24    DAEP, Delta Alternative Education Program, Spring Oaks

25    Middle School, Memorial Middle School, Academy of

1    Choice, Cornerstone.

2              For elementaries, Woodview, Westwood,

3    Wilchester, Bunker Hill, Edgewood.

4         **Q.   I missed one.  Woodview, Westwood, Bunker**

5    **Hill -- I missed one in between.**

6         A.   Woodview, Westwood, Wilchester.

7         **Q.   Wilchester.  Got it.**

8         A.   Edgewood.

9         **Q.   If I'm following, you've worked, then, in**

10   **Aldine ISD.**

11              **Were you in Magnolia ISD?**

12        A.   I was in Magnolia for 1 year --

13        **Q.   Okay.**

14        A.   -- as a principal at an elementary school.

15        **Q.   You've been in HISD and now you're with us**

16   **here in Spring Branch ISD, correct?**

17        A.   Yes.

18        **Q.   Did any of the districts besides HISD that**

19   **you worked for in the past use single-member districts**

20   **to elect their school board trustees?**

21        A.   I believe Aldine was at-large.  I believe

22   Magnolia was at-large, but I was only there for a

23   year.

24        **Q.   So the only district for which you've worked**

25   **that has had single-member districts used for its**

1    school board elections is Houston Independent School
2    District?
3         A.   Correct.
4         Q.   How, if at all, did you observe that the
5    election of school board trustees from single-member
6    districts as opposed to at-large had any impact on the
7    delivery of educational services to the children in
8    the district?
9         A.   So I was in HISD for a year.  And I attended
10   the school board meetings, so I got to see how
11   community interacted with the board.
12              I don't recall -- I don't have any
13   recollection of board elections during my time.
14        Q.   Okay.  Have you ever been a party to
15   litigation, meaning have you ever been the person
16   suing or being sued?
17              Because you understand you're just here
18   today as a witness, you're not a party to this.  You
19   don't have a dog in this fight.
20              But in other context, have you ever been
21   a plaintiff or a defendant in any other lawsuits?
22        A.   No.
23        Q.   Okay.  Have you ever been deposed before,
24   going through this process of giving sworn testimony?
25        A.   No.

1     Q.   Have you ever testified before in some other

2  academic setting, administrative hearing or the like?

3     A.   Administrative hearing meaning something from

4  the district?

5     Q.   Could be.  I mean, I understand that there's

6  a fairly -- I started to say Byzantine, but that's

7  only because of my lack of experience.

8          I know that there's a fairly elaborate

9  administrative structure that governs certain academic

10  appeals and other things for teachers and the like.

11          Have you ever served as a witness in any

12  of those types of proceedings where you've been sworn

13  to give testimony?

14     A.   No, I've not been a witness.

15     Q.   What professional licenses or certifications

16  do you have?

17     A.   I'm a certified teacher in Texas and also an

18  certified administrator and a certified superintendent

19  for Texas.

20     Q.   Have you ever been charged and convicted of

21  any criminal offense?

22     A.   No.

23     Q.   Let me hand you what was earlier marked as

24  Exhibit 2.

25     A.   Okay.

1      Q.    This is an infographic from the district's

2   Web site which describes the demographics of the

3   student body in the lower right-hand corner.

4      A.    Uh-huh.

5      Q.    Are you familiar with those statistics?

6      A.    Yes.

7      Q.    And I've seen statistics from a group called

8   the National Center for Education Statistics.

9                Are you familiar with that organization?

10     A.    NCES, yes.

11     Q.    Their statistics seem to be pretty much the

12  same with maybe rounding differences in the district

13  statistics.

14                So as we sit here today, does Exhibit 2

15  seem to represent the demographic breakdown of the

16  student population in the district?

17     A.    Yes.

18     Q.    Earlier in the proceedings, we marked as

19  Exhibit 5 a map that the district has produced which

20  depicts two things simultaneously.

21                One, it depicts the election districts

22  that the district uses for its school board elections,

23  but it also is based upon the school enrollment zones

24  for the middle schools in the district.

25                Are you familiar with Exhibit 5?

1    A.   Yes.

2    Q.   Do you agree that the ethnic makeup of

3    students among the seven different enrollment

4    districts is heavily segregated?

5              MR. CRAWFORD:  Objection; form.

6    A.   Can you repeat the question?  Do I agree?

7    Q.   (BY MR. ABRAMS)  Yeah.  Does the -- does the

8    district -- and by the way, since you're appearing

9    today as the district's representative --

10   A.   Uh-huh.

11   Q.   -- I will try to ask the questions in the

12   form of whether the district's position is so-and-so,

13   but if I slip and I say "you," I understand you're

14   here as the district's representative.

15              Are we in agreement about that?

16   A.   Yes.

17   Q.   Does the district agree that the ethnic and

18   racial composition of its seven enrollment districts

19   is heavily segregated?

20              MR. CRAWFORD:  Objection; form.

21   A.   That's not the term we use in the district.

22   We have ethnic makeup across all of our schools.

23   There are Hispanic students at every school.  There

24   are Anglo students at schools.  African American

25   students at schools.

```
 1                 And so each school has their
 2   accountability reports that show the breakdown of
 3   students who attend each school.
 4        Q.   (BY MR. ABRAMS)  Do you agree that four of the
 5   seven middle school enrollment districts are
 6   overwhelmingly comprised of Hispanic students with an
 7   average of approximately 87 percent of the students in
 8   those districts being of Hispanic origin?
 9                 MR. CRAWFORD:  Objection; form.
10        A.   So I am aware of four middle school sections
11   that do have a large number of Hispanic students.
12        Q.   (BY MR. ABRAMS)  Specifically the Landrum,
13   Northbrook, Spring Oaks, and Spring Woods Middle
14   School enrollment districts are comprised
15   overwhelmingly of Hispanic students.
16            When I say "overwhelmingly," more than
17   85 percent of the students are Hispanic, right?
18        A.   I would have to look at demographic reports,
19   but I would say, yes, they are majority Hispanic
20   students at those schools.
21        Q.   And from your experience working in the
22   district, you know that to be true, right?
23                Those are heavily Hispanic-oriented
24   enrollment districts, correct?
25        A.   Correct.
```

```
 1        Q.    No secret about that in the district?

 2        A.    No secret.

 3        Q.    And in the remaining three election

 4   enrollment districts, the Memorial, Spring Branch, and

 5   Spring Forest areas, between 42 and 52 percent of the

 6   students in those districts are white, correct?

 7        A.    I would have to confirm with accountability

 8   reports, but they have more Anglo students than the

 9   north side.

10        Q.    How and when did the district draw the

11   current boundaries of its school enrollment districts,

12   and starting with Exhibit 5, which is the middle

13   school enrollment districts?

14        A.    I am not aware of that.

15        Q.    Okay.  And I'm looking at my notes.  That's

16   not your topic, so I'll skip it.  I apologize.

17             MR. CRAWFORD:  Good try, though.

18             MR. ABRAMS:  Nope.  It's just a mistake.

19   I apologize.

20        Q.    (BY MR. ABRAMS)  Earlier in the proceedings we

21   marked as Exhibit 4 a map that depicts the location of

22   what are known as the Memorial Villages.

23             Are you familiar with the term the "Memorial

24   Villages"?

25        A.    Yes.
```

1    Q.   And the map depicts the location within the
2    Spring Branch Independent School District of Bunker
3    Hill Village, Piney Point Village, Hunters Creek
4    Village, Hedwig Village, Spring Valley Village, and
5    Hilshire Village.
6              And are you familiar with their location
7    within the district?
8    A.   Yes.
9    Q.   Has the district ever investigated the extent
10   to which the ethnic and racial composition in the
11   Memorial Villages, what the cause of the ethnic and
12   racial composition of those villages may be?
13   A.   No, not to my knowledge.
14   Q.   From your work in the district and from as a
15   district representative, do you acknowledge that the
16   racial and ethnic composition of the population and
17   student population in the Memorial Villages is largely
18   white?
19   A.   Yes.
20   Q.   And that ethnic and racial composition is
21   significantly different than the ethnic and racial
22   composition of the student and citizen populations
23   north of I-10 or the Interstate Highway 10, correct?
24   A.   Yes.
25   Q.   Has the district ever evaluated why there are

```
 1    those differences in ethnic and racial composition of
 2    the student and resident populations between the north
 3    and south sides of the freeway?
 4         A.   Not to my knowledge.
 5         Q.   Does the district agree that there are
 6    significant socioeconomic disparities between the
 7    populations on the north and south sides of I-10?
 8              MR. CRAWFORD:  Objection; form.
 9         A.   Every school has statistics on the level of
10    economically disadvantaged students, so I'm aware of
11    the differences.
12              (Marked Craft Exhibit No. 10.)
13         Q.   (BY MR. ABRAMS)  My question is focused on a
14    north south distinction.  I realize and appreciate the
15    district has campus-by-campus data, and we'll take a
16    look at some of that in just a second.
17         A.   Okay.
18         Q.   But as a general statement, isn't it true
19    that there are significant differences in the socio
20    and economic condition of the populations north and
21    south of I-10?
22              MR. CRAWFORD:  Objection; form.
23         A.   There are distinct differences.
24         Q.   (BY MR. ABRAMS)  Let me hand you what's been
25    marked now as Exhibit 10.  This is a document with the
```

1   production No. SBISD 000405.  And it's titled "Fall

2   Eco Dis Percent and Membership for 2021 for Spring

3   Branch ISD for All Campuses for All Grades."  And then

4   there's some more identifying information.

5            Are you familiar with Exhibit 10?

6       A.   Yes.

7       Q.   What is it?

8       A.   So this is a summary of every campus in our

9   district, their campus number, the name of the campus,

10  and for this school year, the number of students who

11  are considered economically disadvantaged, the total

12  number of students, and the percent of eco dis

13  students on each campus.

14      Q.   What is the factor that determines whether a

15  campus or a student is considered economically

16  disadvantaged for the purposes of this type of report?

17      A.   So the eco dis is related to students'

18  designation for free or reduced lunch.  So parents

19  fill out an application for free and reduced price

20  meals, and that, in turn, is our eco dis number.

21      Q.   What is the criteria for being eligible for

22  free and reduced lunch?

23      A.   I'm not aware of the exact number, but they

24  do look at salary of families and how many individuals

25  are in the household.  And those forms all go through

1    the child nutrition department.

2        Q.   Is it fair to say that the economically

3    disadvantaged characterization is a function of income

4    and family size?

5        A.   Yes.

6        Q.   And the details of that are something

7    somebody else would handle?

8        A.   Correct.

9        Q.   Okay.  Is the economic disadvantaged

10   characterization one that reflects socioeconomic

11   disparities between those students and students that

12   don't fall in that category?

13       A.   Yes.

14       Q.   In looking at the Exhibit No. 10, eco dis

15   is -- is a shorthand for what?  Economic what?

16       A.   Eco dis stands for economically

17   disadvantaged.

18       Q.   Disadvantaged.

19            Okay.  And then on the right-hand side

20   of Exhibit 10, we have three columns.  The first

21   column is the total economically disadvantaged

22   population.

23            Is that what that is?

24       A.   Correct.  The number of students eco dis and

25   then the second column is the total number of students

1    on a campus.

2        Q.    So in the district, 57 percent of the

3    children in the district are classified as

4    economically disadvantaged?

5        A.    Correct.

6        Q.    And then campuses that have a higher

7    percentage of economically disadvantaged students are

8    more disadvantaged economically than those that have

9    lower statistics, right?

10       A.    Correct.

11       Q.    If one looks -- and this chart appears to be

12   organized by a level of school, for the most part,

13   right?

14                We start with the high schools, then go

15   to the middle schools, then the elementary schools,

16   and then the preK programs?

17       A.    Correct.  And it's organized, it looks like,

18   by campus number on the left.

19       Q.    And the campus numbers likewise seem to be

20   numerically based on the level of the school that

21   is --

22       A.    Correct.

23       Q.    So, for example, if we look at -- let me back

24   up.

25                The district has four traditional high

1    schools, correct?

2       A.   Correct.

3       Q.   And it has specialty academies, like

4    Westchester [verbatim] and the Spring Branch Academic

5    Institute, but it has four traditional high schools

6    with 4-year classes, Memorial, Spring Woods,

7    Northbrook, and Stratford, right?

8       A.   True.

9       Q.   And do you agree with me that all of the

10   campuses north of I-10 reflect economically

11   disadvantaged populations in excess of 80 percent and

12   all of the high school campuses south of I-10 reflect

13   economically disadvantaged populations of roughly

14   25 percent or less?

15      A.   That's correct.

16      Q.   So that the socioeconomic characteristics of

17   the north-side high schools are materially different

18   using this as a variable than the socioeconomic

19   characteristics of the high school students south of

20   the freeway?

21      A.   Correct.

22      Q.   Turning, then, to the traditional middle

23   school category, which I believe starts with Landrum,

24   although I'm not familiar with what the title "Spring

25   Branch Academic Institute" means.

1              What is -- what is Spring Branch
2    Academic Institute?
3         A.    Spring Branch Academic Institute may also be
4    known as the school for the highly gifted.  And so it
5    serves students K-12 and their different -- they
6    co-locate across three different schools for the K-12
7    experience.
8         Q.    Turning then to the middle school category,
9    again, if I'm looking at this correctly, the Spring
10   Woods Middle School is 35 percent economically
11   disadvantaged.  Spring Oaks is 43.  Northbrook is --
12   I'm sorry -- Spring Oaks is 92.
13             Let me take another run at this.  I'm
14   trying to evaluate the economic disability
15   characteristics of the middle schools.
16             Memorial and Spring Branch Middle School
17   both have relatively low economic disability
18   statistics, correct?
19        A.    Correct.  Memorial has 8 percent, Spring
20   Branch Middle 35 percent.
21        Q.    And then Spring Woods, which is on the north
22   side, is it 92 percent?
23        A.    Correct.
24        Q.    Spring Forest on the south side, is it
25   43 percent?

```
1        A.    Correct.
2        Q.    Spring Oaks on the north side is 92 percent?
3        A.    Correct.
4        Q.    Northbrook on the north side is 93, nearly
5   94 percent?
6        A.    Correct.
7        Q.    So, again, as is true with the high schools,
8   the middle schools in the district that evidence the
9   greatest economic disability are the middle schools on
10  the north side of I-10, not the south side?
11       A.    Correct.
12       Q.    Do you agree with me that Cornerstone Academy
13  and Bendwood school, while they're fine academic
14  institutions, are not traditional schools in the
15  normal sense of things?
16            Cornerstone is a school of choice, I
17  guess, and Bendwood is a special needs campus, for
18  lack of a better word?
19       A.    Correct.  Cornerstone is a choice middle
20  school, so it serves grades 6, 7, and 8.  But they do
21  have size limits, so it doesn't get much bigger
22  than -- less than 400.
23            And Bendwood is a specialty school as
24  well serving special needs.
25       Q.    Then turning to the traditional elementary
```

```
1   school campuses, and, again, referring to Exhibit 10,
2   Edgewood, which is on the north side, has a 94 plus
3   percent economic disadvantaged characterization.
4   Hollibrook on the north side of I-10 is 99 plus
5   percent economically disadvantaged.  Housman north
6   side 91 percent plus economically disadvantaged.
7            Where is Pine Shadows located in the --
8   in the district?
9       A.   Pine Shadows is north of I-10 off Gessner and
10  Neuens, maybe.
11      Q.   Okay.  And its -- its economically
12  disadvantaged statistic is 77 percent?
13      A.   Correct.
14      Q.   Which is above the average but below the high
15  90s that we've seen on some other elementary campuses,
16  correct?
17      A.   Correct.
18      Q.   Ridgecrest, is that also north of I-10?
19      A.   Yes.
20      Q.   94.41 percent economically disadvantaged,
21  correct?
22      A.   Yes.
23      Q.   Shadow Oaks 96 percent plus disadvantaged and
24  that's north of I-10?
25      A.   Yes.
```

1      Q.    Spring Branch Elementary 96 plus percent, is
2  that likewise north of I-10?
3      A.    Yes.
4      Q.    Westwood, is that located north of I-10?
5      A.    Yes.
6      Q.    That's 95.84 percent economically
7  disadvantaged.
8            Woodview, is that also north of I-10?
9      A.    Yes.
10     Q.    95.26 percent economically disadvantaged.
11           Sherwood Elementary, is that also north
12  of I-10?
13     A.    Yes, it is.
14     Q.    That's a lower but above average economically
15  disadvantaged figure of 67.86 percent, correct?
16     A.    Yes.
17     Q.    Spring Shadows is north of I-10, that's at
18  94.76 percent economically disadvantaged?
19     A.    Yes.
20     Q.    Terrace north of I-10, 77 percent
21  economically disadvantaged?
22     A.    Yes.
23     Q.    Cedar Brook north of I-10, 76.82 percent
24  economically disadvantaged?
25     A.    Yes.

1    Q.   Treasure Forest north of I-10, 96.15 percent
2  economically disadvantaged?
3    A.   Correct.
4    Q.   And Buffalo Creek north of I-10, 93.56
5  percent economically disadvantaged?
6    A.   Correct.
7    Q.   Do you agree with me that Exhibit 10 reflects
8  that substantially all of the most significantly
9  economically disadvantaged campuses in the district
10 are located north of I-10?
11   A.   Correct.
12   Q.   What does the district contend is the cause
13 of the significant socioeconomic disparities existing
14 between the north-side schools and the south-side
15 schools?
16   A.   The -- I'm not aware that anyone has
17 investigated the cause of why there's economic
18 disparity.
19   Q.   So the district recognizes the substantial
20 socioeconomic disparities between the student
21 populations and campuses on the north and south sides
22 but has not investigated why that is so?
23   A.   To my knowledge.
24   Q.   Has the district received complaints in the
25 past about alleged instances of racial or ethnic

1  **discrimination affecting either its students, its**

2  **residents, or its employees?**

3       A.   I'm not aware of employees.  So when I was

4  reflecting on this question, you know, principals

5  receive a variety of complaints from time to time that

6  they just work through that I would not be aware of.

7            I was thinking of a parent.  So when I

8  supervised Stratford, when I first came into the

9  district, a parent had complained about their -- her

10 son's treatment and she claimed it was because her son

11 was African American and took issue with how the

12 school treated her son.

13           She filed an OCR, Office of Civil

14 Rights, complaint back in 2015-2016 school year.  That

15 was before I was here.

16           So those are some of the documents that

17 I was reviewing in regards to this question.

18      **Q.   How, if at all, was the complaint by the**

19 **African-American parent at Stratford resolved?**

20      A.   The complaint originated when the student was

21 a freshman.  And it took a number of years.  It wasn't

22 a -- there wasn't a quick resolution because of just

23 delays from hearing from the OCR designee who was

24 assigned the case.

25           In the end, I had to do a reassessment

1    of the complaints.  And that was back when Dr. Blaine

2    was over administration and her office did the initial

3    response.

4              But at the end, you know, as a district,

5    we found no evidence of racial discrimination against

6    her son.

7              The parent complained that her son had

8    failing grades and the parent thought it was because

9    the teachers were discriminating against the son.

10             But when the teachers reviewed their

11   rationale for grading assignments, the student, you

12   know, did not meet certain measures on assignments.

13             The parent also claimed that her son was

14   denied access to accelerated placement classes.  And

15   going back through my reassessment report, it was

16   determined that the parent complained about freshman

17   year not being able to take AP classes, but when you

18   look at back at course requests, freshman don't take

19   AP classes.  And he did in the end.  By the time he

20   was a junior or senior did take accelerated and dual

21   credit placement courses.

22             So the number of items that the parent

23   was alleging, we were not -- I was not able to confirm

24   was a result of racial discrimination.

25        Q.   And was that the end of the complaint, when

1    **the district determined that there wasn't a factual**

2    **basis for the complaint?**

3         A.   Correct.  So we did offer additional college

4    counseling by district staff and we did offer to pay

5    for another opportunity to take an SAT or ACT test.

6              To my knowledge, the parent did not have

7    any interest in pursuing those offers.  And the

8    student has since graduated.

9         **Q.   Apart from that one incident involving this**

10   **African-American student and parent at Stratford, are**

11   **you aware of any other complaints the district has**

12   **received about instances of purported racial or ethnic**

13   **discrimination?**

14        A.   I'm aware of complaints by someone by the

15   name of Mr. Rodney [phonetic].  He was a parent.  That

16   was when I was overseeing district -- the DAEP,

17   alternative education program.

18             While he did not file any formal

19   complaints, he was someone that would speak at board

20   meetings.

21             And I reached out to him after the first

22   time he spoke at a board meeting to hear more from him

23   and his perspective.

24             And he, in the end, turned out to be a

25   valuable partner on the DAEP campus improvement team

1    committee.  And we had a number of conversations about

2    services at DAEP.

3                    (Marked Craft Exhibit No. 11.)

4         Q.   (BY MR. ABRAMS)  I'm going to hand you what's

5    been marked as Exhibit 11.

6              Do you recognize this as an e-mail from

7    Mr. Roy Rodney dated April 5, 2019, to a variety of

8    people on the board with a copy to you and others?

9         A.   Yes.

10        Q.   Mr. Rodney sent this e-mail in April of 2019

11   in which he enclosed a study of DAEP and discipline

12   HISD, which had comparative statistics from HISD.

13              Do you recall seeing the attachments

14   that Mr. Rodney forwarded to the district?

15        A.   Yes, I recall seeing this.

16        Q.   What is DAEP force?

17        A.   DAEP stands for District Alternative

18   Education Program.  And so when students who are

19   governed by the code of conduct -- so there may be

20   certain discipline consequences that result in either

21   mandatory or discretionary placement at the DAEP.

22        Q.   Do you recall that Mr. Rodney furnished the

23   district with two studies, one prepared by the Center

24   for Justice Research at Texas Southern University,

25   which reported statistics for Spring Branch indicating

1    that it, second only to HISD, had the highest

2    disparity ratio when one compared black and Hispanic

3    student discipline with discipline imposed on white

4    students?

5         A.   Yes, I'm aware that he's provided this

6    report.

7         Q.   Similarly, do you recall that in April of

8    2019 Mr. Rodney provided the district with a report

9    that by a group calling itself the Coalition of

10   Advocates for Restorative Education, which likewise

11   analyzed what that group contended were disparate

12   disciplinary statistics affecting Hispanics and

13   African Americans relative to the discipline affecting

14   the white students?

15        A.   I'm aware of the report.

16        Q.   After receipt of Exhibit 11, what, if

17   anything, did the district do to communicate its

18   reaction to the information supplied by Mr. Rodney and

19   the group, the Coalition of Advocates for Restorative

20   Education?

21        A.   I believe there were some e-mail exchanges

22   that I was copied on.  Perhaps Josef Klam was board

23   president at the time.

24             Mr. Rodney wanted this to be a topic at

25   a school board meeting, is my recollection.  And

1   the -- while this was e-mailed to board members, I

2   don't -- you know, it didn't come up as a topic.  This

3   specific report was not a topic on a board meeting.

4             However, we do talk about our code of

5   conduct regularly.  And so in the spring, there is

6   a -- the board adopts our code of conduct and student

7   handbook.

8             And I was in communication with

9   Mr. Rodney throughout and, you know, he would attend

10  board meetings from time to time.

11       **Q.   Did the district take any tangible actions in**

12  **direct response to the report or the reports that are**

13  **included as part of Exhibit No. 11 to address the**

14  **purported disparities, disciplinary treatment of**

15  **minority and white students in the district?**

16       A.   So I -- I met Mr. Rodney.  It was probably in

17  2016.  And so that's, you know, well before he

18  produced this report.

19             So by the time he e-mailed this in 2019,

20  I was in a different role.  I was in the chief

21  academic officer role.

22             But in preparing for today and

23  reflecting on the work with Mr. Rodney, he was a

24  member of our -- the campus improvement team at DAEP.

25             He asked good questions and his -- my

1    recollection is that he wanted the gold standard for

2    Spring Branch for DAEP, meaning that students wouldn't

3    lose ground when they went to DAEP, that parents were

4    informed.  There's a parent orientation session that

5    takes place.

6              Part of -- I would say a result and some

7    things that we put in place because of Mr. Rodney's

8    involvement took place well before this report was

9    written.

10             So I was responsible for helping to

11   ensure that we had a summer program for DAEP.  And

12   that was something that Roy was very passionate about,

13   that students could have a fresh start at a new school

14   year and you would not have to start the year at DAEP.

15             So we began a summer program for any

16   students who still had to, you know, finish their

17   placement, that that would take place over the summer.

18             He also had complaints about assignments

19   from his homeschool teachers to the teachers at DAEP.

20   So I facilitated the process of tightening up how

21   assignments were provided for advance placement

22   courses so that the -- while a child would be at DAEP,

23   that they had access to their advanced coursework.

24             Because there are only -- there are

25   minimal teachers at DAEP, so there might be four high

1  school teachers, one for each core, and they would
2  have a lot of preps that they would be responsible
3  for, depending on the students that joined their class
4  for a brief period of time.
5      **Q.   Do you recall that one of the core concerns**
6  **expressed in the reports attached as part of**
7  **Exhibit 11 was the disparity in disciplinary treatment**
8  **of minority and white students?**
9      A.   Yes.  I recall that's part of the report.
10  And it also said that students -- so principals assign
11  consequences based upon discipline infractions.
12              And so principals on a regular basis do
13  review their discipline infractions, consequences they
14  align with their administrators.  So that would be
15  a -- a common practice that happens across middle
16  schools and high schools.
17      **Q.   After the district received Exhibit 11, what**
18  **steps did it take to investigate the legitimacy of the**
19  **disparity reflected in the report in the disciplinary**
20  **treatment of minority and white students in the**
21  **district?**
22      A.   I am not aware.  I would have been in the
23  chief academic officer role, and so there would have
24  been someone else who oversaw DAEP and discipline and
25  administration -- administrative responses.

```
1      Q.   Is -- are you aware of any steps the district
2   took after receipt of Exhibit 11 to evaluate the
3   reason for the significant disparities in disciplinary
4   treatment of minority and white students reported in
5   the documents contained in Exhibit 11?
6      A.   I am not aware.
7      Q.   Are you aware of any tangible or concrete
8   actions or changes in policy or procedure that the
9   district implemented in response to the concern that
10  there were significant statistical disparities in the
11  disciplinary treatment of minority and white students
12  in the district?
13     A.   So there was a conversation which resulted in
14  some adjustments to first time offense for alcohol and
15  marijuana possession.
16          So prior to Mr. Rodney bringing some of
17  this information to light, schools would send students
18  to DAEP for the first time if they were caught under
19  the influence at school.
20          The district believed that we wanted to
21  take a more restorative approach.  And so it's called
22  the AMP program.  AMP stands for alcohol, marijuana,
23  prevention program.
24          And so the first time a student was
25  caught under the influence or in possession of drugs,
```

1    they were offered counseling, restorative practices

2    type approach and which was really drug and alcohol

3    counseling by our system of care team.

4              And so in lieu of going to DAEP, so a

5    parent had a choice.  You could attend this

6    rehabilitation program or you could attend DAEP.  And

7    the majority would select the alcohol and marijuana

8    prevention program.

9        **Q.   Is it the district's position that the**

10   **incidents of alcohol and marijuana abuse among**

11   **minority students is different than the incidents of**

12   **alcohol and marijuana abuse among white students?**

13       A.   Could you repeat the first part of the

14   question?

15       **Q.   Sure.  Is it the district's position that the**

16   **incidents of alcohol and marijuana abuse among**

17   **minority students is different than the incidents of**

18   **alcohol and marijuana abuse among white students in**

19   **the district?**

20       A.   No.

21       **Q.   All right.  Then whatever the district did**

22   **with regard to changing its policy about alcohol and**

23   **marijuana discipline was not directly related to**

24   **addressing the concern that that had been expressed**

25   **about significant disparities in discipline imposed on**

1    **minority and white students, right?**

2        A.    So some of the information that Mr. Rodney

3    had shared was, when you look at the data, there were

4    large number of students going to DAEP for alcohol

5    and -- alcohol and marijuana possession.

6              And so that was a step that the district

7    took, was to build in another layer of support for

8    students before having them attend the DAEP program.

9        **Q.    Did the district ever investigate why more**

10   **minority students were being sent to discipline for**

11   **alcohol and marijuana offenses than white students?**

12       A.    I'm not aware.

13       **Q.    And what I'm trying to zero in on is the**

14   **difference between global policy changes that affect**

15   **minority and white students equally and whether**

16   **anybody ever drilled down on and made any policy**

17   **changes addressing the statistical disparities in**

18   **discipline.**

19              **And I think your answer is that the**

20   **district did not make procedural changes to**

21   **specifically address the statistical disparities in**

22   **discipline of minority and white students.  Is that**

23   **correct?**

24       A.    So when I think of procedural changes, I

25   think of principals evaluating their discipline

1    practices at every campus and looking at that by

2    quarter or by semester.

3              And so principals, as part of the campus

4    improvement plan, would be reviewing their discipline

5    data on a regular basis and then adjusting training,

6    working with our system of care, training assistant

7    principals, ensuring that there's consistent

8    application of consequences.

9        Q.   Has the district maintained statistics

10   similar to those shown on Pages 12 and 13 of the

11   coalition of advocates for restorative education

12   report after the 2016 school year that would reflect

13   whether or not expulsions and other forms of

14   discipline within the district still vary as

15   materially among Hispanic, African-American, and white

16   students as they are shown to vary on Pages 12 and 13

17   of this report for the period from 2007 through 2016?

18       A.   There is data that's collected.  I don't know

19   that I've seen a formal report.

20       Q.   Has the pattern of disparate disciplinary

21   action reflected on Pages 12 and 13 of the restorative

22   coalition report in Exhibit 11 changed since that

23   time?

24       A.   I am not aware.  I would have to look at the

25   data, because that's 4 or 5 years have since passed

1  since this was produced or the data that's referred

2  here was produced.

3      **Q.   Did the board of trustees take up**

4  **Mr. Rodney's request that the board address this**

5  **differential disciplinary issue at the board level?**

6      A.   There were board agenda items specific to the

7  code of conduct, but there were no board agenda items

8  specific to Mr. Rodney's care report.

9      **Q.   Did any individual board member take up**

10 **Mr. Rodney's concerns about differential disciplinary**

11 **actions against minority versus white students and**

12 **champion it?**

13     A.   I can't speak to individual correspondence

14 that board members have had with Mr. Rodney.  So I'm

15 not aware.

16     **Q.   Does -- I'm sorry, go ahead?**

17     A.   I was -- Chris Gonzalez, who was on the

18 board, she -- she would regularly ask questions in

19 regards to discipline, restorative practices,

20 et cetera.

21          Pam Goodson and Karen Peck have also

22 been my board liaisons and they would -- you know, Pam

23 may have had conversations with Mr. Rodney.  I'm not

24 aware.

25     **Q.   But as you sit here today, the district is**

1    unaware of any specific actions that were taken in

2    response to the statistical data presented by

3    Mr. Rodney and his group reflecting differential and

4    disparate disciplinary treatment of minority and white

5    students; is that correct?

6         A.   Correct.

7         Q.   I now want to turn to the subject of the

8    available state-mandated academic results that the

9    district has.  And I will confess my eyes glazed over

10   when I tried to understand them.

11        A.   Uh-huh.

12        Q.   Both as a parent and as a lawyer, I found it

13   very difficult slogging, so I'm going to defer to and

14   ask you sort of general questions.  They're not trick

15   questions.  They're a reflection of my inability to

16   find a way through the seemingly impenetrable

17   statistics in those reports.

18             So I apologize for my inability to

19   digest what information you've -- the district has

20   provided.

21             Starting at the most global level, are

22   there any patterns evident in the most recently

23   available state-mandated academic results about where

24   campuses that are succeeding fall in the district and

25   where campuses that are not succeeding using the

1    State's measure of success fall?

2        A.    So the most recent accountability report for

3    last school year has since come out since we provided

4    the AEIS report.  So that is the report that I'm most

5    familiar with.

6        Q.    Let me just mention I haven't seen that one.

7    I probably wouldn't understand it any better than I

8    understood what I have received, but I have not yet

9    been provided that report.

10                    Please go ahead.

11        A.    So last school year was 2021.  That report

12    has been finalized and every district has received

13    their report now.

14                    As a district, Spring Branch has

15    performance above the state and region in the vast

16    majority of academic indicators.

17                    When you look at STAAR testing, that

18    begins in third grade through eighth grade and then

19    there's high school courses or tests called the

20    end-of-course tests.

21        Q.    We're going to come back to that, but I just

22    realized that I skipped over a topic that we were on

23    before.

24                    Earlier you were talking about

25    complaints, mentioned that principals receive

1   complaints from time to time at the principal level

2   and you wouldn't be -- presumably the district

3   wouldn't necessarily be apprised of that.

4               Is there a procedure or a process within

5   the district where principals are to document

6   complaints they receive about racial or ethnic

7   discrimination against students?

8        A.   Is there a place where they would document

9   that?  It would --

10       Q.   If a -- if a principal receives a report --

11   because you indicated that's one place there could be

12   report -- complaints made -- does the district have a

13   policy that requires that those reports be documented

14   so someone like me could, after the fact, go and find

15   out what complaints about racial or ethnic

16   discrimination have been made?

17       A.   So the district has a formal grievance

18   policy.  And Level 1 is typically at the principal

19   level.

20               And so there would be formal records

21   maintained.  But if there's a phone call or a parent

22   is upset about a grade or some comment somebody made,

23   the principal would most likely pick up the phone,

24   call the parent, invite them in, you know, let me hear

25   what happened and they would go about resolving it

1    informally.

2              So I don't know that there is a set

3    formal documentation expectation when they resolve

4    complaints at the lowest level possible.

5         Q.   If I'm following you, then, one type of

6    complaint, which I'll characterize as an informal

7    complaint, would not result in someone formally

8    invoking whatever grievance process is in place in the

9    district.  Is that correct?  The phone calls --

10        A.   Right correct.

11        Q.   -- the conversation.

12             If someone has the desire to make a

13   formal complaint about racial or ethnic

14   discrimination, does the district's what you call

15   grievance process encompass those types of complaints?

16        A.   It could, yes.

17        Q.   And if one were to look at the student

18   handbook, would that document tell a parent that if

19   they chose to make a more formal complaint about that

20   type of conduct, they could invoke the formal

21   grievance process?

22        A.   Yes.  It's clearly outlined.

23        Q.   Does the district maintain records of what,

24   if any, complaints of racial or ethnic discrimination

25   have been made through the formal grievance process

```
1   call for under the student handbook?
2       A.   I would assume that there's record of those
3   reports because we would have to fall under the -- the
4   records retention policy for the State.
5       Q.   To date has the district reviewed its
6   grievance records to determine what, if any,
7   complaints about racial or ethnic discrimination
8   toward a student have been made through the formal
9   grievance process?
10      A.   I -- I don't have knowledge of that.
11      Q.   Who oversees that part of the administrative
12  structure?
13      A.   Karen Heeth oversees administration.  So
14  those types of complaints would be fielded by the
15  administration side.
16      Q.   And as we sit here today, the only two
17  complaints that fall under the label of racial or
18  potential racial or ethnic discrimination are the
19  Stratford parents' complaint and the dialogue with
20  Mr. Rodney.
21               Those are the two only you're aware of;
22  is that correct?
23      A.   Those are the only two I've been a part of
24  that I'm aware of.
25      Q.   And you're unaware what, if anything, might
```

1    be found in the district's formal grievance process

2    files?

3        A.    Correct.

4        Q.    Now, back to academic performance.  Thank

5    you.

6        A.    Uh-huh.

7        Q.    From your review of the State reports -- and

8    what's the right vocabulary to use to describe those

9    reports so I'm talking your language?

10       A.    So the names have changed.  So going back to

11   2011, you will see AEIS, but most recently we would

12   refer to it as TAPR, T-A-P-R.

13       Q.    And what did AEIS stand for?

14       A.    Academic Excellence Indicator System.

15       Q.    And what does TAPR stand for?

16       A.    I should know this.  Texas Accountability

17   Performance Report is what I believe it stands for.

18       Q.    If I use the term "accountability reports" to

19   cover this category, will that be acceptable to you?

20       A.    Yes.

21       Q.    Do the accountability reports that you've

22   reviewed for the district reflect that student

23   academic performance in the district is correlated in

24   some way with the ethnic and racial characteristics of

25   the campuses?

1       A.    Generally.

2       Q.    As a general proposition, if one were to look

3  at a campus that has 85 to 90 percent minority

4  students, as a general proposition, their academic

5  results are not going to be comparable to those of the

6  campus that has a largely white population, correct?

7       A.    Generally, but I would say we talk more about

8  eco dis.  It's more about poverty than about race or

9  ethnicity.

10      Q.    Do you agree that there is a very strong

11  correlation within the district between the economic

12  disadvantaged category and the ethnic and racial

13  characteristics of the campuses?

14      A.    Can you repeat the -- that question?

15      Q.    Sure.  Let me break it down this way.  Let's

16  go back to -- let goes back to Exhibit 10 to make it

17  more concrete.

18            And let's -- let's look at Northbrook

19  Middle because it's one of the election precincts and

20  it's one of the student enrollment districts that's

21  been discussed.

22            Northbrook Middle has a 93.97 percent

23  economically disadvantaged student population,

24  correct?

25      A.    Correct.

1    Q.    As a general proposition, does the district

2  agree that there's a strong correlation between the

3  race and ethnicity of the students at schools like

4  Northbrook that are highly economically disadvantaged?

5    A.    Correct.

6    Q.    I don't have the figure in front of me, but

7  Northbrook is a heavily Hispanic school, correct?

8    A.    Yes.

9    Q.    Do you have -- off the top of your head, do

10  you have a feel for roughly how large their Hispanic

11  student population is as a percentage?

12    A.    I don't know.  It would be large.

13    Q.    North of 85 percent?

14    A.    Most likely, yes.

15    Q.    And I'm using that as an example, but is that

16  example something that generally translates across the

17  district, that there's a strong correlation between

18  the percentage of students on a campus that are

19  economically disadvantaged and the percentage of

20  students on the campus that fall into one of the

21  minority classifications?

22    A.    Yes.  They're very similar.  They may be a

23  few percentage points off, but they're generally very

24  close.

25    Q.    We earlier walked through Exhibit 10 and

1    talked about the fact that the vast majority of the

2    campuses with high economic disadvantaged statistics

3    are on the north side and relatively few, if any, are

4    on the south side.

5            Do you remember that discussion?

6    A.    Yes.

7    Q.    If we were to do a similar analysis of the

8    accountability reports that you've had the opportunity

9    to review, would we see a similar pattern, that is to

10   say that the schools that are generally performing

11   better on those -- in those accountability reports are

12   found on the south side and the schools that are

13   generally found to be performing poor in the

14   accountability reports are found on the north side?

15   A.    Yes.

16   Q.    Based on the accountability reports that

17   you've reviewed most recently, and realizing you don't

18   have them here in front of you, can you, from your

19   experience and memory, tell me what the several

20   strongest and several weakest elementary school

21   campuses in the district are based on those reports?

22   A.    So several stronger performing, Wilchester,

23   Rummel Creek.  Valley Oaks would be performing at high

24   levels.

25            Schools performing not as strongly as

1    those schools, Housman, Ridgecrest, Sherwood.

2        Q.    Does the State any longer give grades to

3    these campuses or has that fallen by the wayside?

4        A.    So they started to give grades, but because

5    of COVID in 2020 they canceled STAAR.  And then this

6    year, even though we took STAAR and we have results

7    from STAAR, there's no grades given.

8              Even this school year that we're in,

9    '21-'22, there will be no grade lower than a C.  So,

10   yes, they started to give grades, but there's been a

11   bit of a pause because of COVID.

12       Q.    Does -- does the State or the district use

13   any evaluation tool where either or both determine a

14   campus is failing as opposed to succeeding?

15             Is there an F anymore or a fail?

16       A.    Yes, there are Ds and Fs, A, B, C, D, F.

17       Q.    And as a general proposition, do you agree

18   that -- does the district agree that the schools that

19   are rated as Ds and Fs are almost universally, if not

20   universally, on the north side of I-10?

21       A.    Schools that have struggled with that

22   primarily are on the north side.

23       Q.    Are there any schools on the south side of

24   I-10 that have received a rating or evaluation of D or

25   F?

1    A.   There -- I don't recall the exact letter

2  rating, so when you have a D or an F, sometimes it

3  comes with accountability.

4         So there's state accountability

5  sanctions and there's federal accountability

6  sanctions.

7         My recent recollection is that

8  Thornwood, which is on the south side, did have some

9  accountability one year where they had a dip in scores

10 that caused them to have a lower rating.  Thornwood.

11   **Q.   Thornwood is near where we are now out at --**

12 **on Dairy Ashford, right?**

13   A.   It's down further.

14   **Q.   Right.**

15   A.   Yes, it's close.

16   **Q.   It's near -- near Tully Stadium?**

17   A.   Yes.

18   **Q.   And is the student population of Thornwood**

19 **comprised of a larger percentage of students from**

20 **multifamily dwellings than is generally the case in**

21 **the district, apartments, for lack --**

22   A.   There are a good number of apartments next to

23 the school.

24   **Q.   And do you recall the racial or ethnic**

25 **composition of the student body at Thornwood off the**

1    top of your head?

2         A.   No.

3         Q.   Okay.  With respect to the middle school

4    campuses in the district, which two are the strongest

5    and which two are the weakest based upon state

6    accountability testing?

7         A.   Memorial Middle School.  Cornerstone.

8         Q.   Let's stick for a moment to traditional --

9    traditional campuses.

10             Aren't Memorial and Spring Branch Middle

11   the two stronger campuses and Spring Wood and Spring

12   Forest and Spring Oaks and Northbrook the less?

13        A.   Generally, yes, Memorial Middle and Spring

14   Branch Middle.

15        Q.   And the two weakest campus or the remainder

16   are weaker campuses based upon at least state

17   accountability results, right?

18        A.   Correct.

19        Q.   So the two south-side middle schools have the

20   strongest reports and all of the north side middle

21   schools have weaker reports?

22        A.   Correct.

23             Now, the same is not necessarily true

24   for elementary.  So if you look at Hollibrook

25   Elementary, they have been very successful.

```
 1              I don't recall their exact letter
 2    rating, if it was a B yet or not or a C, but they
 3    have -- they have led the way on the north side.
 4         Q.   To what do you attribute Hollibrook's
 5    academic success in light of the socioeconomic
 6    characteristics of its student population?
 7         A.   So before I got here, Hollibrook had received
 8    a state grant, many millions of dollars that they
 9    received that went towards hiring additional staff to
10    decrease student-teacher ratios and additional
11    training, just a real intense focus by the leader of
12    the campus.
13              MR. ABRAMS:  I told you we would stop
14    after about an hour.  And I've busted my hour thing
15    because I just got caught up in this.  Why don't we
16    take a brief break mand then we'll close this out and
17    we won't be very much longer.
18              THE WITNESS:  Okay.
19              (Break from 10:46 a.m. to 10:52 a.m.)
20         Q.   (BY MR. ABRAMS)  Dr. Craft, I want to spend
21    the last few minutes with you visiting about the
22    provision and assessment of bilingual services in the
23    district and how the district evaluates its success or
24    lack of success in that area.
25              How does the district grade its paper on
```

1  **whether it's succeeding, failing, or getting better or**

2  **getting worse in respect to bilingual education?**

3      A.   So we have -- we believe in multiple

4  measures.  So, yes, we have the State report that we

5  get the data desegregated.

6           But we also use TELPAS, which is the

7  Texas English Language Proficiency Assessment System,

8  that all bilingual or ESL students are required to

9  take until they exit.  So we use that.

10          We also look at performance on our local

11 measures, meaning running record data for reading

12 fluency, reading development, measures of academic

13 process, or the MAP test, and we look at reading and

14 math growth there.

15          So we have, you know, district data, but

16 then every campus also has their campus level data.

17 And so we look at trends over time.

18          We also have our district improvement

19 plan that contains those quantifiable measures as

20 well.

21     **Q.   How does the district's academic performance**

22 **and success of its Spanish language students compare**

23 **with other districts that have a majority Hispanic**

24 **student population?**

25     A.   So I'll speak to the PBMAS -- or I'm sorry,

1    it has a new name.  RDA.

2        Q.    What's the acronym for?

3        A.    RDA comes from the State.  It's called

4    Results Driven Accountability.  And for the report

5    that was just recently released in November-ish, we

6    were at or above the State rates in almost every area

7    related to bilingual ESL student performance.

8              So I've not had a chance to get my hands

9    on a regional report, but every district does have a

10   rating compared to the State rate.

11       Q.    If I followed you, then, in the most recent

12   State reporting, the district's bilingual performance

13   is at or above the State average?

14       A.    So when you look at the results driven

15   accountability and the State rate and target listed,

16   yes, we are either at or above in the majority of

17   those indicators.

18       Q.    From your work in the area, are there

19   districts in the state that are considered to be

20   leaders in the Spanish language area, who have

21   majority Hispanic student population?

22              What I'm driving at is -- and I'm fairly

23   parochial, but to me being average or above average

24   isn't enough as a parent, a taxpayer, and a citizen.

25              And so I want to know who is doing the

1  best job at least based upon statistical performance

2  in the academic performance of their Spanish language

3  students that have other characteristics like Spring

4  Branch, majority Hispanic population, student

5  populations?

6      A.   So which other districts?

7      Q.   I mean, do any come to mind?

8      A.   There's a comparable indicator report that

9  campuses receive.  I would have to look to see if a

10 district receives it.

11          But TEA does designate the 40 comparable

12 schools most like your demographics.  I have not

13 recently looked at that report but that report would

14 tell us what school districts we benchmark against and

15 who would be school districts of interest.

16     Q.   What's that report called or how would I find

17 it is I guess what I'm trying to say?

18     A.   It's on the TEA Web site.

19     Q.   Okay.

20     A.   It is a comparable list.  I personally would

21 probably have to dig myself to find it online.  It's a

22 list of the 40 schools most like school district.

23     Q.   Do you know where Spring Branch falls on that

24 list of comparable schools in terms of the performance

25 in bilingual education?

```
 1        A.    I don't know where we fall.
 2        Q.    Do you know who is at the top of the list?
 3        A.    I don't know who is at the top of the list.
 4        Q.    When the district evaluates the performance
 5   of its bilingual education program, does it look to
 6   other districts for guidance to see what somebody else
 7   may be doing that's working that Spring Branch is not
 8   yet doing?
 9        A.    Yes.  So we value our relationship with
10   Region 4.  So that's our education service center.
11   Our director of bilingual/multilingual programming
12   does belong to the leadership groups at Region 4.
13              I am in the chief academic officer
14   leadership groups.  EL and bilingual is frequently a
15   topic.
16              We also pay close attention to
17   programming in our regional area of Katy, Alief,
18   Cy-Fair, and we also reference to Klein because
19   they're a district of similar size.
20        Q.    Who is in charge of the district's bilingual
21   EL program, if they're one and the same?
22        A.    The director.  Her name the Aylin Martinez.
23        Q.    Do the board members have areas of assigned
24   supervisory responsibility?
25              For example, would there be some board
```

1    member whose informal assignment is to oversee the

2    bilingual EL program or is it not set up that way?

3        A.    We have board liaisons.  And so my board

4    liaisons are Karen Peck and Pam Goodson.  And I would

5    provide them updates.  They ask questions about any

6    academic areas.

7                    There's also board members who are

8    assigned to committees.  So of the district committees

9    that are established, some may have membership where

10   they attend to stay informed.

11       Q.    With respect to bilingual and EL education, I

12   assume that's an academic subject.  So that falls

13   under --

14       A.    Yes.

15       Q.    -- your umbrella?

16       A.    Yes.

17       Q.    And that's why Karen and Pam would be the

18   board liaisons that liaise with you, and technically

19   then bilingual flows up through you to them if they

20   had interest --

21       A.    Yes.

22       Q.    -- or concerns?

23       A.    Yes.

24       Q.    Okay.

25       A.    And there are frequent board topic of

1    discussion on board meetings.  So the academics

2    division frequently prepares reports to the board

3    members.  And the meetings are twice a month.  So it's

4    very common that members of my team are presenting

5    updates to the board.

6         **Q.   With respect to bilingual and English**

7    **language programming in the district, was the district**

8    **currently have any community committees that are**

9    **pertinent to that; and if not, has it in the past?**

10        A.   I am not sure of in the past what has

11   existed.  We -- every campus has an LPAC committee,

12   language proficiency assessment committee, where they

13   are required by the TEA to maintain LPACs at every

14   campus.

15             Our newcomer center, which is overseen

16   by the director of multilingual programming, any

17   students who are coming in new to the district do have

18   their initial language assessments at the newcomer

19   center.

20             And so they liaise with every campus

21   representative to make sure that they have all the

22   information they need to conduct an LPAC.

23        **Q.   Administratively, is there any super**

24   **structure over the language proficiency committees?**

25             **Do they work up to some other district**

1    level committee or is that just part of the job of the

2    campus principal, to make sure there is such a

3    committee and have it function?

4        A.    So the -- every campus's LPAC designees are

5    trained by the director of multilingual programming.

6    So in a sense, they would report up to her.

7                    She would be -- Aylin is responsible for

8    annual reports.  Aylin is responsible for training all

9    campus staff in accountability and accommodations and

10   anything related to bilingual ESL students.

11       Q.    How long has Ms. Martinez been in that role?

12       A.    Oh, I believe a year and a half.  And prior

13   to that, she was a coordinator in the same department.

14   She was over compliance for bilingual and ESL

15   programs.

16       Q.    And who preceded Ms. Martinez in that role?

17       A.    The former director, her name is Uyen,

18   U-Y-E-N, last name is Tieu, T-I-E-U.  And she has

19   resigned from the district.

20       Q.    You earlier indicated that there are

21   comparability reports that could be consulted to

22   determine where the district falls relative to

23   comparable districts with comparable Hispanic student

24   populations.

25                    Without reference to that report, are

1    there districts that you consider to be the leaders in

2    this area in the state?

3         A.    I believe there are leaders, but I really am

4    thinking in terms of programming and how they model

5    their programs and would not be familiar with the

6    results.

7         Q.    Again, with recognition that you don't have

8    the report in front of you --

9         A.    Uh-huh.

10         Q.    -- are you in a position to tell me whether

11    the district considers its performance in the

12    bilingual area to make it a statistical leader in

13    terms of its academic performance for Spanish language

14    students?

15         A.    A leader in the state?

16         Q.    Comparable campuses.  You brought up the

17    concept of comparability, and I'm willing to accept

18    that.

19               And so I was just wondering whether with

20    reference to comparable campuses you -- you believe

21    statistically the district's performance makes it a

22    leader, top 5, top 10, something like that?

23         A.    I don't know that we would be top 5 or top

24    10.  I would be interested in looking at that report.

25    But when you look at accountability for bilingual and

1    ESL students, it's really -- it's difficult because

2    you have students taking the test in Spanish, but you

3    have students transitioning and taking the test in

4    English for the first time.

5               So when they transition and take the

6    test in English for the first time, you may see a dip

7    in performance, but long term, you know, we want our

8    students to excel at English language proficiency

9    which then they would meet criteria to exit.

10       **Q.   Does the district consider its bilingual**

11   **program to be a success?**

12       A.   I believe that it is successful, but I would

13   share with you back in 2011, 2012, when the district

14   first encountered financial difficulty, the first

15   group of people to go were our academic directors.

16               And so for about 5 years, this district

17   had no academic directors leading the way and schools

18   were doing the best that they knew how to do.

19               But you can imagine over 5 or 6 years

20   the great variation of practices that were taking

21   place.

22               And so it wasn't still 2016, 2017, where

23   we were able to rehire directors whose positions were

24   dissolved.  So it has taken some time to rebuild

25   systems and structures and align with 46 schools to

```
 1   ensure great things are happening for kids.
 2       Q.   Am I correct that the ultimate decision on
 3   the budgetary priorities that resulted in the
 4   elimination of the academic directors' positions rests
 5   with the board?
 6       A.   They approve the budgets, so I guess they
 7   would be the ultimate budget decisionmaker.
 8       Q.   Except when you told me you didn't understand
 9   a question today, do you believe you've understood my
10   questions?
11       A.   Yes, sir.
12       Q.   Are there any answers that you've given that
13   you would like to change or correct at this time?
14       A.   No, not that I'm aware of.
15       Q.   Thank you very much for your time and your
16   courtesy.
17               MR. ABRAMS:  I have no further questions
18   at this time.
19               THE WITNESS:  Okay.  Thank you.
20               MR. ABRAMS:  Thank you.
21               MR. CRAWFORD:  We will reserve our
22   questions.  Thank you, Barry.
23               MR. ABRAMS:  Thank you.
24               (The deposition concluded at 11:06 a.m.)
25
```

Page 70

1       WITNESS CORRECTIONS AND SIGNATURE.

2         Please indicate changes on this sheet of paper,

    giving the change, page number, line number and reason

3   for the change.  Please sign each page of changes.

4   PAGE/LINE         CORRECTION      REASON FOR CHANGE

5   11 / 14      change "word" to "work" — typo

6   15 / 24      change "delta" to "District" — typo

7   16 / 3       add more schools to the

8              list → "Buffalo Creek, Frostwood,

9              Shadow Oaks, and Spring Branch

10             Elementary"

11             (Reason → I reviewed my original

12             list of schools)

13  62 / 22      instead of "school district"

14             should say "a given school"

15             Reason → I confirmed that

16             the comparable schools list is

17             only generated at the

18             campus level — there is

19             no similar report at

20             district level

21

22

23   _____  Kristin Craft

            KRISTIN CRAFT

24                              1-26-22

25

```
 1           S I G N A T U R E   O F   W I T N E S S

 2

 3       I, KRISTIN CRAFT, solemnly swear or affirm under

 4    the pains and penalties of perjury that the foregoing

 5    pages contain a true and correct transcript of the

 6    testimony given by me at the time and place stated

 7    with the corrections, if any, and the reasons therefor

 8    noted on the foregoing correction page(s).

 9

10

11          KRISTIN CRAFT

12                                      1-26-22

13

14

15

16    Job 70025

17

18

19

20

21

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                   COURT FOR THE SOUTHERN
 2             DISTRICT OF TEXAS HOUSTON DIVISION
 3

     VIRGINIA ELIZONDO,   |
 4        Plaintiff,      |
                          |
 5   V.                   |   Civil Action No. 4:21-CV-01997
                          |
 6   SPRING BRANCH        |
     INDEPENDENT SCHOOL   |
 7   DISTRICT, ET AL.,    |
          Defendants.     |
 8

     THE STATE OF TEXAS :
 9   COUNTY  OF  HARRIS :
10       I, MENDY A. SCHNEIDER, a Certified Shorthand
11   Reporter in and for the State of Texas, do hereby
12   certify that the facts as stated by me in the caption
13   hereto are true; that the above and foregoing answers
14   of the witness, KRISTIN CRAFT, to the interrogatories
15   as indicated were made before me by the said witness
16   after being first duly sworn to testify the truth, and
17   same were reduced to typewriting under my direction;
18   that the above and foregoing deposition as set forth
19   in typewriting is a full, true, and correct transcript
20   of the proceedings had at the time of taking of said
21   deposition.
22           I further certify that I am not, in any
23   capacity, a regular employee of the party in whose
24   behalf this deposition is taken, nor in the regular
25   employ of this attorney; and I certify that I am not
```

```
 1    interested in the cause, nor of kin or counsel to
 2    either of the parties.
 3        .
 4            That the amount of time used by each party at
 5    the deposition is as follows:
 6
              MR. ABRAMS - 01:29:00
 7
 8
            GIVEN UNDER MY HAND AND SEAL OF OFFICE,
 9    this, the ___ day of _____, 2022.
10
11    _____
              MENDY A. SCHNEIDER, CSR, RPR
12            Certification No.:  7761
              Expiration Date:  1-31-2023
13
14    Worldwide Court Reporters, Inc.
      Firm Registration No. 223
15    3000 Weslayan, Suite 235
      Houston, TX 77027
16    (713) 572-2000
17
18
19
20
21
22
23
24
25
```

**A**

**a.m** 1:17,17
59:19,19 69:24
**ABERNATHY**
2:9
**able** 35:17,23
68:23
**above-styled**
1:16
**Abrams** 2:4 3:3
4:4,14 11:7
13:9,17 20:7
21:4,12 22:18
22:20 24:13,24
37:4 59:13,20
69:17,20,23
73:6
**abroad** 14:14
**abuse** 43:10,12
43:16,18
**academic** 8:14
8:22 15:7 18:2
18:9 28:4,25
29:2,3 30:13
39:21 41:23
47:8,23 48:16
52:4,14,23
53:4 59:5
60:12,21 62:2
63:13 64:6,12
67:13 68:15,17
69:4
**academics** 8:13
65:1
**academies** 28:3
**Academy** 15:25
30:12
**accelerated**
35:14,20
**accept** 67:17
**acceptable**
52:19
**access** 35:14
40:23
**accommodate**
6:13

**accommodati...**
66:9
**accountability**
8:18 11:12,13
11:17,20,23
12:1,16 21:2
22:7 48:2
52:16,18,21
55:8,11,14,16
57:3,4,5,9 58:6
58:17 61:4,15
66:9 67:25
**acknowledge**
23:15
**acronym** 61:2
**Act** 9:8 36:5
**action** 1:5 45:21
72:5
**actions** 39:11
42:8 46:11
47:1
**additional** 36:3
59:9,10
**address** 39:13
44:21 46:4
**addressing**
43:24 44:17
**adjusting** 45:5
**adjustments**
42:14
**administration**
35:2 41:25
51:13,15
**administrative**
18:2,3,9 41:25
51:11
**Administrativ...**
65:23
**administrator**
18:18
**administrators**
41:14
**adopts** 39:6
**advance** 40:21
**advanced** 40:23
**advocates** 38:10
38:19 45:11

**AEIS** 48:4 52:11
52:13
**affect** 44:14
**affirm** 71:3
**African** 20:24
34:11 38:13
**African-Amer...**
34:19 36:10
45:15
**agenda** 46:6,7
**agree** 20:2,6,17
21:4 24:5 28:9
30:12 33:7
53:10 54:2
56:17,18
**agreeing** 9:13
**agreement** 5:24
6:16 10:5
20:15
**agreements** 5:6
5:7 7:13
**ahead** 46:16
48:10
**AL** 1:7 72:7
**alcohol** 42:14,22
43:2,7,10,12
43:16,18,22
44:4,5,11
**Aldine** 14:17,20
14:21 16:10,21
**Alief** 63:17
**align** 41:14
68:25
**alleged** 33:25
**alleging** 35:23
**allowed** 6:15
**alternative**
15:24 36:17
37:17
**American** 20:24
34:11
**Americans**
38:13
**amount** 73:4
**AMP** 42:22,22
**analysis** 55:7
**analyzed** 38:11

**Anglo** 20:24
22:8
**annual** 66:8
**answer** 5:23
6:15 44:19
**answered** 7:3
**answering** 6:5,8
**answers** 5:10
69:12 72:13
**anybody** 44:16
**anymore** 56:15
**AP** 35:17,19
**Apart** 36:9
**apartments**
57:21,22
**apologize** 22:16
22:19 47:18
**appeals** 18:10
**appear** 10:9,20
**appearing** 9:19
20:8
**appears** 27:11
**application**
25:19 45:8
**appreciate** 6:6
24:14
**apprised** 49:3
**approach** 42:21
43:2
**approve** 69:6
**approximately**
21:7
**April** 37:7,10
38:7
**area** 59:24 61:6
61:18,20 63:17
67:2,12
**areas** 8:20,23
22:5 63:23
64:6
**Ashford** 1:19
57:12
**asked** 39:25
**asking** 6:11 9:10
**assessment** 8:18
59:22 60:7
65:12

**assessments**
65:18
**assign** 41:10
**assigned** 34:24
63:23 64:8
**assignment** 64:1
**assignments**
35:11,12 40:18
40:21
**assistant** 14:18
45:6
**Associate** 8:13
**assume** 7:2 51:2
64:12
**at-large** 9:15
16:21,22 17:6
**Athletic** 1:19
**attached** 1:20
41:6
**attachments**
37:13
**attend** 21:3 39:9
43:5,6 44:8
64:10
**attended** 17:9
**attention** 63:16
**attorney** 10:13
72:25
**attorneys** 11:1,2
12:7
**attribute** 59:4
**Audrey** 2:13
11:4 12:7
13:21
**authorized**
10:20
**available** 47:8
47:23
**Avenue** 2:5
**average** 21:7
31:14 32:14
61:13,23,23
**aware** 4:21 9:12
9:18 13:1
21:10 22:14
24:10 25:23
33:16 34:3,6

36:11,14 38:5
38:15 41:22
42:1,6,7 44:12
45:24 46:15,24
51:21,24 69:14
**Aylin** 63:22 66:7
66:8

**B**

**B** 56:16 59:2
**Babrams@bla...**
2:6
**back** 11:14
13:24 14:21
27:23 34:14
35:1,15,18
48:21 52:4,10
53:16,16 68:13
**background**
13:24 14:8
**backwards**
15:21
**Barry** 2:4 4:14
69:22
**based** 19:23
27:20 41:11
55:16,21 58:5
58:16 62:1
**basis** 8:24 9:1
36:2 41:12
45:5
**began** 14:17
40:15
**beginning** 14:8
**begins** 48:18
**behalf** 9:21 11:8
72:24
**believe** 16:21,21
28:23 38:21
52:17 60:3
66:12 67:3,20
68:12 69:9
**believed** 42:20
**belong** 63:12
**benchmark**
62:14
**Bendwood**

30:13,17,23
**best** 62:1 68:18
**better** 5:6 30:18
48:7 55:11
60:1
**bigger** 30:21
**bilingual** 59:22
60:2,8 61:7,12
62:25 63:5,14
63:20 64:2,11
64:19 65:6
66:10,14 67:12
67:25 68:10
**bilingual/mult...**
63:11
**bit** 5:12 6:21
56:11
**black** 38:2
**Blaine** 10:12,14
10:17,22 35:1
**BLANK** 2:4
**board** 4:18 8:5,7
8:8 9:2,5,9,11
16:20 17:1,5
17:10,11,13
19:22 36:19,22
37:8 38:22,25
39:1,3,6,10
46:3,4,5,6,7,9
46:14,18,22
63:23,25 64:3
64:3,7,18,25
65:1,2,5 69:5
**body** 19:3 57:25
**booklet** 5:11
**born** 14:5
**Boulevard** 2:10
**boundaries**
22:11
**BOYD** 2:9
**Branch** 1:6,18
3:9 4:17 7:23
8:5,7 15:3,3
16:16 22:4
23:2 25:3 28:4
28:25 29:1,3
29:16,20 32:1

37:25 40:2
48:14 58:10,14
62:4,23 63:7
72:6
**break** 7:6,8,9
11:11,24 53:15
59:16,19
**breakdown**
19:15 21:2
**Briar** 14:2
**brief** 41:4 59:16
**bringing** 42:16
**Brook** 32:23
**brought** 8:25
9:7 67:16
**budget** 69:7
**budgetary** 69:3
**budgets** 69:6
**Buffalo** 33:4
**build** 44:7
**Bunker** 16:3,4
23:2
**busted** 59:14
**Byzantine** 18:6

**C**

**C** 2:1 56:9,16
59:2
**call** 4:22 5:2
49:21,24 50:14
51:1
**called** 5:9 9:3,7
10:3 19:7
42:21 48:19
61:3 62:16
**calling** 38:9
**calls** 50:9
**campus** 25:8,9,9
25:13,15 27:1
27:18,19 30:17
36:25 39:24
45:1,3 53:3,6
54:18,20 56:14
58:15 59:12
60:16,16 65:11
65:14,20 66:2
66:9

**campus's** 66:4
**campus-by-ca...**
24:15
**campuses** 3:9
25:3 27:6
28:10,12 31:1
31:15 33:9,21
47:24,25 52:25
53:13 55:2,21
56:3 58:4,9,11
58:16 62:9
67:16,20
**canceled** 56:5
**candidates** 9:17
**capacities** 4:19
**capacity** 72:23
**caption** 72:12
**care** 43:3 45:6
46:8
**case** 4:19 34:24
57:20
**category** 26:12
28:23 29:8
52:19 53:12
**caught** 42:18,25
59:15
**cause** 1:17 23:11
33:12,17 73:1
**caused** 57:10
**Ccrawford@a...**
2:11
**Cedar** 32:23
**center** 1:19
15:18 19:8
37:23 63:10
65:15,19
**certain** 9:21
10:10 13:7,13
18:9 35:12
37:20
**Certification** 3:5
73:12
**certifications**
18:15
**certified** 18:17
18:18,18 72:10
**certify** 72:12,22

72:25
**cetera** 46:20
**challenging** 9:8
**champion** 46:12
**chance** 61:8
**change** 69:13
70:2,3,4
**changed** 45:22
52:10
**changes** 42:8
44:14,17,20,24
70:2,3
**changing** 43:22
**characteristics**
28:16,19 29:15
52:24 53:13
59:6 62:3
**characterizati...**
26:3,10 31:3
**characterize**
50:6
**charge** 63:20
**charged** 18:20
**Charles** 2:9 11:4
12:7
**chart** 27:11
**chief** 8:14 15:7
39:20 41:23
63:13
**child** 26:1 40:22
**children** 17:7
27:3
**choice** 16:1
30:16,19 43:5
**chose** 50:19
**Chris** 46:17
**Christine** 12:8
12:12
**citizen** 23:22
61:24
**City** 14:6
**Civil** 1:5,19
34:13 72:5
**claimed** 34:10
35:13
**class** 41:3
**classes** 28:6

35:14,17,19
**classifications**
54:21
**classified** 27:3
**clearer** 5:16
**clearly** 5:19
50:22
**client** 7:16
**close** 54:24
57:15 59:16
63:16
**co-locate** 29:6
**coalition** 38:9,19
45:11,22
**code** 37:19 39:4
39:6 46:7
**collected** 45:18
**college** 36:3
**column** 26:21,25
**columns** 26:20
**come** 5:18 39:2
48:3,21 62:7
**comes** 57:3 61:3
**coming** 65:17
**comment** 49:22
**committee** 37:1
65:11,12 66:1
66:3
**committees** 64:8
64:8 65:8,24
**common** 41:15
65:4
**communicate**
38:17
**communication**
39:8
**community** 15:4
15:9 17:11
65:8
**comparability**
66:21 67:17
**comparable**
53:5 62:8,11
62:20,24 66:23
66:23 67:16,20
**comparative**
37:12

**compare** 60:22
**compared** 38:2
61:10
**complained** 34:9
35:7,16
**complaint** 34:14
34:18,20 35:25
36:2 50:6,7,13
50:19 51:19
**complaints**
33:24 34:5
35:1 36:11,14
36:19 40:18
48:25 49:1,6
49:12,15 50:4
50:15,24 51:7
51:14,17
**compliance**
66:14
**composition**
20:18 23:10,12
23:16,20,22
24:1 57:25
**comprised** 21:6
21:14 57:19
**concept** 67:17
**concern** 13:15
42:9 43:24
**concerns** 41:5
46:10 64:22
**concluded** 69:24
**concrete** 42:7
53:17
**condition** 24:20
**conduct** 37:19
39:5,6 46:7
50:20 65:22
**confess** 47:9
**confirm** 22:7
35:23
**consequences**
37:20 41:11,13
45:8
**consider** 67:1
68:10
**considered** 8:14
25:11,15 61:19

**considers** 67:11
**consistent** 5:21
45:7
**consulted** 66:21
**contain** 71:5
**contained** 42:5
**contains** 60:19
**contend** 33:12
**contended** 38:11
**context** 17:20
**continue** 6:15
**convenience** 8:8
**conversation**
5:22 42:13
50:11
**conversations**
37:1 46:23
**convicted** 18:20
**coordination**
10:12
**coordinator**
66:13
**copied** 38:22
**copies** 13:10
**copy** 37:8
**core** 41:1,5
**corner** 19:3
**Cornerstone**
16:1 30:12,16
30:19 58:7
**corporate** 9:19
**correct** 10:15
16:16 17:3
21:24,25 22:6
23:23 26:8,24
27:5,10,17,22
28:1,2,15,21
29:18,19,23
30:1,3,6,11,19
31:13,16,17,21
32:15 33:3,6
33:11 36:3
44:23 47:5,6
50:9,10 51:22
52:3 53:6,24
53:25 54:5,7
58:18,22 69:2

69:13 71:5
72:19
**correction** 70:4
71:8
**corrections** 70:1
71:7
**correctly** 29:9
**correlated** 52:23
**correlation**
53:11 54:2,17
**correspond**
15:12
**correspondence**
46:13
**counsel** 10:5
12:4 13:9 73:1
**counseling** 36:4
43:1,3
**COUNTY** 72:9
**couple** 13:4
**course** 35:18
**courses** 35:21
40:22 48:19
**coursework**
40:23
**court** 1:1,1 4:20
5:9 6:1 9:10
72:1,1 73:14
**courtesy** 69:16
**courtroom** 6:22
**cover** 13:25
52:19
**COVID** 56:5,11
**Craft** 1:12,15
3:2 4:1,8,9,9
4:10,14 13:11
24:12 37:3
59:20 70:23
71:3,11 72:14
**CRAWFORD**
2:9 11:5 20:5
20:20 21:9
22:17 24:8,22
69:21
**credit** 35:21
**Creek** 23:3 33:4
55:23

**criminal** 18:21
**criteria** 25:21
68:9
**CSR** 1:17 73:11
**current** 22:11
**currently** 14:1
65:8
**cut** 6:5,14
**Cy-Fair** 63:18

---

**D**

**D** 56:16,24 57:2
**DAEP** 15:24
36:16,25 37:2
37:11,16,17,21
39:24 40:2,3
40:11,14,19,22
40:25 41:24
42:18 43:4,6
44:4,8
**Dairy** 1:19 57:12
**data** 24:15 44:3
45:5,18,25
46:1 47:2 60:5
60:11,15,16
**date** 51:5 73:12
**dated** 37:7
**day** 12:12 73:9
**December** 1:13
1:17
**decision** 10:9,23
69:2
**decisionmaker**
69:7
**decrease** 59:10
**defendant** 17:21
**Defendants** 1:7
1:16 2:8 72:7
**defer** 47:13
**degree** 14:13
**delays** 34:23
**delivery** 17:7
**Delta** 15:24
**demerits** 9:14
**demographic**
19:15 21:18
**demographics**

19:2 62:12
**denied** 35:14
**department**
  26:1 66:13
**depending** 41:3
**depicts** 19:20,21
  22:21 23:1
**deposed** 13:21
  17:23
**deposition** 1:11
  1:15,20 9:22
  9:24 10:6 12:6
  12:17 13:12,18
  69:24 72:18,21
  72:24 73:5
**depositions** 10:4
**describe** 11:19
  52:8
**describes** 19:2
**desegregated**
  60:5
**designate** 62:11
**designated** 9:20
  10:24
**designation**
  25:18
**designee** 34:23
**designees** 66:4
**desire** 50:12
**details** 26:6
**determine** 51:6
  56:13 66:22
**determined**
  35:16 36:1
**determines**
  25:14
**development**
  60:12
**dialogue** 51:19
**difference** 44:14
**differences**
  19:12 24:1,11
  24:19,23
**different** 20:3
  23:21 28:17
  29:5,6 39:20
  43:11,17

**differential** 46:5
  46:10 47:3
**difficult** 47:13
  68:1
**difficulty** 68:14
**dig** 62:21
**digest** 47:19
**dilute** 9:16
**dip** 57:9 68:6
**direct** 39:12
**direction** 72:17
**directly** 43:23
**director** 11:12
  11:17 63:11,22
  65:16 66:5,17
**directors** 8:21
  8:22 68:15,17
  68:23
**directors'** 69:4
**dis** 25:2,12,17
  25:20 26:14,16
  26:24 53:8
**disability** 29:14
  29:17 30:9
**disadvantaged**
  24:10 25:11,16
  26:3,9,17,18
  26:21 27:4,7,8
  28:11,13 29:11
  31:3,5,6,12,20
  31:23 32:7,10
  32:15,18,21,24
  33:2,5,9 53:12
  53:23 54:4,19
  55:2
**disciplinary**
  38:12 39:14
  41:7,19 42:3
  42:11 45:20
  46:5,10 47:4
**discipline** 37:11
  37:20 38:3,3
  38:13 41:11,13
  41:24 43:23,25
  44:10,18,22,25
  45:4,14 46:19
**discretionary**

37:21
**discriminating**
  35:9
**discrimination**
  34:1 35:5,24
  36:13 49:7,16
  50:14,24 51:7
  51:18
**discussed** 53:21
**discussion** 55:5
  65:1
**disparate** 38:11
  45:20 47:4
**disparities** 24:6
  26:11 33:13,20
  39:14 42:3,10
  43:25 44:17,21
**disparity** 33:18
  38:2 41:7,19
**DisPercent** 3:8
**dissolved** 68:24
**distinct** 24:23
**distinction**
  24:14
**district** 1:1,2,7
  4:18 7:23,24
  7:24 8:6,8,15
  9:21,25 10:15
  10:21 11:9,13
  11:15 12:5
  13:5 14:3
  16:24 17:2,8
  18:4 19:12,16
  19:19,22,24
  20:8,17,21
  21:22 22:1,10
  23:2,7,9,14,15
  23:25 24:5,15
  25:9 27:2,3,25
  30:8 31:8 33:9
  33:12,19,24
  34:9 35:4 36:1
  36:4,11,16
  37:14,17,23
  38:8,17 39:11
  39:15 41:17,21
  42:1,9,12,20

43:19,21 44:6
  44:9,20 45:9
  45:14 46:25
  47:9,19,24
  48:12,14 49:2
  49:5,12,17
  50:9,23 51:5
  52:22,23 53:11
  54:1,17 55:21
  56:12,18 57:21
  58:4 59:23,23
  59:25 60:15,18
  61:9 62:10,22
  63:4,19 64:8
  65:7,7,17,25
  66:19,22 67:11
  68:10,13,16
  72:1,2,7
**district's** 9:9
  19:1 20:9,12
  20:14 43:9,15
  50:14 52:1
  60:21 61:12
  63:20 67:21
**districts** 9:11,16
  11:24 16:18,19
  16:25 17:6
  19:21 20:4,18
  21:5,8,14,24
  22:4,6,11,13
  53:20 60:23
  61:19 62:6,14
  62:15 63:6
  66:23 67:1
**division** 1:2 65:2
  72:2
**document** 24:25
  49:5,8 50:18
**documentation**
  50:3
**documented**
  49:13
**documents**
  12:15,21 34:16
  42:5
**dog** 17:19
**doing** 10:19

61:25 63:7,8
  68:18
**dollars** 59:8
**Dr** 4:9,14 10:12
  10:14,22 12:10
  13:11 35:1
  59:20
**draw** 22:10
**drilled** 44:16
**Drive** 14:2
**driven** 61:4,14
**driving** 61:22
**drug** 43:2
**drugs** 42:25
**Ds** 56:16,19
**dual** 35:20
**duly** 1:16 4:2
  72:16
**dwellings** 57:20

———————

**E**

**E** 2:1,1 4:3 71:1
  71:1
**e-mail** 3:11 37:6
  37:10 38:21
**e-mailed** 39:1,19
**e-mails** 12:18,23
  13:6,11
**earlier** 9:23 10:4
  18:23 19:18
  22:20 48:24
  54:25 66:20
**earning** 9:5
**easier** 5:15
**easily** 6:2
**eco** 3:8 25:2,12
  25:17,20 26:14
  26:16,24 53:8
**economic** 24:20
  26:9,15 29:14
  29:17 30:9
  31:3 33:17
  53:11 55:2
**economically**
  24:10 25:11,15
  26:2,16,21
  27:4,7,8 28:10

28:13 29:10
31:5,6,11,20
32:6,10,14,18
32:21,24 33:2
33:5,9 53:23
54:4,19
**Edgewood** 16:3
16:8 31:2
**education** 15:24
19:8 36:17
37:18 38:10,20
45:11 60:2
62:25 63:5,10
64:11
**educational** 14:8
17:7
**eighth** 48:18
**either** 34:1
37:20 56:13
61:16 73:2
**EL** 12:19 63:14
63:21 64:2,11
**elaborate** 18:8
**elect** 9:11,17
16:20
**electing** 9:9
**election** 9:3 17:5
19:21 22:3
53:19
**elections** 17:1,13
19:22
**elementaries**
16:2
**elementary**
14:23 15:19
16:14 27:15
30:25 31:15
32:1,11 55:20
58:24,25
**eligible** 25:21
**elimination** 69:4
**Elizondo** 1:3
4:16 7:16,17
7:18 9:2 72:3
**employ** 72:25
**employee** 72:23
**employees** 34:2

34:3
**enclosed** 37:11
**encompass**
50:15
**encountered**
68:14
**end-of-course**
48:20
**English** 12:20
60:7 65:6 68:4
68:6,8
**enrollment**
19:23 20:3,18
21:5,14,24
22:4,11,13
53:20
**ensure** 40:11
69:1
**ensuring** 45:7
**equally** 44:15
**ESL** 14:14 60:8
61:7 66:10,14
68:1
**established** 64:9
**et** 1:7 46:20 72:7
**ethnic** 20:2,17
20:22 23:10,11
23:16,20,21
24:1 33:25
36:12 49:6,15
50:13,24 51:7
51:18 52:24
53:12 57:24
**ethnicity** 53:9
54:3
**evaluate** 29:14
42:2
**evaluated** 23:25
**evaluates** 59:23
63:4
**evaluating** 44:25
**evaluation** 56:13
56:24
**evaluations**
12:20
**events** 13:7
**evidence** 30:8

35:5
**evident** 47:22
**exact** 25:23 57:1
59:1
**EXAMINATI...**
3:1,3
**example** 27:23
54:15,16 63:25
**excel** 68:8
**Excellence** 52:14
**excess** 28:11
**exchanges** 38:21
**executive** 8:21
11:12
**Exhibit** 3:6,8,10
9:24 18:24
19:14,19,25
22:12,21 24:12
24:25 25:5
26:14,20 31:1
33:7 37:3,5
38:16 39:13
41:7,17 42:2,5
45:22 53:16
54:25
**exist** 15:13
**existed** 65:11
**existing** 33:13
**exit** 60:9 68:9
**expectation** 50:3
**experience** 18:7
21:21 29:7
55:19
**Expiration**
73:12
**expressed** 41:6
43:24
**expressions** 5:17
**expulsions** 45:13
**extent** 23:9
**eyes** 47:9

---

**F**

**F** 56:15,16,25
57:2 71:1
**facilitated** 40:20
**fact** 49:14 55:1

**factor** 25:14
**facts** 72:12
**factual** 36:1
**fail** 56:15
**failing** 35:8
56:14 60:1
**fair** 26:2
**fairly** 7:2 18:6,8
61:22
**fall** 3:8 25:1
26:12 47:24
48:1 51:3,17
54:20 63:1
**fallen** 56:3
**falls** 62:23 64:12
66:22
**familiar** 19:5,9
19:25 22:23
23:6 25:5
28:24 48:5
67:5
**families** 25:24
**family** 26:4
**federal** 4:20 9:7
57:5
**feeder** 15:13
**feel** 54:10
**fielded** 51:14
**fight** 17:19
**figure** 32:15
54:6
**file** 36:18
**filed** 34:13
**files** 52:2
**fill** 25:19
**finalized** 48:12
**financial** 68:14
**find** 47:16 49:14
62:16,21
**fine** 4:11 30:13
**finish** 40:16
**Firm** 73:14
**first** 4:2 13:4
14:16 26:20
34:8 36:21
42:14,18,24
43:13 68:4,6

68:14,14 72:16
**five** 14:25
**flows** 64:19
**fluency** 60:12
**focus** 59:11
**focused** 24:13
**followed** 61:11
**following** 16:9
50:5
**follows** 4:2 73:5
**force** 37:16
**foregoing** 71:4,8
72:13,18
**Forest** 22:5
29:24 33:1
58:12
**forgot** 12:11
**form** 20:5,12,20
21:9 24:8,22
**formal** 5:14
36:18 45:19
49:17,20 50:3
50:13,19,20,25
51:8 52:1
**formally** 50:7
**former** 66:17
**forms** 25:25
45:13
**forth** 72:18
**forward** 5:5
**forwarded** 37:14
**found** 35:5
47:12 52:1
55:12,13,14
**four** 21:4,10
27:25 28:5
40:25
**fourth** 15:8
**free** 25:18,19,22
**freeway** 24:3
28:20
**frequent** 64:25
**frequently** 63:14
65:2
**fresh** 40:13
**freshman** 34:21
35:16,18

front 54:6 55:18
    67:8
Fs 56:16,19
full 72:19
function 26:3
    66:3
furnished 37:22
further 57:13
    69:17 72:22

**G**
G 71:1
general 12:1
    24:18 47:14
    53:2,4 54:1
    56:17
generally 11:20
    53:1,7 54:16
    54:23 55:10,13
    57:20 58:13
Gessner 31:9
gestures 5:18
getting 60:1,2
gifted 29:4
give 14:7 18:13
    56:2,4,10
given 12:2 56:7
    69:12 71:6
    73:8
giving 6:19
    17:24 70:2
glazed 47:9
global 44:14
    47:21
go 4:9 5:5 7:7
    25:25 27:14
    46:16 48:10
    49:14,25 53:16
    68:15
goes 53:16
going 4:12,22
    5:7 6:14 7:6,7
    11:14 13:10
    17:24 35:15
    37:4 43:4 44:4
    47:13 48:21
    52:10 53:5

gold 40:1
Gonzalez 46:17
good 4:5,6 6:1
    13:22 22:17
    39:25 57:22
Goodson 46:21
    64:4
governed 37:19
governs 18:9
grade 48:18,18
    49:22 56:9
    59:25
grades 3:9 25:3
    30:20 35:8
    56:2,4,7,10
grading 35:11
graduated 14:10
    14:11 36:8
grant 59:8
great 68:20 69:1
greatest 30:9
grievance 49:17
    50:8,15,21,25
    51:6,9 52:1
ground 40:3
group 19:7 38:9
    38:11,19 47:3
    68:15
groups 63:12,14
growth 60:14
guess 30:17
    62:17 69:6
guidance 63:6

**H**
Haffey 11:18
    12:4
half 66:12
hand 9:23 18:23
    24:24 37:4
    73:8
handbook 39:7
    50:18 51:1
handful 15:19
handle 26:7
hands 61:8
happened 49:25

happening 69:1
happens 41:15
hard 5:23 6:4
HARRIS 72:9
hazard 6:10
head 54:9 58:1
hear 36:22 49:24
hearing 18:2,3
    34:23
heavily 20:4,19
    21:23 54:7
Hedwig 23:4
Heeth 12:8,10
    51:13
helpful 5:5
helping 40:10
hereto 1:20
    72:13
high 14:8,10,23
    14:25 15:20,21
    15:22,23 27:14
    27:25 28:5,12
    28:17,19 30:7
    31:14 40:25
    41:16 48:19
    55:2,23
higher 27:6
highest 38:1
highly 29:4 54:4
Highway 23:23
Hill 16:3,5 23:3
Hilshire 23:5
hiring 59:9
HISD 14:24
    15:1 16:15,18
    17:9 37:12,12
    38:1
Hispanic 20:23
    21:6,8,11,15
    21:17,19 38:2
    45:15 54:7,10
    60:23 61:21
    62:4 66:23
Hispanic-orie...
    21:23
Hispanics 38:12
history 11:13

Hollibrook 31:4
    58:24 59:7
Hollibrook's
    59:4
homeschool
    40:19
hour 7:7,8,8
    59:14,14
hours 13:19,20
    13:22
household 25:25
Housman 31:5
    56:1
Houston 1:2,19
    2:5 4:20 14:2
    14:16,24 17:1
    72:2 73:15
huh-uh 5:18
HULLETT 2:9
Hunters 23:3

**I**
I-10 23:23 24:7
    24:21 28:10,12
    30:10 31:4,9
    31:18,24 32:2
    32:4,8,12,17
    32:20,23 33:1
    33:4,10 56:20
    56:24
identifying 25:4
imagine 68:19
impact 17:6
impenetrable
    47:16
implemented
    42:9
important 5:16
    6:18,21
imposed 38:3
    43:25
improvement
    36:25 39:24
    45:4 60:18
inability 47:15
    47:18
incident 36:9

incidents 13:3
    43:10,11,16,17
included 39:13
income 26:3
Independent 1:6
    4:17 7:23 8:6,7
    17:1 23:2 72:6
INDEX 3:1,6
indicate 70:2
indicated 11:21
    49:11 66:20
    72:15
indicating 37:25
indicator 52:14
    62:8
indicators 12:1
    48:16 61:17
individual 46:9
    46:13
individuals
    25:24
influence 42:19
    42:25
infographic 19:1
informal 4:13
    50:6 64:1
informally 50:1
information
    25:4 38:18
    42:17 44:2
    47:19 65:22
informed 40:4
    64:10
infractions
    41:11,13
initial 35:2
    65:18
inside 14:3,4
instance 1:16
instances 33:25
    36:12
Institute 28:5,25
    29:2,3
institutions
    30:14
intense 59:11
intentionally

6:14
**interacted** 17:11
**interchangeably** 7:18
**interest** 36:7 62:15 64:20
**interested** 67:24 73:1
**intermediate** 14:23
**interpretation** 5:19
**interrogatories** 72:14
**Interstate** 23:23
**introduced** 15:2
**investigate** 41:18 44:9
**investigated** 23:9 33:17,22
**invite** 49:24
**invoke** 50:20
**invoking** 50:8
**involved** 13:4
**involvement** 40:8
**involving** 36:9
**Iowa** 14:6,11
**ISD** 1:18 3:9 14:24 16:10,11 16:16 25:3
**issue** 34:11 46:5
**items** 35:22 46:6 46:7

**J**

**J** 2:9
**Jennifer** 10:17
**job** 5:15 14:17 62:1 66:1 71:16
**jog** 13:3
**joined** 15:3,4 41:3
**Josef** 38:22
**jump** 5:7 13:24
**junior** 35:20

**Justice** 37:24

**K**

**K-12** 29:5,6
**Karen** 12:8,13 46:21 51:13 64:4,17
**Katy** 63:17
**Keith** 11:18
**kept** 13:19
**kids** 69:1
**kin** 73:1
**kind** 11:12 13:2
**Klam** 38:22
**Klein** 63:18
**knew** 68:18
**Knoll** 14:2
**know** 5:3,21 7:19 8:1,9 11:14 12:2,2 12:23 15:18 18:8 21:22 34:4 35:4,12 39:2,9,17 40:16 45:18 46:22 49:24 50:2 52:16 54:12 60:15 61:25 62:23 63:1,2,3 67:23 68:7
**knowing** 11:6
**knowledge** 23:13 24:4 33:23 36:6 51:10
**known** 22:22 29:4
**Kristin** 1:12,15 3:2 4:1,8,11 70:23 71:3,11 72:14

**L**

**label** 51:17
**lack** 18:7 30:18 57:21 59:24

**Landrum** 21:12 28:23
**language** 12:20 52:9 60:7,22 61:20 62:2 65:7,12,18,24 67:13 68:8
**large** 9:10 21:11 44:4 54:10,12
**largely** 23:17 53:6
**larger** 57:19
**lawsuit** 4:17,22 4:23 5:2 7:14 8:25 9:1,6,14 9:15 12:3,25
**lawsuits** 17:21
**lawyer** 4:15 47:12
**lawyers** 10:22
**layer** 44:7
**layman's** 8:16
**leader** 59:11 67:12,15,22
**leaders** 61:20 67:1,3
**leadership** 63:12 63:14
**leading** 68:17
**learners** 12:20
**learning** 8:18
**led** 11:15 59:3
**left** 5:8 27:18
**legal** 6:20 7:15
**legitimacy** 41:18
**let's** 53:15,18,18 58:8
**letter** 57:1 59:1
**level** 14:22 24:9 27:12,20 46:5 47:21 49:1,18 49:19 50:4 60:16 66:1
**levels** 55:24
**liaise** 64:18 65:20
**liaisons** 46:22

64:3,4,18
**licenses** 18:15
**lieu** 43:4
**light** 42:17 59:5
**likewise** 27:19 32:2 38:10
**limits** 30:21
**line** 70:2
**list** 62:20,22,24 63:2,3
**listed** 61:15
**litigation** 17:15
**little** 5:12
**local** 60:10
**located** 31:7 32:4 33:10
**location** 22:21 23:1,6
**long** 13:17 66:11 68:7
**longer** 56:2 59:17
**look** 5:11 21:18 24:16 25:24 27:23 35:18 44:3 45:24 48:17 50:17 53:2,18 58:24 60:10,13,17 61:14 62:9 63:5 67:25
**looked** 11:21 62:13
**looking** 11:25 12:19 13:1 22:15 26:14 29:9 45:1 67:24
**looks** 27:11,17
**lose** 40:3
**lot** 41:2
**loud** 5:16
**low** 29:17
**lower** 19:3 27:9 32:14 56:9 57:10
**lowest** 50:4

**LPAC** 65:11,22 66:4
**LPACs** 65:13
**Lucas** 12:7
**lunch** 25:18,22

**M**

**M** 4:3
**machine** 1:18
**Magnolia** 14:21 16:11,12,22
**maintain** 50:23 65:13
**maintained** 45:9 49:21
**majority** 21:19 43:7 48:16 55:1 60:23 61:16,21 62:4
**makeup** 20:2,22
**mand** 59:16
**mandatory** 37:21
**map** 19:19 22:21 23:1 60:13
**marijuana** 42:15,22 43:7 43:10,12,16,18 43:23 44:5,11
**marked** 9:23 18:23 19:18 22:21 24:12,25 37:3,5
**Martinez** 63:22 66:11,16
**materially** 28:17 45:15
**materials** 12:24
**math** 60:14
**McKinney** 2:10
**meals** 25:20
**mean** 18:5 62:7
**meaning** 17:15 18:3 40:2 60:11
**means** 28:25
**measure** 48:1

measures 35:12
60:4,11,12,19
meet 35:12 68:9
meeting 11:11
36:22 38:25
39:3
meetings 13:2
17:10 36:20
39:10 65:1,3
member 39:24
46:9 64:1
members 9:9,11
39:1 46:14
63:23 64:7
65:3,4
membership 3:8
25:2 64:9
Memorial 15:25
22:4,22,23
23:11,17 28:6
29:16,19 58:7
58:10,13
memory 13:3
55:19
Mendy 1:17
72:10 73:11
mention 48:6
mentioned
11:17 12:16
13:11 48:25
merits 9:14
met 39:16
middle 15:20,25
15:25 19:24
21:5,10,13
22:12 27:15
28:22 29:8,10
29:15,16,20
30:8,9,19
41:15 53:19,22
58:3,7,10,13
58:14,19,20
millions 59:8
mind 62:7
minimal 40:25
minor 14:13
minority 9:16

39:15 41:8,20
42:4,11 43:11
43:17 44:1,10
44:15,22 46:11
47:4 53:3
54:21
minutes 13:23
59:21
missed 16:4,5
mistake 22:18
model 67:4
moment 58:8
Monday 12:12
month 65:3
months 14:14
morning 4:5,6
mouthful 7:22
Moved 14:16
moving 15:7
multifamily
57:20
multilingual
65:16 66:5
multiple 60:3

N

N 2:1 4:3,3 71:1
71:1
name 4:7,14
15:11 25:9
36:15 61:1
63:22 66:17,18
names 52:10
National 19:8
NCES 19:10
near 57:11,16,16
nearly 30:4
necessarily
15:14 49:3
58:23
need 65:22
needs 30:17,24
Neuens 31:10
new 15:16 40:13
61:1 65:17
newcomer 65:15
65:18

Nope 22:18
normal 30:15
north 2:10 9:5
14:10 22:9
23:23 24:2,7
24:14,20 28:10
29:21 30:2,4
30:10 31:2,4,5
31:9,18,24
32:2,4,8,11,17
32:20,23 33:1
33:4,10,21
54:13 55:3,14
56:20,22 58:20
59:3
north-side 28:17
33:14
Northbrook
21:13 28:7
29:11 30:4
53:18,22 54:4
54:7 58:12
Northern 14:11
notary 1:21
noted 71:8
notes 22:15
notice 9:22,24
10:3,6,11
13:25
November-ish
61:5
number 13:22
21:11 25:9,10
25:12,20,23
26:24,25 27:18
34:21 35:22
37:1 44:4
57:22 70:2,2
numbered 1:16
numbers 27:19
numerically
27:20
nutrition 26:1

O

O 4:3 71:1
Oaks 15:24

21:13 29:11,12
30:2 31:23
55:23 58:12
Objection 20:5
20:20 21:9
24:8,22
observe 17:4
occupational
6:10
occur 10:4
OCR 34:13,23
offense 18:21
42:14
offenses 44:11
offer 36:3,4
offered 43:1
offers 36:7
office 34:13 35:2
73:8
officer 8:14
14:25 15:7
39:21 41:23
63:13
offices 1:18
official 4:19
Oh 66:12
Okay 4:12,24
5:13 7:10,11
15:15 16:13
17:14,23 18:25
22:15 24:17
26:9,19 31:11
58:3 59:18
62:19 64:24
69:19
once 7:6,8
online 62:21
operative 10:6
opportunity
9:16 10:1 36:5
55:8
opposed 10:25
17:6 56:14
oral 1:11,15
9:24
order 9:10
organization

19:9
organized 27:12
27:17
orientation 40:4
origin 21:8
originally 10:3
originated 34:20
outlined 50:22
outside 14:3
oversaw 15:23
41:24
oversee 64:1
overseeing 15:10
36:16
overseen 65:15
oversees 51:11
51:13
overwhelmingly
21:6,15,16

P

P 2:1,1
page 3:3,7 70:2
70:3
page(s) 71:8
PAGE/LINE
70:4
pages 45:10,16
45:21 71:5
pains 71:4
Pam 46:21,22
64:4,17
Panda 15:18
paper 11:22
59:25 70:2
parent 34:7,9,19
35:7,8,13,16
35:22 36:6,10
36:15 40:4
43:5 47:12
49:21,24 50:18
61:24
parents 9:4
25:18 40:3
parents' 51:19
parochial 61:23
part 12:13 27:12

39:13 40:6
41:6,9 43:13
45:3 51:11,23
66:1
**parties** 73:2
**partner** 36:25
**party** 17:14,18
72:23 73:4
**passed** 45:25
**passionate** 40:12
**Path** 15:18
**pattern** 45:20
55:9
**patterns** 15:13
47:22
**pause** 6:9,12
56:11
**pay** 36:4 63:16
**PBMAS** 60:25
**Peck** 46:21 64:4
**penalties** 71:4
**pending** 4:19
**people** 10:25
37:8 68:15
**percent** 21:7,17
22:5 25:2,12
27:2 28:11,14
29:10,19,20,22
29:25 30:2,5
31:3,5,6,12,20
31:23 32:1,6
32:10,15,18,20
32:23 33:1,5
53:3,22 54:13
**percentage** 27:7
54:11,18,19,23
57:19
**performance**
11:23 12:19
48:15 52:4,17
52:23 60:10,21
61:7,12 62:1,2
62:24 63:4
67:11,13,21
68:7
**performing**
55:10,13,22,23

55:25
**period** 41:4
45:17
**perjury** 71:4
**person** 11:16
17:15
**personal** 13:24
**personally** 62:20
**perspective**
36:23
**pertinent** 65:9
**phone** 49:21,23
50:9
**phonetic** 36:15
**pick** 49:23
**Pine** 31:7,9
**Piney** 23:3
**place** 40:5,7,8
40:17 49:8,11
50:8 68:21
71:6
**placement** 35:14
35:21 37:21
40:17,21
**plaintiff** 1:4 2:3
4:16 7:17
17:21 72:4
**plan** 45:4 60:19
**play** 5:12
**please** 4:7 48:10
70:2,3
**plus** 31:2,4,6,23
32:1
**Point** 23:3
**points** 54:23
**policy** 42:8
43:22 44:14,16
49:13,18 51:4
**poor** 55:13
**population**
19:16 23:16,17
26:22 53:6,23
54:11 57:18
59:6 60:24
61:21 62:4
**populations**
23:22 24:2,7

24:20 28:11,13
33:21 62:5
66:24
**Porter** 12:8,9
**position** 8:12
20:12 43:9,15
67:10
**positions** 68:23
69:4
**possession** 42:15
42:25 44:5
**possibility** 9:4
**possible** 6:12
50:4
**potential** 51:18
**poverty** 53:8
**practice** 41:15
**practices** 43:1
45:1 46:19
68:20
**pre-K** 15:18
**preceded** 66:16
**precincts** 53:19
**prefer** 4:9 9:17
**preK** 27:16
**preparation**
12:5,11,13
13:2,12
**prepare** 11:7
12:16 13:18
**prepared** 37:23
**prepares** 65:2
**preparing** 39:22
**preps** 41:2
**PRESENT** 2:13
**presented** 47:2
**presenting** 65:4
**president** 38:23
**presumably**
49:2
**pretty** 19:11
**prevention**
42:23 43:8
**price** 25:19
**primarily** 56:22
**principal** 14:18
14:19,22 16:14

49:1,10,18,23
66:2
**principals** 34:4
41:10,12 44:25
45:3,7 48:25
49:5
**prior** 12:18
42:16 66:12
**priorities** 69:3
**probably** 7:6,23
39:16 48:7
62:21
**procedural** 4:13
44:20,24
**procedure** 1:19
42:8 49:4
**proceed** 7:14
**proceeding** 6:20
**proceedings**
4:13 7:15
18:12 19:18
22:20 72:20
**process** 17:24
40:20 49:4
50:8,15,21,25
51:9 52:1
60:13
**produced** 1:15
12:21,22,24
19:19 39:18
46:1,2
**production** 25:1
**professional**
18:15
**proficiency** 60:7
65:12,24 68:8
**program** 12:20
15:24 36:17
37:18 40:11,15
42:22,23 43:6
43:8 44:8 63:5
63:21 64:2
68:11
**programming**
63:11,17 65:7
65:16 66:5
67:4

**programs** 27:16
66:15 67:5
**promise** 6:13
**proposition** 53:2
53:4 54:1
56:17
**provide** 64:5
**provided** 38:5,8
40:21 47:20
48:3,9
**provision** 59:22
**provisions** 1:20
**public** 1:21
**purported** 36:12
39:14
**purposes** 25:16
**pursuant** 1:19
**pursuing** 36:7
**put** 40:7

**Q**

**quantifiable**
60:19
**quarter** 45:2
**question** 6:6,23
9:4 12:3 20:6
24:13 34:4,17
43:14 53:14
69:9
**questions** 5:10
6:7,11,19 7:3
13:2 20:11
39:25 46:18
47:14,15 64:5
69:10,17,22
**quick** 34:22
**quite** 4:12

**R**

**R** 2:1 71:1
**race** 53:8 54:3
**racial** 20:18
23:10,12,16,20
23:21 24:1
33:25 35:5,24
36:12 49:6,15
50:13,24 51:7

51:17,18 52:24
53:12 57:24
**raised** 14:5
**ran** 9:2
**rate** 61:10,15
**rated** 56:19
**rates** 61:6
**rating** 56:24
57:2,10 59:2
61:10
**ratio** 38:2
**rationale** 9:15
35:11
**ratios** 59:10
**rattling** 4:25
**RDA** 61:1,3
**reached** 36:21
**reaction** 38:18
**read** 1:20
**reading** 60:11
60:12,13
**real** 59:11
**realize** 24:14
**realized** 48:22
**realizing** 55:17
**really** 5:23 6:4
12:18 43:2
67:3 68:1
**reason** 42:3 70:2
70:4
**reasons** 4:13
71:7
**reassessment**
34:25 35:15
**rebuild** 68:24
**recall** 17:12
37:13,15,22
38:7 41:5,9
57:1,24 59:1
**receipt** 38:16
42:2
**receive** 34:5
48:25 49:6
62:9
**received** 33:24
36:12 41:17
48:8,12 56:24

59:7,9
**receives** 49:10
62:10
**recognition** 67:7
**recognize** 37:6
**recognizes** 33:19
**recollection** 13:7
13:13 17:13
38:25 40:1
57:7
**record** 1:20 5:16
10:19 51:2
60:11
**recorded** 1:18
**records** 49:20
50:23 51:4,6
**Redbud** 2:10
**reduced** 25:18
25:19,22 72:17
**refer** 7:14,17,24
8:7 52:12
**reference** 63:18
66:25 67:20
**referenced**
12:18
**referencing** 11:2
**referred** 46:1
**referring** 5:3 8:2
11:3 31:1
**reflect** 28:10,12
45:12 52:22
**reflected** 41:19
45:21
**reflecting** 11:14
12:2 34:4
39:23 47:3
**reflection** 47:15
**reflects** 26:10
33:7
**refresh** 13:6
**refreshed** 13:12
**regard** 9:13
43:22
**regards** 34:17
46:19
**region** 48:15
63:10,12

**regional** 61:9
63:17
**Registration**
73:14
**regular** 41:12
45:5 72:23,24
**regularly** 39:5
46:18
**rehabilitation**
43:6
**rehire** 68:23
**related** 25:17
43:23 61:7
66:10
**relationship**
63:9
**relative** 38:13
66:22
**relatively** 29:17
55:3
**released** 61:5
**remainder** 58:15
**remaining** 22:3
**remember** 55:5
**repeat** 20:6
43:13 53:14
**report** 25:16
35:15 38:6,8
38:15 39:3,12
39:18 40:8
41:9,19 45:12
45:17,19,22
46:8 48:2,4,9
48:11,13 49:10
49:12 52:17
60:4 61:4,9
62:8,13,13,16
66:6,25 67:8
67:24
**reported** 37:25
42:4
**reporter** 5:9 6:1
72:11
**REPORTER'S**
3:5
**Reporters** 73:14
**reporting** 61:12

**reports** 11:10,13
11:20,22,23
12:16 21:2,18
22:8 39:12
41:6 47:17
49:13 51:3
52:7,9,18,21
55:8,11,14,16
55:21 58:20,21
65:2 66:8,21
**represent** 19:15
**representative**
9:20 10:21
11:8 20:9,14
23:15 65:21
**representatives**
9:25
**representing**
4:16
**request** 13:10,10
46:4
**REQUESTED**
3:4
**requests** 35:18
**required** 60:8
65:13
**requires** 49:13
**rescheduled**
10:5
**Research** 37:24
**reserve** 69:21
**reside** 14:1
**resident** 24:2
**residents** 34:2
**resigned** 66:19
**resolution** 34:22
**resolve** 50:3
**resolved** 34:19
**resolving** 49:25
**respect** 58:3
60:2 64:11
65:6
**response** 35:3
39:12 42:9
47:2
**responses** 41:25
**responsibility**

63:24
**responsible** 8:17
40:10 41:2
66:7,8
**restate** 6:24
**restorative**
38:10,19 42:21
43:1 45:11,21
46:19
**rests** 69:4
**result** 35:24
37:20 40:6
50:7
**resulted** 42:13
69:3
**results** 47:8,23
53:5 56:6
58:17 61:4,14
67:6
**results-driven**
11:25
**retention** 51:4
**review** 11:12
41:13 52:7
55:9
**reviewed** 12:15
12:24 13:6,11
35:10 51:5
52:22 55:17
**reviewing** 11:10
34:17 45:4
**Ridgecrest**
31:18 56:1
**right** 5:3 11:24
21:17,22 27:9
27:13 28:7
43:21 44:1
50:10 52:8
57:12,14 58:17
**right-hand** 19:3
26:19
**Rights** 9:8 34:14
**Rodney** 36:15
37:7,10,14,22
38:8,18,24
39:9,16,23
42:16 44:2

46:14,23 47:3
51:20
**Rodney's** 40:7
46:4,8,10
**ROEDER** 2:9
**role** 15:6,8,16
39:20,21 41:23
66:11,16
**ROME** 2:4
**roughly** 28:13
54:10
**rounding** 19:12
**Roy** 37:7 40:12
**RPR** 1:17 73:11
**Rules** 1:19
**Rummel** 55:23
**run** 29:13
**running** 60:11

**S**

**S** 2:1 71:1,1,1
**salary** 25:24
**sanctions** 57:5,6
**SAT** 36:5
**SBISD** 3:8,10
7:25 25:1
**Schneider** 1:17
72:10 73:11
**school** 1:6 4:18
7:23 8:6,8
11:23 14:9,10
14:23,24 15:11
15:23,25,25
16:14,20 17:1
17:1,5,10
19:22,23 20:23
21:1,3,5,10,14
22:11,13 23:2
24:9 25:10
27:12,20 28:12
28:19,23 29:4
29:8,10,16
30:13,16,20,23
31:1 34:12,14
38:25 40:13
41:1 42:19
45:12 48:3,11

48:19 54:7
55:20 56:8
57:23 58:3,7
62:14,15,22
72:6
**schools** 14:25
15:5,10,17,19
15:20,20,21,22
19:24 20:22,24
20:25 21:20
27:14,15,15
28:1,5,17 29:6
29:15 30:7,8,9
30:14 33:14,15
41:16,16 42:17
54:3 55:10,12
55:25 56:1,18
56:21,23 58:19
58:21 62:12,22
62:24 68:17,25
**scores** 57:9
**script** 5:12
**SEAL** 73:8
**seat** 9:5
**seated** 5:8
**second** 24:16
26:25 38:1
**secret** 22:1,2
**sections** 21:10
**see** 10:1 17:10
52:11 55:9
62:9 63:6 68:6
**seeing** 37:13,15
**seemingly** 47:16
**seen** 19:7 31:15
45:19 48:6
**segregated** 20:4
20:19
**select** 43:7
**selection** 15:17
**semester** 45:2
**send** 42:17
**senior** 35:20
**sense** 30:15 66:6
**sent** 37:10 44:10
**served** 18:11
**serves** 11:16

29:5 30:20
**service** 63:10
**services** 8:19
17:7 37:2
59:22
**serving** 15:9
30:24
**session** 40:4
**set** 50:2 64:2
72:18
**setting** 18:2
**seven** 20:3,18
21:5
**Shadow** 31:23
**Shadows** 31:7,9
32:17
**Shakra** 2:13
11:4 12:8
**share** 68:13
**shared** 44:3
**she'll** 5:10
**sheet** 70:2
**Sherwood** 32:11
56:1
**shorthand** 1:18
26:15 72:10
**show** 21:2
**shown** 45:10,16
**side** 9:5 12:25
22:9 26:19
29:22,24 30:2
30:4,10,10
31:2,4,6 51:15
55:3,4,12,14
56:20,22,23
57:8 58:20
59:3
**sides** 24:3,7
33:21
**sign** 70:3
**SIGNATURE**
3:4 70:1
**signed** 1:20
**significant** 24:6
24:19 33:13
42:3,10 43:25
**significantly**

23:21 33:8
**similar** 45:10
54:22 55:7,9
63:19
**Similarly** 6:1 8:4
38:7
**simply** 10:19
**simultaneously**
19:20
**single-member**
9:10 16:19,25
17:5
**sir** 69:11
**sit** 19:14 46:25
51:16
**site** 19:2 62:18
**size** 26:4 30:21
63:19
**sketch** 14:7
**skip** 22:16
**skipped** 48:22
**slip** 20:13
**slogging** 47:13
**so-and-so** 20:12
**socio** 24:19
**socioeconomic**
24:6 26:10
28:16,18 33:13
33:20 59:5
**solemn** 6:21
**solemnly** 71:3
**somebody** 26:7
49:22 63:6
**son** 34:10,12
35:6,7,9,13
**son's** 34:10
**sorry** 29:12
46:16 60:25
**sort** 47:14
**sounds** 5:17,23
**south** 24:3,7,14
24:21 28:12,19
29:24 30:10
33:21 55:4,12
56:23 57:8
**south-side** 33:14
58:19

**Southern** 1:1
37:24 72:1
**Spanish** 14:13
60:22 61:20
62:2 67:13
68:2
**speak** 5:16,22
12:9 36:19
46:13 60:25
**special** 30:17,24
**specialty** 28:3
30:23
**specific** 39:3
46:6,8 47:1
**specifically**
21:12 44:21
**spend** 13:23
59:20
**spent** 13:18,21
14:14
**spoke** 36:22
**spoken** 12:5
**spring** 1:6,18
3:9 4:17 7:22
8:5,7 15:2,3,24
16:16 21:13,13
22:4,5 23:2,4
25:2 28:4,6,24
29:1,3,9,11,12
29:16,19,21,24
30:2 32:1,17
37:25 39:5
40:2 48:14
58:10,11,11,12
58:13 62:3,23
63:7 72:6
**STAAR** 48:17
56:5,6,7
**Stadium** 57:16
**staff** 36:4 59:9
66:9
**stand** 52:13,15
**standard** 40:1
**stands** 26:16
37:17 42:22
52:17
**start** 6:8 27:14

40:13,14
**started** 11:11
  18:6 56:4,10
**starting** 22:12
  47:21
**starts** 28:23
**state** 1:18 4:7
  48:15 51:4
  52:7 56:2,12
  57:4 58:5,16
  59:8 60:4 61:3
  61:6,10,12,13
  61:15,19 67:2
  67:15 72:8,11
**State's** 48:1
**state-mandated**
  47:8,23
**stated** 1:20 71:6
  72:12
**statement** 24:18
**STATES** 1:1
  72:1
**statistic** 31:12
**statistical** 42:10
  44:17,21 47:2
  62:1 67:12
**statistically**
  67:21
**statistics** 19:5,7
  19:8,11,13
  24:9 27:9
  29:18 37:12,25
  38:12 45:9
  47:17 55:2
**stay** 64:10
**step** 44:6
**steps** 41:18 42:1
**stick** 58:8
**stop** 7:10 59:13
**Stratford** 15:23
  28:7 34:8,19
  36:10 51:19
**strong** 53:10
  54:2,17
**stronger** 55:22
  58:11
**strongest** 55:20

58:4,20
**strongly** 55:25
**structure** 18:9
  51:12 65:24
**structures** 68:25
**struggled** 56:21
**student** 8:18 9:4
  19:3,16 23:17
  23:22 24:2
  25:15 33:20
  34:20 35:11
  36:8,10 38:3
  39:6 42:24
  50:17 51:1,8
  52:22 53:20,23
  54:11 57:18,25
  59:6 60:24
  61:7,21 62:4
  66:23
**student-teacher**
  59:10
**students** 20:3,23
  20:24,25 21:3
  21:6,7,11,15
  21:17,20 22:6
  22:8 24:10
  25:10,12,13
  26:11,11,24,25
  27:7 28:19
  29:5 34:1
  37:18 38:4,14
  39:15 40:2,13
  40:16 41:3,8
  41:10,20 42:4
  42:11,17 43:11
  43:12,17,18
  44:1,4,8,10,11
  44:15,22 45:16
  46:11 47:5
  49:7 53:4 54:3
  54:18,20 57:19
  60:8,22 62:3
  65:17 66:10
  67:14 68:1,2,3
  68:8
**students'** 25:17
**studies** 37:23

**study** 37:11
**stuff** 4:25
**subject** 5:19
  47:7 64:12
**substantial**
  33:19
**substantially**
  33:8
**succeeding**
  47:24,25 56:14
  60:1
**success** 48:1
  59:5,23,24
  60:22 68:11
**successful** 58:25
  68:12
**sued** 17:16
**suing** 17:16
**Suite** 2:5,10
  73:15
**summary** 25:8
**summer** 40:11
  40:15,17
**super** 65:23
**superintendent**
  8:13 10:14,22
  15:9 18:18
**superintendents**
  15:4
**supervised**
  14:25 15:5,19
  34:8
**supervision**
  15:22
**supervisory**
  63:24
**supplied** 38:18
**support** 8:18
  14:25 44:7
**sure** 7:7 13:16
  43:15 53:15
  65:10,21 66:2
**swear** 71:3
**sworn** 1:16 4:2
  17:24 18:12
  72:16
**system** 9:9 43:3

45:6 52:14
  60:7
**systems** 68:25

---

## T

**T** 4:3 71:1,1
**T-A-P-R** 52:12
**T-I-E-U** 66:18
**take** 6:2 24:15
  29:13 35:17,18
  35:20 36:5
  39:11 40:17
  41:18 42:21
  46:3,9 59:16
  60:9 68:5
**taken** 1:16 47:1
  68:24 72:24
**takes** 40:5
**talk** 6:4 8:4 39:4
  53:7
**talked** 7:13 55:1
**talking** 6:3 7:20
  8:9 48:24 52:9
**tangible** 39:11
  42:7
**TAPR** 52:12,15
**target** 61:15
**taxpayer** 61:24
**TEA** 62:11,18
  65:13
**teacher** 14:18
  18:17
**teachers** 18:10
  35:9,10 40:19
  40:19,25 41:1
**teaching** 8:17
  14:16
**team** 36:25
  39:24 43:3
  65:4
**technically**
  64:18
**tell** 6:24 7:9
  50:18 55:19
  62:14 67:10
**TELPAS** 60:6
**tendency** 6:9

**term** 7:14 8:6
  20:21 22:23
  52:18 68:7
**terminology**
  7:12
**terms** 8:16 62:24
  67:4,13
**Terrace** 32:20
**test** 36:5 60:13
  68:2,3,6
**testified** 4:2 18:1
**testify** 9:20
  10:10,24 11:8
  72:16
**testifying** 6:22
**testimony** 5:14
  6:19 17:24
  18:13 71:6
**testing** 48:17
  58:6
**tests** 48:19,20
**Texas** 1:2,18,19
  1:19 2:5,5,10
  11:22 14:2
  18:17,19 37:24
  52:16 60:7
  72:2,8,11
**Thank** 8:11 11:5
  52:4 69:15,19
  69:20,22,23
**therefor** 71:7
**thing** 7:12 59:14
**things** 18:10
  19:20 30:15
  40:7 69:1
**think** 6:10 15:7
  44:19,24,25
**thinking** 6:10
  12:19 34:7
  67:4
**third** 15:5 48:18
**Thornwood**
  57:8,10,11,18
  57:25
**thought** 35:8
**three** 8:19,21
  15:16 22:3

26:20 29:6
**thumbnail** 14:7
**Tieu** 66:18
**tightening** 40:20
**time** 6:2 7:4 8:4
  8:4 10:4 13:21
  17:13 34:5,5
  35:19 36:22
  38:23 39:10,10
  39:19 41:4
  42:14,18,24
  45:23 49:1,1
  60:17 68:4,6
  68:24 69:13,15
  69:18 71:6
  72:20 73:4
**title** 8:12 28:24
**titled** 25:1
**today** 5:1 6:20
  7:12 9:19
  10:10 11:8
  17:18 19:14
  20:9 39:22
  46:25 51:16
  69:9
**told** 59:13 69:8
**tool** 56:13
**top** 54:9 58:1
  63:2,3 67:22
  67:22,23,23
**topic** 22:16
  38:24 39:2,3
  48:22 63:15
  64:25
**topics** 9:21
  10:10,24 13:13
  13:25
**total** 25:11
  26:21,25
**track** 13:19
**traditional**
  27:25 28:5,22
  30:14,25 58:8
  58:9
**trained** 66:5
**training** 45:5,6
  59:11 66:8

**transcript** 71:5
  72:19
**transition** 68:5
**transitioning**
  68:3
**translates** 54:16
**Treasure** 33:1
**treated** 34:12
**treatment** 34:10
  39:14 41:7,20
  42:4,11 47:4
**trends** 60:17
**trick** 47:14
**tried** 47:10
**true** 21:22 24:18
  28:8 30:7
  58:23 71:5
  72:13,19
**trustees** 4:18 8:5
  8:8 16:20 17:5
  46:3
**truth** 72:16
**try** 5:22 6:4,13
  20:11 22:17
**trying** 29:14
  44:13 62:17
**Tully** 57:16
**turn** 25:20 47:7
**turned** 36:24
**turning** 28:22
  29:8 30:25
**twice** 65:3
**two** 19:20 37:23
  51:16,21,23
  58:4,5,11,15
  58:19
**TX** 73:15
**type** 5:11 25:16
  43:2 50:5,20
**types** 18:12
  50:15 51:14
**typewriting**
  72:17,19
**typically** 49:18

_____
**U**
_____
**U** 71:1

**U-Y-E-N** 66:18
**uh-huh** 5:4,18
  19:4 20:10
  47:11 52:6
  67:9
**ultimate** 69:2,7
**umbrella** 64:15
**unaware** 47:1
  51:25
**understand** 4:15
  6:18,24,25
  9:14 10:7
  17:17 18:5
  20:13 47:10
  48:7 69:8
**understanding**
  8:24 9:1,6
  13:20
**understood** 7:3
  48:8 69:9
**unique** 8:19
**UNITED** 1:1
  72:1
**universally**
  56:19,20
**University** 14:11
  37:24
**updates** 64:5
  65:5
**upset** 49:22
**use** 5:17 8:6
  16:19 20:21
  52:8,18 56:12
  60:6,9
**uses** 19:22
**usually** 7:24
**Uyen** 66:17

_____
**V**
_____
**V** 1:5 72:5
**Valley** 23:4
  55:23
**valuable** 36:25
**value** 63:9
**variable** 28:18
**variation** 68:20
**variety** 34:5

37:7
**vary** 45:14,16
**varying** 5:19
**vast** 48:15 55:1
**verbatim** 28:4
**versus** 46:11
**Village** 23:3,3,4
  23:4,4,5
**villages** 22:22,24
  23:11,12,17
**Virginia** 1:3
  4:16 7:16,17
  9:2 72:3
**visiting** 10:13
  59:21
**vocabulary** 52:8
**voters** 9:16
**Voting** 9:8

_____
**W**
_____
**W** 71:1
**walked** 54:25
**want** 7:9 13:23
  47:7 59:20
  61:25 68:7
**wanted** 38:24
  40:1 42:20
**wasn't** 34:21,22
  36:1 68:22
**way** 6:7,25 20:8
  47:16 52:24
  53:15 59:3
  64:2 68:17
**wayside** 56:3
**we'll** 7:8,9 13:25
  24:15 59:16
**we're** 5:7 6:3 7:6
  7:7 48:21 56:8
**we've** 10:5 12:21
  12:21 31:15
**weaker** 58:16,21
**weakest** 55:20
  58:5,15
**Web** 19:2 62:18
**Webster** 14:6
**went** 14:10,12
  14:24 40:3

59:9
**Weslayan** 73:15
**Westchester**
  28:4
**Westwood** 16:2
  16:4,6 32:4
**white** 22:6 23:18
  38:3,14 39:15
  41:8,20 42:4
  42:11 43:12,18
  44:1,11,15,22
  45:15 46:11
  47:4 53:6
**Wilchester** 16:3
  16:6,7 55:22
**willing** 67:17
**win** 9:3
**winter** 11:11
**witness** 1:16 3:2
  13:16 17:18
  18:11,14 59:18
  69:19 70:1
  72:14,15
**woman** 5:8
**wondering**
  67:19
**Wood** 58:11
**Woods** 21:13
  28:6 29:10,21
**Woodview** 16:2
  16:4,6 32:8
**word** 5:9,10
  11:14 30:18
**words** 5:17,23
**work** 5:6 12:2
  23:14 34:6
  39:23 61:18
  65:25
**worked** 16:9,19
  16:24
**working** 15:21
  21:21 45:6
  63:7
**Worldwide**
  73:14
**worse** 60:2
**wouldn't** 40:2

48:7 49:2,3
**written** 40:9

---
**X**
---
**X** 4:3

---
**Y**
---
**Yeah** 20:7
**year** 15:8 16:12
    16:23 17:9
    25:10 34:14
    35:17 40:14,14
    45:12 48:3,11
    56:6,8 57:9
    66:12
**years** 12:3 13:4
    14:12,18,19,20
    15:6 34:21
    45:25 68:16,19

---
**Z**
---
**zero** 44:13
**zones** 19:23
**Zoom** 12:13

---
**0**
---
**000405** 25:1
**01:29:00** 73:6

---
**1**
---
**1** 9:24 16:12
    49:18
**1-31-2023** 73:12
**10** 3:8 23:23
    24:12,25 25:5
    26:14,20 31:1
    33:7 53:16
    54:25 67:22,24
**10:46** 59:19
**10:52** 59:19
**1050** 1:19
**11** 3:10 14:20
    37:3,5 38:16
    39:13 41:7,17
    42:2,5 45:22
**11:06** 1:17 69:24
**12** 45:10,16,21
**13** 45:10,16,21

**1400** 2:5
**1700** 2:10
**19** 14:14,18

---
**2**
---
**2** 15:6 18:24
    19:14
**20** 14:15
**2007** 45:17
**2011** 52:11
    68:13
**2012** 68:13
**2015** 14:24
**2015-2016** 34:14
**2016** 11:15 15:3
    39:17 45:12,17
    68:22
**2017** 68:22
**2019** 37:7,10
    38:8 39:19
**2020** 56:5
**2021** 1:13,17 3:9
    25:2 48:11
**2022** 73:9
**21-'22** 56:9
**214** 2:11
**223** 73:14
**228-6601** 2:6
**235** 73:15
**24** 3:8
**25** 28:14
**29** 1:13,17

---
**3**
---
**300** 2:10
**3000** 73:15
**35** 29:10,20
**37** 3:10

---
**4**
---
**4** 3:3 14:12
    22:21 45:25
    63:10,12
**4-year** 28:6
**4:21-CV-01997**
    1:5 72:5
**40** 62:11,22

**400** 30:22
**42** 22:5
**43** 29:11,25
**46** 68:25

---
**5**
---
**5** 19:19,25 22:12
    37:7 45:25
    67:22,23 68:16
    68:19
**501** 14:2
**52** 22:5
**544-4000** 2:11
**57** 27:2
**572-2000** 73:16

---
**6**
---
**6** 14:14 30:20
    68:19
**67.86** 32:15

---
**7**
---
**7** 30:20
**70025** 71:16
**71** 3:4
**713** 2:6 73:16
**717** 2:5
**72** 3:5
**75069** 2:10
**76.82** 32:23
**77** 31:12 32:20
**77002** 2:5
**77027** 73:15
**77079** 14:2
**7761** 73:12

---
**8**
---
**8** 29:19 30:20
**80** 28:11
**85** 21:17 53:3
    54:13
**87** 21:7

---
**9**
---
**9:30** 1:17
**90** 53:3
**90s** 31:15
**91** 14:12 31:6

**92** 29:12,22 30:2
**93** 30:4
**93.56** 33:4
**93.97** 53:22
**94** 30:5 31:2
**94.41** 31:20
**94.76** 32:18
**95.26** 32:10
**95.84** 32:6
**96** 31:23 32:1
**96.15** 33:1
**99** 31:4

Fall Eco Dis Percent in Membership for 2021 for Spring Branch ISD for All Campuses for All Grades
County-District Number: 101920 District Name: SPRING BRANCH ISD

Fall Eco Dis Percent in Membership for 2021 for Spring Branch ISD for All Campuses for All Grades

| District/Campus | 2020 - 2021 Eco Dis Pop | Total Pop | Percent |
|---|---|---|---|
| 101920 - Spring Branch ISD | 18961 | 33233 | 57.05 |
| 101920001 - Memorial H S | 329 | 2577 | 12.77 |
| 101920003 - Spring Woods H S | 1814 | 2085 | 87 |
| 101920005 - Northbrook H S | 2112 | 2573 | 82.08 |
| 101920006 - Stratford H S | 564 | 2192 | 25.73 |
| 101920014 - Westchester Academy For International Studies | 464 | 924 | 50.22 |
| 101920018 - Spring Branch Academic Institute | 4 | 127 | 3.15 |
| 101920041 - Landrum Middle | 911 | 973 | 93.63 |
| 101920042 - Memorial Middle | 109 | 1362 | 8 |
| 101920043 - Spring Branch Middle | 398 | 1127 | 35.32 |
| 101920044 - Spring Woods Middle | 829 | 901 | 92.01 |
| 101920045 - Spring Forest Middle | 412 | 953 | 43.23 |
| 101920046 - Spring Oaks Middle | 639 | 692 | 92.34 |
| 101920047 - Northbrook Middle | 889 | 946 | 93.97 |
| 101920048 - Cornerstone Academy | 69 | 361 | 19.11 |
| 101920101 - Bendwood School | 22 | 31 | 70.97 |
| 101920102 - Bunker Hill EL | 79 | 649 | 12.17 |
| 101920103 - Edgewood EL | 556 | 587 | 94.72 |
| 101920104 - Frostwood EL | 73 | 737 | 9.91 |
| 101920105 - Hollibrook EL | 709 | 711 | 99.72 |
| 101920106 - Housman EL | 369 | 405 | 91.11 |
| 101920107 - Hunters Creek EL | 111 | 576 | 19.27 |
| 101920108 - Meadow Wood EL | 192 | 586 | 32.76 |
| 101920109 - Memorial Drive EL | 42 | 390 | 10.77 |
| 101920110 - Pine Shadows EL | 569 | 739 | 77 |
| 101920111 - Ridgecrest EL | 693 | 734 | 94.41 |
| 101920112 - Rummel Creek EL | 38 | 784 | 4.85 |
| 101920113 - Shadow Oaks EL | 527 | 548 | 96.17 |
| 101920114 - Spring Branch EL | 463 | 482 | 96.06 |
| 101920115 - Valley Oaks EL | 84 | 732 | 11.48 |
| 101920116 - Westwood EL | 461 | 481 | 95.84 |
| 101920117 - Woodview EL | 502 | 527 | 95.26 |
| 101920118 - Wilchester EL | 53 | 807 | 6.57 |
| 101920119 - Sherwood EL | 304 | 448 | 67.86 |
| 101920120 - Spring Shadows EL | 543 | 573 | 94.76 |
| 101920121 - Nottingham EL | 231 | 589 | 39.22 |
| 101920122 - Terrace EL | 299 | 388 | 77.06 |
| 101920123 - Thornwood EL | 360 | 394 | 91.37 |
| 101920124 - Cedar Brook EL | 497 | 647 | 76.82 |
| 101920125 - Treasure Forest EL | 449 | 467 | 96.15 |
| 101920126 - Buffalo Creek EL | 407 | 435 | 93.56 |
| 101920128 - The Wildcat Way School | 85 | 226 | 37.61 |
| 101920129 - The Panda Path School | 146 | 148 | 98.65 |
| 101920130 - The Lion Lane School | 172 | 186 | 92.47 |
| 101920131 - The Bear Blvd School | 171 | 200 | 85.5 |
| 101920132 - The Tiger Trail School | 211 | 233 | 90.56 |



From: Roy Rodney <rjr@rodneylaw.com<mailto:rjr@rodneylaw.com>>
Date: April 5, 2019 at 2:58:40 PM CDT
To: 'Karen Peck' <kbpeck@att.net<mailto:kbpeck@att.net>>, 'Josef Klam'
<josefklam@gmail.com<mailto:josefklam@gmail.com>>,
"'goodson31@aol.com<mailto:goodson31@aol.com>'"
<goodson31@aol.com<mailto:goodson31@aol.com>>
Cc: "'Craft, Kristin'" <Kristin.Craft@springbranchisd.com<mailto:Kristin.Craft@springbranchisd.com>>,
"Witney, Elliott" <Elliott.Witney@springbranchisd.com<mailto:Elliott.Witney@springbranchisd.com>>,
'Esheeta Bavare' <ebavare98@gmail.com<mailto:ebavare98@gmail.com>>, 'Mahroosa Hussain Haideri'
<mahroosa.haideri@utexas.edu<mailto:mahroosa.haideri@utexas.edu>>, "Karen Christopher (Tyce)"
<kchristo555@gmail.com<mailto:kchristo555@gmail.com>>, "'Henderson, Howard'"
<Howard.Henderson@tsu.edu<mailto:Howard.Henderson@tsu.edu>>, 'michael fields'
<michaelrfields@hotmail.com<mailto:michaelrfields@hotmail.com>>,
"'Stacy.Kim@springbrnchisd.com<mailto:Stacy.Kim@springbrnchisd.com>'"
<Stacy.Kim@springbrnchisd.com<mailto:Stacy.Kim@springbrnchisd.com>>, "Williams, Bryan"
<Bryan.Williams@springbranchisd.com<mailto:Bryan.Williams@springbranchisd.com>>
Subject: FW: Charts you can appreciate

To Whom It May Concern,

In anticipation of the workshop on Monday, we enclose a study of DAEP and discipline in HISD which
used comparative statistics from SBISD which are pretty embarrassing (See, pages 9-12). The charts
indicate that second only to HISD. SBISD has the highest Disparity Ratio Comparing Black and Hispanic
Students with the Rates Of Total Classroom Removal Among White Students averaged over the years
2012-2016.This is consistent with CARES' own study on similar periods and even in a more recent school
year. Of course HISD has a much higher population of minority students than SBISD.

Because the SBISD has not expressed in engaging directly in a discussion of racial disparity in discipline
and other inequities addressed in our 9/2/18 report, we have included Ms. Kim in the correspondence
so she can file this correspondence and the attached study in to the official correspondence of the
SBISD.

We hope this will inform and add to your discussion.


Roy J. Rodney, Jr.



Case 4:21-cv-01997 Document 27-1 Filed on 02/01/22 in TXSD Page 301 of 463



# Racial Disparity in Harris County Independent School Districts

Presented by:
Jennifer Wyatt Bourgeois, MS
Arron "Corey" Clay, MLA, MSCJ

CENTER for JUSTICE RESEARCH
TEXAS SOUTHERN UNIVERSITY



**36%**

| In-School Suspension (ISS) | Out-of-School Suspension (OSS) | Disciplinary Alternative Education Program (DAEP) | Juvenile Justice Alternative Education Program (JJAEP) | Expulsion |





Total Population of Students and Total Classroom Removal of Students in Harris County by Ethnicity
(Academic School Year 2016-2017)



# Explanations

- Lack of empirical support that disparate removal rate is due to higher rate of misbehavior by minorities.



# Previous Research

- Minorities more likely to be removed from the classroom.

- Placement in special education classes, delay in academic progress, risk of dropping out, and juvenile justice involvement.

- Limited in numbers local studies that examine factors contributing to disparity in classroom removals.



# Purpose of the Study

Examine racial disparity in school discipline in Harris County's independent school districts.



# Research Design

## Data Source

- Texas Education Agency

## Variables

- Ethnicity
- Type of School Discipline Sanction
    - In-School Suspension (ISS)
    - Out-of-School Suspension (OSS)
    - Disciplinary Alternative Education Program (DAEP)
    - Juvenile Justice Alternative Education Program (JJAEP)
    - Expulsion
    - Total Classroom Removal

## Data Analysis

Descriptive

$$\text{Rate (Risk Index)} = \frac{\text{Black students (ISS)}}{\text{Total number of Black students}} \times 100$$

$$\text{Relative Risk Index (Disparity Ratio)} = \frac{\text{Rate of Black students (ISS)}}{\text{Rate of White students (ISS)}}$$





Disparity Ratios Comparing the Rates of each Ethnic Group with the Rate of Total Classroom Removals Among White Students (2016-2017 Academic School Year)











# Recommendations



1. Root Cause Analysis
2. Evidence-Based Interventions
   a. Cultural Awareness Training
   b. Positive Behavioral Interventions and Suppors
   c. Professional Develoment
   d. Community-Based Partnerships
   e. Restorative Justice
   f. Limit the Use of School Resource Officers



CENTER for JUSTICE RESEARCH
TEXAS SOUTHERN UNIVERSITY









# Thank You!
## For more information please contact:

**Jennifer Wyatt Bourgeois**
jennifer@center4justice.org

**Arron "Corey" Clay**
Corey@center4justice.org



TEXAS SOUTHERN UNIVERSITY

Barbara Jordan – Mickey Leland
School of Public Affairs
*Center for Justice Research*

# The Coalition of Advocates for Restorative Education



# A Call for Restorative Education Initiatives in the administration of discipline in Spring Branch ISD

## Report On Discipline and The Disciplinary Alternative Education Program In The Spring Branch ISD

*A Call for Restorative Education*

# TABLE OF CONTENTS

**Preface**     **4**

**Introduction and Overview**     **5**

**Executive Summary**     **7**

**Key Findings, Opinions, and Observations at a Glance**     **7**

**Recommendations At-A-Glance**     **11**

**Background and History of Alternative Disciplinary Programs**     **14**

**Types and Terms of DAEP Assignment**     **16**

**Legal Framework**     **17**

**A Brief History of DAEP Assignments in Texas Over the Past 11 years, 2016-2017**     **18**

**Other Practices in DAEPs in Texas and Around the Country**     **22**

**Issues in DAEP Education Today; Spring Branch ISD**     **24**

**Review and Analysis of Current Spring Branch ISD DAEP**     **26**

**District Changes to the DAEP Policies and Operations**     **30**

**Conclusion and Recommendation**     **33**

**Thank You Listing**     **40**



## APPENDICES:[1]

Appendix 1 – DAEP Study References

Appendix 2 - CARE Legal Framework Outline

Appendix 3 - List of Regulatory Agencies

Appendix 4 - 16 Habits of Mind

Appendix 5 - References

Appendix 6 - List of Acronyms

Appendix 7 - Interested Organizations List

Appendix 8 – School Discipline: A Timeline

Appendix 9 – Texas Education Code, Chapter 37: Discipline; Law & Order, aka Safe Schools Act

Appendix 10 – DAEP Reports

Appendix 11 –  Example of a Restorative Justice Flowchart

Appendix 12 – Restorative Justice in Oakland Schools

Appendix 13 – SBISD Drug and Alcohol Counseling Contracts

Appendix 14 – Proposed Update to the 2018-2019 Student Code of Conduct

Appendix 15 –U.S. Department of Education's Office of Civil Rights Compliance Review of FBISD

Appendix 16 – Towards School Discipline Reform through Systemic Change

Appendix 17 – Transitioning Students from DAEP to Regular Campus

Appendix 18 – SBISD Transition Specialist Job Description

Appendix 19 – Impact of Transition Service Plans on Student Recidivism Rates

Appendix 20 – Impact of Transition Service Plans on Student Recidivism Rates- SBISD

Appendix 21 – SBISD Final Report on Impact of Transition Service Plans on Recidivism Rates



ONCE LOST, NOW FOUND.

---

[1] Appendices are voluminous and are available upon request



# I.   PREFACE

**"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal."**

> **— Earl Warren,** *Chief Justice of the U.S. Supreme Court*

**"The most basic form of the DAEP must be a positive, therapeutic, diagnostic, successful and restorative program that directly addresses the causes of referral and is held accountable for the reductions in referrals and recidivism. The DAEP has the potential to be a net exporter of justice to the entire district. It's not C.A.R.E.'s intention to recommend changes to a broken system. We hope to identify issues that require and redesign current operations, engage the board, and establish a new standard of fair and relevant discipline in the district."**

> **— Roy J. Rodney Jr.,** *CARE Chair 2017-2018*

**"Both experience and research tell us that a child's education succeeds best when there is good communication and a strong partnership between home and school….Serving as a parent representative on the district-level or campus-level planning committees, assisting in the development of educational goals and plans to improve student achievement."**

> **— Spring Branch ISD Student/Parent Handbook,** *2017-2018*



## II.    INTRODUCTION AND OVERVIEW

The Coalition of Advocates for Restorative Education ("CARE") is dedicated to supporting a reformative process that is just, fair, and provides an uninterrupted quality education for students subjected to discipline including those referred to off-campus disciplinary facilities. Research confirms that students removed from the home campus classroom are more likely to repeat a grade, drop out of school, and become involved in the juvenile justice system. Incarceration results in decreased earning capacity added costs to society and lost tax revenue. (Appendix 1). Because off-campus discipline is provided by the SBISD DAEP program it is a focus of this report, but most of the recommended improvements in this report are the result of SBISD policy and operation and decision-making.

CARE 2017-2018 Goals and Objectives include:

- Organizing support within the secular and religious communities

- Sponsoring or participating in workshops with collaborative education leaders

- Obtaining support of SBISD Board while retaining independent advocacy

- Investigating key complaints regarding transition issues

- Investigating transition services and recidivism

- Assisting the district in defining the "gold standard" of DAEP programs

- Recommending operational and prognostic goals and policy change to the Student Code of Conduct

- Advocating for the implementation of technology and data collection

- Researching and analyzing the DAEP budget as applied to every child

We hope the following information and recommendations will be of assistance to the SBISD Board of Directors, administrators, faculty, and staff. CARE will remain a committed parent-based organization advocating for these recommendations and goals. CARE has always maintained its position as an advocacy group, independent, self-funded and capable of critical review.



CARE introduced itself to the Board of Directors of the SBISD in December of 2016. Since its first appearance before the SBISD Board of Directors in 2016 and in its first letter to President Peck in February of 2017, CARE has been involved in the following activities:

- Meeting with Superintendent Scott Muri
- Dozens of phone conferences
- Meetings with SBISD President Karen Peck and Joseph Klam
- Campus Improvement Team  meetings at the DAEP facility
- Meetings with Mr. Kedrick Lookadoo, SBISD DAEP Administrators, Faculty and Staff
- Attendance in several SBISD Strategic Planning Sessions conducted by Elliot Whitney
- Meetings with Associate Superintendent Kristin Craft
- Visits to other DAEP facilities in other school districts
- Meetings with SOC staff and Natalia Fernandez
- Authored more than ten letters to staff and the administration including three letters to President Peck
- Meetings with Innovation Team
- Attendance in Board Workshops on changes to the Parent/Student Handbook and the Student Disciplinary Code

CARE became a legal entity in February 2017 and more than 28 parents have participated in CARE activities since that time. CARE has always maintained its position as an advocacy group: independent, self-funded and capable of critical review. In March 2017, we adopted the phrase "Once Lost Now Found." Forty-three meetings later, CARE has become a devoted parent-advocate group dedicated to improving the SBISD DAEP and providing the need resources to the program. In 2016-2017, CARE collaborated with Board Members, administrators, faculty, and staff of Spring Branch ISD ("SBISD") to identify policy areas in need of systemic reform.

CARE attended several meetings at the DAEP facility on Campbell Road including the Campus Improvement Team (CIT) meetings and strategic planning sessions, the Leadership University meeting of Principals and Administrators and the Restorative Justice Summit. Meetings at the DAEP were attended by Principal Mr. Kedrick Lookadoo; Assistant Principal Dr. Rhonda Sneed; and both Community Superintendent Dr. Kristin Craft and invited faculty and staff. In the initial and in subsequent meetings, the DAEP shared its Mission and Vision Statements, Core Beliefs, and a copy of the DAEP Campus Focus Areas which provide aspirational statements regarding relationships, instructions, class management, intervention, and support. The staff has recognized issues raised by CARE advocacy, including the need for additional programmatic support, faculty, and other resources required to fulfill their legal mandate to educate children.



## III.   EXECUTIVE SUMMARY

We recommend an experience which restores those kids who have made bad choices to their place as productive and contributing members of their home campus. The aspirational goal for CARE is for the SBISD DAEP to become the gold standard for restorative education in Texas if not the nation.

Substantial progress has been made including reforms to the Spring Branch School District Student Disciplinary Code and its Parent/Student Handbook. Further changes should be made to the SBISD Student Code if the district strives to provide an exemplary off-campus discipline program and a fair and restorative disciplinary system. Hopefully, this report will assist in the endeavor to promote a healthy discussion of restorative justice.

While the DAEP has broad ambitions, its current level of resources is insufficient to support its fundamental mission and additional work must still be done regarding the allocation of resources to the venue. It needs additional tools in the toolbox in the form of human resources, a budgetary increase, technology and contractor support. In our observations of the DAEP, we noticed that many of its deficiencies are tied directly to antiquated SBISD Board policies and a lack of resources. There are substantial inequities between resources provided to students at the home campuses and what is provided to students at the DAEP including; technology, transportation, academic materials and even meals.

### A.  Key Findings, Opinions, and Observations at a Glance

1. **Spring Branch Independent School District's (SBISD) disciplinary practices disproportionately impact minority youth.** Hispanic American youth, who were 58.3% of the district's school's population in their 2016 - 2017 census report, made up 86% of Disciplinary Alternative Education Program (DAEP) referrals, 74% of the out-of-school suspensions, and 72% of the in-school suspensions. African American Students are 4.7% of the district's student population; however, they were 15% of DAEP referrals, 14% of out-of-school suspensions, and 12% of in-school suspensions





**Disproportionate Representation of Students of Color**
The number of Hispanic and African-American student disciplinary referrals to In-School classrooms,
Out-of-School Suspensions, ultimately to alternative campuses (DAEPs, JJAEPs) and school
expulsions increased dramatically.

2. **The DAEP Program suffers from a high frequency rate of recidivism.** This raises important issues of the effectiveness of the program and its long term consequences.

3. **There has been a significant lack of communication between the DAEP and the home campus.** Coordination of improvement efforts between the DAEP and the home campus should require each home campus to appoint a person(s) responsible for assuring speedy and efficient communication between the DAEP and the home campus about assignments, special projects, testing and other classroom activities while the student is at DAEP and before, during and after transition.This inequity could also be addressed with technology readily available to other SBISD students. It is our understanding that the "It's Learning" software has allowed for 24/7 communication but that not all schools have fully implemented the system and not all teachers utilize the software.

4. **The DAEP requires additional faculty, applied technology and more educational options for learning for those students requiring advanced studies, foreign language, or special education.** The system currently works to the disadvantage of students with advanced educational curriculums or special educational needs and, therefore, disproportionately punishes them. It is contrary to the mission of the SBISD and federal law to punish students by depriving them of an education. According to the National Council on Disability report, Breaking the School-to-Prison Pipeline for Students (See Appendix 1), students with disabilities who receive special education services in school have poorer outcomes and are suspended and expelled more often than their peers without disabilities. Studies show that up to 85 percent of youth in juvenile detention facilities have limitations that make them eligible for special education services, yet only 37 percent receive these services while in school. Students with disabilities are more than twice as likely to receive an out-of-school suspension (13%) than students without disabilities (6%). These dire statistics are even worse for students of color with disabilities, who are disproportionately classified as having an emotional disturbance or



an intellectual disability and disproportionately segregated. Twenty-seven percent of African-American boys with disabilities and 19 percent of African-American girls with disabilities received at least one out-of-school suspension in 2011-2012. At the DAEP teachers have multiple grade levels in one classroom and do not provide instructions for electives or advanced courses (AP) despite the fact that students remain enrolled in those courses throughout the DAEP referral.

5. **The current system of mandatory DAEP referrals of 45 days undermines opportunities for meritorious release beyond simple good behavior, eschews individual compliance and sacrifices personal accomplishment to an arbitrary fixed detention period without consideration of the violation or the child.** All stakeholders and current research agree that the longer a student is away from the home campus, the more difficult it is to obtain academic success. There is no academic or scientific support for these mandatory minimums. DAEP policy should also allow for meritorious release and other incentive programs for an earlier version. (While recently proposed changes to the Student Disciplinary code have reduced the minimum 60 days to 45 days, it is still a high, unjust arbitrary number). SBISDs should consider encouraging multiple options including off campus services, probationary placements at the home campus and assigning DAEP referrals during summer sessions.

6. **Transparency is an issue in discipline and operations.** The SBISD should require the publication of an annual detailed report and analysis of discipline in SBISD schools, including the achievement of stated yearly goals and a current assessment of SWOT and budgetary effectiveness at the DAEP. The appeals process for a DAEP referral should be made transparent to all families, as students from lower socioeconomic backgrounds have complained they were not aware of such an option. With additional resources and coordination, the DAEP and SOC could become to be a net exporter of information, school discipline innovations and restorative justice implementations for the SBISD. Mr. Kedrick Lookadoo and the DAEP have recently begun to conduct their own exit poll students with regard to DAEP services. This innovation should be extended to all disciplinary programs.

7. **The SBISD employs many disciplinary policies and punitive operations which lack empirical or scientific support.** Many of the rules and procedures lack any empirical support. For example in addition to mandatory minimums, and uniforms students assigned to the DAEP may not attend or participate in school activities until after their time there is completed. This is despite the fact that there is some evidence that extracurricular activities such as sports, for example, are a protective factor against poor academic performance[2]. The image of the DAEP as a punitive rather than a restorative place is further exemplified by its location, certain operational rules which reinforce the existing stigma of punishment rather than reform and restoration.

---

[2] Jordan, W. (1999). Black High School Students' Participation in School-Sponsored Sports Activities: Effects on School Engagement and Achievement. *The Journal of Negro Education, 68*(1), 54-71. doi:10.2307/2668209

8. **There are inadequate resources for drug/alcohol use/addiction and anger management.** The need for drug and alcohol abuse education and treatment is profound. Also there should be uniform discipline for drug offenses for each school. Our review of the alcohol abuse counseling contracts determined they were inadequate in size and scope. There were long periods of time in which no services of this nature provided despite the fact that  most students referred to DAEP are there due to drug and alcohol-related offenses. (See Appendix 13). Recently Mr. Lookadoo and the DAEP staff have enlisted community partners and outside resources to provide drug and alcohol services. This outreach for  community support should be encouraged at the home campuses.

9. **There is an urgent need for additional transition resources.** The existing Transition Coordinator has only recently been allowed to follow the current job description.The expectation that the transition coordinator has three transition meetings for each DAEP referral is too much for one person. The transition of students from the DAEP back to their home campus requires substantially more staff and resources from the home campus. The DAEP and the home campus should provide a detailed transition plan that includes a schedule of tutoring, counseling, parental and other resources necessary for a true seamless return to the students' regular academic calendar.However the activity is understaffed and the current DAEP Transition Coordinator needs additional resources to continue her excellent work plan. ( See Appendix 17-21)

10. **DAEP has a high staff turnover rate, and several employees have left in the past few years.** High staff turnover may impact morale and the ability to achieve the requirements of professional and paraprofessional positions.  SBISD should provide adequate resources including staffing of needed positions, which will allow already staffed roles to perform pursuant to their job description. While the additional staff has been requested since CARE's involvement in and review of  the program, it is unclear whether those positions relate to obvious needs priority at the DAEP, including transition services, substance abuse counseling and subject matter skills and remedial resources.

11. **The disciplinary process at SBISD lacks parental involvement.** Parental involvement is a fundamental SBISD value and a required commitment. Yet the current SBISD disciplinary scheme  provides few if any opportunities for proactive parental participation. The current program inhibits what should be a key support system. A DAEP referral should seek and credit parental involvement throughout the child's tenure at the facility. The SBISD Student/Parent Handbook, page H-20, recognizes the importance of parental involvement. based on previous experience and research, that all parents should participate in all parent organizations. With CARE as a sponsor Mr. Lookadoo and the DAEP administration have approved a parent "Open House" as well as other parent contact activities.

12. **The SBISD  administration lacks short and long-term aspirational goals for its disciplinary and program. CARE encourages the SBISD to to adjust and follow the**



**National Education Association's 15 Guidelines for an Exemplary Alternative Education Program**. Specifically the SBISD DAEP should use the rubric given by the NEA to measure the success of their current and future programs.  (See Appendix 1)

## B. Recommendations At-A-Glance

1.  **Encourage parental involvement in DAEP**

2.  **Develop, staff,  fund and implement a comprehensive transition program**

3.  **Provide meaningful drug and alcohol counseling and rehabilitation services**

4.  **Use technology to improve communication the home campus and the DAEP**

5.  **Provide equal resources, technology and services to DAEP students**

6.  **Improve DAEP academic offerings and course offerings.**

7.  **Determine the basis for racial disparity in SBISD discipline**

8.  **Eliminate mandatory minimums and reduce recidivism rates.**

9.  **Remove referrals for discretionary offenses to summer and probationary programs**

10. **Implement innovative and evidence-based scientific practices at the DAEP**

11. **Establish long and short-term quantifiable goals for SBISD disciplinary operations**

12. **Improve the Physical Environment of the DAEP and fully fund operations**

13. **Improve coordination between DAEP and SOC and provide meaningful budgets**

14. **Provide for a meaningful, progressive and transparent budgeting process for student discipline in SBISD.**











Racial Disparity in Spring Branch Independent School District (SBISD)
Native American
Asian
African American
Hispanic
White
School Suspensions by
/Ethnicity 2007-2017
SBISD Out of School Suspensions by Race/Ethnicity 2007-2017
Texas Out of School Suspensions by Race/Ethnicity 2007-2017
SBISD DAEP by Race/Ethnicity 2007-2017
Texas DAEP by Race/Ethnicity 2007-2017
2007-2008
2009-2010
2011-2012
2013-2014
2015-2016

**SBISD JJAEP by Race/Ethnicity 2007-2017**

**Texas JJAEP by Race/Ethnicity 2007-2017**

**SBISD Expulsions by Race/Ethnicity 2007-2017**

**Texas Expulsions by Race/Ethnicity 2007-2017**

Administrators, teachers, and school resource officers DISPROPORTIONATELY discipline African-American students.

- **While 6% all K-12 students received ONE or MORE out-of-school suspensions, the percentage is 18% of Black boys, 10% of Black girls, 5% of White boys and 2% of White girls.**

CENTER for JUSTICE RESEARCH
TEXAS SOUTHERN UNIVERSITY

## IV.   BACKGROUND AND HISTORY OF ALTERNATIVE DISCIPLINARY PROGRAMS

In the 1970s, school districts across the United States began to establish alternative education programs as well as schools for student populations considered to be at risk of school failure or dropping out. With the passage of the Federal Gun-Free Schools Act of 1994, disciplinary alternative education programs were created for a more specific group of students: those violated local or state-mandated rules of conduct or have been determined to be disruptive to the education of other students in their assigned schools (Institute for the Study of Students at Risk {ISSR], 2001; Kleiner, Porch, & Farris, 2002; Zweig, 2003).

Disciplinary alternative education differs from other kinds of alternative teaching primarily in the method of student placement and the program's purpose. Students are placed in a disciplinary alternative education setting after removal from their assigned classrooms or schools, and attendance is compulsory for prescribed periods of time and prescribed offenses. The purpose of alternative disciplinary education is to provide temporary student placements for behavior management, often as an alternative to expulsion. The goal is for students to return to, and succeed in, their regularly assigned classrooms and schools. Research has often identified racial and ethnic disproportionality in the make-up of the these programs as compared to their home campuses. Once assigned to a DAEP research has also found that "transitions", or return to the home campus, may affect the future academic success of students. See TEA Policy Research Reports. (See Appendix 1)

As the U.S. Department of Education has acknowledged, the over-disciplining of Black students begins as soon as they start school: "Black preschool children are 3.6 times as likely to receive one or more out-of-school suspensions as white preschool children." Although "black children represent only 19% of preschool enrollment," they account for "47% of preschool children receiving one or more out-of-school suspensions[.]" By contrast, "white children represent 41% of preschool enrollment, but [only] 28% of preschool children receiving one or more out-of-school suspensions." These disparities exist regardless of student gender. "Black boys represent 19% of male preschool enrollment, but 45% of male preschool children receiving one or more out-of-school suspensions. Black girls represent 20% of female preschool enrollment, but 54% of female preschool children receiving one or more out-of-school suspensions."

14





A growing body of research on stereotyping and implicit bias supports this notion that inherent bias influences educators' perceptions and contributes to racial disparities in discipline. Many students have shown that administrators dole out harsher punishment to students of color than White students for the same or similar behavior. (*See LDF Report, Locked Out of The Classroom: How Implicit Bias Contributes to Disparity in School Discipline.*)





### A. Types and Terms of DAEP Assignment

The Texas Education Code provides for a DAEP referral for specific types of student misconduct on or near school grounds and at school-sponsored activities; however, school districts may also exercise discretion to send students to DAEPs for other kinds of mischief specified in their Student Codes of Conduct. The average length of stay in a DAEP in Texas is 30 to 40 days. Smaller districts may provide a DAEP room on the home campus, where disciplined students are kept apart from other students.

Each school district Code of Conduct must specify the circumstances under which a student may be removed from a classroom, campus, or DAEP and the conditions that authorize or require the transfer of a student to a DAEP. It also must stipulate whether, in decisions to order removal to a DAEP, consideration is given to self-defense, intent or lack of purpose at the time the student engaged in the conduct, the student's disciplinary history, or a disability that substantially impairs the student's capacity to appreciate the wrongfulness of his or her behavior. The Code is required to provide guidelines for setting the length of a term of removal to a DAEP and address notification of a student's parent or guardian of any violation that results in the student's relocation to a DAEP.

Within three days after the date, the student has been removed from class, and the principal or another appropriate administrator must schedule a conference with the student, the parent or guardian of the student, and the teacher or administrator who removed the student from class. The student may not be returned to the regular classroom before the conference is held. At the meeting, the student is entitled to an opportunity to respond to the reasons for the removal. Following the conference, the principal may order placement of the student for a period consistent with the Student Code of Conduct. SBISD allows a student to appeal such a decision to the board of trustees or designee, but the conclusion of the board is final and may not be disputed.

Students may be assigned to DAEPs more than once per year. The length of time a student attends a DAEP may differ from the period initially ordered. Reasons for a difference can include modification of the terms of the assignment, early completion of the terms of the appointment, failure to complete the full assignment before the end of the school year, student withdrawal from school, and student incarceration. The names of mandatory assignment prohibit attendance or participation in school-sponsored or school-related events.

For each placement in a DAEP, school districts must report to the Texas Education Agency (TEA) information about the student, the offense, and the arrangement, as specified in TEC §37.020. TEA is required to evaluate DAEPs to identify school districts at high risk of having inaccurate DAEP data or of failing to comply with DAEP requirements. A district must be notified of any potential problems with its DAEP data; any violations of law or rule revealed by the data, including any breach of DAEP requirements; and any TEA recommendations concerning the data.



## B. Legal Framework

SBISD Code of Student Conduct (CSC) is rooted in Texas Statutory law which provides "Each school district shall cooperate with government agencies and community organizations that provide services in the district."

The legal framework for disciplinary alternative education programs involves both federal law and jurisprudence, state statutes and jurisprudence, and regulations. The Texas TEA has direct responsibility for ensuring the compliance of Texas school districts with the applicable law and specific regulations. See CARE's Outline of Applicable Law in Appendix 2.

TEA publishes state and district DAEP placement rates as part of annual performance-based monitoring analysis system reports. Also, the agency releases the Comprehensive Annual Report on Texas Public Schools, which includes information on DAEPs required under TEC §39.182. The report presents state-level data on DAEP assignments and participation and performance of DAEP students on state assessments. TEA also has developed annual online disciplinary action reports and data files of disciplinary data at the state, regional, and district levels.



## V.   A BRIEF HISTORY OF DAEP ASSIGNMENTS IN TEXAS OVER THE PAST 11 Years

The mission of a DAEP is to enable students to perform at grade level. Chapter 37 of the Texas Education Code (TEC, 2005) stipulates that school districts must meet the educational and behavioral needs of students assigned to DAEPs but leaves design and content to local discretion. A school district must offer a student removed to a DAEP an opportunity to complete coursework before the beginning of the next school year at no expense to the student. The opening may be provided through any method available, including a correspondence course, distance learning, or summer school. A school district may choose to provide a program of educational and support services to a student and the student's parents when the offense involves drugs or alcohol as specified under TEC §37.006 or §37.007. A DAEP that provides chemical dependency treatment services must be licensed under Chapter 464 of the Texas Health and Safety Code. A school district must allocate to a DAEP the same expenditure, including federal, state, and local funds, per student attending the DAEP that would be awarded to the student's school if the student were attending his or her regularly assigned education program, including a unique education program.

In Texas zero-tolerance policies have removed thousands of juveniles from the classroom and sent them to DAEPs. The number of student disciplinary referrals to ISS classrooms, out-of-school suspension – and ultimately to alternative campuses (DAEPs) – increased dramatically in the mid-1990s following passage of the Federal Gun-Free Schools Act of 1994 and the subsequent 1995 overhaul of Texas school discipline laws (see Texas Education Code, Chapter 37, Discipline; Law & Order). Chapter 37 mandates the serious offenses for which students must be removed to DAEP to maintain safe schools. It also gives school districts wide latitude to exclude students for other violations of their student Code of Conduct. For too many, involvement in the school disciplinary system becomes a gateway to the justice system. A study published by Texas A&M University's Public Policy Research Institute in 2005 concluded that, among the "risk factors" commonly associated with future involvement in the juvenile justice system, the single most important predictor is a history of disciplinary referrals at school.

Frequent use of out-of-school suspensions has no academic benefit and is strongly associated with low achievement, a heightened risk for dropping out, and a higher likelihood of juvenile justice involvement. SBISD should develop instruments and procedures to evaluate implicit racial and disability bias in schools where minorities are overrepresented in the identification, discipline, or placement in segregated settings. It is crucial to understand how inherent bias works in the school environment if we are ever to remedy the overrepresentation of minorities in these areas. SBISD should consider if their current discipline system is based on "social maladjustment," "environmental, cultural, or economic disadvantage," or "willful or deliberate conduct."



**Out-of-School Suspension Rates by Race and Disability Status in Texas, 2016-2017**

| Race | Suspension Rate for Disabled Students (%) | Suspension Rate for Non Disabled Students (%) |
|------|-------------------------------------------|-----------------------------------------------|
| All | 13 | 7 |
| African American | 25 | 16 |
| Latino/Hispanic | 12 | 7 |
| Native American | 11 | 8 |
| White | 9 | 4 |
| Asian | 3 | 2 |

A growing body of research on stereotyping and implicit bias supports this notion that inherent bias influences educators' perceptions and contributes to racial disparities in discipline. Many students have shown that administrators dole out harsher punishment to students of color than white students for the same or similar behavior. ***See, LDF Report, Locked Out of The Classroom: How Implicit Bias Contributes to Disparity in School Discipline.***

Reducing these disparities is imperative. Frequent use of out-of-school suspensions has no academic benefit and is strongly associated with low achievement, a heightened risk for dropping out, and a higher likelihood of juvenile justice involvement. SBISD should develop instruments and procedures to evaluate implicit racial and disability bias in schools where minorities are overrepresented in the identification, discipline, or segregated settings. It is crucial to understand how inherent bias works in the school environment if we are ever to remedy the overrepresentation of minorities in these areas. SBISD should examine whether the racial bias influences school district was gatekeeping, particularly about denials of IDEA eligibility based on "social maladjustment," "environmental, cultural, or economic disadvantage," or "willful or deliberate conduct."

In the 2016-2017 school year, 72,380 students accounted for the 87,455 complete assignments (Table 2). About 80 percent of the students assigned to DAEPs were referred only once during the school year. Most of the remaining students were appointed twice (14.8%), and 3.2 percent were sent there multiple time.

In the 2016-2017 school year, Hispanic students accounted for almost half (48.0%) of all DAEP assignments, including multiple assignments for individual students (Table 3). African-American students accounted for 25.8 percent of all appointments, and White students accounted for 25.2 percent. Males accounted for almost three-fourths (73.9%) of DAEP assignments; economically disadvantaged students accounted for 62.1 percent of appointments, and students receiving special education services accounted for 23.9 percent of appointments.



In the 2016-2017 school year, 72,380 students accounted for the 87,455 complete assignments (Table 2). About 80 percent of the students assigned to DAEPs were referred only once during the school year. Most of the remaining students were appointed twice (14.8%), and 3.2 percent were sent there multiple times. Males accounted for almost three-fourths (73.9%) of DAEP assignments; economically disadvantaged students accounted for 62.1 percent of appointments, and students receiving special education services accounted for 23.9 percent of appointments.



In-School Suspension by Demographic 2016-2017







**Texas DAEP Placements 2016-2017**

**Out-of School Suspensions by Demographic 2016-2017**

In the 2016-2017 school year, Hispanic students accounted for almost half (48.0%) of all DAEP assignments, including multiple assignments for individual students (Table 3). African-American students accounted for 25.8 percent of all appointments, and White students accounted for 25.2 percent. Males accounted for almost three-fourths (73.9%) of DAEP assignments, economically disadvantaged students accounted for 62.1 percent of appointments, and students receiving special education services accounted for 23.9 percent of appointments.



**Out-Of School Suspensions Assignments in Texas 2016-2017**



**In-School Suspension Assignments in Texas 2016-2017**



## VI.    OTHER PRACTICES IN DAEPS IN TEXAS AND AROUND THE COUNTRY

Research on alternative education was reviewed for indications of "best practices in DAEPs." Best practices include program structures, procedures, and activities determined to be successful in programs or schools serving students in disciplinary settings. Among the few studies that focus exclusively on DAEP-type programs, four were selected for discussion in the report entitled, Policy Research, DAEP Practices Report 17, August 2007 by the Division of Accountability Research, Dept. of Assessment. Definitions of "best practice" vary among studies. A history of studies, many of which are now dated, are seen in Appendix 1.

In order to glean practices that might be imported into SBISD, CARE participated in four school visits with the DAEP staff and SBISD Community Superintendent Kristen Craft, including visits to:

1.  Furr High School
2.  Raines High School
3.  Galena Park Placement
4.  Katy ISD

The programs at Furr High School and Galena Park Placement offered stark contrasts in how discipline can take place.

### A. MAJOR FINDINGS:

### 1.    VISIT WITH FURR HIGH SCHOOL

"They don't suspend students because suspension does not work."

Furr has adopted a system of restorative discipline. The philosophical basis of the Furr High School Restorative Justice Program is based upon Habits of Mind, by Dr. Arthur L. Costa and Bena. Adopting "Habits of Mind" has led to the following Habits of Mindset, a set of 16 problem-solving, life-related skills necessary to operate in society and promote strategic reasoning and insightfulness. Every teacher has a Respect Agreement, the violation of which requires students to respond to three questions:
- "What happened?"
- "How are you feeling now?"
- "What do you think needs to be done to make it right?"

Offenders are sent to the "Thinkery," a comfortable environment where conflict is resolved and restored. Students go to "Principal's Court" with an academic discipline.

As a result of restorative practices, dropouts and off-campus discipline were practically non-existent, and the Furr graduation rate has increased from 57% to 97% in 2016.

22



## 2. VISIT WITH GALENA PARK PLACEMENT

Galena Park had many procedures like SBISD before the recent policy code revision, including:

- 20 days mandatory minimum assignment
- No formal character education
- Mandatory uniform program (they are required to wear their CFS clothes at their home campus)
- Offenders and complainants in the same classes
- Transition not formalized or detailed
- The curriculum is offered online, but students attend the off-campus center
- Elective work is sent from the home campus
- Licensed dependency counselor visits students after referral and hosts evening meetings with guest speakers
- Recidivism is their weakness - 25 of 300 annual students return multiple times
- The budget and staff have been reduced.
- 
- They have a shortage of faculty (they are minus eight teachers, two aides and secretary, and they have one academic counselor

Some of the disciplinary tactics are based on disrupting communication. The sentiment was expressed that they want the kids to experience a punitive system. as a tactic to modify behavior.



## VII.   Issues in DAEP Education Today: Spring Branch ISD

"Spring Branch Independent School District (SBISD) encompasses about 44 square miles of wooded suburbs, vibrant business and retail districts located west of downtown Houston in Harris County along I-10, the Katy Freeway. Its student body reflects the increasing diversity of Texas and the nation. About 193,000 district residents live in this region of west Houston which includes the incorporated Memorial Villages and the nearby Energy Corridor. Many families have lived in the Memorial/Spring Branch area all their lives, while others are new to the city. Others choose to return to this school district because they rank high-quality education as a top priority for their children. This school district prides itself on being on the forefront of leading innovative implementation of educational programs. The district's core focus is always on the students and collective greatness. They insist on community engagement to challenge each other to set goals; a collaborative spirit; finding joy and passion in one's work; limitless curiosity; and finally, a strong moral compass."

The above description was taken from SBISD's description of itself.

In 2017 the Texas Education Agency (TEA) published the following summary of discipline incidents at the SBISD. Much of this report relies upon statistics from the TEA.

| STUDENT GROUP | NUMBER OF STUDENTS | ISS ACTIONS | OSS ACTIONS | DAEP ACTIONS | DAEP STUDENTS | JJAEP STUDENTS |
|---|---|---|---|---|---|---|
| ALL STUDENTS | 37,533 | 6,000 | 2,446 | 353 | 318 | N/A |
| AMERICAN INDIAN | 110 | N/A | 11 | N/A | N/A | 0 |
| ASIAN | 2,360 | 104 | 20 | 5 | 5 | 0 |
| BLACK OR AFRICAN AMERICAN | 2,020 | 720 | 352 | 52 | 48 | 0 |
| HISPANIC/LATINO | 22,648 | 4,347 | 1,806 | 251 | 221 | N/A |
| NATIVE HAWAIIAN | 14 | N/A | 0 | 0 | 0 | 0 |
| TWO OR MORE RACES | 713 | 89 | 30 | N/A | N/A | 0 |
| WHITE | 9,668 | 706 | 227 | 40 | 39 | 0 |
| FEMALE | 18,090 | 1,756 | 616 | 110 | 105 | 0 |
| MALE | 19,443 | 4,244 | 1,830 | 243 | 213 | N/A |
| SPECIAL ED. | 3,053 | 757 | 467 | 41 | 38 | N/A |
| ECON. DIS. | 22,952 | 4,937 | 2,131 | 277 | 248 | N/A |
| AT RISK | 20,763 | 4,731 | 1,919 | 274 | 242 | N/A |





**In-School Suspension Rates 2007-2017**

Legend:
- ▲ African American
- ▲ Hispanic/ Latino
- ▲ White
- ▲ Asian
- ▲ Native American

Y-axis: Number of Students (0, 2500, 5000, 7500, 10000, 12500)

Data labels: 7,353   7,251   8,297   8,684   10,587   8,222   6,414   5,433   4,933   4,347

X-axis: 2008, 2010, 2012, 2014, 2016



**Out-of-School Suspension Rates 2007-2017**

Legend:
- ▲ African American
- ▲ Hispanic/ Latino
- ▲ White
- ▲ Asian
- ▲ Native American

Y-axis: Number of Students (0, 2000, 4000, 6000, 8000)

Data labels: 1,933   1,936   2,292   2,939   2,551   2,023   2,067   1,825   1,806

X-axis: 2008, 2010, 2012, 2014, 2016



## VIII.     REVIEW AND ANALYSIS OF CURRENT SPRING BRANCH ISD DAEP

### A. Budget Review

The annual budget for the Spring Branch ISD DAEP is around $60,000, fluctuating anywhere between $64,000 to $81,000 in the last five years. In the current year, the budget was reduced by 21%, from $81,972.95 to $64,762.32. The budget took minor amounts of money from every department, but the most significant one was in the instructional department which experienced a $12,509.70 cut. Although the budget is projected to increase for the 2018-2019 school year, it will only be an increase of approximately $2,000, a 3% increase from the previous year. These data points allowed CARE to evaluate the financial thought process of the SBISD DAEP. There is a net decrease in the investments made in student's education quality through decreased budgets for supplies, instruction material, and extracurricular activities over the course of the past five years.

| | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | | FY 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | REVISED BUDGET | YTD EXPENDED | REVISED BUDGET | YTD EXPENDED | REVISED BUDGET | YTD EXPENDED | REVISED BUDGET | YTD EXPENDED | REVISED BUDGET | YTD EXPENDED as of 4/24/2018 |
| 11 Instruction | 854,275.00 | 857,770.15 | 836,524.00 | 860,345.73 | 852,725.62 | 866,396.88 | 942,386.63 | 943,476.11 | 926,167.42 | 573,314.08 |
| 12 Instructional Media | 500.00 | 500.00 | 500.00 | 0.00 | 500.00 | 0.00 | 92.05 | 92.05 | | |
| 13 Curr & Personnel Develop | 0.00 | 12,140.00 | 14,920.00 | 6,520.00 | 8,000.00 | 9,004.83 | 27,200.00 | 80,429.37 | 29,210.07 | 17,991.74 |
| 23 School Leadership | 60,049.00 | 53,223.34 | 57,253.00 | 53,313.30 | 39,232.00 | 217,182.41 | 38,712.00 | 219,725.37 | 253,455.35 | 185,227.79 |
| 31 Guidance & Counseling | 1,452.00 | 87.39 | 1,452.00 | 65,922.74 | 51,737.00 | 2,909.00 | 64,712.00 | 86,484.65 | 80,634.00 | 61,367.60 |
| 33 Health Services | 0.00 | 0.00 | 0.00 | 0.00 | 20,000.00 | 19,558.97 | 20,000.00 | 18,240.25 | 21,000.00 | 15,483.10 |
| 36 Extracurricular Activities | 453.00 | 0.00 | 75.00 | 0.00 | 75.00 | 0.00 | 75.00 | 0.00 | 154.00 | 0.00 |
| 51 Plant Maint & Operations | 1,100.00 | 0.00 | 1,100.00 | 0.00 | 1,000.00 | 304.50 | 500.00 | 0.00 | 0.00 | 0.00 |
| 52 Security & Monitoring Svcs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,567.88 | 500.00 | 1,193.51 | 300.00 | 126.00 |
| Expense Total | 917,749.00 | 923,729.82 | 986,712.00 | 929,501.77 | 1,156,227.62 | 1,337,016.45 | 1,091,580.66 | 1,299,443.31 | 1,289,971.00 | 854,610.31 |

| Instruction | 2017 REVISED BUD | 2016 REVISED BUD | 2019 Campus | 2019 Br Staff | 2019 Budget | 2019 Board |
|---|---|---|---|---|---|---|
| TOTAL Instruction | 45,851.55 | 33,342.25 | 36,560.00 | .00 | .00 | .00 |
| TOTAL Curr & Personnel Devel | 27,200.00 | 23,220.07 | 26,005.00 | .00 | .00 | .00 |
| TOTAL School Leadership | 7,921.00 | 7,980.00 | 3,600.00 | .00 | .00 | .00 |
| TOTAL Plant Maint & Operatio | 500.00 | .00 | 500.00 | .00 | .00 | .00 |
| TOTAL Security & Monitoring | 500.00 | 300.00 | 300.00 | .00 | .00 | .00 |
| GRAND TOTAL | 81,972.95 | 64,762.32 | 66,965.00 | .00 | .00 | .00 |

** END OF REPORT - Generated by Stewart, Cristie **

The budget document presented to us is not an accurate reflection of the DAEP budget because it does not include contracted expenses that directly involve the DAEP student. This makes it difficult to establish a precise cost of the current DAEP program. What's more, it makes it challenging to determine the effectiveness of the current program. It also raises an issue of transparency. For example, the drug and alcohol program is independently contracted through System of Care.



The budget does not reflect other grant or outside funding sources used in the program. For example, CARE was involved in obtaining a Rockwell grant. This is seen in the discussion regarding drug abuse, prevention and intervention contracts at least a portion of which are counted towards explicitly addressing disciplinary issues.

The most significant factor in determining the number of financial resources allocated to the DAEP, according to the CFO, is the amount of money requested by the DAEP itself. Over the past years, the DAEP has not sought any additional funds other than the ones mentioned above. The budget has been tied to a $60,000.00 baseline for so long that there is no current institutional memory of how that number was initially calculated, nor has there been any analysis of how that amount relates to today's needs.

**B.  Staffing**

From the staffing data points, it is clear that in the past five years the DAEP has increased its staffing by providing additional members. These additions included a counselor, two teacher assistants, and one person in an administrative role. We were also recently informed that the recommendation for a physical education/teen leadership professional and another teacher's assistant role was approved. Through the reported data you can see that the addition of the Transition Specialist into the teaching staff resulted in a net loss for the teaching position since the original post has always budgeted for a Transition Specialist. The development of this Transition Specialist role is key to the cohesion of a student's home campus and the DAEP. This role provides support for students and coordinates among the teachers at both schools about the student's curriculum while they are in the program. Due to the low amount of teachers staffed at the DAEP teachers have multiple grade levels in the same class, and potentially various subjects as well.

Currently, there is a 50% turnover rate for the faculty of this facility. Twenty-seven people in the past five years have left their roles – that's more than the highest hiring number in any year. The DAEP staffing should reflect the educational and support needs of the students. For example, if the majority of students are involved in drug and alcohol-related issues their should be a rehabilitation program in place for long-term benefits. The Transition roles must be increased

**C.  Operations**

The DAEP operates primarily pursuant to its Campus Improvement Plan. However many of the resources necessary to accomplish the plan are not provided by SBISD or supported by SBISD resources and expenditure. For example the plan requires a comprehensive needs assessment data documentation. (See Appendix 1) The documentation requires comprehensive student data and parent/community data. This information is not made



available to the DAEP staff in a usable format.

Similarly, and as set in Appendix 18 , the DAEP does not have the human resources to provide the services required by its own plan. The district has recognized the need to address transitions, particularly transitions from DAEP back to the home campus. See SBISD Project Title: Impact of Transition Service Plans on Student Recidivism Rates, Hodso (2012, 2014), it has not followed its plan for evaluation and sustainability for transition services or continued detailed accounting of the effect of a lack of transition services on recidivism in the district. In addition the DAEP Transition Specialist has never been provided the resources which would allow him/her to meet and fulfill all of the requirements to succeed in that role. (See Appendix 20 )

D. **Student Input**

During the 2017-2018 the Spring Branch ISD DAEP presented the current students with an innovative voluntary survey to evaluate the effectiveness of the program. The main four goal that were being targeted were classroom management, instruction, intervention and support, and relationships. CARE commends Mr.Lookado and the DAEP staff for allowing student input and attempting to measure student satisfaction. The low response rate and sample size of the survey does not allow for statistical reliability, it does merit further inquiry.

Classroom management was rated an overall score of 47%, with a focus on safety, energy levels, and respect. All of the scores reported more than 50% of students felt negative energy levels or  disrespect from the teachers. Most students felt uninvolved in their class reporting that less than 50% of the time they are motivated to academically excel. Students reported extremely low number on the amount of information and ideas that they take home from the program.

While a 50% approval rate or below for each category, is a clear indication for the need of improvement. The survey will be most functional when assessed regularly and the participation level is increased. Recent polling indicates that the program is improving.



## IX.     DISTRICT CHANGES TO THE Disciplinary POLICIES

No review of discipline on the SBISD would be fair without acknowledging recent changes in the Student Code of Conduct and the innovations instituted by the DAEP and SOC.

### A.  The Creation of the System of Care

In the 2014-15 school year, SBISD leadership created the System of Care (SOC) team in response to rising discipline numbers and a decrease in academic achievement. The goal was to increase the academic performance of all students by exploring an alternative to traditional discipline and supporting campuses in the implementation of these alternatives. The SOC team supported positive outcomes at the schools which had the highest student referral rates to the Disciplinary Alternative Education Program (DAEP). The SOC team also endorsed campuses who were leading the district with restorative efforts. In the last three years, the district has managed to lower suspension and reassignment data by 26%. The SOC has been a positive agent for change in the system through its project towards school discipline reform through supplemental change, policy change and advocacy. (See Appendix 16). Recently the SOC with CARE as a strategic partner was able to secure a Rockwell grant to further fund their activities.

### B.  District Response to Issues Raised By CARE and Its Own Strategic Planning

**In response to CARE concerns raised in 2016-17 and as a result of its own strategic planning SBISD administration submitted the following initiatives:**

| CARE Concern | Actions to address CARE concerns to date |
|---|---|
| **Parents delivering classwork** | • Effective Feb 2017, a process was implemented for electronic transfer of assignments between homeschools and DAEP |
| **Transition** | • Beginning 2017-18, academic transition conferences will be held before a student leaves the home school for the DAEP |
| | • Expectations were re-established for the role of the DAEP Transition Specialist with the DAEP principal in compliance with the Transition Specialist job description |
| | • Online course options are being explored with our Educational Technology department |
| | • Each MS and HS are expected to develop a campus-specific transition process for students returning to their home campus |
| | • Streamlined process map were created for transitions before/during/after DAEP |
| | • System of Care is building out their role in the development of secondary level students at will pilot supports with schools |



| Summer Programs | • Two summer program options were offered (face-to-face and online)<br>• DAEP staff made home visits throughout summer – as needed<br>• DAEP campus computer lab was made available to students who needed access to a computer, staffed by a paraprofessional |
|---|---|
| Meal Service | • With the re-opening of the new Cornerstone, meal service will be prepared by the AOC/CSA child nutrition staff<br>• Breakfast – two entrée selections<br>• Lunch – hot entrée of the day (the main line item) along with all required components |
| Quality of Instruction | • In 2017, a DAEP principal focused on Model Classroom Project training in the spring semester. A consultant observed classrooms, gave teacher feedback sessions, planned with administrators, and helped principal prioritize the game plan<br>• Students who are taking an online course will continue<br>• Ed Tech department is exploring options for virtual classes |
| Mindset | • The district hosted first Restorative Justice Summit, May 2017<br>• Beginning 2017-18, the study and application of RJ and PBIS best practices became an area of focus for regular assistant principal training<br>• The district received Rockwell Grant to be led by System of Care and Research and Innovation and assisted by the Coalition of Advocates for Restorative Education (CARE) |
| Referrals | • Revised Level 1 infraction section of the handbook to focus on positive behavior supports<br>• A student can no longer be referred to DAEP for a level 1 infraction<br>• The campus is expected to develop intervention supports and involve parents in the process<br>• Administrators are expected to consider mitigating factors, regardless of whether the action is mandatory or discretionary placement |
| Drug/Alcohol Prevention | • Outlined the drug/alcohol abuse prevention program option for students who have a first-time violation to waive DAEP<br>• placement in exchange for successful completion of the district-sponsored program |



| Design sessions | • Division of Research and Innovation facilitated three design sessions with DAEP core team that took place between April and July 2017 |
|---|---|
| | • CARE participated in each session |
| | • DAEP principal and System of Care director are mapping out their team's priorities/next steps for 2017-18 |

Also, the Administration proposed and the SBISD Board of Directors made the following changes to the SBISD Code of Conduct:

- **Reworded** any instance of "guilty"
- **Added** drug/alcohol abuse prevention program option for students with a first-time violation
- **Added** in a "process" section to DAEP placement
- **Added** requirement for an academic conference to take place with the homeschool counselor consulted before starting a DAEP placement
- **Added** a provision that allows a student to return to his/her home campus for a specific school event at the discretion of the building principal, such as ACT/SAT exams
- **Added** requirements for administrators to consider mitigating factors, regardless of whether the action is mandatory or discretionary
- **Added** specific language around the length of placement
- **Added** clarity to language about hearings





## X.    CONCLUSION AND RECOMMENDATIONS

The DAEP must be an affirmative, therapeutic, diagnostic, successful and restorative program that directly addresses the causes of referral and is held accountable for their reductions in referrals and recidivism. Based on its findings, CARE has developed the following policy recommendations to promote school discipline programs that work, are fairly applied, and have the most significant potential to reverse the trend toward higher rates of school dropouts and incarceration. We were also reached out to by the school board to make suggestions to their student code of conduct. The Board has approved several measures designed to improve discipline and institute restorative justice practices in the SBISD. However, many of the CARE Findings and Recommendations will require further action with changes to the Student Code Of Conduct, The Parent Student Handbook and the operations of the DAEP and the SOC,

The DAEP must not be merely receptive of troubled kids, but has the potential for innovation of student discipline and improvement of student discipline throughout the district. They should be able to educate each campus and administrations on the latest discipline practices. Also they must be accountable for addressing and improving the state of discipline and alternative education programs. In other words, the DAEP and SOC can be net exporters of disciplinary information and innovation to the entire system. Hopefully the following paragraphs allow for internal debate and improvement.

1. **Encourage Parental and Community Involvement in Every Aspect of Discipline**

Engage parents as interactive partners in reinforcing positive behaviors at school – notifying them immediately when disciplinary action is taken, and offering them the opportunity to enter into a signed agreement establishing a proactive plan to address the student's behavior as an alternative to a discretionary disciplinary and referral to a DAEP for non-violent, non-criminal behavior. The DAEP program should promote parent involvement in student life to find a more permanent and sustainable solution to their current and future problems.

The DAEP program should also include more opportunities for the community to engage with the staff and program heads. The SBISD is a community of considerable resources and there a number of organizations willing to volunteer and participate in programs for kids including churches, the YMCA and various civic organizations. During the course of its involvement CARE has heard from a wide variety of organizations willing to provide assistance. Recently the DAEP has published its list of community partner and CARE, a member of that grouping, encourages continued community involvement and the SBISD's encouragement and assistance with this effort.

CARE calls for an annual summit that are comprised of parents, students, staff, teachers, administration, and community leaders to discuss discipline and commit to SBISD disciplinary goals.



2. **Transition Planning**

Strengthen transition planning, monitoring, and the support of students upon their return to their home campus from a DAEP placement should be a shared responsibility of the home campus. SBISD and the DAEP  . The SBISD needs to develop more comprehensive transaction processes that include transition staff coordinators, the collection of data on student outcomes, ongoing communication between DAEP and home campus schools. The current transition program promises a minimum of three visits to the students to home campus once they have left the program. Proper data collection on the use of these meetings must be implemented to ensure the success of the program.

CARE endorses the concept of a pre-referral Academic Transition Conference to take place at the home school with a parent, student, counselor, and assistant principal and DAEP representative to provide parents with a clear menu of services to be provided to the parent before the referral to the DAEP as well as an exit conference including review of a Student Support Plan developed by the transition specialist to identify additional required support or interventions. The Student Support Plan is shared with the home campus, and the home campus and Transition Specialist coordinates the student's return to the home campus with a responsible home campus counselor. The transition specialist is to continue follow-up visits with students at the home campus.

The restorative practice of reentry circles[3] have been used nationwide and proven to be effective in reintegrating students back to home campuses. SOC has already been trained in such practices. The district, through the SKY partnership, has in-house access to the practices at YES Prep Northbrook High School, where Dr. Anita Wadhwa – who has taught and facilitated circles at DAEP, and authored *Restorative Justice in Urban Schools: Disrupting the School to Prison Pipeline* – manages a youth leadership model of restorative justice that can easily be replicated at other campuses. She has visitors from all over the world visit her campus regularly to see circles in action, and has been underutilized as a potential resource in the district.

CARE supports the implementation of the transition plan originally proposed by Julie Hodson, SBISD Director of Grants in 2014, 10 (a.)-(f.) (See Appendix 20) In summary these recommendations included: having the transition coordinator to work on final data collection and analysis after  the school year ends to, to publish a report and to meet and reflect on ways to improve the program, having the transition coordinator meet with representatives of technology companies used in the district, such as Skyward, to establish a vast use of technology in the program.

---

[3] One of the most widely used videos of a reentry circle takes place at Bunche High School, an alternative education campus in Oakland, CA. The video can be viewed here: https://www.youtube.com/watch?v=HiLtFVHR8Q0

This year Memorial High School provided students with the option of receiving Chromebooks to use throughout the school year. This technology with other software such as ITS Learning and the Skyward application applied to the DAEP program would eliminate communication issues between a student's home campus and the DAEP campus. This technology would also allow students to maintain their academic assignments and classwork while at the DAEP. and access 24/7 learning.









3. **Provide Meaningful Drug and Alcohol Rehabilitation Services**

Students who have reoccurring disciplinary outbursts related to drugs and alcohol should not be treated as merely disciplinary problems for is nonviolent substance abuse. The main reason that students are sent to the DAEP is due to drug and alcohol violations, yet there is no full-time mandatory Drug and Alcohol education program. Currently, there is a by request district provided program in place that is used for drug and alcohol education. Many of the life skill programs are by request only and not mandatory, essentially

Many students with substance addiction need to be placed in a rehabilitation program. If DAEP is to house such a program, adequate staffing and resources must be provided.Current contractual arrangements are ineffective and inefficient Promptly after finishing their programs, students should enact proper transition plans that will ease their placement back into their home schools. Students should transition back to their home campus with confidence, sobriety, and a panic plan that allows them to have solutions if their temptations arise. CARE calls for the SBISD to enact a progressive substance abuse program under the guidance of experts.



4. **Increasing Staffing and Coordination between the Home Campus and the DAEP**

DAEP needs more qualified teachers in particular content areas. School directors reported teachers often taught multiple grade levels and subjects, some of which they were not certified to teach. DAEP has difficulty providing lab sciences, foreign languages, vocational classes, electives, and advanced courses for students enrolled in such courses in the regular school (Standard 8.0).

DAEP needs more transition staffing. The current workload and follow-up requirements are unrealistic for one staff member who is often called upon to also assist in other administrative tasks. The Transition Service Plan developed by the district in 2014 has not been fully implemented or operated as designed. See, Impact Of transition Service Plan on Student Recidivism Rates, Spring Branch ISD Status Report as of January 31, 2014.(J. Hodson)

Greater coordination and cooperation between SOC and the DAEP administration is required. These administrative units have a similar goal, but coordination is disjointed and lacking. See, Towards School Discipline Reform Through Systematic Change Policy Change and Advocacy. (N. Fernandez) Staff turnover at the DAEP should be reviewed and its causes explored. Staff cannot develop if there is a high turnover.

5. **Teacher/staff training and elimination of racial bias**

CARE  recommends ongoing teacher and staff training in positive behavior management, as well as training of all persons involved in the disciplinary chain,  to enhance cultural competency, avoid implicit bias and the ability to form a positive relationship with parents and students. SBISD should make implicit bias training a core requirement of compliance reviews. It should require inherent bias training requirements for schools found to have racial disparities in discipline, juvenile justice referrals, or access to programs and resources. They should also identify grant applications, target funds and give priority to grants and funding opportunities that include cultural competence and implicit bias training.Collect and publicly report data on discipline related to discretionary offenses, sortable by charge, disaggregated by race and disability status and cross-tabulated by gender.





Conduct an annual comprehensive review and issue a report analyzing all data regarding discretionary offenses and, if necessary, implement interventions to address racial disparities. Prohibit the expulsion or prolonged out of school suspension of students for discretionary offenses. Solicit and employ the feedback of affected community members, including disciplined students and their families, in the process of revising policies and practices related to the disciplining of students for discretionary offenses.

6. **Provide for further amendments to the Student Code of Conduct.**

The Student Code of Conduct should be amended to provide that no student shall be denied access to any of their educations class material, subject matter, and activities that they were involved in prior to their removal. Students at the DAEP shall be provided the same services, materials, engagement, and education as those students at their home campus. The district shall encourage parent participation in all aspects of the discipline. The district shall produce as a part of its annual report on student discipline deducing measurable statistics including those produced by the TEA.

7. **DAEP Procedure and Practices.**

Implement evidence-based practices, such as School-Wide Positive Behavior Supports, shown to adequately address minor misbehavior while improving school safety and academic achievement: http://www.pbis.org. CARE would even suggest renaming the program to reflect restorative education goals and practices.

8. **Restorative Justice Techniques**

Implement a restorative justice model for responding to discretionary offenses by students, allowing the student to be reintegrated into the educational community, as opposed to being unnecessarily excluded. SBISD/CARE/SOC and Administration Committee will identify components of the SBISD Student Codes of Conduct to be reformed. Restorative Justice is a term used to identify a practice that encompasses holistically institutionalizing peaceful, non-punitive techniques to approaching situations that may include harm, or responses to violations of legal rights, human rights, and problem-solving. In school environments, these measures are typically used as alternatives to isolating punishments such as suspension and expulsion. Due to the versatility and flexibility, restorative justice programs may be applied to the entire administration with staff training and team management.





Restorative Practices: Fostering Healthy Relationships & Promoting Positive Discipline in Schools, A Guide for Educators (The Advancement Project, American Federation of Teachers, National Opportunity to Learn Campaign, National Education Association)

Restorative justice's originators meant it as a way for offenders to pay their dues to the community productively and to ensure that all parties to the situations have their needs met. Schools (such as YES Prep Northbrook High) have used this ideology to advocate for all parties involved by creating a model of youth-led circles. While some people use restorative courts, restorative peace circles allow for equity of voice and collective understanding to reach the desired outcome – improved behaviors and reparations for the parties harmed. Moreover, youth are often more prone to listening to their peers to develop more prosocial behaviors. Students who do not change behaviors through restorative practices can then experience punitive consequences, but to be restorative is to never give up on a child.

The SBISD  administration lacks short and long-term aspirational goals for its disciplinary and program. CARE encourages the SBISD to to adjust and follow the National Education Association's 15 Guidelines for an Exemplary Alternative Education Program. Specifically the SBISD DAEP should use the rubric given by the NEA to measure the success of their current and future programs.  (See Appendix 1)

### 9.  Employ Innovative Restorative Practices Today

Various methods may be used as an alternative to orthodox discipline; the zero-tolerance mindset regarding discipline has proven to be extreme and sometimes too harsh of a punishment. The following paragraphs demonstrate that alternatives to traditional off campus discipline is limited only by the imagination.

In "Little Flower Yoga" students from Pre-K-12 are taught yoga and mindfulness in their classroom settings. This program provides students with tools that will help them endure the stressors of life. This program has proven to reduce suspension rates as well as increase their capacity to learn effectively, manage challenging emotions, self-regulate behavior, and achieve



personal and academic success. Students are taught functional life skills which they may apply in their daily life

Another alternative to traditional discipline practices is Positive Alternatives to School Suspensions (i.e. P.A.S.S). In this program, students are given the voluntary option to participate in a program that is located at their home campus. This program consists of interactive supervision in which students participate and discuss in conversations about their behavior and how to manage their emotions and actions. Schools have implemented programs in which a teacher and a coach are assigned to students and develop a mentorship program to maintain direct communication and support of the student. Students at YES Prep Northbrook High are piloting a Restorative Space (RS) where they craft curriculum (reading, writing, videos, art), mindfulness practices, and peace circles (where families are invited) alongside traditional ISS to create more impactful changes in behavior.

### 10. Annual Mental Health/ Disability Screenings

Provide screening of students repeatedly disciplined to ensure that the behavior is not the product of a disability. If it is, discontinue punishing the student for such action and, in its place, provide appropriate accommodation and appropriate mental health services.

### 11. Data and Impact Analysis

SBISD should track those students who were referred to DAEP and analyze recidivism, subsequent academic performance, referrals to the juvenile justice system and other factors which may establish success or failure.

### 12. Improve the Physical Environment of DAEP

Physical environment speaks volumes about an institution's values. Right now, the newly remodeled Cornerstone Academy and Academy of Choice looms in stark contrast to the squat, decades-old building that is DAEP. If we are to provide the most resources to the students who are often the most disadvantaged, then we need our physical structures to reflect that. That students at DAEP did not receive equivalent hot lunches until Cornerstone opened up next door symbolizes which students in the district are valued – and who is not.(DAEP students still do not receive all of the lunch menu items available to students at the adjacent Cornerstone campus.) We call for a plan to remodel and improve the physical environment at DAEP to provide a welcoming and therapeutic space for students with equivalent services.

38



## XI.    THANK YOU LISTING

CARE would like to extend an appreciative thanks to the following individuals for assisting us with the development and research of this report. As well as in our efforts to improve the disciplinary alternative education program in Spring Branch and elsewhere.

- **A. Ricky Smith** *CARE Member*
- **Dawn Dixon** *SBISD DAEP Admin*
- **Elliott Whitney** *Associate Superintendent*
- **Esheeta Bavare** *CARE Reporter, Co-Author, and Editor*
- **Fort Bend ISD DAEP Principal and Staff**
- **Furr High School Principal and Staff**
- **Galena Park ISD DAEP Principal and Staff**
- **Howard Henderson** *Director of The Center for Justice Research at TSU*
- **Joseph Klam** *Chairman of Spring Branch ISD*
- **Julie Hodson** *SBISD Principal Grant Writer*
- **Karen Christopher** *CARE Member*
- **Karen Peck** *Spring Branch ISD Board member*
- **Karen Wilson** *SBISD Finance Director*
- **Kedrick Lookadoo** *SBISD DAEP Principal*
- **Kristin Craft** *SBISD Chief Academic Officer*
- **Natalia Fernandez** *Director - System of Care*
- **Raymorris Barnes** *Principal at Spring Woods Middle School*
- **Rhonda Sneed** *Assistant Principal at SBISD DAEP*
- **Roy J. Rodney Jr.** *CARE Director, Author*
- **SBISD/ DAEP CIT committee**
- **Tanisha Lee** *Spring Early College Academy Spring ISD*
- **Tomoko Traphagan** *TEA Data Analyst*
- **Tyler Reems** *Superintendent of Helena Schools in Montana*



40



# Exemplary Practices 2.0: Standards of Quality and Program Evaluation 2014



**Board of Directors**

President Robert L. Eichorn, M.Ed.
Vice-President Kay Davenport, Ed.S.
Treasurer Thomas Trautman, Ed.D.
Secretary Edward Lowther, Ed.D.
Director Denise Riley, M.S.
Director Jacquelyn Whitt, Ed.S.
Director Richard Kerry Thompson
Director John Holmes

©National Alternative Education Association - All Rights Reserved

1



# Table of Contents

## Exemplary Practices 2.0
## Standards of Quality and Program Evaluation 2014

|      | INTRODUCTION | 3 |
|------|--------------|---|
| 1.0  | VISION AND MISSION | 4 |
| 2.0  | LEADERSHIP | 5 |
| 3.0  | CLIMATE AND CULTURE | 6 |
| 4.0  | STAFFING AND PROFESSIONAL DEVELOPMENT | 7 |
| 5.0  | CURRICULUM AND INSTRUCTION | 8 |
| 6.0  | STUDENT ASSESSMENT | 9 |
| 7.0  | TRANSITION PLANNING AND SUPPORT | 10 |
| 8.0  | PARENT/GUARDIAN INVOLVEMENT | 11 |
| 9.0  | COLLABORATION | 12 |
| 10.0 | PROGRAM EVALUATION | 13 |
| 11.0 | SCHOOL COUNSELING | 14 |
| 12.0 | SCHOOL SOCIAL WORK | 15 |
| 13.0 | DIGITAL AND VIRTUAL LEARNING | 16 |
| 14.0 | POLICIES AND PROCEDURES | 17 |
| 15.0 | NONTRADITIONAL EDUCATION PLAN | 18 |
|      | POSTSCRIPT TO EXEMPLARY PRACTICES 2.0: STANDARDS OF QUALITYAND PROGRAM EVALUATION 2014 | 19 |
|      | REFERENCES | 20 |
|      | ACKNOWLEDGEMENT | 23 |

\* Indicators of Quality Programming on same page as Exemplary Practice



## Introduction to Exemplary Practices 2.0:  Standards of Quality and Program Evaluation 2014

Throughout the world, nontraditional and alternative schools serve students who require or thrive in an environment other than a traditional educational setting.  This population of learners may face challenges in school, home, and community. As a result, their ability to access services in the traditional setting may be at-risk.  Nontraditional and alternative education delivers innovative 21st Century approaches to teaching and learning which provide students with the opportunity to meet graduation requirements, engage in college and career readiness, and participate as productive members of their communities. In an effort to enhance the quality of nontraditional and alternative education in all fifty states, the National Alternative Education Association (NAEA) has identified 15 exemplary practices. Research-based, field tested, and incorporating best practices in the field of education, *Exemplary Practices 2.0: Alternative Education Standards of Quality and Program Evaluation* represents unified standards and indicators of quality programming.  *Exemplary Practices 2.0* provides educational leaders and practitioners with a standards-based approach to program evaluation, identifies essential characteristics, and notes the importance of wrap-around services which include school counseling, social work, and technology; all of which play a role in successful schools and programs.

Each exemplary practice includes an overview of the practice and indicators. The practices relate to the following topic areas:

- ➢ 1.0 Vision and Mission
- ➢ 2.0 Leadership
- ➢ 3.0 Climate and Culture
- ➢ 4.0 Staffing and Professional Development
- ➢ 5.0 Curriculum and Instruction
- ➢ 6.0 Student Assessment
- ➢ 7.0 Transitional Planning and Support
- ➢ 8.0 Parent/Guardian Involvement
- ➢ 9.0 Collaboration

- ➢ 10.0 Program Evaluation
- ➢ 11.0 School Counseling
- ➢ 12.0 School Social Work
- ➢ 13.0 Digital and Virtual Learning
- ➢ 14.0 Policies and Procedures
- ➢ 15.0 Nontraditional Education Plan

The identified practices are appropriate for all nontraditional and alternative education settings including comprehensive campuses, interagency programs, co-facility schools, or stand-alone facilities. *Exemplary Practices 2.0* is designed to ensure quality nontraditional and alternative education programming occur; is accountable to and for students, parents, and stakeholders, and fulfills the mission of helping students matriculate to the next grade level on their path to graduation.

*Exemplary Practices 2.0* is designed to:

- ➢ Assure high quality educational services for any student served by nontraditional or alternative schools are delivered with fidelity and accountability
- ➢ Develop standards, indicators, and technical language that will serve as operational and performance guidelines
- ➢ Promote 21st Century learning in the creation of new nontraditional and alternative programs
- ➢ Evaluate the effectiveness of new and existing programs based on standards and indicators
- ➢ Create a common framework for future nontraditional and alternative education policy development

*Exemplary Practices in Alternative Education: Indicators of Quality Programming 2009* has been revisited and revised to reflect the most innovative exemplary practices for alternative programs. *Exemplary Practices 2.0:  Alternative Education Standards of Quality and Program Evaluation 2014* provides an updated document with a research based evaluation instrument designed to assist educators in assessing current programs and to aide in the creation of new and effective schools.

© National Alternative Education Association - All Rights Reserved

3

**43**



## EXEMPLARY PRACTICE 1.0: VISION AND MISSION

- An exemplary nontraditional or alternative education school develops a guiding vision and mission that drives the overall operation of the program.
- All stakeholders (i.e., administrators, community representatives, parents/guardians, staff, and students) share in developing, implementing, directing and maintaining the vision and mission for the school.
- The vision and mission of the school includes the identification of the target student population and promotes the success of all students.
- Additionally, the vision and mission embody high expectations for academic achievement, and the nurturing of positive social interactions between staff and students.

### Indicators of Quality Programming:

**1.1** The vision clearly articulates goals to the stakeholders.

**1.2** The mission is documented, published and visible to students, parents/guardians, staff, and the community stakeholders.

**1.3** All stakeholders are involved in developing the vision, mission, goals, and projected outcomes for the school.

**1.4** The mission includes the identification of the student population for whom the nontraditional or alternative education school is designed to serve.

**1.5** The vision and mission of the school has a unifying theme that evokes high levels of student and stakeholder support.

**1.6** The driving vision and mission of the nontraditional or alternative school is consistent with the district's strategic goals while aligning with specific state standard(s).

**1.7** Student success is central to the vision and mission of the school, which includes the development of effective and affective skills, social competencies, and career readiness skills.

**1.8** The vision and mission of the school promotes a safe and secure environment while developing the emotional and physical wellness of all students.

**1.9** The development of school culture and student ownership of their school is facilitated through the use of symbols, ceremonies, celebrations, and the development of traditions.

**1.10** Resources are sought and obtained to support the implementation of the vision and mission.

**1.11** Barriers to achieving the vision and mission are identified, clarified, and addressed through the schools strategic plan.

**1.12** The vision and mission shape the educational plans and activities undertaken by the nontraditional or alternative school.

**1.13** The vision and mission are monitored, evaluated, and revised (as needed) on a annual basis.

4

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 2.0: LEADERSHIP

- An exemplary nontraditional or alternative school employs passionate, innovative, competent, and experienced leadership.
- School leadership purposely engages in opportunities to promote program success and strategically includes community, business, and media in celebrations.
- All stakeholders, including administrators, teachers, and staff, must be committed to full implementation of the mission and core values of the school.
- On-site leadership utilizes and engages in a collaborative approach that ensures shared decision-making, high expectations, and continuous monitoring of program quality.
- The superintendent sustains the independence of the school and allocates sufficient resources (i.e., financial or other necessary resources) to protect the integrity of the program.

### Indicators of Quality Programming:

**2.1** The superintendent provides sufficient oversight to ensure quality programming while protecting the autonomy of the nontraditional or alternative school's operation.

**2.2** The superintendent provides adequate financial support and other needed resources for implementation of quality alternative education services (i.e., teaching and non-teaching staff, equipment, technology, supplies, curriculum, etc.).

**2.3** School administrators are experienced and competent, enabling them to be engaged in all aspects of the program's operation and management.

**2.4** The shared vision of the nontraditional or alternative school is communicated by leadership through the program's mission.

**2.5** School leadership engages stakeholders in a collaborative process when making program decisions (i.e., advisory board and other opportunities that promote stakeholder participation in the decision-making process).

**2.6** School leadership ensures decisions regarding operations align with state legislation and local policies and procedures.

**2.7** School leadership recruits, hires and trains highly qualified teachers and support personnel.

**2.8** School administrators ensure appropriate student to teacher ratios exist, that ratios reflect the needs of the student population, and that the student to teacher ratio never exceeds 12 to 1.

**2.9** Leadership promotes collaboration between the school of origin, community, and home, thereby fostering an effective learning environment for the student.

**2.10** Administration ensures that reliable data and student performance measures guide the instructional practices of the program.

**2.11** School and district leaders work to offer transportation, food services, and appropriate health services to students.

**2.12** Consistent and constructive performance evaluations of administrative, teaching, and support personnel are conducted by leadership in a timely manner.

©National Alternative Education Association - All Rights Reserved

5



## EXEMPLARY PRACTICE 3.0: CLIMATE AND CULTURE

- › A safe, caring, and orderly climate and culture that promotes collegial relationships among students, parents/guardians, and staff is maintained in an exemplary nontraditional or alternative school.
- › The school culture and climate are characterized by a positive rather than punitive atmosphere for behavioral management and student discipline.
- › School staff establish clear expectations for learning and conduct.
- › The staff actively models and rewards appropriate student behavior.
- › Proven practices to foster healthy communities are implemented at the school.
- › Connections among all stakeholders that are positive and encourage academic, behavioral, and social success are actively promoted at the school.

### Indicators of Quality Programming:

**3.1** Services are efficiently organized into effective delivery systems whether the entity is a nontraditional or alternative school, program, or classroom.

**3.2** The program is housed in a safe, well-maintained, aesthetically pleasing, and physically accessible environment that supports optimal student learning.

**3.3** Rules and behavioral expectations are clearly written (i.e., code of conduct and comprehensive student discipline action plan), understood and accepted by staff, students, and parents/guardians.

**3.4** The program has a designated team of representatives (i.e., administrative, teaching and support personnel, parents/guardians, and, if possible, student representatives) that strategically plan, monitor, and implement prevention and intervention strategies that reflect the culture and climate of the nontraditional or alternative school.

**3.5** The school actively promotes student engagement and affords students with the opportunity to have a role in shaping the learning environment to facilitate feelings of connectedness.

**3.6** The nontraditional or alternative school communicates high expectations for student and staff performance and celebrates success on a regular basis.

**3.7** Student, parent, and staff survey feedback are presented at staff meetings and used to make appropriate programming changes.

**3.8** The school demonstrates an understanding and sensitivity to academic, behavioral, cultural, developmental, gender, and societal needs of students, parents/guardians and the community.

**3.9** Short and long-term goals address the needs of the students, parents/guardians, and staff.

**3.10** School growth plans are measurable and built upon student performance in the effective and affective domains, attendance, matriculation, and graduation.

©National Alternative Education Association - All Rights Reserved

6



## EXEMPLARY PRACTICE 4.0: STAFFING AND PROFESSIONAL DEVELOPMENT

> ✓ An exemplary nontraditional or alternative school is staffed with effective, innovative, and qualified individuals trained in current research based teaching methods that facilitate active learning, promote creativity, and encourage self-evaluation.

### Indicators of Quality Programming:

**4.1** Enthusiastic, energetic, and innovative teachers who demonstrate multiple teaching styles are employed at the school.

**4.2** The staff understands and practices the concept of facilitative learning.

**4.3** The diversity of the staff mirrors the diversity of the student body, and the experience of the alternative education faculty mirrors the faculty experience of the school district.

**4.4** The teacher to student ratio of the nontraditional or alternative school promotes individualized instruction. The recommended student to teacher ratio is 12 to 1.

**4.5** Staff members create written professional development plans that facilitate personal and professional growth, identify the professional development needs of the individual, establish short and long term SMART (Specific, Measurable, Achievable, Results Focused, Time Bound) goals, and align professional development training to address the individual's overall plan.

**4.6** Staff members create a professional learning community (PLC) that encourages the sharing of successes and growth areas to cultivate an attitude of continuous improvement and lifelong learning.

**4.7** The focus of professional development is on student achievement, effective and affective skills development, social skills, and college and career readiness.

**4.8** A variety of professional development approaches, including technology, to accomplish the goals of improving instruction and increasing student achievement are used at the school.

**4.9** Professional development opportunities include information related to effective collaboration with community agencies and services to support the student in the home and workplace.

**4.10** Increasing staff capacity through training to ensure the use of research-based strategies that align with the needs of the program population is used strategically at the school.

**4.11** Sufficient fiscal and capital resources are allotted to allow all staff to participate in workshops, conferences, and seminars.

**4.12** Administration ensures ongoing professional development is geared towards the specific needs of teachers and support personnel as it relates to their role in the nontraditional or alternative school.

7

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 5.0: CURRICULUM AND INSTRUCTION

> ✔ Instructional practices and curriculum are rigorous and inclusive, support the needs of second language and disabled students, and are individualized to meet the needs of all learners.

### Indicators of Quality Programming:

**5.1** Access to the academic core curriculum is ensured at the nontraditional or alternative schools.

**5.2** Teachers are highly qualified in the content area based on individual state standards.

**5.3** All faculty are competent in research based teaching techniques and behavior management strategies appropriate for the target student population.

**5.4** The school is operated in full compliance with local, state, and federal laws governing students.

**5.5** Curricular options reflect, but are not limited to, those offered in the traditional educational setting.

**5.6** Credit by proficiency, as allowed by the local education agency and/or state, to increase probability of student graduation with his or her age cohort is investigated and applied.

**5.7** Teachers identify and provide appropriate instruction designed to close gaps in student learning.

**5.8** Differentiated instructional strategies are employed to accommodate for students with different backgrounds, individual learning styles (e.g. visual, auditory, and kinesthetic learners), and multiple intelligences.

**5.9** Students have opportunities to learn and/or participate in non-core content areas to include, but not limited to, the following: fine and practical arts, leadership, health/physical education, music, service learning, and technical/vocational courses.

**5.10** Community involvement using service learning as a teaching and learning strategy that integrates meaningful community service with instruction, teaches civic responsibility, and strengthens the student's role in his or her community through self-reflection is promoted at the school.

**5.11** Instruction integrates life skills (e.g., career preparation, citizenship, conflict resolution, decision making skills, problem solving, public speaking, self-management, social skills, teamwork, time management, work-based learning, etc.) into the curricula and affords the student with opportunities to put the acquired skills into action.

**5.12** Using interest inventories and vocational investigation, opportunities for career exploration (e.g., job shadowing and training, mentorships, work-based learning, career fairs, etc.) related to the student's interests and postsecondary goals are provided at secondary programs.

**5.13** Small group lessons in concert with project-based learning are used to build social relationships by supporting collaboration and teamwork.

**5.14** Researched based dropout prevention strategies for students at-risk of dropping out of school are used at the nontraditional or alternative school.

**5.15** Technology is blended into the instructional delivery process across all content areas.

**5.16** The curriculum is supported by access to a balance of up-to-date, well-maintained collection of textbooks, library media, technology, software, and other instructional materials that are age and grade appropriate for all learners.

8

©National Alternative Education Association - All Rights Reserved

**48**



## EXEMPLARY PRACTICE 6.0: STUDENT ASSESSMENT

- › An exemplary nontraditional or alternative school includes screening, progress monitoring, diagnostic and outcome-based measurements, and procedures to improve short and long term results at the student level.
- › Student assessments are used to measure achievement and identify specific learner needs. The school uses reliable measures to monitor student progress and adjust program services.

### Indicators of Quality Programming:

**6.1** School administrators promote assessment as a means to identify individual and group learner needs.

**6.2** School administrators enforce data-driven accountability as required by state and local authorities.

**6.3** The purpose of assessments is clearly defined and communicated to students, parents/guardians, and staff. These will include program accountability for quality instruction and student qualification for matriculation or graduation.

**6.4** Data collection procedures are clearly outlined to ensure reliable and valid student assessment results.

**6.5** Teachers use reliable formative and summative assessment tools that align with curriculum and instruction to track student performance and progress.

**6.6** The program utilizes multiple measures to monitor student achievement, effective and affective performance, and preparation for matriculation or graduation with an emphasis on both informal and formal assessments.

**6.7** Quantitative and qualitative data are used to identify student progress as prescribed by the district and state.

**6.8** Assessments are directly linked to identifying appropriate curriculum and instructional methods to accommodate a variety of individual learning needs.

**6.9** Results of assessments are used to adjust instructional practices, provided to students and parents/guardians in a timely manner, and used to update student academic/graduation plans.

9

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 7.0: TRANSITION PLANNING AND SUPPORT

- Clear transition criteria and procedures are in place to address student enrollment, transfers, and reintegration, if applicable, to a traditional setting at exemplary nontraditional or alternative schools.
- Transition plans include college and career readiness support for high school students.
- School counselors or transition specialists are specifically trained to address student transitions.
- The transition process ensures the nontraditional or alternative school is the most appropriate placement based on the student's effective and affective needs, academic requirements, and post-baccalaureate goals.

### Indicators of Quality Programming:

**7.1** A screening committee to ensure the placement is most appropriate for the student's specific effective and affective needs, academic requirements, and post-baccalaureate goals is in place at exemplary nontraditional or alternative schools.

**7.2** A formal transition process for students from entry to exit which includes the following elements: an orientation which consists of rapport building, assessment of the student, IEP review, information and record sharing regarding the student, short and long-term goal setting, development of an individualized student plan, and other mechanisms designed to orient the student to the alternative education setting is in place at exemplary schools.

**7.3** Transition planning and the student plan afford students the opportunity to maintain and accelerate their current progress toward matriculation or graduation.

**7.4** A Student Support Team (SST) is established that consists of educators from the school of origin, educators from the nontraditional or alternative school, the student, parents/guardians and other trained transitional personnel. The team is directly involved in all aspects of the transition process including assessment, planning, and implementation of the student's transition plan.

**7.5** Transition planning includes referral and timely access to community agencies, and support services such as: mental health, public health, family support, housing, physical fitness activities, and other youth services.

**7.6** When appropriate, students are provided with opportunities to develop and maintain supportive links to the school of origin.

**7.7** Student areas of strength and growth are addressed as part of transition in, throughout, and upon exit of the nontraditional or alternative school.

**7.8** Prior to a student's entrance and exit from the school, transition services are coordinated by the SST with all appropriate entities to ensure successful entry into the student's next educational setting or workforce.

**7.9** Within the bounds of the Family Educational Rights and Privacy Act (FERPA), information sharing (availability of pertinent records) takes place between the school of origin, the nontraditional or alternative school, and other social service organizations. Copies of the student cumulative academic file should be sent to the nontraditional or alternative school to ensure adherence to second language, special needs, or medical plans, to establish accurate student schedules, and to ensure the student's areas of academic strength and growth are known and used by the nontraditional or alternative school to develop the individual student plan.

©National Alternative Education Association - All Rights Reserved

10



**50**

## EXEMPLARY PRACTICE 8.0: PARENT/GUARDIAN INVOLVEMENT

- > An exemplary nontraditional or alternative school actively involves parents/guardians beyond parent/guardian-teacher meetings.
- > Non-judgmental, solution based approaches that incorporate parents/guardians as respected partners throughout the student's length of stay at the school are emphasized in nontraditional and alternative programs.
- > The school works with parents/guardians to provide proper training and support to advance the learning and personal success of each student in the program.

### Indicators of Quality Programming

**8.1** Parental/guardian involvement is welcomed and actively recruited by the nontraditional or alternative program.

**8.2** Effective communication and interaction takes place between parents/guardians and school staff to include consistent notification of student progress (regular progress reports or as needed).

**8.3** Parents/guardians are recognized as equal partners and involved in the decision-making process for the student and the program, including the following: to serve on the Student Support Team (SST), to help develop the individualized student plan, to help guide and direct the mission and purpose of the program via an Advisory Council, and to help evaluate the overall effectiveness of the nontraditional and alternative program.

**8.4** Parents/guardians participate as partners to create solution based strategies to support the effect and affect growth of their student.

**8.5** Consultation regarding strategies to support the learning and personal success of students is made readily available to all parents/guardians.

**8.6** Parents/guardians have access to parent education programs sponsored by the nontraditional or alternative school and other community agencies.

**8.7** Procedures are in place to address all parent/guardian grievances in a timely manner with an emphasis on flexibility, accountability, and consistency.

©National Alternative Education Association - All Rights Reserved

11



## EXEMPLARY PRACTICE 9.0: COLLABORATION

> ⟩ Partnerships with community agencies, businesses and groups based on trust, open communication, clearly defined goals, and shared responsibility at exemplary nontraditional or alternative schools.
> ⟩ Collaborative efforts enhance the student's performance in the school, home, and community.
> ⟩ Collaborative partnerships promote opportunities for life skills, soft skills, service learning and career exploration for all students.
> ⟩ Community representatives have a role in the planning and resource development of the nontraditional or alternative school.

### Indicators of Quality Programming

**9.1** Partnerships with community resources are secured and established to help the nontraditional or alternative school solve problems and achieve goals as outlined in the program's vision and mission.

**9.2** Partnerships are designed to support and enrich the school by including the community as a resource for education, advocacy, and volunteerism.

**9.3** A comprehensive outreach program utilizing the Parent Advisory Council is established by the nontraditional or alternative school.

**9.4** Interagency and community partnerships exist to support the physical and mental health of students enrolled in the program.

**9.5** A student assistance program which allows for referrals to community agencies when appropriate is provided at exemplary nontraditional or alternative schools.

**9.6** Community representatives are drawn upon as resources during the planning phase of the individualized student plan that involves student planning for the following:  community participation, employment, independent living, and postsecondary education.

**9.7** Community partners are utilized when integrating life skills, soft skills, college and career readiness, and service learning into the nontraditional or alternative school.

**9.8** Community representatives serve on the Advisory Board and assist in planning, resource development, and decision-making for the nontraditional or alternative school.

©National Alternative Education Association - All Rights Reserved

12



**52**



## EXEMPLARY PRACTICE 10.0: PROGRAM EVALUATION

> ➤ Systematic program evaluations for continuous school improvement are conducted at
> exemplary nontraditional or alternative schools.
> ➤ Data triangulation is employed with three different sources of data:
>   • program implementation ratings
>   • student achievement data
>   • and student/parent surveys
> ➤ All sources of data are gathered and used to assess quality, provide a course for improvement,
> and direct future activities of the school.

### Indicators of Quality Programming

**10.1** Routine, yearly evaluations to determine progress toward meeting the vision and mission of the program and plans for continuous school improvement are conducted at nontraditional or alternative schools.

**10.2** Evaluation measures include a review of program implementation ratings (based on observable and measurable data). Ratings are given based on alignment with state specific standards and the *NAEA Evaluation Rubric*.

**10.3** Student outcome data (graduation rates, credits earned, grades, attendance, disciplinary data, and dropout statistics) is gathered as a means to evaluate the success of the nontraditional or alternative school.

**10.4** On a yearly basis, student, parent/guardian, staff and community surveys are administered by the nontraditional or alternative school to assess school improvement.

**10.5** Staff surveys are administered to assess attitudes and opinions about school culture and climate, the learning environment, staff-administrator/staff-staff relations, perceptions of program effectiveness and success relative to students' academic, behavioral, and social progress.

**10.6** Transition services are routinely evaluated to determine the program's effectiveness in preparing the student for the next educational setting or workforce.

13

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 11.0: School Counseling

- ›  An exemplary professional school counseling program that serves nontraditional or alternative students targets academic performance, is grounded in research based practices, and addresses the current and future needs of students.
- ›  Effective and affective strategies to enhance student achievement are integrated in exemplary school programs.
- ›  Professional school counselors collaborate with school stakeholders to support best practices, articulate instruction, and create effective citizens.

## Indicators of Quality Programming:

**11.1** Improvement of academic self-concept is promoted at the school.

**11.2** Students acquire affective skills to become self-directed and independent learners.

**11.3** Students develop interests and abilities to achieve school success.

**11.4** An environment for academic preparation that promotes a wide range of post-secondary options including trade/technical school, the armed services, and college is created at the program.

**11.5** Students work with professional counselors to establish challenging effective and affective academic goals.

**11.6** Students understand the relationship between success in school and transition to the world of work.

**11.7** Opportunities for students to engage in service learning are created at the program.

**11.8** Students investigate the world of work as it relates to their interests, skills, and goals.

**11.9** Students develop an awareness of self, others, and the importance of working effectively in teams.

**11.10** Helping students establish career readiness skills is a goal of the program.

**11.11** Students develop research and critical thinking skills that include the use of technology to explore and prepare for future employment.

**11.12** Students acquire interpersonal skills to recognize, respect, and appreciate the differences in others.

**11.13** Students develop a clear understanding of consequences of decisions and choices.

14

©National Alternative Education Association - All Rights Reserved

54



## EXEMPLARY PRACTICE 12.0 SCHOOL SOCIAL WORK

- › A social work program that is proactive, promotes educational equity, and removes barriers to learning is a characteristic of an exemplary nontraditional or alternative school.
- › Practices are consistent with local, state, and federal mandates.
- › The program promotes the academic mission of the nontraditional or alternative school fostering policies that are responsive, rigorous, and emphasize intervention and prevention services.
- › To maintain sustainability, the program is receptive to growth producing feedback from community stakeholders.

## Indicators of Quality Programming:

**12.1** Social justice is emphasized by the program.

**12.2** Social workers demonstrate knowledge of local, state and federal mandates related to informed consent, privacy, and confidentiality.

**12.3** Social workers have a graduate degree from a Council on Social Work Education (CSWE) accredited social work program and are licensed by their state board of social work.

**12.4** Continuous assessment of students and families with the goal of improving social/emotional outcomes in school and community is conducted by the social work program.

**12.5** The program conducts annual needs assessments targeting the interactions of students, families, and school personnel.

**12.6** School-based intervention, research and evidence, and informed practices are utilized in social work services.

**12.7** Intervention strategies use a multi-tier framework with an emphasis on salient *ecologies* (school, home, or community) to address a student's social/emotional growth.

**12.8** Yearly data related to practices are collected and analyzed.

**12.9** Accurate and confidential records that demonstrate outcome and ensure service accountability are maintained.

**12.10** The program is organized with an emphasis on student and program needs, professional skills of the social worker, and availability of resources.

**12.11** Social workers participate in ongoing professional development activities that target nontraditional, alternative, and at-risk populations.

**12.12** Social workers develop and demonstrate specialized knowledge of nontraditional and alternative populations and are culturally responsive to stakeholders needs.

**12.13** Social workers take a proactive role in the development of positive school climate and culture.

**12.14** Social workers provide stakeholders with training and engage the community with an emphasis on developing equal access of service for all students.

15

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 13.0 DIGITAL AND VIRTUAL LEARNING

- ◦ An exemplary digital or virtual learning program implemented in a nontraditional or alternative school is accessible via the World Wide Web and in secure facilities.
- ◦ Digital or Virtual courses are aligned to state/national standards and meet local education agency course content guidelines.
- ◦ Digital and Virtual courses are rigorous, prescriptive, and standard and assessment based.

### Indicators of Quality Programming:

**13.1** The course content is characterized by rigor, is aligned to state and local standards, and includes an overview, syllabus, and scope of sequence for delivery.

**13.2** The course content incorporates literacy and communication skills, reflects multicultural education, and is research based.

**13.3** The course design is clear, incorporates multiple ways to engage in learning, and is organized in sequential lessons and units.

**13.4** The course design provides students the opportunity to engage in critical thinking, readability is grade level appropriate, and assignments are aligned to course content.

**13.5** Course assessments are aligned with objectives, reliable and valid, and provide for timely and frequent feedback to inform teaching and learning.

**13.6** Grading tools and materials provide the student and teacher with immediate feedback, provide flexibility in assessment, and are easy to understand and manage.

**13.7** The course construction allows instructors to add content and activities, provides clear navigation parameters for students, and includes rich and varied multimedia.

**13.8** The course construction supports multiple schedules and pacing guides, clearly identifies technology requirements, notes prerequisite technology skills, and includes content specific tools.

**13.9** Course materials provide appropriate access for all students, and student information remains confidential as required by the Family Educational Rights and Privacy Act (FERPA).

**13.10** The course is updated regularly noting changes in state and national standards and is facilitated by a highly qualified teacher.

©National Alternative Education Association - All Rights Reserved

16



**56**



## EXEMPLARY PRACTICE 14.0 POLICIES AND PROCEDURES

> - A current policies and procedures manual that is consistent with the vision and mission of the nontraditional or alternative school, approved by the local board of education, and articulated to all stakeholders in the form of standard operating procedures (SOPs) is maintained.
> - The manual is reviewed and updated on a yearly basis.
> - The manual is made available in an electronic and hardcopy format.

### Indicators of Quality Programming:

**14.1** Clearly defined roles and responsibilities for all teaching and support personnel are written and fully explained to nontraditional or alternative school staff.

**14.2** Referral, screening, and intake procedures are outlined and promote timely, user-friendly access to program services for students.

**14.3** Procedures to collect, share, and store individual student records are developed for participants that ensure student confidentiality.

**14.4** Processes are established that coordinate effective placements, assess student needs to match appropriate program services and interventions, and formalize the transition of students from one learning environment to the next.

**14.5** Reliable assessments are identified and inform procedures for developing an individualized student plan that addresses student achievement, effective and affective growth, and college and career readiness skills.

**14.6** Schools have established a thorough written code of conduct and a comprehensive student discipline action plan that outlines rules and behavioral expectations, appropriate interventions, and consequences for infractions.

**14.7** Program policies encourage the active engagement of parents/guardians as equal partners in the planning, implementation, and development of the nontraditional or alternative school.

**14.8** Policies for developing collaborative partnerships with public and private agencies are established and formalized by school/division leadership (i.e., memoranda of understanding or MOU's) and outline the roles and responsibilities of partnered social service organizations in accordance with local education agency guidelines.

**14.9** A formal Crisis Management Plan is developed and managed by school leadership to include strategies that sustain a safe, well-maintained, caring, and orderly program environment that is in compliance with state and local policies, standards, procedures, and legislation.

**14.10** Lists and procedures for conducting emergency drills (fire/tornado drills, shelter in place, lock down) are included in both the school manual and Crisis Management Plan.

**14.11** Procedures to collect, store, and share program data ensure that students, parents/guardians, and staff are protected and identities are preserved.

**14.12** Procurement procedures, time and leave policies, professional development requirements, and professional responsibilities are outlined in a systematic, clear, and concise manner.

[17]

©National Alternative Education Association - All Rights Reserved



## EXEMPLARY PRACTICE 15.0 NONTRADITIONAL EDUCATION PLAN

> ⟩ Individualized curriculum and instruction is implemented using individualized learning plans at exemplary nontraditional or alternative schools.
> ⟩ The individual student plan targets student achievement, effective and affective growth, social skill development, and college and career readiness skills.

### Indicators of Quality Programming:

**15.1** A Student Support Team (SST) is established and involved in forming and monitoring the student's progress on the nontraditional education plan while further providing the reinforcement necessary for achievement.

**15.2** Students and parents/guardians are on the SST and involved in drafting, developing, and implementing the student's plan.

**15.3** Plans are developed based on the student's differentiated (accelerated or remedial) needs.

**15.4** Processes for the nontraditional education plan include reviewing current credit accrual and ensuring the student is making adequate progress toward graduation.

**15.5** Three strands are embedded into the nontraditional education plan that engages the student in post-secondary planning for the following: effective citizenship, independent living, and college and career readiness.

**15.6** Teachers and school counselors utilize individual student data in making instructional decisions and developing the nontraditional education plan.

**15.7** Plans incorporate goals for developing healthy behaviors and effective social skills.

**15.8** The nontraditional education plan addresses required services to meet the educational needs of students with disabilities and second language learners.

**15.9** Student plans are updated on a bi-yearly basis based on informal and formal assessment data, student feedback, and interest inventory results.

**15.10** The students maintain a copy of the plan and reference it during school counseling sessions, teacher conferences, and administrative meetings.

©National Alternative Education Association - All Rights Reserved

18



## Postscript to Exemplary Practices 2.0:  Standards of Quality and Program Evaluation 2014

Students are provided with the opportunity to accelerate their learning, rediscover their capacity as life-long learners, and receive individualized and differentiated instruction to meet the needs of our global student community at exemplary nontraditional and alternative schools. *Exemplary Practices 2.0: Alternative Education Standards of Quality and Program Evaluation 2014* provides the structure to ensure students and those that serve them are provided with the human, capital, and technical resources to create and maintain exemplary schools.  In addition, *Exemplary Practices 2.0* informs school districts, divisions, communities, and their stakeholders on the critical *'look fors'* that should be evident in nontraditional or alternative schools and found in the school community that supports each program.

The result will be a nontraditional or alternative school that communicates high expectations for student and teacher performance, uses student performance data to initiate program development, creates long and short term goals in a transparent manner inclusive of all stakeholders, and celebrates success in an authentic and public manner.

We challenge your educational community to implement these practices not only in your nontraditional or alternative schools, but  also in your traditional schools as well.  You will see graduation rates increase, dropout  rates diminish, and most importantly your schools will thrive and meet the needs of your 21st Century  community.

19

©National Alternative Education Association - All Rights Reserved



## Acknowledgments

Our most socio-economically challenged, emotionally in need, and intellectually starved students deserve the best schools, teachers, and support services. When provided with a world class education, these students become self-sufficient, confident, and motivated life-long learners. They turn despair to hope, create happiness from sadness, and mold failure into success. The National Alternative Education Association, first and foremost, acknowledges the significant contribution our students played in the revision and development of *Exemplary Practices 2.0: Standards of Quality and Program Evaluation 2014*.

In addition to the educational professionals responsible for *Exemplary Practices in Alternative Education: Indicators of Quality Programming 2009*, the membership of the National Alternative Education Association would also like recognize the following organizations for their contributions to *Exemplary Practices 2.0: Standards of Quality and Program Evaluation 2014*: *The American School Counselor Association, National Association of Social Workers, International Association for K-12 Online Learning, Association for Supervision and Curriculum Development*, and Oklahoma Technical Assistance Center. Exemplary practices for nontraditional and alternative education students are derived from the best practices found in world class schools, exemplified by outstanding teachers, and illustrated in the outcomes found across the nation in our nontraditional and alternative schools.

©National Alternative Education Association - All Rights Reserved

*Measuring Success: Accountability for Alternative Education*
Submitted by Dr. Kelly Hurtado
*Measuring Success: Accountability for Alternative Education*. (2017, November). Deeds, C. & DePaoli. Retrieved 4/6/2018 from http://www.aypf.org/wp-content/uploads/2017/11/Measuring-Succes_Accountability-for-Alt.-Ed.-.pdf

This policy report addresses four key topics – Definition of alternative education, Accountability Systems appropriate for alternative settings, Accountability Measures that accurately reflect quality of alternative setting, and how states could use accountability as a tool for Continuous Improvement.

The American Youth Policy Forum (AYPF) and Civic Enterprises hosted two input sessions with state leaders to help guide their study. AYPF conducted a scan of the 50 states plus the District of Columbia and Puerto Rico to learn about alternative education in each entity

This "must-read" report provides up-to-date (November 2017) information about alternative education in the United States. The report is very readable making it appropriate for alternative educators to share with their state policy makers as decisions are made about accountability for alternative education.



# **<u>Exhibit E</u>**

IN THE UNITED STATES DISTRICT COURT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON DIVISION

VIRGINIA ELIZONDO,      |
   Plaintiff,        |
                |
V.                      |      Civil Action No. 4:21-CV-01997
                |
SPRING BRANCH          |
INDEPENDENT SCHOOL     |
DISTRICT, ET AL.,      |
   Defendants.       |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
KAREN HEETH
DECEMBER 29, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL DEPOSITION of KAREN HEETH, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on December 29, 2021, from 11:16 a.m. to
12:13 p.m., before Mendy A. Schneider, CSR, RPR, in
and for the State of Texas, recorded by machine
shorthand, at the offices of Spring Branch ISD
Athletic Center, 1050 Dairy Ashford, Houston, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

```
 1                    A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3
         MR. BARRY ABRAMS
 4       BLANK ROME
         717 Texas Avenue, Suite 1400
 5       Houston, Texas 77002
         (713) 228-6601
 6       Babrams@blankrome.com
 7
     FOR THE DEFENDANTS:
 8
         MR. CHARLES J. CRAWFORD
 9       ABERNATHY ROEDER BOYD HULLETT
         1700 North Redbud Boulevard, Suite 300
10       McKinney, Texas 75069
         (214) 544-4000
11       Ccrawford@abernathy-law.com
12
     ALSO PRESENT:
13        MS. AUDREY SHAKRA
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    EXAMINATION INDEX
 2   WITNESS:   KRISTIN CRAFT
 3       EXAMINATION                                PAGE
             BY MR. ABRAMS                             4
 4
         SIGNATURE REQUESTED                          47
 5
         REPORTER'S CERTIFICATION                     48
 6
                       EXHIBIT INDEX
 7
                                                     PAGE
 8       SBISD EXHIBIT NO. 12                         31
             Staff Fall/Summer by Campus by Ethnicity
 9       Race Report Category
10       SBISD EXHIBIT NO. 13                         35
             SBISD Police Department Data on Race and
11       Ethnicity
12       SBISD EXHIBIT NO. 14                         41
             Survey Responses
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1                          KAREN HEETH,
 2    having been first duly sworn, testified as follows:
 3                    E X A M I N A T I O N
 4    BY MR. ABRAMS:
 5         Q.   Would you please state your name?
 6         A.   Karen Heeth.
 7         Q.   Dr. Heeth, my name is Barry Abrams.  I'm a
 8    lawyer who represents Virginia Elizondo, who is a
 9    resident of Spring Branch Independent School District
10    who has filed a lawsuit against the district and the
11    board members in their official capacities that's
12    pending in federal court here in Houston.
13               Do you understand that's my role and
14    that the lawsuit is pending?
15         A.   Yes.
16         Q.   I'm going to use the term "lawsuit" to refer
17    to the legal proceeding just as a shorthand.
18               If I do that, will you know what I'm
19    talking about?
20         A.   Yes.
21         Q.   What do you do for a living?
22         A.   I'm the associate superintendent of
23    administration and talent.  So that's kind of a big
24    area.  I actually support athletics, the day-to-day
25    operations of the police department.  I've been the
```

```
 1    COVID health safety person.
 2         Q.    You have my condolences?
 3         A.    Yes.  And just safety and security in general
 4    for the district as well as any student issues that
 5    come up from not following the code of conduct.
 6               I've been in this role -- this is going
 7    on my second year.  And I also oversee all of the
 8    human resources aspects, so...
 9         Q.    What is your understanding about the basis of
10    the lawsuit?
11         A.    That Dr. Virginia Elizondo is -- we have a --
12    an at-large election system and she feels as though a
13    single-member election system would be better.
14         Q.    Do you understand that the lawsuit is being
15    brought under a federal law called the "Voting Rights
16    Act" and it is contesting whether the current at-large
17    system that the district uses to elect its board
18    improperly dilutes the voting strength of racial,
19    ethnic, or language minorities in the district?
20    That's the claim?
21         A.    Yes.  Yes.
22         Q.    In front of you is Deposition Exhibit No. 1.
23    That's the notice of deposition.
24               Have you had an opportunity in the past
25    to look at that?
```

```
 1         A.    Yes.
 2         Q.    During the deposition, I'm going to refer to
 3   Spring Branch ISD as "the district" for shorthand.
 4         A.    Okay.
 5         Q.    I might occasionally say "SBISD," but if I
 6   use that expression will you know what I'm talking
 7   about?
 8         A.    Yes.
 9         Q.    You're appearing today as a corporate
10   representative that's been designated to testify about
11   certain topics on behalf of the district.
12               Who made the decision that you would
13   appear as a representative speaking on behalf of the
14   district?
15         A.    Our attorneys and -- that's what I know.
16         Q.    Who made -- who actually authorized you to
17   appear as a representative to speak for the district?
18         A.    Dr. Blaine and our attorneys.
19         Q.    Who made the decision about which of the
20   topics you would be designated to talk about?
21         A.    That was in consultant [verbatim] with our
22   attorneys.
23         Q.    What, if anything, did you do to prepare for
24   your deposition today to be a representative for the
25   district?
```

1    A.   I consulted with the attorneys, reviewed the

2    exhibits, and looked at all the data that we needed.

3    I did talk to Wayne Schaper, Sr., because there were

4    some items I just felt like I didn't have the

5    historical knowledge of.  So I did talk to him.

6              And Dr. Blaine, because she had been

7    over administration for part of her -- one -- one of

8    her jobs that she's done over the years.

9    Q.   **What topics did you consult with Mr. Schaper**

10   **about?**

11   A.   The one about past history of discrimination.

12   And I asked him also about the attendance zones,

13   because I didn't start working in Spring Branch until

14   1999.

15             So everything was in place and so I

16   didn't have any history of how those zones were, you

17   know, brought into being.

18   Q.   **What did Mr. Schaper tell you was the origin**

19   **of the attendance zones for the schools?**

20   A.   He said what he remembered is that our

21   attendance zones were put in place based on the -- the

22   size of the schools and the needs that were related to

23   our bulging attendance, basically.

24             He used Ridgecrest as an example.  He

25   remembered that Cedar Brook and Buffalo Creek were

1   being built.  And he said at the time Ridgecrest
2   enrollment was around 1100 to 1300, which is really
3   large for an elementary.

4            And so when those schools were built,
5   there was a decision made to move some of that
6   enrollment there and also to Treasure Forest.

7            There was a time when they needed to
8   move some kids over to Treasure Forest.

9            But his recollection of how the zones
10  were created were they were based on the neighborhood
11  schools, the elementary schools.

12           And that's why we also don't have like
13  clear feeder patterns because they -- like I said,
14  Ridgecrest was a good example because they -- the
15  elementary schools weren't even built when Ridgecrest
16  was.

17           So Ridgecrest had been taking on a load
18  of students and because of the size of those -- that
19  school, they had to move the kids to the other
20  campuses.

21     **Q.   We'll touch on this in greater detail a**
22  **little bit later.**

23            **But did Mr. Schaper shed any light on**
24  **why in certain specific instances student enrollment**
25  **districts move children from the north side of I-10 to**

1    **schools on the south side of I-10 rather than being**

2    **allocated among schools that are closer to their**

3    **homes?**

4        A.    Dr. Blaine actually shared some information

5    on that with me and she said that -- and it was a

6    conversation she had had when she took on the

7    administration role because also in administration we

8    have to deal with transfers.

9                And so she said that Mr. Schaper had

10   once told her that it was with the neighborhood

11   schools like they are, there were some strange -- like

12   there would be a street where we were having issues

13   with overenrollment at a campus and they kept the

14   schools zoned to -- example is Landrum, they kept the

15   school to Landrum but gave that small -- there's a

16   small area within that zone that those residents get

17   choice and they can go to Spring Branch Middle School

18   if, you know, they choose to do that and as long as

19   they have the grades and behavior, whatever it is that

20   they need to transfer.

21                But she said there's only a couple

22   places where it's like that and it was because what

23   was assumed at the time there was enrollment -- you

24   know, higher enrollment issues and so they zoned --

25   they gave choice to those schools.

```
 1              It wasn't that they were rezoned, but
 2   they gave some choice to 1 or 2 streets or, you know,
 3   an area that they could go and transfer.
 4       Q.   Let me hand you what was earlier marked as
 5   Exhibit 5.  This is a document the district has
 6   provided.  It's off the Web site.  It reflects two
 7   things at least.  It reflects the middle school
 8   enrollment zones.
 9       A.   Uh-huh.
10       Q.   Those happen to correspond to the seven
11   election precincts that the district currently uses.
12   Looking at Exhibit 5, I see a whole area south of Long
13   Point but north of I-10 that appears to be
14   traditionally zoned to Spring Branch Middle School.
15              That's not the kind of area you were
16   talking about where people were zoned to Landrum and
17   given an option to go somewhere else, is it?
18       A.   Without knowing the addresses, because we
19   have to look by address, I -- I really can't -- I
20   can't say for sure.
21       Q.   Okay.
22       A.   I just know that there is an area where those
23   like a street or two --
24       Q.   Sure.
25       A.   -- where they may be given choice.
```

1      Q.   We'll come back to this in greater detail.

2           But did either Dr. Blaine or Mr. Schaper

3  offer an explanation to you about why the student

4  enrollment zone for Spring Branch Middle School

5  encompasses the area that it does north of I-10?

6      A.   No.

7      Q.   Did either Mr. Schaper or Dr. Blaine offer an

8  explanation to you for why the area in the western

9  part of the district for Spring Forest Middle School

10 north of I-10 is zoned south of I-10 to Spring Forest?

11     A.   No.

12     Q.   What else did either Mr. Schaper or

13 Dr. Blaine relate to you that is pertinent to the

14 topics that you're here to talk about?

15     A.   That's all I can remember that they mentioned

16 to me, was that it was our -- Mr. Schaper said he got

17 here in 1988.  I don't know -- I mean, I'm assuming

18 that's in an official capacity here in Spring Branch.

19           I don't know how long he's lived here.

20 He's always been a staple to our community, and I know

21 I see him as a historian somewhat.

22     Q.   He actually was a principal at Memorial in

23 the '60s, so I don't know where the '88 came from.

24 Maybe when he went on the board.

25     A.   Maybe that's what me meant.  Maybe that's

```
 1    what he meant by 1988.  He said his memory is slipping
 2    too, so --
 3        Q.    That may be when he joined the board.
 4        A.    But, anyway, he said that, you know, it
 5    was -- everything with our attendance zone was based
 6    on neighborhood schools.
 7              And, you know, like I said, when I got
 8    here, this was -- these were the zones that --
 9        Q.    Right.
10        A.    -- I knew of.
11        Q.    What else in the way of documentation did you
12    review to prepare to testify?
13        A.    The data, the -- some of the -- the cases
14    that I had discussed with the attorneys just to make
15    sure that I knew which ones, because we were looking
16    at employees and resident kind of cases that would
17    have come up.
18        Q.    This is the complaint topic?
19        A.    Complaints, uh-huh.
20        Q.    Okay.
21        A.    Complaint, yeah.
22        Q.    Did looking at that material refresh your
23    recollection about when there had in the past been
24    complaints about purported mistreatment?
25        A.    Yes.
```

1      Q.    Okay.

2      A.    Yeah.  And those complaints -- I mean,

3  complaints was a very general term, so I -- I wanted

4  to make sure I understood what was meant by that.

5            I took that to mean Level 3 grievances,

6  which the board would have heard because we -- I mean,

7  when you say "complaints," we have 35,000 students and

8  almost 5,000 employees.  So you could get complaints

9  from all different places.

10           But when I looked at Level 3 complaints,

11 TEA complaints, EEOC, OCR, or lawsuits, those were

12 where I focused on, what items I focused on.

13     Q.    And when you did that homework, you reviewed

14 some documents?

15     A.    Yeah.  The -- for Level 3 -- Level 3 I didn't

16 really see anything that went to a Level 3 complaint.

17 When it was a TEA complaints OCR and EEOC, those

18 were -- any complaints that we did have were

19 dismissed.

20           And then the lawsuits, there were three

21 lawsuits and these three also were dismissed, so with

22 no findings on Spring Branch.

23     Q.    With regard to the dismissals that you're

24 referencing, were those rulings that the complaints

25 lacked merit or simply resolutions where the

1    complainant dismissed their complaint or do you

2    recall?

3        A.   What I -- it seemed like it was that they

4    had -- did not have merit.  That's what I can remember

5    from the review of the three.

6             MR. ABRAMS:  Charles, to the extent

7    that's a discrete universe of documents that the

8    witness has reviewed to refresh her recollection, we

9    would request that that material be provided.

10       Q.   (BY MR. ABRAMS)  How long did you spend

11   preparing for your testimony?

12       A.   Maybe 10, 15 hours.

13       Q.   And apart from meeting or talking with the

14   district's lawyers and speaking with Mr. Schaper and

15   Dr. Blaine, did you speak with anyone else to prepare?

16       A.   William Norris.  He's -- he's the one that

17   pulls data for us.  And he -- I wanted to make sure I

18   understood the time frame he was using, because I had

19   also looked at TEA's data.

20            And they use snapshot versus the time

21   frame we used is March.  Because of the Census Bureau,

22   they pull the data every year in March.

23            So our data may be slightly different

24   than what you would see on TEA, but for the most part

25   they're in alignment.

```
 1              And he also is -- he helps with the
 2    elections, and so there was a question about student
 3    registrars.
 4              And I did ask him if we used student
 5    registrars.  And he said, no, that we haven't in past
 6    that he could remember.  He had worked previously with
 7    Karen Wilson, our CFO, and he now works with
 8    Christine.
 9         Q.   What do you mean by the term "student
10    registrars"?
11         A.   There was a question that you-all had about
12    that, and we had gone to the schools to ask them how
13    they -- the process they use.  And I believe there's
14    an exhibit --
15         Q.   Right.
16         A.   -- to that.
17         Q.   Well, let me clarify, then.
18              By the term "student registrars," you're
19    referring to what process there was were registering
20    students as opposed to deputizing a student to be a
21    registrar, right?
22         A.   Yes.
23         Q.   Okay.
24         A.   Yes.
25         Q.   I wanted to make sure I was understanding
```

1    your use of the term.

2         A.   Okay.

3         Q.   We'll come to that topic, and I'm on the same

4    page with you.

5         A.   Okay.

6         Q.   To make this go easily or at least more

7    easily, I want to have several agreements with you.  I

8    want to mention the woman who is seated to your left

9    is a court reporter.

10                 She's taking down my questions and your

11   answers word for word and will type up your testimony

12   in a booklet.  It will look a lot like a script to a

13   play.

14        A.   Okay.

15        Q.   Do you understand that?

16        A.   Yes.

17        Q.   Your testimony today, even though we're in

18   the informal surroundings of a conference room, your

19   Tully Stadium, is every bit as important as it would

20   be if you were testifying in court.

21                 And do you understand that this is

22   formal testimony that will be available for use in the

23   court proceedings?

24        A.   Yes.

25        Q.   You've been doing a very good job of

1  answering out loud to this point.  But it's impossible

2  for our court reporter to be very happy with us if we

3  don't answer out loud rather than using gestures or

4  nods of the head alone or sounds like uh-huh or

5  huh-uh, because those don't translate well to the

6  written record.

7         So will you continue to answer out loud

8  as you have to this point?

9  A.   Yes.

10 Q.   It's very important that you understand my

11 questions because I'm entitled to rely upon your

12 answers.

13        If I ask you a question you don't

14 understand, will you tell me so I can restate it until

15 you do understand it?

16 A.   Yes.

17 Q.   And may I fairly assume that you've

18 understood a question when you've answered it?

19 A.   Yes.

20 Q.   If you want to take a break before we reach

21 the hour mark, I'll be happy to accommodate you.

22 We'll try to break once an hour.

23        I'm not sure we'll make an hour, but

24 we'll see.  But, anyway, this is not going to be a

25 long proceeding.  But if you need a break before I

```
 1   volunteer one, tell me and we'll break.  Okay?
 2       A.   Okay.
 3       Q.   I might refer to Mrs. Elizondo, my client, as
 4   "the plaintiff" or "Virginia Elizondo" or
 5   "Mrs. Elizondo."
 6               If I do, you'll know who I'm referring
 7   to, right?
 8       A.   Uh-huh.  Yes.
 9       Q.   Similarly, I'm going to use the shorthand
10   "the district" or "SBISD" to refer to the Spring
11   Branch Independent School District for convenience.
12               If I use that term, will you know what
13   I'm talking about?
14       A.   Yes.
15       Q.   Similarly, I'm going to use the shorthand
16   word "board" to refer to the Spring Branch Independent
17   School District board of trustees.
18               If I use the term "board," you'll know
19   I'm talking about the board of trustees, right?
20       A.   Yes.
21       Q.   I want to spend just a very few minutes on
22   your background.
23               Where do you reside?
24       A.   I reside at -- you need my address?
25       Q.   Yes, ma'am.
```

```
 1        A.    12170 Shady Fern Court and it's 77065.
 2        Q.    Is that inside or outside the district?
 3        A.    It's outside.  It's Cy-Fair.
 4        Q.    Have you ever been a district resident?
 5        A.    No, I have not.
 6        Q.    Where were you born and raised?
 7        A.    Here in Houston, in the Garden Oaks area.
 8        Q.    Starting with high school, will you give me a
 9   thumbnail sketch of your educational background,
10   please?
11        A.    Sure.  I graduated from Waltrip High School.
12   Went to community college and worked.  And then I went
13   to the University of St. Thomas for my bachelor's and
14   my master's degree in education.
15              And I started in 1999 with Spring
16   Branch.  I -- previous to that, I had worked 20 years
17   in industrial heat treat industries for a calibration
18   company.
19              And in Spring Branch I started out as a
20   classroom teacher at Ridgecrest, and then I became a
21   school improvement specialist for science at the
22   campus, at Ridgecrest.
23              And then was hired at the district, a
24   school support specialist for science.  Did that for
25   several years.
```

```
 1                    Then was an assistant principal at
 2      Sherwood Elementary.  And after doing that, I went to
 3      human resources to be a district recruiter.
 4                    And from the -- after I did the
 5      recruiting job, I was hired as a director for human
 6      resources.
 7                    And then I became the executive director
 8      for human resources.  And now the associate
 9      superintendent for administration and talent.
10           Q.   Am I correct, then, that the only school
11      districts you've worked for has been Spring Branch?
12           A.   Yes.
13           Q.   You're here today as a witness.  You don't
14      have a dog in this fight.
15                    I want to ask you whether you've ever
16      been a party to a lawsuit, meaning the party suing,
17      the person suing, or the person being sued?
18           A.   We -- in the Ms. Silva case that -- one of
19      the cases that I reviewed, she did name me in that
20      case.  So that was a --
21           Q.   What were the allegations or the charges in
22      that case?
23           A.   Ms. Silva claimed that she was discriminated
24      against.  She had been a substitute for us for several
25      years.  And we fired her.
```

```
 1              And I was the person that she spoke
 2   with.  She also named the executive superintendent
 3   of -- or the executive director of talent, the --
 4   our -- her secretary, our attorney.  She named several
 5   people in this lawsuit.
 6              But the bottom line for us was she -- we
 7   had a complaint from a parent that her child had been
 8   required to kneel all day long and we had pictures of
 9   the child's knees.  And the child was a good student
10   in second grade and we'd never had problems or
11   complaints from that parent or that child.
12              We later found out that Ms. Silva had
13   told the children stories about Superman breaking his
14   neck falling out of a chair -- or falling off a horse,
15   but she equated that to falling out of a chair.
16              So the child was made to either sit --
17   kneel or stand all day.  And so, anyway, that was --
18   that's what the reason was for her being let go.  She
19   interpreted that somewhat differently.
20       Q.   Apart from that lawsuit, where you were one
21   of several school personnel named, have you ever been
22   a party to a lawsuit before?
23       A.   No.
24       Q.   Have you ever given a deposition,
25   participated in this type of process before?
```

1       A.    No.

2       Q.    Have you ever testified in any administrative

3    or other types of hearings under oath before?

4       A.    No.

5       Q.    What professional licenses or certifications

6    do you have?

7       A.    Just the teaching certification.  I have my

8    master's principal certification.

9       Q.    Have you ever been charged and convicted of a

10   criminal offense?

11      A.    Oh, I'm sorry.  I also have a SHRM

12   certification.

13      Q.    Could you tell me what that abbreviation is

14   for?

15      A.    For human resources, that's the certification

16   that you get for being certified in that.

17      Q.    Okay.  Have you ever been charged and

18   convicted of a criminal offense?

19      A.    No.

20      Q.    You have in front of you Exhibit 5, which is

21   the map depicting the various student enrollment

22   districts for the middle schools.

23      A.    Uh-huh.

24      Q.    Do you agree with me that four of the seven

25   enrollment zones, those for Landrum, Northbrook,

1  Spring Oaks, and Spring Woods, are overwhelmingly
2  comprised of Hispanic students?
3      A.   I mean, I -- I would feel better seeing the
4  data and saying that, but just based on what I know
5  about that -- those school areas, I would say
6  probably.
7      Q.   I've seen an estimate that the average
8  Hispanic component on those campuses is 87 percent.
9           Does that seem likely to you?
10     A.   That sounds approximately like that number.
11     Q.   And does the district agree that in the
12  remaining three enrollment districts, Memorial, Spring
13  Branch, and Spring Forest, roughly 42 to 52 percent of
14  the students are white?
15     A.   Without seeing the data, I can't say for
16  sure, but I would say that sounds like a reasonable
17  number.
18     Q.   Is the district familiar with what the
19  current ethnic and racial background of the
20  citizenship voting age population of voters in the
21  district is?
22     A.   I don't know.  I don't deal with the
23  elections.
24     Q.   You earlier related to me what Mr. Schaper
25  and Dr. Blaine had related to you --

1      A.    Uh-huh.

2      Q.    -- about the history of the school attendance

3   zones.

4            Do you have any independent knowledge of

5   any other information that explains why the enrollment

6   zones shown on Exhibit 5 have the boundaries that they

7   do?

8      A.    I do not.  I mean, everything I've been told

9   is it was based on the neighborhood schools.  I do

10   know that Spring Branch is landlocked, so I do

11   understand that to be that we don't have extra space

12   to be building a lot of schools like some districts

13   like Cy-Fair.

14            And so I can understand that they would

15   have -- it makes sense to me that they would have

16   started out looking at the elementary schools that

17   were built and then trying to build from there.

18            But these the zones have been in place

19   and I -- I really had nothing to do with how these the

20   attendance zones were put in place.

21      Q.    Do you agree that with the exception of

22   Spring Branch Middle School and Spring Forest Middle

23   School, the middle school zones are divided between

24   schools on the north and south sides of Interstate 10

25   or I-10?

1      A.   That's how it appears on the map.

2      Q.   **Does the district have any explanation for**

3  **why portions of the attendance zone for Spring Branch**

4  **Middle and Spring Forest Middle move students from**

5  **north of I-10 to schools on the south side of I-10?**

6      A.   Other than what I already stated to you, I --

7  I don't know why.

8      Q.   **Let me hand you what was earlier marked as**

9  **Exhibit 6.  That's the district's map of high school**

10  **attendance zones.**

11           **Are you familiar with that?**

12      A.   Yes.

13      Q.   **Like the case with the middle schools, there**

14  **are two schools where students are zoned from the**

15  **north side of I-10 to the south side of I-10, Memorial**

16  **High School and Stratford High School, correct?**

17      A.   Yes.

18      Q.   **What is the racial or ethnic composition of**

19  **the students from the north side of I-10 that is --**

20  **that are zoned to the south side high schools?**

21      A.   Without looking at the data, I -- I can't

22  tell you for sure.

23      Q.   **Let me hand you what was earlier marked as**

24  **Exhibit 4.  That's a map that depicts the location of**

25  **what are commonly referred to as the Memorial**

1    Villages, Bunker Hill Village, Piney Point Village,

2    Hunters Creek Village, Hedwig Village, Spring Valley

3    Village, and Hilshire Village.

4                    Are you familiar with the location of

5    the Memorial Villages within the district?

6       A.    Yes.

7       Q.    Can you confirm that the areas shown on

8    Exhibit 4 for Spring Valley Village and Hilshire

9    Village are among the areas shown on Exhibit 6 that

10   are zoned to Memorial rather than to one of the

11   north-side high schools?

12      A.    That is how it appears on the map, yes.

13      Q.    Do you know what the historical rationale is

14   for zoning the students from Spring Valley and

15   Hilshire Village to the south-side high school rather

16   than to one of the north-side high schools?

17      A.    I don't know, other than I -- I would want to

18   be sure that they are actually zoned and not that

19   they're -- like I was telling you earlier, Dr. Blaine

20   was explaining Landrum had students that were still

21   zoned to Landrum, but they were given choice.

22                    So I just -- I don't know looking at

23   this if that's the case, if they are actually zoned

24   there or if they're given a choice to go to the other

25   school.

1      Q.   I'll represent to you that this is the

2   district's map disclosing to parents and citizens in

3   the community what the existing attendance zones are.

4               And you'll notice, for example, on

5   Exhibit 6 there is an area in the most northern

6   portion of the district where there's a expressed

7   statement that there's an attendance option for some

8   students to go to either Spring Woods or Northbrook,

9   but there's no similar designation for the areas north

10  of I-10 where the students appear to be zoned to

11  Memorial and Stratford.  Right?

12     A.   That's what it looks like on this map, yeah.

13     Q.   Does the district contend that it's simply

14  coincidental that the students that are zoned from the

15  north side of I-10 to Memorial and Stratford are

16  largely white students rather than minority students?

17     A.   Without looking at the data, I can't say for

18  sure, but...

19     Q.   Had the boundaries of the school enrollment

20  or attendance zones been the subject of discussion

21  with any of the municipalities within the district,

22  specifically the Memorial Villages?

23     A.   Not that I know of.

24     Q.   Have the boundaries of the school enrollment

25  or attendance zones been the subject of discussion

1    **with any developers or builders within the district**

2    **who prefer to have their home sites zoned to a**

3    **south-side school?**

4        A.    Dr. Blaine mentioned one David Weekley Homes

5    years ago when they came in.   There's a couple of

6    neighborhoods where they're given choice -- a couple

7    of streets where they're given choice.   They're still

8    zoned.

9                I think she said they're in the Valley

10   Oaks area, but they're actually zoned to Landrum, but

11   they have choice also to go to Spring Branch Middle is

12   what I think she said.

13       **Q.    What was the rationale for acquiescing in a**

14   **developer's request that the residents of its home**

15   **sites be given the opportunity to attend schools south**

16   **of I-10?**

17       A.    She said she couldn't remember what the

18   reason was.   She didn't know if at the time, you

19   know -- back to the attendance, if the attendance was

20   really large in a school at that time, then they would

21   have been given an option.

22                But she said she really couldn't

23   remember.   She just -- she remembered that that

24   happened, but she didn't remember all the reasons

25   behind it.

1          She said but based on what she had

2     learned in the past, it was due to attendance.  And

3     that's the same thing Mr. Schaper said.  If the

4     attendance had gotten really large, then they would

5     look at did they need to move kids to another area.

6          **Q.    Has the district ever taken into account the**

7     **disparate racial and ethnic composition of the schools**

8     **when deciding whether to rezone the school attendance**

9     **zones?**

10          A.    Not to my knowledge.

11          **Q.    Has the district ever investigated or does it**

12     **have any knowledge about whether there's any past**

13     **history of official discrimination concerning the**

14     **rights of minority group members to register, vote, or**

15     **otherwise participate in the democratic processes in**

16     **the district?**

17          A.    I asked Mr. Schaper that question, because I

18     didn't know of any.  And he said there was a case in

19     the '90s.

20               And I believe that was in -- that was in

21     the information the attorneys shared with us -- with

22     me only.  I think it was a Cantu case.  And that one

23     was dismissed.

24          **Q.    What's your understanding about what the**

25     **Cantu case involved?**

1    A.    It was also around our at-large voting and

2    they -- they were claiming discrimination to the

3    minorities for not having an opportunity.

4    **Q.    Is the district aware that the predecessor to**

5    **the district, the Spring Branch schools had an**

6    **official policy of segregating white and black**

7    **students in separate schools in the Spring Branch**

8    **area?**

9    A.    I don't know of any.  I mean, I would imagine

10   we've been -- this is our 75th year.  So I -- I just

11   would say that all school districts were probably

12   dealing with that back in that period of time, but I

13   don't know of any and Mr. Schaper didn't mention any

14   to me.

15   **Q.    Is the district -- does the district**

16   **acknowledge that in the past it officially supported**

17   **for a period of time a breakaway in segregated school**

18   **district in west Houston?**

19   A.    I don't have any knowledge of that.

20   **Q.    Has the district investigated or does it have**

21   **any knowledge about the extent to which there is a**

22   **past history of official discrimination against the**

23   **rights of minority group members to register, vote, or**

24   **otherwise participate in the democratic processes in**

25   **the municipal governments that make up the district,**

1   specifically the Memorial Villages of the City of

2   Houston?

3       A.   Again, I asked Mr. Schaper about that, and I

4   don't have any -- he didn't have anything other than

5   that one case in the '90s that he told me about.  And

6   I don't have any other knowledge about that.

7       Q.   I'm going to turn now to the racial and

8   ethnic composition of teachers, staff, and employees

9   in the district.

10              (Marked Heeth Exhibit No. 12.)

11       Q.   (BY MR. ABRAMS)  Let me hand you what's been

12   marked as Exhibit 12.  This is a document the district

13   has produced with document No. SBISD 000079 titled

14   "Staff Fall/Summer by Campus by Ethnicity Race Report

15   Category."

16              Are you familiar with this report?

17       A.   Yes.

18       Q.   What is it?

19       A.   It's the information that is pulled from TEA

20   on our campus ethnic and race breakdown.

21       Q.   In your position with the district overseeing

22   various employment matters, are you generally familiar

23   with what the percentage of minority teachers and

24   staff are throughout the district?

25       A.   Yes.

1      Q.   This report, Exhibit 12, does this purport to

2   deal with all staff, teachers, nonteachers?

3                    I mean, what -- what group does this

4   report purport to encompass?

5      A.   Without saying for sure how they pulled it

6   off of TEA, I mean, I would -- this looks like it's

7   a -- probably a teacher pull, not an all staff,

8   because when we do all staff and compare Hispanic to

9   non -- non-Hispanic, since about 2014, the numbers are

10   more Hispanic than they are non-Hispanic, based on

11   what I can see here.

12      Q.   Yeah, I -- I don't believe I've received

13   another report that purports to tell me staff versus

14   teachers.

15                    So your impression is, from looking at

16   the number of people on the report for each school,

17   that this -- this relates to teachers and not all

18   employees on a campus?

19      A.   That's what I -- I would think.  I -- I just

20   don't know for sure because there's various ways to

21   pull these reports from TEA.  And I don't know if it's

22   all staff or teachers.

23                    MR. ABRAMS:  Well, We don't have to

24   clarify that today, but I would like to get a

25   clarification because I'm interested in knowing what

 1    data exists.  Let me stop for a minute.

 2              (Discussion off the record.)

 3        Q.   (BY MR. ABRAMS)  I'm interested in being able

 4    to evaluate what the racial and ethnic composition of

 5    teachers, nonteachers around.

 6              And so I just don't know.  When I looked at

 7    this report, Exhibit 12, and it said "staff," I didn't

 8    know whether it was teachers, all employees, or

 9    nonteacher staff.

10              And so if we could get some clarification on

11    that.  And I understood you to say there is some other

12    report that I don't think I've seen, that by staff

13    breaks out the race and ethnicity.

14              And your impression is that more recently the

15    nonteacher staff is more heavily Hispanic than -- than

16    white?

17        A.   It -- when we pull all staff --

18        Q.   Yes, ma'am.

19        A.   -- we look at Hispanic versus non-Hispanic.

20              And over the last several years the

21    non -- the Hispanic group has gotten to be slightly

22    larger than the non-Hispanic.

23        Q.   Right.  And what I want to be able to do is

24    to compare the ratio, the ethnic and racial

25    composition of administrators, teachers, and staff.

1      A.    Right.

2      Q.    **As a general proposition, would you agree**

3    **with me that the vast majority of the upper level**

4    **district staff is comprised of white employees?**

5      A.    Yes.  And when I compare our percentages to

6    the statewide percentages, they're very similar to the

7    state -- what the state demographics look like.

8      Q.    **Do you agree that the demographics of the**

9    **upper level staff in the district do not correspond to**

10   **the population demographics of the district, that is**

11   **to say there are a lot more white administrators than**

12   **Hispanic and the Hispanic population is a much larger**

13   **percentage of the district population than is**

14   **reflected in its administrative staff?**

15     A.    Again, we're not looking at the data, but I

16   would say it's possible that that's the -- the case

17   most probably the -- I will also say we just need more

18   teachers, leaders.  We need more employees period in

19   education and the pool is not very large for people

20   going into education.

21     Q.    **On the assumption that Exhibit 12 is**

22   **teachers, because that's your best --**

23     A.    Uh-huh.

24     Q.    **-- understanding today, does Exhibit 12,**

25   **then, reflect the racial and ethnic breakdown of the**

1    teachers on the various campuses in the district?

2        A.   Without knowing exactly how this was pulled,

3    I would say, yes, this looks similar to the data that

4    I have seen.

5               (Marked Heeth Exhibit No. 13.)

6        Q.   (BY MR. ABRAMS)  Let me hand you what's been

7    marked as Exhibit 13.

8               Can you tell me what that is, please?

9        A.   This is data pulled on our police department

10   on race and ethnicity.

11       Q.   I was trying to understand the organization

12   of Exhibit 13.  And it appears to me that what we have

13   is the EEOC race by classified position over a period

14   of time.

15               So starting at the top, for example, it

16   says captain police department and that's fiscal year

17   '11 through '18, correct?

18       A.   Yes, that's what I see there.

19       Q.   So that's one position.  And during that

20   period of time, that one position was occupied by

21   someone that is classified as white?

22       A.   Yes.  That was the same individual that was

23   in that position for all those years.

24       Q.   I'm just trying to understand the report.

25   This is not a criticism.

1           **So what happens after '18 for that**

2   **position?**

3       A.   We froze the position and it did not get

4   filled until recently.

5       **Q.   Recently meaning after this report was run?**

6       A.   We reinstated the position in 2021, so this

7   school year.

8       **Q.   Oh, I see.**

9           **So there is a police -- captain police**

10  **department became police captain 2021?**

11      A.   Yes.  Yes.

12      **Q.   I'm with you.  So that's -- that column --**

13      A.   Yes.

14      **Q.   -- and those entries all correspond to one**

15  **position?**

16      A.   Yeah.  We had a new chief of police come in.

17  And he wanted time to look at the organization and

18  determine what the needs were of the campus.

19           So we just did not fill it.  We held

20  that position, what we call freezing a position.  And

21  then this year he decided he did want to fill that

22  with the captain position.

23      **Q.   And when I look at the position of corporal,**

24  **that seems to have ended in '18 and not been**

25  **reinstated.**

```
 1                    So that position has been eliminated or
 2     at least not filled?
 3          A.    Correct.  He's restructured, so now he has
 4     the captain and he has lieutenants and then his
 5     sergeants and the police officers, so...
 6          Q.    And then when we move to the lieutenant
 7     category, there are two entries for 2021 "lieutenant
 8     police (EMER management)."
 9                    So does that suggest there are two
10     positions, one held by a Hispanic, one held by a
11     white?
12          A.    No.  He has a total of three lieutenant
13     positions now and --
14          Q.    Oh.
15          A.    -- so that's --
16          Q.    Two white, one Hispanic?
17          A.    Yes.
18          Q.    Okay.  So you need to look at the year to
19     figure out whether it's the current data and then
20     track back to the left-hand column to figure out the
21     position?
22          A.    Yeah.
23          Q.    Okay.  I'm just trying to understand the
24     report.  And the same thing is true on police
25     officers, I can -- other than divining a pattern, if I
```

**want to know what police officers are currently on the force, I can skip all the pages until I get to 814, SBISD 814, and that will tell me what positions currently exist in the race or ethnicity --**

A. Yes.

**Q. -- of the police officers for 2021?**

A. Yes. On this report that's how it's listed.

**Q. Okay. I'm not going to ask you to do the math for me. We can -- I'll do the math myself at some point. But I couldn't understand the report, so I -- the math is what the math is. So help -- thank you for helping me understand the report.**

**As a general proposition, would you agree with me that if you exclude the professional staff from your calculation, the majority of the nonprofessional staff in the district are minority employees?**

A. Yes.

**Q. Would you agree with me that if you exclude the nonprofessional staff, that the majority of the professional staff in the district are white employees?**

A. That one is a little harder because professional staff I feel -- I would feel better looking at the data on that, but it -- it's possible

```
 1    that it is because just like our percentages for
 2    teachers have been predominantly white, it's in
 3    those -- if those people got a job, they would move up
 4    to a professional, I would say most probably.  But
 5    without looking at the data, I -- I'm guessing yes.
 6        Q.    And what data would you need to consult that
 7    you don't yet have before you to answer that question
 8    definitively?
 9        A.    We have -- like I told you, we run those
10    reports with our Hispanic, non-Hispanic, look at the
11    categories.
12              I know I've looked at it on teachers,
13    principals, like leadership positions, administrative
14    roles.
15              But I don't know that we've pulled it
16    specifically for all professionals, because that can
17    be several different categories of individuals.
18        Q.    Well, let's use the category that you
19    indicate you're more familiar with, what you
20    categorize as leadership roles.
21        A.    Uh-huh.
22        Q.    Who falls within the label or the scope of
23    the term "leadership role"?
24        A.    For administrators, anyone that would be like
25    campus principals, assistant principals, up to a
```

```
 1   director, executive director, those types of
 2   positions.
 3       Q.   And with respect to the leadership roles as
 4   you've defined it within the district, are a majority
 5   of those positions filled by white employees?
 6       A.   Yes.  Non-Hispanic, yes.
 7       Q.   Non-Hispanic whites.  Okay.
 8            Can you make the same general statement
 9   for me about the composition of the leadership in the
10   police department, whether the leadership above the
11   police officer ranks within the police department is
12   majority white?
13       A.   I would say yes based on this data here.
14       Q.   I now want to turn to the topic that you
15   touched on earlier, which was the district's use of
16   student registrars as allowed by the election code.
17       A.   Uh-huh.
18       Q.   Are you familiar with the fact that there is
19   a state law that states that each principal of a
20   public or private high school or the principals
21   designee shall serve as a deputy registrar for the
22   county?
23       A.   Yes.
24       Q.   Are you familiar with the state law that says
25   that at least twice each school year, a high school
```

1    deputy registrar shall distribute and officially

2    prescribe a registration application form to each

3    student who is or will be 18 during that year?

4        A.   Yes.

5        Q.   And are you familiar with the law that says

6    each application form distributed must be accompanied

7    by a notice informing the student or the employee that

8    the application may be submitted in person or by mail

9    to the voter registrar?

10       A.   Yes.

11       Q.   Do you agree with me that the district has

12   not been compliant with that statute in that it has

13   not assured that its principal -- principals each year

14   inform every student who is 18 or older of their right

15   to vote and provided them with an application form as

16   required by the statute?

17            MR. CRAWFORD:  Objection; form.

18       A.   Yeah.  I mean, I'm new to this role, and I

19   just found out about that Election Code.  When the

20   question was given to me, I was -- I -- I was unaware

21   of it, so I --

22       Q.   (BY MR. ABRAMS)  This is not a criticism of

23   you.  I'm merely asking about procedures.

24            (Marked Heeth Exhibit No. 14.)

25       Q.   (BY MR. ABRAMS)  This is Exhibit 14.  It bears

1    SBISD Document No. 874.

2         **Are you familiar with this survey, set of**

3    **survey responses?**

4         A.   I am.  Our community superintendent,

5    Dr. Bryan Williams, asked our principals to share what

6    they -- how they take care of this and this is the

7    information that he received.

8         Q.   **Do you recall the time frame during which**

9    **this response was provided?**

10         **Is this the most current information**

11    **that the district has about how, if at all, it has**

12    **been dealing with voter registration in the high**

13    **schools?**

14         A.   This is the only information I've seen.  So

15    like I said, until I got notice that we were going to

16    do this deposition, I did not know about -- about

17    this.

18         Q.   **Right.**

19         A.   So...

20         Q.   **On behalf of the district, can you tell me is**

21    **this current information about what each campus**

22    **principal has reported goes on at their campus?**

23         A.   Yes.  It's my understanding this is current

24    information that was collected from our campus

25    principals.

1    Q.   And are you familiar with the principals'
2  responses --
3    A.   Yes.
4    Q.   -- that are shown?
5    A.   I'm familiar with this document, yes.
6    Q.   Right.
7         And do you agree with me that when you
8  read through the responses, they don't reflect that on
9  each campus at least twice a year, the principal or
10 its designee is distributing a registration form to
11 each student 18 or older along with a notice informing
12 the student or employee about how to submit their
13 application?
14   A.   Based on that information in this document,
15 yes.
16   Q.   Once I have a chance to confer with counsel
17 for the district about some of the documents you
18 reviewed to refresh your recollection and to clarify
19 some of the questions that you seem to have in your
20 own mind --
21   A.   Yeah.
22   Q.   -- about the data that we have, I might in
23 the future have additional questions, but I don't
24 currently have any additional questions --
25   A.   Sure.

```
 1        Q.   -- for you.
 2             Do you believe you've understood my
 3   questions here today except for when you told me you
 4   didn't?
 5        A.   Yes.
 6        Q.   And have you understood the questions you've
 7   answered?
 8        A.   Yes.
 9        Q.   Are there any answers you would like to now
10   change or correct?
11        A.   No.  I mean, the data that I have just looks
12   different.  I mean, we categorize it slightly
13   different than what is data shown here.
14             And I'm sure you can share that data,
15   but, yes, we -- I mean, to your question about our
16   ethnic makeup, we are primarily white.
17             But when you look at the State's data
18   also, in the field of teaching that's what you're
19   going to see and our numbers really line up with the
20   State's data also for the breakdowns of our race and
21   ethnicity percentages.
22        Q.   I believe you're telling me, and correct if
23   I'm wrong, that the district's percentage of employees
24   broken down by race and ethnicity corresponds to the
25   State average?
```

```
 1        A.   Yes.
 2        Q.   Anything else you would like to share?
 3        A.   No.  I feel like I went to the people I
 4   needed to -- to ask questions of and looked at the
 5   data I needed to.
 6        Q.   Thank you very much for your time and thank
 7   you for taking time out during your break.
 8        A.   Thank you.
 9             MR. CRAWFORD:  We'll reserve questions.
10   Thank you very much.
11                  (The deposition concluded at 12:13 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1            WITNESS CORRECTIONS AND SIGNATURE
2         Please indicate changes on this sheet of paper,
      giving the change, page number, line number and reason
3     for the change.  Please sign each page of changes.
4     PAGE/LINE        CORRECTION        REASON FOR CHANGE
5     6/21  Change "consultant" to "consultation" - Correct word choice
6     14/20  Change "they" to "TEA."    - To identify "they" referred to TEA
7     14/20  Change "use" to "uses the"
8     14/20  Change "snapshot" to "Snapshot date"  To clarify what data was
                                                    used and when it
9     14/21  Change "is" to "; which was March."   was pulled -
10    14/22  Change "they" to "we"    - clarify "we" SBISD pulled data
                                         at a different time.
11    15/1  Change "he" to "William"    To identify the individual
12    15/8  Add "Porter" after Christine    To identify the individual.
13    15/12  Change "schools" to "principals" - Clarify that principals
14    15/12  Change "how" to "what" - correct word choice   were asked about the process
15    15/13  Delete "they - the"    - Not needed
16    21/9  Add "bruised" knees    Include detail
17    22/12  Add SHRM-SCP    Clarification of certification
18    22/15  Add Society of Human Resources Management - Senior Certified Professional
19          To define the SHRM-SCP abbreviation. -
20    23/10  Change "that" to "the"  - Correct word
21    24/9  Add "elementary" before schools  - clarify elementary neighborhood
                                                schools
22    24/19  Add "Since I've been in SBISD"  - clarify the time frame
23              Karen Heeth
              KAREN HEETH
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1          WITNESS CORRECTIONS AND SIGNATURE
 2        Please indicate changes on this sheet of paper,
        giving the change, page number, line number and reason
 3      for the change.  Please sign each page of changes.
 4      PAGE/LINE        CORRECTION       REASON FOR CHANGE
 5      26/21   Change "choice" to "opportunity transfer"   To use
 6      28/6    Change "choice" to "opportunity transfer"   appropriate
                                                            transfer
 7      28/7    Change "choice" to "opportunity transfer"   language
 8      28/8    Add "to one campus"  -  To clarify students are
 9                                     zoned to one campus eventhough
                                       they are offered an
10                                     opportunity transfer.
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23              Karen Heeth
                KAREN HEETH
24
25
```

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
1              S I G N A T U R E   O F   W I T N E S S

2

3       I, KAREN HEETH, solemnly swear or affirm under the

4    pains and penalties of perjury that the foregoing

5    pages contain a true and correct transcript of the

6    testimony given by me at the time and place stated

7    with the corrections, if any, and the reasons therefor

8    noted on the foregoing correction page(s).

9

10

                    _____
11                  KAREN HEETH

12

13

14

15

16   Job 70099

17

18

19

20

21

22

23

24

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT
                  COURT FOR THE SOUTHERN
 2            DISTRICT OF TEXAS HOUSTON DIVISION

 3

    VIRGINIA ELIZONDO,   |
 4       Plaintiff,      |
                         |
 5  V.                   |   Civil Action No. 4:21-CV-01997
                         |
 6  SPRING BRANCH         |
    INDEPENDENT SCHOOL    |
 7  DISTRICT, ET AL.,     |
        Defendants.       |

 8

    THE STATE OF TEXAS :
 9  COUNTY  OF  HARRIS :
10      I, MENDY A. SCHNEIDER, a Certified Shorthand
11  Reporter in and for the State of Texas, do hereby
12  certify that the facts as stated by me in the caption
13  hereto are true; that the above and foregoing answers
14  of the witness, KAREN HEETH, to the interrogatories as
15  indicated were made before me by the said witness
16  after being first duly sworn to testify the truth, and
17  same were reduced to typewriting under my direction;
18  that the above and foregoing deposition as set forth
19  in typewriting is a full, true, and correct transcript
20  of the proceedings had at the time of taking of said
21  deposition.
22          I further certify that I am not, in any
23  capacity, a regular employee of the party in whose
24  behalf this deposition is taken, nor in the regular
25  employ of this attorney; and I certify that I am not
```

```
 1  interested in the cause, nor of kin or counsel to
 2  either of the parties.
 3
 4          That the amount of time used by each party at
 5  the deposition is as follows:
 6
            MR. ABRAMS - 00:56:58
 7
 8          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
    this, the ____ day of _____, 2022.
 9
10
                    _____
11                  MENDY A. SCHNEIDER, CSR, RPR
                    Certification No.:  7761
12                  Expiration Date:  1-31-2023
13
14  Worldwide Court Reporters, Inc.
    Firm Registration No. 223
15  3000 Weslayan, Suite 235
    Houston, TX 77027
16  (713) 572-2000
17
18
19
20
21
22
23
24
25
```

**A**

a.m 1:16
abbreviation
  22:13
ABERNATHY
  2:9
able 33:3,23
above-styled
  1:15
Abrams 2:3 3:3
  4:4,7 14:6,10
  31:11 32:23
  33:3 35:6
  41:22,25 49:6
accommodate
  17:21
accompanied
  41:6
account 29:6
acknowledge
  30:16
acquiescing
  28:13
Act 5:16
Action 1:5 48:5
additional 43:23
  43:24
address 10:19
  18:24
addresses 10:18
administration
  4:23 7:7 9:7,7
  20:9
administrative
  22:2 34:14
  39:13
administrators
  33:25 34:11
  39:24
affirm 47:3
age 23:20
ago 28:5
agree 22:24
  23:11 24:21
  34:2,8 38:14
  38:19 41:11

43:7
agreements 16:7
AL 1:7 48:7
alignment 14:25
allegations
  20:21
allocated 9:2
allowed 40:16
amount 49:4
answer 17:3,7
  39:7
answered 17:18
  44:7
answering 17:1
answers 16:11
  17:12 44:9
  48:13
anyway 12:4
  17:24 21:17
apart 14:13
  21:20
appear 6:13,17
  27:10
appearing 6:9
appears 10:13
  25:1 26:12
  35:12
application 41:2
  41:6,8,15
  43:13
approximately
  23:10
area 4:24 9:16
  10:3,12,15,22
  11:5,8 19:7
  27:5 28:10
  29:5 30:8
areas 23:5 26:7
  26:9 27:9
Ashford 1:18
asked 7:12 29:17
  31:3 42:5
asking 41:23
aspects 5:8
assistant 20:1
  39:25
associate 4:22

20:8
assume 17:17
assumed 9:23
assuming 11:17
assumption
  34:21
assured 41:13
at-large 5:12,16
  30:1
Athletic 1:18
athletics 4:24
attached 1:19
attend 28:15
attendance 7:12
  7:19,21,23
  12:5 24:2,20
  25:3,10 27:3,7
  27:20,25 28:19
  28:19 29:2,4,8
attorney 21:4
  48:25
attorneys 6:15
  6:18,22 7:1
  12:14 29:21
AUDREY 2:13
authorized 6:16
available 16:22
Avenue 2:4
average 23:7
  44:25
aware 30:4

**B**

Babrams@bla...
  2:6
bachelor's 19:13
back 11:1 28:19
  30:12 37:20
background
  18:22 19:9
  23:19
Barry 2:3 4:7
based 7:21 8:10
  12:5 23:4 24:9
  29:1 32:10
  40:13 43:14
basically 7:23

basis 5:9
bears 41:25
behalf 6:11,13
  42:20 48:24
behavior 9:19
believe 15:13
  29:20 32:12
  44:2,22
best 34:22
better 5:13 23:3
  38:24
big 4:23
bit 8:22 16:19
black 30:6
Blaine 6:18 7:6
  9:4 11:2,7,13
  14:15 23:25
  26:19 28:4
BLANK 2:4
board 4:11 5:17
  11:24 12:3
  13:6 18:16,17
  18:18,19
booklet 16:12
born 19:6
bottom 21:6
Boulevard 2:9
boundaries 24:6
  27:19,24
BOYD 2:9
Branch 1:6,17
  4:9 6:3 7:13
  9:17 10:14
  11:4,18 13:22
  18:11,16 19:16
  19:19 20:11
  23:13 24:10,22
  25:3 28:11
  30:5,7 48:6
break 17:20,22
  17:25 18:1
  45:7
breakaway
  30:17
breakdown
  31:20 34:25
breakdowns

44:20
breaking 21:13
breaks 33:13
broken 44:24
Brook 7:25
brought 5:15
  7:17
Bryan 42:5
Buffalo 7:25
build 24:17
builders 28:1
building 24:12
built 8:1,4,15
  24:17
bulging 7:23
Bunker 26:1
Bureau 14:21

**C**

C 2:1
calculation
  38:15
calibration
  19:17
call 36:20
called 5:15
campus 3:8 9:13
  19:22 31:14,20
  32:18 36:18
  39:25 42:21,22
  42:24 43:9
campuses 8:20
  23:8 35:1
Cantu 29:22,25
capacities 4:11
capacity 11:18
  48:23
captain 35:16
  36:9,10,22
  37:4
caption 48:12
care 42:6
case 20:18,20,22
  25:13 26:23
  29:18,22,25
  31:5 34:16
cases 12:13,16

20:19
**categories** 39:11
    39:17
**categorize** 39:20
    44:12
**category** 3:9
    31:15 37:7
    39:18
**cause** 1:16 49:1
**Ccrawford@a...**
    2:11
**Cedar** 7:25
**Census** 14:21
**Center** 1:18
**certain** 6:11
    8:24
**certification** 3:5
    22:7,8,12,15
    49:11
**certifications**
    22:5
**certified** 22:16
    48:10
**certify** 48:12,22
    48:25
**CFO** 15:7
**chair** 21:14,15
**chance** 43:16
**change** 44:10
    46:2,3,4
**changes** 46:2,3
**charged** 22:9,17
**charges** 20:21
**Charles** 2:8 14:6
**chief** 36:16
**child** 21:7,9,11
    21:16
**child's** 21:9
**children** 8:25
    21:13
**choice** 9:17,25
    10:2,25 26:21
    26:24 28:6,7
    28:11
**choose** 9:18
**Christine** 15:8
**citizens** 27:2

**citizenship**
    23:20
**City** 31:1
**Civil** 1:5,18 48:5
**claim** 5:20
**claimed** 20:23
**claiming** 30:2
**clarification**
    32:25 33:10
**clarify** 15:17
    32:24 43:18
**classified** 35:13
    35:21
**classroom** 19:20
**clear** 8:13
**client** 18:3
**closer** 9:2
**code** 5:5 40:16
    41:19
**coincidental**
    27:14
**collected** 42:24
**college** 19:12
**column** 36:12
    37:20
**come** 5:5 11:1
    12:17 16:3
    36:16
**commonly** 25:25
**community**
    11:20 19:12
    27:3 42:4
**company** 19:18
**compare** 32:8
    33:24 34:5
**complainant**
    14:1
**complaint** 12:18
    12:21 13:16
    14:1 21:7
**complaints**
    12:19,24 13:2
    13:3,7,8,10,11
    13:17,18,24
    21:11
**compliant** 41:12
**component** 23:8

**composition**
    25:18 29:7
    31:8 33:4,25
    40:9
**comprised** 23:2
    34:4
**concerning**
    29:13
**concluded** 45:11
**condolences** 5:2
**conduct** 5:5
**confer** 43:16
**conference**
    16:18
**confirm** 26:7
**consult** 7:9 39:6
**consultant** 6:21
**consulted** 7:1
**contain** 47:5
**contend** 27:13
**contesting** 5:16
**continue** 17:7
**convenience**
    18:11
**conversation** 9:6
**convicted** 22:9
    22:18
**corporal** 36:23
**corporate** 6:9
**correct** 20:10
    25:16 35:17
    37:3 44:10,22
    47:5 48:19
**correction** 46:4
    47:8
**corrections** 46:1
    47:7
**correspond**
    10:10 34:9
    36:14
**corresponds**
    44:24
**counsel** 43:16
    49:1
**county** 40:22
    48:9
**couple** 9:21 28:5

28:6
**court** 1:1,2 4:12
    16:9,20,23
    17:2 19:1 48:1
    48:1 49:14
**COVID** 5:1
**CRAFT** 3:2
**CRAWFORD**
    2:8 41:17 45:9
**created** 8:10
**Creek** 7:25 26:2
**criminal** 22:10
    22:18
**criticism** 35:25
    41:22
**CSR** 1:16 49:11
**current** 5:16
    23:19 37:19
    42:10,21,23
**currently** 10:11
    38:1,4 43:24
**Cy-Fair** 19:3
    24:13

----

**D**

**Dairy** 1:18
**data** 3:10 7:2
    12:13 14:17,19
    14:22,23 23:4
    23:15 25:21
    27:17 33:1
    34:15 35:3,9
    37:19 38:25
    39:5,6 40:13
    43:22 44:11,13
    44:14,17,20
    45:5
**Date** 49:12
**David** 28:4
**day** 21:8,17 49:8
**day-to-day** 4:24
**deal** 9:8 23:22
    32:2
**dealing** 30:12
    42:12
**December** 1:12
    1:16

**decided** 36:21
**deciding** 29:8
**decision** 6:12,19
    8:5
**Defendants** 1:8
    1:15 2:7 48:7
**defined** 40:4
**definitively** 39:8
**degree** 19:14
**democratic**
    29:15 30:24
**demographics**
    34:7,8,10
**department**
    3:10 4:25 35:9
    35:16 36:10
    40:10,11
**depicting** 22:21
**depicts** 25:24
**deposition** 1:10
    1:14,19 5:22
    5:23 6:2,24
    21:24 42:16
    45:11 48:18,21
    48:24 49:5
**deputizing**
    15:20
**deputy** 40:21
    41:1
**designated** 6:10
    6:20
**designation** 27:9
**designee** 40:21
    43:10
**detail** 8:21 11:1
**determine** 36:18
**developer's**
    28:14
**developers** 28:1
**different** 13:9
    14:23 39:17
    44:12,13
**differently** 21:19
**dilutes** 5:18
**direction** 48:17
**director** 20:5,7
    21:3 40:1,1

disclosing 27:2
discrete 14:7
discriminated 20:23
discrimination 7:11 29:13 30:2,22
discussed 12:14
discussion 27:20 27:25 33:2
dismissals 13:23
dismissed 13:19 13:21 14:1 29:23
disparate 29:7
distribute 41:1
distributed 41:6
distributing 43:10
district 1:1,2,7 4:9,10 5:4,17 5:19 6:3,11,14 6:17,25 10:5 10:11 11:9 18:10,11,17 19:2,4,23 20:3 23:11,18,21 25:2 26:5 27:6 27:13,21 28:1 29:6,11,16 30:4,5,15,15 30:18,20,25 31:9,12,21,24 34:4,9,10,13 35:1 38:16,21 40:4 41:11 42:11,20 43:17 48:1,2,7
district's 14:14 25:9 27:2 40:15 44:23
districts 8:25 20:11 22:22 23:12 24:12 30:11
divided 24:23
divining 37:25

DIVISION 1:2 48:2
document 10:5 31:12,13 42:1 43:5,14
documentation 12:11
documents 13:14 14:7 43:17
dog 20:14
doing 16:25 20:2
Dr 4:7 5:11 6:18 7:6 9:4 11:2,7 11:13 14:15 23:25 26:19 28:4 42:5
due 29:2
duly 1:15 4:2 48:16

———
E
———
E 2:1,1 4:3 47:1 47:1
earlier 10:4 23:24 25:8,23 26:19 40:15
easily 16:6,7
education 19:14 34:19,20
educational 19:9
EEOC 13:11,17 35:13
either 11:2,7,12 21:16 27:8 49:2
elect 5:17
election 5:12,13 10:11 40:16 41:19
elections 15:2 23:23
elementary 8:3 8:11,15 20:2 24:16
eliminated 37:1
Elizondo 1:4 4:8

5:11 18:3,4,5 48:3
EMER 37:8
employ 48:25
employee 41:7 43:12 48:23
employees 12:16 13:8 31:8 32:18 33:8 34:4,18 38:17 38:22 40:5 44:23
employment 31:22
encompass 32:4
encompasses 11:5
ended 36:24
enrollment 8:2,6 8:24 9:23,24 10:8 11:4 22:21,25 23:12 24:5 27:19,24
entitled 17:11
entries 36:14 37:7
equated 21:15
estimate 23:7
ET 1:7 48:7
ethnic 5:19 23:19 25:18 29:7 31:8,20 33:4,24 34:25 44:16
ethnicity 3:8,11 31:14 33:13 35:10 38:4 44:21,24
evaluate 33:4
exactly 35:2
EXAMINATI... 3:1,3
example 7:24 8:14 9:14 27:4 35:15
exception 24:21
exclude 38:14,19

executive 20:7 21:2,3 40:1
exhibit 3:6,8,10 3:12 5:22 10:5 10:12 15:14 22:20 24:6 25:9,24 26:8,9 27:5 31:10,12 32:1 33:7 34:21,24 35:5 35:7,12 41:24 41:25
exhibits 7:2
exist 38:4
existing 27:3
exists 33:1
Expiration 49:12
explaining 26:20
explains 24:5
explanation 11:3,8 25:2
expressed 27:6
expression 6:6
extent 14:6 30:21
extra 24:11

———
F
———
F 47:1
fact 40:18
facts 48:12
fairly 17:17
Fall/Summer 3:8 31:14
falling 21:14,14 21:15
falls 39:22
familiar 23:18 25:11 26:4 31:16,22 39:19 40:18,24 41:5 42:2 43:1,5
federal 4:12 5:15
feeder 8:13
feel 23:3 38:24

38:24 45:3
feels 5:12
felt 7:4
Fern 19:1
field 44:18
fight 20:14
figure 37:19,20
filed 4:10
fill 36:19,21
filled 36:4 37:2 40:5
findings 13:22
fired 20:25
Firm 49:14
first 4:2 48:16
fiscal 35:16
focused 13:12,12
following 5:5
follows 4:2 49:5
force 38:2
foregoing 47:4,8 48:13,18
Forest 8:6,8 11:9,10 23:13 24:22 25:4
form 41:2,6,15 41:17 43:10
formal 16:22
forth 48:18
found 21:12 41:19
four 22:24
frame 14:18,21 42:8
freezing 36:20
front 5:22 22:20
froze 36:3
full 48:19
further 48:22
future 43:23

———
G
———
G 47:1
Garden 19:7
general 5:3 13:3 34:2 38:13 40:8

Page 53

generally 31:22
gestures 17:3
give 19:8
given 10:17,25
  21:24 26:21,24
  28:6,7,15,21
  41:20 47:6
  49:8
giving 46:2
go 9:17 10:3,17
  16:6 21:18
  26:24 27:8
  28:11
goes 42:22
going 4:16 5:6
  6:2 17:24 18:9
  18:15 31:7
  34:20 38:8
  42:15 44:19
good 8:14 16:25
  21:9
gotten 29:4
  33:21
governments
  30:25
grade 21:10
grades 9:19
graduated 19:11
greater 8:21
  11:1
grievances 13:5
group 29:14
  30:23 32:3
  33:21
guessing 39:5

**H**

hand 10:4 25:8
  25:23 31:11
  35:6 49:8
happen 10:10
happened 28:24
happens 36:1
happy 17:2,21
harder 38:23
HARRIS 48:9
head 17:4

health 5:1
heard 13:6
hearings 22:3
heat 19:17
heavily 33:15
Hedwig 26:2
Heeth 1:11,14
  4:1,6,7 31:10
  35:5 41:24
  46:23 47:3,11
  48:14
held 36:19 37:10
  37:10
help 38:11
helping 38:12
helps 15:1
hereto 1:19
  48:13
high 19:8,11
  25:9,16,16,20
  26:11,15,16
  40:20,25 42:12
higher 9:24
Hill 26:1
Hilshire 26:3,8
  26:15
hired 19:23 20:5
Hispanic 23:2,8
  32:8,10 33:15
  33:19,21 34:12
  34:12 37:10,16
  39:10
historian 11:21
historical 7:5
  26:13
history 7:11,16
  24:2 29:13
  30:22
home 28:2,14
homes 9:3 28:4
homework
  13:13
horse 21:14
hour 17:21,22
  17:23
hours 14:12
Houston 1:2,18

2:5 4:12 19:7
  30:18 31:2
  48:2 49:15
huh-uh 17:5
HULLETT 2:9
human 5:8 20:3
  20:5,8 22:15
Hunters 26:2

**I**

I-10 8:25 9:1
  10:13 11:5,10
  11:10 24:25
  25:5,5,15,15
  25:19 27:10,15
  28:16
imagine 30:9
important 16:19
  17:10
impossible 17:1
impression
  32:15 33:14
improperly 5:18
improvement
  19:21
independent 1:7
  4:9 18:11,16
  24:4 48:6
INDEX 3:1,6
indicate 39:19
  46:2
indicated 48:15
individual 35:22
individuals
  39:17
industrial 19:17
industries 19:17
inform 41:14
informal 16:18
information 9:4
  24:5 29:21
  31:19 42:7,10
  42:14,21,24
  43:14
informing 41:7
  43:11
inside 19:2

instance 1:15
instances 8:24
interested 32:25
  33:3 49:1
interpreted
  21:19
interrogatories
  48:14
Interstate 24:24
investigated
  29:11 30:20
involved 29:25
ISD 1:17 6:3
issues 5:4 9:12
  9:24
items 7:4 13:12

**J**

J 2:8
job 16:25 20:5
  39:3 47:16
jobs 7:8
joined 12:3

**K**

Karen 1:11,14
  4:1,6 15:7
  46:23 47:3,11
  48:14
kept 9:13,14
kids 8:8,19 29:5
kin 49:1
kind 4:23 10:15
  12:16
kneel 21:8,17
knees 21:9
knew 12:10,15
know 4:18 6:6
  6:15 7:17 9:18
  9:24 10:2,22
  11:17,19,20,23
  12:4,7 18:6,12
  18:18 23:4,22
  24:10 25:7
  26:13,17,22
  27:23 28:18,19
  29:18 30:9,13

32:20,21 33:6
  33:8 38:1
  39:12,15 42:16
knowing 10:18
  32:25 35:2
knowledge 7:5
  24:4 29:10,12
  30:19,21 31:6
KRISTIN 3:2

**L**

label 39:22
lacked 13:25
landlocked
  24:10
Landrum 9:14
  9:15 10:16
  22:25 26:20,21
  28:10
language 5:19
large 8:3 28:20
  29:4 34:19
largely 27:16
larger 33:22
  34:12
law 5:15 40:19
  40:24 41:5
lawsuit 4:10,14
  4:16 5:10,14
  20:16 21:5,20
  21:22
lawsuits 13:11
  13:20,21
lawyer 4:8
lawyers 14:14
leaders 34:18
leadership 39:13
  39:20,23 40:3
  40:9,10
learned 29:2
left 16:8
left-hand 37:20
legal 4:17
let's 39:18
level 13:5,10,15
  13:15,16 34:3
  34:9

**licenses** 22:5
**lieutenant** 37:6
    37:7,12
**lieutenants** 37:4
**light** 8:23
**line** 21:6 44:19
    46:2
**listed** 38:7
**little** 8:22 38:23
**lived** 11:19
**living** 4:21
**load** 8:17
**location** 25:24
    26:4
**long** 9:18 10:12
    11:19 14:10
    17:25 21:8
**look** 5:25 10:19
    16:12 29:5
    33:19 34:7
    36:17,23 37:18
    39:10 44:17
**looked** 7:2 13:10
    14:19 33:6
    39:12 45:4
**looking** 10:12
    12:15,22 24:16
    25:21 26:22
    27:17 32:15
    34:15 38:25
    39:5
**looks** 27:12 32:6
    35:3 44:11
**lot** 16:12 24:12
    34:11
**loud** 17:1,3,7

**M**

**M** 4:3
**ma'am** 18:25
    33:18
**machine** 1:17
**mail** 41:8
**majority** 34:3
    38:15,20 40:4
    40:12
**makeup** 44:16

**management**
    37:8
**map** 22:21 25:1
    25:9,24 26:12
    27:2,12
**March** 14:21,22
**mark** 17:21
**marked** 10:4
    25:8,23 31:10
    31:12 35:5,7
    41:24
**master's** 19:14
    22:8
**material** 12:22
    14:9
**math** 38:9,9,11
    38:11
**matters** 31:22
**McKinney** 2:10
**mean** 11:17 13:2
    13:5,6 15:9
    23:3 24:8 30:9
    32:3,6 41:18
    44:11,12,15
**meaning** 20:16
    36:5
**meant** 11:25
    12:1 13:4
**meeting** 14:13
**members** 4:11
    29:14 30:23
**Memorial** 11:22
    23:12 25:15,25
    26:5,10 27:11
    27:15,22 31:1
**memory** 12:1
**Mendy** 1:16
    48:10 49:11
**mention** 16:8
    30:13
**mentioned**
    11:15 28:4
**merely** 41:23
**merit** 13:25 14:4
**middle** 9:17 10:7
    10:14 11:4,9
    22:22 24:22,22

    24:23 25:4,4
    25:13 28:11
**mind** 43:20
**minorities** 5:19
    30:3
**minority** 27:16
    29:14 30:23
    31:23 38:16
**minute** 33:1
**minutes** 18:21
**mistreatment**
    12:24
**move** 8:5,8,19
    8:25 25:4 29:5
    37:6 39:3
**municipal** 30:25
**municipalities**
    27:21

**N**

**N** 2:1 4:3,3 47:1
    47:1
**name** 4:5,7
    20:19
**named** 21:2,4,21
**neck** 21:14
**need** 9:20 17:25
    18:24 29:5
    34:17,18 37:18
    39:6
**needed** 7:2 8:7
    45:4,5
**needs** 7:22 36:18
**neighborhood**
    8:10 9:10 12:6
    24:9
**neighborhoods**
    28:6
**never** 21:10
**new** 36:16 41:18
**nods** 17:4
**non** 32:9 33:21
**non-Hispanic**
    32:9,10 33:19
    33:22 39:10
    40:6,7
**nonprofessional**

    38:16,20
**nonteacher** 33:9
    33:15
**nonteachers**
    32:2 33:5
**Norris** 14:16
**north** 2:9 8:25
    10:13 11:5,10
    24:24 25:5,15
    25:19 27:9,15
**north-side** 26:11
    26:16
**Northbrook**
    22:25 27:8
**northern** 27:5
**notary** 1:20
**noted** 47:8
**notice** 5:23 27:4
    41:7 42:15
    43:11
**number** 23:10
    23:17 32:16
    46:2,2
**numbered** 1:15
**numbers** 32:9
    44:19

**O**

**O** 4:3 47:1
**Oaks** 19:7 23:1
    28:10
**oath** 22:3
**Objection** 41:17
**occasionally** 6:5
**occupied** 35:20
**OCR** 13:11,17
**offense** 22:10,18
**offer** 11:3,7
**OFFICE** 49:8
**officer** 40:11
**officers** 37:5,25
    38:1,6
**offices** 1:17
**official** 4:11
    11:18 29:13
    30:6,22
**officially** 30:16

    41:1
**Oh** 22:11 36:8
    37:14
**Okay** 6:4 10:21
    12:20 13:1
    15:23 16:2,5
    16:14 18:1,2
    22:17 37:18,23
    38:8 40:7
**older** 41:14
    43:11
**once** 9:10 17:22
    43:16
**ones** 12:15
**operations** 4:25
**opportunity**
    5:24 28:15
    30:3
**opposed** 15:20
**option** 10:17
    27:7 28:21
**ORAL** 1:10,14
**organization**
    35:11 36:17
**origin** 7:18
**outside** 19:2,3
**overenrollment**
    9:13
**oversee** 5:7
**overseeing** 31:21
**overwhelmingly**
    23:1

**P**

**P** 2:1,1
**p.m** 1:16 45:11
**page** 3:3,7 16:4
    46:2,3
**page(s)** 47:8
**PAGE/LINE**
    46:4
**pages** 38:2 47:5
**pains** 47:4
**paper** 46:2
**parent** 21:7,11
**parents** 27:2
**part** 7:7 11:9

14:24
**participate**
29:15 30:24
**participated**
21:25
**parties** 49:2
**party** 20:16,16
21:22 48:23
49:4
**pattern** 37:25
**patterns** 8:13
**penalties** 47:4
**pending** 4:12,14
**people** 10:16
21:5 32:16
34:19 39:3
45:3
**percent** 23:8,13
**percentage**
31:23 34:13
44:23
**percentages**
34:5,6 39:1
44:21
**period** 30:12,17
34:18 35:13,20
**perjury** 47:4
**person** 5:1 20:17
20:17 21:1
41:8
**personnel** 21:21
**pertinent** 11:13
**pictures** 21:8
**Piney** 26:1
**place** 7:15,21
24:18,20 47:6
**places** 9:22 13:9
**plaintiff** 1:4 2:2
18:4 48:4
**play** 16:13
**please** 4:5 19:10
35:8 46:2,3
**point** 10:13 17:1
17:8 26:1
38:10
**police** 3:10 4:25
35:9,16 36:9,9

**Procedure** 1:18
**procedures**
41:23
**proceeding** 4:17
17:25
**proceedings**
16:23 48:20
**process** 15:13,19
21:25
**processes** 29:15
30:24
**produced** 1:14
31:13
**professional**
22:5 38:14,21
38:24 39:4
**professionals**
39:16
**proposition** 34:2
38:13
**provided** 10:6
14:9 41:15
42:9
**provisions** 1:19
**public** 1:20
40:20
**pull** 14:22 32:7
32:21 33:17
**pulled** 31:19
32:5 35:2,9
39:15
**pulls** 14:17
**purport** 32:1,4
**purported** 12:24
**purports** 32:13
**pursuant** 1:18
**put** 7:21 24:20

_____
**Q**
**question** 15:2,11
17:13,18 29:17
39:7 41:20
44:15
**questions** 16:10
17:11 43:19,23
43:24 44:3,6
45:4,9

_____
**R**
**R** 2:1 47:1
**race** 3:9,10
31:14,20 33:13
35:10,13 38:4
44:20,24
**racial** 5:18 23:19
25:18 29:7
31:7 33:4,24
34:25
**raised** 19:6
**ranks** 40:11
**ratio** 33:24
**rationale** 26:13
28:13
**reach** 17:20
**read** 1:19 43:8
**really** 8:2 10:19
13:16 24:19
28:20,22 29:4
44:19
**reason** 21:18
28:18 46:2,4
**reasonable**
23:16
**reasons** 28:24
47:7
**recall** 14:2 42:8
**received** 32:12
42:7
**recollection** 8:9
12:23 14:8
43:18
**record** 1:19 17:6
33:2
**recorded** 1:17
**recruiter** 20:3
**recruiting** 20:5
**Redbud** 2:9
**reduced** 48:17
**refer** 4:16 6:2
18:3,10,16
**referencing**
13:24
**referred** 25:25
**referring** 15:19

18:6
**reflect** 34:25
43:8
**reflected** 34:14
**reflects** 10:6,7
**refresh** 12:22
14:8 43:18
**regard** 13:23
**register** 29:14
30:23
**registering**
15:19
**registrar** 15:21
40:21 41:1,9
**registrars** 15:3,5
15:10,18 40:16
**registration** 41:2
42:12 43:10
49:14
**regular** 48:23,24
**reinstated** 36:6
36:25
**relate** 11:13
**related** 7:22
23:24,25
**relates** 32:17
**rely** 17:11
**remaining** 23:12
**remember** 11:15
14:4 15:6
28:17,23,24
**remembered**
7:20,25 28:23
**report** 3:9 31:14
31:16 32:1,4
32:13,16 33:7
33:12 35:24
36:5 37:24
38:7,10,12
**reported** 42:22
**reporter** 16:9
17:2 48:11
**REPORTER'S**
3:5
**Reporters** 49:14
**reports** 32:21
39:10

**policy** 30:6
**pool** 34:19
**population**
23:20 34:10,12
34:13
**portion** 27:6
**portions** 25:3
**position** 31:21
35:13,19,20,23
36:2,3,6,15,20
36:20,22,23
37:1,21
**positions** 37:10
37:13 38:3
39:13 40:2,5
**possible** 34:16
38:25
**precincts** 10:11
**predecessor**
30:4
**predominantly**
39:2
**prefer** 28:2
**prepare** 6:23
12:12 14:15
**preparing** 14:11
**prescribe** 41:2
**PRESENT** 2:12
**previous** 19:16
**previously** 15:6
**primarily** 44:16
**principal** 11:22
20:1 22:8
40:19 41:13
42:22 43:9
**principals** 39:13
39:25,25 40:20
41:13 42:5,25
**principals'** 43:1
**private** 40:20
**probably** 23:6
30:11 32:7
34:17 39:4
**problems** 21:10

36:10,16 37:5
37:8,24 38:1,6
40:10,11,11

represent 27:1
representative
6:10,13,17,24
represents 4:8
request 14:9
28:14
REQUESTED
3:4
required 21:8
41:16
reserve 45:9
reside 18:23,24
resident 4:9
12:16 19:4
residents 9:16
28:14
resolutions
13:25
resources 5:8
20:3,6,8 22:15
respect 40:3
response 42:9
responses 3:12
42:3 43:2,8
restate 17:14
restructured
37:3
review 12:12
14:5
reviewed 7:1
13:13 14:8
20:19 43:18
rezone 29:8
rezoned 10:1
Ridgecrest 7:24
8:1,14,15,17
19:20,22
right 12:9 15:15
15:21 18:7,19
27:11 33:23
34:1 41:14
42:18 43:6
rights 5:15
29:14 30:23
ROEDER 2:9
role 4:13 5:6 9:7
39:23 41:18

roles 39:14,20
40:3
ROME 2:4
room 16:18
roughly 23:13
RPR 1:16 49:11
Rules 1:18
rulings 13:24
run 36:5 39:9

─────────
        S
─────────
S 2:1 47:1,1,1
safety 5:1,3
saying 23:4 32:5
says 35:16 40:24
41:5
SBISD 3:8,10,10
3:12 6:5 18:10
31:13 38:3
42:1
Schaper 7:3,9
7:18 8:23 9:9
11:2,7,12,16
14:14 23:24
29:3,17 30:13
31:3
Schneider 1:16
48:10 49:11
school 1:7 4:9
8:19 9:15,17
10:7,14 11:4,9
18:11,17 19:8
19:11,21,24
20:10 21:21
23:5 24:2,22
24:23,23 25:9
25:16,16 26:15
26:25 27:19,24
28:3,20 29:8
30:11,17 32:16
36:7 40:20,25
40:25 48:6
schools 7:19,22
8:4,11,11,15
9:1,2,11,14,25
12:6 15:12
22:22 24:9,12

24:16,24 25:5
25:13,14,20
26:11,16 28:15
29:7 30:5,7
42:13
science 19:21,24
scope 39:22
script 16:12
SEAL 49:8
seated 16:8
second 5:7 21:10
secretary 21:4
security 5:3
see 10:12 11:21
13:16 14:24
17:24 32:11
35:18 36:8
44:19
seeing 23:3,15
seen 23:7 33:12
35:4 42:14
segregated
30:17
segregating 30:6
sense 24:15
separate 30:7
sergeants 37:5
serve 40:21
set 42:2 48:18
seven 10:10
22:24
Shady 19:1
SHAKRA 2:13
share 42:5 44:14
45:2
shared 9:4 29:21
shed 8:23
sheet 46:2
Sherwood 20:2
shorthand 1:17
4:17 6:3 18:9
18:15 48:10
shown 24:6 26:7
26:9 43:4
44:13
SHRM 22:11
side 8:25 9:1

25:5,15,15,19
25:20 27:15
sides 24:24
sign 46:3
SIGNATURE
3:4 46:1
signed 1:19
Silva 20:18,23
21:12
similar 27:9
34:6 35:3
Similarly 18:9
18:15
simply 13:25
27:13
single-member
5:13
sit 21:16
site 10:6
sites 28:2,15
size 7:22 8:18
sketch 19:9
skip 38:2
slightly 14:23
33:21 44:12
slipping 12:1
small 9:15,16
snapshot 14:20
solemnly 47:3
somewhat 11:21
21:19
sorry 22:11
sounds 17:4
23:10,16
south 9:1 10:12
11:10 24:24
25:5,15,20
28:15
south-side 26:15
28:3
SOUTHERN
1:2 48:1
space 24:11
speak 6:17 14:15
speaking 6:13
14:14
specialist 19:21

19:24
specific 8:24
specifically
27:22 31:1
39:16
spend 14:10
18:21
spoke 21:1
Spring 1:6,17
4:9 6:3 7:13
9:17 10:14
11:4,9,10,18
13:22 18:10,16
19:15,19 20:11
23:1,1,12,13
24:10,22,22
25:3,4 26:2,8
26:14 27:8
28:11 30:5,7
48:6
Sr 7:3
St 19:13
Stadium 16:19
staff 3:8 31:8,14
31:24 32:2,7,8
32:13,22 33:7
33:9,12,15,17
33:25 34:4,9
34:14 38:15,16
38:20,21,24
stand 21:17
staple 11:20
start 7:13
started 19:15,19
24:16
starting 19:8
35:15
state 1:17 4:5
34:7,7 40:19
40:24 44:25
48:8,11
State's 44:17,20
stated 1:19 25:6
47:6 48:12
statement 27:7
40:8
states 1:1 40:19

48:1
**statewide** 34:6
**statute** 41:12,16
**stop** 33:1
**stories** 21:13
**strange** 9:11
**Stratford** 25:16
  27:11,15
**street** 9:12 10:23
**streets** 10:2 28:7
**strength** 5:18
**student** 5:4 8:24
  11:3 15:2,4,9
  15:18,20 21:9
  22:21 40:16
  41:3,7,14
  43:11,12
**students** 8:18
  13:7 15:20
  23:2,14 25:4
  25:14,19 26:14
  26:20 27:8,10
  27:14,16,16
  30:7
**subject** 27:20,25
**submit** 43:12
**submitted** 41:8
**substitute** 20:24
**sued** 20:17
**suggest** 37:9
**suing** 20:16,17
**Suite** 2:4,9
  49:15
**superintendent**
  4:22 20:9 21:2
  42:4
**Superman** 21:13
**support** 4:24
  19:24
**supported** 30:16
**sure** 10:20,24
  12:15 13:4
  14:17 15:25
  17:23 19:11
  23:16 25:22
  26:18 27:18
  32:5,20 43:25

44:14
**surroundings**
  16:18
**survey** 3:12 42:2
  42:3
**swear** 47:3
**sworn** 1:15 4:2
  48:16
**system** 5:12,13
  5:17

------

**T**

**T** 4:3 47:1,1
**take** 17:20 42:6
**taken** 1:15 29:6
  48:24
**talent** 4:23 20:9
  21:3
**talk** 6:20 7:3,5
  11:14
**talking** 4:19 6:6
  10:16 14:13
  18:13,19
**TEA** 13:11,17
  14:24 31:19
  32:6,21
**TEA's** 14:19
**teacher** 19:20
  32:7
**teachers** 31:8,23
  32:2,14,17,22
  33:5,8,25
  34:18,22 35:1
  39:2,12
**teaching** 22:7
  44:18
**tell** 7:18 17:14
  18:1 22:13
  25:22 32:13
  35:8 38:3
  42:20
**telling** 26:19
  44:22
**term** 4:16 13:3
  15:9,18 16:1
  18:12,18 39:23
**testified** 4:2 22:2

**testify** 6:10
  12:12 48:16
**testifying** 16:20
**testimony** 14:11
  16:11,17,22
  47:6
**Texas** 1:2,17,18
  1:18 2:4,5,10
  48:2,8,11
**thank** 38:11
  45:6,6,8,10
**therefor** 47:7
**thing** 29:3 37:24
**things** 10:7
**think** 28:9,12
  29:22 32:19
  33:12
**Thomas** 19:13
**three** 13:20,21
  14:5 23:12
  37:12
**thumbnail** 19:9
**time** 8:1,7 9:23
  14:18,20 28:18
  28:20 30:12,17
  35:14,20 36:17
  42:8 45:6,7
  47:6 48:20
  49:4
**titled** 31:13
**today** 6:9,24
  16:17 20:13
  32:24 34:24
  44:3
**told** 9:10 21:13
  24:8 31:5 39:9
  44:3
**top** 35:15
**topic** 12:18 16:3
  40:14
**topics** 6:11,20
  7:9 11:14
**total** 37:12
**touch** 8:21
**touched** 40:15
**track** 37:20
**traditionally**

10:14
**transcript** 47:5
  48:19
**transfer** 9:20
  10:3
**transfers** 9:8
**translate** 17:5
**Treasure** 8:6,8
**treat** 19:17
**true** 37:24 47:5
  48:13,19
**trustees** 18:17
  18:19
**truth** 48:16
**try** 17:22
**trying** 24:17
  35:11,24 37:23
**Tully** 16:19
**turn** 31:7 40:14
**twice** 40:25 43:9
**two** 10:6,23
  25:14 37:7,9
  37:16
**TX** 49:15
**type** 16:11 21:25
**types** 22:3 40:1
**typewriting**
  48:17,19

------

**U**

**U** 47:1
**uh-huh** 10:9
  12:19 17:4
  18:8 22:23
  24:1 34:23
  39:21 40:17
**unaware** 41:20
**understand** 4:13
  5:14 16:15,21
  17:10,14,15
  24:11,14 35:11
  35:24 37:23
  38:10,12
**understanding**
  5:9 15:25
  29:24 34:24
  42:23

**understood** 13:4
  14:18 17:18
  33:11 44:2,6
**UNITED** 1:1
  48:1
**universe** 14:7
**University** 19:13
**upper** 34:3,9
**use** 4:16 6:6
  14:20 15:13
  16:1,22 18:9
  18:12,15,18
  39:18 40:15
**uses** 5:17 10:11

------

**V**

**V** 1:5 48:5
**Valley** 26:2,8,14
  28:9
**various** 22:21
  31:22 32:20
  35:1
**vast** 34:3
**verbatim** 6:21
**versus** 14:20
  32:13 33:19
**Village** 26:1,1,2
  26:2,3,3,8,9,15
**Villages** 26:1,5
  27:22 31:1
**Virginia** 1:4 4:8
  5:11 18:4 48:3
**volunteer** 18:1
**vote** 29:14 30:23
  41:15
**voter** 41:9 42:12
**voters** 23:20
**voting** 5:15,18
  23:20 30:1

------

**W**

**W** 47:1
**Waltrip** 19:11
**want** 16:7,8
  17:20 18:21
  20:15 26:17
  33:23 36:21

38:1 40:14
**wanted** 13:3
    14:17 15:25
    36:17
**wasn't** 10:1
**way** 12:11
**Wayne** 7:3
**ways** 32:20
**we'll** 8:21 11:1
    16:3 17:22,23
    17:24 18:1
    45:9
**we're** 16:17
    34:15
**we've** 30:10
    39:15
**Web** 10:6
**Weekley** 28:4
**went** 11:24
    13:16 19:12,12
    20:2 45:3
**weren't** 8:15
**Weslayan** 49:15
**west** 30:18
**western** 11:8
**white** 23:14
    27:16 30:6
    33:16 34:4,11
    35:21 37:11,16
    38:21 39:2
    40:5,12 44:16
**whites** 40:7
**William** 14:16
**Williams** 42:5
**Wilson** 15:7
**witness** 1:15 3:2
    14:8 20:13
    46:1 48:14,15
**woman** 16:8
**Woods** 23:1
    27:8
**word** 16:11,11
    18:16
**worked** 15:6
    19:12,16 20:11
**working** 7:13
**works** 15:7

**Worldwide**
    49:14
**written** 17:6
**wrong** 44:23

---
**X**
---
**X** 4:3

---
**Y**
---
**yeah** 12:21 13:2
    13:15 27:12
    32:12 36:16
    37:22 41:18
    43:21
**year** 5:7 14:22
    30:10 35:16
    36:7,21 37:18
    40:25 41:3,13
    43:9
**years** 7:8 19:16
    19:25 20:25
    28:5 33:20
    35:23
**you-all** 15:11

---
**Z**
---
**zone** 9:16 11:4
    12:5 25:3
**zoned** 9:14,24
    10:14,16 11:10
    25:14,20 26:10
    26:18,21,23
    27:10,14 28:2
    28:8,10
**zones** 7:12,16,19
    7:21 8:9 10:8
    12:8 22:25
    24:3,6,18,20
    24:23 25:10
    27:3,20,25
    29:9
**zoning** 26:14

---
**0**
---
**00:56:58** 49:6
**000079** 31:13

---
**1**
---

**1** 5:22 10:2
**1-31-2023** 49:12
**10** 14:12 24:24
**1050** 1:18
**11** 35:17
**11:16** 1:16
**1100** 8:2
**12** 3:8 31:10,12
    32:1 33:7
    34:21,24
**12:13** 1:16 45:11
**12170** 19:1
**13** 3:10 35:5,7
    35:12
**1300** 8:2
**14** 3:12 41:24,25
**1400** 2:4
**15** 14:12
**1700** 2:9
**18** 35:17 36:1,24
    41:3,14 43:11
**1988** 11:17 12:1
**1999** 7:14 19:15

---
**2**
---
**2** 10:2
**20** 19:16
**2014** 32:9
**2021** 1:12,16
    36:6,10 37:7
    38:6
**2022** 49:8
**214** 2:10
**223** 49:14
**228-6601** 2:5
**235** 49:15
**29** 1:12,16

---
**3**
---
**3** 13:5,10,15,15
    13:16
**300** 2:9
**3000** 49:15
**31** 3:8
**35** 3:10
**35,000** 13:7

---
**4**
---
**4** 3:3 25:24 26:8
**4:21-CV-01997**
    1:5 48:5
**41** 3:12
**42** 23:13
**47** 3:4
**48** 3:5

---
**5**
---
**5** 10:5,12 22:20
    24:6
**5,000** 13:8
**52** 23:13
**544-4000** 2:10
**572-2000** 49:16

---
**6**
---
**6** 25:9 26:9 27:5
**60s** 11:23

---
**7**
---
**70099** 47:16
**713** 2:5 49:16
**717** 2:4
**75069** 2:10
**75th** 30:10
**77002** 2:5
**77027** 49:15
**77065** 19:1
**7761** 49:11

---
**8**
---
**814** 38:2,3
**87** 23:8
**874** 42:1
**88** 11:23

---
**9**
---
**90s** 29:19 31:5

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| 101920001 - MEMORIAL H S | A - Asian | 7 |
| | B - Black or African American | 18 |
| | H - Hispanic/Latino | 26 |
| | T - Two or More Races | 3 |
| | W - White | 151 |
| 101920003 - SPRING WOODS H S | A - Asian | 10 |
| | B - Black or African American | 34 |
| | H - Hispanic/Latino | 48 |
| | T - Two or More Races | 6 |
| | W - White | 122 |
| 101920005 - NORTHBROOK H S | A - Asian | 15 |
| | B - Black or African American | 35 |
| | H - Hispanic/Latino | 66 |
| | I - American Indian or Alaska Native | 1 |
| | T - Two or More Races | 2 |
| | W - White | 121 |
| 101920006 - STRATFORD H S | A - Asian | 7 |
| | B - Black or African American | 23 |
| | H - Hispanic/Latino | 26 |
| | T - Two or More Races | 6 |
| | W - White | 134 |
| 101920007 - HAROLD D GUTHRIE CENTER FOR EXCELLENCE | B - Black or African American | 2 |
| | W - White | 4 |
| 101920011 - DISCIPLINE ALTERNATIVE EDUCATION PROGRAM | A - Asian | 1 |
| | B - Black or African American | 5 |
| | H - Hispanic/Latino | 2 |



SBISD
12
29-Dec-2021
M. Schneider CJR BRB

**SBISD000799**

Staff - Fall/Summer by Campus by Ethnicity Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity Race Report Category | 20-21 |
|---|---|---|
| 101920014 - WESTCHESTER ACADEMY FOR INTERNATIONAL STUDIES | A - Asian | 7 |
| | B - Black or African American | 9 |
| | H - Hispanic/Latino | 21 |
| | T - Two or More Races | 1 |
| | W - White | 73 |
| 101920016 - ACADEMY OF CHOICE | A - Asian | 2 |
| | B - Black or African American | 6 |
| | H - Hispanic/Latino | 5 |
| | W - White | 25 |
| 101920018 - SPRING BRANCH ACADEMIC INSTITUTE | A - Asian | 4 |
| | B - Black or African American | 9 |
| | H - Hispanic/Latino | 14 |
| | T - Two or More Races | 3 |
| | W - White | 60 |
| 101920041 - LANDRUM MIDDLE | A - Asian | 7 |
| | B - Black or African American | 24 |
| | H - Hispanic/Latino | 27 |
| | I - American Indian or Alaska Native | 1 |
| | T - Two or More Races | 3 |
| | W - White | 44 |
| 101920042 - MEMORIAL MIDDLE | A - Asian | 2 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 10 |
| | T - Two or More Races | 3 |
| | W - White | 79 |
| 101920043 - SPRING BRANCH MIDDLE | A - Asian | 4 |
| | B - Black or African American | 15 |
| | H - Hispanic/Latino | 14 |

SBISD000800

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| | T - Two or More Races | 1 |
| | W - White | 57 |
| 101920044 - SPRING WOODS MIDDLE | A - Asian | 6 |
| | B - Black or African American | 28 |
| | H - Hispanic/Latino | 30 |
| | T - Two or More Races | 1 |
| | W - White | 45 |
| 101920045 - SPRING FOREST MIDDLE | A - Asian | 6 |
| | B - Black or African American | 14 |
| | H - Hispanic/Latino | 19 |
| | W - White | 53 |
| 101920046 - SPRING OAKS MIDDLE | A - Asian | 6 |
| | B - Black or African American | 17 |
| | H - Hispanic/Latino | 29 |
| | W - White | 44 |
| 101920047 - NORTHBROOK MIDDLE | A - Asian | 2 |
| | B - Black or African American | 24 |
| | H - Hispanic/Latino | 30 |
| | T - Two or More Races | 1 |
| | W - White | 37 |
| 101920048 - CORNERSTONE ACADEMY | A - Asian | 2 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 4 |
| | T - Two or More Races | 1 |
| | W - White | 26 |
| 101920101 - BENDWOOD SCHOOL | A - Asian | 2 |
| | B - Black or African American | 1 |
| | H - Hispanic/Latino | 9 |
| | I - American Indian or Alaska Native | 1 |

SBISD000801

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| | T - Two or More Races | 2 |
| | W - White | 12 |
| 101920102 - BUNKER HILL EL | B - Black or African American | 2 |
| | H - Hispanic/Latino | 8 |
| | W - White | 49 |
| 101920103 - EDGEWOOD EL | A - Asian | 1 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 38 |
| | T - Two or More Races | 2 |
| | W - White | 17 |
| 101920104 - FROSTWOOD EL | A - Asian | 3 |
| | H - Hispanic/Latino | 6 |
| | I - American Indian or Alaska Native | 1 |
| | W - White | 57 |
| 101920105 - HOLLIBROOK EL | A - Asian | 1 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 51 |
| | W - White | 22 |
| 101920106 - HOUSMAN EL | A - Asian | 1 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 25 |
| | W - White | 24 |
| 101920107 - HUNTERS CREEK EL | A - Asian | 2 |
| | B - Black or African American | 5 |
| | H - Hispanic/Latino | 10 |
| | W - White | 41 |
| 101920108 - MEADOW WOOD EL | A - Asian | 2 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 10 |

SBISD000802

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| | T - Two or More Races | 1 |
| | W - White | 48 |
| 101920109 - MEMORIAL DRIVE EL | A - Asian | 2 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 6 |
| | W - White | 39 |
| 101920110 - PINE SHADOWS EL | A - Asian | 4 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 35 |
| | W - White | 27 |
| 101920111 - RIDGECREST EL | A - Asian | 3 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 44 |
| | W - White | 26 |
| 101920112 - RUMMEL CREEK EL | B - Black or African American | 5 |
| | H - Hispanic/Latino | 6 |
| | I - American Indian or Alaska Native | 2 |
| | T - Two or More Races | 2 |
| | W - White | 55 |
| 101920113 - SHADOW OAKS EL | A - Asian | 3 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 44 |
| | T - Two or More Races | 1 |
| | W - White | 21 |
| 101920114 - SPRING BRANCH EL | A - Asian | 1 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 41 |
| | T - Two or More Races | 1 |
| | W - White | 12 |

SBISD000803

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| 101920115 - VALLEY OAKS EL | A - Asian | 2 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 8 |
| | T - Two or More Races | 1 |
| | W - White | 61 |
| 101920116 - WESTWOOD EL | A - Asian | 3 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 33 |
| | I - American Indian or Alaska Native | 1 |
| | W - White | 19 |
| 101920117 - WOODVIEW EL | A - Asian | 1 |
| | B - Black or African American | 6 |
| | H - Hispanic/Latino | 40 |
| | T - Two or More Races | 1 |
| | W - White | 21 |
| 101920118 - WILCHESTER EL | A - Asian | 2 |
| | H - Hispanic/Latino | 13 |
| | T - Two or More Races | 2 |
| | W - White | 51 |
| 101920119 - SHERWOOD EL | A - Asian | 2 |
| | B - Black or African American | 5 |
| | H - Hispanic/Latino | 20 |
| | W - White | 25 |
| 101920120 - SPRING SHADOWS EL | A - Asian | 3 |
| | B - Black or African American | 8 |
| | H - Hispanic/Latino | 34 |
| | I - American Indian or Alaska Native | 1 |
| | W - White | 18 |
| 101920121 - NOTTINGHAM EL | A - Asian | 4 |

SBISD000804

Staff - Fall/Summer by Campus by Ethnicity Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity Race Report Category | 20-21 |
|---|---|---|
| | B - Black or African American | 11 |
| | H - Hispanic/Latino | 10 |
| | T - Two or More Races | 3 |
| | W - White | 38 |
| 101920122 - TERRACE EL | A - Asian | 2 |
| | B - Black or African American | 3 |
| | H - Hispanic/Latino | 24 |
| | W - White | 23 |
| 101920123 - THORNWOOD EL | A - Asian | 5 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 23 |
| | W - White | 18 |
| 101920124 - CEDAR BROOK EL | A - Asian | 2 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 52 |
| | W - White | 13 |
| 101920125 - TREASURE FOREST EL | A - Asian | 1 |
| | B - Black or African American | 4 |
| | H - Hispanic/Latino | 40 |
| | T - Two or More Races | 1 |
| | W - White | 16 |
| 101920126 - BUFFALO CREEK EL | A - Asian | 2 |
| | B - Black or African American | 1 |
| | H - Hispanic/Latino | 34 |
| | W - White | 15 |
| 101920128 - THE WILDCAT WAY SCHOOL | A - Asian | 4 |
| | B - Black or African American | 1 |
| | H - Hispanic/Latino | 16 |
| | W - White | 17 |

SBISD000805

Staff - Fall/Summer by Campus by Ethnicity  Race Report Category
County-District Number: 101920 District Name: SPRING BRANCH ISD

| Campus | Ethnicity  Race Report Category | 20-21 |
|---|---|---|
| 101920129 - THE PANDA PATH SCHOOL | A - Asian | 2 |
| | B - Black or African American | 1 |
| | H - Hispanic/Latino | 20 |
| | W - White | 3 |
| 101920130 - THE LION LANE SCHOOL | A - Asian | 1 |
| | B - Black or African American | 1 |
| | H - Hispanic/Latino | 22 |
| | W - White | 6 |
| 101920131 - THE BEAR BLVD SCHOOL | A - Asian | 1 |
| | B - Black or African American | 2 |
| | H - Hispanic/Latino | 16 |
| | T - Two or More Races | 2 |
| | W - White | 9 |
| 101920132 - THE TIGER TRAIL SCHOOL | A - Asian | 1 |
| | H - Hispanic/Latino | 23 |
| | W - White | 9 |
| TOTALS | | 3,589 |

SBISD000806

| Position Description | EEO Race | Fiscal Year |
|---|---|---|
| CAPTAIN POLICE DEPT | W | 2011 |
| CAPTAIN POLICE DEPT | W | 2012 |
| CAPTAIN POLICE DEPT | W | 2013 |
| CAPTAIN POLICE DEPT | W | 2014 |
| CAPTAIN POLICE DEPT | W | 2015 |
| CAPTAIN POLICE DEPT | W | 2016 |
| CAPTAIN POLICE DEPT | W | 2017 |
| CAPTAIN POLICE DEPT | W | 2018 |
| POLICE CAPTAIN | H | 2021 |
| CHIEF OF POLICE | W | 2011 |
| CHIEF OF POLICE | W | 2012 |
| CHIEF OF POLICE | W | 2013 |
| CHIEF OF POLICE | W | 2014 |
| CHIEF OF POLICE | W | 2015 |
| CHIEF OF POLICE | W | 2016 |
| CHIEF OF POLICE | W | 2017 |
| CHIEF OF POLICE | W | 2017 |
| CHIEF OF POLICE | W | 2018 |
| CHIEF OF POLICE | W | 2018 |
| CHIEF OF POLICE | W | 2019 |
| CHIEF OF POLICE | W | 2020 |
| CHIEF OF POLICE | W | 2021 |
| CORPORAL 10 250 | W | 2011 |
| CORPORAL 10 250 | H | 2011 |
| CORPORAL 10 250 | W | 2012 |
| CORPORAL 10 250 | H | 2012 |
| CORPORAL 10 250 | W | 2013 |
| CORPORAL 10 250 | H | 2013 |
| CORPORAL 10 250 | W | 2014 |
| CORPORAL 10 250 | H | 2014 |
| CORPORAL 10 250 | W | 2015 |
| CORPORAL 10 250 | H | 2015 |
| CORPORAL 10 250 | W | 2016 |
| CORPORAL 10 250 | H | 2016 |
| CORPORAL 10 250 | W | 2017 |
| CORPORAL 10 250 | H | 2017 |
| CORPORAL 10 250 | W | 2018 |
| CORPORAL 10 250 | H | 2018 |
| LIEUTENANT POLICE | W | 2020 |
| LIEUTENANT POLICE | W | 2021 |
| LIEUTENANT POLICE (EMER MGT) | H | 2020 |
| LIEUTENANT POLICE (EMER MGT) | H | 2021 |
| LIEUTENANT POLICE (EMER MGT) | W | 2021 |
| POLICE OFFICER | B | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |

SBISD
13
29-Dec-2021

| | | |
|---|---|---|
| POLICE OFFICER | B | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | B | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | B | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | B | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | H | 2011 |
| POLICE OFFICER | W | 2011 |
| POLICE OFFICER | B | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | B | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | B | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | B | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | B | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | W | 2012 |

SBISD000808

| | | |
|---|---|---|
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | H | 2012 |
| POLICE OFFICER | W | 2012 |
| POLICE OFFICER | B | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | B | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | B | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | B | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | B | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | H | 2013 |
| POLICE OFFICER | W | 2013 |
| POLICE OFFICER | B | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | B | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | B | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | B | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | B | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |

SBISD000809

| | | |
|---|---|---|
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | H | 2014 |
| POLICE OFFICER | W | 2014 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | H | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | B | 2015 |
| POLICE OFFICER | W | 2015 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | B | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | B | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | B | 2016 |

SBISD000810

| | | |
|---|---|---|
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | B | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | B | 2016 |
| POLICE OFFICER | W | 2016 |
| POLICE OFFICER | B | 2016 |
| POLICE OFFICER | H | 2016 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | W | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | H | 2017 |
| POLICE OFFICER | B | 2017 |

SBISD000811

| | | |
|---|---|---|
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | B | 2017 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |

SBISD000812

| | | |
|---|---|---|
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | B | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | W | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2018 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | B | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | W | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |
| POLICE OFFICER | H | 2019 |

| | | |
|---|---|---|
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | B | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | W | 2020 |
| POLICE OFFICER | H | 2020 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |

SBISD000814

| | | |
|---|---|---|
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | W | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | H | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER | B | 2021 |
| POLICE OFFICER CRS INTRVN | B | 2020 |
| POLICE OFFICER CRS INTRVN | B | 2021 |
| SERGEANT 11 250 | W | 2011 |
| SERGEANT 11 250 | W | 2011 |
| SERGEANT 11 250 | W | 2012 |
| SERGEANT 11 250 | W | 2012 |
| SERGEANT 11 250 | W | 2013 |
| SERGEANT 11 250 | W | 2013 |
| SERGEANT 11 250 | W | 2014 |
| SERGEANT 11 250 | W | 2014 |
| SERGEANT 11 250 | W | 2015 |
| SERGEANT 11 250 | W | 2015 |
| SERGEANT 11 250 | W | 2016 |
| SERGEANT 11 250 | W | 2016 |
| SERGEANT 11 250 | W | 2017 |
| SERGEANT 11 250 | W | 2017 |
| SERGEANT 11 250 | W | 2018 |
| SERGEANT 11 250 | W | 2018 |
| SERGEANT 250 | W | 2018 |
| SERGEANT 250 | W | 2018 |
| SERGEANT 250 | W | 2018 |
| SERGEANT 250 | H | 2018 |
| SERGEANT 250 | H | 2018 |
| SERGEANT 250 | H | 2018 |
| SERGEANT 250 | W | 2018 |

| | | |
|---|---|---|
| SERGEANT 250 | W | 2019 |
| SERGEANT 250 | W | 2019 |
| SERGEANT 250 | H | 2019 |
| SERGEANT 250 | H | 2019 |
| SERGEANT 250 | H | 2019 |
| SERGEANT 250 | W | 2019 |
| SERGEANT 250 | W | 2019 |
| SERGEANT 250 | W | 2019 |
| SERGEANT 250 | W | 2020 |
| SERGEANT 250 | H | 2020 |
| SERGEANT 250 | H | 2020 |
| SERGEANT 250 | W | 2020 |
| SERGEANT 250 | W | 2020 |
| SERGEANT 250 | W | 2020 |
| SERGEANT 250 | W | 2021 |
| SERGEANT 250 | H | 2021 |
| SERGEANT 250 | H | 2021 |
| SERGEANT 250 | W | 2021 |
| SERGEANT 250 | W | 2021 |
| SERGEANT 250 | W | 2021 |

SBISD000816

**Voter Registration Information by High School**

Each campus principal was asked to respond to the following prompt:
*How does your campus handle student voting for local, state, and national elections? (Not internal voting for student council, prom, etc.) Do you communicate anything to your students?*

### AOC
My first year at AOC, there were people who came to school to register kids to vote. Since we have changed the program, we have not said anything about it outside of Government classes.

### MHS
Sometimes we get voter registration cards sent to us and we put then in government teachers boxes to pass out. We have not had a consistent process since I have been here.

### NHS
From, Social Studies DC: *In compliance with state law, we have voter registration cards available in the classrooms and some were given to the senior office. We discuss registration. However, many of our students are not eligible, so we do not force the issue.*

This year, representatives from Harris County Elections Administration were allowed to announce to students during our lunches on September 29 and 30 that they could go to their table and register to vote. YP did the same. In addition, YP reports that during the Spring semester one of the Econ/Gov teachers brings a speaker from Mi Familia Vota to give a presentation about voting rights and registers eligible students to vote.

### SHS
We do it through Gov/Econ classes. The week before voter registration deadlines we go over it and offer voter registration cards and offer to mail them in for the kids if they want us to (once they are sealed) Most of our kids do it through the DMV but we do get those kids who turn 18 between the deadline and election day who are eligible to vote. This year is a weird one because there are only constitutional amendments on the ballot so it was a little more low key than say next year when there will be city, state, and national stuff on the ballot. We will do another round of registrations before primaries in the spring. I know some other campuses have had people come on to register the kids but we have found that because most of ours drive, they have already registered so keep it in the classes and make a big deal of it there.

### SWHS
During elections that are held at SWHS, we walk students down to the polls when they are open in the gym. We get the election judges to speak with them and if they are registered to vote. We give them an opportunity to vote while in school.



SBISD000874

All students are also given a blank voter registration forms when they turn 18 if they are registered in government classes. Then the student mails them to the county to register to vote.

There have been a few years where we have our students become paid student election workers for the county. Last fall, we had 8 students go through training and become student poll workers.

We remind students on election day that polls are open from 7am-7pm and that Harris county also offers early voting. Students are also reminded that they are able to vote at any polling location in Harris county early or on election day.

We invite Harris county deputy registrars to Spring Woods High School. We usually have them come once a semester. They register students on campus who are eligible.
We send out via remind app and PA lunch announcements when voter registrars will be on campus. We have signs posted in our classroom reminding them to register to vote and vote on election day. Or take advantage of early voting. We also conduct a voter registration drive in our classrooms on national voter registration day which is September 28th.

**WAIS**
We have made announcements about voter registration. We've had students get selected as volunteers to work the polls on election day (not at our site). Other than that, there's nothing we do.

# Exhibit F

**EXHIBITS TO**
**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:21-cv-01997 |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, CHRIS GONZALEZ, | § | |
| PAM GOODSON, KAREN PECK, JOSEF D. | § | |
| KLAM, MINDA CAESAR, CHRIS | § | |
| EARNEST, J. CARTER BREED, in their | § | |
| official capacity as members of the Board of | § | |
| Trustees of Spring Branch ISD. | § | |
| | § | |
| *Defendants*. | § | |

---

Declaration of Plaintiff Virginia Elizondo

---

Pursuant to 28 U.S.C. § 1746, I, Virginia Elizondo, declare the following:

1. My name is Virginia Elizondo and I am over the age of eighteen years old. The facts stated in this declaration are true and correct to the best of my knowledge.

2. I was a candidate for Spring Branch Independent School District (SBISD) trustee in 2015 and, again, in 2021. I lost both times.

3. I am a registered voter in SBISD and my voter registration address is 9235 Blankenship, Houston, TX 77080.

4. I have reviewed the proposed single-member district plan formulated by my litigation team in this case. The map is attached as Exhibit #1 to this affidavit.  I reside in proposed District 1.

5. I am Mexican-American.

1

6.  I have voted in previous SBISD trustee elections and I will vote in future SBISD elections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Houston, Harris County, Texas on _31_ January, 2022.


_____
Virginia Elizondo

# EXHIBIT 1 –

# Proposed Single District Map

# *Elizondo v SBISD*

