IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § § § | |
| *Plaintiff* | § § | |
| v. | § § | Case No. 4:21-cv-01997 |
| **SPRING BRANCH INDEPENDENT SCHOOL DISTRICT, CHRIS GONZALEZ, PAM GOODSON, KAREN PECK, JOSEF D. KLAM, MINDA CAESAR, CHRIS EARNEST, J. CARTER BREED** | § § § § § § § § § § § § | |
| *Defendants* | § § | |

**AMICUS CURIAE JENNY MORACE'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND REPLY TO DEFENDANT SBISD'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Amicus Curiae Jenny Morace ("Morace") hereby respectfully submits this Response to Plaintiff's Motion for Preliminary Injunction and Reply to Defendant SBISD's Response to Plaintiff's Motion for Preliminary Injunction. As will be demonstrated herein, Plaintiff's Motion for Preliminary Injunction should be in all things denied, the May 2022 election, which has already begun, should not be

1

postponed, the current election should be allowed to continue and be completed under the current at-large system.

### Description of Jennie Morace's Interest as Amicus Curiae

1. As the Court will recall from prior filings, Morace is a long-time resident, faithful taxpayer, active registered voter, and concerned parent who lives within the political boundaries of the Spring Branch Independent School District ("SBISD"). Her neighborhood is zoned for Housman Elementary, which has a significant Hispanic student population.

2. In addition, Morace is now a declared candidate for election to the SBISD Board of Trustees. The candidate filing period for the May 2022 election commenced on January 19, 2022, and concludes on February 18, 2022, which is a mere two (2) days from the date of this filing. Indeed, by the time Plaintiff's Motion is submitted to this Court for decision, the candidate filing period will have ended. Morace filed her paperwork on February 1, 2022, and is seeking election under the current at-large system. Three (3) seats are set for election this election cycle. In addition to Morace, there are eight (8) other declared candidates thus far for a total of nine (9) candidates.

3. The next uniform election date for SBISD Trustees is scheduled May 7, 2022. Absent Court intervention, the upcoming May 7, 2022 election for three (3)

seats on the SBISD Board of Trustees will be governed by the current at-large system.

### Plaintiff's Motion for Preliminary Injunction Should Be Denied

4.  As the Court is well aware, the United States Supreme Court has established a three-prong test, known as the *Gingles* preconditions (along with a totality of circumstances test), to determine whether a single-member majority-minority district is legally required to be drawn in an at-large districting scheme. *See Thornburg v. Gingles*, 478 U.S.30 (1986). The first prong requires a minority concentration of 50% or greater of a certain minority's citizen voting age population percentage (known as "CVAP"). Because the Plaintiff's Motion seeks to impose a Hispanic single member district in this case, the relevant inquiry is whether it is possible to draw such a district with a Hispanic CVAP (known as "HCVAP") of 50% or greater before prongs two (2) and three (3) can even be considered.

5.  The Plaintiff's Motion for Preliminary Injunction demonstrates that, <u>*at most*, *she can only draw one single-member district*</u>—proposed District number 1—with an HCVAP of 52.8%. None of the other six (6) proposed single-member districts reach that legally-required minimum threshold. Thus, from the outset, there is absolutely no legal requirement for the Court to impose seven (7) single-member districts under Section 2 of the Voting Rights Act as requested by Plaintiff. To the contrary, **<u>at most</u>**, an analysis must occur as to whether there is a legal requirement

to draw even one single-member district, with the other six (6) Districts remaining at-large.

6.      With respect to the proposed District 1 in Plaintiff's Motion, there is no admissible competent evidence that the second and third preconditions are satisfied under *Gingles*. Plaintiff merely relies on expert reports from two of their designated experts, Robert M. Stein, see Exhibit A to Plaintiff's Appendix, and Dr. Andre Tijerina, see Exhibit B to Plaintiff's Appendix. These reports contain inadmissible hearsay, improper legal conclusions, unauthenticated documents, articles, historical references, and other cited materials, lack foundation, and are devoid of any evidence that they have personal knowledge of what they suggest. Moreover, the only elections considered by Mr. Stein are past SBISD elections, which are not the best evidence of electoral outcomes to demonstrate the presence of the *Gingles* preconditions. Indeed, local SBISD election outcomes are not due to race, but instead are based considerations such as candidate policy positions, perceptions of candidate party affiliation, and other non-racial related political outcomes. Plaintiff makes no effort to examine other relevant elections, such as those for the Texas House, Senate, Judicial races, other down ballot races, or statewide and federal races. Simply put, by putting blinders on, and by ignoring every other relevant electoral outcome, renders the Plaintiff's data set highly suspect and both legally and factually insufficient to support injunctive relief. Nor is there any meaningful submission,

discussion, or examination of a regression analysis to prove that this proposed District 1 would actually perform in such a manner so as to allow Hispanics to elect preferred candidates of their choice. It is not enough for the Plaintiff to simply state that the three *Gingles* preconditions are satisfied; legally competent and factually sufficient and admissible evidence must be submitted. And even the SBISD races are not properly examined by the Plaintiff's experts. For example, Hispanics did not vote as a bloc in 2021. Indeed, current incumbent Chris Earnest defeated Plaintiff Virginia Elizondo with voter support in the Landrum Middle School neighborhood, which is 90% Hispanic, as stated on their website.

7. Furthermore, as the Court knows, a proposed minority District is unconstitutional if it is drawn in such a manner so as to consciously consider race. Careful scrutiny of the Plaintiff's demonstration map wreaks of racial gerrymandering. For example, Plaintiff lives on the very farthest edge of proposed District 1. It would have made much more sense for her to have been put in proposed District 2. The reason the Plaintiff's demonstration map puts the Plaintiff in proposed District 1 and not proposed District 2 is simple: Plaintiff's entire case would be subject to dismissal for lack of standing if she were placed where she actually belongs, which is in proposed District 2. Why? Because the HCVAP for proposed District 2 is a mere 30.7%, which means that the proposed District 2 does not satisfy the first precondition of the *Gingles* test and is not legally required to be

5

drawn. That is why Plaintiff racially gerrymandered proposed District 1, because she knew that she needed a HCVAP District in excess of 50%, and also she knew that she needed to live in that proposed minority majority District.

8.  In addition, proposed District 1 has a strange protruding slim rectangle on its southernmost boundary. It is blatantly obvious that the proposed District 1 was drawn in order to reach the 50% minority HCVAP concentration, with race being the goal of the proposed redistricting. This rectangle includes two townhouse complexes, which are: French Village with 65 residents and Village Woods with 91 residents, and which also include areas known as Wellington Court North and South, with 67 residents, and Gingerleaf and Westwood, which both have 26 residents, respectively.  This causes Plaintiff's proposed District 1 voting-age population to increase from 8,905 to 9,180. These complexes cannot be considered as communities of interest with the rest of proposed District 1, as these specific areas are zoned to Valley Oaks Elementary (23.4% Hispanic), Landrum Middle School (90% Hispanic), Spring Branch Middle School (41.1% Hispanic) and Memorial High School (21.1% Hispanic). The students in these complexes attend different schools than the rest of proposed District 1, which are Edgewood Elementary (88.1% Hispanic), Hollibrook Elementary (98.4% Hispanic), Ridgecrest Elementary (94.1% Hispanic), Cedar Brook Elementary (85.9% Hispanic), Buffalo Creek Elementary (86.8% Hispanic), Landrum Middle School (90% Hispanic) and (Northbrook High

School (92.7% Hispanic). If these communities were not included, then the HCVAP number for proposed District 1 would fall below 50%. Such race-based redistricting is both illegal and unconstitutional.

**Plaintiff's Request to Postpone the May 2022 Election Should Be Denied**

9. Plaintiff's request to postpone the election should be summarily rejected under both well-established federal and state law. "[P]erhaps the most fundamental individual liberty of our people," Justice Black famously wrote, is "the right of each man to participate in the self-government of his society." In re Winship, 397 U.S. 358, 385 (1970) (Black, J., dissenting). The right to vote makes self-government possible and undergirds the premise that the government has the consent of the governed.

10. Federal law is well-established that "The right to vote is fundamental, as it preserves all other rights." *Andrade*, 345 S.W.3d at 12 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886)); see also Tex. Const. art. I, § 3 (providing equal rights). Federal courts have zealously protected the right to vote. See *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964) ("No right is more precious in a free country than that of

7

having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."); *Stewart v. Blackwell*, 444 F.3d 843, 862 (6th Cir. 2006) ("Few rights have been so extensively and vigorously protected as the right to vote. Its fundamental nature and the vigilance of its defense, both from the courts, Congress, and through the constitutional amendment process, stem from the recognition that our democratic structure and the preservation of our rights depends to a great extent on the franchise."); see also *United States v. Mosley*, 238 U.S. 383, 386, 35 S. Ct. 904, 59 L. Ed. 1355 (1915) ("We regard it as equally unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box."); *Avery v. Midland County*, 406 S.W.2d 422, 425 (Tex. 1966) ("Petitioner as a voter in the county has a justiciable interest in matters affecting the equality of his voting and political rights."); *Thomas Paine*, Dissertation on the Principles of Government, 1795 ("The right of voting . . . is the primary right by which all other rights are protected.").

11. Like Federal law, the Texas Supreme Court has held as a matter of state law that the right to vote is protected by Article I, Section 3 of the Texas Constitution. *State v. Hodges*, 92 S.W.3d 489, 496, 501-02 (Tex. 2002). Moreover, the Texas Supreme Court has found a constitutional "right to vote" in Texas's equal protection clause, art. I, § 3, and applies federal voting-rights case law to voting-

rights claims raised under the Texas Constitution. See *State v. Hodges*, 92 S.W.3d 489, 496, 501-02 (Tex. 2002). It should be emphasized, however, that in addition to this Court finding a right to vote in Texas's equal protection clause, there is yet another provision under our Texas Constitution, which explicitly recognizes a right to vote: "Every person subject to none of the disqualifications provided by Section 1 of this article or by a law enacted under that section who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter." TEX. CONST. art. VI, § 2(a).

12. In reviewing the constitutionality of laws affecting voting rights under this provision, the Texas Supreme Court has borrowed from the framework established by the U.S. Supreme Court for reviewing alleged infringements on voting rights. Id. A court applying this framework "first consider[s] the character and magnitude of the asserted injury to [voting] rights," and then balances the purported injury against the "interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983). Under this "flexible standard," a "severe" impediment to the right to vote must survive strict scrutiny, an exacting standard that places the burden of proof on the government to demonstrate that its restriction is narrowly tailored to achieve a compelling governmental interest. *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992). The government

carries this burden only by establishing "a 'strong basis in evidence,'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500, 109 S. Ct. 706, 102 L. Ed. 2d 854 (1989) (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S. Ct. 1842, 90 L. Ed. 2d 260 (1986) (plurality opinion)), beyond mere "anecdote [or] supposition"—demonstrating that the restriction on constitutional rights is the least restrictive means of achieving legitimate regulatory goals. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000).

13. Accordingly, under both federal and state standards, the first inquiry is whether the challenged restriction on voting is "severe," which triggers strict scrutiny. Where, as here, the voters' right to vote in an upcoming election is completely destroyed, rather than minimally inconvenienced, strict scrutiny must apply. Applying that standard, there is no possible basis for postponement of the election and the total disenfranchisement of over 180,000 people of their right to vote which would survive such strict scrutiny.

**Defendants' "Response" to Plaintiff's Motion for Preliminary Injunction**

14. Morace is deeply disturbed that Defendant SBISD's "Response" fails to point out any legal or factual shortcomings of Plaintiff's Motion for Preliminary Injunction. Indeed, the Defendants make no attempt whatsoever to show this Honorable Court that the Plaintiffs have failed to meet their burden for injunctive relief. To the contrary, the Defendants put all their eggs in the basket of asking the

Court to ignore the Plaintiff's Motion on the basis that the May election should be postponed, discovery should be completed, and a trial on the merits should be conducted in June. With all due respect, that is not a spirited response. To the contrary, it is both a retreat and a refusal to engage, coupled with the hope that if the Defendants ignore the contents of Plaintiff's Motion, maybe the Court will too. Morace is not willing to take that chance.

15.    Moreover, Morace is highly concerned that the Defendants told the Court during the February 14, 2022 status conference that no evidence needs to be taken and that the Plaintiff's Motion for Preliminary Injunction may be determined on the papers. This makes no sense, if the Defendants truly want to provide an adequate defense. A strong defense would challenge and cross-examine the Plaintiff, the Plaintiff's experts, the Plaintiff's proposed demonstration map, and the Plaintiff's feeble attempt to satisfy the three-prong *Gingles* preconditions (along with the totality of the circumstances test). A vigorous and rigorous defense would put on an opposing expert to point out the weaknesses of the proposed demonstration map, and to challenge the utter lack of any established regression analysis to demonstrate lack of performance of these proposed districts. A strong defense would also highlight the public interest in having elections on time so that the voters voices

can be heard. But none of these arguments have been made. Defendant SBISD's decision to go silent is deafening[1].

16.     Instead of fighting the merits, the Defendants nonsensically retreat to a request that the May election should be postponed to November, citing that it is a "better solution to simply delay, rather than, potentially, later void the entire May school board election should the Court determine after a trial on its merits that SBISD's current at-large system is impermissible." Morace would rhetorically ask, a better solution for who and according to what? The assumption that the May 7, 2022 election would be "void" is erroneous at best, fearmongering at worst. Should the Court side with Plaintiff, then remedial maps required by the Court will have to be drawn and evaluated, which takes time.  Once a map is achieved, it would apply to the next election cycle.  It typically would not become retroactive and invalidate a prior election outcome.  In addition, the facts of the May 7, 2022 election will either support or dispute Plaintiff's claims, just in time for the June trial date, thus bolstering or weakening Plaintiff's case. So why delay? The truth is that if three new Board Trustees get elected, then the majority sentiments of the direction of the defense of this lawsuit will radically change.  The current Defendants know that.  What if the case is not finally adjudicated by November?  Then what? As will be

---

[1] It is ironic that the Defendants devote a mere 3 and one-half pages of argument in their Response to Plaintiff's Motion for Preliminary Injunction, but those same Defendants wrote significantly longer briefs and vigorously opposed Morace's participation in this case.

explained below, not only is this is an outrageous and irresponsible move, but this gratuitous concession clearly demonstrates what Morace has been saying from the outset; SBISD wants to lose this case. The current SBISD Board does not want voter input and would rather get the judicial cover on this litigation than have an electoral process despite consistent and widespread outcry from voters.

17. As recently as last month, the Texas Supreme Court made clear that an election has begun once the candidate application process for obtaining a place on the ballot has commenced. *See In re Khanoyan,* Case No. 21-1111 (Tex. January 6, 2022). Indeed, the Texas Supreme Court said:

> To begin, the executive and legislative branches of government are the primary managers of our state's elections. They, no less than the courts, are sworn to uphold the Constitution and the laws. Texas courts do not sit as general overseers of election processes; they sit only to resolve any concrete and justiciable disputes that may arise. A party with such a dispute certainly has access to judicial resolution. But for a court to resolve an election dispute, the court must receive the case early enough to order relief that would not disrupt the larger election. This Court, like the U.S. Supreme Court, therefore has repeatedly explained that invoking judicial authority in the election context requires unusual dispatch—the sort of speed not reasonably demanded of parties and lawyers when interests less compelling than our society's need for smooth and uninterrupted elections are at stake. Time is particularly of the essence if a lawsuit seeks judicial action that may prevent the election from happening on time. Like the courts themselves, all parties must minimize delays in this context. Avoidable delays, in particular, may be fatal to the courts' ability to proceed at all.

Id. Accordingly, postponement of an election that has already begun is an impermissible intrusion into the political process.

18. The Plaintiff inexplicably waited to file her Motion for Preliminary Injunction until February 1, 2022, <u>which was well after the commencement of the May 7, 2022 election</u>. This unexcused tardiness is solely the byproduct of Plaintiff's lack of diligence. Indeed, filing so late is nothing more than an attempt to create an eleventh-hour emergency of Plaintiff's own making. There is no reason why Plaintiff could not have filed her Motion last year upon release of census data in the Fall. Having waited so long, it would be an incredible judicial overreach to delay the May 7, 2022 election, even if Defendant SBISD is hoping its invitation to do so will entice the Court to do so. Morace respectfully asks the Court not to do so.

19. These principles are not novel. Courts at every level, including the U.S. Supreme Court and the Texas Supreme Court, have declined to implement even "*seemingly innocuous*" alterations to election laws on the eve of an election, let alone after one has begun. Democratic Nat'l Comm. v. Wis. State Legislature, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring); see In re Hotze, 627 S.W.3d 642, 646 (2020) ("[C]ourt changes of election laws close in time to the election are strongly disfavored.") (quoting Tex. All. for Retired Ams. v. Hughs, 976 F.3d 564, 567 (5th Cir. 2020)); see also Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (per curiam) (holding that a lower court errs when it changes election laws on the eve of the election without sufficient showing of constitutional burdens). All parties must move with maximum expedition so that the courts—

which also must act quickly when properly called upon—do not themselves contribute to electoral confusion. See, e.g., Purcell v. Gonzalez, 549 U.S. 1, 4–6 (2006) (per curiam) (refusing to allow judicial interference in electoral rules in light of an imminent election); In re Hotze, 627 S.W.3d 642, 645–46 (Tex. 2020) (orig. proceeding) (citing Purcell and other cases to explain refusal to interfere in an imminent election through mandamus); In re Francis, 186 S.W.3d 534, 541 n.32 (Tex. 2006) (orig. proceeding) ("[C]ourts generally should not delay an election."); In re Gamble, 71 S.W.3d 313, 318 (Tex. 2002) (orig. proceeding) ("Generally, courts will not exercise equitable powers when their exercise may delay the election."); Blum v. Lanier, 997 S.W.2d 259, 263 (Tex. 1999) ("It is well settled that separation of powers and the judiciary's deference to the legislative branch require that judicial power not be invoked to interfere with the elective process.").

20.  Defendant SBISD's "kick the can" strategy is particularly egregious in light of the fact that three of the incumbent board trustees face opponents on May 7, 2022. Delaying the election gives these three board members an additional six months with which to make decisions on behalf of an electorate hungry for an election.  There is a very palpable and serious conflict of interest for incumbents to suggest to the Court that it delay an election. As explained above, there is a very real potential for a shift of political power resulting from three (3) new board trustees being elected, whereby the current litigation posture would be jettisoned in favor of

actually defending the current system of election. Indeed, the candidates running for office, Morace included, strongly oppose single member districts. It is no surprise, therefore, that the current SBISD board would use the adage of "not switching horses mid-stream." But that adage kicks as hard as it shoots. The very purpose of an election is to "throw the rascals out." Elections provide the electorate with an opportunity switch horses mid-stream.

21. This thinly veiled ploy to impose a single-member redistricting plan, even though not legally required under Section 2 of the Voting Rights Act, utterly fails to account for the fact that it would disenfranchise over 180,000 citizens of their right to vote for their candidates of choice on May 7, 2022. No matter how strongly the current Board of Trustees want to preserve their incumbencies long enough to ram home a new redistricting plan, postponing the May 7, 2022 election is not legally required and something which the voters *themselves* vehemently oppose. As can be seen by the attached Exhibit A, which resulted from a mere 5 hours of effort, there are 937 residents (approximately 61.0% of all the votes that voted in the 2019 election) who vigorously oppose postponement of the May election.

22. Morace's resources are not unlimited. She is a single mother and is not able to fund the full cost of supporting the voters interests against the District's abdication of its responsibility to its constituents' rights. Even the cost of this filing let alone future activity will be a harsh burden on Morace that will only be

exacerbated by a delay in the election; these cost are also likely to impact Morace's ability to finance her own election campaign. Moving the election to November makes participation meaningfully more partisan and a lot more expensive as the school district issues will be drowned out by the general election noise. This dynamic hurts Morace and other non-partisan candidates by increasing the cost of the election dramatically and improving the chances of partisan supported insider candidates and incumbents. Importantly, the only Hispanic male that has filed (John Perez) appeared at the February 14, 2022 SBISD Board meeting and stated unequivocally that he would like the election to proceed in May. He stated that "postponing the election deprives me of the opportunity to potentially serve on the board as this lawsuit gets resolved. The lawsuit is against the board and the board serves the community. The resolution of the lawsuit should be managed by a board elected by the people per the protocols and scheduled election. As of May 8th, the lawsuit impacting the community will be managed by a board with three members beyond their terms and potentially not representing the will of the community. The above also means an election in November may not be at at-large election with many potential Hispanic voters unable to vote for me thereby changing my likelihood of success."

23. Accordingly, Morace asks this Honorable Court to deny Plaintiff's Motion for Preliminary Injunction in its entirety. In addition, Morace asks this Court

not to delay the May 7, 2022 election. A final trial on the merits in June is sufficient to protect Plaintiff's interests, given Plaintiff's belated filing for injunctive relief. Alternatively, should this Court be inclined to grant Plaintiff *any* relief, which Morace opposes, such relief should be restricted to a preliminary finding that one - and only one - proposed District may potentially be a protected minority-majority district, coupled with a finding that the May 7, 2022 election shall proceed uninterrupted on an at-large basis. Should the Court further find on final hearing that a solitary single-member district is required, then an order and judgment may be crafted to impose such a remedial plan for the next round of elections in May of 2023.

24. In closing, Morace would point out once again that the Voting Rights Act was not passed to protect incumbents, nor was the United States Constitution. Under our system of laws, race and ethnicity are illegal to use as a weapon to dilute the voting strength of any racial or ethnic group, whether those diluted voters happen to be Black, Latino or White. To the contrary, redistricting is supposed to dictate map-drawing outcomes in spite of—***not because of***—race or ethnicity. In order to avoid race-conscious map drawing, other neutral considerations and criteria must be taken into consideration, such as compactness, contiguity, equal population, preservation of existing political communities, partisan fairness, and yes, racial fairness. To be sure, minority-majority districts may be legally required in a

particular redistricting dispute, but only upon an adequate showing that the three-prong test of *Gingles* and the totality of the circumstances test are satisfied. But that is not even close to a foregone conclusion for the at-large SBISD district in this case. Indeed, concrete evidence has yet to have been developed to prove *any* violation(s) of Section 2 of the Voting Rights Act. Add to that, Defendant SBISD's concern about continuity is not a legal argument. Moving the election to November subverts the will of the people in both the upcoming election and the past election by extending the terms of three Trustees. Such subversion of a scheduled democratic election is a serious and abnormal event, not near being justified by either the Plaintiff or Defendant SBISD. Delaying the election would be an affront to the voters and potentially allows the current incumbents to agree and construct a new voting scheme and associate maps that may benefit their own self-interest while completely denying voters their rights.

Dated: February 16, 2022

>Respectfully submitted,
>BY:  /s/ Andy Taylor
>Andy Taylor
>State Bar No. 19727600
>**ANDY TAYLOR & ASSOCIATES, P.C.**
>2628 Highway 36S, #288
>Brenham, Texas 77833
>713-222-1817 (telephone)
>713-222-1855 (facsimile)
>ataylor@andytaylorlaw.com

**ATTORNEYS FOR JENNY MORACE**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was electronically filed with the Court's electronic filing system on February 16, 2022, and that a copy has been served upon all counsel of record identified below.

Barry Abrams
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
babrams@blankrome.com
Attorneys for Plaintiff

Martin Golando
The Law Office of Martin Golando, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
Office: (210) 471-1185
Fax: (210) 405-6772
martin.golando@gmail.com
Attorneys for Plaintiff

Charles J. Crawford
ccrawford@abernathy-law.com
Lucas Henry
lhenry@abernathy-law.com
ABERNATHY ROEDER BOYD HULLETT,LLP
1700 N. Redbud Blvd. Ste. 300
McKinney, Texas 75069
Attorneys for Defendants

/s/ Andy Taylor
Andy Taylor