# EXHIBIT B

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF TEXAS
              HOUSTON DIVISION

VIRGINIA ELIZONDO,              )
                                )
   Plaintiff,                   )
                                )  Civil Action No.
v.                              )  4:21-cv-01997
                                )
SPRING BRANCH INDEPENDENT       )
SCHOOL DISTRICT, CHRIS          )
GONZALEZ, PAM GOODSON,          )
KAREN PECK, JOSEF D. KLAM,      )
MINDA CAESAR, CHRIS EARNEST,    )
J. CARTER BREED, in their       )
official capacity as members    )
of the Board of Trustees of     )
Spring Branch ISD               )
                                )
   Defendants.                  )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

ROBERT M. STEIN, Ph.D.

FEBRUARY 9, 2022

(REPORTED REMOTELY)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ROBERT M. STEIN, Ph.D.,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

numbered cause on February 9, 2022, from 9:27 a.m. to

11:31 a.m., before Dana Taylor, CSR in and for the

State of Texas, reported remotely via Zoom by machine

shorthand, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

## Page 2

A P P E A R A N C E S
(Via Zoom)

FOR THE PLAINTIFF:
   MR. BARRY ABRAMS
   BLANK ROME
   717 Texas Avenue
   Suite 1400
   Houston, Texas   77002-2727
   713-228-6606
   713-228-6630 Fax
   barry.abrams@blankrome.com

   - and -

   MR. MARTIN GOLANDO
   THE LAW OFFICE OF MARTIN GOLANDO, PLLC
   405 North Saint Mary's Street
   Suite 700
   San Antonio, Texas   78205-2334
   210-892-8543

FOR THE DEFENDANTS:
   MR. CHARLES J. CRAWFORD
   ABERNATHY, ROEDER, BOYD & HULLETT, P.C.
   1700 Redbud Boulevard
   Suite 300
   McKinney, Texas   75069
   214-544-4000
   214-544-4040 Fax
   ccrawford@abernathy-law.com

## Page 3

INDEX

                                         PAGE
Appearances                                2
Stipulations                               5

WITNESS:  ROBERT M. STEIN, Ph.D.

   Examination by Mr. Crawford             6

Signature and Changes                     85
Reporter's Certificate                    87

## Page 4

EXHIBITS

NUMBER      DESCRIPTION                        PAGE
Exhibit 1   Expert Report of                    7
            Robert M. Stein, Ph.D.
            January 20, 2022
Exhibit 2   Email Dated February 7, 2022       23
            with Attachments
Exhibit 3   Color Map                          50
            SBISD000001
Exhibit 4   Demonstrative Spring Branch ISD    51
            Single-Member District
Exhibit 5   "Partisanship, Structure, and      63
            Representation: The Puzzle of
            African American Education
            Politics" by Kenneth J. Meier
            and Amanda Rutherford
Exhibit 6   "The Impact of At-Large            69
            Elections on the Representation
            of Blacks and Hispanics" by
            Susan Welch
Exhibit 7   "At-Large Elections and            75
            Minority Representation in
            Local Government" by
            Carolyn Abott and Asya Magazinnik
Exhibit 8   Press Release "Republican Party    81
            of Texas Doubles Down on Local
            Elections

Page 5

```
 1              P R O C E E D I N G S
 2        FEBRUARY 9, 2022 - 9:27 A.M.
 3            (Reported Remotely)
 4              * * * *
 5        THE REPORTER:  Today is February 9, 2022.
 6 The time is approximately 9:27 a.m.
 7        My name is Dana Taylor.  My Texas CSR
 8 Number is 6048.  I will be administering the oath
 9 and reporting the deposition stenographically from
10 Mansfield, Texas.
11        The witness is located in Houston, Texas.
12        Will Counsel please state your appearances
13 and any agreements for the record, and then I will swear
14 in the witness.
15        MR. CRAWFORD:  Sure.  I'll start.
16        Charles Crawford for the Defendants.
17        And we'll take it pursuant to the federal
18 rules.
19        MR. ABRAMS:  Barry Abrams for the
20 Plaintiff.
21        I agree that we're taking it per the rules.
22        MR. GOLANDO:  Martin Golando for the
23 Plaintiffs.
24        And I agree with Barry.
25            (witness sworn.)
```

Page 6

```
 1            ROBERT M. STEIN, Ph.D.,
 2 having been first duly sworn, testified as follows:
 3              EXAMINATION
 4 BY MR. CRAWFORD:
 5    Q.  Good morning.
 6    A.  Good morning.
 7    Q.  Can you hear me okay?
 8    A.  Yes.
 9    Q.  Good.  If any time it's -- because we're doing
10 this by Zoom, I'm garbled or unclear, please let me
11 know, and I'll do the same for you.
12    A.  I will.
13    Q.  Okay.  Will you please state your name, please?
14    A.  Robert Mark Stein.
15    Q.  Dr. Stein, what is your occupation?
16    A.  I am a professor of political science at
17 Rice University.
18    Q.  How long have you been a professor at Rice?
19    A.  Since 1979.
20    Q.  And have you been hired by the Plaintiff in
21 this case as an expert?
22    A.  Yes, I have.
23    Q.  When were you hired?
24    A.  That's a very good question.  It was last year.
25 I think Mr. Abrams and Golando approached me late
```

Page 7

```
 1 summer, early spring.  The early spring, late --
 2 early -- late spring, early summer.  Excuse me.
 3    Q.  Of 2021?
 4    A.  2021.
 5    Q.  And what is your rate of compensation?
 6    A.  $250 per hour.
 7    Q.  I have -- I have sent Barry and Dana copies of
 8 the exhibits I'd like to use with you in your deposition
 9 today.  Do you have access to those?
10    A.  Yes, I do.
11    Q.  Perfect.  The first exhibit I would like to
12 talk to you about and mark is your report.
13        MR. CRAWFORD:  And so, Dana, if you would
14 mark that as Exhibit 1.
15        Barry, do you want to start these new,
16 or do we want to start after the last number from your
17 depositions?  Do you have a preference?
18        MR. ABRAMS:  I'm really indifferent.
19 I don't honestly recall where we left off.  So I think
20 there will be few enough exhibits in this case that
21 maybe we can do it per witness or per group of
22 witnesses.
23        MR. CRAWFORD:  Perfect.  Then we'll just
24 make this Stein Deposition Exhibit 1.
25            (Exhibit 1 identified.)
```

Page 8

```
 1    Q.  Dr. Stein, is Exhibit 1 a copy of your report
 2 in this case?
 3    A.  Yes, it is.
 4    Q.  Is your resume attached to the report?
 5    A.  Yes, it is.
 6    Q.  And does your resume adequately describe and
 7 list your qualifications to opine as an expert in this
 8 case?
 9    A.  Yes, it does.
10    Q.  Okay.  So rather than go through that, we'll
11 just rest on the resume, if that's okay?
12    A.  (Nods head.)
13    Q.  What is the scope of your employment as an
14 expert in the lawsuit?
15    A.  And -- and I'll be looking to my -- to your
16 left because I have another screen that has my -- has
17 the exhibit up.  So I'm not trying to be rude or just
18 wanted you to think I'm -- but on Page 2 --
19    Q.  I absolutely understand.
20    A.  -- and 3, I stipulate, I guess, I have been
21 retained by counsel to provide expert testimony, and
22 there are, I believe, five, six, seven -- eight bullets.
23        I can go through them, but they're
24 basically the -- the issues of whether Spring Branch ISD
25 school board elections are racially polarized.
```

9

1        Whether Latinos or Hispanics are
2 politically cohesive in the Spring Branch ISD school
3 board trustee elections and vote as a block for
4 Latino-preferred candidates -- or candidate.
5        Whether Hispanic or Latino voting-age
6 population in the Spring Branch ISD is sufficiently
7 large and geographically compact to constitute a
8 majority of voting population in at least one, or more,
9 single-member districts under what I offer later on as
10 an illustrative district plan.
11        And then the last four points deal with
12 whether White Non-Hispanics vote sufficiently as a block
13 to enable them, in the absence of special circumstances,
14 like a special -- like a single-member district, to
15 defeat a minority candidate who is a preferred choice of
16 the minority voter.
17        whether single-member district elections
18 or at-large elections enhance the proportional
19 representation of minority-preferred candidates on
20 elected legislative bodies, like a school board.
21        whether taxing and spending practices
22 differ significantly between governments with
23 single-member district representation and at-large
24 elections or representation.
25        And then, finally, whether legislative

10

1 bodies are more responsive to the preferences of
2 minority and nonminority voters in at-large or
3 single-member district forms of representation.
4    Q.  Are the bullet points you read off more
5 commonly known as the Gingles factors?
6    A.  Yes.  That was how I understood these issues,
7 from reading Gingles and being advised.
8    Q.  And would the scope of your opinion and
9 engagement be to opine on Gingles Factors 1, 2, and 3?
10    A.  Yes, they would.
11    Q.  And are you opining on the Senate Factors also?
12    A.  I'm -- I'm sorry.  I couldn't hear that last
13 word.
14    Q.  The Senate Factors.  Are you opining on the
15 Senate Factors or the "totality of the circumstances"
16 factors?
17    A.  Oh, okay.  I didn't know what "Senate" meant.
18        I -- I am opining on what I said here.
19 If -- if that constitutes a -- I think you called it the
20 totality of circumstances, I'm inclined to agree with
21 that, yes.
22    Q.  Okay.  Are there any other subjects that you
23 are opining on that are not listed in the bullet points
24 in your report?
25    A.  No.

11

1    Q.  what have you done in order to render your
2 opinion in this case?
3    A.  A number of things.  Of course, I -- to deal
4 with the last four points, in reverse order, I reread
5 the literature on -- the scholarly literature on these
6 issues that I -- the last four bullets, I think on
7 Page -- help me here -- 3.
8        I requested -- to deal with these issues
9 on the first three bullets -- actually, the first four
10 bullets; I apologize -- I requested materials and
11 information from the Spring Branch ISD.  I acquired
12 information from the Harris County election
13 administrator's office.
14        And, where necessary, I read newspaper
15 accounts of the candidates running for office in the
16 Spring Branch ISD trustee -- school board trustee
17 elections.
18    Q.  Did you --
19    A.  Oh, I'm sorry.
20    Q.  Oh, go ahead.
21    A.  I also acquired data from the U.S. Bureau of
22 Census for demographic information.
23    Q.  Did you keep copies of the newspaper accounts
24 that you just were referring to that you had reviewed?
25    A.  I think one or two, yes.

12

1    Q.  Would you be able to locate those and provide
2 those to Barry to be able to provide to me?
3    A.  Yes, I -- I am certain I can.
4    Q.  Okay.  I'd ask if you could do that, please?
5    A.  Can I just write myself a note?
6    Q.  Sure.
7    A.  I'm forgetful.
8        Got it.
9    Q.  Okay.  You were telling me what you had done in
10 order to render your opinion, and I interrupted you with
11 the newspaper request.  Any other tasks that you've
12 done, other than what you've just told me, in order to
13 render your opinion?
14    A.  No, I don't -- no.
15    Q.  who did you talk to in preparation to render
16 your opinion?
17    A.  Well, of course Mr. Abrams and Mr. Golando, and
18 that's it.  I -- I didn't talk to anybody else.  As I
19 said, I -- I read a good deal.  And that is -- those are
20 the only people I talked to about this case.
21    Q.  Is there anything else that you need or want or
22 plan to do to render your opinion in this case?
23    A.  At this time, no.
24    Q.  Are you fully prepared to render your opinion
25 today?

**13**

1   A.  Yes.

2   Q.  What is your opinion?

3   A.  Well, as I said in my report, I think there is

4 statistically significant evidence of racial polarized

5 voting in the Spring Branch ISD -- Independent School

6 District trustee elections from 2015 to 2021.

7   Q.  And, Dr. Stein, are you reading from the

8 "Summary of Opinions" portion of your report on Page 3?

9   A.  Yes.

10   Q.  Okay.

11   A.  I think that non-white (sic) Hispanics vote

12 sufficiently as a block to enable them, in the absence

13 of a single-member district form of representation, to

14 defeat minority voters, which would be the preferred

15 candidates of choice for those Hispanic voters.

16       I also believe the geographic concentration

17 of Hispanics in the Spring Branch ISD district is

18 sufficient to constitute a majority of the voting-age

19 population in at least one single-member district under

20 what I offered as an illustrative seven-district plan.

21 Although, there may be more.  I have not investigated

22 that.  I only looked for the one.

23       Regarding the literature and research,

24 scholarly literature, I find strong evidence that

25 single-member district forms of representation do -- do,

**14**

1 in fact, enhance proportional representation of minority

2 candidates on legislative bodies.

3       Single-member district representation

4 increases the likelihood that minority candidates will

5 contest -- that means run for -- positions on

6 legislative bodies.

7       And single-member district representation

8 will produce policies, decisions of these legislative

9 bodies, that are more responsive to minority voters and

10 their policy preferences.

11       THE WITNESS:  And if I'm going too fast,

12 Ms. Taylor, please just slow me down.  I am working

13 extremely hard to not deliver a fast answer.

14   A.  Oh, and I'm sorry.  I apologize.  The

15 concluding recommendation is that the Spring Branch ISD

16 should adopt single-member district plans for the

17 election of its seven district trustees.

18   Q.  And that is a summary of your opinions in the

19 case.  Do you have any other opinions, other than the

20 ones that you just listed for me?

21   A.  No, I do not.

22   Q.  Your last summary talks about a single-member

23 district plan, and I want to ask, if you could, tell me

24 the positive aspects of at-large systems for school

25 districts?

**15**

1   A.  That's a good question.

2       As I write in the report -- although, I --

3 I should be careful here.  I know the arguments in

4 favor of at-large forms of representation.  So I'll

5 distinguish my answer by saying there have been

6 arguments -- or hypotheses, I should say, about the

7 advantages of single-member district representation

8 over at-large.

9       Those advantages seem to flow from the

10 idea that single-member district representation has

11 disadvantages that are overcome by at-large.  Those

12 disadvantages include excessive spending above demand.

13 Sometimes we call this a pork barrel.

14       So single-member district representation

15 leads single-member district representatives to increase

16 spending for their district at the expense of the

17 benefits to the whole district, a sort of

18 particularization, and a greater concern for the --

19 not for the many, but for the some.

20       Second, at-large forms of representation

21 are thought to be able to represent what is known as

22 the collective interest, the greater good of the

23 district, over the -- the good of a particular segment

24 or geography.

25       The literatures I offer here -- and I'm on

**16**

1 Page 3 -- do not seem to conclusively -- there are mixed

2 results, and there's even results that would support.

3 But to use the phrase the totality of the research and

4 the -- and the best research and the most recent does

5 not seem to support those arguments in favor of at-large

6 over single-member district representation.

7   Q.  And I note that you were very careful, at

8 the beginning of your answer, to say that these were

9 arguments in favor of at-large, not necessarily your

10 opinion about that.

11       So let me ask you.  Do you agree or

12 disagree with the arguments that you've laid out for me?

13   A.  It's my conclusion that the literature and

14 my own findings here -- but particularly the literature

15 that I reviewed -- would not support the arguments

16 or hypotheses that suggested at-large forms of

17 representation are superior, on those points I made,

18 to single-member district representation.

19   Q.  What about the middle ground of those two

20 systems, the at-large on one end, pure single-member

21 districts on the other?  What about mixed districts

22 where you have one or two at-large seats and the

23 remainder are single-member districts?  Tell me about

24 the positive aspects of that sort of a system.

25   A.  I -- I did not review that literature.  I know

**17**

1 that literature exists, and I'm -- I'm quite happy to --
2 to review it. But I, at this point, have not formed an
3 opinion about mixed systems. And there -- there are
4 many of them. Our own City of Houston city council has
5 a mixed plan and has since 1981.
6           But I have not -- I want to be clear
7 here -- have not reviewed that literature, nor have
8 I formed an opinion about the superiority, inferiority,
9 or -- or any of the issues I addressed here. I only
10 looked at single-member versus at-large.
11     Q.  You mentioned the City of Houston in your
12 answer, and so that -- that leads me to ask this
13 question. When you are looking at elections and
14 systems, is there a difference between analyzing those
15 systems and elections with regard to cities versus
16 school districts?
17     A.  I am certain there is, but, again, except for
18 the literature I reviewed, I -- my first focus was
19 school districts, but there's no question that there
20 have been -- and my literature review includes both
21 school districts and some studies on general purpose
22 municipal governments.
23           But I am not ready to opine whether or not
24 single-member district forms of representation and
25 at-large vary by form of government, school district

**18**

1 and -- and general purpose governments. It was not the
2 scope of my work, which is not to say that I -- I
3 couldn't have done that. I just did not. I was not
4 asked to do that.
5     Q.  I want to turn back to your report, and we're
6 on Page 3, the fourth bullet point, the Summary of
7 opinions, and you discuss the scholarly literature.
8 You make reference to scholarly literature to conclude
9 certain items.
10           What scholarly literature are you referring
11 to specifically there?
12     A.  In the first bullet?
13     Q.  Or just when you say "There is strong" --
14     A.  Or all three?
15     Q.  -- "evidence in the scholarly literature,"
16 are there certain studies that you're specifically
17 referencing, and can you tell me what that -- what those
18 are?
19     A.  Sure. Yeah, I mean, the best way to answer
20 that would be to go to page -- help me here -- Page 10.
21 And I tried to organize my review of the literature
22 around, I believe, at least three. Did minority
23 representation in at-large districts increase -- did
24 at-large -- excuse me.
25           Did at-large versus single-member district

**19**

1 forms of representation increase -- increase or have no
2 effect on the election of minority candidates, and that
3 literature is -- I think the core of it is at the top of
4 Page 11, if you can see that.
5     Q.  Yes. And I'm going to --
6     A.  And it's --
7     Q.  I'm going to come back to those later because
8 we're just going to work -- just so you know, I'm just
9 going to work through your report sequentially --
10     A.  Sure.
11     Q.  -- because it's easier for simple minds like
12 me to do it that way. And so I'm going to come back
13 to some of these studies that you reference on Page 11.
14           But these are primarily what you're
15 referencing, on Page 3, when you say "the scholarly
16 literature"?
17     A.  Yes.
18     Q.  Perfect.
19           I want to turn quickly to Page 2 of your
20 report, and you state, towards the bottom, that "I have
21 also designed voting districts for municipal governments
22 and school districts in Texas. I am currently designing
23 election districts for Lancaster ISD, Goose Creek ISD,
24 and the City of Baytown."
25           My question is are there any other school

**20**

1 districts for which you are designing election
2 districts --
3     A.  That I --
4     Q.  -- or that you have designed election districts
5 for?
6     A.  Have or -- or currently? I'm sorry.
7     Q.  It's a two-part question.
8     A.  Sure.
9     Q.  So both of them.
10     A.  I -- I have done it for HISD; Houston Community
11 College; Lone Star; San Jacinto. Give me a second.
12 I've just got to -- oh, Lyman County ISD, South Dakota.
13 And, to the best of my memory, that's it, and then the
14 ones I'm currently doing.
15     Q.  And does that entail actually drawing a map,
16 like you've done in your report in our case?
17     A.  Let me clarify, yes, I first have -- I didn't
18 draw a map here. I -- I worked with the map that I was
19 given. Needless to say, I was working with the precinct
20 or enrollment districts that are currently being used
21 for electing trustees.
22           But to -- to your first, yes, I have drawn
23 maps. I think -- I use the word "design." I think
24 your -- your language is maybe better. I -- I
25 constructed or drew maps, yes.

21

1    Q.  Is that normally the type of work that
2 demographers do?
3    A.  I don't know.  I -- and that's a fair question.
4 The -- the short answer is I have worked with
5 demographers.  I'm -- I'm not altogether certain what
6 exactly they do, except enrollment districts.  But the
7 short answer is I'm not certain, but I would -- I would
8 assume so, yes.
9    Q.  And as opposed to analyzing election data, what
10 are -- what do you believe your qualifications are to
11 design the district themselves, or draw the maps, as
12 we've been talking here?
13    A.  Well, I'm -- I am familiar with, as -- as I'm
14 often advised by attorneys I work for or the school
15 districts whose attorneys I work for, regarding rules
16 and requirements, voting rights, single-member
17 districts, one person one vote.
18         I've trained and taken courses on
19 geographical information systems.  I have trained and
20 actually served on the U.S. Bureau of Census advisory
21 board; so I'm pretty familiar with the data that is
22 provided there.
23         And I believe I am knowledgeable about
24 elections and election procedures, such that I can work
25 with the voting data provided by, in this case, county

22

1 and election administrators.
2    Q.  Of the -- of the election districts that you've
3 designed for schools before, have they all been pure
4 single-member districts, or have any of them been a
5 mixed system of partially at-large and partially
6 single-member?
7    A.  Only the City of Houston has been a mixed
8 system.  All others have been single-member districts.
9         I -- I qualify that.  I'm sorry.  My
10 memory.  I did -- and this is a while back -- Fort Bend
11 ISD.  And I did their redistricting when they moved from
12 an at-large to a single-member.  And if you're going to
13 ask me the year, I'm going to vaguely recall it as in
14 the early 1980s.
15    Q.  Going to page -- back to Page 3 now of your
16 report, your final opinion is that "Spring Branch should
17 adopt a single-member district plan for the election of
18 the district's seven trustees."
19         Did I take your earlier testimony to say
20 that you did not analyze whether or not Spring Branch
21 should adopt a mixed system?
22    A.  No, I did not.
23    Q.  Okay.  So you don't have an opinion whether
24 that would be good, bad, or indifferent at this point?
25    A.  Not based on the work I have done in -- in my

23

1 expert report.
2    Q.  The next section of your -- of Page 3 is
3 "Materials Reviewed."  And you say that you consulted
4 the scholarly, peer-reviewed research on, and then you
5 list some bullet points.
6         Is that the same research that you and
7 I were talking about just a moment ago, or is this a
8 different --
9    A.  Yes, it is.
10    Q.  -- body of research?
11    A.  I'm sorry.  I couldn't hear.
12    Q.  or is this a different body of research?
13    A.  No, no.  This is what we had previously --
14 previously discussed and I elaborate on later in the
15 report.
16    Q.  And then the last paragraph on Page 3 says that
17 you have "relied on election results provided by the
18 Spring Branch ISD for trustee elections, data from the
19 U.S. Bureau of the Census, and Harris County's Election
20 Administrator Office for my analysis of racially
21 polarized voting in SBISD's trustee elections."
22         Do you see that reference?
23    A.  Yes.
24         (Exhibit 2 identified.)
25    Q.  If you would, as the next exhibit, look at the

24

1 email from Barry to me, and it has attachments to it.
2    A.  I -- I don't recall seeing that.  I apologize.
3 I'm sure I got it.  I just don't have it at --
4    Q.  This is an email that Barry sent me on this
5 Monday, and it says "Attached are materials provided by
6 Dr. Stein."
7    A.  Yes.  Yes, I do remember.  If you give me a
8 second, I'll get it up.
9         Okay.  And which exhibit is it?
10    Q.  We can mark this now as Exhibit Number 2.
11    A.  Okay.  Barry Abrams' email.  I got it.  I see
12 it.
13    Q.  Okay.  My first question is are these the
14 materials that you're referring to on the bottom of
15 Page 3 of your report?
16    A.  Yes.
17    Q.  Are there any other materials that you're
18 referring to, in your report on Page 3, that are not
19 contained in the email that Barry sent me?
20    A.  Yes.  If you go to the bottom -- and I
21 apologize.  I omitted this in my report.  There is
22 another source of information, and I have to get it.
23         Yeah, on Page 9, Footnote 2.
24    Q.  I'm with you.
25    A.  I used data from the NCES, the National --

25

1 well, you're going to ask me what it stands for; it's
2 the National Center for Education Statistics -- to
3 acquire information on the racial makeup of schools and
4 enrollment districts in Spring Branch.  And that was
5 used in my racial and ethnic segregation analysis on
6 Page 9.  That was not included on the bottom of Page 3.
7      Q.  Okay.  Would you be able to print those
8 materials and send them to Barry so he could forward
9 them to me?
10     A.  Yes, yeah.
11     Q.  Okay.  Thank you.
12     A.  There's one -- yeah.
13     Q.  If you need to finish an answer, please feel
14 free.
15     A.  There was one other piece of information I
16 acquired from Mr. Golando on the American Community
17 Survey, on Page Number 8, and that's Table Number 1.
18 And I will -- well, that data's there.  The source is
19 the American Community Survey, and I should have put a
20 footnote in that for the website as well, which I will
21 do.
22     Q.  All right.  And I had a couple of questions
23 about that, but I'll get to those later.
24         Other than the -- what you've now told me
25 about, the additional information, is there any other

26

1 information that you're referring to, in Page 4 of your
2 report, that's not included in the materials that Barry
3 sent me the other day?
4      A.  I'm just double-checking to make certain, if
5 you don't mind.
6      Q.  Sure.
7      A.  I want to make certain I didn't -- no.  No,
8 there is no other information.
9      Q.  Okay.  Turning to Exhibit 2, which is Barry's
10 email and the attachments, I just want to ask you what
11 the attachments are and what they -- what them mean and
12 how you use them.
13     A.  Okay.
14     Q.  And so the first one, the first attachment, I
15 think, is labeled "Copy of SBISD Demonstrative Data,"
16 and it appears to be a chart.  And it looks like this
17 chart may have formed part of the basis of your chart on
18 Page 8 of your report.
19     A.  Help me here.
20     Q.  Sure.
21     A.  Are we talking about the -- the one that's
22 "Special Tabulation of Citizen Voting Age Population"?
23     Q.  It's the one that --
24     A.  Yeah, I got it.  That's it.
25     Q.  Yeah.  So tell me what this is and how you used

27

1 it.
2      A.  This was used for -- I'm parsing everything
3 together here.  Give me just one second so I can tell
4 you.
5          These are the data that I -- I used for
6 table number -- get this back up.  Yeah, these are the
7 data I used for Table Number 1 on Page 8.
8      Q.  And if I am reading this correctly, the first
9 three columns of the spreadsheet all came from the 2020
10 census?
11     A.  Yes.
12     Q.  And then do all the remaining columns come from
13 the American Community Survey?
14     A.  That is correct.
15     Q.  And that's the 2015 to 2019 --
16     A.  That is --
17     Q.  -- five-year ACS?
18     A.  I believe all of the -- oh, I'm sorry.  Yes,
19 the first three columns are the census, and the
20 remaining columns are from the American Community Census
21 (sic) from 2015 to 2019.
22     Q.  Is there a reason why you use the census for
23 the first three columns and not for the remaining
24 columns?
25     A.  Citizen voting age population is not data

28

1 collected in the census; whereas, citizen -- let me get
2 that -- citizen voting age population is collected only
3 in the American Community Survey.  It is not collected
4 in the census.
5      Q.  And is there a 2020 American Community Survey,
6 or was the 2015 to 2019 the most recent data set that
7 you were able to use?
8      A.  It was the most recent that was available to us
9 at the time.
10     Q.  Is there a 2020 ACS?
11     A.  I believe there is, but I am not certain it's
12 been released.  I -- I just don't know.  I honestly
13 don't know.
14     Q.  And then under your column that says
15 "Hispanic CVAP" -- and CVAP stands for citizen voting
16 age population; is that correct?
17     A.  Yes.
18     Q.  And in your proposed District 1, you have a
19 52.8 percent Hispanic CVAP; is that correct?
20     A.  That's correct.
21     Q.  And so that puts it over the 50 percent
22 Gingles 1 threshold for an acceptable illustrative
23 district, correct?
24     A.  That is correct.
25     Q.  Next to the 52.8, you have a plus/minus of 5.9.

**29**

1 Is that plus/minus of 5.9 the margin of error?
2    A.  That is correct.
3    Q.  So does that mean that the Hispanic CVAP in
4 District 1, within the margin of error that you've
5 listed, could be below 50 percent?
6    A.  Yes.
7    Q.  How did you -- do you know how the ACS gathered
8 or computed the Hispanic CVAP in Spring Branch?
9    A.  They would have conducted surveys.
10   Q.  Is it -- is it self-identification or is it
11 surname based or do you know?
12   A.  No, the -- my understanding -- and on this,
13 I will have to -- I'd have to do more work.  It is
14 self-identified.
15   Q.  I'm sorry.  I didn't --
16   A.  Self-identified.  It's the result of a survey
17 question asked.
18   Q.  Did you use the chart that we're referring to
19 for any other purpose than using it for Table 1 in your
20 report?
21   A.  No, I did not.
22   Q.  And other than the 2020 census and the 2015 to
23 2019 ACS survey, did you rely on any other information
24 or data to create this spreadsheet?
25   A.  This one here on -- that we're looking --

**30**

1    Q.  Yes.
2    A.  -- I'm looking at?  No, I did not.
3    Q.  Okay.  The next attachment to Barry's email
4 that I would like to ask you about is the one entitled
5 "Data SBISD Election."  And when you -- when Barry sent
6 it to me, it was on an Excel spreadsheet, and then, when
7 I printed it off, it gives me a harder-to-read version.
8    A.  Yes, sir.
9    Q.  But it was sent in Excel form.
10        Can you tell me what this is and what you
11 used this for, in terms of your opinion?
12   A.  I'll start with the second question.  It was
13 used to do my voter polarization racial -- racial
14 polarization.  It's a result of trustee elections by
15 year, by precinct or voting tabulation area, by
16 candidate, along with the racial or ethnic makeup of
17 each voting place, in terms of what was the racial
18 makeup of the men and women that cast ballots in that
19 election, in that year, in that polling place, or in
20 this case precinct.
21        Trustee -- maybe this will help.  When I
22 refer to precincts and polling places and enrollment
23 districts, they're all the same.  There are seven
24 trustees, and, although they are at-large, these
25 elections are held in these seven.  There was actually

**31**

1 an additional overflow on some years, but this is
2 basically the data that informed my racial polarization
3 analysis.
4    Q.  And where did you -- what information did you
5 use to come up with your chart?
6    A.  The data that I -- I'm not certain -- repeat
7 that again, please.
8    Q.  Sure.  What data did you use to input into your
9 Excel spreadsheet to create this?
10   A.  I asked, as I said I think on Page 3, for
11 the Spring Branch ISD to provide me vote totals by
12 candidate, by year, by polling location.
13   Q.  And, ultimately, did the information in this
14 spreadsheet, that we're looking at -- we're talking
15 about, become part of Figures 1, 2, 3, and 4 on
16 Pages 5 through 7 of your report?
17   A.  I'm going to switch back and forth.  I just
18 want to make certain I'm -- yes, these are the ones for
19 Figures 1 through 4, yes.
20   Q.  Okay.  Perfect.
21        The next attachment to Barry's email, that
22 I'd like to ask you about, is entitled "Election Results
23 2015 to 2021."
24   A.  Okay.  Yes.
25   Q.  And like the prior one, this came on an Excel

**32**

1 spreadsheet, and I'd like to ask you, what did you use
2 this for, and what data did you use to input to create
3 this?
4    A.  This is virtually the same data, coming from
5 the same source, as we saw in the spreadsheet above.
6 It is a different display of the data, but it's the same
7 data and the same source, and it was used to inform my
8 analysis on racial polarized voting, as reported in -- I
9 forgot the section -- but Figures 1 through 4.
10   Q.  Perfect.
11        The next attachment to Barry's email is
12 entitled "Polarization Spreadsheet."
13   A.  Oh, yes, I'm with you.
14   Q.  Okay.  And like the -- like the earlier
15 questions, I just want to ask, you know, how did you --
16 what is this, how did you use it, and what did you use
17 to create it?
18   A.  All right.  Let me just -- give me one second.
19        So if you go to my report and you go to
20 Page -- help me here -- 9, this data, which came from
21 the National Center on Educational Statistics --
22 Education -- National Center for Education Statistics,
23 and this informed Section 6 of my report on "Racial and
24 ethnic segregation in Spring Branch ISD."
25   Q.  Where did you get the information to put into

33

1 your spreadsheet?
2      A.   From the National Center for Education
3 Statistics.  The website is in Footnote Number 2 on
4 Page 9.
5      Q.   And that's the one we talked about earlier?
6      A.   Yes.
7      Q.   And then the final attachment to Barry's
8 email was entitled "Spring Branch Segregation ISD Data
9 Analysis 2."
10      A.   Let me go back.  Yes.
11      Q.   And if you could tell me what this is, how you
12 used it, and what you used to create it?
13      A.   These are the calculations that I made.  Let
14 me go back to the report.  And on Page 9, again, in
15 Section 6, this formula for calculating racial
16 segregation scores, those are the computed
17 scores for each of the schools and each of the
18 enrollment districts in Spring Branch ISD.
19      Q.   All right.  I think I'm ready to move on to
20 Page 4 of your report.
21      A.   Give me one second.  Okay.
22      Q.   And this is the section entitled "Racially
23 Polarized Voting in Spring Branch ISD."  And your first
24 paragraph states that you "used a definition of racially
25 polarized voting as outlined in Thornburg versus Gingles

34

1 case to assess whether this condition existed in the
2 Spring Branch ISD trustee elections between 2017 and
3 2021."
4      A.   2015 and --
5      Q.   Okay.  You anticipated my question.
6      A.   That's a typo, for which I do apologize.
7      Q.   Okay.  Because I --
8      A.   It should be 2015.
9      Q.   I was going to ask you why you chose 2017, but
10 you've --
11      A.   No.
12      Q.   -- now answered that.
13      A.   It's a -- it's a typographical error.
14      Q.   Okay.  So why did you choose -- why didn't you
15 go earlier than 2015?
16      A.   I'm sorry.  I couldn't hear that.
17      Q.   Sure.  Why didn't you do any analysis earlier
18 than 2015?
19      A.   I -- and to -- the honest answer is I -- my
20 recollection was I couldn't get data before 2015, and
21 I -- this was the data that was available to me.  But
22 I -- that is my recollection.
23      Q.   Do you know who the minority-preferred
24 candidates were in the Spring Branch elections prior
25 to 2015?

35

1      A.   No, I do not.
2      Q.   You analyze, I believe, ten trustee elections,
3 in Spring Branch ISD, to form the basis of your opinion?
4      A.   That's correct.
5      Q.   You did not analyze any exogenous elections,
6 did you?
7      A.   Say that again.  Any?
8      Q.   You did not analyze any exogenous elections,
9 did you?  Non-Spring Branch elections?
10      A.   No, no.
11      Q.   Why did you -- can you tell me why you did not
12 do that?
13      A.   It wasn't what was asked of me.
14      Q.   The final paragraph, on Page 4 of your report,
15 states that "The dominate races and ethnicities among
16 Spring Branch ISD voters are White, the majority, and
17 Hispanic, the minority."
18           Do you know the current percentages of
19 those two groups based on the 2020 census?
20      A.   I think that's in -- as in total population or
21 total voting age population?
22      Q.   Well, that's a great question.  I'm just trying
23 to refer it to the statement in your report.  So what
24 were you referring to in your report when you say that
25 the dominate races among the voters are White, the

36

1 majority, and Hispanic, the minority?
2      A.   I think I was referring here to Section 6 of
3 my report, racial and ethnic segregation.  And if I
4 remember correctly, for example, Spring Branch is
5 comprised of 26.7 percent White students and 59 percent
6 Hispanic students.
7      Q.   Right.  But now the percentages of students
8 does not necessarily correspond to the percentages of
9 voters, does it?
10      A.   That's correct.
11      Q.   Because most students don't vote?
12      A.   Well, yes, most students will have parents,
13 maybe all students, and we will assume that, but not
14 necessarily, the -- race and ethnicity.  So the only
15 other source of information I have would have been the
16 census data and citizen voting age population that are
17 reported in the exhibit that I --
18      Q.   Would it also be on the -- your Table 1 on
19 Page 8 of your report?  You have a chart.
20      A.   Yes, that -- that would be the makeup of
21 the districts, but I'd go back to the census and the
22 ACS reports.  And then from that, I would have
23 calculated the percent of population, Spring Branch ISD,
24 White, Hispanic.  I cannot give you that number now.
25      Q.   Okay.  Turning to the next page of your report,

37

1 Page 5, at the very beginning of Page 5, you state,
2 "To measure the degree to which there is racially
3 polarized voting in Spring Branch ISD trustee elections,
4 I regressed the proportion of persons," et cetera,
5 et cetera.
6          My question is what does "I regressed"
7 mean?
8     A.  It -- Footnote Number 1.  It's a kind of
9 "ordinary least squares."  Basically, it's a plot.
10 Simply, along the -- what you'd call the Y -- well,
11 the horizontal axis --
12    Q.  And so you'll understand, I'm a liberal arts
13 major, and so a lot of what you're going to say might be
14 very simple to you, but is very --
15    A.  I understand.
16    Q.  -- detailed to me.  So help -- help the
17 uninitiated.
18    A.  What I'm asking is simply this, given an
19 election -- let me -- let me re- -- I'm going to go back
20 up so you can see in the report.
21          It's a proportion of vote cast for the
22 white candidate, the minority-preferred candidate, in
23 this case Hispanic surname candidate, and the proportion
24 of vote Hispanic and white in each precinct in each
25 election for each candidate.

38

1          So all I'm saying -- asking is, if I have a
2 Precinct 1, and it's 70 percent Hispanic, how many votes
3 did the Hispanic-preferred candidate get in that
4 precinct in that election.
5          My expectation is that there's a
6 relationship between the race or racial makeup of a
7 voting precinct and their support for minority -- excuse
8 me -- for minority-preferred candidates.  And if that
9 relationship is significant and steep -- steep tells me
10 how many units of racial makeup in the precinct are
11 related to how many unit changes in vote for the
12 minority-preferred candidate or the majority-white
13 candidate.
14          So that, if a line is steep and moving from
15 left to right, like in Figure 1, that tells me that, as
16 the racial makeup of a precinct increases, that is
17 white, the share of vote in that precinct for the white
18 candidate goes up proportionately.
19          The slope is simply the change in the
20 racial makeup of a precinct to the change in the share
21 of vote for the white or minority-preferred candidate.
22 A slope of 1 would mean that, for every percentage
23 increase in the racial makeup of the voting precinct,
24 there is an equal 1 percent increase in the share of
25 vote for the white candidate; the same for the minority.

39

1          Does that help?
2    Q.  It does.
3    A.  Okay.
4    Q.  And I believe you say in your report, on
5 Page 5, that Hispanic surname candidates were identified
6 as the minority-preferred candidate, for purposes of
7 your figures, correct?
8    A.  Yes.
9    Q.  Did you take into consideration a white
10 candidate with a Hispanic surname?  For example,
11 Chris Gonzalez, who is the current board president of
12 the Spring Branch trustees.  How did you -- how did you
13 compensate for somebody with a surname of Gonzalez that
14 is not Hispanic?
15    A.  I don't know that I -- I apologize.  Did you
16 say how did I compensate?
17    Q.  Sure.
18    A.  I'm not certain I'm understanding.
19    Q.  Well, I guess --
20    A.  I know she's not -- I know Ms. Gonzalez has a
21 Hispanic surname, and that's all I -- as my report
22 indicated, if the surname of the candidate was Hispanic,
23 I assumed that they were the preferred candidate of the
24 Hispanic voter.  I did not determine whether voters were
25 aware of Ms. Gonzalez's preferred ethnic identification.

40

1    Q.  So for purposes of your table -- figures in
2 your report, you considered Chris Gonzalez to be a
3 preferred Hispanic candidate?
4    A.  That is correct.
5    Q.  Okay.  You kind of did this already, but I'm
6 going to ask you, if you did it, to do it again.  And
7 that is to walk me through Figures 1, 2, 3, and 4, your
8 charts, and -- and just tell me what they mean, how to
9 read them.
10    A.  So, as I said before, what I'm trying to
11 ascertain is if the racial makeup of a voting precinct
12 is related to the support for the preferred -- excuse
13 me -- preferred minority candidate or the preferred
14 majority racial group.
15          And what we do on the horizontal axis is
16 simply tell you what the racial makeup of each voting
17 precinct was in each of the elections conducted between
18 2015 and 2017.  That goes from, oh, you know, around
19 50 percent to 100 percent for Whites; obviously
20 different for Hispanics.
21          I then identify the White or minority, in
22 this case Hispanic surname, candidate, and simply ask,
23 if the racial makeup of the precinct changes, how does
24 the vote share for candidates, by race, change.
25          A slope.  A slope is simply the change

41

1 in the number of -- or share of vote for a candidate
2 matched with a change in the proportion of vote, White
3 or Hispanic.
4        A positive line, a line -- and positive
5 means it goes from the lower left-hand to the upper
6 right-hand corner. It tells me that there is a racially
7 polarized pattern of voting. As there are more White or
8 Hispanic people in the precinct voting, there will be
9 more votes for the White or Hispanic candidate.
10        The strength of that relationship, the
11 significance of the racial polarized, is measured by
12 that slope. And as I said before, if there's a
13 1 percent change in the percent of people in the voting
14 precinct White and a 1 percent change in the proportion
15 of vote for the White candidate, that slope is 1. And
16 that is a positive, I would say. That's as extreme as
17 you can get for racial polarized voting.
18        If it's negative, it slopes -- for
19 instance, in Figure 2, it slopes downward. That tells
20 me that, as the percent of Hispanic voters in the
21 precinct increases, the share of vote those voters give
22 to the White candidate goes down. And, again, as -- if
23 it approaches 1, that's extreme racial polarized voting.
24        So if you start with Number 1, you find
25 that White voters tend to vote for White candidates.

42

1 If you -- in my table figure, you can see the .856, in
2 the left-hand side of the figure.
3      Q. Let's see. Yes, I do.
4      A. There's the slope, correlation, and P.
5        So .856 is -- gets very close to 1. There
6 is a statistical test of significance. Is that slope
7 significant or could it have happened just by chance?
8 And the answer is 99 -- .01 -- can you see that, .014?
9      Q. Yes, sir.
10      A. That would mean that 99 times out of 100, if
11 you saw this distribution, you would conclude it was
12 nonrandom. It would mean that only 1 time out of 99
13 would you say that that relationship was random, as if
14 you were just throwing darts at a dartboard. And it's a
15 very --
16      Q. And this Figure 1 --
17      A. I'm sorry.
18      Q. In this Figure 1 that we're talking about, are
19 White candidates voting for -- White voters voting for
20 White candidates?
21      A. Yes.
22      Q. Is that what Figure 1 is showing?
23      A. Yes. So there we find highly polarized -- it's
24 not 1, but it -- you know, and .85 is -- is pretty high.
25        If you go down to Figure 2, here all that

43

1 we've changed -- same elections; same candidates; same
2 precincts. Only difference is I'm now asking what
3 about Hispanic voters in precincts and their support
4 for White candidates, and the slope here is .99 -- 996.
5 It's negative. It means this is about total racial
6 polarization. Hispanic candidates will vote at
7 increasingly lower rates for White candidates, almost
8 1 to 1.
9      Q. Did you mean Hispanic voters? I think you said
10 Hispanic candidates.
11      A. Did I say -- voters, yes. I apologize.
12        Hispanic voters in precincts will vote
13 against, or not for, the White candidate at almost a
14 perfect 1-to-1 relationship. 1 percent increase in the
15 Hispanic share of vote in that precinct results in a
16 1 percent lower share of vote for the White candidate.
17        I can -- you want me to -- I know you're
18 busy -- I didn't want to -- you were looking for
19 something, and I didn't want to --
20      Q. No.
21      A. -- interrupt you.
22      Q. Continue, please.
23      A. Figure 3 is the percent of White vote in each
24 precinct regressed or displayed with the percent of
25 Hispanic candidate vote. So in a precinct with White

44

1 voters, as the share of the precinct's White vote goes
2 up, the share of -- excuse me -- the share of vote cast
3 for the Hispanic candidate goes down, and there the
4 slope actually exceeds 1.
5        So what does that mean? It means that, for
6 every 1 percent increase in the share of votes that are
7 White, there is a 1.06 percent drop in the share of vote
8 casts for Hispanic candidates. So that level of extreme
9 polarization exceeds. It actually goes over the
10 1 percent change. There's even more drop in support
11 for Hispanic candidates as the precinct's share of
12 White voters goes up. And that, of course, is negative.
13        Finally, Figure 4 is the percent of
14 Hispanic vote in each precinct and the share of vote for
15 each Hispanic candidate in that precinct. There, the
16 slope exceeds 1. That means that, with a 1 percent
17 increase in the percent of vote Hispanic in each
18 precinct, there is 1.13, or 13 percent, more votes for
19 the Hispanic candidate in that precinct.
20        This suggests to me that White and Hispanic
21 voters are highly polarized when voting for candidates
22 who are White and Hispanic.
23      Q. Would you --
24        THE WITNESS: Can I indulge and just ask if
25 I can get a glass of water?

```
                                              45
1                 MR. CRAWFORD:  In fact, we've been going
2  close to an hour.  Would you like to take a short break?
3                 THE WITNESS:  If it's -- if it's all right.
4  I don't --
5                 MR. CRAWFORD:  It is perfectly fine.  Why
6  don't we take -- I've got 10:28.  Do you want to take
7  five minutes?
8                 THE WITNESS:  That'll be fine.  Thank you.
9                 (Break from 10:28 to 10:34.)
10      Q.  (BY MR. CRAWFORD)  Before we left off, we were
11 talking about your analysis of racial polarization and
12 the four figures in your report.
13                Would you agree that your method of
14 assessing racially polarized voting in Spring Branch ISD
15 elections combines all ten of the contests that you
16 examined into one overall analysis, rather than an
17 election-by-election polarization analysis?
18      A.  Yes, I -- I think, yes.
19      Q.  Can we determine, from your reported analysis,
20 which specific election contests were polarized and to
21 what degree?
22      A.  Yes.
23      Q.  How would we do that?
24      A.  So take a look at Figure 4.
25      Q.  Okay.
```

```
                                              46
1       A.  If you look at the points -- those are the
2  percentages -- you can see that some are closer and some
3  are further from that line that I've drawn.  When you do
4  a regression, when you regress, when you look at the
5  slopes, some cases will be closer to the fitted line and
6  some will be further away.
7                 So what we do here is we try to look at
8  the totality, all of the elections, and say that,
9  over the period 2015 to 2021, we find that there is
10 a statistically significant and strong -- there's a
11 difference between significant and strong --
12 relationship.  There are some elections where this
13 relationship may not be as strong as others.
14      Q.  Did you perform any of the typical King's
15 ecological inference analysis on individual election
16 contests?
17      A.  I use the -- the ecological inference mostly
18 for imputing --
19      Q.  That's normally known as EI, correct?
20      A.  Yes, yes.
21      Q.  Okay.
22      A.  I use the ecological inference to impute the
23 racial and ethnic membership of each voter.  But in this
24 analysis, there's some debate about whether or not this
25 is, in fact, ecological inference.
```

```
                                              47
1                 The regression technique is the same, but
2  I had only a universe of, I think -- I think about 73
3  election contest precincts.  That's not a lot of cases.
4  It's sufficient to make statistical inferences and --
5  and parametric statistics around 30.  In fact, exactly
6  30 is about what you need.
7                 And so I had, obviously, twice -- a little
8  more than twice 30 observations.  So the inference --
9  ecological inference wasn't necessary in estimating
10 polarization.  The data, how can I say, speak for
11 itself.
12      Q.  You did not run an EI analysis as a
13 confirmation or double-check?
14      A.  No, I did not.
15      Q.  Did you perform any racially polarized election
16 analysis using CVAP or Spanish surname registered
17 voters, as typically done in these cases?
18      A.  Yes.  I mean, we wanted to know the racial
19 or ethnic composition of the electric, and we used an
20 imputation that is -- we -- I think I discussed it on --
21 help me here.  I'll find it.  It's on page -- give me a
22 second.
23                On Page 4 we identify the racial and
24 ethnic membership of each registered voter in each
25 election year, of course, in each election precinct,
```

```
                                              48
1  using Imai and Khana's.  This is the EI approach, I
2  believe, you're reporting -- or referring to.  And,
3  as I said, it describes how we do it.
4                 We use the Center for Disease Control's
5  racial and ethnic surname list, along with the census
6  data for the residential location of each voter, to
7  impute their race or ethnicity.  And that, I think, is
8  recorded in the email that Barry sent you.  And then we
9  use that estimate to say this person is Black, Hispanic,
10 Asian, white.
11      Q.  Did you use a Bayesian Improved Surname
12 Geocoding analysis?
13      A.  That -- that is how we -- I believe, on page --
14 help me here.  I think you're referring to -- oh, give
15 me another second.  The Barreto, Cohen, Collingwood, and
16 Dunn paper, that's referred to as "A Novel Method for
17 Showing Racially Polarized Voting:  Bayesian Improved
18 Surname Geocoding."
19      Q.  And is that typical analysis of these types of
20 cases?
21      A.  I'd be careful to use the word "typical."  I
22 consider it the state of the art or the best practice.
23 It is not typical, and it has not been widely used in
24 the past.  I -- and I cannot comment about -- I don't
25 know how widely used it is now, but, in the literature
```

49

1  I have read, I consider this the best practice.
2      Q.  And why do you consider it best practice?
3      A.  Well, it's a long explanation, and I apologize.
4  Having taught -- having taught this in my survey
5  research class, I believe it does two things.  It
6  leverages a lot of information.  It leverages the
7  surname of a person.  It leverages where they live,
8  and that -- the research about how people choose where
9  they live tells you a lot about who they are, Democrats,
10 Republicans, African Americans, and Hispanics.
11          So I am -- how can I say? -- convinced,
12 not so much by the Barreto article, but by the
13 Imai and Khana paper.  And I've taken some time to
14 talk to Imai and Khana about this for other research
15 that I have conducted, and I'm convinced that it is the
16 most exact means of measuring racial without, of course,
17 surveying the voter themselves.
18     Q.  Anything else you'd like to add to --
19     A.  No.
20     Q.  -- that answer?
21         Okay.  Great.  Then let's now turn to your
22 proposed illustrative district, and that is on Page 8 of
23 your report.
24     A.  Yeah.
25     Q.  And Page 8 has a table, Table 1, and then,

50

1  below it, a demonstrative map of a single-member
2  district.
3          My first question is what did you do to
4  create the map?
5      A.  I didn't really do very much.  I started with
6  the seven districts that the Spring Branch ISD has
7  identified as polling places.  Those were, of course,
8  the basis of my voter polarization analysis.
9          And other than obtaining, from Mr. Golando,
10 the data from the American Community Survey, I
11 identified at least one, District Number 1, where there
12 was a sufficient -- in this case, majority -- of
13 Hispanic voting age to create a district.
14              (Exhibit 3 identified.)
15     Q.  Okay.  I would like you to look at what I'm
16 going to ask Dana to mark as Exhibit 3, which is the
17 color map, that hopefully was forwarded to you.  And
18 it's --
19     A.  Hold on; hold on.  Okay.  Not the one in the
20 report?
21     Q.  No, no.  But that's going to be the next one.
22         It's this one right here.
23     A.  Yes, yes.  I've got it.  Okay.
24     Q.  Great.  I'd like to mark that as Exhibit 3, the
25 colored map.

51

1          And then, as Exhibit 4, I'd like to mark
2  just a bigger copy of the map from your report.  This
3  was a page from a document filed by the Plaintiff in the
4  case, and it just simply replicates your map and your
5  Table Number 1.  I did this because I might want to draw
6  on it, and it's kind of bigger.  But it should be the
7  same table and map that's in your report.
8              (Exhibit 4 identified.)
9      Q.  And so the first question I have for you is
10 Exhibit 3, which is the colored map, is this the map
11 of the middle school attendance zones that you're
12 referring to that you based your table -- your
13 demonstrative map off of?
14     A.  Yes.
15     Q.  And I believe you've already told me this, and
16 so just confirm that you have.  But you got -- where did
17 you get the 52.8 percent Hispanic citizen voting age
18 population for your District 1?
19     A.  Mr. Golando had shared that with me from the
20 ACS.
21     Q.  Okay.  And we've already talked about that in
22 fair detail?
23     A.  (Nods head.)
24     Q.  Any other information that went into providing
25 that number of 52.8 percent?

52

1      A.  No.
2      Q.  Okay.  Also looking at Table 1 -- and I'll just
3  use District 1 as the example -- you have a voting age
4  population of 18,782, and a citizen voting age
5  population of 9,180.
6          Can you explain the difference in those two
7  numbers, the reason why?
8      A.  Well, I suspect it will be noncitizens.
9      Q.  Is that because many Hispanic residents are
10 noncitizens?
11     A.  I don't know if many are, but I -- I would say
12 that it is due to the fact that residents -- some
13 residents, and a large number in that district, are not
14 citizens.  And it would infer that, if it's heavily
15 Hispanic, that, yes, some portion of them, probably as
16 many as half.
17     Q.  Would it also be due to, in general, Hispanic
18 residents tend to be younger, and, therefore, not
19 vote -- not of voting age?
20     A.  Those are reasonable hypotheses, but I -- I
21 just don't -- I mean, to answer that definitively, I
22 can't tell you.  I have not looked at that data.
23     Q.  And in your proposed District 1, you have a
24 52.8 percent Hispanic citizen voting population.  Do you
25 know would that have been possible prior to the 2020

53

1 census?

2    A.   I don't know.  I have not looked at that data.

3    Q.   In determining the numbers and percentages

4 of your Hispanic population for your map, did you use

5 Hispanic surname data?

6    A.   This data, which comes from the ACS, would have

7 used self-reported Hispanic identification.  That's my

8 understanding of the ACS and data I've used in the past.

9    Q.   If you -- if you could tell me, what is

10 "raking"?

11    A.   (No response.)

12    Q.   Raking, r-a-k-i-n-g.

13    A.   In what -- I'm sorry.  I don't know.  Raking

14 leaves?  Raking data?

15    Q.   No.  In terms of constructing illustrative

16 districts, are you familiar with the process known as

17 "raking"?

18    A.   I am not.  I'm not certain.  I'm -- I'm

19 familiar with it in very different survey research

20 contexts.

21    Q.   And another phrase it may go by -- maybe this

22 will sound more familiar -- is "iterative proportional

23 fitting."  Are you familiar with that?

24    A.   I -- I have heard the term, but I couldn't give

25 you a definitive def- -- no.

54

1    Q.   okay.

2    A.   I wouldn't feel comfortable.

3    Q.   And you did not use that method or analysis in

4 creating your illustrative district?

5    A.   No.

6    Q.   Do you understand the term "traditional

7 districting principles"?

8    A.   Not -- I mean, the -- it makes perfect sense

9 to me, but I don't know what you're referring -- I mean,

10 I don't know what those conditions would be.

11    Q.   okay.  In creating your map, the demonstrative

12 district, did you respect neighborhoods and

13 subdivisions?  Did you try to keep those intact?

14    A.   No.  I took the districts that currently exist

15 for the purposes of conducting elections for trustee

16 elections.  I have to say that was the sole criteria;

17 that is, the districts -- enrollment districts

18 corresponded to the voting places.

19        And as I said -- I think we call this a

20 demonstrative or illustrative district map -- there

21 might be other -- I think I said in my report there

22 are -- it doesn't preclude other district plans, other

23 configurations that could be done following other

24 practices I would have used in drawing district

25 boundaries -- have used in drawing district boundaries.

55

1    Q.   But you have not attempted to draw any other

2 map, other than the one that is on Page 8 of your

3 report --

4    A.   No.

5    Q.   -- right?

6    A.   No, I have not.

7    Q.   Did you -- did you take into account or respect

8 census blocks when you were creating your illustrative

9 map?

10    A.   No, I did not.

11    Q.   Did race predominate in your creation of

12 District 1 of your illustrative map?  Was that the

13 predominate factor you considered, race?

14    A.   That's a hard question.  I -- I don't want

15 to be evasive.  Let me -- let me say exactly what I

16 attempted to do.

17        Because I was doing racial polarized voting

18 based on seven districts, it seemed logical to use those

19 seven districts as the initial illustrative or

20 demonstrative.  So the only consideration I gave was

21 what are the current district boundaries.

22        I'll give you an example.  I did not look

23 for one person, one vote.  I don't know if these are --

24 if they meet that one -- the Baker -- Baker Carr, like

25 every district has to be within a top-to-bottom

56

1 10 percent.

2        I simply said, if you were to create a

3 district map from the current voting locations, what

4 would it look like; could there actually have been a

5 majority/minority?  I did not attempt to do any other

6 drawings or use other criteria.

7    Q.   okay.  So I would like you to have in front

8 of you, if you're able to, both the colored map of the

9 district boundaries and either the map from your report

10 or Exhibit 4, whichever is easier for you to refer to.

11    A.   I've got my -- the map from my report.

12    Q.   okay.  And I note that, although your

13 illustrative map is similar to the attendance districts

14 in Exhibit 3, they're -- they're not exactly the same.

15 would you agree with that?

16    A.   I -- I have to check that.  I had thought they

17 were exactly the same.  They may deviate a little, but

18 I -- I --

19    Q.   All right.

20    A.   The answer is I don't know.

21    Q.   okay.  So, for example, I'm going to draw on

22 my copy of the map -- and hopefully you're able to see

23 this.  This is why in person is so much more fun than

24 Zoom.

25        I have drawn a circle between District 1

57

1 and District 7 that has, like, a little jut in it. Are
2 you able to see what I'm talking about?
3     A.  Yes, I do.  I do.
4     Q.  Okay.  And that does not appear on the district
5 boundary.  That's a change from the normal attendance
6 boundary to your proposed map.
7         And so my question is can you explain to me
8 why you have that little jut in your proposed district?
9     A.  I can't.  Those were maps that were shared
10 with -- with me by Mr. Golando, and they may have
11 reflected a slight change in the makeup, the deviation
12 from the current enrollment districts.  I had not
13 noticed that before.
14     Q.  Okay.  And then similarly, between your
15 Districts 5 and 6, there's a little jut, you know,
16 a little kind of carve-out that is not as part of the
17 regular attendance boundaries.  Can you explain why?
18     A.  Again, I assume that that was a change that
19 Mr. Golando had made to adjust boundaries for the
20 demonstrative plan.
21     Q.  Okay.  And can you explain why your proposed
22 District 6 is the only proposed district that is both
23 north and south of I-10?
24     A.  No, I can't, other than it seemed to follow the
25 boundaries of enrollment districts.

58

1     Q.  Did you do anything to check to confirm that
2 your proposed District 1 will, in fact, have the effect
3 of allowing Hispanic voters to elect the trustee of
4 their choice?
5     A.  Other than the majority voting age population,
6 that is of course Hispanic, no.
7     Q.  Did you run any simulated elections?
8     A.  No, I did not.
9     Q.  I'd like to turn now to Page 10 of your report.
10     A.  Page?
11     Q.  10, 1-0.
12     A.  Okay.
13     Q.  And I guess I need to at least -- I need to
14 start with Page 9 because I think it's the setup for the
15 question.  And on the bottom of Page 9, you identify
16 certain percentages indicating whether you have low,
17 middle, or high levels of segregation.
18         And so, based on those numbers, on Page 10
19 you say "There is strong evidence that the racial and
20 ethnic makeup of Spring Branch schools and enrollment
21 districts is highly segregated."  And then you have a
22 chart.
23         Do you see that?
24     A.  Yes.
25     Q.  So my question is are you saying, with this

59

1 chart, that the Spring Forest Middle School is highly
2 segregated?
3     A.  Spring Forest?
4     Q.  The Spring Forest Middle School that has
5 .42 percent White and .36 percent Hispanic.
6     A.  Well, again, the -- what you -- maybe I should
7 go back and make clear what I mean by disparity or
8 highly segregated.
9         So if you have a district that currently
10 has -- go up to Page 9 -- Page 9, middle paragraph,
11 "The dissimilarity index captures how proportional
12 Hispanics and whites are distributed across the
13 district."
14         So if Spring Branch ISD is composed of
15 26.7 percent White and 59.2 Hispanic, that's the
16 baseline from which you would expect to see the
17 distribution deviate.  And what I've noticed is that
18 there's a significant deviation from that proportional
19 distribution.  There's some districts that -- and
20 schools, some enrollment districts that are more and
21 some less.
22         What constitutes the degree of
23 dissimilarity is a judgment that I drew from the
24 literature, and anything around .3 to .6 is moderate,
25 anything above .6, in the dissimilarity indexes are,

60

1 in some cases at the school level, .69 and .59.  So yes.
2         To your question, is Spring Forest
3 significantly dissimilar or -- or segregated, I'd say
4 so.  Those indexes are -- are pretty high and not,
5 again, due to what I will call chance, but to some force
6 that's moving those students into a highly dissimilar
7 racial and ethnic makeup.
8     Q.  And would your answer be the same as to the
9 Spring Branch Middle School?  It's the one right below
10 Spring Forest.
11     A.  Yeah, I -- I would say those numbers are almost
12 identical.  And when you compare them to the -- you
13 know, they're -- the word -- the term I would use would
14 be "moderate dissimilarity."
15     Q.  What about Memorial Middle School?  What would
16 you consider Memorial Middle School?
17     A.  I would consider that from moderate to
18 beginning to get high-moderate.
19     Q.  On Page 11 of your report -- we've talked about
20 this briefly already, and I told you I'd come back to
21 it, and I'd like to now.  About some of the reports and
22 research, the scholarly literature that you looked at
23 and relied on, and you list some of it here on the top
24 of Page 11.  Are you with me?
25     A.  Yes.

61

1    Q.  The first question I have for you, after you
2 cite a number of the studies, you say, "several studies
3 have reported null findings," n-u-1-1.  What do you mean
4 by "null findings"?
5    A.  There was no significant effect between the
6 form of representation and the proportion of minority
7 representatives on these representative bodies.  No
8 relationship.  No positive; no negative; no significant
9 relationship.  Null means you reject the null hypothesis
10 that there is -- you accept the null hypothesis that
11 there's no -- no relationship here.
12   Q.  And then in Footnote 4, you note that,
13 "The authors qualify their null findings by noting
14 that Hispanics may be able to profit from at-large
15 districting when they are a majority of the population."
16       Do you agree with that statement?
17   A.  Do I agree that -- that they wrote that, or
18 that I agree with --
19   Q.  I guess, first, do you agree that they wrote
20 it, and, second, do you agree with their conclusion?
21   A.  Yes, it's their conclusion.  I think that I
22 would say that that is probably true, in the literature,
23 yes.  Yes, I would agree with the statement.
24   Q.  Based on the --
25   A.  Excuse me.

62

1    Q.  No, no problem.
2        Based on the population trends in
3 Spring Branch from, say, you know, the 2010 census to
4 the 2020 census, the Hispanic population is growing in
5 Spring Branch, correct?
6    A.  I -- I don't want to be evasive, but I don't
7 know that.  I mean, if you said that to me -- I have
8 not looked at the growth in Hispanic population in
9 Spring Branch.  Honestly, I just don't know.
10   Q.  So you don't -- you don't know, one way or the
11 other, whether Hispanics will be the majority population
12 in Spring Branch in the near future?
13   A.  I would -- I could not make that judgment at
14 this time.
15   Q.  You reference a study by Meier and Rutherford
16 and a study by Welch and Karnig for the proposition that
17 "Two studies have reported a negative relationship
18 between single-member district elections and minority
19 representation."
20       Do you see that reference?
21   A.  Yes.
22       MR. CRAWFORD:  I would like Dana to mark as
23 Exhibit 4 a copy of the Meier and Rutherford article.
24       THE REPORTER:  I believe we did the
25 black-and-white map as Exhibit 4.

63

1            MR. CRAWFORD:  Oh, Exhibit 5.
2            THE REPORTER:  Okay.
3            MR. CRAWFORD:  Thank you.
4            (Exhibit 5 identified.)
5    Q.  Dr. Stein, do you have that?
6    A.  Let me get it up.
7    Q.  Sure.
8    A.  Give me one second.  I had it up, and I'm
9 trying to -- what's the word here?  And you're referring
10 to the Meier and Rutherford?
11   Q.  Meier and Rutherford.
12   A.  Well, I can't find it.  Give me a second.
13 I know I had it a second ago, and I apologize.
14   Q.  Oh, no problem.  You're doing a great job.
15   A.  I got it.  I got it.
16   Q.  Okay.  I'd like to ask you a couple of
17 questions about this article.  The first page -- first
18 of all, this is the article that you're referring to in
19 your report?
20   A.  Yes.
21   Q.  Okay.  The first page of the report, which is
22 Page 265, towards the bottom of the left-hand column of
23 the page, states that "African Americans actually do
24 better in at-large systems.  Although this minority
25 group has been disadvantaged by at-large districts

64

1 30 years ago, they have since overcome these hurdles and
2 now appear to be better off under this type of electoral
3 structure in the case of school board elections."
4        Are you aware of this finding by Meier and
5 Rutherford?
6    A.  Yes.
7    Q.  Do you agree or disagree with it?
8    A.  I think that that is -- I think that the --
9 that their explanation, which comes in later, I agree
10 with.  This is not the full explanation for what's going
11 on.
12   Q.  I'd like to turn to the next page of the
13 article, Page 266, the -- second full paragraph
14 on the left-hand column, beginning with the word
15 "Other studies."
16   A.  Got it.
17   Q.  Okay.  This says that "Other studies question
18 the detrimental impact of at-large elections on
19 descriptive representation, either disputing the
20 negative impact on minorities in general or suggesting
21 that the impact has disappeared over time," citing
22 MacManus and but see Davidson.
23       "Other studies find that no impact of
24 electoral structure include Fraga and Elis's 2009
25 examination of Latino representation in school districts

65

1 in California."
2     A.   Yes, sir.
3     Q.   Are you aware of those studies?
4     A.   Yes.
5     Q.   Do you dispute the findings of those studies?
6     A.   No, no.  I -- I'm aware of them.  I don't --
7 I think they -- my characterization in my report -- if
8 I could go to that --
9     Q.   Please do.
10    A.   -- for a second -- is this -- hold on.
11         On Page 11 of my report --
12    Q.   Yes, sir.
13    A.   -- second paragraph, so I -- the Meier and
14 Rutherford, Welch and Karnig, and I'd -- I'd even
15 include the Cole paper, the MacManus paper, which show
16 no result.
17         There are two factors that explain what
18 I would call the lack of unanimity in this field, right.
19 I mean, the -- if you look at the totality of research,
20 although it -- the balance is single-member districts
21 do tend to promote minority representation, there are
22 a good number of papers that show not.
23         So I offer the explanation that there are
24 two explanations, I think, in the literature.  I think
25 even Ken points this out, Ken and Ms. Rutherford.  One

66

1 is that the nature of electoral reform on minority
2 representation is contingent.  And the other, to be very
3 simple and blunt, is that the quality of the research
4 and the research designs of some older research is
5 simply not sufficient to answer the question at hand.
6         I think that some of the cross-sectional
7 work -- and I would include in this Ken's and
8 Ms. Rutherford's paper.  It is a 2014 paper.  Others
9 that I've -- Abott and Magazinnik use much more
10 powerful, much more improved and state of the art.
11         And I want to be clear here.  We -- we did
12 not have these types of tools in 2000 or 2014, and we
13 surely didn't have these tools for causal inference in
14 the previous century.
15         So my conclusion about these papers is
16 that -- that they're -- are they wrong?  They're simply
17 not using the most sophisticated scientific methods for
18 answering the question at hand.  I'm not suggesting
19 that, at the time that they were written, they were
20 wrong.  I'm simply suggesting we've advanced, and that
21 advancement has given us a better and more reliable and
22 valid answer to the question about representation.
23         So I didn't write the articles, but I do
24 think that Ken would agree with -- as he says, it's
25 contingent on a condition of larger size minority

67

1 representation producing the effect he sees.
2     Q.   On the same page on the right-hand side of
3 the paper, the first full paragraph talks about, "The
4 literature has also ignored one fundamental element of
5 U.S. elections, the role of partisanship."
6         And I won't read the whole paragraph for
7 you, but I'd ask you to read it and just ask, do you
8 agree with the statements that he's making in that
9 paragraph?
10    A.   Yes, yes.
11    Q.   What about Spring Branch ISD elections?  Did
12 you look into the role of partisanship in the outcome of
13 SBISD elections?
14    A.   No, I did not.
15    Q.   Further down the page, same page 266, it's
16 the last full paragraph, and it begins with, "Although
17 framed as a way."
18    A.   Yes.
19    Q.   The second sentence of that paragraph reads,
20 "The low turnout of nonpartisan school board elections
21 held in the spring has meant an electorate dominated by
22 those with a direct interest in schools, primarily
23 parents and teachers."
24         Do you agree with that statement?
25    A.   Yes.  I mean, I think that -- yes.  I don't

68

1 think there's any -- yes, I do agree with this
2 statement.
3     Q.   And is that -- is that a good or a bad thing,
4 that --
5     A.   I don't have a judgment about --
6     Q.   -- that the electorate is dominated by teachers
7 and parents?
8     A.   I -- I don't have an opinion on whether that's
9 good or bad.
10    Q.   Fair enough.
11         Do you know whether -- and I'm not talking
12 about school board elections.  But, in general, whether
13 the population of Spring Branch ISD has a democratic or
14 a republican voting majority?
15    A.   I don't know.  I do not know.
16    Q.   And, finally, my last question about this
17 article is on Page 275, left-hand column, the last
18 full paragraph, beginning "One open question."  And
19 the very last sentence of that paragraph states,
20 "Election systems establish the rules of the game and
21 incentives; they do not necessarily determine winners."
22         Do you agree with that statement?
23    A.   You're just a few steps ahead of me.
24    Q.   Oh, I'm sorry.
25    A.   Page 170?

69

1    Q.  275.

2    A.  275.  Right- or left-hand column?

3    Q.  Left-hand column.

4    A.  Okay.  And the --

5    Q.  The last full paragraph, beginning "One open
6  question."

7    A.  Got it.

8    Q.  And it's the very last sentence.  And rather
9  than reread it again, I'll just ask you if you agree
10 with that statement?

11   A.  I'd agree with it.

12        (Exhibit 6 identified.)

13   Q.  I'd like to mark, as Exhibit 6, the next
14 article that I sent you in advance from Susan Welch.

15   A.  Yes.  Give me one second.

16   Q.  No problem.

17   A.  I've got to close one.  I'm just running out
18 of -- okay.  I'm ready.

19   Q.  Okay.  Are you familiar with Susan Welch?

20   A.  Yes, very, very familiar with her.

21   Q.  You kind of smiled and -- and like you have a
22 good relationship?

23   A.  I -- I've known her, I suspect, longer than --
24 I met Susan Welch when I started graduate school.  I
25 won't tell you when that was, but a long -- I've known

70

1  her a long time, yes.

2    Q.  And she -- is she a professor at the University
3  of Nebraska?

4    A.  No.  She -- she's a retired emeritus from the
5  University -- Pennsylvania State.  She was at Nebraska
6  when she wrote that paper.

7    Q.  Okay.  And the article that I have given you
8  is called "The Impact of At-Large Elections on the
9  Representation of Blacks and Hispanics."  And this
10 apparently is from the Journal of Politics from 1990.

11        And the report that you cite in your
12 report, on Page 11, is Welch and Karnig 1978.  Do you
13 know if this Exhibit 6 is an update of that 1978 study?

14   A.  It -- it's a -- yeah, it's -- the word "update"
15 wouldn't -- I'd just say it's based on the same data
16 and -- and a further analysis, yes.

17   Q.  And I'd like to ask you just a few questions
18 about some of the statements that Dr. Welch made in her
19 article.  The first page I'd like to ask you questions
20 about is on Page 1053 of the article.

21   A.  Okay.  I'm on that page.

22   Q.  Okay.  And the top of the -- the top paragraph
23 says, "The findings concerning election structures and
24 Hispanic representation are, however, less clear cut."

25        And then she cites the MacManus 1978 study,

71

1  "showed that, among the major types of electoral
2  systems, Hispanic representation is slightly more
3  equitable in district than pure at-large elections,
4  but most equitable in mixed systems."

5        And she cites a Taebel article, from 1978,
6  that, "like MacManus, found that Hispanics were best
7  represented in mixed systems."

8        And she cites Welch and Karnig, 1978, for
9  finding "that structure makes hardly any difference for
10 Hispanic representation."

11        So my first question to you is are you
12 familiar with these three studies?

13   A.  Yes.  I mean, I -- I can't tell you I've read
14 the papers recently, but -- and I did not read them for
15 this report.  But I am -- I know of the -- I know about
16 that work, yes.

17   Q.  And do you know -- do you agree or disagree
18 with their conclusions, as stated in Dr. Welch's
19 article?

20   A.  I don't disagree with their findings.  I mean,
21 whether they're generalizable to the 21st century, to
22 the contemporary situation in Spring Branch, I have not
23 made a conclusion.

24   Q.  And just so we're clear, when we're
25 talking "mixed system," we're talking about a system

72

1  that has one or more at-large positions and one or more
2  single-member positions, correct?

3    A.  That's correct, yes.

4    Q.  Okay.  So if we were to accept the results
5  of these studies as being accurate, would a mixed
6  Spring Branch ISD system be more equitable to Hispanics
7  than a pure single-member system?

8        MR. ABRAMS:  Objection to the form of the
9  question.

10   A.  You know, I just -- you know, it's a fair
11 question; one that should be studied.  I did not.
12 I can't form an opinion for the Spring Branch ISD.

13   Q.  Fair enough.

14        Turning to Page 1065 of Dr. Welch's
15 article.

16   A.  260?

17   Q.  1065.

18   A.  Oh, 1065?

19   Q.  Yes, sir.

20   A.  Yes, I'm there.

21   Q.  And I think she is simply reiterating what
22 she stated on the page that we were just looking at.
23 Under the heading "Hispanic Representation," the first
24 full paragraph, last sentence, she states, "Hispanics
25 appear to do somewhat better in cities with both

73

1 at-large and district elections than in either of
2 the pure types."
3           Do you see that reference?
4     A.  Yes.
5     Q.  And your answer, on whether you agree or
6 disagree, would be the same as we just discussed before?
7     A.  Yes, I'm -- it's not a question I -- you know,
8 it's a -- it's a fair question, but it is not one that
9 I looked at for this -- the purposes of this report and
10 case.
11     Q.  Turning to Page 1067 of her report.
12     A.  1067, got it.
13     Q.  Yes.  The paragraph that begins "Another
14 complicating factor."
15     A.  Got it.
16     Q.  Okay.  About a little bit more than halfway
17 down the paragraph, she states, "In Texas, on the other
18 hand, Hispanic representation is quite high (.83) in
19 mixed systems."
20           Do you know where she got that from, those
21 statistics?
22     A.  No, I do not.
23     Q.  You're not in a position to either agree or
24 disagree with those statistics?
25     A.  No, I -- you know, I want to be very clear

74

1 here.  I think Susan's a fine scholar, and I -- these
2 are peer-reviewed, but I have no idea where that data
3 came from.
4     Q.  And on a similar question on Page 1072 of her
5 report.
6     A.  Yes, I'm there.
7     Q.  The very last paragraph, second sentence, she
8 states, "Overall, district elections do not promote more
9 equitable representation for Hispanics."
10           And then, skipping a sentence, she says,
11 "We found that small Hispanic populations are best
12 represented in mixed elections."
13           Do you have any comment on those findings?
14     A.  No.  I mean, again, I'm not questioning her
15 findings.  I'm simply saying that I have no basis for
16 making a judgment.
17     Q.  Page 11 of your report also discusses a report
18 from Abott -- and I'm going to butcher his coauthor's
19 last name.  It starts with an M.
20     A.  Magazinnik.
21     Q.  Magazinnik?
22     A.  We both will make the same mistake.
23     Q.  Okay.  I would ask Dana to mark, as Exhibit 7,
24 a copy of the Abott and the name we can't pronounce
25 report.

75

1           (Exhibit 7 identified.)
2     Q.  And, Dr. Stein, I'd ask if you could get that
3 in front of you?
4     A.  Let me get that up.  Give me one second.  I've
5 just got -- I've got so many -- okay.  I'm just about --
6 I had to close the Welch and -- I think it's -- no.
7 I've got -- I'm sorry.  I keep opening up the Meier and
8 Rutherford one.  I'll get it.  Give me just a second.
9 Wait a minute.  Where is it?  Oh, you added that.  That
10 was the one that -- in the second --
11     Q.  Yes, sir.  Yes, sir, that was the one.
12     A.  Yeah, I've got all these attachments, and that
13 was in Barry's second attachment.  There it is.  I got
14 it.
15     Q.  Great.  And I'm going to -- I'm going to ask
16 you a question about this article, and I'm going to
17 refer it to something you stated on Page 9 of your
18 report.
19     A.  Okay.
20     Q.  So it's going to be kind of a compare and
21 contrast.  And so I would like you to look at the
22 Abott article and go to Page 726.
23     A.  Got it.
24     Q.  And there is a highlighted paragraph on that
25 page on the right-hand column.  And rather than read it,

76

1 I would just ask you to read it to yourself, and let me
2 know after you've had a chance to do that.
3     A.  Yes.
4     Q.  Okay.  And you've had a chance to read what
5 Abott said in that paragraph?
6     A.  (Nods head.)
7     Q.  On Page 9 of your report, the next -- the last
8 full paragraph on that page, you cite, Researchers,
9 Abott and our other author from the 2020 study.  Is this
10 the report that you're referring to in your report?
11     A.  Let me just quickly read it.
12     Q.  Sure.
13     A.  Yes.
14     Q.  Okay.  And you say that Abott -- and some other
15 researchers, but we're talking about the Abott report --
16 "identify dissimilarity index scores below .3 as
17 indicating low levels of segregation, .3 to .6 as
18 moderate levels of segregation, and .6 and above as
19 high levels of segregation.  SBISD's dissimilarity
20 index score at the school level is .694 and .596 at
21 the enrollment zone level."
22           Did I read that correctly?
23     A.  Yes.
24     Q.  Okay.  So with the current Spanish surname
25 registered voter proportion for Spring Branch below

77

1  20 percent and the Spanish surname registered voter
2  proportion among actual Spring Branch ISD 2021 board
3  election voters below 6 percent, would you agree that
4  Spring Branch ISD is in the category that the authors
5  identify as low on Latino eligible voters and high on
6  segregation?
7      A.  Yes.
8      Q.  Do you agree the conclusion in that case --
9  with the conclusion in that case, in the case of
10  Spring Branch, that "reformers ought to carefully
11  consider moving forward with conversion efforts under
12  this set of adverse conditions"?
13     A.  I'm not certain what they meant by "carefully
14  consider moving forward with conversion."  What I would
15  believe you would want to be careful about is drawing
16  those districts to take into consideration the range of
17  concentration of Hispanic voters.
18         I think you would not necessarily be
19  cautious about making the conversion.  I would be
20  careful about how to make that conversion and be more
21  careful about drawing those districts.
22     Q.  Turning to Page 12 of your report, Section 9 of
23  your report deals with "The taxing and spending policies
24  of governments with at-large and single-member district
25  representation," correct?

78

1      A.  Yes.
2      Q.  Do you -- how are Spring Branch ISD's Title I
3  funds affected by its having an at-large system?
4      A.  I don't know.
5      Q.  As part of Page 12 of your report, this
6  section, the last paragraph, it begins with a sentence
7  that states "Empirical support for a significant and
8  positive relationship between spending and the electoral
9  fortunes of single-member district representatives has
10  been mixed, modest, and conditional."
11         Do you see that?
12     A.  Yes.
13     Q.  What did you mean by that statement?
14     A.  You know, it -- it's a -- it's a big
15  literature.  I should point out I contributed to it with
16  my colleague Ken Bickers.  And like a lot of things,
17  it's just not simple.
18         Spending levels, mixed in that large
19  system, seem to be conditional on a whole set of
20  factors, not the least of which is not only the form of
21  government but the composition and preferences of voters
22  in those districts.
23     Q.  Turning to Page 13 of your report, the first
24  full paragraph, you state that "Research on the spending
25  and taxing policies of subnational governments," and

79

1  then you continue with the sentence.
2         And my question, on the front end, is what
3  is a subnational government?
4      A.  It -- it's cities and counties and, of course,
5  rural districts and special districts.
6      Q.  I thought that might be what it meant, but I
7  wasn't positive.
8      A.  I apologize for the jargon.
9      Q.  And then the next paragraph on this page, you
10  state that "The research on spending and taxing among
11  governments with different modes of representation
12  presumes that the higher levels of spending governments
13  in jurisdictions with single-member district
14  representation is both inefficient and nonrepresentative
15  of the preferences of the full community."
16         Do you agree with that presumption?
17     A.  The literature has always -- yes, I -- I think
18  the characterization of the literature has been that
19  single and at-large differ because of this what we call
20  pork barrel spending hypothesis.  I don't agree with
21  that being true, but I think the literature has been
22  dominated by that working hypothesis.
23     Q.  And when you say "pork barrel spending," that
24  would be for single-member districts, correct?
25     A.  That is correct.

80

1      Q.  Okay.  Page 14 of your report.  And I note that
2  your report is only 15 pages long; so we're doing great.
3         The first full paragraph begins with
4  "A great number of minority school board members," and
5  it goes to talk about two reports.  "Robinson, 2016,
6  finds that a great proportion of Hispanic school board members
7  leads to less support for bilingual policies, popular
8  among Hispanic voters."
9         And you cite "Flink and Molina, from 2016,
10  as finding the level of Hispanic representation has a
11  positive effect on bilingual education spending only
12  when the proportion of bilingual population in the
13  district is relatively small."
14         My first question is do you agree with
15  those conclusions of those studies?
16     A.  Yes, I think they are -- they are an accurate
17  result.
18     Q.  And the next paragraph talks about a study by
19  Leal about teachers and administrators and particularly
20  Latino representation.
21         Do you know, in Texas, what the actual
22  percentage of the available teacher pool that is
23  Hispanic?
24     A.  I don't.
25     Q.  And do you know where Spring Branch level of

21 (Pages 81-84)

81

1 Latino representation, how that corresponds with the
2 available pool in the state?
3       A.   No, I do not.
4       Q.   All right.  I just have a few follow-up
5 questions, not from your report.  We are now finished.
6            Are you aware of the increase in
7 partisanship playing a role in school board elections?
8       A.   I am aware of news coverage of that, yes, and
9 I am aware of anecdotes like our -- I mean, I've read
10 accounts of that in the news, yes.
11      Q.   So I'd like Dana to mark, as Exhibit 8, our
12 final exhibit, which is a Press Release from the
13 Republican Party of Texas.
14      A.   I've seen it.  Yes, I know -- I've got it right
15 here.
16            (Exhibit 8 identified.)
17      Q.   First of all, before I -- before I showed this
18 to you, were you familiar with this press release?
19      A.   No, no.  I just read news accounts.
20      Q.   Okay.  And this is a --
21      A.   The press -- I don't -- I've not seen the
22 press release before, no.
23      Q.   Great.  So this is a press release from the
24 Republican Party of Texas, dated December 6, 2021.  And
25 the first paragraph of the press release reads, "As part

82

1 of a growing commitment to advance conservative
2 principles on a local level, the Republican Party of
3 Texas, RPT, announced Monday an initiative to play a
4 greater role in nonpartisan races and ballot
5 propositions.  As part of this initiative, the RPT
6 announced the creation of a Local Government Committee
7 composed of RPT Executive Committee members and local
8 GOP leaders.  The committee will assist county parties
9 in electing conservative candidates in often-overlooked
10 school board and municipal elections."
11           Were you aware that the Republican Party of
12 Texas was -- has this new commitment and new initiative?
13      A.   I had read about it in the newspapers, yes.
14      Q.   And the next sentence of the press release
15 notes that "The Texas GOP has celebrated major successes
16 in recent nonpartisan races."
17            Is that a true statement, to your
18 knowledge?
19      A.   I -- I don't know that to be true, but I think
20 it -- the short answer is I don't know if it's true.
21 I don't know.
22      Q.   And part of what -- of the successes they list
23 in the press release is that "GOP-supported challengers
24 unseated three long-time incumbents in Cypress-Fairbanks
25 ISD, in Harris County."

83

1            Were you aware of that?
2       A.   Yes, I was aware of the Harris -- of HISD, in
3 particular, and I've known about Cypress-Fairbanks.
4 And I should reveal to you that I have worked for
5 Cypress-Fairbanks before, both on bond elections and
6 redistricting.
7       Q.   And then the next two paragraphs, of the
8 press release, have statements from the Republican Party
9 Chairman Matt Rinaldi and the Republican Vice Chair
10 Cat Parks.
11            Are you aware of the statements that these
12 two leaders of the Republican Party of Texas have made
13 regarding school board elections?
14      A.   Not until I read this press release, no.
15      Q.   Are you familiar with the Chris Earnest
16 election for the Spring Branch board?
17      A.   No, I'm not, I mean, other than what I've done
18 in my report.  I mean, he's -- he's a data point, yes,
19 but I -- no, I don't know anything about the campaign.
20      Q.   Okay.  So you're not aware, one way or the
21 other, whether the partisanship, that was expressed
22 by the GOP in the press release, played a role in the
23 election of Mr. Earnest?
24      A.   No, I am not aware of that.
25            MR. CRAWFORD:  Dr. Stein, I think that's

84

1 all I have today.  I really appreciate your time.
2            THE WITNESS:  Thank you so much.  It was a
3 pleasure.  I hope I didn't talk too fast, Ms. Taylor.
4            MR. CRAWFORD:  You were wonderful.
5            MR. ABRAMS:  Plaintiff will reserve its
6 questions until later.
7            (Per the Federal Rules of Civil Procedure,
8            signature was requested by the deponent
9            or a party before the deposition was
10           completed.)
11           (End of proceedings at 11:31.)

**Page 85**

1 WITNESS NAME: ROBERT M. STEIN, Ph.D.

2 DATE OF DEPOSITION: FEBRUARY 9, 2022

3                CHANGES AND SIGNATURE

4 PAGE/LINE     CHANGE                    REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

**Page 86**

1     I, ROBERT M. STEIN, Ph.D., have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5                _____

6                ROBERT M. STEIN, Ph.D.

7

8

9 STATE OF _____ )

10 COUNTY OF _____ )

11

12     Before me, _____, on this day

13 personally appeared ROBERT M. STEIN, Ph.D. known to me

14 (or proved to me under oath or through _____)

15 (description of identity card or other document) to be

16 the person whose name is subscribed to the foregoing

17 instrument and acknowledged to me that they executed the

18 same for the purposes and consideration therein

19 expressed.

20     Given under my hand and seal of office this _____

21 day of _____, 2022.

22

23

24                _____

                 NOTARY PUBLIC IN AND FOR

25               THE STATE OF _____

**Page 87**

1          IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF TEXAS

2                  HOUSTON DIVISION

3 VIRGINIA ELIZONDO,          )

                              )

4     Plaintiff,              )

                              )   Civil Action No.

5 v.                          )   4:21-cv-01997

                              )

6 SPRING BRANCH INDEPENDENT   )

  SCHOOL DISTRICT, CHRIS      )

7 GONZALEZ, PAM GOODSON,      )

  KAREN PECK, JOSEF D. KLAM,  )

8 MINDA CAESAR, CHRIS EARNEST,)

  J. CARTER BREED, in their   )

9 official capacity as members)

  of the Board of Trustees of )

10 Spring Branch ISD           )

                              )

11    Defendants.             )

12

13          REPORTER'S CERTIFICATION

14             ORAL DEPOSITION

15        OF ROBERT M. STEIN, Ph.D.

16             FEBRUARY 9, 2022

17            (REPORTED REMOTELY)

18

19     I, Dana A. Taylor, Certified Shorthand Reporter in

20 and for the State of Texas, hereby certify to the

21 following:

22     That the witness, ROBERT M. STEIN, Ph.D., was duly

23 sworn by the officer and that the transcript of the oral

24 deposition is a true record of the testimony given by

25 the witness;

**Page 88**

1     That the deposition was submitted on

2 March 1st, 2022, to the attorney for the

3 witness for examination, signature, and return to me by

4 April 5th, 2022;

5     I further certify pursuant to FRCP Rule 25

6 30(f)(1) that the signature of the deponent:

7     _X_ was requested by the deponent or a

8 party before the completion of the deposition and that

9 the signature is to be before any notary public and

10 returned within 30 days from date of receipt of the

11 transcript. If returned, the attached Changes and

12 Signature Page contains any changes and the reasons

13 therefore:

14     ____ was not requested by the deponent or a

15 party before the completion of the deposition.

16     That pursuant to information given to the deposition

17 officer at the time said testimony was taken, the

18 following includes all parties of record and the amount

19 of time used by each party at the time of the

20 deposition:

21 FOR THE PLAINTIFF:

22     MR. BARRY ABRAMS

       BLANK ROME

23     717 Texas Avenue, Suite 1400

       Houston, Texas  77002-2727

24     713-228-6606, 713-228-6630 Fax

       barry.abrams@blankrome.com

25     Time used:  (0:00)

23 (Pages 89-89)

```
                                                                89
 1 FOR THE PLAINTIFF:
 2     MR. MARTIN GOLANDO
       THE LAW OFFICE OF MARTIN GOLANDO, PLLC
 3     405 North Saint Mary's Street, Suite 700
       San Antonio, Texas  78205-2334
 4     210-892-8543
       Time used:  (0:00)
 5
 6 FOR THE DEFENDANTS:
 7     MR. CHARLES J. CRAWFORD
       ABERNATHY, ROEDER, BOYD & HULLETT, P.C.
 8     1700 Redbud Boulevard, Suite 300
       McKinney, Texas  75069
 9     214-544-4000, 214-544-4040 Fax
       ccrawford@abernathy-law.com
10     Time used:  (1:58)
11         That $690.55 is the deposition officer's charges
12 to the Defendants for preparing the original deposition
13 transcript and any copies of exhibits;
14         I further certify that I am neither counsel for,
15 related to, nor employed by any of the parties or
16 attorneys in the action in which this proceeding was
17 taken, and further that I am not financially or
18 otherwise interested in the outcome of this action.
19         Certified to by me this 1st day of March, 2022.
20
21                  /s/ Dana Taylor_____
                    DANA TAYLOR, TEXAS CSR 6048
22                  Expiration Date: 04/30/23
                    STORMY JACKSON REPORTING
23                  Firm Registration No. 610
                    1518 Clear Creek Drive
24                  Allen, Texas  75002
                    214.491.0117
25                  stormyrpr@outlook.com
```