**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:21-CV-01997 |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, *ET AL.*, | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S MOTION TO COMPEL**

Under FED. R. CIV. P. 37, Plaintiff Virginia Elizondo moves to compel Defendant Spring

Branch Independent School District ("the District" or "SBISD") to:

➢ Produce previously undisclosed analyses by its expert, Dr. John Alford, concerning racially polarized voting in the District, which the District improperly has withheld without complying with the requirements of FED. R. CIV. P. 26(b)(5)(A);[1]

➢ Produce the information required by FED. R. CIV. P. 26(b)(5)(A) with respect to any other information that the District has withheld from production on the basis of any purported privilege, so that the privilege issue can be presented to the Court; and

➢ Amend its answer in this proceeding to admit rather than deny that the *Gingles* factors[2] in the case are satisfied, because "the denials of [those] factual contentions are [not] warranted on the evidence." *See* FED. R. CIV. P. 11(b)(4).

---

[1] Rule 26(b)(5)(A) states:

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

[2] In *Thornburg v. Gingles*, 478 U.S. 30, 34 (1986), the Supreme Court set out three "preconditions" that must be met for a challenge under Section 2 of the Voting Rights Act to be successful (the "*Gingles* factors"):

1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district;
2) the minority group must be politically cohesive and vote as a bloc; and
3) the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate.

# I.
## INTRODUCTION

This lawsuit challenges the "at-large" method of electing members of the SBISD Board of Trustees under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. §10301 ("VRA"). Threshold issues concern whether: (1) the Latino population in the District is sufficiently large and geographically compact to constitute a majority in a single member district; (2) the Latino population in the District is politically cohesive and votes as a bloc; and (3) the white majority in the district votes sufficiently as a block to enable it, in the absence of special circumstances, to defeat the Latino community's preferred candidate.

Unsurprisingly, the discovery in this case has conclusively established each of these three factors.[3] What *is* surprising is that the District appears to have knowingly concealed the fact that before this lawsuit was filed, its own voting expert, Dr. John Alford, had advised it about whether the *Gingles* factors were likely satisfied, yet when the District answered the lawsuit, it expressly denied those facts.[4]

When the District's corporate representative was deposed, the District conceded that – contrary to the statement in its answer – the first *Gingles* factor has been satisfied.[5] That is, the District admitted that the Hispanic population in the District is sufficiently large and geographically compact to constitute a majority in one or more single member districts even though the District had denied that fact in its answer. But the District disclaimed having conducted any analysis to determine whether or not political cohesion and bloc voting among Hispanic voters exists and whether in the

---

[3] The Report of Robert M. Stein, Ph.D., attached as **Exhibit A** ("Stein Report") and Supplement to Expert Report of Robert M. Stein, Ph.D., attached as **Exhibit B** ("Stein Supplement**). In compliance with the requirements of Fed. R. Civ. P. 26(e)(2), before the discovery cutoff, and well before the date for pretrial disclosures per Rule 26(a)(3), Dr. Stein timely updated his deposition testimony and the District's counsel has been offered the opportunity to depose him about the Supplement.

[4] *See* Defendants' Original Answer to Plaintiff's First Amended Complaint, ¶¶40, 41, 45 (Doc. 8).

[5] *See* **Exhibit C**, Deposition of SBISD Corporate Representative Christine Porter ("SBISD Porter Deposition"), at pp. 34/8 – 35/13;

absence of special circumstances, the white majority votes sufficiently as a block to defeat the Hispanic community's preferred candidate – yet in its answer the District denied those facts as well.[6]

On March 24, 2022, those statements were also discovered to be false. During the deposition of the District's voting expert, Dr. John Alford, Dr. Alford disclosed for the first time that – contrary to the District's earlier sworn testimony – before this lawsuit was filed he had twice been hired to analyze whether racially polarized voting existed and that he had provided his opinions to the District.[7] According to Dr. Alford, in the last four years[8] he performed racially polarized voting analyses for SBISD on two occasions. When counsel for the Plaintiff sought to elicit the substance of those newly-disclosed opinions, the District purported to invoke a privilege and instructed Dr. Alford not to answer direct questions about the subject[9] – even though the District had not complied with and did not comply with FED. R. CIV. P. 26(b)(5)(A), which required that it expressly make that claim previously, so that the Court could assess any such privilege claim.

Instead, while belatedly trying to conceal Dr. Alford's substantive opinions, which apparently support the Plaintiff's allegations in this case, the District nevertheless has purported to engage him as a testifying expert for the limited purpose of critiquing the analysis of his mentor and Rice University colleague, Dr. Robert Stein – all the while withholding from the Court and the public the facts that in the past he previously had rendered opinions to the District that are, at a minimum, consistent with those now rendered by Dr. Stein. Here are examples from Dr. Alford's deposition:

**Q. Did you do a racially polarized voting analysis?**

A. At that point there was a -- I did just a very preliminary, not -- sort of -- maybe not an actual racially polarized voting analysis, but a quick look at -- just looking at sort of where -- where candidate votes were centered across the rough -- you can only do it across the rough geography because there's so few polling places. But just looking at

---

[6] SBISD Porter Deposition, pp. 31/4 – 33/4; 33/12 – 34/7.

[7] Deposition of John Alford, Ph.D., attached as **Exhibit D** ("Alford Depo.")**.**

[8] Alford Depo. at 16/16 -  18/9.

[9] *See, e.g.*, *id.* at 23/17 – 25/4, 26/9 – 27/5, 102/12 – 103/25.

where vote totals were centered and how they varied across the geography, but not a formal -- not like a EI formal analysis. At that point it was just to look at the -- at sort of what the election results looked like across the rough geography.

**Q. What was your informal conclusion? Do you recall?**

A. My informal conclusion was that that rough look was certainly consistent with the possibility that -- both that Hispanic voters were voting at above 50 percent for preferred candidates, including Hispanic candidates, and that Anglo voters are voting below 50 percent for those candidates, and those candidates weren't being elected to the board.

**Q. Fair enough. And I think I -- in your answer I heard you say you had not done one yet. Have you done a racially polarized voting analysis?**

A. Since?

**Q. Since.**

A. Yes.

**Q. And not for this case, but for --**

A. Right. Not for this case, but -- but more recently than the -- so there -- there are sort of three distinct eras here, the old –

**Q. Sure.**

A. -- the dinosaur era, which was about meeting Gingles 1 with Bob Heath, the more recent stuff three, four years ago looking at -- particularly focusing on potential things the district might want to think about. That was, again, this rough kind of look. And in addition a more direct focus on cumulative voting on systems with some at-large, you know, some single-member. And then more recently I was asked by -- we're now at the -- at the second set of attorneys rather than the third -- at the second set of attorneys asked to provide the attorneys with, you know, a more complete analysis of the sort that you typically will see in a case like this.[10]

**Q. Did you do ecological inference?**

A. Yes.[11]

**Q. I understand. And did you do the numbers yourself?**

A. I think -- so there were two -- two pieces to that. There was a standard, just an OLS, which I often do just as a first estimate. It's not as -- it doesn't do as good a job.

---

[10] *Id.* at 21/6 – 23/2.

[11] *Id.* at 23/3-4.

It doesn't give you statistical significance, but it usually gives you a pretty good quick picture, which I did. And then the actual EI would have been run by Randy Stevenson, who's a professor at Rice, who does a lot of programming and statistical work with me.

**Q. And this was before the filing of this suit, correct?**

A. I believe so, although I'm not -- I'm not exactly certain when the suit was filed or exactly when --

**Q. Yes, sir.**

A. -- when the work was done. But I -- yeah, I would say -- I think it was before the suit was filed, but it could have been -- no, no, no, because there was discussion -- I think the district was aware that they could be sued so -- what I'm not sure about is the – I had been asked to sort of take a look, so I had done that very informal look. And I had been asked by the lawyers to take a look at that, and at that stage I think probably was when I ran the sort of regression analysis. Whether that -- whether the actual EI analysis was done before or shortly after the lawsuit was filed I don't -- I don't know.

**Q. Do you recall the conclusions of that report?**

A. I did not provide a report.

**Q. Did you recall -- do you recall the findings from your analysis?**

A. So the findings I shared with the attorneys from that analysis.

MR. CRAWFORD: And so based on that answer I'll ask you not to disclose what you told the attorneys based on the attorney-client privilege.[12]

**Q. (BY MR. GOLANDO) Is Lisa McBride your attorney?**

A. My attorney? No, she doesn't represent me.

**Q. All right.**

A. But that's who I was working for when she represented the school board.

**Q. Yeah, I understand. And when she contacted you to do the EI analysis I heard you to say that it's possible it happened before the institute of this lawsuit. Correct?**

A. That's possible, yes.[13]

---

[12] *Id.* 23/17 – 25/4.

[13] *Id.* 25/13-23.

**Q. (BY MR. GOLANDO) As I understand it, I asked you what the contents of that previous analysis was, and you -- Mr. Crawford objected on the basis of attorney-client privilege, is that correct, and you're currently refusing to answer that question? Correct?**

A. I'm deferring to whatever -- whatever Charles tells me to do that's what I'll do.

**Q. I don't think there's a basis to object to that because I need to know your previous analyses for credibility and weight. You've been hired on this position and --**

MR. GOLANDO: What I'd like to do instead is to see if we can put this answer under seal, and we can go fight about it with the --

MR. CRAWFORD: No, I'm not willing to waive it. So what we can do is we can note it in the record, and then after the deposition we can take it up with the court. And if we need to re-present Dr. Alford we will, but I'm not comfortable even under seal waiving the -- waiving the objection.

MR. GOLANDO: I understand. I think that's reasonable. Fair enough. So let's just move on.[14]

**Q. (BY MR. GOLANDO) I'm going to hand you Exhibit 1 again, please. I want you to look at the last number three of the subpoena. Do you see that, sir?**

A. Yes.

**Q. Okay. What does that say? Could you repeat it for the court?**

A. It says "All reports that the witness has prepared for the Spring Branch Independent School District or its counsel, on any subject for which he has been compensated."

**Q. Would you agree with me that those analyses that you provided Ms. McBride would have been captured by that -- that request?**

A. I guess I didn't -- so two issues for me. One is I wasn't certain about what of that would be – sort of normally would be disclosable or not, so I – you know, I checked with Charles. And, also, I never provided a report to the district or the counsel. I provided, you know, information and some tables, but I -- I didn't -- it never reached the point of my actually providing an expert report. So I guess I wasn't -- I wasn't sure about exactly whether this entailed sort of everything I ever told the lawyers. And then I also wasn't sure about what of that was -- what was protected and not, so I'm relying on the attorneys --

**Q. I understand.**

---

[14] *Id*. 26/9 – 27/5.

A. -- on that.

**Q. Did you provide Mr. Crawford or anybody else at that firm the documents we've just been talking about, the OLS, or the EI that you did, and it sounds like in the summer of 2021?**

A. Anything that had actually -- that I had shared with the previous attorneys that I still had I would have provided to Mr. Crawford.

**Q. Okay.**

A. I'm not sure that there was any -- I'm not sure that the OLS analysis was ever even -- anything done other than just sort of looking at that real quickly in Excel. I'm not sure that was ever reduced to anything that -- that would have been transmissible either to attorneys or to Mr. Crawford. But certainly anything else that would fall in that category was provided to him.

**Q. Do you still have the OLS Excel file?**

A. It's -- I guess it's possible. I haven't gone back to look for it because I think, you know, it's superseded by the EI analysis. But it's possible that it's -- I could look. It's possible I guess.

**Q. Without telling me the contents, was the OLS consistent with the EI?**

A. Not inconsistent. I guess. . . .[15]

**Q. Are there any other reports that you've done for SBISD that you haven't disclosed to us?**

A. That's -- I mean, I think we've covered all of what I recall of information, types of information that I've shared with -- with the attorneys, or the attorneys shared with the board, or that I was present to discuss with the board.

**Q. And as we're sitting here today you have not provided the plaintiff with that data for the OLS or the data for the EI, correct?**

A. Correct.[16]

**Q. What's the scope of your engagement in your contract, if you don't mind me asking?**

A. At least my understanding of it -- you know, I probably pay less attention to these contracts than I should.

---

[15] *Id.* 28/25 – 31/1.

[16] *Id.* 32/25 – 33/10.

**Q. If you want to refresh your recollection –**

A. I just say what I -- what I agreed to before this was drawn up, and this looked to me like it didn't exceed that, was that I would provide a report that was essentially responsive to Dr. Stein's report, so that that was the extent of my involvement, was to provide response and commentary to his report as opposed to analysis itself. It was -- my role was to – basically to provide a critique and context for Dr. Stein's report.

**Q. And so you have been hired in the past by SBISD to determine whether or not elections are racially polarized in SBISD elections, correct?**

A. That was certainly one of the tasks I was asked to perform previously, yes.[17]

**Q. I'm asking you as an expert are Latinos politically cohesive in SBISD elections?**

MR. CRAWFORD: I'm going to object to the extent that it's outside the scope of this engagement. And I'll let Dr. Alford make that determination but –

**Q. (BY MR. GOLANDO) You can still answer, sir.**

A. I'd say, you know, based on -- I mean, for example, based on the -- on Dr. Stein's report I'd say there's evidence of modest cohesion among Latino voters. So there's certainly no evidence of the sort we would see in the black voters. I don't think Hispanic voters are voting 90 percent one direction or another. But there's certainly evidence that suggests that at least in some of the elections more than -- more than a bare majority of Hispanic voters are favoring Hispanic candidates.

**Q. Based on your experience as a election observer and an analyst for SBISD in the last 20 years of your employment here, or engagement here, do you believe in your expert opinion that Latinos are politically cohesive outside of the Stein report?**

A. I would say modestly to moderately cohesive.

**Q. Do you believe that, same question, as to Anglos? Are they politically cohesive in SBISD elections?**

MR. CRAWFORD: Same objection as before to the extent it exceeds the scope of his engagement.

MR. GOLANDO: Yes, sir.

A. I think it's harder to say they are, but I think -- on balance I'd say moderately co -- modestly -- again, sort of modestly to moderately cohesive. So in -- again, in the sense

---

[17] *Id*. 37/23 – 38/17.

of the sort of Gingles 2 and Gingles 3 threshold, not in sort of the broader totality of the circumstances. But just addressing it as, you know, what -- what my guess would be about Gingles 2 or my guess about where you would be on Gingles 3 that's -- that's what I would guess. And I think that's roughly what Dr. Stein's analysis suggests.[18]

**Q. Based on your years of experience and the data reviewed for SBISD do Latino voters in SBISD elections support different candidates than Anglo voters in SBISD?**

A. I have not -- I don't know. Comprehensively I don't know.

**Q. You did an EI report, correct?**

A. The what?

**Q. You did an EI before the litigation began?**

A. Yes.

**Q. Okay. And you recall the contents of that EI report, correct?**

A. I do.

**Q. And I'm asking you to call into that based -- based on your expertise and your -- the data you've collected and your experience in SBISD. Do you recall whether or not Latino voters in SBISD elections support different candidates than Anglo voters generally?**

A. I guess I'm not clear on -- I mean, you're asking me about the results of the analysis that I provided the attorneys, so I'm not sure -- is this like -- are we back in the realm of what's acceptable here or –

**Q. I'm asking you just based on your experience. It's a question about do you believe them to be so based on the entirety of your experience here?**

MR. CRAWFORD: And based on Dr. Alford's interpretation of the question I think it would call for protected communications, and so I'll instruct you not to answer.

**Q. (BY MR. GOLANDO) You can answer if you want.**

A. I've been instructed not to answer --

**Q. Fair enough.**

A. -- by my employer.

---

[18] Id. 40/13 – 41/25.

**Q. I think we've asked that question before. In your opinion based on your years of experience at SBISD, does the Anglo majority vote sufficiently as a bloc to enable it to defeat the minority preferred candidate?**

A. I would say sometimes.[19]

\* \* \*

On March 25, 2022, the District was consulted about the Plaintiff's concerns that:

- It appears that before the lawsuit was filed, the District had been advised and was aware that the demographic and election data either established or supported an affirmative finding concerning each of the *Gingles* factors.

- Despite those facts, when suit was filed, the District filed an answer in which it expressly denied the factual bases for the *Gingles* factors.

- When the District's representatives were deposed about the factual bases for the District's denial of the factual bases for the *Gingles* factors, the District testified that it had not conducted and was unaware of any investigation into whether the factual bases for the *Gingles* factors did or did not exist.

- At a minimum, it appears that the District's denial of the existence of the factual bases for the *Gingles* factors was not warranted on the evidence, which would constitute a violation of FED. R. CIV. P. 11(b)(4).

- At a minimum, it appears that the District's denial of the existence of any investigation or study into the factual bases for the *Gingles* factors before it filed its Answer, was false.

- The District's failure previously to disclose, produce or, at a minimum, comply with FED. R. CIV. P. 26(b)(5)(A), with respect to the previous analyses that Dr. Alford has now confirmed exist, constitutes a waiver of any privilege over any such material.

- The District's designation and proffer of Dr. Alford as an expert to rebut and contest the sufficiency of at least some of Dr. Stein's analytical work puts in issue the previous racially polarized voting analyses that Dr. Alford has now acknowledged exist, which is another reason that any purported privilege over that information has been waived.

- Because the District and its then counsel were both well aware that its own expert had opined that Plaintiff could readily prove the *Gingles* factors, in November 2021, the District approached the Plaintiff to discuss whether the case could be resolved amicably.[20]

- After someone apparently violated the confidentiality obligations concerning discussions occurring in the School Board's executive sessions, and disclosed to members of the community that the District intended to confer with the Plaintiff about potential avenues to resolve the litigation, the Board received multiple communications from a vocal segment of the community, who then appeared at Board meetings to complain about any resolution of what the District had already been advised was a lawsuit in which the facts

---

[19] *Id*. 102/12 – 103/25.

[20] *See* Deposition of Christina Gonzalez at pp. 28/20 – 30/16, attached as **Exhibit E**.

supported the Plaintiff's pleadings and allegations (despite the District's improper denial of those facts).[21]

- The District then directed its counsel at the time to renege on the agreement that the District had itself proposed to discuss resolution of the lawsuit and those counsel,[22] who were aware of the fact that the legal position the District had taken in the litigation was contradicted by the opinions of its own experts, withdrew from representing the District, based upon their ethical obligation to do so.[23]

- When the District re-engaged Dr. Alford as a testifying expert in the lawsuit, through its new lawyers, apparently to try to conceal the fact that Dr. Alford had previously expressed the same opinions as those of Dr. Stein, an attempt was made to limit the scope of his engagement to simply commenting on certain aspects of Dr. Stein's report,[24] with the hope that Dr. Alford's previous opinions, which support those of Dr. Stein, would never see the light of day.[25]

When the District expressed its opposition to Plaintiff's proposed motion to compel the production of the previous Alford opinions, to compel the District to amend its answer, and to compel the District to comply with FED. R. CIV. P. 26(b)(5)(A), apparently advancing the philosophy that "the best defense is a good offense," the District announced its intent to move to strike and suppress work that Dr. Stein has done,[26] which further confirms the validity of his original and unchanged opinions that:

1. There is statistically significant evidence of racially polarized voting in the Spring Branch Independent School District's Board of Trustees elections for the period 2015-2021.

2. White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances, to defeat the minority voters' preferred candidates of choice.

---

[21] *Id.*

[22] *Id.*

[23] Motion to Withdraw and Substitute Counsel for Defendants (Doc. 24).

[24] Alford Depo. at 37/23 – 38/17.

[25] *See* March 25, 2022 email from B. Abrams to C. Crawford and L. Henry re: Elizondo/SBISD, attached as **Exhibit F**.

[26] Defendants' Motion to Strike Supplemental Expert Report and to Limit Expert Testimony (Doc. 41). The District's expert, Dr. Alford, has acknowledged that if Dr. Stein (who Alford credits as an "excellent," "well-respected" scholar who "always ends up producing work that is among the best of the work that's done in [his] area," who does "very good, very high quality work" and who is "as skilled as anyone doing work in the social sciences today" and is a "top scholar in analyzing voter behavior") conducted a traditional ecological inference ("EI") evaluation Alford preferred over the approach that Dr. Stein had chosen, then, "all of th[e] problems [Alford had expressed concern about] would be solved." *See* Alford Depo. at 44/11 – 46/21, 76/9-25. In its motion to strike, Defendants now ask the Court to suppress the work Dr. Stein did in response to Dr. Alford's implicit invitation that he do so.

3.    The geographic concentration of Hispanics in the Spring Branch Independent School District is sufficient to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan.[27]

The District should be compelled to disclose the truth to the public and to this Court and the Court should not permit the District to suppress the inconvenient truths about the existence of racially-polarized voting which support Plaintiff's Voting Rights Act claims.

## II.
### THE DISTRICT DID NOT COMPLY WITH OF FED. R. CIV. P. 26(B)(5)(A) AND WAIVED ANY OBJECTION TO PRODUCING THE PREVIOUS OPINIONS OF ITS TESTIFYING EXPERT, DR. JOHN ALFORD

The District was requested during discovery to produce responsive documents, including reports concerning racially-polarized voting in SBISD, and Dr. Alford specifically was requested to produce previous reports he had prepared for SBISD for which he had been compensated. In response, the District did not comply with Rule 26(b)(5)(A), which states that:

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

The District's failure to comply with Rule 26(b)(5)(A) waives any purported attorney client or work product privilege it belatedly has sought to invoke with respect to Dr. Alford's previous work for SBISD. *See, e.g., Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 569 (N.D. Tex. 2018)(ordering production of all responsive documents withheld on basis of work product privilege due to failure to comply with FED. R. CIV. P. 26(b)(5)(A); *Smith v. Shelter Mut. Ins. Co.*, No. 15-357-JJB-RLB, 2017 U.S. Dist. LEXIS 108658, *10 (M.D. La. July13, 2017)(failure to comply with Rule 26(b)(5)(A) waives attorney-client and/or work product privileges).

---

[27] *See* Stein Report and Stein Supplement.

### III.
### THE DISTRICT WAIVED ANY OBJECTION TO PRODUCING THE PREVIOUS OPINIONS OF ITS TESTIFYING EXPERT BY PUTTING THOSE OPINIONS IN ISSUE AND BECAUSE THEY ARE RELEVANT TO BIAS AND CREDIBILITY

The Federal Rules do not authorize gamesmanship to conceal a testifying expert's relevant opinions from disclosure in this context:

> "What [the party] is attempting to do here is to shield from discovery the observations and opinions of its own [expert] by designating him as a litigation expert and then improperly conflating his non-litigation work . . . with his litigation consulting work. It's an obvious attempt to whitewash what it must consider damaging commentary by [the expert]. And it is entirely improper and inconsistent with the letter and the spirit of the Federal Rules."

*Baltic Wind v. Lady of Perpetual Help, M/V*, No. 18-13449, 2020 U.S. Dist. LEXIS 260259, *11 (E.D. La. Aug. 6, 2020).

Plaintiff is "entitled to discover documents/reports related to other factually similar scenarios" because they are "relevant and could lead to admissible evidence on the issues of bias and . . . credibility as an expert witness." *Duarte v. St. Paul Fire & Marine Ins. Co.*, No. EP-14-CV-305-KC, 2015 U.S. Dist. LEXIS 161254, *19-21  (W.D. Tex. Sept. 25, 2015)(compelling production of prior expert reports from matters involving similar subject matter to present case); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, No. MDL-1446, Civ. A. No. H-01-3624, 2009 U.S. Dist. LEXIS 93299 (S.D. Tex. Sept. 29, 2009)("[A]n expert's report is relevant because bias is of course one of the quintessential bases for impeachment of a witness and a plaintiff is entitled to inquire into an expert's comparative record in testifying [and] [a] party is entitled to explore potential inconsistencies between the views [the expert] intends to express in the underlying case, and the . . . opinions he has given, and the . . . theories and methodologies he has adopted in prior cases or on related subjects." (internal  quotation marks and citations omitted)).

The District had no obligation to utilize Dr. Alford as its testifying expert, but when it chose to do so, it relinquished any right to have him critique Dr. Stein's work, while simultaneously

concealing and withholding his own previous analyses, which appear to confirm and buttress Dr. Stein's conclusions and opinions.

## IV.
### THE DISTRICT SHOULD BE ORDERED TO WITHDRAW ITS DENIAL OF THE *GINGLES* FACTORS

The District has conceded the falsity of its earlier denial of the first *Gingles* factor – that the Hispanic population in the District is sufficiently large and geographically compact to constitute a majority in one or more single member districts.[28] After ordering the District to produce and allow discovery concerning Dr. Alford's previous opinions about the existence of racially-polarized voting in SBISD, and assuming that information confirms what objectively appears to be the case – namely, that the District has previously been advised that the second and third *Gingles* factors have been satisfied, the Court should order the District to amend and withdraw its denial of those facts in its answer.

Accordingly, Plaintiff respectfully requests that  Court order the District to:

> ➤ Produce previously undisclosed analyses by its expert, Dr. John Alford, concerning racially polarized voting in the District, which the District improperly has withheld without complying with the requirements of FED. R. CIV. P. 26(b)(5)(A);

> ➤ Produce the information required by FED. R. CIV. P. 26(b)(5)(A) with respect to any other information that the District has withheld from production on the basis of any purported privilege, so that the privilege issue can be presented to the Court; and

> ➤ Amend its answer in this proceeding to admit rather than deny that the *Gingles* factors[29] in the case are satisfied, because the denials of those factual contentions are not warranted on the evidence.

---

[28] *See* **Exhibit C**, SBISD Porter Deposition, at pp. 34/8 – 35/13.

[29]  In *Thornburg v. Gingles*, 478 U.S. 30, 34 (1986), the Supreme Court set out three "preconditions" that must be met for a challenge under Section 2 of the Voting Rights Act to be successful (the "*Gingles* factors"):

4)  the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district;
5)  the minority group must be politically cohesive and vote as a bloc; and
6)  the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate.

Respectfully submitted:

  /s/ Barry Abrams                                  
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com

  /s/ Martin Golando                                 
The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF CONFERENCE

I certify that I conferred with Defendants' counsel, Charles Crawford regarding the subject of the foregoing motion and that he represented that Defendants oppose it.

/s/ Barry Abrams                              
Barry Abrams

## CERTIFICATE OF SERVICE

I certify that on April 6, 2022, a true and correct copy of the foregoing document was served on the following counsel via email:

Charles Crawford
ccrawfdord@abernathy-law.com
Lucas Henry
lhenry@abernathy-law.com

Andy Taylor
ataylor@andytaylorlaw.com

 /s/ Barry Abrams                                
Barry Abrams

15