# EXHIBIT "D"

**Exhibit to**
**Plaintiff's Response to Motion to Strike Supplemental Expert Report**
**and to Limit Expert Testimony**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIRGINIA ELIZONDO,      §
    Plaintiff,      §
              §
              §
v.           § Civil Action No.
              § 4:21-CV-01997
              §
SPRING BRANCH INDEPENDENT  §
SCHOOL DISTRICT, ET AL.,   §
    Defendants.      §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
JOHN R. ALFORD, PH.D.
MARCH 24, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF JOHN R. ALFORD, PH.D., produced
as a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 24th day of March, 2022, from 10:27 a.m. to
2:16 p.m., before John G. Rochelle, CSR in and for the
State of Texas, reported by machine shorthand, at the
SBISD Athletic Complex, 1050 Dairy Ashford Street,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

```
1                A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Mr. Barry Abrams
         Blank Rome LLP
5        717 Texas Avenue, Suite 1400
         Houston, Texas 77002
6        Phone: (713) 228-6606
         Email: babrams@blankrome.com
7
              AND
8
9        Mr. Martin Golando
         The Law Office of Martin Golando, PLLC
10       2326 W. Magnolia
         San Antonio, Texas 78201
11       Phone: (210) 471-1185
         Email: martin.golando@gmail.com
12
13   FOR THE DEFENDANTS:
14       Mr. Charles J. Crawford
         Abernathy, Roeder, Boyd & Hullett, P.C.
15       1700 N. Redbud Boulevard, Suite 300
         McKinney, Texas 75069
16       Phone: (214) 544-4000
         Email: ccrawford@abernathy-law.com
17
18
19   ALSO PRESENT:
20       Ms. Audrey Shakra
21
22
23
24
25
```

## Page 3

```
1                     INDEX
                                      PAGE
2
      Appearances............................. 2
3
      JOHN R. ALFORD, PH.D.
4
        Examination by Mr. Golando.................. 5
5
      Signature and Changes....................... 170-171
6
      Reporter's Certificate...................... 172
7
8
                    EXHIBITS
9
      NO. DESCRIPTION                        PAGE
10
      Exhibit 1........................................ 13
11        Notice of Oral Deposition for John R. Alford, Ph.D.
12
      Exhibit 2........................................ 64
13        Expert Report of John R. Alford, Ph.D. dated
          February 21, 2022
14
15    Exhibit 3........................................ 69
          Expert Report of Robert M. Stein, Ph.D. dated
16        January 20, 2022
17
      Exhibit 4........................................ 119
18        Article entitled "Political Attitudes Vary with
          Detection of Androstenone"
19
20    Exhibit 5........................................ 88
          Article entitled "At-Large Elections and
21        Minority Representation in Local Government"
22
23    Exhibit 6........................................ 163
          Document entitled "Letter of Agreement for
24        Services of Consulting and Testifying Expert"
25
```

## Page 4

```
1    Exhibit 7........................................ 165
         Article entitled "Republican Party of Texas
2        Doubles Down on Local Election"
3
     Exhibit 8........................................ 166
4        Article entitled "Do District-Based Elections
         for School Board Help Minority Candidates Get
5        Elected?"
6
7
8
```

1 (Pages 1 to 4)

Page 5

1      (Exhibit Nos. 1 through 8 premarked.)
2           JOHN R. ALFORD, PH.D.,
3    having been first duly sworn, testified as follows:
4           EXAMINATION
5    BY MR. GOLANDO:
6      Q. Good morning, Dr. Alford.
7      A. Good morning.
8      Q. My name is Martin Golando. We've met before.
9    I represent Virginia Elizondo in this case. And you've
10   read the pleadings, and you've read the expert reports;
11   is that correct?
12     A. That's correct.
13     Q. And you've had your deposition taken -- I don't
14   know -- 140 times, something like that?
15     A. I don't know if it's that many times, but it
16   seems like that many times.
17     Q. So you're well-acquainted with the process. I
18   don't think I've ever deposed you before, but --
19     A. I don't think so.
20     Q. -- I am a little inarticulate. I talk a little
21   mushmouthy. And so if you don't understand what I'm
22   asking you to do, or asking you to say, it's my fault.
23   So just ask me to repeat it, or I'll have him repeat it
24   to you. It's just I want to make sure that we're very
25   clear on the record the questions and answers. Right?

Page 6

1    The second instruction, I think, is the -- I need you to
2    wait till I finish asking the question, and then you can
3    answer. And I will try not to interrupt you. If you
4    would try not to interrupt me, I'd be appreciative. And
5    if you don't understand anything I'm saying or if you
6    don't understand the question, again, just let me know,
7    and we'll try to work it through. I promise.
8         So would you mind telling me what is your
9    full name for the record, please?
10     A. It's John Richard Alford.
11     Q. And where do you live, sir?
12     A. I live in Houston, Texas.
13     Q. Okay. And did you go to high school here? I
14   think you did. Right?
15     A. I went to -- it's a good, good question. I
16   went to -- I went to Clear Creek High School, which is
17   of course in Galveston County. And we lived on the --
18   what would not be in Houston, but at the time had not
19   yet been annexed so --
20     Q. Interesting. Fair enough. And so where did
21   you go to school first for college?
22     A. University of Houston.
23     Q. And when were you there roughly?
24     A. Late '70s.
25     Q. Okay. Did you ever do any drama there?

Page 7

1      A. No.
2      Q. Because they had a great drama teacher. I
3    don't know if you knew that or not.
4      A. Oh, yeah. Like world-renowned, really amazing.
5    And a very -- the University of Houston is a place I'm
6    very proud of.
7      Q. I would be, too. So if you watch any of the
8    Lakers series, the guy who's playing Bill Sharman --
9      A. Yeah.
10     Q. -- actually went to the University of Houston
11   at roughly the time you were there.
12     A. Yeah.
13     Q. I didn't know if you --
14     A. Yeah.
15     Q. -- if you knew him or not.
16     A. Yeah. They had a pretty good basketball team
17   back then, too.
18     Q. They did. Is that Calvin Hayes or --
19     A. Yeah. Yeah.
20     Q. Yeah. Fair enough.
21     A. Yeah. When I was in high school was sort of
22   their -- it was their real peak for U of H basketball.
23   I guess I was in middle school when -- I think when
24   they -- when they beat UCLA, which was just spectacular.
25     Q. And it was 1973?

Page 8

1      A. Yeah. Yeah. So it would have been -- no.
2    Yeah, I guess I would have been there. Pretty -- you
3    know, I spent a lot of time talking to people from
4    the -- sort of that era and the era just before I was
5    there. It was just a really interesting time. And Gene
6    Locke has some fascinating stories about his time at U
7    of H. It was just a -- you know, it was a very short
8    time before I was there, but a different world than it
9    was by the time -- by the '70s. The '60s at U of H was
10   quite different. So it's interesting.
11     Q. That's interesting. And after that you went
12   and got an MPA; is that correct?
13     A. I got a -- yes. I got a bachelor's and a
14   master's of public administration.
15     Q. And then you went to Iowa, correct?
16     A. Iowa. Correct.
17     Q. And when were you in Iowa?
18     A. So Iowa would have been from, say, '79 to '84.
19   Something like that.
20     Q. And what did you study at Iowa? What was your
21   major course of study?
22     A. So American politics, methodology, and public
23   policy.
24     Q. And did you study Bernie Grofman then and his
25   ecological regression at the time, or what did you --

2  (Pages 5 to 8)

Page 9

1   what was your first introduction to regression?
2       A. That probably would have been the first time I
3   was familiar with that. And then when I -- I continued
4   to work with some people at U of H, and so I -- and
5   Bernie back and forth for a time period because mother
6   lived in Houston a while. So I met him. And we
7   didn't ever actually work on any research projects
8   together; but, you know, he's a -- he's an amazing
9   fella.
10      Q. He is. He's extraordinarily impressive. So
11  you were at Iowa, got your Ph.D., and you came back to
12  Houston? Or what was your first job out of Iowa?
13      A. No. I got a job at Oakland University.
14      Q. In Michigan?
15      A. Yes.
16      Q. Okay.
17      A. I wasn't aware of the fact it was in Michigan.
18  When I accepted the interview I thought it was in
19  Oakland. Foolish me. You know, pretty much -- I was
20  born in Japan, but I pretty much grew up in Houston.
21  And so Iowa was a very cold experience for me.
22      Q. I bet.
23      A. I was excited about getting somewhere else, and
24  I wasn't really thinking about going kind of further
25  north. And so I went to -- I went to Oakland. I was

Page 10

1   there for a year. And then I got recruited by
2   University of Georgia. So I was at University of
3   Georgia for a couple of years. And then the professor
4   who had been my mentor at U of H in the meantime had
5   jumped to Rice, and he recruited me to come back to
6   Houston.
7       Q. Must have been nice to come home, I guess?
8       A. Yeah.
9       Q. So you said you were born in Japan? Is that
10  correct?
11      A. Yes.
12      Q. Was your dad in the military, mom in the
13  military?
14      A. My dad is a -- yeah, an Army officer, and
15  so we -- it was during the Korean war. He was stationed
16  in -- he had been in the Pacific in World War II but
17  then came back in the Korean war and was in a -- running
18  a supply area in southern Japan. That's where I was
19  born.
20      Q. I didn't know that. I guess you bounced around
21  a bit, huh, after that or --
22      A. Iran, Vienna, lots of different places in the
23  United States. When he retired from the military out
24  of -- we came back to Fort Bliss. He retired out of
25  Fort Bliss and then immediately took a job with a

Page 11

1   construction company in Iran. Then we spent a year in
2   Vienna, then a couple years in Washington, D.C., where
3   he was doing consulting, and then Corpus Christi and
4   some other places before he -- he finally settled down,
5   went to work for NASA when they were just building
6   the -- building that up. And that's where -- so that's
7   where I settled in and went to middle school and high
8   school. But a lot of moving around before that.
9       Q. Me too. Not quite to Iran, but -- I'm going to
10  hand you the --
11      A. Yeah. You pretty much trump anybody with Iran
12  because nobody lived there.
13      Q. So you were in Iran during -- when there was a
14  shah, right?
15      A. We actually met the shah.
16      Q. What was that like?
17      A. Unimaginably weird, like -- like waking up in
18  some kind of a weird '50s Disney movie or something
19  because they -- this was to celebrate the opening of --
20  the completion of this dam project, and they completely
21  remade the town. I mean, they just -- like they changed
22  the -- you know, artificially sort of with paper and
23  stuff changed the outside of the building. So they had
24  all these gold banners everywhere. Everybody put on
25  these fancy clothes. And just like a weird retinue of

Page 12

1   people coming through. And, you know, it was just -- it
2   was very, very strange.
3       Q. How old were you?
4       A. It was -- let's see. Six.
5       Q. Wow.
6       A. So it was -- at the time it just seemed -- I
7   mean, everything about Iran seemed fanciful. Most
8   things about Vienna seemed fanciful, too, but -- but I
9   actually haven't been back to Iran, but I've been back
10  to where we lived in Vienna. It's one of those things
11  where you -- when you're a kid you think, you know,
12  everything is weird and strange and big. And I remember
13  talking to my brother, and I said, "You know, do you
14  remember like when we lived in Vienna? I remember we
15  were living in this really huge, almost like a castle on
16  a hill, and it had a turret, and there were like" --
17  "the people lived in the turret, and we weren't allowed
18  to go in there." And my brother said -- he was younger.
19  My brother was a couple of years younger than me. He
20  said, "You know, I've heard like our sister talking
21  about that," but he said, "I'm not sure that is true."
22  So I went back to Vienna, and it turned out it all was
23  true.
24      Q. That's wild.
25      A. Yeah.

3 (Pages 9 to 12)

Worldwide Court Reporters, Inc.
(800) 745-1101

## Page 13

1    Q. So you're here pursuant to a notice of
2    deposition, correct?
3    A. Correct.
4    Q. Have you seen the notice, sir?
5    A. I have.
6    Q. I'm going to hand it to you. It's been
7    previously marked as Exhibit No. 1. Could you review it
8    for me and make sure it's authentic?
9    A. Yeah, that's what I remember seeing.
10   Q. So did you see the subpoena in the back for the
11   documents?
12   A. Yes.
13   Q. Okay. Did you have any documents for me?
14   A. I have -- I consulted with Mr. Crawford, and I
15   have documents that are related to my report.
16   Q. Okay.
17   A. And to my contract with the attorneys.
18   Q. Did you bring them with you today? Because I
19   have not seen them.
20   A. Oh. Sorry.
21       MR. CRAWFORD: John, are these your
22   originals?
23       THE WITNESS: They're --
24       MR. CRAWFORD: We can get copies made for
25   you.

## Page 14

1        MR. GOLANDO: Please. That would be great.
2    A. So this is a -- this is just the email exchange
3    that was related to the contract. This is the contract.
4    And this is -- in the report I referenced a web page
5    related to single-member versus at-large. And then I
6    referenced a press release from the Republican Party.
7    So those are the -- other than the documents that I
8    consulted that were either Dr. Stein's report or his own
9    articles he cited, that sort of thing, these are the
10   things that both related to the contract and to
11   materials I relied on or referenced in the report.
12   Q. (BY MR. GOLANDO) This is the entirety of the
13   documents --
14   A. Yes.
15   Q. -- that you believe are responsive to the
16   subpoena, correct?
17   A. Yes.
18   Q. I'm going to give these to your counsel so he
19   can review them and then give me what he thinks is
20   responsive. And I'm going to have Barry review it
21   during the deposition. And I don't think we'll have any
22   questions about it, but if we do I want to make sure we
23   get it tacked on at the end, if you don't mind.
24   A. Yes.
25   Q. Have you worked for Spring Branch ISD in the

## Page 15

1    past?
2    A. Yes.
3    Q. What was the nature of that engagement?
4    A. So I'm -- I'm not entirely sure about the
5    specific years, but sort of the timeline, my
6    recollection is that there was a lawsuit filed against
7    the district previously. And it could have been in
8    the -- perhaps in the '90s, maybe in the early 2000s,
9    but some -- some time ago. And I was hired by Robert
10   Heath, who was the attorney that was hired to defend the
11   school district. And I worked with him on that. And I
12   don't know if the -- I can't remember what the
13   resolution of that was. It didn't go to trial. I think
14   it was either dismissed or nonsuited. I'm not really
15   sure.
16   Q. Do you remember the nature of it? Was it a
17   voting rights lawsuit?
18   A. It was a -- it was a Section 2 voting rights
19   lawsuit, and the -- it turned out that it wasn't
20   possible to -- the only part that I had in it, my
21   recollection is, that it started with some -- a lot of
22   debate about whether Gingles 1 could be met, and that
23   ended up being what the suit was either dismissed or
24   nonsuited over, was the inability to actually draw a
25   majority-minority district.

## Page 16

1    Q. Did you review Gingles 2 or 3 testimony?
2    A. I -- I just don't -- I don't remember whether
3    that -- whether we had started that or hadn't, but I --
4    I certainly didn't do anything in the sense of a report
5    on it or anything. I don't -- you know, Bob Heath may
6    still have that information. I don't even have the
7    records from that era anymore. But I don't -- I don't
8    recall doing -- again, I may have or may not. I know it
9    wasn't -- -- it never got to that stage in terms of --
10   either of my doing a formal report or a deposition.
11   Q. Do you recall coming to an opinion about
12   racially polarized voting in any sense in SBISD at that
13   time period?
14   A. No, I don't think -- I don't recall anything at
15   that time period, no.
16   Q. Is that the extent of your previous engagement
17   with SBISD? Did you do anything else for them in the
18   intervening years?
19   A. So in the intervening years when -- I'm not
20   sure exactly about the dates on this, but sometime more
21   recently I was retained to work with counsel for the
22   district on issues related to the districting scheme.
23   So they -- the district was considering alternatives to
24   the current at-large system, including single-member or
25   mixed plans. There was -- I think most of my discussion

Page 17

1  with them had to do with alternative elections,
2  particularly moving to something like cumulative
3  elections.  So I've been involved in the shift in
4  Amarillo to cumulative elections.  And so I think most
5  of what I provided to the attorneys was information
6  about kind of the nature of -- I think they had
7  demographers that were working.  I wasn't doing -- so I
8  do both, you know, sort of redistricting lawsuits, and I
9  also do redistricting, so I do district drawing.  I
10 didn't -- I wasn't involved in drawing districts for
11 them.  They had some demographer doing that.  I was
12 mainly involved in sort of providing information about
13 how cumulative elections would work and sort of what
14 were the -- what were kind of the critical break points.
15         One of the issues in cumulative elections
16 are -- it's these thresholds of exclusion.  And they
17 vary depending on how many people are up.  And so that
18 was one of the questions.  It's -- you know, it's really
19 easy to meet the threshold of exclusion if you put all
20 seven board members up in the same election, but -- but,
21 you know, there are reasons why districts typically
22 don't put all their board members up at the same time.
23 So that was I think the main question that I was
24 addressing for them, was, you know, what -- what -- what
25 set of staggered terms involving how many members would

Page 18

1  meet the threshold of exclusion.
2      **Q.  Was that in 2020, or was that in 2019?**
3      A.  I think -- I could be wrong about this, but I
4  think there -- that this may have come up sort of in
5  that time frame, and then come up again more recently,
6  maybe -- coming up again maybe in 2017, 2018, somewhere
7  in that time frame.
8      **Q.  But in the last four years roughly?**
9      A.  Yes.
10     **Q.  Do you recall why they wanted to investigate an**
11 **alternative election system?  By "they" I mean SBISD.**
12     A.  I don't -- I don't think I was given a lot of
13 direct information about sort of what the thinking was,
14 but my impression was -- or at least I approached it as
15 probably a combination of motivations maybe, different
16 motivations possibly by different -- either by different
17 board members or different people involved.  But -- so
18 my sense is they were -- that they were both looking at
19 that as something the district might just want to do,
20 and also looking at it as something the district might
21 do in a -- in a sort of a prophylactic way; that is, to
22 avoid being -- to avoid being sued.
23         So at the -- in the very earliest instance
24 where it was clear that you couldn't draw a Gingles 1
25 district, I mean, one of the things that -- that I

Page 19

1  indicated at the time was that while they couldn't draw
2  a Gingles 1 district at that point, which I think may
3  have been around 2000, that it was clear that the
4  population trends, given the direction of population
5  trends, the day was going to come when they could
6  draw -- when they could draw a single -- when you could
7  draw a Gingles 1 district, and that in my experience any
8  district that could draw a Gingles 1 district should be
9  thinking seriously about what they intended to do about
10 it because it's -- it's not that hard to get -- it's not
11 that hard to win a Voting Rights Act Section 2 case if
12 you can't draw a single-member district.  There's really
13 only one thing where you're not at the mercy of sort of
14 interpretation or the court's feelings, or whatever, and
15 that is the bright line, like -- I mean, even if they
16 just go under it by, you know, a tenth of a percentage
17 point, apparently like the one person, one vote standard
18 for congressional districts, that -- apparently the
19 court means, literally means one person, one vote.
20     **Q.  Yeah.**
21     A.  The bright-line test literally means the
22 bright-line test.  And nothing after that, as I always
23 tell districts when I talk to them, nothing after that
24 is a bright line, nothing after that you can be assured,
25 you can say "okay, given this set of facts we're

Page 20

1  definitely going to win this case or we're going to" --
2  "you know, we could get this" -- "we could get the
3  summary judgment or something."  Once you get into not
4  only the other thresholds but the totality of the
5  circumstance then you -- it's not only does that mean
6  that you're actually going to probably end up in a full
7  trial as opposed to getting summary judgment on Gingles
8  1.  That's going to be expensive and it's -- and it's
9  going to be uncertain and it involves a lot of political
10 considerations that I think are important for a board to
11 be -- to be thinking about in advance.
12         It's not something you want to take
13 lightly.  So that was sort of where things were left, or
14 initially was that this was -- that that point was going
15 to come, and when that point -- when they reached the
16 point where they were no longer sort of protected by the
17 fact that a district couldn't be drawn that they were --
18 they needed to be thinking about what they wanted to do
19 at that point so --
20     **Q.  Do you remember the names of the demographers**
21 **involved?**
22     A.  I do not.
23     **Q.  Do you recall if they did a racially polarized**
24 **voting analysis, if anybody did?**
25     A.  I -- I'm -- I wasn't sort of privy to all of

5 (Pages 17 to 20)

Page 21

1  whatever their discussions were. I'm not sure I was
2  ever in -- either in direct contact with any of the
3  demographers or present when they were discussing things
4  with the lawyers, so I -- if they did, I wasn't aware of
5  it, but I don't know whether they did or not.
6      Q. Did you do a racially polarized voting
7  analysis?
8      A. At that point there was a -- I did just a very
9  preliminary, not -- sort of -- maybe not an actual
10 racially polarized voting analysis, but a quick look
11 at -- just looking at sort of where -- where candidate
12 votes were centered across the rough -- you can only do
13 it across the rough geography because there's so few
14 polling places. But just looking at where vote totals
15 were centered and how they varied across the geography,
16 but not a formal -- not like a EI formal analysis. At
17 that point it was just to look at the -- at sort of what
18 the election results looked like across the rough
19 geography.
20     Q. What was your informal conclusion? Do you
21 recall?
22     A. My informal conclusion was that that rough look
23 was certainly consistent with the possibility that --
24 both that Hispanic voters were voting at above 50
25 percent for preferred candidates, including Hispanic

Page 22

1  candidates, and that Anglo voters are voting below 50
2  percent for those candidates, and those candidates
3  weren't being elected to the board.
4      Q. Fair enough. And I think I -- in your answer I
5  heard you say you had not done one yet. Have you done a
6  racially polarized voting analysis?
7      A. Since?
8      Q. Since.
9      A. Yes.
10     Q. And not for this case, but for --
11     A. Right. Not for this case, but -- but more
12 recently than the -- so there -- there are sort of three
13 distinct eras here, the old --
14     Q. Sure.
15     A. -- the dinosaur era, which was about meeting
16 Gingles 1 with Bob Heath, the more recent stuff three,
17 four years ago looking at -- particularly focusing on
18 potential things the district might want to think about.
19 That was, again, this rough kind of look. And in
20 addition a more direct focus on cumulative voting on
21 systems with some at-large, you know, some
22 single-member. And then more recently I was asked by --
23 we're now at the -- at the second set of attorneys
24 rather than the third -- at the second set of attorneys
25 asked to provide the attorneys with, you know, a more

Page 23

1  complete analysis of the sort that you typically will
2  see in a case like this.
3      Q. Did you do ecological inference?
4      A. Yes.
5      Q. Gary King's?
6      A. Well -- oh, God. It's -- it is essentially
7  Gary King's, but not Gary King's original, and
8  particularly not his iterative, which I for some reason
9  find myself fighting about all over the country. People
10 still insist on using King's iterative, which King only
11 just mentioned in passing, and then immediately, you
12 know, replaced with a -- so, yes, the -- what I
13 typically use is the variant of King's EI that's
14 sometimes called the Bayesian or I -- I think it more
15 appropriately is R x C approach. But it's essentially
16 King's EI.
17     Q. I understand. And did you do the numbers
18 yourself?
19     A. I think -- so there were two -- two pieces to
20 that. There was a standard, just an OLS, which I often
21 do just as a first estimate. It's not as -- it doesn't
22 do as good a job. It doesn't give you statistical
23 significance, but it usually gives you a pretty good
24 quick picture, which I did. And then the actual EI
25 would have been run by Randy Stevenson, who's a

Page 24

1  professor at Rice, who does a lot of programming and
2  statistical work with me.
3      Q. And this was before the filing of this suit,
4  correct?
5      A. I believe so, although I'm not -- I'm not
6  exactly certain when the suit was filed or exactly
7  when --
8      Q. Yes, sir.
9      A. -- when the work was done. But I -- yeah, I
10 would say -- I think it was before the suit was filed,
11 but it could have been -- no, no, no, because there was
12 discussion -- I think the district was aware that they
13 could be sued so -- what I'm not sure about is the -- I
14 had been asked to sort of take a look, so I had done
15 that very informal look. And I had been asked by the
16 lawyers to take a look at that, and at that stage I
17 think probably was when I ran the sort of regression
18 analysis. Whether that -- whether the actual EI
19 analysis was done before or shortly after the lawsuit
20 was filed I don't -- I don't know.
21     Q. Do you recall the conclusions of that report?
22     A. I did not provide a report.
23     Q. Did you recall -- do you recall the findings
24 from your analysis?
25     A. So the findings I shared with the attorneys

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 25

1    from that analysis.
2         MR. CRAWFORD:  And so based on that answer
3    I'll ask you not to disclose what you told the attorneys
4    based on the attorney-client privilege.
5         Q.  (BY MR. GOLANDO)  Is Lisa Turner your attorney,
6    sir?
7         A.  Lisa --
8         Q.  I'm sorry.  What was the previous attorney's
9    name?
10        MR. CRAWFORD:  Lisa McBride.
11        MR. GOLANDO:  I'm sorry.  I apologize.
12        MR. CRAWFORD:  No problem.
13        Q.  (BY MR. GOLANDO)  Is Lisa McBride your
14   attorney?
15        A.  My attorney?  No, she doesn't represent me.
16        Q.  All right.
17        A.  But that's who I was working for when she
18   represented the school board.
19        Q.  Yeah, I understand.  And when she contacted you
20   to do the EI analysis I heard you to say that it's
21   possible it happened before the institute of this
22   lawsuit.  Correct?
23        A.  That's possible, yes.
24        Q.  Okay.
25        MR. GOLANDO:  I think we need to -- I need

Page 26

1    to talk to Barry real quick, if you don't mind.
2         MR. CRAWFORD:  Okay.
3         MR. GOLANDO:  We're going to take a -- just
4    a two-minute break.
5         MR. CRAWFORD:  Sure.
6         MR. GOLANDO:  Two or three-minute break.
7         (Off the record from 10:54 a.m.
8         to 10:55 a.m.)
9         Q.  (BY MR. GOLANDO)  As I understand it, I asked
10   you what the contents of that previous analysis was, and
11   you -- Mr. Crawford objected on the basis of
12   attorney-client privilege, is that correct, and you're
13   currently refusing to answer that question?  Correct?
14        A.  I'm deferring to whatever -- whatever Charles
15   tells me to do that's what I'll do.
16        Q.  I don't think there's a basis to object to that
17   because I need to know your previous analyses for
18   credibility and weight.  You've been hired on this
19   position and --
20        MR. GOLANDO:  What I'd like to do instead
21   is to see if we can put this answer under seal, and we
22   can go fight about it with the --
23        MR. CRAWFORD:  No, I'm not willing to waive
24   it.  So what we can do is we can note it in the record,
25   and then after the deposition we can take it up with the

Page 27

1    court.  And if we need to re-present Dr. Alford we will,
2    but I'm not comfortable even under seal waiving the --
3    waiving the objection.
4         MR. GOLANDO:  I understand.  I think that's
5    reasonable.  Fair enough.  So let's just move on.
6         Q.  (BY MR. GOLANDO)  So the OLS that you did was
7    definitely before the lawsuit, correct, the ordinary
8    least squares?
9         A.  Could you remind me when the lawsuit was filed?
10   That might be --
11        MS. SHAKRA:  June -- June --
12        MR. GOLANDO:  June of last year.
13        MS. SHAKRA:  2021.  Probably like June --
14        MR. GOLANDO:  The 30th?
15        MS. SHAKRA:  No.  It was before the 26th.
16   I want to say it was maybe like the 12th.
17        MR. ABRAMS:  I'll be able to tell you in a
18   minute.  Just give me a second.
19        THE WITNESS:  I feel better for not
20   knowing.  I felt kind of stupid, like I didn't know when
21   the lawsuit was filed.  So this is nice.  I feel better.
22        MS. SHAKRA:  Okay.  Let's see.
23        MR. ABRAMS:  The amended complaint was
24   filed on June 22nd, so the original complaint would have
25   been filed several days before.

Page 28

1         Q.  (BY MR. GOLANDO)  So mid June.
2         A.  I was -- I thought it was in the fall, so
3    that's earlier.  So I don't -- I don't know.  I mean, I
4    could -- I could figure that out, but I just don't --
5    that's -- I didn't realize the lawsuit was filed quite
6    that early, so I don't -- I may have done that -- I
7    think I probably did it sometime in the summer, but I
8    think it might have been more like August rather than --
9    than in -- sort of in the -- in May.  I'm just not sure.
10        Q.  I understand.
11        A.  But I can find out.
12        Q.  If it was in May, then do you recall the
13   outcome or what the ordinary least squares regression
14   showed?
15        MR. CRAWFORD:  Again, I'm going to object
16   to that based on the attorney-client and work product
17   privileges and doctrine.  And, Martin, just to your
18   point, I believe that even if the lawsuit had not been
19   filed at that time it was in -- at least in anticipation
20   of litigation, and the privilege would also apply.
21        MR. GOLANDO:  Okay.
22        MR. CRAWFORD:  And the doctrine.
23        MR. GOLANDO:  We'll see about that.
24        MR. CRAWFORD:  Sure.
25        Q.  (BY MR. GOLANDO)  I'm going to hand you Exhibit

7 (Pages 25 to 28)

Page 29

 1  again, please. I want you to look at the last number
 2  three of the subpoena. Do you see that, sir?
 3     A. Yes.
 4     Q. Okay. What does that say? Could you repeat it
 5  for the court?
 6     A. It says "All reports that the witness has
 7  prepared for the Spring Branch Independent School
 8  District or its counsel, on any subject for which he
 9  has been compensated."
10     Q. Would you agree with me that those analyses
11  that you provided Ms. McBride would have been captured
12  by that -- that request?
13     A. I guess I didn't -- so two issues for me. One
14  is I wasn't certain about what of that would be -- sort
15  of normally would be disclosable or not, so I -- you
16  know, I checked with Charles. And, also, I never
17  provided a report to the district or the counsel. I
18  provided, you know, information and some tables, but
19  I -- I didn't -- it never reached the point of my
20  actually providing an expert report. So I guess I
21  wasn't -- I wasn't sure about exactly whether this
22  entailed sort of everything I ever told the lawyers.
23  And then I also wasn't sure about what of that was --
24  what was protected and not, so I'm relying on the
25  attorneys --

Page 30

 1     Q. I understand.
 2     A. -- on that.
 3     Q. Did you provide Mr. Crawford or anybody else at
 4  that firm the documents we've just been talking about,
 5  the OLS, or the EI that you did, and it sounds like in
 6  the summer of 2021?
 7     A. Anything that had actually -- that I had shared
 8  with the previous attorneys that I still had I would
 9  have provided to Mr. Crawford.
10     Q. Okay.
11     A. I'm not sure that there was any -- I'm not sure
12  that the OLS analysis was ever even -- anything done
13  other than just sort of looking at that real quickly in
14  Excel. I'm not sure that that was ever reduced to anything
15  that -- that would have been transmissible either to
16  attorneys or to Mr. Crawford. But certainly anything
17  else that would fall in that category was provided to
18  him.
19     Q. Do you still have the OLS Excel file?
20     A. It's -- I guess it's possible. I haven't gone
21  back to look for it because I think, you know, it's
22  superseded by the EI analysis. But it's possible that
23  it's -- I could look. It's possible I guess.
24     Q. Without telling me the contents, was the OLS
25  consistent with the EI?

Page 31

 1     A. Not inconsistent. I guess -- so, I mean, I --
 2  you know, I think -- my recollection is that I wasn't
 3  satisfied that I sort of understood fully what was going
 4  on on the basis of that analysis. So one of the things
 5  that can be problematic with -- well, in lots of things
 6  that can be problematic with OLS -- but it just was
 7  not -- it -- it had, you know, sort of large confidence
 8  intervals, and my recollection is there were some things
 9  internally that didn't look like they -- they were
10  consistent across some of the elections, whatever,
11  that -- that led me to think that -- I mean, one of the
12  things that obviously is important here, as true with
13  any case where you're dealing with Hispanic voters, is
14  turnout is really critical to understanding what you're
15  actually seeing. And turnout doesn't get captured in
16  the OLS, and so it's -- well, normally -- when I say
17  "normally," so in a case where you have either the
18  surnames of the voters, or a case involving black voters
19  where black VAP is solid as a rock, it really doesn't
20  make -- you can do the analysis either way. It's going
21  to be about the same.
22        The advantage for -- for using -- in my
23  view for using R x C EI with -- if the case is a
24  Hispanic case and if you're relying on something other
25  than the vote codes -- so a lot of time you're relying

Page 32

 1  on CVAP for example, and CVAP doesn't account for
 2  turnout. So R x C builds turnout estimation into the
 3  estimation of the vote parameters, and that can -- in
 4  that instance it can produce quite different results
 5  than what you would get where -- where in the exact same
 6  analysis for black voters there would be virtually no
 7  substantive difference. So I'm never very surprised
 8  if -- if the quality of data is low, which for -- that
 9  means anything other than surnames for Hispanic voters,
10  it's just hard to say for sure if you're going to get a
11  clean -- a clean result out of the -- out of the OLS.
12     Q. I think I understand. But if you used voters
13  for your OLS and you used the -- either the -- an icon
14  Bayesian database that would solve that problem,
15  correct?
16     A. Yeah. I would expect you'd get a much -- you'd
17  get a much less problematic OLS result. I don't have --
18  I haven't sort of stress-tested this on this particular
19  set of data, and I could be wrong about where the --
20  where the -- where the noise in the OLS was coming from,
21  but my suspicion at the time was that it was coming
22  from -- from the lack of turnout information.
23     Q. Fair enough. I don't have any more questions
24  about that.
25        Are there any other reports that you've

8 (Pages 29 to 32)

Page 33

1  done for SBISD that you haven't disclosed to us?
2      A. That's -- I mean, I think we've covered all of
3  what I recall of information, types of information that
4  I've shared with -- with the attorneys, or the attorneys
5  shared with the board, or that I was present to discuss
6  with the board.
7      Q. And as we're sitting here today you have not
8  provided the plaintiff with that data for the OLS or the
9  data for the EI, correct?
10     A. Correct.
11     Q. Thank you, sir. So let's just go a little bit
12  more into your history, if you don't mind.
13         How many times -- how many times have you
14  been an expert in a case involving Section 2 of the
15  Voting Rights Act?
16     A. It would be 40 or 50 times.
17     Q. Yeah. A bunch. Have you ever been an expert
18  for an individual voter challenging an election statute?
19     A. I don't know. Individual voter challenging an
20  election statute?
21     Q. As opposed to working for the entity.
22     A. So mostly by happenstance, or whatever, I
23  mostly work for entities, I think probably because I
24  started doing this locally mostly in -- in the area of
25  drawing districts for entities, and then ended up moving

Page 34

1  into sort of the Section 2 issues beyond drawing the
2  districts. So I mostly worked for entities, but I
3  have -- I mean, I worked on cases where -- where
4  representatives were challenging district plans, but I
5  don't know -- I mean, I don't think they were
6  challenging them as individual voters. I think their
7  challenge was -- I could be wrong. I don't know why
8  they were -- what their actual standing was.
9      Q. Do you remember the representatives? Do you
10  mean state representatives, or do you mean other
11  governmental officials, incumbents?
12     A. Well, I worked for a group of Democratic
13  representatives I think organized by Martin Frost --
14     Q. Okay.
15     A. -- challenging a congressional plan. I worked
16  for the Democratic Party in Florida, a challenge
17  related to I think the congressional districts in
18  Florida.
19     Q. And do you have a time period for that, please?
20  The '90s?
21     A. The '90s I think.
22     Q. And the Frost would have been in the '90s, too?
23  That was the Bush v. Vera case, right?
24     A. No.
25     Q. Okay.

Page 35

1      A. I think Frost would have been -- I think Frost
2  was the redistricting.
3      Q. Right, right, right. That was the 1997 -- '95,
4  '97 reset. I'm sorry.
5      A. No. This was the two thousand -- this is
6  when --
7      Q. Oh. This is the mid-decade --
8      A. Yeah. So this is when I worked -- so I worked
9  for the legislative redistricting board because the
10  state didn't -- didn't draw lines right. So the
11  redistricting board drew the lines, but they couldn't
12  draw the congressional lines. So the court drew the
13  congressional lines. So that's my congressional plan.
14  The court actually asked me to give them advice about
15  how they should go about that, "what would you do, what
16  would a neutral plan look like?" So I gave them some
17  advice, and they acknowledged in the decision where they
18  released the plan that they had appreciated my input, or
19  whatever.
20         So I told everybody, I was like, "This is a
21  dream for somebody who studies Congress. I actually had
22  a hand in a congressional plan." And they held exactly
23  one election under it, and then the state -- the state
24  just like gutted it like a fish. And so -- and so then
25  this is where the Frost and the other congressional

Page 36

1  intervenors, they filed suit. They wanted to -- you
2  know, they wanted to -- basically the point of their
3  suit was that the state couldn't engage in a
4  mid-redistricting, or mid-season redistrict, whatever,
5  that it was already an official plan.
6      Q. So you drew the plan in Balderas. That's the
7  2000 case. And then you were an expert for the
8  intervenors in the 2003 case?
9      A. Yes. I didn't draw the plan, but I --
10     Q. Advised?
11     A. -- provided some guidelines in what I thought
12  was appropriate for the court to use, and then testified
13  on behalf of that plan, when the -- when the state
14  replaced the plan and then there was a suit over whether
15  the -- whether that mid-decade redistricting was
16  appropriate or not. So that was with the -- it was a
17  Democratic congressman who intervened. I don't remember
18  exactly who all was in that, but -- but I remember the
19  lawyer for the state, the first question when I was put
20  on the stand was, you know, "Why did you switch sides?"
21  And I said, "I didn't switch sides. You did. This is
22  the" -- "this is the exact plan, you know, that I" --
23  "when I was working for you that we helped the court
24  to" -- because the Attorney General's Office was
25  involved as well in trying to provide a neutral plan

9 (Pages 33 to 36)

Page 37

1    that the court could use.  And so --
2        Q.  And that lawyer was Andy Taylor?
3        A.  I think it was Andy at that point.  Yeah.
4    Yeah.  That would have been back in Andy's day.
5        Q.  So it sounds like those were drawing districts.
6    Did you ever do racially polarized voting --
7        A.  No, I was not -- sorry.  I was not drawing
8    districts in the -- when I was working for the
9    congressional intervenors because they were just
10   defending the court drawn district against the -- the
11   district the state had drawn to replace it.  But I don't
12   remember the entire scope of what -- what I was actually
13   looking at relative to the -- to the new draw as opposed
14   to the court draw.
15       Q.  Fair enough.
16       A.  And I think in -- if I'm remembering the
17   Florida case right, it did -- it was a -- it was voting
18   rights issues related to the treatment of Hispanic
19   voters in Florida.  And I think it was also a
20   congressional plan, specifically sort of how voters in
21   southeast versus southwest Florida were treated in terms
22   of drawing Hispanic districts.
23       Q.  What's the scope of your engagement in your
24   contract, if you don't mind me asking?
25       A.  At least my understanding of it -- you know, I

Page 38

1    probably pay less attention to these contracts than I
2    should.
3        Q.  If you want to refresh your recollection --
4        A.  I just say what I -- what I agreed to before
5    this was drawn up, and this looked to me like it didn't
6    exceed that, was that I would provide a report that was
7    essentially responsive to Dr. Stein's report, so that
8    that was the extent of my involvement, was to provide
9    response and commentary to his report as opposed to
10   analysis itself.  It was -- my role was to -- basically
11   to provide a critique and context for Dr. Stein's
12   report.
13       Q.  And so you have been hired in the past by SBISD
14   to determine whether or not elections are racially
15   polarized in SBISD elections, correct?
16       A.  That was certainly one of the tasks I was asked
17   to perform previously, yes.
18       Q.  Given your time as an election law expert,
19   racially polarized voting expert, and your association
20   with SBISD since I guess the early 2000s, do you believe
21   that elections in SBISD are racially polarized?
22       A.  I try pretty hard not to reach legal
23   conclusions in my work as an expert partly because I'm
24   not a lawyer, and it always pisses me off when lawyers
25   reach expert conclusions.  And so there's sort of a turf

Page 39

1    issue.  But I think also it's -- in my experience, and I
2    don't think I'm alone in this, you know, the courts have
3    not -- this is not an area broadly in which the courts
4    have distinguished themselves in making clear what it is
5    they want entities to do or plaintiffs to do or lawyers
6    to do.  So, I mean, I have my own sort of view of kind
7    of how this -- how this makes sense.  But I recognize
8    that the term is used in a variety of ways.  It's used
9    to indicate, by some people, to indicate -- for example,
10   many plaintiffs' experts believe that the definition of
11   racially polarized voting is if 50 percent plus one of
12   the minority voters vote for candidate A and 50 percent
13   plus one of nonminority voters vote for candidate B then
14   that's racially polarized voting, and that's -- I don't
15   think that's true in the -- in itself I don't think
16   that's true in the legal sense, and I don't actually
17   think it's even an appropriate label for what's going on
18   there.
19           But, you know, that's an old dispute going
20   all the way back to Brennan about -- in which I think
21   Brennan captured exactly the issue there, is -- you
22   know, I think -- I'm not sure everybody never says it,
23   but I think in the current debate what Brennan would
24   like is for people to come up with a name for that that
25   isn't racially polarized voting in the sense that, you

Page 40

1    know, the public understanding of that is -- is that
2    voting is polarized by race, meaning by some sentiment
3    or concerns of the race of voters or the race of
4    candidates, as opposed to just these two groups maybe
5    voting differently for the same reason lots of other
6    groups might vote differently.
7        Q.  I think I -- I understand that.
8        A.  Yeah.  I'm just not -- I'm not sure if
9    you're -- what is -- what is it you're asking me?
10   Have I reached a conclusion, a legal --
11       Q.  No.
12       A.  In a legal sense, no.
13       Q.  I'm asking you as an expert are Latinos
14   politically cohesive in SBISD elections?
15           MR. CRAWFORD:  I'm going to object to the
16   extent that it's outside the scope of this engagement.
17   And I'll let Dr. Alford make that determination but --
18       Q.  (BY MR. GOLANDO)  You can still answer, sir.
19       A.  I'd say, you know, based on -- I mean, for
20   example, based on the -- on Dr. Stein's report I'd say
21   there's evidence of modest cohesion among Latino voters.
22   So there's certainly no evidence of the sort we would
23   see in the black voters.  I don't think Hispanic voters
24   are voting 90 percent one direction or another.  But
25   there's certainly evidence that suggests that at least

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 41

1  in some of the elections more than -- more than a bare
2  majority of Hispanic voters are favoring Hispanic
3  candidates.
4      Q. Based on your experience as a election observer
5  and an analyst for SBISD in the last 20 years of your
6  employment here, or engagement here, do you believe in
7  your expert opinion that Latinos are politically
8  cohesive outside of the Stein report?
9      A. I would say modestly to moderately cohesive.
10     Q. Do you believe that, same question, as to
11  Anglos? Are they politically cohesive in SBISD
12  elections?
13         MR. CRAWFORD: Same objection as before to
14  the extent it exceeds the scope of his engagement.
15         MR. GOLANDO: Yes, sir.
16     A. I think it's harder to say they are, but I
17  think -- on balance I'd say moderately co -- modestly --
18  again, sort of modestly to moderately cohesive. So
19  in -- again, in the sense of the sort of Gingles 2 and
20  Gingles 3 threshold, not in sort of the broader totality
21  of the circumstances. But just addressing it as you,
22  know, what -- what my guess would be about Gingles 2 or
23  my guess about where you would be on Gingles 3 that's --
24  that's what I would guess. And I think that's roughly
25  what Dr. Stein's analysis suggests.

Page 42

1      Q. (BY MR. GOLANDO) Would you based on your
2  experience as an expert and a observer of SBISD
3  elections in your 20 years here and your prior
4  engagement do Latinos support different candidates than
5  Anglos in SBISD elections?
6      A. Sometimes.
7      Q. How often?
8      A. I don't know how often, but it certainly
9  happens.
10     Q. Can you recall a time when they didn't based on
11  your analyses and your expertise?
12     A. I don't know. I mean, I can't think of a
13  specific -- a specific example, but I -- but I'm not at
14  all sure that that is -- that it's generally the case
15  across elections that -- in fact, I suspect it's not.
16  My guess is that there are elections in which both
17  Anglos and Hispanics are supporting the same candidates,
18  but I don't -- again, I -- I don't know for certain, but
19  that's my guess.
20     Q. Okay. I understand. We're going to talk a
21  little bit about Bob Stein now. Do you know Professor
22  Stein?
23     A. I do.
24     Q. How do you know him, sir?
25     A. He hired me to come to Rice. He had been at

Page 43

1  University of Georgia before I came to University of
2  Georgia. We didn't actually overlap, but I had had
3  conversations with him. At that point prior to -- to
4  actually working with him I had met him at a convention.
5  And he's the one who at that time was the -- I can't
6  remember if he was the -- I think -- yeah. He was the
7  department head at that time. Georgia actually tried to
8  hire me twice. And the first time -- my former mentor
9  from U of H, David -- Dr. David Brady was the chair, and
10 he had contacted me and tried to work out a deal to get
11 me to come to Rice. And I really wasn't -- I hadn't
12 been at Georgia very long, and I wasn't ready to go. So
13 I ended up turning it down, and he was very unhappy
14 about that. And then a year later circumstances had
15 changed. I was in the middle of a divorce.
16     Q. I'm sorry.
17     A. I was not very happy with my colleagues at the
18 University of George. And by then Dr. Stein was the
19 chair. And so he called up and said, you know, "We
20 would like you to come to Rice." And I said, you know,
21 "I'm not a very good negotiator, so whatever you offer
22 me I'm going to take it." And he said, "I'm not a good
23 negotiator either because whatever you want we'll give
24 it to you." And so we then worked out something that
25 sort of fell within those -- within that range, and I

Page 44

1  was hired. And David Brady never forgave me for
2  allowing Stein to outhire him on the recruiting front.
3  So -- but I've known him since I -- I knew him before I
4  came to Rice, but certainly since I came to Rice, and
5  we're -- we've always been close colleagues. We're
6  close personal friends. Our families are friends. He
7  was just having dinner with my daughter in Washington,
8  D.C. over the weekend.
9      Q. Oh. Wow.
10     A. So we remain very close.
11     Q. Do you know his reputation as a scholar?
12     A. Yes.
13     Q. What is his reputation as a scholar?
14     A. It's an excellent rep -- he's very prolific.
15 He's very well-respected. He's moved around across a
16 variety of areas in his career and always had -- the
17 areas he's worked in has always ended up being important
18 work, widely recognized work, so --
19     Q. How would you personally rate him as a scholar,
20 Professor Stein?
21     A. On a -- what are we doing here? A scale of one
22 to ten or --
23     Q. Is he an expert in his studies?
24     A. Yes.
25     Q. Okay. Is he -- is he at the top levels of his

Page 45

1   scholarly research?
2       A.  I would say in the areas that he works in he
3   always ends up producing work that is among the best of
4   the work that's done in that area.  So I would say that
5   both -- when he was doing things like the distribution
6   of federal funds, pork barrel, his more recent work on
7   things like ballot form and access, that sort of stuff,
8   again very -- he does very good, very high quality work.
9       Q.  Would you call him an expert in social science
10  statistical research?
11      A.  That's a time-bound question.  So when I came
12  out of graduate school Stein and I both would have been
13  experts in statistical social science research.  We were
14  like go-to people.  We were, you know, the young Turks
15  and, you know, drove all our old professors crazy by,
16  you know, asserting they had no clue what they were
17  doing and we did.  But those things change over time.
18  So, you know, he's a -- he's a extremely competent data
19  analyst and is I -- I would say among people who are not
20  actually political methodologists he's -- is as skilled
21  as anybody doing work in social sciences today.  But
22  he's -- political science didn't really have
23  methodologists when he and I came out of graduate
24  school.  And now we have -- we have people in our
25  department who we hire as methodologists.  They only

Page 46

1   teach methods.  They only research methods.  We're not
2   in that category.  Neither of us are methodologists in
3   that sense.  We're not going to develop the next --
4   we're not Gary King --
5       Q.  Right.
6       A.  -- which is -- I guess you could say for pretty
7   much everybody in the United States.  But he
8   certainly -- he employees up-to-date methods, and he
9   does them accurately and skillfully for the -- for his
10  research question.  But he's more interested in
11  answering a research question than he is in developing a
12  methodology.
13      Q.  I don't blame him.  Do you agree that Bob
14  Stein's expert opinion is relevant to the task at hand?
15      A.  Yes.
16      Q.  Okay.  Would you agree that racially polarized
17  voting analyses using ecological regression rest on
18  scientifically reliable foundations generally?
19      A.  Yes.
20      Q.  Would you call Bob Stein an expert or a top
21  scholar in analyzing voter behavior?
22      A.  Yes.
23      Q.  Are you familiar with the use of ordinary least
24  squares?
25      A.  Oh, yes.

Page 47

1       Q.  Yeah.  Me too.
2       A.  My -- the professor who taught me methods at
3   university of Iowa said, "By the end of this course
4   you'll not only recognize that OLS is the superior
5   research method, you'll also recognize that it's a way
6   of life and will be the only thing you dream about."
7   And I thought that was an exaggeration, but I
8   honestly -- it is an approach to life.  You know, life
9   is about trying to understand the world around you.  And
10  to this day when I'm -- when something puzzles me, like
11  the behavior of one of my daughters for example, I
12  actually like find myself unable to not think of it as
13  an OLS equation.  So, yes, I -- I worship at the alter
14  of ordinary least squares regression.
15      Q.  Me too.  I do.  And I remember my scopes and
16  methods class.  I know exactly how you feel.
17          So is ordinary least squares a
18  scientifically verifiable way to evaluate racially
19  polarized voting?
20      A.  Yes.
21      Q.  Okay.  Is OLS a technique generally accepted in
22  the social scientific community?
23      A.  Yes.
24      Q.  Has OLS analysis been subjected to peer review
25  and publication?

Page 48

1       A.  Yes.
2       Q.  Okay.  Can OLS be tested and verified?
3       A.  Yes.
4       Q.  Does OLS have a known error rate?
5       A.  It -- assuming you meet the assumptions of OLS
6   it is -- what's called a BLUE method is the best linear
7   unbiased estimator.  So -- but that means you have to
8   meet the -- the basic assumption.  So, yes, it's --
9   there is a way to test the accuracy.  OLS provides
10  measures of the stability and usability of its results.
11  But like any technique they do depend on meeting the
12  assumptions.
13      Q.  Do you believe that Dr. Stein is an expert
14  qualified by knowledge, skill, experience, training, and
15  education?
16      A.  Yes.
17      Q.  Do you believe that Dr. Stein's opinion is
18  based on sufficient data?
19      A.  So we're getting into the crux of things here.
20  I think the -- I think the data he has is probably
21  enough to answer the question.  I don't think it's
22  necessarily the best data he could have.  But I don't
23  think the -- and I don't -- I don't disagree with the
24  results of the analysis he did as it is, but I don't
25  think -- I don't think it's sufficient to answer at

Page 49

1  least some of the questions that routinely have to be
2  answered in my view in a full racially polarized voting
3  analysis.
4      Q. I want to be very clear. We'll get to see your
5  problems with the Stein report in a moment. I promise
6  you. But does the data he used, is it sufficient to
7  determine the outcome?
8      A. I think the -- yes, I think so.
9      Q. Do you believe that Dr. Stein's opinion is the
10  product of reliable principles and methods?
11      A. Again, I don't want to over endorse or under
12  endorse. There's -- yeah, I think he's running OLS
13  correctly. I don't doubt that those are the right
14  parameters coming out of OLS. I -- I just think it's
15  not -- the data has been aggregated in a way that I
16  think is -- I have questions about the way the data has
17  been aggregated. I have questions about the quality of
18  the input data on the demographic side, the BISG result,
19  and I have questions about at least some of the ways in
20  which election result data was treated. So I don't
21  exactly -- it's not the data itself that's problematic,
22  but the way -- you can't divorce that from the way it's
23  been aggregated for input into the -- into estimation.
24  And I think that's where -- where we have disagreements.
25      Q. I think that's a reasonable thing to say. Do

Page 50

1  you believe that Dr. Stein has applied the principles
2  and methods reliably to the facts of the case? You may
3  disagree. But has he done so reliably?
4      A. So it's interesting how certain things come
5  back routinely in depositions. So within the narrow
6  meaning, the narrow statistical meaning of reliability,
7  yes.
8      Q. Perfect answer. I appreciate it. All right.
9  Let's talk about racially polarized voting generally,
10  and then I promise you we'll get to your words. I
11  promise. I just want to make sure --
12      A. It's fine with me if we don't.
13      Q. Because I think primaries are important. And,
14  again, if I ask you a question that doesn't make sense
15  it's not your fault. It's my fault. Okay?
16          If 90 percent of Latino voters voted for
17  one candidate, are they politically cohesive together in
18  a given jurisdiction?
19      A. Yes.
20      Q. Okay. If 80 percent of Latino voters voted for
21  one candidate, are they politically cohesive together?
22      A. Yes.
23      Q. Okay. If 70 percent of Latino voters voted for
24  one candidate, are they politically cohesive together?
25      A. I don't know. I mean, that's where I would

Page 51

1  start -- because, again, "cohesive" is a -- is not a
2  binary term. Cohesive is a -- is a term that's being
3  applied to what is, in fact, a continuous measure from
4  zero cohesion to perfect cohesion. And so if a measure
5  goes from no cohesion to perfect cohesion there's always
6  a question of "what do people mean by cohesion?" And I
7  know some people mean by cohesion anything other than
8  zero, which means actually by definition in virtually
9  every election in the United States every group is
10  cohesive. I take that to be a nonsensical -- I know
11  that I'm in the minority here of my -- at least some of
12  the experts. But I take that to be nonsensical with
13  regard to providing that information to the court
14  because -- because the court has said that Gingles 2 is
15  a threshold test. And if the threshold is by definition
16  always met then it doesn't belong in the Gingles -- it's
17  not a threshold at all. It's not even a test. There's
18  no reason -- there's no reason to even have it there.
19          So, you know, we can go down that slippery
20  slope. And you know, we can start at 50 percent, which
21  is zero cohesion. We can start at 100 percent, which is
22  perfect cohesion. And then the question is sort of
23  where does -- where does cohesion fall on that scale.
24  And I don't believe it's the entire scale. So one way
25  of thinking about that is this -- this actually isn't a

Page 52

1  scale from 50 to 100, of course, because 50 would
2  suggest half cohesion, and it's zero. So turn it into
3  what it really is, is zero to 100 scale. And in that
4  zero to 100 scale 75 is actually at 50 percent cohesion.
5  It's half of the values are less cohesive. Half would
6  be more cohesive. So that's a kind of midrange of
7  cohesion, and so that's sort of roughly -- in my view
8  roughly you clearly have cohesive behavior at sort of
9  80 -- 75, 80, 90 percent. But the question of what you
10  have at -- once you get to something like 70 or 60 or
11  51, I mean, I just think you're -- again, the court has
12  provided exactly zero guidance here. So I just try to
13  be careful in the use of the language. So I think at 70
14  you're starting into a -- you're getting into a range
15  where you might say there's -- we talked earlier on
16  things like modest or moderate cohesion. So there's
17  some moderate level of cohesion there. And I think
18  that's -- sort of in that 60 to 70 percent range is what
19  I think of as moderate or modest cohesion. Below 65,
20  certainly below 60, I don't really think that's -- if
21  that's cohesion, then, again, it doesn't -- in a Gingles
22  2 sense then cohesion doesn't matter because cohesion is
23  always greater than 50 so --
24      Q. So just to be clear, so from 60 to 70 it's
25  moderate cohesion? Sixty to 75. I don't want to

13 (Pages 49 to 52)

1  misstate --
2      A. Yeah. Well, yeah, I mean, it's -- in that sort
3  of middle range I think the -- the question, again, it's
4  very -- it's not hard to see. So I don't think many
5  people would dispute that 80 to 100 is cohesion. And in
6  that sense if you were going to make it symmetric then
7  50 to 70 would be noncohesion. Right? So if the upper
8  20 percent is clearly cohesion then the lowest possible
9  20 percent, if you're going to have a scale that
10 balances in a -- you know, in a kind of a normal sort of
11 scale sense, then you could describe everything below 70
12 as not cohesive and -- and sort of, you know, kind of --
13 then you'd have kind of a middle range in there
14 somewhere.
15     Q. If 70 percent of the Latino community supports
16 a candidate, that means that 30 percent didn't, correct?
17     A. Correct.
18     Q. So two-to-one?
19     A. Yep.
20     Q. More than two-to-one really, right?
21     A. (Moving head up and down.)
22     Q. And that's still not cohesive enough from your
23 perspective?
24     A. It's -- again, it's -- I don't know what you
25 mean by "cohesive enough." But I don't think it's

1  helpful given the nature not only of what the court
2  is -- so there are two questions here I think. I mean,
3  one is is it cohesive enough to clear the threshold
4  test? And that's -- then there's another question
5  because, of course, racially polarized voting enters
6  twice, in its mechanical Gingles 2 and 3, and
7  then again in the totality of the circumstances. And
8  while I don't think those should be -- given their
9  proximity to each other I think it's inefficient to have
10 them mean different things. I'm aware that the -- from
11 cases I've been involved in that currently there are a
12 lot of judges who want to make those two very different
13 things, the Gingles 2 and 3 racially polarized voter,
14 and the totality of circumstances racially polarized
15 voting. You know, whatever the judges want to do I'm
16 fine with. I give them the information. They make
17 sense out of it.
18         But I think it's an awkward situation both
19 in terms of analysis and in terms of the law to say that
20 they're both -- we're going to call both of them
21 racially polarized voting, but they're going to be
22 defined in very different ways and very different
23 implications. So I just think if the Gingles 2 test
24 is -- are minority voters voting cohesively then that's
25 either going to need to be defined as in are they a

1  majority or not a majority. That's the dichotomy, and
2  because it's a dichotomy it has a bright line. That's
3  the great thing about dichotomies: "yes" or "no." If
4  this is a "yes" or "no" question, then where is the --
5  where does the -- where does the "no" become a "yes"?
6      Q. Fair enough.
7      A. And so I think -- my preference because I'm not
8  making that legal decision, it's not up to me to say --
9  I'm always getting pressured, you know, "but you're the
10 expert, so in your expert opinion is this legally" --
11 you know, "is this cohesive voting"? I just want to
12 tell the court how cohesive the voting is from zero to
13 100. Right? And if you want -- you want to force me to
14 put a term on it then in the middle I can put a term
15 like "moderate" or whatever. And then if the judge
16 thinks -- the number is still there. In your example
17 the 70 is there. If a judge thinks that's what -- what
18 the court means by cohesive voting, have at it. I'm
19 glad I don't have to make that decision.
20     Q. Me too, for the record. And I want to be very
21 clear. I'm not interested in your legal opinion. I
22 mean, I am generally. You're a nice guy. You're a
23 smart guy. But for the testimony I'm only interested in
24 your expert opinion as a social science researcher. And
25 I think I understood your question so -- or your answer

1  to my bad questions.
2         I'm asking the same questions about Anglo
3  voters because I wonder if there's a difference in your
4  mind. If 90 percent of Anglo voters support one
5  candidate, are they politically cohesive?
6      A. Yes.
7      Q. Eighty percent?
8      A. Yes.
9      Q. Seventy percent?
10     A. I think you're getting -- again, now you're in
11 a range where they're sort of what you might describe as
12 modest or moderate cohesion. It's certainly in that --
13 in that kind of range. And I think that's where -- if
14 you think about sort of functional definition kind of
15 thing, what's going on here, there it becomes clear the
16 two things are interacting with each other. Right? And
17 that's what I think is both important to recognize, but
18 also I think problematic in the sense that -- on the --
19 on the Gingles 2 side there's just this question of
20 minority cohesion. On the Gingles 3 side there's
21 minorities voting or majorities voting cohesively so as
22 to usually defeat. Well, so as to usually defeat the
23 level then of what would be defined as majority cohesion
24 is going to be on a sliding scale depending on minority
25 cohesion.

14 (Pages 53 to 56)

Page 57

1  And weirdly enough it's going to slide in
2  the direction that the less cohesive minorities are the
3  more likely it is that at the same levels of cohesion
4  majorities are voting cohesively to defeat the preferred
5  candidate.  If the preferred candidate is only getting
6  51 percent of the vote, then a majority that's in fact
7  splitting its vote almost perfectly evenly can still be
8  sufficiently cohesive to defeat the candidate.  So this
9  is a weird scale in which as -- the further away we move
10  from racially polarized voting the easier it is to find
11  racially polarized voting in that sense because, again,
12  these are -- in essence they are no longer -- they're no
13  longer absolute -- again, a threshold test must mean
14  that you can -- that you can in isolation answer that
15  question.  And judges in my experience frequently join
16  two and three together to ask what they call the -- the
17  Gingles 2 and 3 are the racially polarized voting
18  question.  Once you join them together they are not
19  threshold.  Two is not a threshold test if it doesn't
20  stop the inquiry at two.
21      Q.  I understand.
22      A.  And so I don't have the solution to that issue,
23  but it is problematic.  And so that's why I think it's
24  better to be imprecise in the language about -- about
25  calling something cohesion or not cohesion.  It's better

Page 58

1  to be imprecise about that and to just look at exactly
2  how all that's operating and then think about what that
3  means because ultimately, you know, Gingles 1, 2, and 3
4  is about determining if there's a solution in order to
5  answer the question about whether there's a tort.  And
6  thinking about the solution is where you really do have
7  to take it all into account because if cohesion is
8  really low on the part of minorities then if -- if it's
9  also the case that it's very difficult to get a district
10  that's above majority, then the district is not going to
11  be a district that's typically going to work.  Right?
12  It isn't going to solve the -- it isn't going to solve
13  the problem.  Fifty percent plus one voters lets you
14  control the district as long as you're perfectly
15  cohesive.  Well, if your cohesion level is 52 percent,
16  the district isn't going to do anything.  Right?  It's
17  going to give you 25 percent of the vote.  It's not
18  going to win anything.  It's not a solution to the
19  problem.  And, in fact, the problem is not the drawing
20  of district lines.  Right?  The problem was very low
21  cohesion.  You know, splitting your vote doesn't let you
22  control politics.  And so that's -- that's my short
23  answer.
24      Q.  Fair enough.  All right.  Let's talk a little
25  bit about racially polarized voting.  We've talked a lot

Page 59

1  about it already, but I want to make sure I get you on
2  the record.
3      What do you believe racially polarized
4  voting is, and how would you define it?
5      A.  So I would define racially polarized voting as,
6  in the broadest sense, as a situation where -- where
7  voting is being affected by racial considerations at a
8  level that -- you know, given the -- the sort of
9  numerical conditions and sort of things you assess in
10  Gingles 1, that you have a situation where minorities
11  are not able to elect minority candidates in a
12  particular setting and would be able to in the --
13  whatever the legally available alternative settings are.
14      Q.  I think I understand that.  So I'm going to ask
15  you a couple of general questions about that, if you
16  don't mind.
17      If 90 percent of the Latinos support
18  candidate A and 75 percent of the Anglos support
19  candidate B in the same race, is that racially polarized
20  voting, assuming your -- your first part of your
21  definition?
22      A.  This is where -- I know you're going to be
23  happy to hear this.  But I don't think you can determine
24  if voting is racially polarized in a single election.
25  You can say the election is compat -- that's an election

Page 60

1  that's compatible with -- with the existence of racially
2  polarized voting, but I don't think it establishes
3  racially polarized voting.  And I don't think it's
4  really -- you can given that -- if that's the fact
5  pattern, I got one election in that fact pattern, I have
6  no idea if voting in that jurisdiction is racially
7  polarized or not.  All I can tell you about is that
8  one -- is that one election.
9      Q.  That one election is certainly racially
10  polarized, correct?
11      A.  The election?
12      Q.  There's -- I'm sorry.  I don't want to
13  mischaracterize your testimony.  I think you said there
14  was -- it would be an example of racially polarized
15  voting.  Correct?
16      A.  So the election is compatible with racially
17  polarized voting because I think it's important that
18  when we -- when you characterize voting in an area
19  that's racially polarized, you're -- you're
20  characterizing the behavior of the voters over -- over a
21  set of elections and over a type of election stimulus.
22  And so I think it's -- it isn't a characteristic of the
23  election.  It's a characteristic of the voters.  So I
24  think that -- we don't know if that is an appropriate
25  characterization of what the voters do in that -- in

Page 61

1    that election.  I mean, just for example, if that's a --
2    you know, if that's a general partisan election between,
3    you know, two Hispanic candidates, one Democrat and one
4    Republican, I don't think that's racially polarized
5    voting.
6         Q.  Right.
7         A.  But it has -- the election has those features.
8    So, again, it's -- it's not an election that would stand
9    as obviously incompatible with racially polarized
10   voting, but I -- in and of itself that doesn't tell you
11   either that the election is racially polarized or that
12   the voters are behaving in a fashion compatible with
13   racially polarized voting.
14        Q.  So imagine that election, same thing happens
15   five elections in a row.  Is that racially polarized?
16        A.  Again, if -- if you're saying that that happens
17   five times in a row -- and, again, I'd want to know what
18   the -- you know, I want to know the race of the -- or
19   ethnicity of the candidates.
20        Q.  Fair enough.  So let's say Latino candidate A
21   is Latino, Anglo candidate B is Anglo, these are
22   nonpartisan elections, it happens five times in a row.
23   Is that racially polarized voting?
24        A.  Assuming that the -- assuming that the -- that
25   the Hispanic candidate -- that the Hispanic candidate,

Page 62

1    who is also the Hispanic preferred candidate, is being
2    defeated, in most of those elections then I think that's
3    a sort of a -- a nice little set piece for what racially
4    polarized voting looks like.
5         Q.  Same question, same assumptions, please.  For
6    90 percent support of Latinos for the Latino candidate,
7    and 65 percent support for Anglos, and this outcome is
8    the same?
9         A.  Outcome is the same I think the -- yeah, the
10   result is the same.
11        Q.  And that would be racially polarized voting,
12   correct?
13        A.  Yes.
14        Q.  Fair enough.  In your time as a litigation
15   expert and a social scientist, do you agree that
16   Hispanic surname candidates are the likely preferred
17   candidate of choice for Latino voters?  Likely.
18        A.  Well, I'd want to qualify it a little bit
19   because --
20        Q.  Sure.
21        A.  -- in my experience in modern U.S. elections
22   that depends entirely on which party that candidate is
23   running under.
24        Q.  Let's assume --
25        A.  Ted Cruz is not the choice of Latino voters in

Page 63

1    Texas.
2         Q.  No.
3         A.  But that's a different topic.  And that's not
4    just for Ted Cruz.  Right?  It's just -- there are lots
5    of -- Texas has lots of Republican Hispanics, and when
6    they run as Republicans they do not get the majority of
7    the Hispanic vote.  When they run as Democrats, they get
8    the majority of the Hispanic vote.  And when they run
9    against Anglos as -- and when Hispanic Republicans run
10   against Anglo Democrats the Anglo Democrats gets the
11   majority of the vote.  So in partisan elections it's not
12   the case, no longer the case -- it may well have been
13   the case in the past -- but it is no longer the case in
14   the sort of current polarized atmosphere that the race
15   of the candidate for either co-ethnics or for -- for
16   nonethnic groups is -- is the determinative factor in
17   voting behavior.
18        Q.  How about in nonpartisan races, like the SBISD
19   race?
20        A.  I'd say in nonpartisan elections it's -- it's
21   certainly variable depending on the -- you know, the
22   area of the country and -- and some local factors.  But
23   there I think you're -- it's more often the case there
24   that you would see Hispanic voters preferring Hispanic
25   candidates.

Page 64

1         Q.  In Texas and SBISD, correct?
2         A.  I think that's -- I think that's a fair
3    statement.  Yeah, I would -- that's what I would expect
4    to see if I was coming in novel into some area.  That
5    would -- it wouldn't necessarily be the case, but it's
6    what I would expect to be the case.
7         Q.  And that's what you did see when you did your
8    OLS report and your EI report, correct?
9         A.  I'm not a hundred percent sure.
10        Q.  Well, I don't want you to speculate.  If you
11   don't recall, you don't recall.
12        A.  Yeah.
13        Q.  All right.  Let's talk about your great report.
14   I'm going to hand you a copy of it.  I think I've
15   labeled it as Exhibit No. 2.  Could you review this and
16   make sure that it's authentic?
17        A.  This looks like it.
18        Q.  That's your expert report, correct?
19        A.  Yes.
20        Q.  Okay.  And we've labeled that Exhibit 2.  In
21   preparation for your report, other than reviewing the
22   data provided by the plaintiff did you review anything
23   else?
24        A.  So I reviewed the data.  I reviewed the --
25   Dr. Stein's report itself.  I looked at several of the

Page 65

1  articles that he had cited.  I looked at a couple of
2  other things that I provided you here that are sort of
3  things that came to my attention as a result of looking
4  through the things in his report, one being this kind of
5  a general statement from a group in California about the
6  use of at-large elections and its effect on Latino
7  representation, and the other being something from the
8  Texas Republican Party about the -- essentially
9  injecting -- deliberately injecting partisanship into
10 nonpartisan elections.
11     Q.  That's the totality of what you -- all those
12 documents form the basis of your report, correct?
13 That's the totality?
14     A.  It's everything I recall.  We get into
15 specifics and I recall something else I'll -- I will
16 let you know, but that's what I recall.
17     Q.  I appreciate it.  In preparation for this
18 report, did you do any -- did you review any survey
19 data?
20     A.  No, I don't think so.
21     Q.  Did you perform a survey about voter behavior
22 in SBISD?
23     A.  No.
24     Q.  Okay.  For this report did you do an ecological
25 regression analysis or EI or any kind of a OLS?

Page 66

1      A.  No.
2      Q.  Okay.  For this report did you analyze election
3  returns in SBISD elections?
4      A.  No.
5      Q.  For this report did you review campaign finance
6  data?
7      A.  No.
8      Q.  Did you for this report -- did you analyze
9  incumbency advantage for this report?
10     A.  No.
11     Q.  For this report did you analyze any of the
12 issues that form the basis of the campaigns themselves?
13 By which I mean policy issues.
14     A.  No.
15     Q.  Did you analyze any partisan data for this
16 report?
17     A.  No.
18     Q.  Okay.  Did you look at ballot drift and how
19 that would have affected outcomes?
20     A.  No.
21     Q.  Did you look at ballot formation and how that
22 would have affected outcomes?
23     A.  No.
24     Q.  Did you look at any kinds of early vote
25 patterns or precinct data associated with elections, for

Page 67

1  SBISD elections, in formation of this report?
2      A.  Other than what's provided by Dr. Stein, no.
3      Q.  Okay.  I have asked this before, but I want to
4  make sure that I'm clear.  In your -- in preparation for
5  your report, did you perform any independent racially
6  polarized voting analysis?
7      A.  No.
8      Q.  Okay.  How long did it take you to review the
9  data?
10     A.  I don't know.  I have a -- I have a billing
11 spreadsheet someplace.  I could give you -- I could give
12 you a very precise, down to a tenth of an hour, but I
13 don't -- I don't recall offhand.
14     Q.  Was it 10 hours?
15     A.  I -- I really have -- as you might, as you
16 probably -- it's that time of year.  I'm working on a
17 dozen cases simultaneously so I don't --
18     Q.  Me too.
19     A.  Yeah.  I -- at some point those -- you know,
20 I'll hit, you know, some at the bottom of a spreadsheet,
21 and I'll know how much time I spent.  I saw a report --
22 I just looked at a -- some disclosure from another
23 expert in Kansas.  It was a guy I know at University of
24 Michigan.  And he was hired and provided a report for
25 him two weeks later, along with a bill for $63,000.  I

Page 68

1  thought I'm doing something wrong because I know he's --
2  I know he's working for at least a dozen people because
3  I see his name all the time.  And, my God, I -- you
4  know, whenever I hit "add" it never adds up to anything
5  like that in a two-week period.  That's pretty -- that's
6  pretty astonishing.  So I can tell you this.  I know
7  when I saw that I was shocked, so I know it's less than
8  $63,000 worth of my time.
9      Q.  How much of the report did you write?
10     A.  I wrote the entire report.
11     Q.  Mr. Crawford and none of the lawyers wrote the
12 report for you?
13     A.  That's correct.
14     Q.  These are your words, these are your findings,
15 correct?
16     A.  My words, my findings.
17     Q.  And you didn't use a data assistant to review
18 the data?
19     A.  No, I did not.
20     Q.  And you didn't use Mr. Stevenson?  I'm not sure
21 if I'm getting the name correct.
22     A.  Stevenson.
23     Q.  Okay.  It's Dr. Stevenson I suppose?
24     A.  Yes.  I did not -- Dr. Stevenson was not
25 involved.

Page 69

1  Q. This is 100 percent your work product?
2  A. Correct.
3  Q. Yes, sir. What instructions were you given by
4  counsel in preparation of the report?
5  A. You know, we discussed at the time we were
6  negotiating my employment, you know, what -- what I
7  could do for Mr. Crawford in this case, which was to,
8  you know, provide a commentary on Dr. Stein's report and
9  Dr. Stein's analysis. And that was -- that was the
10 extent of the discussion so --
11 Q. And this is an obvious answer, but I need to
12 ask it anyway. You've reviewed Dr. Stein's report,
13 correct?
14 A. Correct.
15 Q. Okay. I've previously labeled this Expert
16 Exhibit No. 3. Could you review this, make sure that's
17 the report you reviewed?
18 A. Yes, that's the report I reviewed.
19 Q. Make sure that's handy in case you need to
20 refer to it.
21 A. Okay.
22 Q. So just generally first before we get into your
23 specific points, do you disagree with any of the data
24 that was used by Professor Stein in his expert opinion,
25 the data itself?

Page 70

1  A. I don't have any reason to disagree with the
2  election data, the results by election place. I -- I'm
3  uncertain of what to make exactly of the BISG analysis.
4  I'm not sure if I agree with it or don't agree with it.
5  I may completely agree with it, and I may completely
6  disagree, but I can't quite figure out -- there's sort
7  of different forms of it that are being used there.
8  It's not a hundred percent clear to me what the
9  distinction is or how that's being utilized. But I --
10 in terms of the -- how that leads the -- the voting
11 places to be, roughly to be arrayed, to the extent I can
12 see that, it's -- it's not obviously backwards or
13 anything like that. I'm not sure that it's a -- it's a
14 very precise way of measuring the proportion of Hispanic
15 voters at the polls, but it doesn't -- to the extent I
16 can see that pattern in the scatter plots it's not -- I
17 don't think it's -- in its rough direction it's not
18 incorrect. So it's -- in that sense I think it's
19 accurate enough for the kind of analysis he did to
20 reach -- reasonably, reliably reach a kind of narrow
21 conclusion about this kind of mass of elections.
22 Q. I understand. And it's not inconsistent with
23 the OLS that you ran and the EI that you ran, correct?
24 A. It's not inconsistent. It's not inconsistent
25 with my view of what you would likely see if you did

Page 71

1  what he did. So I guess it's not inconsistent with -- I
2  don't think it demonstrates in an appropriate manner
3  that there is legally significant racially polarized
4  voting in SBISD, but it's a finding that certainly is
5  not incompatible with that.
6  Q. And it's not incompatible with the EI that you
7  ran or the OLS that you ran previously, correct?
8  A. I didn't -- nothing in it surprised me. I'll
9  say that.
10 Q. I understand. Do you agree that Bob Stein's
11 expert report and the methods he used demonstrate
12 racially polarized voting just generally?
13 A. I don't know.
14 Q. Okay.
15 A. Again, it's not inconsistent with that, but I
16 don't know that it actually demonstrates that.
17 Q. I'm not talking as a legal matter. I'm talking
18 only as a social scientific matter.
19 A. I just don't know.
20 Q. Okay.
21 A. It's really hard to say. It's a -- it's a very
22 scattered set of data, and it's a very unusual set of
23 data. It's just hard to say what it demonstrates. I'm
24 really not -- it's not clear to me what it demonstrates.
25 Q. But you would agree that the slopes of the line

Page 72

1  are inverted, correct?
2  A. Yes.
3  Q. And that those slopes are generally consistent
4  with racially polarized voting, correct?
5  A. They're in the correct direction.
6  Q. Okay. What is a p-value?
7  A. A p-value typically is a -- it gives you a
8  probability. So it's, you know, a probability that some
9  value is, and in comparison to some null hypothesis,
10 that it's, you know, within some appropriate range of
11 that -- of that value. So, I mean, that's -- depending
12 on what statistic you're talking about it's a -- you
13 know, it's a probability.
14 Q. Would a layperson call that statistical
15 significance?
16 A. They might. So p-value underlies what we call
17 statistical significance, which requires a null
18 hypothesis. It also underlies what you call a
19 confidence interval. Sometimes people are more familiar
20 with that.
21 Q. Sure.
22 A. That doesn't require a null hypothesis. That
23 just talks about, you know, plus or minus around a --
24 Q. Yeah.
25 A. -- a predicted value.

18 (Pages 69 to 72)

1     Q.  Would you agree that Dr. Stein's report shows
2  statistical significance, that his findings are
3  statistically significant?
4     A.  He reports -- he reports a number that by
5  social science standards would typically indicate
6  statistical significance.
7     Q.  A perfect answer.  I appreciate that.
8     A.  Okay.
9     Q.  Okay.  Do you agree with Professor Stein that
10  his findings show that voting is racially polarized in
11  SBISD elections?  Do you agree?
12     A.  No.
13     Q.  Okay.  Why don't you agree?
14     A.  I just don't think it's -- well, for several
15  reasons.  One is going back to the -- to the statistical
16  significance.  OLS is not a technique, nor is
17  correlation that can generate an appropriate measure of
18  statistical significance for ecological analysis.
19     Q.  Okay.
20     A.  So that's a well-known -- that's going all the
21  way back to its very origins.  Bernie Grofman has
22  written some articles about this.  There just isn't an
23  appropriate method for deducing that from OLS with --
24  with ecological data as opposed to with actual
25  individual level data.  So we just have to be -- we can

1  report -- it's not that OLS doesn't produce that
2  estimate.  It's just that that estimate is not an actual
3  estimate given the nature of the data.  And so it's --
4  you can't rely on it in the sense that if it's, you
5  know, something significant to the 0.05 level, with --
6  where that 0.05 estimate comes out of OLS it does not
7  mean that you would expect that result -- you know, that
8  you're in that 95 percent confidence interval or
9  whatever.  That's just not true.  There are lots of
10  studies that are looked at that said, you know, you can
11  do this kind of analysis, and it shows that, you know,
12  like 95 percent of the results are in fact nowhere near
13  the confidence interval.  It just doesn't -- it
14  doesn't -- it's not mathematically correct, and in
15  practice doesn't work.  So we -- that we don't --
16  we don't know about, so we can't tell whether --
17  whatever the pattern is here we can't tell whether it's
18  actually statistically significant or not.
19         We're also mixing data from a lot of
20  different elections, and within those elections a lot of
21  different conditions.  So at least the best I can
22  understand it in some of these elections there is only
23  one candidate and -- and we're mixing sort of a vote for
24  the candidate with rolloff, or something, as a vote for
25  the noncandidate.  It's not the same thing as voting for

1  another candidate.  And then we're sort of over a span
2  of time and over a series of candidates we're -- we're
3  sort of putting all that together into one -- one giant
4  OLS analysis.  And -- and we're not actually looking at
5  the cohesion for the preferred candidate or the voting
6  against the preferred candidate by the majority.  The
7  candidate it's already been defined as the candidate
8  with a Hispanic surname.  And that's just -- that's just
9  not the right way to do this.
10     Q.  Okay.
11     A.  I mean, it's important to have -- I think it's
12  important to include information about the ethnicity of
13  the candidates, particularly to have a mix -- it's
14  useful to have a mix of races that are ethnically
15  contested and races that aren't.  But the -- ultimately
16  the issues is the -- is voting for the candidate
17  preferred by minorities, not for the assumption that
18  that's the candidate who is, in fact, an ethnic
19  minority, or in this case who has a minority surname but
20  may in fact not be of that ethnicity at all.
21         And so, again, I think that's -- it's not
22  to say that with all of that that this isn't compatible
23  with an analysis that would show -- show that done in
24  what I think is a more appropriate way, but in and of
25  itself it's also compatible with a lot of other things.

1  So I just don't know what to -- it's not the way this is
2  usually done and I -- that doesn't -- you know, the way
3  things are usually done doesn't always mean it's the
4  right way or the best way or even a better way to do
5  things.  But in this circumstance I think it attempts to
6  ask too much in a single analysis when a more discrete
7  analysis would solve almost all those problems and be a
8  clearer result.
9     Q.  So if he did an ecological inference for each
10  of the races that would be preferential, that would be
11  what you preferred, and --
12     A.  Yes.
13     Q.  -- that would solve the problems you --
14     A.  All those problems would be solved.  If you
15  just do that for all the elections, you'll have
16  elections you'll be able to decide who the preferred
17  candidate is rather than assuming it.  You'll then be
18  able to look and see was the preferred candidate almost
19  or always the minority candidate.  That's a useful piece
20  of information in itself.  You'll have reasonable
21  measures of statistical significance that are actually
22  valid.  You know, all sorts of good.
23     Q.  So if he did that we might be square, correct?
24     A.  Of course I got to look at it.
25     Q.  Yeah.

Page 77

1  A. But, yes, that's -- I mean, that's really my --
2  my primary criticism here of this is that -- that while
3  this method is compat -- could be compatible with it, it
4  could also be showing us something else, and that done
5  differently we would -- we would be able to deal with
6  the -- we'd be able to have a shared understanding of
7  the facts on the ground.  And as it is I don't think
8  that that's really -- it's not clear enough yet in this
9  analysis.
10  Q. I understand.  And you also have two specifics
11  indicts, if I recall correctly.  One is that you believe
12  he only surveyed specific races, correct?
13  A. My understanding is that he said that he -- he
14  identified the preferred candidate as the minority, the
15  candidate with the Hispanic surname.
16  Q. Let me just go to the part of your report where
17  you reference that, if you don't mind.  I'm going to
18  take a moment.  I think you said -- I think this is
19  on --
20  A. Page 3.
21  Q. Yeah.  "Dr. Stein's analysis proceeds by
22  selecting only contests with at least one candidate with
23  a Hispanic surname."  That's what you wrote, correct?
24  A. Yeah, that was my understanding.
25  Q. If he didn't do that, that wouldn't apply,

Page 78

1  correct?
2  A. Correct.
3  Q. All right.  Fair enough.  And then we go -- you
4  go into I think a really interesting description of R
5  and R-square.  That's the other specific indict you have
6  about Stein's report, correct?
7  A. Yes.
8  Q. Could you explain the R score and what that
9  means to the court, please?
10  A. So R is a measure typically -- it's a
11  correlation measure.  It's often called Pearson's
12  correlation, even though it wasn't actually developed by
13  Pearson but by Pearson's mentor.  And it's a -- it's a
14  measure that varies between zero and one, with zero
15  being the absence of relationship between two variables
16  presumably at least semicontinuous, and at one a perfect
17  correspondence between the two measures.  Unfortunately
18  in the area in between it's not a linear measure.  It's
19  a curvilinear measure.  And so it's really easy to be
20  deceived by that measure.  So an R of 0.5 sounds like
21  you're halfway between zero and one, but in fact you're
22  not.  An R of 0.5 corresponds to the independent
23  variable accounting for 25 percent of the variation in
24  the dependent variable.  So through the early part of
25  that scale you're really, even when you get up to what

Page 79

1  looked like fairly substantial correlation, you have to
2  get above 0.7 before you're even explaining half the
3  variance.  And so if you're familiar with it and you use
4  it a lot, you know, you're capable of kind of making
5  that mental adjustment.  But otherwise it tends to
6  suggest there's more here than there is.
7  In this case the -- I think the correlation
8  is something like 0.33, which suggests that it's
9  accounting for about a third of the variation, when just
10  the -- you know, sort of the optical statistic, you can
11  look at this scatter plot, and it's clear that a third
12  of the variation has not been captured here.  And, in
13  fact, that's where -- again, for ordinary least squares
14  the -- actually, the correlation is not really what
15  typically is reported for an ordinary least squares
16  regression.  What's typically reported is the R-squared,
17  which is the coefficient that tells you what proportion
18  of the variation in the dependent variable explained by
19  variation in the independent variable.  And that's
20  important here because that's really what we're -- we're
21  trying to understand -- you got a variation in the
22  proportion of voters at the precinct that are Anglo or a
23  proportion of voters at the precinct that are Hispanic,
24  and you want to know how much that variation is driving
25  the election results.  And in this case it's driving

Page 80

1  less than 12 percent of the election result, and 88
2  percent of this bouncing around is produced by something
3  else.
4  Q. That's the claim in the report, and I think I
5  understand that.
6  What level of R-square, if any, should lead
7  to a conclusion that any model is satisfactory?  Is
8  there a specific level of R-square?
9  A. No.
10  Q. Okay.
11  A. Well, I guess -- I mean, an R-square of zero --
12  it depends on what you're -- what you want the model to
13  do.
14  Q. A correlation.  You want to prove a correlation
15  and --
16  A. Oh, a correlation.  There are all kinds of
17  scales of correlation that -- you know, some people say,
18  like in the social sciences, a -- you know, a
19  correlation of 0.2 is a pretty good correlation because
20  a lot of things we do have low correlation.  You know,
21  that's true for a variety of reasons, not the least of
22  which is extremely poor measurement in the social
23  sciences but -- so in and of itself there's not --
24  correlation is not -- it's not providing you a metric by
25  which you can judge the degree to which your independent

20 (Pages 77 to 80)

Page 81

1  variable is -- is impacting the dependent variable.  And
2  so it's -- it is very seldom used in the OLS context
3  because -- because OLS produces instead the summary
4  statistic, the R-squared.
5      Q.  I think I understand.  What are some of the
6  factors that might explain the variance in R-square on
7  this model?
8      A.  So I think one of the things that probably
9  explains the low R-squared is that you've thrown
10  together -- your data points are not really discrete
11  data points from an event.  They're a set of data points
12  from a whole bunch of events.  They're at different
13  points in time.  So normally if we're looking -- again,
14  if we're looking at a single election, then we could
15  say, you know, whatever the proportion of explained
16  variance is that's how much this variable is explaining
17  about what happened in this election.  When you compound
18  this by throwing a bunch of elections together, you've
19  got -- some of this trends over time, and some of this,
20  the very different nature of these elections.  Some of
21  these elections are competitive.  Some of them are not
22  at all competitive.  In a noncompetitive election you're
23  not -- this is not going to explain much in a
24  noncompetitive election because everybody is going to be
25  voting the same way.  In a competitive election, it may

Page 82

1  actually be more useful.  By separating out the
2  elections you separate out the context.  Right?  You can
3  say, look, it's really explanatory here.  Over here in
4  this election where there was like just a write-in
5  candidate it doesn't explain much, but we wouldn't
6  expect it to explain much.  So part of the -- part of
7  the issue here is just there's an artificial increase in
8  the amount of variance that needs to be explained, and
9  that's not a necessary -- that's a choice of putting it
10  all in -- in one picture instead of pulling it out
11  separately.
12      Q.  I think I understand.  But as we're sitting
13  here today you can't explain the variance, what causes
14  the variance here in this R-square, correct?  It could
15  be incumbency?  It could be issues in the campaign like
16  you said?  It could be ballot drift?  It could be any of
17  those things, correct?
18      A.  It's -- it can be a host of factors.  All you
19  can say is that whatever those factors are they're more
20  influential, substantially more influential than is the
21  question of what's the racial composition of the
22  precinct.
23      Q.  And to be the clear, if he did an EI analysis
24  election by election that solves his problem for you,
25  correct?

Page 83

1      A.  It doesn't -- it solves part of the problem.
2  Again, it unbundles the characteristics of the election,
3  so you don't -- in trying to analyze what happened in
4  2020 you're not stuck with the variance that came from,
5  you know, 2015 when somebody ran unopposed and somebody
6  was an incumbent, whatever.  You still have the issues
7  that are germane to that election.  But in exactly the
8  form you're suggesting you can look at those and say,
9  you know, it's more predictive in this election than
10  this election, why might that be, and you can talk about
11  the characteristics of that election.  It's really hard
12  to do that when the election itself is -- it's almost
13  hard to find where the particular elections are in here
14  because they're kind of all over the place.
15      Q.  I understand.  That's reasonable.  So how about
16  this?  Is having a high R-square always good?
17      A.  I don't know.  I guess I'm tempted to think
18  that in social sciences you -- it's like a higher --
19  it's like you can't be too rich or too thin.  Right?
20  Can you have -- can you have too high in R-squared?  I
21  don't think it's -- certainly there are equations with
22  high R-squareds that are less useful than ones with low
23  R-squareds because it depends on what it is you're
24  measuring.  Right?  There's an old joke about if you
25  measure the same thing twice, right, you'll get a high

Page 84

1  R-squared, except in the social sciences where even if
2  you measure the same thing twice you don't get a high
3  R-squared because measure and error, et cetera, et
4  cetera, et cetera.  So it's a -- it's an indicator of
5  the completeness of the model.  Among other things
6  it's -- it's cautionary I think.  A low R-squared is
7  cautionary in the sense that, you know, you need to --
8  you need to pay some attention.  It can be humbling in
9  the sense of what you're explaining.  It can be
10  challenging in the sense that you know that there's
11  other things to take into account.
12      It can also reveal that your model is
13  underspecified, so it -- and specification is not just
14  an issue of -- one of the things you can't do is just
15  ignore the fact that the model has a low R-squared, in
16  the sense that your certainty about what's in -- about
17  the parameters in the model is partly a function of what
18  you left out of the model.  And if the model is
19  improperly specified, which is often the case with low
20  R-squared models, then a properly specified model may
21  produce a different result.  So you point out
22  incumbency.  It's possible that if you bring incumbency
23  in as a variable that this correlation will diminish.
24  It's control variables because of specification error.
25  Bringing in the right specification can diminish,

21 (Pages 81 to 84)

Page 85

1  sometimes can reverse correlation. So it's -- it is --
2  it's not always better to have a higher R-squared. But
3  certainly a low R-squared signals -- should make you
4  cautious about overinterpreting the one parameter you've
5  estimated because you really -- you don't have a full
6  model that let's you estimate that parameter.
7      **Q. Is R-squared a biased estimator in the term,**
8  **whatever that means, the -- the statistics?**
9      A. Well, it's -- to the extent that you have met
10 the basic requirements for OLS then the R-squared, like
11 the estimates of the parameters, are linear, unbiased
12 estimators. They're -- and to the extent you violate
13 assumptions the -- the nice thing about OLS, one of the
14 many, many nice things about OLS, is that even when you
15 violate assumptions it tends to have more impact on
16 efficiency than it does on bias. So the estimator is
17 often linear -- OLS estimates, even when you violate a
18 condition that causes them not to be the most efficient
19 estimator, they're often surprisingly robust with regard
20 to bias. So, you know, in the -- in the context of
21 social science estimation the -- you know, R-squared
22 is -- is a relatively reliable indication of how good a
23 job you're doing of accounting for variation.
24     **Q. Could a high R-Square score be a symptom of**
25 **overfitting your best fit line?**

Page 86

1      A. Absolutely.
2      **Q. Yeah.**
3      A. It's -- you know, as the number of independent
4  variables approaches the number of data points you will,
5  you know, by definition have one less parameter than you
6  have data points. You will perfectly fit your -- fit
7  your line. So in and of itself it's not -- you can --
8  you can produce the high R-squared trivially. On the
9  other hand, I'm not sure that you can produce a low
10 R-squared trivially. I think that really does tell
11 you that -- again, it's not -- in and of itself it
12 doesn't -- it doesn't say you haven't learned anything.
13 It is a -- it is an appropriate caution I think in this
14 kind of modeling, and I think a -- and I think a very
15 valid one because I think one of the things it tells you
16 is this is not the right way to do this analysis. Or I
17 wouldn't say "not the right." Not the best -- not the
18 best way, not the most informative way to do this
19 analysis.
20     **Q. I understand. When you analyzed Professor**
21 **Stein's report, I just want to be clear for the record,**
22 **you used normal R-squared, not R-squared adjusted,**
23 **correct?**
24     A. Correct.
25     **Q. Okay.**

Page 87

1      A. There's -- I mean, there is only one
2  independent variable so --
3      **Q. Right.**
4      A. But the adjusted R-squared just accounts for
5  the fact that you've got, you know, multiple independent
6  variables. And it produces a result as you get close to
7  reaching a level where your number of variables is close
8  to the number of cases. But the R-squared, adjusted
9  R-squared are not going to be very different here.
10     **Q. On page 5 of your report, sir, you say -- if**
11 **you want to turn to that page, I just want to make sure**
12 **I'm quoting you correctly -- "Taken together, the issues**
13 **identified above suggest that the evidence relating to**
14 **Gingles 2 and Gingles 3 provided in Dr. Stein's report**
15 **are not sufficient to meet the plaintiff's burden of**
16 **proof on these two threshold conditions, or the broader**
17 **totality of the circumstances." Is that what you wrote,**
18 **sir?**
19     A. Yes.
20     **Q. Okay. And I'm not trying to get horsey with**
21 **you. I think I -- you know I have enormous respect for**
22 **you, but I want to be clear about a couple of things.**
23 **You're not an attorney, correct?**
24     A. Correct.
25     **Q. And you've never done a survey of burdens of**

Page 88

1  **proof or sufficiency of evidence, correct?**
2      A. Correct.
3      **Q. And while you have extensive background in**
4  **testifying you have no background in what sufficient**
5  **evidence is for a judge, correct?**
6      A. Correct.
7      **Q. Okay. In the final part of your report you**
8  **cite I think this -- this report from Abott and**
9  **Magazinnik; is that correct?**
10     A. Yes.
11     **Q. Okay. I'm going to hand it to you. I've**
12 **labeled this Exhibit 5. We're out of order. I**
13 **apologize. But I just did it incorrectly.**
14         **Could you review this and make sure this is**
15 **the right article?**
16     A. I think this is right.
17     **Q. And so in the final part of your report you**
18 **caution us based on this article that the use of**
19 **single-member districts may actually be worse for**
20 **Latinos in some communities, correct?**
21     A. Correct.
22     **Q. And that's based largely on the data for these**
23 **California elections that are analyzed by Abott and**
24 **Magazinnik, correct?**
25     A. It's -- as they cite, they're unlike the

Page 89

1 literature on single-member districts and black
2 representation.  There's long been controversy about
3 whether that same relationship was present for Latino
4 voters sometimes in earlier studies, sometimes in
5 different locals.  So they're really addressing what's
6 kind of been a mixed set of findings in the past, I
7 guess a much more -- a much less certain area of the
8 literature than would be the case for the value of
9 single-member districts in providing for increased black
10 representation.
11     Q.  Okay.  That's in relation to the Latinos you
12 mean, correct?
13     A.  Correct.
14     Q.  All right.  And I think in your report you
15 posit that in highly segregated areas with low vote
16 participation by Latinos single-member districts may not
17 lead to more representation.  That's what you posit,
18 correct?
19     A.  I'm not -- I'm not positing that.
20     Q.  Okay.  You're just recording that?
21     A.  So -- yeah.  And particularly -- so this is --
22 I don't cite these -- I've never cited this paper in a
23 report before.  I'm citing it only because when
24 Dr. Stein laid out kind of his three areas of evidence
25 he suggested that this was part of what he was advancing

Page 90

1 in the report, and it's his citation to their work that
2 I'm referencing.  So what I'm just providing is sort of
3 some context for his discussion of their -- of their
4 report.  I think it -- their -- what their conclusion
5 that I quote indicates is that they see there's reason
6 in some areas to be cautious because the effect is not
7 going to be -- in their view is not going to be
8 uniformly positive.  It may just be -- it may be
9 neutral.  It may be negative.  And, again, I think that
10 just provides some context for what Dr. Stein is saying
11 here.  It's not something I'm saying.  It's just, I
12 think, is a little bit of a corrective to what he's
13 saying they're saying.
14     Q.  Okay.  So you're not going to testify about it?
15 This is not something you're saying you will testify
16 about?
17     A.  I mean, if I'm asked about it, I would testify
18 about it.
19     Q.  All right.
20     A.  I don't get to control that.
21     Q.  I'm going to need to delve into it just a
22 little bit, then, if you don't mind.
23     A.  Yeah.  Absolutely.
24     Q.  In this -- on the report on page 7, you say the
25 following: "Spanish Surname Registered" -- I guess turn

Page 91

1 to it.  It's on the -- it looks like the second full
2 paragraph.  It's the second sentence.  It starts with --
3     A.  Yes.
4     Q.  -- "Spanish Surname Registered Voters (SSRV)
5 make up less than 20 percent of the registered voters in
6 Spring Branch ISD, and in the most recent school board
7 elections that included the Position 4 Elizondo -
8 Earnest contest, Spanish Surname Registered Voters made
9 up less than six percent of the actual election day
10 Spring Branch voters."  Correct?
11     A.  Correct.
12     Q.  And then you draw similarity, is it fair to
13 say, between the article's use of voter eligible
14 population and SSR -- SSVR, correct?
15     A.  Correct.
16     Q.  But isn't it true that -- how about this?  How
17 does Abott and Magazinnik define voter eligible
18 population in their article?
19     A.  I believe they're using -- I don't know if
20 they're using VAP or CVAP.  I don't recall.
21     Q.  All right.  Let's take a look at the article so
22 we're not -- I think it's on -- it's on Figure 4.  I
23 think this is page -- let's see.  Here's the exhibit.
24 One second.  Let me find it for you.  I apologize.  I
25 should have put the page number here, and I thought that

Page 92

1 I had.
2         MR. ABRAMS:  Figure 4 is on page 22.
3         MR. GOLANDO:  Twenty-two.  Okay.
4     Q.  (BY MR. GOLANDO)  On page 22, sir, here, I
5 believe the discussion -- so I think it's on page 21.
6         MR. ABRAMS:  The text begins on page 21 at
7 the bottom.
8         MR. GOLANDO:  Yeah.
9     Q.  (BY MR. GOLANDO)  So here it is.  How are they
10 defining -- what is your understanding of how they are
11 defining voter eligible population?
12     A.  So they -- it looks like they're defining it as
13 CVAP or H -- I guess Latino CVAP or Hispanic CVAP.
14     Q.  So HCVAP and VEP are the same thing here,
15 correct?
16     A.  Yes.
17     Q.  And would you agree with me that SSVR and HCVAP
18 are different measures?
19     A.  Yes.
20     Q.  And SSVR is a lower measure often done, or has
21 to be --
22     A.  Well, one hopes.
23     Q.  One would hope so.
24     A.  Not always in Texas or Louisiana.  But, yes, it
25 should be a subset of CVAP.

23 (Pages 89 to 92)

Page 93

1      Q. And in SBISD it is absolutely a subset of
2   HCVAP, correct?
3      A. It is lower than CVAP, yes.
4      Q. And so HCVAP is likely to be far higher in
5   SBISD than SSVR, correct?
6      A. It is higher.
7      Q. I think I got the adjective. It's higher?
8      A. Yeah, it's higher. It's -- it's significantly
9   higher. So it's not just marginally higher. It's
10  significantly higher.
11     Q. Okay.
12     A. Yes.
13     Q. And so in the article itself on page 22 --
14  let's pull it up for you again -- there are a couple of
15  different graphs. If you'll look at Figure 5, I
16  believe, it says -- in the article it says "there is a
17  dramatically" -- "dramatic and precisely estimated
18  positive effect in large districts that are composed of
19  at least 30 percent Latinos." That's Figure 5. What
20  does that mean exactly?
21     A. That means that there's -- there's an upward
22  slope when they constrain or confine the population for
23  the figure to that set of districts.
24     Q. How does the -- what is the definition of a
25  large district in this article?

Page 94

1      A. You mean a district with a large Latino
2   population?
3      Q. I think they actually do it by enrollment, if
4   I'm not mistaken. Maybe here is the -- so small
5   districts -- so how does the article define a small
6   district?
7      A. Enrollment of less than 13,700.
8      Q. And how does it define a large district?
9      A. Larger than 13,700.
10     Q. And how many students does SBISD enroll?
11     A. I have no clue.
12     Q. Is it higher than 13,000?
13     A. I would think so.
14     Q. It's probably a large --
15     A. It's a big district. Yeah.
16     Q. Fair enough. How many Latinos have been
17  elected to the school board in SBISD's history?
18     A. I don't know.
19     Q. Would you be surprised to hear there was zero?
20     A. I wouldn't be surprised, no.
21     Q. And how many African Americans have been
22  elected in SBISD's history?
23     A. I don't know.
24     Q. Would you be surprised if it was zero?
25     A. No.

Page 95

1      Q. How many have been appointed?
2      A. I don't know.
3      Q. And would you be surprised it was zero?
4      A. No.
5      Q. Okay. The fact that the voter eligible
6   population is north of 20 percent and that SBISD is a
7   large school district, does that change your opinion of
8   whether or not single-member districts might be a better
9   fit given this article?
10     A. I guess I'm -- I'm going on what they say,
11  which is "increasingly racially polarized voting coupled
12  with small numbers of Latino voters relative to other
13  groups-may create new barriers." And so they're
14  actually talking about the small number of voters, so I
15  guess -- I don't know how eligible is translating into
16  voters in California, but eligible is not translating
17  into voters here. And so in the sense that their
18  concern is about what happens when you have a small
19  number of Hispanic voters in an increasingly polarized,
20  politicized environment as a result of issues related to
21  change in the nature of elections, they offer a caution
22  about that that I think is -- continue to believe is
23  precisely correct for SBISD.
24     Q. But right now you would agree with me that
25  there's zero chance that a Latino preferred candidate

Page 96

1   can be elected today, correct?
2      A. I didn't know you thought that, and I don't
3   agree with it.
4      Q. Okay. Let's just go historically.
5   Historically the minority preferred candidate has not
6   been elected, correct?
7      A. I don't know that that's correct. I don't
8   believe it's correct.
9      Q. Fair enough. You said before that you believe
10  that the Latino candidate is usually the Latino surname
11  candidate, correct?
12     A. I said I thought it's probably the case that
13  when -- yes. So if there's a Latino -- a candidate that
14  is Latino I think they probably would usually be the
15  preferred candidate of Latinos, yes.
16     Q. And it's -- you were not surprised to learn
17  that no Latino has ever been elected to the school
18  board --
19     A. Yes.
20     Q. -- in SBISD, correct?
21     A. (Moving head up and down.)
22     Q. So the Latino preferred candidate in SBISD
23  elections has never been elected in SBISD, correct?
24        MR. CRAWFORD: Objection, form.
25     A. No. That's -- most of the elections to SBISD

24 (Pages 93 to 96)

## Page 97

1  board have not included Latino candidates, and so in --
2  I assume in many of those elections the --
3      **Q. (BY MR. GOLANDO) Fair enough.**
4      A. -- Latino preferred candidate was elected.  So
5  a Latino that was the preferred Latino candidate, if --
6  and I'm just accepting your assertion that no Latino has
7  ever been elected.  If it's true that no Latino has ever
8  been elected, then the Latino candidates that were also
9  the preferred candidate of Latino voters, which is a
10  subset, has not been elected.
11      **Q. And that's -- that's a much better way to say**
12  **that.**
13      A. Okay.
14      **Q. And you agree with that, correct?**
15      A. I agree with that.
16      **Q. All right.  So the chance -- okay.  Fair**
17  **enough.  I think I understand.**
18          **Did you review Professor Stein's proposed**
19  **single-member district plan in his report?**
20      A. I looked at it.  One of the things that I was
21  clear about in the sort of scope of what I was going to
22  do and the amount of time I had to do it was that I was
23  going to stay out of being a demographer.
24      **Q. I understand.**
25      A. So I did not do any -- I looked at it.  I

## Page 98

1  recognized what it was.  It's a -- a modified version of
2  the -- he says basically the polling places.  It isn't.
3      **Q. No.**
4      A. It's a -- I mean, that obviously -- you know, a
5  quick look at the population deviation will tell you
6  that -- you know, nobody gets the population perfect in
7  an attendance district because there it's about
8  students, not about people.  So -- but it obviously is
9  based on -- the cores of the districts are the
10  recognizable cores of the -- of the current polling
11  places are, which would be the attendance districts,
12  with some modifications to -- you know, to get the
13  population equal.  So that's what I saw there.  It looks
14  like the area that he says is the district that's CVAP
15  majority is an area where I would suspect there's a --
16  it could be you could draw a CVAP majority district
17  so --
18      **Q. Does anything about that district give you**
19  **pause as a map drawer?  Because you've done that in the**
20  **past, correct?**
21      MR. GOLANDO:  Actually, strike that.  Let
22  me just do it correctly.
23      **Q. (BY MR. GOLANDO)  Historically you've drawn**
24  **maps for jurisdictions, right?**
25      A. Yes.

## Page 99

1      **Q. All right.  So you have a vast history of**
2  **drawing maps, correct?**
3      A. I've drawn a lot.  I wouldn't say vast.
4      **Q. Okay.**
5      A. But I've drawn a lot of school district maps,
6  yes.
7      **Q. Fair enough.  Does anything about that, the way**
8  **it's shaped geometrically, give you pause?**
9      A. No.
10      **Q. Would you agree that it's a compact district?**
11      A. Yes.
12      **Q. Okay.  Would you agree that if the numbers are**
13  **correct that it's CVAP majority?**
14      A. Yes.
15      **Q. Would you agree that that map meets Gingles 1?**
16      MR. CRAWFORD:  Objection, exceeds the scope
17  of his engagement and his opinion.
18      **Q. (BY MR. GOLANDO) But as an expert in map**
19  **drawing I'm asking and as -- and one who's drawn several**
20  **Gingles 1 maps does it meet the form of Gingles 1?**
21      A. Again, I -- so I haven't looked at any of this,
22  so I'm going entirely on your assertion that the numbers
23  that were provided match the numbers that -- the
24  picture.  Right?  And I have no idea whether that -- you
25  know, whether that picture actually produces the numbers

## Page 100

1  or not but --
2      **Q. Sure.**
3      A. -- if that picture produces those numbers, and
4  that's the most current CVAP estimate, then I'd say
5  that's what you'd be looking for in a -- you know, in a
6  district to establish Gingles 1.
7      **Q. So yes?**
8      MR. CRAWFORD:  Same objection.
9      A. Yes.
10      **Q. (BY MR. GOLANDO) Thank you, sir.  All right.**
11  **Only about nine more pages.**
12      **Is the Latino community in SBISD**
13  **sufficiently large and geographically compact to**
14  **constitute a majority in a single-member district?**
15      A. I don't know.
16      **Q. In your experience?  You've drawn maps.**
17      A. I don't know.
18      **Q. And you've reviewed election analyses, and you**
19  **know SBISD well.  You've worked here for 20 years.**
20      **In your opinion, given your broad history**
21  **of working with SBISD, do you think it's sufficiently**
22  **large and geographically compact?**
23      MR. CRAWFORD:  Object to the extent it --
24      A. I mean, I don't have --
25      MR. CRAWFORD:  -- exceeds the scope of his

1    opinion.
2        A. I don't have an expert opinion about that.
3        Q. (BY MR. GOLANDO)  How about just a lay opinion,
4    then?
5        A. A lay opinion?  It wouldn't surprise me.  I
6    guess that's one of our -- that's one of our answers.  I
7    wouldn't be surprised if that was true, but I haven't --
8    I have not at any time trying to draw -- tried to draw a
9    district.  So, you know, I don't have any -- I don't
10   have any information to add to this beyond what is in
11   Dr. Stein's report, but it wouldn't surprise me.
12       Q. Based on your years of experience in data
13   reviewed for SBISD are Latinos generally politically
14   cohesive in SBISD elections?
15       A. Again, it's -- you know --
16       Q. It's a range?
17       A. It just depends.  It's a range.  And they're
18   certainly not in the -- not cohesive at the levels that
19   we would traditionally see for black voters.
20       Q. And that would be 90 percent and above,
21   correct?
22       A. Yes.
23       Q. Okay.
24       A. And I'm not sure even -- if it would even be
25   cohesive at the level you would normally see in a

1    general election.  So there's some -- again, there's
2    modest to moderate cohesion.
3        Q. Based on your years of experience as an
4    election analyst and demography expert, in the data
5    reviewed for SBISD historically, not just for this case,
6    but historically are Anglos politically cohesive in
7    SBISD elections generally?
8        A. Moderately I'd say.  I mean, it's -- it varies
9    from election to election.  But, yeah, it's a --
10   probably -- probably somewhere in that same range, but
11   I don't really know.
12       Q. Based on your years of experience and the data
13   reviewed for SBISD do Latino voters in SBISD elections
14   support different candidates than Anglo voters in SBISD?
15       A. I have not -- I don't know.  Comprehensively I
16   don't know.
17       Q. You did an EI report, correct?
18       A. The what?
19       Q. You did an EI before the litigation began?
20       A. Yes.
21       Q. Okay.  And you recall the contents of that EI
22   report, correct?
23       A. I do.
24       Q. And I'm asking you to call into that based --
25   based on your expertise and your -- the data you've

1    collected and your experience in SBISD.  Do you recall
2    whether or not Latino voters in SBISD elections support
3    different candidates than Anglo voters generally?
4        A. I guess I'm not clear on -- I mean, you're
5    asking me about the results of the analysis that I
6    provided the attorneys, so I'm not sure -- is this
7    like -- are we back in the realm of what's acceptable
8    here or --
9        Q. I'm asking you just based on your experience.
10   It's a question about do you believe them to be so based
11   on the entirety of your experience here?
12          MR. CRAWFORD:  And based on Dr. Alford's
13   interpretation of the question I think it would call for
14   protected communications, and so I'll instruct you not
15   to answer.
16       Q. (BY MR. GOLANDO)  You can answer if you want.
17       A. I've been instructed not to answer --
18       Q. Fair enough.
19       A. -- by my employer.
20       Q. I think we've asked that question before.
21          In your opinion based on your years of
22   experience at SBISD, does the Anglo majority vote
23   sufficiently as a bloc to enable it to defeat the
24   minority preferred candidate?
25       A. I would say sometimes.

1        Q. How often?
2        A. I don't know.
3        Q. More often than not?
4        A. I don't know.
5        Q. Does Texas have a history of official
6    discrimination in the jurisdiction in SBISD that
7    affected the right to vote?  Does Texas have it?
8        A. Now we're -- we're not just outside of my
9    expertise on this case.  We're just --
10       Q. Yeah.  I'm just trying to limit your testimony.
11   I just want to make sure you're not going to testifying
12   in totality.  So if you don't have an opinion that's
13   great.  You can just say "no."
14       A. Yeah, I don't have an opinion.
15       Q. Okay.  Does Harris County?
16       A. I don't have an opinion.  I don't have an
17   expert opinion.
18       Q. Does SBISD?
19       A. I have no idea.
20       Q. Does SBISD use the place system for voting?
21       A. It's my understanding they do.
22       Q. Okay.  Have minority candidates been denied
23   access to the jurisdiction's candidate slating process
24   formally or informally to your knowledge?
25       A. I don't know anything about the slating

26 (Pages 101 to 104)

1  process, if there is one.

2  **Q. Are SBISD minorities discriminated against in**

3  **socioeconomic areas such as education, employment, or**

4  **health?**

5  A. I don't know.

6  **Q. Have there been overt or subtle racial appeals**

7  **in campaigns in SBISD elections?**

8  A. I don't know.

9  **Q. Okay. Has a minority ever won an election in**

10  **SBISD to your knowledge?**

11  A. I don't know.

12  **Q. Okay. Are elected officials -- are the SBISD**

13  **trustees responsive to the concerns of minority voters**

14  **in SBISD? Do you have an opinion?**

15  A. My opinion, yes, I think they are.

16  **Q. What is that based on?**

17  A. Just on -- you know, the degree -- sort of my

18  sort of nonexpert kind of information you get from

19  reading the paper sort of thing, that certainly

20  there's -- you know, the district floats bonds and

21  builds facilities in a variety of areas. Like most

22  districts they run a -- you know, the bilingual

23  education program. They have programs that are designed

24  to, you know, help students, early start kinds of

25  things, whatever. So that's just -- my sense is the

1  district has a reputation as a district that has, you

2  know, made a variety of efforts, provided resources and

3  expertise directed toward -- toward minority students.

4  **Q. Will you be testifying about that?**

5  A. I don't think so. It's not an area in my

6  report. It's not my area -- I mean, that's -- again,

7  that's a -- you can have a sense about that, and then

8  there's empirical information about it. I don't have

9  the empirical information and it's not an area that I do

10  work in so I don't testify about it.

11  **Q. Fair enough. We're entering the last stages,**

12  **the -- my category of this is fun stuff, so I hope this**

13  **is enjoyable for you. It will be for me.**

14  **My first question to you actually is what**

15  **is the ecological fallacy?**

16  A. So the ecological -- normally you gather data

17  at the level that you want to ask or answer a question.

18  So if I want to know what effect people's gender has on

19  how they vote I would -- because that's a question in

20  which the unit of analysis of the question is an

21  individual person then the unit of analysis for my study

22  should be people. So I would ask people about their

23  gender, and I would ask them about how they vote. And

24  that would be a normal analysis. An ecological analysis

25  is one where your -- your question -- you want an answer

1  at the individual level, but you're not getting the data

2  at the individual level. You're getting it at some

3  level of aggregation. So, for example, I could do a

4  study of counties in the United States based on the --

5  what proportion of the county is male and female, and

6  then look at Republican, Democratic voting, and try to

7  draw a conclusion about the effect of gender on

8  Republican or Democratic voting. And that's the

9  ecological fallacy, right, that -- that once aggregated

10  that the variation across those aggregations is

11  disclosing simply the same variation that's taking place

12  across individuals. It's not necessarily the case that

13  that's happening.

14  **Q. Okay. So as I learned it -- this is very --**

15  **this is like Science 101, right -- it's when you infer**

16  **individual behavior from aggregated measurements. Is**

17  **that fair?**

18  A. Yes.

19  **Q. Okay. So ecological regression describes a**

20  **voting behavior between certain relationships, right?**

21  A. Correct.

22  **Q. Okay. But you can't infer the intent of the**

23  **voter, correct?**

24  A. It doesn't measure the intent of the voter.

25  People infer the intent all the time.

1  **Q. For sure. Right.**

2  A. But, no, you don't have -- you're not measuring

3  the voter's intent, although it's true in any research

4  scheme you have a variety of tools that help -- can help

5  you to eliminate certain possibilities or to make

6  certain things more likely than not. So I'm going to

7  give you an example in a partisan general election. If

8  you find that -- as I talked about earlier, if you find

9  that when the Republican candidate is a Hispanic,

10  Hispanics vote against that candidate when -- when the

11  candidate is Anglo. So what you see there then is a

12  pattern, that the changes in the partisanship of the

13  candidate drives voting, but the changes in the

14  ethnicity candidate doesn't drive the voting. That's

15  sufficient -- not that you would know that from any one

16  analysis, but that's sufficient to suggest that given

17  that you've added this other condition that the behavior

18  of the voters, whatever their intention, their behavior

19  is not being driven by the signal that they're getting,

20  right, because you've separated two signals, signal

21  about the candidate and party, and signal about the

22  candidate and ethnicity. And where you can separate

23  those you can see whether it's a mix of those or whether

24  it's mostly one or mostly the other or neither.

25  **Q. So you infer the intent of the voter by**

Page 109

```
 1    subtraction almost, correct?
 2         A.  You still don't infer the intent.  I'm very
 3    uncomfortable with intent analysis in all of its forms.
 4    I don't believe people have intent quite frankly.  It
 5    requires that people have a unified personality, that
 6    people have -- that people's brain is -- that part of
 7    the brain that actually makes decisions is entirely in
 8    control, and therefore the -- I mean, I think just the
 9    idea that -- I mean, there's a lot more than just
10    unintended consequences.  There are just completely
11    unintended actions as well.  So even talking about
12    intent at the individual level where you have the most
13    chance of it making sense I'm not comfortable with it.
14    We certainly don't have tools for teasing that out.  And
15    then, of course, when you get to collective bodies my
16    favorite is the intent of the legislature.  Anybody who
17    has ever been near a legislature knows the idea, as you
18    well know, that the legislature itself generates an
19    intent, it's like forget about the -- I mean, the
20    individual legislators could barely figure out what
21    their intent is on a good day.  Collectively Lord only
22    knows what's going on but --
23         Q.  Yeah.  I think voters are pretty irrational, I
24    think legislators are definitely irrational, in policy
25    meetings pretty irrational, right?  I understand.
```

Page 110

```
 1         A.  And collectively whatever we're guilty of as
 2    individuals put -- put us in groups of two, in groups of
 3    four, in groups of eight, in groups of twelve, and then
 4    talk about the outcome of that irrationality when it
 5    gets aggregated.  And I think it's really -- it's not
 6    just difficult.  I just don't think it's -- that there's
 7    a value to it.  So I don't think it's valuable to talk
 8    about the intent of the -- to the intent of the voters.
 9    I think it's valuable to talk about -- certainly it's
10    valuable to talk about what the cue is the voters are
11    responding to.  And this is a context where that's
12    really important.  If the -- if voters are responding to
13    a cue of ethnicity, then that tells you something about
14    the behavior.  And if they're not, it tells you
15    something about their behavior and --
16         Q.  And we would know that they were responding to
17    a cue about their ethnicity in this case if we ran an EI
18    and there was cohesion for Latino voters and cohesion
19    for Anglo voter candidates, correct?
20         A.  No.
21         Q.  How would we know, I guess is more or less --
22         A.  Okay.  So that -- we can certainly
23    distinguish -- again, you need an analysis that brings
24    in some other factors so that you can tell whether
25    that's the factor that's explaining it or the cue.  Just
```

Page 111

```
 1    as if you don't bring in partisanship you can't tell the
 2    difference in the -- you know, in a general analysis.
 3    So if you -- I mean, you can look at -- you can vary
 4    things like, you know, the location of voters within the
 5    district.  You can vary things about, you know, the
 6    voters' opinions and so forth.  So there are a lot of
 7    other things you can look at that -- you know, that
 8    would allow you to at least get some sense of how
 9    powerful or durable or influential any particular
10    characteristic is.
11         Q.  Okay.
12         A.  But I still think it's -- it's not really --
13    it's not really about intent.  It's about -- it's about
14    the behavior rather than the internal process.
15         Q.  Do you believe that there is a link between
16    biology and political ideology?
17         A.  Yes.
18         Q.  Could you tell me what that -- what you believe
19    that is?
20         A.  So for many aspects -- so I -- first of all,
21    ideology is not an abstract way of organizing your
22    thinking about the world.  This is some of the oldest
23    work in American politics.  You ask people ideology in
24    the "ism" sense, liberalism, conservatism, communism,
25    you know, libertarianism, whatever, they don't have a
```

Page 112

```
 1    clue.  They don't know what the basic principles are.
 2    They never apply them.  They have no clue.  So at the
 3    same time, as John Jost has pointed out, the behavior of
 4    voters is remarkably -- if you know, you know, as he
 5    says in "The End of Ideology," if you think ideology
 6    disappeared from American political life you must not be
 7    seeing the same American political like I'm seeing
 8    because this ideology runs rampant.  So what is it?  And
 9    clearly it's -- you know, we don't have to scratch the
10    surface to know it's not principle.  Right?
11         So if it was principle conservatism then --
12    like Greg Abbott believes local governments should make
13    their own decisions, not central governments.  Right?
14    Well, yeah, that's true.  Just tell me what the subject
15    matter is of the local government, and I'll tell you
16    whether he favors it or not.  So that's not the same
17    thing as saying that he's not ideological.  Right?  He's
18    very ideological because the kind of things he wants to
19    stop Harris County from doing are a very specific kind
20    of thing.  Right?  It's not hard to predict what
21    Governor Abbott is going to get on about these days.
22    It's going to be a series of things that are very
23    closely related.  And as it happens those things are
24    closely related to things that vary in the way human
25    brains are built.  So --
```

28 (Pages 109 to 112)

Page 113

1    Q.  How do you --
2    A.  -- the more --
3    Q.  I'm sorry.  I didn't mean to cut you off.
4    Please go ahead.
5    A.  So, I mean, the more easily disgusted someone
6    is in general the more conservative they'll be in
7    general on a very specific set of conservative issues,
8    those issues related basically to sexual behavior.  So I
9    can do a really good job if I just know how easily
10   you're disgusted.  And I can measure that by skin
11   conductance, by -- just by showing you a picture of
12   somebody eating worms.  I can measure your skin
13   conductance, and I can do a good job of predicting your
14   opinion on gay marriage or abortion or premarital sex,
15   things that are related to basically just sexual purity
16   or sanctity.  I can't do a very good job of saying
17   whether you're a fiscal conservative or whether you're a
18   hawk, but I can for that particular area.
19   Q.  Are there any other areas that are close to
20   sexual areas?
21   A.  Well, I mean, if I'm -- if instead of giving
22   you a disgusting image I give you a threatening image,
23   or I unexpectedly play a loud burst of white noise in
24   your earphones, I can do a very good job of predicting
25   your position on securing the border, gun control, more

Page 114

1    funding for the military, whether you would like to have
2    a bomb shelter in your backyard in the '60s.  So we have
3    a mechanism in our brain that responds to threat.
4    It's -- among other things it's a -- part of that is a
5    startle mechanism.  So we startle when we hear loud
6    noises.  People who are conservative on national defense
7    startle significantly more easily than do liberals on
8    national defense, even if the -- what they're startling
9    to is just a burst of white noise, absolutely content
10   free.  That startled reaction varies across individuals.
11   And there's a really nice study that looked at startle
12   reflex in infants, so how easily startled is an infant
13   because that gets recorded as part of Apgar.  Like,
14   you're supposed to startle.
15   Q.  Sure.
16   A.  So they recorded that, and then followed that
17   up like 40 years later with how easily startled they
18   were as adults.  And it's a -- there's about a 90
19   percent predictive relationship.  So our startle
20   ability, the degree to which our amygdala and the
21   networks that serve the amygdala moving both to
22   impulsive reactions, like a jerking motion, and to
23   things like sensing, feeling, experience, and fear,
24   those things are -- those differences are differences
25   we're born with.  And so being born into -- being born a

Page 115

1    person who is more easily startled or has a more active
2    threat system or threat recognition system places you in
3    a more threatening world.  And someone who has, you
4    know, very little of that kind of -- and I think both
5    liberals and conservatives recognize this.  Right?
6    Liberals recognize that conservatives see a
7    more dangerous world.  And, of course, because different
8    ideologies like to be pejorative with each other
9    liberals say conservatives are just paranoid, and
10   everywhere they look they see a threat.  Right?  And
11   then you ask conservatives like, "Well, what about
12   liberals?"  And they say, "Oh, yeah, that's great.  Put
13   liberals in charge of the Defense Department.  They
14   don't see threats anywhere."  Right?  "Liberals wear
15   rose-colored glasses.  They look out in the world and
16   say, 'Maybe if we were just nice to them they'd be nice
17   to us.'"  And conservatives say, "No.  You could be nice
18   to them, and they'll kill you."  Right?  So one side is
19   seeing a scarier world than the other side.  We know
20   that if we manipulate how scary the world is, like if
21   you make conservatives feel safer, you put them in a
22   safer environment, you create a safer system, they
23   become more liberal in their views.  They actually
24   become more liberal across a fairly wide range of views.
25   If you threaten liberals, they become more

Page 116

1    conservative.  So you have both a resting state
2    difference, and then you have this reaction difference.
3    Right?  If I ask you whether homosexual relations are
4    inappropriate or immoral or -- well, that would work 20
5    years ago.  It doesn't really work anymore except with
6    people over the age of 70.  It won't work with students
7    anymore.  There's no variation in that at all.  But if I
8    ask you whether incest was appropriate on a scale of one
9    to five, from one being absolutely never, you know, to
10   five being sure, what the heck, if I ask you that in a
11   nice, clean setting you'll answer that measurably
12   differently than if you do that in a setting where
13   there's something that might prompt disgust, a presence
14   of rotting food or -- one study that's a remarkable
15   study, they -- the only thing they varied in the entire
16   study was when they would direct the students who came
17   in in the central entryway, and then the hallway split.
18   And one side of the hallway was a hand sanitizer
19   dispenser.  On the other side there wasn't.  So the
20   experiment is just to flip which light of the hall the
21   table is on when they fill out the survey.  So they
22   either told the students to go to the right, or they
23   told the students to go over to the table by the hand
24   sanitizer.  That changes people's opinion.  It
25   measurably changes their opinion on gay marriage, on

29 (Pages 113 to 116)

Page 117

1    homosexuality in general, on abortion, on a whole series
2    of things related to sexual purity.
3        Q. That is fascinating.
4        A. Just a prompt of purity. It's something as
5    simple as that that prompts purity. And if you think
6    about traditional notions of ideology it's very hard to
7    understand why purity is a part of that at all.
8    Honestly, what in the -- in the thoughtful scheme,
9    Marxism or John Locke or whoever, what does sexual
10   behavior got to do with it? How did it get to be so
11   central to the political debate between liberals and
12   conservatives not just here but in every country in the
13   world and every period of history? Why is it so
14   central? Why is it so central to religion, between
15   liberal and conservative religions? Why is it important
16   to the orthodoxy and not important to the reformed?
17       So my answer to that is the reason that
18   it's central and the reason it's ever present is that
19   human beings differ from each other. And they differ in
20   two ways. They differ in the sense that their life
21   experience is completely unique. And so you are who you
22   are because of what you lived. But you also were
23   completely unique the day you were born. And that
24   uniqueness the day you were born is not just your genes.
25   It's a whole set of structures inside your brain that

Page 118

1    are going to make you a different person than, for
2    example, your twin. I have twins, and they are as
3    different as night and day. And the same is not true
4    for identical twins.
5        Q. That's true.
6        A. Identicals are not different as night and day.
7    The likelihood that they'll share the same adult
8    ideology is twice as high if they're identical twins as
9    if they're not identical twins. And parents don't
10   raise -- parents don't tell -- when they have identical
11   twins, they don't say, you know, "Republicans are great,
12   and let's support Donald Trump." But if they're
13   nonidentical twins they take one of them aside and say,
14   "Trump is a great guy." They take the other one aside
15   and say, "Joe Biden is a terrific guy." Right? They
16   lived in the same environment, they were born at the
17   same time, and yet they are markedly different on
18   fundamental issues like political ideology. And that to
19   me tells me there's a biological basis to it.
20       And that biological basis, like all the
21   rest of our biology, is just distributed randomly as a
22   result of sexual reproduction. Right? I'm more likely
23   to have the same -- politics runs in families because,
24   after all, George W. Bush has 50 percent of George H.W.
25   Bush's genetic material. Preston, on the other hand, is

Page 119

1    out there like 1.12 percent, so you're going to -- as
2    the family spreads out, you see -- you see more
3    difference. And then more broadly across the population
4    we're for the most part unrelated. We share
5    approximately zero segregating genes within the average
6    person in the population so --
7        Q. That's interesting. And the course of that
8    study -- I think that you cited this study -- it's
9    called "Political Attitudes Vary with Detection of
10   Androstenone"?
11       A. Androstenone. Yeah.
12       Q. Am I saying that correctly? This is your work,
13   correct?
14       A. It's a team.
15       Q. Yeah, of course. I've labeled this Expert --
16   Expert Exhibit No. 4. Could you review it and
17   authenticate it for me, please?
18       A. It looks like the study.
19       Q. So this is a report you published with three
20   other folks it looks like; is that correct?
21       A. Yes.
22       Q. And could you describe what this report is to
23   the court, please?
24       A. So this is a study that -- there's a -- people
25   have a biological difference in their ability to detect

Page 120

1    and in their classification of the pleasantness or
2    unpleasantness of androstenone. And this is a study
3    that looks at whether that difference is related to
4    anything that might be related to politics, in
5    particular sort of what broadly might be called a
6    preference for hierarchy.
7        Q. And what were the findings? Do you recall?
8        A. The findings, that there is a modest
9    relationship between the ability to and the valence on
10   the detection of androstenone and a preference for
11   hierarchy.
12       Q. So what is androstenone? I'm not sure I
13   understand what it is.
14       A. It's a -- it's a -- it's a chemical that's
15   present in humans. It's a -- part of a breakdown
16   product of testosterone. So it's slightly more elevated
17   in males than females, but it's present in all humans.
18   It makes its way as a discrete molecule out of the body
19   through sweat. And when you give people a whiff of it
20   people either -- a substantial portion of the public
21   can't smell anything, so they don't detect any odor at
22   all. And then another set of the public describes the
23   odor as being similar to vanilla or ginger, something
24   like that, a kind of a pleasant spicy odor. And then
25   another portion of the public describes the odor as sort

1   of offensive.  Urine is one of the things people often
2   say it smells like.  So for some people it's a very
3   unpleasant odor, for some people it's a pleasant,
4   pleasing odor, and then for some people it's no odor at
5   all.
6       Q.  That's interesting.
7       A.  There are actually -- although we have the
8   ability to separate about 400,000 chemicals through our
9   olfactory sense, which is in itself a remarkable -- it's
10  the only part of our brain that's exposed to air.  The
11  olfactory bulb is literally a part of the physical brain
12  that protrudes out into the sinuses in order to have the
13  immediate ability to detect these chemical keys.  And
14  the keys are very specific.  There is a -- there is a
15  receptor for every single chemical that you can detect.
16  The ones where the receptor is -- where we have
17  receptors that at one time were active but are no
18  longer -- because of mutation are no longer functional,
19  we can't smell, so we actually over time have lost a lot
20  of active receptor capability.  And uniquely among
21  things related to brain physiology each one of those
22  receptors has to be built by a separate gene.
23          So as a class we have more genes for
24  olfaction receptors than we have for any other
25  physiological character, precisely because it takes a

1   separate gene to build the protein that can detect the
2   chemical key for each one of them.  And what that means
3   is across that you very often have situations where
4   people are more or less able to smell certain things.
5   So some -- for almost everything there's at least some
6   subset of people who can't detect the odor because of a
7   mutation in the -- in the genes or an improperly formed
8   receptor.  But it's rare to have -- and often that's
9   accompanied by people who describe it as intensely
10  something or not so intensely something.  But it's rare
11  to have a complete valence, for something to be detected
12  by some people that's very positive and other people
13  it's very negative.
14      Q.  That's fascinating.
15      A.  Cilantro is the --
16      Q.  Right.
17      A.  -- the only taste equivalent in taste, is that
18  cilantro either tastes lovely or like soap.  And
19  people -- a lot of people don't like soap in their food.
20  I don't like soap in my food, so I don't like cilantro.
21  But other people find it wonderful.  So it's in that
22  same rare category.
23      Q.  Yeah.  I love it, so I guess we're just
24  different.
25      A.  There but for the grace of God, go I.

1       Q.  So it looks like on page 14 -- if you will turn
2   to that, please.  I want to discuss some of the
3   findings, if you don't mind.  On the bottom part it
4   discusses the results for the political batteries or
5   some of the batteries in Table 1; is that correct?
6       A.  Yes.
7       Q.  And it looks like there was some findings.  So
8   it looks like "Preferences for literalism were
9   positively correlated with androstenone intensity,
10  albeit at a relaxed level of significance."  Is that
11  correct?
12      A.  Correct.
13      Q.  What's the R score for that?
14      A.  0.16.
15      Q.  Okay.  Now, you stand by that finding, correct?
16      A.  Yes.
17      Q.  Okay.  What is the R-square score for that
18  finding?
19      A.  That would be whatever 0.16 is squared so it --
20      Q.  I have that as 0.0256.  Correct?
21      A.  That would be correct.  Yes.
22      Q.  Is that lower or higher than Bob Stein's
23  R-square?
24      A.  Lower.
25      Q.  Okay.  Again on -- you wrote a little bit below

1   that that "disgust sensitivity and androstenone
2   intensity" -- let's see here -- so there's a -- I'm
3   going to get you the whole thing.  "The same trended for
4   disgust sensitivity and androstenone intensity."  Is
5   that correct?
6       A.  Yes.
7       Q.  And you stand by that finding, correct?
8       A.  Yes.
9       Q.  What is the R score for that finding?
10      A.  That one is 0.16.
11      Q.  And what is the R-square of that finding?
12      A.  I assume it would be pretty similar to the
13  previous one.
14      Q.  Correct.  Yes, sir.
15      A.  Yes.
16      Q.  And I think I have that as 0.0256.  Correct?
17      A.  Yes.
18      Q.  And is that lower or higher than Bob Stein's
19  R-square?
20      A.  Lower.
21      Q.  Okay.  I think there is another finding here.
22  "Threat sensitivity."  Right below that it says "Threat
23  sensitivity was also positively correlated with
24  androstenone intensity."  Is that correct?
25      A.  Yes.

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 125

```
1        Q.  And you stand by that finding, correct?
2        A.  Yes.
3        Q.  And what is the R score of that finding?
4        A.  That is 0.17.
5        Q.  And what is the R-square score of that?
6        A.  Slightly, however slightly, minisculey higher
7    than the previous two.
8        Q.  I have that as 0.0289.  Does that seem correct?
9        A.  That seems correct.
10       Q.  Is that lower or higher than Bob Stein's
11   R-square?
12       A.  Lower.
13       Q.  Okay.  Further down you wrote that
14   "androstenone intensity was positively correlated with
15   the Preferences for Social Order battery."  Is that
16   correct?
17       A.  Correct.
18       Q.  And what was the R score for that finding?
19       A.  That is 0.19.
20       Q.  Pretty good?
21       A.  We're starting to get up there now.  We're
22   getting pretty close to -- we're getting to the threes,
23   aren't we?
24       Q.  Yes, sir.
25       A.  I'm getting excited.
```

Page 126

```
1        Q.  So what is the R-square of that?
2        A.  It's something in the -- between three and --
3    0.03 and 0.04.
4        Q.  I have it as 0.0361.  Does that sound about
5    correct?
6        A.  It sounds fair.
7        Q.  All right.  And you stand by that finding,
8    correct?
9        A.  Yes.
10       Q.  And is that lower or higher than Bob
11   Stein's R-square?
12       A.  Lower.
13       Q.  Further down you say "we do find that
14   androstenone intensity continues to exhibit a
15   significant positive relationship with preferences
16   for social order."  Is that correct?
17       A.  Correct.
18       Q.  And do you stand by that finding, sir?
19       A.  Yes.
20       Q.  Okay.  And what was the R score for that
21   number?  I have it as -- it should be on page 16 in the
22   full -- first full graph, the last sentence, or the next
23   to last sentence.  "Though we do find that androstenone
24   intensity continues to exhibit a significant positive
25   relationship" --
```

Page 127

```
1        A.  Yeah.  0.21.
2        Q.  Okay.  And what is the R-square for that
3    finding?
4        A.  Must have made it to 0.04 by now.
5        Q.  Yes, we did.  It's 0.0441.  Is that correct?
6    That seem about right to you?
7        A.  That seems a little higher than I would think,
8    but okay.  I'll take it.
9        Q.  Well, let's just do it real quick.  Let me see,
10   get a calculator.  I may have done it incorrectly.  I'm
11   not a social scientist.  I just square the number,
12   correct?
13       A.  Yeah, you just square the number.
14       Q.  Okay.
15       A.  I'm not a calculator, so we're in the same boat
16   when it comes to this one.  This is not really about
17   being a social scientist.  I don't know.  It just
18   seems -- oh, golly.  We are getting somewhere.  I'm
19   impressed.
20       Q.  Just to be clear with the record, the R-square
21   for that finding is 0.0441, correct?
22       A.  That's correct.
23       Q.  And is that lower or higher than Bob Stein's
24   R-square?
25       A.  Lower.
```

Page 128

```
1        Q.  Okay.  That's all I have, I think, on that.
2           Would you believe that biological
3    ideological preferences, are they more outcome
4    determinative in a nonpartisan election I wonder?
5        A.  It's -- I haven't really thought about that
6    much.  It's -- partisanship itself is -- the direction
7    of partisanship itself is not very biological.
8        Q.  Okay.
9        A.  So there's very little heritability.  Party ID
10   comes from exactly where you expect it to come from.  It
11   comes from your parents.  It comes from your life
12   experience.  To the extent that it shows heritability
13   it's largely through the heritability of ideology.  So,
14   for example, if your parents are liberal Democrats but,
15   you know, you turn out to be sort of biologically a tilt
16   conservative, then while you will start out, probably
17   start out identifying as a Democrat, you may by the time
18   you're 30 have drifted over and be an independent or
19   possibly even a moderate Republican.  So that what's
20   being -- what's operating there is this underlying
21   ideological tendency to make you more or less
22   comfortable with a party.
23          I remember talking to a southern senator at
24   one point, and he said, "This is a bunch of baloney.  I
25   know it's a bunch of baloney because I used to be a
```

Page 129

1  Democrat, and now I'm a Republican." I said, "So even
2  though" -- he said, "How could it be biology? I have
3  the same" -- "I have the same genes that I had 20 years
4  ago when I was a Democrat, but now I'm a Republican." I
5  said, "Well, I guess maybe you just
6  thought about it and decided to change your world of
7  view." He said, "I didn't change. The damn party has
8  changed." I said, "Okay. You're sure making my point
9  for me here, and you're sure making it easy." It's
10  like -- it really is a really good example. Right?
11  He -- you know, he was comfortable enough for a while in
12  the old Democratic Party because it had a very
13  conservative southern wing, but he shifted over.
14          So in that sense your -- sort of your
15  predisposition can affect your likelihood of staying in
16  a party you inherit from your parents. It can have an
17  affect when your parents are of different parties. I
18  come from a mixed marriage. My mother was a Democrat.
19  My father was a Republican. My brother is a Republican.
20  I'm a Democrat. So you know how those things work. You
21  got to pick your battles and pick who you're going to
22  side with. But partisanship itself is largely a choice
23  people make or a choice they don't make in the sense
24  that they inherit it, so I -- in the U.S. at least party
25  ideas is an identification. It is closer to your

Page 130

1  religious affiliation than it is to most other traits.
2  It is not just a preference for one party over the
3  other. People don't just say "I prefer the Democrats."
4  People say "I am a Democrat."
5  **Q. Correct.**
6      A. That wouldn't be true in Europe. Most
7  Europeans don't identify themselves as a party. They
8  identify which party they prefer or vote for or where
9  they are in a kind of party spectrum, but they don't
10  typically think of themselves as -- in the way that we
11  think of ourselves as Texans or Catholics or Americans.
12  So it's a -- it's a self-identification, and like most
13  self-identifications there's strong childhood effects,
14  and then strong adult choice effects. So what -- so
15  would underlying -- underlying ideological drive more in
16  a nonpartisan than a partisan? I think it would --
17  obviously it would depend on a lot of things. There's a
18  social science answer for you.
19          My guess is it's probably more important --
20  it probably is more important as the salience of
21  ideology goes up in the campaign itself. So I'll make a
22  bold prediction here. Ideology is going to become
23  increasingly important in nonpartisan elections, not
24  just because they're nonpartisan, but because ideology
25  is being injected into those elections, even in the form

Page 131

1  of really frank partisanship. Right? So they just
2  aren't -- you know, the old days when the median
3  Republican and the median Democrat were both sort of
4  good school people, right, the -- the school board
5  elections were nonpartisan because mainstream
6  Republicans and Democrats, although they were
7  ideologically different, believed in quality, free
8  public education, believed in good universities. Right?
9  Those days are over. That just is not the case anymore.
10  **Q. Indeed.**
11      A. And so that's going to become -- you know, we
12  don't -- go to a school board meeting. My God. I used
13  to tell my students to go to school board meetings and
14  federal court hearings because it would be
15  inspirational. I sure as heck don't tell them that
16  anymore. Federal court still is inspirational. You
17  know, I know. I'm pretty careful telling them which
18  judge. No, I'm not going to share that --
19  **Q. Okay.**
20      A. -- information at this point. So yeah. I
21  mean, I don't know. I guess it's -- it's a good
22  research question.
23  **Q. Is it possible?**
24      A. It is -- I think it is possible that -- I mean,
25  quite frankly I think, yeah, it's -- and, again, I don't

Page 132

1  think it really -- I don't think you can really -- one
2  of the things I think people misunderstand about our
3  work is that people have this idea that if something has
4  some genetic precursor or some physical brain precursor
5  that it must be more important or less -- you know, less
6  variable or something else. And I always try to tell
7  students that, you know, the -- sort of the biology of
8  human politics is like the -- is like the bayou current.
9  You may not even realize bayous are flowing bodies of
10  water. You could live right here a long time and not
11  recognize the bayou actually flows in some direction,
12  you know, unless of course we got a quarter of an inch
13  of rain, in which case they're obviously moving. But
14  it's a very small, very weak force, but it's a constant
15  force. And the day-to-day forces, the things that
16  happen in our lives, the people that we respect, the
17  jobs we take, those are big forces. They're powerful
18  forces. They push us all over the place.
19          And you just -- you can -- you can just
20  look at the change in, you know, in the average Democrat
21  or the average Republican's position on a whole host of
22  things over time. Those social forces are powerful
23  forces. The power of your brain's biology is that it
24  works 24 hours a day very quietly in the background and
25  slowly -- whatever position you get pushed to you --

33 (Pages 129 to 132)

Page 133

1   like a boat on a very slow -- I can predict the
2   direction. All other things being equal you're going to
3   come back toward that center of gravity that your
4   biology gives you with regard to ideology. And that's
5   about all. Just a weak force that tends to pull you --
6   it tends to pull you in a direction. So it's definitely
7   not the strong force that people normally think of
8   biology as being. When it comes to things like
9   ideology, which are quite abstract, we're much too smart
10  to be led around by that. Right? Because we're unlike
11  other animals. We don't just think. We think about our
12  thinking. That metacognition is a really distinctive
13  trait, and it reduces, right, and it reduces -- that's
14  why we have the ability to defer gratification in ways
15  that are really remarkable.
16  **Q. Some of us. Not necessarily me.**
17      A. Yeah. Well, you know, I'm not doing such a
18  great job myself. But just speaking as one person to
19  another who can only defer certain kinds of
20  gratification on a successful basis. But the point is,
21  of course, right, that the -- sort of the ability to be
22  aware of that, to be able to think about that really
23  reduces the ability for -- for at least some drive.
24          So the other thing I think is really
25  important is that politics is a -- is a part of what

Page 134

1   makes us social animals. And that's really not the most
2   fundamental part. Right? The really fundamental parts
3   of us, the things that are survival driven are
4   appetitive and aversive. Right? So our appetitive
5   drives, our drive to sexually reproduce, our drive to
6   get food, to get shelter, those basic drives are really
7   powerful things. And those are things that we have --
8   can struggle with controlling. But, you know, this sort
9   of slight left-right predispositions are pretty modest
10  drives, and therefore our ability to outthink ourselves
11  is really pretty powerful in that realm.
12  **Q. Fair enough.**
13      A. Not to mention the effect of other people.
14  Like any time I find myself drifting however slightly
15  conservative I have my wife to correct my thinking and
16  to point out that I'm drifting a little bit, a little
17  bit in the wrong -- in the wrong direction, or my
18  brother to point out that I'm just a complete idiot for
19  believing pretty much anything, anything that I believe
20  so --
21  **Q. Do you believe, or is it your position, that**
22  **there's a genetic component to race?**
23      A. Yes.
24  **Q. Could you talk a little bit more about that**
25  **please?**

Page 135

1       A. So, I mean, if you think about the -- obviously
2   there's a -- there's a thing called race that's a
3   completely social figment -- not a figment -- but it's
4   completely a social creation. It's an intellectual
5   thing. It's an abstract category in which we bundle all
6   kinds of things. But if you want to look at sort of
7   what are the things that are most likely to create that
8   bundle, right, there's a reason why we talk about people
9   of color. Right? There are gradations in the tint of
10  people's skin, and that gradation of the tint of their
11  skin is genetic. We can be tanned or untanned, but the
12  amount of -- you know, all other things being equal, the
13  proportion of external melanin in your skin is
14  hereditary. Right? If both of your parents are black,
15  you're likely to be black. Right?
16          So in that sense the markers out of which
17  we've created this -- this kind of sometimes reasonable
18  and mostly unreasonable figment about racial categories,
19  the markers themselves are -- are often genetic. And
20  because they're genetic they both provide an easy hook
21  for saying "you're different than me." Right? "I can
22  see that you're different." And skin color is one of
23  the markers that's commonly used for that. Although
24  there are other more subtle markers that are used in
25  things like the caste system in India, for example.

Page 136

1   **Q. Sure.**
2       A. So there's a biological hook there. And then
3   does that biological hook create all this other
4   epiphenomena around it? It doesn't. But it does make
5   that -- it helps make that epiphenomena more powerful
6   out in the world. The fact that it's biological helps
7   account not only its -- for some of its power, but also
8   for some of its invidiousness. Right? Because you
9   can't change the -- you're born a skin color. You're
10  born tall, or you're born short. Right? So physical
11  characteristics that are -- you're born with that are
12  present at birth and are genetic are not things that you
13  can change. And recognizing that you can't change them
14  can be powerful in reducing things like racism, but they
15  also can be things that trap people. Right?
16          If you're in the Dalit category, you're
17  born into it, and you're trapped into it. And if you
18  are -- you know, if your parents are black and you're
19  lighter skinned than they are, you may be able to choose
20  a different racial category for yourself. But for the
21  most part there's not something people can do. So it
22  isn't an act of will, and so things that are imposed on
23  that basis are things that people can't control.
24  Recognizing that I think is really -- can be very -- can
25  be damaging in the sense that it -- when people think of

34 (Pages 133 to 136)

Page 137

1   it as biologically different they think, therefore, the
2   solution to that might be genocide. On the other hand,
3   if you think it's not biological, then the solution may
4   be reeducation. Right? So for a genocide -- I always
5   tell my students genocide is wrong not because it's
6   mistaken, although it is, it's wrong because it's
7   genocide. Right? But reeducation -- the Chinese
8   cultural revolution is wrong. It killed millions of
9   people. It destroyed families and societies all on the
10  false belief that you could completely change, you know,
11  a college professor of art into a good farm laborer in
12  their mind by just making them do farm labor. Right?
13  So you can't change everything about people, whether
14  it's what they think or the way they appear.
15           And the solution to that can be much more
16  positive. And I think you see that with sexual
17  orientation. Right? So in an era when people believe
18  sexual orientation was a choice then people did not want
19  people to make the wrong choice. Well-meaning parents,
20  probably to protect their kids from making a mistake in
21  that era, possibly even well-meaning lawmakers, tried
22  to -- tried to regulate that. As the proportion of
23  people who think that sexual orientation is something
24  you're born with goes up the proportion of people who
25  care about it goes down.

Page 138

1        Q. I understand.
2        A. So young people today believe that you're born
3   into the sexual orientation, and so that expression
4   "born that way," right, what about it? Right? "This
5   is" -- "this is just" -- "this is who I am." And so I
6   think as much as history has come down for the most part
7   on negatively exploiting the characteristics, the
8   physical -- heritable physical characteristics that we
9   then bundle up into this fiction of race it's -- it's
10  also possible understanding that those are just physical
11  characteristics people are born with can -- can diminish
12  that, as it does in the case of sexual orientation. And
13  my hope is that the same thing is true with regard to
14  ideology.
15           I tell my students, "I know you don't
16  like" -- I mean, these are Rice students. So there are
17  like two conservatives in the class, and they're not --
18  nobody is happy with them when they pipe up. And so I
19  say, "Look, you're not happy with," you know, whatever
20  it is they're saying here, "but you know what? Don't be
21  so full of yourself. Don't be so proud that you're a
22  liberal. You know, but for the grace of God or but from
23  your genetics you could have been this person. How
24  would you feel about that? And you conservatives,
25  you're like looking down your nose at all these

Page 139

1   liberals. You know, just roll the dice. You could have
2   been born a liberal." Right? "So if you just accept
3   that they're born that way then you can stop
4   wanting them" -- you can stop thinking that what they're
5   doing is directed at you, and you can stop thinking that
6   you're going to change them" because anybody who's spent
7   any time discussing politics knows you're not going to
8   change very many minds. You're going to make people
9   mad, but you're not going to change -- you can change
10  policy. You can find a way to make a policy work that
11  fits somewhere in between. But if your way to change
12  policy is change the mind; that is, change the
13  fundamental ideological beliefs of your fellow
14  legislator or your next door neighbor, that's a fool's
15  errand. Right? It's just not going to happen.
16           So if you just accept it -- I mean, most of
17  my neighbors are conservatives and, you know, I'm not
18  fans of their politics, but I -- you know, I don't have
19  any personal animosity to them. You know, I put up my
20  signs, and they put up theirs, and, you know, we stare
21  at each other, but I don't -- most of them are what they
22  are, and I -- that's just -- one of our graduate
23  students, a very talented black graduate student is
24  very, very conservative and very political. And he
25  said, "It's hard. It is hard. It's" -- "in many ways,"

Page 140

1   he said, "it's harder now to be a black conservative
2   than it is just to be black," right, that the -- the
3   people just don't like it. They just think he's wrong,
4   and they don't understand why he would -- why he would
5   side with people who don't side -- who have animosity
6   toward him because of the color of his skin.
7            Just a really tough -- another student who
8   is very openly gay and very conservative, like
9   Federalist Society, and he said the weird thing about
10  being at Rice is nobody cared that he was gay, but
11  everybody thought the fact that he was in The Federalist
12  Society was like -- like people looked at him with open
13  disgust when they found out he was in The Federalist
14  Society. He said the funniest thing was that the other
15  people in The Federalist Society because they were just
16  young Rice people, right, they just said, "You're gay.
17  I mean, obviously. You know, you're a smart person, and
18  you are a moral person, so you wouldn't choose to be
19  gay." Or it wasn't that they weren't, you know, openly
20  prejudice against that idea. But they said, "You know,
21  you're a good example." Right? "People don't choose to
22  be gay because God knows you wouldn't choose to be. So
23  that's just the way you are." And they were pretty
24  accepting of him. But the people in the Gay and Lesbian
25  Student Association never accepted the fact that he was

35 (Pages 137 to 140)

Page 141

1  a conservative.  At the end of the day that kept coming
2  up.  This was actually during that era of the W.
3  campaign --
4       Q.  Sure.
5       A.  -- when it was being openly exploited to drive
6  voter turnout in Florida and Texas.  And they just could
7  not -- and he said, you know, until he took this class
8  he didn't -- he didn't really have a response.  He just
9  knew that he believed in conservative things.  And so he
10  said, "This is" -- "this is what I tell people now.
11  When people say 'how could you be a conservative,' I say
12  'I was born that way.  This is the way God made me, and
13  I can't help it.'"  So, you know, I think it can be --
14  again, it could be a positive or a negative thing.
15       I don't think it's useful -- again, denying
16  that there's a biology to sexual orientation I think is
17  a very bad idea.  Whether at a particular moment in time
18  that's the -- that's creating prejudice.  Right?  You
19  can think -- you know, one of the solutions if -- if in
20  fact people are just born that way and they can't change
21  it, then there's an obvious solution.  If gay is wrong,
22  then you just kill gay people.  You could just do one of
23  those little tests like Down's syndrome.  "Wait a
24  minute.  My kid is going to be born gay.  Let's, you
25  know" -- "you know, you should just get rid of those

Page 142

1  people."  And obviously that's not the way the modern
2  world thinks, but you can see where that might occur to
3  people if they believed it was -- if they believed it
4  was biological.  It might be easier from that
5  perspective to be able to convince people that you could
6  change your sexual orientation.
7       The same way that, you know, Protestants
8  and Jews in Europe, like, you know, "Tell me kiss the
9  ring.  Whatever.  What is it you need me to do here?
10  Like, I don't want to end up with my head on a pike."
11  So -- so I think there can be -- there can be a downside
12  to it.  But at the same time I think denying -- denying
13  that there are -- when you say that everything about
14  race is nonbiological, including then the suggestion
15  that there are not physical traits that have been used
16  to build on top of that racial fiction, then I think
17  you -- you really put yourself in a bad position because
18  empirically it's -- there are characteristics that are
19  heritable.  And if we're going to -- if by person of
20  color you just mean someone with darker skin, that
21  characteristic you're referring to is a -- very much a
22  biological characteristic.  It's something they can't
23  change by will.  It's something that they're going to
24  pass on to their children.  And so it's a -- it's a --
25  you know, it is a -- it is a physical marker.  And I

Page 143

1  think that's -- that part of it is a reality.  The rest
2  of it not.
3       Q.  Okay.  Fair enough.
4       A.  Hence -- hence the fact that you got to -- when
5  you look at ideology across race and ethnicity there are
6  big party differences, but as Texas Republicans are
7  discovering while there are party differences across
8  Hispanics and non-Hispanics there are also some pretty
9  big ideological mismatches between those categories.
10  And you can -- that can be exploited, or you can -- you
11  know, you can ignore that.
12       W. wanted to -- well, W. very much wanted,
13  you know, to make Hispanics majority Republican.  I
14  don't believe that that's shared by all the leaders of
15  the current Republican party.  But there's certainly --
16  there's a lever to do that, and the lever to do that is
17  that, you know, Hispanics are conservative, moderate, or
18  liberal at pretty much the same levels as everybody else
19  in Texas, and -- and so if you stop poking them in the
20  eye with a sharp stick they -- you know, they might
21  actually come around and vote for a more -- for sort of
22  a business conservative party so --
23       Q.  My next question actually is that do you
24  believe that there is a correlation between genetically
25  determined ideology and race?

Page 144

1       A.  No.
2       Q.  Do you believe that there's a correlation
3  between genetically determined ideology and ethnicity?
4       A.  No.
5       Q.  Okay.  So the dispersion of ideology among the
6  ethnicities and races is roughly equal regardless of --
7       A.  Yeah, I don't -- I don't believe that.  I
8  don't -- I don't know that, so the -- the kind of scale
9  of study that it would take to establish that is -- it
10  would take a very large-scale study.  It would have to
11  be -- it would have to be a global study because you
12  don't want to get people in particular settings.  So I'm
13  not aware that anybody has actually done that on that
14  scale, but I've never seen anything to indicate that
15  there -- that those two things were associated, and nor
16  do I have any reason to believe they would be.
17       Q.  Okay.  Just one last question I think, and then
18  I'm going to confer with Barry and make sure I got all
19  the spaces.  But I did want to ask you a little bit
20  about your book, if you don't mind.  So you wrote a
21  book.  What's the title of the book, sir?
22       A.  "Predisposed."
23       Q.  You wrote it with some other authors, and
24  you've --
25       A.  Yes.

1    Q. -- published with these authors before?
2    A. Yes.
3    Q. Largely on the topic of conversation we just
4    had for about the last 25 minutes, correct?
5    A. Correct.
6    Q. Okay.  Now, I haven't read the entirety.  But
7    what portion of the book did you write?
8    A. Fairly little.
9    Q. Okay.
10   A. So the actual writing, sort of the text is
11   mostly the work of -- I'd say probably two-thirds the
12   work of Kevin Smith and -- and first draft.  The rest of
13   it would be Hibbing.  So mine sort of -- the book is --
14   pulls together a bunch of things that we've done
15   research on, or that we've presented papers on, talked
16   about and so forth.  So I was actively involved at
17   the -- at the research phase and served primarily as --
18   sort of in the early stages in outlining what the book
19   was going to look like, what we were going to put in
20   what sections.  But the book itself was written almost
21   entirely by, the text of the book, by Hibbing and Kevin
22   Smith at Nebraska.
23   Q. But you endorse these findings largely?
24   A. Yes.
25   Q. Is there any part of the book that you don't

1    endorse?
2    A. I don't -- I haven't read the book since the
3    book came out, so I -- I couldn't -- if you point me in
4    the direction of something, I'll tell you if I endorse
5    it or don't endorse it.
6    Q. I'm not cherry-picking.  I'm just wondering.  I
7    want to make sure that this is your opinion and are
8    parts of your opinion.
9    A. Parts of it are certainly my opinion but I
10   didn't write most of it so there may well be stuff in
11   there that I don't agree with.  That's -- you know,
12   there are values to team research, you know, there are --
13   there are disvalues.  Right?  Sometimes there are things
14   in there that -- you know, that weren't what you
15   personally believed but, you know, somebody feels
16   strongly about them.
17   Q. So I want to talk a little bit about the
18   portion called "Different Slates."  And specifically I
19   want to talk about the racial portion of it or the --
20   that's the wrong way to say it.  There's a portion of
21   this chapter that talks about racial policies,
22   specifically Affirmative Action.  Do you -- are you
23   aware -- do you remember that part of the book?
24   A. Yeah.
25   Q. And I'm not sure I understand the conclusion.

1    And I want to -- I don't want to put this in the record.
2    This is my book.  I love it.  But I want to make sure
3    I --
4    A. Well, we got that on the record.  I'm happy.
5    Do whatever you want.
6    Q. I want to talk about the finding here.  So if I
7    could hand it to you.
8    A. Yes.
9    Q. If you could read it, review it, and tell me
10   what's being said, specifically from the last paragraph
11   of 163 to the first paragraph of 165.
12   A. All right.
13   Q. All right.  Here you go.
14   A. Yes.
15   Q. So what is that part of the book talking about?
16   A. So there are -- this is not our research, but
17   there's a big body of research by Haidt and Graham and a
18   whole research team that focuses on kind of dimensions
19   of -- they call them dimensions of moral thinking that
20   underlie dimensions of kind of political belief or
21   political ideology.  And John Jost, a political
22   psychologist, picks up on some of this as well.  So, you
23   know, people have sort of placed different values on
24   different kinds of things.  Right?  So one of the things
25   some people feel very strongly about is that basically

1    everybody should be treated the same, right, that we
2    should be colorblind or race blind, whatever.  And
3    they -- and that's a -- for them that's a -- that's a
4    strong principle.  For other people in their -- their
5    moral judgments are more connected to what Haidt's -- a
6    category Haidt calls care or harm, which is people are
7    motivated to respond on the basis of, you know, if -- if
8    someone has been harmed, they -- they deserve care.  And
9    so that they look at it in terms of, you know, sort of
10   responding in a -- what you might think of as maybe a
11   more empathetic way.
12         But, again, you can -- there's a morality
13   if you believe Haidt and Graham.  There is a kind of
14   morality and also a kind of a political belief centered
15   around the issue about -- about care and harm.  This is
16   what Lakoff, who I think is mistaken, calls this
17   maternal politics versus paternal politics.  So the sort
18   of politics of order and respect and hierarchy, he
19   teaches those as sort of paternal politics.  And
20   maternal politics is more about this kind of care and so
21   forth.  So you can think about that in -- I think one of
22   the areas is -- maybe it's quite clear -- is sort of in
23   like sentencing guidelines.  Right?  So what should --
24   how should you sentence people?  I mean, this -- one of
25   my colleagues asked, he says, "I never understood why if

Page 149

1  you're going to pass a law to make something illegal why
2  don't you define what the punishment is for it?" Right?
3  "So if the punishment is the death penalty, it's the
4  death penalty." Right? "And if not's the death penalty
5  then I'd like to know what it is." He said, "Like if
6  you rob a bank what is the appropriate punishment? I
7  mean, if it's a year, make it a year. If it's 10 years,
8  make it 10 years." So his idea is you take an action,
9  the action has a consequence, and the consequence should
10  be the same for everybody. He doesn't like the idea
11  that some people get life in prison and some people get
12  parole. He thinks that's just wrong, everybody should
13  be treated the same.
14        And, of course, we've experimented with
15  that in terms of judicial sentencing guidelines, and we
16  know the havoc that can produce. Right? Because it
17  just doesn't make any -- it doesn't make any sense to
18  not treat people as individuals. This is what students
19  of a bureaucracy called Bureaupathology, which is
20  everybody wants -- when somebody walks into a Social
21  Security office what do they want? They want to explain
22  to someone what their particular problem is, and then
23  they want the person to fix their particular problem on
24  their particular basis. Like, "I know that this is
25  supposed to take it here, or whatever, but I need it to

Page 150

1  be fixed now because" -- "you know, fix it." And what a
2  bureaucrat does, of course, is they just follow standard
3  operating procedures. So to some people that's the
4  morality of large-scale organized standard operating
5  procedures bureaucracies, is if you're the king of
6  England or, you know, if you're a homeless person you're
7  treated exactly, in the case of most people's belief,
8  exactly as badly by the Social Security Administration
9  regardless. Right?
10        And the other side of that is, of course,
11  is people in different situations being treated equally,
12  for example, being punished equally, or being served as
13  poorly or slowly, is completely inappropriate because it
14  doesn't at all match the circumstance they find
15  themselves in. It's not equal when you treat everybody
16  equally when they're not in the same situation, when
17  they haven't done the same thing, or when they're not
18  capable of achieving the same thing or so forth. Right?
19  So the question is do you want to -- you know, do -- are
20  you inclined toward viewing treating difference
21  differently as a moral hallmark or on treating everyone
22  equally as a moral hallmark. And then the question is
23  is one of those hallmarks in and of itself inappropriate
24  or -- they are the way -- these are just -- these aren't
25  things that we create out of philosophy. These are

Page 151

1  discovered things. They're found things. This is the
2  way some people view the world. Most people are
3  somewhere in between. But there are people who feel
4  very strongly that sort of equality under the law means
5  everybody is treated exactly the same way and there
6  could be no -- no interference in that.
7        Other people feel very strongly that that's
8  a really -- it's, you know, an immoral approach and, in
9  fact, is born of a kind of indifference to people's
10  humanity, which it may be. But some people are much
11  less sensitive to the humanity of other people. Some
12  people have very high levels of empathy. Some people
13  have remarkably low levels. And that's not always
14  because of the conditions they grew up in. Those are
15  also -- there's actually a syndrome called Williams
16  syndrome in which people simply don't have the
17  capability of separating their utilities from other
18  people's. They'll -- they act only on other people's
19  utility, no concern for themselves at all. That's -- I
20  mean, in some ways that's amazing. Right? What a great
21  kind of a person. But it's hardly neurotypical. People
22  who are completely and unalterably selfish, which we
23  often call sociopaths, are also not neuro -- thankfully
24  not neurotypicals. But they -- but that is -- that is
25  what they believe.

Page 152

1     Q. But these moral hallmarks -- I didn't mean to
2  cut you off. I apologize. I think the point is is that
3  they're -- it's biologically measurable, correct?
4     A. Right. So there is an -- there is an
5  underpinning to that that has to do with different
6  brains. Right? So, again, people who are -- who tend
7  to be selfish can learn to be less selfish, can -- but
8  it's really about -- it's sort of on second thought.
9  Right? You can learn -- because we have metacognition
10  we can learn that our first impulse is perhaps not very
11  generous or that our first impulse may be too generous.
12  Right? And then we can learn to discipline that on our
13  own. But the impulse is the impulse, and some part of
14  that impulse comes from life experience, but some part
15  of that impulse also differs biologically across
16  individuals.
17     Q. And I think that in that paragraph one of the
18  impulses is a racial impulse, correct? By which I mean
19  racist.
20     A. So, I mean, you certainly could have a racist
21  impulse.
22     Q. That's biologically determined, correct?
23     A. I think there are -- there are features of
24  biology that incline people to be -- again, I think you
25  have to be careful about exactly what you mean by

38 (Pages 149 to 152)

Page 153

```
 1    racist.  But to be ethnocentric; that is, to be
 2    suspicious of people who are not like them on a whole
 3    lot of -- in a whole lot of ways, people that aren't
 4    like them on the basis of race, on the basis of
 5    nationality, the basis of language, on the basis of
 6    religion, on the basis of appearance, even on the basis
 7    of gender, right, sort of the -- you know, the sort of
 8    traditional patriarchal religion is very suspicious of
 9    having women anywhere around them, so those -- those
10    impulses can vary across individuals biologically or the
11    kind of things that socially build into those and create
12    things like fascism can come out of those, can be
13    encouraged by those.  It doesn't mean that everybody who
14    ends up falling into the thrall of that in a national
15    situation, for example, is therefore sort of -- again,
16    the environment has a big influence.  And so the
17    question of sort of how could Germany get this way or
18    how could Japan get this way that was asked around World
19    War II is really inappropriate in the sense that in --
20    in one sense the Japanese could be that way because they
21    were Asian, and for the Germans it's, well, I guess
22    because they were Germany, I mean, because they weren't
23    France.  I don't know what.  But, again, that was -- you
24    know, that's -- that's inappropriate.
25          But it is the case that some individuals,
```

Page 154

```
 1    you know, take to -- take to those kinds of things very
 2    quickly, very easily, right, without much effort can
 3    fall into almost habitually think in ways that are
 4    clearly racist.  And for other individuals it's less so.
 5    And the point here is not that.  The point is that
 6    people that have a strong belief in the importance of
 7    equality -- I was involved in a case where the expert,
 8    the expert for the other side said Clarence Thomas was
 9    clearly a racist.  I have trouble with that.  He -- I
10    mean, I happen to think he's a remarkably poor jurist,
11    but that's really a separate issue.  Right?  I differ
12    with him on all kinds of notions of not only judicial
13    philosophy, but, I mean, you know, his habitual
14    inactivity for a long time on the court, and he's now
15    rediscovered his voice and -- my God.  I hope to God
16    he's back out of the hospital and fine because this will
17    be just the kind of thing, have me like --
18    Q.  I won't do that to you.  I promise you.
19    A.  -- ragging on Clarence Thomas and then he's
20    dead.  Like we find out, we come out here, he died
21    recently.
22    Q.  I promise I won't do that to you.
23    A.  Yeah.  So, you know, I'll say this.  Again,
24    I -- I assume that Clarence Thomas is remarkable -- I
25    mean, judicial conservatism almost to the point of
```

Page 155

```
 1    blindness is not unnatural.  I mean, I think he is --
 2    you know, some people are on -- you see this on the
 3    autism spectrum.  People on the autism spectrum are also
 4    incredibly literal so you have to be really careful
 5    because they -- a sign says something, they follow it,
 6    and everybody else says, "no, no, no, that's not" --
 7    it's like "no."  Right?  So that literalism, you see
 8    some of that in constitutional interpretation, right,
 9    that inability -- you know, when Scalia says, "Why
10    wouldn't it mean exactly what it says," and my question
11    is, "Why do you think it means" -- "what makes you think
12    that when people put something on a piece of paper it's
13    literally exactly what they meant?"  Right?  Literalism
14    is a -- is, again, a -- you can -- you can sort of --
15    you can see where a brain that's to this side on the
16    autism spectrum would be a natural host for a belief
17    that all other things being equal probably people meant
18    exactly what they wrote down.  Whereas on this other
19    side you'd say, "Well, people write all kinds of stuff."
20    Right?  "It probably doesn't tell us anything."  So you
21    can be -- you can believe that everyone should be
22    treated equally.  You can believe it's inappropriate to,
23    as the current -- I think the current majority of the
24    Supreme Court believes -- that -- that because race is a
25    suspect category that anything that incorporates race
```

Page 156

```
 1    into decision-making, whether it's drawing district
 2    lines or anything else, is suspect.  Why is it suspect?
 3    It's suspect because all other things being equal you
 4    ought not to be using race in making decisions.
 5          Now, the court recognizes that while that
 6    sets a high -- a high threshold for what a state can do,
 7    for example, they recognize that there are conditions
 8    under which you do something about that.  Right?  So
 9    that's -- we wouldn't have Section 2 without it.  We
10    wouldn't draw districts without that.  On the other
11    hand, they also recognize that absent meeting that high
12    threshold that it is a suspect category, that in just
13    sort of regular legislation if you put race in there
14    that's inappropriate, and it ought not be in there
15    because everybody ought to be treated the same
16    regardless of race.  So that -- the point of this
17    paragraph is just that you should not assume that people
18    who believe that everyone should be treated equally
19    believe that because they're fundamentally racist.
20    Among other things, it dilutes the importance of
21    understanding that people are fundamentally racist.
22    Right?
23          I think that's really one of my problems
24    with calling every difference in voting behavior,
25    however slight, and even if it occurs without regard to
```

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 157

1    the race of candidates, racially polarized voting, is
2    exactly Brennan's concern, which is if that -- if you're
3    going to label that, people are going to say "wait a
4    minute.  So you're saying the voters of Spring Branch
5    are racist?"  And the answer is "yes, some of the voters
6    in Spring Branch are racist."  Right?  We're in Houston,
7    Texas.  There are racists here.  But that's not -- it's
8    not to say that the entire electorate is or even that
9    the behavior of the electorate in those elections is the
10   result of racism as opposed to something else, right,
11   some policy concern or whatever.  So I think if you
12   don't preserve the possibility that individuals can
13   believe in treating everyone the same without that being
14   a code for racism then you diminish the real importance
15   of what it means for someone to actually be racist
16   because racists don't want everybody to be treated the
17   same regardless of race.
18       Q. Fair.
19       A. They very much want people of a certain race to
20   be treated differently.  Right?  So that's, I think, is
21   a -- it's not only important to distinguish that in --
22   just in a general sense of thinking.  Although, you
23   know, nothing that we posit here is proven in any
24   scientific sense.  We never really quite get there in
25   science.  But I think there's good scientific reason to

Page 158

1    believe that those are different states of thinking,
2    that they are -- I would -- I would be willing to wager
3    that in, given six months, 60 subjects in an fMRI
4    machine, I could -- I could show you a brain signature
5    that distinguishes everyone should be treated equally
6    from racism.
7        **Q. Which presupposes that you could use the fMRI**
8    **machine to determine if someone is a racist, correct?**
9        A. It means -- not certainly.  But at some -- at
10   some predictive value above random that you could
11   separate -- you could have a -- you could take a set of
12   people in which everybody said "this is what I think the
13   law should be, no regard to race," and you could find
14   the signal that separates -- I mean, I don't even --
15   honestly I wouldn't take your money this is so easy.
16   But yes.  The brain's signature for actual racism is
17   really not hard.
18       **Q. How common is it?**
19       A. That we don't know.  We don't know how common
20   that is.
21       **Q. Does it affect voting behavior?**
22       A. I would -- it's hard to imagine that racism
23   wouldn't affect voting behavior.
24       **Q. So some part of voting is affected by racial**
25   **politics and racial biological determinism, correct?**

Page 159

1        A. I don't believe in biological determinism, so
2    I'm not going to say that.  I really don't.  I don't
3    believe in environmental determinism, and I don't
4    believe in biological determinism.  It's just not a
5    way -- as is true with voting.  There are a host of
6    factors that affect people's votes.  Those factors may
7    be very small factors for some people.  They may be
8    subconscious factors for some people.  They may be
9    factors that they override in metacognition.  They may
10   be factors that they don't override.  They may be
11   factors that are in fact their view of the world and
12   their -- and the way they see things.  Right?  So they
13   may be frank and open racist attitudes.
14           And I think you -- to understand -- to
15   characterize the impact of that on a particular election
16   system you have to have a sense of the degree to which
17   that's actually playing out in the election system.  And
18   I don't think the -- sort of the current court system
19   for doing that is perfect, but I think it's been pretty
20   serviceable and done a pretty decent job.  And I don't
21   think it tries to -- my view of this -- and I know it's
22   not universally agreed to -- but my view of this is that
23   what's important is if the -- if the -- if the nature of
24   the way that force is operating in the election system
25   creates certain things that can happen and certain

Page 160

1    things that can't, and those things disproportionally
2    affect both the choice of minority voters and the
3    opportunity of minority candidates, then that's the
4    level at which you need to think about getting another
5    election system, for example.
6        **Q. And do you have an opinion about whether that**
7    **has been met here today or for SBISD?  Have you ever**
8    **advised them on that?**
9        A. Well, I don't think I'm supposed to tell you
10   what I told the lawyers in terms of my advice.
11       **Q. It depends on when.  Right?**
12       A. What?
13       **Q. It depends on when.  Let's say before 2017 did**
14   **you ever advise them that they had to consider adopting**
15   **single-member districts?**
16       A. My recollection is that as early as the
17   dismissal of the case in what I think was maybe the '90s
18   on Gingles 1 my advice to the district was that as
19   change took place over time they should think seriously
20   about changing -- in whatever form they wanted to they
21   should change their election system.  And I was
22   certainly, you know, happy to talk to them later about
23   alternatives in terms of things like cumulative voting.
24   So that's -- you know, my view has ben that that's --
25   that was prudent for the district to do.  It's not that

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 161

1    I knew for certain.  No one ever knows what's going to
2    happen in a lawsuit.  But I think, you know, you can
3    give advice as I do quite commonly to -- to districts
4    about what's prudent.  And I think that was my advice
5    then.  That's -- you know, I don't -- I personally don't
6    think lawsuits are something that's good for school
7    boards.  So I know they have their own -- again, they
8    have their own preferences.  I'm not an opponent in any
9    sense of at-large elections.  I think there's a very
10   good reason why at-large elections are not on their face
11   illegal.  I think there's a very good reason why groups
12   like the Urban League still -- you know, it's still a
13   very common form of election for small cities and
14   municipalities, and it has -- it has benefits to it.
15          On the other hand, I don't worship at the
16   alter of -- I was at a school board meeting once and a
17   fella in full uniform, about 80 years old, stood up and
18   said, "I didn't fight in World War II and Korea for
19   single-member districts."  And so I didn't say anything
20   because it's really rude to say things like that to old
21   people.  Besides, he had a -- just enough of a
22   resemblance to my dad that I was afraid he might smack
23   me if I said anything.  But my answer to him would have
24   been, "Yes, you did."  Right?  "The entire United States
25   Government, every election to every office in the United

Page 162

1    States Government is based on some form of single-member
2    district whether it's the House or the Senate, the House
3    which declared the war you fought in first and didn't
4    the second.  And we're so obsessed with it that even the
5    president even though it's impossible to elect a single
6    individual in a series of single-member districts we
7    insist on doing it anyway and electing the president in
8    each of our 50 states.  That's how" -- "that's how
9    obsessed we are as a country.  The country you fought
10   for is a country obsessed with single-member geography
11   in a way the Europeans find just absolutely implausible
12   and unaccountable."
13          So there's -- there's nothing magic about
14   at-large elections, but -- and, again, I -- you know, I
15   would much prefer the U.S. adopt a parliamentary system.
16   I think we're at the breaking point for geographic
17   representation.  We're not going to solve the partisan
18   gerrymandering problem short of just getting rid of the
19   obvious problem, which is geography.  Right?  We
20   don't -- we are not a geography to be represented
21   anymore.  That just doesn't make any sense.  We once
22   were, but we are now people to be represented.  That's
23   what proportional representation is for.  It solves
24   pretty much all the problems you can think of but --
25          **Q. We need a Constitutional Conventional to do**

Page 163

1    **that, right, so --**
2        A. Yeah.  And God knows -- I'll tell you what.  I
3    used to always scoff, you know, when people say "oh,
4    you" -- "you don't want a Constitutional Convention
5    because God knows what they would do."
6        **Q. God knows.**
7        A. But that's before -- that was before like the
8    last 10 years.  And now I'm coming around to the view of
9    I don't think I want a Constitutional Convention because
10   God knows what they would do.
11          MR. GOLANDO:  I'm going to take a small
12   break here, sir.
13          THE WITNESS:  All right.
14          MR. GOLANDO:  I really enjoyed the
15   conversation.  I appreciate your time, but let me just
16   make sure that I have done my job correctly.
17          MR. CRAWFORD:  Sure.
18          (Recess from 1:59 p.m. to 2:07 p.m.)
19       **Q. (BY MR. GOLANDO)  Okay.  We have just a few**
20   **questions.  I want to authenticate some documents and**
21   **add some documents into the record.  And then I have**
22   **some questions based on this, if you don't mind.**
23       A. All right.
24       **Q. So my first thing is I want to -- I'm going to**
25   **hand you Exhibit 6, Expert Exhibit No. 6.  I believe**

Page 164

1    **this is a copy of your consulting agreement with SBISD.**
2    **Would you authenticate that for me, please?**
3        A. Yes, that's correct.
4        **Q. And that's your signature on the back page?**
5        A. It is.
6        **Q. And that's a true and correct copy of that,**
7    **correct?**
8        A. Yes.
9        **Q. And do you have your contract that you had**
10   **before twenty -- before the litigation began, the one**
11   **where you -- that governs the OLS and the EI that you**
12   **provided to Ms. McBride?**
13       A. I -- I might or I might not.  I'm not sure
14   because I was doing a whole bunch of things with the
15   same law firm, so I don't know if we were just, you
16   know, working on different things or if there's a
17   separate, something that -- either an umbrella or an
18   actual contract, but I'm happy to look and see.
19       **Q. If you wouldn't mind taking a look.**
20       A. Yeah.
21       **Q. I'd like to see it.  And if you want to make**
22   **the record more fulsome you have time to edit the**
23   **deposition or to provide any discovery.  Discovery does**
24   **close on March 30th, but --**
25       A. All right.

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 165

1    Q. -- whenever you get to it I'd be appreciative.
2        The next one is the article you provided
3    that formed the basis of part of your report. It's --
4    I've labeled it Expert Exhibit No. 7. The title of it
5    is "Republican Party of Texas Doubles Down on Local
6    Elections." Is this a true and correct copy of that
7    article, sir, that you relied on?
8    A. Yes, it is.
9        Q. And I noted in your report that -- I don't
10   think you made a reference to partisanship at all. And
11   I also asked you if you had measured partisanship. I
12   just wonder what role did this play in your report, sir.
13   A. In the -- it sort of comes in in two places,
14   but primarily with regard to the discussion of the --
15   the literature on the potential negative effects of
16   switching to at-large elections. There's the discussion
17   about how this can end up becoming -- itself becoming a
18   political issue, and so that -- it's part of that notion
19   that board elections are becoming increasingly
20   politicized, not just partisan but politicized, and that
21   this is sort of one of the things that may -- that may
22   feed into that. So there's -- there's just a
23   different -- or there's a different system for both
24   identifying potential candidates and for advancing
25   political campaigns for school boards and for

Page 166

1    nonpartisan cities than there was 20 years ago.
2        Q. Reasonable. But your report doesn't cite to
3    this article, correct?
4    A. It's something that I looked at, and so I
5    brought it because I didn't remember if I had cited it
6    directly --
7        Q. Okay.
8    A. -- or if I was just -- but it is something that
9    I looked at, and that affected my thinking in
10   writing the report.
11       Q. Thank you, sir. I appreciate it. The last one
12   is Expert Exhibit No. 8. It looks like what's called an
13   SSN memo. I'm not sure of the source of that. It's
14   titled "Do District-Based Elections for School Board
15   Help Minority Candidates Get Elected?" I'm going to
16   hand it to you. Could you authenticate it for me, sir?
17   A. Yes.
18       Q. Is that a true and correct copy of the article?
19   A. Is there a -- is there a page missing?
20       Q. That's what we have I think.
21       MR. ABRAMS: I think there was a third page
22   with a -- just one line on it.
23       MR. CRAWFORD: I believe those were your
24   originals. So let's see if we --
25       MS. SHAKRA: This page or --

Page 167

1        MR. ABRAMS: No. I think that there was --
2        MS. SHAKRA: Let me see.
3        MR. ABRAMS: I just remember there being
4    like a one sentence page.
5        THE WITNESS: Yeah. I think this is the --
6        MS. SHAKRA: The one missing?
7        THE WITNESS: Is there a page that looks
8    like that?
9        MR. CRAWFORD: I don't know that we made
10   a -- that made the copy.
11       MR. GOLANDO: Maybe it's in the back of the
12   contract.
13       MS. SHAKRA: Did it get out of order?
14       THE REPORTER: Do y'all want to go off the
15   record, by the way?
16       MR. CRAWFORD: Sure.
17       (Discussion off the record from
18   2:11 p.m. to 2:12 p.m.)
19       Q. (BY MR. GOLANDO) I've handed you expert
20   Exhibit No. 8. Could you authenticate it? Is that the
21   article you relied on in part for your report?
22   A. Yes.
23       Q. Okay. What was important about this article
24   for your report from your perspective?
25   A. It's not particularly important because it's

Page 168

1    not really research, per se. But I thought it was
2    useful because it's a -- you know, this is part of a
3    kind of a public policy synopsis kind of thing that sort
4    of -- it's supposed to be helpful to policymakers. And
5    the researcher points out two things. One is he points
6    out this idea that, you know, that may not always be --
7    there might not always be a positive effect for Latino
8    representation in the switch from at-large to
9    single-member. And he also points out that his research
10   shows that school board elections are partisan even if
11   they're not explicitly partisan in the form of the
12   ballot. And so I thought that not only does it sort of
13   show those two things, but it -- it shows that it's
14   being discussed by people not just in a research sense
15   but in a kind of -- sort of the form of kind of public
16   policy recommendation.
17       Q. And what is the source of this article?
18   A. I found it on the Internet, and it's a -- as
19   best I remember, it's a site that has a whole series of
20   things where people reflect on -- sort of produce brief
21   summaries of kind of research findings that may be of
22   use related to -- related to public policy.
23       Q. And --
24   A. I think it's San -- San Diego I think is where
25   this -- where the person is.

Page 169

1    Q. And there's no data associated with this?  He's
2  just summarizing previous reports, correct?
3    A. Correct.
4    Q. And you're not sure of the source of that data
5  or whether it has implications for SBISD, correct?
6    A. Correct.
7    Q. Okay.  And finally, sir, if you could read this
8  paragraph.  The first paragraph right after the subject
9  heading.
10   A. Yep.
11   Q. What does that say, sir?
12   A. He's saying that the effect is mixed but one
13 directional.  That is, it can either help to close the
14 gap, or it can have no effect.
15   Q. So at worst it has zero effect, and at best it
16 could actually increase representation, correct?
17   A. That's -- that's his summary.
18   Q. And the election change he's talking about they
19 are single-member districts, correct?
20   A. I assume that's what he's talking about.
21        MR. GOLANDO:  All right.  Pass the witness.
22        MR. CRAWFORD:  We'll reserve our questions.
23        (Whereupon at 2:16 p.m. the
24        deposition was concluded.)
25

Page 170

1         CHANGES AND SIGNATURE
2    WITNESS NAME:  JOHN R. ALFORD, PH.D.
3    DATE OF DEPOSITION:  MARCH 24, 2022
4  PAGE LINE          CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 171

1         I, JOHN R. ALFORD, PH.D., have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5         _____
               JOHN R. ALFORD, PH.D.
6
7
   THE STATE OF _____)
8  COUNTY OF _____)
9
10
        Before me, _____, on
11 this day personally appeared JOHN R. ALFORD, PH.D.,
   known to me (or proved to me under oath or through
12 _____) (description of identity
   card or other document) to be the person whose name is
13 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
14 consideration therein expressed.
        Given under my hand and seal of office this
15 _____ day of _____, _____.
16
17
        _____
18      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
19      COMMISSION EXPIRES: _____
20
21
22
23
24
25

Page 172

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2            HOUSTON DIVISION
3
   VIRGINIA ELIZONDO,       §
4      Plaintiff,          §
                           §
5  v.                 §  Civil Action No.
                      §  4:21-CV-01997
6                     §
   SPRING BRANCH INDEPENDENT §
7  SCHOOL DISTRICT, ET AL.,  §
       Defendants.        §
8
9
10      REPORTER'S CERTIFICATION
      DEPOSITION OF JOHN R. ALFORD, PH.D.
11           MARCH 24, 2022
12
13      I, John G. Rochelle, Certified Shorthand Reporter
14 in and for the State of Texas, hereby certify to the
15 following:
16      That the witness, JOHN R. ALFORD, PH.D., was duly
17 sworn by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness;
20      That the deposition transcript was submitted on
21 _____ to the witness or to the attorney for
22 the witness for examination, signature and return to
23 Worldwide Court Reporters, Inc., by _____;
24      That the amount of time used by each party at the
25 deposition is as follows:

43 (Pages 169 to 172)

Page 173

1    Mr. Barry Abrams - 00:00
2    Mr. Martin Golando - 03:39
3    Mr. Charles J. Crawford - 00:00
4    That pursuant to information given to the
5    deposition officer at the time said testimony was taken,
6    the following includes counsel for all parties of
7    record:
8    Mr. Barry Abrams, Mr. Martin Golando, Attorneys for
9    Plaintiff;
10   Mr. Charles Crawford, Mr. Lucas Henry, Attorneys
11   for Defendants.
12   That $_____ is the deposition officer's
13   charges to the Plaintiff for preparing the original
14   deposition transcript and any copies of exhibits;
15   I certify that a review of the transcript was
16   requested.
17   I further certify that I am neither counsel for,
18   related to, nor employed by any of the parties or
19   attorneys in the action in which this proceeding was
20   taken, and further that I am not financially or
21   otherwise interested in the outcome of the action.
22
23
24
25

Page 174

1    Certified to by me this 5th day of April, 2022.
2
3
4
5    JOHN G. ROCHELLE, Texas CSR 3041
     Expiration Date:  10/31/23
6    Worldwide Court Reporters, Inc.
     Firm Registration No. 223
7    3000 Weslayan, Suite 235
     Houston, Texas 77027
8    (713) 572-2000
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

44 (Pages 173 to 174)