# Exhibit C

**EXHIBIT TO**
**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Page 1

IN THE UNITED STATES DISTRICT COURT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON DIVISION

VIRGINIA ELIZONDO,  |
  Plaintiff,  |
          |
V.       | Civil Action No. 4:21-CV-01997
          |
SPRING BRANCH  |
INDEPENDENT SCHOOL  |
DISTRICT, ET AL.,  |
  Defendants.  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
CHRISTINE PORTER
DECEMBER 28, 2021
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION of CHRISTINE PORTER, produced as
a witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on December 28, 2021, from 9:34 a.m. to
11:45 a.m., before Mendy A. Schneider, CSR, RPR, in
and for the State of Texas, recorded by machine
shorthand, at the offices of Spring Branch ISD
Athletic Center, 1050 Dairy Ashford, Houston, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

---

Page 2

```
 1        A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4        MR. BARRY ABRAMS
          BLANK ROME
 5        717 Texas Avenue, Suite 1400
          Houston, Texas 77002
 6        (713) 228-6601
          Babrams@blankrome.com
 7
 8    FOR THE DEFENDANTS:
 9        MR. CHARLES J. CRAWFORD
          ABERNATHY ROEDER BOYD HULLETT
10        1700 North Redbud Boulevard, Suite 300
          McKinney, Texas 75069
11        (214) 544-4000
          Ccrawford@abernathy-law.com
12
13    ALSO PRESENT:
          MS. AUDREY SHAKRA
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1              EXAMINATION INDEX
 2    WITNESS:  CHRISTINE PORTER
 3    EXAMINATION                      PAGE
        BY MR. ABRAMS                   4
 4
      SIGNATURE REQUESTED               92
 5
      REPORTER'S CERTIFICATION          93
 6
                EXHIBIT INDEX
 7
                             PAGE
 8    SBISD EXHIBIT NO. 1          6
        Notice of Deposition
 9
      SBISD EXHIBIT NO. 2          24
10        District Web Site Screenshot
11    SBISD EXHIBIT NO. 3          30
          2010 to 2021 District List of Candidates
12
      SBISD EXHIBIT NO. 4          39
13        Map
14    SBISD EXHIBIT NO. 5          44
          Map
15
      SBISD EXHIBIT NO. 6          50
16        Map
17    SBISD EXHIBIT NO. 7          53
          Map
18
      SBISD EXHIBIT NO. 8          65
19        Notice of Trustee Election
20    SBISD EXHIBIT NO. 9          70
          Spring Branch ISD 10-Year Per Student
21        Cost General Fund
22
23
24
25
```

---

Page 4

```
 1              CHRISTINE PORTER,
 2    having been first duly sworn, testified as follows:
 3            E X A M I N A T I O N
 4    BY MR. ABRAMS:
 5        Q.  Good morning.
 6        A.  Good morning.
 7        Q.  Would you please state your name?
 8        A.  Christine Porter.
 9        Q.  Ms. Porter, my name is Barry Abrams.  I'm a
10    lawyer representing Virginia Elizondo in a lawsuit
11    against the Spring Branch Independent School District
12    and its board members in their official capacities.
13            Do you understand that?
14        A.  Yes.
15        Q.  What do you do for a living?
16        A.  I am the chief financial officer for Spring
17    Branch ISD currently.  I've actually been in school
18    finance in a few different school districts for the
19    past 30 years.
20        Q.  And at Spring Branch, what does that entail?
21        A.  It entails primarily handling all financial
22    aspects of the district, the collection, the expending
23    of all dollars.
24            And in that role, I oversee finance, tax
25    office, purchasing, child nutrition, and federal
```

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 5

1    funds. I also have the role of being the election
2    official for the district.
3        Q.  Do you understand that we're here today for
4    you to provide sworn testimony that can be used in the
5    lawsuit?
6            The number is 4:21-CV-01997. It's
7    titled Virginia Elizondo versus spring Branch
8    Independent School District and it's pending in the
9    United States District Court for the Southern District
10   of Texas Houston Division.
11           Do you understand that's why we're here?
12       A.  Yes, I do.
13       Q.  If I refer to that proceeding as "the
14   lawsuit," will you know what I'm talking about?
15       A.  Yes.
16       Q.  What's your understanding about the basis for
17   the lawsuit?
18       A.  My understanding is that there is a feeling
19   by Virginia but I believe representing a group of
20   people who feel underrepresented specifically on the
21   board of trustees and within the dealings of the
22   school district.
23       Q.  Do you understand that the lawsuit is being
24   brought under what's called the Federal Voting Rights
25   Act?

Page 6

1        A.  Yes.
2        Q.  Do you understand that the lawsuit contests
3    whether the district's system of electing its trustees
4    at large improperly dilutes the voting strength of
5    certain minorities in the district?
6        A.  That the lawsuit --
7        Q.  That claims that.
8        A.  Yes. Uh-huh.
9        Q.  Let me hand you what's been marked as Exhibit
10   No. 1. This is a copy of the deposition notice that
11   was originally issued for this to take place on
12   December the 20th. We, by agreement with the
13   district's lawyer, reset it for today.
14           (Marked Porter Exhibit No. 1.)
15       Q.  (BY MR. ABRAMS) Have you ever seen the
16   notice?
17       A.  Yes.
18       Q.  Do you understand that you're appearing today
19   as one of the representatives for the district that's
20   been designated to testify on the district's behalf
21   with regard to certain topics that are listed in the
22   notice?
23       A.  Yes, I do.
24       Q.  Who made the decision that you would appear
25   as a representative for the district?

Page 7

1        A.  I think -- I believe through conversations
2    with the superintendent, our general counsel felt that
3    I would be the one that could best answer certain of
4    these questions.
5        Q.  And who authorized you to appear today in the
6    capacity as a representative for the district?
7        A.  The superintendent.
8        Q.  Who decided what topics you would be
9    designated to testify about on behalf of the district?
10       A.  That was through discussion with our general
11   counsel.
12       Q.  What preparation have you made to appear
13   today as the corporate representative on the
14   district's behalf with respect to certain of the
15   topics that are listed in the notice?
16       A.  I read through the various topics and tried
17   to ensure that I understood what they meant, what was
18   being asked for, and then if I had certain documents
19   that I could review to make sure that -- or background
20   knowledge just to make sure I could have those facts
21   ready to talk about today.
22       Q.  Have you brought any documents with you here
23   today to assist you in testifying?
24       A.  No, I did not bring any documents.
25       Q.  Who did you speak with to prepare for your

Page 8

1    deposition?
2        A.  Our general counsel.
3        Q.  And beyond what you've described, have you
4    done anything else to prepare?
5        A.  No.
6        Q.  What documents did you review in preparation
7    for your deposition?
8        A.  I reviewed legal -- our Spring Branch ISD's
9    legal policy. I reviewed the election results for the
10   last 10 years. I reviewed information concerning
11   early election sites as well as number of voters and
12   things that happen at them.
13           I reviewed the presentation that was
14   provided -- that was given by Thompson Horton back in
15   2020. I didn't actually attend it, but I did review
16   the presentation as it's a public document.
17           I also just made sure I was
18   understanding what's happening with our current
19   election calendar to ensure that people were aware for
20   of the critical dates tied to this current year.
21           I also looked at financial information
22   because one of the topics is covering -- is asking
23   about some per student costs. So I reviewed that.
24       Q.  You mentioned a 2020 presentation by
25   Thompson & Horton.

2   (Pages 5 to 8)

Page 9

1          Just for our record, Thompson & Horton
2   is a law firm that has, for a number of years,
3   represented the district, correct?
4       A.  Correct.
5       Q.  And in 2020, they made a presentation to the
6   board about what that's relevant here?
7       A.  They talked about the different types of
8   electoral systems that are legal in the state of Texas
9   for school districts and how if -- if the board of
10  trustees were considering making any changes, what
11  they would need to do in order to make those changes.
12      Q.  You also mentioned that you refreshed your
13  recollection about the critical dates for the 2022
14  board elections.
15          What are the critical dates for the 2022
16  board elections as you've defined the term "critical
17  dates"?
18      A.  Well, December 20 of 2021 was critical
19  because I had to post on our Web site information
20  about the upcoming election.
21          January 3 is when our office reopens and
22  people can pick up applications for -- to apply -- to
23  complete in order to run for the election.
24          They can start turning in those
25  applications on January 19 and they have until

Page 10

1   5:00 p.m. on February 18 in order to turn in those.
2           Within that next week -- I don't have
3   the exact date for that off the top of my head --
4   they'll do the drawing for the order for the ballot
5   and as well as we have to get information -- we have
6   to tell the State that we are hosting an election.
7           So within about a week of that, we have
8   to let the State know that we're hosting the election.
9           Early elections start the last full week
10  in April with our election date being on April 7 --
11  excuse me -- May 7.  Sorry.
12      Q.  Thank you.
13          Who have you met with, other than
14  lawyers for the district, to prepare?
15      A.  I have -- I talked with the previous CFO just
16  to make sure I knew where files were like for the
17  previous election results.
18      Q.  Who was that person?
19      A.  That person is Karen Wilson.
20          I also talked -- we have a technology --
21  a person in technology who helps run the actual
22  equipment and so making sure, you know, my
23  understanding of what equipment is needed and that
24  type of thing, mainly in preparation for this next
25  election and then in response to some changes we're

Page 11

1   going to make specifically on early election sites.
2       Q.  What changes are anticipated on early
3   election sites?
4       A.  We're adding an additional site up in the
5   northwest quadrant of the school district.
6   Previously, we actually had relatively low in
7   comparison to the entire election numbers of people
8   voting in the early election.
9           This last year, we actually had over
10  5,000 voters in the early election and feel that
11  another site is warranted to allow for that type of
12  count as well as ensuring that some of the -- some
13  concerns have been raised about whether or not we were
14  ensuring that everybody could get to all of the
15  locations easily enough.  And so we have a site now
16  that's on Gessner so it would allow for easy public
17  access.
18      Q.  We'll touch on the early election sites that
19  the district historically has used a little later.
20          But is it fair to say that none of those
21  sites were located north of the northeast corner of
22  Hilshire Village?
23      A.  Yes, that's correct.
24      Q.  So none of the sites were located in the
25  election precinct that corresponds to the Northbrook

Page 12

1   election precinct, correct?
2       A.  Correct.
3       Q.  None of the sites were located within the
4   precinct that corresponds to the Landrum precinct,
5   correct?
6       A.  Correct.
7       Q.  None of the sites were located in the
8   precinct that corresponds to the Spring Woods election
9   precinct?
10      A.  I'm not for sure on their boundaries, but I
11  don't believe that's true.
12      Q.  You don't believe it's true or you do believe
13  it's true?
14      A.  I mean, I believe that's -- I believe it's a
15  true statement that it is not in the Spring Woods High
16  School.  I just don't know how far Spring Woods High
17  School...
18      Q.  Okay.  And is the same thing true with
19  respect to the Spring Oaks election precinct, that
20  there were no early voting sites located within the
21  Spring Oaks election precinct?
22      A.  Correct.
23      Q.  The only sites historically that Spring
24  Branch ISD has had for early voting in the recent past
25  and going back as far as I could see were located

3 (Pages 9 to 12)

Page 13

1   within the Memorial Spring Branch and Spring Forest
2   election precincts, correct?
3       A. That's correct.
4       Q. Which of the lawyers for the district have
5   you met with in connection with preparation?
6       A. I've met with -- oh, in preparation for the
7   deposition?
8       Q. Yes, ma'am.
9       A. Charles and Lucas and Audrey.
10      Q. When did you meet with them?
11      A. Yesterday as well as we had a conference call
12  last week. And I met with Audrey in a -- probably a
13  few different times, I mean, you know, in the week
14  leading up to Christmas break.
15      Q. All told, how much time have you devoted to
16  preparing to testify about the topics listed that
17  correspond to your testimony in the case?
18      A. I would say about 20 hours.
19      Q. To make this go as easily as possible, I
20  would like to have several agreements with you. And
21  it's important that you understand the proceedings.
22          The lady who is seated to your left is
23  called a court reporter. She is typing down word for
24  word my questions and your answers. And my questions
25  and your answers will be typed up in a booklet called

Page 14

1   a transcript and that testimony can be used in the
2   lawsuit.
3           Do you understand that?
4       A. Yes.
5       Q. You've been doing a great job thus far, but
6   it's important that you continue to answer out loud
7   rather than relying on gestures such as nods of the
8   head or sounds like uh-huh or huh-uh, because those
9   are not things that can be easily taken down by the
10  court reporter.
11          So will you continue to testify using
12  words and out loud?
13      A. Yes.
14      Q. As our court reporter mentioned before we
15  went on the record, it's very important that you and I
16  try to not talk over each other, that is, that we
17  speak one at a time, because it's very difficult for
18  the court reporter to untangle people talking over
19  each other.
20          I promise you I will try very hard not
21  to cut you off when you're answering a question. If I
22  do inadvertently, you just tell me and I'll stop.
23          By the same token, I sometimes take a
24  while to get a question out. So even if you think you
25  know where I'm going, if you'll give me the courtesy

Page 15

1   of letting me finish my question before you start an
2   answer, our record will be more complete and our court
3   reporter will be much happier with us.
4           Can you do that?
5       A. Yes.
6       Q. It's also very important that you understand
7   the questions that you're asked today because the
8   parties have a right to rely upon your testimony.
9           And so I want you to tell me if I ask
10  you a question that I -- that you do not understand.
11  And I will promise you I will try to rephrase it in a
12  way that you do understand it.
13          So will you tell me if you think you
14  don't understand a question?
15      A. Yes, I will.
16      Q. And may I fairly assume when you've answered
17  my questions that you understood them at the time?
18      A. Yes.
19      Q. We'll probably break at least once an hour.
20  But in any event, if you need a make at some other
21  time, if you'll simply let me know, I'll be happy to
22  accommodate you. Okay?
23      A. Okay.
24      Q. We've already talked about the fact I'm going
25  to use the shorthand expression "lawsuit" to refer to

Page 16

1   the legal proceeding.
2           I don't know that we'll refer very often
3   to the plaintiff, Virginia Elizondo. But if so, if I
4   refer to "the plaintiff" or "Ms. Elizondo," will you
5   know who I'm talking about?
6       A. Uh-huh. Yes.
7       Q. I will variously refer to the Spring Branch
8   Independent School District as "the district" or
9   "SBISD," and we'll know what we we're talking about,
10  your employer?
11      A. Yes. Yes.
12      Q. Similarly, from time to time there will be
13  questions about the Spring Branch Independent School
14  District board of trustees. I'll probably shorthand
15  that to refer to simply "the board."
16          If I refer to "the board," will you know
17  that I'm talking about the board of trustees?
18      A. Yes.
19      Q. I'm going to spend a moment or two just on
20  your personal background.
21          Where do you reside?
22      A. I reside at -- in Spring Branch ISD at 1507
23  Shady Villa Manor, Houston, Texas 77055.
24      Q. How long have you been a district resident?
25      A. Five months.

Page 17

1    Q.  Where did you live before that?
2    A.  I lived up in Spring for 21 years.
3    Q.  Where were you born and raised?
4    A.  I'm a military brat.  I was born in
5  California.  My dad was stationed out there.  Mainly
6  grew up, though, on the East Coast in Virginia, North
7  Carolina, and South Carolina.
8         Graduated high school in 1986, and then
9  we all moved to Texas.  Dad retired and went to SMU
10  and became -- got his master's of divinity and became
11  a Methodist minister in the Central Conference.
12         So we're all in Texas now, but I would
13  say pretty much I grew up on the East Coast.
14    Q.  You mentioned that you graduated from high
15  school in 1986.
16         What high school was that?
17    A.  Buford Academy in Buford, South Carolina.
18    Q.  After high school, did you then go on to
19  college?
20    A.  I did.  I went to Texas A&M University in
21  College Station, Texas.  Graduated in 1990 with a
22  degree in accounting.
23    Q.  Could you give me a horseback view of your
24  employment experience after graduating from A&M?
25    A.  Sure.  I started off as an internal auditor

Page 18

1  at First Bank of Texas.  After doing that for about a
2  year and a half.  As they got taken over by the Feds
3  by the second time, I realized it was probably time to
4  move on.
5         I actually responded to -- you know,
6  back then, you can used to look at newspaper articles,
7  you know, the classifieds and circled.
8         So I responded to a job application at
9  955 Campbell Road, not really knowing what I was
10  applying for.
11         And it was Spring Branch ISD.  So I
12  started here -- I'll call myself a baby accountant.
13  And I was here for 5 years.
14         When I left, I was the budget manager.
15  I went to Tomball ISD.  Was the business manager there
16  for 3 years.
17         And then went to Spring ISD.  Started
18  off as the controller.  And when I left there, I was
19  the CFO.  And then came back to Spring Branch.  After
20  a little break came back to Spring Branch and was the
21  payroll manager, the tax assessor, and then the CFO a
22  year and a half ago.
23    Q.  Did any of the school districts you worked
24  for, before you came back to Spring Branch, elect any
25  of their trustees from single-member districts?

Page 19

1    A.  No.
2    Q.  Do you have any personal experience working
3  for school districts where trustees have been elected
4  from single-member districts?
5    A.  No, I do not.
6    Q.  Have you ever personally been a party to a
7  lawsuit, that is, sued somebody or been sued?
8    A.  No.
9    Q.  You understand you're not a party to this
10  lawsuit?
11    A.  Yeah, I do.
12    Q.  You're here merely as a witness and you're
13  here merely as a witness on behalf of the district.
14    A.  I do.
15    Q.  Okay.
16    A.  I do.
17    Q.  Have you ever been through this process of
18  being deposed before?
19    A.  No.
20    Q.  Have you ever gone through the process of
21  testifying in some other setting before?
22    A.  Yes.
23    Q.  If you would, tell me about that prior
24  testifying experience.
25    A.  It was a -- a friend of mine had been accused

Page 20

1  of an improper relationship with a student, and so I
2  was a character witness on his behalf.
3    Q.  Are there any other occasions where you have
4  testified other than that one instance?
5    A.  No.
6    Q.  Do you have any professional licenses or
7  certifications?
8    A.  I do.  I have a certified public accountancy
9  certificate.
10    Q.  From the State of Texas?
11    A.  From the State of Texas, yes.
12    Q.  And when -- when did you obtain your
13  certification?
14    A.  1992 or '3.
15    Q.  Have you ever been charged and convicted of
16  any criminal offense?
17    A.  No.
18    Q.  Are you familiar with Ms. Elizondo?
19    A.  Yes.
20    Q.  How?
21    A.  She led a committee that I was a part of
22  during the -- let me get my years straight -- the
23  '20-'21 year, the visioning committee that focused on
24  what a Spring Branch ISD graduate would look like, and
25  not just an official graduate but as they move between

Page 21

1  elementary to middle and middle to high school.
2        I also -- she also ran for the school
3  board in 2021.
4        **Q.  Are you familiar with her educational**
5  **background?**
6        A.  I believe she has lots of educational
7  background.  I remember being familiar and have -- you
8  know, seeing that on the application.  I believe she
9  has at least a master's, if I'm remembering correctly.
10        **Q.  And if I understood your prior testimony,**
11  **you're familiar with at least some of her involvement**
12  **in district activities because she headed a committee**
13  **that you participated in?**
14        A.  Yes.
15        **Q.  Do you recall the title of the committee or**
16  **whatever the topic was?**
17        A.  I thought it was the visioning committee.
18        **Q.  Does the district agree that Ms. Elizondo met**
19  **all the legal requirements to be eligible for election**
20  **to the district board when she ran?**
21        A.  Yes.
22        **Q.  Let's now turn to some of the issues in the**
23  **lawsuit for which you've been designated as a**
24  **representative.**
25        **Has the racial and ethnic composition of**

Page 22

1  **the voters in the district changed over time?**
2        A.  Yes.
3        **Q.  How has it changed?**
4        A.  I believe, without knowing exact numbers,
5  that the -- we've become a much more diverse school
6  district, and the population of the school district is
7  reflecting -- is reflected in that.  The minority
8  groups are larger than they've been, you know,
9  30 years ago.
10        **Q.  Do you agree that when the district was**
11  **formed and for a number of years its population was**
12  **virtually all white?**
13        A.  Yes.
14        **Q.  And do you agree that in the -- let me back**
15  **up and say when I use the term "you," you're here in a**
16  **representative capacity.  So we're going to be talking**
17  **about the district.**
18        A.  Right.
19        **Q.  It will be a little less cumbersome if I can**
20  **still refer to you knowing you're speaking for the**
21  **district than always saying does the district agree.**
22        A.  Okay.
23        **Q.  Are you okay with that convention?**
24        A.  Yes, as long as my response looks like I'm
25  responding on behalf of the district.

Page 23

1        **Q.  All right.  I mean, I can do it either way.**
2        A.  No, it's fine.
3        **Q.  Do you -- does the district agree that in the**
4  **past 20 years the racial and ethnic composition of the**
5  **population in the district has changed significantly?**
6        A.  Yes.
7        **Q.  Does the district agree that what was once a**
8  **district in which a majority of the voters and**
9  **students were white is a now a district where the**
10  **Hispanic population is greater than the white**
11  **population and the percentage of Hispanic students**
12  **more than twice the percentage of white students?**
13        A.  Yes.
14        **Q.  Does the district agree that it is now a**
15  **majority minority district in terms of the total**
16  **population in student population?**
17        A.  I can attest to the student population as
18  yes.
19        **Q.  With respect to the total population, does**
20  **the district agree that the total population of the**
21  **district is now majority minority?**
22        A.  I just haven't seen numbers to that to know
23  that for sure.  I haven't seen recent census numbers,
24  but I know we -- we believe that and act in that
25  manner.

Page 24

1        **Q.  The district's position is without regard to**
2  **the specifics, it acknowledges its belief that it is a**
3  **majority minority district in terms of total**
4  **population at this point in time?**
5        A.  Yes.
6        **Q.  Let me hand you what's been marked as**
7  **Exhibit 2.  This is a screenshot from the district's**
8  **Web site.**
9        **(Marked Porter Exhibit No. 2.)**
10        **Q.  (BY MR. ABRAMS)  Are you familiar with --**
11        A.  Yes.
12        **Q.  -- this page from the district's Web site?**
13        A.  (Nodding head.)
14        **Q.  The district's Web site purports to break**
15  **down the demographics of its students.  And is it the**
16  **district's position that the little graph on the**
17  **right-hand side properly describes the racial and**
18  **ethnic composition of its student body --**
19        A.  Yes.
20        **Q.  -- as of 2021?**
21        A.  Yes.
22        **Q.  Exhibit 2 shows that 59 percent of the**
23  **district's students are Hispanic, 27 percent of its**
24  **students are white, 7 percent of its students are**
25  **Asian, and 5 percent of its students are**

Page 25

1      African-American, correct?
2         A.   Correct.
3         Q.   Exhibit 2 also reflects that 58 percent of
4    the district students are economically disadvantaged.
5             Is that correct?
6         A.   Correct.
7         Q.   What does that term mean in the way that the
8    district uses it on its Web site?
9         A.   It means that 58 percent of the students have
10   completed information concerning free and reduced
11   lunch applications and have been found to be -- to be
12   eligible for free or reduced meals through our lunch
13   program.
14        Q.   As a general proposition, what is the
15   standard financially that a some -- that a student
16   needs to meet to be eligible for the free and reduced
17   lunch program which qualifies it as an economically
18   disadvantaged student?
19        A.   You mean what's the level of income in the
20   family?
21        Q.   Yes, ma'am.
22        A.   I don't have that -- I don't know that number
23   off the top of my head.
24        Q.   I noticed that the infographic, Exhibit 2,
25   says that 59 percent of the students are Hispanic and

Page 26

1    58 percent of the total student body are economically
2    disadvantaged.
3             Does the district know what the
4    correlation is between the race and ethnicity of the
5    economically disadvantaged students in that status?
6         A.   That information can be pulled.  I don't know
7    that.
8         Q.   Does the district acknowledge that a greater
9    proportion of its minority students are economically
10   disadvantaged than its white students?
11        A.   I -- I believe that's a trend that can be
12   deduced from the two graphs.
13        Q.   I'm not clear about your answer.
14            Are you telling me that's something that
15   one could determine or that you think that that is the
16   case based upon the information available to you?
17        A.   I think based on seeing these percentages,
18   that's a fair assumption, but I would want to verify
19   that data.
20        Q.   We talked earlier about how the demographics
21   of the district changed over time.
22            I want to now ask you:  Do you -- does
23   the district agree that in the past 20 years the
24   socioeconomic background of the district's residents
25   and students has likewise changed?

Page 27

1         A.   Yes.
2         Q.   How has it changed?
3         A.   I believe the percentage used to be less than
4    50 percent and now it is over 50 percent.
5         Q.   What percentage?
6         A.   The percentage of economically disadvantaged
7    students.
8         Q.   What proportion of the students in the
9    district now attend what are called Title I schools?
10        A.   I wish I would know that percentage off the
11   top of my head.  I would have to compare two different
12   lists, a list of students by campus and highlight the
13   Title I campuses.
14        Q.   What's your best estimate -- what's the
15   district's best estimate realizing that's subject to
16   mathematical verification?
17        A.   I would say at least 50 percent.
18        Q.   What is Title I?
19        A.   Title I is the short-term version of monies
20   we receive directly from -- or through -- through the
21   State of Texas, but from the federal government that
22   are based on the number of students at campuses that
23   are considered economically disadvantaged.
24            And so it's supplemental dollars we
25   receive that gets -- that is provided to campuses to

Page 28

1    spend at their discretion to focus on the needs of
2    their campuses.
3         Q.   If I'm following you, then, Title I funds are
4    federal funds that are allocated through the State
5    then to the district and then to individual campuses.
6             Is that a correct generalization?
7         A.   It's more of a passthrough --
8         Q.   Okay.
9         A.   -- of the state.
10            They don't really allocate it.  The
11   federal government determines that a school district
12   gets X amount based on their number of students.
13        Q.   Does the district agree that all of the
14   current members of its board are white or -- or
15   Caucasian?
16        A.   Yes.
17        Q.   Does the district agree that it has no record
18   that any minority candidate has ever been elected to
19   serve on the Spring Branch Independent School District
20   board?
21        A.   Yes.
22        Q.   What investigation or search of district
23   records has been done to confirm that fact?
24        A.   I looked at the election results.  So I could
25   only base it on surnames, I mean, some recent

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 29

1 surnames, obviously Chris Gonzalez, if you saw that,
2 and didn't know otherwise.
3 But no other surnames indicated such.
4 While I didn't personally do it, I understand that a
5 review of pictures of the board has been done and
6 based on those review and on the pictures that could
7 be found, nobody of it -- nobody of color has been
8 elected.
9 Q. Does the district agree that in every trustee
10 election for the past 10 years the candidate elected
11 was white?
12 A. Yes.
13 Q. And as we confirmed a moment ago, a hundred
14 percent of the current board members are white?
15 A. Yes.
16 Q. Does the district agree that no Hispanic or
17 other minority candidate has been elected to the board
18 in the past 10 years even though the percentage of
19 both the minority student and adult populations is
20 greater than the percentage of white population and
21 students in the district?
22 A. Yes.
23 Q. Does the district agree that every minority
24 candidate for the board during the period from 2010 to
25 2021 was defeated by a white candidate?

Page 30

1 A. Yes.
2 (Marked Porter Exhibit No. 3.)
3 Q. (BY MR. ABRAMS) Let me hand you what's been
4 marked as Exhibit 3. This is a document the district
5 has produced titled "2010 to 2021 List/Names of All
6 Candidates," correct?
7 A. Correct.
8 Q. Does the district acknowledge that in 2015
9 Virginia Elizondo was a minority candidate for the
10 board?
11 A. Yes.
12 Q. And in 2018, Noel Lezama was a minority
13 candidate for the board?
14 A. Yes.
15 Q. And in 2019, David Lopez was a minority
16 candidate for the board?
17 A. Yes.
18 Q. And, again, in 2021, Virginia Elizondo was a
19 minority candidate for the board?
20 A. Yes.
21 Q. And in each of the elections in which they
22 ran, the white candidate defeated the minority
23 candidate, correct?
24 A. Yes.
25 Q. Does the district agree that there is

Page 31

1 statistically significant evidence of racially or
2 ethnically polarized voting in the district's board
3 elections for the period 2015 to 2021?
4 A. Can you define "racial polarization"?
5 Q. Yes.
6 By the term "racially polarized," I mean
7 that there's a consistent relationship between the
8 race or ethnicity of the voter and the way their
9 votes and that white and minority voters vote
10 differently.
11 A. That is not data we obtain on our voters, so
12 I would expect that an expert might be able to get
13 that data.
14 Q. In the lawsuit, the district filed an answer.
15 Do you understand that's part of the
16 procedure?
17 A. Yes.
18 Q. And in that answer, the district took the
19 position that as a matter of fact there is no such
20 evidence of racially polarized voting.
21 What investigation had the district
22 conducted before filing an answer in the lawsuit
23 denying that there's racially polarized voting in the
24 district's board elections for the past 6 years?
25 A. The district itself didn't do any actual

Page 32

1 investigation of it. Again, because we don't track,
2 we don't obtain that data of the race or ethnicity of
3 the actual voters, that information would have come
4 through discussion with the experts.
5 Q. Before the district filed a document with the
6 federal court denying that there is racially or
7 ethnically polarized voting in its board
8 investigations, what investigation had the district
9 conducted to corroborate that position?
10 A. None.
11 Q. Has the district ever investigated or does it
12 have any knowledge about whether or not racially or
13 ethnically polarized voting exists in the elections of
14 the municipal governments that make up the district?
15 A. We're not aware of any.
16 Q. Are you telling me you're not aware of any
17 investigation the district has ever undertaken to
18 determine whether or not the voting in the cities that
19 make up the district, which are Hunters Creek Village,
20 Piney Point Village, Bunker Hill Village, Spring
21 Valley Village, Hilshire Village, and the City of
22 Houston, involve racially polarized voting?
23 A. We don't know anything about the data that's
24 been happening in those sites.
25 Q. And the district has not conducted any

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 33

1    investigation to determine whether or not the voting
2    in any of those jurisdictions is racially polarized or
3    ethnically polarized, correct?
4        A.   Correct.
5        Q.   Given that the district had not conducted any
6    investigation about whether or not the voting in its
7    trustee elections was racially or ethnically polarized
8    when it denied that fact in the federal lawsuit, what
9    was the basis for making such a denial?
10       A.   We did not have evidence to the contrary.  We
11   had investigated it, but we had no evidence.
12       Q.   Does the district agree that white
13   non-Hispanics in the district vote sufficiently as a
14   block to enable them to defeat minority voters'
15   preferred candidates of choice in the various trustee
16   elections?
17       A.   I believe that's something that an expert can
18   look at the data.  And the district has never looked
19   at the voting population by race to be able to make
20   that deduction ourselves.
21       Q.   So does the district agree that when it filed
22   a document in the federal lawsuit denying that white
23   non-Hispanics in the district vote sufficiently as a
24   block to enable them to defeat minority voters'
25   preferred candidates, it had no evidence to support

Page 34

1    that denial?
2        A.   Or evidence against that denial, but correct.
3        Q.   And before making that denial in the federal
4    lawsuit, the district did not undertake an
5    investigation to determine whether or not the
6    statement was true, correct?
7        A.   Correct.
8        Q.   Does the district agree that the geographic
9    concentration of Hispanics in the district is large
10   enough to constitute a majority of the voting age
11   population in one or more single-member districts if
12   there was a seven-member election plan adopted or
13   ordered by the court?
14       A.   It's our understanding that that can happen,
15   that -- that they can make those single-member
16   districts.
17       Q.   What is the district's position about the
18   number of single-membered districts that could be
19   formed in which the geographic concentration of
20   Hispanics would constitute a majority of the voting
21   age population?
22       A.   I've heard that three, up to three could be
23   established.
24       Q.   Who has provided the factual information to
25   the district that as many as three single-membered

Page 35

1    districts could be drawn in which a majority of the
2    voting age population would be Hispanic?
3        A.   That was based on some meetings we had with
4    legal counsel at the time.
5        Q.   Does the district possess any written
6    investigation or report confirming that the geographic
7    concentration of Hispanics in the district is
8    sufficient to constitute a majority of the voting age
9    population in as many as three single-membered
10   districts if a seven-member plan were adopted?
11       A.   We don't maintain documents.  Those were
12   mainly talked about during discussions with our legal
13   counsel.
14       Q.   Setting aside communications with legal
15   counsel, which I presume and understand the district
16   will assert privilege over, are you aware of any other
17   sources of information confirming that as many as
18   three single-membered districts could be drawn in
19   Spring Branch in which the concentration of voting age
20   Hispanics would be a majority?
21       A.   No.
22       Q.   Does the district agree that single-member
23   district forms of representation can enhance the
24   proportional representation of minority candidates?
25       A.   The district understands that it is within --

Page 36

1    it is legal within the electoral system to use that
2    and it does provide an opportunity for participation
3    in some areas of the district that have lower
4    participation.
5        Q.   Isn't the district's position that adoption
6    of a single-member district form of representation can
7    result in enhanced representation of the minority
8    community on its board?
9        A.   The board believes they represent the entire
10   district already, so it would be more a focus on
11   ensuring that they have participation from the areas
12   of those school districts, the area of the school
13   district.
14           MR. ABRAMS:  Object to the answer as
15   nonresponsive.
16       Q.   (BY MR. ABRAMS)  My question is whether or not
17   the district has a position on whether single member
18   district forms of representation can have the effect
19   of enhancing the representation of minority candidates
20   on the district's board?
21           MR. CRAWFORD:  Objection; form.
22       A.   I have not heard the board discuss anything
23   like that.
24       Q.   (BY MR. ABRAMS)  So as we sit here today, is
25   it fair to say the district has no position on whether

Page 37

```
1    single-membered district forms of representation can,
2    in fact, enhance proportional representation of
3    minority candidates on the board?
4        MR. CRAWFORD:  Objection; form.
5        A.  They stand that they represent the entire
6    district as it is.  I know that's not answering your
7    question.
8        Q.  (BY MR. ABRAMS)  Has the district investigated
9    whether or not single-membered district forms of
10   representation can enhance proportional representation
11   of minority individuals on the board?
12       A.  To the extent that that is a legal way to
13   hold your electoral system, that investigation -- or
14   requests for information from legal counsel has
15   happened, which led to that presentation in January of
16   2020.
17       Q.  In connection with the lawsuit and the
18   district's answer that it filed in the lawsuit and
19   prior to filing that answer, had the district
20   investigated whether adopting a single member form of
21   representation could enhance the representation of
22   minority residents on the board?
23       A.  I'm not aware of any.
24       Q.  Does the district agree that single-membered
25   district representation can increase the likelihood
```

Page 38

```
1    that minority candidates will run for office on the
2    board?
3        A.  It can increase the likelihood that they will
4    run for the board.
5        Q.  Does the district agree that the
6    single-member district representation can produce
7    policies that are more responsive to the preferences
8    of minority voters than at-large systems do?
9        MR. CRAWFORD:  Objection; form.
10       A.  I know the board feels that they represent
11   the entire district.
12       MR. ABRAMS:  Objection to the answer as
13   nonresponsive.
14       Q.  (BY MR. ABRAMS)  My question does not concern
15   the district's current plan.  My question concerns
16   whether the district has a position on the issue of
17   single-member representation producing policies that
18   are even more responsive to the preferences of
19   minority voters than is the case under the current
20   at-large system.
21       Does the district have a position on that?
22       MR. CRAWFORD:  Objection; form.
23       A.  No, we don't have a position on that.
24       Q.  (BY MR. ABRAMS)  Does the district agree that
25   the racial and ethnic demographics in the so-called
```

Page 39

```
1    Memorial Villages are substantially different than the
2    racial and ethnic composition of the areas outside the
3    villages located north of Interstate Highway 10?
4        A.  Yes.
5        Q.  I'm going to probably refer to Interstate
6    Highway 10 as "I-10" or the "Katy Freeway."
7        If I use those expressions, will you
8    know what I'm talking about?
9        A.  Yes.
10       Q.  Probably I-10 is the more current version.  I
11   group up in an era where it was the Katy Freeway.  But
12   you know -- either use you'll know what I'm talking
13   about?
14       A.  Yes.
15       Q.  Okay.
16       (Marked Porter Exhibit No. 4.)
17       Q.  (BY MR. ABRAMS)  Let me hand you what's been
18   marked as Exhibit 4.
19       Do you recognize that as a map depicting the
20   boundaries of what I call the so-called Memorial
21   Villages, which encompasses Bunker Hill Village, Piney
22   Point Village, Hunters Creek Village, Hedwig Village,
23   Spring Valley Village, and Hilshire Village?
24       A.  Yes.
25       Q.  And I'm not holding you to the standards of a
```

Page 40

```
1    demographer, but do the boundaries appear to be --
2    correspond for what you understand and the district
3    understands the boundaries of those villages are?
4        A.  Yes.
5        Q.  Does the district acknowledge that the
6    non-Hispanic white populations in the Memorial
7    Villages range from 94 plus percent to 67 percent of
8    those populations?
9        A.  Can you repeat that question?
10       Q.  Yes, ma'am.
11       Does the district acknowledge that the
12   non-Hispanic white populations of the Memorial
13   Villages vary from 94 plus percent to 67 percent of
14   the total populations in those communities?
15       A.  Yes.
16       Q.  Does the district acknowledge that the
17   villages report very small Hispanic and black
18   populations?
19       A.  Yes.
20       Q.  Does the district acknowledge that the racial
21   and ethnic segregation in the villages corresponds to
22   the racial and ethnic segregation evident in the
23   student populations on the north and south sides of
24   the freeway?
25       MR. CRAWFORD:  Objection; form.
```

Page 41

1    A.  I'm not sure about the word "segregation" and
2  the connotation with that.
3    Q.  (BY MR. ABRAMS)  Let me -- let me rephrase the
4  question.
5      Does the district acknowledge that the racial
6  and ethnic demographics in the villages correspond to
7  the racial and ethnic demographics evident in the
8  student populations in the district's north and
9  south-side schools?
10    A.  I'm going to try to reword the question.
11    Q.  Yes, ma'am.
12    A.  Tell me if I'm correct.
13    Q.  Yes, ma'am.
14    A.  You're asking if the racial breakdown of the
15  villages represents the entire school district?
16    Q.  No, ma'am.
17    A.  I'm sorry.
18    Q.  Let me -- let me take another crack at it.
19    A.  I'm sorry.
20    Q.  I think we're in agreement, and the district
21  acknowledges, I think, that the population of the Memorial
22  Villages is largely white and nonminority, correct?
23    A.  Correct.
24    Q.  It is also the case, isn't it -- isn't it
25  that the populations of the schools on the south side

Page 42

1  of I-10 are largely white and not minority?
2    A.  I believe that to be accurate, but I would
3  want to see the data to verify that.
4    Q.  While the district has maintained its current
5  at-large system for electing school board trustees,
6  has it ever investigated why residential demographics
7  of the Memorial Villages are what they are?
8    A.  No.
9    Q.  Has the district ever investigated how the
10  racial and ethnic demographics came about in the
11  district as evidenced by the demographics of the
12  Memorial Villages?
13    A.  No.
14    Q.  Has the district ever investigated how the
15  racial and ethnic demographics on the north side of
16  I-10 have come about over time?
17    A.  No.
18    Q.  Has the district ever investigated whether
19  the racial and ethnic demographics in the district has
20  negatively affected the delivery of educational
21  services to its students?
22    A.  Can -- will you repeat that?
23    Q.  Sure.  Has the district ever investigated
24  whether the racial and ethnic demographics in the
25  district, which I'll oversimplify to mean the

Page 43

1  south-side schools are largely white and many, if not
2  all of the north-side schools are largely minority,
3  how that demographic breakdown affects the delivery of
4  educational services to the students?
5    A.  We focus more -- not based on racial.  We
6  focus more on economically disadvantaged and the needs
7  of specific students versus just whether or not
8  there's Hispanics in a campus or not.
9      Economically disadvantaged often brings
10  other opportunities for need for certain services,
11  additional services, and supports.  So that would be
12  more the focus on the educational delivery.
13    Q.  If I'm following you, then, the district has
14  had a focus on the impact of socioeconomic factors on
15  the delivery of educational services to its students
16  rather than the impact of the racial and ethnic
17  demographics of the district.
18      Is that what you're saying?
19    A.  We've seen the effect of that.  When you say
20  "investigation," we haven't -- I don't know the
21  right -- I apologize -- into why that is, we just
22  recognize that the students often need additional
23  services and support when they're lower socioeconomic.
24    Q.  We're coming up on an hour.  Would you like a
25  break or you want to keep trucking?  I'm at your

Page 44

1  disposal.  I told you we would break around every hour
2  and it looks like we're close to an hour.  So if you
3  would like to take a short break, we can.  If you
4  don't, we'll keep trucking.
5    A.  Let's take a short break.  That would be
6  great.
7    Q.  Very good.
8    A.  Thanks.
9    Q.  Uh-huh.
10      (Break from 10:24 a.m. to 10:32 a.m.)
11    Q.  (BY MR. ABRAMS)  Ms. Porter, the ethnic and
12  racial makeup of the students in the District 7
13  election precincts is heavily segregated, right?
14    A.  Heavily diverse?  I just -- I apologize.
15    Q.  The racial and ethnic composition is
16  concentrated and varies among the districts?
17    A.  Correct.
18    Q.  Let me hand you what's been marked as
19  Exhibit 5.  That was produced by the district as SBISD
20  No. 1.
21      (Marked Porter Exhibit No. 5.)
22    Q.  (BY MR. ABRAMS)  Do you recognize that as a
23  map from the district's Web site that depicts both the
24  attendant zones for the middle schools in the district
25  and because those attendant zones are used as the

11 (Pages 41 to 44)

Page 45

1    election precincts -- the election precincts for the
2    district?
3        A.  Yes.
4        Q.  Does the district agree that four of the
5    seven districts shown, namely the Landrum, Northbrook,
6    Spring Woods, and Spring Oaks Middle School areas and
7    precincts, are overwhelmingly comprised of Hispanic
8    students?
9        A.  Yes.
10       Q.  Based on my math, there's an average of
11   87 percent of the students in those election precincts
12   and enrollment districts are Hispanic.
13           Does that figure sound about right?
14       A.  Yes, that sounds about right.
15       Q.  In the remaining three election or enrollment
16   districts, the Memorial, Spring Branch, and Spring
17   Forest precincts, the student body is somewhere
18   between 42 percent and 52 percent white, correct?
19       A.  That sounds correct.
20       Q.  One of the topics that you've been designated
21   to testify about is the current ethnic and racial
22   background of the citizenship voting age population
23   voters in the district.
24           Do you agree that the ethnic and racial
25   background of the voting age population of the voters

Page 46

1    in the district more or less tracks the ethnic and
2    racial background of its students?
3        A.  I have not seen recent -- any recent census
4    numbers, but I would believe that it follows the
5    breakdown of the students.
6        Q.  And -- and based upon the investigation
7    that's been conducted by the district to date, at
8    least three single-member districts could be drawn in
9    the district in which the Hispanic voting age
10   population would constitute a majority, correct?
11       A.  Yes.
12       Q.  How and when did the district draw the
13   current boundaries of its election precincts, which
14   happen to be at school enrollment districts?
15       A.  In 2011, I believe that was when the
16   Legislature passed a law stating that we, as a
17   district, host our own elections if we went into a
18   contract with either a county or a city, host our own
19   election in May.
20           Prior to that, 2011 and prior, we
21   actually had the precincts of our elementary schools.
22   So in -- when the law passed, we had discussions with
23   the county and the county said that they would be
24   willing to partner with us, but would only agree to do
25   elections every other year.

Page 47

1        And I believe it would be the even years
2    in the sense that when they do their even year
3    elections in November, there's lots of runoffs that
4    happen in the spring that would make it too difficult
5    for them to host our elections separately.
6        So we -- instead we didn't want to -- at
7    the time didn't want to change our setup of our
8    staggered terms of every 3 years because we would have
9    had to switch to every 4 years for -- if we had gone
10   with the county.
11       So we were able to partner with Piney
12   Point, who we currently have a contract with, because
13   they used one of our far east elementary schools as a
14   site for their elections already prior to that.
15       And by taking over the election process
16   ourselves, we had to look at the administration and
17   financial implications of such.
18       And so having seven election sites would
19   be easier to handle both administratively and
20   financially because of the equipment and the people
21   involved than 26 sites of the elementary school.
22       So that was when that decision made
23   for -- and it occurred in the 2012 election the first
24   time.
25       Q.  Do you agree that with the exception of the

Page 48

1    Spring Branch Middle School and the Spring Forest
2    Middle School election precincts and enrollment
3    boundaries, those areas are divided between schools
4    located on the north and south sides of I-10?
5        A.  Yes.
6        Q.  What's the rationale for having election
7    precincts and middle school boundaries that zone
8    voters and students from the north side of I-10 to the
9    south side of I-10 for the Spring Branch and Spring
10   Forest Middle Schools?
11       A.  Using them for election sites -- I mean, for
12   election precincts?
13       Q.  Yeah.  It's kind of intertwined.  The
14   district elected chose to use its middle school
15   enrollment districts --
16       A.  Uh-huh.
17       Q.  -- as its election districts?
18       A.  Yes.
19       Q.  And so I'm not trying to take you into the
20   school enrollment question, but since the district
21   chose to use its middle school enrollment districts as
22   its election precincts, my question is:  What's the
23   rationale for having precincts in -- for Spring Branch
24   and Spring Forest that span I-10?
25       A.  Those enrollment boundaries were set many

Page 49

1  years ago. So I don't know the rationale why there
2  was north and south, but primarily it has to do with
3  ensuring that you -- the schools could handle the
4  number of students.
5       I've seen in other districts' enrollment
6  boundaries change as a school may increase, not be
7  able to handle their growth.
8       So it's possible changes could be made.
9  But as we are pretty steady in our growth of students,
10  we haven't had to have any type of change to our
11  middle schools or any of our enrollment zones, for
12  that matter.
13       Q.  When did the district adopt the middle school
14  enrollment zones that are shown on Exhibit 5?
15       A.  When the last middle school was built, which
16  would have been -- I believe is Northbrook Middle. So
17  I would say at least the mid-'80s.
18       Q.  So the boundaries of the election precincts
19  and the boundaries of the middle school enrollment
20  zones have been in place since sometime in the 1980s,
21  correct?
22       A.  The fact that they're the same, that didn't
23  happen until 2012, but yes.
24       Q.  Let me clarify that.
25       In 2012, the district elect -- chose to

Page 50

1  use its middle school enrollment zones as its election
2  precincts, correct?
3       A.  Yes.
4       Q.  And the district's decision to set the
5  boundaries of its middle school enrollment zones dates
6  back to the 1980s?
7       A.  Yes.
8            (Marked Porter Exhibit No. 6.)
9       Q.  (BY MR. ABRAMS)  Let me hand you what's been
10  marked as Exhibit 6.
11       You recognize this as the enrollment zones
12  from the district's Web site for its high schools?
13       A.  Yes.
14       Q.  It follows the same general layout as
15  Exhibit 5 except this map, Exhibit 6, depicts the high
16  school enrollments or attendance zones?
17       A.  Yes.
18       Q.  And the same pattern holds true for the high
19  schools as is true for the middle schools, and that is
20  there are two enrollment zones where students on the
21  north side go to the south side, the Memorial and the
22  Stratford enrollment zones, correct?
23       A.  Correct.
24       Q.  And that mirrors the pattern for middle
25  schools where students on the north side of I-10 go to

Page 51

1  Spring Branch Middle and students on the north side of
2  I-10 go to Spring Forest Middle, correct?
3       A.  Yes.
4       Q.  What is the racial and ethnic composition of
5  the students from the north side of I-10 that are
6  zoned to the south side middle schools and high
7  schools?
8       A.  I don't know that. I would have to dive into
9  street addresses.
10       Q.  We earlier looked at Exhibit 4.  Would you
11  pull that back out just so you can refer to it when
12  you look at Exhibit 5?
13            Exhibit 4 depicts the boundaries of the
14  Memorial Villages north of I-10.
15       Do you see that?
16       A.  Yes.
17       Q.  Spring Valley Village and Hilshire Village?
18       A.  Uh-huh.
19       Q.  Is that a "yes"?
20       A.  Yes.
21       Q.  Thank you.
22            Can you confirm that with reference to
23  Exhibit 5 the areas of Spring Valley Village and
24  Hilshire Village are among the areas zoned from north
25  to south?

Page 52

1            Their students go to Spring Branch
2  Middle rather than to one of the north-side middle
3  schools?
4       A.  Let me just verify. Yes. It looks like
5  Spring Valley Village and Hilshire Village all attend
6  Spring Branch Middle.
7       Q.  And we earlier confirmed that the racial and
8  ethnic composition of Spring Valley Village and
9  Hilshire Village is majority -- substantially majority
10  white, correct?
11       A.  Correct.
12       Q.  From that, does it follow that the students
13  that are sent from the north side from Spring Valley
14  Village and Hilshire Village to the south side middle
15  school, Spring Branch Middle, are substantially white
16  students?
17       A.  Yes.
18       Q.  Do you happen to know anything about the
19  demographics of the area north of I-10 where the
20  Spring Forest Middle School students go from north to
21  south?
22       A.  No, I don't.
23       Q.  Isn't it the case that the demographics of
24  that subdivision likewise are largely white, with
25  white students going from north to south?

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 53

1    A.  I don't know that.
2    Q.  You're not denying it, you just don't know?
3    A.  I don't know.
4        (Marked Porter Exhibit No. 7.)
5    Q.  (BY MR. ABRAMS)  Let me hand you what's been
6    marked as Exhibit 7.
7        Do you recognize that as the map from the
8    district's Web site akin to Exhibits 5 and 6?  This
9    one, Exhibit 7, depicts the enrollment zones for the
10   district's elementary schools.
11   A.  Yes.
12   Q.  And can you confirm that the same pattern or
13   a similar pattern holds true with respect to the
14   elementary schools that, with the exception of a
15   couple of schools, school enrollment boundaries are
16   divided between schools located on the north and south
17   side of I-10?
18   A.  Yes.
19   Q.  What is the racial and ethnic composition of
20   the students zoned from the north side of I-10 to
21   south-side schools?
22   A.  I believe there's more minorities.
23   Q.  Pardon me?
24   A.  I believe that it's a higher minority in
25   that -- in the schools that are on the north side.

Page 54

1    Q.  Right.
2        With respect to Hunters Creek Elementary
3    on the right side of Exhibit 7, if I'm interpreting
4    these colors correctly, it looks like the area between
5    Wirt and not quite up to Antoine is zoned for north to
6    south?
7    A.  Yes.
8    Q.  Can you confirm that the racial and ethnic
9    composition of the students zoned from north to south
10   there is largely white?
11   A.  I don't know that.  It is outside of Hilshire
12   Village, however.
13   Q.  Does the district contend that it is purely
14   coincidental that the vast majority of the voters and
15   students zoned from the north side of I-10 to the
16   south side of I-10 are white students from white
17   households?  For example, Spring Branch Middle School
18   Spring Forest Middle School, Memorial High School,
19   Stratford High School, Hunters Creek Elementary, and
20   Thornwood?
21       MR. CRAWFORD:  Objection; form.
22   A.  Yeah.
23   Q.  (BY MR. ABRAMS)  Is that just a coincidence
24   that the vast majority of the students and voters that
25   are moved from the north side to the south side for

Page 55

1    those schools are white?
2    A.  Yes.
3    Q.  Does the district advance the theory that it
4    is a proponent of neighborhood schools?
5    A.  Yes.
6    Q.  Why, if the district advances the theory of
7    neighborhood schools, are students placed in
8    enrollment districts that take them to schools that
9    are physically farther from their home than schools
10   nearby their home?
11       MR. CRAWFORD:  Objection; form.
12   A.  When an elementary school is built, they
13   consider having students its being built for.  And
14   schools aren't built in these perfectly middle of
15   squares and divided out among the school district.
16       And so that very well could be the case,
17   that a person -- that a household could be zoned to a
18   school that's actually further away from a school that
19   could literally be right across the street.
20   Q.  (BY MR. ABRAMS)  I'm looking at Exhibit 5, the
21   election precinct map which corresponds to the middle
22   school attendance zone map.
23       Do you have that?
24   A.  I do.
25   Q.  Has the district ever taken into account the

Page 56

1    racial, ethnic, and socioeconomic characteristics of
2    each of these election precincts and school attendance
3    zones?
4    A.  In what regard?  I mean, taken into account
5    as election zones?
6    Q.  And/or school enrollment zones, the fact that
7    their school enrollment zones where there are white
8    students on the north side of I-10 that could readily
9    be zoned to a school a stone's throw away but
10   nevertheless they're zoned to a white school south of
11   I-10?
12   A.  When these boundaries were established, I
13   believe it was based on how many students a school
14   could hold.
15   Q.  Have the boundaries of any election precinct
16   or school enrollment zone been the subject of
17   discussion with any of the municipalities in the
18   district?
19   A.  Not that I'm aware of.
20   Q.  Had the boundaries of any election precinct
21   or school enrollment zone been the subject of
22   discussion with any developers or builders within the
23   district?
24   A.  Not that I'm aware of.  In knowing my history
25   of working with school districts, when a developer is

Page 57

1    making decisions on where to build, they want to know
2    the facts about what schools they would go to so that
3    that's what they can start tabbing as they're
4    building.
5          So it's information they need.  So I
6    imagine those discussions have happened as different
7    areas have been built up just to make sure that
8    they're -- they know that.
9    **Q.  Have the boundaries of any election precinct**
10   **or school enrollment zone been the subject of**
11   **discussion with any homeowners associations or**
12   **subdivisions or neighborhood groups?**
13       A.  Not that I'm aware of.
14   **Q.  Has the district ever investigated the extent**
15   **to which the ethnic and racial demographics that**
16   **differ between the north and south sides of I-10 are**
17   **the result of restrictive zoning that was adopted in**
18   **the Memorial Villages when they were incorporated?**
19       A.  No.  We've never investigated that, nor are
20   aware of anything like that.
21   **Q.  We earlier discussed the fact that the racial**
22   **and ethnic demographics of the Memorial Villages vary**
23   **dramatically from the racial and ethnic demographics**
24   **of the north side of the district, right?**
25       A.  Yes.

Page 58

1    **Q.  Yet the district's never looked into why**
2    **those patterns exist?**
3        A.  Not in any way in the sense to educate the
4    students that show up.
5    **Q.  So is it the district's position that it is**
6    **ignorant of the cause of the ethnic and racial**
7    **demographics that vary between the communities on the**
8    **north and souths sides of I-10?**
9        MR. CRAWFORD:  Objection; form.
10       A.  We're aware that there are differences, but
11   why it's happened, no, we don't know.
12   **Q.  (BY MR. ABRAMS)  Has the district ever**
13   **investigated why the dramatically different**
14   **demographics exist between the north and south side**
15   **residential areas of the district?**
16       A.  In the sense that we know that there's more a
17   lower socioeconomic level on the north side.  We also
18   have a lot more apartment complexes and such that
19   would lead to that potential.
20          More families leaving -- living in a
21   closer area and in lower cost housing indicates a
22   lower socioeconomic level.  And most of the homes on
23   the south side are more expensive, so that indicates a
24   higher level of socioeconomic, not necessarily deal
25   with race, though.

Page 59

1    **Q.  Has the ever investigated the fact that**
2    **multifamily housing is not permitted under the zoning**
3    **ordinances of the Memorial Villages, which translates**
4    **into there not being apartments?**
5        A.  Wouldn't investigate it.  We know that
6    different villages have their own deed restriction,
7    yes.
8    **Q.  Has the district ever looked at the history**
9    **of the incorporation of the Memorial Villages, which**
10   **was in 1954 and 1955, shortly after the United States**
11   **Supreme Court decision in Brown versus Board of**
12   **Education, which inte -- which required integration of**
13   **schools?**
14       A.  No, has not investigated that.
15   **Q.  Does the district acknowledge that the**
16   **Memorial Villages were incorporated in 1954 and 1955?**
17       A.  Yes.
18   **Q.  But the district knows nothing about the**
19   **history or rationale for their incorporation at that**
20   **time?**
21       A.  No.
22   **Q.  Is that correct?**
23       A.  That's correct.
24   **Q.  And the district does not claim to have any**
25   **understanding about the explanation for the racial and**

Page 60

1    **ethnic demographics of the residential patterns that**
2    **vary between the north and south-side communities,**
3    **correct?**
4        A.  Correct.
5    **Q.  What process historically did the district**
6    **follow when designating early voting locations in the**
7    **district and what was the rationale for the number and**
8    **placement of those locations through 2021?**
9        A.  2011 and prior, we actually only had one
10   early voting site.  It was essential administration
11   building.
12          When we made the change in 2012, it was
13   important to the board because we went from 26 sites
14   down to 7 on election day, to offer some additional
15   sites for early voting to offer the citizens an
16   opportunity.
17          And so they made the decision to choose
18   a location in the west side that would support the
19   west side and one that would support the east side.
20   And that's how this location was picked as well as the
21   one at that Holy Cross Lutheran Church.
22          We also, as part of the agreement with
23   Piney Point, agreed to -- that they would host an
24   early election site at their site, but that was just
25   part of the contract agreement and the very fact that

15 (Pages 57 to 60)

Page 61

1   we have to have one with a city or county in order to
2   host those May elections.
3       Q.  Did anyone ever discuss the irony of putting
4   a early election site at Piney Point's city hall given
5   that Piney Point city hall is not located in Piney
6   Point and that's why Piney Point has to have its
7   elections at a Spring Branch Independent School
8   District elementary school so it can actually conduct
9   its elections within its own city?
10      A.  It was --
11          MR. CRAWFORD:  No objection other than
12  to note that that was a mouthful.
13          THE WITNESS:  Yes.
14      A.  I mean, that --
15          MR. ABRAMS:  Just an observation.
16      A.  It is, because they actually -- they host
17  meetings and such at our sites too.  But yeah.
18      Q.  (BY MR. ABRAMS)  With reference to Exhibit 5,
19  the election precincts and middle school attendance
20  zones, the west side location you said for the
21  attendance zone was basically near where we are here
22  at the Don Coleman Center?
23      A.  Yes.
24      Q.  And looking at Exhibit 5, if we look at Dairy
25  Ashford, it's near -- it's between Memorial and I-10

Page 62

1   on Dairy Ashford, right?
2       A.  Correct.
3       Q.  And it's in the Spring Forest Middle School
4   zone south of the freeway?
5       A.  Yes.
6       Q.  Another location is the so-called ad
7   building, now properly known as the Wayne Schaper
8   Leadership Center.  And that is located south of I-10,
9   two-thirds of the way to the right, between Echo Lane
10  and Voss on this map.  It shows a letter C, I think.
11      A.  Yes.
12      Q.  So that location likewise is south of I-10,
13  correct?
14      A.  Correct.
15      Q.  The city of Piney Point Village location on
16  Woodway is not depicted, but it's in fairly -- the --
17  the fairly southernmost portion of the Spring Branch
18  Middle School zone, correct?
19      A.  Correct.
20      Q.  And then the Holy Cross Lutheran Church is on
21  Westview and it is on the easternmost portion of
22  Westview within Hilshire Village, essentially.
23          Can you pick a -- a landmark on
24  Exhibit 5 that will tell us roughly where the Holy
25  Cross early voting location was?

Page 63

1       A.  A little south and east of 115, the red
2   circle for Valley Oaks.
3       Q.  Okay.
4       A.  So south and east of that is...
5       Q.  And I believe we earlier talked about the
6   fact that's within Hilshire Village, right?
7       A.  Correct.
8       Q.  So up until the -- and through the 2021
9   election, none of the early voting locations were
10  located among the Landrum, Spring Woods, Northbrook,
11  Spring Oaks Middle School attendance zones and none
12  were located north of I-10 other than the one at
13  Hilshire Village?
14      A.  Correct.
15      Q.  You indicated there's an intention to put in
16  one more early voting location in 2022?
17      A.  Yes.
18      Q.  Has the board voted on that?
19      A.  No.  They'll vote on that in January.
20      Q.  When -- when and in what context have
21  discussions occurred about the potential of adding a
22  new early voting location?
23      A.  After the 2021 election, after analyzing how
24  many early votes we had, which was well over 5,000
25  votes, when normally it's less than a thousand votes

Page 64

1   in early election and often around 400 or 500, as well
2   as we heard from, I would say a handful, maybe five
3   different people asking us to add an additional early
4   election site last year, which I couldn't at that
5   point because that decision has already been made
6   based on the historical occurrence of how voting fell,
7   we began to ponder where we would have another early
8   election site.
9           And actually John Knox Presbyterian, the
10  minister from that church that's at Hammerly and
11  Gessner reached out to us and offered their location
12  as a site for early election.
13          And so we went and looked at their room,
14  what they have, and feel that it will be a good fit
15  for us, mainly because I appreciate that it's on
16  Gessner, which would allow for some public
17  transportation, access to -- easier access to -- to
18  people on the northwest side, because that's who we
19  were hearing from, that they were having some
20  difficulties getting to the early election sites.
21      Q.  Did the reports from northwest residents
22  about difficulties with early voting sites occur
23  before or after the 2021 election?
24      A.  During.
25      Q.  During the election?

16 (Pages 61 to 64)

Page 65

1      A.  (Nodding head.)
2      Q.  And what impact does the district acknowledge
3  limiting access to early voting locations may have on
4  the election?
5      A.  We don't believe it limited their access
6  because early elections are over eight different --
7  let me get my numbers right -- eight different days
8  which would -- with the weekends as an opportunity to
9  get to early elections as well as they would have
10 their neighborhood middle schools on the election day
11 to vote on.
12           (Marked Porter Exhibit No. 8.)
13     Q.  (BY MR. ABRAMS)  What day of the week is the
14 regular election held?
15     A.  Saturday.
16     Q.  Let me hand you what's been marked as
17 Exhibit 8.
18          Do you recognize this as the notice for
19 the last trustee election --
20     A.  Yes.
21     Q.  -- indicating the various early voting
22 locations?
23     A.  Yes.
24     Q.  And those are the locations you indicated
25 were in place from 2012 to 2021?

Page 66

1      A.  Yes.
2      Q.  And before that time, there was only one
3  early voting location?
4      A.  Correct.
5      Q.  And that was at the Wayne Schaper Leadership
6  Center or then the ad building --
7      A.  Yes.
8      Q.  -- administration building --
9      A.  Uh-huh.
10     Q.  -- which is also located on the south side --
11     A.  Yes.
12     Q.  -- of I-10?
13     A.  (Nodding head.)
14     Q.  So before 2012, there were no early voting
15 locations on the north side of I-10, correct?
16     A.  Correct.
17     Q.  And after 2012, there's been one early voting
18 location, and that's on the northeast corner of
19 Hilshire Village?
20     A.  Correct.
21     Q.  Does the district have any knowledge to --
22 about the extent to which can district trustee
23 elections have involved formal or informal candidates
24 slating processes?
25     A.  Can you define "slating"?

Page 67

1      Q.  Organized groups that endorse candidates and
2  provide slates of candidate to elect.
3      A.  We don't have any knowledge of that.  Is that
4  what the question was?  I'm sorry.
5      Q.  Right.
6          Has the district ever investigated the
7  extent to which in these school board trustee
8  elections there have been formal or informal candidate
9  slating processes where groups endorse candidates?
10     A.  We have not investigated it.
11     Q.  In the -- does the district have any
12 knowledge of the extent to which there has been
13 candidate slating either formally or informally during
14 trustee elections?
15     A.  We have no knowledge.
16     Q.  Is the district aware of the extent to which
17 during the period 2011 to 2021 any trustee election
18 has involved in the campaign process overt or subtle
19 racial or ethnic appeals?
20     A.  We're not aware of any.  I've heard in some
21 recent public comments, I believe it was Noel --
22     Q.  Referring to Mr. Lezama?
23     A.  Yes.
24     Q.  Thanks.
25     A.  Mr. Lezama.

Page 68

1      Q.  Thank you.
2      A.  -- talked to some of that happening during
3  his campaign.
4          And I know he talked with a newspaper
5  reporter.  That's all I'm aware of.  I don't have any
6  documentation of that happening.
7          If things like that were brought to my
8  attention, we would always recommend that people
9  report that to the appropriate either Secretary of
10 State or Ethics Commission because they're the ones
11 that actually oversee the campaigning process of
12 elections.
13     Q.  Apart from the recent reports by Mr. Lezama
14 about racial or ethnic communications during his
15 campaign, does the district have any awareness of any
16 other campaigns in which similar communications were
17 distributed?
18     A.  No, not aware.
19     Q.  Does the district have access to the 2020
20 Census and American Community Survey information?
21     A.  I understand it's in the hands of our
22 demographer, but, no, we, ourselves, haven't seen any
23 reports from that census data.
24     Q.  Who is the district's demographer?
25     A.  Davis Templeton, I believe, is the name.  I

                              17 (Pages 65 to 68)

Page 69

1  don't know if that's the completely -- there might be
2  another name on the title.  I know Ms. Templeton.
3      Q.  Is Davis Templeton, independent of the
4  lawsuit, charged with any responsibilities to assist
5  the district on demographic matters?
6      A.  They help us with enrollment projections,
7  mainly.  That's where we've -- where we've used their
8  data before, what they acknowledge -- you know,
9  they're able to track, you know, what developing --
10  developments are in play, like who has put in permits
11  and things like that, to let us know that homes are
12  being built or apartments are being built to prepare
13  us for influx of kids.
14      Q.  What role, if any, do you understand Davis
15  Templeton is currently undertaking to analyze the 2020
16  Census or American Community Survey demographic
17  information for the district?
18      A.  Primarily to help us with the enrollment
19  trends that are happening.  Because our information is
20  provided in the census, like racial breakdown, that
21  could give us some indication of some areas that are
22  starting to grow to ensure that we're prepared to
23  provide, you know, supports that don't necessarily
24  come with the race but might come with other things
25  tied to them, primarily socioeconomic needs.

Page 70

1      Q.  Does the district know what the current
2  percentage of citizenship voting age population for
3  voters in the district is by race and ethnic group?
4      A.  No, we don't know that.
5          (Marked Porter Exhibit No. 9.)
6      Q.  (BY MR. ABRAMS)  Let me hand you what's been
7  marked as Exhibit 9.
8          Exhibit 9 is a document the district produced
9  with Bates No. SBISD 798 titled "Spring Branch ISD
10  10-Year Per Student Cost General Fund."
11          What does this document show?
12      A.  This takes the expenditures that happened out
13  of our -- specifically out of our general fund and
14  using the student enrollments at -- on each of those
15  years to determine a per student cost of actual
16  expenditures.
17          Out of that general fund, we've also
18  indicated by highlighting in each year what campuses
19  were considered Title I campuses.
20      Q.  Earlier in your testimony, I asked you about
21  Title I campuses.
22          And does Exhibit 9, by its highlighting,
23  tell us all which of the campuses are Title I
24  campuses?
25      A.  Yes.

Page 71

1      Q.  And a Title I campus requires that what
2  percentage of the students are eligible for free and
3  reduced lunch?
4      A.  At least 45 percent and definitely over
5  50 percent.  A campus can fluctuate year to year.  And
6  so once they meet Title I standards or once they meet
7  the Title I threshold, they could drop a little bit,
8  you know, if one year just a few less kids fill out
9  the form and then, you know, come back up.
10          But I would say need at least 45 to
11  50 percent of free and reduced lunch.
12      Q.  I want to kind of go behind the numbers to
13  understand what differences in funding exist and how
14  general fund dollars are allocated that result in the
15  differences.
16      A.  Okay.
17      Q.  With reference to the 2019-2020 figures, for
18  example, I see different per student averages.
19          What factors can result in the
20  differential on per student expenditures among the
21  different schools because I assume that all the
22  Title I influences separate and apart from this sheet,
23  right?
24      A.  Correct.
25      Q.  So Exhibit 9 doesn't reflect any Title I

Page 72

1  funding, which would flow through campus -- two
2  campuses that have economically disadvantaged
3  students, right?
4      A.  Correct.
5      Q.  What explanations are there for the per
6  student differentials reflected in Exhibit 9?
7      A.  There's several pieces of data that affect
8  that.
9          For one, the actual enrollment of
10  students.  When you consider a campus, every campus
11  has to have a principal, for instance.  And so more or
12  less students spreads out that cost per student.  So
13  definitely the enrollment of students as well as the
14  programs at those campuses.
15          For instance, if you look at an
16  elementary school, Bendwood School --
17      Q.  Yes.  Sure.
18      A.  -- that has very specialized special
19  education programs there.  Much, much lower
20  student-teacher ratios and things like that.
21          So they're going to have -- by nature of
22  their programatic happening specific to their campus
23  is going to, you know, produce more dollars there.
24          We also look at specific programs that
25  happen at each campus, CTE programs, for instance, as

18 (Pages 69 to 72)

Page 73

1    well as specific special education programs.  Not
2    every campus hosts every program there.
3            Another thing we do look at that free
4    and reduced lunch percentage.  And if you -- depending
5    on how many kids were reported with an approved free
6    and reduced lunch application, we then give additional
7    staffing and dollars for those -- at those campuses.
8            So a campus with a higher free and
9    reduced lunch percentage by design would receive
10   additional dollars towards staffing or additional --
11   well, towards spending in programs and then additional
12   staffing allocations.
13       Q.   And the factors that I've heard so far that
14   would be an explanation for why there are differential
15   per student expenditures start with enrollment.
16       A.   Uh-huh.
17       Q.   If you have fewer students, then the costs
18   are spread among fewer students.  That's one factor,
19   correct?
20       A.   Uh-huh.
21       Q.   A second -- is that a "yes"?
22       A.   Yes.
23       Q.   A second factor is there really are some
24   specialized campuses.  You used Bendwood as an
25   example, which is not akin to a traditional elementary

Page 74

1    school?
2        A.   Correct.
3        Q.   A third factor is there's some campuses where
4    there are specialized programs such as CTE or special
5    ed where the dollars are tracked to that campus, but
6    they correspond to a specialized program?
7        A.   Yes.
8        Q.   And then the fourth factor is some additional
9    amount allocated to campuses that exceed some
10   threshold for free and reduced lunch children?
11       A.   Correct.
12       Q.   Is there a per student stipend or per student
13   add-on that corresponds to this fourth factor, the
14   free and reduced lunch?
15       A.   Primarily, we see it in the staffing
16   allocations at the high schools where they're based on
17   their counts.  And I -- may not be exact, but I
18   want to say, you know, for every 25 or 30 free and
19   reduced lunch kits, they get an additional staffing
20   unit.  Something along that line.
21       Q.   So there's some ratio --
22       A.   Yes.
23       Q.   -- that determines how much additional
24   funding goes to a campus based upon the number of free
25   and reduced lunch children?

Page 75

1        A.   Primarily at the secondary campus, yes.
2        Q.   Are there any other significant factors that
3    go into explaining the differential expenditures
4    reflected on Exhibit 9 on a per student basis out of
5    the general fund other than what you've told me?
6        A.   We also have campuses that are considered
7    catalyst schools.  That's our definition of schools
8    that are struggling to meet the requirements by the
9    State to be considered -- passing might be the
10   terminology.
11           And so in some cases we've allocated an
12   additional position or supports at those campuses to
13   help them analyze data to help them ensure kids are
14   getting the specific support on the specific subject
15   that they need.
16       Q.   Where within the system are these budgetary
17   and staffing decisions made to reallocate funds from
18   the districtwide average?
19       A.   Probably with -- it starts at
20   administratively.  We look at the trends and the
21   needs.  We look to see what those costs would be.
22           Also, I would say in cohort with the
23   board defining their goals, that's actually -- we
24   watch what the needs are.  We look at the board goals.
25           And more than likely, they're often in

Page 76

1    line in the sense that, for instance, numeracy and
2    literacy, superintendent goals, board goals, focus
3    needs to be made on that.
4            So we've ensured -- you've heard people
5    talk about the federal dollars we've got in the ESSER
6    dollars.  Those specifically, quite a bit of it, are
7    very focussed on numerous needs at -- to help the
8    entire district.  And then those are assigned to
9    campuses that need that.
10           So the decision, you know, we -- however
11   then have to analyze can we handle the budget costs.
12   That case we specifically had ESSER dollars.  In
13   another case, if we didn't have those types of
14   dollars, we would have to analyze our programs and
15   determine what programs aren't as supportive of what
16   we need.
17           So I would say between the
18   administration and the board, the board ultimately
19   approves the budget.
20       Q.   Right.  I was going to say I know that as a
21   legal matter the board has to approve the budget, but
22   I also suspect as a practical matter administratively
23   you have to roll up to the board level --
24       A.   Absolutely.
25       Q.   -- with your line items.

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 77

1    A.  Yes.
2        **Q.  And those begin with the -- with the**
3    **administrative staff?**
4        A.  With the administrative staff down to, I
5    mean, campuses are given their allotments and
6    departments --
7        **Q.  Okay.**
8        A.  -- you know, have their requests and bring us
9    their budget.
10       **Q.  During the period from 2011 to 2021, the last**
11   **decade, has the district either received or published**
12   **information about whether it should or shouldn't**
13   **change its method of elected trustees?**
14       A.  I know in the recent year there's been
15   various e-mails.  I haven't seen them specifically.
16   I've just heard talk about e-mails that board members
17   have received, talking about whether or not -- from
18   both sides of the argument, whether or not we should
19   switch or not, especially tied to once the lawsuit was
20   filed, not really leading up to it.
21       I know, again, going back to that there
22   was a discussion in 2020, obviously with the board,
23   tied to -- I mean, at that time, you know, over that
24   previous year, several school districts in the north
25   side of Texas had been sued basically under this --

Page 78

1    relatively same premise.
2        I know there's some different facts
3    there.  And the board recognized that the diversity of
4    our school district appears to not be literally
5    represented on the school board, and so just wanted to
6    see what the options were to ensure that we were
7    getting that participation.
8        So I know that type of discussion has
9    happened, but other than the more recent comments
10   really tied to the lawsuit, I'm not aware.
11       **Q.  Between the time of the 2020 presentation by**
12   **the district's lawyers until the lawsuit, did the**
13   **district undertake any other discussions or**
14   **investigations of whether or not it would consider**
15   **changing its electual [phonetic] system?**
16       A.  No.  They were waiting for the results from
17   the 2020 Census to determine if the need.
18       **Q.  Has the district made any attempt to collect**
19   **and produce the e-mail communications, which you**
20   **indicated it has received, concerning whether or not**
21   **it should change its method of elected trustees?**
22       A.  My understanding is there may have been some
23   public information requests that some of those e-mails
24   might have come a part of, but that's all I know.
25       I don't know of any specific collection

Page 79

1    just for the purposes to see what -- you know, to
2    account for who was supportive or not supportive of
3    changing.
4        **Q.  Has the district requested from its trustees**
5    **copies of communications they have received in their**
6    **capacity as trustees concerning whether or not the**
7    **district should change its method of electing its**
8    **trustees?**
9        A.  I believe it's -- if it's been requested
10   through public information requests, then those
11   requests have been made; but I don't know, again, of
12   the specific requests.
13       MR. ABRAMS:  Charles, we'll talk
14   separately about it.  We made such a request and we
15   didn't get anything, and so I think there was a
16   suggestion that maybe we needed to define search
17   terms.
18       MR. CRAWFORD:  My understanding was --
19       MR. ABRAMS:  You and I can talk about
20   that separately.
21       MR. CRAWFORD:  Sure.  Yeah, that was my
22   understanding, is that Chris was waiting for some
23   search terms from you so that we could -- because
24   apparently there's a large volume of e-mails that
25   might come up.  So he was trying to narrow that down.

Page 80

1    That hadn't happened yet, and we're in the process.
2        MR. ABRAMS:  That would be a subject for
3    our discussion.
4        MR. CRAWFORD:  Sounds great.
5        MR. ABRAMS:  No need to trouble
6    Ms. Porter with that.
7        **Q.  (BY MR. ABRAMS)  I'm now going to turn --**
8    **actually, let me see.  We're almost at the hour mark.**
9    **And I'm closing in on a series of questions that are**
10   **going to go back to the allegations in the lawsuit.**
11       **If you're ready, this might be a good time to**
12   **take another one of our short breaks and we might be**
13   **able to close this out after our next break.**
14       A.  Sounds great.
15       **Q.  Okay?**
16       A.  Okay.
17       (Break from 11:23 a.m. to 11:31 a.m.)
18       **Q.  (BY MR. ABRAMS)  Ms. Porter, I now want to**
19   **visit with you about topics in the notice of**
20   **deposition that concern some of the factual**
21   **allegations in the lawsuit and the district's stated**
22   **position when it answered, just to give you a**
23   **heads-up.**
24       **In the defendant's answer, it denied that its**
25   **election system violates the Voting Rights Act or**

                                    20  (Pages 77 to 80)

Page 81

1   denies minority voters' rights.
2           My question is:  Before the district filed
3   that denial, what investigation and analysis did it
4   do?
5       A.  I don't know of a specific investigation or
6   analysis that we did.  It was just the belief that we
7   were not denying their rights.
8       Q.  Can you confirm that before filing that
9   denial the district did not conduct an investigation
10  into whether or not the allegations were true?
11          MR. CRAWFORD:  Objection; form.
12      A.  Can you word it again, because I just lost
13  how I would answer that?  I'm sorry.
14      Q.  (BY MR. ABRAMS)  Yes, ma'am.
15      A.  The proper word.
16      Q.  Yes, ma'am.  I'll ask you again.
17          Before the district denied that its
18  conduct violates the Voting Rights Act or denies
19  minority voters rights under that act, can you confirm
20  the district did not conduct any investigation or
21  analysis of that subject?
22          MR. CRAWFORD:  Objection; form.
23      A.  Yes, I can confirm that.
24      Q.  (BY MR. ABRAMS)  In Paragraph 8 of the
25  district's answer -- and by the term "district," now

Page 82

1   I'm referring to the district and its trustees that
2   have been sued in their official capacity --
3       A.  Yes.
4       Q.  -- with the defendant's answer.
5           The defendants denied that its at-large
6   system was the reason that the plaintiff lost in the
7   most recent election.
8           Before making that denial, can you
9   confirm that the district did not conduct any
10  investigation or analysis of that allegation?
11          MR. CRAWFORD:  Objection; form.
12      A.  We did not do any investigation.
13      Q.  (BY MR. ABRAMS)  In the defendant's answer,
14  the district denied that its elections involve
15  racially polarized voting.
16          Can you confirm that before the district
17  denied that allegation it did not conduct any
18  investigation or analysis of the truth or falsity
19  of -- of that fact?
20          MR. CRAWFORD:  Objection; form.
21      A.  We did not do any investigation.
22      Q.  (BY MR. ABRAMS)  In Paragraph 48 of its
23  answer, the district denied that Spring Branch's
24  neighborhoods evidence a history of residential
25  segregation and racial conflict.

Page 83

1           Before denying that, did the district conduct
2   any investigation or analysis of whether that fact is
3   true?
4           MR. CRAWFORD:  Objection; form.
5       A.  We had no history.  We -- we knew of no
6   history of that happening, so we did not do any
7   additional investigation.
8       Q.  (BY MR. ABRAMS)  Does the district know one
9   way or the other whether in the school board elections
10  during the 10-year period 2011 to 2021 involved a
11  majority of its white voters supporting different
12  candidates than did the majority of its Hispanic and
13  African-American voters?
14      A.  We did not know that.
15      Q.  Don't know one way or the other?
16      A.  Correct.
17      Q.  Maybe happened, maybe didn't happen?
18      A.  That's correct.
19      Q.  And the district's not investigated whether
20  or not that happened?
21      A.  Correct.
22      Q.  Has the district investigated whether or not
23  in the most recent school board trustee election in
24  2021 the majority of the white voters supported the
25  white candidates and that amount exceeded the number

Page 84

1   of white voters who supported the plaintiff?
2       A.  We have --
3           MR. CRAWFORD:  Objection; form.
4       A.  We have not investigated that.
5       Q.  (BY MR. ABRAMS)  Might be true, might not be
6   true?  District doesn't know?
7       A.  We do not know.
8       Q.  In Paragraph 53 of the defendant's answer,
9   the defendants denied that district elections are
10  deeply racially polarized.
11          Before denying that allegation, had the
12  district conducted any investigation or analysis of
13  whether or not that allegation was true?
14          MR. CRAWFORD:  Objection; form.
15      A.  No.
16      Q.  (BY MR. ABRAMS)  In Paragraph 58 of the
17  defendant's answer, the defendants denied that the
18  district has enacted any barriers to voting.
19          Before making that denial, had the district
20  conducted any investigation or analysis of whether or
21  not that allegation is true?
22          MR. CRAWFORD:  Objection; form.
23      A.  No.
24      Q.  (BY MR. ABRAMS)  Does the district
25  acknowledge that the location of its early voting

21 (Pages 81 to 84)

Page 85

1    sites provides an impediment to voters on the north
2    side of the district to vote -- early vote?
3        A.   Based on responses or comments I received
4    during this election, I realized I would be better
5    serving the voters of the district if I put another
6    one on the northwest side.  But going into the
7    election, we did not believe that was an impediment.
8        Q.   Does the district acknowledge that the
9    location of its early voting sites has an impact on
10   voter turnout?
11       A.   I don't know.
12       Q.   In Paragraph 75 of the defendant's answer,
13   the district made the statement that single-member
14   districts can promote balkanization of a school
15   district by electing trustees who are only focused on
16   the interest of the constituents of their smaller
17   single-member districts and not necessarily on the
18   overall good of the school district.
19            Before making that statement and its
20   answer, had the district investigated whether or not
21   the existing body of social science research
22   contradicts that statement?
23            MR. CRAWFORD:  Objection; form.
24       A.   Nothing scientific.  No scientific
25   investigation.  The -- there's fear -- an underlying

Page 86

1    fear in all school districts that that potentially can
2    happen with single-member districts.
3        Q.   (BY MR. ABRAMS)  What analysis has the
4    district ever conducted to determine whether in school
5    districts with single-member districts that negative
6    effect has occurred?
7        A.   No investigation.
8        Q.   What, then, was the source of this fear that
9    the district voiced in its answer that single-member
10   districts might have negative impacts?
11            MR. CRAWFORD:  Objection; form.
12       A.   No specific source.  Just the belief that
13   they represent the entire district as the board stands
14   now at the at-large.
15            It was more a strong belief that the
16   at-large system can support and represent the entire
17   district.
18       Q.   (BY MR. ABRAMS)  In Paragraph 75 of its
19   answer, the defendants claim that there are, quote,
20   sound nonrace-based policy reasons for maintaining
21   at-large voting systems, close quote.
22            What are those sound nonbased -- nonrace-based
23   policy reasons?
24       A.   Can you repeat that question?
25       Q.   In Paragraph 75 of the defendant's answer, it

Page 87

1    stated that --
2        A.   Is that -- I'm sorry, is that on this, so I
3    can read it as you say it?
4        Q.   Sure.  If you look at Topic 38, if I've
5    accurately created my notes.
6        A.   Yes.  I'm sorry.
7        Q.   Are you with me, Topic 38?
8        A.   Yes.
9        Q.   I'm asking you about the last part of that
10   topic, which is the assertion by the defendants that
11   there are, quote, sound nonrace-based policy reasons
12   for maintaining at-large voting systems.
13            What's the factual basis for the
14   district's position?
15       A.   That everybody who is a voting citizen has
16   the right to vote for whoever they want to and
17   regardless of race throughout the district at every
18   election.
19            That is not limited to only certain
20   elections.  And that's because we are an at-large
21   system.
22       Q.   Does the district acknowledge, in light of
23   its awareness of litigation involving other Texas
24   school districts, that the Voting Rights Act assures
25   that the voting strength of its minority voters is not

Page 88

1    to be diluted by the majority?
2        A.   Yes, they understand that.
3        Q.   Does the district acknowledge that there are
4    sound policy reasons for adopting a single-member
5    district plan as has been the case in various other
6    Texas school districts?
7            MR. CRAWFORD:  Objection; form.
8        A.   Single-member districts would ensure that
9    specific minority groups have an opportunity to be
10   represented as required by the Texas voters' rights.
11       Q.   (BY MR. ABRAMS)  So the district acknowledges
12   that there are also sound policy reasons for adopting
13   a single-member plan just as there are some policy
14   reasons that support maintenance of an at-large plan?
15            MR. CRAWFORD:  Objection; form.
16       Q.   (BY MR. ABRAMS)  Correct?
17       A.   Correct.
18       Q.   And one of the policy reasons supporting the
19   adoption of single member plans is that those plans
20   may allow minority voters references to be better
21   reflected in the election results?
22            MR. CRAWFORD:  Objection; form.
23       A.   That's possible.  Correct.
24       Q.   (BY MR. ABRAMS)  In Paragraph 76 of the
25   defendant's answer, the defendants denied that its

22 (Pages 85 to 88)

Page 89

1   system for electing trustees dilutes the voting
2   strength of racial or language minorities.
3           Before making that denial, what investigation
4   or analysis had the district conducted to determine
5   whether or not that allegation was true?
6           MR. CRAWFORD:  Objection; form.
7       A.  No investigation.
8       Q.  (BY MR. ABRAMS)  In Paragraph 79 of the
9   defendant's answer, the district denied that it had
10  done anything which gave the Latino community or any
11  other minority citizens less of an opportunity to
12  participate in the political process, before making
13  that denial what investigation or analysis had the
14  district conducted of that allegation to determine
15  whether or not it's true?
16          MR. CRAWFORD:  Objection; form.
17      A.  No specific investigation.
18      Q.  (BY MR. ABRAMS)  Do you believe you've
19  understood my questions here today except for when you
20  told me you didn't?
21      A.  Yes.
22      Q.  And when you told me you didn't, did I work
23  with you until I asked you a question that you did
24  understand?
25      A.  Yes.

Page 90

1       Q.  Are there any of your answers on behalf of
2   the district that you would like to change or correct
3   at this time?
4       A.  Not at this time.
5       Q.  Okay.
6           MR. ABRAMS:  At this time I have no
7   further questions.
8           And I thank you for your courtesy.
9           THE WITNESS:  Thank you.
10          MR. CRAWFORD:  Thank you.  We -- we will
11  reserve our questions.
12          MR. ABRAMS:  Okay.
13          (The deposition concluded at 11:45 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 91

1               WITNESS CORRECTIONS AND SIGNATURE
2       Please indicate changes on this sheet of paper,
    giving the change, page number, line number and reason
3   for the change.  Please sign each page of changes.
4   PAGE/LINE    CORRECTION    REASON FOR CHANGE
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
            _____
25          CHRISTINE PORTER

Page 92

1       I, CHRISTINE PORTER, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted on the previous
    page(s), and that I am signing this before a Notary
3   Public.
4
5
6       _____
        CHRISTINE PORTER
7
8   STATE OF T E X A S    *
9   COUNTY OF _____  *
10
        Before me, _____, on
11  this day personally appeared CHRISTINE PORTER, known
    to me, or proved to me under oath or through
12  _____ (description of identity card or
    other document), to be the person whose name is
13  subscribed to the foregoing instrument and
    acknowledged to me that they executed the same for the
14  purposes and consideration therein expressed.
15      Given under my hand and seal of office on
    this, the _____ day of _____, 2022.
16
17
18      _____
        NOTARY PUBLIC IN AND FOR THE
19          STATE OF TEXAS
20  My Commission Expires: _____
21
22
23
24
25  JOB NO. 70024

## Page 93

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
            COURT FOR THE SOUTHERN
 3          DISTRICT OF TEXAS HOUSTON DIVISION
 4   VIRGINIA ELIZONDO, |
          Plaintiff,   |
 5                      |
     V.        | Civil Action No. 4:21-CV-01997
 6                      |
     SPRING BRANCH      |
 7   INDEPENDENT SCHOOL |
     DISTRICT, ET AL.,  |
 8      Defendants.     |
 9          REPORTER'S CERTIFICATION
        ORAL DEPOSITION OF CHRISTINE PORTER
10              DECEMBER 28, 2021
11      I, Mendy A. Schneider, a Certified Shorthand
12   Reporter in and for the State of Texas, hereby certify
13   to the following:
14      That the witness, CHRISTINE PORTER, was duly sworn
15   by the officer and that the transcript of the oral
16   deposition is a true record of the testimony given by
17   the witness;
18      That the deposition transcript was submitted on
19   _____, 2022, to the witness, or to the
20   attorney for the witness, for examination, signature,
21   and return to Worldwide Court Reporters, by
22   _____, 2022;
23      That the amount of time used by each party at the
24   deposition is as follows:
25          MR. ABRAMS - 01:19:22
```

## Page 94

```
 1      That pursuant to information given to the
 2   deposition officer at the time said testimony was
 3   taken, the following includes counsel for all parties
 4   of record:
 5          MR. BARRY ABRAMS AND MR. MARTIN GOLANDO,
     Attorneys for Plaintiff.
 6          MR. CHARLES J. CRAWFORD, Attorney for
     Defendants.

 7
 8      I further certify that I am neither counsel for,
 9   related to, nor employed by any of the parties or
10   attorneys in the action in which this proceeding was
11   taken, and further that I am not financially or
12   otherwise interested in the outcome of the action.
13      Further certification requirements pursuant to
14   Rule 203 of TRCP will be certified to after they have
15   occurred.
16      Certified to by me this _____.
17
18
19
20   _____
     Mendy A. Schneider, CSR NO. 7761
21   Expiration Date:  1-31-2023
22
23
24
25
```

## Page 95

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition was _____ was not _____
 3   returned to the deposition officer on _____,
     2022.
 4      If returned, the attached Corrections and
 5   Signature page contains any changes and the reasons
 6   therefor;
        If returned, the original deposition was delivered
 7   to MR. BARRY ABRAMS, Custodial Attorney;

 8      That $_____ is the deposition officer's charges
     to the Attorney for Plaintiff, MR. BARRY ABRAMS, TBA#
 9   00822700, for preparing the original deposition
     transcript and any copies of exhibits;
10      That the deposition was delivered in accordance
11   with Rule 203.3, and that a copy of this certificate
     was served on all parties shown herein and filed with
12   the Clerk.

13      Certified to by me this _____.
14
15   _____
        Mendy A. Schneider, CSR NO. 7761
16      Expiration Date:  1-31-2023
17
18
     JOB NO. 70024
19
20
21
22
23
24
25
```

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT
                   COURT  FOR  THE  SOUTHERN
 2            DISTRICT  OF  TEXAS  HOUSTON  DIVISION

 3

      VIRGINIA  ELIZONDO,    |
 4        Plaintiff,         |
                             |
 5    V.                     |   Civil  Action  No.  4:21-CV-01997
                             |
 6    SPRING  BRANCH         |
      INDEPENDENT  SCHOOL    |
 7    DISTRICT,  ET  AL.,    |
          Defendants.        |
 8
      THE  STATE  OF  TEXAS  :
 9    COUNTY   OF   HARRIS  :
10        I,  MENDY  A.  SCHNEIDER,  a  Certified  Shorthand
11    Reporter  in  and  for  the  State  of  Texas,  do  hereby
12    certify  that  the  facts  as  stated  by  me  in  the  caption
13    hereto  are  true;  that  the  above  and  foregoing  answers
14    of  the  witness,  CHRISTINE  PORTER,  to  the
15    interrogatories  as  indicated  were  made  before  me  by
16    the  said  witness  after  being  first  duly  sworn  to
17    testify  the  truth,  and  same  were  reduced  to
18    typewriting  under  my  direction;  that  the  above  and
19    foregoing  deposition  as  set  forth  in  typewriting  is  a
20    full,  true,  and  correct  transcript  of  the  proceedings
21    had  at  the  time  of  taking  of  said  deposition.
22            I  further  certify  that  I  am  not,  in  any
23    capacity,  a  regular  employee  of  the  party  in  whose
24    behalf  this  deposition  is  taken,  nor  in  the  regular
25    employ  of  this  attorney;  and  I  certify  that  I  am  not
```

 1    interested in the cause, nor of kin or counsel to

 2    either of the parties.

 3

 4         That the amount of time used by each party at

 5    the deposition is as follows:

 6         MR. ABRAMS - 01:19:22

 7

 8         GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

      this, the _10_ day of _January_, 2022.

 9

10

            _Mendy Schneider_____

11          MENDY A. SCHNEIDER, CSR, RPR

            Certification No.:  7761

12          Expiration Date:  1-31-2023

13

      Worldwide Court Reporters, Inc.

14    Firm Registration No. 223

      3000 Weslayan, Suite 235

15    Houston, TX 77027

      (713) 572-2000

16

17

18

19

20

21

22

23

24

25

Page 91

```
 1          WITNESS CORRECTIONS AND SIGNATURE.
 2       Please indicate changes on this sheet of paper,
    giving the change, page number, line number and reason
 3  for the change.  Please sign each page of changes.
 4  PAGE/LINE        CORRECTION      REASON FOR CHANGE
 5  7/3     Certain of these questions - clarify.
 6  17/17   Buford Beaufort     correct spelling
 7  60/10   isstentrat Central     correction.
 8  69/2    I know Ms. Templeton  wasn't said
 9  74/19   Kits Kids          correction :
10  74/17   their the counts    correction
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22
23  _____
              CHRISTINE PORTER
24
25
```

DIANE DICKENS
2400814
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEBRUARY 7, 2024

Diane Dickens
Diane Dickens, notary.
Feb. 7, 2024

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

Page 92

```
 1            S I G N A T U R E   O F   W I T N E S S

 2

 3        I, CHRISTINE PORTER, solemnly swear or affirm

 4    under the pains and penalties of perjury that the

 5    foregoing pages contain a true and correct transcript

 6    of the testimony given by me at the time and place

 7    stated with the corrections, if any, and the reasons

 8    therefor noted on the foregoing correction page(s).

 9

10

                     _____

11                   CHRISTINE PORTER

12

13

14

15

16    Job 70024

17

18

19

20

21

22

23

24

25
```

DIANE DICKENS
2400814
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEBRUARY 7, 2024

*Diane Dickens*
Diane Dickens, notary
Feb. 7, 2024

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**