# <u>Exhibit E</u>

**EXHIBIT TO**
**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIRGINIA ELIZONDO,          §
        Plaintiff,          §
                            §
                            §
v.                          §  Civil Action No.
                            §  4:21-CV-01997
                            §
SPRING BRANCH INDEPENDENT   §
SCHOOL DISTRICT, ET AL.,    §
        Defendants.         §

*********************************************************

ORAL DEPOSITION OF
JOHN R. ALFORD, PH.D.
MARCH 24, 2022

*********************************************************

    ORAL DEPOSITION OF JOHN R. ALFORD, PH.D., produced
as a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 24th day of March, 2022, from 10:27 a.m. to
2:16 p.m., before John G. Rochelle, CSR in and for the
State of Texas, reported by machine shorthand, at the
SBISD Athletic Complex, 1050 Dairy Ashford Street,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      Mr. Barry Abrams
        Blank Rome LLP
 5      717 Texas Avenue, Suite 1400
        Houston, Texas 77002
 6      Phone: (713) 228-6606
        Email: babrams@blankrome.com
 7
           AND
 8
        Mr. Martin Golando
 9      The Law Office of Martin Golando, PLLC
        2326 W. Magnolia
10      San Antonio, Texas 78201
        Phone: (210) 471-1185
11      Email: martin.golando@gmail.com
12
13   FOR THE DEFENDANTS:
14      Mr. Charles J. Crawford
        Abernathy, Roeder, Boyd & Hullett, P.C.
15      1700 N. Redbud Boulevard, Suite 300
        McKinney, Texas 75069
16      Phone: (214) 544-4000
        Email: ccrawford@abernathy-law.com
17
18
19   ALSO PRESENT:
20      Ms. Audrey Shakra
21
22
23
24
25
```

## Page 3

```
 1              INDEX
                                      PAGE
 2
 3   Appearances.............................  2
 4   JOHN R. ALFORD, PH.D.
 5      Examination by Mr. Golando..............  5
 6   Signature and Changes...............  170-171
 7   Reporter's Certificate..................  172
 8
            EXHIBITS
 9
10   NO.  DESCRIPTION                       PAGE
11   Exhibit 1...........................  13
        Notice of Oral Deposition for John R. Alford, Ph.D.
12
13   Exhibit 2...........................  64
        Expert Report of John R. Alford, Ph.D. dated
14      February 21, 2022
15   Exhibit 3...........................  69
        Expert Report of Robert M. Stein, Ph.D. dated
16      January 20, 2022
17
18   Exhibit 4...........................  119
        Article entitled "Political Attitudes Vary with
19      Detection of Androstenone"
20   Exhibit 5...........................  88
        Article entitled "At-Large Elections and
21      Minority Representation in Local Government"
22
23   Exhibit 6...........................  163
        Document entitled "Letter of Agreement for
24      Services of Consulting and Testifying Expert"
25
```

## Page 4

```
 1   Exhibit 7...........................  165
        Article entitled "Republican Party of Texas
 2      Doubles Down on Local Election"
 3
     Exhibit 8...........................  166
 4      Article entitled "Do District-Based Elections
        for School Board Help Minority Candidates Get
 5      Elected?"
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Page 5

1    (Exhibit Nos. 1 through 8 premarked.)
2         JOHN R. ALFORD, PH.D.,
3    having been first duly sworn, testified as follows:
4         EXAMINATION
5    BY MR. GOLANDO:
6    Q. Good morning, Dr. Alford.
7    A. Good morning.
8    Q. My name is Martin Golando. We've met before.
9    I represent Virginia Elizondo in this case. And you've
10   read the pleadings, and you've read the expert reports;
11   is that correct?
12   A. That's correct.
13   Q. And you've had your deposition taken -- I don't
14   know -- 140 times, something like that?
15   A. I don't know if it's that many times, but it
16   seems like that many times.
17   Q. So you're well-acquainted with the process. I
18   don't think I've ever deposed you before, but --
19   A. I don't think so.
20   Q. -- I am a little inarticulate. I talk a little
21   mushmouthy. And so if you don't understand what I'm
22   asking you to do, or asking you to say, it's my fault.
23   So just ask me to repeat it, or I'll have him repeat it
24   to you. It's just I want to make sure that we're very
25   clear on the record the questions and answers. Right?

Page 6

1    The second instruction, I think, is the -- I need you to
2    wait till I finish asking the question, and then you can
3    answer. And I will try not to interrupt you. If you
4    would try not to interrupt me, I'd be appreciative. And
5    if you don't understand anything I'm saying or if you
6    don't understand the question, again, just let me know,
7    and we'll try to work it through. I promise.
8         So would you mind telling me what is your
9    full name for the record, please?
10   A. It's John Richard Alford.
11   Q. And where do you live, sir?
12   A. I live in Houston, Texas.
13   Q. Okay. And did you go to high school here? I
14   think you did. Right?
15   A. I went to -- it's a good, good question. I
16   went to -- I went to Clear Creek High School, which is
17   of course in Galveston County. And we lived on the --
18   what would not be in Houston, but at the time had not
19   yet been annexed so --
20   Q. Interesting. Fair enough. And so where did
21   you go to school first for college?
22   A. University of Houston.
23   Q. And when were you there roughly?
24   A. Late '70s.
25   Q. Okay. Did you ever do any drama there?

Page 7

1    A. No.
2    Q. Because they had a great drama teacher. I
3    don't know if you knew that or not.
4    A. Oh, yeah. Like world-renowned, really amazing.
5    And a very -- the University of Houston is a place I'm
6    very proud of.
7    Q. I would be, too. So if you watch any of the
8    Lakers series, the guy who's playing Bill Sharman --
9    A. Yeah.
10   Q. -- actually went to the University of Houston
11   at roughly the time you were there.
12   A. Yeah.
13   Q. I didn't know if you --
14   A. Yeah.
15   Q. -- if you knew him or not.
16   A. Yeah. They had a pretty good basketball team
17   back then, too.
18   Q. They did. Is that Calvin Hayes or --
19   A. Yeah. Yeah.
20   Q. Yeah. Fair enough.
21   A. Yeah. When I was in high school was sort of
22   their -- it was their real peak for U of H basketball.
23   I guess I was in middle school when -- I think when
24   they -- when they beat UCLA, which was just spectacular.
25   Q. And it was 1973?

Page 8

1    A. Yeah. Yeah. So it would have been -- no.
2    Yeah, I guess I would have been there. Pretty -- you
3    know, I spent a lot of time talking to people from
4    the -- sort of that era and the era just before I was
5    there. It was just a really interesting time. And Gene
6    Locke has some fascinating stories about his time at U
7    of H. It was just a -- you know, it was a very short
8    time before I was there, but a different world than it
9    was by the time -- by the '70s. The '60s at U of H was
10   quite different. So it's interesting.
11   Q. That's interesting. And after that you went
12   and got an MPA; is that correct?
13   A. I got a -- yes. I got a bachelor's and a
14   master's of public administration.
15   Q. And then you went to Iowa, correct?
16   A. Iowa. Correct.
17   Q. And when were you in Iowa?
18   A. So Iowa would have been from, say, '79 to '84.
19   Something like that.
20   Q. And what did you study at Iowa? What was your
21   major course of study?
22   A. So American politics, methodology, and public
23   policy.
24   Q. And did you study Bernie Grofman then and his
25   ecological regression at the time, or what did you --

2 (Pages 5 to 8)

Page 9

1  what was your first introduction to regression?
2  A. That probably would have been the first time I
3  was familiar with that. And then when I -- I continued
4  to work with some people at U of H, and so I -- and
5  Bernie back and forth for a time period because mother
6  lived in Houston a while. So I met him. And we
7  didn't ever actually work on any research projects
8  together; but, you know, he's a -- he's an amazing
9  fella.
10  Q. He is. He's extraordinarily impressive. So
11  you were at Iowa, got your Ph.D., and you came back to
12  Houston? Or what was your first job out of Iowa?
13  A. No. I got a job at Oakland University.
14  Q. In Michigan?
15  A. Yes.
16  Q. Okay.
17  A. I wasn't aware of the fact it was in Michigan.
18  When I accepted the interview I thought it was in
19  Oakland. Foolish me. You know, pretty much -- I was
20  born in Japan, but I pretty much grew up in Houston.
21  And so Iowa was a very cold experience for me.
22  Q. I bet.
23  A. I was excited about getting somewhere else, and
24  I wasn't really thinking about going kind of further
25  north. And so I went to -- I went to Oakland. I was

Page 10

1  there for a year. And then I got recruited by
2  University of Georgia. So I was at University of
3  Georgia for a couple of years. And then the professor
4  who had been my mentor at U of H in the meantime had
5  jumped to Rice, and he recruited me to come back to
6  Houston.
7  Q. Must have been nice to come home, I guess?
8  A. Yeah.
9  Q. So you said you were born in Japan? Is that
10  correct?
11  A. Yes.
12  Q. Was your dad in the military, mom in the
13  military?
14  A. My dad is a -- yeah, an Army officer, and
15  so we -- it was during the Korean war. He was stationed
16  in -- he had been in the Pacific in World War II but
17  then came back in the Korean war and was in a -- running
18  a supply area in southern Japan. That's where I was
19  born.
20  Q. I didn't know that. I guess you bounced around
21  a bit, huh, after that or --
22  A. Iran, Vienna, lots of different places in the
23  United States. When he retired from the military out
24  of -- we came back to Fort Bliss. He retired out of
25  Fort Bliss and then immediately took a job with a

Page 11

1  construction company in Iran. Then we spent a year in
2  Vienna, then a couple years in Washington, D.C., where
3  he was doing consulting, and then Corpus Christi and
4  some other places before he -- he finally settled down,
5  went to work for NASA when they were just building
6  the -- building that up. And that's where -- so that's
7  where I settled in and went to middle school and high
8  school. But a lot of moving around before that.
9  Q. Me too. Not quite to Iran, but -- I'm going to
10  hand you the --
11  A. Yeah. You pretty much trump anybody with Iran
12  because nobody lived there.
13  Q. So you were in Iran during -- when there was a
14  shah, right?
15  A. We actually met the shah.
16  Q. What was that like?
17  A. Unimaginably weird, like -- like waking up in
18  some kind of a weird '50s Disney movie or something
19  because they -- this was to celebrate the opening of --
20  the completion of this dam project, and they completely
21  remade the town. I mean, they just -- like they changed
22  the -- you know, artificially sort of with paper and
23  stuff changed the outside of the building. So they had
24  all these gold banners everywhere. Everybody put on
25  these fancy clothes. And just like a weird retinue of

Page 12

1  people coming through. And, you know, it was just -- it
2  was very, very strange.
3  Q. How old were you?
4  A. It was -- let's see. Six.
5  Q. Wow.
6  A. So it was -- at the time it just seemed -- I
7  mean, everything about Iran seemed fanciful. Most
8  things about Vienna seemed fanciful, too, but -- but I
9  actually haven't been back to Iran, but I've been back
10  to where we lived in Vienna. It's one of those things
11  where you -- when you're a kid you think, you know,
12  everything is weird and strange and big. And I remember
13  talking to my brother, and I said, "You know, do you
14  remember like when we lived in Vienna? I remember we
15  were living in this really huge, almost like a castle on
16  a hill, and it had a turret, and there were like" --
17  "the people lived in the turret, and we weren't allowed
18  to go in there." And my brother said -- he was younger.
19  My brother was a couple of years younger than me. He
20  said, "You know, I've heard like our sister talking
21  about that," but he said, "I'm not sure that is true."
22  So I went back to Vienna, and it turned out it all was
23  true.
24  Q. That's wild.
25  A. Yeah.

3 (Pages 9 to 12)

Worldwide Court Reporters, Inc.
(800) 745-1101

1      Q. So you're here pursuant to a notice of
2  deposition, correct?
3      A. Correct.
4      Q. Have you seen the notice, sir?
5      A. I have.
6      Q. I'm going to hand it to you. It's been
7  previously marked as Exhibit No. 1. Could you review it
8  for me and make sure it's authentic?
9      A. Yeah, that's what I remember seeing.
10     Q. So did you see the subpoena in the back for the
11 documents?
12     A. Yes.
13     Q. Okay. Did you have any documents for me?
14     A. I have -- I consulted with Mr. Crawford, and I
15 have documents that are related to my report.
16     Q. Okay.
17     A. And to my contract with the attorneys.
18     Q. Did you bring them with you today? Because I
19 have not seen them.
20     A. Oh. Sorry.
21         MR. CRAWFORD: John, are these your
22 originals?
23         THE WITNESS: They're --
24         MR. CRAWFORD: We can get copies made for
25 you.

1         MR. GOLANDO: Please. That would be great.
2      A. So this is a -- this is just the email exchange
3  that was related to the contract. This is the contract.
4  And this is -- in the report I referenced a web page
5  related to single-member versus at-large. And then I
6  referenced a press release from the Republican Party.
7  So those are the -- other than the documents that I
8  consulted that were either Dr. Stein's report or his own
9  articles he cited, that sort of thing, these are the
10 things that both related to the contract and to
11 materials I relied on or referenced in the report.
12     Q. (BY MR. GOLANDO) This is the entirety of the
13 documents --
14     A. Yes.
15     Q. -- that you believe are responsive to the
16 subpoena, correct?
17     A. Yes.
18     Q. I'm going to give these to your counsel so he
19 can review them and then give me what he thinks is
20 responsive. And I'm going to have Barry review it
21 during the deposition. And I don't think we'll have any
22 questions about it, but if we do I want to make sure we
23 get it tacked on at the end, if you don't mind.
24     A. Yes.
25     Q. Have you worked for Spring Branch ISD in the

1  past?
2      A. Yes.
3      Q. What was the nature of that engagement?
4      A. So I'm -- I'm not entirely sure about the
5  specific years, but sort of the timeline, my
6  recollection is that there was a lawsuit filed against
7  the district previously. And it could have been in
8  the -- perhaps in the '90s, maybe in the early 2000s,
9  but some -- some time ago. And I was hired by Robert
10 Heath, who was the attorney that was hired to defend the
11 school district. And I worked with him on that. And I
12 don't know if the -- I can't remember what the
13 resolution of that was. It didn't go to trial. I think
14 it was either dismissed or nonsuited. I'm not really
15 sure.
16     Q. Do you remember the nature of it? Was it a
17 voting rights lawsuit?
18     A. It was a -- it was a Section 2 voting rights
19 lawsuit, and the -- it turned out that it wasn't
20 possible to -- the only part that I had in it, my
21 recollection is, that it started with some -- a lot of
22 debate about whether Gingles 1 could be met, and that
23 ended up being what the suit was either dismissed or
24 nonsuited over, was the inability to actually draw a
25 majority-minority district.

1      Q. Did you review Gingles 2 or 3 testimony?
2      A. I -- I just don't -- I don't remember whether
3  that -- whether we had started that or hadn't, but I --
4  I certainly didn't do anything in the sense of a report
5  on it or anything. I don't -- you know, Bob Heath may
6  still have that information. I don't even have the
7  records from that era anymore. But I don't -- I don't
8  recall doing -- again, I may have or may not. I know it
9  wasn't -- -- it never got to that stage in terms of --
10 either of my doing a formal report or a deposition.
11     Q. Do you recall coming to an opinion about
12 racially polarized voting in any sense in SBISD at that
13 time period?
14     A. No, I don't think -- I don't recall anything at
15 that time period, no.
16     Q. Is that the extent of your previous engagement
17 with SBISD? Did you do anything else for them in the
18 intervening years?
19     A. So in the intervening years when -- I'm not
20 sure exactly about the dates on this, but sometime more
21 recently I was retained to work with counsel for the
22 district on issues related to the districting scheme.
23 So they -- the district was considering alternatives to
24 the current at-large system, including single-member or
25 mixed plans. There was -- I think most of my discussion

Page 17

1    with them had to do with alternative elections,
2    particularly moving to something like cumulative
3    elections.  So I've been involved in the shift in
4    Amarillo to cumulative elections.  And so I think most
5    of what I provided to the attorneys was information
6    about kind of the nature of -- I think they had
7    demographers that were working.  I wasn't doing -- so I
8    do both, you know, sort of redistricting lawsuits, and I
9    also do redistricting, so I do district drawing.  I
10   didn't -- I wasn't involved in drawing districts for
11   them.  They had some demographer doing that.  I was
12   mainly involved in sort of providing information about
13   how cumulative elections would work and sort of what
14   were the -- what were kind of the critical break points.
15          One of the issues in cumulative elections
16   are -- it's these thresholds of exclusion.  And they
17   vary depending on how many people are up.  And so that
18   was one of the questions.  It's -- you know, it's really
19   easy to meet the threshold of exclusion if you put all
20   seven board members up in the same election, but -- but,
21   you know, there are reasons why districts typically
22   don't put all their board members up at the same time.
23   So that was I think the main question that I was
24   addressing for them, was, you know, what -- what -- what
25   set of staggered terms involving how many members would

Page 18

1    meet the threshold of exclusion.
2          Q.  Was that in 2020, or was that in 2019?
3          A.  I think -- I could be wrong about this, but I
4    think there -- that this may have come up sort of in
5    that time frame, and then come up again more recently,
6    maybe -- coming up again maybe in 2017, 2018, somewhere
7    in that time frame.
8          Q.  But in the last four years roughly?
9          A.  Yes.
10         Q.  Do you recall why they wanted to investigate an
11   alternative election system?  By "they" I mean SBISD.
12         A.  I don't -- I don't think I was given a lot of
13   direct information about sort of what the thinking was,
14   but my impression was -- or at least I approached it as
15   probably a combination of motivations maybe, different
16   motivations possibly by different -- either by different
17   board members or different people involved.  But -- so
18   my sense is they were -- that they were both looking at
19   that as something the district might just want to do,
20   and also looking at it as something the district might
21   do in a -- in a sort of a prophylactic way; that is, to
22   avoid being -- to avoid being sued.
23          So at the -- in the very earliest instance
24   where it was clear that you couldn't draw a Gingles 1
25   district, I mean, one of the things that -- that I

Page 19

1    indicated at the time was that while they couldn't draw
2    a Gingles 1 district at that point, which I think may
3    have been around 2000, that it was clear that the
4    population trends, given the direction of population
5    trends, the day was going to come when they could
6    draw -- when they could draw a single -- when you could
7    draw a Gingles 1 district, and that in my experience any
8    district that could draw a Gingles 1 district should be
9    thinking seriously about what they intended to do about
10   it because it's -- it's not that hard to get -- it's not
11   that hard to win a Voting Rights Act Section 2 case if
12   you can't draw a single-member district.  There's really
13   only one thing where you're not at the mercy of sort of
14   interpretation or the court's feelings, or whatever, and
15   that is the bright line, like -- I mean, even if they
16   just go under it by, you know, a tenth of a percentage
17   point, apparently like the one person, one vote standard
18   for congressional districts, that -- apparently the
19   court means, literally means one person, one vote.
20         Q.  Yeah.
21         A.  The bright-line test literally means the
22   bright-line test.  And nothing after that, as I always
23   tell districts when I talk to them, nothing after that
24   is a bright line, nothing after that you can be assured,
25   you can say "okay, given this set of facts we're

Page 20

1    definitely going to win this case or we're going to" --
2    "you know, we could get this" -- "we could get the
3    summary judgment or something."  Once you get into not
4    only the other thresholds but the totality of the
5    circumstance then you -- it's not only does that mean
6    that you're actually going to probably end up in a full
7    trial as opposed to getting summary judgment on Gingles
8    1.  That's going to be expensive and it's -- and it's
9    going to be uncertain and it involves a lot of political
10   considerations that I think are important for a board to
11   be -- to be thinking about in advance.
12          It's not something you want to take
13   lightly.  So that was sort of where things were left, or
14   initially was that this was -- that that point was going
15   to come, and when that point -- when they reached the
16   point where they were no longer sort of protected by the
17   fact that a district couldn't be drawn that they were --
18   they needed to be thinking about what they wanted to do
19   at that point so --
20         Q.  Do you remember the names of the demographers
21   involved?
22         A.  I do not.
23         Q.  Do you recall if they did a racially polarized
24   voting analysis, if anybody did?
25         A.  I -- I'm -- I wasn't sort of privy to all of

5 (Pages 17 to 20)

Page 21

1   whatever their discussions were. I'm not sure I was
2   ever in -- either in direct contact with any of the
3   demographers or present when they were discussing things
4   with the lawyers, so I -- if they did, I wasn't aware of
5   it, but I don't know whether they did or not.
6       Q. Did you do a racially polarized voting
7   analysis?
8       A. At that point there was a -- I did just a very
9   preliminary, not -- sort of -- maybe not an actual
10  racially polarized voting analysis, but a quick look
11  at -- just looking at sort of where -- where candidate
12  votes were centered across the rough -- you can only do
13  it across the rough geography because there's so few
14  polling places. But just looking at where vote totals
15  were centered and how they varied across the geography,
16  but not a formal -- not like a EI formal analysis. At
17  that point it was just to look at the -- at sort of what
18  the election results looked like across the rough
19  geography.
20      Q. What was your informal conclusion? Do you
21  recall?
22      A. My informal conclusion was that that rough look
23  was certainly consistent with the possibility that --
24  both that Hispanic voters were voting at above 50
25  percent for preferred candidates, including Hispanic

Page 22

1   candidates, and that Anglo voters are voting below 50
2   percent for those candidates, and those candidates
3   weren't being elected to the board.
4       Q. Fair enough. And I think I -- in your answer I
5   heard you say you had not done one yet. Have you done a
6   racially polarized voting analysis?
7       A. Since?
8       Q. Since.
9       A. Yes.
10      Q. And not for this case, but for --
11      A. Right. Not for this case, but -- but more
12  recently than the -- so there -- there are sort of three
13  distinct eras here, the old --
14      Q. Sure.
15      A. -- the dinosaur era, which was about meeting
16  Gingles 1 with Bob Heath, the more recent stuff three,
17  four years ago looking at -- particularly focusing on
18  potential things the district might want to think about.
19  That was, again, this rough kind of look. And in
20  addition a more direct focus on cumulative voting on
21  systems with some at-large, you know, some
22  single-member. And then more recently I was asked by --
23  we're now at the -- at the second set of attorneys
24  rather than the third -- at the second set of attorneys
25  asked to provide the attorneys with, you know, a more

Page 23

1   complete analysis of the sort that you typically will
2   see in a case like this.
3       Q. Did you do ecological inference?
4       A. Yes.
5       Q. Gary King's?
6       A. Well -- oh, God. It's -- it is essentially
7   Gary King's, but not Gary King's original, and
8   particularly not his iterative, which I for some reason
9   find myself fighting about all over the country. People
10  still insist on using King's iterative, which King only
11  just mentioned in passing, and then immediately, you
12  know, replaced with a -- so, yes, the -- what I
13  typically use is the variant of King's EI that's
14  sometimes called the Bayesian or I -- I think it more
15  appropriately is R x C approach. But it's essentially
16  King's EI.
17      Q. I understand. And did you do the numbers
18  yourself?
19      A. I think -- so there were two -- two pieces to
20  that. There was a standard, just an OLS, which I often
21  do just as a first estimate. It's not as -- it doesn't
22  do as good a job. It doesn't give you statistical
23  significance, but it usually gives you a pretty good
24  quick picture, which I did. And then the actual EI
25  would have been run by Randy Stevenson, who's a

Page 24

1   professor at Rice, who does a lot of programming and
2   statistical work with me.
3       Q. And this was before the filing of this suit,
4   correct?
5       A. I believe so, although I'm not -- I'm not
6   exactly certain when the suit was filed or exactly
7   when --
8       Q. Yes, sir.
9       A. -- when the work was done. But I -- yeah, I
10  would say -- I think it was before the suit was filed,
11  but it could have been -- no, no, no, because there was
12  discussion -- I think the district was aware that they
13  could be sued so -- what I'm not sure about is the -- I
14  had been asked to sort of take a look, so I had done
15  that very informal look. And I had been asked by the
16  lawyers to take a look at that, and at that stage I
17  think probably was when I ran the sort of regression
18  analysis. Whether that -- whether the actual EI
19  analysis was done before or shortly after the lawsuit
20  was filed I don't -- I don't know.
21      Q. Do you recall the conclusions of that report?
22      A. I did not provide a report.
23      Q. Did you recall -- do you recall the findings
24  from your analysis?
25      A. So the findings I shared with the attorneys

Page 25

1    from that analysis.
2         MR. CRAWFORD:  And so based on that answer
3    I'll ask you not to disclose what you told the attorneys
4    based on the attorney-client privilege.
5         Q.  (BY MR. GOLANDO)  Is Lisa Turner your attorney,
6    sir?
7         A.  Lisa --
8         Q.  I'm sorry.  What was the previous attorney's
9    name?
10        MR. CRAWFORD:  Lisa McBride.
11        MR. GOLANDO:  I'm sorry.  I apologize.
12        MR. CRAWFORD:  No problem.
13        Q.  (BY MR. GOLANDO)  Is Lisa McBride your
14   attorney?
15        A.  My attorney?  No, she doesn't represent me.
16        Q.  All right.
17        A.  But that's who I was working for when she
18   represented the school board.
19        Q.  Yeah, I understand.  And when she contacted you
20   to do the EI analysis I heard you to say that it's
21   possible it happened before the institute of this
22   lawsuit.  Correct?
23        A.  That's possible, yes.
24        Q.  Okay.
25        MR. GOLANDO:  I think we need to -- I need

Page 26

1    to talk to Barry real quick, if you don't mind.
2         MR. CRAWFORD:  Okay.
3         MR. GOLANDO:  We're going to take a -- just
4    a two-minute break.
5         MR. CRAWFORD:  Sure.
6         MR. GOLANDO:  Two or three-minute break.
7         (Off the record from 10:54 a.m.
8         to 10:55 a.m.)
9         Q.  (BY MR. GOLANDO)  As I understand it, I asked
10   you what the contents of that previous analysis was, and
11   you -- Mr. Crawford objected on the basis of
12   attorney-client privilege, is that correct, and you're
13   currently refusing to answer that question?  Correct?
14        A.  I'm deferring to whatever -- whatever Charles
15   tells me to do that's what I'll do.
16        Q.  I don't think there's a basis to object to that
17   because I need to know your previous analyses for
18   credibility and weight.  You've been hired on this
19   position and --
20        MR. GOLANDO:  What I'd like to do instead
21   is to see if we can put this answer under seal, and we
22   can go fight about it with the --
23        MR. CRAWFORD:  No, I'm not willing to waive
24   it.  So what we can do is we can note it in the record,
25   and then after the deposition we can take it up with the

Page 27

1    court.  And if we need to re-present Dr. Alford we will,
2    but I'm not comfortable even under seal waiving the --
3    waiving the objection.
4         MR. GOLANDO:  I understand.  I think that's
5    reasonable.  Fair enough.  So let's just move on.
6         Q.  (BY MR. GOLANDO)  So the OLS that you did was
7    definitely before the lawsuit, correct, the ordinary
8    least squares?
9         A.  Could you remind me when the lawsuit was filed?
10   That might be --
11        MS. SHAKRA:  June -- June --
12        MR. GOLANDO:  June of last year.
13        MS. SHAKRA:  2021.  Probably like June --
14        MR. GOLANDO:  The 30th?
15        MS. SHAKRA:  No.  It was before the 26th.
16   I want to say it was maybe like the 12th.
17        MR. ABRAMS:  I'll be able to tell you in a
18   minute.  Just give me a second.
19        THE WITNESS:  I feel better for not
20   knowing.  I felt kind of stupid, like I didn't know when
21   the lawsuit was filed.  So this is nice.  I feel better.
22        MS. SHAKRA:  Okay.  Let's see.
23        MR. ABRAMS:  The amended complaint was
24   filed on June 22nd, so the original complaint would have
25   been filed several days before.

Page 28

1         Q.  (BY MR. GOLANDO)  So mid June.
2         A.  I was -- I thought it was in the fall, so
3    that's earlier.  So I don't -- I don't know.  I mean, I
4    could -- I could figure that out, but I just don't --
5    that's -- I didn't realize the lawsuit was filed quite
6    that early, so I don't -- I may have done that -- I
7    think I probably did it sometime in the summer, but I
8    think it might have been more like August rather than --
9    than in -- sort of in the -- in May.  I'm just not sure.
10        Q.  I understand.
11        A.  But I can find out.
12        Q.  If it was in May, then do you recall the
13   outcome or what the ordinary least squares regression
14   showed?
15        MR. CRAWFORD:  Again, I'm going to object
16   to that based on the attorney-client and work product
17   privileges and doctrine.  And, Martin, just to your
18   point, I believe that even if the lawsuit had not been
19   filed at that time it was in -- at least in anticipation
20   of litigation, and the privilege would also apply.
21        MR. GOLANDO:  Okay.
22        MR. CRAWFORD:  And the doctrine.
23        MR. GOLANDO:  We'll see about that.
24        MR. CRAWFORD:  Sure.
25        Q.  (BY MR. GOLANDO)  I'm going to hand you Exhibit

7 (Pages 25 to 28)

Page 29

1     again, please.  I want you to look at the last number
2     three of the subpoena.  Do you see that, sir?
3          A. Yes.
4          Q. Okay.  What does that say?  Could you repeat it
5     for the court?
6          A. It says "All reports that the witness has
7     prepared for the Spring Branch Independent School
8     District or its counsel, on any subject for which he
9     has been compensated."
10         Q. Would you agree with me that those analyses
11    that you provided Ms. McBride would have been captured
12    by that -- that request?
13         A. I guess I didn't -- so two issues for me.  One
14    is I wasn't certain about what of that would be -- sort
15    of normally would be disclosable or not, so I -- you
16    know, I checked with Charles.  And, also, I never
17    provided a report to the district or the counsel.  I
18    provided, you know, information and some tables, but
19    I -- I didn't -- it never reached the point of my
20    actually providing an expert report.  So I guess I
21    wasn't -- I wasn't sure about exactly whether this
22    entailed sort of everything I ever told the lawyers.
23    And then I also wasn't sure about what of that was --
24    what was protected and not, so I'm relying on the
25    attorneys --

Page 30

1          Q. I understand.
2          A. -- on that.
3          Q. Did you provide Mr. Crawford or anybody else at
4     that firm the documents we've just been talking about,
5     the OLS, or the EI that you did, and it sounds like in
6     the summer of 2021?
7          A. Anything that had actually -- that I had shared
8     with the previous attorneys that I still had I would
9     have provided to Mr. Crawford.
10         Q. Okay.
11         A. I'm not sure that there was any -- I'm not sure
12    that the OLS analysis was ever even -- anything done
13    other than just sort of looking at that real quickly in
14    Excel.  I'm not sure that that was ever reduced to anything
15    that -- that would have been transmissible either to
16    attorneys or to Mr. Crawford.  But certainly anything
17    else that would fall in that category was provided to
18    him.
19         Q. Do you still have the OLS Excel file?
20         A. It's -- I guess it's possible.  I haven't gone
21    back to look for it because I think, you know, it's
22    superseded by the EI analysis.  But it's possible that
23    it's -- I could look.  It's possible I guess.
24         Q. Without telling me the contents, was the OLS
25    consistent with the EI?

Page 31

1          A. Not inconsistent.  I guess -- so, I mean, I --
2     you know, I think -- my recollection is that I wasn't
3     satisfied that I sort of understood fully what was going
4     on on the basis of that analysis.  So one of the things
5     that can be problematic with -- well, in lots of things
6     that can be problematic with OLS -- but it just was
7     not -- it -- it had, you know, sort of large confidence
8     intervals, and my recollection is there were some things
9     internally that didn't look like they -- they were
10    consistent across some of the elections, whatever,
11    that -- that led me to think that -- I mean, one of the
12    things that obviously is important here, as true with
13    any case where you're dealing with Hispanic voters, is
14    turnout is really critical to understanding what you're
15    actually seeing.  And turnout doesn't get captured in
16    the OLS, and so it's -- well, normally -- when I say
17    "normally," so in a case where you have either the
18    surnames of the voters, or a case involving black voters
19    where black VAP is solid as a rock, it really doesn't
20    make -- you can do the analysis either way.  It's going
21    to be about the same.
22              The advantage for -- for using -- in my
23    view for using R x C EI with -- if the case is a
24    Hispanic case and if you're relying on something other
25    than the vote codes -- so a lot of time you're relying

Page 32

1     on CVAP for example, and CVAP doesn't account for
2     turnout.  So R x C builds turnout estimation into the
3     estimation of the vote parameters, and that can -- in
4     that instance it can produce quite different results
5     than what you would get where -- where in the exact same
6     analysis for black voters there would be virtually no
7     substantive difference.  So I'm never very surprised
8     if -- if the quality of data is low, which for -- that
9     means anything other than surnames for Hispanic voters,
10    it's just hard to say for sure if you're going to get a
11    clean -- a clean result out of the -- out of the OLS.
12         Q. I think I understand.  But if you used voters
13    for your OLS and you used the -- either the -- an icon
14    Bayesian database that would solve that problem,
15    correct?
16         A. Yeah.  I would expect you'd get a much -- you'd
17    get a much less problematic OLS result.  I don't have --
18    I haven't sort of stress-tested this on this particular
19    set of data, and I could be wrong about where the --
20    where the -- where the noise in the OLS was coming from,
21    but my suspicion at the time was that it was coming
22    from -- from the lack of turnout information.
23         Q. Fair enough.  I don't have any more questions
24    about that.
25              Are there any other reports that you've

Page 33

1  done for SBISD that you haven't disclosed to us?
2      A. That's -- I mean, I think we've covered all of
3  what I recall of information, types of information that
4  I've shared with -- with the attorneys, or the attorneys
5  shared with the board, or that I was present to discuss
6  with the board.
7      Q. And as we're sitting here today you have not
8  provided the plaintiff with that data for the OLS or the
9  data for the EI, correct?
10     A. Correct.
11     Q. Thank you, sir. So let's just go a little bit
12  more into your history, if you don't mind.
13         How many times -- how many times have you
14  been an expert in a case involving Section 2 of the
15  Voting Rights Act?
16     A. It would be 40 or 50 times.
17     Q. Yeah. A bunch. Have you ever been an expert
18  for an individual voter challenging an election statute?
19     A. I don't know. Individual voter challenging an
20  election statute?
21     Q. As opposed to working for the entity.
22     A. So mostly by happenstance, or whatever, I
23  mostly work for entities, I think probably because I
24  started doing this locally mostly in -- in the area of
25  drawing districts for entities, and then ended up moving

Page 34

1  into sort of the Section 2 issues beyond drawing the
2  districts. So I mostly worked for entities, but I
3  have -- I mean, I worked on cases where -- where
4  representatives were challenging district plans, but I
5  don't know -- I mean, I don't think they were
6  challenging them as individual voters. I think their
7  challenge was -- I could be wrong. I don't know why
8  they were -- what their actual standing was.
9      Q. Do you remember the representatives? Do you
10  mean state representatives, or do you mean other
11  governmental officials, incumbents?
12     A. Well, I worked for a group of Democratic
13  representatives I think organized by Martin Frost --
14     Q. Okay.
15     A. -- challenging a congressional plan. I worked
16  for the Democratic Party in Florida, a challenge
17  related to I think the congressional districts in
18  Florida.
19     Q. And do you have a time period for that, please?
20  The '90s?
21     A. The '90s I think.
22     Q. And the Frost would have been in the '90s, too?
23  That was the Bush v. Vera case, right?
24     A. No.
25     Q. Okay.

Page 35

1      A. I think Frost would have been -- I think Frost
2  was the redistricting.
3      Q. Right, right, right. That was the 1997 -- '95,
4  '97 reset. I'm sorry.
5      A. No. This was the two thousand -- this is
6  when --
7      Q. Oh. This is the mid-decade --
8      A. Yeah. So this is when I worked -- so I worked
9  for the legislative redistricting board because the
10  state didn't -- didn't draw lines right. So the
11  redistricting board drew the lines, but they couldn't
12  draw the congressional lines. So the court drew the
13  congressional lines. So that's my congressional plan.
14  The court actually asked me to give them advice about
15  how they should go about that, "what would you do, what
16  would a neutral plan look like?" So I gave them some
17  advice, and they acknowledged in the decision where they
18  released the plan that they had appreciated my input, or
19  whatever.
20         So I told everybody, I was like, "This is a
21  dream for somebody who studies Congress. I actually had
22  a hand in a congressional plan." And they held exactly
23  one election under it, and then the state -- the state
24  just like gutted it like a fish. And so -- and so then
25  this is where the Frost and the other congressional

Page 36

1  intervenors, they filed suit. They wanted to -- you
2  know, they wanted to -- basically the point of their
3  suit was that the state couldn't engage in a
4  mid-redistricting, or mid-season redistrict, whatever,
5  that it was already an official plan.
6      Q. So you drew the plan in Balderas. That's the
7  2000 case. And then you were an expert for the
8  intervenors in the 2003 case?
9      A. Yes. I didn't draw the plan, but I --
10     Q. Advised?
11     A. -- provided some guidelines in what I thought
12  was appropriate for the court to use, and then testified
13  on behalf of that plan, when the -- when the state
14  replaced the plan and then there was a suit over whether
15  the -- whether that mid-decade redistricting was
16  appropriate or not. So that was with the -- it was a
17  Democratic congressman who intervened. I don't remember
18  exactly who all was in that, but -- but I remember the
19  lawyer for the state, the first question when I was put
20  on the stand was, you know, "Why did you switch sides?"
21  And I said, "I didn't switch sides. You did. This is
22  the" -- "this is the exact plan, you know, that I" --
23  "when I was working for you that we helped the court
24  to" -- because the Attorney General's Office was
25  involved as well in trying to provide a neutral plan

Page 37

1     that the court could use.  And so --
2          Q.  And that lawyer was Andy Taylor?
3          A.  I think it was Andy at that point.  Yeah.
4     Yeah.  That would have been back in Andy's day.
5          Q.  So it sounds like those were drawing districts.
6     Did you ever do racially polarized voting --
7          A.  No, I was not -- sorry.  I was not drawing
8     districts in the -- when I was working for the
9     congressional intervenors because they were just
10    defending the court drawn district against the -- the
11    district the state had drawn to replace it.  But I don't
12    remember the entire scope of what -- what I was actually
13    looking at relative to the -- to the new draw as opposed
14    to the court draw.
15         Q.  Fair enough.
16         A.  And I think in -- if I'm remembering the
17    Florida case right, it did -- it was a -- it was voting
18    rights issues related to the treatment of Hispanic
19    voters in Florida.  And I think it was also a
20    congressional plan, specifically sort of how voters in
21    southeast versus southwest Florida were treated in terms
22    of drawing Hispanic districts.
23         Q.  What's the scope of your engagement in your
24    contract, if you don't mind me asking?
25         A.  At least my understanding of it -- you know, I

Page 38

1     probably pay less attention to these contracts than I
2     should.
3          Q.  If you want to refresh your recollection --
4          A.  I just say what I -- what I agreed to before
5     this was drawn up, and this looked to me like it didn't
6     exceed that, was that I would provide a report that was
7     essentially responsive to Dr. Stein's report, so that
8     that was the extent of my involvement, was to provide
9     response and commentary to his report as opposed to
10    analysis itself.  It was -- my role was to -- basically
11    to provide a critique and context for Dr. Stein's
12    report.
13         Q.  And so you have been hired in the past by SBISD
14    to determine whether or not elections are racially
15    polarized in SBISD elections, correct?
16         A.  That was certainly one of the tasks I was asked
17    to perform previously, yes.
18         Q.  Given your time as an election law expert,
19    racially polarized voting expert, and your association
20    with SBISD since I guess the early 2000s, do you believe
21    that elections in SBISD are racially polarized?
22         A.  I try pretty hard not to reach legal
23    conclusions in my work as an expert partly because I'm
24    not a lawyer, and it always pisses me off when lawyers
25    reach expert conclusions.  And so there's sort of a turf

Page 39

1     issue.  But I think also it's -- in my experience, and I
2     don't think I'm alone in this, you know, the courts have
3     not -- this is not an area broadly in which the courts
4     have distinguished themselves in making clear what it is
5     they want entities to do or plaintiffs to do or lawyers
6     to do.  So, I mean, I have my own sort of view of kind
7     of how this -- how this makes sense.  But I recognize
8     that the term is used in a variety of ways.  It's used
9     to indicate, by some people, to indicate -- for example,
10    many plaintiffs' experts believe that the definition of
11    racially polarized voting is if 50 percent plus one of
12    the minority voters vote for candidate A and 50 percent
13    plus one of nonminority voters vote for candidate B then
14    that's racially polarized voting, and that's -- I don't
15    think that's true in the -- in itself I don't think
16    that's true in the legal sense, and I don't actually
17    think it's even an appropriate label for what's going on
18    there.
19              But, you know, that's an old dispute going
20    all the way back to Brennan about -- in which I think
21    Brennan captured exactly the issue there, is -- you
22    know, I think -- I'm not sure everybody never says it,
23    but I think in the current debate what Brennan would
24    like is for people to come up with a name for that that
25    isn't racially polarized voting in the sense that, you

Page 40

1     know, the public understanding of that is -- is that
2     voting is polarized by race, meaning by some sentiment
3     or concerns of the race of voters or the race of
4     candidates, as opposed to just these two groups maybe
5     voting differently for the same reason lots of other
6     groups might vote differently.
7          Q.  I think I -- I understand that.
8          A.  Yeah.  I'm just not -- I'm not sure if
9     you're -- what is -- what is it you're asking me?
10    Have I reached a conclusion, a legal --
11         Q.  No.
12         A.  In a legal sense, no.
13         Q.  I'm asking you as an expert are Latinos
14    politically cohesive in SBISD elections?
15              MR. CRAWFORD:  I'm going to object to the
16    extent that it's outside the scope of this engagement.
17    And I'll let Dr. Alford make that determination but --
18         Q.  (BY MR. GOLANDO)  You can still answer, sir.
19         A.  I'd say, you know, based on -- I mean, for
20    example, based on the -- on Dr. Stein's report I'd say
21    there's evidence of modest cohesion among Latino voters.
22    So there's certainly no evidence of the sort we would
23    see in the black voters.  I don't think Hispanic voters
24    are voting 90 percent one direction or another.  But
25    there's certainly evidence that suggests that at least

10 (Pages 37 to 40)

Page 41

1 in some of the elections more than -- more than a bare
2 majority of Hispanic voters are favoring Hispanic
3 candidates.
4      Q. Based on your experience as a election observer
5 and an analyst for SBISD in the last 20 years of your
6 employment here, or engagement here, do you believe in
7 your expert opinion that Latinos are politically
8 cohesive outside of the Stein report?
9      A. I would say modestly to moderately cohesive.
10      Q. Do you believe that, same question, as to
11 Anglos? Are they politically cohesive in SBISD
12 elections?
13      MR. CRAWFORD: Same objection as before to
14 the extent it exceeds the scope of his engagement.
15      MR. GOLANDO: Yes, sir.
16      A. I think it's harder to say they are, but I
17 think -- on balance I'd say moderately co -- modestly --
18 again, sort of modestly to moderately cohesive. So
19 in -- again, in the sense of the sort of Gingles 2 and
20 Gingles 3 threshold, not in sort of the broader totality
21 of the circumstances. But just addressing it as, you
22 know, what -- what my guess would be about Gingles 2 or
23 my guess about where you would be on Gingles 3 that's --
24 that's what I would guess. And I think that's roughly
25 what Dr. Stein's analysis suggests.

Page 42

1      Q. (BY MR. GOLANDO) Would you based on your
2 experience as an expert and a observer of SBISD
3 elections in your 20 years and your prior
4 engagement do Latinos support different candidates than
5 Anglos in SBISD elections?
6      A. Sometimes.
7      Q. How often?
8      A. I don't know how often, but it certainly
9 happens.
10      Q. Can you recall a time when they didn't based on
11 your analyses and your expertise?
12      A. I don't know. I mean, I can't think of a
13 specific -- a specific example, but I -- but I'm not at
14 all sure that that is -- that it's generally the case
15 across elections that -- in fact, I suspect it's not.
16 My guess is that there are elections in which both
17 Anglos and Hispanics are supporting the same candidates,
18 but I don't -- again, I -- I don't know for certain, but
19 that's my guess.
20      Q. Okay. I understand. We're going to talk a
21 little bit about Bob Stein now. Do you know Professor
22 Stein?
23      A. I do.
24      Q. How do you know him, sir?
25      A. He hired me to come to Rice. He had been at

Page 43

1 University of Georgia before I came to University of
2 Georgia. We didn't actually overlap, but I had had
3 conversations with him. At that point prior to -- to
4 actually working with him I had met him at a convention.
5 And he's the one who at that time was the -- I can't
6 remember if he was the -- I think -- yeah. He was the
7 department head at that time. Georgia actually tried to
8 hire me twice. And the first time -- my former mentor
9 from U of H, David -- Dr. David Brady was the chair, and
10 he had contacted me and tried to work out a deal to get
11 me to come to Rice. And I really wasn't -- I hadn't
12 been at Georgia very long, and I wasn't ready to go. So
13 I ended up turning it down, and he was very unhappy
14 about that. And then a year later circumstances had
15 changed. I was in the middle of a divorce.
16      Q. I'm sorry.
17      A. I was not very happy with my colleagues at the
18 University of George. And by then Dr. Stein was the
19 chair. And so he called up and said, you know, "We
20 would like you to come to Rice." And I said, you know,
21 "I'm not a very good negotiator, so whatever you offer
22 me I'm going to take it." And he said, "I'm not a good
23 negotiator either because whatever you want we'll give
24 it to you." And so we then worked out something that
25 sort of fell within those -- within that range, and I

Page 44

1 was hired. And David Brady never forgave me for
2 allowing Stein to outhire him on the recruiting front.
3 So -- but I've known him since I -- I knew him before I
4 came to Rice, but certainly since I came to Rice, and
5 we're -- we've always been close colleagues. We're
6 close personal friends. Our families are friends. He
7 was just having dinner with my daughter in Washington,
8 D.C. over the weekend.
9      Q. Oh. Wow.
10      A. So we remain very close.
11      Q. Do you know his reputation as a scholar?
12      A. Yes.
13      Q. What is his reputation as a scholar?
14      A. It's a excellent rep -- he's very prolific.
15 He's very well-respected. He's moved around across a
16 variety of areas in his career and always had -- the
17 areas he's worked in has always ended up being important
18 work, widely recognized work, so --
19      Q. How would you personally rate him as a scholar,
20 Professor Stein?
21      A. On a -- what are we doing here? A scale of one
22 to ten or --
23      Q. Is he an expert in his studies?
24      A. Yes.
25      Q. Okay. Is he -- is he at the top levels of his

Worldwide Court Reporters, Inc.
(800) 745-1101

1  scholarly research?

2      A.  I would say in the areas that he works in he

3  always ends up producing work that is among the best of

4  the work that's done in that area.  So I would say that

5  both -- when he was doing things like the distribution

6  of federal funds, pork barrel, his more recent work on

7  things like ballot form and access, that sort of stuff,

8  again very -- he does very good, very high quality work.

9      Q.  Would you call him an expert in social science

10  statistical research?

11      A.  That's a time-bound question.  So when I came

12  out of graduate school Stein and I both would have been

13  experts in statistical social science research.  We were

14  like go-to people.  We were, you know, the young Turks

15  and, you know, drove all our old professors crazy by,

16  you know, asserting they had no clue what they were

17  doing and we did.  But those things change over time.

18  So, you know, he's a -- he's extremely competent data

19  analyst and is I -- I would say among people who are not

20  actually political methodologists he's -- is as skilled

21  as anybody doing work in social sciences today.  But

22  he's -- political science didn't really have

23  methodologists when he and I came out of graduate

24  school.  And now we have -- we have people in our

25  department who we hire as methodologists.  They only

1  teach methods.  They only research methods.  We're not

2  in that category.  Neither of us are methodologists in

3  that sense.  We're not going to develop the next --

4  we're not Gary King --

5      Q.  Right.

6      A.  -- which is -- I guess you could say for pretty

7  much everybody in the United States.  But he

8  certainly -- he employees up-to-date methods, and he

9  does them accurately and skillfully for the -- for his

10  research question.  But he's more interested in

11  answering a research question than he is in developing a

12  methodology.

13      Q.  I don't blame him.  Do you agree that Bob

14  Stein's expert opinion is relevant to the task at hand?

15      A.  Yes.

16      Q.  Okay.  Would you agree that racially polarized

17  voting analyses using ecological regression rest on

18  scientifically reliable foundations generally?

19      A.  Yes.

20      Q.  Would you call Bob Stein an expert or a top

21  scholar in analyzing voter behavior?

22      A.  Yes.

23      Q.  Are you familiar with the use of ordinary least

24  squares?

25      A.  Oh, yes.

1      Q.  Yeah.  Me too.

2      A.  My -- the professor who taught me methods at

3  university of Iowa said, "By the end of this course

4  you'll not only recognize that OLS is the superior

5  research method, you'll also recognize that it's a way

6  of life and will be the only thing you dream about."

7  And I thought that was an exaggeration, but I

8  honestly -- it is an approach to life.  You know, life

9  is about trying to understand the world around you.  And

10  to this day when I'm -- when something puzzles me, like

11  the behavior of one of my daughters for example, I

12  actually like find myself unable to not think of it as

13  an OLS equation.  So, yes, I -- I worship at the alter

14  of ordinary least squares regression.

15      Q.  Me too.  I do.  And I remember my scopes and

16  methods class.  I know exactly how you feel.

17          So is ordinary least squares a

18  scientifically verifiable way to evaluate racially

19  polarized voting?

20      A.  Yes.

21      Q.  Okay.  Is OLS a technique generally accepted in

22  the social scientific community?

23      A.  Yes.

24      Q.  Has OLS analysis been subjected to peer review

25  and publication?

1      A.  Yes.

2      Q.  Okay.  Can OLS be tested and verified?

3      A.  Yes.

4      Q.  Does OLS have a known error rate?

5      A.  It -- assuming you meet the assumptions of OLS

6  it is -- what's called a BLUE method is the best linear

7  unbiased estimator.  So -- but that means you have to

8  meet the -- the basic assumption.  So, yes, it's --

9  there is a way to test the accuracy.  OLS provides

10  measures of the stability and usability of its results.

11  But like any technique they do depend on meeting the

12  assumptions.

13      Q.  Do you believe that Dr. Stein is an expert

14  qualified by knowledge, skill, experience, training, and

15  education?

16      A.  Yes.

17      Q.  Do you believe that Dr. Stein's opinion is

18  based on sufficient data?

19      A.  So we're getting into the crux of things here.

20  I think the -- I think the data he has is probably

21  enough to answer the question.  I don't think it's

22  necessarily the best data he could have.  But I don't

23  think the -- and I don't -- I don't disagree with the

24  results of the analysis he did as it is, but I don't

25  think -- I don't think it's sufficient to answer at

1   least some of the questions that routinely have to be
2   answered in my view in a full racially polarized voting
3   analysis.
4           **Q. I want to be very clear. We'll get to see your**
5   **problems with the Stein report in a moment. I promise**
6   **you. But does the data he used, is it sufficient to**
7   **determine the outcome?**
8           A. I think the -- yes, I think so.
9           **Q. Do you believe that Dr. Stein's opinion is the**
10  **product of reliable principles and methods?**
11          A. Again, I don't want to over endorse or under
12  endorse. There's -- yeah, I think he's running OLS
13  correctly. I don't doubt that those are the right
14  parameters coming out of OLS. I -- I just think it's
15  not -- the data has been aggregated in a way that I
16  think is -- I have questions about the way the data has
17  been aggregated. I have questions about the quality of
18  the input data on the demographic side, the BISG result,
19  and I have questions about at least some of the ways in
20  which election result data was treated. So I don't
21  exactly -- it's not the data itself that's problematic,
22  but the way -- you can't divorce that from the way it's
23  been aggregated for input into the -- into estimation.
24  And I think that's where -- where we have disagreements.
25          **Q. I think that's a reasonable thing to say. Do**

1   **you believe that Dr. Stein has applied the principles**
2   **and methods reliably to the facts of the case? You may**
3   **disagree. But has he done so reliably?**
4           A. So it's interesting how certain things come
5   back routinely in depositions. So within the narrow
6   meaning, the narrow statistical meaning of reliability,
7   yes.
8           **Q. Perfect answer. I appreciate it. All right.**
9   **Let's talk about racially polarized voting generally,**
10  **and then I promise you we'll get to your words. I**
11  **promise. I just want to make sure --**
12          A. It's fine with me if we don't.
13          **Q. Because I think primaries are important. And,**
14  **again, if I ask you a question that doesn't make sense**
15  **it's not your fault. It's my fault. Okay?**
16              **If 90 percent of Latino voters voted for**
17  **one candidate, are they politically cohesive together in**
18  **a given jurisdiction?**
19          A. Yes.
20          **Q. Okay. If 80 percent of Latino voters voted for**
21  **one candidate, are they politically cohesive together?**
22          A. Yes.
23          **Q. Okay. If 70 percent of Latino voters voted for**
24  **one candidate, are they politically cohesive together?**
25          A. I don't know. I mean, that's where I would

1   start -- because, again, "cohesive" is a -- is not a
2   binary term. Cohesive is a -- is a term that's being
3   applied to what is, in fact, a continuous measure from
4   zero cohesion to perfect cohesion. And so if a measure
5   goes from no cohesion to perfect cohesion there's always
6   a question of "what do people mean by cohesion?" And I
7   know some people mean by cohesion anything other than
8   zero, which means actually by definition in virtually
9   every election in the United States every group is
10  cohesive. I take that to be a nonsensical -- I know
11  that I'm in the minority here of my -- at least some of
12  the experts. But I take that to be nonsensical with
13  regard to providing that information to the court
14  because -- because the court has said that Gingles 2 is
15  a threshold test. And if the threshold is by definition
16  always met then it doesn't belong in the Gingles -- it's
17  not a threshold at all. It's not even a test. There's
18  no reason -- there's no reason to even have it there.
19              So, you know, we can go down that slippery
20  slope. And you know, we can start at 50 percent, which
21  is zero cohesion. We can start at 100 percent, which is
22  perfect cohesion. And then the question is sort of
23  where does -- where does cohesion fall on that scale.
24  And I don't believe it's the entire scale. So one way
25  of thinking about that is this -- this actually isn't a

1   scale from 50 to 100, of course, because 50 would
2   suggest half cohesion, and it's zero. So turn it into
3   what it really is, is zero to 100 scale. And in that
4   zero to 100 scale 75 is actually at 50 percent cohesion.
5   It's half of the values are less cohesive. Half would
6   be more cohesive. So that's a kind of midrange of
7   cohesion, and so that's sort of roughly -- in my view
8   roughly you clearly have cohesive behavior at sort of
9   80 -- 75, 80, 90 percent. But the question of what you
10  have at -- once you get to something like 70 or 60 or
11  51, I mean, I just think you're -- again, the court has
12  provided exactly zero guidance here. So I just try to
13  be careful in the use of the language. So I think at 70
14  you're starting into a -- you're getting into a range
15  where you might say there's -- we talked earlier on
16  things like modest or moderate cohesion. So there's
17  some moderate level of cohesion there. And I think
18  that's -- sort of in that 60 to 70 percent range is what
19  I think of as moderate or modest cohesion. Below 65,
20  certainly below 60, I don't really think that's -- if
21  that's cohesion, then, again, it doesn't -- in a Gingles
22  2 sense then cohesion doesn't matter because cohesion is
23  always greater than 50 so --
24          **Q. So just to be clear, so from 60 to 70 it's**
25  **moderate cohesion? Sixty to 75. I don't want to**

1 misstate --
2      A. Yeah. Well, yeah, I mean, it's -- in that sort
3 of middle range I think the -- the question, again, it's
4 very -- it's not hard to see. So I don't think many
5 people would dispute that 80 to 100 is cohesion. And in
6 that sense if you were going to make it symmetric then
7 50 to 70 would be noncohesion. Right? So if the upper
8 20 percent is clearly cohesion then the lowest possible
9 20 percent, if you're going to have a scale that
10 balances in a -- you know, in a kind of a normal sort of
11 scale sense, then you could describe everything below 70
12 as not cohesive and -- and sort of, you know, kind of --
13 then you'd have kind of a middle range in there
14 somewhere.
15      Q. If 70 percent of the Latino community supports
16 a candidate, that means that 30 percent didn't, correct?
17      A. Correct.
18      Q. So two-to-one?
19      A. Yep.
20      Q. More than two-to-one really, right?
21      A. (Moving head up and down.)
22      Q. And that's still not cohesive enough from your
23 perspective?
24      A. It's -- again, it's -- I don't know what you
25 mean by "cohesive enough." But I don't think it's

1 helpful given the nature not only of what the court
2 is -- so there are two questions here I think. I mean,
3 one is is it cohesive enough to clear the threshold
4 test? And that's -- then there's another question
5 because, of course, racially polarized voting enters
6 twice, one is in its mechanical Gingles 2 and 3, and
7 then again in the totality of the circumstances. And
8 while I don't think those should be -- given their
9 proximity to each other I think it's inefficient to have
10 them mean different things. I'm aware that the -- from
11 cases I've been involved in that currently there are a
12 lot of judges who want to make those two very different
13 things, the Gingles 2 and 3 racially polarized voter,
14 and the totality of circumstances racially polarized
15 voting. You know, whatever the judges want to do I'm
16 fine with. I give them the information. They make
17 sense out of it.
18      But I think it's an awkward situation both
19 in terms of analysis and in terms of the law to say that
20 they're both -- we're going to call both of them
21 racially polarized voting, but they're going to be
22 defined in very different ways and very different
23 implications. So I just think if the Gingles 2 test
24 is -- are minority voters voting cohesively then that's
25 either going to need to be defined as in are they a

1 majority or not a majority. That's the dichotomy, and
2 because it's a dichotomy it has a bright line. That's
3 the great thing about dichotomies: "yes" or "no." If
4 this is a "yes" or "no" question, then where is the --
5 where does the -- where does the "no" become a "yes"?
6      Q. Fair enough.
7      A. And so I think -- my preference because I'm not
8 making that legal decision, it's not up to me to say --
9 I'm always getting pressured, you know, "but you're the
10 expert, so in your expert opinion is this legally" --
11 you know, "is this cohesive voting"? I just want to
12 tell the court how cohesive the voting is from zero to
13 100. Right? And if you want -- you want to force me to
14 put a term on it then in the middle I can put a term
15 like "moderate" or whatever. And then if the judge
16 thinks -- the number is still there. In your example
17 the 70 is there. If a judge thinks that's what -- what
18 the court means by cohesive voting, have at it. I'm
19 glad I don't have to make that decision.
20      Q. Me too, for the record. And I want to be very
21 clear. I'm not interested in your legal opinion. I
22 mean, I am generally. You're a nice guy. You're a
23 smart guy. But for the testimony I'm only interested in
24 your expert opinion as a social science researcher. And
25 I think I understood your question so -- or your answer

1 to my bad questions.
2      I'm asking the same questions about Anglo
3 voters because I wonder if there's a difference in your
4 mind. If 90 percent of Anglo voters support one
5 candidate, are they politically cohesive?
6      A. Yes.
7      Q. Eighty percent?
8      A. Yes.
9      Q. Seventy percent?
10      A. I think you're getting -- again, now you're in
11 a range where they're sort of what you might describe as
12 modest or moderate cohesion. It's certainly in that --
13 in that kind of range. And I think that's where -- if
14 you think about sort of functional definition kind of
15 thing, what's going on here, there it becomes clear the
16 two things are interacting with each other. Right? And
17 that's what I think is both important to recognize, but
18 also I think problematic in the sense that -- on the --
19 on the Gingles 2 side there's just this question of
20 minority cohesion. On the Gingles 3 side there's
21 minorities voting or majorities voting cohesively so as
22 to usually defeat. Well, so as to usually defeat the
23 level then of what would be defined as majority cohesion
24 is going to be on a sliding scale depending on minority
25 cohesion.

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 57

1    And weirdly enough it's going to slide in
2 the direction that the less cohesive minorities are the
3 more likely it is that at the same levels of cohesion
4 majorities are voting cohesively to defeat the preferred
5 candidate. If the preferred candidate is only getting
6 51 percent of the vote, then a majority that's in fact
7 splitting its vote almost perfectly evenly can still be
8 sufficiently cohesive to defeat the candidate. So this
9 is a weird scale in which as -- the further away we move
10 from racially polarized voting the easier it is to find
11 racially polarized voting in that sense because, again,
12 these are -- in essence they are no longer -- they're no
13 longer absolute -- again, a threshold test must mean
14 that you can -- that you can in isolation answer that
15 question. And judges in my experience frequently join
16 two and three together to ask what they call the -- the
17 Gingles 2 and 3 are the racially polarized voting
18 question. Once you join them together they are not
19 threshold. Two is not a threshold test if it doesn't
20 stop the inquiry at two.
21    Q. I understand.
22    A. And so I don't have the solution to that issue,
23 but it is problematic. And so that's why I think it's
24 better to be imprecise in the language about -- about
25 calling something cohesion or not cohesion. It's better

Page 58

1 to be imprecise about that and to just look at exactly
2 how all that's operating and then think about what that
3 means because ultimately, you know, Gingles 1, 2, and 3
4 is about determining if there's a solution in order to
5 answer the question about whether there's a tort. And
6 thinking about the solution is where you really do have
7 to take it all into account because if cohesion is
8 really low on the part of minorities then if -- if it's
9 also the case that it's very difficult to get a district
10 that's above majority, then the district is not going to
11 be a district that's typically going to work. Right?
12 It isn't going to solve the -- it isn't going to solve
13 the problem. Fifty percent plus one voters lets you
14 control the district as long as you're perfectly
15 cohesive. Well, if your cohesion level is 52 percent,
16 the district isn't going to do anything. Right? It's
17 going to give you 25 percent of the vote. It's not
18 going to win anything. It's not a solution to the
19 problem. And, in fact, the problem is not the drawing
20 of district lines. Right? The problem was very low
21 cohesion. You know, splitting your vote doesn't let you
22 control politics. And so that's -- that's my short
23 answer.
24    Q. Fair enough. All right. Let's talk a little
25 bit about racially polarized voting. We've talked a lot

Page 59

1 about it already, but I want to make sure I get you on
2 the record.
3    What do you believe racially polarized
4 voting is, and how would you define it?
5    A. So I would define racially polarized voting as,
6 in the broadest sense, as a situation where -- where
7 voting is being affected by racial considerations at a
8 level that -- you know, given the -- the sort of
9 numerical conditions and sort of things you assess in
10 Gingles 1, that you have a situation where minorities
11 are not able to elect minority candidates in a
12 particular setting and would be able to in the --
13 whatever the legally available alternative settings are.
14    Q. I think I understand that. So I'm going to ask
15 you a couple of general questions about that, if you
16 don't mind.
17    If 90 percent of the Latinos support
18 candidate A and 75 percent of the Anglos support
19 candidate B in the same race, is that racially polarized
20 voting, assuming your -- your first part of your
21 definition?
22    A. This is where -- I know you're going to be
23 happy to hear this. But I don't think you can determine
24 if voting is racially polarized in a single election.
25 You can say the election is compat -- that's an election

Page 60

1 that's compatible with -- with the existence of racially
2 polarized voting, but I don't think it establishes
3 racially polarized voting. And I don't think it's
4 really -- you can given that -- if that's the fact
5 pattern, I got one election in that fact pattern, I have
6 no idea if voting in that jurisdiction is racially
7 polarized or not. All I can tell you about is that
8 one -- is that one election.
9    Q. That one election is certainly racially
10 polarized, correct?
11    A. The election?
12    Q. There's -- I'm sorry. I don't want to
13 mischaracterize your testimony. I think you said there
14 was -- it would be an example of racially polarized
15 voting. Correct?
16    A. So the election is compatible with racially
17 polarized voting because I think it's important that
18 when we -- when you characterize voting in an area
19 that's racially polarized, you're -- you're
20 characterizing the behavior of the voters over -- over a
21 set of elections and over a type of election stimulus.
22 And so I think it's -- it isn't a characteristic of the
23 election. It's a characteristic of the voters. So I
24 think that -- we don't know if that is an appropriate
25 characterization of what the voters do in that -- in

15 (Pages 57 to 60)

## Page 61

1  that election.  I mean, just for example, if that's a --
2  you know, if that's a general partisan election between,
3  you know, two Hispanic candidates, one Democrat and one
4  Republican, I don't think that's racially polarized
5  voting.
6      **Q.  Right.**
7      A.  But it has -- the election has those features.
8  So, again, it's -- it's not an election that would stand
9  as obviously incompatible with racially polarized
10  voting, but I -- in and of itself that doesn't tell you
11  either that the election is racially polarized or that
12  the voters are behaving in a fashion compatible with
13  racially polarized voting.
14      **Q.  So imagine that election, same thing happens**
15  **five elections in a row.  Is that racially polarized?**
16      A.  Again, if -- if you're saying that that happens
17  five times in a row -- and, again, I'd want to know what
18  the -- you know, I want to know the race of the -- or
19  ethnicity of the candidates.
20      **Q.  Fair enough.  So let's say Latino candidate A**
21  **is Latino, Anglo candidate B is Anglo, these are**
22  **nonpartisan elections, it happens five times in a row.**
23  **Is that racially polarized voting?**
24      A.  Assuming that the -- assuming that the -- that
25  the Hispanic candidate -- that the Hispanic candidate,

## Page 62

1  who is also the Hispanic preferred candidate, is being
2  defeated, in most of those elections then I think that's
3  a sort of a -- a nice little set piece for what racially
4  polarized voting looks like.
5      **Q.  Same question, same assumptions, please.  For**
6  **90 percent support of Latinos for the Latino candidate,**
7  **and 65 percent support for Anglos, and this outcome is**
8  **the same?**
9      A.  Outcome is the same I think the -- yeah, the
10  result is the same.
11      **Q.  And that would be racially polarized voting,**
12  **correct?**
13      A.  Yes.
14      **Q.  Fair enough.  In your time as a litigation**
15  **expert and a social scientist, do you agree that**
16  **Hispanic surname candidates are the likely preferred**
17  **candidate of choice for Latino voters?  Likely.**
18      A.  Well, I'd want to qualify it a little bit
19  because --
20      **Q.  Sure.**
21      A.  -- in my experience in modern U.S. elections
22  that depends entirely on which party that candidate is
23  running under.
24      **Q.  Let's assume --**
25      A.  Ted Cruz is not the choice of Latino voters in

## Page 63

1  Texas.
2      **Q.  No.**
3      A.  But that's a different topic.  And that's not
4  just for Ted Cruz.  Right?  It's just -- there are lots
5  of -- Texas has lots of Republican Hispanics, and when
6  they run as Republicans they do not get the majority of
7  the Hispanic vote.  When they run as Democrats, they get
8  the majority of the Hispanic vote.  And when they run
9  against Anglos as -- and when Hispanic Republicans run
10  against Anglo Democrats the Anglo Democrats gets the
11  majority of the vote.  So in partisan elections it's not
12  the case, no longer the case -- it may well have been
13  the case in the past -- but it is no longer the case in
14  the sort of current polarized atmosphere that the race
15  of the candidate for either co-ethnics or for -- for
16  nonethnic groups is -- is the determinative factor in
17  voting behavior.
18      **Q.  How about in nonpartisan races, like the SBISD**
19  **race?**
20      A.  I'd say in nonpartisan elections it's -- it's
21  certainly variable depending on the -- you know, the
22  area of the country and -- and some local factors.  But
23  there I think you're -- it's more often the case there
24  that you would see Hispanic voters preferring Hispanic
25  candidates.

## Page 64

1      **Q.  In Texas and SBISD, correct?**
2      A.  I think that's -- I think that's a fair
3  statement.  Yeah, I would -- that's what I would expect
4  to see if I was coming in novel into some area.  That
5  would -- it wouldn't necessarily be the case, but it's
6  what I would expect to be the case.
7      **Q.  And that's what you did see when you did your**
8  **OLS report and your EI report, correct?**
9      A.  I'm not a hundred percent sure.
10      **Q.  Well, I don't want you to speculate.  If you**
11  **don't recall, you don't recall.**
12      A.  Yeah.
13      **Q.  All right.  Let's talk about your great report.**
14  **I'm going to hand you a copy of it.  I think I've**
15  **labeled it as Exhibit No. 2.  Could you review this and**
16  **make sure that it's authentic?**
17      A.  This looks like it.
18      **Q.  That's your expert report, correct?**
19      A.  Yes.
20      **Q.  Okay.  And we've labeled that Exhibit 2.  In**
21  **preparation for your report, other than reviewing the**
22  **data provided by the plaintiff did you review anything**
23  **else?**
24      A.  So I reviewed the data.  I reviewed the --
25  Dr. Stein's report itself.  I looked at several of the

Page 65

1   articles that he had cited.  I looked at a couple of
2   other things that I provided you here that are sort of
3   things that came to my attention as a result of looking
4   through the things in his report, one being this kind of
5   a general statement from a group in California about the
6   use of at-large elections and its effect on Latino
7   representation, and the other being something from the
8   Texas Republican Party about the -- essentially
9   injecting -- deliberately injecting partisanship into
10  nonpartisan elections.
11      Q.  That's the totality of what you -- all those
12  documents form the basis of your report, correct?
13  That's the totality?
14      A.  It's everything I recall.  We get into
15  specifics and I recall something else I'll -- I will
16  let you know, but that's what I recall.
17      Q.  I appreciate it.  In preparation for this
18  report, did you do any -- did you review any survey
19  data?
20      A.  No, I don't think so.
21      Q.  Did you perform a survey about voter behavior
22  in SBISD?
23      A.  No.
24      Q.  Okay.  For this report did you do an ecological
25  regression analysis or EI or any kind of a OLS?

Page 66

1       A.  No.
2       Q.  Okay.  For this report did you analyze election
3   returns in SBISD elections?
4       A.  No.
5       Q.  For this report did you review campaign finance
6   data?
7       A.  No.
8       Q.  Did you for this report -- did you analyze
9   incumbency advantage for this report?
10      A.  No.
11      Q.  For this report did you analyze any of the
12  issues that form the basis of the campaigns themselves?
13  By which I mean policy issues.
14      A.  No.
15      Q.  Did you analyze any partisan data for this
16  report?
17      A.  No.
18      Q.  Okay.  Did you look at ballot drift and how
19  that would have affected outcomes?
20      A.  No.
21      Q.  Did you look at ballot formation and how that
22  would have affected outcomes?
23      A.  No.
24      Q.  Did you look at any kinds of early vote
25  patterns or precinct data associated with elections, for

Page 67

1   SBISD elections, in formation of this report?
2       A.  Other than what's provided by Dr. Stein, no.
3       Q.  Okay.  I have asked this before, but I want to
4   make sure that I'm clear.  In your -- in preparation for
5   your report, did you perform any independent racially
6   polarized voting analysis?
7       A.  No.
8       Q.  Okay.  How long did it take you to review the
9   data?
10      A.  I don't know.  I have a -- I have a billing
11  spreadsheet someplace.  I could give you -- I could give
12  you a very precise, down to a tenth of an hour, but I
13  don't -- I don't recall offhand.
14      Q.  Was it 10 hours?
15      A.  I -- I really have -- as you might, as you
16  probably -- it's that time of year.  I'm working on a
17  dozen cases simultaneously so I don't --
18      Q.  Me too.
19      A.  Yeah.  I -- at some point those -- you know,
20  I'll hit, you know, some at the bottom of a spreadsheet,
21  and I'll know how much time I spent.  I saw a report --
22  I just looked at a -- some disclosure from another
23  expert in Kansas.  It was a guy I know at University of
24  Michigan.  And he was hired and provided a report for
25  him two weeks later, along with a bill for $63,000.  I

Page 68

1   thought I'm doing something wrong because I know he's --
2   I know he's working for at least a dozen people because
3   I see his name all the time.  And, my God, I -- you
4   know, whenever I hit "add" it never adds up to anything
5   like that in a two-week period.  That's pretty -- that's
6   pretty astonishing.  So I can tell you this.  I know
7   when I saw that I was shocked, so I know it's less than
8   $63,000 worth of my time.
9       Q.  How much of the report did you write?
10      A.  I wrote the entire report.
11      Q.  Mr. Crawford and none of the lawyers wrote the
12  report for you?
13      A.  That's correct.
14      Q.  These are your words, these are your findings,
15  correct?
16      A.  My words, my findings.
17      Q.  And you didn't use a data assistant to review
18  the data?
19      A.  No, I did not.
20      Q.  And you didn't use Mr. Stevenson?  I'm not sure
21  if I'm getting the name correct.
22      A.  Stevenson.
23      Q.  Okay.  It's Dr. Stevenson I suppose?
24      A.  Yes.  I did not -- Dr. Stevenson was not
25  involved.

17 (Pages 65 to 68)

Page 69

1      Q. This is 100 percent your work product?
2      A. Correct.
3      Q. Yes, sir. What instructions were you given by
4   counsel in preparation of the report?
5      A. You know, we discussed at the time we were
6   negotiating my employment, you know, what -- what I
7   could do for Mr. Crawford in this case, which was to,
8   you know, provide a commentary on Dr. Stein's report and
9   Dr. Stein's analysis. And that was -- that was the
10  extent of the discussion so --
11     Q. And this is an obvious answer, but I need to
12  ask it anyway. You've reviewed Dr. Stein's report,
13  correct?
14     A. Correct.
15     Q. Okay. I've previously labeled this Expert
16  Exhibit No. 3. Could you review this, make sure that's
17  the report you reviewed?
18     A. Yes, that's the report I reviewed.
19     Q. Make sure that's handy in case you need to
20  refer to it.
21     A. Okay.
22     Q. So just generally first before we get into your
23  specific points, do you disagree with any of the data
24  that was used by Professor Stein in his expert opinion,
25  the data itself?

Page 70

1      A. I don't have any reason to disagree with the
2   election data, the results by election place. I -- I'm
3   uncertain of what to make exactly of the BISG analysis.
4   I'm not sure if I agree with it or don't agree with it.
5   I may completely agree with it, and I may completely
6   disagree, but I can't quite figure out -- there's sort
7   of different forms of it that are being used there.
8   It's not a hundred percent clear to me what the
9   distinction is or how that's being utilized. But I --
10  in terms of the -- how that leads the -- the voting
11  places to be, roughly to be, arrayed, to the extent I can
12  see that, it's -- it's not obviously backwards or
13  anything like that. I'm not sure that it's a -- it's a
14  very precise way of measuring the proportion of Hispanic
15  voters at the polls, but it doesn't -- to the extent I
16  can see that pattern in the scatter plots it's not -- I
17  don't think it's -- in its rough direction it's not
18  incorrect. So it's -- in that sense I think it's
19  accurate enough for the kind of analysis he did to
20  reach -- reasonably, reliably reach a kind of narrow
21  conclusion about this kind of mass of elections.
22     Q. I understand. And it's not inconsistent with
23  the OLS that you ran and the EI that you ran, correct?
24     A. It's not inconsistent. It's not inconsistent
25  with my view of what you would likely see if you did

Page 71

1   what he did. So I guess it's not inconsistent with -- I
2   don't think it demonstrates in an appropriate manner
3   that there is legally significant racially polarized
4   voting in SBISD, but it's a finding that certainly is
5   not incompatible with that.
6      Q. And it's not incompatible with the EI that you
7   ran or the OLS that you ran previously, correct?
8      A. I didn't -- nothing in it surprised me. I'll
9   say that.
10     Q. I understand. Do you agree that Bob Stein's
11  expert report and the methods he used demonstrate
12  racially polarized voting just generally?
13     A. I don't know.
14     Q. Okay.
15     A. Again, it's not inconsistent with that, but I
16  don't know that it actually demonstrates that.
17     Q. I'm not talking as a legal matter. I'm talking
18  only as a social scientific matter.
19     A. I just don't know.
20     Q. Okay.
21     A. It's really hard to say. It's a -- it's a very
22  scattered set of data, and it's a very unusual set of
23  data. It's just hard to say what it demonstrates. I'm
24  really not -- it's not clear to me what it demonstrates.
25     Q. But you would agree that the slopes of the line

Page 72

1   are inverted, correct?
2      A. Yes.
3      Q. And that those slopes are generally consistent
4   with racially polarized voting, correct?
5      A. They're in the correct direction.
6      Q. Okay. What is a p-value?
7      A. A p-value typically is a -- it gives you a
8   probability. So it's, you know, a probability that some
9   value is, and in comparison to some null hypothesis,
10  that it's, you know, within some appropriate range of
11  that -- of that value. So, I mean, that's -- depending
12  on what statistic you're talking about it's a -- you
13  know, it's a probability.
14     Q. Would a layperson call that statistical
15  significance?
16     A. They might. So p-value underlies what we call
17  statistical significance, which requires a null
18  hypothesis. It also underlies what you call a
19  confidence interval. Sometimes people are more familiar
20  with that.
21     Q. Sure.
22     A. That doesn't require a null hypothesis. That
23  just talks about, you know, plus or minus around a --
24     Q. Yeah.
25     A. -- a predicted value.

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 73

1    Q. Would you agree that Dr. Stein's report shows
2    statistical significance, that his findings are
3    statistically significant?
4    A. He reports -- he reports a number that by
5    social science standards would typically indicate
6    statistical significance.
7    Q. A perfect answer. I appreciate that.
8    A. Okay.
9    Q. Okay. Do you agree with Professor Stein that
10   his findings show that voting is racially polarized in
11   SBISD elections? Do you agree?
12   A. No.
13   Q. Okay. Why don't you agree?
14   A. I just don't think it's -- well, for several
15   reasons. One is going back to the -- to the statistical
16   significance. OLS is not a technique, nor is
17   correlation that can generate an appropriate measure of
18   statistical significance for ecological analysis.
19   Q. Okay.
20   A. So that's a well-known -- that's going all the
21   way back to its very origins. Bernie Grofman has
22   written some articles about this. There just isn't an
23   appropriate method for deducing that from OLS with --
24   with ecological data as opposed to with actual
25   individual level data. So we just have to be -- we can

Page 74

1    report -- it's not that OLS doesn't produce that
2    estimate. It's just that that estimate is not an actual
3    estimate given the nature of the data. And so it's --
4    you can't rely on it in the sense that if it's, you
5    know, something significant to the 0.05 level, with --
6    where that 0.05 estimate comes out of OLS it does not
7    mean that you would expect that result -- you know, that
8    you're in that 95 percent confidence interval or
9    whatever. That's just not true. There are lots of
10   studies that are looked at that said, you know, you can
11   do this kind of analysis, and it shows that, you know,
12   like 95 percent of the results are in fact nowhere near
13   the confidence interval. It just doesn't -- it
14   doesn't -- it's not mathematically correct, and it in
15   practice doesn't work. So we -- that we don't --
16   we don't know about, so we can't tell whether --
17   whatever the pattern is here we can't tell whether it's
18   actually statistically significant or not.
19       We're also mixing data from a lot of
20   different elections, and within those elections a lot of
21   different conditions. So at least the basic I can
22   understand it in some of these elections there is only
23   one candidate and -- and we're mixing sort of a vote for
24   the candidate with rolloff, or something, as a vote for
25   the noncandidate. It's not the same thing as voting for

Page 75

1    another candidate. And then we're sort of over a span
2    of time and over a series of candidates we're -- we're
3    sort of putting all that together into one -- one giant
4    OLS analysis. And -- and we're not actually looking at
5    the cohesion for the preferred candidate or the voting
6    against the preferred candidate by the majority. The
7    candidate it's already been defined as the candidate
8    with a Hispanic surname. And that's just -- that's just
9    not the right way to do this.
10   Q. Okay.
11   A. I mean, it's important to have -- I think it's
12   important to include information about the ethnicity of
13   the candidates, particularly to have a mix -- it's
14   useful to have a mix of races that are ethnically
15   contested and races that aren't. But the -- ultimately
16   the issues is the -- is voting for the candidate
17   preferred by minorities, not for the assumption that
18   that's the candidate who is, in fact, an ethnic
19   minority, or in this case who has a minority surname but
20   may in fact not be of that ethnicity at all.
21       And so, again, I think that's -- it's not
22   to say that with all of that that this isn't compatible
23   with an analysis that would show -- show that done in
24   what I think is a more appropriate way, but in and of
25   itself it's also compatible with a lot of other things.

Page 76

1    So I just don't know what to -- it's not the way this is
2    usually done and I -- that doesn't -- you know, the way
3    things are usually done doesn't always mean it's the
4    right way or the best way or even a better way to do
5    things. But in this circumstance I think it attempts to
6    ask too much in a single analysis when a more discrete
7    analysis would solve almost all those problems and be a
8    clearer result.
9    Q. So if he did an ecological inference for each
10   of the races that would be preferential, that would be
11   what you preferred, and --
12   A. Yes.
13   Q. -- that would solve the problems you --
14   A. All those problems would be solved. If you
15   just do that for all the elections, you'll have
16   elections you'll be able to decide who the preferred
17   candidate is rather than assuming it. You'll then be
18   able to look and see was the preferred candidate almost
19   or always the minority candidate. That's a useful piece
20   of information in itself. You'll have reasonable
21   measures of statistical significance that are actually
22   valid. You know, all sorts of good.
23   Q. So if he did that we might be square, correct?
24   A. Of course I got to look at it.
25   Q. Yeah.

19 (Pages 73 to 76)

Page 77

1    A. But, yes, that's -- I mean, that's really my --
2    my primary criticism here of this is that -- that while
3    this method is compat -- could be compatible with it, it
4    could also be showing us something else, and that done
5    differently we would -- we would be able to deal with
6    the -- we'd be able to have a shared understanding of
7    the facts on the ground.  And as it is I don't think
8    that that's really -- it's not clear enough yet in this
9    analysis.
10    **Q. I understand.  And you also have two specifics**
11    **indicts, if I recall correctly.  One is that you believe**
12    **he only surveyed specific races, correct?**
13    A. My understanding is that he said that he -- he
14    identified the preferred candidate as the minority, the
15    candidate with the Hispanic surname.
16    **Q. Let me just go to the part of your report where**
17    **you reference that, if you don't mind.  I'm going to**
18    **take a moment.  I think you said -- I think this is**
19    **on --**
20    A. Page 3.
21    **Q. Yeah.  "Dr. Stein's analysis proceeds by**
22    **selecting only contests with at least one candidate with**
23    **a Hispanic surname."  That's what you wrote, correct?**
24    A. Yeah, that was my understanding.
25    **Q. If he didn't do that, that wouldn't apply,**

Page 78

1    **correct?**
2    A. Correct.
3    **Q. All right.  Fair enough.  And then we go -- you**
4    **go into I think a really interesting description of R**
5    **and R-square.  That's the other specific indict you have**
6    **about Stein's report, correct?**
7    A. Yes.
8    **Q. Could you explain the R score and what that**
9    **means to the court, please?**
10    A. So R is a measure typically -- it's a
11    correlation measure.  It's often called Pearson's
12    correlation, even though it wasn't actually developed by
13    Pearson but by Pearson's mentor.  And it's a -- it's a
14    measure that varies between zero and one, with zero
15    being the absence of relationship between two variables
16    presumably at least semicontinuous, and at one a perfect
17    correspondence between the two measures.  Unfortunately
18    in the area in between it's not a linear measure.  It's
19    a curvilinear measure.  And so it's really easy to be
20    deceived by that measure.  So R of 0.5 sounds like
21    you're halfway between zero and one, but in fact you're
22    not.  An R of 0.5 corresponds to the independent
23    variable accounting for 25 percent of the variation in
24    the dependent variable.  So through the early part of
25    that scale you're really, even when you get up to what

Page 79

1    looked like fairly substantial correlation, you have to
2    get above 0.7 before you're even explaining half the
3    variance.  And so if you're familiar with it and you use
4    it a lot, you know, you're capable of kind of making
5    that mental adjustment.  But otherwise it tends to
6    suggest there's more here than there is.
7         In this case the -- I think the correlation
8    is something like 0.33, which suggests that it's
9    accounting for about a third of the variation, when just
10    the -- you know, sort of the optical statistic, you can
11    look at this scatter plot, and it's clear that a third
12    of the variation has not been captured here.  And, in
13    fact, that's where -- again, for ordinary least squares
14    the -- actually, the correlation is not really what
15    typically is reported for an ordinary least squares
16    regression.  What's typically reported is the R-squared,
17    which is the coefficient that tells you what proportion
18    of the variation in the dependent variable explained by
19    variation in the independent variable.  And that's
20    important here because that's really what we're -- we're
21    trying to understand -- you got a variation in the
22    proportion of voters at the precinct that are Anglo or a
23    proportion of voters at the precinct that are Hispanic,
24    and you want to know how much that variation is driving
25    the election results.  And in this case it's driving

Page 80

1    less than 12 percent of the election result, and 88
2    percent of this bouncing around is produced by something
3    else.
4    **Q. That's the claim in the report, and I think I**
5    **understand that.**
6         **What level of R-square, if any, should lead**
7    **to a conclusion that any model is satisfactory?  Is**
8    **there a specific level of R-square?**
9    A. No.
10    **Q. Okay.**
11    A. Well, I guess -- I mean, an R-square of zero --
12    it depends on what you're -- what you want the model to
13    do.
14    **Q. A correlation.  You want to prove a correlation**
15    **and --**
16    A. Oh, a correlation.  There are all kinds of
17    scales of correlation that -- you know, some people say,
18    like in the social sciences, a -- you know, a
19    correlation of 0.2 is a pretty good correlation because
20    a lot of things we do have low correlation.  You know,
21    that's true for a variety of reasons, not the least of
22    which is extremely poor measurement in the social
23    sciences but -- so in and of itself there's not --
24    correlation is not -- it's not providing you a metric by
25    which you can judge the degree to which your independent

20 (Pages 77 to 80)

Page 81

1    variable is -- is impacting the dependent variable. And
2    so it's -- it is very seldom used in the OLS context
3    because -- because OLS produces instead the summary
4    statistic, the R-squared.
5        **Q. I think I understand. What are some of the**
6    **factors that might explain the variance in R-square on**
7    **this model?**
8        A. So I think one of the things that probably
9    explains the low R-squared is that you've thrown
10   together -- your data points are not really discrete
11   data points from an event. They're a set of data points
12   from a whole bunch of events. They're at different
13   points in time. So normally if we're looking -- again,
14   if we're looking at a single election, then we could
15   say, you know, whatever the proportion of explained
16   variance is that's how much this variable is explaining
17   about what happened in this election. When you compound
18   this by throwing a bunch of elections together, you've
19   got -- some of this trends over time, and some of this,
20   the very different nature of these elections. Some of
21   these elections are competitive. Some of them are not
22   at all competitive. In a noncompetitive election you're
23   not -- this is not going to explain much in a
24   noncompetitive election because everybody is going to be
25   voting the same way. In a competitive election, it may

Page 82

1    actually be more useful. By separating out the
2    elections you separate out the context. Right? You can
3    say, look, it's really explanatory here. Over here in
4    this election where there was like just a write-in
5    candidate it doesn't explain much, but we wouldn't
6    expect it to explain much. So part of the -- part of
7    the issue here is just there's an artificial increase in
8    the amount of variance that needs to be explained, and
9    that's not a necessary -- that's a choice of putting it
10   all in -- in one picture instead of pulling it out
11   separately.
12       **Q. I think I understand. But as we're sitting**
13   **here today you can't explain the variance, what causes**
14   **the variance here in this R-square, correct? It could**
15   **be incumbency? It could be issues in the campaign like**
16   **you said? It could be ballot drift? It could be any of**
17   **those things, correct?**
18       A. It's -- it can be a host of factors. All you
19   can say is that whatever those factors are they're more
20   influential, substantially more influential than is the
21   question of what's the racial composition of the
22   precinct.
23       **Q. And to be the clear, if he did an EI analysis**
24   **election by election that solves his problem for you,**
25   **correct?**

Page 83

1        A. It doesn't -- it solves part of the problem.
2    Again, it unbundles the characteristics of the election,
3    so you don't -- in trying to analyze what happened in
4    2020 you're not stuck with the variance that came from,
5    you know, 2015 when somebody ran unopposed and somebody
6    was an incumbent, whatever. You still have the issues
7    that are germane to that election. But in exactly the
8    form you're suggesting you can look at those and say,
9    you know, it's more predictive in this election than
10   this election, why might that be, and you can talk about
11   the characteristics of that election. It's really hard
12   to do that when the election itself is -- it's almost
13   hard to find where the particular elections are in here
14   because they're kind of all over the place.
15       **Q. I understand. That's reasonable. So how about**
16   **this? Is having a high R-square always good?**
17       A. I don't know. I guess I'm tempted to think
18   that in social sciences you -- it's like a higher --
19   it's like you can't be too rich or too thin. Right?
20   Can you have -- can you have too high in R-squared? I
21   don't think it's -- certainly there are equations with
22   high R-squareds that are less useful than ones with low
23   R-squareds because it depends on what it is you're
24   measuring. Right? There's an old joke about if you
25   measure the same thing twice, right, you'll get a high

Page 84

1    R-squared, except in the social sciences where even if
2    you measure the same thing twice you don't get a high
3    R-squared because measure and error, et cetera, et
4    cetera, et cetera. So it's a -- it's an indicator of
5    the completeness of the model. Among other things
6    it's -- it's cautionary I think. A low R-squared is
7    cautionary in the sense that, you know, you need to --
8    you need to pay some attention. It can be humbling in
9    the sense of where you're explaining. It can be
10   challenging in the sense that you know that there's
11   other things to take into account.
12           It can also reveal that your model is
13   underspecified, so it -- and specification is not just
14   an issue of -- one of the things you can't do is just
15   ignore the fact that the model has a low R-squared, in
16   the sense that your certainty about what's in -- about
17   the parameters in the model is partly a function of what
18   you left out of the model. And if the model is
19   improperly specified, which is often the case with low
20   R-squared models, then a properly specified model may
21   produce a different result. So you point out
22   incumbency. It's possible that if you bring incumbency
23   in as a variable that this correlation will diminish.
24   It's control variables because of specification error.
25   Bringing in the right specification can diminish,

Page 85

1  sometimes can reverse correlation. So it's -- it is --
2  it's not always better to have a higher R-squared. But
3  certainly a low R-squared signals -- should make you
4  cautious about overinterpreting the one parameter you've
5  estimated because you really -- you don't have a full
6  model that let's you estimate that parameter.
7      **Q. Is R-squared a biased estimator in the term,**
8  **whatever that means, the -- the statistics?**
9      A. Well, it's -- to the extent that you have met
10  the basic requirements for OLS then the R-squared, like
11  the estimates of the parameters, are linear, unbiased
12  estimators. They're -- and to the extent you violate
13  assumptions the -- the nice thing about OLS, one of the
14  many, many nice things about OLS, is that even when you
15  violate assumptions it tends to have more impact on
16  efficiency than it does on bias. So the estimator is
17  often linear -- OLS estimates, even when you violate a
18  condition that causes them not to be the most efficient
19  estimator, they're often surprisingly robust with regard
20  to bias. So, you know, in the -- in the context of
21  social science estimation the -- you know, R-squared
22  is -- is a relatively reliable indication of how good a
23  job you're doing of accounting for variation.
24      **Q. Could a high R-Square score be a symptom of**
25  **overfitting your best fit line?**

Page 86

1      A. Absolutely.
2      **Q. Yeah.**
3      A. It's -- you know, as the number of independent
4  variables approaches the number of data points you will,
5  you know, by definition have one less parameter than you
6  have data points. You will perfectly fit your -- fit
7  your line. So in and of itself it's not -- you can --
8  you can produce the high R-squared trivially. On the
9  other hand, I'm not sure that you can produce a low
10  R-squared trivially. I think that really does tell
11  you that -- again, it's not -- in and of itself it
12  doesn't -- it doesn't say you haven't learned anything.
13  It is a -- it is an appropriate caution I think in this
14  kind of modeling, and I think a -- and I think a very
15  valid one because I think one of the things it tells you
16  is this is not the right way to do this analysis. Or I
17  wouldn't say "not the right." Not the best -- not the
18  best way, not the most informative way to do this
19  analysis.
20      **Q. I understand. When you analyzed Professor**
21  **Stein's report, I just want to be clear for the record,**
22  **you used normal R-squared, not R-squared adjusted,**
23  **correct?**
24      A. Correct.
25      **Q. Okay.**

Page 87

1      A. There's -- I mean, there is only one
2  independent variable so --
3      **Q. Right.**
4      A. But the adjusted R-squared just accounts for
5  the fact that you've got, you know, multiple independent
6  variables. And it produces a result as you get close to
7  reaching a level where your number of variables is close
8  to the number of cases. But the R-squared, adjusted
9  R-squared are not going to be very different here.
10      **Q. On page 5 of your report, sir, you say -- if**
11  **you want to turn to that page, I just want to make sure**
12  **I'm quoting you correctly -- "Taken together, the issues**
13  **identified above suggest that the evidence relating to**
14  **Gingles 2 and Gingles 3 provided in Dr. Stein's report**
15  **are not sufficient to meet the plaintiff's burden of**
16  **proof on these two threshold conditions, or the broader**
17  **totality of the circumstances." Is that what you wrote,**
18  **sir?**
19      A. Yes.
20      **Q. Okay. And I'm not trying to get horsey with**
21  **you. I think I -- you know I have enormous respect for**
22  **you, but I want to be clear about a couple of things.**
23  **You're not an attorney, correct?**
24      A. Correct.
25      **Q. And you've never done a survey of burdens of**

Page 88

1  **proof or sufficiency of evidence, correct?**
2      A. Correct.
3      **Q. And while you have extensive background in**
4  **testifying you have no background in what sufficient**
5  **evidence is for a judge, correct?**
6      A. Correct.
7      **Q. Okay. In the final part of your report you**
8  **cite I think this -- this report from Abott and**
9  **Magazinnik; is that correct?**
10      A. Yes.
11      **Q. Okay. I'm going to hand it to you. I've**
12  **labeled this Exhibit 5. We're out of order. I**
13  **apologize. But I just did it incorrectly.**
14          **Could you review this and make sure this is**
15  **the right article?**
16      A. I think this is right.
17      **Q. And so in the final part of your report you**
18  **caution us based on this article that the use of**
19  **single-member districts may actually be worse for**
20  **Latinos in some communities, correct?**
21      A. Correct.
22      **Q. And that's based largely on the data for these**
23  **California elections that are analyzed by Abott and**
24  **Magazinnik, correct?**
25      A. It's -- as they cite, they're unlike the

22 (Pages 85 to 88)

Page 89

1  literature on single-member districts and black
2  representation.  There's long been controversy about
3  whether that same relationship was present for Latino
4  voters sometimes in earlier studies, sometimes in
5  different locals.  So they're really addressing what's
6  kind of been a mixed set of findings in the past, I
7  guess a much more -- a much less certain area of the
8  literature than would be the case for the value of
9  single-member districts in providing for increased black
10  representation.
11      Q.  Okay.  That's in relation to the Latinos you
12  mean, correct?
13      A.  Correct.
14      Q.  All right.  And I think in your report you
15  posit that in highly segregated areas with low vote
16  participation by Latinos single-member districts may not
17  lead to more representation.  That's what you posit,
18  correct?
19      A.  I'm not -- I'm not positing that.
20      Q.  Okay.  You're just recording that?
21      A.  So -- yeah.  And particularly -- so this is --
22  I don't cite these -- I've never cited this paper in a
23  report before.  I'm citing it only because when
24  Dr. Stein laid out kind of his three areas of evidence
25  he suggested that this was part of what he was advancing

Page 90

1  in the report, and it's his citation to their work that
2  I'm referencing.  So what I'm just providing is sort of
3  some context for his discussion of their -- of their
4  report.  I think it -- their -- what their conclusion
5  that I quote indicates is that they see there's reason
6  in some areas to be cautious because the effect is not
7  going to be -- in their view is not going to be
8  uniformly positive.  It may just be -- it may be
9  neutral.  It may be negative.  And, again, I think that
10  just provides some context for what Dr. Stein is saying
11  here.  It's not something I'm saying.  It's just, I
12  think, is a little bit of a corrective to what he's
13  saying they're saying.
14      Q.  Okay.  So you're not going to testify about it?
15  This is not something you're saying you will testify
16  about?
17      A.  I mean, if I'm asked about it, I would testify
18  about it.
19      Q.  All right.
20      A.  I don't get to control that.
21      Q.  I'm going to need to delve into it just a
22  little bit, then, if you don't mind.
23      A.  Yeah.  Absolutely.
24      Q.  In this -- on the report on page 7, you say the
25  following: "Spanish Surname Registered" -- I guess turn

Page 91

1  to it.  It's on the -- it looks like the second full
2  paragraph.  It's the second sentence.  It starts with --
3      A.  Yes.
4      Q.  -- "Spanish Surname Registered Voters (SSRV)
5  make up less than 20 percent of the registered voters in
6  Spring Branch ISD, and in the most recent school board
7  elections that included the Position 4 Elizondo -
8  Earnest contest, Spanish Surname Registered Voters made
9  up less than six percent of the actual election day
10  Spring Branch voters."  Correct?
11      A.  Correct.
12      Q.  And then you draw similarity, is it fair to
13  say, between the article's use of voter eligible
14  population and SSR -- SSVR, correct?
15      A.  Correct.
16      Q.  But isn't it true that -- how about this?  How
17  does Abott and Magazinnik define voter eligible
18  population in their article?
19      A.  I believe they're using -- I don't know if
20  they're using VAP or CVAP.  I don't recall.
21      Q.  All right.  Let's take a look at the article so
22  we're not -- I think it's on -- it's on Figure 4.  I
23  think this is page -- let's see.  Here's the exhibit.
24  One second.  Let me find it for you.  I apologize.  I
25  should have put the page number here, and I thought that

Page 92

1  I had.
2          MR. ABRAMS:  Figure 4 is on page 22.
3          MR. GOLANDO:  Twenty-two.  Okay.
4      Q.  (BY MR. GOLANDO)  On page 22, sir, here, I
5  believe the discussion -- so I think it's on page 21.
6          MR. ABRAMS:  The text begins on page 21 at
7  the bottom.
8          MR. GOLANDO:  Yeah.
9      Q.  (BY MR. GOLANDO)  So here it is.  How are they
10  defining -- what is your understanding of how they are
11  defining voter eligible population?
12      A.  So they -- it looks like they're defining it as
13  CVAP or H -- I guess Latino CVAP or Hispanic CVAP.
14      Q.  So HCVAP and VEP are the same thing here,
15  correct?
16      A.  Yes.
17      Q.  And would you agree with me that SSVR and HCVAP
18  are different measures?
19      A.  Yes.
20      Q.  And SSVR is a lower measure often done, or has
21  to be --
22      A.  Well, one hopes.
23      Q.  One would hope so.
24      A.  Not always in Texas or Louisiana.  But, yes, it
25  should be a subset of CVAP.

23 (Pages 89 to 92)

Page 93

1    Q. And in SBISD it is absolutely a subset of
2  HCVAP, correct?
3    A. It is lower than CVAP, yes.
4    Q. And so HCVAP is likely to be far higher in
5  SBISD than SSVR, correct?
6    A. It is higher.
7    Q. I think I got the adjective. It's higher?
8    A. Yeah, it's higher. It's -- it's significantly
9  higher. So it's not just marginally higher. It's
10 significantly higher.
11   Q. Okay.
12   A. Yes.
13   Q. And so in the article itself on page 22 --
14 let's pull it up for you again -- there are a couple of
15 different graphs. If you'll look at Figure 5, I
16 believe, it says -- in the article it says "there is a
17 dramatically" -- "dramatic and precisely estimated
18 positive effect in large districts that are composed of
19 at least 30 percent Latinos." That's Figure 5. What
20 does that mean exactly?
21   A. That means that there's -- there's an upward
22 slope when they constrain or confine the population for
23 the figure to that set of districts.
24   Q. How does the -- what is the definition of a
25 large district in this article?

Page 94

1    A. You mean a district with a large Latino
2  population?
3    Q. I think they actually do it by enrollment, if
4  I'm not mistaken. Maybe here is the -- so small
5  districts -- so how does the article define a small
6  district?
7    A. Enrollment of less than 13,700.
8    Q. And how does it define a large district?
9    A. Larger than 13,700.
10   Q. And how many students does SBISD enroll?
11   A. I have no clue.
12   Q. Is it higher than 13,000?
13   A. I would think so.
14   Q. It's probably a large --
15   A. It's a big district. Yeah.
16   Q. Fair enough. How many Latinos have been
17 elected to the school board in SBISD's history?
18   A. I don't know.
19   Q. Would you be surprised to hear there was zero?
20   A. I wouldn't be surprised, no.
21   Q. And how many African Americans have been
22 elected in SBISD's history?
23   A. I don't know.
24   Q. Would you be surprised if it was zero?
25   A. No.

Page 95

1    Q. How many have been appointed?
2    A. I don't know.
3    Q. And would you be surprised it was zero?
4    A. No.
5    Q. Okay. The fact that the voter eligible
6  population is north of 20 percent and that SBISD is a
7  large school district, does that change your opinion of
8  whether or not single-member districts might be a better
9  fit given this article?
10   A. I guess I'm -- I'm going on what they say,
11 which is "increasingly racially polarized voting coupled
12 with small numbers of Latino voters relative to other
13 groups-may create new barriers." And so they're
14 actually talking about the small number of voters, so I
15 guess -- I don't know how eligible is translating into
16 voters in California, but eligible is not translating
17 into voters here. And so in the sense that their
18 concern is about what happens when you have a small
19 number of Hispanic voters in an increasingly polarized,
20 politicized environment as a result of issues related to
21 change in the nature of elections, they offer a caution
22 about that that I think is -- continue to believe is
23 precisely correct for SBISD.
24   Q. But right now you would agree with me that
25 there's zero chance that a Latino preferred candidate

Page 96

1  can be elected today, correct?
2    A. I didn't know you thought that, and I don't
3  agree with it.
4    Q. Okay. Let's just go historically.
5  Historically the minority preferred candidate has not
6  been elected, correct?
7    A. I don't know that that's correct. I don't
8  believe it's correct.
9    Q. Fair enough. You said before that you believe
10 that the Latino candidate is usually the Latino surname
11 candidate, correct?
12   A. I said I thought it's probably the case that
13 when -- yes. So if there's a Latino -- a candidate that
14 is Latino I think they probably would usually be the
15 preferred candidate of Latinos, yes.
16   Q. And it's -- you were not surprised to learn
17 that no Latino has ever been elected to the school
18 board --
19   A. Yes.
20   Q. -- in SBISD, correct?
21   A. (Moving head up and down.)
22   Q. So the Latino preferred candidate in SBISD
23 elections has never been elected in SBISD, correct?
24   MR. CRAWFORD: Objection, form.
25   A. No. That's -- most of the elections to SBISD

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 97

1    board have not included Latino candidates, and so in --
2    I assume in many of those elections the --
3        Q. (BY MR. GOLANDO) Fair enough.
4        A. -- Latino preferred candidate was elected.  So
5    a Latino that was the preferred Latino candidate, if --
6    and I'm just accepting your assertion that no Latino has
7    ever been elected.  If it's true that no Latino has ever
8    been elected, then the Latino candidates that were also
9    the preferred candidate of Latino voters, which is a
10   subset, has not been elected.
11       Q. And that's -- that's a much better way to say
12   that.
13       A. Okay.
14       Q. And you agree with that, correct?
15       A. I agree with that.
16       Q. All right.  So the chance -- okay.  Fair
17   enough.  I think I understand.
18           Did you review Professor Stein's proposed
19   single-member district plan in his report?
20       A. I looked at it.  One of the things that I was
21   clear about in the sort of scope of what I was going to
22   do and the amount of time I had to do it was that I was
23   going to stay out of being a demographer.
24       Q. I understand.
25       A. So I did not do any -- I looked at it.  I

Page 98

1    recognized what it was.  It's a -- a modified version of
2    the -- he says basically the polling places.  It isn't.
3        Q. No.
4        A. It's a -- I mean, that obviously -- you know, a
5    quick look at the population deviation will tell you
6    that -- you know, nobody gets the population perfect in
7    an attendance district because there it's about
8    students, not about people.  So -- but it obviously is
9    based on -- the cores of the districts are the
10   recognizable cores of the -- of the current polling
11   places are, which would be the attendance districts,
12   with some modifications to -- you know, to get the
13   population equal.  So that's what I saw there.  It looks
14   like the area that he says is the district that's CVAP
15   majority is an area where I would suspect there's a --
16   it could be you could draw a CVAP majority district
17   so --
18       Q. Does anything about that district give you
19   pause as a map drawer?  Because you've done that in the
20   past, correct?
21           MR. GOLANDO:  Actually, strike that.  Let
22   me just do it correctly.
23       Q. (BY MR. GOLANDO) Historically you've drawn
24   maps for jurisdictions, right?
25       A. Yes.

Page 99

1        Q. All right.  So you have a vast history of
2    drawing maps, correct?
3        A. I've drawn a lot.  I wouldn't say vast.
4        Q. Okay.
5        A. But I've drawn a lot of school district maps,
6    yes.
7        Q. Fair enough.  Does anything about that, the way
8    it's shaped geometrically, give you pause?
9        A. No.
10       Q. Would you agree that it's a compact district?
11       A. Yes.
12       Q. Okay.  Would you agree that if the numbers are
13   correct that it's CVAP majority?
14       A. Yes.
15       Q. Would you agree that that map meets Gingles 1?
16           MR. CRAWFORD:  Objection, exceeds the scope
17   of his engagement and his opinion.
18       Q. (BY MR. GOLANDO) But as an expert in map
19   drawing I'm asking and as -- and one who's drawn several
20   Gingles 1 maps does it meet the form of Gingles 1?
21       A. Again, I -- so I haven't looked at any of this,
22   so I'm going entirely on your assertion that the numbers
23   that were provided match the numbers that -- the
24   picture.  Right?  And I have no idea whether that -- you
25   know, whether that picture actually produces the numbers

Page 100

1    or not but --
2        Q. Sure.
3        A. -- if that picture produces those numbers, and
4    that's the most current CVAP estimate, then I'd say
5    that's what you'd be looking for in a -- you know, in a
6    district to establish Gingles 1.
7        Q. So yes?
8            MR. CRAWFORD:  Same objection.
9        A. Yes.
10       Q. (BY MR. GOLANDO) Thank you, sir.  All right.
11   Only about nine more pages.
12           Is the Latino community in SBISD
13   sufficiently large and geographically compact to
14   constitute a majority in a single-member district?
15       A. I don't know.
16       Q. In your experience?  You've drawn maps.
17       A. I don't know.
18       Q. And you've reviewed election analyses, and you
19   know SBISD well.  You've worked here for 20 years.
20           In your opinion, given your broad history
21   of working with SBISD, do you think it's sufficiently
22   large and geographically compact?
23           MR. CRAWFORD:  Object to the extent it --
24       A. I mean, I don't have --
25           MR. CRAWFORD:  -- exceeds the scope of his

Page 101

```
 1    opinion.
 2         A. I don't have an expert opinion about that.
 3         Q. (BY MR. GOLANDO)  How about just a lay opinion,
 4    then?
 5         A. A lay opinion?  It wouldn't surprise me.  I
 6    guess that's one of our -- that's one of our answers.  I
 7    wouldn't be surprised if that was true, but I haven't --
 8    I have not at any time trying to draw -- tried to draw a
 9    district.  So, you know, I don't have any -- I don't
10    have any information to add to this beyond what is in
11    Dr. Stein's report, but it wouldn't surprise me.
12         Q. Based on your years of experience in data
13    reviewed for SBISD are Latinos generally politically
14    cohesive in SBISD elections?
15         A. Again, it's -- you know --
16         Q. It's a range?
17         A. It just depends.  It's a range.  And they're
18    certainly not in the -- not cohesive at the levels that
19    we would traditionally see for black voters.
20         Q. And that would be 90 percent and above,
21    correct?
22         A. Yes.
23         Q. Okay.
24         A. And I'm not sure even -- if it would even be
25    cohesive at the level you would normally see in a
```

Page 102

```
 1    general election.  So there's some -- again, there's
 2    modest to moderate cohesion.
 3         Q. Based on your years of experience as an
 4    election analyst and demography expert, in the data
 5    reviewed for SBISD historically, not just for this case,
 6    but historically are Anglos politically cohesive in
 7    SBISD elections generally?
 8         A. Moderately I'd say.  I mean, it's -- it varies
 9    from election to election.  But, yeah, it's a --
10    probably -- probably somewhere in that same range, but
11    I don't really know.
12         Q. Based on your years of experience and the data
13    reviewed for SBISD do Latino voters in SBISD elections
14    support different candidates than Anglo voters in SBISD?
15         A. I have not -- I don't know.  Comprehensively I
16    don't know.
17         Q. You did an EI report, correct?
18         A. The what?
19         Q. You did an EI before the litigation began?
20         A. Yes.
21         Q. Okay.  And you recall the contents of that EI
22    report, correct?
23         A. I do.
24         Q. And I'm asking you to call into that based --
25    based on your expertise and your -- the data you've
```

Page 103

```
 1    collected and your experience in SBISD.  Do you recall
 2    whether or not Latino voters in SBISD elections support
 3    different candidates than Anglo voters generally?
 4         A. I guess I'm not clear on -- I mean, you're
 5    asking me about the results of the analysis that I
 6    provided the attorneys, so I'm not sure -- is this
 7    like -- are we back in the realm of what's acceptable
 8    here or --
 9         Q. I'm asking you just based on your experience.
10    It's a question about do you believe them to be so based
11    on the entirety of your experience here?
12         MR. CRAWFORD:  And based on Dr. Alford's
13    interpretation of the question I think it would call for
14    protected communications, and so I'll instruct you not
15    to answer.
16         Q. (BY MR. GOLANDO)  You can answer if you want.
17         A. I've been instructed not to answer --
18         Q. Fair enough.
19         A. -- by my employer.
20         Q. I think we've asked that question before.
21         In your opinion based on your years of
22    experience at SBISD, does the Anglo majority vote
23    sufficiently as a bloc to enable it to defeat the
24    minority preferred candidate?
25         A. I would say sometimes.
```

Page 104

```
 1         Q. How often?
 2         A. I don't know.
 3         Q. More often than not?
 4         A. I don't know.
 5         Q. Does Texas have a history of official
 6    discrimination in the jurisdiction in SBISD that
 7    affected the right to vote?  Does Texas have it?
 8         A. Now we're -- we're not just outside of my
 9    expertise on this case.  We're just --
10         Q. Yeah.  I'm just trying to limit your testimony.
11    I just want to make sure you're not going to be testifying
12    in totality.  So if you don't have an opinion that's
13    great.  You can just say "no."
14         A. Yeah, I don't have an opinion.
15         Q. Okay.  Does Harris County?
16         A. I don't have an opinion.  I don't have an
17    expert opinion.
18         Q. Does SBISD?
19         A. I have no idea.
20         Q. Does SBISD use the place system for voting?
21         A. It's my understanding they do.
22         Q. Okay.  Have minority candidates been denied
23    access to the jurisdiction's candidate slating process
24    formally or informally to your knowledge?
25         A. I don't know anything about the slating
```

1    process, if there is one.

2         **Q. Are SBISD minorities discriminated against in**

3    **socioeconomic areas such as education, employment, or**

4    **health?**

5         A. I don't know.

6         **Q. Have there been overt or subtle racial appeals**

7    **in campaigns in SBISD elections?**

8         A. I don't know.

9         **Q. Okay. Has a minority ever won an election in**

10   **SBISD to your knowledge?**

11        A. I don't know.

12        **Q. Okay. Are elected officials -- are the SBISD**

13   **trustees responsive to the concerns of minority voters**

14   **in SBISD? Do you have an opinion?**

15        A. My opinion, yes, I think they are.

16        **Q. What is that based on?**

17        A. Just on -- you know, the degree -- sort of my

18   sort of nonexpert kind of information you get from

19   reading the paper sort of thing, that certainly

20   there's -- you know, the district floats bonds and

21   builds facilities in a variety of areas. Like most

22   districts they run a -- you know, the bilingual

23   education program. They have programs that are designed

24   to, you know, help students, early start kinds of

25   things, whatever. So that's just -- my sense is the

1    district has a reputation as a district that has, you

2    know, made a variety of efforts, provided resources and

3    expertise directed toward -- toward minority students.

4         **Q. Will you be testifying about that?**

5         A. I don't think so. It's not an area in my

6    report. It's not my area -- I mean, that's -- again,

7    that's a -- you can have a sense about that, and then

8    there's empirical information about it. I don't have

9    the empirical information and it's not an area that I do

10   work in so I don't testify about it.

11        **Q. Fair enough. We're entering the last stages,**

12   **the -- my category of this is fun stuff, so I hope this**

13   **is enjoyable for you. It will be for me.**

14        **My first question to you actually is what**

15   **is the ecological fallacy?**

16        A. So the ecological -- normally you gather data

17   at the level that you want to ask or answer a question.

18   So if I want to know what effect people's gender has on

19   how they vote I would -- because that's a question in

20   which the unit of analysis of the question is an

21   individual person then the unit of analysis for my study

22   should be people. So I would ask people about their

23   gender, and I would ask them about how they vote. And

24   that would be a normal analysis. An ecological analysis

25   is one where your -- your question -- you want an answer

1    at the individual level, but you're not getting the data

2    at the individual level. You're getting it at some

3    level of aggregation. So, for example, I could do a

4    study of counties in the United States based on the --

5    what proportion of the county is male and female, and

6    then look at Republican, Democratic voting, and try to

7    draw a conclusion about the effect of gender on

8    Republican or Democratic voting. And that's the

9    ecological fallacy, right, that -- that once aggregated

10   that the variation across those aggregations is

11   disclosing simply the same variation that's taking place

12   across individuals. It's not necessarily the case that

13   that's happening.

14        **Q. Okay. So as I learned it -- this is very --**

15   **this is like Science 101, right -- it's when you infer**

16   **individual behavior from aggregated measurements. Is**

17   **that fair?**

18        A. Yes.

19        **Q. Okay. So ecological regression describes a**

20   **voting behavior between certain relationships, right?**

21        A. Correct.

22        **Q. Okay. But you can't infer the intent of the**

23   **voter, correct?**

24        A. It doesn't measure the intent of the voter.

25   People infer the intent all the time.

1         **Q. For sure. Right.**

2         A. But, no, you don't have -- you're not measuring

3    the voter's intent, although it's true in any research

4    scheme you have a variety of tools that help -- can help

5    you to eliminate certain possibilities or to make

6    certain things more likely than not. So I'm going to

7    give you an example in a partisan general election. If

8    you find that -- as I talked about earlier, if you find

9    that when the Republican candidate is a Hispanic,

10   Hispanics vote against that candidate when -- when the

11   candidate is Anglo. So what you see there then is a

12   pattern, that the changes in the partisanship of the

13   candidate drives voting, but the changes in the

14   ethnicity candidate doesn't drive the voting. That's

15   sufficient -- not that you would know that from any one

16   analysis, but that's sufficient to suggest that given

17   that you've added this other condition that the behavior

18   of the voters, whatever their intention, their behavior

19   is not being driven by the signal that they're getting,

20   right, because you've separated two signals, signal

21   about the candidate and party, and signal about the

22   candidate and ethnicity. And where you can separate

23   those you can see whether it's a mix of those or whether

24   it's mostly one or mostly the other or neither.

25        **Q. So you infer the intent of the voter by**

27 (Pages 105 to 108)

1    subtraction almost, correct?
2        A.  You still don't infer the intent.  I'm very
3    uncomfortable with intent analysis in all of its forms.
4    I don't believe people have intent quite frankly.  It
5    requires that people have a unified personality, that
6    people have -- that people's brain is -- that part of
7    the brain that actually makes decisions is entirely in
8    control, and therefore the -- I mean, I think just the
9    idea that -- I mean, there's a lot more than just
10   unintended consequences.  There are just completely
11   unintended actions as well.  So even talking about
12   intent at the individual level where you have the most
13   chance of it making sense I'm not comfortable with it.
14   We certainly don't have tools for teasing that out.  And
15   then, of course, when you get to collective bodies my
16   favorite is the intent of the legislature.  Anybody who
17   has ever been near a legislature knows the idea, as you
18   well know, that the legislature itself generates an
19   intent, it's like forget about the -- I mean, the
20   individual legislators could barely figure out what
21   their intent is on a good day.  Collectively Lord only
22   knows what's going on but --
23       **Q.  Yeah.  I think voters are pretty irrational, I**
24   **think legislators are definitely irrational, in policy**
25   **meetings pretty irrational, right?  I understand.**

1        A.  And collectively whatever we're guilty of as
2    individuals put -- put us in groups of two, in groups of
3    four, in groups of eight, in groups of twelve, and then
4    talk about the outcome of that irrationality when it
5    gets aggregated.  And I think it's really -- it's not
6    just difficult.  I just don't think it's -- that there's
7    a value to it.  So I don't think it's valuable to talk
8    about the intent of the -- to the intent of the voters.
9    I think it's valuable to talk about -- certainly it's
10   valuable to talk about what the cue is the voters are
11   responding to.  And this is a context where that's
12   really important.  If the -- if voters are responding to
13   a cue of ethnicity, then that tells you something about
14   the behavior.  And if they're not, it tells you
15   something about their behavior and --
16       **Q.  And we would know that they were responding to**
17   **a cue about their ethnicity in this case if we ran an EI**
18   **and there was cohesion for Latino voters and cohesion**
19   **for Anglo voter candidates, correct?**
20       A.  No.
21       **Q.  How would we know, I guess is more or less --**
22       A.  Okay.  So that -- we can certainly
23   distinguish -- again, you need an analysis that brings
24   in some other factors so that you can tell whether
25   that's the factor that's explaining it or the cue.  Just

1    as if you don't bring in partisanship you can't tell the
2    difference in the -- you know, in a general analysis.
3    So if you -- I mean, you can look at -- you can vary
4    things like, you know, the location of voters within the
5    district.  You can vary things about, you know, the
6    voters' opinions and so forth.  So there are a lot of
7    other things you can look at that -- you know, that
8    would allow you to at least get some sense of how
9    powerful or durable or influential any particular
10   characteristic is.
11       **Q.  Okay.**
12       A.  But I still think it's -- it's not really --
13   it's not really about intent.  It's about -- it's about
14   the behavior rather than the internal process.
15       **Q.  Do you believe that there is a link between**
16   **biology and political ideology?**
17       A.  Yes.
18       **Q.  Could you tell me what that -- what you believe**
19   **that is?**
20       A.  So for many aspects -- so I -- first of all,
21   ideology is not an abstract way of organizing your
22   thinking about the world.  This is some of the oldest
23   work in American politics.  You ask people ideology in
24   the "ism" sense, liberalism, conservatism, communism,
25   you know, libertarianism, whatever, they don't have a

1    clue.  They don't know what the basic principles are.
2    They never apply them.  They have no clue.  So at the
3    same time, as John Jost has pointed out, the behavior of
4    voters is remarkably -- if you know, you know, as he
5    says in "The End of Ideology," if you think ideology
6    disappeared from American political life you must not be
7    seeing the same American political like I'm seeing
8    because this ideology runs rampant.  So what is it?  And
9    clearly it's -- you know, we don't have to scratch the
10   surface to know it's not principle.  Right?
11       So if it was principle conservatism then --
12   like Greg Abbott believes local governments should make
13   their own decisions, not central governments.  Right?
14   Well, yeah, that's true.  Just tell me what the subject
15   matter is of the local government, and I'll tell you
16   whether he favors it or not.  So that's not the same
17   thing as saying that he's not ideological.  Right?  He's
18   very ideological because the kind of things he wants to
19   stop Harris County from doing are a very specific kind
20   of thing.  Right?  It's not hard to predict what
21   Governor Abbott is going to get on about these days.
22   It's going to be a series of things that are very
23   closely related.  And as it happens those things are
24   closely related to things that vary in the way human
25   brains are built.  So --

## Page 113

1  Q.  How do you --
2  A.  -- the more --
3  Q.  I'm sorry.  I didn't mean to cut you off.
4  Please go ahead.
5  A.  So, I mean, the more easily disgusted someone
6  is in general the more conservative they'll be in
7  general on a very specific set of conservative issues,
8  those issues related basically to sexual behavior.  So I
9  can do a really good job if I just know how easily
10  you're disgusted.  And I can measure that by skin
11  conductance, by -- just by showing you a picture of
12  somebody eating worms.  I can measure your skin
13  conductance, and I can do a good job of predicting your
14  opinion on gay marriage or abortion or premarital sex,
15  things that are related to basically just sexual purity
16  or sanctity.  I can't do a very good job of saying
17  whether you're a fiscal conservative or whether you're a
18  hawk, but I can for that particular area.
19  Q.  Are there any other areas that are close to
20  sexual areas?
21  A.  Well, I mean, if I'm -- if instead of giving
22  you a disgusting image I give you a threatening image,
23  or I unexpectedly play a loud burst of white noise in
24  your earphones, I can do a very good job of predicting
25  your position on securing the border, gun control, more

## Page 114

1  funding for the military, whether you would like to have
2  a bomb shelter in your backyard in the '60s.  So we have
3  a mechanism in our brain that responds to threat.
4  It's -- among other things it's a -- part of that is a
5  startle mechanism.  So we startle when we hear loud
6  noises.  People who are conservative on national defense
7  startle significantly more easily than do liberals on
8  national defense, even if the -- what they're startling
9  to is just a burst of white noise, absolutely content
10  free.  That startled reaction varies across individuals.
11  And there's a really nice study that looked at startle
12  reflex in infants, so how easily startled is an infant
13  because that gets recorded as part of Apgar.  Like,
14  you're supposed to startle.
15  Q.  Sure.
16  A.  So they recorded that, and then followed that
17  up like 40 years later with how easily startled they
18  were as adults.  And it's a -- there's about a 90
19  percent predictive relationship.  So our startle
20  ability, the degree to which our amygdala and the
21  networks that serve the amygdala moving both to
22  impulsive reactions, like a jerking motion, and to
23  things like sensing, feeling, experience, and fear,
24  those things are -- those differences are differences
25  we're born with.  And so being born into -- being born a

## Page 115

1  person who is more easily startled or has a more active
2  threat system or threat recognition system places you in
3  a more threatening world.  And someone who has, you
4  know, very little of that kind of -- and I think both
5  liberals and conservatives recognize this.  Right?
6  Liberals recognize that conservatives see a
7  more dangerous world.  And, of course, because different
8  ideologies like to be pejorative with each other
9  liberals say conservatives are just paranoid, and
10  everywhere they look they see a threat.  Right?  And
11  then you ask conservatives like, "Well, what about
12  liberals?"  And they say, "Oh, yeah, that's great.  Put
13  liberals in charge of the Defense Department.  They
14  don't see threats anywhere."  Right?  "Liberals wear
15  rose-colored glasses.  They look out in the world and
16  say, 'Maybe if we were just nice to them they'd be nice
17  to us.'"  And conservatives say, "No.  You could be nice
18  to them, and they'll kill you."  Right?  So one side is
19  seeing a scarier world than the other side.  We know
20  that if we manipulate how scary the world is, like if
21  you make conservatives feel safer, you put them in a
22  safer environment, you create a safer system, they
23  become more liberal in their views.  They actually
24  become more liberal across a fairly wide range of views.
25  If you threaten liberals, they become more

## Page 116

1  conservative.  So you have both a resting state
2  difference, and then you have this reaction difference.
3  Right?  If I ask you whether homosexual relations are
4  inappropriate or immoral or -- well, that would work 20
5  years ago.  It doesn't really work anymore except with
6  people over the age of 70.  It won't work with students
7  anymore.  There's no variation in that at all.  But if I
8  ask you whether incest was appropriate on a scale of one
9  to five, from one being absolutely never, you know, to
10  five being sure, what the heck, if I ask you that in a
11  nice, clean setting you'll answer that measurably
12  differently than if you do that in a setting where
13  there's something that might prompt disgust, a presence
14  of rotting food or -- one study that's a remarkable
15  study, they -- the only thing they varied in the entire
16  study was when they would direct the students who came
17  in in the central entryway, and then the hallway split.
18  And one side of the hallway was a hand sanitizer
19  dispenser.  On the other side there wasn't.  So the
20  experiment is just to flip which light of the hall the
21  table is on when they fill out the survey.  So they
22  either told the students to go to the right, or they
23  told the students to go over to the table by the hand
24  sanitizer.  That changes people's opinion.  It
25  measurably changes their opinion on gay marriage, on

29 (Pages 113 to 116)

Page 117

1    homosexuality in general, on abortion, on a whole series
2    of things related to sexual purity.
3        Q. That is fascinating.
4        A. Just a prompt of purity. It's something as
5    simple as that that prompts purity. And if you think
6    about traditional notions of ideology it's very hard to
7    understand why purity is a part of that at all.
8    Honestly, what in the -- in the thoughtful scheme,
9    Marxism or John Locke or whoever, what does sexual
10   behavior got to do with it? How did it get to be so
11   central to the political debate between liberals and
12   conservatives not just here but in every country in the
13   world and every period of history? Why is it so
14   central? Why is it so central to religion, between
15   liberal and conservative religions? Why is it important
16   to the orthodoxy and not important to the reformed?
17       So my answer to that is the reason that
18   it's central and the reason it's ever present is that
19   human beings differ from each other. And they differ in
20   two ways. They differ in the sense that their life
21   experience is completely unique. And so you are who you
22   are because of what you lived. But you also were
23   completely unique the day you were born. And that
24   uniqueness the day you were born is not just your genes.
25   It's a whole set of structures inside your brain that

Page 118

1    are going to make you a different person than, for
2    example, your twin. I have twins, and they are as
3    different as night and day. And the same is not true
4    for identical twins.
5        Q. That's true.
6        A. Identicals are not different as night and day.
7    The likelihood that they'll share the same adult
8    ideology is twice as high if they're identical twins as
9    if they're not identical twins. And parents don't
10   raise -- parents don't tell -- when they have identical
11   twins, they don't say, you know, "Republicans are great,
12   and let's support Donald Trump." But if they're
13   nonidentical twins they take one of them aside and say,
14   "Trump is a great guy." They take the other one aside
15   and say, "Joe Biden is a terrific guy." Right? They
16   lived in the same environment, they were born at the
17   same time, and yet they are markedly different on
18   fundamental issues like political ideology. And that to
19   me tells me there's a biological basis to it.
20       And that biological basis, like all the
21   rest of our biology, is just distributed randomly as a
22   result of sexual reproduction. Right? I'm more likely
23   to have the same -- politics runs in families because,
24   after all, George W. Bush has 50 percent of George H.W.
25   Bush's genetic material. Preston, on the other hand, is

Page 119

1    out there like 1.12 percent, so you're going to -- as
2    the family spreads out, you see -- you see more
3    difference. And then more broadly across the population
4    we're for the most part unrelated. We share
5    approximately zero segregating genes within the average
6    person in the population so --
7        Q. That's interesting. And the course of that
8    study -- I think that you cited this study -- it's
9    called "Political Attitudes Vary with Detection of
10   Androstenone"?
11       A. Androstenone. Yeah.
12       Q. Am I saying that correctly? This is your work,
13   correct?
14       A. It's a team.
15       Q. Yeah, of course. I've labeled this Expert --
16   Expert Exhibit No. 4. Could you review it and
17   authenticate it for me, please?
18       A. It looks like the study.
19       Q. So this is a report you published with three
20   other folks it looks like; is that correct?
21       A. Yes.
22       Q. And could you describe what this report is to
23   the court, please?
24       A. So this is a study that -- there's a -- people
25   have a biological difference in their ability to detect

Page 120

1    and in their classification of the pleasantness or
2    unpleasantness of androstenone. And this is a study
3    that looks at whether that difference is related to
4    anything that might be related to politics, in
5    particular to sort of what broadly might be called a
6    preference for hierarchy.
7        Q. And what were the findings? Do you recall?
8        A. The findings, that there is a modest
9    relationship between the ability to and the valence on
10   the detection of androstenone and a preference for
11   hierarchy.
12       Q. So what is androstenone? I'm not sure I
13   understand what it is.
14       A. It's a -- it's a -- it's a chemical that's
15   present in humans. It's a -- part of a breakdown
16   product of testosterone. So it's slightly more elevated
17   in males than females, but it's present in all humans.
18   It makes its way as a discrete molecule out of the body
19   through sweat. And when you give people a whiff of it
20   people either -- a substantial portion of the public
21   can't smell anything, so they don't detect any odor at
22   all. And then another set of the public describes the
23   odor as being similar to vanilla or ginger, something
24   like that, a kind of a pleasant spicy odor. And then
25   another portion of the public describes the odor as sort

30 (Pages 117 to 120)

Page 121

1  of offensive.  Urine is one of the things people often
2  say it smells like.  So for some people it's a very
3  unpleasant odor, for some people it's a pleasant,
4  pleasing odor, and then for some people it's no odor at
5  all.
6        Q.  That's interesting.
7        A.  There are actually -- although we have the
8  ability to separate about 400,000 chemicals through our
9  olfactory sense, which is in itself a remarkable -- it's
10  the only part of our brain that's exposed to air.  The
11  olfactory bulb is literally a part of the physical brain
12  that protrudes out into the sinuses in order to have the
13  immediate ability to detect these chemical keys.  And
14  the keys are very specific.  There is a -- there is a
15  receptor for every single chemical that you can detect.
16  The ones where the receptor is -- where we have
17  receptors that at one time were active but are no
18  longer -- because of mutation are no longer functional,
19  we can't smell, so we actually over time have lost a lot
20  of active receptor capability.  And uniquely among
21  things related to brain physiology each one of those
22  receptors has to be built by a separate gene.
23        So as a class we have more genes for
24  olfaction receptors than we have for any other
25  physiological character, precisely because it takes a

Page 122

1  separate gene to build the protein that can detect the
2  chemical key for each one of them.  And what that means
3  is across that you very often have situations where
4  people are more or less able to smell certain things.
5  So some -- for almost everything there's at least some
6  subset of people who can't detect the odor because of a
7  mutation in the -- in the genes or an improperly formed
8  receptor.  But it's rare to have -- and often that's
9  accompanied by people who describe it as intensely
10  something or not so intensely something.  But it's rare
11  to have a complete valence, for something to be detected
12  by some people that's very positive and other people
13  it's very negative.
14        Q.  That's fascinating.
15        A.  Cilantro is the --
16        Q.  Right.
17        A.  -- the only taste equivalent in taste, is that
18  cilantro either tastes lovely or like soap.  And
19  people -- a lot of people don't like soap in their food.
20  I don't like soap in my food, so I don't like cilantro.
21  But other people find it wonderful.  So it's in that
22  same rare category.
23        Q.  Yeah.  I love it, so I guess we're just
24  different.
25        A.  There but for the grace of God, go I.

Page 123

1        Q.  So it looks like on page 14 -- if you will turn
2  to that, please.  I want to discuss some of the
3  findings, if you don't mind.  On the bottom part it
4  discusses the results for the political batteries or
5  some of the batteries in Table 1; is that correct?
6        A.  Yes.
7        Q.  And it looks like there was some findings.  So
8  it looks like "Preferences for literalism were
9  positively correlated with androstenone intensity,
10  albeit at a relaxed level of significance."  Is that
11  correct?
12        A.  Correct.
13        Q.  What's the R score for that?
14        A.  0.16.
15        Q.  Okay.  Now, you stand by that finding, correct?
16        A.  Yes.
17        Q.  Okay.  What is the R-square score for that
18  finding?
19        A.  That would be whatever 0.16 is squared so it --
20        Q.  I have that as 0.0256.  Correct?
21        A.  That would be correct.  Yes.
22        Q.  Is that lower or higher than Bob Stein's
23  R-square?
24        A.  Lower.
25        Q.  Okay.  Again on -- you wrote a little bit below

Page 124

1  that that "disgust sensitivity and androstenone
2  intensity" -- let's see here -- so there's a -- I'm
3  going to get you the whole thing.  "The same trended for
4  disgust sensitivity and androstenone intensity."  Is
5  that correct?
6        A.  Yes.
7        Q.  And you stand by that finding, correct?
8        A.  Yes.
9        Q.  What is the R score for that finding?
10        A.  That one is 0.16.
11        Q.  And what is the R-square of that finding?
12        A.  I assume it would be pretty similar to the
13  previous one.
14        Q.  Correct.  Yes, sir.
15        A.  Yes.
16        Q.  And I think I have that as 0.0256.  Correct?
17        A.  Yes.
18        Q.  And is that lower or higher than Bob Stein's
19  R-square?
20        A.  Lower.
21        Q.  Okay.  I think there is another finding here.
22  "Threat sensitivity."  Right below that it says "Threat
23  sensitivity was also positively correlated with
24  androstenone intensity."  Is that correct?
25        A.  Yes.

1      Q.  And you stand by that finding, correct?
2      A.  Yes.
3      Q.  And what is the R score of that finding?
4      A.  That is 0.17.
5      Q.  And what is the R-square score of that?
6      A.  Slightly, however slightly, minisculey higher
7   than the previous two.
8      Q.  I have that as 0.0289.  Does that seem correct?
9      A.  That seems correct.
10      Q.  Is that lower or higher than Bob Stein's
11   R-square?
12      A.  Lower.
13      Q.  Okay.  Further down you wrote that
14   "androstenone intensity was positively correlated with
15   the Preferences for Social Order battery."  Is that
16   correct?
17      A.  Correct.
18      Q.  And what was the R score for that finding?
19      A.  That is 0.19.
20      Q.  Pretty good?
21      A.  We're starting to get up there now.  We're
22   getting pretty close to -- we're getting to the threes,
23   aren't we?
24      Q.  Yes, sir.
25      A.  I'm getting excited.

1      Q.  So what is the R-square of that?
2      A.  It's something in the -- between three and --
3   0.03 and 0.04.
4      Q.  I have it as 0.0361.  Does that sound about
5   correct?
6      A.  It sounds fair.
7      Q.  All right.  And you stand by that finding,
8   correct?
9      A.  Yes.
10      Q.  And is that lower or higher than Bob
11   Stein's R-square?
12      A.  Lower.
13      Q.  Further down you say "we do find that
14   androstenone intensity continues to exhibit a
15   significant positive relationship with preferences
16   for social order."  Is that correct?
17      A.  Correct.
18      Q.  And do you stand by that finding, sir?
19      A.  Yes.
20      Q.  Okay.  And what was the R score for that
21   number?  I have it as -- it should be on page 16 in the
22   full -- first full graph, the last sentence, or the next
23   to last sentence.  "Though we do find that androstenone
24   intensity continues to exhibit a significant positive
25   relationship" --

1      A.  Yeah.  0.21.
2      Q.  Okay.  And what is the R-square for that
3   finding?
4      A.  Must have made it to 0.04 by now.
5      Q.  Yes, we did.  It's 0.0441.  Is that correct?
6   That seem about right to you?
7      A.  That seems a little higher than I would think,
8   but okay.  I'll take it.
9      Q.  Well, let's just do it real quick.  Let me see,
10   get a calculator.  I may have done it incorrectly.  I'm
11   not a social scientist.  I just square the number,
12   correct?
13      A.  Yeah, you just square the number.
14      Q.  Okay.
15      A.  I'm not a calculator, so we're in the same boat
16   when it comes to this one.  This is not really about
17   being a social scientist.  I don't know.  It just
18   seems -- oh, golly.  We are getting somewhere.  I'm
19   impressed.
20      Q.  Just to be clear with the record, the R-square
21   for that finding is 0.0441, correct?
22      A.  That's correct.
23      Q.  And is that lower or higher than Bob Stein's
24   R-square?
25      A.  Lower.

1      Q.  Okay.  That's all I have, I think, on that.
2         Would you believe that biological
3   ideological preferences, are they more outcome
4   determinative in a nonpartisan election I wonder?
5      A.  It's -- I haven't really thought about that
6   much.  It's -- partisanship itself is -- the direction
7   of partisanship itself is not very biological.
8      Q.  Okay.
9      A.  So there's very little heritability.  Party ID
10   comes from exactly where you expect it to come from.  It
11   comes from your parents.  It comes from your life
12   experience.  To the extent that it shows heritability
13   it's largely through the heritability of ideology.  So,
14   for example, if your parents are liberal Democrats but,
15   you know, you turn out to be sort of biologically a tilt
16   conservative, then while you will start out, probably
17   start out identifying as a Democrat, you may by the time
18   you're 30 have drifted over and be an independent or
19   possibly even a moderate Republican.  So that what's
20   being -- what's operating there is this underlying
21   ideological tendency to make you more or less
22   comfortable with a party.
23         I remember talking to a southern senator at
24   one point, and he said, "This is a bunch of baloney.  I
25   know it's a bunch of baloney because I used to be a

Page 129

1  Democrat, and now I'm a Republican." I said, "So even
2  though" -- he said, "How could it be biology? I have
3  the same" -- "I have the same genes that I had 20 years
4  ago when I was a Democrat, but now I'm a Republican." I
5  said, "Well, I guess maybe you just
6  thought about it and decided to change your world of
7  view." He said, "I didn't change. The damn party has
8  changed." I said, "Okay. You're sure making my point
9  for me here, and you're sure making it easy." It's
10 like -- it really is a really good example. Right?
11 He -- you know, he was comfortable enough for a while in
12 the old Democratic Party because it had a very
13 conservative southern wing, but he shifted over.
14       So in that sense your -- sort of your
15 predisposition can affect your likelihood of staying in
16 a party you inherit from your parents. It can have an
17 affect when your parents are of different parties. I
18 come from a mixed marriage. My mother was a Democrat.
19 My father was a Republican. My brother is a Republican.
20 I'm a Democrat. So you know how those things work. You
21 got to pick your battles and pick who you're going to
22 side with. But partisanship itself is largely a choice
23 people make or a choice they don't make in the sense
24 that they inherit it, so I -- in the U.S. at least party
25 ideas is an identification. It is closer to your

Page 130

1  religious affiliation than it is to most other traits.
2  It is not just a preference for one party over the
3  other. People don't just say "I prefer the Democrats."
4  People say "I am a Democrat."
5  **Q. Correct.**
6  A. That wouldn't be true in Europe. Most
7  Europeans don't identify themselves as a party. They
8  identify which party they prefer or vote for or where
9  they are in a kind of party spectrum, but they don't
10 typically think of themselves as -- in the way that we
11 think of ourselves as Texans or Catholics or Americans.
12 So it's a -- it's a self-identification, and like most
13 self-identifications there's strong childhood effects,
14 and then strong adult choice effects. So what -- so
15 would underlying -- underlying ideological drive more in
16 a nonpartisan than a partisan? I think it would --
17 obviously it would depend on a lot of things. There's a
18 social science answer for you.
19       My guess is it's probably more important --
20 it probably is more important as the salience of
21 ideology goes up in the campaign itself. So I'll make a
22 bold prediction here. Ideology is going to become
23 increasingly important in nonpartisan elections, not
24 just because they're nonpartisan, but because ideology
25 is being injected into those elections, even in the form

Page 131

1  of really frank partisanship. Right? So they just
2  aren't -- you know, the old days when the median
3  Republican and the median Democrat were both sort of
4  good school people, right, the -- the school board
5  elections were nonpartisan because mainstream
6  Republicans and Democrats, although they were
7  ideologically different, believed in quality, free
8  public education, believed in good universities. Right?
9  Those days are over. That just is not the case anymore.
10 **Q. Indeed.**
11 A. And so that's going to become -- you know, we
12 don't -- go to a school board meeting. My God. I used
13 to tell my students to go to school board meetings and
14 federal court hearings because it would be
15 inspirational. I sure as heck don't tell them that
16 anymore. Federal court still is inspirational. You
17 know, I know. I'm pretty careful telling them which
18 judge. No, I'm not going to share that --
19 **Q. Okay.**
20 A. -- information at this point. So yeah. I
21 mean, I don't know. I guess it's -- it's a good
22 research question.
23 **Q. Is it possible?**
24 A. It is -- I think it is possible that -- I mean,
25 quite frankly I think, yeah, it's -- and, again, I don't

Page 132

1  think it really -- I don't think you can really -- one
2  of the things I think people misunderstand about our
3  work is that people have this idea that if something has
4  some genetic precursor or some physical brain precursor
5  that it must be more important or less -- you know, less
6  variable or something else. And I always try to tell
7  students that, you know, the -- sort of the biology of
8  human politics is like the -- is like the bayou current.
9  You may not even realize bayous are flowing bodies of
10 water. You could live right here a long time and not
11 recognize the bayou actually flows in some direction,
12 you know, unless of course we got a quarter of an inch
13 of rain, in which case they're obviously moving. But
14 it's a very small, very weak force, but it's a constant
15 force. And the day-to-day forces, the things that
16 happen in our lives, the people that we respect, the
17 jobs we take, those are big forces. They're powerful
18 forces. They push us all over the place.
19       And you just -- you can -- you can just
20 look at the change in, you know, in the average Democrat
21 or the average Republican's position on a whole host of
22 things over time. Those social forces are powerful
23 forces. The power of your brain's biology is that it
24 works 24 hours a day very quietly in the background and
25 slowly -- whatever position you get pushed to you --

33 (Pages 129 to 132)

1  like a boat on a very slow -- I can predict the
2  direction. All other things being equal you're going to
3  come back toward that center of gravity that your
4  biology gives you with regard to ideology. And that's
5  about all. Just a weak force that tends to pull you --
6  it tends to pull you in a direction. So it's definitely
7  not the strong force that people normally think of
8  biology as being. When it comes to things like
9  ideology, which are quite abstract, we're much too smart
10 to be led around by that. Right? Because we're unlike
11 other animals. We don't just think. We think about our
12 thinking. That metacognition is a really distinctive
13 trait, and it reduces, right, and it reduces -- that's
14 why we have the ability to defer gratification in ways
15 that are really remarkable.
16 **Q. Some of us. Not necessarily me.**
17 A. Yeah. Well, you know, I'm not doing such a
18 great job myself. But just speaking as one person to
19 another who can only defer certain kinds of
20 gratification on a successful basis. But the point is,
21 of course, right, that the -- sort of the ability to be
22 aware of that, to be able to think about that really
23 reduces the ability for -- for at least some drive.
24         So the other thing I think is really
25 important is that politics is a -- is a part of what

1  makes us social animals. And that's really not the most
2  fundamental part. Right? The really fundamental parts
3  of us, the things that are survival driven are
4  appetitive and aversive. Right? So our appetitive
5  drives, our drive to sexually reproduce, our drive to
6  get food, to get shelter, those basic drives are really
7  powerful things. And those are things that we have --
8  can struggle with controlling. But, you know, this sort
9  of slight left-right predispositions are pretty modest
10 drives, and therefore our ability to outthink ourselves
11 is really pretty powerful in that realm.
12 **Q. Fair enough.**
13 A. Not to mention the effect of other people.
14 Like any time I find myself drifting however slightly
15 conservative I have my wife to correct my thinking and
16 to point out that I'm drifting a little bit, a little
17 bit in the wrong -- in the wrong direction, or my
18 brother to point out that I'm just a complete idiot for
19 believing pretty much anything, anything that I believe
20 so --
21 **Q. Do you believe, or is it your position, that**
22 **there's a genetic component to race?**
23 A. Yes.
24 **Q. Could you talk a little bit more about that**
25 **please?**

1  A. So, I mean, if you think about the -- obviously
2  there's a -- there's a thing called race that's a
3  completely social figment -- not a figment -- but it's
4  completely a social creation. It's an intellectual
5  thing. It's an abstract category in which we bundle all
6  kinds of things. But if you want to look at sort of
7  what are the things that are most likely to create that
8  bundle, right, there's a reason why we talk about people
9  of color. Right? There are gradations in the tint of
10 people's skin, and that gradation of the tint of their
11 skin is genetic. We can be tanned or untanned, but the
12 amount of -- you know, all other things being equal, the
13 proportion of external melanin in your skin is
14 hereditary. Right? If both of your parents are black,
15 you're likely to be black. Right?
16         So in that sense the markers out of which
17 we've created this -- this kind of sometimes reasonable
18 and mostly unreasonable figment about racial categories,
19 the markers themselves are -- are often genetic. And
20 because they're genetic they both provide an easy hook
21 for saying "you're different than me." Right? "I can
22 see that you're different." And skin color is one of
23 the markers that's commonly used for that. Although
24 there are other more subtle markers that are used in
25 things like the caste system in India, for example.

1  **Q. Sure.**
2  A. So there's a biological hook there. And then
3  does that biological hook create all this other
4  epiphenomena around it? It doesn't. But it does make
5  that -- it helps make that epiphenomena more powerful
6  out in the world. The fact that it's biological helps
7  account not only its -- for some of its power, but also
8  for some of its insidiousness. Right? Because you
9  can't change the -- you're born a skin color. You're
10 born tall, or you're born short. Right? So physical
11 characteristics that are -- you're born with that are
12 present at birth and are genetic are not things that you
13 can change. And recognizing that you can't change them
14 can be powerful in reducing things like racism, but they
15 also can be things that trap people. Right?
16         If you're in the Dalit category, you're
17 born into it, and you're trapped into it. And if you
18 are -- you know, if your parents are black and you're
19 lighter skinned than they are, you may be able to choose
20 a different racial category for yourself. But for the
21 most part that's not something people can do. So it
22 isn't an act of will, and so things that are imposed on
23 that basis are things that people can't control.
24 Recognizing that I think is really -- can be very -- can
25 be damaging in the sense that it -- when people think of

1  it as biologically different they think, therefore, the
2  solution to that might be genocide.  On the other hand,
3  if you think it's not biological, then the solution may
4  be reeducation.  Right?  So for a genocide -- I always
5  tell my students genocide is wrong not because it's
6  mistaken, although it is, it's wrong because it's
7  genocide.  Right?  But reeducation -- the Chinese
8  cultural revolution is wrong.  It killed millions of
9  people.  It destroyed families and societies all on the
10  false belief that you could completely change, you know,
11  a college professor of art into a good farm laborer in
12  their mind by just making them do farm labor.  Right?
13  So you can't change everything about people, whether
14  it's what they think or the way they appear.
15            And the solution to that can be much more
16  positive.  And I think you see that with sexual
17  orientation.  Right?  So in an era when people believe
18  sexual orientation was a choice then people did not want
19  people to make the wrong choice.  Well-meaning parents,
20  probably to protect their kids from making a mistake in
21  that era, possibly even well-meaning lawmakers, tried
22  to -- tried to regulate that.  As the proportion of
23  people who think that sexual orientation is something
24  you're born with goes up the proportion of people who
25  care about it goes down.

1            Q.  I understand.
2            A.  So young people today believe that you're born
3  into the sexual orientation, and so that expression
4  "born that way," right, what about it?  Right?  "This
5  is" -- "this is just" -- "this is who I am."  And so I
6  think as much as history has come down for the most part
7  on negatively exploiting the characteristics, the
8  physical -- heritable physical characteristics that we
9  then bundle up into this fiction of race it's -- it's
10  also possible understanding that those are just physical
11  characteristics people are born with can -- can diminish
12  that, as it does in the case of sexual orientation.  And
13  my hope is that the same thing is true with regard to
14  ideology.
15            I tell my students, "I know you don't
16  like" -- I mean, these are Rice students.  So there are
17  like two conservatives in the class, and they're not --
18  nobody is happy with them when they pipe up.  And so I
19  say, "Look, you're not happy with," you know, whatever
20  it is they're saying here, "but you know what?  Don't be
21  so full of yourself.  Don't be so proud that you're a
22  liberal.  You know, but for the grace of God or but from
23  your genetics you could have been this person.  How
24  would you feel about that?  And you conservatives,
25  you're like looking down your nose at all these

1  liberals.  You know, just roll the dice.  You could have
2  been born a liberal?  Right?  "So if you just accept
3  that they're born that way then you can stop
4  wanting them" -- you can stop thinking that what they're
5  doing is directed at you, and you can stop thinking that
6  you're going to change them" because anybody who's spent
7  any time discussing politics knows you're not going to
8  change very many minds.  You're going to make people
9  mad, but you're not going to change -- you can change
10  policy.  You can find a way to make a policy work that
11  fits somewhere in between.  But if your way to change
12  policy is change the mind; that is, change the
13  fundamental ideological beliefs of your fellow
14  legislator or your next door neighbor, that's a fool's
15  errand.  Right?  It's just not going to happen.
16            So if you just accept it -- I mean, most of
17  my neighbors are conservatives and, you know, I'm not
18  fans of their politics, but I -- you know, I don't have
19  any personal animosity to them.  You know, I put up my
20  signs, and they put up theirs, and, you know, we stare
21  at each other, but I don't -- most of them are what they
22  are, and I -- that's just -- one of our graduate
23  students, a very talented black graduate student is
24  very, very conservative and very political.  And he
25  said, "It's hard.  It is hard.  It's" -- "in many ways,"

1  he said, "it's harder now to be a black conservative
2  than it is just to be black," right, that the -- the
3  people just don't like it.  They just think he's wrong,
4  and they don't understand why he would -- why he would
5  side with people who don't side -- who have animosity
6  toward him because of the color of his skin.
7            Just a really tough -- another student who
8  is very openly gay and very conservative, like
9  Federalist Society, and he said the weird thing about
10  being at Rice is nobody cared that he was gay, but
11  everybody thought the fact that he was in The Federalist
12  Society was like -- like people looked at him with open
13  disgust when they found out he was in The Federalist
14  Society.  He said the funniest thing was that the other
15  people in The Federalist Society because they were just
16  young Rice people, right, they just said, "You're gay.
17  I mean, obviously.  You know, you're a smart person, and
18  you are a moral person, so you wouldn't choose to be
19  gay."  Or it wasn't that they weren't, you know, openly
20  prejudice against that idea.  But they said, "You know,
21  you're a good example."  Right?  "People don't choose to
22  be gay because God knows you wouldn't choose to be.  So
23  that's just the way you are."  And they were pretty
24  accepting of him.  But the people in the Gay and Lesbian
25  Student Association never accepted the fact that he was

Page 141

1  a conservative.  At the end of the day that kept coming
2  up.  This was actually during that era of the W.
3  campaign --
4      Q.  Sure.
5      A.  -- when it was being openly exploited to drive
6  voter turnout in Florida and Texas.  And they just could
7  not -- and he said, you know, until he took this class
8  he didn't -- he didn't really have a response.  He just
9  knew that he believed in conservative things.  And so he
10  said, "This is" -- "this is what I tell people now.
11  When people say 'how could you be a conservative,' I say
12  'I was born that way.  This is the way God made me, and
13  I can't help it.'"  So, you know, I think it can be --
14  again, it could be a positive or a negative thing.
15          I don't think it's useful -- again, denying
16  that there's a biology to sexual orientation I think is
17  a very bad idea.  Whether at a particular moment in time
18  that's the -- that's creating prejudice.  Right?  You
19  can think -- you know, one of the solutions if -- if in
20  fact people are just born that way and they can't change
21  it, then there's an obvious solution.  If gay is wrong,
22  then you just kill gay people.  You could just do one of
23  those little tests like Down's syndrome.  "Wait a
24  minute.  My kid is going to be born gay.  Let's, you
25  know" -- "you know, you should just get rid of those

Page 142

1  people."  And obviously that's not the way the modern
2  world thinks, but you can see where that might occur to
3  people if they believed it was -- if they believed it
4  was biological.  It might be easier from that
5  perspective to be able to convince people that you could
6  change your sexual orientation.
7          The same way that, you know, Protestants
8  and Jews in Europe, like, you know, "Tell me kiss the
9  ring.  Whatever.  What is it you need me to do here?
10  Like, I don't want to end up with my head on a pike."
11  So -- so I think there can be -- there can be a downside
12  to it.  But at the same time I think denying -- denying
13  that there are -- when you say that everything about
14  race is nonbiological, including then the suggestion
15  that there are not physical traits that have been used
16  to build on top of that racial fiction, then I think
17  you -- you really put yourself in a bad position because
18  empirically it's -- there are characteristics that are
19  heritable.  And if we're going to -- if by person of
20  color you just mean someone with darker skin, that
21  characteristic you're referring to is a -- very much a
22  biological characteristic.  It's something they can't
23  change by will.  It's something that they're going to
24  pass on to their children.  And so it's a -- it's a --
25  you know, it is a -- it is a physical marker.  And I

Page 143

1  think that's -- that part of it is a reality.  The rest
2  of it not.
3      Q.  Okay.  Fair enough.
4      A.  Hence -- hence the fact that you got to -- when
5  you look at ideology across race and ethnicity there are
6  big party differences, but as Texas Republicans are
7  discovering while there are party differences across
8  Hispanics and non-Hispanics there are also some pretty
9  big ideological mismatches between those categories.
10  And you can -- that can be exploited, or you can -- you
11  know, you can ignore that.
12          W. wanted to -- well, W. very much wanted,
13  you know, to make Hispanics majority Republican.  I
14  don't believe that that's shared by all the leaders of
15  the current Republican party.  But there's certainly --
16  there's a lever to do that, and the lever to do that is
17  that, you know, Hispanics are conservative, moderate, or
18  liberal at pretty much the same levels as everybody else
19  in Texas, and -- and so if you stop poking them in the
20  eye with a sharp stick they -- you know, they might
21  actually come around and vote for a more -- for sort of
22  a business conservative party so --
23      Q.  My next question actually is that do you
24  believe that there is a correlation between genetically
25  determined ideology and race?

Page 144

1      A.  No.
2      Q.  Do you believe that there's a correlation
3  between genetically determined ideology and ethnicity?
4      A.  No.
5      Q.  Okay.  So the dispersion of ideology among the
6  ethnicities and races is roughly equal regardless of --
7      A.  Yeah, I don't -- I don't believe that.  I
8  don't -- I don't know that, so the -- the kind of scale
9  of study that it would take to establish that is -- it
10  would take a very large-scale study.  It would have to
11  be -- it would have to be a global study because you
12  don't want to get people in particular settings.  So I'm
13  not aware that anybody has actually done that on that
14  scale, but I've never seen anything to indicate that
15  there -- that those two things were associated, and nor
16  do I have any reason to believe they would be.
17      Q.  Okay.  Just one last question I think, and then
18  I'm going to confer with Barry and make sure I got all
19  the spaces.  But I did want to ask you a little bit
20  about your book, if you don't mind.  So you wrote a
21  book.  What's the title of the book, sir?
22      A.  "Predisposed."
23      Q.  You wrote it with some other authors, and
24  you've --
25      A.  Yes.

Page 145

1  Q. -- published with these authors before?
2  A. Yes.
3  Q. Largely on the topic of conversation we just
4  had for about the last 25 minutes, correct?
5  A. Correct.
6  Q. Okay. Now, I haven't read the entirety. But
7  what portion of the book did you write?
8  A. Fairly little.
9  Q. Okay.
10  A. So the actual writing, sort of the text is
11  mostly the work of -- I'd say probably two-thirds the
12  work of Kevin Smith and -- and first draft. The rest of
13  it would be Hibbing. So mine sort of -- the book is --
14  pulls together a bunch of things that we've done
15  research on, or that we've presented papers on, talked
16  about and so forth. So I was actively involved at
17  the -- at the research phase and served primarily as --
18  sort of in the early stages in outlining what the book
19  was going to look like, what we were going to put in
20  what sections. But the book itself was written almost
21  entirely by, the text of the book, by Hibbing and Kevin
22  Smith at Nebraska.
23  Q. But you endorse these findings largely?
24  A. Yes.
25  Q. Is there any part of the book that you don't

Page 146

1  endorse?
2  A. I don't -- I haven't read the book since the
3  book came out, so I -- I couldn't -- if you point me in
4  the direction of something, I'll tell you if I endorse
5  it or don't endorse it.
6  Q. I'm not cherry-picking. I'm just wondering. I
7  want to make sure that this is your opinion and are
8  parts of your opinion.
9  A. Parts of it are certainly my opinion but I
10  didn't write most of it so there may well be stuff in
11  there that I don't agree with. That's -- you know,
12  there are values to team research, and there are --
13  there are disvalues. Right? Sometimes there are things
14  in there that -- you know, that weren't what you
15  personally believed but, you know, somebody feels
16  strongly about them.
17  Q. So I want to talk a little bit about the
18  portion called "Different Slates." And specifically I
19  want to talk about the racial portion of it or the --
20  that's the wrong way to say it. There's a portion of
21  this chapter that talks about racial policies,
22  specifically Affirmative Action. Do you -- are you
23  aware -- do you remember that part of the book?
24  A. Yeah.
25  Q. And I'm not sure I understand the conclusion.

Page 147

1  And I want to -- I don't want to put this in the record.
2  This is my book. I love it. But I want to make sure
3  I --
4  A. Well, we got that on the record. I'm happy.
5  Do whatever you want.
6  Q. I want to talk about the finding here. So if I
7  could hand it to you.
8  A. Yes.
9  Q. If you could read it, review it, and tell me
10  what's being said, specifically from the last paragraph
11  of 163 to the first paragraph of 165.
12  A. All right.
13  Q. All right. Here you go.
14  A. Yes.
15  Q. So what is that part of the book talking about?
16  A. So there are -- this is not our research, but
17  there's a big body of research by Haidt and Graham and a
18  whole research team that focuses on kind of dimensions
19  of -- they call them dimensions of moral thinking that
20  underlie dimensions of kind of political belief or
21  political ideology. And John Jost, a political
22  psychologist, picks up on some of this as well. So, you
23  know, people have sort of placed different values on
24  different kinds of things. Right? So one of the things
25  some people feel very strongly about is that basically

Page 148

1  everybody should be treated the same, right, that we
2  should be colorblind or race blind, whatever. And
3  they -- and that's a -- for them that's a -- that's a
4  strong principle. For other people in their -- their
5  moral judgments are more connected to what Haidt's -- a
6  category Haidt calls care or harm, which is people are
7  motivated to respond on the basis of, you know, if -- if
8  someone has been harmed, they -- they deserve care. And
9  so that they look at it in terms of, you know, sort of
10  responding in a -- what you might think of as maybe a
11  more empathetic way.
12  But, again, you can -- there's a morality
13  if you believe Haidt and Graham. There is a kind of
14  morality and also a kind of a political belief centered
15  around the issue about -- about care and harm. This is
16  what Lakoff, who I think is mistaken, calls this
17  maternal politics versus paternal politics. So the sort
18  of politics of order and respect and hierarchy, he
19  teaches those as sort of paternal politics. And
20  maternal politics is more about this kind of care and so
21  forth. So you can think about that in -- I think one of
22  the areas is -- maybe it's quite clear -- is sort of in
23  like sentencing guidelines. Right? So what should --
24  how should you sentence people? I mean, this -- one of
25  my colleagues asked, he says, "I never understood why if

37 (Pages 145 to 148)

Page 149

1    you're going to pass a law to make something illegal why
2    don't you define what the punishment is for it?" Right?
3    "So if the punishment is the death penalty, it's the
4    death penalty." Right? "And if not's the death penalty
5    then I'd like to know what it is." He said, "Like if
6    you rob a bank what is the appropriate punishment? I
7    mean, if it's a year, make it a year. If it's 10 years,
8    make it 10 years." So his idea is you take an action,
9    the action has a consequence, and the consequence should
10   be the same for everybody. He doesn't like the idea
11   that some people get life in prison and some people get
12   parole. He thinks that's just wrong, everybody should
13   be treated the same.
14          And, of course, we've experimented with
15   that in terms of judicial sentencing guidelines, and we
16   know the havoc that can produce. Right? Because it
17   just doesn't make any -- it doesn't make any sense to
18   not treat people as individuals. This is what students
19   of a bureaucracy called Bureaupathology, which is
20   everybody wants -- when somebody walks into a Social
21   Security office what do they want? They want to explain
22   to someone what their particular problem is, and then
23   they want the person to fix their particular problem on
24   their particular basis. Like, "I know that this is
25   supposed to take it here, or whatever, but I need it to

Page 150

1    be fixed now because" -- "you know, fix it." And what a
2    bureaucrat does, of course, is they just follow standard
3    operating procedures. So to some people that's the
4    morality of large-scale organized standard operating
5    procedures bureaucracies, is if you're the king of
6    England or, you know, if you're a homeless person you're
7    treated exactly, in the case of most people's belief,
8    exactly as badly by the Social Security Administration
9    regardless. Right?
10          And the other side of that is, of course,
11   is people in different situations being treated equally,
12   for example, being punished equally, or being served as
13   poorly or slowly, is completely inappropriate because it
14   doesn't at all match the circumstance they find
15   themselves in. It's not equal when you treat everybody
16   equally when they're not in the same situation, when
17   they haven't done the same thing, or when they're not
18   capable of achieving the same thing or so forth. Right?
19   So the question is do you want to -- you know, do -- are
20   you inclined toward viewing treating difference
21   differently as a moral hallmark or on treating everyone
22   equally as a moral hallmark. And then the question is
23   is one of those hallmarks in and of itself inappropriate
24   or -- they are the way -- these are just -- these aren't
25   things that we create out of philosophy. These are

Page 151

1    discovered things. They're found things. This is the
2    way some people view the world. Most people are
3    somewhere in between. But there are people who feel
4    very strongly that sort of equality under the law means
5    everybody is treated exactly the same way and there
6    could be no -- no interference in that.
7          Other people feel very strongly that that's
8    a really -- it's, you know, an immoral approach and, in
9    fact, is born of a kind of indifference to people's
10   humanity, which it may be. But some people are much
11   less sensitive to the humanity of other people. Some
12   people have very high levels of empathy. Some people
13   have remarkably low levels. And that's not always
14   because of the conditions they grew up in. Those are
15   also -- there's actually a syndrome called Williams
16   syndrome in which people simply don't have the
17   capability of separating their utilities from other
18   people's. They'll -- they act only on other people's
19   utility, no concern for themselves at all. That's -- I
20   mean, in some ways that's amazing. Right? What a great
21   kind of a person. But it's hardly neurotypical. People
22   who are completely and unalterably selfish, which we
23   often call sociopaths, are also not neuro -- thankfully
24   not neurotypicals. But they -- but that is -- that is
25   what they believe.

Page 152

1    Q. But these moral hallmarks -- I didn't mean to
2    cut you off. I apologize. I think the point is is that
3    they're -- it's biologically measurable, correct?
4    A. Right. So there is an -- there is an
5    underpinning to that that has to do with different
6    brains. Right? So, again, people who are -- who tend
7    to be selfish can learn to be less selfish, can -- but
8    it's really about -- it's sort of on second thought.
9    Right? You can learn -- because we have metacognition
10   we can learn that our first impulse is perhaps not very
11   generous or that our first impulse may be too generous.
12   Right? And then we can learn to discipline that on our
13   own. But the impulse is the impulse, and some part of
14   that impulse comes from life experience, but some part
15   of that impulse also differs biologically across
16   individuals.
17   Q. And I think that in that paragraph one of the
18   impulses is a racial impulse, correct? By which I mean
19   racist.
20   A. So, I mean, you certainly could have a racist
21   impulse.
22   Q. That's biologically determined, correct?
23   A. I think there are -- there are features of
24   biology that incline people to be -- again, I think you
25   have to be careful about exactly what you mean by

38 (Pages 149 to 152)

1    racist. But to be ethnocentric; that is, to be
2    suspicious of people who are not like them on a whole
3    lot of -- in a whole lot of ways, people that aren't
4    like them on the basis of race, on the basis of
5    nationality, the basis of language, on the basis of
6    religion, on the basis of appearance, even on the basis
7    of gender, right, sort of the -- you know, the sort of
8    traditional patriarchal religion is very suspicious of
9    having women anywhere around them, so those -- those
10   impulses can vary across individuals biologically or the
11   kind of things that socially build into those and create
12   things like fascism can come out of those, can be
13   encouraged by those. It doesn't mean that everybody who
14   ends up falling into the thrall of that in a national
15   situation, for example, is therefore sort of -- again,
16   the environment has a big influence. And so the
17   question of sort of how could Germany get this way or
18   how could Japan get this way that was asked around World
19   War II is really inappropriate in the sense that in --
20   in one sense the Japanese could be that way because they
21   were Asian, and for the Germans it's, well, I guess
22   because they were Germany, I mean, because they weren't
23   France. I don't know what. But, again, that was -- you
24   know, that's -- that's inappropriate.
25           But it is the case that some individuals,

1    you know, take to -- take to those kinds of things very
2    quickly, very easily, right, without much effort can
3    fall into almost habitually think in ways that are
4    clearly racist. And for other individuals it's less so.
5    And the point here is not that. The point is that
6    people that have a strong belief in the importance of
7    equality -- I was involved in a case where the expert,
8    the expert for the other side said Clarence Thomas was
9    clearly a racist. I have trouble with that. He -- I
10   mean, I happen to think he's a remarkably poor jurist,
11   but that's really a separate issue. Right? I differ
12   with him on all kinds of notions of not only judicial
13   philosophy, but, I mean, you know, his habitual
14   inactivity for a long time on the court, and he's now
15   rediscovered his voice and -- my God. I hope to God
16   he's back out of the hospital and fine because this will
17   be just the kind of thing, have me like --
18   **Q. I won't do that to you. I promise you.**
19   A. -- ragging on Clarence Thomas and then he's
20   dead. Like we find out, we come out here, he died
21   recently.
22   **Q. I promise I won't do that to you.**
23   A. Yeah. So, you know, I'll say this. Again,
24   I -- I assume that Clarence Thomas is remarkable -- I
25   mean, judicial conservatism almost to the point of

1    blindness is not unnatural. I mean, I think he is --
2    you know, some people are on -- you see this on the
3    autism spectrum. People on the autism spectrum are also
4    incredibly literal so you have to be really careful
5    because they -- a sign says something, they follow it,
6    and everybody else says, "no, no, no, that's not" --
7    it's like "no." Right? So that literalism, you see
8    some of that in constitutional interpretation, right,
9    that inability -- you know, when Scalia says, "Why
10   wouldn't it mean exactly what it says," and my question
11   is, "Why do you think it means" -- "what makes you think
12   that when people put something on a piece of paper it's
13   literally exactly what they meant?" Right? Literalism
14   is a -- is, again, a -- you can -- you can sort of --
15   you can see where a brain that's to this side on the
16   autism spectrum would be a natural host for a belief
17   that all other things being equal probably people meant
18   exactly what they wrote down. Whereas on this other
19   side you'd say, "Well, people write all kinds of stuff."
20   Right? "It probably doesn't tell us anything." So you
21   can be -- you can believe that everyone should be
22   treated equally. You can believe it's inappropriate to,
23   as the current -- I think the current majority of the
24   Supreme Court believes -- that -- that because race is a
25   suspect category that anything that incorporates race

1    into decision-making, whether it's drawing district
2    lines or anything else, is suspect. Why is it suspect?
3    It's suspect because all other things being equal you
4    ought not to be using race in making decisions.
5           Now, the court recognizes that while that
6    sets a high -- a high threshold for what a state can do,
7    for example, they recognize that there are conditions
8    under which you do something about that. Right? So
9    that's -- we wouldn't have Section 2 without it. We
10   wouldn't draw districts without that. On the other
11   hand, they also recognize that absent meeting that high
12   threshold that it is a suspect category, that in just
13   sort of regular legislation if you put race in there
14   that's inappropriate, and it ought not be in there
15   because everybody ought to be treated the same
16   regardless of race. So that -- the point of this
17   paragraph is just that you should not assume that people
18   who believe that everyone should be treated equally
19   believe that because they're fundamentally racist.
20   Among other things, it dilutes the importance of
21   understanding that people are fundamentally racist.
22   Right?
23           I think that's really one of my problems
24   with calling every difference in voting behavior,
25   however slight, and even if it occurs without regard to

Page 157

1    the race of candidates, racially polarized voting, is
2    exactly Brennan's concern, which is if that -- if you're
3    going to label that, people are going to say "wait a
4    minute. So you're saying the voters of Spring Branch
5    are racist?" And the answer is "yes, some of the voters
6    in Spring Branch are racist." Right? We're in Houston,
7    Texas. There are racists here. But that's not -- it's
8    not to say that the entire electorate is or even that
9    the behavior of the electorate in those elections is the
10   result of racism as opposed to something else, right,
11   some policy concern or whatever. So I think if you
12   don't preserve the possibility that individuals can
13   believe in treating everyone the same without that being
14   a code for racism then you diminish the real importance
15   of what it means for someone to actually be racist
16   because racists don't want everybody to be treated the
17   same regardless of race.
18        Q. Fair.
19        A. They very much want people of a certain race to
20   be treated differently. Right? So that's, I think, is
21   a -- it's not only important to distinguish that in --
22   just in a general sense of thinking. Although, you
23   know, nothing that we posit here is proven in any
24   scientific sense. We never really quite get there in
25   science. But I think there's good scientific reason to

Page 158

1    believe that those are different states of thinking,
2    that they are -- I would -- I would be willing to wager
3    that in, given six months, 60 subjects in an fMRI
4    machine, I could -- I could show you a brain signature
5    that distinguishes everyone should be treated equally
6    from racism.
7        Q. Which presupposes that you could use the fMRI
8    machine to determine if someone is a racist, correct?
9        A. It means -- not certainly. But at some -- at
10   some predictive value above random that you could
11   separate -- you could have a -- you could take a set of
12   people in which everybody said "this is what I think the
13   law should be, no regard to race," and you could find
14   the signal that separates -- I mean, I don't even --
15   honestly I wouldn't take your money this is so easy.
16   But yes. The brain's signature for actual racism is
17   really not hard.
18        Q. How common is it?
19        A. That we don't know. We don't know how common
20   that is.
21        Q. Does it affect voting behavior?
22        A. I would -- it's hard to imagine that racism
23   wouldn't affect voting behavior.
24        Q. So some part of voting is affected by racial
25   politics and racial biological determinism, correct?

Page 159

1        A. I don't believe in biological determinism, so
2    I'm not going to say that. I really don't. I don't
3    believe in environmental determinism, and I don't
4    believe in biological determinism. It's just not a
5    way -- as is true with voting. There are a host of
6    factors that affect people's votes. Those factors may
7    be very small factors for some people. They may be
8    subconscious factors for some people. They may be
9    factors that they override in metacognition. They may
10   be factors that they don't override. They may be
11   factors that are in fact their view of the world and
12   their -- and the way they see things. Right? So they
13   may be frank and open racist attitudes.
14        And I think you -- to understand -- to
15   characterize the impact of that on a particular election
16   system you have to have a sense of the degree to which
17   that's actually playing out in the election system. And
18   I don't think the -- sort of the current court system
19   for doing that is perfect, but I think it's been pretty
20   serviceable and done a pretty decent job. And I don't
21   think it tries to -- my view of this -- and I know it's
22   not universally agreed to -- but my view of this is that
23   what's important is if the -- if the -- if the nature of
24   the way that force is operating in the election system
25   creates certain things that can happen and certain

Page 160

1    things that can't, and those things disproportionately
2    affect both the choice of minority voters and the
3    opportunity of minority candidates, then that's the
4    level at which you need to think about getting another
5    election system, for example.
6        Q. And do you have an opinion about whether that
7    has been met here today or for SBISD? Have you ever
8    advised them on that?
9        A. Well, I don't think I'm supposed to tell you
10   what I told the lawyers in terms of my advice.
11        Q. It depends on when. Right?
12        A. What?
13        Q. It depends on when. Let's say before 2017 did
14   you ever advise them that they had to consider adopting
15   single-member districts?
16        A. My recollection is that as early as the
17   dismissal of the case in what I think was maybe the '90s
18   on Gingles 1 my advice to the district was that as
19   change took place over time they should think seriously
20   about changing -- in whatever form they wanted to they
21   should change their election system. And I was
22   certainly, you know, happy to talk to them later about
23   alternatives in terms of things like cumulative voting.
24   So that's -- you know, my view has ben that that's --
25   that was prudent for the district to do. It's not that

Page 161

1    I knew for certain. No one ever knows what's going to
2    happen in a lawsuit. But I think, you know, you can
3    give advice as I do quite commonly to -- to districts
4    about what's prudent. And I think that was my advice
5    then. That's -- you know, I don't -- I personally don't
6    think lawsuits are something that's good for school
7    boards. So I know they have their own -- again, they
8    have their own preferences. I'm not an opponent in any
9    sense of at-large elections. I think there's a very
10   good reason why at-large elections are not on their face
11   illegal. I think there's a very good reason why groups
12   like the Urban League still -- you know, it's still a
13   very common form of election for small cities and
14   municipalities, and it has -- it has benefits to it.
15          On the other hand, I don't worship at the
16   alter of -- I was at a school board meeting once and a
17   fella in full uniform, about 80 years old, stood up and
18   said, "I didn't fight in World War II and Korea for
19   single-member districts." And so I didn't say anything
20   because it's really rude to say things like that to old
21   people. Besides, he had a -- just enough of a
22   resemblance to my dad that I was afraid he might smack
23   me if I said anything. But my answer to him would have
24   been, "Yes, you did." Right? "The entire United States
25   Government, every election to every office in the United

Page 162

1    States Government is based on some form of single-member
2    district whether it's the House or the Senate, the House
3    which declared the war you fought in first and didn't
4    the second. And we're so obsessed with it that even the
5    president even though it's impossible to elect a single
6    individual in a series of single-member districts we
7    insist on doing it anyway and electing the president in
8    each of our 50 states. That's how" -- "that's how
9    obsessed we are as a country. The country you fought
10   for is a country obsessed with single-member geography
11   in a way the Europeans find just absolutely implausible
12   and unaccountable."
13          So there's -- there's nothing magic about
14   at-large elections, but -- and, again, I -- you know, I
15   would much prefer the U.S. adopt a parliamentary system.
16   I think we're at the breaking point for geographic
17   representation. We're not going to solve the partisan
18   gerrymandering problem short of just getting rid of the
19   obvious problem, which is geography. Right? We
20   don't -- we are not a geography to be represented
21   anymore. That just doesn't make any sense. We once
22   were, but we are now people to be represented. That's
23   what proportional representation is for. It solves
24   pretty much all the problems you can think of but --
25   **Q. We need a Constitutional Conventional to do**

Page 163

1    **that, right, so --**
2       A. Yeah. And God knows -- I'll tell you what. I
3    used to always scoff, you know, when people say "oh,
4    you" -- "you don't want a Constitutional Convention
5    because God knows what they would do."
6       **Q. God knows.**
7       A. But that's before -- that was before like the
8    last 10 years. And now I'm coming around to the view of
9    I don't think I want a Constitutional Convention because
10   God knows what they would do.
11          MR. GOLANDO: I'm going to take a small
12   break here, sir.
13          THE WITNESS: All right.
14          MR. GOLANDO: I really enjoyed the
15   conversation. I appreciate your time, but let me just
16   make sure that I have done my job correctly.
17          MR. CRAWFORD: Sure.
18          (Recess from 1:59 p.m. to 2:07 p.m.)
19   **Q. (BY MR. GOLANDO) Okay. We have just a few**
20   **questions. I want to authenticate some documents and**
21   **add some documents into the record. And then I have**
22   **some questions based on this, if you don't mind.**
23      A. All right.
24      **Q. So my first thing is I want to -- I'm going to**
25   **hand you Exhibit 6, Expert Exhibit No. 6. I believe**

Page 164

1    **this is a copy of your consulting agreement with SBISD.**
2    **Would you authenticate that for me, please?**
3       A. Yes, that's correct.
4       **Q. And that's your signature on the back page?**
5       A. It is.
6       **Q. And that's a true and correct copy of that,**
7    **correct?**
8       A. Yes.
9       **Q. And do you have your contract that you had**
10   **before twenty -- before the litigation began, the one**
11   **where you -- that governs the OLS and the EI that you**
12   **provided to Ms. McBride?**
13      A. I -- I might or I might not. I'm not sure
14   because I was doing a whole bunch of things with the
15   same law firm, so I don't know if we were just, you
16   know, working on different things or if there's a
17   separate, something that -- either an umbrella or an
18   actual contract, but I'm happy to look and see.
19      **Q. If you wouldn't mind taking a look.**
20      A. Yeah.
21      **Q. I'd like to see it. And if you want to make**
22   **the record more fulsome you have time to edit the**
23   **deposition or to provide any discovery. Discovery does**
24   **close on March 30th, but --**
25      A. All right.

41 (Pages 161 to 164)

1    Q. -- whenever you get to it I'd be appreciative.
2         The next one is the article you provided
3    that formed the basis of part of your report.  It's --
4    I've labeled it Expert Exhibit No. 7.  The title of it
5    is "Republican Party of Texas Doubles Down on Local
6    Elections."  Is this a true and correct copy of that
7    article, sir, that you relied on?
8    A. Yes, it is.
9         Q. And I noted in your report that -- I don't
10   think you made a reference to partisanship at all.  And
11   I also asked you if you had measured partisanship.  I
12   just wonder what role did this play in your report, sir.
13   A. In the -- it sort of comes in in two places,
14   but primarily with regard to the discussion of the --
15   the literature on the potential negative effects of
16   switching to at-large elections.  There's the discussion
17   about how this can end up becoming -- itself becoming a
18   political issue, and so that -- it's part of that notion
19   that board elections are becoming increasingly
20   politicized, not just partisan but politicized, and that
21   this is sort of one of the things that may -- that may
22   feed into that.  So there's -- there's just a
23   different -- or there's a different system for both
24   identifying potential candidates and for advancing
25   political campaigns for school boards and for

1    nonpartisan cities than there was 20 years ago.
2         Q. Reasonable.  But your report doesn't cite to
3    this article, correct?
4    A. It's something that I looked at, and so I
5    brought it because I didn't remember if I had cited it
6    directly --
7         Q. Okay.
8    A. -- or if I was just -- but it is something that
9    I looked at that, and that affected my thinking in
10   writing the report.
11        Q. Thank you, sir.  I appreciate it.  The last one
12   is Expert Exhibit No. 8.  It looks like what's called an
13   SSN memo.  I'm not sure of the source of that.  It's
14   titled "Do District-Based Elections for School Board
15   Help Minority Candidates Get Elected?"  I'm going to
16   hand it to you.  Could you authenticate it for me, sir?
17   A. Yes.
18        Q. Is that a true and correct copy of the article?
19   A. Is there a -- is there a page missing?
20        Q. That's what we have I think.
21        MR. ABRAMS:  I think there was a third page
22   with a -- just one line on it.
23        MR. CRAWFORD:  I believe those were your
24   originals.  So let's see if we --
25        MS. SHAKRA:  This page or --

1         MR. ABRAMS:  No.  I think that there was --
2         MS. SHAKRA:  Let me see.
3         MR. ABRAMS:  I just remember there being
4    like a one sentence page.
5         THE WITNESS:  Yeah.  I think this is the --
6         MS. SHAKRA:  The one missing?
7         THE WITNESS:  Is there a page that looks
8    like that?
9         MR. CRAWFORD:  I don't know that we made
10   a -- that made the copy.
11        MR. GOLANDO:  Maybe it's in the back of the
12   contract.
13        MS. SHAKRA:  Did it get out of order?
14        THE REPORTER:  Do y'all want to go off the
15   record, by the way?
16        MR. CRAWFORD:  Sure.
17        (Discussion off the record from
18   2:11 p.m. to 2:12 p.m.)
19        Q. (BY MR. GOLANDO)  I've handed you expert
20   Exhibit No. 8.  Could you authenticate it?  Is that the
21   article you relied on in part for your report?
22   A. Yes.
23        Q. Okay.  What was important about this article
24   for your report from your perspective?
25   A. It's not particularly important because it's

1    not really research, per se.  But I thought it was
2    useful because it's a -- you know, this is part of a
3    kind of a public policy synopsis kind of thing that sort
4    of -- it's supposed to be helpful to policymakers.  And
5    the researcher points out two things.  One is he points
6    out this idea that, you know, that may not always be --
7    there might not always be a positive effect for Latino
8    representation in the switch from at-large to
9    single-member.  And he also points out that his research
10   shows that school board elections are partisan even if
11   they're not explicitly partisan in the form of the
12   ballot.  And so I thought that not only does it sort of
13   show those two things, but it -- it shows that it's
14   being discussed by people not just in a research sense
15   but in a kind of -- sort of the form of kind of public
16   policy recommendation.
17        Q. And what is the source of this article?
18   A. I found it on the Internet, and it's a -- as
19   best I remember, it's a site that has a whole series of
20   things where people reflect on -- sort of produce brief
21   summaries of kind of research findings that may be of
22   use related to -- related to public policy.
23        Q. And --
24   A. I think it's San -- San Diego I think is where
25   this -- where the person is.

Page 169

1      Q. And there's no data associated with this?  He's
2   just summarizing previous reports, correct?
3      A. Correct.
4      Q. And you're not sure of the source of that data
5   or whether it has implications for SBISD, correct?
6      A. Correct.
7      Q. Okay.  And finally, sir, if you could read this
8   paragraph.  The first paragraph right after the subject
9   heading.
10     A. Yep.
11     Q. What does that say, sir?
12     A. He's saying that the effect is mixed but one
13  directional.  That is, it can either help to close the
14  gap, or it can have no effect.
15     Q. So at worst it has zero effect, and at best it
16  could actually increase representation, correct?
17     A. That's -- that's his summary.
18     Q. And the election change he's talking about they
19  are single-member districts, correct?
20     A. I assume that's what he's talking about.
21        MR. GOLANDO:  All right.  Pass the witness.
22        MR. CRAWFORD:  We'll reserve our questions.
23        (Whereupon at 2:16 p.m. the
24        deposition was concluded.)
25

Page 170

1            CHANGES AND SIGNATURE
2       WITNESS NAME:  JOHN R. ALFORD, PH.D.
3       DATE OF DEPOSITION:  MARCH 24, 2022
4   PAGE LINE            CHANGE            REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 171

1         I, JOHN R. ALFORD, PH.D., have read the
2   foregoing deposition and hereby affix my signature that
3   same is true and correct, except as noted above.
4
5              _____
                JOHN R. ALFORD, PH.D.
6
7
    THE STATE OF _____)
8   COUNTY OF _____)
9
10
         Before me, _____, on
11  this day personally appeared JOHN R. ALFORD, PH.D.,
    known to me (or proved to me under oath or through
12  _____) (description of identity
    card or other document) to be the person whose name is
13  subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
14  consideration therein expressed.
         Given under my hand and seal of office this
15  _____ day of _____, _____.
16
17
18              _____
                NOTARY PUBLIC IN AND FOR
19              THE STATE OF _____
                COMMISSION EXPIRES: _____
20
21
22
23
24
25

Page 172

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION
3
    VIRGINIA ELIZONDO,        §
4       Plaintiff,            §
                              §
5   v.                        §  Civil Action No.
                              §  4:21-CV-01997
6                             §
    SPRING BRANCH INDEPENDENT §
7   SCHOOL DISTRICT, ET AL.,  §
        Defendants.           §
8
9
10        REPORTER'S CERTIFICATION
       DEPOSITION OF JOHN R. ALFORD, PH.D.
11              MARCH 24, 2022
12
13       I, John G. Rochelle, Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16       That the witness, JOHN R. ALFORD, PH.D., was duly
17  sworn by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20       That the deposition transcript was submitted on
21  _____ to the witness or to the attorney for
22  the witness for examination, signature and return to
23  Worldwide Court Reporters, Inc., by _____;
24       That the amount of time used by each party at the
25  deposition is as follows:

43  (Pages 169 to 172)

Page 173

```
1        Mr. Barry Abrams - 00:00
2        Mr. Martin Golando - 03:39
3        Mr. Charles J. Crawford - 00:00
4        That pursuant to information given to the
5    deposition officer at the time said testimony was taken,
6    the following includes counsel for all parties of
7    record:
8        Mr. Barry Abrams, Mr. Martin Golando, Attorneys for
9    Plaintiff;
10       Mr. Charles Crawford, Mr. Lucas Henry, Attorneys
11   for Defendants.
12       That $_____ is the deposition officer's
13   charges to the Plaintiff for preparing the original
14   deposition transcript and any copies of exhibits;
15       I certify that a review of the transcript was
16   requested.
17       I further certify that I am neither counsel for,
18   related to, nor employed by any of the parties or
19   attorneys in the action in which this proceeding was
20   taken, and further that I am not financially or
21   otherwise interested in the outcome of the action.
22
23
24
25
```

Page 174

```
1        Certified to by me this 5th day of April, 2022.
2
3
4
5    _____
     JOHN G. ROCHELLE, Texas CSR 7746
     Expiration Date:  10/31/23
6    Worldwide Court Reporters, Inc.
     Firm Registration No. 223
7    3000 Weslayan, Suite 235
     Houston, Texas 77027
8    (713) 572-2000
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

44 (Pages 173 to 174)