IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VIRGINIA ELIZONDO, §<br>    *Plaintiff*, §<br>§<br>v. §<br>§<br>SPRING BRANCH INDEPENDENT SCHOOL §<br>DISTRICT, ET AL., §<br>    *Defendants*. §<br>§ | CIVIL ACTION NO.: 4:21cv1997 |

## MEMORANDUM AND RECOMMENDATION

This Voting Rights Act case is before the Court on Defendants' Motion for Summary Judgment. ECF 43.[1] Plaintiff filed a Response and Defendants filed a Reply. ECF 48; ECF 49. Having considered the parties' submissions and the law, the Court RECOMMENDS that Defendants' Motion for Summary Judgment be DENIED.

### I. Background Information

Plaintiff Virginia Elizondo is a registered voter who has sued Defendants Spring Branch Independent School District (SBISD) and individual SBISD board members in their official capacities (collectively SBISD), challenging the "at-large" election system used by SBISD to elect its Trustees. ECF 3, ¶¶ 3-4. The SBISD Board of Trustees is composed of seven members elected on an at-large basis, in non-partisan contests, by all voters within the district's geographic boundaries. *Id.* ¶ 32. According to Elizondo, no person of color has ever served on the SBISD

---

[1] This case was previously before United States District Judge Kenneth M. Hoyt, who denied Elizondo's application for a preliminary injunction and rejected SBISD's proposal to delay the May 7, 2022 school board election. ECF 39. The election went forward on May 7, 2022 and the newly-elected board members were substituted as Defendants. ECF 53, 57, 62. The case was reassigned to United States District Judge Sim Lake, who referred to the matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 60, 61.

Board of Trustees. *Id.* ¶ 1. Elizondo alleges that she "lives in a minority community that is sufficiently compact and numerous to elect a candidate who is the choice of the minority community in SBISD should single-member districts be created." *Id.* ¶ 4. Thus, Elizondo claims the at-large system for electing the SBISD Board of Trustees violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, *et seq*. *Id.* ¶ 3.[2]

## II. Section 2 of the Voting Rights Act, As Amended

Congress revised § 2 of the Voting Rights Act in 1982 to clarify that a plaintiff need not prove discriminatory intent and that a violation can be demonstrated by discriminatory effect alone. *Benavidez v. Irving Indep. School Dist., Tex*., 690 F. Supp. 2d 451, 455 (N. D. Tex. 2010). In the first Supreme Court case to consider the amended version of § 2, the Supreme Court wrote that it "has long recognized that "multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (citations omitted). The Supreme Court held in *Gingles* that three threshold conditions must be met in order to establish vote dilution in violation of § 2:

(1) The minority group must be sufficiently large and geographically compact to

---

[2] Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered; provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

>    constitute a majority in a single member district;
>
> (2) The minority group must be politically cohesive;
>
> (3) The majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority group's preferred candidate.

*Benavidez v. City of Irving Tex.*, 638 F. Supp. 2d 709, 712 (citing *Thornburg v. Gingles,* 478 U.S. at 50-51)). These preconditions, referred to as the "*Gingles* factors," operate as a "bright-line test" and "[f]ailure to establish any one of the *Gingles* factors precludes a finding of vote dilution, because '[t]hese circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice.'" *Benavidez*, 690 F. Supp. 2d at 455-56 (citations omitted).

## III. Summary Judgment standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and must present evidence such as affidavits, depositions, answers to interrogatories, and admissions on file to show "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Conclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a

genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (citation omitted).

The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013). In ruling on a motion for summary judgment the Court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987). In a non-jury trial, the judge is the ultimate trier of fact. In such cases, the court may grant summary judgment where a trial would not enhance the court's ability to draw inferences and conclusions. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978); *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991). However, the court must be aware that assessments of credibility come into sharper focus upon hearing live witnesses. *Placid Oil*, 932 F.2d at 398.

## IV.     Analysis

The SBISD Defendants move for summary judgment on the sole basis that Elizondo cannot establish the first *Gingles* factor—that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. In order to survive the Motion for Summary Judgment, Elizondo must raise a genuine issue of fact regarding her ability to prove the first *Gingles* factor by a preponderance of the evidence at trial. *See Morris v. City of Houston*, 894 F. Supp. 1062, 1064 (S.D. Tex. 1995) (recognizing that to survive summary judgment on a § 2 claim, plaintiff must establish a genuine issue of material fact on the challenged *Gingles* prerequisite). Having reviewed the summary judgment record, the Court finds Elizondo has met her burden to raise a fact issue regarding the first *Gingles* factor.

The summary judgment evidence includes the expert report of Robert M. Stein. Ph.D. (ECF

4

43-1, ECF 48-1); deposition testimony of Dr. Stein (ECF 43-2, ECF 48-2); deposition testimony of Christine Porter (ECF 48-3); the expert report of Andres Tijerina, Ph.D. (ECF 48-4), and deposition testimony of John R. Alford, Ph.D. (ECF 48-5). Dr. Stein's expert report, and therefore the summary judgment record, includes a demonstrative map that identifies a potential majority-minority single member district identified as "District 1":

Demonstrative Spring Branch ISD Single-Member District

ECF 48-1 at 9.

     Elizondo's summary judgment evidence must raise a fact issue as to numerosity, or whether the minority population in her proposed single-member district exceeds 50% of the citizen voting age population (CVAP). *See Benavidez*, 690 F. Supp. 2d at 456 (noting that the first *Gingles* prong required plaintiff to show a "potential single member district (the 'demonstration district') in which a majority of the CVAP is Hispanic") (citing *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009)). The summary judgment evidence also must raise a fact issue as to whether the minority

population in her proposed single member district is sufficiently geographically compact. *See Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 737–38 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015) (stating that compactness is necessary to show that the challenged voting practice, rather than the dispersion of the minority community prevents the minority from electing its candidates of choice.) SBISD argues that Dr. Stein's report is insufficient as a matter of law to meet the numerosity requirement because once the statistical margin of error is taken into account, his report fails to demonstrate a majority-minority district. SBISD also appears to argue that Dr. Stein's report cannot, as a matter of law, demonstrate the geographic compactness requirement because Dr. Stein's report and methodology suffers from various flaws, such as: a failure to consider "traditional districting principles;" a lack of reliability making it subject to exclusion; and insufficiency as a matter of law as a remedial plan[3] or as demonstrating all *Gingles* preconditions. *See* ECF 43 at 5-7. In response, Elizondo argues that Dr. Stein's report establishes the required *Gingles* factors, and that even absent Dr. Stein's report, the record precludes summary judgment because it contains testimony by SBISD's corporate representative and expert that the first *Gingles* factor is satisfied. ECF 48 at 10-11 (citing the testimony of Christine Porter and the testimony of defense expert, John Alford, Ph.D.).

The court addresses SBISD's "numerosity" and "compactness" arguments separately below.

**A. Elizondo has met her summary judgment burden to present evidence creating a fact issue as to "numerosity," or whether the citizen voting age population (CVAP) in the demonstrative District 1 is greater than 50%.**

SBISD's argument — that summary judgment must be granted because, as a matter of law,

---

3 The Court does not address the suitability of Dr. Stein's map as a remedial plan because the *Gingles* factors, and even the liability finding at a trial, focus only on whether a demonstrative plan is a possible solution to a Voting Rights Act violation, not whether it should be imposed as the remedial plan. *See Rodriguez*, 964 F. Supp. 2d at 746 (stating "Defendants' reading collapses the liability and remedy determinations into a single threshold analysis," citing *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 667 (5th Cir. 2009)); *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994) (recognizing that plaintiff's proposed district "is not cast in stone," but was "simply presented to demonstrate that a majority-black district is feasible in Calhoun County").

6

the statistical margin of error associated with Dr. Stein's calculations for District 1 precludes a finding that the CVAP exceeds 50% — is without merit. Table 1 of Dr. Stein's report identifies the total population, voting age population, CVAP, and percentage of Hispanic CVAP based on data from the 2020 U.S. Census and the American Community Survey (ACS) from 2015-2019. ECF 48-1 at 8. The 52.8% Hispanic CVAP is based on ACS data. ECF 43-2 at 14 (Stein Dep. at 51:15-20). At least one other district court in this circuit has held that the ACS "point estimate" for CVAP (in this case 52.8%) is an appropriate benchmark that may be relied upon for determining the percentage of the CVAP in a demonstrative district. *See Benavides*, 638 F.Supp.2d at 720-21 (stating "ACS data is accurate and reliable."). As explained by the court in *Benavides* when relying on ACS data *at the trial stage*, "the Census Bureau provides point estimates with the purpose that they may be relied upon and utilized and [the court] finds it unnecessary to inject an additional level of probability calculations into the equation." *Id*. at 721. Finally, the *Benavidez* court rejected the very same argument SBISD makes here—that Elizondo cannot meet the first *Gingles* factor as a matter of law because *some* of the percentages in the range created by applying the margin of error (here a range of 58.7% to 46.9%) fall below the 50% bright-line mark.

Furthermore, even if the Court ignored *Benavides*' finding that the ACS point estimate for CVAP is reliable regardless of the published margin of error, the fact that SBISD is raising this argument on summary judgment demonstrates its futility. At the summary judgment stage, Elizondo must raise a fact issue as to whether the CVAP in the demonstrative district exceeds 50%. Elizondo has presented an expert opinion based on ACS data that the CVAP in the demonstrative district is 52.8%. Even if the Court believed the ACS data could not be used absent application of the margin of error, the summary judgment evidence demonstrates a Hispanic CVAP ranging from

7

46.9% to 58.7%, a range which includes percentages above 50%. As Elizondo explains in her Response, nearly three-quarters of the percentages in that range fall above the 50% mark, which makes it "more likely than not" that the true percentage exceeds 50%. ECF 48 at 19. Elizondo has met her summary judgment burden to demonstrate a fact issue that the demonstrative single member district has a Hispanic CVAP of greater than 50%.

### B. Elizondo has met her summary judgment burden to present evidence creating a fact issue regarding the geographic compactness of the minority population in demonstrative District 1.

#### 1. Dr. Stein's report, at a minimum, creates an issue of fact regarding geographic compactness.

As stated above, Elizondo's summary judgment evidence includes the expert report of Robert M. Stein, Ph.D. ECF 48-1. Dr. Stein opines in his report that the "geographic concentration of Hispanics in the Spring Branch Independent School District is sufficient to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan." ECF 48-1 at 4. Dr. Stein's demonstrative map (shown above) depicts seven proposed single-member districts, with District 1 representing a majority minority district. ECF 48-1 at 9. Dr. Stein's report notes that the demonstrative map is one example of a map demonstrating a district with a majority Hispanic citizen voting age population, but there may be "other configurations of voting districts that could yield more than one majority Hispanic trustee districts." *Id.*

SBISD argues that Dr. Stein ignored traditional districting principles when constructing his demonstrative map and therefore it is legally insufficient to show geographic compactness of the minority community as required for the first *Gingles* factor. ECF 43 at 6-7. The Supreme Court has not developed a "precise rule" for evaluating geographic compactness for purposes of § 2 of the Voting Rights Act. *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022). However, the Fifth

8

Circuit has held that a plaintiff's proposed illustrative districting must take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* Yet, the Fifth Circuit has not established a clear definition of traditional districting principles or limited the type of evidence that can be used to prove that a plaintiff's proposed districting map accounts for such principles.

When assessing geographic compactness of a minority community the Fifth Circuit has considered, for example, whether illustrative maps: appear compact on visual inspection; take into consideration political subdivision lines; group populations with similar economic demographics; and, preserve communities of interest. *Id.* at 218-19. Furthermore, the Fifth Circuit has recognized fidelity to administrative boundaries as a traditional districting principle. *Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000) (characterizing "fidelity to administrative boundaries" as a traditional districting principle). District courts within the Fifth Circuit have found that illustrative districts with generally equal total population, and which are "consistent with existing official political boundaries (along city or county lines) and informal geographic boundaries, such as neighborhoods or communities that share a common interest[,]" to comply with traditional districting principles. *Benavidez*, 638 F. Supp. 2d at 714.

Furthermore, courts have allowed evidence of a proposed plan's compliance with traditional districting principles to come from lay witnesses. For example, the Fifth Circuit in *Robinson* approved a district court's reliance on testimony of resident voters to establish that a map preserved communities of interest. *Id.* at 219. In short, courts have not demanded a precise or perfect standard for demonstrating the geographic compactness of a minority community. One district court found at the trial stage that an illustrative district met the first *Gingles* factor even though it split some neighborhoods, subdivisions, and congressional districts, and its compliance

with certain traditional districting principles was unintentional, stating: "[T]he inquiry into illustrative districts is a flexible one that permits room to grow at the remedial phase rather than calling for perfection at the liability phase[.] *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 502 (E.D. Tex. 2020).

Applying guidance from the above cases, the Court finds Elizondo's demonstrative map creates at least a fact issue as to the first *Gingles* condition of compactness. First, the proposed districts are visually compact:

Demonstrative Spring Branch ISD Single-Member District

Second, the districts on the demonstrative map, with a few small variations, are based on SBISD's middle school enrollment districts. ECF 48-2 at 6, 16. SBISD purports to be a proponent of neighborhood schools. ECF 48-3 at 15. The boundaries for middle school attendance zones were drawn in the 1980s. ECF 48-3 at 14. In 2011, SBISD decided to use those middle school attendance zones as the basis for SBISD's current election districts, which presumably follow

10

traditional districting principles. ECF 48-3 at 13-14. The record, at a minimum, demonstrates that Dr. Stein's demonstrative map, which is based largely on SBISD's current at-large election districts, complies with traditional districting principles of recognizing existing community and administrative boundaries. Again, conformity with administrative boundaries is ordinarily seen as a virtue in the districting process. *Chen*, 206 F.3d at 514. Plaintiff may or may not be prepared to introduce at trial further evidence regarding whether the proposed districts comply with traditional districting purposes such as shared common interests or common socioeconomic characteristics. *See Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608, 616 (M.D. La. 2019) (after bench trial court found plaintiff's proposed plan met compactness requirement based in part on testimony of plaintiffs themselves). Meanwhile, Dr. Stein's opinion precludes a finding on summary judgment that Elizondo cannot meet the first *Gingles* factor.

SBISD also argues that Dr. Stein did so little to create the demonstrative map and account for "traditional districting principles" that his methodology is unreliable and his opinion is inadmissible. ECF 43 at 7. To support its argument, SBISD relies on the following testimony from Stein's deposition:

> Q. . . . what did you do to create the map?
> A. I didn't really do much. I started with the seven districts that the Spring Branch ISD has identified as polling places. Those were, of course, the basis for my voter polarization analysis.
> And other than obtaining, from Mr. Golando [Plaintiff's counsel], the data from the American Community Survey, I identified at least one, District Number 1, where there was a sufficient – in this case, majority – of Hispanic voting age to create a district.

ECF 43-2 at 14. And:

> Q. Do you understand the term "traditional districting principles'?
> A. Not – I mean, the – it makes perfect sense to me, but I don't know what you're referring – I mean, I don't know what those conditions would be.
> Q. Okay. In creating your map, the demonstrative district, did you respect neighborhoods and subdivisions? Did you try to keep those intact?

> A. No. I took the districts that currently exist for the purposes of conducting elections for trustee elections. I have to say that was the sole criteria: that is, the districts – enrollment districts correspond to the voting places.

*Id.* at 15. As discussed, the demonstrative map comports with at least some traditional districting principles: it is visually compact; it follows SBISD's existing election districts (which were based on SBISD's middle school enrollment districts); it creates districts with roughly equal total and voting age populations; and it appears to generally respect natural neighborhood boundaries. Dr. Stein testified that because he was

> doing racial polarized voting based on seven districts, it seemed logical to use those seven districts as the initial illustrative or demonstrative. . . . So the only consideration I gave was what are the current district boundaries. I simply said, if you were to create a district map from the current voting locations, what would it look like; could there actually have been a majority minority: I did not attempt to do any other drawings or use other criteria.

ECF 48-2 at 15. Because Dr. Stein relied primarily on an existing map of polling districts created by SBISD, which in turn was based on school enrollment boundaries in a district that is a proponent of neighborhood schools, the Court rejects SBISD's argument that, at the summary judgment stage, it must disregard Dr. Stein's opinion as unreliable.

### 2. The testimony from SBISD's own witnesses creates an issue of fact regarding geographic compactness.

In addition to the expert report and testimony of Dr. Stein, Elizondo's summary judgment evidence includes testimony from SBISD's 30(b)(6) witness, Christine Porter, and the testimony of Dr. Alford, SBISD's own expert. Elizondo contends that the testimony of these witnesses precludes summary judgment even if Dr. Stein's testimony is not considered. ECF 48 at 10-11.

Elizondo points to testimony from Christine Porter to show that she has satisfied her summary judgment burden as to the first *Gingles* factor. Ms. Porter testified as follows:

> **Q.** Does [SBISD] agree that the geographic concentration of Hispanics in the district is large enough to constitute a majority of the voting age

>    population in one or more single-member districts if there was a seven-member election plan adopted or ordered by the court?
> A. It's our understanding that that can happen, that – that they can make those single-member districts.
>
> * * *
>
> Q. Who has provided the factual information to the district that as many as three single-membered districts could be drawn in which a majority of the voting age population would be Hispanic?
> A. That was based on some meetings we had with legal counsel at the time.

ECF 48-3 at 10. Porter also testified that based on SBISD's investigation, as many as three single-member districts could be drawn in the district in which the Hispanic voting age population would constitute a majority. *Id.* at 13.

"[S]tatements by corporate designees under Rule 30(b)(6) are binding on a corporate party because the corporation, by making the designation, 'represents that the employee has authority to speak on behalf of the corporation.'" *Reed v. LKQ Corp.*, 436 F. Supp. 3d 892, 913 (N.D. Tex. 2020) (citation omitted). However, it is the general rule that the corporate representative's testimony is not a "judicial admission" that decides an issue with finality or estops a party from contradicting the testimony. *Id.* Thus, Porter's testimony is not a judicial admission that conclusively establishes the first *Gingles* factor. It is, however, evidence that can be considered by the Court in determining whether Elizondo has met her burden to prove an essential element of her claim. *Lindquist v. City of Pasadena, Tex.*, 656 F. Supp. 2d 662, 698 (S.D. Tex. 2009) ("A Rule 30(b)(6) deposition is admissible against the party designating the representative but is not 'binding' on the entity for which the witness testifies in the sense of preclusion or judicial admission."). Thus, Porter's testimony is sufficient to raise a fact issue on the issue of compactness and further demonstrates that Elizondo has met her summary judgment burden.

Elizondo also points to the testimony of SBISD's expert John Alford, Ph.D. as precluding summary judgment. Dr. Alford's testimony includes the following:

> Q. . . . Does anything about that, the way [Stein's demonstrative map is] shaped geographically, give you pause?
> A. No.
> Q. Would you agree that it's a compact district?
> A. Yes.
> Q. Okay. Would you agree that if the numbers are correct that it's CVAP [Citizens Voting Age Population] majority?
> A. Yes.
> Q. Would you agree that map meets *Gingles* I?
> [Objection, exceeds the scope of his engagement and his opinion.]
> Q. But as an expert in map drawing I'm asking and as – and one who's drawn several *Gingles* I maps does it meet the form of *Gingles* I?
> A. Again, I – so I haven't looked at any of this, so I'm going entirely on your assertion that the numbers that were provided match the numbers that – the picture. Right? And I have no idea whether that – you know, whether that picture actually produces the numbers or not but –
> Q. Sure.
> A. – if that picture produces those numbers, and that's the most current CVAP estimate, then I'd say that's what you'd be looking for in a – you know, in a district to establish *Gingles* I.
> Q. So, yes?
> [Same objection.]
> A. Yes.

ECF 48-5 at 26. SBISD argues that its counsel's objections should be sustained and the testimony excluded as outside the scope of Dr. Alford's expert engagement. ECF 49 at 5. SBISD also argues that Dr. Alford testified that "he had not looked at any of this" and therefore this testimony should be excluded. ECF 49 at 5. On its face, Dr. Alford's testimony is evidence that, assuming Dr. Stein's numbers and data are correct, Dr. Stein's demonstrative map satisfies *Gingles* I. SBISD's summary judgment does not impugn the correctness of Dr. Stein's numbers (apart from whether the CVAP of 52.8% can be used without deducting the margin of error). The correctness and reliability of his data is a question for the factfinder at trial. It is also for the fact finder to weigh the evidence and assess the credibility of the witnesses. At this stage, Dr. Alford's testimony is some evidence that Dr. Stein's demonstrative map creates a geographically compact District 1 and therefore precludes summary judgment.

I. **Conclusion and Recommendation**

For the reasons set forth above, the Court RECOMMENDS that Defendants' Motion for Summary Judgment (ECF 43) be DENIED.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on February 13, 2023, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge