IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VIRGINIA ELIZONDO,<br>　　*Plaintiff*,<br><br>v.<br><br>SPRING BRANCH INDEPENDENT<br>SCHOOL DISTRICT, *ET AL.*,<br><br>　　*Defendants*. | §<br>§<br>§<br>§　Civil Action No. 4:21-CV-01997<br>§<br>§<br>§<br>§<br>§ |

**RESPONSE TO DEFENDANTS' OBJECTION TO**
**MEMORANDUM AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Virginia Elizondo ("Dr. Elizondo") responds to Defendants' Objection (ECF 65) to the February 13, 2023 Memorandum and Recommendation by United States Magistrate Judge Christina A. Bryan (ECF 64) ("Recommendation"), and urges the Court to accept and adopt Judge Bryan's thoughtful and well-reasoned Recommendation as the opinion of the Court.

**I.**
**INTRODUCTION AND OVERVIEW**

As Judge Bryan observes, this is a Voting Rights Act ("Act") case asserting that the at-large system for electing Spring Branch Independent School District ("SBISD" or "District") school board trustees violates Section of 2 of the Act.[1] (ECF 64, ¶I at 1-2).

Under Section 2 as amended in 1982, a "plaintiff need not prove discriminatory intent and

---

[1] Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered; provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

. . . a violation can be demonstrated by discriminatory effect alone. *Benavides v. Irving Indep. School Dist*., Tex., 690 F. Supp.2d 451, 455 (N.D. Tex. 2010)." (ECF 64, ¶II at 2). In the seminal Supreme Court decision to consider Section 2 after its amendment, *Thornberg v. Gingles*, 478 U.S. 30, 47 (1986), the Supreme Court stated that "it has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" (ECF 64, ¶II at 2) (citations omitted).

That is the basis for Dr. Elizondo's claim: SBISD's system of electing all of its school board trustees on an at-large basis has the discriminatory effect of cancelling out the voice of the large and growing Hispanic citizens voting age population in the District.[2]

---

[2] The important objective of Section 2 is to ensure that the voting preferences of minority voters are not cancelled and overridden by the votes of non-minority voters. *Gingles*, 478 U.S. at 47. At the time this suit was filed, no person of color had ever served on the SBISD board of trustees. (ECF 3, ¶1). SBISD observes in its objection that since suit was filed two years ago, one person with a Hispanic surname has been elected to its board. Objection (ECF 65, n. 1).

To the extent the District implies without evidentiary support that minority voters necessarily prefer a minority-surnamed candidate for office – without regard for the candidate's qualifications or views – the District is incorrect. For example, the Hispanic voters in SBISD resoundingly rejected the candidacy of the individual the District identifies as Hispanic, in favor of a non-minority candidate. *See* Supplement to Expert Report re: 2022 SBISD Trustee Elections of Robert M. Stein, Ph.D. (Oct. 10, 2022) at 3, 4)(attached as **Exhibit 1**):

> "***District Trustee 6 Election***
>
> Three candidates contested for SBISD Trustee Position 6, including Perez, Mafrige and Kaczenski. . . . White voters overwhelmingly preferred Perez to Mafrige and Kaczenski. Perez received a 73% mean share of the White vote while . . . Kaczenski received an 83% mean share of Hispanic voters' support compared to a 5% . . . mean share of Hispanic vote for Perez . . . . The election for Trustee Position 6 demonstrates racial polarized voting. Hispanic and White voters demonstrate sufficient cohesiveness in their support for different candidates. The cohesiveness of White voter support for Perez was sufficient to elect Perez, and block the election of Hispanic voters' preferred candidate, Kaczenski. It is noteworthy that a Hispanic surname candidate – Perez – garnered miniscule support among Hispanic voters, while the White candidate, Kaczenski received in excess of 80% of the Hispanic vote. Hispanic voters in SBISD were not persuaded to vote for Mr. Perez solely on the basis of his Hispanic surname, a not unexpected finding. A preferred candidate of Hispanic voters does not assume nor require that the preferred Hispanic candidate share the race or ethnicity of Hispanic voters.
>
> ***Conclusion***
>
> The 2022 Spring Branch ISD Trustee elections continues a trend of racial polarized voting in SBISD trustee elections dating back to 2015. In my initial and supplemental expert reports I identified five of the six contested trustee elections between 2015 and 2021 that exhibited significant racial polarized voting among Hispanic and White voters. The remaining contested election demonstrated modest racial polarized voting. In 2022, the trend in racial polarized voting in SBISD continued unabated. All three trustee elections on the 2022 ballot showed significant evidence of racial polarized voting."

2

## II.
### JUDGE BRYAN CORRECTLY CONCLUDED THAT DEFENDANTS' MOTION SHOULD BE DENIED.

Of the three conditions that must be satisfied to establish vote dilution violative of Section 2,[3] the District seeks summary judgment on only one: whether Dr. Elizondo can establish at trial the first *Gingles* factor – "that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district." (ECF 64, ¶IV at 4). Unsurprisingly, given the strength of the evidence of racially-polarized voting in SBISD,[4] the District's summary judgment motion does not dispute that Dr. Elizondo can satisfy the second and third *Gingles* factors at trial.

Judge Bryan correctly recommends that Defendants' Motion for Summary Judgment (ECF 43) be denied because:

A. For summary judgment to be appropriate, the District bears the burden "to prove there are no genuine issues of material fact for trial," such as by establishing "that the record contains no support for the non-moving party's claim." (ECF 64, ¶III at 3)(citing *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001) and quoting *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019)).

B. All that Dr. Elizondo need do to preclude summary judgment is to "raise a genuine issue of fact regarding her ability to prove the first Gingles factor by a preponderance of the evidence at trial." (ECF 64, ¶IV at 4)(citing *Morris v. City of Houston*, 894 F. Supp. 1062, 1064 (S.D. Tex. 1995)).

C. The summary judgment record establishes that "[Dr.]Elizondo has met her burden to raise a fact issue regarding the first *Gingles* factor" for multiple independent reasons:

   1. Dr. Elizondo met her summary judgment burden to adduce evidence creating a fact issue regarding "numerosity," *i.e.*, whether the citizen voting age population ("CVAP") in the demonstrative district exceeds 50%. (ECF 64, ¶IVA at 6-8) (finding that the District's argument regarding the statistical margin of error

---

[3] "The Supreme Court held in *Gingles* that three threshold conditions must be met in order to establish vote dilution in violation of § 2:

   (1) The minority group must be sufficiently large and geographically compact to constitute a majority in a single member district;
   (2) The minority group must be politically cohesive;
   (3) The majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority group's preferred candidate.

*Benavidez v. City of Irving Tex.*, 638 F. Supp. 2d 709, 712 (citing *Gingles,* 478 U.S. at 50-51))." (ECF 64, ¶11).

[4] *See* Expert Report of Robert M. Stein, Ph.D. ("Dr. Stein")(Jan. 20, 2022)(ECF 44-1), Supplement to Expert Report of Robert M. Stein, Ph.D. (Mar. 28, 2022) (ECF 44-2), and Supplement to Expert Report re: 2022 SBISD Trustee Elections of Robert M. Stein, Ph.D. (Oct. 10, 2022)(**Exhibit 1**).

associated with Dr. Stein's calculations "is without merit" and that Dr. Elizondo "has met her summary judgment burden to demonstrate a fact issue that the demonstrative single member district has a Hispanic CVAP of greater than 50%.").

2. Dr. Elizondo met her summary judgment burden to adduce evidence creating a fact issue regarding the geographic compactness of the minority population in the demonstrative district because:

   a. The *Gingles* factors "focus only on whether a demonstrative plan is a *possible* solution to a Voting Rights Act violation, not whether it should be imposed as the remedial plan." (ECF ¶IV at 6 n.3) (emphasis added) (citing *Clark v. Calhoun Cty.*, Miss. 21 F.3d 92, 95 (5th Cir. 1994) (recognizing that proposed plan was presented simply to demonstrate that a minority-majority district was "feasible")).

   b. "The testimony from SBISD's own witnesses creates an issue of fact regarding geographic compactness."[5] (ECF 64, ¶IVB(2 at 12-14)(citing testimony by the District's Rule 30(b)(6) corporate representative that the geographic concentration of Hispanics in the district is sufficiently large to comprise a majority of the voting age population in one or more single-member districts *and* testimony by the District's expert witness, Dr. John Alford, that if Dr. Stein's numbers and data are correct, the demonstrative district he proposed satisfies the *Gingles* I factor).

   c. "Dr. Stein's report, at a minimum, creates an issue of fact regarding geographic compactness" because:

      i. "Dr. Stein opines in his report that the 'geographic concentration of Hispanics in the Spring Branch Independent School District is sufficient to constitute a majority of the voting-age population in one or single member districts under an illustrative seven-district plan" and that "the demonstrative map is one example of a map demonstrating a district with a majority Hispanic citizen voting age population but there may be 'other configurations of voting districts that could yield more than on Hispanic trustee districts.'" (ECF 64, ¶IVB(1) at 8).

      ii. Neither the Supreme Court nor the Fifth Circuit has "developed a 'precise rule' for evaluating geographic compactness for purposes of §2 of the Voting Rights Act." (ECF 64, ¶IVB(1) at 8-9)(citing *Robinson v. Ardoin*, 37 F.4th 208, 218-19 (5th Cir. 2022)).

      iii. "[T]he Fifth Circuit has not established a clear definition of traditional districting principles or limited the type of evidence that can be used to

---

[5] Although "[s]atisfying the first *Gingles* precondition – compactness – *normally* requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans," *Gonzales v. Harris County*, 601 Fed. Appx. 255, 258 (5th Cir. 2015)(emphasis added), a plaintiff need not do so when a defendant has admitted that precondition has been satisfied. *See, e.g., Anthony v. Michigan*, 35 F. Supp.2d 989, 1000, 1004 (E.D. Mich. 1999)(parties agreed that the first *Gingles* precondition was satisfied because African Americans are a sufficiently large and geographically compact group to constitute a majority in a single-member district.").

        prove that a plaintiff's proposed districting map accounts for such principles." (ECF 64, ¶IVB(1) at 9).[6]

    iv. The District is in error in presuming that evidence of an illustrative proposed map's compliance with traditional districting principles must come from an expert witness. The Fifth Circuit has allowed evidence of a proposed plan's compliance with traditional districting principles to be provided by lay witnesses. (ECF 64, ¶IVB(1) at 9)(citing *Robinson*, 37 F.4th at 219).

    v. Federal "courts have not demanded a precise or perfect standard for demonstrating the geographic compactness of a minority community" and one Texas district court "found at the trial stage that an illustrative district met the first *Gingles* factor even though it split some neighborhoods, subdivisions, and congressional districts, and its compliance with certain traditional district principles was unintentional, stating: '[T]he inquiry into illustrative districts is a flexible one that permits room to grow at the remedial phase rather than calling for perfection at the liability phase [.]" (EFC 64, ¶IVB(1) at 9-10) (citing *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp.3d 439, 502 (E.D. Tex. 2020)).

    vi. "Applying guidance" from the cited cases, the demonstrative map Dr. Elizondo proposes creates at least a fact issue regarding the first *Gingles* condition of compactness because:

        a. "[T]he proposed districts are visually compact" (64, ¶IVB(1) at 10);

        b. "[T]he districts on the demonstrative map, with a few small variations, are based on SBISD's middle school enrollment districts"; "SBISD purports to be a proponent of neighborhood schools"; "SBISD decided to use those middle school attendance zones as the basis for SBISD's current election districts, which presumably follow traditional districting principles" (ECF 64, ¶IVB(1) at 10-11);

---

[6] Dr. Stein's deposition makes explicit that when questioned about whether he had considered "traditional districting principles," he did not understand counsel's terminology. *See* Stein Depo. at 54/6-10:

    **Q.** Do you understand the term "traditional districting principles"?

    **A.** Not – I mean, the – it makes perfect sense to me but I don't know what you're referring – I mean I don't know what those conditions would be.

Elsewhere in his deposition, Dr. Stein evidenced his awareness of various of the so-called "traditional districting principles," such as "one person one vote," (21/9-17). Table 1 to his report establishes that the illustrative plan complies with applicable one-person, one-vote requirement based upon both total and voting age populations of representative districts. Although Dr. Stein did not compute the *Baker v. Carr* one person one vote calculation, which he understands calls for no more than a ten percent variance in total population among the various districts (Stein Depo. at 55/22 – 56/1), as an indisputable mathematical matter, the illustrative district exhibits a less than ten percent variance in total population. *See Chen. v. City of Houston*, 206 F.3d 502, 522-528 (5th Cir. 2000)(endorsing use of total population rather than CVAP for purposes of one person one vote analysis).

c. "[C]onformity with administrative boundaries is ordinarily seen as a virtue in the districting process" and one of the traditional districting principles (ECF 64, ¶IVB(1) at 9,11)(citing *Chen v. City of Houston*, 206 F.3d 502, 507, 514 (5th Cir. 2000)).

d. "The record, at a minimum, demonstrates that Dr. Stein's demonstrative map, which is based largely on SBISD's current at-large election districts complies with traditional districting principles of recognizing existing community and administrative boundaries" and Plaintiff may "introduce at trial further evidence regarding whether the proposed districts comply with [other] traditional districting purposes such as shared common interests or common socioeconomic characteristics," since compliance of a proposed plan with compactness requirements may be based in part on the testimony of the plaintiff and others. (ECF 64, ¶IVB(1) at 11) (citing *Terrebone v. Par. Branch NAACP v. Edwards*, 399 F. Supp.3d 608, 616 (M.D. La. 2019)(following bench trial court found plaintiffs' proposed plan met compactness requirement based in part on plaintiffs' testimony)).

e. "[T]he demonstrative map comports with at least some traditional districting principles: it is visually compact; it follows SBISD's existing election districts (which were based on SBISD's middle school enrollment districts); it creates districts with roughly equal total and voting age populations; and it appears to generally respect natural neighborhood boundaries." (ECF 64, ¶IVB(1) at 12).

f. "Because Dr. Stein relied primarily on an existing map of polling districts created by SBISD, which in turn was based on school enrollment boundaries in a district that is a proponent of neighborhood schools, the Court rejects SBISD's argument that, at the summary judgment stage, it must disregard Dr. Stein's opinion as unreliable." (ECF 64, ¶IVB(1) at 12).

### III.
### THIS COURT NEED NOT AWAIT A DECISION IN *MERRILL V. MILLIGAN*[7] BEFORE APPROVING AND ADOPTING THE MAGISTRATE'S RECOMMENDATION

The Court should reject the plea that it defer its review of Judge Bryan's Recommendation due to the District's hopes that the Supreme Court in *Merrill* might "abandon [the] *Gingles* analysis altogether" and, contrary to the statutory directive that Section 2 liability turns on "a results test"

---

[7] *Singleton v. Merrill*, 582 F. Supp.3d 924 (N.D. Ala. 2022, *cert. granted, Merrill v. Milligan*, 142 S. Ct. 879 (2022). On March 21, 2022, the Supreme Court amended the question presented, which states: "Whether the State of Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives violated section 2 of the Voting Rights Act, 52 U.S.C. §10301." 142 S. Ct. 1358.

rather than proof of intentional discrimination, instead adopt a contradictory standard that "would eviscerate Plaintiff's claims," because "there is no allegation of intentional discrimination in this case." (ECF 65, ¶2.13).

The District's request ignores the facts that:

- *Merrill* arises out of a materially different factual context than this case. *Merrill* does not involve the issue before this Court: whether SBISD's use of a multi-member at-large electoral scheme violates Section 2. *Merrill* instead concerns a challenge to the boundaries drawn in a *re*districting plan for electing individual congressional representatives from single-member districts.

- The "results" or "effects" test for imposing liability under Section 2 resulted from Congress statutorily-overriding the Supreme Court's previous requirement that discriminatory intent had to be shown:

> After appellees brought suit [in *Gingles*], but before trial, Congress amended §2. The amendment was largely a response to this Court's plurality opinion in *Mobile* v. *Bolden*, 446 U.S. 55 (1980), which had declared that, in order to establish a violation either of §2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised §2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White* v. *Regester*, 412 U.S. 755 (1973), and by other federal courts before *Bolden, supra*. S. Rep. No. 97-417, p. 28 (1982) (hereinafter S. Rep.).

*Gingles,* 478 U.S. at 35.[8]

---

[8] "The Senate Report which accompanied the 1982 amendments elaborates on the nature of § 2 violations and on the proof required to establish these violations. First and foremost, the Report dispositively rejects the position of the plurality in *Mobile* v. *Bolden*, 446 U.S. 55 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters. *See, e. g*., S. Rep., at 2, 15-16, 27. The intent test was repudiated for three principal reasons -- it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." *Id*., at 36. The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id*., at 28. *See also id*., at 2, 27, 29, n. 118, 36." *Gingles*, 478 U.S. 30, 43-44.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority]and white voters to elect their preferred representatives. This Court has long recognized that multimember districts and at-large voting schemes may "'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Burns* v. *Richardson*, 384 U.S. 73, 88 (1966) (quoting *Fortson* v. *Dorsey*, 379 U.S. 433, 439 (1965)). The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters. Multimember districts and at-large election schemes, however, are not *per se* violative of minority voters' rights. S. Rep., at 16. Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multimember electoral

- Multimember districts and at-large voting schemes are voting practices and procedures within the ambit of Section 2 of the Voting Rights Act, and the *Gingles* factors spell out the principles for contesting such schemes mandated by Congress and Supreme Court precedent.

- Judge Bryan's Recommendation correctly analyzes Section 2 of the Voting Rights Act and why the District's summary judgment motion properly should be denied.

The Court should review the Recommendation on the basis of current law and affirm and adopt it. Should the controlling law later change in a material respect, the Court may then reconsider its decision.

Respectfully submitted,

  /s Barry Abrams
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No.17911800
S.D. Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

  /s/ Martin Golando
Martin Golando
State Bar No. 24059153
Admitted Pro Hac Vice
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

### CERTIFICATE OF SERVICE

I certify that the foregoing pleading was served on all parties of record via the Court's electronic filing system on March 9, 2023.

   /s/ Barry Abrams
Barry Abrams

---

structure operates to minimize or cancel out their ability to elect their preferred candidates. *See, e. g.,* S. Rep., at 16." *Gingles*, 478 U.S. at 47-48 (internal citations omitted).