# Exhibit 10

**EXHIBIT TO**
**JOINT PRETRIAL ORDER**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-01997 |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, *ET AL.* | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW

---

Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No. 17911800
SD Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

Martin Golando
State Bar No. 24059153
Admitted Pro Hac Vice
The Law Office of Martin Golando, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
  138 S. Ct. 2305 (U.S. 2018) ................................................................16

*Benavidez v. City of Irving, Tex.*,
  638 F. Supp. 2d 709 (N.D. Tex. 2009) ...............................................9

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980) ...............................................................................3

*Clark v. Calhoun County, Miss.*,
  88 F.3d 1393 (5th Cir. 1996) ....................................................9, 10, 11

*E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*,
  926 F.2d 487 (5th Cir. 1991) ..............................................................7

*Fabela v. City of Farmers Branch, Tex.*,
  No. 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012) ..................5, 9

*Gomez v. City of Watsonville*,
  863 F.2d 1407 (9th Cir. 1988) .............................................................9

*Harding v. Cty. of Dallas*,
  948 F.3d 302 (5th Cir. 2020) ...............................................................16

*Jamison v. Tupelo, Mississippi*,
  471 F. Supp. 2d 706 (N.D. Miss. 2007) ..............................................9

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993) ...................................................................10

*Johnson v. DeGrandy*,
  507 U.S. 997 (1994) ........................................................................5, 10

*Kirksey v. Bd. of Supervisors*,
  528 F.2d 139,145 (5th Cir. 1977) ........................................................11

*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ...............................................................11

*LULAC v. Perry*,
  548 U.S. 399 .....................................................................................11, 12

*Rodriguez v. Harris Cnty., Tex.*,
   964 F. Supp. 2d 686 (S.D.Tex.2013) ...................................................................5, 9

*Rose v Raffensberger*,
   619 F. Supp. 3d 1241 (N.D. Ga. 2022) ...................................................................15

*Session v. Perry*,
   298 F. Supp. 2d 451 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543
   U.S. 941, 125 S. Ct. 351, 160 L. Ed. 2d 252 (2004)...............................................12

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)........................................................................................... *passim*

*United States v. City of Euclid*,
   580 F. Supp. 2d 584 (N.D. Ohio 2008)...................................................................10

*United States v. Village of Port Chester*,
   No. 06 Civ. 15173(SCR), 2008 WL 190502 (S.D.N.Y. Jan. 17, 2008)...................10

*Vera v. Richards*,
   861 F. Supp. 1304 (S.D.Tex.1994) .........................................................................12

*Westwego Citizens for Better Government v. City of Westwego*,
   946 F.2d 1109 (5th Cir. 1991) ...................................................................................9

*White v. Regester*,
   412 U.S. 755 (1973)..................................................................................................11

*Zimmer v. McKeithen*,
   485 F.2d 1297 ...........................................................................................................13

## Statutes

Voting Rights Act § 2 ....................................................................................... *passim*

## Other Authorities

S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N.............................3, 5, 11, 13

## TABLE OF CONTENTS

**PAGE**

I.  Factual Background ........................................................................................1

    A.  The District ........................................................................................1

    B.  District Governance ...........................................................................2

    C.  A Tale of a Single District With Two Parts .......................................2

II.  Argument .......................................................................................................3

    A.  Vote Dilution in Violation of Section 2 of the Voting Rights Act ...............3

        1.  *Gingles* 1: Hispanics are Sufficiently Numerous and Compact to Constitute the Majority of One District in a Seven Member District Plan ................................................................................5

        2.  *Gingles* 2 and 3: Racially Polarized Voting ....................................7

        3.  Totality of Circumstances ...............................................................10

    B.  SBISD's Counter Arguments Lack Merit ........................................13

        1.  The Election of a Single Minority Candidate Does not Nullify Section 2 of the Voting Rights Act ..................................................13

        2.  The Claim that SBISD Elections are Partisan not Racial, is Irrelevant .......................................................................................14

        3.  Plaintiff Need Not Demonstrate that a Minority- Preferred Candidate Necessarily will be Elected ...............................................15

III.  Conclusion ...................................................................................................16

i

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| *Plaintiff,* | § § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-01997 |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, *ET AL.*, | § | |
| | § | |
| *Defendants.* | § | |

### PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW

Plaintiff Virginia Elizondo submits her pre-trial Memorandum of Law.

### I.       Factual Background

#### A.       The District.

The Spring Branch Independent School District (SBISD or "the District") is located in Western Harris County and has a growing population of Hispanic, African American, and Asian students. It also has a growing population of minority voters. The District was founded in 1946 and contains portions of the City of Houston and the six Memorial villages.

Once the District was largely a homogenous, affluent, largely Anglo district. But that is no longer the case. In the 2020 Census, SBISD was a minority-majority District, with a total population of 183,364. The Hispanic or Latino population was 74,701 or 40.7% of the total. The Anglo population totaled 76,444 or 41.7%. The African American population was 6.6% of the total. According to the 2020 Census and the 2015-2019 U.S. Census American Community Survey, Latinos make up roughly 37.6% of the Citizen Voting Age Population (CVAP) of SBISD. Anglos make up 55.3%.

1

Although the racial, ethnic, economic and social conditions in the District have changed dramatically since it was created – its governance structure has not. The diversity of the District's citizens and students is not reflected in the elected leadership of its Board of Trustees.

**B.     District Governance.**

The District is governed by the Spring Branch ISD Board of Trustees, which is composed of seven members elected on an at-large basis, in non-partisan contests, by all voters within the District's geographic boundaries. Members of the Board serve staggered three-year terms and are elected annually on the May uniform election date.

In the history of SBISD, only one person of color has ever been elected to the Board of Trustees, which occurred for the first time after this litigation was filed, in a 2023 election. And that individual was not the candidate preferred by the Hispanic voters in the District.

SBISD's practice of electing the members of its school board at-large, based upon votes cast across the entire district, rather than selecting board members elected from individual or single-member districts, has the negative and improper effect of preventing the voices of its minority citizens from being heard, by diluting their voting strength.

**C.     A Tale of a Single District With Two Parts**.

SBISD is a heavily segregated school district. Most Latinos live in the northern half of the district (north of Interstate Highway 10 or I-10) and attend schools in that region. Most of the Anglo students live in the southern half of the district and attend schools in that region. Nearly all of the highly-rated schools in the District are located in the more Anglo portion of the school district. The children living in the north are more likely to be Hispanic, economically disadvantaged, more likely to dropout, far less likely to meet State academic standards or attend schools that do, and far more likely to be severely disciplined. The children living in the south are

more likely to be White, affluent, go to college, more likely to meet or exceed State academic standards and to attend schools that do, and are far less likely to be severely disciplined.

The reason this occurs relates to the leadership of this school district and its failure adequately to represent the views of all SBISD families. Racially-polarized bloc voting by the Anglo majority prevents the District's Hispanic voters from electing their preferred candidates.

Why? Hispanic and White voters have consistently preferred different candidates and the Hispanic population is submerged in a majority population that regularly defeats the minority population's preferred choices. The District also has reduced the number of election day polling locations, which are located farther from where Hispanic voters live, preferentially placed early voting locations in areas more convenient to White than Hispanic voters, and failed to comply with Texas election laws regarding voter registration of 18 year old students.

## II.     Argument

### A.  Vote Dilution in Violation of Section 2 of the Voting Rights Act.

In 1982, Congress amended Section 2 of the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden,* 446 U.S. 55 (1980). The 1982 amendment created a "results-based" test to analyze vote dilution claims. S. Rep. No. 97-417, at 40 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 218 ("S. Rep.")

In *Thornburg v. Gingles*, 478 U.S. 30 (1986)*,* the U.S. Supreme Court set out the framework for determining whether a districting plan dilutes minority voting strength in violation of Section 2. In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims. *Id.* at 50-51. First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single member district;"

(2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id.*

The second step of the inquiry requires the Court "to consider the 'totality of the circumstances' and to determine, based 'upon a searching practical evaluation of the 'past and present reality' whether the political process is equally open to minority voters.'" *Id.* at 79 (citations and internal quotation marks omitted). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court should consider in determining whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives.

These factors include, but are not limited to:

(1)     the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

(2)     the extent to which voting in government elections is racially polarized;

(3)     the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

(4)     exclusion of minorities from a candidate slating process;

(5)     the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6)     the use of overt or subtle racial appeals in political campaigns; and

(7)     the extent to which minorities have been elected to public office in the jurisdiction.

Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy

underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29.

1. ***Gingles* 1: Hispanics are Sufficiently Numerous and Compact to Constitute the Majority of One District in a Seven Member District Plan.**

Hispanics in SBISD are sufficiently numerous and compact to constitute the citizen voting age majority in at least one of seven districts in a Board of Trustees redistricting plan. *See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994). Hispanics are not, however, the majority of SBISD's citizen voting age population.

When determining the citizen voting age population (CVAP), courts look to the most reliable data, which comes from the U.S. Census American Community Survey (ACS). The Southern District of Texas has found that "[t]he ACS is at present the only reliable source of citizen-voting age population data." *Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 728 (S.D.Tex.2013).

Because the ACS is based on a sample, the most reliable data is drawn from the five-year report. *See Fabela v. City of Farmers Branch*, Tex., No. 3:10-CV-1425-D, 2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012) ("Moreover, the five-year ACS is the most reliable version of the ACS for analyzing small populations."). The ACS five-year estimate of the Hispanic share of total CVAP in SBISD for 2017-2021 is 25.8% with a margin of error (MOE) of plus or minus 1.5%. The MOE is based on 90% statistical confidence, which is the Census Bureau standard for ACS MOE estimates. The ACS five-year estimate of the Anglo share of total CVAP in SBISD is 57.9% with a margin of error of 1.3%.[1]

---

[1] These numbers represent the most updated ACS available. ACS numbers are published every year, usually in May. Previous CVAP used in prior filings are derived from earlier ACS surveys.

Although: (i) the District's corporate representative has acknowledged that the geographic concentration of Hispanics in the district is large enough to constitute a majority of the voting age population in one or more single member districts;[2] (ii) the District's expert made a similar, but qualified admission;[3] and (iii) Plaintiff's expert, Dr. Robert Stein, has established that under at least one proposed illustrative single member district plan at least one majority Hispanic trustee district can be created that complies with relevant neutral districting criteria, including "one person, one vote"[4]-- the District nevertheless contests at trial whether Plaintiff has satisfied *Gingles* 1 (depicted below along with a corresponding table detailing relevant population data).



Demonstrative Spring Branch ISD Single-Member District

---

[2] SBISD Christine Porter Deposition at pp. 34/8-35/13 (excerpt attached as Exhibit A).
[3] John Alford Deposition at 97/18-20, 98/23-25, 99/1-100/9 (excerpt attached as Exhibit B).
[4] Expert Report of Robert M. Stein, Ph.D. at 3, 7-18 and Table 1 (attached as Exhibit C).

| District | Total Population | Voting Age Population | Citizen Voting Age Population | % Hispanic Citizen Voting Age Population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

### 2. *Gingles* 2 and 3: Racially Polarized Voting.

Prong two of the *Gingles* test requires plaintiff to demonstrate that Hispanics are politically cohesive, while *Gingles* prong three requires plaintiff to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate. *See Gingles*, 478 U.S. at 51. In practice, the two inquiries merge into the concept of racially polarized voting. *See, e.g. E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).

Racially polarized voting is a practical inquiry into whether racial voting patterns impede the election of minority-preferred candidates. Thus, the Supreme Court noted in *Gingles*, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 50. Similarly, the standard for bloc voting is whether "the white majority votes *sufficiently as a bloc* to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate." *Id*. (emphasis added) (internal citations omitted).

7

Plaintiff will show that Hispanics vote cohesively in SBISD elections. Specifically, Plaintiff's expert, Dr. Stein, will show that Latinos vote cohesively for candidates of their choice at high levels of polarization. He will also show that Anglo voters in SBISD usually vote cohesively against Hispanic-preferred candidates. Here is one of the many examples of the racially polarized elections in SBISD that have occurred during the period 2015-2023:

Table 2: Estimated Proportion White Vote for Each Candidate

|              | Mean  | Standard Deviation | 95% Lower CI | 95% High CI |
|--------------|-------|--------------------|--------------|-------------|
| Casear       | 54.10 | 0.70               | 52.55        | 54.70       |
| Lezama       | 35.13 | 0.03               | 35.08        | 35.22       |
| Vierra       | 84.25 | 0.70               | 82.44        | 85.72       |
| Vierra.under | 16.11 | 1.60               | 12.35        | 18.85       |

Table 3: Estimated Proportion Hispanic Vote for Each Candidate

|              | Mean  | Standard Deviation | 95% Lower CI | 95% High CI |
|--------------|-------|--------------------|--------------|-------------|
| Casear       | 9.42  | 7.49               | 0.04         | 24.88       |
| Lezama       | 99.01 | 0.31               | 98.45        | 99.52       |
| Vierra       | 50.30 | 9.43               | 31.93        | 67.84       |
| Vierra.under | 51.20 | 9.23               | 32.13        | 67.91       |

**Visual**



8

This election was a contest between Noel Lezama, a Hispanic candidate, and Minda Caesar, who is not Hispanic. In this election, Dr. Stein estimates that candidate Lezama received 99.01 % of the Latino Vote, while only receiving an estimated 35% of the White vote. Caesar, on the other hand, received 54.01% of the White vote, while only receiving 9.42% of the Hispanic vote. This is but one of many examples of racially polarized voting experienced by minority voters in SBISD elections analyzed in Dr. Stein's multiple reports of SBISD trustee elections between 2015 and 2023.

Voting patterns need not be extreme in order to be racially polarized. *See Thornburg*, 478 U.S. at 81 (Appendix A to Opinion of Brennan, J); *see also*, *Clark v. Calhoun County, Miss*., 88 F.3d 1393 (5th Cir. 1996) (citing to 71% cohesive voting by Black voters); *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1191 (5th Cir. 1991). In the *Gingles* analysis, polarized voting is judged "primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988). Because ballots are secret, experts estimate group voting behavior using statistical analyses. One such analysis is "ecological inference," which was utilized by Dr. Stein.

"[Ecological inference] is similar to [ecological regression], but abandons the assumption of linearity that ER [ecological regression] relies upon." *Benavidez v. City of Irving*, Tex., 638 F.Supp.2d 709, 724 (N.D. Tex. 2009). "This methodology was developed subsequent to the *Gingles* decision, and was designed specifically for the purpose of arriving at estimates in this type of case." *Id*. Ecological inference is an accepted method of analysis. *See e.g., Rodriguez v. Harris Cnty., Tex*., 964 F. Supp. 2d 686, 768 (S.D. Tex. 2013); *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009); *Jamison v. Tupelo, Mississippi*, 471 F. Supp. 2d 706, 713 (N.D. Miss.

2007); *United States v. Village of Port Chester,* No. 06 Civ. 15173(SCR), 2008 WL 190502, at *11 (S.D.N.Y. Jan. 17, 2008); *United States v. City of Euclid,* 580 F.Supp.2d 584, 596 (N.D. Ohio 2008).

Using Ecological Inference (EI) and other methods, Dr. Stein concluded that in the eleven contested SBISD trustee elections that he reviewed, ten of the eleven contested trustee elections exhibit significant racially-polarized voting among Hispanic and White voters. And, the remaining contested election also demonstrated modest racially-polarized voting. Dr. Stein has opined that the election data shows that Hispanic voters in SBISD elections are highly cohesive in their election preferences in nearly all SBISD elections and that White voters in SBISD elections do not share that preference. From, this he will show that White voters in SBISD elections have the ability to override or veto the election of Hispanic-preferred candidates, as demonstrated by the loss of all contested SBISD elections in which Hispanics had a preferred candidate that differed from the candidate preferred by White voters.

### 3. Totality of Circumstances.

Establishing the three *Gingles* preconditions is necessary but not sufficient to prove a Section 2 violation. *See Johnson v. DeGrandy*, 507 U.S. 997, 1011 (1994). However, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of §2 under the totality of the circumstances." *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ*., 4 F.3d 1103, 1135 (3d Cir. 1993)).

In addition to the *Gingles* preconditions, the court may also examine the Senate Factors enumerated in the Senate Judiciary Committee Report to Section 2 and adopted by the Supreme Court in *Gingles*, 473 U.S. at 36, 37, 44-45, to determine whether, under the totality of the

circumstances, the challenged practice or structure results in a lack of equal opportunity for Hispanics to participate in the political process and to elect candidates of their choice. See Senate Factors discussed in §II.A. *supra*.

There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29 n. 118. The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120.

"[C]ourts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socioeconomic status and the depressed level of political participation." S. Rep. at 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) and *Kirksey v. Bd. of Supervisors*, 528 F.2d 139,145 (5th Cir. 1977); *see also Clark*, 88 F.3d at 1399; and *LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (Senate Report does not "insist[] upon a causal nexus between socioeconomic status and depressed participation").

In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and found a Section 2 violation under the totality of the circumstances.

*LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session v. Perry*, 298 F. Supp. 2d 451, 473 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543 U.S. 941, 125 S. Ct. 351, 160 L. Ed. 2d 252 (2004) and *Gingles,* 478 U.S., at 45).

The Supreme Court explained: "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and the restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the state as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions." *LULAC v. Perry*, 548 U.S. 399, 439-40 (2006), quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D.Tex.1994).

Dr. Andres Tijerina, an historian and expert in Texas Mexican American history, concludes that there exists a long history of discrimination against Hispanics in Texas, Harris County and in SBISD, and that Hispanics bear the present effects of that discrimination in the form of lower rates of political participation. Much of that discrimination in Texas, including the poll tax, refusal to register voters, segregated public facilities, and segregated schools and employment discrimination, has been experienced by Hispanic voters still living today. The legacy of historical discrimination persists today in the form of lower socioeconomic status for Hispanics in SBISD.

With respect to the remaining Senate Factors, SBISD elections are characterized by racially polarized voting, practices that enhance dilution such as majority vote and numbered place requirements, and racial appeals. Historically, only one Hispanic has been elected to the Board of

Trustees under the at-large system, and that candidate was not the preferred choice of the Hispanic community and was not elected before this suit was filed. SBISD has been "unresponsive to the particularized needs" of Hispanic families and Hispanic students and the reasons the District advances to oppose conversion from an at-large election system to a different election system that might allow the election of one or multiple Latino-preferred candidates, are tenuous at best.

**B**. **SBISD's Counter Arguments Lack Merit.**

**1. The Election of a Single Minority Candidate Does not Nullify Section 2 of the Voting Rights Act.**

In 2022, SBISD elected a Hispanic candidate for the first time in its recorded history, John Perez. That election was a three-way contest among candidates Lopez, Mafridge, and Kaczenski. Perez won with 65.6% of the overall vote. Using EI, Dr. Stein has determined that even though Lopez had a Spanish surname, he received only a minuscule amount of support from Hispanic voters in SBISD, while Kaczenski received an overwhelming 80% share of the Hispanic vote. Perez, therefore, was not the preferred candidate of the Hispanic voters.

The recent election of a minority candidate like Perez does not void a long history of racially polarized voting, especially when that candidate is not the preferred choice of the minority community. As stated in the Senate Report:

> The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote', in violation of this section. If it did, the possibility exists that the majority citizens might evade the section e.g., by manipulating the election of a 'safe' minority candidate. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution.

S. Rep. at 29 n. 115. (quoting *Zimmer v. McKeithen*, 485 F.2d 1297, 1307).

More to the point, the inquiry this court must make is whether or not the preferences of the minority community are overwhelmed by racially polarized voting by the Anglo-majority in SBISD. Candidate Perez is a poster-boy for this phenomenon. Perez plainly was not the preference of the minority community but he was swept into office by the racially polarized vote of the majority White voters, who overrode the will of the Hispanic voters. The Perez election exemplifies the Anglo stranglehold on SBISD elections; it does not evidence the success of minority voter preferences.

### 2.   The Claim that SBISD Elections are Partisan not Racial, is Irrelevant.

The presence or absence of political polarization in SBISD elections is of no consequence to this court's analysis of the voter preferences in these elections.

First, SBISD trustee elections are expressly non-partisan by their very nature. No party affiliation is listed on the ballot. There is low voter attention to the partisan make-up of the candidates, and no evidence exists that partisanship played any role in the vast majority of the elections at issue occurring between 2015 and 2023. The fact that partisan actors may have participated in one of the most recent elections analyzed by the litigants is immaterial.

Second, no evidence exists that partisans of any political party participated in or influenced SBISD trustee elections before 2020. And, factually, partisan politics cannot explain the SBISD election in 2022, because all of the candidates in that contest were members of the same political party.

Finally, partisan differences that mirror racial differences do not undermine Section 2 of the Voting Rights Act because any such characteristic is simply one component of racial cohesion. As one court recently observed: "A high correlation between race and partisanship does not undermine a Section 2 claim, it is necessary to it. The minority voting group must be politically

14

cohesive, which is a *Gingles* prerequisite, and the best (albeit imperfect) proxy for political cohesion is partisan alignment." *Rose v Raffensberger*, 619 F. Supp. 3d 1241, 1260 (N.D. Ga. 2022) (invalidating at-large system for electing Public Service Commission members because of vote dilution violative of Section 2, holding that "nothing in the VRA requires a plaintiff to control for every possible covariant to assure that the discriminatory effect is caused solely or even predominantly by race as opposed to some other factor.").

The District may seek to obscure the law regarding the vote dilution analysis under Section 2, by claiming that differing electoral results are due simply to partisanship. However, that argument only strengthens and enhances the evidence of racial polarization that has existed in all SBISD trustee elections the parties have analyzed.

### 3. Plaintiff Need Not Demonstrate that a Minority- Preferred Candidate Necessarily will be Elected.

The evidence conclusively establishes that under SBISD's current at-large election system, there is no chance for a minority-preferred candidate to win any trustee election. The current make-up of the citizen voting age population of SBISD makes it clear that if the racially polarized voting that has historically occurred continues, then Hispanic-preferred candidates will lose both now and in the future. This will continue to occur until SBISD becomes a jurisdiction with a large plurality of Hispanic citizens of voting age. But that is unlikely to occur in the next several decades.

Therefore, any single-member district that has a majority Hispanic CVAP will provide a greater opportunity for the Hispanic community in SBISD to elect its preferred candidates than the current election system. That is all that is required under Section 2.

More to the point, the precedents cited by the District in support of its claim that VRA plaintiffs must prove that the minority voters' preference can win election in their proposed districts are cases in which the jurisdictions already had single-member districts and the issue was

whether the proposed redistricting plan would "enhance the ability of minority voters to elect the candidates of their choice." *See e.g. Abbott v. Perez,* 138 S. Ct. 2305, 2332 (U.S. 2018). ("[u]nder *Gingles*, the ultimate question is whether a ***districting*** decision dilutes the votes of minority voters, . . . and it is hard to see how this standard could be met if the alternatives to the districting decision at issue would not ***enhance the ability of minority voters to elect the candidates of their choice***.") (emphasis added). *See also Harding v. Cty. of Dallas*, 948 F.3d 302, 310-11 (5th Cir. 2020)(redistricting challenge brought by Anglo voters)(discussing relevant standard as whether the proposed plan would "**improve the ability of Latinos to elect their preferred candidates**" or "**enhance the ability of minority voters to elect the candidates of their choice**" or "provide Latinos with an **improved opportunity to elect [a] Latino-preferred candidate**.")(emphasis added).

If that standard is applied here, the evidence will conclusively demonstrate that the single member districting system proposed by Plaintiff will "improve" and "enhance" the opportunities of Hispanic voters in SBISD to elect their preferred candidates to the school board. The Voting Rights Act requires nothing more.

### III. Conclusion

For the foregoing reasons, and for the additional reasons to be established at trial, the at-large method of electing SBISD school board trustees discriminates against Hispanics in violation of the Voting Rights Act of 1965.

Respectfully submitted,

    /s/ Barry Abrams

Barry Abrams                                Martin Golando
State Bar No. 00822700                      State Bar No. 24059153
SD Tex. Bar No. 2138                        Admitted Pro Hac Vice
Robert Scott                                THE LAW OFFICE OF MARTIN
State Bar No. 17911800                      GOLANDO, PLLC
SD Tex. Bar No. 3085                        2326 W. Magnolia
Domingo Llagostera                          San Antonio, Texas 78201
State Bar No. 24070157                      (210) 471-1185
SD Tex. Bar No. 1120040                     (210) 405-6772 (fax)
BLANK ROME LLP                              martin.golando@gmail.com
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com


### CERTIFICATE OF SERVICE

    I certify that the foregoing document was served on all parties of record via the Court's electronic filing system on October 6, 2023

                            /s/ Barry Abrams
                            Barry Abrams

# EXHIBIT A

**EXHIBIT TO**
**PLAINTIFF'S PRE-TRIAL**
**MEMORANDUM OF LAW**

Page 1

IN THE UNITED STATES DISTRICT COURT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS HOUSTON DIVISION

VIRGINIA ELIZONDO,    |
  Plaintiff,    |
            |
V.         | Civil Action No. 4:21-CV-01997
            |
SPRING BRANCH    |
INDEPENDENT SCHOOL    |
DISTRICT, ET AL.,    |
  Defendants.    |

*******************************************************
ORAL DEPOSITION OF
CHRISTINE PORTER
DECEMBER 28, 2021
*******************************************************

    ORAL DEPOSITION of CHRISTINE PORTER, produced as
a witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on December 28, 2021, from 9:34 a.m. to
11:45 a.m., before Mendy A. Schneider, CSR, RPR, in
and for the State of Texas, recorded by machine
shorthand, at the offices of Spring Branch ISD
Athletic Center, 1050 Dairy Ashford, Houston, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before
any notary public.

---

Page 3

```
 1              EXAMINATION INDEX
 2   WITNESS: CHRISTINE PORTER
 3   EXAMINATION                        PAGE
        BY MR. ABRAMS                     4
 4
 5      SIGNATURE REQUESTED               92
 6      REPORTER'S CERTIFICATION          93
 7          EXHIBIT INDEX
                           PAGE
 8      SBISD EXHIBIT NO. 1              6
           Notice of Deposition
 9
        SBISD EXHIBIT NO. 2             24
10         District Web Site Screenshot
11      SBISD EXHIBIT NO. 3             30
           2010 to 2021 District List of Candidates
12
        SBISD EXHIBIT NO. 4             39
13         Map
14      SBISD EXHIBIT NO. 5             44
           Map
15
        SBISD EXHIBIT NO. 6             50
16         Map
17      SBISD EXHIBIT NO. 7             53
           Map
18
        SBISD EXHIBIT NO. 8             65
19         Notice of Trustee Election
20      SBISD EXHIBIT NO. 9             70
           Spring Branch ISD 10-Year Per Student
21         Cost General Fund
22
23
24
25
```

---

Page 2

```
 1           A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      MR. BARRY ABRAMS
        BLANK ROME
 5      717 Texas Avenue, Suite 1400
        Houston, Texas 77002
 6      (713) 228-6601
        Babrams@blankrome.com
 7
 8   FOR THE DEFENDANTS:
 9      MR. CHARLES J. CRAWFORD
        ABERNATHY ROEDER BOYD HULLETT
10      1700 North Redbud Boulevard, Suite 300
        McKinney, Texas 75069
11      (214) 544-4000
        Ccrawford@abernathy-law.com
12
13   ALSO PRESENT:
        MS. AUDREY SHAKRA
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1              CHRISTINE PORTER,
 2   having been first duly sworn, testified as follows:
 3              E X A M I N A T I O N
 4   BY MR. ABRAMS:
 5      Q.  Good morning.
 6      A.  Good morning.
 7      Q.  Would you please state your name?
 8      A.  Christine Porter.
 9      Q.  Ms. Porter, my name is Barry Abrams.  I'm a
10   lawyer representing Virginia Elizondo in a lawsuit
11   against the Spring Branch Independent School District
12   and its board members in their official capacities.
13          Do you understand that?
14      A.  Yes.
15      Q.  What do you do for a living?
16      A.  I am the chief financial officer for Spring
17   Branch ISD currently.  I've actually been in school
18   finance in a few different school districts for the
19   past 30 years.
20      Q.  And at Spring Branch, what does that entail?
21      A.  It entails primarily handling all financial
22   aspects of the district, the collection, the expending
23   of all dollars.
24          And in that role, I oversee finance, tax
25   office, purchasing, child nutrition, and federal
```

1 (Pages 1 to 4)

Page 5

1   funds.  I also have the role of being the election
2   official for the district.
3       Q.  Do you understand that we're here today for
4   you to provide sworn testimony that can be used in the
5   lawsuit?
6           The number is 4:21-CV-01997.  It's
7   titled Virginia Elizondo versus spring Branch
8   Independent School District and it's pending in the
9   United States District Court for the Southern District
10  of Texas Houston Division.
11          Do you understand that's why we're here?
12      A.  Yes, I do.
13      Q.  If I refer to that proceeding as "the
14  lawsuit," will you know what I'm talking about?
15      A.  Yes.
16      Q.  What's your understanding about the basis for
17  the lawsuit?
18      A.  My understanding is that there is a feeling
19  by Virginia but I believe representing a group of
20  people who feel underrepresented specifically on the
21  board of trustees and within the dealings of the
22  school district.
23      Q.  Do you understand that the lawsuit is being
24  brought under what's called the Federal Voting Rights
25  Act?

Page 6

1       A.  Yes.
2       Q.  Do you understand that the lawsuit contests
3   whether the district's system of electing its trustees
4   at large improperly dilutes the voting strength of
5   certain minorities in the district?
6       A.  That the lawsuit --
7       Q.  That claims that.
8       A.  Yes.  Uh-huh.
9       Q.  Let me hand you what's been marked as Exhibit
10  No. 1.  This is a copy of the deposition notice that
11  was originally issued for this to take place on
12  December the 20th.  We, by agreement with the
13  district's lawyer, reset it for today.
14          (Marked Porter Exhibit No. 1.)
15      Q.  (BY MR. ABRAMS)  Have you ever seen the
16  notice?
17      A.  Yes.
18      Q.  Do you understand that you're appearing today
19  as one of the representatives for the district that's
20  been designated to testify on the district's behalf
21  with regard to certain topics that are listed in the
22  notice?
23      A.  Yes, I do.
24      Q.  Who made the decision that you would appear
25  as a representative for the district?

Page 7

1       A.  I think -- I believe through conversations
2   with the superintendent, our general counsel felt that
3   I would be the one that could best answer certain of
4   these questions.
5       Q.  And who authorized you to appear today in the
6   capacity as a representative for the district?
7       A.  The superintendent.
8       Q.  Who decided what topics you would be
9   designated to testify about on behalf of the district?
10      A.  That was through discussion with our general
11  counsel.
12      Q.  What preparation have you made to appear
13  today as the corporate representative on the
14  district's behalf with respect to certain of the
15  topics that are listed in the notice?
16      A.  I read through the various topics and tried
17  to ensure that I understood what they meant, what was
18  being asked for, and then if I had certain documents
19  that I could review to make sure that -- or background
20  knowledge just to make sure I could have those facts
21  ready to talk about today.
22      Q.  Have you brought any documents with you here
23  today to assist you in testifying?
24      A.  No, I did not bring any documents.
25      Q.  Who did you speak with to prepare for your

Page 8

1   deposition?
2       A.  Our general counsel.
3       Q.  And beyond what you've described, have you
4   done anything else to prepare?
5       A.  No.
6       Q.  What documents did you review in preparation
7   for your deposition?
8       A.  I reviewed legal -- our Spring Branch ISD's
9   legal policy.  I reviewed the election results for the
10  last 10 years.  I reviewed information concerning
11  early election sites as well as number of voters and
12  things that happen at them.
13          I reviewed the presentation that was
14  provided -- that was given by Thompson Horton back in
15  2020.  I didn't actually attend it, but I did review
16  the presentation as it's a public document.
17          I also just made sure I was
18  understanding what's happening with our current
19  election calendar to ensure that people were aware for
20  of the critical dates tied to this current year.
21          I also looked at financial information
22  because one of the topics is covering -- is asking
23  about some per student costs.  So I reviewed that.
24      Q.  You mentioned a 2020 presentation by
25  Thompson & Horton.

Page 33

1 investigation to determine whether or not the voting
2 in any of those jurisdictions is racially polarized or
3 ethnically polarized, correct?
4    A.   Correct.
5    Q.   Given that the district had not conducted any
6 investigation about whether or not the voting in its
7 trustee elections was racially or ethnically polarized
8 when it denied that fact in the federal lawsuit, what
9 was the basis for making such a denial?
10    A.   We did not have evidence to the contrary.  We
11 had investigated it, but we had no evidence.
12    Q.   Does the district agree that white
13 non-Hispanics in the district vote sufficiently as a
14 block to enable them to defeat minority voters'
15 preferred candidates of choice in the various trustee
16 elections?
17    A.   I believe that's something that an expert can
18 look at the data.  And the district has never looked
19 at the voting population by race to be able to make
20 that deduction ourselves.
21    Q.   So does the district agree that when it filed
22 a document in the federal lawsuit denying that white
23 non-Hispanics in the district vote sufficiently as a
24 block to enable them to defeat minority voters'
25 preferred candidates, it had no evidence to support

Page 34

1 that denial?
2    A.   Or evidence against that denial, but correct.
3    Q.   And before making that denial in the federal
4 lawsuit, the district did not undertake an
5 investigation to determine whether or not the
6 statement was true, correct?
7    A.   Correct.
8    Q.   Does the district agree that the geographic
9 concentration of Hispanics in the district is large
10 enough to constitute a majority of the voting age
11 population in one or more single-membered districts if
12 there was a seven-member election plan adopted or
13 ordered by the court?
14    A.   It's our understanding that that can happen,
15 that -- that they can make those single-member
16 districts.
17    Q.   What is the district's position about the
18 number of single-membered districts that could be
19 formed in which the geographic concentration of
20 Hispanics would constitute a majority of the voting
21 age population?
22    A.   I've heard that three, up to three could be
23 established.
24    Q.   Who has provided the factual information to
25 the district that as many as three single-membered

Page 35

1 districts could be drawn in which a majority of the
2 voting age population would be Hispanic?
3    A.   That was based on some meetings we had with
4 legal counsel at the time.
5    Q.   Does the district possess any written
6 investigation or report confirming that the geographic
7 concentration of Hispanics in the district is
8 sufficient to constitute a majority of the voting age
9 population in as many as three single-membered
10 districts if a seven-member plan were adopted?
11    A.   We don't maintain documents.  Those were
12 mainly talked about during discussions with our legal
13 counsel.
14    Q.   Setting aside communications with legal
15 counsel, which I presume and understand the district
16 will assert privilege over, are you aware of any other
17 sources of information confirming that as many as
18 three single-membered districts could be drawn in
19 Spring Branch in which the concentration of voting age
20 Hispanics would be a majority?
21    A.   No.
22    Q.   Does the district agree that single-member
23 district forms of representation can enhance the
24 proportional representation of minority candidates?
25    A.   The district understands that it is within --

Page 36

1 it is legal within the electoral system to use that
2 and it does provide an opportunity for participation
3 in some areas of the district that have lower
4 participation.
5    Q.   Isn't the district's position that adoption
6 of a single-member district form of representation can
7 result in enhanced representation of the minority
8 community on its board?
9    A.   The board believes they represent the entire
10 district already, so it would be more of a focus on
11 ensuring that they have participation from the areas
12 of those school districts, the area of the school
13 district.
14         MR. ABRAMS:  Object to the answer as
15 nonresponsive.
16    Q.   (BY MR. ABRAMS)  My question is whether or not
17 the district has a position on whether single member
18 district forms of representation can have the effect
19 of enhancing the representation of minority candidates
20 on the district's board?
21         MR. CRAWFORD:  Objection; form.
22    A.   I have not heard the board discuss anything
23 like that.
24    Q.   (BY MR. ABRAMS)  So as we sit here today, is
25 it fair to say the district has no position on whether

9  (Pages 33 to 36)

# EXHIBIT B

**EXHIBIT TO**
**PLAINTIFF'S PRE-TRIAL**
**MEMORANDUM OF LAW**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIRGINIA ELIZONDO,       §
          Plaintiff,     §
                         §
.                        §
v.                       §  Civil Action No.
                         §  4:21-CV-01997
                         §
SPRING BRANCH INDEPENDENT §
SCHOOL DISTRICT, ET AL.,  §
          Defendants.    §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
JOHN R. ALFORD, PH.D.
MARCH 24, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF JOHN R. ALFORD, PH.D., produced
as a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 24th day of March, 2022, from 10:27 a.m. to
2:16 p.m., before John G. Rochelle, CSR in and for the
State of Texas, reported by machine shorthand, at the
SBISD Athletic Complex, 1050 Dairy Ashford Street,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Page 2

1
2        A P P E A R A N C E S
3   FOR THE PLAINTIFF:
4       Mr. Barry Abrams
        Blank Rome LLP
5       717 Texas Avenue, Suite 1400
        Houston, Texas 77002
6       Phone: (713) 228-6606
        Email: babrams@blankrome.com
7
            AND
8
9       Mr. Martin Golando
        The Law Office of Martin Golando, PLLC
        2326 W. Magnolia
10      San Antonio, Texas 78201
        Phone: (210) 471-1185
11      Email: martin.golando@gmail.com
12
13  FOR THE DEFENDANTS:
14      Mr. Charles J. Crawford
        Abernathy, Roeder, Boyd & Hullett, P.C.
15      1700 N. Redbud Boulevard, Suite 300
        McKinney, Texas 75069
16      Phone: (214) 544-4000
        Email: ccrawford@abernathy-law.com
17
18
19  ALSO PRESENT:
        Ms. Audrey Shakra
20
21
22
23
24
25

Page 3

1           INDEX
                              PAGE
2
    Appearances.......................................... 2
3
    JOHN R. ALFORD, PH.D.
4
      Examination by Mr. Golando..................... 5
5
    Signature and Changes........................ 170-171
6
    Reporter's Certificate........................... 172
7
8
           EXHIBITS
9
    NO.  DESCRIPTION                           PAGE
10
    Exhibit 1.......................................... 13
11     Notice of Oral Deposition for John R. Alford,Ph.D.
12
    Exhibit 2.......................................... 64
13     Expert Report of John R. Alford, Ph.D. dated
       February 21, 2022
14
15  Exhibit 3.......................................... 69
       Expert Report of Robert M. Stein, Ph.D. dated
16     January 20, 2022
17
    Exhibit 4......................................... 119
18     Article entitled "Political Attitudes Vary with
       Detection of Androstenone"
19
20  Exhibit 5.......................................... 88
       Article entitled "At-Large Elections and
21     Minority Representation in Local Government"
22
23  Exhibit 6......................................... 163
       Document entitled "Letter of Agreement for
24     Services of Consulting and Testifying Expert"
25

Page 4

1   Exhibit 7......................................... 165
       Article entitled "Republican Party of Texas
2      Doubles Down on Local Election"
3
    Exhibit 8......................................... 166
4      Article entitled "Do District-Based Elections
       for School Board Help Minority Candidates Get
5      Elected?"
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

1    (Exhibit Nos. 1 through 8 premarked.)
2         JOHN R. ALFORD, PH.D.,
3    having been first duly sworn, testified as follows:
4              EXAMINATION
5    BY MR. GOLANDO:
6         Q. Good morning, Dr. Alford.
7         A. Good morning.
8         Q. My name is Martin Golando.  We've met before.
9    I represent Virginia Elizondo in this case.  And you've
10   read the pleadings, and you've read the expert reports;
11   is that correct?
12        A. That's correct.
13        Q. And you've had your deposition taken -- I don't
14   know -- 140 times, something like that?
15        A. I don't know if it's that many times, but it
16   seems like that many times.
17        Q. So you're well-acquainted with the process.  I
18   don't think I've ever deposed you before, but --
19        A. I don't think so.
20        Q. -- I am a little inarticulate.  I talk a little
21   mushmouthy.  And so if you don't understand what I'm
22   asking you to do, or asking you to say, it's my fault.
23   So just ask me to repeat it, or I'll have him repeat it
24   to you.  It's just I want to make sure that we're very
25   clear on the record the questions and answers.  Right?

Page 6

1    The second instruction, I think, is the -- I need you to
2    wait till I finish asking the question, and then you can
3    answer.  And I will try not to interrupt you.  If you
4    would try not to interrupt me, I'd be appreciative.  And
5    if you don't understand anything I'm saying or if you
6    don't understand the question, again, just let me know,
7    and we'll try to work it through.  I promise.
8         So would you mind telling me what is your
9    full name for the record, please?
10        A. It's John Richard Alford.
11        Q. And where do you live, sir?
12        A. I live in Houston, Texas.
13        Q. Okay.  And did you go to high school here?  I
14   think you did.  Right?
15        A. I went to -- it's a good, good question.  I
16   went to -- I went to Clear Creek High School, which is
17   of course in Galveston County.  And we lived on the --
18   what would not be in Houston, but at the time had not
19   yet been annexed so --
20        Q. Interesting.  Fair enough.  And so where did
21   you go to school first for college?
22        A. University of Houston.
23        Q. And when were you there roughly?
24        A. Late '70s.
25        Q. Okay.  Did you ever do any drama there?

Page 7

1         A. No.
2         Q. Because they had a great drama teacher.  I
3    don't know if you knew that or not.
4         A. Oh, yeah.  Like world-renowned, really amazing.
5    And a very -- the University of Houston is a place I'm
6    very proud of.
7         Q. I would be, too.  So if you watch any of the
8    Lakers series, the guy who's playing Bill Sharman --
9         A. Yeah.
10        Q. -- actually went to the University of Houston
11   at roughly the time you were there.
12        A. Yeah.
13        Q. I didn't know if you --
14        A. Yeah.
15        Q. -- if you knew him or not.
16        A. Yeah.  They had a pretty good basketball team
17   back then, too.
18        Q. They did.  Is that Calvin Hayes or --
19        A. Yeah.  Yeah.
20        Q. Yeah.  Fair enough.
21        A. Yeah.  When I was in high school was sort of
22   their -- it was their real peak for U of H basketball.
23   I guess I was in middle school when -- I think when
24   they -- when they beat UCLA, which was just spectacular.
25        Q. And it was 1973?

Page 8

1         A. Yeah.  Yeah.  So it would have been -- no.
2    Yeah, I guess I would have been there.  Pretty -- you
3    know, I spent a lot of time talking to people from
4    the -- sort of that era and the era just before I was
5    there.  It was just a really interesting time.  And Gene
6    Locke has some fascinating stories about his time at U
7    of H.  It was just a -- you know, it was a very short
8    time before I was there, but a different world than it
9    was by the time -- by the '70s.  The '60s at U of H was
10   quite different.  So it's interesting.
11        Q. That's interesting.  And after that you went
12   and got an MPA; is that correct?
13        A. I got a -- yes.  I got a bachelor's and a
14   master's of public administration.
15        Q. And then you went to Iowa, correct?
16        A. Iowa.  Correct.
17        Q. And when were you in Iowa?
18        A. So Iowa would have been from, say, '79 to '84.
19   Something like that.
20        Q. And what did you study at Iowa?  What was your
21   major course of study?
22        A. So American politics, methodology, and public
23   policy.
24        Q. And did you study Bernie Grofman then and his
25   ecological regression at the time, or what did you --

                                        2  (Pages 5 to 8)

Page 97

1   board have not included Latino candidates, and so in --
2   I assume in many of those elections the --
3        Q. (BY MR. GOLANDO) Fair enough.
4        A. -- Latino preferred candidate was elected.  So
5   a Latino that was the preferred Latino candidate, if --
6   and I'm just accepting your assertion that no Latino has
7   ever been elected.  If it's true that no Latino has ever
8   been elected, then the Latino candidates that were also
9   the preferred candidate of Latino voters, which is a
10  subset, has not been elected.
11       Q. And that's -- that's a much better way to say
12  that.
13       A. Okay.
14       Q. And you agree with that, correct?
15       A. I agree with that.
16       Q. All right.  So the chance -- okay.  Fair
17  enough.  I think I understand.
18       Did you review Professor Stein's proposed
19  single-member district plan in his report?
20       A. I looked at it.  One of the things I was
21  clear about in the sort of scope of what I was going to
22  do and the amount of time I had to do it was that I was
23  going to stay out of being a demographer.
24       Q. I understand.
25       A. So I did not do any -- I looked at it.  I

Page 98

1   recognized what it was.  It's a -- a modified version of
2   the -- he says basically the polling places.  It isn't.
3        Q. No.
4        A. It's a -- I mean, that obviously -- you know, a
5   quick look at the population deviation will tell you
6   that -- you know, nobody gets the population perfect in
7   an attendance district because there it's about
8   students, not about people.  So -- but it obviously is
9   based on -- the cores of the districts are the
10  recognizable cores of the -- of the current polling
11  places are, which would be the attendance districts,
12  with some modifications to -- you know, to get the
13  population equal.  So that's what I saw there.  It looks
14  like the area that he says is the district that's CVAP
15  majority is an area where I would suspect there's a --
16  it could be you could draw a CVAP majority district
17  so --
18       Q. Does anything about that district give you
19  pause as a map drawer?  Because you've done that in the
20  past, correct?
21       MR. GOLANDO:  Actually, strike that.  Let
22  me just do it correctly.
23       Q. (BY MR. GOLANDO) Historically you've drawn
24  maps for jurisdictions, right?
25       A. Yes.

Page 99

1        Q. All right.  So you have a vast history of
2   drawing maps, correct?
3        A. I've drawn a lot.  I wouldn't say vast.
4        Q. Okay.
5        A. But I've drawn a lot of school district maps,
6   yes.
7        Q. Fair enough.  Does anything about that, the way
8   it's shaped geometrically, give you pause?
9        A. No.
10       Q. Would you agree that it's a compact district?
11       A. Yes.
12       Q. Okay.  Would you agree that if the numbers are
13  correct that it's CVAP majority?
14       A. Yes.
15       Q. Would you agree that that map meets Gingles 1?
16       MR. CRAWFORD:  Objection, exceeds the scope
17  of his engagement and his opinion.
18       Q. (BY MR. GOLANDO) But as an expert in map
19  drawing I'm asking and as -- and one who's drawn several
20  Gingles 1 maps does it meet the form of Gingles 1?
21       A. Again, I -- so I haven't looked at any of this,
22  so I'm going entirely on your assertion that the numbers
23  that were provided match the numbers that -- the
24  picture.  Right?  And I have no idea whether that -- you
25  know, whether that picture actually produces the numbers

Page 100

1   or not but --
2        Q. Sure.
3        A. -- if that picture produces those numbers, and
4   that's the most current CVAP estimate, then I'd say
5   that's what you'd be looking for in a -- you know, in a
6   district to establish Gingles 1.
7        Q. So yes?
8        MR. CRAWFORD:  Same objection.
9        A. Yes.
10       Q. (BY MR. GOLANDO) Thank you, sir.  All right.
11  Only about nine more pages.
12       Is the Latino community in SBISD
13  sufficiently large and geographically compact to
14  constitute a majority in a single-member district?
15       A. I don't know.
16       Q. In your experience?  You've drawn maps.
17       A. I don't know.
18       Q. And you've reviewed election analyses, and you
19  know SBISD well.  You've worked here for 20 years.
20       In your opinion, given your broad history
21  of working with SBISD, do you think it's sufficiently
22  large and geographically compact?
23       MR. CRAWFORD:  Object to the extent it --
24       A. I mean, I don't have --
25       MR. CRAWFORD:  -- exceeds the scope of his

# EXHIBIT C

**EXHIBIT TO**
**PLAINTIFF'S PRE-TRIAL**
**MEMORANDUM OF LAW**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIRGINIA ELIZONDO

Plaintiff,

v.

SPRING BRANCH INDEPENT SCHOOL DISTRICT, CHRIS GONZALEZ, PAM
GOODSON, KAREN PECK, JOSEF D. KLAM, MINDA CAESAR, CHRIS EARNEST, J.
CARTER BREED, in their official capacity as member of the Board of Trustee of Spring
Branch ISD

Defendants

EXPERT REPORT
OF
Robert M. Stein, Ph.D.

January 20, 2022

1

## I.     Background and Qualifications

I am the Lena Gohlman Fox Professor of Political Science and a fellow in urban politics at the Baker Institute at Rice University.  A copy of my curriculum vitae is attached as Appendix A.  I am being compensated at $250 per hour.

My current research focuses on alternative modes of elections and voting procedures, voting behavior and public policy in the United States.  I teach classes on voting behavior, election sciences, public policy and survey research.

My work has been supported by the National Science Foundation, the City of Houston's Office of Public Safety and Homeland Security and the Pew Charitable Trusts, among others. Some of my select publications include "Reducing the Undervote with Vote by Mail" (published in *American Politics Research*), "Election Administration during National Disasters and Emergencies: Hurricane Sandy and the 2012 Election" (published in *Election Law Journal*),  "Voting for Minority Candidates in Multi-Racial/Ethnic Communities," (published in *Urban Affairs Review*) and "The Effect of Election Day Vote Centers on Voter Participation" (published in *Election Law Journal*).  In addition, I have written extensively on federal spending, 'pork barrel politics' and the electoral connection between single member district representatives, spending policies and incumbent reelection (published in *American Journal of Political Science* and *Journal of Politics*).  I am co-author of *Perpetuating the Pork Barrel* (*Cambridge University Press*).  A complete list of my publications is included in my attached curriculum vitae.

Since 2010, I have been an expert witness in several cases involving election administration and voting.  I have consulted for several jurisdictions in the design, implementation and evaluation of alternative voting systems including early voting, Election Day vote centers, mail-assisted voting and in-person polling locations. In these jurisdictions, I have worked closely with election administrators and elected officials to fulfill their obligation to conduct elections.   These jurisdictions include: Collin, Harris and Lubbock Counties, Texas, 64 Colorado counties that make up the Colorado County Clerks Association, and Albuquerque, New Mexico.  I have also designed voting districts for municipal governments and school districts in Texas.  I am currently designing election districts for Lancaster ISD, Goose Creek ISD and the City of Baytown.

I have been retained by counsel for Virginia Elizondo to provide expert testimony on:

- Whether voting in SBISD school board elections is racially polarized.
- Whether Latinos or Hispanics are politically cohesive in SBISD school board trustee elections and vote as a block for Latino-preferred candidate.
- Whether the Latino or Hispanic voting age population in SBISD is sufficiently large and geographically compact to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan.

- Whether White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.
- Whether single member district elections or at-large elections enhances the proportional representation of minority-preferred candidates on elected legislatives bodies.
- Whether taxing and spending practices differ significantly between governments with single member district and at-large elections.
- Whether legislative bodies are more responsive to the preferences of minority and non-minority voters in at-large or single member district elections.

## II.    Summary of Opinions

- There is statistically significant evidence of racial polarized voting in the Spring Branch Independent District's Board of Trustees elections for the period 2015-2021.
- White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.
- The geographic concentration of Hispanics in the Spring Branch Independent School District is sufficient to constitute a majority of the voting-age population in one or more single member districts under an illustrative seven-district plan.
- There is strong evidence in the scholarly literature to conclude that:
  - o   Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.
  - o   Single member district representation increases the likelihood that minority candidates will contest elections for position on legislative bodies.
  - o   Single member district representation will produce policies more responsive to the preference of minority voters.
- SBISD should adopt a single member district plan for the election of the district's seven trustees.

## III.    Materials Reviewed

To establish an expert opinion in this case, I reviewed a variety of materials from academic, governmental, legal and media sources.  Building on my existing knowledge, expertise and experience, I consulted the scholarly (peer reviewed) research on:

- Minority representation in local governments and school districts with single member and at-large representation.
- Spending and taxing practices of local governments and school districts with single member and at-large representation.
- The responsiveness of policies in local governments and school districts with single member and at-large forms of government.

I have relied on election results provided by the SBISD for trustee elections, data from the U.S. Bureau of the Census and Harris County's Election Administrator Office for my analysis of racially polarized voting in SBISD's trustee elections.

3

## IV.      Racially polarized voting in Spring Branch Independent School District

I used a definition of racially polarized voting as outlined in *Thronburg v. Gingles* to assess whether this condition existed in the Spring Branch School District trustee elections between 2017-2021.  I further sought to determine whether the extent of racially polarized voting in SBISD trustee elections was of sufficient magnitude to dilute the votes of minority voters and prevent them from electing a candidate of their choice.  Finally, I assessed the likelihood that single member district elections would remedy the effect of racially polarized voting in SBISD trustee elections.

Racially polarized voting is defined as when the relevant minority group "is politically cohesive and that the white majority voters sufficiently as a bloc to enable it… usually to defeat the minority's preferred candidate (Thornburg v Gingles 478 U.S. 30, 49 (1986)."

In assessing the degree of racially polarized voting in SBISD trustee elections I obtained the following information:

- A list of all persons eligible to vote in SBISD trustee elections for the years in which trustee elections were held between 2015 and 2021.
- The residential location and voting precinct (i.e., latitude and longitude) of all eligible SBISD voters
- The voting histories of each eligible SBISD voter in the 2015, 2017, 2019 and 2021 SBISD trustee elections from data provide by SBISD and Harris County.
- The racial and ethnicity of each eligible SBISD voter using Imai and Khana (2016) ecological inference software.  These estimates of racial and ethnicity are obtained by using the Center for Disease Control's list of common racial and ethnic surnames along with information about the racial and ethnic makeup of the voter's residential location i.e., census block or block group.  Estimates at or above 90% were used to assigning voters to one racial and/or ethnic group including: Non-Hispanic White, Non-Hispanic Black, Non-Hispanic Asian, Non-Hispanic other and Hispanic.

I aggregated the proportion of voters by race and ethnicity by SBISD's voting precincts (N=7) by election (N=5) to identify majority-minority and majority White precincts.  I further calculated the proportion of vote cast for each trustee candidate by voting precinct.

Ten trustee contests were held between 2015 and 2021 in seven to eight election precincts per election.  Four of the ten contests were uncontested (i.e., only one candidate stood for election).  We can identify the share of vote cast for one or more trustee candidates and the share of voters in each precinct that are Non-Hispanic White, Non-Hispanic Black, Non-Hispanic Asian, Non-Hispanic other and Hispanic in 73 precinct election contests.

The dominant races and ethnicities among SBISD voters are White (majority) and Hispanic (minority).  Asian and African-American SBISD voters rarely exceed 10% of the district voting population in any election year.

4

To measure the degree to which there is racially polarized voting in SBISD Trustee elections I regressed[1] the proportion of persons White and Hispanic in each voting district on the proportion of votes cast for each candidate. Racially polarized voting is established when the direction of these relationships are signed in opposite directions. A second condition for polarized voting is when the White majority vote against a minority preferred candidate i.e., Hispanic candidate is significant and positive. That is, the share of vote the Hispanic received increases significantly as the proportion of voters in each voting district increases.

Racially polarized voting is observed in every election studied. White and Hispanic voters diverge in their support for each candidate on the ballot, including uncontested contests where we report under vote as the second candidate.

Figures 1-4 report the proportion of vote cast for the White candidate, minority-preferred candidate (i.e., Hispanic surname candidate), and the proportion of vote Hispanic and White in each precinct in all elections. Hispanic surname candidates are identified as the minority-preferred candidate. A minority-preferred candidate appeared on the ballot in seven of ten contests. The findings confirm significant (p<.05) racially polarized voting for White and Hispanic voters.

*Fig 1: The proportion of vote cast for white candidate and Share of vote White*



[1] Ordinary least squares regression.

*Fig 2: The proportion of vote cast for white candidate and Share of vote Hispanic*



*Fig 3: The proportion of vote cast for Hispanic candidate and Share of vote White*

*Fig 4: The proportion of vote cast for Hispanic candidate and Share of vote Hispanic*



## V.   Compactness of Hispanic citizen voting age persons in SBISD

Table 1 reports the number and proportion of citizen voting age by race and ethnicity for the seven proposed voting districts in SBISD.  These data are from the 2020 U.S. Census and the American Community Survey 2015-2019 and best approximate that the likelihood that at least one or more majority Hispanic trustee districts can be constructed. More than half (52.8%) of the citizen voting age population in proposed district 1 is sufficient to enable Hispanic voters to elect a candidate of their choice i.e., an Hispanic.

Table 1
Citizen Voting Age Population by SBSID Voting District

| District | Total Population | Voting Age Population | Citizen Voting Age Population | % Hispanic Citizen Voting Age Population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

Under the proposed configuration of voting districts in SBSID there is sufficient evidence to show that at least one single member majority Hispanic trustee district can be created.  There may be other configurations of voting districts that could yield more than one majority Hispanic trustee districts.

Demonstrative Spring Branch ISD Single-Member District



8

## VI.     Racial and ethnic segregation in SBISD

The ethnic makeup of the district's seven election/enrollment districts is heavily skewed.  Four districts (i.e., Landrum, Northbrook, Spring Oaks and Spring Woods) are overwhelmingly comprised of Hispanic students, with an average of 87% of students in these election/enrollment districts Hispanic.  In the remaining three election/enrollment districts (Memorial, Spring Branch and Spring Forest) between 42% and 52% of the student are white.

I have measured segregation of SBISD students using the index of dissimilarity between whites and Hispanics at the school and enrollment zone level.  The index is equal to:

$$\frac{1}{2} \sum_{i=1}^{N} \left| \frac{w_i}{W} - \frac{l_i}{L} \right|,$$

where $w_i$ and $l_i$  represent the number of whites and Latinos in school I respectively, W and L represent the total number of whites and Latinos in the district, respectively and N represents the total number of schools (enrollment zones) in the district.  Information on the racial and ethnic makeup of SBISD schools comes from National Center for Education Statistics[2].

The dissimilarity index captures how proportional Hispanics and whites are distributed across schools and enrollment zones.  For example, SBISD is comprised of 26.7% white students 59.2% Hispanic students.[3]  Given these district-wide distributions, one would expect every school and/or enrollment zone would have the same proportion of students Hispanic and white if the district was not segregated or was fully integrated.  Another way to think about the dissimilarity index is the proportion of Hispanic (white) students who would have to move to a different school or enrollment zone in order for the composition of each school or enrollment zone to be identical to the composition of the district as a whole.

Researchers (Abbott and Magazinnik 2020;Massey and Denton 1993; Ananat 2011; Collins and Margo 2000; Cutler and Glaeser 1997; Cutler, Glaeser and Vigdor 1999) identify dissimilarity index scores below .3 as indicating low levels of segregation, .3 to .6 as moderate levels of segregation and .6 and above as high levels of segregation.  SBISD's dissimilarity index score at the school level is .694 and .596 at the enrollment zone level.  These scores suggest that well over half of the Hispanic students enrolled in SBISD schools would have to move to another school in order to achieve an integrated distribution of students by ethnicity.

Table 2 reports the proportion of students by enrollment zone in SBISD by race and ethnicity.  In four of the districts seven enrollment zones 78% or more of the students are Hispanic.   In the

---

[2] Source: https://nces.ed.gov/ccd/schoolsearch/school_list.asp?Search=1&DistrictID=4841100
[3] The remaining proportion of the SBISD students at Asian (5.9%), Black (4.8%), and two or more races (2.3%).

remaining three enrollment zones 42% to 52% of the students are White.  There is strong evidence that the racial and ethnic makeup of SBISD schools and enrollment districts is high segregated

Table 2 Percent Enrollment by Race/Ethnicity

| Enrollment Zone | % White | % Hispanic |
|---|---|---|
| Northbrook Middle | 0.02 | 0.96 |
| Spring Woods Middle | 0.05 | 0.88 |
| Spring Oaks Middle | 0.07 | 0.85 |
| Landrum Middle | 0.13 | 0.78 |
| Spring Forest Middle | 0.42 | 0.36 |
| Spring Branch Middle | 0.47 | 0.36 |
| Memorial Middle | 0.52 | 0.25 |

## VII.   Recommendations

The degree of racial segregation and voter polarization in SBISD supports the plaintiff's request that future SBISD trustee elections be held with a single member district plan of representation. The district currently has seven board members and elections are conducted in seven precincts corresponding to the district's enrollment districts.  Using a single member district plan to elect trustees will most likely result in the election of at least one school board trustee reflecting the preferences of SBISD's Hispanic voters, and likely more.

## VIII.   Minority representation in at-large and single member systems

How we elect our legislative representatives has long been a prominent subject of study.  A core research question in this field of study is whether the method of election discriminates against representation of non-majority populations including racial and ethnic minorities.   In the United States, the two most popular ways for electing our representatives are single member district and at-large elections.   In at-large elections, voters across an entire jurisdiction (e.g., city, county, school district) have the opportunity to select from among contesting candidates for every available seat in the governing body.   Alternatively, single member district representation divides the jurisdiction into separate precincts/wards each with its own seat in the legislative/governing body.

Opponents of at-large representation claim that majority interests, voting in a bloc, dilute minority votes. When minorities are concentrated in particular areas such that they comprise a majority, switching to single member district representation can afford minorities representation in the legislative body.   Properly configured, single member district representation can produce representation for minorities proportionate to their representation in the jurisdiction.  For example, if a minority group comprises 20% of the adult voting age population in a school district, it is more likely that 20% of the legislative body will be comprised of members preferred by the minority group with single member district elections than at-large elections.

Though the vast majority of empirical research demonstrates that single district representation results in greater and more proportional representation for Black and Hispanic voters (Davidson

and Grofman 1994; Davidson and Korbel 2981; Engstrom and McDonald 1981; Karnig and Welch 1982; Leal, Martinez-Ebers and Meier 2004; Marschall, Ruhil, and Shah 2010; Meier et al 2005; Molina Jr and Meier 2018; Moncrief and Thompson 1992; Polinard 1994; Robinson and England 1981; Stewart, England and Meier 1989; Trounstine and Valdini 2008; Abbot and Magazinnik 2020), several studies, have reported null findings (Bullock and MacManus 1987; Cole 1974; MacManus 1978; Welch 1990; Leal, Martinez-Ebers and Meier 2004[4]).  Two studies have reported a negative relationship between single member district elections and minority representation (Meier and Rutherford 2014; Welch and Karnig 1978).

Two factors explain the lack of unanimity in the scholarly literature on the effect of single member district representation on minority representation.  The first is the contingent nature of electoral reform on minority representation and the second is the challenge researchers face in making reliable and valid casual inferences and estimates of this effect.  Single member district elections can succeed in electing minority-preferred candidates when the minority population is sufficiently large and geographically concentrated such that it constitutes a majority in the area they occupy, as is the case in SBISD.  Most studies compare the representation of minority populations among single member and at-large systems of representation without consideration of how and why these different forms of representations were first adopted, thus omitting unobserved differences between jurisdictions with long histories of at-large representation.

Abott and Magazinnik (2020) identify two contingencies which condition the positive effect of single member district representation has on minority representation.  "[T]he voting population be segregated enough for the minority group to constitute a local majority in at least one ward, and that the political boundaries be drawn accordingly (2020:719)."  A second condition is that the district must be of sufficient size to attract candidates to run for office.

Studies by Abott and Magazinnik (2020), Marschall, Ruhil and Shah 2010) and Trounstine and Valdini (2008) all employ contingent effects of minority group size and segregation when estimating the effects of changing from at-large to single member district representation on minority representation.   These scholars all report significant gains in minority representation, albeit for different genders, races and ethnicities in city councils and school districts with single member district representation and where the same changed from at-large to single member district representation.

To date, the strongest empirical evidence supports the thesis that the likelihood of proportional representation of racial and ethnic minorities on legislative bodies is greater with single member districts than at-large elections when district size is large and minority group size is sufficiently large and segregated.  Abott and Magazinnik note "When all of these conditions are met, the positive impact of reform is striking, exceeding one additional officeholder for every three available seats (730)."  When these conditions are not met, however, moving from an at-large to single member system of representation was found to have a null or even negative effect on

---

[4] The authors qualify their null findings by noting that Hispanics "may be able to profit from at-large districting when they are a majority of the population (2004:1241)."  In non-majority Hispanic settings, Hispanic representation does not benefit from at-large districting.

minority representation, accounting for "why a large and active academic literature …has produced so many conflicting findings (731)."

The scholarly literature supports the following conclusions:

- o   Single member district representation increases the likelihood that minority candidates will contest elections for positions on legislative bodies.
- o   Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.
- o   Single member district representation will produce policies more responsive to the preference of minority voters.

## IX.   The taxing and spending policies of governments with at-large and single member district representation

A purported advantage of at-large over single member district elections is that elected single member district representatives trade off the virtues of public goods against the attractiveness of spending on particularistic goods ('pork') benefitting voters in their home or single member districts.  In at-large systems, representatives are thought to voice the preferences of the average (median) resident throughout the entire jurisdiction.  In single member systems, the representative better expresses the preferences of the average resident within a specific geography.  Assuming preferences vary by geography, at-large systems work to pull the tails of the preference distributions inward, reducing the representation of diverse preferences.  A potential consequence of this presumed effect of at-large representation is to under represent (and under value) non-majority voters' preferences.

At the federal level Mayhew's seminal work (1974) established the logic underlying higher spending and taxing in governments with single member district representation.  Mayhew and subsequently Sheplse, Weingast and Johnson (1981) argued that representatives elected from single member districts had a strong incentive to extract distributive[5] spending benefits for their constituents to enhance their re-election. A system of log rolling in which single member district representatives agreed to support each other's district specific spending priorities produced an inefficient level of spending and taxing i.e., produce more taxing and spending than might occur with an at-large system of representation.  By implication, the level of spending and taxing was assumed lower in legislative bodies with at-large representation, where the electoral benefits of distributive taxes and concentrated spending are not available.

Empirical support for a significant and positive relationship between spending and the electoral fortunes of single member district representatives has been mixed, modest and conditional.  Most research has been unsuccessful in corroborating a significant relationship between spending allocations to single member district congressional representatives (Bickers and Stein 2000).  The prevailing finding is the electoral connection is conditional on incumbent's electoral vulnerability,

---

[5] Distributive spending refers to outlays concentrated to specific rather than generalized recipients, often defined by geography and which is funded by taxes levied on all persons inside and more importantly outside the area in which the spending benefits are located.  An example of distributive spending is infrastructure projects located in specific areas of a jurisdiction and not readily accessible to persons not living in the immediate area.

a rare condition and related to grant awards, not the amount of money flowing to the district (Stein and Bickers 1994).

Research on the spending and taxing policies of subnational governments does not demonstrate significant differences between jurisdictions with at-large and single member representation (Morgan and Pelissero 1980; Lineberry and Fowler 1967; Langbein, Crewson and Brasher 1997; Farnham 1990). In a few instances, (Zax 1990; Deno and Mehay 1987) researchers have found that cities with at-large elections spend more on municipal employees than cities with single member district representation. The few studies that did find significantly higher spending in cities with single member representation (Southwick 1997; Dalenberg and Duffy-Deno 1991) used weaker cross sectional research designs with limited controls for factors that shape municipal taxing and spending policies, including state laws,[6] the range of goods and services provided[7] and most importantly citizens' preferences for spending. These studies fail to take into account that the adoption of at-large or single member district systems is related to the same factors shaping spending and taxing decisions.

The research on spending and taxing among governments with different modes of representation presumes that the higher levels of spending governments in jurisdictions with single member district representation is both inefficient and non-representative of the preferences of the full community. Though spending and taxing may be higher in single member district governments this finding does not suggest anything other than that citizens in these jurisdictions prefer higher spending. In the next section of my report I turn to this question asking whether single member or at-large modes of representation better represent the interest of citizens, both majority and minority citizens.

## X.    The representation of policy preferences among jurisdictions with different modes of representation

Tausanovitch and Warshaw's research (2014) ask whether different modes of representation provide for better representation of public preferences. Using a unique database that measured public preferences for spending and tax policies among every U.S. city and town over 20,000 in population (N=1,600) the authors estimate whether the taxing and spending policies of these communities match citizen preferences by mode of representation.[8]

Drawing upon previously discussed explanations for spending and taxing among at-large and single member district systems of representation the authors hypothesized that *cities with at-large districts are more responsive to citizens' policy preferences than cities with single-member districts*. The authors' design was sufficiently rigorous to correct many of the deficiencies in previous research that produced mixed findings about the relationship between spending and

---

[6] Many states mandate minimum spending and service content for the goods and services their municipalities provide their citizens, independently influencing spending. Tax limits imposed by states on cities and school districts further shape spending.

[7] Cities differ significantly on the number and scope of goods and services they provide their constituents (Peterson 1991). The repertoire of goods and services is itself a function of the constituent preferences, constituents' ability to pay for these goods and services as well as how these goods and service are produced (Stein 1991).

[8] The authors constructed a measure of public preferences for taxing and spending across a large number public policies e.g., public employee pensions, recycling, health care and bans on smoking in bars and restaurants.

alternative modes of representation. The authors conclude: "our findings provide no support ….
that at-large districts lead to better representation (2014: 621)."

A great number of minority school board members, in either at-large or single member districts
elections, should produce policies favored by minorities.  Multiple studies suggest greater minority
representation on school boards translates into outcomes that are more positive for minority
students (Meier, Stewart and England 1989; Reyes, Scribner and Schribner 1999; Spring 2000;
Leal and Hess 2000; Rocha and Wrinke 2011; Theobold 2007; Leal, Martinez-Ebers and Meier
2004).  Robinson (2016), however, finds that a great proportion of Hispanic board members leads
to *less* support for bilingual policies, popular among Hispanic voters.  Flink and Molina (2016)
find the level of Hispanic representation has a positive effect on bilingual education spending only
when the proportion of bilingual population in the district is relatively small.  Is the relationship
between minority representation and policies preferred by minorities stronger under single member
district or at-large elections?

Leal et al (2004) asked whether greater Latino representation on school boards with single member
rather than at-large elections nets great Latino representation among the district's teachers and
administrators.   They find that "at-large elections negatively influence Latino educational
representation, which produces a ripple effect that ultimately reduces the share of Latino teachers
(2004:1224)."

> "Latino representation on school boards is significantly associated with increases
> in the percentage of Latino administrators, and the percentage of Latinos in
> administration is the most important variable determining the presence of Latino
> teachers. As we know the Latino community wants more Latinos teaching their
> children, greater Latino school board representation is therefore more likely to lead
> to education policies congruent with community wishes (2004:1242)."

Leal et al (2004) also uncover an important condition governing the link between single member
district election, proportional minority representation on school boards and minority supported
educational policies.  "…[W]hen Latinos are a minority in the population, the population-
representation relationship is non-linear, with larger percentages getting significantly more
representation than smaller percentages (2004: 1234)."  This finding suggests the etiology pro-
minority policies under single member district elections with proportional minority representation
is conditional on the size of the minority population

McBrayer (2020) builds on Leal et al findings and suggests descriptive representation (i.e.,
minority board members) does not always lead to substantive policy representation.  Instead
McBrayer hypothesizes that this relationship is conditioned on the mode of representation i.e.,
single member versus at-large.  She specifically looks at the provision of bilingual education
services among at-large and single member district school districts in Texas school districts.
McBrayer finds that different modes of representation are better at translating minority
representation into substantive policies when demand for these policies varies.  Specifically
McBrayer finds:

- Hispanic representatives have a positive effect on bilingual funding allocation when the entire board serves single-member districts, suggesting that this specific electoral arrangement strengthens the relationship between descriptive and substantive representation.

- Hispanic representatives in at-large electoral systems allocate more bilingual funding proportion only when there are small portions of qualifying students.

- Hispanic representatives in at-large systems have a negative effect on bilingual allocation when there are large portions of qualifying students.

  "This suggests that schools with the least demand for bilingual funding are best represented by minority officials in at-large systems, yet schools with the most demand are underrepresented by minority officials. Thus, in both electoral scenarios, Hispanic representatives substantively represent campuses with low demand for bilingual programming, which is congruent with Flink and Molina's (2016) findings. Only Hispanic officials in single-member districts substantively represent campuses with high demand for bilingual programming, congruent with theoretical expectations (McBrayer 2020:1689-1690)."

The extant literature on the representation of minority policy preferences shows that descriptive representation (i.e., proportional minority representation on school boards) is a necessary but not sufficient condition for fulfilling the policy preferences of minority constituents.  This policy connection for minority interests is significantly enhanced with single member district elections rather than at-large elections.

A single-member plan for SBISD would likely strongly improve bilingual and other educational outcomes critical for Hispanic students. In addition, a single-member districting plan for SBISD will increase the responsiveness of school board trustees to minority and low-income students, minority voters and minority educators.

I state under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2022.

*robert stein*
_____
Robert M. Stein

## Bibliography

Abbot, Carolyn and Asya Magazinnik. 2021. "At-Large Elections and Minority Representation in Local Government," *American Journal of Political Science*. 64:717-773. Xx:219-233

Ananat, E.O. 2011. "The wrong side(s) of the tracks: The causal effects of racial segregation on urban poverty," *American Economic Journal: Applied Econometrics*. 3:34-66.

Barrreto, Matthew, Michael Cohen, Loren Collingwood, Chard W. Dunn and Sonni Waknin. 2022. "A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding." *New York University Review of Law and Social Change*. 46: 1-28.

Brockington, D., Donovan, T., Bowler, S., & Brischetto, R. (1998). Minority Representation under Cumulative and Limited Voting. *The Journal of Politics*, *60*(4), 1108–1125. https://doi.org/10.2307/2647733

Bullock, Charles S., and Susan A. MacManus. 1990. "Structural Features of Municipalities and the Incidence of Hispanic Councilmembers." *Social Science Quarterly* 71(4):665-81.

Cole, Leonard A. 1974. "Electing Blacks to Municipal Office: Structural and Social Determinants." *Urban Affairs Review* JO(l): 17-39.

Collingwood, L., & Long, S. (2021). Can States Promote Minority Representation? Assessing the Effects of the California Voting Rights Act. *Urban Affairs* Review. 57(3), 731–762. https://doi.org/10.1177/1078087419896854

Collins, William J., and Robert A. Margo. 2000. "Residential Segregation and Socioeconomic Outcomes: When Did Ghettos Go Bad?" *Economics Letters* 69(2): 239-43.

Cutler, David M., and Edward L. Glaeser. 1997. "Are Ghettos Good or Bad?" *Quarterly Journal of Economics* 23:827-72.

Cutler, David M., Edward L. Glaeser and Jacob L. Vigdor. 1999. "The Rise and Decline of the American Ghetto." *Journal of Political Economy* 107(3): 455-506

Dalenberg, D. and K. Duffy-Deno, "At-Large versus Ward Elections: Implications for Public Infrastructure," *Public Choice*, 70(3), June 1991, 335-342

Davidson, Chandler, and Bernard Grofman, eds. 1994. *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990*. Princeton, NJ: Princeton University Press.

Davidson, C., & Korbel, G. (1981). At-Large Elections and Minority-Group Representation: A Re-Examination of Historical and Contemporary Evidence. *The Journal of Politics*, *43*(4), 982–1005. https://doi.org/10.2307/2130184

Engstrom, Richard L., and Michael D. McDonald. 1981. "The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship." *American Political Science Review* 75(2): 344-54.

Fiva, Joh H. and Askill H. Halse. 2016. "Local Favoritism in at-large proportional representation systems." *Journal of Public Economics* 143:15-26.

16

Flink, Carla M. and Angel Luis Molina. 2016. "Politics or Professionalism? Budgeting for Bilingual Education," *Urban Affairs Review* 53:1064-1087.

Hicks, W. D., Klarner, C. E., McKee, S. C., & Smith, D. A. (2018). Revisiting Majority-Minority Districts and Black Representation. *Political Research Quarterly*, *71*(2), 408–423. https://doi.org/10.1177/1065912917738574

Karnig, Albert K., and Susan Welch. 1982. "Electoral Structure and Black Representation on City Councils." *Social Science Quarterly* 63*:*99-114.

Langbein, Laura I., Philip Crewson and Charles Niel Brasher. 1996. "Rethinking ward and at-large elections in cities. Total spending, the number of locations of selected city services and policy types." *Public Choice* 88:275-293.

Leal, David, and Frederick M. Hess. 2000. "The Politics of Bilingual Education Expenditures in Urban School Districts." *Social Science Quarterly* 8:1064–72.

Leal, David, Valerie Martinez-Ebers, and Kenneth J. Meier. 2004. "The Politics of Latino Education: The Biases of At-large Elections." *Journal of Politics* 66:1224–44.

Leal, D. L., Martinez-Ebers, V., & Meier, K. J. (2004). The Politics of Latino Education: The Biases of At-Large Elections. *The Journal of Politics*, *66*(4), 1224–1244. https://doi.org/10.1111/j.0022-3816.2004.00297.x

Lineberry, Robert and Edmund P. Fowler 1967. "Reformism and Public Policies in American Cities." *American Political Science Review* 61:701-716.

MacManus, Susan A. 1978. "City Council Election Procedures and Minority Representation: Are They Related?" *Social Science Quarterly* 59: 153–61.

Marschall, M. J., Ruhil, A. V. S., & Shah, P. R. (2010). The New Racial Calculus: Electoral Institutions and Black Representation in Local Legislatures. *American Journal of Political Science*, 54*:*107–124. https://doi.org/10.1111/j.1540-5907.2009.00421.x

Massey, Douglas S., and Nancy A. Denton. 1993. *American Apartheid: Segregation and the Making of the Underclass.* Cambridge, MA: Harvard University Press.

Mayhew, David. 1974. *The Electoral Connection.* New Haven: Yale University Press

McBrayer, M. (2020). Translating Descriptive Representation into Substantive Representation: The Role of Electoral Institutions in Urban School Districts in Texas. *Urban Affairs Review* 56: 1687–1714. https://doi.org/10.1177/1078087419844028

Meier, Kenneth J. 1993. "Latinos and Representative Bureaucracy: Testing the Thompson and Henderson Hypotheses." *Journal of Public Administration Research and Theory* 3: 393–414.

Meier, Kenneth J., Eric Gonzalez Juenke, Robert D. Wrinkle, and J. L. Polinard. 2005. "Structural Choices and Representational Biases: The Post-election Color of Representation." *American Journal of Political Science* 49: 758–68.

Meier, Kenneth J., Robert D. Wrinkle, and Jerry L. Polinard. 1999. "Representative Bureaucracy and Distributional Equity: Addressing the Hard Question." *Journal of Politics* 61: 1025–39.

Meier, Kenneth J., Joseph Stewart and Robert E. England. l991. "The Politics of Bureaucratic Discretion: Educational Access as an Urban Service." *American Journal of Political Science* 35: 155-77.

Meier, Kenneth J. and A. Rutherford. 2014. Partisanship, Structure, and Representation: The Puzzle of African American Education Politics. *The American Political Science Review*, 108: 265–280. https://doi.org/10.1017/S0003055414000148

Molina, A. L., & Meier, K. J. (2018). "Demographic dreams, institutional realities: election design and Latino representation in American education." *Politics, Groups & Identities*, 6: 77–94. https://doi.org/10.1080/21565503.2016.1182931

Moncrief, Gary F. and Thompson, Joel A. 1992. "Electoral Structure and State Legislative Representation: A Research Note". *Journal of Politics,* 54: 246-254.

Morgan, David R. and John P. Pelissero, "Urban Policy: Does Political Structure Matter?" *The American Political Science Review* 74: 999-1006.

Polinard, Jerry L., ed. 1994. *Electoral Structure and Urban Policy: The Impact on Mexican American Communities: Bureaucracies, Public Administration and Public Policy*. Armonk, NY: M.E. Sharpe.

Reyes, Pedro, Jay D. Scribner and Alicia Paredes Schribner eds. 1999. *Lessons from High-Performing Hispanic Schools*. New York: Teachers College Press.

Robinson, Ted, and Robert E. England. 1981. "Black Repre- sentation on Central City School Boards Revisited." *Social Science Quarterly* 62(3): 495-502.

Rocha, Rene R., and Robert D. Wrinkle. 2011. "Gender, Ethnicity, and Support for Bilingual Education: Will Just Any Woman or Latino Do? A Contingent 'No.'" *Policy Studies Journal* 39: 309–28.

Smith, John, S., , H., & Zack, E. (2018). The alternative vote: Do changes in single-member voting systems affect descriptive representation of women and minorities? *Electoral Studies*, *54*, 90–102. https://doi.org/10.1016/j.electstud.2018.05.009

Spicer, Z., McGregor, M., & Alcantara, C. (2017). Political opportunity structures and the representation of women and visible minorities in municipal elections. *Electoral Studies*, *48*, 10–18. https://doi.org/10.1016/j.electstud.2017.01.002

Spring, Joe.  2000. *American Education,* 9th Ed. Boston: McGraw-Hill.

Tausanovitch, Chris and Christopher Warshaw. 2014. "Representation in Municipal Government." *American Political Science Review* 108:605-641

Theobald, Nick A. 2007. "¡Mue'streme el Dinero! Assessing the Linkage Between Latino School Superintendents and English-Language Learner Program Resources." *In Latino Politics*:

*Identity, Mobilization, and Representation*, edited by Rodolfo Espino, David L. Leal, and Kenneth J. Meier, 249–64. Charlottesville: Univ. of Virginia Press

Trebbi, F., Aghion, P., & Alesina, A. (2008). Electoral Rules and Minority Representation in U.S. Cities. *The Quarterly Journal of Economics*, 123*:* 325–357. https://doi.org/10.1162/qjec.2008.123.1.325

Trounstine, J., & Valdini, M. E. (2008). The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity. *American Journal of Political Science*, 52*:* 554–569. https://doi.org/10.1111/j.1540-5907.2008.00329.x

Southwick, Lawrence, Jr. 1997. "Local government spending and at-large versus district representation: Do wards results in more "Pork"?" *Economics and Politics*. 9:173-203

Stewart, Joseph, Jr., Robert E. England, and Kenneth J. Meier. 1989. "Black Representation in Urban School Districts: From School Board to Office to Classroom." *Western Political Quarterly* 42 (2): 287–305.

Welch, S. (1990). The Impact of At-Large Elections on the Representation of Blacks and Hispanics. *The Journal of Politics*, *52*(4), 1050–1076. https://doi.org/10.2307/2131682

Welch, Susan, and Albert Karnig. 1979. "The Impact of Black Elected Officials on Urban Social Expenditures." *Policy Studies Journal* Summer: 707-14.

CURRICULUM VITAE
January, 2021

ROBERT M. STEIN
Lena Gohlman Fox Professor of Political Science
Rice University
Houston, Texas 77251
713-348-2795
Email: Stein@rice.edu

Place of birth: New York, NY

Married, two children

**Education**

B.A., Ohio Wesleyan University, Delaware, Ohio, 1972.

M.A., University of Wisconsin-Milwaukee, Milwaukee, WI, 1974

Ph.D., University of Wisconsin-Milwaukee, Milwaukee, WI, 1977

**Fields of Specialization**

Elections and election administration, Federalism and intergovernmental relations, state and local government, urban politics and public policy.

**Teaching Positions**

Lena Gohlman Fox Professor of Political Science, 1996

Fellow, James A. Baker III Institute for Public Policy, 2006

Professor, Department of Political Science, Rice University, 1989-1996

Visiting Associate Professor and research scientist, Workshop in Political Theory-Public Policy and Department of Political Science, Indiana University, 1987-1988

Associate Professor, Department of Political Science, Rice University, 1983-1989

Assistant Professor, Department of Political Science, Rice University, 1979-1983

Assistant Professor, University of Georgia, 1977-1978

**Administrative positions**

Faculty Director, Center for Civic Engagement, Rice University 2007-2021

Dean, School of Social Sciences, Rice University, 1996- 2006

Interim Dean, School of Social Sciences, Rice University, 1995-1996

Chair, Department of Political Science, Rice University, 1994-1995

Director, Policy Studies Program (undergraduate major), Rice University, 1987-1995

Director, Graduate Studies, Department of Political Science, Rice University, 1987
Chair, Department of Political Science, Rice University, 1984-1986

Director, Rice Institute of Policy Analysis Public Opinion Poll, 1983-present

Political analyst, KHOU-TV, Houston, TX, 1983-present

**Fellowships, awards, and offices**

Outstanding reviewer award, *Political Research Quarterly,* 2010.

Best paper award on Federalism and Intergovernmental Relations for "Inter-Local Cooperation and the Distribution of Federal Grants," by the section on Federalism and Intergovernmental Relations, American Political Science Association, 2004 (with Kenneth Bickers).

President, Urban Politics Subsection, American Political Science Association, 1999-2000.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1998.

President, Southwestern Political Science Association, 1998.

Recipient, Outstanding Mentor of Women in Political Science Award, Women's Caucus for Political Science, American Political Science Association, 1996.

Special book award from the Urban Politics and Policy Section of the American Political Science Association for *Urban Alternatives: Private and Public Markets in the Provision of Local Services*, 1991.

Research fellowship, Indiana University, Workshop in Political Theory and Public Policy, 1987-1988.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1987.

Fellowship, U.S. Advisory Commission on Intergovernmental Relations, 1978-1979.

**Research Grants and Contracts**

Measuring and improving the impact of using stadiums and arenas for voting. Funded by New Venture Fund. 8/1/2021-2/28/2022. Co-PI, $125,350.

The integrity of mail-in voting in the 2020 Election.  Funded by the National Science Foundation (2105671), 12/1/2020-11/30/2020. PI, $120,283.

Optimizing vote-by-mail implementations on consumer grade equipment. Funded by the National Science Foundation (2033923), 7/1/2020-6/30/2021. Co-PI, $200,000.

Making voting safe for voters and poll workers: Meeting the challenge of the COVID-19 Virus. Funded by Rice University, COVID-19 Initiative, 5/1/2020-12/31/2020. PI, $45,300.

Election Day Vote Centers in Harris County, Texas. Funded by the Arnold Foundation, May 2019-December 2020, $100,000.

Hurricane Harvey: Longitudinal Survey. Funded by the National Science Foundation, January 2018 – December 2021 (SBER1760292). Co-PI, $200,000.

Urban Flooding: Identifying where it floods and evaluating remedies.  May 2018-September 2019.  Funded by the Kinder Institute, Ken Kennedy Institute and Office of Research, Rice University. Co-PI, $74,450.

2016 City of Houston Citizen Survey, September 2016-January 2017. Funded by the City of Houston, $23,500.

Vote by mail, September 2014-September 2015. Funded by The Pew Charitable Trusts, $48,000.

Saturday Run-off Election Exit Poll Survey, City of Houston, October-November, 2013. $4,000.

Prioritizing and selecting bridge management actions for heightened truck loads and natural hazards in light of funding allocation patterns. Funded by the National Science Foundation, September 2012-August, 2015. Co-PI, $1.2 million.

Phase 2, Development and enhancement of online storm risk calculator tool for public usage, City of Houston, Office of Public Safety and Homeland Security, November, 2012-June 2013. Co-PI, $189,000.

NetSE: Large Urban-Scale Polymorphic Wireless Networks: Community-Driven Assessment, Design and Access. Funded by the National Science Foundation, September 2010-2013. Co-PI, $1.9 million.

Development and enhancement of online storm risk calculator tool for public usage, City of Houston, Office of Public Safety and Homeland Security, January, 2011-June 2011. Co-PI, $309,000.

Increasing turnout among the less engaged: A study of Election Day vote centers. Funded by The Pew Charitable Trusts, September, 2007-May, 2009. PI, $260,000.

Independent Response of Complex Urban Infrastructures Subjected to Multiple Hazards, National Science Foundation, October 2007–October 2010. Co-PI, $20,000.

Program evaluation, City of Houston, SAFEclear, traffic incident management program, July 2006-January 2008. PI, $20,000.

Program evaluation, City of Houston, SAFEclear, traffic incident management program, February 2005-December 2005. PI, $20,000.

Program Utilization Among Households Eligible for Head Start Enrollment, funded by the Harris County Department of Education, June, 2001. PI, $15,000.

The Changing Structure of Federal Aid and the Politics of the Electoral Connection.  Funded by the National Science Foundation, 2001-2002 (SES0095997). January 2001-January 2003. PI, $230,000.

Greater Harris County 9-1-1 Emergency Network Data Archive and Analysis, January 2000-January 2001. PI, $15,000.

Evaluation of Greater Harris County Emergency Network: Round II. Funded by the Greater Harris County Emergency Network, September, 1993-January, 1994. PI, $5,000.

Evaluation of Greater Harris County 9-1-1 Emergency Network. Funded by the Greater Harris County Emergency Network, January 1992-July 1993. PI, $5,000.

Selective Universalization of Domestic Public Policy. Funded by the National Science Foundation (SES8921109) 1990-1992. PI, $185,000.

Contracting for Municipal Services. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1986-1990. PI.

The Fiscal Austerity and Urban Innovation Project.  Funded by the U.S. Department of Housing and Urban Development. 1983-1985. PI.

Research Associate, Field Network Evaluation Study of the Reagan Domestic Program.  Princeton Urban and Regional Center, Princeton University. Funded by the Ford Foundation. 1982-1984. PI.

Research Associate, Field Network Evaluation Study of the Community Development Block Grant: Round 8. Funded by the U.S. Department of Housing and Urban Development. Summer 1982. PI.

The Structural Character of Federal Grants-in-Aid. Funded by the U.S. Department of Housing and Urban Development. 1982-83. PI.

The Allocation of Federal Grants-in-Aid. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1979-1981. PI.

The Allocation of State-Local Aid: An Examination of Within State Variation. Funded by the U.S. Advisory Commission on Intergovernmental Relations. 1979-1981. PI.

**Editorial Positions**

Editorial board member, *Journal of Election Technology and Systems*, 2013-2016

Editorial board member, *American Political Science Review*, 2001- 2007

Executive Committee, American Politics, *American Political Science Review*, 2004-2007

Editorial board member, *American Journal of Political Science*, 1994-1998

Editorial board member, *Journal of Politics*, 1994-1998

Editorial board member, *Social Science Quarterly*, 1993-present

Editorial board member, *State and Local Government Review*, 1987-1992

Editorial board member, *Urban Affairs Review* (formerly *Urban Affairs Quarterly*), 1996- 2000

Referee, *American Political Science Review, American Politics Quarterly,  Journal of Urban Affairs, Urban Affairs Quarterly, Publius,* National Science Foundation

**Books**

*Perpetuating the Pork Barrel: Policy Subsystems and American Democracy*, Cambridge University Press, 1995, with Kenneth N. Bickers.

*Federal Domestic Outlays, 1983-1990*. 1991. M.E. Sharp, with Kenneth N. Bickers

*Urban Alternatives: Public and Private Markets in the Provision of Local Services*. 1990  Pittsburgh Press.

## <u>Articles</u>

"Recruiting Persons to Work the Polls," 2021. *Election Law Journal*, 30:315-326. With Colin Jones. https://www.liebertpub.com/doi/10.1089/elj.2020.0701.

"How to Measure and Assess the Turnout Effects of Election Reforms." 2020. *Journal of Political Institutions and Policy Economy,* 1:1-28.  With Andrew Menger. http://dx.doi.org/10.1561/113.00000009

"How Human Factors Can Help Preserve Democracy in the Age of Pandemics." 2020. *Human Factors*, 62(4):1077-1086. With Philip Kortum, Claudia Zeigler Aceyman, Elizabeth Vann and Dan Wallach. http://DOI: 10. 1177/ 0018 7208 20946896

"Choosing the less convenient way to vote: An anomaly in vote by mail elections." 2020. *Political Research Quarterly*, 73:196-207. With Andrew Menger. https://journals.sagepub.com/doi/full/10.1177/10659129198900009

"Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study." 2019. *Political Research Quarterly*, 73:439-453. With Charles Stewart, Christopher Mann and others. https://journals.sagepub.com/doi/full/10.1177/1065912919832374

"This Way Out." 2018. *Scientific American*, October 18, pp. 76-79. With Leonardo Dueñas-Osorio and Devika Subramanian.

"Pedagogical Value of Polling-Place Observation by Students." 2018 *PS: Political Science & Politics*. 51:831-837. With Christopher B. Mann, , Gayle A. Alberda, Nathaniel A. Birkhead, Yu Ouyang, Chloe Singer, Charles Stewart, Michael C. Herron, et al. https://doi.org/10.1017/S1049096518000550.

"Reducing the undervote with vote by mail." 2018. *American Politics Research,* 46(6):1039-1064. With Andrew Menger and Greg Vonnahme. https://doi.org/10.1177/1532673X17737059

"Enlisting the public in facilitating election administration: A field experiment." 2018. *Public Administration Review*, 78(6):892-903. With Andrew Menger. https://doi.org/10.1111/puar.12833

 "Survey Experiments with Google Consumer Surveys: Promise and Pitfalls for Academic Research in Social Science." 2016. *Political Analysis,* 24(3):256-373. With Philip Santaso and Randolph Stevenson. https://doi.org/10.1093/pan/mpw016

"Election Administration During National Disasters and Emergencies: Hurricane Sandy and the 2012 Election." 2016. *Election Law Journal*, 14:1-8. http://doi.org/10.1089/elj.2014.0271

"The social and private benefits of preparing for natural disasters." 2014. *International Journal of Mass Emergencies and Disasters,* 32:459-483. With Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, and Devika Subramanian. http://www.ijmed.org/articles/664/download/

"Building and validating geographically refined hurricane wind risk models for residential structures." 2014. *Natural Hazards Review*, 15(3):1-10. With Devika Subramanian, Leonardo Dueñas-Osorio, and Josue Salazar. https://doi.org/10.1061/(ASCE)NH.1527-6996.0000130

"How risk perceptions influence evacuations from hurricanes and compliance with government directives." 2013. *Policy Studies Journal*. 41(2):319-341. With Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian, and David Kahle.  https://doi.org/10.1111/psj.12019

"Early voting and campaign news coverage." 2013. *Political Communication*, 30:278-396. With Johanna Dunaway. https://doi.org/10.1080/10584609.2012.737420

"The effect of election day vote centers on voter participation." 2012. *Election Law Journal,* 11(4):291-301. With Greg Vonnahme.

"Where, when and how we vote: Does it matter?" 2012. *Social Science Quarterly,* 93(3):693-712. With Greg Vonnahme.

"Prospectus for the Future Administration of Elections." 2012. *Baker Center Journal of Applied Public Policy,* 4(1):45-57.

"Engineering-based hurricane risk estimates and comparison to perceived risks in storm-prone areas."  2012. *Natural Hazards Review,* 13(1):1-12. With Leonardo Dueñas-Osorio, Devika Subramanian and Birnur Buzcu-Guven.

"Voting at non-precinct polling places: A review and research agenda." 2011. *Election Law Journal,* 10:307-11.  With Greg Vonnahme.

"Interface network models for complex urban infrastructure systems." 2011. *Journal of Infrastructure Systems*, 17(4): 138-150. With James Winkler, Leonardo Dueñas-Osorio, Robert Stein, and Devika Subramanian.

"Performance assessment of topological diverse power systems subjected to hurricane events." 2010. *Reliability Engineering and System Safety*, 95:323-336. With James Winkler, Leonardo Dueñas-Osorio and Devika Subramanian.

"Who evacuates when hurricanes approach? The role of risk, information and location." 2010. *Social Science Quarterly,* 91:816-834. With Leonardo Dueñas-Osorio and Devika Subramanian.

"Crunching collisions." 2009. *Roads and Bridges*, 13:2. With Robert Dahnke, Ben Stevenson, and Tim Lomax.

"Voting technology, election administration and voter performance" 2008. *Election Law Journal,* 7:123-135. With Greg Vonnahme, Michael Byrne and Daniel Wallach.

"Engaging the unengaged voter: Voter centers and voter turnout." 2008. *Journal of Politics,* 70:487-497. With Greg Vonnahme.

"Assessing the Micro-Foundations of the Tiebout Model." *Urban Affairs Review*, 42:57-80. With Kenneth Bickers and Lapo Salucci.

"Who is Held Responsible When Disaster Strikes? The Attribution of Responsibility for a Natural Disaster in an Urban Election." 2006. *Journal of Urban Affairs*, 28:43-54. With Kevin Arceneaux.

"Voting for Minority Candidates in Multi-Racial/Ethnic Communities." 2005. *Urban Affairs Review*, 41:157-181. With Stacy Ulbig and Stephanie Post.

"Inter-Local Cooperation and the Distribution of Federal Grant Awards." 2004. *Journal of Politics*, 66:800-22. With Kenneth Bickers.

"Language Choice, Residential Stability, and Voting among Latino-Americans." 2003. *Social Science Quarterly*, 84:412-24. With Martin Johnson and Robert Wrinkle.

"Public Support for Term Limits: Another Look at Conventional Thinking." 2002. *Legislative Studies Quarterly*, 27:459-480. With Martin Johnson and Stephanie Shirley Post.

"Contextual Data and the Study of Elections and Voting Behavior: Connecting Individuals to Environments." 2002. *Electoral Studies,* 21:63-77. With Martin Johnson, W. Phillips Shively.  Also appearing in *The Future of Electoral Studies.* Mark N. Franklin and Christopher Wlezien, eds. Oxford: Elsevier Press (2003).

"The Congressional Pork Barrel in a Republican Era." 2000. *Journal of Politics*, 62:1070-1086. With Kenneth Bickers.

"State Economies, Regional Governance, and Urban-Suburban Economic Dependence." 2000. *Urban Affairs Review*, 36:46-60. With Stephanie Shirley Post.

"Reconciling Context and Contact Effects on Racial Attitudes." 2000. *Political Research Quarterly*, 53:285-303. With Stephanie Shirley Post and Allison Rinden.

"The Micro Foundations of the Tiebout Model." 1998. *Urban Affairs Review,* 34:76-93. With Kenneth Bickers.

"Early Voting." 1998. *Public Opinion Quarterly*, 62:57-70.

"Voting Early, But Not Often." 1997. *Social Science Quarterly,* 78:657-677. With Patricia Garcia-Monet.

"Building Majority Coalitions for Sub-Majority Benefit Distributions." 1997. *Public Choice*, 91:229-249. With Kenneth Bickers.

"The Electoral Dynamics of the Federal Pork Barrel." 1996. *American Journal of Political Science*, 40:1300-1326. With Kenneth Bickers.

"Privatization and the Arrangement of City Services." 1996. *Estudios De Economia*, 23:323.

"A Portfolio Theory of Policy Subsystems." 1994. *Administration and Society*, 26:158-184. With Kenneth Bickers.

"Congressional Elections and the Pork Barrel." 1994. *Journal of Politics*, 56:377-399.

"Explaining State Aid Allocations: Targeting Within Universalism." 1994. *Social Science Quarterly*, 75:524-540. With Keith E. Hamm.

"Universalism and the Electoral Connection:  A Test and Some Doubts." 1994. *Political Research Quarterly*, 47:295-318. With Kenneth N. Bickers.

"Response to Weingast's 'Reflections on Distributive Politics and Universalism.'" *Political Research Quarterly*, 47:329-334. With Kenneth N. Bickers.

 "Arranging City Services." 1993. *Journal of Public Administration: Research and Theory,* 3:66-93.

 "Alternative Means of Delivering Municipal Services: 1982-1988." 1993.  *Intergovernmental Perspective,* 19:27-30.

 "A Federalist Explanation of Municipal Elections." *The Midsouth Political Science Journal*, 13:211-229. With Cheryl Young.

"The Budgetary Effects of Municipal Service Contracting: A Principal-Agent Explanation." 1990. *American Journal of Political Science*, 34:471-502.

"Economic Voting for Governor and U.S. Senator:  The Electoral Consequences of Federalism." 1990. *Journal of Politics*, 52:29-54.

"Market Maximization of Individual Preferences and Metropolitan Municipal Service Responsibility." *Urban Affairs Quarterly*, 24:86-116.

"A Comparative Analysis of the Targeting Capacity of State and Federal Intergovernmental Aid Allocations: 1977-1982." *Social Science Quarterly*, 68:447-466.  With Keith Hamm.

"Tiebout's Sorting Hypothesis." 1987. *Urban Affairs Quarterly,* 22:199-225.

"Federal Aid and The Mobilization of Black Political Influence." 1986. *Research in Urban Policy,* 2:97-117. With Keith Hamm.

"The Fiscal Impact of U.S. Military Assistance Programs, 1967-1976." 1985.  *The Western Political Quarterly,* 38:27-43. With R. Stoll and M. Ishimatsu.

"Municipal Public Employment:  An Examination of Intergovernmental Influences." 1984. *American Journal of Political Science,* 28:636-653.

"State Regulation and the Political Consequences of Municipal Fiscal Stress." 1984. *Publius*, 14:41-54.

"Implementation of Federal Policy: An Extension of the 'Differentiated Theory of Federalism.'" 1984. *Research in Urban Policy*, 3:341-348.

"The Structural Character of Federal Aid: An Examination of Fiscal Impact." 1984. *Research in Urban Economics,* 4:167-186.

"Trends and Prospects in State and Local Finance." 1983. *Journal of Urban Economics,* 14:224-241. With P. Mieszkowski.

"An Analysis of  Support for Tax Limitation Referenda." 1983. *Public Choice,* 40:187-194. With K. Hamm and P. Freeman.

"The Political Economy of Municipal Functional Responsibility." 1982. *Social Science Quarterly*, 63:530-549.

"The Effects of Reagan Domestic Budget Cuts: The Case of Houston." 1982. *Texas Business Review*, 13:11-18.  With S.A. MacManus.

"The Targeting of State Aid: A Comparison of Grant Delivery Mechanisms." 1981. *Urban Interest*, 2:47-59.

"The Allocation of Federal Aid Monies: The Synthesis of Demand-Side and Supply-Side Explanations." 1981. *American Political Science Review*, 75:334-343.

"Functional Integration at the Substate Level:  A Policy Perspective." 1980. *Urban Affairs Quarterly,* 16:211-233.

"Federally Mandated Substate Regional Government: The Maintenance of Governmental Structures.*"* 1980. *Urban Interest,* 1:74-82.

"Federal Categorical Aid:  Equalization and the Application Process." 1979. *Western Political Quarterly*, 32: 396-408.

"The Electability of Women Candidates: The Effects of Sex Role Stereotyping." 1979. *Journal of Politics*, 41:513-524. With R. Hedlund, K. Hamm, and P. Freeman.

"Regional Planning Assistance:  Its Distribution to Local Governments and its Relationship to Local Grant Getting." 1977. *The Journal of the American Institute of Planners*, 43:871-891. With B. Hawkins.

**Chapters in edited volumes**

"Polling Place Quality," in *The Future of Election Administration,* Kathleen Hale and Bridgett A. King, eds., Palgrave.  2019: 83-100.

"Help America Vote Act of 2002" in *Voting and Political Representation in America: Issues and Trends,* Mark P. Jones, ed. Forthcoming, 2019. Santa Barbara, CA: ABC-CLIO

"Convenience modes of voting" in *Voting and Political Representation in America: Issues and Trends,* Edited by Mark P. Jones. Forthcoming, 2019. Santa Barbara, CA: ABC-CLIO

"Polling Place Practices," in *Electoral Performance,* Charles Stewart, III, and Barry Burden, eds. Cambridge University Press, 2014:166-187. With Greg Vonnahme.

"Early, Absentee, and Mail-in Voting," in *Handbook of American Elections and Political Behavior*, Jan Leighley, ed., Oxford University Press. 2010:182-199. With Greg Vonnahme.

"The Political Market for Intergovernmental Cooperation," in *Self-Organizing Federalism: Collaborative Mechanisms to Mitigate Institutional Collective Action Dilemma,* Richard C. Feiock and John T. Scholz, eds. Cambridge University Press.  2010:161-178. With Kenneth N. Bickers and Stephanie Post.

"Local Services, Provision and Production," in *Encyclopedia of Public Administration and Public Policy*. Marcel Dekker, New York. 2003:734-748.

"The Politics of Revenue and Spending Policies," in *Cities, Politics, and Policy*. John Pelissero, ed., Washington, D.C., CQ Press. 2002:217-236.

 "Implications for Citizen Participation," in *Choosing a President The Electoral College and Beyond,* Paul Schumacher and Burdette Loomis eds. New York, Catham House. 2002:125-142. With Paul Johnson, Daron Shaw and Robert Weissberg.

"Devolution and the Challenge for Local Governance," in *Change and Continuity in American State and Local Politics,* Ronald E. Weber and Paul Brace, eds. New York, Catham House. 2000:21-33.

"Contracting for Municipal Services," in *Privatization of the Justice System,* P. Seidenstat, S. Hakim and G. Bowman, eds. McFarland and Co. Publishers. 1992:82-107. With Delores Martin.

"Urban Public Policy Under Fiscal Stress:  A Comparison of Spending and Employment Decisions," in *Cities Under Fiscal Stress*, Mark Gottdiner, ed. Sage. 1986:111-144. With M. Neiman and E. Sinclair.

"The Texas Response to Reagan's New Federalism Programs:  The Early Years," in *Managing the New Federalism*, L. Bender and J. Stever, eds. Denver: Westview Press, 1986:124-159. With S.A. MacManus.

"Implementation of federal policy: An extension of the 'differentiated theory of federalism,'" in *Research in Urban Policy,* Terry Nichols Clark, ed. Chicago: JAI Press. 1985:341-348.

"Policy Implementation in the Federal Aid System:  The Case of Grant Policy,"  in *Public Policy Implementation,* G. Edwards, ed. , JAI Press. 1984:125-155.

"The Allocation of State Aid to Local Governments:  An Examination of Interstate Variations," pp. 202-225. in *The Federal Influence on State and Local Roles in the Federal System*, U.S. Advisory Commission on Intergovernmental Relations, U.S. Government Printing Office. 1982:202-225

"The Impact of Federal Grant Programs on Municipal Functions: An Empirical Analysis," in *The Federal Influence on State and Local Roles in the Federal System*, U.S. Advisory Commission on Intergovernmental Relations. U.S. Government Printing Office. 1981:65-122.

"The Impact of Socio-Economic Environment on Revenue Policies," in *The Politics of Raising State and Local Revenues*, R. Bingham, B. Hawkins, and F. Hebert, eds. Praeger, 1978:133-172. With R. Bingham, B. Hawkins, and R. Robertson.

"Grant Seeking and the Allocation of Federal Grant-in-Aid Monies:  The Case of Southeastern Wisconsin," in *Milwaukee's Economy:  Federal Programs, Local Resources and Community Action*, John P. Blair and Ronald S. Edari, eds. Federal Reserve Bank of Chicago. 1978:199-219,

"Substate Regionalism:  Another View From the States," in *Substate Regionalism in the United States: Perspectives and Issues,* Charles Tyer, ed. University of South Carolina Press. 1978:69-102.

**Recent papers, completed manuscripts, conference papers and invited presentations**

"Choosing the less convenient way to vote: An anomaly in vote by mail elections," presented at Election Science Meeting, University of Pennsylvania, Philadelphia, PA. June 2019.

"Compositional effects of vote by mail elections," presented at VBMcon: A conference to discuss vote by mail election reform, Washington, D.C. June 20, 2019.

"Vote fraud and errant voting," invited presentation at the Department of Political Science, University of Nebraska, Lincoln, NE. April 25, 2013.

"Polling place practices," prepared for presentation at the Measure of Elections Conference, Massachusetts Institute of Technology, Boston, MA. June 18-19, 2012.

"Where, when and how we vote: Does it matter?" Presented at the Scottish National Election Commission, Strathclyde University, Glasgow, Scotland. November 12-15, 2010.

"The future of elections," presented at the Future of Governance Conference, Howard Baker Institute of Government, University of Tennessee, Knoxville, TN. October 14-15, 2010.

"Cost of elections," presented at the 2010 Meeting of the Midwest Political Science Association, Chicago, IL April 3-5, 2000. With Greg Vonnahme.

"Early voting and campaign news coverage," presented at the 2010 Meeting of the American Political Science Association, Washington, D.C. September 1-3, 2010.

"The cost of elections," prepared for The Pew Charitable Trusts. 2009. With Greg Vonnahme.

"The effects of early voting on congressional campaign expenditures." Presented at the 2009 Meeting of the Midwest Political Science Association, Chicago, IL. April 13-15, 2009. With Marvin McNeese.

"The effects of Election Day vote centers on voter experiences," presented at the 2008 Meeting of the Midwest Political Science Association, Chicago, IL. April 3-5, 2008. With Greg Vonnahme.

**Professional Associations**

President, Urban Subsection, American Political Science Association, 1999-2000
President, Southwest Political Science Association, 1997-1998
Chair, Nominations Committee, Southern Political Science Association, 1995

Nomination committee, Southern Political Science Association, 1993-1994
Executive Council, Southwest Political Science Association, 1992-1994
Chair, Nominations Committee, Southwest Political Science Association, 1993-1994
Section Head, State and Local Government, Southern Political Science Association Meetings, 1993
Section Head, State and Intergovernmental Relations, Midwest Political Science Association, 1992
Executive Board, Urban Politics Section, American Political Science Association, 1990-1992
Executive Board, Southwestern Political Science Association, 1985-1991, 1993-1994
Program Chair, Southwestern Political Science Association Annual Meetings, 1983
Section Head, Intergovernmental Relations, Southern Political Science Association Meetings, 1983

**Ph.D. Thesis advisees**

Albert Ellis, Ph.D. 1989. Associate Professor, University of Texas, Corpus Christi (deceased)
Stephanie Post, Ph.D. 1998. Director, Center for Civic Engagement, Rice University
Martin Johnson, Ph.D. 2002. Professor and Dean, Louisiana State University (deceased)
Gavin Dillingham, Ph.D. 2004. Research Scientist, Houston Advanced Research Center
Johanna Dunaway, Ph.D. 2006. Associate Professor, Texas A&M University
Gregory Vonnahme, Ph.D. 2009. Assistant Professor, University of Missouri-Kansas City
Marvin McNeese, Ph.D. 2015, Christian Bible University, Houston, TX
Andrew Menger, Ph.D. 2017. Vanderbilt University, Nashville, TN
Matthew Lamb, Ph.D. 2020. Austin Community College, Austin, TX

## Teaching

Urban Politics (undergraduate)
Public Policy (graduate and undergraduate)
Bureaucracy and Public Policy
Policy Implementation
Federalism
Political Behavior

## Recent expert testimony

Expert Report in *The League of Women Voters of Arkansas and Arkansas United et al v John Thurston in his official capacity as the Secretary of State of Arkansas, et al*, CASE NO. 60CV-21-3138 [Voting rights case in the state of Arkansas] December, 2021-January, 2022.

Expert Report in *Mark Wandering Medicine et al. v. Linda McCulloch et al.,* No. CV 12-135-BLG-DWM, 2014 WL 12588302 (D. Mont. Mar. 26, 2014), [voting rights case in the state of Montana] February-June, 2014

Expert Report in *Thomas Poor Bear, et al. vs. The County of Jackson, South Dakota*, 2014 WL 4702282 [voting rights case in the state of South Dakota] June-November, 2015.

Expert Report in the case of *Martin Cowen, et al. vs Brian P. Kemp*, No. 1:17-CV-04660-LMM, 2018 WL 8141305 (N.D. Ga. Jan. 25, 2018) [ballot access case, challenge to state's candidate and party ballot access requirements] January-May, 2018.

Expert Report in *Jayla Allen et al. v. Waller County, Texas et al.*, 472 F. Supp. 3d 351 (S.D. Tex. 2020) [challenge to the operation of early voting] September 2019-September 2020.
Expert Report in *Donald J. Trump et al. v. Kathy Boockvar et al.* 141 S. Ct. 1044, 208 L. Ed. 2d 517 (2021) [challenge to Pennsylvania's new no-excuse voting procedures] August, 2020.

Consultant on election administration to: Harris County, Texas; Albuquerque, New Mexico; Colorado County Clerks Association; The Pew Charitable Trusts; Arnold Foundation; Collin County, Texas; Lubbock County, Texas