# EXHIBIT 12

**EXHIBIT TO**
**JOINT PRETRIAL ORDER**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § § § | |
| **Plaintiff,** | § § | |
| vs. | § § | Civil Action No. 4:21-CV-01997 |
| **SPRING BRANCH INDEPENDENT SCHOOL DISTRICT, COURTNEY ANDERSON, JOHN PEREZ, CAROLINE BENNETT, SHANNON MAHAN, MINDA CAESAR, CHRIS EARNEST, LISA ALPE, in their official capacity as members of the Board of Trustees of Spring Branch ISD** | § § § § § § § § § § | |
| **Defendants.** | § | |

### DEFENDANTS' MEMORANDUM OF LAW

Defendants Spring Branch Independent School District ("SBISD") and its Board of Trustees file the following Memorandum of Law.

**1.    The *Gingles* Preconditions**

Plaintiff Elizondo alleges that SBISD's at-large system of electing its school board trustees violates Section 2 of the Voting Rights Act, 52 U.S.C. §10301, *et seq*. Section 2 claims brought against at-large electoral districts are governed by the framework established in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

"Under *Gingles*, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *LULAC v. Clements,* 999 F.2d 831, 849 (5th Cir. 1993) (en banc). ***"Failure to establish***

*any one of these threshold requirements is fatal."* Campos v. City of Houston, 113 F.3d 544 (5th Cir. 1997). It is the Plaintiff's burden to "prove by a preponderance of the evidence that all of the *Gingles* preconditions [are] satisfied." *LULAC #4552 v. Roscoe Indep. Sch. Dist.,* 123 F.3d 843, 846 (5th Cir. 1997).

However, nothing in the Voting Rights Act requires proportional representation: "[N]othing in [§2] establishes a right to have members of a protected class elected in numbers equal to their proportion to the population." 52 U.S.C. §10301(b).

Importantly, at-large voting schemes "are not per se violations of section 2." *Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1204 (5th Cir. 1989). "Rather, the determination whether an at-large election system [ ] violates section 2 'depends upon a searching practical evaluation of the past and present reality' and on a 'functional view of the political process.'" *Id*. (quoting *Gingles*). See also *Gingles*, 478 U.S. at 48.

**2.      The First *Gingles* Precondition – Compactness**

"Satisfying the first *Gingles* precondition – compactness – normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans." *Gonzalez,* 601 Fed. Appx. at 258; see also *Lopez v. Abbott,* 339 F.Supp.3d 589, 606 (S.D. Tex. 2018) ("The first *Gingles* precondition 'requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans.'"). "The proposed plan must [ ] encompass a district with a greater-than-50-percent-voting-age minority population." *Gonzalez,* 601 Fed. Appx. at 258. "As the Supreme Court has made clear, the 50% threshold is a bright line test." *Benevidez v. Irving Indep. Sch. Dist.,* 690 F.Supp.2d 451, 457 (N.D. Tex. 2010).

Importantly, however, "reading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting (plus some other incidents of societal bias to be

expected where bloc voting occurs) causes its own dangers, and they are not to be courted. … [R]eading §2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. … Failure to maximize cannot be the measure of §2." *Johnson v. De Grandy*, 512 U.S. 997, 1016-17 (1994).

### A. Plaintiff's illustrative district must respect traditional districting principles.

According to the Fifth Circuit, "under *Gingles,* ***compactness requires accounting for traditional districting principles*** such as maintaining communities of interest and traditional boundaries." *Gonzalez*, 601 Fed. Appx. at 258 (emphasis added). Importantly, "***those principles must be considered when analyzing that aspect of the first Gingles precondition***." *Id.* at 259. See also *Fairley v. Hattiesburg,* 584 F.3d 660, 670 (5th Cir. 2009) ("Courts are expected, in evaluating redistricting plans, to take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'"); *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (it is the plaintiff's burden to show that the proposed illustrative district "is consistent with traditional districting principles such as maintaining communities of interest and traditional boundaries").

"[W]hile [ ] a compactness determination should not hinge on the shape of a district, the shape of a district certainly cannot be disregarded in a compactness inquiry. …[I]t is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton,* 385 F.3d 591, 596 (5th Cir. 2004). And, in addition to shape, plaintiffs cannot "ignore traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id*. at 598. "Thus, to evaluate compactness, the Court considers the dispersion of the relevant minority population, the shape of the proposed district (as measured by a visual evaluation and by statistical measures of compactness) and the causes underlying its shape,

and the district's compliance with traditional redistricting principles (such as respect for communities of interest and traditional boundaries)." *Perez v. Abbott,* 274 F.Supp.3d 624, 639 (W.D. Tex. 2017), rev'd in part on other grounds, 138 S.Ct. 2305 (2018); see also, *Perez v. Abbott*, 253 F.Supp.3d 864, 911 (W.D. Tex. 2017) (same).

Here, the evidence will show Plaintiff's expert, when creating his sole proposed illustrative district, did not consider traditional districting principles and, therefore, Plaintiff has not met the *Gingles* compactness requirement.

> **B. Race cannot predominate over traditional districting principles, and bizarrely shaped districts based on race are not compact.**

As observed by the three judge panel in *Perez v. Abbott,*

> Justice O'Connor's plurality opinion in *Bush v. Vera* [517 U.S. 952, 980 (1996)] makes clear that 'district shape is not irrelevant.' … Justice O'Connor agreed with the district court's finding that the district had 'no integrity in terms of traditional, neutral redistricting criteria'…. Although she used these facts to determine that race predominated over traditional districting principles in drawing [the proposed district], Justice O'Connor also relied on them to determine that the district was non-compact…. Plaintiffs offer no explanation of why certain bizarrely shaped appendages are included, while nearby areas that could presumably form communities of interest are carefully excised. There is no evidence that specific lines [ ] respect specific communities of interest such as neighborhoods…. Thus, because of a lack of such evidence, the shape of the proposed district, and the other factors discussed above, the inescapable inference remains that the Hispanic citizen voting age population is not sufficiently compact and it is necessary to draw bizarre and convoluted lines to obtain enough population to reach the majority threshold…. Precedent thus indicates that if a proposed district is simply too bizarrely shaped because the minority population is dispersed in such a way that traditional districting criteria are barely considered, if at all, in drawing the district, it will be found to be non-compact for §2 purposes.

*Perez*, 253 F.Supp.3d at 913-17.

Traditional principles of "drawing districts and well-established demographic considerations" include the following: "First, districts should generally have equal total population. For municipalities, the population size of each district should not deviate from the others by more than 10%. Second, districts must comply with legal requirements, such as the Equal Protection Clause. And third, districts must be drawn consistent with existing official political boundaries (along city or county lines) and informed geographic boundaries, such as neighborhoods or communities that share a common interest." *Benavides v. City of Irving,* 638 F.Supp.2d 709, 714 (N.D. Tex. 2009); see also *Perez*, 253 F.Supp.3d at 911 (traditional districting principles include "contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents").

A district's compactness must be a relative measure based on location and population density and "[i]n a major urban county [like Harris County], compactness makes little sense if considered in terms of geographic sprawl alone, but it seems far more probative when viewed in terms of a city's or county's neighborhoods, geopolitical subdivisions, and business location." *Vera v. Richards*, 861 F.Supp. 1304, 1341 (S.D. Tex. 1994), aff'd sub nom, *Bush v. Vera*, 517 U.S. 952 (1996).

To summarize, as stated by the district court in *Jindal,* "in assessing whether a district complies with traditional districting principles, a court should also determine whether the hypothetical district respects 'communities defined by actual shared interests.' If race is the only 'common thread' that binds certain areas together, the district cannot be said to respect communities of interest." *Terrebonne Parish Branch NAACP v. Jindal,* 274 F.Supp.3d 395, 424 (M.D. La. 2017) (quoting *Miller v. Johnson,* 515 U.S. 900, 916, 920 (1995)).

Here, the evidence will show that, in creating Plaintiff's sole illustrative district, race predominates over traditional districting principles and, therefore, cannot satisfy the first *Gingles* precondition.

3. **The Second *Gingles* Precondition – Minority Political Cohesion**

   A. **Plaintiff must show his minority group votes cohesively.**

"The minority group must also demonstrate that it is 'politically cohesive' to pass the *Gingles* threshold inquiry." *LULAC v. Clements,* 986 F.2d 728, 743 (5th Cir. 1993). "The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *Id.* at 744. Here, that minority group is Hispanics residing in SBISD.

Also, in analyzing racial bloc voting, "[i]f the minority candidate is not serious and gains little support from any segment of the community, it cannot be said that the minority community 'sponsored' the candidate and that election need not be examined." *Campus v. Baytown,* 840 F.2d 1240, 1245 n. 7 (5th Cir. 1988); see also *Teague v. Attala County,* 92 F.3d 283, 289 (5th Cir. 1996).

4. **The Third *Gingles* Precondition – White Bloc Voting**

   A. **The Plaintiff must prove voting in SBISD is racially polarized.**

The third *Gingles* precondition requires a plaintiff show that the white majority votes sufficiently as a bloc to enable it "***usually***" to defeat the minority preferred candidate. *Clements,* 999 F.2d at 849. According to Webster's.com dictionary, "usually" is defined as "most often or as a rule." In analyzing the *Gingles* three part test, "the import of the word 'usually' cannot be underestimated." *Campos v. City of Houston*, 894 F.Supp. 1062, 1066 (S.D. Tex. 1995). The dictionary definition of "usually" means "according to the usual or ordinary course of things; most

often; as a rule." http://www.Merriam-Webster.com/dictionary/usually. "Usually" is an adverb "used to describe what happens or exists most of the time or in most cases." http://www.learnersdictionary.com/definition/usually. Thus, if an event occurs 50% of the time, it does not occur "usually" because it does not occur "in most cases." *Campos*, 894 F.Supp. at 1066.

Here, Plaintiff cannot meet her burden to show that the white majority in SBISD historically votes sufficiently as a bloc to enable it to "*usually*" – *"in most cases"* – defeat the minority preferred candidate in SBISD school board elections.

"The term racially polarized voting [as opposed to political cohesiveness] describes an electorate in which white voters favor and vote for certain candidates or propositions, and minority voters vote for other candidates or propositions. Thus, while a showing of racially polarized voting will frequently demonstrate that minority voters are politically cohesive, a showing that minority voters are politically cohesive will not, by itself, establish racially polarized voting." *Clements*, 986 F.2d at 744. See also *LULAC v. Abbott*, 2022 U.S. Dist. Lexis 224928, *11 (W.D. Tex. 2022) ("[T]he second and third preconditions are not mirror-image requirements for different racial groups.").

Moreover,

> *Gingles III* requires an inquiry into whether White voters in [SBISD] vote "sufficiently as a bloc to usually defeat [Hispanic voters'] preferred candidate." …
>
> The Fifth Circuit and the Supreme Court have held that "the question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'"[1]… In *Covington v. North Carolina,* which was affirmed by the Supreme Court in 2017,[2] the District Court for the Middle District of North Carolina held that "a general finding regarding the existence of any racially polarized voting, no matter the level, is not enough."

---

[1] Quoting *Clements,* 999 F.2d at 850 (quoting *Gingles,* 478 U.S. at 55).

[2] 316 F.R.D. 117 (M.D. N.C. 2016), aff'd, 137 S.Ct. 2211 (2017).

> Because a statistically significant level of racially polarized voting could be found at, say, 51%-49%, the court explained, merely statistically significant levels "cannot be considered as conclusive evidence of the third *Gingles* factor."
>
> … It is true that the *Covington* court called for an analysis of crossover voting under *Gingles III,* noting [however] that high levels of crossover voting undermine a finding of legally significant polarized voting.

*Robinson v. Ardoin,* 605 F.Supp.3d 759, 842 (M.D. La. 2022). See also *Bartlett v. Strickland,* 556 U.S. 1, 16 (2009) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson,* 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was *not* racially polarized).

Here, the evidence will show that crossover voting does not support a finding that SBISD school board elections are racially polarized.

**B. The Plaintiff cannot show a Voting Rights Act violation if partisan politics, not race, is the cause of the defeat of the minority preferred candidate.**

Regarding the third *Gingles* precondition, "bloc voting [is] a matter of degree, with a variable legal significance depending on other facts." *Johnson,* 512 U.S. at 1011. "[C]onclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id*. "Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the totality of circumstances, including the extent of the opportunities minority voters enjoy to participate in the political processes." *Id*. at 1011-12.

Critical to the Court's analysis of the third *Gingles* precondition and/or the totality of the circumstances in this case, "failures of a minority group to elect representatives of its choice that are attributable to '***partisan politics***' provide no grounds for relief. Section 2 is a balm for racial

minorities, not political ones – even though the two often coincide. …We conclude that the district court clearly erred in finding dilution. The undisputed facts indicate that partisan affiliation, not race, caused the defeat of the minority-preferred candidate." *Clements,* 999 F.2d at 854, 891 (emphasis added). See also *Johnson,* 512 U.S. at 1014 n. 11 ("[T]he ultimate right of §2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); *Lopez,* 339 F.Supp.3d at 604 ("In sum, the *LULAC* opinion calls upon the court to look at all of the evidence regarding each of the factors to determine whether racial bias or partisan politics better explains the voting patterns."). As the en banc court in *Clements* elaborated, "[a]bsent evidence that minorities have been excluded from the political process, a lack of success at the polls is not sufficient to trigger judicial intervention. Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of partisan politics or racial vote dilution, political defeat or built-in bias." 999 F.3d at 853-54.

Here, the evidence will show that Hispanics who reside in SBISD have not been excluded from the political process in electing school district trustees; rather, any lack of success at the board of trustee elections are the product of partisan politics/political defeat.

The following statement by the court in *LULAC v. Abbott* is informative: "The facts alleged by Plaintiffs, therefore, strongly implicate the conclusion that the relevant bloc frustrating Plaintiffs' election success is not whites but Republicans. As the Fifth Circuit has recognized, '[t]here is… a powerful argument supporting a rule that plaintiffs, to establish legally sufficient racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a mere euphemism for political defeat at the polls, or the result of partisan

politics.'" *LULAC v. Abbott,* 369 F.Supp.3d 768, 785 (W.D. Tex. 2019) (quoting *Clements,* 999 F.2d at 859).

Here, the evidence will show that the *present reality* (i.e., the "current political condition"[3]) in SBISD trustee elections is that partisan politics – not race – is the cause of Hispanics' alleged failure to elect the school board candidates of their choice.

5. **The New, Additional Factor Announced by the Fifth Circuit in *Harding v. County of Dallas***

In *Harding v. County of Dallas,* Judge Ho, in his concurring opinion, set forth the Supreme Court's recent changes to the *Gingles* voting rights framework:

> In *Abbott v. Perez,* 138 S.Ct. 2305, 201 L. Ed. 2d 714 (2018), the Supreme Court increased the evidentiary burden on plaintiffs in vote dilution cases under Section 2 of the Voting Rights Act. …
>
> For decades, the Supreme Court has applied a two-pronged test to assess vote dilution claims under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [citing *Gingles*]. First, the plaintiff must satisfy three threshold conditions, commonly known as the *Gingles* factors… Second, if the plaintiff satisfies all three *Gingles* factors, she must then demonstrate that vote dilution has occurred under the totality of circumstances test set forth by the Court – in essence, whether a history of racial discrimination exists in the relevant jurisdiction. …
>
> *Perez* alters this framework. In addition to the three *Gingles* factors, plaintiffs must survive an additional inquiry before reaching the totality of the circumstances test. Plaintiffs must now affirmatively prove that the minority group will have a "real" opportunity to elect representatives of its choice. *Perez,* 138 S.Ct. at 2333.
>
> So after *Perez,* it is no longer enough for plaintiffs to draw a proposed district that satisfies the *Gingles* factors. It must additionally prove that the proposed district will in fact perform as plaintiffs hope.
>
> This performance requirement is new….

---

[3] *Northwest Austin Municipal Util. Dist. No. One v. Holder,* 557 U.S. 193, 203 (2009).

948 F.3d 302, 315-16 (5th Cir. 2020) (Ho, concurring and dissenting). See also *Fusilier v. Landry,* 963 F.3d 447, 462 (5th Cir. 2020).

Here, Plaintiff has no evidence that her proposed illustrative district would, in fact, perform as Plaintiff hopes, and Defendant will proffer evidence that it would not.

**6.     The Totality of the Circumstances**

"Satisfaction of [*Gingles'*] three 'preconditions,' is necessary, but not sufficient to establish liability under § 2. Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Clements,* 999 F.2d at 849. See also *Thomas v. Bryant*, 938 F.3d 134, 180 (5th Cir. 2019) (Willett, dissenting) ("The VRA explicitly disavows the maximization of minority electoral success and explicitly emphasizes electoral participation and opportunity. Section 2 tells us to look to 'the totality of the circumstances' to determine if 'members of a racial group … have less *opportunity* … to *participate* in the political process and to elect representatives of their choice.'").

The "totality of circumstances" (or Senate Factors) include the following factors: (1) the history of voting-related discrimination in the political subdivision (here, SBISD); (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the extent to which the minority group members bear the effects of past discriminations in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (5) the use of overt or subtle racial appeals in political campaigns; (6) the extent to which members of the minority group have been elected to public office in the jurisdiction; (7) evidence demonstrating

that elected officials are unresponsive to the particularized needs of the members of the minority group, (8) evidence that the policy underlying the political subdivision's use of the contested practice or structure is tenuous, and (9) whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant areas. *Id.* at 849, n. 22; *Fairly v. Hattiesburg,* 662 Fed. Appx. 291, 295-96 (5th Cir. 2016); *Lopez v. Abbott,* 339 F.Supp.3d 589, 602 (S.D. Tex. 2018).

Important here, regarding the first Senate Factor – the history of voting-related discrimination in the political subdivision – the Court must not "rel[y] too heavily on the evidence of State-sponsored discrimination dating back hundreds of years." *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016) (en banc). See also *Shelby County v. Holder,* 570 U.S. 529, 552-53 (2013) (rejecting the government's argument in Voting Rights Act case because "[t]his argument does not look to 'current political conditions,'[4] but instead relies on a comparison between the states in 1965. … But history did not end in 1965. … It cannot rely simply on the past. We made that clear in *Northwest Austin,* and we make it clear again today."). As stated by the en banc court in *Veasey,* relying on Supreme Court precedent:

> "The historical background of the decision is one evidentiary source, particularly if it reveals a series of the official actions taken for invidious purpose,"[5] but the Supreme Court has cautioned that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value."[6] More recently, the Court in *Shelby County* also counseled against undue reliance on noncontemporary evidence of discrimination in the voting rights context. 133 S. Ct. at 2618-19, 2631. In light of these cases, ***the most relevant "historical" evidence is relatively recent history, not long-past history***.

---

[4] Quoting *Northwest Austin Municipal Util. Dist. No. One,* 557 U.S. at 203.

[5] Quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267 (1997).

[6] Quoting *McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20 (1987).

830 F.3d at 232 (emphasis added); *Rollerson v. Brazos River Harbor Navigation Dist.,* 6 F.4th 633, 641 (5th Cir. 2021) ("But 'the most relevant "historical" evidence is relatively recent history, not long-past history.'") (quoting *Veasey,* 830 F.3d at 232). In *Veasey*, the en banc court noted that "[o]ne type of evidence on which the district court relied … was Texas's history of enacting racially motivated discriminatory voting measures. It noted, for instance, Texas's use of all-white primaries from 1895-1944, literacy tests and secret ballots from 1905-1970, and poll taxes from 1902-1966." 830 F.3d at 213. However, notwithstanding this history of past discrimination, the Fifth Circuit nevertheless held in light of *Shelby County* that "the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years." *Id*. See also *N.C. State Conf. of the NAACP v. McCrory,* 997 F.Supp.2d 322, 349 (M.D. N.C. 2014):

> Plaintiffs' historical evidence in these cases focuses largely on racial discrimination that occurred between a quarter of a century to over a century ago. However, as the Supreme Court recently stated, "history did not end in 1965." *Shelby Cnty.,* 133 S.Ct. at 2628. In the period between the enactment of the VRA and 2013, "voting tests were abolished, disparities in voter registration and turnout due to race were erased, and African-Americans attained political office in record numbers." *Id*. … In examining the totality of the circumstances, therefore, the court views all evidence in context, giving it due weight, but also being careful to acknowledge that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not in itself unlawful."[7]

Although there are nine factors discussed by the courts, the totality of the circumstances factors list "is not exhaustive, and 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' Moreover, 'not every factor will be relevant in every case.' Rather, the proper assessment of vote dilution claims is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and

---

[7] Quoting *Mobile v. Bolden,* 446 U.S. 55, 74 (1980).

impact of the contested electoral mechanisms." *Fairly,* 662 Fed. Appx. at 296.[8] "[T]he totality of the circumstances inquiry is not an empty formalism, and satisfying the *Gingles* preconditions does not necessitate liability. To the contrary, this final inquiry can be powerful indeed." *Id.*

Again, the totality of the circumstances factors list "is not exhaustive." Relevant here, an additional factor to consider is Texas Education Code §11.052, which is unique to Texas public school districts such as SBISD. According to this statute,

> (a) … the board of trustees of an independent school district, on its own motion, may order that trustees of the district are to be elected from single-member districts or that not fewer than 70 percent of the members of the board of trustees are to be elected from single-member trustee districts with the remaining trustees to elected from the district at large.
>
> (e) If at least 15 percent or 15,000 of the registered voters of the school district, whichever is less, sign and present to the board of trustees a petition requesting submission to the voters of the proposition that trustees of the district be elected in a specific manner, which must be generally described on the petition and which must be a manner of election that the board could have ordered on its own motion under Subsection (a) or (b) …
>
> (f) If single-member trustee districts are adopted or approved as provided by this section, the board shall divide the school district into the appropriate number of trustee districts, based on the number of members of the board that are to be elected from single-member trustee districts, and shall number each trustee district. The trustee districts must be compact and contiguous and must be as nearly as practicable of equal population. …[9]

Tex. Educ. Code §11.052(a), (e) and (f). If, under section 11.052(e), the required number of voters of a public school district have passed a proposition requiring that trustees of that school district

---

[8] "[W]hile these [totality of the circumstances] factors 'may be relevant' to a Section 2 analysis… courts must undertake 'a searching practical evaluation of the "past and *present reality*," with a "functional" view of the political process.' Courts must make 'an intensely local appraisal of the design and impact of' electoral administration 'in the light of past and *present reality*.'" *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 240-41 (4th Cir. 2014) (quoting *Gingles,* 478 U.S. at 45, 78) (emphasis added).

[9] Tex. Educ. Code §11.052(f) was precleared in 1987. *Villegas v. Dallas Indep. Sch. Dist.,* 2003 U.S. Dist. Lexis 20236, *27 (N.D. Tex. 2003).

be elected in single-member districts, then "the plan approved by voters *is required* to be implemented"; if the required number of voters have passed the proposition to have single-member districts, it is the *ministerial duty* of the school board to place the proposition on the next election ballot. *Rodriguez v. Beaumont Indep. Sch. Dist.,* 413 S.W.3d 524, 527, 530 (Tex. App. – Beaumont 2013, no pet.); *In re Vann de Cordova,* 2011 Tex. App. Lexis 221, * 1-3 (Tex. App. – Beaumont 2011, no pet.). Thus, in SBISD, if enough Hispanic voting residents desired single-member districts to elect the school board's trustees, there is a mechanism to do so. This statutory ability to put single-member school board elections on the ballot (and, to date, the failure to do so) must be factored into the totality of the circumstances.

Moreover, as recently held by the Fifth Circuit, voter turnout "bears on the totality of the circumstances" and the Court "**must consider voter turnout**" as part of this analysis. *Fusilier,* 963 F.3d at 456-57, 462. Here, the evidence will show that there is low Hispanic voter turnout in SBISD school board elections (verses higher white voter turnout), particularly in Plaintiff's proposed illustrative district. Thus, considering low Hispanic voter turnout, Plaintiff cannot meet "the overarching demand" that her proposed single-member voting district enhances Hispanics' ability to elect SBISD school board candidates of their choosing.

"The totality of circumstances test is the means by which the inference of vote dilution [*Gingles* second and third factors] may be rebutted or cemented." *Lopez,* 339 F.Supp.3d at 602. Here, the totality of the circumstances test will rebut any inference of vote dilution in SBISD's school board elections.

7. **Plaintiff's Expert's Testimony Regarding the *Gingles* Preconditions Must be Reliable**

A court should exclude the testimony of an expert if it is not reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-

93 (1993). An expert witness may be qualified and highly credible, but his conclusions may be based on unreliable methodology. Opinions based on unreliable methodology and/or data is no more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002). As stated by the Fifth Circuit, "[e]ven on a motion for summary judgment, we are not required to take heed of an ill-reasoned expert opinion." *Chen v. City of Houston*, 206 F.3d 502, 508 (5th Cir. 2000). See also *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

For the expert's testimony to be reliable, the following requirements must be met: (1) the testimony must be based on sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702.

In *Daubert,* the Supreme Court offered the following non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication[10]; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 593-94; *Pipitone,* 288 F.3d at 244.

---

[10] The peer review factor "may be particularly important where [like here] conclusions have been drawn solely for purpose of litigation." *Raynor v. Merrell Pharms.,* 104 F.3d 1371, 1375 (D.C. Cir. 1997).

Here, the evidence will show that Plaintiff's expert Dr. Stein's opinion regarding the first *Gingles* precondition is not reliable because it is based on unreliable methodology and, therefore, should not be considered as evidence sufficient to meet this precondition.

Respectfully submitted,

**ABERNATHY, ROEDER, BOYD & HULLETT, P.C.**

*/s/Charles J. Crawford*
**Charles J. Crawford**
State Bar No. 05018900
**Lucas C. Henry**
State Bar No. 24101901
1700 Redbud Blvd., Suite 300
McKinney, Texas 75069
Telephone: (214) 544-4000
Facsimile: (214) 544-4040
ccrawford@abernathy-law.com
lhenry@abernathy-law.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Defendants' Memorandum of Law was served upon Plaintiff's counsel by attachment to the Joint Pretrial Order on October 6, 2023.

*/s/Charles J. Crawford*
Charles J. Crawford