**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:21-cv-01997** |
| | § | |
| **SPRING BRANCH INDEPENDENT** | § | |
| **SCHOOL DISTRICT, et al.,** | § | |
| *Defendants.* | § | |

## COMPARISON OF PLAINTIFF'S ORIGINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REFLECTING FINDINGS AND CONCLUSIONS TO WHICH DEFENDANTS HAVE OBJECTED AND AGREED ADDITIONS

At the Court's request, Plaintiff Virginia Elizondo and Defendants the Spring Branch Independent School District and its Board of Trustees submit the attached document, which is a highlighted version of Plaintiff's Original Proposed Findings of Fact and Conclusions of Law[1] reflecting proposed findings and conclusions to which Defendants have objected, and agreed additions by the Parties.

Proposed Findings and Conclusions which are the subject of the Parties' Agreed Stipulation of Facts[2] or which are not contested, are shown in regular text. Proposed Findings and Conclusions to which Defendants object are noted as omissions highlighted in yellow. Agreed-upon additions or revisions to the Proposed Findings are noted in red.

---

[1] Dkt. 71, Ex. 9.
[2] Dkt. 99, pp. 3-17.

Under separate cover, Plaintiff will forward a thumb drive to the Court with a Word Perfect Version 8 of Plaintiff's Original Proposed Findings of Fact and Conclusions of Law.

Respectfully submitted,

Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No. 17911800
SD Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

Martin Golando
State Bar No. 24059153
Admitted Pro Hac Vice
THE LAW OFFICE OF MARTIN
GOLANDO, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

COUNSEL FOR PLAINTIFF

Charles J. Crawford
State Bar No. 05018900
SD Tex. Bar No. 335298
Lucas C. Henry
State Bar No. 24101901
SD Tex. Bar No. 372871
ABERNATHY, ROEDER, BOYD & JULLETT, P.C.
Redbud Blvd., Suite 300
McKinney, Texas 75069
(214) 544-4000
(214) 544-4040 (fax)
ccrawford@abernathy-law.com
lhenry@abernathy-law.com

COUNSEL FOR DEFENDANTS

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-01997 |
| | § | |
| SPRING BRANCH INDEPENDENT SCHOOL DISTRICT, *ET AL.,* | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

HIGHLIGHTED VERSION OF PLAINTIFF'S ORIGINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW TO WHICH DEFENDANTS HAVE OBJECTED AND AGREED ADDITIONS

<u>Findings of Fact</u>

Objections are highlighted in yellow; additions are in red.

**A.    <u>The Plaintiff</u>**

1.    Plaintiff Dr. Virginia Elizondo is a United States citizen and registered voter who resides at 9235 Blankenship Drive, Houston, Texas 77080, which is in Harris County, Texas and within the boundaries of the Spring Branch Independent School District (the "District" or "SBISD").

2.    Dr. Elizondo's residence is within the boundaries of Plaintiff's proposed Illustrative District which contains a majority Hispanic Citizens Voting Age Population (CVAP) and it also is within the boundaries of other alternative illustrative districts containing a majority Hispanic CVAP.

3.   Dr. Elizondo is Hispanic and is a parent whose child attends a SBISD school.

4.   Dr. Elizondo has consistently voted in SBISD elections since moving to the District. She has masters and doctorate degrees in Education Leadership, with a special focus on bilingual education. She is a fluent Spanish speaker who has taught thousands of English Language Learners to read and write English. She has been an active and vocal member of the SBISD volunteer community, serving on several leadership committees, including LEAD SBISD and Visioning for the Future. Both committees play important roles in developing plans for the future education of SBISD students.

5.   Dr. Elizondo has run for the position as a SBISD trustee twice, unsuccessfully, because of the at-large system of electing SBISD school board trustees.

6.   Dr. Elizondo has standing to seek relief pursuant to the 5th Circuit's holding in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) because she is a minority District voter who is asserts that she has been injured by the dilution of the impact of her vote resulting from the SBISD at-large system for electing members of its Board of Trustees.

B.   **The District – SBISD**

7.   Defendant SBISD is a Texas public school district. It is a political and geographical subdivision of the State of Texas.

8.   SBISD has a growing population of Hispanic, African American, and Asian students. It also has a growing population of minority voters.

9.   SBISD was organized as an independent public school district in 1946, is located in Western Harris County, and lies within the City of Houston and what are commonly referred to as the Memorial Villages (the Cities of Hunters Creek Village, Piney Point Village, Bunker Hill Village, Hedwig Village, Spring Valley Village and Hilshire Village).

10.  SBISD reached its peak enrollment of approximately 41,000 in 1976, with the District opening campuses at the rate of nearly one per year. In the 1980's, District enrollment declined by 41%, In recent years the District's enrollment has increased to a consistent level of 35,000+ students. This enrollment increase was fueled by Hispanic families moving into SBISD so that their children could have the opportunity to realize the American Dream that an excellent education makes possible.

11.  Taken as a whole, Spring Branch is a high functioning school district. But that does not provide a complete or accurate picture. In reality, SBISD consists of two disparate parts: one located North of IH-10 and one located mostly south of it. In the southern portion of SBISD, the students are more likely to be White, affluent, go to college and more likely to meet or exceed the

State's academic standards. In the Northern portion of the district, the students are more likely to be Hispanic or African-American, economically disadvantaged, dropout, less likely to meet state academic standards, and far more likely to be severely disciplined. One portion of the district therefore is majority white, the other portion is heavily minority.

12.   SBISD is highly racially segregated. Well over half of the Hispanic students enrolled in SBISD schools would have to move to another school in order to achieve an integrated distribution of students by ethnicity. *See* Report of Robert M, Stein, Ph.D., pp. 9-10 ("Stein Report").

13.   In the 2010 Census, SBISD was a minority-majority District, with a total population of 178,140. The Hispanic population was 78,534 or 44.08% of the total. The Anglo population totaled 78,588 or 44.1%. The African American population was 4.3% of the total.

14.   District population statistics remain similar today. According to the 2015-2019 American Community Survey, the Citizen Voting Age Population (CVAP) of SBISD is 24.8% Hispanic, 59.7% White, 6.2% African American, and 7.6% Asian. Spanish Surname Voter Registration (SSVR) measures the amount and percentage of registered voters with Hispanic surnames. The SSVR for SBISD for the 2020 election was 17.26%.

15.   According to the 2020 Census, SBISD contains a total population of 183,364. If SBISD were divided into a seven member

districting plan, then each district would contain approximately 26,194 people. SBISD's total population is 40.7% Hispanic, 41.7% White, 10.2% Asian, and 6.6% African American.

### SBISD Total Population - 2020 US Census

| District | Total | Anglo | Non-Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|---|---|
| Total Population | 183,364 | 76,444 | 106,920 | 18,756 | 12,190 | 74,701 |
| Voting Age Population | 136,493 | 60,978 | 75,515 | 14,122 | 8,759 | 51,384 |

| District | % Anglo | %Non-Anglo | % Asian | % Black | % Hispanic |
|---|---|---|---|---|---|
| Total Population | 41.7 | 58.3 | 10.2 | 6.6 | 40.7 |
| Voting Age Population | 44.7 | 55.3 | 10.3 | 6.4 | 37.6 |

16. According to the Texas Education Agency, SBISD had 33,288 students enrolled for the 2020-2021 school year, of which 19,335 were Latino or Hispanic, 58% of the student population. By contrast, white students make up 27% of the total.

17. SBISD's student body is overwhelmingly majority minority.

C. **SBISD's Election System**

18. The SBISD Board of Trustees is composed of seven members elected on an at-large basis, in non-partisan contests, by all voters within the District's geographic boundaries.

19. Members of the Board serve staggered three-year terms and are elected annually on the May uniform election date.

20. SBISD trustees do not have term limits.

21.  SBISD trustees are elected through an at-large system to a designated "place" or seat.

22.  The SBISD "places" do not have any geographical significance, but serve to stagger terms over a three year cycle.

23.  Candidates who file for election must choose to run for a particular "place" number and compete only with other candidates filing for the same seat or place number.

24.  Each voter may vote for all places on the ballot each year but may cast only one vote for one candidate among those competing for a particular place, and the candidate who receives the most votes (a plurality) for that place wins.

25.  To be eligible to be a candidate for Trustee, a person must be a U.S. Citizen, 18 years of age or older, not mentally incapacitated, not finally convicted or felony, a Texas resident continuously for 12 months, resident in the District for 6 months, and registered to vote.

26.  Texas law does not mandate that expressly authorizes school districts to adopt at-large trustee plans in which school board trustees be are elected district wide, as SBISD has historically done. To the contrary, Texas law expressly authorizes school districts to adopt as well as single member district plans in which plans calling for the election of school board trustees are elected from single-member districts, following a few statutory parameters. *See* TEX. EDUC. CODE §11.052.

27.  Between 2015 and 2021, SBISD conducted ten trustee elections. Four of the ten contests were uncontested (i.e., only one candidate

stood for election). In four elections, a Hispanic candidate ran and was defeated by an Anglo candidate. Virginia Elizondo ran in 2015 and 2021. Noel Lezama ran in 2018. David Lopez ran in 2019.

28.   Until the May 2022 election, which occurred while this lawsuit has been pending, to SBISD's knowledge, no person of color had ever been elected or served as a Trustee for SBISD.

29.   SBISD has seven election precincts, which are based upon the SBISD middle school enrollment zones: Spring Forest, Spring Oaks, Northbrook, Spring Woods, Landrum, Spring Branch, and Memorial. Four of the election precincts and middle school enrollment zones lie north of Interstate Highway 10 ("I-10") and are overwhelmingly populated by Hispanic students; three of the precincts and middle school enrollment zones lie south of I-10, apart from portions north of I-10 largely falling within the boundaries of two heavily racially and segregated incorporated villages (Spring Valley Village and Hilshire Village). The majority student population of the enrollment districts south of I-10 are Anglo, or White.

**Spring Branch ISO Enrollment Zones/Voting Precincts**



D.    **Spring Branch Community History and Racial and Ethnic Change**

25.    The Spring Branch community was settled in the late 1840s as an early wagon road constructed along the trail from Stephen F. Austin's colony in 1830, now located in Spring Branch in the west side of present-day Houston, Texas. An early settlement, Piney Point Village, developed along the south side of Buffalo Bayou, along with Hunters Creek Village, while other villages developed north of Buffalo Bayou in the region that came to be known as Spring Branch. The other villages included Hedwig Village, Bunker Hill Village, Hilshire Village, and Spring Valley Village. Collectively, the villages are often called the "Memorial Villages." The original settlers were German immigrants and Anglo Americans, many of whom brought enslaved African Americans to the settlement.

26.    When the U.S. Supreme Court ruled racially discriminatory schools to be unconstitutional in *Brown v. Board of Education* (1954), Houston city leaders railed against the ruling. During this time a group of "prominent Houstonians" organized a Citizens League against desegregation of "white and Negro pupils" in the Houston public school system. Chaired by Atty. Fred W. Moore, the Citizens League raised "substantial financial aid," and launched a series of legal challenges and proposals in opposition to integration.

27.   Contemporaneously, the Memorial Villages incorporated with strict zoning ordinances. The larger Spring Branch area was annexed by the city of Houston in 1957, excluding the Memorial villages. By 1973 the Spring Branch Independent School District represented the Memorial Villages and the city of Houston, and had 40,200 students and 2,276 teachers. The exclusive Memorial Villages developed an affluent character, and their school district reflected a similar success rate with over 80% of the Spring Branch ISO graduates continuing into college by the 1980s.

28.   The 1980s saw a major downturn in the Texas oil economy, and the effects of over-building in real estate. The real estate market decline left large apartment complexes vacant, and by 1990 a major influx of low-income families had moved into the apartments in the West Houston and Spring Branch area. Many of the new residents were recent immigrants from Central America as well as a members of a sizeable Korean population. The result was that the Spring Branch Independent School District suddenly included low-income ethnic immigrants, mostly Hispanic or Latino, in addition to residents of the exclusive Memorial Villages, located primarily south of I-10. This demographic change resulted in a stark contrast by almost any standard demographic or social criterion between the north and south sides of I-10.

29.   The Memorial Villages were (and are) exclusive Anglo enclaves, surrounded by the City of Houston, and adjacent to their

new fellow Hispanic and Latino school district residents. The
websites of the Memorial Villages reported that according to the
2010 U. S. Census, their populations consisted of 67% to 94.4%
Anglos, with very small populations of Asians, Latinos, or African
Americans. Hunters Creek Village, for example, reported only 2.7%
Latinos and a Black population of 0.4%.

30.   The rapid and significant change in population in Spring
Branch in the past thirty years is reflected in the national
census records. This surge was exacerbated even more by the racial
and cultural differences between the resident population and the
new immigrants. Texas led the nation in population increase, and
its cities led all other cities in the nation. For example in the
decade before 2010, Houston, Atlanta, and Dallas-Fort Worth (26.1
percent, 24.0 percent, and 23.4 percent, respectively) were the
fastest-growing metro areas in the Nation. The Houston and Dallas-
Fort Worth metro areas alone accounted for almost one-half (49.0
percent) of the Texas population and over one-half (56.9 percent)
of the state's population growth. Two counties, Harris County and
Dallas County, accounted for over one-quarter (25.7 percent) of
the population of the nation's second largest state and 19.6
percent of its growth. The Houston-Sugar Land-Baytown Metro area
grew by 1,231,393 or 26.1 percent between 2000 and 2010-m which
was a smaller increase than the growth between 1990 and 2000. From
its population of 1,430,000 in 1960, Houston had already grown by

39.8% to 1,999,000 in 1970. This was matched by the Dallas - Ft. Worth metroplex, which grew by 36.8% from 1,738,000 in1960 to 2,378,000 by1970.

31. The rate of increase in Houston's Hispanic or Latino population after 2010 exceeded the growth rate of Houston's overall population. The increase of its Mexican population alone, for example, distinguished Houston as one of the top three growing MSA's in the United States, with its Mexican population nearly tripling in the years between 1990 and 2000. The Mexican population of Houston increased by 75% in 2000 (from 576,937 in 1990 to 1,010,721). In 2010, it increased another 55% ( to 1,567,286). That represented a 172% increase in the Mexican population  of Houston from 1990 to 2010, excluding Latinos of other national origins. The Spring Branch census statistics also reflect the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicate that by 2019, the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only 13.1% White.

E.   **SBISD's Hispanic Community**

32.   The Latino or Hispanic population of the SBISD is sufficiently large and geographically compact to constitute a majority of the voting-age population in one or more single-member districts under one or more illustrative seven-district plans.

33.   This fact is acknowledged by SBISD and established by  Dr.

Robert Stein. *See* Deposition of SBISD Corporate Representative Christine Porter ("SBISD Porter Deposition"), at pp. 34/8 – 35/13; Expert Report of Robert M. Stein, Ph.D. ("Stein Report") at p. 3, 7-8.

34. Professor Stein has drawn an illustrative single-member district plan under which SBISD would maintain the same number of Trustees, but elected by district rather than at large. *(See* Stein Report at p. 8) and the graphic below:

### One Demonstrative Spring Branch ISD Single-Member District



**Table 1**
**Citizen Voting Age Population by SBSID Voting District**

| District | Total Population | Voting Age Population | Citizen Voting Age Population | % Hispanic Citizen Voting Age Population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

35.  Based on the 2020 Census and the 2015-2019 American Community Survey, Hispanics constitute a 72% majority of the voting age population and a 52.8% majority of the citizen voting age population of District 1 in the illustrative plan. The illustrative district plan complies with one person, one vote principles and each district is reasonably compact. The variance in the size of the total population among the districts in the illustrative plan is less than two and a half percent (2.5%).

36.  The illustrative plan satisfies the first *Gingles* precondition that Hispanics in SBISD are sufficiently large and geographically compact to constitute a majority in a single member district.

37.  The illustrative plan also respects existing communities of interest by respecting both the integrity of areas of minority population concentrations and existing and traditional administrative boundaries such as SBISD's existing election precincts/middle school enrollment zones.

38.   Any illustrative district will necessarily cross some existing political or physical boundaries and drawing a proposed or remedial district will involve a balancing of priorities among different communities of interest.

39.   Plaintiff's illustrative district is geographically compact.

40.   Plaintiff's illustrative district is at least as compact and regular in shape as, if not more than, many districts currently in use for elections in Texas.

41.   Hispanic citizens within SBISD are sufficiently numerous and geographically compact that an illustrative district can be drawn which has a majority of minority Citizen Voting Age Population ("CVAP") in at least one single member district comprising 1/7 of SBISD's total population.

**E.   <u>Racially-Polarized Elections in SBISD</u>**

42.   Voting in SBISD board elections is racially-polarized.

43.   Hispanics are politically cohesive in SBISD elections and vote as a bloc for Hispanic-preferred candidates.

44.   In SBISD, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice.

45.   Throughout SBISD as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.

46.   In SBISD, minority voting power is not protected through the creation of minority- majority Trustee districts.

47.   Professor Stein analyzed the extent to which voting behavior in SBISD trustee elections is racially polarized. ( *See* Expert Report of Robert M. Stein, Ph.D., pp. 3, 5-7)(Jan. 20, 2022). Professor Stein has analyzed each of the SBISD elections from 2015 to 2023 and found that a strong pattern of racial and ethnic voter polarization exists.

48.   Racially polarized voting is established when the direction of the relationships between the race or ethnicity of voters and candidates are "signed" in opposite directions. A second condition for polarized voting is when the White majority vote against a minority preferred candidate e.g., a Hispanic candidate, is significant and positive. That is, the share of vote the Hispanic-preferred candidate received increases significantly as the proportion of Hispanic voters **in** each voting district increases. Racially polarized voting is observed in every election in SBISD studied by Professor. Stein. *Id.* at 5.

49.   As evidenced in Figures 1 – **4** below, White and Hispanic voters diverge in their support for each candidate on the ballot, including uncontested contests, where under votes are treated as a second candidate. *Id.*

*Fig 1: The proportion of vote cast for white candidate and Share of vote White*



*Fig 2: The proportion of vote cast for white candidate and Share of vote Hispanic*



*Fig 3: The proportion of vote cast for Hispanic candidate and Share of vote White*



*Fig 4: The proportion of vote cast for Hispanic candidate and Share of vote Hispanic*



50.   As the foregoing graphs indicate, whites and Hispanics had opposite preferences for candidates in all SBISD elections from 2015 to 2021. The Hispanic preferred candidate has lost in every trustee election in SBISD. At the same time, the White majority preferred different candidates and their preferred candidates won every election in the time period examined from 2021 through 2023.

51.   In addition, Professor Stein performed an election-by-election analysis of racially-polarized voting in the Spring Branch Independent School District's trustee elections using ecological inference (EI) statistical techniques. Supplement to Expert Report of Robert M. Stein, Ph.D. (Mar. 28, 2022).Analyses of racially-polarized voting was conducted for all contested and uncontested trustee elections between 2015 and 2023. In the case of uncontested elections, the under vote in these contests was measured against the vote for the unopposed candidate.

52.   Ecological inference is a statistical technique using precinct election data and either voter history files by precinct or Census demographic data by precinct to construct individual voting behavior from aggregate data. The method accounts for racial variation in voting behavior by precinct, to arrive at the most likely point estimate corresponding to the share of the vote for each racial/ethnic group and each candidate.

53.   The results of the EI analysis of racially-polarized by Professor Stein confirmed his conclusions that: (a) there is statistically significant evidence of racially-polarized voting in

the Spring Branch Independent District's Board of Trustees elections for the period 2015-2023; and (b) White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.

54.   In 2015 there were two trustee elections in which four candidates vied for two seats on the SBISD Board of Trustees. Elizondo and Vierra contested for one of the two seats and Dawson and Adams competed for the other seat. The descriptive analysis, correlations and estimated proportion of vote for each candidate by the race/ethnicity of voters confirm significant racially-polarized voting among Hispanic and White voters in both elections. On average the share of White vote received by Vierra was 85.9% compared to 13.4% for Elizondo. The share of Hispanic vote for the same pair of candidates was 92% for Elizondo and 1% for Vierra. In the Dawson/Adams contest, Professor Stein observed the same polarized voting among Whites and Hispanics. Dawson's average share of White vote was 87.7% and 1.3% share of Hispanic vote cast. Conversely, Adams' share of the Hispanic vote was 98% and his share of the White vote was 12.1%. The confidence intervals for these findings shows the estimated proportions are reliable and significant.

55.   Mettenbrink and Gonzalez (a Hispanic-surnamed but Non-Hispanic candidate) contested for one seat on the SBISD board in 2017. The contest between Mettenbrink and Gonzalez did not reflect significant evidence of racially-polarized voting. The EI analysis shows

Gonzalez, the incumbent, garnered a majority of support from both White (74.5%) and Hispanic voters (90.8%). The difference in White voter support versus Hispanic voter support for Gonzalez, however, is 16.3 percentage points, a significant margin but not sufficient to demonstrate that non-Hispanic Whites voted as a block to defeat the Hispanic candidate of choice, Gonzalez.

56.   Two trustee positions were on the 2018 ballot, but only one position was contested. The contested election featured Caesar and Lezama. The second contest featured the uncontested re-election of Vierra. Evidence of racially-polarized voting is evident in the Caesar and Lezama election. The Vierra re-election exhibits weak evidence of racially-polarized voting. The descriptive plots and correlations for Caesar's and Lezama' s respective shares of White and Hispanic vote show that their support significantly diverges between White and Hispanic voters. Caesar's vote share is positively related (.80) to the share of White vote in each precinct and negatively (-.76) related to the share of Hispanic vote in each precinct. Conversely, Lezama's vote share is positively related to the share of Hispanic vote in each precinct (.77) and negatively related the share of White vote (-.82) in each precinct. The EI estimates of the mean proportion of White and Hispanic vote for each candidate further underscore the racially-polarized voting in this election. Caesar and Lezama received 54% and 35% of the White vote respectively and 9% and 99% of the Hispanic vote respectively. The confidence intervals show these differences to be significant.

57.   One trustee seat was contested in 2019 with two candidates, Lopez and Breed. Two other Trustees, Peck and Goodson, ran unopposed for re-election. The descriptive plots and correlations for the Lopez and Breed election show substantial racial polarization between the vote for both candidates among White and Hispanic voters. Vote shares for the two uncontested trustee elections show weak evidence of racially-polarized voting when the under vote in these two elections is measured against the vote for the two uncontested candidates. The share of vote cast for Breed was positively related (.68) to the share of White vote in each precinct and negatively related to the share of Hispanic vote in each precinct (−.84). Conversely, Lopez's share of vote is positively related to the share of Hispanic vote in each precinct (.84) and negatively related to the share of White vote in each precinct (−.68). The EI estimates of the mean proportion of White and Hispanic vote for each candidate are skewed. Lopez received a 24.7% mean share of the White vote while garnering a 98% mean share of the Hispanic vote. Breed received a 75% mean share of the White vote and mean share of less than 2% of the Hispanic vote.

58.   There were elections for two trustee positions in 2021. The contested election was between Elizondo and Earnest. Caesar ran unopposed for re-election. The descriptive plots and correlations show that the degree of racially-polarized voting in the contest between Elizondo and Earnest was significant. On average, Earnest garnered 66% of White voters' support compared to only 34% for Elizondo. Elizondo's estimated proportion of the Hispanic vote was

92.5% compared to only 5.7% for Earnest. The confidence intervals show these estimates to be statistically significant.

59.   Professor Stein's EI findings show that five of the six contested trustee elections between 2015 and 2021 exhibit significant racially-polarized voting among Hispanic and White voters. One contested election demonstrates modest racially-polarized voting. These findings in Professor Stein's March 28, 2022 Supplemental Report confirm and corroborate those reported in his January 20, 2022 report.

60.   In 2022 three trustee positions, 5, 6 and 7 were on the ballot. All three elections were contested. Professor Stein also analyzed the 2022 elections. Supplement to Expert Report re 2022 SBISD Trustee Elections of Robert M. Stein, Ph.D. (Oct. 10, 2022). The results of Professor Stein's EI analysis of racial polarized voting in the 2022 election shows: (a) there is statistically significant evidence of racial polarized voting in the 2022 Spring Branch Independent District's Board of Trustees elections; and (b) White Non-Hispanics voted sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice in each of the three 2022 trustee elections.

61.   Two candidates contested for the SBISD District Trustee Position 5 seat in 2022. Alpe defeated Breed by a margin of 67% to 33%. The EI estimates of the mean proportion of White and Hispanic vote for each candidate in the District 5 Trustee election are significantly skewed. Alpe received a 76% mean share of the White vote while Breed

garnered a 25% mean share of White voters' support. Breed received a 93% mean share of the Hispanic vote and Alpe received a 3% mean share of Hispanic voters' support. These findings provide evidence of racial polarized voting in the election for Trustee Position 5, sufficient to prevent the candidate preferred by Hispanic voters, Breed, from being elected. The cohesiveness of White voter support for Alpe and against Breed, the preferred Hispanic candidate, was sufficient to prevent the election of Breed.

62.   Three candidates contested for SBID Trustee Position 6 seat in 2022, including Perez, Mafrige and Kaczenski. The winner, Perez garnered 65.6% of the votes cast, Kaczenski finished second 27.8% of the votes cast and Mafrige received 6.6% of the votes cast. White voters overwhelmingly preferred Perez to Mafrige and Kaczenski. Perez received a 73% mean share of the White vote while Mafrige and Kaczenski received a 5% and a 21% mean share of the White vote respectively. Kaczenski received an 83% mean share of Hispanic voters' support compared to a 5% and a 30% mean share of Hispanic vote for Perez and Mafrige respectively. The election for Trustee Position 6 demonstrates racial polarized voting. Hispanic and White voters demonstrate sufficient cohesiveness in their support for different candidates. The cohesiveness of White voter support for Perez was sufficient to elect Perez, and block the election of Hispanic voters' preferred candidate, Kaczenski.

63.   It is noteworthy that a Hispanic surname candidate-Perez- garnered miniscule support among Hispanic voters, while the White

candidate, Kaczenski received in excess of 80% of the Hispanic vote. Hispanic voters in SBISD were not persuaded to vote for Mr. Perez solely on the basis of his Hispanic surname, a not unexpected finding. A preferred candidate of Hispanic voters does not assume nor require that the preferred Hispanic candidate share the race or ethnicity of Hispanic voters.

64.   The 2022 Spring Branch ISO Trustee elections continued a trend of racial polarized voting in SBISD trustee elections dating back to 2015. The degree of racial polarized voting observed in 2022 occurred in an election where more voters cast a ballot than in previous trustee elections.

65.   In 2023 two trustee positions, Position 1 and Position 2, were on the ballot. Both elections were contested. Professor Stein also analyzed the 2023 elections. Supplement to Expert Report re 2023 SBISD Trustee Elections of Robert M. Stein, Ph.D. (Aug. 21, 2023) The results of Professor Stein's EI analysis of racial polarized voting in the 2023 elections show: (a) There is statistically significant evidence of racial polarized voting in the 2023 Spring Branch Independent School District's Board of Trustees elections; and (b) White Non-Hispanics voted sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice in both of the two 2023 trustee elections.

66.   Two candidates contested for the SBISD District Trustee Position 1 seat in 2023. Courtney Anderson defeated David Lopez by a margin

of 67% to 33%. The EI estimates of the mean proportion of White and Hispanic vote for each candidate in the District 1 Trustee election are significantly skewed. Anderson received a 81% mean share of the White vote while Lopez received a 16% mean share of the White vote. Lopez received a 90% mean share of the Hispanic vote compared to Anderson's 3% mean share of Hispanic voters' support. These findings provide evidence of racial polarized voting in the 2023 election for SBISD Trustee Position 1, sufficient to prevent the candidate preferred by Hispanic voters, Lopez, from being elected. The cohesiveness of White voter support for Anderson against Lopez, the preferred Hispanic candidate, was sufficient to prevent the election of Lopez.

67.   Two candidates vied for the SBISD District 2 Trustee position in the 2023 election, Shannon Mahan and Becky Downs. Mahan, the winner of the election, received 68% of the total vote to Downs' 32% of all votes cast. Mahan receive an 85% mean share of the White vote while Downs received a mean share of 17% of the White Vote. Downs received an 85% mean share of the Hispanic vote compared to Mahan's 3% mean share of the Hispanic vote. The 2023 election for SBISD Trustee Position 2 demonstrates racial polarized voting. Hispanic and White voters significantly diverged in their preferred candidates. Hispanics overwhelmingly and cohesively preferred Downs over Mahan, the overwhelmingly preferred White candidate. These findings support the conclusion that racial polarized voting occurred in the 2023 Spring Branch ISO election for Position 1 Trustee.

68.   The 2023 Spring Branch ISO Trustee elections continued a trend of racial polarized voting in SBISD trustee elections dating back to 2015 and most recently observed in the three 2022 Trustee elections. Professor Stein's initial and supplemental expert reports identified five of the six contested trustee elections between 2015 and 2021 that exhibited significant racial polarized voting among Hispanic and White voters. The remaining contested election demonstrated modest racial polarized voting. In 2022, the trend in racial polarized voting in SBISD continued unabated. All three trustee elections on the 2022 ballot showed significant evidence of racial polarized voting. The two 2023 SBISD trustee elections continued the trend of racial polarized voting in the district. The degree of racial polarized voting observed in 2023 occurred in an election where voter turnout exceeded 10,000 voters, an above average turnout for school trustee elections in Harris County, Texas. If more voters, especially white voters, engage in racial polarized voting it is more likely than not that Hispanic voters will continue to be unsuccessful in electing the candidates of their choice.

69.   Throughout Texas, federal courts have found that past Texas elections bear the taint of racial polarization. "Regardless of methodology, experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at 1 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan  C185).

70.   Other federal courts have found that elections in Harris County also evidence strong signs of racial polarization. "[T]he Latino community does not merely vote straight party ticket, instead they are bloc voting Latino surnamed candidates..... Moreover, when Anglos have the opportunity to choose between a Latino Republican candidate or an Anglo Republican candidate, they tend to choose the Anglo Republican candidate. Thus, the evidence shows that race is playing a factor in the decisions of both Anglos and Latinos in their selection of candidates." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013).

**F.   Totality of Circumstances**

    **i.   Whether minority group members have been elected to office and whether voting is racially polarized.**

71.   As discussed in greater detail above, Professor Stein's analysis conclusively establishes that voting in SBISD trustee elections is polarized along ethnic lines.

72.   Before the May 2022 election, during the pendency of this litigation, to SBISD's knowledge, no person of color had ever been elected a trustee in SBISD and that person (an affluent Hispanic candidate who resided south of I 10 and whose children attend south side schools was included in a three candidate slate endorsed by a conservtate political actions committee as well as several out-of-district and

out-of-state political action committees) was not the preferred candidate of the Hispanic voting population.

73.   Minority-preferred candidates have not been successful **in** trustee elections in SBISD except where minority and White voter preferences have been the same.

ii.   **History of discrimination against Hispanics and impact of effects in education, employment and health that impair their ability to participate in the political process.**

74.   Hispanics, African Americans, and Asian Americans have each historically suffered from official discrimination affecting their right to vote.

75.   There is a longstanding history of official discrimination against Hispanics in Harris County, including in SBISD.

76.   Professor Andres Tijerina, a historian and expert witness retained by the Plaintiffs who specializes in the history of discrimination Tejanos and Hispanics in Texas, has detailed the extensive history of discrimination against Hispanics in Texas, Harris County, and SBISD. *See* Report of Andres Tijerina, Ph.D., ("Tijerina Report").

77.   Until the very recent past, Texas had a segregated school system in which Latinos and Anglo school children were taught at separate schools. *Id.* at p. 22-3. "The 'Mexican School' became a widespread phenomenon in Texas education. The various school districts segregated their Latino students, but they provided

significantly poorer facilities for them." *Id.* at p. 22. In one study, "[t]he Latino schools had 48 students per room compared to 23 Anglo students per room. The school funding revealed similar contrast, as the school board spent $24.50 for each Latino student compared to $35.96 average spending per Anglo pupil." *Id.* at p. 24. "Gerrymandering of attendance zones within a district became widespread by the late 1940s." *Id.*

78. SBISD has experienced a dramatic influx of Hispanic students over the past thirty years. "The Spring Branch census statistics . . . showed the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicated that the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only 13.1% White by by 2019." *Id.* at p. 34. The rapid statistical transition in Spring Branch is also starkly reflected in the social, cultural, and economic changes within SBISD.

79. SBISD admits that in the past twenty years the racial and ethnic composition of the population in the district has changed significantly. *See* SBISD Porter Deposition at p. 23. SBISD, the district admits, is now a majority minority district. *Id.* at 24.What once was a district in which the majority of the voters and students were white is now a district where the Hispanic population is greater than the white population and the percentage of Hispanic students is more than twice the percentage of White

students. *Id.* at 23. Moreover, a substantial majority of its students are economically disadvantaged, and a greater proportion of its minority students are economically disadvantaged than are its White students. *Id.* at 25-26. SBISD also admits that in the four election precincts and middle school enrollment districts located north of I-10, the student population is overwhelmingly comprised of Hispanic students, averaging approximately 87 percent of the student population in those areas. *Id.* at 45. In the remaining three election and middle school enrollment districts located primarily south of I-19, the student bodies are between 42 and 52 percent White. *Id.*

80. The growing cultural differences between the affluent Anglo American Spring Branch residents and their northern Latino and minority neighbors has in the past manifested itself in suspicion, conflict, and outright fear. *See* Tijerina Report at pp. 35-36. These differences were most visible in the legislative proposals advanced by the then State Representative for the area. In 2005, that Representative proposed a bill for public health agencies to enforce vending regulations on the popular Latino taco trucks, or taquerias "in the same manner [they enforce] other health and safety regulations relating to food service." Latinos complained that it this was just a "smoke screen" to disguise racial prejudice. But in a very real operation "health and law enforcement officers swept down on 27 taco trucks in Spring Branch" and shut

down thirteen. Latinos complained that an "onslaught of squad cars" to enforce a health and safety regulation was needlessly intimidating. *Id.* at p. 35.

81.    In another campaign, the State Representative promoted a bill to allow local law enforcement authorities to challenge Latinos, and deport them if they lacked legal status in the U.S. The Representative not only campaigned publicly on these and other similar issues, but he also reportedly boasted his rigid stance in public meetings and civic club meetings. According to one Latino candidate for the SBISD Board of Trustees, the Representative established a reputation among Spring Branch Latinos as "insensitive" to their needs. Indeed, Latinos quietly articulated their fear of retaliation from their State Representative. *Id.* at p. 36.

82.    More recently, SBISD has negatively affected Hispanic voters by: (1) its placement of every early voting location solely within majority White communities and its failure to designate any early voting locations within any of the portions of the district where a majority of its Hispanic residents and voters live *See* SBISD Porter Deposition at pp, 11/22 – 13/3, 60/5 – 65/1; and (2) by its violation of Texas law regarding the requirement that its high school principals or their designees facilitate voter registration for students who are 18 or who will be 18 years of age or older. *See* SBISD Heeth Deposition at pp. 40/14 – 43/15). The failure to

locate early voting locations within the portions of the district where the majority of its Hispanic voters reside (and the location of all such early polling places only within the portions of the district where a majority of its White residents live) and the violation of state law intended to enhance voter participation by students 18 or older, given that the majority of its students are Hispanic, are two recent examples of official actions by SBISD which have had a discriminatory impact on its Hispanic voters.

83.   SBISD's staggered election system also enhances the dilutive effect of its at-large system. The Supreme Court has held that staggered terms enhance the discriminatory effect of at-large voting systems. *See City of Rome v. United States*, 446 U.S. 156, 185 n.21 (1980). "[S]taggered terms promote the dilution of minority voting strength because they limit the number of seats, create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting.   The discriminatory effect of staggered terms was specifically considered by Congress in the enactment  of § 2." *Buckanaga v. Sisseton Indep. Sch. Dist.,* 804 F.2d 469, 475 (8th Cir. 1986).

84. SBISD's Hispanics bear the effects of historical discrimination in education, employment, and health that hinder their ability to participate in the political process. Professor Tijerina notes that "a 1977 report issued by the U.S. Commission

on Civil Rights reported that 19% of the Hispanics over age 25 in Texas were illiterate. Hispanics had twice the Anglo unemployment rate, and 15% of them still lived in overcrowded housing with inadequate plumbing as compared to the Anglo 1.7%."Tijerina Report at p. 40). A clear holdover to the Texas 'Mexican town' was the 70% of Hispanics in Texas who still lived in barrios. *Id*. In 1981, Judge William Wayne Justice found the state bilingual plan inadequate, and that measures had not been taken to fully "remove the disabling vestiges of past de jure discrimination." *Id*. He ordered corrections to train teachers, identify students in Limited English Proficiency (LEP), and to expand the program. *Id*. And in 1980, the Southwest Voter Registration and Education Project (SVREP) found that Hispanics were underrepresented on school boards in 92% of the 361 Texas school districts where Latinos make up over 20% of the school population. *Id*. In many other comparisons, Texas educational statistics show evidence of past discrimination. A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas, the majority of Hispanic students are still in "inferior and highly segregated schools." (Gomez- Quinones 1994, pp. 155, 166, 172). *Id*. They are "extremely overage" and "disproportionally enrolled in remedial English classes." *Id*. Texas Hispanic students still have an unacceptably "high dropout" rate, and receive poor preparation for college. *Id*.

85.   The vestiges of this history racial and ethnic discrimination remain present in SBISD. The contrast between a Hispanic or Latino SBISD school and a school with a majority white student population is starkly illustrated by a comparison of the Accountability Rating and ethnic composition of Hollibrook Elementary School, located north of I-10 (and in the proposed Hispanic single member district) and Hunters Creek Elementary in a Memorial Village, located south of I-10 (School Year 2018-2019). Hunters Creek had 56.9% Anglo students with 20.2% Economically Disadvantaged while Hollibrook had 98.4% Hispanic students, with 98.6% disadvantaged. Hunters Creek has only 18.9% Hispanic students, while Hollibrook Elementary had only .4% Anglo students. *Id.* at p. 36.

**Spring Branch ISD: School Year 2018 – 2019**

| School | Total Students | Hunters Creek | Hollibrook Elem. |
| --- | --- | --- | --- |
| Accountability rating | | A | B |
| Total Students | 35,136 | 613 | 7 64 |
| Hispanic: | 59.3% | 18.9% | 98.4% |
| Anglo: | 26.6% | 60.2% | .4? |
| At-risk students: | 56.9 ? | 24.6 | 94.2% |
| Economically disadvantaged: | 59.4 % | 20.2% | 98.6% |
| Limited English proficiency: | 36.7 % | 16.3% | 91.2% |

(Texas Tribune, "Spring Branch ISD" 2021]
https://schools.texastribune.org/districts/spring-branch-isd/)

*86.*   In four of SBISD's seven voting precincts and middle school enrollment zones 78% or more of the students are Hispanic. Stein Report, pp. 9 – 10. In the remaining three voting precincts and middle school enrollment zones 42% to 52% of the students are White. *Id.*

*87.*   Strong evidence exists that the racial and ethnic makeup of SBISD schools and enrollment districts is highly segregated. *Id.* at p. 9. Researchers have identified dissimilarity index scores below .3 as indicating low levels of segregation, .3 to .6 as moderate levels of segregation and .6 and above as high levels of segregation. *Id.* SBISD's dissimilarity index score at the school level is .694 and .596 at the enrollment zone level. *Id.* These scores reflect that well over half of the Hispanic students enrolled in SBISD schools would have to move to another school if one desired to achieve an integrated distribution of students within the district by ethnicity. *Id.*

**Table 2 Percent Enrollment by Race/Ethnicity**

| Enrollment Zone | % White | % Hispanic |
|---|---|---|
| Northbrook Middle | 0.02 | 0.96 |
| Spring Woods Middle | 0.05 | 0.88 |
| Spring Oaks Middle | 0.07 | 0.85 |
| Landrum Middle | 0.13 | 0.78 |
| Spring Forest Middle | 0.42 | 0.36 |
| Spring Branch Middle | 0.47 | 0.36 |
| Memorial Middle | 0.52 | 0.25 |

88.  Another indicator of the contrast in conditions within SBISD schools for Hispanic and other minority students is the Differential Discipline index. The Coalition of Advocates for Restorative Education (CARE) gathered and reported disciplinary statistics from the Center for Justice Research, Texas Southern University (the "TSU Center"). The CARE report cited the TSU Center's report on "Racial Disparity in SBISD Disciplinary Programs." Its basic finding was that SBISD's disciplinary practices disproportionately impacted minority youth. The report found that while Hispanic American students were only 58.3% of the district's school's population census report, they comprised 86% of the Disciplinary Alternative Education Program (DAEP) referrals in 2016 2017. Similarly, although African American students comprise only 4.7% of the district's student population, they represented 15% of DAEP referrals. The report also observed that many of the disciplinary policies and punitive operations employed by the SBISD have no empirical or scientific support. *Id.* at p. 34-5.

89.  The rapid demographic transition in Spring Branch also starkly reflects the social, cultural, and economic changes occurring in the district. One early indication was the condition of the apartments that the Latino immigrants were moving into during the late 1980s and early 1990s. Residents in  nearby

neighborhoods complained that the community north of I-10 was overburdened with apartment complexes. Indeed, one apartment complex was so dilapidated that a Houston City Council person led an effort to demolish the 250-unit apartment complex because the City had declared the buildings to be dangerous to other residents. An estimated 8,000 primarily Hispanic residents lived in the five apartment communities surrounding the complex at the time. The effort to purchase and demolish the dilapidated complex failed, but the complex was eventually sold and removed. *Id.* at p. 35.

90. SBISD Hispanics and Latinos bear the effects of discrimination in education, employment, and health which hinder their ability to participate in the political process.

### iii. Racial and ethnic appeals in elections involving Hispanic candidates.

91. SBISD elections involving Hispanic candidates have involved racial and ethnic appeals. When SBISD Hispanic and Latino parents complained in the past about inadequate facilities and insensitive State Representatives and School Board members, Anglo parents organized their efforts into committees with names like the Pine Shadows Concerned Citizens or the Parents for Fair Full Funding. *Id.* at p. 38. The Anglo parents couched their complaints in terms of statistics and pedagogical terms, but they openly revealed that their demands had a strong racial appeal as well. *Id.* In 1990, reportedly "Hundreds of Spring Branch parents banded together in

opposition to construction of new Pine Shadows Elementary School. *Id.* They say boundary expansion and "increased size of the campus will reduce the quality of education" by adding 700 additional students. But the opponents also observed that the proposed enrollment would result from "a large group coming from low-income apartments primarily occupied by minorities," according to Wayne Schaper, then executive director of SBISD administration. *Id.* Bill Ray, then chairman of the Pine Shadows Concerned Citizens, said the concern was about increased size of the campus, "not a racial issue," but his group member Kathleen Drinnan said "racial balance" is the issue. *Id.* She added quite candidly, "We don't want them (the minorities) all in our neighborhood. The associated social problems are documented in schools that are largely minority." *Id.* 92.   In another meeting to protest the mixing of students across the "Mason-Dixon Line" [I-10] one Anglo parent styled her complaint as a social class conflict. *Id.* Germaine Sitomer admitted that she was sending her own child to a private school. *Id.* She said "'For sale' signs are coming up in Spring Valley. . We would like to go to Hunters Creek. We think that moving a piece of the population of upper middle-class people to an upper middle-class school is the best solution." *Id.* Carlee Klam, president of the Valley Oaks PTA denied "racism, but admitted there has been 'white flight' for the past six years or so as the apartment buildings have added minority children to the school." Id. at p. 39. Spring

Branch ISO Board President Jerry Mischon said that racism "has been a part of community discussions" at the least "and bigotry at the most." *Id.*

93. "[M]oving a piece of the population of upper middle-class people to an upper middle class school" is precisely what SBISD has done with respect to districting White residents in Spring Valley Village and Hilshire Villages to schools located south of I-10. **See** SBISD Porter Deposition at pp. 47/25 - 55/2 and SBISD Exhibits 5, 6 and 7, which depict areas north of I-10 comprised largely of White residents and students zoned to schools south of I-10 with majority White enrollments. SBISD contends that the fact that the vast majority of the students and voters that SBISD has moved from the north side of I-10 to the south side are White students from White households is "purely coincidental." *Id.*

94. Political campaigns in SBISD also have been characterized by overt and subtle racial appeals.

95. Examples include anonymous hate mail received by SBISD trustee candidate Noel Lezama in connection with his 2018 campaign and false accusations brought against the Plaintiff during her campaign concerning issues stereotypically attributed to minority candidates, such as purported support for "Critical Race Theory" and unionizing SBISD teachers and staff.

    **iv.  Existence of Any Electoral Mechanisms that Enhance the Opportunity for Minority Vote Dilution**

96.   In the past decade, the State of Texas has erected several barriers to minority participation which enhance minority vote dilution.

97.   In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas also was found to have intentionally racially discriminated against minority voters by the enactment and enforcement of its Voter ID law.

98.   Also in 2011, Texas enacted several redistricting plans, many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. A three-judge panel found that in adopting those plans, Texas had intentionally discriminated against minority voters.

99.   In 2019, Texas instituted a voter purge of its voting rolls, supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens from its rolls. Texas settled these claims before a court could make a determination of the legality of Texas' intent.

100. Harris County, itself, has had a troubling history of voter disfranchisement. "In 2008, a number of Latino residents reported that the Harris County Tax Assessor's Office, which is responsible for voter registration, was not timely processing the voter

registration applications of Latino citizens.... The Harris County Tax Assessor-Collector and Registrar of Voters, Paul Bettencourt, used his position in 2008 to slow the dramatic rise in voter registrations that year among younger, mostly minority, applicants." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 781 (S.D. Tex. 2013).

101. And, in the recent past, Harris County also failed to provide bilingual voting materials that would assist non-English-speaking voters.

102. SBISD's at-large method of electing school board trustees is yet another practice and procedure that has had the result of impairing Latino and other minority's electoral opportunities. These practices include, but are not limited to, the conduct of at-large elections, staggered terms, and off-year elections.

103. Before 2011, SBISD's election precincts and voting locations were based upon its elementary school enrollment zones. With approximately 27 elementary schools, SBISD voters could vote in close proximity to their residences by voting at their nearby elementary schools.

### iii. Changes in number and location of SBISD election precincts and voting locations.

104. In 2012, SBISD reduced the number and changed the location of its election precincts, adopting its middle school enrollment zones as its election precincts. As a result, the number of polling places was reduced from approximately 27 locations, to 7 locations, and the proximity of the election day polling places were located

farther from the residences of most voters than when voting occurred at the neighborhood elementary schools.

105. SBISD also allows for early voting.

106. In recent years, the impact of early voting in SBSID has been determinative of the outcome of trustee elections, with substantially greater numbers of residents voting early than voting on election day. In the most recent, May 2022 election, for example, more than 61% of the total votes cast were cast during the early voting period.

107. None of the four early voting locations SBISD utilized through its 2021 elections were located within or near the areas of the district where the majority of its minority voters reside. Three of the four early voting sites were located south of I-10 and in close proximity to the majority White communities; the fourth early voting site and the only one located north of I-10 was located a short distance north of I-10 and within the political boundaries of one of the majority White Memorial Villages.

108. In the 2022 board election cycle, SBISD added one additional early voting location, in the northwestern portion of the district. which is far-removed from the areas of the district where the majority of its minority voters reside.

109. As a result of the reduction in the number of SBISD polling places in 2012 and the location of the SBISD early voting

locations, minority SBISD voters are required to travel greater distances to vote, than are White SBISD voters.

110. A greater proportion of SBISD's minority voting population is economically-disadvantaged than is its White population. The relative lack of transportation available to economically-disadvantaged Hispanic residents, in comparison to White residents, impacts their ability to access both the SBISD early voting sites and election-day polling places.

### v. Socio-Economic Disparity

111. In Harris County and in SBISD, a strong and consistent correlation exists between socio-economic welfare and race, such that Hispanics and African Americans are more likely to be economically disadvantaged than their Anglo peers.

112. Anglos have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Hispanics. Moreover, median income for Anglo households is more than twice that of Hispanic households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Hispanics. African Americans in Harris County have an unemployment rate of 10.9%, which is more than twice the unemployment rate of Anglos. In Harris County, the per capita income for African Americans is $22,511, which is less than half the Anglo median income.

113. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Hispanics have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Hispanics earn less than 150% of the poverty level. The African American poverty rate in Harris County is 15.9%.

114. Hispanics in Harris County also are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Hispanics over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

115. Under the de facto segregated public school system in Harris County, thousands of children were not provided appropriate educational resources necessary to learn the English language. Today, those children are adults with limited English proficiency. These limited English-proficient adults do not possess the requisite language skills to facilitate their participation in the democratic process.

116. Economically-disadvantaged people tend to become disaffected, believing that government does not and will not respond to their needs. This also lowers their participation in elections.

117. The socioeconomic disparities which exist in Harris County and in SBISD impact the ability of the minority community to

influence state officials, state elections, and state educational policy, as a whole.

### vi.  Tenuousness of the policy of At-Large Elections

118.  The at-large system of election is not mandated by state law. In fact, more than one hundred Texas school systems elect their trustees from single member districts.

119.  No sound policy reason or rationale  exists for the continued use of the at-large system for electing SBISD Trustees.

120.  There is strong evidence in the scholarly literature to conclude that:

- Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.

- Single member district representation increases the likelihood that minority candidates will contest elections for position on legislative bodies.

- Single member district representation will produce policies more responsive to the preference of minority voters.

121.  In totality, the at-large method of electing the Trustees of Spring Branch ISO dilutes the voting strength of Latinos and other racial or language minorities.

## Conclusions of Law

1. Section 2 of the Voting Rights Act, 52 U.S.C. Section 10301 et seq. (Section 2 of the Voting Rights Act of 1965, as amended)

(the "VRA"), prohibits enforcement of any voting qualification, prerequisite to voting, standard, practice, or procedure that results in the denial or abridgment of the right to vote on account of race, color, or language minority status.

2.    The "at-large" method of electing members of the Spring Branch Independent School District ("SBISD") Board of Trustees violates the VRA because it deprives Hispanic voters in SBISD of their voting rights guaranteed by law.

3.    Plaintiff, Virginia Elizondo, is a Hispanic registered voter in SBISD with standing to assert the VRA Claim.

4.    Section 2 of the VRA, 52 U.S.C. Section 10301 *et seq.*, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group.

5.    In *Gingles v. Thornberg*, 478 U.S. 30, 47 (1986), the Supreme Court

> "described the 'essence of a §2 claim' as when 'a certain electoral practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters.'. . . That occurs where an 'electoral structure operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.' . . . Such a risk is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority population that 'regularly defeat[s]' their choices."

*Allen v. Milliken*, 599 U.S. ___, 143 S.Ct. 1487,1494, 216 L.Ed.2d 60, 65, 2023 U.S. LEXIS 2423, *4(2023)(internal citations omitted).

6.   Under Supreme Court precedent, to prove a violation of the VRA, a plaintiff must first satisfy the following three preconditions (called the "*Gingles*" preconditions, *Milliken*, *id*.; *Gingles*, 478 U.S. at 50):

> a. the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district;
>
> b. the minority group is politically cohesive; and
>
> c. the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.

7.   If the *Gingles* preconditions are satisfied, a plaintiff must then show under the totality of circumstances that the challenged political process is not equally open to minority voters.  Factors relevant to this showing may include one or more of the following "Senate Factors" found in S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982):

> a. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;
>
> b. the extent to which voting in the elections of the state of political subdivision is racially polarized;
>
> c. the extent to which the state or political subdivision has used unusually large election districts, majority vote

requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

d. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

e. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

f. whether political campaigns have been characterized by overt or subtle racial appeals;

g. the extent to which members of the minority group have been elected to public office in the jurisdiction;

h. whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group or

i. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Senate Factors are not comprehensive or exclusive. Plaintiff need not prove a majority of these factors, nor even any particular number of them in order to sustain her claims. *See Gingles*, 478 U.S. at 45.

8. The three *Gingles* preconditions are satisfied here because: (1) Hispanics are sufficiently large in number and geographically compact to constitute a majority in at least one single member district in SBISD; (2) Hispanics in SBISD are politically cohesive

and vote as a bloc; and (3) their preferred candidates are usually defeated by White bloc voting.

9.   Plaintiff's proposed illustrative single member district plan complies with traditional districting principles because it satisfies the "one person, one vote" requirement, and maintains communities of interest because it conforms to existing and traditional administrative boundaries such as SBISD's existing election precincts/middle school enrollment zones.

10.   Under the totality of the circumstances, the SBISD at-large electoral system violates Section 2 of the VRA, since:

a.   it results in the District's Hispanic citizens having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

b.   SBISD's schools and residential populations are starkly segregated by race and ethnicity;

c.   SBISD has a historical pattern and practice of impairing the voting rights of its minority voters by, among other things, discriminatory placement of early voting locations solely in majority white portions of the district, reducing the number and limiting the location of election day polling places from twenty-seven to seven locations, and failing to comply with State voter registration laws which would increase minority voter participation;

d.    as a result of historical discrimination against Hispanics in Texas, Houston and Spring Branch, their ability to participate effectively in the political process remains impaired; and

e.    a single-member plan for SBISD would likely strongly improve bilingual and other educational outcomes critical for Hispanic students and increase the responsiveness of school board trustees to minority and low-income students, minority voters and minority educators.

11.    For these reasons and the reasons proven at trial, Plaintiff is entitled to declaratory and injunctive relief, precluding Defendants from maintaining an at-large system for electing SBISD school board trustees, as well as her attorneys fees, litigation expenses, and court costs and such other and further relief to which the Court determines she is justly and equitably entitled.