## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | Civil Action No. 4:21-cv-01997 |
| | § | |
| **SPRING BRANCH INDEPENDENT** | § | |
| **SCHOOL DISTRICT, et al.,** | § | |
| *Defendants.* | § | |

### Post-Trial Submission of Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law Containing Defendants' Responses

Plaintiff Virginia Elizondo and Defendants the Spring Branch Independent School District and its Board of Trustees file Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law containing Defendants' responses, per the Court's instructions at the end of the evidentiary portion of the trial.

1.      The portions of the attached document highlighted in yellow represent Plaintiff's proposals.

2.      The portions of the attached document highlighted in green represent Defendants' proposals.

3.      The portions of the text in the body of the attached document that are not highlighted represent agreed or undisputed matters.

4.      For reasons of practicality, none of the text of the footnoted material is highlighted, but each footnote relates to the corresponding text of the document (whether proposed by Plaintiff or Defendants).

5.      A copy of the attached amended proposed findings and conclusions is being submitted to the Case Manager in WordPerfect v. 8 format, on a USB thumb drive.

Respectfully submitted,

Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No. 17911800
SD Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

Martin Golando
**COUNSEL FOR PLAINTIFF**

State Bar No. 24059153
Admitted Pro Hac Vice
THE LAW OFFICE OF MARTIN
GOLANDO, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

Charles J. Crawford
State Bar No. 05018900
SD Tex. Bar No. 335298
Lucas C. Henry
State Bar No. 24101901
SD Tex. Bar No. 372871
ABERNATHY, ROEDER, BOYD & JULLETT, P.C.
Redbud Blvd., Suite 300
McKinney, Texas 75069
(214) 544-4000
(214) 544-4040 (fax)
ccrawford@abernathy-law.com
lhenry@abernathy-law.com

**COUNSEL FOR DEFENDANTS**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-01997 |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, ET AL., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

**PLAINTIFF'S AMENDED PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW WITH DEFENDANTS' PROPOSALS**

**Introduction**

The United States Supreme Court long ago described the "political franchise of voting" as a "fundamental political right . . . preservative of all rights." *Yick Wo v. Hopkins*, 6 S. Ct. 1064, 1071 (1886).

This is a voting rights case brought under Section 2 of the Voting Rights Act, 52 U.S.C. §§10301 et seq. and 42 U.S.C. §1983. Plaintiff asserts that the at-large system of electing trustees to the Spring Branch Independent School District violates the federal voting rights of Hispanic voters because it "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters" and "'operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates'" to the school board. *Allen v*

1

*Milligan*, 143 S. Ct. 1487, 1494 (U.S. 2023)(internal citations omitted).

However, the Supreme Court has stated that the Senate Report which accompanied the 1982 amendments to the Voting Rights Act "limits the circumstances under which §2 violations may be proved in three ways. First, electoral devices, such as at-large elections, may not be considered per se violative of §2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Id., at 16. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Ibid. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986).

Further, "[a]bsent evidence that minorities have been excluded from the political process, a 'lack of success at the polls' is not sufficient to trigger judicial intervention. Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of 'partisan politics' or 'racial vote dilution,' 'political defect' or 'built-in bias.'" *LULAC v. Clements*, 999 F.2d 831, 853-54 (5th Cir. 1993) (en banc).

But "[a]fter plaintiff[] present[s] statistical evidence showing a racially divergent voting pattern, the burden shifts to

defendants to show that there is a race-neutral explanation for the racially divergent voting pattern. *Teague v. Attala County*, 92 F.3d 283, 290 (5th Cir. 1996); *see Gingles*, 478 U.S. at 63, [106 S.Ct. at 2773]; *Rodriguez [v. Harris County]*, 964 F. Supp.2d [686,] at 760 [(S.D. Tex. 2013)]. . . . Contrary to the defendants' contentions, plaintiffs do not need to initially show that party affiliation does *not* cause divergent voting patterns. *Rodriguez*, 964 F.Supp.2d at 760; *Lopez v. Abbott*, 339 F.Supp.3d 589, 603 (S.D.Tex. 2018)." *Petteway v. Galveston Cnty.*, 698 F.Supp.3d 952, 1010-1011 (S.D. Tex.2023), rev'd and remanded on other grounds, 111 F.4th 596 (5th Cir. 2024)(en banc). Absent "reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting 'thwarts' . . . Latino voting . . . for reasons wholly unconnected to race [,] [t]he preponderance of the evidence supports the conclusion that the challenged [electoral system] 'thwarts a distinctive minority vote' at least plausibly on account of race.'" *Id*. at 1011 (internal citations omitted).

"Consistent with Gingles, the Court holds that Plaintiffs have the duty , in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test. Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns. If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality of circumstances factors

to determine whether racial bias best explains the alleged vote dilution." *Lopez v. Abbott*, 339 F.Supp3d 589, 604 (S.D. Tex. 2018); *see also Rodriguez v. Harris Cnty.*, 964 F.Supp.2d 686, 760 (S.D. Tex. 2013) ("After the defendant demonstrates that partisanship, rather than race, explains the difference in the divergent voting patterns of Anglos and Latinos, the burden then shifts back to the plaintiff to negate the role of partisanship").

The Court tried the case to the bench from September 9-13, 2024.

## **Findings of Fact**

Findings of fact and conclusions of law are required in all actions "tried on the facts without a jury." FED. R. CIV. P. 52(a)(1). A district court must "find the facts specially and state its conclusions of law separately." *Id*. But "Rule 52(a) does not require that the district court set out findings on all factual questions that arise in a case." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997); *see also Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998)(quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir 1996)(observing that Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness."). A court satisfies Rule 52 if it "afford[s] the reviewing court a clear understanding of the factual basis for [its] decision." *Holman v. Life Ins. Co. of N. Am.*, 533 F. Supp.3d

502, 506 (S.D. Tex. 2021)(quoting *InterFirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985)). If the court fails to make a specific finding on a particular issue, the reviewing court "may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence." *Century Marine Inc.*, 153 F.3d at 231.

To the extent that any factual finding reflects or is better understood as a legal conclusion, it is also deemed a conclusion of law. To the extent that any legal conclusion reflects or is better understood as factual finding, it is also deemed a factual finding.

**A.    Procedural History**

In June 2021, Plaintiff filed suit, challenging the at-large system of electing trustees to the Spring Branch Independent School District (the "District" or "SBISD")as violative of Section 2 of the Voting Rights Act. Dkt. 1.

The case was initially assigned to District Judge Ken Hoyt. Judge Hoyt recused in September 2022 (Dkt. 58)and the case was reassigned to Judge Charles Eskridge, who also recused, in October 2022. (Dkt.60) The case was then reassigned to Judge Sim Lake for all further proceedings. Dkt.60.

The Court held a five-day bench trial beginning on September 9, 2024. The court heard testimony from seventeen witnesses.

Plaintiff presented live testimony from Dr. Duncan Klussmann, the District's former superintendent, a parent of children who attended District schools and an associate clinical professor at the University of Houston in its College of Education;[1] James Shaddix, a retired lawyer, District resident, voter, community volunteer, and parent of children who attended District schools;[2] Dr. Andres Tijerina a historian specializing in Texas Latino history;[3] Ricardo Barnes, the Executive Director of the Spring Branch Family Development Center;[4] the Plaintiff, Dr. Virginia Elizondo, a District resident, voter, educator, former candidate for office as a District school board trustee, and parent of a child who attended District schools;[5] Roy Rodney, a lawyer, District resident, voter, community volunteer, and parent of a child who attended District schools;[6] David Lopez, a District resident, voter, community volunteer, former candidate for office as a District school board trustee, and former educator in the District's SKY Partnership Program;[7] Noel Lezama, a District resident, voter, community volunteer, former candidate for office as a District school board trustee, parent of children attending

---

[1] 1RT30; PX42.

[2] 2RT23.

[3] 2RT61; PX27.

[4] 2RT125;PX90.

[5] 2RT156; PX61.

[6] 3RT61.

[7] 3RT97.

District schools, and former student in the District;[8] Patricia Cabrera, a District resident, voter, community volunteer, and former student in the District;[9] and Dr. Robert Stein, a professor of political science, former Dean of the School of Social Sciences and former Chair of the Political Science Department at Rice University.[10] Plaintiff also offered deposition testimony from Dr. Karen Heeth, one of the District's designated corporate representatives.[11]

Defendants presented live testimony from Christine Porter, the District's chief financial officer;[12] Dr. Kristin Craft, the District's former chief academic officer and current superintendent of Boerne Independent School District;[13] Chris Earnest, a District school board trustee, resident, voter, parent of children in the District's schools, and community volunteer;[14] John Perez, a District school board trustee, resident, voter, parent of children in the District's schools, and community volunteer;[15] Courtney Anderson, a District school board trustee, resident, voter, parent

---

[8] 3RT133; PX45.

[9] 3RT162.

[10] 4RT17; PX18.

[11] 4RT14.

[12] 3RT184.

[13] 3RT13.

[14] 4RT103.

[15] 5RT4.

of children in the District's schools, and community volunteer;[16] and Dr. John Alford, a professor of political science at Rice University.[17]

## B.    **The Plaintiff**

1.    Plaintiff Dr. Virginia Elizondo is a United States citizen and registered voter who resides at 9235 Blankenship Drive, Houston, Texas 77080, which is in Harris County, Texas and within the boundaries of the Spring Branch Independent School District.[18]

2.P  Dr. Elizondo's residence is within the boundaries of Plaintiff's proposed illustrative district[19] which contains a majority Hispanic Citizens Voting Age Population (CVAP).[20] The 52.8% Hispanic Citizens Voting Age Population point estimate in the

---

[16] 5RT44.

[17] 5RT72.

[18] Agreed Stipulation of Facts, Dkt. 99, ¶1; 2RT159:1-13 (Elizondo).

[19] Dkt. 99,¶2; 2RT159:8-9. Although "[p]laintiffs typically attempt to satisfy [the first *Gingles* precondition by drawing hypothetical majority-minority districts," *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406 (5th Cir. 1996), such illustrative districts are "not cast in stone" and are offered only "to demonstrate that a majority-[minority] district is feasible." *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994).

[20] PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. To the contrary, the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33));2RT1199:1-200:2-19 (Elizondo). *See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

proposed illustrative district is an appropriate benchmark that may be relied upon for determining the percentage of the CVAP in a demonstrative district. *Benavidez v. City of Irving*, 638 F. Supp.2d 709, 720-21 (N.D. Tex. 2009)(stating "ACS data is accurate and reliable."). As explained by the court in *Benavidez* when relying on ACS data at the trial stage, "the Census Bureau provides point estimates with the purpose that they may be relied upon and utilized and [the court] finds it unnecessary to inject an additional level of probability calculations into the equation." *Id*. at 721. The fact that some of the percentages in the range created by applying a margin of error (here, a range of 58.7% to 46.9%) fall below a 50% bright line mark is irrelevant. Moreover, the trial testimony established that even when taking into account potential statistical margins of error when computing the Hispanic CVAP, nearly three-quarters of the percentages calculated fall above the 50 percent mark.[21] Therefore, it is more likely than not that the Hispanic CVAP for the proposed illustrative district exceeds 50 percent.

2.D    Dr. Elizondo's residence is within the boundaries of Plaintiff's proposed illustrative district. Based on the admitted margin of error of +/- 5.9%, Plaintiff's expert's proposed illustrative district may or may not encompass a district with a greater-than 50% voting age minority population of Hispanics in SBISD.[22]

---

[21] 4RT38:18-39:17 (Stein).

[22] 4RT76:20-22 (Stein).

3.   Dr. Elizondo is Hispanic and is a parent whose child attends a SBISD school.[23]

4. Dr. Elizondo has consistently voted in SBISD elections since moving to the District. She has masters and doctorate degrees in Education Leadership, with a special focus on bilingual education. She is a fluent Spanish speaker who has taught thousands of English Language Learners to read and write English. She has been an active and vocal member of the SBISD volunteer community, serving on several leadership committees, including LEAD SBISD and Visioning for the Future. Both committees play important roles in developing plans for the future education of SBISD students.[24]

5.P Dr. Elizondo has run for the position as a SBISD trustee twice, unsuccessfully[25], because of the at-large system of electing SBISD school board trustees.[26] The District did not present any study or other methodologically sound evidence sufficient to dispute that the current at-large system for electing SBISD trustees "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters" and "'operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates'" to the school board. *Milligan*, 143 S. Ct. at 1494.

---

[23] Dkt. 99, ¶3.

[24] Dkt. 99, ¶4.

[25] Dkt. 99, ¶5

[26]
  2RT156:17-23, 184:15-187:18, 197:22-201:19 (Elizondo); PX117, PX122, PX127, PX135, PX137; 4RT:50-51, 56, 65-67, 101-102 (Stein).

5.D Dr. Elizondo has run for the position as a SBISD trustee twice, unsuccessfully, because of the influence of partisan politics on SBISD elections.

6. Dr. Elizondo has standing to seek relief pursuant to the 5th Circuit's holding in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023)because she is a minority District voter who asserts that she has been injured by the dilution of the impact of her vote resulting from the SBISD at-large system for electing members of its Board of Trustees.[27]

**C.    The District - SBISD**

7. Defendant SBISD is a Texas public school district. It is a political and geographical subdivision of the State of Texas.[28]

8. SBISD has a growing population of Hispanic students.[29] It also has a growing population of minority voters.[30]

9.  The student population of SBISD is approximately 59% Hispanic, 27% White, 7% Asian, 5% African American, and 2% Other.[31]

10. SBISD was organized  as an independent  public school  district in  1946, is  located in  Western Harris  County, and  lies within

---

[27] Dkt. 99,¶6.

[28] Dkt. 99, ¶7.

[29] PX5,pp.4,30-34; PX6, PX83; PX86; PX103; PX105; 2RT78:20-81:11 (Tijerina).

[30]
 PX1,pp. 7-8; PX5,pp.4,30-34; PX6; PX23; PX83; PX86; PX103; PX105; 2RT78:20-81:11 (Tijerina).

[31] PX 6.

the City of Houston and what are commonly referred to as the Memorial Villages (the Cities of Hunters Creek Village, Piney Point Village, Bunker Hill Village, Hedwig Village, Spring Valley Village, and Hilshire Village).[32]

11. SBISD is not a large school district by area, encompassing only 44 square miles.[33]

12. SBISD reached its peak enrollment of approximately 41,000 in 1976, with the District opening campuses at a rate of nearly one per year. In the 1980's, District enrollment declined by 41%. In recent years, the District's enrollment has increased to a consistent level of 35,000+ students.[34] This enrollment increase was fueled by Hispanic families moving into SBISD.[35] SBISD's

13.P Taken as a whole, Spring Branch is a high functioning school district.[36] But that does not provide a complete or accurate picture. In reality, SBISD consists of two disparate parts: one located North of Interstate Highway 10 ("I-10")and one located

---

[32] Dkt. 99,¶8; PX4; PX44; PX106.

[33] 3RT138:16-17(Lezama).

[34] Dkt. 99, ¶9.

[35] PX5,pp.4,30-35; PX6; PX83; PX86; PX103; PX105; 2RT78:20-81:11 (Tijerina); 3RT214-215 (Porter, District corporate representative).

[36] PX28; PX79; PX140.

mostly south of it.[37] In the southern portion of SBISD, the students are more likely to be White, affluent, go to college, and more likely to meet or exceed the State's academic standards.[38] In the Northern portion of the district, the students are more likely to be Hispanic, economically disadvantaged, dropout, less likely to meet state academic standards, and far more likely to be severely disciplined.[39] One portion of the district therefore is majority white, the other portion is heavily minority Hispanic.[40]

---

[37]
 PX14;PX59; PX60; PX103; PX105; PX106; PX107;PX108; PX112; PX140; PX113; 1RT48-65 (Klussmann); 2RT33-39,41-45 (Shaddix); 2RT83-84 (Tijerina); 2RT178-179 (Elizondo); 2RT135-137 (Barnes); 3RT101-102, 106-107 (Lopez); 3RT137-139, 146-149 (Lezama); 3RT169-170, 177-178 (Cabrera); 3RT214-215 (Porter, District corporate representative); 3RT34-40, 48-49; 53-58 (Craft, District corporate representative); 3RT63-75, 94 (Rodney).

[38]
 PX14; PX59; PX60; PX103; PX105; PX106; PX107;PX108; PX112; PX140; PX113; 1RT48-65 (Klussmann); 2RT33-39,41-45 (Shaddix); 2RT83-84 (Tijerina); 2RT178-179 (Elizondo); 2RT135-137 (Barnes); 3RT101-102, 106-107 (Lopez); 3RT137-139, 146-149 (Lezama); 3RT169-170, 177-178 (Cabrera); 3RT214-215 (Porter, District corporate representative); 3RT34-40, 48-49; 53-58 (Craft, District corporate representative); 3RT63-75, 94 (Rodney).

[39]
 PX14; PX59; PX60; PX103; PX105; PX106; PX107;PX108; PX112; PX140; PX113; 1RT48-65 (Klussmann); 2RT33-39,41-45 (Shaddix); 2RT83-84 (Tijerina); 2RT178-179 (Elizondo); 2RT135-137 (Barnes); 3RT101-102, 106-107 (Lopez); 3RT137-139, 146-149 (Lezama); 3RT169-170, 177-178 (Cabrera); 3RT214-215 (Porter, District corporate representative); 3RT34-40, 48-49; 53-58 (Craft, District corporate representative); 3RT63-75, 94 (Rodney).

[40]
 PX14; PX59; PX60; PX103; PX105; PX106; PX107;PX108; PX112; PX140; PX113; 1RT48-65 (Klussmann); 2RT33-39,41-45 (Shaddix); 2RT83-84 (Tijerina); 2RT178-179 (Elizondo); 2RT135-137 (Barnes); 3RT101-102, 106-107 (Lopez); 3RT137-139, 146-149 (Lezama); 3RT169-170, 177-178 (Cabrera); 3RT214-215 (Porter, District corporate representative); 3RT34-40, 48-49; 53-58 (Craft, District corporate representative); 3RT63-75, 94 (Rodney).

Notwithstanding SBISD academic programming, which it asserts is intended to address the needs of the Hispanic community, the disparities in student academic achievement between the predominantly Hispanic schools and the predominately White schools persists.[41] *See* PX140, which depicts the Texas Education Agency Student Achievement Accountability Ratings for 2019 and 2022, after the District had already implemented the academic programming it described as addressing the needs of the Hispanic community.[42]



2019 & 2022 TEA Accountability Ratings - Student Achievement

Source: TEA 2019 and 2022 A-F Accountability Listing – Spring Branch ISD (101920)- HARRIS COUNTY, PX28 & PX79

PLAINTIFF'S
EXHIBIT
140
Civil Action No. 4:21-cv-01997

---

[41] See PX140.

[42] 3RT40:13–41:8 (Craft, District corporate representative).

13.D    SBISD is responsive to the academic needs of the Hispanic community in the following ways:

- SBISD offers a successful bilingual program for students whose first language is not English.[43]

- SBISD's bilingual program has resulted in measurable improvements in test scores for English Language Learners.[44]

- Because the state mandates that school districts cannot provide a bilingual program beyond fifth grade, SBISD offers a two-way dual language program in excess and beyond what the state of Texas requires so that these students can proceed into middle school.[45]

- SBISD offers supports and intervention systems for enrichment of SBISD bilingual students, including the Communities in Schools mentorship program, Boys and Girls Club, parent advisory committees, STEM clubs, FamilyPoint Resources, and parent trainings.[46]

- SBISD takes English Language Learners to Rice University in the summer for STEM camp, and has created a partnership with Texas A&M's engineering department.[47]

- SBISD has a multi-lingual welcome center where students and parents who are coming in new to the country can access services provided by SBISD.[48]

- SBISD is above the state and region in English Language Learner performance.[49]

---

[43] 3RT13:24-15:7 (Craft).

[44] 3RT15:10-16:7 (Craft).

[45] 3RT16:23-17:5 (Craft).

[46] 3RT17:6-18:1 (Craft).

[47] 3RT18:2-7 (Craft).

[48] 3RT18:8-13 (Craft).

[49] 3RT19:12-16 (Craft).

- SBISD's schools with large populations of economically disadvantaged Hispanic students have shown marked improvement in state accountability ratings in recent years.[50]

14.P SBISD is highly racially segregated.[51] Based upon the school enrollment zones established by SBISD, well over half of the Hispanic students enrolled in SBISD schools would have to move to another (presumably affluent white) school in order to achieve an integrated distribution of students by ethnicity. See PX1, Report of Robert M, Stein, Ph.D., pp. 9-10.

14.D   There is no evidence that SBISD assigns students to attend schools based on race, and no evidence that SBISD ever had segregated "Mexican schools" like Houston ISD and many other Texas school districts.[52]

15. In the 2010 Census, SBISD was a minority-majority District, with a total population of 178,140. The Hispanic population was 78,534 or 44.08% of the total. The Anglo population totaled 78,588 or 44.1%. The African American was 4.3% of the total.[53]

16. District population statistics remain similar today. According to the 2015-2019 American Community Survey, the Citizen Voting Age Population (CVAP) of SBISD is 24.8% Hispanic, 59.7% White, 6.2%

---

[50] 3RT22:1-31:11 (Craft); PX 74; PX 79.

[51] PX1, pp. 9-10; PX5, pp. 4, 30-39; PX44; PX105; PX106; PX113; 1RT53-59 (Klussmann); 2RT38-39 (Shaddix); 2RT78-84 (Tijerina); 4RT42-44 (Stein).

[52] 2RT107:5-108-3 (Stein).

[53] Dkt. 99, ¶10.

African American, and 7.6% Asian. Spanish Surname Voter Registration(SSVR) measures the amount and percentage of registered voters with Hispanic surnames. The SSVR for SBISD for the 2020 election was 17.26%.[54]

16.D Because 44.08% of the total population of SBISD is Hispanic, but only 25.8% of SBISD's citizen voting age population is Hispanic, this means that a little more than half of SBISD's Hispanic population are not voting-age citizens – they are either under voting age, or are not citizens of the United States, and therefore cannot vote in SBISD elections.

17. According to the 2020 Census, SBISD contains a total population of 183,364. If SBISD were divided into a seven member districting plan, then each district would contain approximately 26,194 people. SBISD's total population is 40.7% Hispanic, 41.7% White, 10.2% Asian, and 6.6% African American.[55]

---

[54] Dkt. 99, ¶11.

[55] Dkt. 99, ¶12.

**SBISD Total Population - 2020 US Census**[56]

| District | Total | Anglo | Non-Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|---|---|
| Total Population | 183,364 | 76,444 | 106,920 | 18,756 | 12,190 | 74,701 |
| Voting Age Population | 136,493 | 60,978 | 75,515 | 8,759 | 8,759 | 51,384 |
| **District** | | **% Anglo** | **% Non-Anglo** | **% Asian** | **% Black** | **% Hispanic** |
| Total Population | | 41.7 | 58.3 | 10.2 | 6.6 | 40.7 |
| Voting Age Population | | 44.7 | 55.3 | 10.3 | 6.4 | 37.6 |

18. According to the Texas Education Agency, SBISD had 33,288 students enrolled for the 2020-2021 school year, of which 19,335 were Latino or Hispanic, 58% of the student population. By contrast, white students make up 27% of the total.[57]

19. SBISD's student body is overwhelmingly majority minority.[58]

20. The student population of SBISD is approximately 59% Hispanic, 27% White, 7% Asian, 5% African American, and 2% Other.

---

[56] Dkt. 99, ¶12.

[57] Dkt. 99, ¶13.

[58] PX6; PX25; PX86; PX103; PX105; 3RT214-215 (Porter, District corporate representative).

18

D.   <u>SBISD's Election System</u>

21.  The SBISD Board of Trustees is composed of seven members elected on an at-large basis, in non-partisan contests, by all voters within the District's geographic boundaries.[59]

22. Members of the Board serve staggered three-year terms and are elected annually on the May uniform election date.[60]

23. SBISD trustees do not have term limits.[61]

24. SBISD trustees are elected through an at-large system to a designated "place" or seat.[62]

25. The SBISD "places" do not have any geographical significance, but serve to stagger terms  over a three year cycle.[63]

26. Candidates who file for election must choose to run for a particular "place" number and compete only with other candidates filing for the same seat or place number.[64]

27. Each voter may vote for all places on the ballot each year but may cast only one vote for one candidate among those competing for

---

[59] Dkt. 99, ¶14.

[60] Dkt. 99, ¶15.

[61] Dkt. 99, ¶16.

[62] Dkt. 99, ¶17.

[63] Dkt. 99, ¶18.

[64] Dkt. 99, ¶19.

a particular place, and the candidate who receives the  most votes (a plurality) for that place wins.[65]

28. To be eligible to be a candidate for Trustee, a person must be a U.S. Citizen, 18 years of age or  older, not mentally incapacitated, not  finally  convicted of a felony, a Texas resident continuously for 12 months, resident in the District for 6 months, and registered to vote.[66]

29. Texas law expressly authorizes school districts to adopt at-large trustee plans in which school board trustees are elected district wide as well as single member district plans in which school board trustees are elected from single-member districts, following a few statutory parameters. *See* TEX. EDUC. CODE §11.052.[67]

30. Between 2015 and 2021, SBISD conducted ten trustee elections. Four of the ten contests were uncontested (i.e., only  one candidate stood for election). In four contested elections, a Hispanic candidate ran and was defeated by an Anglo candidate. Virginia Elizondo ran in 2015 and 2021. Noel Lezama ran in 2018. David Lopez ran in 2019.[68]

---

[65] Dkt. 99, ¶20.

[66] Dkt. 99, ¶21.

[67] Dkt. 99, ¶22.

[68] Dkt. 99, ¶23.

31. Until the May 2022 election, which occurred while this lawsuit was pending, to SBISD's knowledge, no  person of color had ever been elected or served as a Trustee for SBISD.[69]

32. SBISD has seven election precincts, which are based upon the SBISD middle school enrollment zones: Spring Forest, Spring  Oaks, Northbrook, Spring Woods, Landrum, Spring Branch, and Memorial.[70] Four of the election precincts and middle school enrollment zones lie north  of I-10 and are overwhelmingly populated by Hispanic students; three of the precincts and middle school enrollment zones lie south of I-10, apart from portions north of  I-10 largely falling within the boundaries of two heavily racially and segregated incorporated villages (Spring Valley Village and Hilshire  Village).[71]  The majority  student population of the enrollment  districts  south  of  I-10  are Anglo, or  White.[72]

---

[69] Dkt. 99, ¶24.

[70] Dkt. 99, ¶25.

[71] PX44; PX105; PX106; 1RT48-54 (Klussmann); 2RT38-39 (Shaddix); 3RT214-215 (Porter, District corporate representative).

[72] PX44; PX105; PX106; 1RT48-54 (Klussmann); 2RT38-39 (Shaddix); 3RT214-215 (Porter, District corporate representative).

**Spring Branch ISD Enrollment Zones/Voting Precincts**[73]



Revised 9-15-2017

### E. Spring Branch Community History and Racial and Ethnic Change

33. The Spring Branch community was settled in the late 1840s along an early wagon road constructed on the trail from Stephen F. Austin's colony in 1830, an area now located in the west side of present-day Houston, Texas. An early settlement, Piney Point Village, developed along the south side of Buffalo Bayou, along with Hunters Creek Village, while other villages developed north of Buffalo Bayou in the region that came to be known as Spring Branch.

---

[73] PX9; PX104.

The other villages included Hedwig Village, Bunker Hill Village, Hilshire Village, and Spring  Valley Village. Collectively, the villages are often called the "Memorial Villages." The original settlers were German immigrants and Anglo Americans, many of whom brought enslaved African Americans to the settlement.[74]

34.P When the U.S. Supreme Court ruled racially discriminatory schools to be unconstitutional in *Brown v. Board of Education* (1954), Houston city leaders railed against the ruling. During this time a group of "prominent Houstonians" organized a Citizens League against desegregation of "white and Negro pupils" in the Houston public school system. Chaired by Atty. Fred W. Moore, the Citizens League raised "substantial financial aid," and launched a series of legal challenges  and proposals in opposition to integration.[75]

34.D   Although there is certainly evidence of discrimination against Hispanics in Texas and US history, there is no evidence that SBISD ever segregated schools or discriminated against students on the basis of race. If the Voting Rights Act exists to ensure that minority groups have an opportunity to elect representatives to the governing bodies of those government entities that have historically discriminated against minorities, the Voting Rights Act would not serve to remedy any historical wrong in this case because there is no evidence that SBISD has been a discriminatory entity.

---

[74] Dkt. 99, ¶26.

[75]
 PX5, pp. 30-31.

35. Contemporaneously, the Memorial Villages incorporated with strict zoning ordinances.[76] The larger Spring Branch area was annexed by the city of Houston in 1957, excluding the Memorial villages. By 1973 the Spring Branch Independent School District represented the Memorial Villages and the city of Houston, and had 40,200 students and 2,276 teachers.[77] The exclusive Memorial Villages developed an affluent character, and their school district reflected a similar success rate with over 80% of the Spring Branch ISD graduates continuing into college by the 1980s.[78]

36. The 1980s saw a major downturn in the Texas oil economy, and the effects of over-building in real estate. The real estate market decline left large apartment complexes vacant, rental rates plummeted, and by 1990 a major influx of low-income families had moved into the apartments in the West Houston and Spring Branch area. Many of the new residents were recent immigrants from Central America as well as members of a sizeable Korean population.[79] The result was that the Spring Branch Independent School District suddenly included ethnic immigrants, mostly Hispanic or Latino living north or I-10, in addition to residents of the Memorial Villages, located primarily south of I-10.[80] This

---

[76] PX44; PX106; 2RT38-39 (Shaddix); Dkt. 118, Plaintiff's Request that Court Take Judicial Notice of Adjudicative Facts regarding landuse ordinances of Hunters Creek Village, Bunker Hill Village, Bunker Hill Village, Piney Point Village, Hedwig Village and Spring Valley Village; 2RT77-82 (Tijerina).

[77] Dkt. 99, ¶27.

[78] PX5, p. 31.

[79] Dkt.99, ¶28.

[80] Dkt.99, ¶28

demographic change resulted in a stark contrast by almost any standard demographic or social criterion between the north and south sides of I-10.[81]

37. The Memorial Villages were formed as and still are exclusive Anglo enclaves, surrounded by the City of Houston, and adjacent to their new fellow Hispanic and Latino school district residents.[82] The websites of the Memorial Villages reported that according to the 2010 U. S. Census, their populations consisted of 67% to 94.4% Anglos, with very small populations of Asians, Latinos, or African Americans. Hunters Creek Village, for example, reported only 2.7% Latinos and a Black population of 0.4%.[83]

38. The rapid and significant change in population in Spring Branch in the past thirty years is reflected in the national census records. This surge was exacerbated even more by the racial and cultural differences between the resident population and the new immigrants. Texas led the nation in state population increase, and its cities led all other cities in the nation as well. For example in the decade before 2010, Houston, Atlanta, and Dallas-Fort Worth (26.1 percent, 24.0 percent, and 23.4 percent, respectively) were the fastest-growing metro areas in the Nation. The Houston and Dallas-Fort Worth metro areas alone accounted for almost one-half (49.0 percent) of the Texas population and over one-half (56.9 percent) of the state's population growth. Two counties, Harris County and Dallas County, accounted for over one-quarter (25.7

---

[81] PX105; PX106; PX107; 3RT34-40 (Craft, District corporate representative); 3RT214-215 (Porter, District corporate representative).

[82] PX44; PX105; PX106; PX107; 1RT59-61 (Klussmann); 2RT79-81 (Tijerina); 2RT38-39, 41 (Shaddix).

[83] PX44; PX106; Dkt. 99, ¶29.

percent) of the population of the nation's second largest state and 19.6 percent of its growth. The Houston-Sugar Land-Baytown Metro area grew by 1,231,393 or 26.1% between 2000 and 2010,which was a smaller increase than the growth between 1990 and 2000. From its population of 1,430,000 in 1960, Houston had already grown by 39.8% to 1,999,000 in 1970. This was matched by the Dallas Ft. Worth metroplex, which grew by 36.8% from 1,738,000 in 1960 to 2,378,000 by 1970.[84]

39. The rate of increase in Houston's Hispanic or Latino population after 2010 exceeded the growth rate of Houston's overall population. The increase of its Mexican population alone, for example, distinguished Houston as one of the top three growing Metropolitan Statistical Areas ("MSA's") in the United States, with its Mexican population nearly tripling in the years between 1990 and 2000. The Mexican population of Houston increased by 75% in 2000 (from 576,937 in 1990 to 1,010,721). In 2010, it increased another 55% (to 1,567,286). That represented a 172% increase in Houston's Mexican population from 1990 to 2010 alone, without taking into account the population growth of Latinos of other national origins. The Spring Branch census statistics also reflect the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicate that by 2019, the 77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and only 13.1% White.[85]

F. **SBISD's Hispanic Community**

40. The Latino or Hispanic population of the SBISD is sufficiently large and geographically compact to constitute a

---

[84] Dkt. 99, ¶30.

[85] Dkt. 99, ¶31.

majority of the voting-age population in one or more single member districts under one or more illustrative seven-district plans.[86] As discussed in greater detail above, the 52.8% Hispanic Citizens Voting Age Population point estimate in the proposed illustrative district is an appropriate benchmark that may be relied upon for determining the percentage of the CVAP in a demonstrative district. Benavidez, 638 F. Supp.2d at 720-21. 2009)("ACS data is accurate and reliable."). As explained by the court in *Benavidez* when relying on ACS data at the trial stage, "the Census Bureau provides point estimates with the purpose that they may be relied upon and utilized and [the court] finds it unnecessary to inject an

---

[86]

   PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. To the contrary, the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33);2RT1199:1-200:2-19 (Elizondo). *See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

   As Magistrate Judge Bryant stated in her Memorandum and Recommendation (Dkt. 64, which this Court adopted (Dkt. 67):

   "The Court does not address the suitability of Dr. Stein's map as a remedial plan because the *Gingles* factors, and even the liability finding at a trial, focus only on whether a demonstrative plan is a possible solution to a Voting Rights Act violation, not whether it should be imposed as the remedial plan. *See Rodriguez* [v. *Harris Cnty.*, 964 F. Supp. 2d 686, 746 (S.D. Tex. 2013)], (stating "Defendants' reading collapses the liability and remedy determinations into a single threshold analysis," citing *Fairley v. Hattiesburg*, Miss., 584 F.3d 660, 667 (5th Cir. 2009)); *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)(recognizing that plaintiff's proposed district 'is not cast in stone,' but was 'simply presented to demonstrate that a majority-black district is feasible in Calhoun County')." Dkt 64 at p. 6 n.3.

additional level of probability calculations into the equation." *Id.* at 721. The fact that some of the percentages in the range created by applying a margin of error (here, a range of 58.7% to 46.9%) fall below a 50% bright line mark is irrelevant. In addition, the trial testimony established that even when taking into account potential statistical margins of error when computing the Hispanic CVAP, nearly three-quarters of the percentages calculated fall above the 50 percent mark.[87] Therefore, it is more likely than not that the Hispanic CVAP for the proposed illustrative district exceeds 50 percent.

41.P This fact is acknowledged by SBISD and established by Dr. Robert Stein.[88]

41.D The margin of error, however, indicates that Plaintiff's illustrative district may or may not satisfy the 50% Hispanic threshold. Further, as discussed herein, Plaintiff's illustrative district fails to respect communities of interest, and fails to account for one-person, one-vote.

42. Dr. Stein has drawn an illustrative single-member district plan under which SBISD would maintain the same number of Trustees,

---

[87] 4RT38:18-39:17 (Stein).

[88]

PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. The District has stipulated to the underlying data. Dkt. 99, ¶¶32-33);2RT1199:1-200:2-19 (Elizondo). *See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

but elected by district rather than at large.[89] *See* PX1 at p. 8, the graphic below, PX24, and PX23 the accompanying population table:

Demonstrative Spring Branch ISD Single-Member District



8

PLAINTIFF'S
EXHIBIT
24

Civil Action No. 4:21-cv-01997

---

[89] Dkt., ¶32.

Table 1[90]
Citizen Voting Age Population by SBISD Voting District

| District | Total Population | Voting Age Population | Citizen Voting Age Population | %Hispanic Citizen Voting age population |
|---|---|---|---|---|
| 1 | 26,171 | 18,782 | 9,180 | 52.8 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1 |

43.P Based on the 2020 Census and the 2015-2019 American Community Survey, Hispanics constitute a 72% majority of the voting age population and a 52.8% majority of the citizen voting age population of District 1 in the illustrative plan.[91] The illustrative district plan complies with one person, one vote principles and each district is reasonably compact.[92] The variance

---

[90] Dkt. 99, ¶32; PX1, at pp. 7-18; PX23; PX24.

[91] Dkt. 99, ¶33.

[92]
   PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement and stipulated variance among total population in proposed district of less than 2.5% satisfies one person-one vote requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. To the contrary, the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33).

in the size of the total population among the districts in the illustrative plan is less than two and a half percent (2.5%).[93]

43.D   Plaintiff's expert did not consider the "one-person, one-vote" principle when drawing Plaintiff's proposed illustrative district.[94]   Plaintiff's proposed illustrative district is not coterminous with any SBISD middle school zone or precinct.[95]

44.P The 52.8% Hispanic Citizens Voting Age Population point estimate in the proposed illustrative district is an appropriate benchmark that may be relied upon for determining the percentage of the CVAP in a demonstrative district. *See discussion above:* "the Census Bureau provides point estimates with the purpose that they may be relied upon and utilized and [the court] finds it unnecessary to inject an additional level of probability calculations into the equation." *Benavidez,* 638 F.Supp.2d 721. The fact that some of the percentages in the range created by applying a margin of error (here, a range of 58.7% to 46.9%) fall below a 50% bright line mark is irrelevant. Moreover, the trial testimony established that even when taking into account potential statistical margins of error when computing the Hispanic CVAP, nearly three-quarters of the percentages calculated fall above the 50 percent mark.[96] Therefore, it is more likely than not that the

---

[93] Dkt. 99, 33.

[94] 4RT78:4-25.

[95] 4RT78:4-25.

[96] 4RT38:18-39:17 (Stein).

Hispanic CVAP for the proposed illustrative district exceeds 50 percent.[97]

44.D  Based on the admitted margin of error of ± 5.9%, Plaintiff's expert's proposed illustrative district may or may not encompass a district with a greater-than-50-percent-voting-age minority population of Hispanics in SBISD.[98]

45.P The illustrative plan satisfies the first *Gingles* precondition that Hispanics in SBISD are sufficiently large and geographically compact to constitute a majority in a single member district.[99]

45.D  The margin of error, however, indicates that Plaintiff's illustrative district may or may not satisfy the 50% Hispanic threshold. Further, as discussed herein, Plaintiff's illustrative district fails to respect communities of interest, and fails to account for one-person, one-vote. Plaintiff's proposed illustrative district does not account for traditional districting principles,

---

[97] 4RT39:1-17 (Stein).

[98] 4RT76:20-22; 78:1-3 (Stein).

[99]
PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement and stipulated variance among total population in proposed district of less than 2.5% satisfies one person-one vote requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. To the contrary, the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33).*See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

including maintaining communities of interest and traditional boundaries. Plaintiff's expert failed to consider communities of interest, including neighborhoods, subdivisions, and census blocks in drawing Plaintiff's illustrative district.[100] In fact, Plaintiff's proposed map would divide SBISD's middle-school zones into different single-member districts.[101] The creation of the shape of Plaintiff's expert's proposed illustrative district – i.e., its carve outs – can only be explained as an effort to segregate the races for purposed voting, without regard for traditional districting principles. The shape – i.e., the carve outs – of Plaintiff's expert's proposed illustrative district therefore violates the first Gingles precondition's compactness inquiry.[102]

46P. The illustrative plan respects existing communities of interest by respecting both the integrity of areas of minority population concentrations and existing and traditional administrative boundaries such as SBISD's existing election precincts/middle school enrollment zones.[103]

---

[100]   4RT77:10-16 (Stein).

[101]   4RT77:17-25 (Stein).

[102]   4RT77:17-25 (Stein).

[103]

As the Magistrate Judge stated in her Memorandum and Recommendation that the District's earlier summary judgment motion be denied (Dkt. 64), which this Court adopted (Dkt.67):

"The Supreme Court has not developed a "precise rule" for evaluating geographic compactness for purposes of §2 of the Voting Rights Act. *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022). However, the Fifth Circuit has held that a plaintiff's proposed illustrative districting must

46.D    Plaintiff's illustrative district combines the Landrum

take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* Yet, the Fifth Circuit has not established a clear definition of traditional districting principles or limited the type of evidence that can be used to prove that a plaintiff's proposed districting map accounts for such principles.

When assessing geographic compactness of a minority community the Fifth Circuit has considered, for example, whether illustrative maps: appear compact on visual inspection; take into consideration political subdivision lines; group populations with similar economic demographics; and, preserve communities of interest. *Id.* at 218-19. Furthermore, the Fifth Circuit has recognized fidelity to administrative boundaries as a traditional districting principle. *Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000) (characterizing "fidelity to administrative boundaries" as a traditional districting principle). District courts within the Fifth Circuit have found that illustrative districts with generally equal total population, and which are "consistent with existing official political boundaries (along city or county lines) and informal geographic boundaries, such as neighborhoods or communities that share a common interest[,]" to comply with traditional districting principles. *Benavidez,* 638 F. Supp.2d at 714.

Furthermore, courts have allowed evidence of a proposed plan's compliance with traditional districting principles to come from lay witnesses. For example, the Fifth Circuit in *Robinson* approved a district court's reliance on testimony of resident voters to establish that a map preserved communities of interest. *Id.* at 219. In short, courts have not demanded a precise or perfect standard for demonstrating the geographic compactness of a minority community. One district court found at the trial stage that an illustrative district met the first *Gingles* factor even though it split some neighborhoods, subdivisions, and congressional districts, and its compliance with certain traditional districting principles was unintentional, stating: "[T]he inquiry into illustrative districts is a flexible one that permits room to grow at the remedial phase rather than calling for perfection at the liability phase[.] *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 502 (E.D. Tex. 2020)."

Middle School attendance zone (Precinct 47) with portions of the Northbrook Middle School attendance zone (Precinct 41).[104] Plaintiff's expert combined these precincts solely "in order to achieve a majority-minority District No. 1" illustrative district.[105]

47P.    Here: (1) the proposed districts are visually compact; (2) with a few small variations, the districts on the proposed demonstrative map are based upon SBISD's middle school enrollment districts; (3) SBISD purports to be a proponent of neighborhood schools; (4) SBISD drew the middle school attendance zones and chose to use them as the basis for its current election districts, which presumably follow traditional districting principles; (5) conformity with administrative boundaries is ordinarily seen as a virtue in the districting process. *Chen*, 206 F.3d at 514; and (6) Plaintiff adduced substantial trial testimony on which Dr. Stein has relied, that the illustrative seven district plan fairly took into account communities of interest based upon shared or common socioeconomic interests. *See League of United Latin Am. Citizens (LULAC) v. Perry,* 126 S. Ct. 2594, 2618 (U.S. 2006)(communities of interest may form by commonalities in "socio-economic status, education, employment, health and other characteristics."); *Terrebonne Par. Branch NAACP v. Edwards*, 399 F. Supp. 3d 608, 616 (M.D. La. 2019) (after bench trial court found plaintiff's proposed

---

[104] 4RT84:7-18 (Stein).

[105] 4RT84:7-18 (Stein).

plan met compactness requirement based in part on testimony of plaintiffs themselves). *See, e.g.*, PX105; PX106; PX107; 1RT65-66 (Klussmann); 2RT42 (Shaddix); 2RT129-130, 134-137 (Barnes); 2RT200 (Elizondo). As the Magistrate Judge stated in her earlier Memorandum and Recommendation Dkt. 64), which this Court adopted (Dkt.67):

> "The Supreme Court has not developed a "precise rule" for evaluating geographic compactness for purposes of §2 of the Voting Rights Act. *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022). . . . [T]he Fifth Circuit has not established a clear definition of traditional districting principles or limited the type of evidence that can be used to prove that a plaintiff's proposed districting map accounts for such principles.

> Furthermore, courts have allowed evidence of a proposed plan's compliance with traditional districting principles to come from lay witnesses. For example, the Fifth Circuit in *Robinson* approved a district court's reliance on testimony of resident voters to establish that a map preserved communities of interest. *Id.* at 219. In short, courts have not demanded a precise or perfect standard for demonstrating the geographic compactness of a minority community. One district court found at the trial stage that an illustrative district met the first *Gingles* factor even though it split some neighborhoods, subdivisions, and congressional districts, and its compliance with certain traditional districting principles was unintentional, stating: "[T]he inquiry into illustrative districts is a flexible one that permits room to grow at the remedial phase rather than calling for perfection at the liability phase[.] *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 502 (E.D. Tex. 2020)."

47.D Dr. Stein did not talk to Dr. Klussmann, Ricardo Barnes, Noel Lezama, or David Lopez about communities of interest before drawing Plaintiff's illustrative district.[106]

---

[106] 4RT70:22-71:8.

36

48.P Drawing a proposed illustrative or remedial district will necessarily involve a balancing of priorities among different communities of interest, which Plaintiff has appropriately done here. And the Fifth Circuit has allowed evidence of a proposed plan's compliance with traditional districting principles to come from lay witnesses. *See Robinson,* where the Fifth Circuit approved a district court's reliance on testimony of resident voters to establish that a map preserved communities of interest. 37 F.4th at 219.

48.D Dr. Stein admittedly did not consider communities of interest such as neighborhoods and subdivisions in drawing Plaintiff's proposed illustrative district.[107]

49.P Among other things, Plaintiff's illustrative district is geographically compact because "the compactness of the minority population – not the proposed district – is what matters for the first *Gingles* precondition." *Robinson v. Ardoin*, 37 F.4th 208, 221 n. 4 (5th Cir. 2022)(citing *League of United Latin Am. Citizens (LULAC),* 126 S. Ct. at 2618).

49.D To satisfy the first *Gingles* precondition, the Plaintiff must account for traditional districting principles such as maintaining communities of interest and traditional boundaries. *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022). Because

---

[107] 4RT77:10–16.

Plaintiff has failed to do so here, Plaintiff has failed to satisfy the compactness requirement within the first *Gingles* precondition.

50.P  Plaintiff's illustrative district is at least as geographically-compact and regular in shape as, if not more than, many districts currently in use by other government entities for elections in Texas. See, e.g., PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement and stipulated variance among total population in proposed district of less than 2.5% satisfies one person-one vote requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. And the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33).*See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

50.D SBISD does not maintain data on the race of voters in SBISD elections or on the correlation between a voter's race and the candidate for whom the voter casts his or her vote.[108]

51. Hispanic citizens within SBISD are sufficiently numerous and geographically compact that an illustrative district can be drawn which has a majority of minority Citizen Voting Age

---

[108] 4RT9:6-16 (Porter).

Population ("CVAP") in at least one single member district comprising 1/7 of SBISD's total population.[109]

52.P Dr. Stein analyzed the extent to which voting behavior in SBISD trustee elections is racially polarized using three statistical analytical techniques: (a) ordinary least squares ecological regression analysis (OLS or ER);[110] (b) ecological inference analysis (EI);[111] and (c) a later version of EI software, known as the ei.MD.bayes application.[112] Dr. Stein analyzed each of the SBISD elections from 2015 to 2024[113] and found that a strong

---

[109] PX1, pp.3, 7-8; PX23; PX24; 4RT24, 37-42 (Stein)(proposed illustrative district 1 satisfies *Gingles* one requirement); 5RT141-143 (Alford)(proposed illustrative district Map satisfies *Gingles* one requirement based upon the underlying data, which neither Alford nor District disputes. To the contrary, the District has stipulated to the underlying data. Dkt. 99, ¶¶32-33).*See* 3RT218:10-23 (Porter, District corporate representative(geographic concentration of Hispanics large enough to constitute majority of voting age population in one or more single member districts under seven member election plan)).

[110] PX1, pp. 4-7; PX19; PX20; PX21; PX22; 4RT30-36 (Stein).

[111] PX2, pp. 1-14; PX3, pp. 2-5; PX4, pp. 1-2; PX122; PX 123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT48:21-61 (Stein). *See Benavidez*, 638 F.Supp.2d at 723 (noting that "[r]ecently EI [ecological inference] has been used to supplement evidence derived from . . . ER.").

[112] PX136, pp. 4-6; PX137; 4RT25-27, 61-67, 100-102 (Stein).

[113] Dr. Stein's first report, PX1, analyzed elections between 2015 and 2021 using the OLS or ER method; Dr. Stein's second report, PX2, analyzed elections between 2015 and 2021 using the EI method; Dr. Stein's third report, PX3, analyzed the 2022 elections using the EI method; Dr. Stein's fourth report, PX4, analyzed the 2023 elections using the EI method; and Dr. Stein's fifth report, PX136, analyzed

pattern of racial and ethnic voter polarization exists.[114] The statistical regression analysis and ecological inference analyses Dr. Stein applied have been approved by both the Supreme Court and the Fifth Circuit and are reliable. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.* 89 F.3d 1205, 1209 n. 6 (5th Cir. 2009)("[s]tatistical regression analysis is a mathematical technique which looks at the relationship between two variables." "Both the Supreme Court and Fifth Circuit have sanctioned the use of regression analysis to prove voting rights violations. *See Thornburg v. Gingles*, 106 S. Ct. 2752, 2761 (1986); and *Houston v. Lafayette County*, 56 F.3d 606, 612 (5th Cir. 1995).") *Benavidez*, 638 F. Supp.2d at 723("ecological regression analysis approved in *Gingles* and utilized by numerous courts in Voting Rights Act cases; technique is "essentially based on a scatter plot in which the horizontal axis reflect the Hispanic percentage of total voters ... and the vertical axis shows the percent of vote received by the Hispanic [preferred] candidate. A straight line, called the line of best fit, is plotted through the data . . . . [T]his methodology in some cases may result in estimates that go below zero or above 100 for a given precinct.");*Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1214-15 (S.D.Tex. 1997)(noting Supreme Court and Fifth Circuit approval of use of regression analysis to evaluate voter

---

the 2024 elections, using the ei.MD.bayes application. 4RT25-27, 30-31,48-51,58-59, 61-62 (Stein).

[114]

 PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX122; PX123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein)

polarization and discussing how slope of the regression line indicates the relationship between votes cast by voting populations and the various candidates).

52.D   With one exception, Plaintiff's expert, Dr. Stein, used an inappropriate technique – regression analysis and an older version of ecological inference software – to analyze the share of Hispanic and non-Hispanic voters who voted for a particular candidate in a given election.[115] Dr. Stein used the correct method only for the most recent election in 2024 when it was "suggested to [him] that there were other technologies or other methodologies that might be thought to be superior."[116] For example, in the 2022 race, Dr. Stein calculated that candidate Kaczenski received 83% of the Hispanic vote, Mafrige 30%, and Perez 5%, for a total of 108%.[117] Similarly, in 2018, Dr. Stein calculated that candidate Caesar received 9.2% of the Hispanic vote, and candidate Lezama received 99.01%, for a total of 108.43%.[118] Defendants' expert, Dr. Alford, has been testifying in Voting Rights Act litigation for 39 years, and has never seen an expert apply the same methodology that Dr. Stein applied in this case.[119] Dr. Stein's methodology used to calculate the share of the Hispanic and non-Hispanic vote received by each

---

[115] 5RT90:3-90:21; 127:11-21 (Alford); DX 7; DX 8; DX 73.

[116]   5RT90:3-90:21; 127:11-21 (Alford); DX 7; DX 8; DX 73.; 5RT25:14-22.

[117] PX 129.

[118] PX 125.

[119] 5RT126:13—127:2.

candidate from 2015-2022 is therefore unreliable, and cannot support a finding of racially polarized voting behavior in SBISD elections.

## G. Racially-Polarized Elections in SBISD[120]

53.P  Voting in SBISD board elections is racially-polarized based upon Dr. Stein's multiple analyses, each of which confirmed his conclusions that statistically significant evidence exists that racially polarized voting exists in SBISD trustee elections from 2015-2024, White non-Hispanic voters vote sufficiently as a bloc to enable them, absent special circumstances, to defeat the minority voters' preferred candidate of choice, and that the geographic concentration of Hispanics in SBISD is sufficiently large and compact to constitute a majority of the citizens voting age population in one or more single member districts under an illustrative seven member plan.[121]  Dr. Stein's opinion, with which

---

[120]  "For purposes of §2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of the voter correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Gingles*, 106 S.Ct. at 2772. "[W]e reject appellants' argument that racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*, is that the reasons [minority] and white voters vote differently have not relevance to the central inquiry of §2. By contrast, the correlation between race of the voter and the selection of certain candidates is crucial to that inquiry." *Id*. at 2772-73.

[121]  PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX124; PX123; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein); 2RT197:22-198, 200:20-201

this Court agrees, is that each of the three *Gingles* pre-conditions is satisfied based upon both reasonable mathematical and statistical probability.[122]

53.D   By contrast, Dr. Alford used the proper EI RxC or "Bayesian" method for calculating the percentage of the Hispanic and non-Hispanic vote earned by each candidate in SBISD elections.[123] The Bayesian method is the universally accepted technique for analyzing this data.[124] Dr. Alford's analysis shows that there is insufficient evidence to conclude that voting is racially polarized in SBISD elections, and also demonstrates the inadequacy of Dr. Stein's methodology. For example, in the 2023 election between Lopez and Anderson, Dr. Alford's analysis found that Lopez, a Hispanic candidate, received an estimated 62% of Hispanic votes, a level very similar to candidate Downs' 64% of Hispanic voters.[125] Dr. Stein, on the other hand, found that Lopez received 90% and Downs received 85% of the Hispanic vote.[126] Dr. Stein's incorrect methodology therefore grossly overestimated the share of the Hispanic vote received by the Hispanic-preferred candidates, thereby exaggerating the estimated level of racial polarization in

---

(Elizondo); 3RT108-110, 118 (Lopez); 3RT137-139 (Lezama); 5RT130-131, 133-136, 145 (Alford).

[122] 4RT66:24-67:3.

[123] 5RT76:2-77:12 (Alford).

[124] 5RT76:2-77:12 (Alford).

[125] DX 8 at p. 6.

[126] DX 8 at p. 6.

SBISD elections. When Dr. Stein realized his error and utilized the appropriate method for analyzing the 2024 SBISD elections, he found that no candidate garnered more than 30% of the Hispanic vote, with candidate Drews obtaining 29% of the Hispanic vote, candidate Slattery 26%, candidate Cone 24%, and candidate Hanson 14%.[127] Notably, this means that 70% of Hispanic voters preferred a candidate other than Drews.[128]  Further, because of the wide credibility intervals (for example, a 95% confidence that Hispanic support for candidate Drews was between 11% and 51% and between 9% and 48% for Slattery--quite a large gap for each), it is not possible to say with any statistical certainty that Slattery, the victorious candidate, was not the Hispanic-preferred candidate.[129] Therefore, even according to Plaintiff's expert, there was no candidate in the 2024 SBISD election who was clearly preferred by Hispanic voters over the other candidates. Accordingly, Plaintiff has failed to carry her burden to demonstrate that voting in SBISD elections, and therefore plaintiff has failed to establish the second *Gingles* factor by a preponderance of the evidence.

54.P Hispanics are politically cohesive in SBISD elections and vote as a bloc for Hispanic-preferred candidates.[130]  The District's

---

[127] PX 136.

[128] DX 73 at p. 4.

[129] DX 73 at p. 4.

[130]
 PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX122; PX123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein); 2RT197:22-198, 200:20-201

contrary reliance upon Dr. Alford's mathematical theory of voter cohesion, "has no foundation in the applicable caselaw" and is unwarranted. *See, e.g., Flores v. Town of Islip*, 382 F. Supp. 3d 197, 233 (E.D.N.Y. 2019)(rejecting Dr. Alford's attempt to advance the same mathematical theory of polarization proposed here). *See also Miss. State. Conf. of the NAACP v. State Bd. Of Election Comm'rs*, No, 3:22-CV-734, 2024 U.S. Dist. LEXIS 127352 *136-137 (S.D. Miss. July 2, 2024)(noting previous instance of Alford polarization testimony in *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), where "the court found his 'opinions are unsupported by meaningful substantive analysis' and 'border on ipse dixit," and likewise finds his opinions did not overcome testimony of plaintiff's expert).

54.D   Moreover, Plaintiff's expert improperly and incorrectly analyzed the cohesiveness of the Hispanic vote in SBISD elections. "Cohesion" among voters is a continous measure that varies from no cohesion at all to complete cohesion.[131] "A 51% majority is 'far short of the large majority typically required to show political cohesion.'" *Petteway v. Galveston Cnty.*, 698 F.Supp.3d 952, 140 (S.D. Tex. 2023) (quoting *Abbott*, 604 F.Supp.3d at 499).When a group splits its vote 50/50 between two candidates, there is no cohesion among members of the group because each candidate earned an equal share of the group members' vote.[132] This would not be a large or overwhelming majority of voters voting as a bloc at 50%. If 100% of the members of a group vote for the same candidate, that

---

(Elizondo); 3RT108-110, 118 (Lopez); 3RT137-139 (Lezama); 5RT130-131, 133-136, 145 (Alford).

[131] 5RT77:13-18 (Alford).

[132] 5RT77:19-24 (Alford).

is perfect cohesion.[133] Therefore, the only nonarbitrary point at which cohesion is present is when a candidate receives more than 75% of the vote of a particular group – this is the center point between zero cohesion (50/50) and perfect cohesion (100% for one candidate).[134] The 2024 SBISD election showed an absence of cohesive voting, with no one candidate receiving a significant enough share of the Hispanic vote to indicate a cohesive preference for that candidate by Hispanic voters.[135] Moreover, the 2023 SBISD election showed an absence of cohesion in the Place 1 and Place 2 elections. In the Place 1 election, candidate Lopez received an estimated 62% of the Hispanic vote, and candidate Anderson received an estimated 38% of the Hispanic vote – a substantially divided Hispanic electorate.[136] Similarly, in the Place 2 election, candidate Downs received approximately 64% of the Hispanic vote and candidate Mahan received approximately 36% of the Hispanic vote; this is not cohesive voting because neither candidate received at least 75% of the Hispanic vote, and a significant percentage of Hispanic voters did not vote for the purported Hispanic-preferred candidate.[137] Moreover, there is a wide margin of error here. For example, candidate Anderson's share of the Hispanic vote is estimated to be somewhere between 10% and 70%. It is therefore statistically difficult to definitively say which candidate was preferred by Hispanic voters.[138] Accordingly, Plaintiff has not met her burden to

---

[133] 5RT78:9-10 (Alford).

[134] 5RT78:21-25 (Alford).

[135] 5RT82:10-25 (Alford).

[136] 5RT83:5-15 (Alford).

[137] 5RT83:16-20 (Alford).

[138] 5RT82:21-83:17.

show that Hispanic voters vote as a cohesive group to support the same candidates in SBISD elections, and therefore Plaintiff has failed to establish the second *Gingles* precondition by a preponderance of the evidence.

55.P  In SBISD, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice.[139]

55.D  Additionally, Plaintiff has failed to show that Anglos vote as a politically cohesive bloc against minority-preferred candidates.

56.P Throughout SBISD as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.[140]

56.D  For example, in the 2024 SBISD election, candidate Slattery received approximately 58.3% of the non-Hispanic voter support, meaning more than 40% of non-Hispanic voters preferred one of the other three candidates – Cone, Drews, or Hanson.[141] Similarly, in the 2023 SBISD Trustee elections, candidate Lopez (the purported

---

[139]
  PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX122; PX123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein); 2RT197:22-198, 200:20-201 (Elizondo); 3RT108-110, 118 (Lopez); 3RT137-139 (Lezama); 5RT130-131, 133-136, 145 (Alford).

[140]
  PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX122; PX123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein); 2RT197:22-198, 200:20-201 (Elizondo); 3RT108-110, 118 (Lopez); 3RT137-139 (Lezama); 5RT130-131, 133-136, 145 (Alford).

[141] DX 73 at p. 3.

Hispanic-preferred candidate in the Place 1 election) received approximately 31% of the non-Hispanic vote, and candidate Downs (the purported Hispanic-preferred candidate in the Place 2 election) received approximately 30% of the non-Hispanic vote.[142] These are relatively high levels of white crossover voting, showing that there was not significant cohesion among white voters sufficient to create a voting bloc to defeat the Hispanic-preferred candidate in SBISD elections.[143]

57. P  In SBISD, minority voting power is not protected through the creation of minority majority Trustee districts.[144]

57. D  SBISD, like the majority of Texas school districts, uses an at-large election system, which is specifically permitted by law.[145]

58. Dr. Stein analyzed the extent to which voting behavior in SBISD trustee elections is racially polarized using three statistical analytical techniques: (a) ordinary least squares ecological regression analysis (OLS or ER);[146] (b) ecological inference

---

[142] DX 8 at p.  6.

[143] DX 73 at p. 3; DX 8 at p.  6; 94RT94:14-25.

[144] Dkt. 99, ¶¶14, 17, 18, 20.

[145] PX 66; 3RT199:2-10 (Porter); 5RT99:8-9 (Alford).

[146]
 PX1, pp. 4-7; PX19; PX20; PX21; PX22; 4RT30-36 (Stein).

*See, e.g., Rollins v. Fort Bend Indep. Sch. Dist.* 89 F.3d 1205, 1209 n. 6 (5th Cir. 2009)("[s]tatistical regression analysis is a mathematical technique which looks at the relationship between two variables." "Both the Supreme Court and Fifth Circuit have sanctioned the use of regression analysis to prove voting rights violations. *See Thornburg v. Gingles*, 106 S. Ct. 2752, 2761 (1986); and *Houston v. Lafayette County*, 56 F.3d 606, 612 (5th Cir. 1995).") *Benavidez,* 638 F. Supp.2d at 723("ecological regression analysis approved in *Gingles* and utilized by numerous courts in Voting Rights Act cases; technique is "essentially based on a

analysis (EI);[147] and (c) a later version of EI software, known as the ei.MD.bayes application.[148] Dr. Stein analyzed each of the SBISD elections from 2015 to 2024[149] and found that a strong pattern of racial and ethnic voter polarization exists.[150]

59. Racially polarized voting is established when the direction of the relationships between the race or ethnicity of voters and candidates are "signed" in opposite directions.[151] A second

---

scatter plot in which the horizontal axis reflect the Hispanic percentage of total voters ... and the vertical axis shows the percent of vote received by the Hispanic [preferred] candidate. A straight line, called the line of best fit, is plotted through the data . . . . [T]his methodology in some cases may result in estimates that go below zero or above 100 for a given precinct."); *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1214-15 (S.D.Tex. 1997)(noting Supreme Court and Fifth Circuit approval of use of regression analysis to evaluate voter polarization and discussing how slope of the regression line indicates the relationship between votes cast by voting populations and the various candidates).

[147] PX2, pp. 1-14; PX3, pp. 2-5; PX4, pp. 1-2; PX122; PX 123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT48:21-61 (Stein). *See Benavidez*, 638 F.Supp.2d at 723 (noting that "[r]ecently EI [ecological inference] has been used to supplement evidence derived from . . . ER.").

[148] PX136, pp. 4-6; PX137; 4RT25-27, 61-67, 100-102 (Stein).

[149] Dr. Stein's first report, PX1, analyzed elections between 2015 and 2021 using the OLS or ER method; Dr. Stein's second report, PX2, analyzed elections between 2015 and 2021 using the EI method; Dr. Stein's third report, PX3, analyzed the 2022 elections using the EI method; Dr. Stein's fourth report, PX4, analyzed the 2023 elections using the EI method; and Dr. Stein's fifth report, PX136, analyzed the 2024 elections, using the ei.MD.bayes application. 4RT25-27, 30-31,48-51,58-59, 61-62 (Stein).

[150] PX1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp.2-5;PX4, pp.1-2; PX136, pp. 2-6; PX19; PX20; PX22;;PX21; PX122; PX123; PX124; PX125;PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein)

[151] PX1, pp. 5-7; PX19; PX20; PX21; PX22; 4RT29-36 (Stein).

condition for polarized voting is when the White majority vote against a minority preferred candidate e.g., a Hispanic candidate, is significant and positive.[152] That is, the share of vote the Hispanic-preferred candidate receives increases significantly as the proportion of Hispanic voters in each voting district increases. Racially polarized voting is observed in every election in SBISD studied by Dr. Stein.[153]

60. As evidenced in Figures 1 - 4 below (PX19, PX20, PX21 and PX22) White and Hispanic voters diverge in their support for each candidate on the ballot, including uncontested contests, where under votes are treated as a second candidate.[154]

*Fig 1: The proportion of vote cast for white candidate and Share of vote White Candidate Vote Share by Percent White in Precinct*



---

[152] PX1, pp. 5-7; PX19; PX20; PX21; PX22; 4RT29-36 (Stein).

[153] PX1, pp. 5-7; PX19; PX20; PX21; PX22; 4RT29-36 (Stein).

[154] PX1, pp. 5-7; PX19; PX20; PX21; PX22; 4RT29-36 (Stein).

*Fig 2: The proportion of vote cast for white candidate and Share of vote Hispanic*



*Fig 3: The proportion of vote cast for Hispanic candidate and Share of vote White*



*Fig 4: The proportion of vote cast for Hispanic candidate and Share of vote Hispanic*



61.P As the foregoing graphs indicate, whites and Hispanics had opposite preferences for candidates in all SBISD elections but one from 2015 to 2021.[155] The Hispanic preferred candidate lost in every trustee election in SBISD save one, when, in 2017, both White and Hispanic voters preferred Gonzales (a non-Hispanic but Hispanic-surnamed candidate).[156] The White majority preferred

---

[155]

  PX19; PX20; PX21; PX22; PX122; PX123; PX124; PX125; PX126; PX127;PX135; PX137.

[156]

  PX19; PX20; PX21; PX22; PX122; PX123; PX124; PX125; PX126; PX127;PX135; PX137.

different candidates and their preferred candidates also won every election in the time period examined from 2021 through 2024.[157]

61.D  The graphs produced by Dr. Stein do not demonstrate statistically significant racially polarized voting in SBISD elections. It is clear that, rather than clustering tightly along the prediction line in the graphs as one would expect if ethnicity of the candidates and voters was the driving force in vote choice in these elections, the results are scattered all over the range of possible vote shares. Even if one focuses on specific polling places, very different results are evident. For example, according to Stein's Figure No. 1, in precinct 42 over 80% of voters supported the non-Hispanic white candidate in 2015, but less than 20% of voters supported the non-Hispanic white candidate in the next election in 2017. This highly scattered pattern suggests that the voters were responding to some set of influences well beyond the ethnicity of the candidates.[158]

62. In addition, Dr. Stein performed an election-by-election analysis of racially polarized voting in the Spring Branch Independent School District's trustee elections using ecological inference (EI) statistical techniques.[159] Analyses of racially-polarized voting was conducted for all contested and uncontested trustee elections between 2015 and 2023 using the EI approach.[160]

---

[157] PX19; PX20; PX21; PX22; PX122; PX123; PX124; PX125; PX126; PX127;PX128; PX129;PX130; PX131:PX132:PX133; PX134;PX135; PX137.

[158] PX 7 at p. 4.

[159] PX2; PX3, PX4.

[160] PX2, PX3, PX4.

63. Ecological inference is a statistical technique using precinct election data and either voter history files by precinct or Census demographic data by precinct to construct individual voting behavior from aggregate data. The method accounts for racial variation in voting behavior by precinct, to arrive at the most likely point estimate corresponding to the share of the vote for each racial/ethnic group and each candidate.[161]

64.P The results of Dr. Stein's EI analysis of racial polarization confirmed his conclusions that:(a) there is statistically significant evidence of racially-polarized voting in the Spring Branch Independent District's Board of Trustees elections for the period 2015-2023; and (b) White Non-Hispanics vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice.[162] As discussed in greater detail in Part K below, the presence or absence of what the District terms "partisan" polarization is of no consequence and, in any event, the District did not present "reliable or methodologically sound evidence sufficient to sustain its burden that Anglo bloc voting 'thwarts' . . . Latino voting . . . for reasons wholly unconnected to race" in a manner that "thwarts a distinctive minority vote." *Petteway*, 698 F. Supp.3d at 1011. *See Miss. State. Conf. of the NAACP*, 2024 U.S. Dist. LEXIS 127352 *136-137 (as in *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), Alford polarization opinions unsupported by meaningful substantive analysis and border on ipse dixit).

---

[161] Dkt. 99, ¶34.

[162] PX2; PX3; PX4; PX125; PX137; 4RT25-27,48-61, 66-67 (Stein).

64.D  There is not "legally significant" evidence of racially polarized voting in SBISD. "As the Court in *Gingles* held, the question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *LULAC Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5TH Cir. 1993). "Electoral losses that are attributable to partisan politics do not implicate the protections of § 2." *Id.* At 863.  The Fifth Circuit agrees that there is not legally significant polarized voting "[w]hen the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *Id.* At 850. In this case, the record proves that the outcomes of SBISD elections are attributable to the influence of partisan politics and low Hispanic voter turnout, not by race or racial bias. As such, Plaintiff has not satisfied the *Gingles* preconditions.

65.P  In 2015 there were two trustee elections in which four candidates vied for two seats on the  SBISD Board of Trustees. Elizondo and Vierra contested for one of the two seats and Dawson and Adams competed for the other seat.[163] The descriptive analysis, correlations and estimated proportion  of vote for each candidate by the race/ethnicity of voters confirm significant racially-polarized  voting among Hispanic and White voters in both elections.[164] On average the share of the White vote received by Vierra was 85.9% compared to 13.4% for Elizondo.[165] The share of the Hispanic vote for the same pair of candidates was 92% for Elizondo and 1% for Vierra.  In the Dawson/Adams   contest, Dr.  Stein

---

[163] Dkt. 99, ¶35.

[164] PX2, pp. 1-3.

[165] PX2, p.1; PX122.

observed the same polarized voting among Whites and Hispanics. Dawson's average share of the White vote was 87.7% and 1.3% share of the Hispanic vote cast.[166] Conversely, Adams' share of the Hispanic vote was 98% and his share of the White vote was 12.1%.[167] The confidence intervals for these findings shows the estimated proportions are reliable and significant.[168]

65.D In Plaintiff's campaign for trustee in 2015, she was supported by an ethnically diverse group of voters.[169] Her campaign did not send mailers to potential voters.[170] But Plaintiff did align herself with traditionally liberal or Democrat groups and issues. Plaintiff's campaign engaged in phone banking with the help of the Spring Branch American Federation of Teachers, or AFT, which is a teacher's union group.[171] Plaintiff was also endorsed by another union group, the AFL-CIO.[172] Plaintiff only received 359 total votes in this election; her opponent, Chris Vierra, received almost five times as many votes – a total of 1,739.[173] Plaintiff did not receive more votes than her opponent in any of SBISD's precincts, including Precincts 41 and 47, which make up Plaintiff's illustrative district.[174] Accordingly, it is highly improbable that Plaintiff

---

[166] PX2, p.1; PX123.

[167] PX2, p.1; PX123.

[168] PX2, pp. 1-3.

[169] 2RT206:24-207:1 (Elizondo).

[170] 2RT207:2-4 (Elizondo).

[171] 2RT207:2-208:2 (Elizondo).

[172] 2RT208:3-7 (Elizondo).

[173] DX 20; 2RT208:8-19 (Elizondo).

[174] DX 20; 2RT208:24-209:7 (Elizondo).

would have carried the vote in Plaintiff's illustrative district in the 2015 election. Plaintiff has therefore not shown that her illustrative district would provide Hispanic voters a real opportunity to elect a candidate of their choice.

66. Mettenbrink and Gonzalez (a Hispanic-surnamed but Non-Hispanic candidate) contested for one seat on the SBISD board in 2017.[175] The contest between Mettenbrink and Gonzalez did not reflect significant evidence of racially-polarized voting.[176] The EI analysis shows Gonzalez, the incumbent, garnered a majority of support from both White (74.5%) and Hispanic voters (90.8%).[177] The difference in White voter support versus Hispanic voter support for Gonzalez, however, is 16.3 percentage points, a significant margin but not sufficient to demonstrate that non-Hispanic Whites voted as a block to defeat the Hispanic candidate of choice, Gonzalez.[178] Although Ms. Gonzales has a Hispanic surname, she is not Hispanic.[179]

67. P Two trustee positions were on the 2018 ballot, but only one position was contested. The contested election featured Caesar and Lezama. The second contest featured the uncontested reelection of Vierra.[180] Evidence of racially-polarized voting is evident in the Caesar and Lezama election.[181] The Vierra re-election exhibits

---

[175] Dkt.99, ¶36.

[176] PX2, p. 3.

[177] PX2, pp.3-15; PX124.

[178] PX2, p.3.

[179] 1RT83:12-20 (Klussmann);4RT53:3-7 (Stein).

[180] Dkt. 99, ¶37.

[181] PX2, pp. 5-8; PX125.

weak evidence of racially polarized voting.[182] The descriptive plots and correlations for Caesar's and Lezama's respective shares of White and Hispanic vote show that their support significantly diverges between White and Hispanic voters.[183] Caesar's vote share is positively related (.80)to the share of the White vote in each precinct and negatively (-.76) related to the share of the Hispanic vote in each precinct.[184] Conversely, Lezama's vote share is positively related to the share of the Hispanic vote in each precinct (.77) and negatively related to the share of the White vote (-.82) in each precinct.[185] The EI estimates of the mean proportion of White and Hispanic vote for each candidate further underscore the racially polarized voting in this election. Caesar and Lezama received 54% and 35% of the White vote respectively and 9% and 99% of the Hispanic vote respectively.[186] The confidence intervals show these differences to be significant.[187]

67.D    In the 2019 election, Mr. Lezama, like Plaintiff, also aligned himself with traditionally Democrat/liberal groups and issues. He was endorsed by the American Federation of Teachers – the same union group that endorsed Plaintiff Elizondo's candidacy in 2015.[188] Mr. Lezama publicized this endorsement on his campaign website, with direction from Crag Adams, the president of the

---

[182] PX2, p.5.

[183] PX2, p.6.

[184] PX2, p.6; PX125.

[185] PX2, p.6.

[186] PX2, p.6.

[187] PX2, p.6.

[188] 3RT155:2-6 (Lezama).

Spring Branch AFT.[189] Mr. Lezama testified that, although he was not active in an political parties at the time of his candidacy, he is "looking forward to" being active in the Democratic Party.[190] There is no evidence that Mr. Lezama's opponent, Minda Caesar, aligned herself with liberal causes or groups. Mr. Lezama testified that it was important for candidates – even in his election contest – to "talk about being fiscally responsible" and to "make sure that you don't lean to progressive or liberal because, otherwise, you won't get voted in."[191] Accordingly, partisan politics, not race, best explains the outcome of the 2018 Lezama-Caesar election.

68.P One trustee seat was contested in 2019 with two candidates, Lopez and Breed. Two other Trustees, Peck and Goodson, ran unopposed for re-election.[192] The descriptive plots and correlations for the Lopez and Breed election show substantial racial polarization between the vote for both candidates among White and Hispanic voters.[193] Vote shares for the two uncontested trustee elections show weak evidence of racially-polarized voting when the under vote in these two elections is measured against the vote for the two uncontested candidates.[194] The share of vote cast for Breed was positively related (.68) to the share of the White vote in each precinct and negatively related to the share of the Hispanic vote

---

[189]   3RT155:2-20 (Lezama); DX 66.

[190]   3RT155:2-156:2 (Lezama).

[191]   3RT158:17-151:1 (Lezama).

[192]   Dkt. 99, ¶38.

[193]   PX2, pp.8-11.

[194]   PX2, pp.8-9.

in each precinct (-.84).[195] Conversely, Lopez's share of the vote is positively related to the share of the Hispanic vote in each precinct (.84) and negatively related to the share of the White vote in each precinct (-.68).[196] The EI estimates of the mean proportion of the White and Hispanic vote for each candidate are skewed.[197] Lopez received a 24.7% mean share of the White vote while garnering a 98% mean share of the Hispanic vote.[198] Breed received a 75% mean share of the White vote and mean share of less than 2% of the Hispanic vote.[199]

68.D  In the 2019 election, candidate Lopez also aligned his campaign with traditionally liberal/Democrat groups and issues. Mr. Lopez is "not a far right-wing political person."[200] During his 2019 campaign, Mr. Lopez emailed Rebecca Shulka, a representative of a left-leaning group called "Swing TX Left"; Ms. Shulka block walked for Mr. Lopez's campaign.[201] Mr. Lopez also reached out to Mario Orrantia of the Texas Democratic Party and expressed that his campaign strategy was to "target Democratic primary voters to come

---

[195] PX2, p.9; PX126.

[196] PX2, p.9.

[197] PX2, p.9.

[198] PX2, p.9.

[199] PX2, p.9.

[200] 3RT127:13-16 (Lopez).

[201] 3RT130:12-131:1 (Lopez); DX 59.

out to vote."[202] Carter Breed, a registered Republican,[203] prevailed over David Lopez in this election. As such, partisan politics, not race, best explains the outcome of the 2019 Lopez-Breed election.

69.P There were elections for two trustee positions in 2021. The contested election was between Elizondo and Earnest. Caesar ran unopposed for re-election.[204] The descriptive plots and correlations show that the degree of racially-polarized voting in the contest between Elizondo and Earnest was significant.[205] On average, Earnest garnered 66% of White voters' support compared to only 34% for Elizondo.[206] Elizondo's estimated proportion of the Hispanic vote was 92.5% compared to only 5.7% for Earnest.[207] The confidence intervals show these estimates to be statistically significant.[208]

71.D In Plaintiff's election against Chris Earnest in 2021, Plaintiff again aligned herself with traditionally Democrat/ liberal groups and causes. The AFL-CIO union group again made phone bank calls on her behalf to promote her candidacy and gave Plaintiff a formal endorsement.[209] Union involvement in SBISD became an issue of importance to voters in the 2021 election, and

---

[202] 3RT131:2-23 (Lopez).

[203] 3RT159:2-6 (Lezama).

[204] Dkt.99, ¶39.

[205] PX2,pp.11-14; PX127.

[206] PX2, p.11.

[207] PX2, p.11.

[208] PX2, p.11.

[209] 2RT209:11-13 (Elizondo); 2RT215:16-216:1-6 (Elizondo); DX 16.

Plaintiff was argued to be the candidate who would bring union involvement into SBISD.[210] Although Plaintiff considers herself an "independent," she has voted in the Democratic primary election, but has never voted in the Republican primary elections.[211] Plaintiff was denied attendance to the Village Republican Women's event in 2021 because her opponents believed Plaintiff was a Democrat.[212] Plaintiff received several emails from potential voters inquiring about her positions on hot-button political issues such as "Critical Race Theory" (CRT), gender education, and the 1776 / 1619 Projects, but Plaintiff cannot recall whether or how she responded to these inquiries because Plaintiff had designated this duty to others within her campaign team.[213] Despite CRT being a hot button issue of importance to voters, Plaintiff did not know what it was at the time, nor did she attempt to communicate her position on this issue to the community.[214] Plaintiff was endorsed by the Democratic Party and by Democratic Congressional candidate Diana Alexander.[215] By contrast, Chris Earnest aligned himself with traditionally conservative / Republican causes. Mr. Earnest was endorsed by the Republican Party.[216] He was very vocal about not

---

[210] 2RT216:7-13 (Elizondo)

[211] 2RT206:8-20 (Elizondo).

[212] 2RT214:9-23 (Elizondo).

[213] 2RT209:18-211:1(Elizondo).

[214] 2RT211:14-19 (Elizondo).

[215] 2RT215:3-10 (Elizondo).

[216] 4RT108:8-15 (Earnest).

wanting kids to have to wear masks at school.[217] Chris Earnest communicated to potential voters that he was against union involvement in SBISD.[218] He appeared as a guest on the conservative radio program: The Michael Berry Show which was broadcast to voters in the Houston area.[219] SBISD voters viewed Earnest as the conservative candidate with conservative values such as opposition to mask mandates and support for in-person rather than virtual education during the COVID pandemic.[220] Chris Earnest's victory over Plaintiff in the 2021 election is best explained by partisan politics, not by race. Moreover, candidate Earnest earned more votes than Plaintiff in the Landrum Middle School zone (Precinct 41), and it is therefore uncertain whether Plaintiff would have garnered more votes than Earnest in Plaintiff's proposed illustrative district, which is comprised of Precinct 41 and part of Precinct 47. Plaintiff has therefore not shown that her illustrative district would provide Hispanic voters a real opportunity to elect candidates of their choice.

72. Dr. Stein's EI findings show that five of the six contested trustee elections between 2015 and 2021 exhibited significant racially- polarized voting among Hispanic and White voters.[221] One

---

[217] 2RT218:3-6 (Elizondo); 4RT128:8-13 (Earnest); 4RT108:8-13 (Earnest).

[218] 4RT128:8-18 (Earnest).

[219] 4RT112:3-16 (Earnest).

[220] 4RT12:7-15 (Perez); 4RT47:8-48:1.

[221] PX2, p.14.

contested election demonstrates modest racially-polarized voting.[222] The findings in PX2 confirm and corroborate those reported in PX1, Dr. Stein's first report.[223]

73.P In 2022 three trustee positions, 5, 6 and 7 were on the ballot. All three elections were contested.[224] Dr. Stein also analyzed the 2022 elections.[225] The results of Dr. Stein's EI analysis of racially-polarized voting in the 2022 election shows: (a) there is statistically significant evidence of racial polarized voting in the 2022 Spring Branch Independent District's Board of Trustees elections; and (b) White Non-Hispanics voted sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice in each of the three 2022 trustee elections.[226]

71.D  The results of the 2022 SBISD elections are also best explained by partisan politics, not by race.

72.P Two candidates contested for the SBISD District Trustee Position 5 seat in 2022.[227] Alpe defeated Breed by a margin of 67%

---

[222] PX2, p.14.

[223] PX2, p.14; 4RT25:23-26:3 (Stein).

[224] Dkt.99, ¶40.

[225] PX3.

[226] PX3, p.2.

[227] Dkt.99,¶41.

to 33%.[228] The EI estimates of the mean proportion of the White and Hispanic vote for each candidate in the District 5 Trustee election are significantly skewed.[229] Alpe received a 76% mean share of the White vote while Breed garnered a 25% mean share of White voters' support.[230] Breed received a 93% mean share of the Hispanic vote and Alpe received a 3% mean share of Hispanic voters' support.[231] These findings provide evidence of racially-polarized voting in the election for Trustee Position 5, sufficient to prevent the candidate preferred by Hispanic voters, Breed, from being elected.[232] The cohesiveness of White voter support for Alpe and against Breed, the preferred Hispanic candidate, was sufficient to prevent the election of Breed.[233]

72.D  Candidate Lisa Alpe defeated Candidate Breed in the Position 5 election.[234]  Although candidate Breed was a registered Republican,[235] candidate Alpe distinguished herself as the more conservative candidate. Carter Breed was endorsed by the Democratic party and never disavowed it, and was therefore labeled and

---

[228] PX3, p.2.

[229] PX3, p.2.

[230] PX3, p.2; PX128.

[231] PX3, p.2; PX128.

[232] PX3, p.2.

[233] PX3, p.2.

[234] PX 87.

[235] 3RT159:2-6 (Lezama).

perceived as a Democrat by voters.[236] Conversely, voters perceived Alpe as the candidate with conservative values.[237] She was endorsed by the conservative Spring Branch Families PAC.[238] Alpe had an alliance with the other two conservative candidates in the race – Perez and Bennett.[239] As such, partisan politics, not race, explains the outcome of the 2022 Alpe-Breed election. Moreover, Alpe received more votes than Breed in the Landrum (Precinct 41) and Northbrook (Precinct 47) Middle School zones – the two precincts combined to make Plaintiff's illustrative district.[240] Accordingly, it is unlikely that the purported Hispanic-preferred candidate (Breed) would prevail in the illustrative district, and Plaintiff has not shown that her proposed district would provide Hispanic voters a real opportunity to elect a candidate of their choice.

73.P Three candidates contested for SBISD Trustee Position 6 seat in 2022, including Perez, Mafrige and Kaczenski.[241] The winner, Perez, garnered 65.6% of the votes cast, Kaczenski finished second with 27.8% of the votes cast, and Mafrige received 6.6% of the votes cast.[242] White voters overwhelmingly preferred Perez to

---

[236] 4RT115:2-9 (Earnest).

[237] 5RT51:3-9(Anderson); 4RT115:10-12 (Earnest).

[238] 5RT39:19-40:1 (Perez)

[239] 5RT37:12-16 (Perez).

[240] PX 87.

[241] Dkt. 99, ¶42.

[242] PX3, p.3.

Mafrige and Kaczenski.[243] Perez received a 73% mean share of the White vote while Mafrige and Kaczenski received a 5% and a 21% mean share of the White vote respectively.[244] Kaczenski received an 83% mean share of Hispanic voters' support compared to a 5% and a 30% mean share of Hispanic vote for Perez and Mafrige respectively.[245] The election  for Trustee Position 6 demonstrates racially-polarized voting.[246] Hispanic and White voters demonstrate sufficient cohesiveness in their support for different candidates.[247] The cohesiveness of White voter support for Perez was sufficient to elect Perez, and block the election of Hispanic voters' preferred candidate, Kaczenski.[248]

73.D  The outcome of the 2023 SBISD election in which Candidate John Perez defeated candidates Ed Kaczenski and Laura Mafrige is also best explained by partisan politics, not race. Candidate Perez, who is Hispanic, set himself apart as the most conservative candidate in that race. Mr. Kaczenski was endorsed by the Democratic Party, while candidate Perez was endorsed by the Republican Party; these were signals to the community about the candidates' political leanings.[249] Perez was also endorsed by the 1776 Project PAC, the Harris County Republicans, the Spring Branch Families PAC, Katy Christian Magazine] and the Freedom Foundation

---

[243] PX3, p.3; PX129.

[244] PX3, p.3; PX129.

[245] PX3, p.3; PX129.

[246] PX3, p.3.

[247] PX3, p.3.

[248] PX3, p.3.

[249] 5RT30:10-23 (Perez).

of Texas, all of which are conservative organizations.[250] He was also endorsed by Republican Party Chairman Matt Rinaldi.[251] Perez allied himself with the other two conservative candidates–Bennett and Alpe[252] who were all endorsed by the Parents for in-Person Education (or PIPE Line) steering committee, an organization pushing for in-person education and against COVID regulations in schools.[253] Perez opposed the "woke ideology that had become pervasive into our schools,"[254] and differentiated himself from his opponents by speaking against the sexually explicit materials in school libraries.[255] Voters perceived John Perez as the conservative candidate with conservative values.[256] Accordingly, John Perez's election is best explained by partisan politics, not racial animus.[257]

74.P It is noteworthy that a Hispanic surname candidate Perez garnered minuscule support among Hispanic voters, while the White candidate, Kaczenski, received in excess of 80% of the Hispanic

---

[250] DX 31; 5RT24:13–25:14 (Perez).

[251] 5RT25:21–24 (Perez).

[252] 5RT37:5–16 (Perez).

[253] 5RT39:19–40:1 (Perez).

[254] 5RT12:7–25 (Perez).

[255] 5RT20:6–11 (Perez).

[256] 4RT114:11–17 (Earnest). 5RT51:3–16 (Anderson).

[257]
 Laura Mafrige only received 878 votes, about 6% of the total votes cast, and is therefore not considered a serious candidate under Voting Rights Act precedent. *See* DX 11; *Teague v. Attala County*, 92 F.3d 283 (5th Cir. 1996) ("Michael Lee could not realistically be considered a serious candidate given the paucity of support (less than 10%) that he earned from any segment of the voting population).

vote.[258] Hispanic voters in SBISD were not persuaded to vote for Mr. Perez solely on the basis of his Hispanic surname, a not unexpected finding.[259] A preferred candidate of Hispanic voters does not assume nor require that the preferred Hispanic candidate share the race or ethnicity of Hispanic voters.[260]

74.D   Notably, Perez is of Hispanic heritage (Mexican-American) and has a Hispanic surname.[261] His father was a migrant worker who picked crops from Texas to Wisconsin, but eventually became the mayor of Carrizo Springs, Texas.[262] Mr. Perez was born in Carrizo Springs where he lived until fourth grade, when he began to live abroad, including in Guatemala and Costa Rica.[263] According to Plaintiff's expert, Mr. Perez was not the Hispanic-preferred candidate, but was instead preferred overwhelmingly by Anglo voters.[264] If Plaintiff is correct, this demonstrates that Anglo voters clearly did not perceive Mr. Perez's race to be a problem in electing him to office.[265] As such, partisan politics is the logical explanation for the outcome of the Perez-Breed election.

75. The 2022 Spring Branch ISD Trustee elections continued a trend of racially-polarized voting in SBISD trustee elections dating

---

[258] PX3, p.3.

[259] PX3, p.3.

[260] PX3, p.3.

[261] 5RT6:22-25 (Perez).

[262] 5RT8:1-6 (Perez).

[263] 5RT8:5-21 (Perez).

[264] PX 125.

[265] 5RT103:5-12 (Alford).

back to 2015.[266] The degree of racially-polarized voting observed in 2022 occurred in an election where more voters cast a ballot than in previous trustee elections.[267] As Dr. Stein observed, "[i]f more voters, especially white voters, engage in racially polarized voting it is more likely than not that Hispanic voters will continue to be unsuccessful in electing the candidates of their choice.[268]

76.P In 2023 two trustee positions, Position 1 and Position 2, were on the ballot. Both elections were contested.[269] Dr. Stein also analyzed the 2023 elections.[270] The results of Dr. Stein's EI analysis of racially-polarized voting in the 2023 elections show: (a) There is statistically significant evidence of racial polarized voting in the 2023 Spring Branch Independent School District's Board of Trustees elections;[271] and (b) White Non-Hispanics voted sufficiently as a bloc to enable them, in the absence of special circumstances (e.g., single-member districts), to defeat the minority voters' preferred candidates of choice in both of the two 2023 trustee elections.[272]

---

[266] PX3, p.4.

[267] PX3, p.5.

[268] PX3,p.5.

[269] Dkt. 99, ¶43.

[270] PX4.

[271] PX4,p.1.

[272]
PX4,p.4 and DX8, p.6. See and compare PX132 and PX133, which depict the results of Dr. Stein's 2023 analysis, and PX 134 and PX135, which depict the results of Dr. Alford's analysis. Both analyses "demonstrate significant racially polarized voting in both

76.D The trend of partisan politics influencing SBISD elections continued into 2023.

77.P Two candidates contested for the SBISD District Trustee Position 1 seat in 2023.[273] Courtney Anderson defeated David Lopez by a margin of 67% to 33%.[274] The EI estimates of the mean proportion of the White and Hispanic vote for each candidate in the District 1 Trustee election are significantly skewed.[275] Anderson received an 81% mean share of the White vote while Lopez received a 16% mean share of the White vote.[276] Lopez received a 90% mean share of the Hispanic vote compared to Anderson's 3% mean share of Hispanic voters' support.[277] These findings provide evidence of racially-polarized voting in the 2023 election for SBISD Trustee Position 1, sufficient to prevent the candidate preferred by Hispanic voters, Lopez, from being elected.[278] The cohesiveness of White voter support for Anderson against Lopez, the preferred Hispanic candidate, was sufficient to prevent the election of Lopez.[279]

---

2023 SBISD trustee elections." PX136, p.4.

[273] PX4, p.1.

[274] PX4, p.1.

[275] PX4, p.1.

[276] PX4, p.1; PX131.

[277] PX4, p.1; PX131.

[278] PX4, p.1.

[279] PX4, p.1.

77.D The 2023 Place 1 election was Lopez's second attempt to run for trustee. Mr. Lopez again aligned himself with Democrat / liberal groups and causes. He was endorsed by Mom's Demand Action as the "Gun Sense" candidate, opposing guns in schools despite the State's effort to put armed marshals and police officers in each school in Texas.[280] The Blue Action Democrats publicized Lopez's endorsement by a group called "Safe Schools for All,"[281] and the Harris County Democrats Precinct 0407 posted online in support of his campaign.[282] Democratic congressional candidate Diana Alexander endorsed Mr. Lopez, promoted his campaign, and block walked on his behalf.[283] Mr. Lopez ran a very liberal campaign.[284] By contrast, Courtney Anderson aligned herself with traditionally conservative Republican groups and issues. Republican Senator Ted Cruz endorsed Lopez's opponent, Courtney Anderson.[285] Ms. Anderson attended constitutional conservatives events to get her message out.[286] Mr. Lopez agreed that far-right national political groups were attempting to influence SBISD's elections for political purposes, and that the other candidate in his election ran a partisan campaign.[287] The outcome of the 2023 Lopez-Anderson election is best

---

[280] 2RT125:7-123:6 (Lopez); DX 51.

[281] DX 54; 3RT127:17-24 (Lopez).

[282] DX 52; 3RT126:13-15 (Lopez).

[283] 3RT132:6-20 (Lopez).

[284] 4RT115:23-116:2 (Earnest).

[285] DX 56; 3RT128:24-129:8 (Lopez).

[286] DX 35-38; DX 43; DX 45; 5RT57:6-17 (Anderson).

[287] 3RT129:9-19 (Lopez).

explained by partisan politics, not race. Moreover, Courtney Anderson received more votes than David Lopez in both the Landrum (41) and Northbrook (47) precincts, the two precincts that make up Plaintiff's proposed illustrative district.[288] Plaintiff's proposed district would therefore not provide Hispanics a real opportunity to elect a candidate of their choice.

78.P Two candidates vied for the SBISD District 2 Trustee position in the 2023 election, Shannon Mahan and Becky Downs.[289] Mahan, the winner of the election, received 68% of the total vote to Downs' 32% of all votes cast.[290] Mahan received an 85% mean share of the White vote while Downs received a mean share of 17% of the White Vote.[291] Downs received an 85% mean share of the Hispanic vote compared to Mahan's 3% mean share of the Hispanic vote.[292] The 2023 election for SBISD Trustee Position 2 demonstrates racially-polarized voting.[293] Hispanic and White voters significantly diverged in their preferred candidates.[294] Hispanics overwhelmingly and cohesively preferred Downs over Mahan, the overwhelmingly preferred White candidate.[295] These findings support the conclusion

---

[288] PX 88.

[289] PX4, p.1.

[290] PX4, p.1.

[291] PX4, pp.1-2.

[292] PX4, p.2.

[293] PX4, p.2.

[294] PX4, p.2.

[295] PX4, p.2.

that  racially-polarized voting occurred in the 2023 Spring Branch ISD election for Position 1 Trustee.[296]

78.D  Similarly, the purported Hispanic-preferred candidate, Becky Downs (who is Anglo),[297] also aligned herself with liberal/Democrat groups and issues, while her opponent, Shannon Mahan, aligned herself with conservative Republican groups and issues. David Lopez supported Downs during her campaign, and they collaborated campaign resources.[298] Mahan and Anderson were the right wing candidates, while Lopez and Downs were not.[299] Mahan was endorsed by Republican Senator Ted Cruz.[300] Mahan was perceived as the conservative candidate who would continue to push the Board's conservative agenda.[301] As such, the outcome of the Downs-Mahan election can be explained by partisan politics, not race. Additionally, this election evidenced significant cross over voting, showing that voting was not racially polarized. An estimated 64% of Hispanics voted for Downs, and 36% for Mahan.[302] Using the 75% threshold for cohesion discussed by Dr. Alford, this is not cohesive voting, and demonstrates that Plaintiff failed to meet her burden with regard to the second *Gingles* factor.[303] Moreover, Mahan won both the

---

[296] PX4, p.2.

[297] 3RT128:5-8 (Lopez).

[298] DX 55; 3RT128:9-20 (Lopez).

[299] 3RT128:9-20 (Lopez).

[300] DX 56; 3RT128:24-129-8 (Lopez).

[301] 4RT115:13-22 (Earnest).

[302] DX 73; 5RT83:16-20 (Alford).

[303] DX 73; 5RT83:16-20 (Alford).

Landrum and Northbrook precincts, demonstrating yet again that Plaintiff's proposed illustrative district would not afford Hispanics a real opportunity to elect a candidate of their choice.[304]

79.P The 2023 Spring Branch ISD Trustee elections continued a trend of racially-polarized voting in SBISD trustee elections dating back to 2015 and again observed in the three 2022 Trustee elections.[305] Dr. Stein's initial and supplemental expert reports identified five of the six contested trustee elections between 2015 and 2021 that exhibited significant racially-polarized voting among Hispanic and White voters.[306] The remaining contested election demonstrated modest racially-polarized voting.[307] In 2022, the trend in racially-polarized voting in SBISD continued unabated.[308] All three trustee elections on the 2022 ballot showed significant evidence of racially-polarized voting.[309] The two 2023 SBISD trustee elections continued the trend of racially-polarized voting in the district.[310] The degree of racially-polarized voting observed in 2023 occurred in an election where voter turnout exceeded 10,000 voters, an above average turnout for school trustee elections in Harris County,

---

[304] PX 88; 3RT97:1-7 (Stein).

[305] PX4, p.2.

[306] PX4, p.2.

[307] PX4, p.2.

[308] PX4, p.2.

[309] PX4, p.2.

[310] PX4, p.2.

Texas.[311] As Dr. Stein again observed, "[i]f more voters, especially white voters, engage in racial polarized voting it is more likely than not that Hispanic voters will continue to be unsuccessful in electing the candidates of their choice."[312]

79.D   Although school board elections are nominally non-partisan in that there is no D or R next to each candidate's name, school board elections have become partisan affairs.[313] The influence of partisan politics in SBISD elections is undeniable. The Republican Party of Texas has publicly announced an intention to influence local, "non-partisan" elections, especially school board elections.[314] In fact, many of the witnesses at trial had involvement in national partisan politics, including Plaintiff's witness Duncan Klussmann (the former superintendent of SBISD), who ran for Congress as a Democrat,[315] Plaintiff's witness James Shaddix, who supported Plaintiff's campaign and also campaigned for Democrat US Congresswoman Lizzie Fletcher and Democrat US Senate candidate Colin Allred and against Republican Governor Greg Abbott, Lieutenant Governor Dan Patrick, and Republican State Senator Bettancourt, and Defendant's witness and SBISD trustee John Perez who ran for the republican nomination for Texas House District 133[316] Plaintiff's expert did not look at the role of partisan

---

[311] PX4, p.2.

[312] PX4, p.2.

[313] 2RT18:15-18 (Klussmann).

[314] DX 6; 4RT68:23-69:16 (Stein).

[315] 2RT18:19-25 (Klussmann).

[316] 5RT15:4-13 (Perez).

politics in the outcome of SBISD elections.[317] In contrast, Defendants' expert testified that partisan politics, rather than race, explains the outcomes of SBISD elections.[318]

80. PX135 below visually summarizes the results of Dr. Stein's 2015-2023 voter polarization analyses, and graphically depicts the pattern of opposite White and Hispanic vote percentages in all but one election:



**Comparison of White Voter and Hispanic Voter Preferences**

| Contest | Candidates | White Vote Percentage | | Hispanic Vote Percentage | |
|---------|-----------|----------------------|---|-------------------------|---|
| 2015 | Vierra / Elizondo | Vierra | | Elizondo | |
| 2015 | Dawson / Adams | Dawson | | Adams | |
| 2017 | Gonzales / Mettenbrink | Gonzales | | Gonzales | |
| 2018 | Caesar / Lezama | Caesar | | Lezama | |
| 2019 | Breed / Lopez | Breed | | Lopez | |
| 2021 | Earnest / Elizondo | Earnest | | Elizondo | |
| 2022 | Alpe / Breed | Alpe | | Breed | |
| 2022 | Perez / Kaczenski / Mafrige | Perez | | Kaczenski | |
| 2022 | Bennett / Slattery / Morace | Bennett | | Slattery | |
| 2023 | Anderson / Lopez (Stein Report) | Anderson | | Lopez | |
| 2023 | Mahan / Downs (Stein Report) | Mahan | | Downs | |

PLAINTIFF'S
EXHIBIT
135
Civil Action No. 4:21-cv-01997

81.P PX137 summarizes the results of the 2015-2014 SBISD Trustee Elections in tabular form, and reflects that the Hispanic-preferred candidate lost every election except for one – the 2017 election where a non-Hispanic but Hispanic-surnamed candidate was preferred by both Hispanic and White voters:

---

[317] 4RT68:3-6 (Stein).

[318] 5RT113:19-118:10 (Alford).

**2015-2024 SBISD Trustee Elections and Hispanic-Preferred Candidate Results**

| Election | Result | Hispanic-Preferred Candidate Win or Lose |
|---|---|---|
| 2015 | Vierra v. Elizondo*<br>Dawson v. Adams* | Lose<br>Lose |
| 2017 | Gonzales* v. Mettenbrink | Win |
| 2018 | Caesar v. Lezama* | Lose |
| 2019 | Breed v. Lopez* | Lose |
| 2021 | Earnest v. Elizondo* | Lose |
| 2022 | Alpe v. Breed*<br>Perez v. Kaczenski*/Mafrige<br>Bennett v. Slattery*/Morace | Lose<br>Lose<br>Lose |
| 2023 | Anderson v. Lopez*<br>Mahan v. Downs* | Lose<br>Lose |
| 2024 | Slattery v. Drews*/Cone/Hanson | Lose |

Defeat rate for Hispanic-Preferred Candidates 2015-2024 = 11 losses/12 elections = **91.66%**
HISPANIC-PREFERRED CANDIDATES MARKED WITH AN ASTERISK (*)

PX137                                                                                    1

PLAINTIFF'S
EXHIBIT
**137**
Civil Action No. 4:21-cv-01997

81.D   However, Plaintiff's expert, Dr. Stein, did not analyze the role of partisan politics in SBISD elections, and could not opine on the impact of partisan politics on the outcome of these contests.[319]

82. Defendant, not the Plaintiff, has the burden to show that there is a race-neutral explanation for the racially divergent voting pattern established in this case. *Teague*, 92 F.3d at 290; *see Gingles*, 106 S.Ct. at 2773; *Rodriguez,* 964 F. Supp.2d 760. Plaintiff has no obligation initially to show that party affiliation does *not* cause divergent voting patterns. *Petteway,* 698 F.Supp.3d at 1010-1011; *Rodriguez*, 964 F.Supp.2d at 760; *Lopez*, 339 F.Supp.3d at 603. Here, neither the District nor its expert, Dr. Alford performed any canvassing, utilized any questionnaires or

---

[319] 4RT68:3-70:20 (Stein).

78

presented "reliable or methodologically sound evidence" to sustain the District's burden to prove by a preponderance of the evidence that a race-neutral explanation exists for the racially divergent voting pattern established in this case. *See Miss. State. Conf. of the NAACP*, 2024 U.S. Dist. LEXIS 127352 *136-137 (as in *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), Alford polarization opinions unsupported by meaningful substantive analysis and border on ipse dixit).

83.P Dr. Alford also estimated racially-polarized voting in the 2023 SBISD trustee elections, using the ei.MD.Bayes program, rather than the EI program utilized by Dr. Stein.[320] Though their methods for estimating racially polarized voting differed, Dr. Alford's findings, like Dr. Stein's findings, demonstrate significant racially-polarized voting in both 2023 SBISD elections.[321] As Dr. Alford noted in his September 2023 report (DX8), the overall pattern he observed "is very similar to the EI analysis of estimated support provided by Anglo and Hispanic voters by Dr. Stein in these two [2023] contests."[322]

83.D Defendant's expert, on the other hand, did take into account the role of partisan politics in SBISD elections. Dr. Alford explained the shortcomings of using statistical analysis without doing any kind of canvassing or questionnaires–which were not done in this case.[323] He explained how partisan politics is playing an

---

[320] PX136,p.4

[321] PX136,p.4.

[322] PX136, p.4; DX8, p.6.

[323] 5RT34:22-35:9 (Alford).

increasingly significant role in Texas school board elections.[324] As shown by the evidence from each campaign studied, and as opined by Dr. Alford, there is nothing to suggest that either Hispanic or Anglo voters are responding to the ethnicity of candidates; instead, the results appear consistent with an ideological or partisan division.[325]

84. As noted above, Defendant, not the Plaintiff, has the burden to show that there is a race-neutral explanation for the racially divergent voting pattern established in this case. *Teague*, 92 F.3d at 290; *see Gingles*, 106 S.Ct. at 2773; *Rodriguez,* 964 F. Supp.2d 760. Here, neither the District nor its expert, Dr. Alford performed any canvassing, utilized any questionnaires or presented "reliable or methodologically sound evidence" to sustain the District's burden to prove by a preponderance of the evidence that a race-neutral explanation exists for the racially divergent voting pattern established in this case. The mere *ipse dixit* conclusion of its expert has no probative value. *See Miss. State. Conf. of the NAACP*, 2024 U.S. Dist. LEXIS 127352 *136-137 (as in *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), Alford polarization opinions unsupported by meaningful substantive analysis and border on ipse dixit).

85. Dr. Stein also analyzed the results of the 2024 elections.[326] The results of Dr. Stein's analysis of racially-polarized voting in the 2024 elections show: (a)the 2023 and 2024 SBISD trustee

---

[324] 5RT114:2-116:19 (Alford).

[325] 5RT117:1-8 (Alford).

[326] PX136.

elections produced racially-polarized election results sufficient to justify SBISD moving to a single member district election of District Trustees; (b)the degree of racially-polarized voting in past SBISD Trustee elections has deterred candidates who can garner support from a majority of Hispanic voters from running in SBISD at-large Trustee elections; and (c) the absence of candidates that a majority of Hispanic voters support coincides with a decline in Hispanic voter participation in recent SBISD at-large Trustee elections.[327]

86. In 2024, there were two SBISD Trustee elections.[328] Only one contest, Position 3, was contested.[329] Four candidates ran for Position 3.[330] Incumbent Christopher Earnest was the only candidate for Trustee Position 4.[331] Dr. Stein analyzed the 2024 contested election and again estimated the degree of racially-polarized voting.[332] Among non-Hispanic voters, Slattery was the preferred candidate with 61% of the non-Hispanic vote.[333] No candidate garnered more than 30% of the Hispanic vote, with Drews obtaining 29% of the Hispanic vote, Slattery 26%, Cone 24% and Hanson 14%.[334] The conditions in *Gingles* call for a cohesive electoral majority

---

[327] PX136,pp.2-3.

[328] PX136,p.5.

[329] PX136,p.5.

[330] PX136,p.5.

[331] PX136,p.5.

[332] PX136,pp.2,5-6.

[333] PX136,p.6.

[334] PX136,p.6.

sufficient to block the preferred minority candidate.[335] That condition exists in the 2024 Trustee Position 3 contest, where 74% of Hispanic voters preferred any candidate other than Slattery, the candidate supported by 61% of non-Hispanic voters.[336] This reflects that any candidate other than Slattery, including Drews, the most-preferred candidate among Hispanic voters, was effectively barred from winning the Position 3 trustee election by the electoral cohesiveness of the non-Hispanic voters.[337]

87.P Unlike the 2023 SBISD Trustee elections, no single candidate garnered the support from a majority of Hispanic voters.[338] As Dr. Stein wrote and predicted in his 2022 report (PX2),"single member district representation increases the likelihood that minority preferred candidates will contest for election" and "the data shows that the continual use of at-large elections to select SBISD Trustees has produced a condition where candidates who can garner significant electoral support from Hispanic voters have been deterred from running for office."[339] "The unsuccessful electoral record of past candidates who have won the most of the Hispanic vote support serves as a deterrent to future candidates who might otherwise seek office with the support of Hispanic voters. Voting patterns of non-Hispanic voters in SBISD have proven sufficiently cohesive to block the election of any preferred Hispanic candidate, thereby deterring candidates who could win a majority of the

---

[335] PX136,p.6.

[336] PX136,p.6.

[337] PX136,p.6.

[338] PX136,p.6.

[339] PX136,p.6.

Hispanic vote from running for an at-large Trustee position."[340] Moreover, "[t]he [18%] decline in Hispanic voter participation in SBISD Trustee elections between 2023 and 2024 coincided with the absence of a candidate preferred by a majority of Hispanic voters in the 2024 election."[341]

87.D   The 2024 SBISD election is perhaps the most glaring example of a lack of racial polarization in SBISD elections. Plaintiff's expert opined that 29% of Hispanic voters preferred candidate Drews, while slightly less – 26% – preferred Slattery, the victorious candidate.[342] In short, there was no candidate who was clearly preferred by Hispanic voters, especially given the confidence interval stating that the experts were 95% confident that support for Drews was somewhere between 11% and 51%.[343] Even by Dr. Stein's analysis, 71% of Hispanic voters preferred a candidate other than Drews.[344] This is simply not cohesion – there is no way to spin the data in such a way to suggest that Hispanic voters clearly preferred one candidate over the others. As such, Plaintiff has failed to meet her burden under the second Gingles precondition.

88. Throughout Texas, federal courts have found that past Texas elections bear the taint of racial polarization. "Regardless of methodology, ... experts [have] found that general election and

---

[340] PX136,p.6.

[341] PX136,p.6.

[342] DX 73.

[343] DX 73.

[344] DX 73.

primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v.  Abbott, et al.*, No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan C185).[345]

89. Other federal courts have found that elections in Harris County also evidence strong signs of racial polarization. "[T]he Latino community does not merely vote straight party ticket, instead they are bloc voting Latino surnamed candidates .... Moreover, when Anglos have the opportunity  to choose between a Latino Republican candidate or an Anglo Republican candidate, they tend to choose the Anglo Republican candidate. Thus, the evidence shows that race is playing a factor in  the decisions of both Anglos and Latinos in their selection of candidates." *Rodriguez*, 964 F. Supp. 2d at 777.

90.D  When Anglos have the choice between an Anglo candidate and a Hispanic candidate, partisan affiliation, not race, is the predominate factor. Anglos in SBISD will readily elect a conservative candidate, regardless of the candidate's race. This is most evident in the election of conservative Republican John Perez. And, importantly, there is no evidence of intentional discrimination in SBISD elections. SBISD does not impose any of the tried-and-true discriminatory voting practices, like poll taxes, grandfather clauses, or purging voter rolls. While Plaintiff's expert on discrimination, Dr. Tijerina, set forth several historical examples of discrimination against Hispanics in Texas History and in the United States generally, he set forth no

---

[345] Dkt.99, ¶44.

evidence of discrimination against Hispanics by the school district or through SBISD's election procedures.[346]

91.P Based upon the totality of the credible evidence at trial, the Court finds that: (1) Plaintiff has satisfied the first *Gingles* factor, because Hispanics in the District are sufficiently numerous and compact to constitute a majority of the citizen voting age population in at least one of seven single member districts in a seven member district plan for electing District trustees; and (2) Plaintiff has satisfied the second and third *Gingles* factors, because Hispanic voters in the District are politically cohesive and the White majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the Hispanic voters' preferred candidate. *See Gingles*, 106 S.Ct. at 2766-67.

91.D   Based on the totality of the credible evidence at trial, the Court finds that (1) Plaintiff has failed to satisfy the first *Gingles* factor because Plaintiff failed to proffer a proposed single member district that respects communities of interest and comports with the one-person, one-vote rule; (2) Plaintiff has failed to satisfy the second *Gingles* factor because she has failed to show sufficient evidence of polarized voting behavior, in that Hispanic voters in SBISD are not cohesive; and (3) Plaintiff has not shown that white voters vote as a bloc to usually defeat the Hispanic candidate of choice because there is significant cross-over voting by both Hispanic and Anglo voters, and, most importantly, the outcomes of SBISD elections can be explained by partisan politics and ideological divisions in the electorate.

---

[346] See, generally, testimony of Dr. Tijerina.

## H. **Totality of Circumstances**

92.P Once the three *Gingles* factors have been satisfied, "it will be only the very unusual case in which the plaintiffs . . . have failed to establish a violation of §2 under the totality of the circumstances." *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994).

92.D The totality of circumstances analysis is not a mere formality, and courts must address the totality of the circumstances in all Section 2 cases. While "it will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of §2 under the totality of the circumstances," *Clark v. Calhoun Cty., Miss.*,21 F.3d 92, 97 (5th Cir. 1994), relevant here, "[t]he 'unusual case' that *Clark* refers to is a case, like LULAC, where … the evidence on the totality of circumstances renders political partisanship the better explanation for the defeat of minority-preferred candidates at the polls." *Lopez v. Abbott*, 339 F.Supp.3d 589, 602-03 (S.D. Tex. 2018) (citing *Clements*, 999 F.2d at 859-60). Relevant to the totality of the circumstances analysis: "failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief. Section 2 is a balm for racial minorities, not political ones - even though the two often coincide." *Clements*, 999 F.2d at 854, 891. In this case, to the extent Hispanic-preferred candidates did not prevail in SBISD

86

elections, partisan politics is to blame, not race, racial animus or some other insidious factor. This is dispositive. *Clements*, 999 F.2d at 854-55 (emphasis added)(The Senate Report accorded this inquiry of "***dispositive significance.***")

93. P  But Defendant, not the Plaintiff, has the burden to show that there is a race-neutral explanation for the racially divergent voting pattern established in this case, such as "partisan politics." *Teague*, 92 F.3d at 290; *see Gingles*, 106 S.Ct. at 2773; *Rodriguez,* 964 F. Supp.2d 760.  Here, neither the District nor its expert, Dr. Alford performed any canvassing, utilized any questionnaires or  presented "reliable or methodologically sound evidence" to sustain the District's burden to prove by a preponderance of the evidence that a race-neutral explanation exists for the racially divergent voting pattern established in this case. Because the mere *ipse dixit* conclusion of its expert has no probative value, the District failed to sustain its burden to prove a race-neutral explanation for the polarized voting pattern established in this case. *See Miss. State. Conf. of the NAACP*, 2024 U.S. Dist. LEXIS 127352 *136-137 (as in  *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), Alford polarization opinions unsupported by meaningful substantive analysis and border on ipse dixit). The pattern of polarized voting in SBISD and lack of electoral success of the Hispanic-preferred candidates spans the entire period 2015-2024, well before the period of time when the District claims that "partisan politics" became a factor in SBISD

elections. See PX135 and PX137. The history of SBISD elections therefore contradicts the District's theory, because the same pattern of polarized voting and electoral defeats of Hispanic-preferred candidates that the District claims as an explanation of the results of the most recent elections, existed before any such purported "partisan" factors were supposedly present.

93.D  Defendant's expert, on the other hand, did take into account the role of partisan politics in SBISD elections. Dr. Alford explained the shortcomings of using statistical analysis without doing any kind of canvassing or questionnaires–which were not done in this case. He explained how partisan politics is playing an increasingly significant role in Texas school board elections. As shown by the evidence from each campaign studied, and as opined by Dr. Alford, there is nothing to suggest that either Hispanic or Anglo voters are responding to the ethnicity of candidates; instead, the results appear consistent with an ideological or partisan division. *Lopez v. Abbott*, 339 F.Supp3d 589, 604 (S.D. Tex. 2018) ("Consistent with Gingles, the Court holds that Plaintiffs have the duty , in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test. Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns. If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality

of circumstances factors to determine whether racial bias best explains the alleged vote dilution.").[347]

94.  In addition to the *Gingles* factors, the Court may also examine the Senate Factors enumerated in the Senate Judiciary Committee Report to Section 2 and adopted by the Court in *Gingles*, 106 S.Ct. at 2759, to determine whether under the totality of the circumstances a challenged electoral practice results in a lack of equal opportunity for Hispanics to participate in the political process and to elect their preferred candidates. The Senate Factors include, but are not limited to:

(1)  the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

(2)  the extent to which voting in government elections is racially polarized;

(3)  the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

(4)  exclusion of minorities from a candidate slating process;

(5)  the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6)  the use of overt or subtle racial appeals in political campaigns; and

---

[347] See 5RT34:22-35:9; 114:2-115:19; 117:1-18 (Alford).

(7) the extent to which minorities have been elected to public office in the jurisdiction.

Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29.

95.   There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29 n. 118. The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 106 S.Ct. at 2764, *quoting* S. Rep. at 30 n. 120.

96.   "Under [the] 'functional' view of the political process mandated by §2 . . . **the most important Senate Report factors bearing on §2 challenges to multimember districts are the 'extent to which minority group members have been elected to public office**

in the jurisdiction' *and* the 'extent to which voting in the elections . . . is racially polarized.' If present, **the other factors**, such as the lingering effects of discrimination, the use of racial appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists . . . **are supportive of, but** *not essential to* **a minority voter's claim.**" *Gingles*, 106 S.Ct. at 2765 n. 13 (emphasis added). In other words, Senate Factors 2 and 7 are the "most important," while the remaining Senate Factors are "supportive of, but not essential" to a Section 2 claim.

97. In 1982, Congress amended Section 2 of the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden,* 446 U.S. 55 (1980). The 1982 amendment created a "results-based" test to analyze vote dilution claims, with no showing of discriminatory intent required. *Gingles*, 106 S.Ct. at 2758; S. Rep. No. 97-417, at 40 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 218 ("S. Rep."). The "results" or "effects" test for imposing liability under Section 2 resulted from Congress statutorily-overriding the Supreme Court's previous requirement that discriminatory intent had to be shown:

> After appellees brought suit [in Gingles], but before trial, Congress amended §2. The amendment was largely a response to this Court's plurality opinion in *Mobile v. Bolden*, 446 U.S. 55 (1980), which had declared that, in

order to establish a violation either of §2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised §2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White v. Regester*, 412 U.S. 755 (1973), and by other federal courts before *Bolden*, *supra*. S. Rep. No. 97-417, p. 28 (1982) (hereinafter S. Rep.).

*Gingles*, 106 S.Ct. at 2758.[348]

---

[348] "The Senate Report which accompanied the 1982 amendments elaborates on the nature of §2 violations and on the proof required to establish these violations. First and foremost, the Report dispositively rejects the position of the plurality in *Mobile v. Bolden*, 446 U.S. 55 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters. See, e. g., S. Rep., at 2, 15-16, 27. The intent test was repudiated for three principal reasons -- it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." Id., at 36. The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.*, at 28. *See also id.*, at 2, 27, 29, n. 118, 36." *Gingles*, 106 S.Ct. at 2762-63.

"The essence of a §2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives. This Court has long recognized that multimember districts and at-large voting schemes may "'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Burns v. Richardson*, 384 U.S. 73, 88 (1966) (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)). The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." 106 S.Ct. at 2764-65 (internal citations omitted).

I.   **Senate Factors 2 and 7: The extent to which voting is racially polarized and the extent to which minority group members have been elected to office.**

98. As noted above, under *Gingles*, Senate Factors 2 and 7 are the "most important" to a Section 2 claim.

99.P Dr. Stein's analyses and testimony conclusively establish Factor 2, that voting in SBISD trustee elections is polarized along racial and ethnic lines.[349] As Dr. Stein put it, in Spring Branch at-large trustee elections, white votes are "determinative. They determine the outcome of elections."[350] The testimony and evidence at trial showed that in recent elections, the Hispanic-preferred candidates and the White or Anglo-preferred and successful candidates have emphasized different substantive issues in their campaigns, with the Hispanic-preferred candidates focusing primarily on improving academic outcomes for SBISD students, particularly in Hispanic-majority and economically-disadvantaged schools with poorer academic performance and emphasizing the candidate's previous community involvement with the District, and the White or Anglo-preferred candidates emphasizing "cultural issues" and "conservative values" on issues such as teacher unions, COVID regulations, "parental choice," "woke" ideology in the classrooms. "critical race theory," and sexually explicit library books in school libraries.[351] It therefore is unsurprising that

---

[349] PX1;PX2;PX3;PX4;PX136;PX122;PX123;PX124;PX125;PX126;PX127:PX128; PX129;PX130;PX131;PX132;PX135;PX 137; 4RT17-102.

[350] 4RT101-102.

[351] Compare PX62; PX82; 2RT175-76, 181 (Elizondo); PX52; PX53; PX58; PX59; PX60;3RT102-04, 106-07 (Lopez); PX47; 3RT135-39 (Lezama) with 4RT121-23 (Earnest); 5RT29-30 (Perez); 5RT59-61 (Anderson).

Hispanic and White voters in SBISD and White have consistently preferred different school board trustee candidates in every election between 2015 and 2024, save one. *See* PX135 and PX137.

99.D The testimony and evidence presented at trial showed that partisan politics explains the outcome of SBISD elections. The more conservative/Republican candidate won each of the elections analyzed, whereas the more liberal/Democrat candidate – including Plaintiff (twice) – did not. The partisan issues of union involvement in school governance, COVID regulations, in-person v. online learning, "woke" ideology in the classrooms, CRT, sexually explicit library books determined the outcome-those candidates taking the more conservative stance on these issues prevailed; the candidates taking the more liberal positions lost. Similarly, the candidates endorsed by Republicans won, and those endorsed by Democrats lost. Even when a self-avowed Republican – Carter Breed-was endorsed by the Democratic Party, it was a death sentence, and he could not win, despite having been previously elected to the Board because he was more conservative than his then-opponent, David Lopez. In sum, party politics prevail in SBISD elections, not race.

100. Similarly, the trial evidence conclusively established Factor 7. Before the May 2022 election, during the pendency of this litigation, to SBISD's knowledge, no person of color had ever been elected a trustee in SBISD.[352] The first person of color was elected to the SBISD board in 2022, and that person (an affluent Hispanic candidate who resides south of I-10, whose children attend south-side schools, and was included in a three candidate slate

---

[352] Dkt. 99,¶45

endorsed by a conservative political action committee as well as several out-of-district and out-of-state political action committees), was not the preferred candidate of the Hispanic voting population.[353]

101. The recent election of a minority candidate does not void a long history of racially-polarized voting, especially when, as is the case here, that candidate is not the preferred choice of the minority community. As stated in the Senate Report:

> The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote', in violation of this section. If it did, the possibility exists that the majority citizens might evade the section e.g., by manipulating the election of a 'safe' minority candidate. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution.

S. Rep. at 29 n. 115. (quoting *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973)).

102.P Minority-preferred candidates have never been successful in trustee elections in SBISD, except in a single isolated instance where minority and White voter preferences were the same regarding an Anglo but Hispanic-surnamed candidate.[354]

---

[353] 5RT5, 24-25, 28, 31-32, 38-34 (Perez); PX3,pp.3-4;PX129;PX135;PX137.

[354] PX1;PX2;PX3;PX4;PX136;PX122;PX123;PX124;PX125;PX126;PX127:PX128;PX129;PX130;PX131;PX132;PX135;PX 137; 4RT17-102.

102.D   Although no Hispanic person was elected to the SBISD school board prior to John Perez in 2022, there is no evidence that any Hispanic candidate even ran for school board before Plaintiff Elizondo in 2015 and 2021. Therefore, of the four documented Hispanic candidates for SBISD board (Lopez, Elizondo, Lezama, Perez), one (John Perez)–has succeeded–a 25% success rate. And all of the evidence shows that he was the only conservative candidate among this group. In other words, Hispanics are extremely likely to win SBISD elections if they are also conservative–conservative Hispanic candidates have won 100% of the time (although this is obviously a small sample size, it is all we have to work with, and is truly indicative of the current state of SBISD politics–conservative candidates win, no matter their race). Therefore, partisan politics, not race, explains the outcome of SBISD elections, and the seventh senate factor weighs in favor of Defendants.

> ii.   **Senate Factor 1**:**History of discrimination against Hispanics and impact of effects in education, employment and health that impair their ability to participate in the political process.**

103. Professor Andres Tijerina, a historian and expert witness retained by the Plaintiffs who specializes in the history of discrimination against Tejanos and Hispanics in Texas, has detailed the extensive history of discrimination against Hispanics in Texas, Harris County, and SBISD. *See* Report of Andres Tijerina, Ph.D., ("Tijerina Report")(PX5).[355]

---

[355] Dkt.99, ¶46.

104.P Hispanics in Texas have historically suffered from official discrimination affecting their right to vote.[356]

104.D Although historic discrimination against the minority group is one Senate factor the Court may consider, the most relevant historical evidence is relatively recent history, not long-past history. Plaintiff's expert on discrimination, Dr. Tijerina, presented ample evidence of historic discrimination against Hispanics in Texas, but little to no evidence of **recent** discrimination against Hispanics, or any discrimination by SBISD.

105. There is a longstanding history of official discrimination in the past against Hispanics in Harris County, including in some instances, in SBISD.[357] Spring Branch "is a microcosm of the discriminatory experiences not only in Texas, but throughout Harris County, of many of those same discriminatory practices, policies that have led to the denial of Latinos to be able to practice freely and equitably in the democratic processes."[358]

106.P Until the very recent past, Texas had a segregated school system in which Latinos and Anglo school children were taught at separate schools.[359] "The 'Mexican School' became a widespread phenomenon in Texas education. The various school districts segregated their Latino students, but they provided significantly poorer facilities for them."[360] In one study, "[t]he Latino schools

---

[356] PX5, pp.3-43; PX138,pp.xv, 64-73.

[357] PX5, pp.26-43; 2RT61-62, 69, 72-75, 78-91,123-124 (Tijerina).

[358] 2RT75 (Tijerina).

[359] PX5, pp.22-23.

[360] PX5, p.22,

had 48 students per room compared to 23 Anglo students per room. The school funding revealed similar contrast, as the school board spent $24.50 for each Latino student compared to $35.96 average spending per Anglo pupil."[361] "Gerrymandering of attendance zones within a district became widespread by the late 1940s."[362]

106.D For example, there is no evidence that SBISD ever had segregated "Mexican Schools" like other school districts in Texas, including Houston ISD, which uses a single-member district system.[363] Without any evidence of discrimination against Hispanics in SBISD, Plaintiff cannot show the seventh Senate factor.

107.P The student population in SBISD schools is heavily-segregated, due to the way in which the District has drawn its school enrollment zones, with the north-side schools having Hispanic student populations of 78-96% and the south-side schools having student populations with White students comprising the largest racial or ethnic group.[364]

107.D As discussed by Dr. Tijerina, SBISD has some schools with a large majority of Hispanic students north of I-10 because when SBISD experienced a large influx of Hispanics moving into the area, Latinos could afford these properties. This was "actually advantageous" to Latinos because "they were able to have higher wages than they'd had before."[365] This trend continues to today.

---

[361] PX5, p.24.

[362] PX5, p.24.

[363] 2RT107:5-108-3 (Stein).

[364] PX1, pp.9-10; PX 105.

[365] 2RT81:1-4 (Tijerina).

Thus, societal factors such as the cost of land – not discrimination by SBISD – result in some schools north of I-10 having a higher percentage of Hispanic students.

108. SBISD experienced a dramatic influx of Hispanic students over the past thirty years. "The Spring Branch census statistics . . . showed the results of the rapid Hispanic population growth after 1990 and 2000. The City of Houston Neighborhood Data website indicated that the  77041 zip code in Spring Branch north of I-10 was 57.5% Hispanic or Latino, 13.6% Black, and  only 13.1% White by 2019." *Id.* at p. 34.[366] The rapid statistical transition in Spring Branch is also starkly reflected in the social, cultural, and economic changes within SBISD.[367]

109.  SBISD admits  that in  the past  twenty  years the racial and  ethnic composition  of the population in the district has changed  significantly.[368]  SBISD, the  district admits,  is now a majority minority district.[369] What once was a district in which the majority of the voters and students were white is now a district where the Hispanic population  is greater than the white population and  the  percentage  of  Hispanic  students  is  more  than  twice  the

---

[366] Dkt. 99,¶47.

[367]    PX5,pp.31-35;    3RT214-215    (Porter,   District   corporate representative).

[368]    Dkt.  99,  ¶48;  3RT214-215  (Porter,  District  corporate representative).

[369]    Dkt.  99,  ¶48;  3RT214-215  (Porter,  District  corporate representative).

percentage of White students.[370] Moreover, a substantial majority of its students are economically disadvantaged, and a greater proportion of its minority students are economically disadvantaged than are its White students.[371] SBISD also admits that in the four election precincts and middle school enrollment districts located north of I-10, the student population is overwhelmingly comprised of Hispanic students, averaging approximately 87 percent of the student population in those areas.[372] In the remaining three election and middle school enrollment districts located primarily south of I-10, the student bodies are between 42 and 52 percent White.[373]

110.P The growing cultural differences between the affluent Anglo American Spring Branch residents and their northern Latino and minority neighbors has in the past manifested itself in suspicion, conflict, and outright fear.[374] These differences were most visible in the legislative proposals advanced by the then State Representative for the area.[375] In 2005, that Representative proposed a bill for public health agencies to enforce vending regulations on the popular Latino taco trucks, or taquerias "in the same manner [they enforce] other health and safety regulations

---

[370] Dkt.99,¶48;   3RT214-215   (Porter,   District   corporate representative).

[371] Dkt. 99,¶48.

[372] Dkt. 99,¶48.

[373] Dkt. 99,¶48.

[374] PX5,pp. 35-36.

[375] PX5, pp. 35-36.

relating to food service."[376] Latinos complained that this was just a "smoke screen" to disguise racial prejudice.[377] But in a very real operation "health and law enforcement officers swept down on 27 taco trucks in Spring Branch" and shut down thirteen. Latinos complained that an "onslaught of squad cars" to enforce a health and safety regulation was needlessly intimidating.[378]

110.D To the extent Plaintiff's expert's discussion of the enforcement of health code violations against taco trucks in the greater-Houston area is relevant at all, it is certainly not relevant to whether SBISD should be forced to adopt a single-member district electoral system. The School District did not enact, enforce, or encourage these actions, and this evidence is entirely irrelevant to the question of whether discrimination affects Latinos' participation in SBISD elections.

111.P In another campaign, the State Representative promoted a bill to allow local law enforcement authorities to challenge Latinos, and deport them if they lacked legal status in the U.S. The Representative not only campaigned publicly on these and other similar issues, but he also reportedly boasted his rigid stance in public meetings and civic club meetings.[379] According to one Latino candidate for the SBISD Board of Trustees, the Representative established a reputation among Spring Branch Latinos as

---

[376] PX5,p.35.

[377] PX5,p.35.

[378] PX5,p.35.

[379] PX5, pp.35-36.

"insensitive" to their needs.[380] Indeed, Latinos quietly articulated their fear of retaliation from their State Representative.[381]

111.D   Moreover, SBISD has nothing to do with the enactment or enforcement of immigration laws. SBISD does not check the immigration status of students, nor does it set the qualifications of voters. Therefore, to the extent the State of Texas historically discriminated against Hispanic voters, this does not bear on whether Hispanic voters have been disenfranchised by SBISD, or whether SBISD should be judicially forced to change its election system.

112.P Contemporary official SBISD governmental actions have negatively affected Hispanic voters by:

(1) the placement of early voting locations solely within majority White communities, the failure to designate early voting locations within any of the portions of the district where a majority of its Hispanic residents and voters live or to which they have ready access via public transportation, and limited weekend voting hours.[382] This action has proved increasingly significant in District election results, because early voting now comprises a

---

[380] PX5, p.36.

[381] PX5,p. 36.

[382]
  PX110; 1RT81-83 (Klussmann); 2RT139-140 (Barnes); 2RT183-186 (Elizondo); 3RT107-108,112-113, 117 (Lopez); 3RT171 (Cabrera); 3RT201-203 (Porter, District corporate representative); 4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson).

majority of the total votes cast in each trustee election.[383] In the 2021, 2022 and 2023 elections, for example, early votes comprised 61.35 - 73.23% of the total votes cast District-wide, and the victorious candidates obtained 78.02 - 89% of their early votes from the three southside election districts (Memorial, Spring Branch and Spring Forest), and  obtained a majority of the votes cast from voters in those three election precincts (Memorial, Spring Branch and Spring Forest).[384]

(2) the reduction of the number of election day voting sites from twenty-five elementary school locations to seven middle school locations, with the corresponding effect that Hispanic voters must travel farther distances to reach those poll locations;[385]

(3) the District's violation of state law requirements that its high school principals or their designees serve as deputy registrars and formally facilitate voter registration for students who are 18 or will be 18 years of age or older, in compliance with Texas law.[386] Given the fact that the majority of SBISD students are Hispanic, the failure to comply with Tex. Elec. Code §13.046 has a disparate impact on potential young Hispanic voters in the District.

---

[383] PX117; PX118; PX 119; 1RT83-84 (Klussmann);4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson).

[384] PX117; PX118; PX 119; 1RT83-84 (Klussmann);4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson).

[385] 1RT78-81 (Klussmann); 2RT143-147 (Barnes); 2RT186-187 (Elizondo);3RT198 (Porter, District corporate representative).

[386] 4RT14-17 (Heeth, District corporate representative)

(4) SBISD's staggered election system also enhances the dilutive effect of its at-large system, which the Supreme Court has held enhances the discriminatory effect of at-large voting systems. *See City of Rome v. United States*, 100 S. Ct. 1548,1566 n.21 (U.S.1980). "[S]taggered terms promote the dilution of minority voting strength because they limit the number of seats, create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting. . . . The discriminatory effect of staggered terms was specifically considered by Congress in the enactment of § 2 ." *Buckanaga v. Sisseton Indep. Sch. Dist.,* 804 F.2d 469, 475 (8th Cir. 1986).

112.D   SBISD's placement of early voting locations is also not discriminatory, nor does it warrant a judicially mandated change in SBISD's election system. Prior to 2012, SBISD had only one early voting location – the District administration building. This was because voter turnout was very low, and the demand for early voting was also very low.[387] This location was geographically located in the very middle of the school district, just feet away from I-10, along the north and south sides.[388] In 2012, SBISD expanded to four total early voting locations for its 44 square-mile territory, all within a maximum 10-11 minute drive of the northernmost point of the District.[389] Prior to the 2021 election, SBISD received no

---

[387] 3RT201:12-20 (Porter).

[388] PX 10; 3RT201:9-202:10 (Porter).

[389] 3RT203:4-17

complaints about early voting locations.[390] Upon receipt of these complaints, SBISD added a fifth early voting location in January of 2022 in the Spring Oaks Middle School zone on the North side.[391] Then the District added a sixth early voting location in 2023 in the northern part of SBISD between Northbrook Middle School and Spring Woods Middle School.[392] This increase in voting locations coincides with the explosion in voter turnout for SBISD elections after 2020. Today, there are three early voting locations on SBISD's south side, and three on the north side; one of the south-side locations is required by law because SBISD must partner with the City of Piney Point to hold its elections.[393] There is no evidence of any discriminatory intent or effect of SBISD's placement of its early voting locations. There is no evidence that early voting, SBISD's staggered elections, or its May election date are discriminatory against Hispanic voters-these practices are specifically permitted under Texas law.In fact, these practices permit more, rather than less, participation in elections by Hispanic voters. Under a single-member district system, voters would only be allowed to vote for **one** of the seven trustee places – not all seven trustee places as allowed under the current system – and voters would only be permitted to vote in SBISD elections once every three years when their particular district's representative's term expired; in the current system, all voters vote every year for every place on th ballot. A single-member

---

[390] 3RT203:22-204:12 (Porter).

[391] 3RT204:9-21 (Porter).

[392] 3RT205:3-8 (Porter).

[393]  3RT206:9-207:18 (Porter).

district system would disenfranchise thousands of SBISD voters. Finally, SBISD not only complies with the law regarding the registration of student voters, but excels in doing so on north-side campuses where :there is a very focused intent to ensure that students are aware of the registration possibilities in order to vote."[394]

113.P SBISD's Hispanics also bear the vestiges of historical discrimination in education, employment, and health that hinder their ability to participate in the political process.[395] As Dr. Tijerina notes, "a 1977 report issued by the U.S. Commission on Civil Rights reported that 19% of the Hispanics over age 25 in Texas were illiterate. Hispanics had twice the Anglo unemployment rate, and 15% of them still lived in overcrowded housing with inadequate plumbing as compared to the  Anglo 1.7%."Tijerina Report, PX5, at p. 40). A clear holdover to the Texas 'Mexican town' was the 70% of Hispanics in Texas who still lived in barrios. *Id.* In 1981, Judge William Wayne Justice found the state bilingual plan inadequate, and that measures had not been taken to fully "remove the  disabling vestiges of past de jure discrimination." *Id.* He ordered corrections to train teachers, to identify students in Limited English Proficiency (LEP), and to expand the program. *Id.* And in  1980, the Southwest Voter Registration and Education Project (SVREP) found that Hispanics were underrepresented on school boards in 92% of the 361 Texas school districts where Latinos make up over 20% of the school population. *Id.* In many other comparisons, Texas educational statistics  show evidence of past discrimination. A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas,

---

[394] 4RT193:2-196 (Porter).

[395] 2RT129-131,134-141 (Barnes).

the majority of Hispanic students are still in "inferior and highly segregated schools." (Gomez- Quinones 1994, pp. 155, 166, 172). *Id.* They are "extremely overage" and "disproportionally enrolled in remedial English classes." *Id.* Texas Hispanic students still have an unacceptably "high dropout" rate and receive poor preparation for college. *Id.* The trial testimony established that the current school enrollment zones SBISD has established contain highly-racially-segregated schools, see PX1, pp. 9-10 and PX105:



Source: PX1, Stein Expert Report, January 20, 2022, p.10, Table 2

PLAINTIFF'S
EXHIBIT
105
Civil Action No. 4:21-cv-01997

The trial testimony also established that the levels of student achievement in SBISD schools evidence significant disparities between the predominantly Hispanic schools and the predominantly White schools, see PX140:



2019 & 2022 TEA Accountability Ratings - Student Achievement

Source: TEA 2019 and 2022 A-F Accountability Listing – Spring Branch ISD (101920)- HARRIS COUNTY, PX28 & PX79

PLAINTIFF'S
EXHIBIT
140
Civil Action No. 4:21-cv-01997

.

113.D Plaintiff set forth no evidence of recent discrimination in SBISD. All of Plaintiff's evidence of discrimination involves other government entities, and most of these events occurred long ago, and are therefore not probative of current conditions.

114.P As chronicled in the 2024 report of the American Bar Association Commission on Hispanic Legal Rights and Responsibilities, "Latinos in the United States" (PX138, p.xv):

▶ "Latino children often face a segregated educational system where they attend schools with insufficient resources to meet their needs."

▶ "Hispanics experience higher unemployment rates, harmful

108

working conditions, and persistent workplace discrimination"

▸ "Latinos have limited access to health insurance, which is compounded by language, cultural, technological, and other unique barriers to quality and accessible healthcare."

▸ "Hispanics experience disproportionate rates of homelessness, discriminatory lending, neighborhood segregation and unequal housing opportunities."

▸ "Latino voters are subjected to suppression and harassment, purged from registration rolls, and have their vote diluted by redistricting and gerrymandering efforts."

▸ "Hispanics are unfairly profiled by police, subjected to increased rates of incarceration and routine acts of hate, and forced to pay discriminatory fines and fees in the criminal justice system."

114.D Plaintiff proffered a report by the American Bar Association chronicling discrimination against Hispanics. But nothing in this report discusses Houston or SBISD. It is therefore of limited evidentiary value.

115. The vestiges of this history of racial and ethnic discrimination remain present in SBISD. The contrast between a Hispanic or Latino SBISD school and a school with a majority white student population is starkly illustrated by a comparison of the Accountability Rating and ethnic composition of Hollibrook Elementary School, located north of I-10 (and in the proposed Hispanic single member district) and Hunters Creek Elementary in a Memorial Village, located south of I-10 (School Year 2018-2019). Hunters Creek had 56.9% Anglo students with 20.2% Economically Disadvantaged while Hollibrook had 98.4% Hispanic students, with 98.6% disadvantaged. Hunters Creek has only 18.9% Hispanic students, while Hollibrook Elementary had only .4% Anglo students.

*Id.* at p. 36.[396]

**Spring Branch ISD: School Year 2018 - 2019**

| School | Total | Hunters Creek | Hollibrook |
|---|---|---|---|
| Accountability Rating | | A | B |
| Total Students | 36,136 | 613 | 764 |
| Hispanic | 59.3% | 18.9% | 98.4% |
| Anglo | 26.6% | 60.2% | .4% |
| At-risk students | 56.9% | 24.6% | 94.2% |
| Economically dis | 98.6% | 59.4% | 20.2% |
| Limited English | 91.2% | 36.7% | 16.3% |

(Texas Tribune, "Spring Branch ISD" [2021] https://schools.texastribune.org/districts/spring-branch-isd/). See also PX107, PX 108, and PX140 for summaries of more recent evidence of school segregation within SBISD, disparities in economically-disadvantaged populations within SBISD, and the differential levels of student academic achievement between the largely Hispanic and largely White schools within SBISD.

116. In four of SBISD's seven voting precincts and middle school enrollment zones 78% or more of the students are Hispanic.[397] In the remaining three voting precincts  and middle school enrollment zones 42% to 52% of the students are White.[398]

---

[396] *See* PX105;PX107;PX108;  PX113;  PX114;PX140.

[397] PX1, pp.9-10; PX105.

[398] PX1, pp.9-10; PX105.

117. Strong evidence exists that the racial and ethnic makeup of SBISD schools and enrollment districts is highly segregated.[399] Researchers have identified dissimilarity index scores below .3 as indicating low levels of segregation, .3 to .6 as moderate levels of segregation and .6 and above as high levels of segregation. [400] SBISD's dissimilarity index score at the school level is .694 and .596 at the enrollment zone level.[401] These scores reflect that well over half of the Hispanic students enrolled in SBISD schools would have to move to another school if one desired to achieve an integrated distribution of students within the district by ethnicity.[402]

**Table 2 Percent Enrollment by Race/Ethnicity**[403]

| Enrollment Zone | % White | % Hispanic |
|---|---|---|
| Northbrook Middle | 0.02 | 0.96 |
| Spring Woods | 0.05 | 0.88 |
| Spring Oaks | 0.07 | 0.85 |
| Landrum Middle | 0.13 | 0.78 |
| Spring Forest | 0.42 | 0.36 |
| Spring Branch | 0.47 | 0.36 |
| Memorial Middle | 0.52 | 0.25 |

118.P Another indicator of the contrast in conditions within SBISD schools for Hispanic and other minority students is the

---

[399] PX1, pp.9-10; PX105.

[400] PX1, pp.9-10; PX105.

[401] PX1, pp.9-10; PX105.

[402] PX1, pp.9-10; PX105.

[403] PX1, p.10.

Differential Discipline index.[404] The Coalition of Advocates for Restorative Education (CARE) gathered and reported disciplinary statistics from the Center for Justice Research, Texas Southern University (the "TSU Center").[405] The CARE report cited the TSU Center's report on "Racial Disparity in SBISD Disciplinary Programs."[406] Its basic finding was that SBISD's disciplinary practices disproportionately impacted minority youth.[407] The report found that while Hispanic American students were only 58.3% of the district's school's population census report, they comprised 86% of the Disciplinary Alternative Education Program (DAEP) referrals in 2016 – 2017.[408] Similarly, although African American students comprise only 4.7% of the district's student population, they represented 15% of DAEP referrals.[409] The report also observed that many of the disciplinary policies and punitive operations employed by the SBISD have no empirical or scientific support.[410] The SBISD school board failed and refused to acknowledge, investigate or take any specific remedial action to redress objective evidence that the SBISD DAEP program administered disparate discipline to Hispanic

---

[404] PX14, p. 18,24-25,29-30; 3RT63, 65-66,72-74, 77, 81-82,92-94 (Rodney).

[405] PX14.

[406] PX14.

[407] PX14, p. 18,24-25,29-30; 3RT63, 65-66,72-74, 77, 81-82,92-94 (Rodney).

[408] PX14, p. 18,24-25,29-30; 3RT63, 65-66,72-74, 77, 81-82,92-94 (Rodney).

[409] PX14, p. 18,24-25,29-30; 3RT63, 65-66,72-74, 77, 81-82,92-94 (Rodney).

[410] PX14, p. 18,24-25,29-30; 3RT63, 65-66,72-74, 77, 81-82,92-94 (Rodney).

and African American children than to White children.[411]

118.D Although Plaintiff's witness Roy Rodney produced a report conducted by third-parties analyzing disciplinary outcomes in Texas school districts (including SBISD as one district), the report failed to explain any specifics pertaining to the reasons for the infractions warranting the discipline, the severity of the infractions, or the necessity of the disciplinary consequences.[412] Instead, the report simply showed a that a disproportionate percentage of minority students were assigned to the disciplinary campus, without any underlying information to show why.[413] Nevertheless, SBISD received this report from Mr. Rodney and made changes to its policies as a result of Mr. Rodney's advocacy.[414] SBISD responded by taking a number of affirmative actions, including but not limited to developing a system for transfering student assignments to the DAEP, offering additional transition services to DAEP students; extending summer programs to DAEP students; providing hot meals – breakfast and lunch–to DAEP students; focusing on positive behavioral supports; implementing a drug/alcohol abuse prevention program; and, most importantly, allowing for students to earn an early exit from DAEP with good behavior.[415] Plaintiff's witness Roy Rodney conceded that SBISD made these changes.[416] Accordingly, SBISD has been responsive to the needs of minority students.

---

[411] PX14; 3RT55-58 (Craft, District corporate representative0: 3RT63-82, 94 (Rodney).

[412] See PX 14.

[413] PX 14.

[414] 3RT84:23-85:3 (Rodney).

[415] See PX 14 at pg 29-31.

[416] 3RT85:9-16 (Rodney).

119.P The rapid demographic transition in Spring Branch also starkly reflects the social, cultural, and economic changes occurring in the district.[417] One early indication was the condition of the apartments that the Latino immigrants were moving into during the late 1980s and early 1990s.[418] Residents in nearby neighborhoods complained that the community north of I-10 was overburdened with apartment complexes.[419] Indeed, one apartment complex was so dilapidated that a Houston City Council person led an effort to demolish the 250-unit apartment complex because the City had declared the buildings to be dangerous to other residents.[420] An estimated 8,000 primarily Hispanic residents lived in the five apartment communities surrounding the complex at the time.[421] The effort to purchase and demolish the dilapidated complex failed, but the complex was eventually sold and removed.[422]

119.D Dr. Tijerina did no independent research to verify his conclusions about recent overcrowding and poor living conditions in the Houston / Spring Branch area.[423] Moreover, his opinions on discrimination have little to do with the present day, and nothing

---

[417] PX1, pp. 31-35; 3RT214-215 (Porter, District corporate representative).

[418] PX1, p.35.

[419] PX1, p.25.

[420] PX1, p.35.

[421] PX1, p.35. At the present time, approximately 7583 residents live in 1700 apartment units located near the Spring Branch Family Development Center, on a three-quarter mile long portion of Pitner Road. 2RT128-129 (Barnes). The residents on that street alone would comprise close to 28% of the total population of the Propose illustrative district 1. 2RT129 (Barnes).

[422] PX1, p.35.

[423] 2RT114-115 (Tijerina).

to do with SBISD. Most importantly, there is "no evidence that past or present discrimination has affected minorities' political access in any way."[424]

120. SBISD Hispanics and Latinos bear the effects of discrimination in education, employment, and health which hinder their ability to participate in the political process.[425]

     **iii.** **Senate Factor 3: The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority groups.**

121. In the past decade, the State of Texas has erected several barriers to minority participation  which enhance minority vote dilution. *See* PX14, p. 69, discussing adoption of voter suppression laws by the State of Texas.

122. In 2011, for example, Texas enacted one of the most stringent voter qualification laws of the United States, which the Fifth Circuit invalidated as a violation of Section 2 of the Voting Rights Act because it imposed significant and disparate burdens on the right to vote, given the stark racial disparity between those with required ID and those without, and it interacted with social and historical conditions to cause inequality in electoral opportunities of African Americans and Hispanic voters. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)(en banc), *cert. denied*, 137 S.Ct. 612 (U.S. 2017).

123. In 2019, Texas instituted a voter purge of its voting rolls, supposedly targeting non-citizen voters. However, Texas was

---

[424] *Clements*, 999 F.2d at 853.

[425] PX138; 2RT135-139 (Barnes); 3RT101-102,112-117 (Lopez); 3RT137-139, 148-153 (Lezama); 3RT171-172 (Cabrera).

enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens from its rolls. Texas settled these claims before a court could make a determination of the legality of Texas' intent. *See Perez v. Abbott*, 390 F.Supp.3d 803, 820 n. 13 (W.D. Tex. 2019).

124.P Harris County also has had a troubling history of voter disfranchisement. "In 2008, a number of Latino residents reported that the Harris County Tax Assessor's Office, which is responsible for voter registration, was not timely processing the voter registration applications of Latino citizens.... The Harris County Tax Assessor Collector and Registrar of Voters, Paul Bettencourt, used his position in 2008 to slow the dramatic rise in voter registrations that year among younger, mostly minority, applicants." Rodriguez, 964 F. Supp. 2d at 781.

124.D Plaintiff has produced no evidence of discriminatory practices by SBISD and, most importantly, no **recent** discriminatory practices which impair the rights of Hispanic voters in SBISD. Although Plaintiff has produced some evidence of discrimination against Hispanics by the State of Texas in distant history, there is no evidence that this discrimination prevents Hispanics today from voting in SBISD elections for candidates of their choice. Hispanics have the opportunity for one-person, one-vote, just like black, white, Asian, and all other residents of SBISD.

125. SBISD's at-large method of electing school board trustees is yet another practice and procedure that has had the effect of impairing Latino and other minority's electoral opportunities in the following respects:

(1) before this suit was filed, the District placed its early voting locations solely within majority White communities, failed

to designate early voting locations within any of the portions of the district where a majority of its Hispanic residents and voters live or to which they have ready access via public transportation, and limited weekend voting hours.[426] This action has proved increasingly significant in District election results, because early voting now comprises a majority of the total votes cast in each trustee election.[427] In the 2021, 2022 and 2023 elections, for example, early votes comprised 61.35 - 73.23% of the total votes cast District-wide, and the victorious candidates obtained 78.02 - 89% of their early votes from the three south side election districts (Memorial, Spring Branch and Spring Forest), and obtained a majority of the votes cast from voters in those three election precincts (Memorial, Spring Branch and Spring Forest).[428]

(2) the District reduced the number of election day voting sites from twenty-five elementary school locations to seven middle school locations, with the corresponding effect that Hispanic voters, many of whom are dependent upon public transportation, must travel farther distances to reach those poll locations;[429]

(3) the District's designated corporate representative acknowledged that SBISD has violated state law requirements that its high school principals or their designees serve as deputy

---

[426] PX110; 1RT81-83 (Klussmann); 2RT139-140 (Barnes); 2RT183-186 (Elizondo); 3RT107-108,112-113, 117 (Lopez); 3RT171 (Cabrera); 3RT201-203 (Porter, District corporate representative); 4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson).

[427] PX117; PX118; PX 119; 1RT83-84 (Klussmann);4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson).

[428] PX117; PX118; PX 119; 1RT83-84 (Klussmann);4RT125-131 (Earnest); 5RT35-36 (Perez); 5RT66-69 (Anderson). *See Perez v. Pasadena Indep. Sch. Dist.*, 958 F.Supp.1196, 1223 (S.D. Tex. 1997)(citing *Perkins v. Matthews*, 92 S.Ct. 431-436-37 (U.S.1971), noting that "the abstract right to vote means little unless the right becomes a reality at the polling place on election day. The accessibility, prominence, facilities, and prior notice of the polling place's location all have an effect on a person's ability to exercise his franchise. . . Locations at distances remote from [minority] communities . . . might well have the effect" of denying or abridging the right to vote on account of race.).

[429] 1RT78-81 (Klussmann); 2RT143-147 (Barnes); 2RT186-187 (Elizondo);3RT198 (Porter, District corporate representative). See *Perez*, 958 F. Supp. at 1229 ("The very small number of polling places, the inconvenient location and hours of those polling places and the lack of public transportation within [the district] also discourage Hispanic voting")and *Perkins*, *supra*.

registrars and formally facilitate voter registration for students who are 18 or will be 18 years of age or older, in compliance with Texas law, and the District did not adduce any testimony at trial that it had complied with the statutory requirements.[430] Because the majority of SBISD students are Hispanic, the District's failure to comply with TEX.ELEC.CODE §13.046 has a disparate impact on potential young Hispanic voters in the District;

SBISD complies with state law regarding the registration of students to vote.[431] The predominately Hispanic north-side schools did a superior job in this effort.[432] As such, there is no discriminatory intent or effect from SBISD's application of State law requiring high school voter registration.

(4) SBISD's use of a staggered election system also enhances the dilutive effect of its at-large system, which the Supreme Court has held enhances the discriminatory effect of at-large voting systems. *See City of Rome,* 100 S. Ct. at 1566 n.21. "[S]taggered terms promote the dilution of minority voting strength because they limit the number of seats, create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting. . . . The discriminatory effect of staggered terms was specifically considered by Congress in the enactment of § 2 ." *Buckanaga v. Sisseton Indep. Sch. Dist.,* 804 F.2d 469, 475 (8th Cir. 1986).

    **iv.**  **Senate Factor 5: The extent to which minority group members bear the effects of past discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process.**

126. In SBISD, a strong and consistent correlation exists between socioeconomic welfare and race or ethnicity, such that Hispanic voters in the proposed illustrative district are more likely to be economically disadvantaged than their Anglo peers.[433]

127. The residents of the proposed illustrative district share common socio-economic characteristics: they are primarily Hispanic,

---

[430] 4RT14-17 (Heeth, District corporate representative).

[431] 3RT193:2-196:6 (Porter).

[432]  3RT193:2-196:6 (Porter).

[433] PX103;PX105;PX106;PX107; 1RT35,49-54,58-61, 64-65 (Klussmann); 2RT37-39, 41-42 (Shaddix); 2RT126,129-131,134-140 (Barnes).

have relatively high employment rates (primarily in service industries such as restaurants, construction, yardwork, maids in hotels) but very limited or depressed incomes (with a median income of $28,000 per family) and in some cases work multiple jobs to make ends meet, 85% primarily speak Spanish at home, more than 60% of the population older than 19 years of age has not completed high school, more than 53% of the population does not have access to health care, many (and all those living on Pitner Road near the Spring Branch Family Development Center) live in multi-family apartments, those reliant on public transportation face multiple hour long bus rides to go anywhere within Spring Branch.[434]

128. The schools attended by Hispanic children in SBISD are heavily segregated by ethnicity, economic status, and student academic performance.[435]

129. "Because 'courts have recognized that disproportionate educational[,] employment, income levels and living conditions arising from past discrimination tend to depress minority political participation' plaintiffs 'need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.' S. Rep. At 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977); *see also [LULAC, Council No. 4434 v.]Clements*, 999 F.2d [831] at 867 (noting that the Senate Report does not '[i]nsist upon a causal nexus between socioeconomic status and depressed participation"')." *Petteway*, 698 F.Supp.3d at 1013.

---

[434] 2RT130,135-139 (Barnes).

[435] PX1, pp.9-10; PX5, pp. 4, 30-39; PX103; PX105;PX106; PX107.

119

130.  P  The socioeconomic disparities which exist in SBISD impact the ability of the minority community to influence District officials, District elections, and District educational policy.

130.D   Regarding the fifth Senate factor - the effects of past discrimination - "[t]he effects of past discrimination, as the text of the Senate Report indicates, pertain solely to the 'political access' prong of a §2 claim." *Clements*, 999 F.2d at 863. Thus, "[a]bsent an indication that [the effects of past discrimination] 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to [SBISD's] political process." *NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001). See also *Fairley v. Hattiesburg, Miss.*, 662 Fed. Appx. 291, 298 (5th Cir. 2016) (although evidence of socioeconomic disparities were presented at trial, "proof of socioeconomic disparities and a history of discrimination 'without more' does not demonstrate that a group of citizens has less opportunity to participate in the political process"); *Veasey v. Abbott*, 830 F.3d 216, 307-08 (5th Cir. 2016) (en banc) (Jones, dissenting) (regarding "*Gingles* Factor 5, the 'effects of past discrimination,' … [t]he Supreme Court recently reaffirmed that state entities should not bear legal responsibility 'for racial disparities they did not create,'" citing cases). SBISD did not create, promote, or worsen the racial disparities cited by Plaintiff. Instead, SBISD provided educational opportunities for these students.[436]

---

[436] See generally, testimony of Craft and Porter.

### v.   Senate Factor 6: Use of overt or subtle racial appeals in political campaigns.

131.P SBISD political discourse and campaigns have involved overt or subtle racial and ethnic appeals. When SBISD Hispanic and Latino parents complained in the past about inadequate facilities and insensitive State Representatives and School Board members, Anglo parents organized their efforts into committees with names like the Pine Shadows Concerned Citizens or the Parents for Fair Full Funding.[437] The Anglo parents couched their complaints in terms of statistics and pedagogical terms, but they openly revealed that their demands had a strong racial appeal as well.[438] In 1990, reportedly "Hundreds of Spring Branch parents banded together in opposition to construction of new Pine Shadows Elementary School.[439] They say boundary expansion and "increased size of the campus will reduce the quality of education" by adding 700 additional students. But the opponents also observed that the proposed enrollment would result from "a large group coming from low-income apartments primarily occupied by minorities," according to Wayne Schaper, then executive director of the SBISD administration.[440] Bill Ray, then chairman of the Pine Shadows Concerned Citizens, said the concern was about the increased size of the campus, "not a racial issue," but his group member Kathleen Drinnan said "racial balance" was the issue and added "We don't want them (the minorities) all in our neighborhood. The associated social problems are documented in schools that are largely

---

[437] PX5, p.38.

[438] PX5, p.38.

[439] PX5, p.38.

[440] PX5, p.38.

minority."[441]

131.D Plaintiff set forth no evidence of recent discrimination in SBISD. All of Plaintiff's evidence of discrimination involves other government entities, and most of these events occurred long ago, and are therefore not probative of current conditions

132. In another meeting to protest the mixing of students across the "Mason-Dixon Line" [I-10] one Anglo parent styled her complaint as a social class conflict.[442] Germaine Sitomer admitted  that she was sending her own child to a private school.[443] She said "'For sale' signs are coming  up in Spring Valley. . . We would like to go to Hunters Creek. . . We think that moving a piece of the population of upper middle-class people to an upper middle-class school is the best solution."[444] Carlee Klam, president of the Valley Oaks PTA denied "racism, but admitted there has been  'white flight' for the past six years or so as the apartment buildings have added minority children  to the school."[445] Spring Branch ISD Board President Jerry Mischon said that racism "has been a part of community discussions" at the least "and bigotry at the most."[446]

133. "[M]oving a piece of the population of upper middle-class people to an upper middle class school" is precisely what SBISD has done with respect to districting White residents in Spring Valley Village and Hilshire Villages to schools located south of I-10. See

---

[441] PX5, p.38.

[442] PX5, p.38.

[443] PX5, p.38.

[444] PX5, p.38.

[445] PX5, p.39.

[446] PX5, p.39.

PX9, PX10, PX11, which depict areas north of I-10 comprised largely of White residents and students that the District has zoned to schools south of I-10 with majority White enrollments.

134.P Political campaigns in SBISD also have been characterized by overt and subtle racial appeals. Examples include anonymous taunting hate mail received by SBISD trustee candidate Noel Lezama in connection with his 2018 campaign, which has caused him concern about retaliation should he run again for public office in the District,[447] and false accusations brought against the Plaintiff during her campaign concerning issues stereotypically attributed to minority candidates, such as purported support for "Critical Race Theory," unionizing SBISD teachers and staff, as well as distribution of election-day campaign materials on a racial basis and harassment of her various supporters.[448]

134.D   SBISD elections have not been characterized by covert or subtle racial appeals. During Chris Earnest's campaign against Plaintiff, he did not hear any overt or subtle racial remarks about his opponent.[449] David Lopez did not testify about any racial remarks made to him.[450] Noel Lezama testified that he received a crude letter from an unknown person of an unknown race, from an unknown address, for unknown reasons **after** his election was over; that is the closest Plaintiff comes to showing any racial appeals in elections –importantly, this does not qualify as a racial "appeal" because it is not by a candidate for office (such as an

---

[447] PX48; PX49; 3RT140-145 (Lezama).

[448] 2RT189-193 (Elizondo); PX63; PX81; 2RT45-47 (Shaddix).

[449] 4RT113:6-11 (Earnest).

[450] See, generally, testimony of David Lopez.

opposing candidate of Lezama making a "dog whistle" argument).[451] Therefore, there is no evidence of actual race-based appeals in SBISD elections.

### vi.   Additional Factor: Tenuousness of the policy of at-large elections.[452]

135.P The at-large system of election is not mandated by state law.[453] More than one hundred Texas school systems elect their trustees from single member districts.[454]

135.D   The at-large election system is specifically allowed by Texas law. The vast majority of school districts–848–in Texas have at-large election systems.[455]

136. As the District's own expert stated, "we're a single member district kind of country."[456] Single member district electoral systems are prevalent throughout American democracy: they are found in school districts, cities, counties (including Harris County), community colleges, the Texas Legislature, and the United States Congress.[457]

137.P As Dr. Stein discussed in his analysis and in his testimony in which he recommends that the District adopt a single member electoral system, there is strong evidence in the scholarly

---

[451] PX 48-49; 3RT153:22-145-154:7 (Lezama).

[452] *Gingles*, 106 S. Ct. at 2759 (quoting S.Rep. At 28-29).

[453] Dkt. 99, ¶22.

[454] PX66, p.5.

[455]  PX 66; 3RT199:2-10 (Porter); 5RT99:8-9 (Alford).

[456] 5RT98 (Alford).

[457] 5RT128 (Alford).

literature and in practice that:

- Single member district forms of representation enhances proportional representation of minority candidates on legislative bodies.
- Single member district representation increases the likelihood that minority candidates will contest elections for position on legislative bodies.
- Single member district representation will produce policies more responsive to the preference of minority voters.[458]

137.D   Although "there's [no] point in demonizing single-member districts," there is "also no point in demonizing at-large elections."[459] The majority of Texas school districts utilize an at-large election system.[460] Many local governments transitioned from single-member district systems to at-large systems around the turn of the last century to break corruption and prevent cronyism.[461] Single member district systems can promote territorial representation wherein representatives seek benefits only for their precinct, while ignoring the good of all constituents.[462] By contrast, at-large systems suppress pork-barrel spending because representatives are beholden to all voters, not just those from a

---

[458] PX1, pp.3, 10-15; PX3, p. 5; PX4, p.3;PX136, p.6; 4RT24-25, 45-48, 63-67, 90-92, 100-102.

[459] 5RT99:6-8 (Alford).

[460] 5RT99:6-11 (Alford).

[461] 5RT99:12-18 (Alford).

[462] 5RT99:12-25 (Alford);

small area.[463] As it stands right now under the at-large system, SBISD trustees are accountable to the voters in every middle school precinct; a single-member district system would change that, even though SBISD is not a large territorial area.[464] Further, the at-large system allows voters to vote for every SBISD trustee position, every year. But a single-member district system would allow voters to vote for only one trustee place every three years.[465] Accordingly, SBISD's reasons for keeping the at-large system are not tenuous.

138.P Every past unsuccessful Hispanic candidate for a position as a District trustee (each of whom was shown to have been the preferred candidate of Hispanic voters in the District) testified at trial that, based upon their experience as District residents, voters, and candidates, the adoption of a single member plan for electing trustees would be both beneficial to the Hispanic voting community and would likely result in the election of a Hispanic-preferred candidate.[466]

138.D The facts simply do not show that Plaintiff's illustrative district would afford Hispanic voters a real opportunity to elect a candidate of their choice. Although Plaintiff's witnesses testified that they believe a single-member district system would

---

[463] 4RT71:15-20 (Stein).

[464] 4RT116:17-117:14 (Earnest).

[465] 5RT52:12-20 (Anderson).

[466] 2RT201-202 (Elizondo); 3RT118-119 (Lopez); 3RT151-153 (Lezama).

enhance their opportunity to elect their preferred candidates, past election results do not support such a claim. For example, Plaintiff contends that Plaintiff was the Hispanic candidate of choice over Chris Earnest in the 2021 election, but Chris Earnest received more votes than Plaintiff in the Landrum Middle School Precinct 41, which makes up the bulk of Plaintiff's proposed illustrative District.[467] And in Plaintiff's 2015 contest against Chris Vierra, Plaintiff did not receive the most votes in **any** precinct.[468] Similarly, in the 2022 election, the purported Hispanic-preferred candidate (Breed) received fewer votes than the purported Anglo-preferred candidate (Alpe) in both the Landrum and Northbrook precincts, and it wasn't particularly close.[469] In that same election year, John Perez (the purported Anglo-preferred candidate for position 6) and Caroline Bennett (the purported Anglo-preferred candidate for Position 7) received more votes in the Landrum precinct than their respective two opponents – **combined.**[470] This trend continued into the 2023 election wherein the purported Anglo-preferred candidates Courtney Anderson and Shannon Mahan **both** defeated the purported Hispanic-preferred candidates David Lopez and Becky Downs in **both** the Landrum and Northbrook precincts.[471] And in 2024, the purported Anglo-preferred candidate,

---

[467] PX 31.

[468] DX 20; 2RT208:24-209:7 (Elizondo).

[469] DX 87.

[470] DX 87.

[471] PX 88.

David Slattery, received more votes than each of the other three candidates in both the Landrum and Northbrook zones (in fact, Slattery received more votes than all three candidates combined in Northbrook, and the same number of votes as all three candidates combined in Landrum).[472] Because the purported Hispanic-preferred candidate repeatedly falls short in the precincts used to draw Plaintiff's illustrative district, Plaintiff cannot show that changing SBISD's entire electoral system would benefit Hispanic voters at all. Given the actual data, it is more likely that this disruptive, systematic change would be all for naught. Accordingly, Plaintiff has failed to show that a single member district system would be beneficial for the Hispanic community.

139. Former District Superintendent Klussmann also explained the important role that having a seat and a voice on the school board plays in affecting educational policymaking by the board and by the District – and its significance to parents whose children comprise a majority of the students in the District.[473]

140. The principal reason proffered by the District for maintaining an at-large system for electing its school board trustees is the stated concern that implementation of a single member plan would necessarily result in factionalism and divisiveness, rather than a board comprised by representatives elected by all voters and charged with responsibility for adopting policies beneficial to the

---

[472] PX 72.

[473] 1RT67-72, 74-75, 85-88 (Klussmann).

District as a whole.[474]

141.   But the very premise of the District's position is its fatal flaw: the evidence at trial conclusively proved that a significant portion of the District electorate – its Hispanic citizens – lack any voice whatsoever in selecting those who serve on the school board, because their voting preferences are routinely overridden by the contrary preferences of the majority White voting population. The District's defense of the current at-large electoral system therefore is based upon the fiction that every voter has an equal say in electing the members of the school board, when the evidence at trial proved that is not the case. To the contrary, under the District's current at large system for electing school board trustees, to quote Dr. Stein, the votes of the White voting majority "do not just count;" instead, "[t]hey determine the outcome of the elections."[475] That is what the Voting Rights Act is

---

[474]   One District witness also voiced the view that, if a single member district plan were implemented, voters in the proposed illustrative district 1 "will only get to vote for one candidate every third year" as opposed to being able to "vote for every trustee every year." 5RT52. On the facts of this case, however, the fallacy in this view is that history has proven that under the current at large electoral system, none of the votes cast by the Hispanic community that would comprise a majority in the proposed district make any difference in any election because in every election since 2015 save one, the Hispanic preferred candidate always lost. PX137. As Dr. Stein testified, the votes of the White voters do "not just count . . .[t]hey determine the outcome of elections." 4RT101-102. Maintenance of the current at large system, therefore, would merely perpetuate a system which cancels out minority voters' "ability to elect their preferred candidates." *Allen*, 143 S.Ct. at 1494. Having the opportunity to cast a meaningless vote annually would merely perpetuate the "futility" of participation, where candidates and voters ultimately decide it is futile to participate. 4RT28 (Stein).

[475]   4RT101-102 (Stein).

intended to prevent.

142. In addition, the District has acknowledged its awareness that: (1) it is lawful to have single member districts and they would provide an opportunity for participation in areas of the district that have lower participation;[476] (2) the Voting Rights Act assures that the voting strength of its minority voters is not to be diluted by the majority;[477] (3) there are sound policy reasons for adopting a single-member district plan because it would ensure that specific minority groups have an opportunity to be represented as required by law and Texas voters' rights;[478] (4) one of the policy reasons supporting the adoption of single-member plans is that those plans may allow minority voters' preferences to be better reflected in the election results;[479] and (5) single-member district representation can increase the likelihood that minority candidates will run for office on the board.[480]

143.P In totality, the at-large method of electing the Trustees of Spring Branch ISD dilutes the voting strength of Latinos and other racial or language minorities in violation of the Voting Rights Act and deprives the District's Hispanic citizens of this fundamental political right.

---

[476] 3RT222 (Porter, District corporate representative).

[477] 3RT222 (Porter, District corporate representative).

[478] 3RT222 (Porter, District corporate representative).

[479] 3RT222-223 (Porter, District corporate representative).

[480] 3RT223 (Porter, District corporate representative).

143.D  In totality, the at-large method of electing SBISD Trustees does not dilute the voting strength of Latinos and other racial or language minorities in violation of the Voting Rights Act, and does not deprive SBISD's Hispanic citizens any political rights. This Court does not serve to guarantee success to some candidates over others, or to serve as a roving chancellor in equity charged with determining what would be the "best" electoral system – these tasks are given to the voters and trustees of SBISD. Instead, this Court serves to interpret and enforce the Voting Rights Act. Having found no violation, this Court declines to impose sweeping changes that would affect the rights of thousands of voters.

144.P No sufficient policy reason or rationale exists for the continued use of the District's at-large system for electing SBISD Trustees.

144.D It should not be discounted that the Hispanic voters – or all voters – in SBISD could force the SBISD Board of Trustees to vote on whether to convert to a single member district system by submitting a petition, but no such petition has ever been submitted.[481]

      **vii. Additional Factor: Significant lack of responsiveness by elected officials to the particularized needs of the minority group.[482]**

145. "Besides the enumerated factors, the Senate Report requires a court to ask  whether there is a significant lack of responsiveness

---

[481] DX 9; 3RT200:9-201:8 (Craft).

[482] *Gingles*, 106 S. Ct. at 2759 (quoting S.Rep. At 28-29).

by elected officials to the minority group members' particularized needs. . . . The 'provision[] of [governmental] services to neighborhoods populated by minority group members' is relevant to this factor. *David v. Garrison*, 553 F.2d 923, 929 (5th Cir. 1977)." *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 715-16 (S.D.Tex. 2017). *Accord Petteway*, 698 F.Supp.3d at 1013-14.

146. Among other things, the significance of polarized bloc voting of the sort challenged here is that it "allows those elected to ignore [minority] interests without fear of political consequences' leaving the minority effectively unrepresented." *Gingles*, 106 S.Ct. at 2765 n. 14; *Clements*, 999 F.2d at 857.

147.P This factor weighs in Plaintiff's favor. Numerous witnesses testified to the lack of responsiveness by the school board to the impact of District decisions on the Hispanic community, including:

- ▸   School and Program Closures: After discussions occurring largely in private Executive Sessions, rather than in public,[483] the school board voted to close multiple schools and educational programs primarily serving and confined to the Hispanic community on the north side of the District, purportedly due solely to budgetary considerations, notwithstanding financial offers to neutralize the financial impact of closing one campus rather than another and the District decided to spend around $30 million dollars to rebuild a new southside elementary school with a lower enrollment, serving primarily White students, where more funds per student are expended, than Hispanic-majority north side schools, some of which the District chose to close.[484]

---

[483] 1RT74-78 (Klussmann); 2RT51-52 (Shaddix).

[484] PX139; 1RT75-78 (Klussmann); 2RT47-53 (Shaddix); 3RT223-233 (Porter, District corporate representative).

- **Disparate and Discriminatory Discipline of Hispanic Students:** The failure and refusal of the school board to acknowledge, investigate, and take any specific remedial action to redress objective evidence that the District's Alternative Education Program (DAEP) administered disparate discipline to Hispanic and African American children than to White children.[485]

- **Ignoring Defaced Athletic Facilities at Hispanic-Majority High School:** After school athletic facilities at Northbrook High School were vandalized and defaced with profane graffiti before a District athletic contest, District board and personnel were unresponsive to parent requests for District assistance to remediate the situation, which was described as a materially different response than would have occurred had the incident involved a south-side majority White high school.[486]

- **Requests that the District Modify its At Large Electoral System:** Notwithstanding the facts that: (1) the District's own expert witness advised it more than twenty years ago that his preliminary analysis of polarized voting was consistent with the possibility that Hispanic voters were voting above 50 percent for their preferred candidates, that Anglo voters were voting below 50 percent for those preferred candidates, and that the Hispanic-preferred candidates were not being elected to the school board – which indicated that the day would come when the District could draw a *Gingles* one district;[487] (2) the District's own expert more recently performed an analysis unrelated to this litigation in which he concluded that SBISD had reached the point where if a Hispanic CVAP majority district could be drawn, and if in five elections in a row, the Hispanic preferred Hispanic candidate was defeated by the Anglo-preferred candidate, that would be a "nice little set piece for what racially polarized voting looks like" and he acknowledged at trial that his own analysis of the SBISD elections between 2015 and 2021 reflected just that result;[488] and (3) the District's own (former) lawyers began informing the Board in January 2020 about alternative electoral systems, the potential impact of the then-forthcoming decennial census, and proposed a

---

[485] PX14; 3RT55-58 (Craft, District corporate representative); 3RT63-82, 94 (Rodney).

[486] PX46; PX76; 2RT42-45 (Shaddix); 3RT145-146 (Lezama).

[487] 5RT130 (Alford).

[488] 5RT130-136 (Alford).

133

timeline for evaluating whether to implement a change in the District's electoral system[489] – the District has been unresponsive to citizen requests that it implement changes to its current at large electoral system.[490] To the contrary, every board member witness voiced his or her opposition to implementing any single member election plan.[491]

147.D   SBISD has been responsive to the needs of the Hispanic community in at least the following ways:

▸ Adopting and implementing a robust bi-lingual program for Spanish speaking students to learn English and succeed in school.[492]

▸ Making changes to disciplinary policies upon request.[493]

▸ Inviting Hispanic members of the community – including Plaintiff and candidate Noel Lezama – to participate in the LEAD SBISD Program.[494]

▸ Using financial bond packages to prioritize improvements to facilities north of I-10. Of the 13 schools that were replaced, 8 were on the north side.[495] Plaintiff's witness, Dr. Klussmann, called this 2007 bond the "most equitable bond program probably in the history of the District."[496]

▸ Inviting Hispanic community members – including Plaintiff and Noel Lezama – to serve on the District's bond committees.[497]

148.D   Plaintiff points to school closures on the north side as

---

[489] PX66;

[490] PX77; 3RT114-117 (Lopez).

[491] 4RT116-117 (Earnest); 5RT13-16 (Perez); 5RT51-52 (Anderson).

[492] 3RT13:24-15:7 (Craft).

[493] 3RT85:9-16 (Rodney); PX 14.

[494] 3RT154:8-17 (Lezama); 2RT176:17-24 (Elizondo).

[495] 1RT100:1-11 (Klussmann).

[496]  1RT100:1-11 (Klussmann)

[497] 2RT205:6-12 (Elizondo); 3RT154:18-24 (Lezama).

anecdotal evidence of discrimination against Hispanics in SBISD. But SBISD's trustees testified that these schools were well under capacity, serving far fewer students than possible, and therefore consolidating campus made financial and educational sense in light of the District's $35,000,000 budget shortfall.[498] Trustee John Perez testified that combining these campuses has actually had a positive impact on student and parent morale because these campuses now have the "vibrancy, the energy of a full school."[499] Plaintiff points to one act of non-race-based vandalism of a north side school to substantiate her claims that the District is not responsive to the needs of Hispanic students. But Plaintiff cannot show who committed this vandalism or why. The person who reported the vandalism was an Anglo parent on the north side, and there is no evidence that the school district knew about the vandalism before it was reported.[500] Vandalism and pranks among rival high schools is not uncommon, and this single incident that had nothing to do with race, and for which there is no evidence that the Hispanic community was treated unfairly, certainly does not support a change to SBISD's electoral system.

## I.  Expert Witness Credibility

149. The Court finds Dr. Stein's testimony highly credible and reliable. Dr. Stein has a long and distinguished career as a Rice University scholar specializing, among other things, in elections,

---

[498] 3RT232-233 (Porter).

[499] 5RT27:9-16 (Perez).

[500] 3RT145:18-146:9; 151:24-24 (Lezama).

election administration and public policy.[501] He has performed and continues to perform research and to teach regarding voting procedures and voting behavior and public policy in the United States.[502] Among other things, Dr. Stein's recent research concerns election administration, access to polling locations, early voting, different modes of voting and their effects on both voter turnout and performance.[503] Dr. Stein has consulted with and served as an expert witness in multiple other matters involving voting and election administration.[504] In addition to his engagement in this case, concerning a plaintiff asserting a Voting Rights Act claim, Dr. Stein also has served as an expert consultant for multiple political subdivisions, including the State of California, the State of Washington, the State of Colorado, as well as multiple local school districts in Texas and Harris County for whom he has worked drawing or redrawing single member district plans.[505] Throughout Dr. Stein's reports and his live testimony, his opinions were clear and consistent, and he had no difficulty articulating his bases for them. During Dr. Stein's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined about his work on this case. He consistently defended his work with careful and deliberate explanations of the bases for his opinions. The Court observed no internal inconsistencies in his

---

[501] PX18.

[502] 4RT18.

[503] 4RT19-20.

[504] 4RT20.

[505] 4RT20.

testimony, no appropriate question he could not or would not answer, and no reason to question the veracity of his testimony. The Court therefore finds his methods and conclusions are highly reliable,[506] and that his work is helpful to the Court.

150.P The *Gingles* and totality of the circumstances analyses and opinions of Defendants' expert, Dr. Alford, are grounded on three legally erroneous propositions; namely, that: (1) the race or ethnicity of the *candidates* that minority voters prefer – as opposed to the race or ethnicity of the *voters,* irrespective of the

---

[506]

The Court also observes that the District's expert, Dr. Alford, acknowledged that his colleague, Dr. Stein: (1) is an expert qualified by knowledge, skill, experience, training, and education to render opinions about voting behavior, the Gingles factors and the totality of the circumstances; (2) has an excellent reputation, is very well respected in the areas where he has done work and has always performed important, well-recognized work; (3) in the areas Dr. Stein has performed work, his work is always among the best of the work done; (4) is "methodologically qualified" and, apart from specialized political methodology technicians, he is as skilled as anybody doing work in the social sciences today; (5) employs up-to-date methods in his research and does them accurately and skillfully. 5RT124-125. Dr. Alford also acknowledged that the initial analytical method Dr. Stein utilized, an ordinary least squares (OLS) regression analysis, is a scientifically verifiable way to evaluate racially polarized voting, is generally accepted in the social science community and has been subjected to peer review and publication.5RT125-16. Alford also admitted that Dr. Stein applied the principles and methods of his OLS statistical work reliably to the facts of this case, within a statistical meaning of reliability.5RT126. Alford acknowledged that he was not contending that Dr. Stein executed his OLS analysis improperly; he simply critiqued that approach as not the "most sophisticated or most reliable analysis to use." 5RT126-127. Alford further acknowledged that Dr. Stein also performed two other methods of analysis: an ecological inference or EI analysis and another analysis with another version of EI software – and Dr. Stein concluded that all three methodologies corroborated his initial opinion.5RT127.

candidate's race or ethnicity – is significant;[507] (2)without proof of discriminatory animus or motivation on the part of voters, there "is simply not a violation of the Voting Rights Act;"[508] and (3) whether political cohesion exists in his mind is a mathematical determination, with anything below a 75% vote share not qualifying as political cohesion.[509] But each of these propositions is

---

[507] 5RT122 (Alford). This operating assumption is incorrect. "For purposes of §2, the legal concept of racially polarized voting incorporates neither causation nor intent. **It means simply that the race of voters correlates with the selection of a candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates**." *Gingles*, 106 S.Ct.at 2772 (emphasis added). "Both §2 itself and the Senate Report make clear that **the critical question is whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity** than other members of the electorate to participate in the political process and **to elect representatives of their choice**." *Id.* at 2773 (emphasis added). The race or ethnicity of the voter is relevant to the Section 2 *Gingles* analysis; the race or ethnicity of the candidate is not. In a vote dilution claim under §2 "it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important. . . .Clearly, only the race of the voter, not the race of the candidate, is relevant to the vote dilution analysis." *Gingles*, 106 S.Ct. at 68-69.

[508] 5RT122-123 (Alford).This operating assumption is also incorrect. "For purposes of §2, the legal concept of racially polarized voting incorporates neither causation nor intent. . . . It is the *difference* between the choices made by [protected minorities] and whites – not the reasons for that difference – that results in [minority group members] having less opportunity than whites to elect their preferred representatives. Consequently, we conclude that under the 'results test' of §2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Gingles*, 106 S.Ct. at 2772-2773.The "results" or "effects" test for imposing liability under Section 2 resulted from Congress statutorily-overriding the Supreme Court's previous requirement that discriminatory intent had to be shown. *Gingles*, 106 S.Ct. at 2758.

[509] 5RT70-80 (Alford).*See, e.g., Flores v. Town of Islip*, 382 F. Supp. 3d 197, 233 (E.D.N.Y. 2019), where Dr. Alford advanced the same

incorrect and has been rejected by numerous other courts.[510] As a

mathematical theory of polarization proposed here, that "has no foundation in the applicable caselaw."

[510]

*See Miss. State. Conf. of the NAACP*, 2024 U.S. Dist. LEXIS 127352 *136-137 (as in *Robinson v. Ardoin*, 605 F.Supp.3d 759, 840 (M.D. La. 2022), Alford polarization opinions unsupported by meaningful substantive analysis and border on ipse dixit); *Nairne v. Ardoin,* No. 22-1278-SDD-SDJ, 2024 U.S. Dist. LEXIS 22181, *89-90 (M.D. La. Feb. 8, 2024(court does not credit Alford testimony as helpful because it "appears to answer a question that *Gingles* II does not ask and in fact squarely rejects, namely, why Black voters in Louisiana are politically cohesive.'It is the difference between the choices made by black and whites – not the reasons for the difference – that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of §2, only the correlation between race of voter and selection of certain candidates, not the cause of the correlation matters.'"); *Alpha Phi Alpha Fraternity v. Raffensberger*, 587 F. Supp.3d 1222, 1306-1307 (N.D. Ga. 2022)("no evidentiary support in the record for Dr. Alford's treatment of race and partisanship as separate and distinct factors affecting voter behavior"; *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) ("[Dr. Alford's] testimony, while sincere, did not reflect current established scholarship and methods of analysis of racially polarized voting and voting estimates."), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) ("At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 709-13 S.D. Tex. 2017) (finding in favor of the plaintiffs as to *Gingles*' second and third prongs, contrary to Dr. Alford's testimony on behalf of the defendant jurisdiction), stay denied pending appeal, 667 F. App'x 950 (5th Cir. 2017) (per curiam); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1401-07 (E.D. Wash. 2014) (finding the same and stating that Dr. Alford's testimony did "not defeat a finding of Latino voter cohesion"); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 U.S. Dist. LEXIS 113239, 2014 WL 4055366, at *11-13 (N.D. Tex. Aug. 15, 2014) (same); *Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 U.S. Dist. LEXIS 108086, 2012 WL 3135545, at *8-13 (N.D. Tex. Aug. 2, 2012) (same); *Texas v. United States*, 887 F. Supp. 2d 133, 181 (D.D.C. 2012) ("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether

result, this Court, like many others that have reached the same conclusion, has determined that Dr. Alford's advocacy[511] has no foundation in the applicable caselaw and should not be relied upon here.[512]

---

minorities are able to elect the candidate of their choice, no matter the political party that may benefit."), vacated on other grounds, 570 U.S. 928 (2013); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 722-25, 731-32 (N.D. Tex. 2009) (finding in favor of the plaintiffs as to Gingles' second and third prongs, contrary to Dr. Alford's testimony on behalf of the defendant jurisdiction).

[511] While holding himself out as an accomplished and busy expert witness (listing 21 recent expert assignments on his CV), Dr. Alford acknowledged that, in contrast to Dr. Stein, he works "almost exclusively for entities" and that he did not work for a plaintiff on any of the engagements itemized in his CV. DX73; 5RT123.

[512] The Court also observes that Dr. Alford acknowledged during cross-examination that: (1) he had advised the District more than twenty years ago that his preliminary analysis of polarized voting was consistent with the possibility that Hispanic voters were voting above 50 percent for their preferred candidates, that Anglo voters were voting below 50 percent for those preferred candidates, and that the Hispanic-preferred candidates were not being elected to the school board – which indicated that the day would come when the District could draw a *Gingles* one district, 5RT130 (Alford); and (2) he had more recently performed an analysis unrelated to this litigation in which he concluded that SBISD had reached the point where if a Hispanic CVAP majority district could be drawn, and if in five elections in a row, the Hispanic preferred Hispanic candidate was defeated by the Anglo-preferred candidate, that would be a "nice little set piece for what racially polarized voting looks like" and he acknowledged at trial that his own analysis of the SBISD elections between 2015 and 2021 reflects just that result. 5RT130-136 (Alford). It therefore is unsurprising that the District did not request that Dr. Alford conduct his own *Gingles* and totality of the circumstances analyses, but instead engaged him solely to serve as a critic of Dr. Stein's work. 5RT143-144 (Alford).

Moreover, Dr. Alford acknowledged that: (1) his findings regarding racially-polarized voting in the 2023 SBISD trustee elections, using his preferred software program, as opposed to the version Dr. Stein utilized, showed an "overall pattern [that] is very similar to the EI analysis of the estimated support provided by Anglo and Hispanic voter by Dr. Stein in these two contests, as reported

140

150.D  The Gingles and totality of the circumstances analysis and opinions of Defendants' expert, Dr. Alford, are well-founded, reliable and helpful to the Court. First, Dr. Alford testified that a showing of discriminatory intent or animus did not underlie his analysis of the Gingles factors but, rather, that discriminatory motivation "is important to both Gingles three, that is, to whether the white bloc voting rises to the level of being legally significant or not, and it's important to the totality of the circumstances because racially polarized voting, absent some discriminatory animus on the part of voters, is simply not a violation of the Voting Rights Act or the Constitution. … 31 years ago in LULAC v. Clements, the Fifth Circuit made it abundantly clear that they care deeply about precisely this issue. Is this about policy - they didn't say party. Is this about policy, or is it about racial animus?"  In LULAC v. Clements, the Fifth Circuit held:

> A central issue here … concerns Gingles' white bloc voting inquiry and the closely related Zimmer factor directing courts to examine "the extent to which voting is racially polarized." As the Court in Gingles held, the question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is "legally significant." …

---

above in Table 2 [Alford's summary table of the results of Dr. Stein's various analyses]." DX8, p. 6 (Alford supplemental report). See also PX136, p. 4 (Stein supplemental report) ("Though our methods for estimating racially polarized voting in the 2023 trustee elections are different, both Dr. Alford's findings and my findings demonstrate significant racially polarized voting in both 2023 SBISD trustee elections."). Therefore, regardless whether Dr. Stein and Dr. Alford analyzed racially-polarized voting with the same version of EI software, they obtained similar results; only their inferences from the data vary.

When the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens in the contested counties, defendants conclude, the district court's judgment must be reversed.

We agree. The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of §2 suggests, extend only to defeats experienced by voters "on account of race or color." Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense "discriminatory," and any distinction between deprivation and mere losses at the polls becomes untenable. In holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the district court loosed §2 from its racial tether and fused illegal vote dilution and political defeat. In doing so, the district court ignored controlling authorities: Whitcomb v. Chavis, 403 U.S. 124, 29 L.Ed.2d 363, 91 S.Ct. 1858 (1971), which established a clean divide between actionable vote dilution and "political defeat at the polls"; the 1982 amendments, enacted to restore a remedy in cases "where a combination of public activity and private discrimination have joined to make it virtually impossible for minorities to play a meaningful role in the electoral process," Hearings on the Voting Rights Act Before the Subcomm. On the Constitution of the Senate Comm. of the Judiciary, 97th Cong., 2d Sess. 1367-68 (statement of Prof. Drew Days) (emphasis added); and Thornburg v. Gingles, 478 U.S. 30, 92 L.Ed.2d 25, 106 S.Ct. 2752 (1986), where a majority of the Justices rejected the very test employed by the district court as a standard crafted to shield political minorities from the vicissitudes of "interest-group politics rather than a rule hedging against racial discrimination." …

Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of "partisan politics" or "racial vote dilution," "political defeat" or "built-in bias." 999 F.2d at 850-51, 853-54 (emphasis added and in original). Dr. Alford's testimony and analysis is consistent with, and supported by, Clements. In addition, Dr. Alford testified that for there to be

Hispanic voting cohesion the nonarbitrary point for such cohesion is at least 75%, which is halfway between 50% [zero cohesion] and 100% [perfect cohesion].  Dr. Alford's testimony and analysis is consistent with, and supported by, the case law that requires an "overwhelming majority" for cohesion. See LULAC v. Abbott, 2022 U.S. Dist. Lexis 224928, * 11 (W.D. Tex. 2022) ("The second and third preconditions are often discussed together. The second requires the minority group to be 'politically cohesive.' The third is that 'the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. … Plaintiffs normally demonstrate minority political cohesion by showing that 'a significant number of minority group members usually vote for the same candidates.' That is described as 'bloc voting' (just like the third precondition) and typically means that a large majority of the group favors the same candidates.") (quoting Gingles, 478 U.S. 51, 56) (emphasis added). See also Blacksher & Menefee, From Reynolds v. Sims to City of Mobile v. Bolden, 34 Hastings L. J. 1, 59 (1982) ("Whether a racial group is politically cohesive depends on its demonstrative propensity to vote as a bloc… The only elections of consequence to this constitutional inquiry, however, would be those in which an overwhelming majority of this group supported one or more candidates") (emphasis added) (cited with approval by Gingles, 478 U.S. at 56). *See also, Petteway v. Galveston Cnty.*, 698 F.Supp.3d 952, 140 (S.D. Tex. 2023) (quoting *Abbott*, 604 F.Supp.3d at 499) ("A 51% majority is 'far short of the large majority typically required to show political cohesion.'").The Court finds that Dr.

Alford's testimony, analysis and opinions are reliable.

**J.   Plaintiff Need Not Demonstrate that a Minority-Preferred Candidate Necessarily Will be Elected in the Proposed Illustrative District.**

151.   The evidence conclusively established that under SBISD's current at-large election system, there is virtually no chance for a minority-preferred candidate to win any trustee election.[513] The current make-up of the citizen voting age population of SBISD makes it clear that if the racially polarized voting that has historically occurred continues, then Hispanic-preferred candidates will lose both now and in the future.[514]

152.   Any single-member district that has a majority Hispanic CVAP will provide a greater opportunity for the Hispanic community in SBISD to elect its preferred candidates than the current election system.[515] That is all that is required under Section 2.

153.   The precedents cited by the District in support of its claim that Voting Rights Act plaintiffs must prove that the minority voters' preferred candidates can win election in their proposed districts, are cases in which the jurisdictions already had single-member districts and the issue was whether the proposed

---

[513]
  PX136, pp. 2-6; PX19; PX20; PX22; PX21; PX122; PX123; PX124; PX125; PX126; PX127; PX128; PX129; PX130; PX131; PX132; PX133; PX134; PX135; PX137; 4RT18-36, 48-67, 100-102 (Stein).

[514]
  PX-1, pp. 3, 4-7; PX2, pp. 1-14; PX3, pp. 2-5; PX4, pp. 1-2; PX136, p. 6.

[515]   4RT23-25,45-48, 63-67, 100-102 (Stein).

144

redistricting plan would "enhance the ability of minority voters to elect the candidates of their choice." *See e.g. Abbott v. Perez*, 138 S. Ct. 2305, 2332 (U.S. 2018). ("[u]nder Gingles, the ultimate question is whether a districting decision dilutes the votes of minority voters, . . . and it is hard to see how this standard could be met if the alternatives to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice.") (emphasis added). *See also Harding v. Cty. of Dallas*, 948 F.3d 302, 310-11 (5th Cir. 2020)(redistricting challenge brought by Anglo voters)(discussing relevant standard as whether the proposed plan would "improve the ability of Latinos to elect their preferred candidates" or "enhance the ability of minority voters to elect the candidates of their choice" or "provide Latinos with an improved opportunity to elect [a] Latino-preferred candidate.")(emphasis added).

154. Even if that standard applied here, the evidence conclusively demonstrated that the single member districting system proposed by Plaintiff will "improve" and "enhance" the opportunities of Hispanic voters in SBISD to elect their preferred candidates to the school board.

155. P Dr. Stein's analysis and testimony established that: (1) single member districts enhance proportional representation of minority candidates on legislative bodies, like the school board; (2) single member district representation increases the likelihood that minority-preferred candidates will contest elections for

positions on legislative bodies; (3) continued use of an at-large electoral system is expected to deter minority-preferred candidates from continuing to seek election and deter minority voters from continuing to turn out to vote, as they observe that their electoral efforts are futile; (4) single member district forms of representation will increase voter turnout by producing candidates that are more likely to represent the preferences of voters in the geographic areas of the districts, giving rise to more participation; (5) the proposed illustrative district 1 would provide Hispanic voters with a "real" opportunity to elect their preferred candidate by creating an environment that would increase voter registration and turnout to support candidates who are preferred by those voters to run for office.[516]

155.D in the May, 2015 SBISD elections, Vierra (the winner of the election) beat Elizondo (the Hispanic preferred candidate according to Dr. Stein) in voting precincts 41 and 47, while Dawson, the winner of the election, beat Adams (the Hispanic preferred candidate according to Dr. Stein) in voting precinct 47.[517] In the May 2021 SBISD election, Earnest, the winner of the election, beat Elizondo, the Hispanic preferred candidate according to Dr. Stein, in voting Precinct 41.[518] In the May, 2022 Election, Alpe, the winner of the election, beat Breed, the purported Hispanic

---

[516] 4RT24-25, 27-28,45-48, 63-65, 90-92, 100-102 (Stein).

[517] 2RT 208-209:8-7; DX 2; DX 20.

[518] 3RT 181:4-9; 107:5-8; DX2; DX 21.

preferred candidate, in voting precincts 41 and 47.[519] In the May 2023 SBISD elections, Anderson (the winner) beat Lopez (the Hispanic preferred candidate, according to Dr. Stein) in precincts 41 and 47, while Mahan (the winner) defeated Downs (the Hispanic preferred candidate, according to Dr. Stein) in precincts 41 and 47. In the May 2024 SBISD election, Slattery (the winner of the election) beat Downs (the Hispanic preferred candidate according to Dr. Stein) in voting precincts 41 and 47.[520]. This poor track record for the purported Hispanic preferred candidates in the Landrum and Northbrook precincts demonstrates that Plaintiff's illustrative district, which is comprised of those precincts, simply would not have the effect Plaintiff seeks. Plaintiff therefore cannot clear the *Gingles* threshold inquiries, and her claims must fail.

156. In addition, every Hispanic candidate who in the past has been the preferred candidate of Hispanic voters in the District, testified that, based upon their familiarity with the proposed illustrative district and their previous campaign experiences, a Hispanic-preferred candidate would prevail in an election in the proposed illustrative district.[521]

157.D In addition, Dr. Stein did not take into account the impact of Hispanic voter turnout on SBISD elections. From 2015-2021, the mean percentage of Hispanic turnout of actual voters in school

---

[519] 3RT182:13-25; 4RT95-96; DX 11.

[520] 4RT97:8-18; DX 72.

[521] 2RT201-202 (Elizondo); 3RT118-119 (Lopez); 3RT153 (Lezama). See also 3RT178 (Cabrera).

board elections in Precinct 41 (Landrum) was 17.2% while the mean percentage of white turnout of actual voters was 74.2%. From 2015–2021, the mean percentage of Hispanic turnout of actual voters in school board elections in Precinct 47 (Northbrook) was 19.1% while the mean percentage of white turnout of actual voters was 80.9%. From 2015-2023, the mean percentage of Hispanic turnout of actual voters in school board elections was 16.3% in Precinct 41 (Landrum) and 18.5% in Precinct 47 (Northbrook).[522] Based on the above voter turnout percentages in the two voting precincts (Voting Precincts 41 and 47) used to form Dr. Stein's proposed Hispanic majority district ()District 1), Hispanics would have never been the majority of actual voters in the proposed District 1 in any election from 2015-2023.[523] Given the narrow 52.8% Hispanic citizen voting age majority in Dr. Stein's proposed Hispanic majority district (District 1), combined with the low Hispanic voter turnout which is less than 20% of actual voters in the two voting precincts (voting precincts 41 and 47) that form the proposed District 1 as well as the results of the recent elections in those two voting precincts, Plaintiff has failed to prove that Dr. Stein's sole proposed Hispanic majority district will in fact perform as Plaintiff hopes.[524]

158. The Voting Rights Act requires nothing more.

---

[522] 4RT85-90; 5RT108-109; DX 2; DX 8.

[523] 4RT92:15-21; 5RT112-113.

[524] 4RT41:13-20; 4RT92-93; 5RT107:11-24; 5RT109-110; 5RT112-113.

**K.  The Presence or Absence of Political Polarization is of No Consequence.**

159.  The District has suggested that the underlying reasons for the different voting preferences by Hispanic and White voters is relevant to the Section 2 analysis, contending that the differences are attributable to various partisan, political or cultural views, rather than due to race.

160.  But that argument is off base for several reasons.

161.  First, SBISD trustee elections are expressly non-partisan by their very nature. No party affiliation is listed on the ballot. No evidence exists that partisanship played any role in the vast majority of the elections at issue occurring between 2015 and 2024. The fact that partisan actors may have participated in one of the most recent elections analyzed by the litigants is immaterial.

162. Second, no evidence exists that partisans of any political party participated in or influenced SBISD trustee elections before 2021. See PX135 and PX137, which reflect the pattern of polarized voting and lack of electoral success of Hispanic-preferred candidates is the same both before and after the point in time when SBISD claims that "partisan" factors became a factor in trustee elections. In addition, partisan politics cannot explain the results of the SBISD election in 2022, because all of the candidates in that contest were members of the same political party.

163.P Finally, partisan, political, cultural, or other differences that may mirror racial differences do not undermine Section 2 of the Voting Rights Act, because any such characteristic is simply one component of racial cohesion. Plaintiff does not need to show that partisan affiliation does *not* cause divergent voting patterns. *See* Rodriguez, 964 F. Supp. at 760; *Lopez*, 339 F. Supp.3d at 603. As one court recently observed: "A high correlation between race and partisanship does not undermine a Section 2 claim, it is necessary to it. The minority voting group must be politically cohesive, which is a Gingles prerequisite, and the best (albeit imperfect) proxy for political cohesion is partisan alignment." *Rose v Raffensberger*, 619 F. Supp. 3d 1241, 1260 (N.D. Ga. 2022(invalidating at-large system for electing Public Service Commission members because of vote dilution violative of Section 2, holding that "nothing in the VRA requires a plaintiff to control for every possible covariant to assure that the discriminatory effect is caused solely or even predominantly by race as opposed to some other factor.")), rev'd on other grounds, 87 F.4th 469 (11th Cir. 2023) . *Accord Nairne,* 2024 U.S. Dist. LEXIS 22181, *89-90 court does not credit Alford testimony as helpful because it "appears to answer a question that Gingles II does not ask and in fact squarely rejects, namely, why Black voters in Louisiana are politically cohesive.'It is the difference between the choices made by black and whites – not the reasons for the difference – that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of §2, only the correlation between race of voter

and selection of certain candidates, not the cause of the correlation matters.'"); *Lopez,* 339 F. Supp. at 610 ("At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); *Texas,* 887 F. Supp. 2d at 181 ("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit.").

163.D "[F]ailures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief. Section 2 is a balm for racial minorities, not political ones – even though the two often coincide." *Clements*, 999 F.2d at 854, 891. In this case, to the extent Hispanic-preferred candidates did not prevail in SBISD elections, partisan politics is to blame, not race, racial animus or some other insidious factor. This is dispositive. Plaintiff cannot seek relief under Section 2 when the overwhelming weight of the evidence shows that the results of SBISD elections are informed by partisan politics, not by race.

**L.  TEX. EDUC. CODE §11.052 Has No Relevance to Plaintiff's Voting Rights Act Claim**

164.P  The District claims that TEX. EDUC. CODE §11.052, which authorizes 15 percent or 15,000 registered voters in the District to petition the school board to put a proposition on the ballot for an election where all District voters can vote to change the manner of electing school board trustees, is relevant to the totality of the circumstances aspect of the Voting Rights Act analysis.

164. D  SBISD has incorporated Tex. Educ. Code §11.052 into its Board Policy BBB (LEGAL).[525] SBISD's Board of Trustees has never been presented a petition pursuant to Tex. Educ. Code §11.052(e) and/or SBISD Policy BBB (LEGAL) and, as a result, SBISD has never placed a proposition requiring that its trustees be elected in single-member districts on an election ballot pursuant to Tex. Educ. Code §11.052(e) and/or Policy BBB (LEGAL).[526] If SBISD's Board of Trustees had received a voter petition pursuant to Tex. Educ. Code §11.052(e) and/or Policy BBB (LEGAL), the school district would have ensured that that proposition was placed on the next election ballot.[527] Based on the above, the Court finds that this additional factor - the availability of Tex. Educ. Code §11.052 and Policy BBB (LEGAL) to implement a single-member electoral system in SBISD - weighs in favor of SBISD under the totality of the circumstances.

---

[525] 3RT 200-201: 7-1; Defendant Exhibit 9.

[526] 2RT 4:16-19; 3RT 119: 12-22; 3RT 201: 2-8.

[527] 3RT 201: 2-8.

165. Plaintiff disagrees, for three reasons. First, nothing in the Voting Rights Act or the jurisprudence that has developed since its amendment in 1982 requires or implies that a party who has satisfied the *Gingles* preconditions for liability under Section 2 has any obligation to exhaust any purported state procedure as a further condition on its ability to vindicate its constitutional and statutory voting rights. Second, compliance with TEX. EDUC. CODE §11.052 is impractical, if not impossible, based upon the voting history in SBISD, in which (apart from elections where a bond proposition was on the ballot), voter turnout between 1988 and 2024 was substantially less that the threshold simply to get a proposition on the ballot.[528] For example, to simply get a single member district proposition on the ballot would require proponents to obtain 50% more signatures than the total number of voters who turned out for the 2023 election.[529] Third, even if a group of citizens were successful in securing a petition to require that the school board put a single member district proposition on the ballot – that ballot initiative would be voted on by the district voters, at large, which would implicate the very same defects that render the District's current at large electoral system illegal under Section 2 of the Voting Rights Act. Namely, because an at large, district-wide vote would allow White voters to "minimize or cancel out" minority voters' "ability" to implement a single member district electoral system, in the same manner that they currently cancel out minority voters' ability to elect their preferred board

---

[528] 4RT7-8 (Porter, District corporate representative).

[529] 4RT8 (Porter, District corporate representative).

members, the statutory procedure in TEX. EDUC. CODE §11.052 cannot excuse the District's failure to fulfill its constitutional and statutory obligations to its Hispanic voters under Section 2 of the Voting Rights Act. To hold otherwise would allow state and local authorities to erect procedural barriers foreclosing Hispanic citizens' "fundamental political right" to vote in accordance with their federal constitutional and statutory rights.

166. The Court agrees that Plaintiff has no obligation to pursue the petitioning process authorized by TEX. EDUC. CODE §11.052, as a condition of vindicating her rights under the Voting Rights Act.

## Conclusions of Law

1. Section 2 of the Voting Rights Act, 52 U.S.C. Section 10301 et seq. (Section 2 of the Voting Rights Act of 1965, as amended) (the "VRA"), prohibits enforcement of any voting qualification, prerequisite to voting, standard, practice, or procedure that results in the denial or abridgment of the right to vote on account of race, color, or language minority status.

1.D However, nothing in the Voting Rights Act requires proportional representation: "[N]othing in [§2] establishes a right to have members of a protected class elected in numbers equal to their proportion to the population." 52 U.S.C. §10301(b).

2.P The "at-large" method of electing members of the Spring Branch Independent School District ("SBISD") Board of Trustees violates the VRA because it deprives Hispanic voters in SBISD of their voting rights guaranteed by law.

154

2.D(a)  At-large  voting  schemes  "are  not  per  se  violations  of section  2."  *Westwego  Citizens  for  Better  Government  v.  Westwego,* 872  F.2d  1201,  1204  (5th  Cir.  1989).  "Rather,  the  determination whether  an  at-large  election  system  [ ]  violates  section  2  'depends upon  a  searching  practical  evaluation  of  the  past  and  present reality'  and  on  a  'functional  view  of  the  political  process.'"  *Id.* (quoting  *Gingles*).  See  also  *Gingles*,  478  U.S.  at  48.

2.D(b) SBISD's at-large voting system does not violate section 2 of the Voting Rights Act; it does not deprive Hispanic voters in SBISD of their voting rights guaranteed by law.

3. Plaintiff, Virginia Elizondo, is a Hispanic registered voter

in SBISD with standing to assert the VRA Claim.

4. Section 2 of the VRA, 52 U.S.C. Section 10301 *et seq.*, applies nationwide  and  prohibits  voting  practices  and  procedures  that result in the denial or abridgement of the right of any citizen to vote  on  account  of  race,  color,  or  membership  in  a  language minority group.

5. In *Thornburg v. Gingles,* 106 S.Ct. 2752 (1986), the Supreme Court:

> "described  the  'essence  of  a  §2  claim'  as  when  'a certain  electoral  practice,  or  structure  interacts with  social  and  historical  conditions  to  cause  an inequality in the opportunities enjoyed by [minority] and white  voters.'. . That  occurs  where  an  'electoral structure operates to minimize or cancel out' minority voters'  'ability to elect their preferred candidates.' . . . Such a risk is greatest 'where minority and majority voters  consistently  prefer  different  candidates'  and where  minority  voters   are  submerged  in  a  majority population that 'regularly defeat[s]' their choices."

*Allen v. Milliken*, 599 U.S. ___, 143 S.Ct. 1487,1494, 216 L.Ed.2d

60, 65, 2023 U.S. LEXIS 2423, *4(2023)(internal citations omitted).

6. Under Supreme Court precedent, to prove a violation of the VRA, a plaintiff must first satisfy the following three preconditions (called the "*Gingles*" preconditions, *Milliken*, *id.*; *Gingles*, 106 S.Ct. at 2766-67):

> a. the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district;

> b. the minority group is politically cohesive; and

> c. the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.

6.D(a) It is the Plaintiff's burden to "prove by a preponderance of the evidence that all of the *Gingles* preconditions [are] satisfied." *LULAC #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997). "Failure to establish any one of these threshold requirements is fatal." *Campos v. City of Houston*, 113 F.3d 544 (5th Cir. 1997). "Consistent with *Gingles*, the Court holds that Plaintiffs have the duty , in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test. Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns. If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality of circumstances factors to determine whether racial bias best explains the alleged vote dilution." *Lopez v. Abbott*, 339 F.Supp3d 589, 604 (S.D. Tex. 2018); *see also Rodriguez v. Harris Cnty.*, 964 F.Supp.2d 686, 760 (S.D. Tex. 2013) ("After the defendant demonstrates that partisanship, rather than race, explains the

difference in the divergent voting patterns of Anglos and Latinos, the burden then shifts back to the plaintiff to negate the role of partisanship").

6.D(b) "The second and third preconditions are often discussed together. The second requires the minority group to be 'politically cohesive.' The third is that 'the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. … Plaintiffs normally demonstrate minority political cohesion by showing that 'a *significant number* of minority group members usually vote for the same candidates.' That is described as 'bloc voting' (just like the third precondition) and typically means that a *large majority* of the group favors the same candidates." *LULAC v. Abbott*, 2022 U.S. Dist. Lexis 224928, * 11 (W.D. Tex. 2022) (quoting *Gingles*, 478 U.S. 51, 56) (emphasis added). See also Blacksher & Menefee, *From Reynolds v. Sims to City of Mobile v. Bolden*, 34 Hastings L. J. 1, 59 (1982) ("Whether a racial group is politically cohesive depends on its demonstrative propensity to vote as a bloc… The only elections of consequence to this constitutional inquiry, however, would be those in which an *overwhelming* majority of this group supported one or more candidates") (emphasis added) (cited with approval by *Gingles*, 478 U.S. at 56).

7. If the *Gingles* preconditions are satisfied, a plaintiff must then show under the totality of circumstances that the challenged political process is not equally open to minority voters. Factors relevant to this showing may include one or more of the following "Senate Factors" found in S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982):

    a.  the extent of any history of official discrimination

in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

b.   the extent to which voting in the elections of the state of political subdivision is racially polarized;

c.   the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

d.   if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

e.   the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

f.   whether political campaigns have been characterized by overt or subtle racial appeals;

g.   the extent to which members of the minority group have been elected to public office in the jurisdiction;

h.   whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group or

I.   whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Senate Factors are not comprehensive or exclusive. Plaintiff need not prove a majority of these factors, nor even any particular number of them in order to sustain her claims. See *Gingles*, 106 S. Ct. at 2763.

8.   After a plaintiff presents statistical evidence showing a racially divergent voting pattern, the burden shifts to defendants to show that there is a race-neutral explanation for the racially

158

divergent voting pattern. *Teague*, 92 F.3d at 290; *see Gingles*,106 S.Ct. at 2773; *Petteway,* 698 F.Supp.3d at 1010-1011; *Rodriguez,* 964 F. Supp.2d at 760. Plaintiff does not need to initially show that party affiliation or partisan issues do *not* cause divergent voting patterns. *Petteway*, 698 F. Supp.3d at 1010-1011; *Rodriguez*, 964 F.Supp.2d at 760; *Lopez v. Abbott*, 339 F.Supp.3d at 603. Absent "reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting 'thwarts' . . . Latino voting . . . for reasons wholly unconnected to race [,] [t]he preponderance of the evidence supports the conclusion that the challenged [electoral system] 'thwarts a distinctive minority vote' at least plausibly on account of race.'" *Petteway,* 698 F.Supp.3d at 1011.

8.D(a) "If all three *Gingles* requirements are established, a court must next consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Benavidez v. City of Irving*, 638 F.Supp.2d 709, 712 (N.D. Tex. 2009) (citing *LULAC v. Perry*, 548 U.S. 399, 425-26 (2006)).

8.D(b) "There is no requirement that every factor be met, that 'any particular number of factors be proved, or that a majority of them point one way or the other.' S. Rep. at 29. 'The courts ordinarily have not used these factors … as a mechanical 'point counting' devise. … Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the

voting strength of minority voters is 'minimized or canceled out.' *Id.* at 29 n. 118. The totality-of-the-circumstances analysis is 'local in nature.'" *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 678 (S.D. Tex. 2017). "Rather than emphasizing any particular factors, Congress has now directed the courts to apply the objective factor test flexibly. The legislative history specifies that the list of factors does not purport to encompass all the indicia of an electoral system that discriminates. The factors merely focus the inquiry whether the electoral system, in light of its present effects and historical context, treats minorities so unfairly that they effectively lose access to the political processes." *Jones v. Lubbock*, 727 F.2d 364, 384-85 (5th Cir. 1984).

8.D(c) "The most important Senate factors in a Section 2 challenge are factors 2 and 7 – the extent to which elections are racially polarized and the extent to which minorities have been elected. If these two Senate factors are present, 'the other factors … are supportive of, but not essential to, a minority voter's claims.'" *Benavidez*, 638 F.Supp.2d at 732 (quoting *Gingles*, 478 U.S. at 51 n. 15).

8.D(d) "While Congress relied heavily on *Zimmer* in articulating the statutory test, two subtle changes in emphasis bear mention. First, Congress not only failed to follow *Zimmer's* distinction between primary and enhancing factors, but also relegated two primary factors – unresponsiveness [Senate factor 5] and tenuousness [Senate factor 9] – to secondary importance. Second, Congress has articulated as an objective factor an evidentiary issue – polarized

voting [Senate factor 2] - that this court's pre-*Bolden* cases had not treated as a matter of primary importance. … The legislative discussion of polarized voting required that we weigh more carefully the effect that polarization has on the political scheme challenged. While this court has often regarded polarized voting as a prerequisite to a voting dilution claim, Congress, and indeed, the most recent Supreme Court case, suggest that polarization carries greater significance." *Jones*, 727 F.2d at 384-85.

8.D(e) The second Senate factor - racially polarized voting – is "closely related" to the third *Gingles* precondition (white bloc voting) inquiry. *Clements*, 999 F.2d at 849.

8.D(f) Critically, the en banc Fifth Circuit in *Clements* has determined that if polarized voting (Senate factor 2) is best explained by partisan politics, rather than race, this is of "***dispositive significance***": "As we explain in greater detail below, the Court's dismissal in Whitcomb of the plaintiff's vote dilution claim as 'mere euphemism for political defeat at the polls,' despite evidence of polarized voting, the lingering effects of past discrimination, and little electoral success among minority candidates, precludes finding a violation of §2 [in this case]. … In keeping with *Whitcomb's* sharp distinction between 'built-in bias' and 'political defeat at the polls,' the Senate Report indicated that proper application of the results test requires courts to 'distinguish between situations in which racial politics play an excessive role in the electoral process, and communities in which they do not.' The Senate Report, again following *Whitcomb*,

accorded this inquiry into 'racial bloc voting,' that is, whether 'race is the predominate determinant of political preference,' ***dispositive significance***." *Clements*, 999 F.2d at 854-55 (emphasis added).[530]

8.D(g) Critical to the Court's analysis of the third *Gingles* precondition and/or the totality of the circumstances (Senate factor 2) in this case, "failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief. Section 2 is a balm for racial minorities, not political ones - even though the two often coincide. …[A court errs] in finding dilution [when] [t]he undisputed facts indicate that partisan affiliation, not race, caused the defeat of the minority-preferred candidate." *LULAC v. Clements*, 999 F.2d 831, 854, 891 (5th Cir. 1993) (en banc). As the en banc court in *Clements* elaborated, "[a]bsent evidence that minorities have been excluded from the political process, a lack of success at the polls is not sufficient to trigger judicial intervention. Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to

---

[530] The Fifth Circuit has said that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of §2 under the totality of the circumstances." *Clark v. Calhoun Cty., Miss.*,21 F.3d 92, 97 (5th Cir. 1994). Relevant here, "[t]he 'unusual case' that *Clark* refers to is a case, like *LULAC*, where … the evidence on the totality of circumstances renders political partisanship the better explanation for the defeat of minority-preferred candidates at the polls." *Lopez v. Abbott*, 339 F.Supp.3d 589, 602-03 (S.D. Tex. 2018) (citing *Clements*, 999 F.2d at 859-60)

determine whether they were the product of partisan politics or racial vote dilution, political defeat or built-in bias." 999 F.3d at 853-54. "There is… a powerful argument supporting a rule that plaintiffs, to establish legally sufficient racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a mere euphemism for political defeat at the polls, or the result of partisan politics.'" *LULAC v. Abbott*, 369 F.Supp.3d 768, 785 (W.D. Tex. 2019) (quoting *Clements*, 999 F.2d at 859).

8.D(h) Regarding the first Senate factor – the history of voting-related discrimination in the political subdivision – the Court must not "rel[y] too heavily on the evidence of State-sponsored discrimination dating back hundreds of years." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc). See also *Shelby County v. Holder*, 570 U.S. 529, 552-53 (2013) (rejecting the government's argument in Voting Rights Act case because "[t]his argument does not look to 'current political conditions,' but instead relies on a comparison between the states in 1965. … But history did not end in 1965. … It cannot rely simply on the past. We made that clear in *Northwest Austin*, and we make it clear again today."); *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 641 (5th Cir. 2021) ("But 'the most relevant "historical" evidence is relatively recent history, not long-past history.'") (quoting Veasey, 830 F.3d at 232).

8.D(I) Regarding the fifth Senate factor – the effects of past discrimination – "[t]he effects of past discrimination, as the text

of the Senate Report indicates, pertain solely to the 'political access' prong of a §2 claim." *Clements*, 999 F.2d at 863. Thus, "[a]bsent an indication that [the effects of past discrimination] 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to [SBISD's] political process." *NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001). See also *Fairley v. Hattiesburg, Miss.*, 662 Fed. Appx. 291, 298 (5th Cir. 2016) (although evidence of socioeconomic disparities were presented at trial, "proof of socioeconomic disparities and a history of discrimination 'without more' does not demonstrate that a group of citizens has less opportunity to participate in the political process"); *Veasey v. Abbott*, 830 F.3d 216, 307-08 (5th Cir. 2016) (en banc) (Jones, dissenting) (regarding "*Gingles* Factor 5, the 'effects of past discrimination,' … [t]he Supreme Court recently reaffirmed that state entities should not bear legal responsibility 'for racial disparities they did not create,'" citing cases).

8.D(j) Regarding the eighth Senate factor - responsiveness to the needs of the minority group – "[u]nder a results test, Congress has expressly disapproved excessive reliance on responsiveness." *Jones v. Lubbock*, 727 F.2d 364, 381 (5th Cir. 1984).

8.D(k) Regarding the ninth Senate factor - the tenuousness factor – "[p]articularly in light of the diminished importance this factor has under the results test, we doubt that the tenuousness factor has any probative value." *Jones v. Lubbock*, 727 F.2d 364, 383 (5th Cir. 1984).

8.D(l) Because the totality of the circumstances nine factors list "is not exhaustive," an additional factor for the Court to consider is Texas Education Code §11.052, which is unique to Texas public school districts such as SBISD. According to this statute,

> (a) … the board of trustees of an independent school district, on its own motion, may order that trustees of the district are to be elected from single-member districts or that not fewer than 70 percent of the members of the board of trustees are to be elected from single-member trustee districts with the remaining trustees to elected from the district at large.

> (e) If at least 15 percent or 15,000 of the registered voters of the school district, whichever is less, sign and present to the board of trustees a petition requesting submission to the voters of the proposition that trustees of the district be elected in a specific manner, which must be generally described on the petition and which must be a manner of election that the board could have ordered on its own motion under Subsection (a) or (b), the board shall order that the appropriate proposition be placed on the ballot at the first regular election of trustees held after the 120th day after the date the petition is submitted to the board. …

> (f) If single-member trustee districts are adopted or approved as provided by this section, the board shall divide the school district into the appropriate number of

trustee districts, based on the number of members of the board that are to be elected from single-member trustee districts, and shall number each trustee district. The trustee districts must be compact and contiguous and must be as nearly as practicable of equal population. …[531]

Tex. Educ. Code §11.052(a), (e) and (f). If, under section 11.052(e), the required number of registered voters of a public school district have passed a proposition requiring that trustees of that school district be elected in single-member districts and that proposition is subsequently approved by the voters on the next election ballot, then "the plan approved by voters is *required* to be implemented"; also, if the required number of voters have passed the proposition to have single-member districts, it is the *ministerial duty* of the school board to place the proposition on the next election ballot. *Rodriguez v. Beaumont Indep. Sch. Dist.*, 413 S.W.3d 524, 527, 530 (Tex. App. – Beaumont 2013, no pet.); *In re Vann de Cordova*, 2011 Tex. App. Lexis 221, * 1-3 (Tex. App. – Beaumont 2011, no pet.). Thus, in SBISD, if enough registered voting residents desired single-member districts to elect the school board's trustees, there is a mechanism to do so.

8.D(m) In addition, in analyzing whether Plaintiff's proposed majority-minority district sufficiently enhances Hispanic voters' ability to elect the candidates of their choice, voter turnout

---

[531] Tex. Educ. Code §11.052(f) was precleared in 1987. *Villegas v. Dallas Indep. Sch. Dist.*, 2003 U.S. Dist. Lexis 20236, *27 (N.D. Tex. 2003).

"bears on the totality of the circumstances," and therefore the Court "must also consider voter turnout" as part of its analysis. *Fusilier v. Landry*, 963 F.3d 447, 462 (5th Cir. 2020).

9. The three *Gingles* preconditions are satisfied here because: (1) Hispanics are sufficiently large in number and geographically compact to constitute a majority in at least one single member district in SBISD; (2) Hispanics in SBISD are politically cohesive and vote as a bloc; and (3) their preferred candidates are usually defeated by White bloc voting.

9.D Plaintiff did not carry her burden to prove (1) the first *Gingles* precondition - compactness; (2) the second *Gingles* precondition - Hispanic political cohesion; or (3) the third *Gingles* precondition - white bloc voting that usually defeats the Hispanic preferred candidate in SBISD school board elections.

10.P Plaintiff's proposed illustrative single member district plan complies with traditional districting principles because it satisfies the "one person, one vote" requirement, and maintains communities of interest because it conforms to existing and traditional administrative boundaries such as SBISD's existing election precincts/middle school enrollment zones.

10.D(a) "[W]hile [ ] a compactness determination should not hinge on the shape of a district, the shape of a district certainly cannot be disregarded in a compactness inquiry. …[I]t is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton*, 385 F.3d 591,

167

596 (5th Cir. 2004).  And, in addition to shape, plaintiffs cannot "ignore traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 598. "Thus, to evaluate compactness, the Court considers the dispersion of the relevant minority population, the shape of the proposed district (as measured by a visual evaluation and by statistical measures of compactness) and the causes underlying its shape, and the district's compliance with traditional redistricting principles (such as respect for communities of interest and traditional boundaries)." *Perez v. Abbott*, 274 F.Supp.3d 624, 639 (W.D. Tex. 2017), rev'd in part on other grounds, 138 S.Ct. 2305 (2018); see also, *Perez v. Abbott*, 253 F.Supp.3d 864, 911 (W.D. Tex. 2017) (same).

10.D(b) According to the Fifth Circuit, when creating a proposed majority-minority illustrative district to satisfy the first *Gingles* precondition, accounting for traditional districting principles such as maintaining communities of interest and traditional boundaries **"must**[532] be considered when analyzing that aspect of the first *Gingles* precondition." *Gonzalez v. Harris County,* 601 Fed. Appx. 255, 259 (5th Cir. 2015). See also *Fairly v. Hattiesburg*, 584 F.3d 660, 670 (5th Cir. 2009) ("Courts are expected, in evaluating redistricting plans, to take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'"); *Robinson v. Ardoin*, 37

---

[532] The word "must" when used by the Fifth Circuit means that the requirement is mandatory.

F.4th 208, 218 (5th Cir. 2022) (it is the plaintiff's burden to show that the proposed illustrative district "is consistent with traditional districting principles such as maintain communities of interest and traditional boundaries").

10.D(c) With respect to creating his proposed Hispanic majority district (District 1), Dr. Stein admitted that "I didn't do much to create this illustrative district" and that he did not look at respecting existing neighborhoods and subdivisions or try to keep them intact. Dr. Stein also did not take into account or respect census blocks when creating his proposed Hispanic majority district (District 1). Dr. Stein did not look at one-person, one-vote when he created his proposed District 1.[533] Accordingly, because Dr. Stein did not, as required by the Fifth Circuit, look at respecting neighborhoods and subdivisions when creating his proposed District 1 and cannot explain the reason for the shape of his proposed Districts 1, District 5 or 6, the Court finds his proposed illustrative plan, including District 1, is based on unreliable methodology and, as a result, Plaintiff therefore failed to meet her burden to prove the first *Gingles* precondition.

11. P Under the totality of the circumstances, the SBISD at-large electoral system violates Section 2 of the VRA, since:

   a. it results in the District's Hispanic citizens having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

---

[533] 4RT 76: 9-19; 4RT 77-78: 10-14.

b.   SBISD's schools and residential populations are starkly segregated by race and ethnicity;

c.   SBISD has a historical pattern and practice of impairing the voting rights of its minority voters by, among other things, discriminatory placement of early voting locations solely in majority white portions of the district, reducing the number and limiting the location of election day polling places from twenty-five to seven locations, and failing to comply with State voter registration laws which would increase minority voter participation;

d.   as a result of historical discrimination against Hispanics in Texas, Houston and Spring Branch, their ability to participate effectively in the political process remains impaired; and

e.   a single-member plan for SBISD would likely strongly improve bilingual and other educational outcomes critical for Hispanic students and increase the responsiveness of school board trustees to minority and low-income students, minority voters and minority educators.

11.D(a) SBISD's at-large electoral system does not violate Section 2 of the Voting Rights Act under the totality of the circumstances since:

(a)   **Factor 1** - the extent of any history of voting-related discrimination in the political subdivision (here, SBISD). The evidence at trial did not show any recent history of voting related discrimination in SBISD elections. See Veasey v Abbott, 830 F.3d 216, 231-32 (5th Cir. 2016) (en banc) ("the Supreme Court in Shelby County also counseled against undue reliance on noncontemporary evidence in the voting rights context. In light of these cases, the most relevant 'historical' evidence is relatively recent history, not long-past history."). At best, Plaintiff showed a "long-past" discriminatory history in SBISD.

(b)   **Factor 2** - the extent to which voting in the

170

elections of the political subdivision is racially polarized (this factor is "closely related" to the third Gingles precondition). The evidence at trial shows partisan politics, not racial polarization, likely best explains SBISD's recent election results. See Clements, 999 F.2d at 854, 859, 891. This factor is of "dispositive significance." Id.

(c) **Factor 7** - the extent to which members of the minority group have been elected to public office in the jurisdiction. While Plaintiff argues that this factor favors Plaintiff, it does not. Of the four known (SBISD does not keep track of the race of candidates for election) Hispanic candidates to run for SBISD trustee, one -- John Perez (a conservative Republican) won the election. Although this is a small sample size, the 25% success rate shows that the minority group can achieve election in SBISD. But more importantly, 100% of all conservative Republican Hispanic candidates have won election to the SBISD board of trustees. The other three Hispanic candidates-Elizondo, Lopez, and Lezama, are not conservative Republicans. John Perez is. The Court's conclusion with respect to Senate factor 2, that the evidence at trial shows partisan politics, not racial polarization, likely best explains SBISD's recent election results, is of "dispositive significance." Clements, 999 F.2d at 854-55.

(d) **Factor 8** - evidence demonstrating that elected officials are significantly unresponsive to the particularized needs of the members of the minority

group. This factor favors SBISD. As examples: SBISD has rebuilt/upgraded its economically disadvantaged north schools equally with the affluent south schools; SBISD spends more per student in its economically disadvantaged schools than its affluent schools; SBISD's economically disadvantaged schools are making material progress in the TEA's accountability ratings; and SBISD's bi-lingual program exceeds state standards.

(e) **Factor 9** - evidence that the policy underlying the political subdivision's use of the contested practice or structure in tenuous. The evidence at trial showed legitimate, non-tenuous, reasons for SBISD's at-large electoral system.

(f) Again, the Senate Factors are not exhaustive, meaning an additional factor the court should consider is Tex. Educ. Code §11.052, which a statute unique to Texas public school districts that allows 15% of registered voters in SBISD (or 15,000 registered voters, whichever is less) to submit a petition to the school board for a ballot vote for the voters to decide the electoral system (single-member or at-large) that the school district will use. SBISD voters have never taken advantage of this statutory process. The Court concludes that this factor is in SBISD's favor.

(g) As recently held by the Fifth Circuit, voter turnout "bears on the totality of the circumstances" and courts "must consider voter turnout" as part of this analysis. Fusilier, 963 F.3d at 456-67, 462. Here, the evidence at trial showed low Hispanic voter turnout in SBISD

elections (less than 20% of actual voters) verses higher white voter turnout (approximately 75% of actual voters), including in Dr. Stein's proposed District 1. As a result, Plaintiff did not carry her burden to affirmatively prove that her sole proposed illustrative district will in fact provide Hispanics in SBISD a "real" opportunity to elect the school board members of their choice. This factor therefore favors SBISD. Id.[534]

11.D(b) Plaintiff did not carry her burden to satisfy the totality of the circumstances test (i.e., the Senate factors) that Hispanics in SBISD do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters in SBISD.

12.P For these reasons and the reasons proven at trial, Plaintiff is entitled to declaratory and injunctive relief, precluding Defendants from maintaining an at-large system for electing SBISD school board trustees, as well as her attorneys' fees, litigation expenses, and court costs and such other and further relief to which the Court determines she is justly and equitably entitled.

---

[534]

Compare *Fusilier*, 963 F.3d at 462-63: "We also must consider voter turnout … And as Perez and *Harding* remind, plaintiffs must meet the overarching demand that their new districting scheme enhances their ability to elect candidates of their choosing. *Perez*, 138 S. Ct. at 2332. The plaintiffs' experts acknowledged that black voter turnout in Terrebonne Parish lags behind white voter turnout. Relatedly, the defendants' expert attested that a 56% black voting age population was required to ensure blacks have the opportunity to elect their preferred candidates. At best, the plaintiffs' proposed remedial district had a black voting age population of 53.33%. that the plaintiffs' proposed majority-minority district sufficiently enhances minority voters' ability to elect the candidates of their choice is not a well-supported proposition on this record. … we are left with the firm conviction that the district court erred in finding a violation of the VRA."

12.D Because Plaintiff did not meet her burden to prove that SBISD's at-large electoral system violates Section 2 of the Voting Rights Act, Plaintiff is not entitled to declaratory or injunctive relief, nor is Plaintiff entitled to attorney's fees, litigation expenses or court costs.

13. P The Court hereby finds and declares that the District's current at-large system of electing school board trustees violates the Voting Rights Act and enjoins the District from conducting trustee elections under its current electoral system.

13.D The Court hereby finds and declares that SBISD's current at-large system of electing school board trustees does not violate Section 2 of the Voting Rights Act and, accordingly, Plaintiff's request that SBISD be enjoined from conducting trustee elections under its current electoral system is denied.4

14. P    The Court further orders that by _____ the District shall file with the Court a single member district plan providing for the election of school board trustees from seven single member districts, with sufficient supporting expert analysis establishing that it complies with Section 2 of the Voting Rights Act; specifically, the District must submit a plan that includes but is not limited to the following requirements: (a) the plan must contain one or more geographically-compact single member districts in which the Hispanic Citizens Voting Age Population constitutes a majority; (b) the plan must comply with the one person-one vote requirement; and (c) the plan must respect existing communities of interest, including but not limited to the integrity of areas of minority population concentrations. Along with these materials, the District may include a memorandum of law of nor more than 10 pages.

14.D Because Plaintiff did not meet her burden to prove that SBISD's at-large electoral system violates Section 2 of the Voting Rights Act, SBISD is under no obligation to propose a remedial single member district plan. Moreover, any potentially required remedial plan would not need to be a seven single-member system but, instead, could be a 5-2 mixed system (i.e., five single-member districts and two at-large trustee positions) so long as that system complies with Section 2 of the Voting Rights Act. See Tex. Educ. Code §11.052(a) (allowing for both 7-0 and 5-2 systems).

15.P The Court further orders that by _____ Plaintiff may file objections to the District's proposed plan and, if desired, an alternative plan with supporting expert analysis. Plaintiff's objections shall be no more than 10 pages.

15.D Because Plaintiff did not meet her burden to prove that SBISD's at-large electoral system violates Section 2 of the Voting Rights Act, SBISD is under no obligation to propose a remedial single member district plan. Moreover, any potentially required remedial plan would not need to be a seven single-member system but, instead, could be a 5-2 mixed system (i.e., five single-member districts and two at-large trustee positions) so long as that system complies with Section 2 of the Voting Rights Act. See Tex. Educ. Code §11.052(a) (allowing for both 7-0 and 5-2 systems).

16.P The Court will conduct an in-person remedial hearing on _____, to decide which districting plan will be ordered into effect.

16.D Because Plaintiff did not meet her burden to prove that SBISD's at-large electoral system violates Section 2 of the Voting Rights Act, SBISD is under no obligation to propose a remedial

single member district plan. Moreover, any potentially required remedial plan would not need to be a seven single-member system but, instead, could be a 5-2 mixed system (i.e., five single-member districts and two at-large trustee positions) so long as that system complies with Section 2 of the Voting Rights Act. See Tex. Educ. Code §11.052(a) (allowing for both 7-0 and 5-2 systems).

17.P If the District fails or prefers not to submit a proposed single member district plan, it is ordered to implement the illustrative plan presented by Dr. Robert Stein (PX24), on or before _____ and use that plan for all further trustee elections unless and until the school board adopts a different plan which complies with Section 2 of the Voting Rights Act.

17.D Because Plaintiff did not meet her burden to prove that SBISD's at-large electoral system violates Section 2 of the Voting Rights Act, SBISD is under no obligation to propose a remedial single member district plan. Moreover, any potentially required remedial plan would not need to be a seven single-member system but, instead, could be a 5-2 mixed system (i.e., five single-member districts and two at-large trustee positions) so long as that system complies with Section 2 of the Voting Rights Act. See Tex. Educ. Code §11.052(a) (allowing for both 7-0 and 5-2 systems).

18.P The Court shall defer deciding the issue of the amount of attorney's fees to which Plaintiff is entitled until Plaintiff seeks such relief under Fed. R. Civ. P. 54(d).

18.D Because she was not the prevailing party, Plaintiff is not entitled to an award of attorney's fees or other relief under Fed. R. Civ. P. 54(d).

18.D(a) In *Harding v. County of Dallas*, the Fifth Circuit set forth the Supreme Court's recent changes to the *Gingles* voting rights framework as follows: "In *Abbott v. Perez*, 138 S.Ct. 2305, 201 L. Ed. 2d 714 (2018), the Supreme Court increased the evidentiary burden on plaintiffs in vote dilution cases under Section 2 of the Voting Rights Act. … In addition to the three *Gingles* factors, plaintiffs must survive an additional inquiry before reaching the totality of the circumstances test. Plaintiffs must now affirmatively prove that the minority group will have a "real" opportunity to elect representatives of its choice. *Perez*, 138 S.Ct. at 2333. So after *Perez*, it is no longer enough for plaintiffs to draw a proposed district that satisfies the *Gingles* factors. It must additionally prove that the proposed district will in fact perform as plaintiffs hope." 948 F.3d 302, 315-16 (5th Cir. 2020) (Ho, concurring and dissenting); see also *Fusilier v. Landry*, 963 F.3d 447, 462 (5th Cir. 2020).

18.D(b) In determining whether Plaintiff has proved that Dr. Stein's proposed Hispanic majority district (District 1) will in fact perform as Plaintiff hopes, the Fifth Circuit has held "We also must consider voter turnout." This is because "'an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity.' And as *Perez* and *Harding* remind, plaintiffs must meet the overarching demand that their new districting scheme enhances their ability to elect candidates of their choosing." *Fusilier*, 963 F.3d at 462 (citing and quoting *Perez* and *Harding*).

18.D(c) Here, the evidence at trial showed low Hispanic voter turnout in SBISD elections (less than 20% of actual voters) verses higher white voter turnout (approximately 75% of actual voters),

including in Dr. Stein's proposed District 1. As a result, Plaintiff did not carry her burden to affirmatively prove that her sole proposed illustrative district will in fact provide Hispanics in SBISD a "real" opportunity to elect the school board members of their choice. See *Fusilier*, 963 F.3d at 462-63.[535]

18.D(e) Because, based on the findings of fact above, Plaintiff has failed to prove that Dr. Stein's proposed Hispanic majority district (District 1) will in fact perform as Plaintiff hopes, the Court concludes that Plaintiff has not met the performance factor now required by the Supreme Court in *Perez*, and her Section 2 Voting Rights Act claim must therefore fail as a matter of law. *Harding*, 948 F.3d at 309-10, 315-16; Fusilier, 963 F.3d at 462-63.

---

[535] *Fusilier*, 963 F.3d at 462-63: "We also must consider voter turnout … And as *Perez* and *Harding* remind, plaintiffs must meet the overarching demand that their new districting scheme enhances their ability to elect candidates of their choosing. *Perez*, 138 S. Ct. at 2332. The plaintiffs' experts acknowledged that black voter turnout in Terrebonne Parish lags behind white voter turnout. Relatedly, the defendants' expert attested that a 56% black voting age population was required to ensure blacks have the opportunity to elect their preferred candidates. At best, the plaintiffs' proposed remedial district had a black voting age population of 53.33%. that the plaintiffs' proposed majority-minority district sufficiently enhances minority voters' ability to elect the candidates of their choice is not a well-supported proposition on this record. … we are left with the firm conviction that the district court erred in finding a violation of the VRA."

Respectfully submitted,

/s/Barry Abrams
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No. 17911800
SD Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
228-6606
228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

Martin Golando
State Bar No. 24059153
Admitted Pro Hac Vice
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 W. Magnolia San Antonio, Texas
78201 (210) 471-1185
405-6772 (fax)
martin.golando@gmail.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was served on all parties of record via the Court's electronic filing system on October 21, 2024.

/s/Barry Abrams
Barry Abrams