UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-01997 |
| | § | |
| **SPRING BRANCH INDEPENDENT** | § | |
| **SCHOOL DISTRICT, et al.,** | § | |
| | § | |
| *Defendants.* | § | |

## **DEFENDANTS' POST-TRIAL BRIEF ON ISSUES RAISED BY THE COURT**

At the Court's invitation, Defendant Spring Branch Independent School District ("SBISD") files the following post-trial brief on several issues raised by the Court during trial.

### A. The Court Should Address Causation

During trial, the Court asked the following question, "But here's my concern: The – going back to the – to the Senate factors, all these factors – and I'm focusing now on one, two and – and seven.[1] Many of the others – talk about the extent of which. Extent, to me, is a term of causation. So – in order to find the applicability of a particular Senate factor, do I have to attribute the existence of that factor to – to causation by the district? … In other words, is there a causation question that I have to address in determining what 'extent' means in that situation also?" (Trial

---

[1] Senate factor one requires the Court to consider "*the extent* of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."

Senate factor two requires the Court to consider "*the extent* to which voting in the elections of the state or political subdivision is racially polarized."

Senate factor seven requires the Court to consider "*the extent* to which members of the minority group have been elected to the public office in the jurisdiction."

transcript, Vol. 3, pp. 50-51; Vol. 5, pp. 147-48). SBISD responds to the Court's question as follows.

### i. SBISD should not bear responsibility for racial disparities it did not create.

As noted by this Court, several of the Senate factors speak to the "extent" to which past discrimination has impacted Hispanic voters. The Court's question on causation is essentially this: should SBISD bear responsibility for past discrimination it did not cause? That is, should SBISD be forced to change its electoral system even though the school district did not inflict discriminatory practices on Hispanic voters, and therefore did not cause the lasting ill-effects of past discrimination? The U.S. Supreme Court has answered this question decisively: **"no."**

In *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, the U.S. Supreme Court examined whether the Texas Department of Housing violated the Fair Housing Act in its allocation of tax credits in predominately black inner-city areas and predominantly white suburban neighborhoods. 135 S.Ct. 2507, 576 U.S. 519 (2015). Much like Plaintiff Elizondo's case here in which she cites to allegedly poor results for Hispanic-preferred candidates in SBISD elections, the *Inclusive Communities* plaintiffs cited to statistical evidence of disparities between benefits received in predominantly white versus predominantly minority areas. *Id.* at 527. Although the Court found that the *Inclusive Communities* plaintiffs' claims were cognizable under the FHA, the Court noted that a "robust causality requirement … protects defendants from being held liable **for racial disparities they did not create.**" *Id.* at 542 (emphasis added). This causality requirement was necessary to "ensure[] that defendants do no resort to the use of racial quotas." *Id.* at 521.

Despite the fact that *Inclusive Communities* was a Fair Housing case, not a Voting Rights case, its holding is applicable to the Senate factors inquiry under § 2. In *Veasey v. Abbott*, five

justices joined in a concurrence in part, and dissent in part, and criticized the majority for failing to address this causation issue in relation to § 2:

> *Gingles* Factor 5, the "effects of past discrimination," comprised on this record comparative socioeconomic data on employment rates, income, educational attainment, and health outcomes. That these (unfortunately) reflect differences among Whites, Blacks and Hispanics is a sociological fact in Texas as elsewhere. The majority attempts to, but does not successfully connect these findings to contemporary discrimination by the state of Texas. The majority goes out of its way, however, to assert that it "does not decide" whether this factor can only be satisfied by a legacy of official state discrimination. The majority is wrong yet again. The Supreme Court recently reaffirmed that state entities should not bear legal responsibility "for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278, 99 S. Ct. 2282, 2295, 60 L. Ed. 2d 870 (1979) (refusing to hold state liable for sex discrimination in U.S. military); *Milliken v. Bradley*, 418 U.S. 717, 745, 94 S. Ct. 3112, 3127, 41 L. Ed. 2d 1069 (1974) (remedy cannot be imposed on other government bodies not having been shown to violate Constitution).

830 F.3d 216, 241-43 (5th Cir. 2016) (Edith Jones, J., concurring in part, and dissenting in part).

Plaintiff's expert on discrimination, Andres Tijerina, testified about discrimination *in and near* the Spring Branch ISD area, but did not present evidence of discrimination *by* SBISD. *See, generally*, testimony of Andres Tijerina, Reporter's Transcript, Volume 2, p. 61-124. And, as noted by the Court's questions to Dr. Tijerina during trial, most of the discrimination discussed by Dr. Tijerina was not recent, but rather occurred long ago. *Id.* at 71. As such, it would defy Supreme Court precedent to hold SBISD liable for long-past discrimination by other governmental entities. See *Inclusive Communities*, 135 S. Ct. at 2523.[2] The small community of SBISD should not be forced to change its electoral system because of wrongdoing by other governmental units any more than the State of Texas should be forced to change its electoral practices on the basis of wrongs

---

[2] As stated by the en banc court in *Veasey,* relying on Supreme Court precedent: "'unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.' … the most relevant 'historical' evidence is relatively recent history, not long-past history." *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016) (en banc).

committed by California, Georgia, or any other state. This is why the causation inquiry is so important.

Because SBISD did not cause the harms examined by the Senate factors, the Court should find that these factors weigh in favor of the District.

### ii. Bloc voting in SBISD is not "legally significant."

The Court must also examine causation with respect to bloc voting. In other words, the Court must examine whether racially polarized voting in SBISD is caused by race, or by some other factor, such as partisan politics. Regarding Senate factor two (racially polarized voting), the Fifth Circuit has called this factor "closely related" to the third *Gingles* precondition (white bloc voting). *LULAC v. Clements,* 999 F.2d 831, 849 (5th Cir. 1993) (en banc). And, with respect to this factor, the Fifth Circuit in *Clements* stated: "the question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is '*legally significant.*'" *Id.* (quoting *Gingles*) (emphasis added). Critically, there is a "crucial difference" between legally significant and statistically significant racially polarized voting and "a general finding regarding the existence of any racially polarized voting, no matter the level, is not enough":

> As discussed above, the third *Gingles* factor [which is "closely related" to Senate factor two] is concerned only with "legally significant racially polarized voting"…
>
> This crucial difference between legally significant and statistically significant racially polarized voting becomes clear when one considers the expansive set of circumstances the latter term can describe. It characterizes elections where 90% of a minority group's voters but only 10% of the majority group's voters prefer a certain candidate. Yet, the label applies equally well where there is only a "minimal degree of polarization," such as when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate (so long as that result is statistically significant).

*Covington v. North Carolina,* 316 F.R.D. 117, 170 (M.D. N.C. 2016), aff'd, 137 S.Ct. 2211 (2017). Thus, in looking at "*the extent* to which"[3] voting in SBISD elections is racially polarized, the Fifth Circuit has stated that courts ***must*** look into the root cause of any statistically significant polarized voting to determine if it is also legally significant:

> When the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens in the contested counties, defendants conclude, the district court's judgment must be reversed.
>
> We agree. The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of §2 suggests, extend only to defeats experienced by voters "on account of race or color." Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense "discriminatory," and any distinction between deprivation and mere losses at the polls becomes untenable. In holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove ***legally significant*** racial bloc voting, the district court loosed §2 from its racial tether and fused illegal vote dilution and political defeat. In doing so, the district court ignored controlling authorities: *Whitcomb v. Chavis,* 403 U.S. 124, 29 L.Ed.2d 363, 91 S.Ct. 1858 (1971), which established a clean divide between actionable vote dilution and "political defeat at the polls"; the 1982 amendments, enacted to restore a remedy in cases "where a combination of public activity and private discrimination have joined to make it virtually impossible for minorities to play a meaningful role in the electoral process," *Hearings on the Voting Rights Act Before the Subcomm. On the Constitution of the Senate Comm. of the Judiciary*, 97th Cong., 2d Sess. 1367-68 (statement of Prof. Drew Days) (emphasis added); and *Thornburg v. Gingles,* 478 U.S. 30, 92 L.Ed.2d 25, 106 S.Ct. 2752 (1986), where a majority of the Justices rejected the very test employed by the district court as a standard crafted to shield political minorities from the vicissitudes of "interest-group politics rather than a rule hedging against racial discrimination."

---

[3] The word "extent" means "the range over which something extends: scope." Merriam-Webster.com Dictionary, www.merriam-webster.com/dictionary/extent. Thus, the "scope" of Senate factor two (its "extent") is limited to legally significant, as opposed to statistically significant, racially polarized voting.

*Clements,* 999 F.2d at 850-541 (emphasis added and in original). Thus, as concluded by the Fifth Circuit en banc in *Clements,* "evidence that white and minority voters generally supported different candidates [does] not constitute legally sufficient racial bloc voting where these patterns [are] attributable to partisan affiliation rather than the race of the candidate." *Id.* at 856. Here, the evidence at trial strongly supports the finding that partisan politics, not race, explains the results of SBISD's elections.

Moreover, the evidence at trial showed SBISD was and/or has a Hispanic majority population. According to the Fifth Circuit in *Salas v. Southwest Texas Junior College Dist.* when discussing the third *Gingles* precondition (which is "closely related" to Senate factor two):

> Underlying these functions of the court and the plaintiffs in a multimember district vote dilution case is an inquiry into causation – whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives. Likewise, the Supreme Court, in measuring legally sufficient white bloc voting, aims at determining whether it is racial voting patterns, along with other objective factors, rather than some other set of causes [such as partisan politics], that explain the lack of electoral success of voters within the protected class. Accordingly, in analyzing legally sufficient white bloc voting in a case where the protected class is also a population, registered voter, or other majority, the third *Gingles* precondition requires an inquiry into the **causal relationship** between the challenged practice and the lack of electoral success by the protected class voters.

964 F.2d 1542, 1554 (5th Cir. 1992) (bold added). See also *Clements,* 999 F.2d at 849 (citing *Salas*).

**B.     Proper Weighing of the Gingles and Senate Factors**

During trial, the Court stated,

> One issue I would like the parties to address is, assuming the *Gingles* factors are satisfied, it's – it's not entirely clear to me yet the relationship between the *Gingles* factors and the totality of the circumstances…

> If you look at a Venn diagram, and the totality of the circumstances is the larger set, are the Senate factors a subset? And if so, what factors beyond the subset fill out the set of the totality of the circumstances, and what is the weight to be given the subset of the eight Senate factors and the – the additional factors concluded within the larger subset? Does that make any sense?
>
> And how – let's assume, hypothetically, that the evidence in support of the *Gingles* factors is stronger on one factor than the other. What is the relationship, in the Court's analysis, in considering the strength of the various *Gingles* factors and the – the Senate factors? And even though it appears that I don't necessarily by preponderance of the evidence the Senate factors or any causation issues thereunder, do I have to weigh the strength or lack thereof of the Senate factors?

(Trial transcript, volume 5, pp. 150-51). SBISD responds to the Court's question as follows.

"There is no requirement that every [Senate] factor be met, that 'any particular number of factors be proved, or that a majority of them point one way or the other.' S. Rep. at 29. 'The courts ordinarily have not used these factors … as a mechanical 'point counting' devise. … Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is 'minimized or canceled out.' *Id.* at 29 n. 118. The totality-of-the-circumstances analysis is 'local in nature.'" *Patino v. City of Pasadena,* 230 F.Supp.3d 667, 678 (S.D. Tex. 2017). "Rather than emphasizing any particular factors, Congress has now directed the courts to apply the objective factor test flexibly. The legislative history specifies that the list of factors does not purport to encompass all the indicia of an electoral system that discriminates. The factors merely focus the inquiry whether the electoral system, in light of its present effects and historical context, treats minorities so unfairly that they effectively lose access to the political processes." *Jones v. Lubbock,* 727 F.2d 364, 384-85 (5th Cir. 1984).

"The most important Senate factors in a Section 2 challenge are factors 2 and 7 – the extent to which elections are racially polarized and the extent to which minorities have been elected. If

these two Senate factors are present, 'the other factors … are supportive of, but not essential to, a minority voter's claims.'" *Benavidez v. City of Irving,* 638 F.2d 702, 732 (N.D. Tex. 2009) (quoting *Gingles,* 478 U.S. at 51 n. 15).

"While Congress relied heavily on *Zimmer* in articulating the statutory test, two subtle changes in emphasis bear mention. First, Congress not only failed to follow *Zimmer's* distinction between primary and enhancing factors, but also relegated two primary factors – unresponsiveness [Senate factor 5] and tenuousness [Senate factor 9] – to secondary importance. Second, Congress has articulated as an objective factor an evidentiary issue – polarized voting [Senate factor 2] – that this court's pre-*Bolden* cases had not treated as a matter of primary importance. … The legislative discussion of polarized voting required that we weigh more carefully the effect that polarization has on the political scheme challenged. While this court has often regarded polarized voting as a prerequisite to a voting dilution claim, Congress, and indeed, the most recent Supreme Court case, suggest that polarization carries greater significance." *Jones,* 727 F.2d at 384-85.

The second Senate factor – racially polarized voting – is "closely related" to the third Gingles precondition (white bloc voting) inquiry. *Clements*, 999 F.2d at 849.

Critically, the en banc Fifth Circuit in *Clements* determined that if polarized voting (Senate factor 2) is best explained by partisan politics, rather than race, this is of ***"dispositive significance"***: "As we explain in greater detail below, the Court's dismissal in *Whitcomb* of the plaintiff's vote dilution claim as 'mere euphemism for political defeat at the polls,' despite evidence of polarized voting, the lingering effects of past discrimination, and little electoral success among minority candidates, precludes finding a violation of §2 [in this case]. … In keeping with *Whitcomb's* sharp distinction between 'built-in bias' and 'political defeat at the polls,' the Senate Report indicated that proper application of the results test requires courts to 'distinguish between situations in which

racial politics play an excessive role in the electoral process, and communities in which they do not.' The Senate Report, again following *Whitcomb*, accorded this inquiry into 'racial bloc voting,' that is, whether 'race is the predominate determinant of political preference,' ***dispositive significance***." *Clements,* 999 F.2d at 854-55 (emphasis added).[4] Here, the evidence at trial strongly supports the ***dispositive*** finding that partisan politics, not race, explains the results of SBISD elections.

## C. The Remedial Plan Process (if Required)

During the trial, the Court also inquired about the process for creating a remedial plan assuming *arguendo* that the Court finds SBISD's at-large system violates Section 2 of the Voting Rights Act. (See Trial transcript, Vol. 5, pp. 148-51).

As advised by the Fifth Circuit, "our practice has been to 'offer governing bodies the first pass at devising' remedies for Voting Rights Act violations." *Veasay v. Abbott,* 830 F.3d 216, 270 (5th Cir. 2016) (en banc). In other words,

> For the sake of future courts, we reiterate briefly some of the principles that the district court should bear in mind. Apportionment is principally a legislative responsibility. A district court should, accordingly, afford to the government body a reasonable opportunity to produce a constitutionally permissible plan. If the government does submit a plan, the court should, before rejecting it, determine that the substitute plan itself is unlawful.

*Jones v. Lubbock,* 727 F.2d 364, 387 (5th Cir. 1984). See also *Rodriguez v. Bexar County,* 385 F.3d 853, 870 (5th Cir. 2004) ("The primary responsibility for correcting Voting Rights Act deficiencies

---

[4] The Fifth Circuit has said that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of §2 under the totality of the circumstances." *Clark v. Calhoun Cty., Miss.,* 21 F.3d 92, 97 (5th Cir. 1994). Relevant here, "[t]he 'unusual case' that *Clark* refers to is a case, like *LULAC*, where … the evidence on the totality of circumstances renders political partisanship the better explanation for the defeat of minority-preferred candidates at the polls." *Lopez v. Abbott,* 339 F.Supp.3d 589, 602-03 (S.D. Tex. 2018) (citing *Clements,* 999 F.2d at 859-60).

rests with the relevant legislative body. Both the Supreme Court and this court have admonished district courts to afford local governments a reasonable opportunity to propose a constitutionally permissible plan and not haphazardly to order injunctive relief."); *United States v. Brown,* 561 F.3d 420, 435 (5th Cir. 2009) ("district courts must offer governing bodies the first pass at devising a remedy").

The Eighth Circuit, in an opinion cited by the Fifth Circuit,[5] explains the process this way:

> In the event the district court finds that under the totality of the circumstances, the plaintiffs are entitled to relief, the district court shall devise and implement a remedy … In doing so, the defendant shall be given an opportunity to propose a remedy within a specified amount of time. The court should then review the proposed order to determine whether it is "legally unacceptable." If the defendant fails to propose a legally acceptable remedy, the district court shall devise a plan…

*Cottier v. City of Martin,* 445 F.3d 1113, 1123 (8th Cir. 2006).

Thus, according to the above authorities, should the Court determine that SBISD's at-large system violates the Voting Rights Act, the Court should give SBISD's school board a sufficient amount of time to take "the first pass" at proposing an acceptable remedial plan.

Respectfully submitted,

**ABERNANTHY, ROEDER, BOYD & HULLETT, P.C.**

*/s/ Charles J. Crawford*
**Charles J. Crawford**
Texas Bar No. 05018900
**Lucas C. Henry**
State Bar No. 24101901
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Boulevard, Suite 300
McKinney, Texas 75069-1210

---

[5] See *Shirt v. Hazeltine,* 461 F.3d 1011, 1022 (5th Cir. 2006) ("When a Section 2 violation is found, the district court is responsible for developing a constitutional remedy. As required, the defendants were afforded the first opportunity to submit a remedial plan," citing *Cottier*).

        Telephone: (214) 544-4000
        Facsimile: (214) 544-4040
        ccrawford@abernathy-law.com
        lhenry@abernathy-law.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

      I hereby certify that on October 28, 2024, a true and correct copy of Defendants' Post-Trial Brief on Issues Raised by the Court was served upon Plaintiff's attorneys by the Court's ECF system.

      */s/Charles J. Crawford*
      Charles J. Crawford