## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **VIRGINIA ELIZONDO,** | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:21-cv-01997** |
| | § | |
| **SPRING  BRANCH  INDEPENDENT** | § | |
| **SCHOOL DISTRICT, et al.,** | § | |
| ***Defendants.*** | § | |

## PLAINTIFF'S RESPONSE
## TO DEFENDANTS' POST-TRIAL BRIEF ON ISSUES RAISED BY THE COURT

The District's Post-trial Brief "is not about the law as it exists," but instead is an "attempt to remake [the Court's] §2 jurisprudence anew." *Cf. Allen v. Milligan*, 143 S.Ct. 1487, 1506 (U.S. 2023)(rejecting government attempt to engraft into §2 novel requirements at the totality of the circumstances stage of analysis). The objective? To allow the District to skirt responsibility for the consequences of its at-large electoral system -- which the trial evidence proved "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters" and "'operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.'" *Id.* at 1494.

This, the District does by:

- Ignoring the text of Section 2, ignoring the text of the "Senate Factors," and ignoring more than 40 years of jurisprudence applying them;

- Claiming that it should bear no responsibility for its own electoral system based upon: (i) one case that is not a Voting Rights Act ("VRA") case, concerns a different statute, with both a different legislative history and regulatory requirements that causation must be established as part of establishing a plaintiff's prima facie case; and (2) an excerpt from a dissenting opinion in a contrary en banc Fifth Circuit decision that also is contrary to controlling Supreme Court and Fifth Circuit authority; and

- Attempting to misapply the concept of what constitutes legally significant bloc voting.

The Court should reject the District's post-trial attempts to misdirect attention from its responsibility for the discriminatory results of its at-large electoral system.

Part 1 below briefly recaps: (a) the important first principles governing Section 2 of the VRA, and  (b) discusses (i) the meaning of the term "the extent" as used in several of the Senate Factors, and (ii) how "causation" does and does not come into play when assessing a Section 2 vote dilution challenge to an at-large electoral system. Part 2 discusses the District's improper reliance upon the two cases on which it grounds its causation argument, in an attempt to divert attention away from the central issue in this case; namely, whether the District's own at-large electoral system interacts with social and historical conditions and operates to minimize or cancel out the ability of Hispanic citizens in SBISD to elect their preferred candidate to the school board. Part 3 explains how the District also misapplies the concept of "legally significant" bloc voting applicable here, in yet another attempt to avoid responsibility for an at-large electoral system that violates Section 2 of the VRA.

## 1.    Section 2 of the VRA and the Role of the Senate Factors.

### a.    <u>The Legislative and Judicial History of Section 2 – the Essence of a Section 2 Claim.</u>

The 1982 amendment to Section 2 of the VRA was the result of a bipartisan compromise proposed by Senator Bob Dole, passed by an overwhelming congressional margin, and signed into law by President Reagan. *Allen*, 143 S.Ct. at 1500:[1]

---

[1] "In its original form, '§2 closely tracked the language of the [Fifteenth] Amendment' and, as a result, had little independent force. . . . That changed in 1965. Spurred by the Civil Rights movement, Congress enacted and President Johnson signed into law the Voting Rights Act. 79 Stat. 437, as amended, 52 U.S.C. §10301 *et seq*. . . . By 1981, in only sixteen years' time, many considered the VRA 'the most successful civil rights statute in the history of the Nation.' S. Rep. No. 97-417, p. 111 (1982) (Senate Report).

"Section 2 prohibits [State and local governments] from imposing any 'standard, practice or procedure . . . in a manner which results in a denial or abridgement of the right of any citizen to vote on account of race or color.'[2] . . . **What that means**, §2 goes on to explain, **is that the political processes in the State must be 'equally open,' such that minority voters do not 'have less opportunity than other members of the electorate to** participate in the political process and to **elect representatives of their choice.'** . . .

**We have understood the language of §2 against the background of the hard-fought compromise that Congress struck. To that end, we have reiterated that §2 turns on the presence of discriminatory effects, not discriminatory intent.** . . . And we have explained that '[i]t is patently clear that **Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination. . . . Individuals thus lack an equal opportunity to participate** in the political process **when a State's electoral structure operates in a manner that 'minimize[s] or cancel[s] out the[ir] voting strength.'** . . . That occurs where an individual is disabled from 'enter[ing] into the political process in a reliable and meaningful manner' '**in light of past or present reality, political and otherwise.'**"

*Id.* at 1507 (internal citations omitted and emphasis added).

"For the past forty years," federal courts have evaluated claims brought under

§2 using the framework announced in *Gingles*, which stated that "[t]he essence of a

---

. . . . The Fifteenth Amendment – and thus §2 – prohibits States from acting with a 'racially discriminatory motivation' or an 'invidious purpose to discriminate. . . .But it does not prohibit laws that are discriminatory only in effect." *Allen*, 143 S.Ct. at 1499 (internal citations omitted). The Supreme Court "held over 40 years ago 'that, even if §1 of the [Fifteenth] Amendment prohibits only purposeful discrimination, the prior decisions of th[e] Court foreclose any argument that Congress may not, pursuant to §2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect. *City of Rome v. United States*, 446 U.S. 156, 173, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). The VRA's 'ban on electoral changes that are discriminatory in effect,' [the Court] emphasized, 'is an appropriate method of promoting the purposes of the Fifteenth Amendment.'" *Allen*, 143 S.Ct. at 1516.

[2] "Subsection 2(a) prohibits all States and political subdivisions from imposing *any* voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote of any citizen who is a member of a protected class of racial **and language minorities**." *Thornburg v. Gingles*, 106 S.Ct. 2752, 2762 (1986)(emphasis added).

§2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunity enjoyed by [minority] and white voters to elect their preferred representatives." *Allen,* 143 S.Ct. at 1502-03; *Gingles,* 106 S.Ct. at 2764. "That occurs 'where an electoral structure operates to minimize or cancel' out minority voters' 'ability to elect their preferred candidates.' . . . Such a risk is greatest 'where minority and majority voters consistently prefer different candidates' and 'where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Allen*, 143 S.Ct. at 1503 (quoting *Gingles*, 478 S.C.t at 2764).

The Supreme Court also "has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.' . . . The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical majority, will regularly defeat the choices of minority voters," which "also 'allows those elected to ignore [minority] interests without fear of political consequences.'" *Gingles*, 106 S.Ct. at 2764-65 & n.14 (internal citations omitted).

This, therefore, is a textbook §2 case, where the District's at-large electoral system interacts with social and historical conditions to cancel out Hispanic voters' ability to elect their preferred representatives, because Hispanic and White voters consistently prefer different candidates and the White majority, by virtue of its numerical majority, regularly defeats the choices of Hispanic voters, thereby enabling

those elected to the District school board to ignore minority interests without fear of political consequences.

      b.    <u>The Senate Factors and the Meaning of the Phrases "the extent of" and "the extent to which" a Factor Exists.</u>

After a plaintiff has satisfied the three so-called *Gingles* preconditions,[3] the court is to conduct a "searching practical evaluation of the 'past and present reality,'" based upon the facts of the case, to determine whether, under the "totality of the circumstances," the challenged political process "is not 'equally open' to minority voters." *Allen*, 143 S.Ct. at 1503 (internal citations omitted). But once the Gingles preconditions have been satisfied, "it will be only the very unusual case in which the plaintiffs . . . have failed to establish a violation of §2 under the totality of the circumstances." *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994). This doubtless is because the Supreme Court has "decline[d] to adopt an interpretation of §2 that would 'revise and reformulate the *Gingles* threshold inquiry that has been the baseline of [its] §2 jurisprudence' for nearly forty years." *Allen*, 143 S.Ct. at 1508 (internal citation omitted).

Among the "totality of the circumstances" that a court may consider when determining whether a §2 violation has occurred are the so-called "Senate factors" enumerated in the Senate Judiciary Report to Section 2 and adopted by the Court in

---

[3] "First, the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district'"; "'[s]econd, the minority group must be able to show that it is politically cohesive'"; and "third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Allen*, 143 S.Ct. at 1503 (quoting and citing *Gingles*, 478 S.Ct. at 2766-67).

*Gingles*, 106 S.Ct. at 2759.[4] There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29 n. 118. The Court in *Gingles* explained that the Senate factors must be applied with an eye

---

[4] The Senate factors include, but are not limited to:

> (1) the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

> (2) the extent to which voting in government elections is racially polarized;

> (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

> (4) exclusion of minorities from a candidate slating process;

> (5) the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

> (6) the use of overt or subtle racial appeals in political campaigns; and

> (7) the extent to which minorities have been elected to public office in the jurisdiction.

Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29.

toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 106 S.Ct. at 2764, *quoting* S. Rep. at 30 n. 120.

Several of the Senate factors include the introductory phrase "the extent of" or "the extent to which." *See* factors 1, 2, 3, 5 and 7 quoted in note 4 *supra*. When considering the significance of those Senate factors to its determination whether the voting strength of minority voters is minimized or cancelled out by the challenged electoral practice, the court is *not* tasked with determining whether the District "caused" that factor or condition to exist. The word "extent" is a noun, not a verb, and per the Merriam-Webster Dictionary variously means "the range over which something extends: SCOPE" or "the amount of space or surface that something occupies over which it extends: MAGNITUDE" or "the point, degree, or limit to which something extends." [5]

Therefore, use of the phrase "the extent of" or "the extent to which" simply calls for an assessment of the "degree" to which a specific factor exists, or its "magnitude" or "scope," not whether any one or more of the factors or conditions referenced in the factors was "caused" by the District. To the contrary, were the Court to limit its consideration of the Senate factors as the District suggests, and immunize the District from responsibility for the "ill effects" of its electoral practices on Hispanic citizens, the Court would not be applying the standard as the Supreme Court requires; namely, to decide whether the District's at-large electoral practices "interact with social and historical conditions to cause an inequality in the opportunity enjoyed

---

[5] http://merriam-webster.com/dictionary/extent.

by [minority] and white voters to elect their preferred representatives." *Allen,* 143 S.Ct. at 1502-03; *Gingles,* 106 S.Ct. at 2764.

Both the Supreme Court and the Fifth Circuit have rejected the District's claim that the Court is to disregard conditions referenced in the Senate factors that "it did not create." For example, a plaintiff need not prove *any* "causal nexus" when Senate factor 5 is taken into account:[6]

> "Because 'courts have recognized that disproportionate educational[,] employment, income levels and living conditions arising from past discrimination tend to depress minority political participation' plaintiffs 'need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.' S. Rep. at 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977)); *see also [LULAC v.]Clements*, 999 F.2d [831] at 867 (noting that the **Senate Report does not '[i]nsist upon a causal nexus between socioeconomic status and depressed participation'**)."

*Petteway v. Galveston County*, 698 F.Supp.3d 952, 1013 (S.D. Tex. 2023), rev'd and remanded on other grounds, 111 F.4th 596 (5th Cir. 2024)(en banc)(emphasis added).

When this Court makes its "practical evaluation of the 'past and present reality'" of conditions existing in SBISD based upon a "'functional' view of the political process," *Gingles*, 106 S.Ct. at 2764, the District would have the court turn a blind eye to both contemporary and relatively recent historical socio-economic and discriminatory conditions within the District's boundaries that bear on the ability of its Hispanic citizens to participate in the political processes, such as the documented instances of past *de jure* and *de facto* discrimination by the State of Texas, Harris

---

[6] "(5) the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;"

County, the City of Houston and the Memorial Villages. But those are relevant "social and historical conditions" which the Court should take into account when assessing whether the *District's* at-large electoral system interacts with those conditions to cause "an inequality in the opportunities enjoyed by [minority] and white voters."[7]

The "causation" issue under Section 2, therefore, has nothing to do with whether the District "caused the harms examined by the Senate factors." District's Post-Trial Brief at p. 4. The relevant causation concept under Section 2 instead concerns whether the District's at-large electoral practices "interact with social and historical conditions to cause an inequality in the opportunity enjoyed by [minority] and white voters to elect their preferred representatives." *Allen,* 143 S.Ct. at 1502-03; *Gingles*, 106 S.Ct. at 2764. And that determination is based upon the court's overall judgment whether the District's at-large electoral system – including its previous placement of early voting locations solely within majority White communities, reduction in the number of election day voting sites, violation of state law requirements for registering 18 year old students to vote and its use of a staggered elections system which enhances the dilutive effect of its at-large system – when considered against the backdrop of racial and ethnic residential segregation in the district and polarized bloc voting by Hispanic and White voters – minimizes or cancels out the voting strength of minority voters.

---

[7] With respect to the relevance of historical evidence of discrimination, the most relevant evidence is "relatively recent history" – but that term "does not mean immediately contemporaneous." *Veasey*, 830 F.3d at 232 & n. 14. Where, as here, historical disparities affecting Hispanics exist that contribute to the inequalities that persist, it is significant that District voters are alive today who have lived through the periods in which de jure discrimination against Hispanics has occurred. *See Petteway*, 698 F.Supp.3d at 997.

2.    The District Improperly Relies Upon Two Inapposite Cases in An Attempt to Divert Attention From the Central Issue in this Case: Whether the District's At-large Electoral System Interacts with Social and Historical Conditions and Operates to Minimize or Cancel Out the Ability of Hispanic Citizens in SBISD to Elect Their Preferred Candidate to the School Board.

The District relies upon two inapposite cases to support its incorrect claim that the Court's assessment of its at-large electoral system under §2 of the VRA should not take into account "racial disparities it did not create": *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507 (2015) and a dissenting opinion in *Veasey v. Abbott*, 830 F.3d 716 (5th Cir. 2016)(Jones, J., dissenting).

*Inclusive Communities* has nothing to do with the Voting Rights Act. Instead, it concerns an interpretation of a different statute (the Fair Housing Act), with a different legislative history, involving an agency-issued regulation requiring a plaintiff to prove as part of its prima facie case "that a challenged practice caused or predictably will cause a discriminatory effect." 135 S.Ct. at 528.

The excerpt the District quotes from *Veasey*, is misleadingly referenced as if it is part of a concurring *and* dissenting opinion. That is incorrect. The cited passage comes solely from a dissent.[8] The cited pages supposedly attributable to the quotation are also incorrect.[9]

And, as noted above, the District's unsupported position also is contrary to the

---

[8] Judge Jones' dissent begins on page 163 and note 1 to the "Dissent" explicitly states that the dissenters joined only in Part IV of the en banc majority option, which concerned a single narrow issue rendering judgment for the State on an unrelated poll tax issue. *See* 830 F.3d at 265-68.

[9] The District erroneously states that the portion of the dissent cited is found on pages 241-43 of the court's opinion. That is incorrect. The cited pages are within the majority opinion and do not concern the subject of the quoted portion of the dissent. The quoted portions of the dissent are found on pages 307-08.

position stated in the Senate Report at 29 n.114 (citing *White v. Regester*, 93 S.Ct. 2332, 2340-41(1973) ), contrary to the holding in *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977),[10] and inconsistent with *Clements*, 999 F.2d at 867 (noting that the Senate Report does not "[i]nsist upon a causal nexus between socioeconomic status and depressed participation"). *See Petteway*, 698 F.Supp.3d at 1013.

### 3. The District Misapplies the Applicable Concept of "Legally Significant" Bloc Voting.

The District also misapplies the concept of "legally significant" racially polarized voting in SBISD and misstates the Hispanic population data in the trial record.

a. <u>The Concept of "Legally Significant" Bloc Voting.</u>

The Supreme Court has stated the purpose for examining the existence of "racially polarized voting" under Section 2 and general principles which govern that determination:

> "The Senate Report states that 'the extent to which voting in the elections of the state or political subdivision is racially polarized,' is relevant to a vote dilution claim. . . . Because, as we explain below, the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district. Nevertheless, it is possible to state some general principles and we proceed to do so.

---

[10] "The Supreme Court and this court have recognized that disproportionate educational, employment, income level and living conditions tend to operate to deny access to political life. In this case the court held that these economic and educational factors were not proved to have "significant effect" on political access in Hinds County. **It is not necessary in any case that a minority prove such a causal link. Inequality of access is an inference which flows from the existence of economic and educational inequalities**." (emphasis added).

The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites sufficiently as a bloc usually to defeat the minority's preferred candidates. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently establishes minority bloc voting within the context of §2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting. . . .

As must be apparent, the degree of racial bloc voting that is cognizable as an element of a §2 vote dilution claim will vary according to a variety of factual circumstances. Consequently, there is no simple doctrinal test for the existence of legally significant racial bloc voting. However, the foregoing general principles should provide courts with substantial guidance in determining whether evidence that [minority] and white voters generally prefer different candidates rises to the level of legal significance under §2."

*Gingles*, 106 S.Ct. at 2769-70 (internal citations omitted). *Accord Robinson v. Ardoin*, 86 F.4th 574, 595 (5th Cir. 2023)("The Supreme Court has recognized that 'a white bloc vote that normally will defeat the combined strength of minority support plus 'crossover' votes rise to the level of legally significant white bloc voting.")(quoting *Gingles*).

  b. <u>The Limited Circumstances When Statistically Significant Racially Polarized Voting May Not Equate to Legally Significant Racially Polarized Voting.</u>

The District cites two cases, involving materially different factual circumstances, in which the Fifth Circuit has addressed scenarios in which statistically significant racially polarized voting was held not to be legally significant racially polarized voting: *LULAC v. Clements*, 999 F.2d 831 (5th Cir.

1993)(unsuccessful §2 challenge to Texas constitutional provision requiring county-wide election of State judges, occurring in partisan political elections) and *Salas v. Southwest Texas Junior College Dist.*, 964 F.2d 1542 (5th Cir. 1992)(unsuccessful §2 challenge to at-large system of election of junior college trustees, where Hispanic voters comprised a majority of the total population and a majority of the registered voters in the district).

i.    *Clements*

In *Clements*, the Fifth Circuit rejected a §2 challenge to Texas' county-wide system of electing state judges, concluding that there was little to marginal proof of racial voter dilution and, in any event, that any such effect was outweighed by the State's substantial and special interest in maintaining the linkage between the electoral and jurisdictional bases of the state district courts embodied in the Texas Constitution. 999 F.2d at 850-63, 868-76.

Unlike the circumstances in SBISD and in this case, the election of Texas state district judges occurs in partisan elections in which candidates run for office based upon political party designations (Republican and Democrat), and the record in *Clements* "unmistakably show[ed] that divergent voting patterns among white and majority voters are best explained by partisan affiliation." *Id.* at 850, 861 (Court agreed that "the record indisputably prove[d] that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens").

The facts in this case therefore differ materially from those in *Clements* and neither the rationale for that decision nor the trial record in this case is remotely similar.

First, SBISD trustee elections are expressly non-partisan. No party affiliation is listed on the ballot. And no evidence exists that partisanship played any role in the vast majority of elections at issues occurring between 2015 and 2024. The mere fact that partisan actors may have participated in one of the most recent elections analyzed by the litigants is, without more, immaterial.

Second, no evidence exists that partisans of any political party participated in or influenced SBISD trustee elections before 2021. See PX135 and PX137, which reflect that the pattern of polarized voting and lack of electoral success of Hispanic-preferred candidates is the same both before and after the point in time when SBISD claims that "partisan" factors became an issue in trustee elections. In addition, partisan (party) politics cannot explain the results of the SBISD election in 2022, because all of the candidates in that contest were members of the same political party.

Third, partisan, political, cultural, or other differences that may mirror racial differences, without more, do not undermine Section 2 of the Voting Rights Act, because any such characteristic is simply one component of racial cohesion.[11] Plaintiff

---

[11] "A high correlation between race and partisanship does not undermine a Section 2 claim, it is necessary to it. The minority voting group must be politically cohesive, which is a *Gingles* prerequisite, and the best (albeit imperfect) proxy for political cohesion is partisan alignment." *Rose v Raffensberger*, 619 F. Supp. 3d 1241, 1260 (N.D. Ga. 2022(invalidating at-large system for electing Public Service Commission members because of vote dilution violative of Section 2, holding that "nothing in the VRA requires a plaintiff to control for every possible covariant to assure that the discriminatory effect is caused solely or even predominantly by race as opposed to some other factor.")), rev'd on other grounds, 87 F.4th 469 (11th Cir. 2023). *Accord Nairne v. Ardoin,* No. 22-1278-SDD-SDJ, 2024 U.S. Dist. LEXIS 22181, *89-90 (M.D. La. Feb. 8, 2024)(court does not credit Alford testimony as helpful because it "appears to answer a question that Gingles II does not ask and in fact squarely rejects, namely, why Black voters in Louisiana are politically cohesive. 'It is the difference between the choices made by black and whites – not the reasons for the difference – that results in blacks having less opportunity than whites to elect their preferred

does not need to show that partisan affiliation does *not* cause divergent voting patterns. After a plaintiff presents statistical evidence showing a racially divergent voting pattern, the burden shifts to defendant to show that there is a race-neutral explanation for the racially divergent voting pattern. *Teague v. Attala County*, 92 F.3d 283, 290 (5th Cir. 1996); *see Gingles*, 106 S.Ct. at 2773; *Petteway*, 698 F.Supp.3d at 1010-11; *Rodriguez v. Harris County*, 964 F. Supp.2d 686, at 760 (S.D. Tex. 2013). Plaintiff need not initially show that party affiliation does *not* cause divergent voting patterns. *Petteway*, 698 F.Supp.3d at 1010-11; *Rodriguez*, 964 F.Supp.2d at 760; *Lopez,* 339 F.Supp.3d at 603. Absent "reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting 'thwarts' . . . Latino voting . . . for reasons wholly unconnected to race [,] [t]he preponderance of the evidence supports the conclusion that the challenged [electoral system] 'thwarts a distinctive minority vote' at least plausibly on account of race.'" *Petteway*, 698 F.Supp.3d at 1011 (internal citations omitted).

---

representatives. Consequently, . . . under the 'results test' of §2, only the correlation between race of voter and selection of certain candidates, not the cause of the correlation matters.'"); *Lopez v. Abbott*, 339 F.Supp.3d 589, 610 (S.D.Tex. 2018)("At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); *Texas v. United States*, 887 F. Supp. 2d, 133  at 181 (D.D.C. 2012)("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit.").

Here, the District did not produce any "reliable or methodologically sound evidence" sufficient to support its claim that partisan politics, rather than racially polarized voting, best explains the polarized electoral results in SBISD.

ii.   *Salas*

*Salas* was an unsuccessful §2 challenge to at-large system of election of junior college trustees, where Hispanic voters comprised a majority of the total population and a majority of the registered voters in the district. 964 F.2d at 1543. Because of that fact, both the trial court and the Fifth Circuit reasoned that white bloc voting was not legally significant – since the Hispanic population was both the majority total and voting population – and did not result in the Hispanic voters "having less opportunity than other members of the [district's] electorate to participate in the political process and to elect the representatives of their choice." *Id.*

In its zeal to suggest that *Salas is* relevant here, when it is not, the District falsely states that "the evidence at trial showed SBISD was and/or has a Hispanic majority population." District Post-trial Brief at p.6. But that statement is demonstrably incorrect and is contradicted by the population data to which the District stipulated in the uncontested portions of Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law With Defendants' Proposals. *See* ¶¶15 (total Hispanic population per 2021 Census was 44.08 of District total; Anglo population totaled 44.1%); 16 (District Citizen Voting Age Population per 2015-2019 American Community Survey – 24.8% Hispanic; 59.7% White); 17 (Per 2020 Census, total SBISD population is 40.7% Hispanic; 41.7% White; and voting age population is 37.6% Hispanic and 44.7% Anglo).

*Salas*, like *Clements*, therefore should not inform how this Court assesses whether the *District's* at-large electoral system interacts with those conditions to cause "an inequality in the opportunities enjoyed by [minority] and white voters."

Accordingly, based upon the evidence adduced at trial and for the reasons stated in Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, Plaintiff respectfully requests that the Court find that Plaintiff is entitled to declaratory and injunctive relief, precluding Defendants from maintaining an at-large system for electing SBISD school board trustees, as well as her attorney's fees, litigation expenses, court costs, and such other and further relief to which the Court determines she is justly and equitably entitled.

Respectfully submitted,

/s/ Barry Abrams
Barry Abrams
State Bar No. 00822700
SD Tex. Bar No. 2138
Robert Scott
State Bar No. 17911800
SD Tex. Bar No. 3085
Domingo Llagostera
State Bar No. 24070157
SD Tex. Bar No. 1120040
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 228-6606
(713) 228-6605 (fax)
barry.abrams@blankrome.com
bob.scott@blankrome.com
domingo.llagostera@blankrome.com

Martin Golando
State Bar No. 24059153
Admitted Pro Hac Vice
THE LAW OFFICE OF MARTIN GOLANDO, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
(210) 471-1185
(210) 405-6772 (fax)
martin.golando@gmail.com

COUNSEL FOR PLAINTIFF

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 6, 2024, a true and correct copy of the foregoing pleading was served upon Defendants' counsel by the Court's ECF system.

/s/ Barry Abrams
Barry Abrams