United States District Court
Southern District of Texas
**ENTERED**
April 28, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA ELIZONDO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-1997 |
| | § | |
| SPRING BRANCH INDEPENDENT | § | |
| SCHOOL DISTRICT, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

**TABLE OF CONTENTS**

I.   **Introduction** . . . . . . . . . . . . . . . . . . . . 4

II.  **Findings of Fact** . . . . . . . . . . . . . . . . 10

    A.   **Background** . . . . . . . . . . . . . . . . . . . 10

        i.   Plaintiff . . . . . . . . . . . . . . . . . . . 10

        ii.  Spring Branch Independent School District ("SBISD")
. . . . . . . . . . . . . . . . . . . . 11

        iii. SBISD's Election System . . . . . . . . . . . 19

        iv.  Hispanic Candidates in SBISD Elections . . . . 24

        v.   The Parties' Expert Witnesses Were Qualified . .
. . . . . . . . . . . . . . . . . . . . . 25

    B.   **Plaintiff Satisfied the Gingles Preconditions by a
Preponderance of the Credible Evidence** . . . . . . . 26

        i.   Plaintiff Established that the Hispanic Citizen
Voting Age Population in SBISD is Sufficiently
Large and Geographically Compact to Constitute a
Majority in at Least One District of an
Illustrative Single Member District Plan . . . . 26

1

ii.  Plaintiff Established that Hispanic Voters in SBISD
     are Politically Cohesive and that the Anglo
     Majority Votes Sufficiently as a Bloc to Enable It
     Usually to Defeat the Hispanic Voters' Preferred
     Candidate . . . . . . . . . . . . . . . . . 31

     a.  Evidence of Racially Polarized Voting . . . 31

         (I)  Ordinary Least Squares Ecological
              Regression . . . . . . . . . . . . . 32

         (II) Ecological Inference Analysis . . . . . 33

              (A)  Pre-Suit Elections . . . . . . . 35

              (B)  Post-Suit Elections . . . . . . . 47

     b.  Plaintiff Established by a Preponderance of
         the Credible Evidence that the Hispanics in
         SBISD are Politically Cohesive . . . . . . 64

     c.  Plaintiff Established by a Preponderance of
         the Credible Evidence that Anglos Vote
         Sufficiently as a Bloc to Enable Them To
         Defeat Hispanic Voters' Preferred Candidates
         . . . . . . . . . . . . . . . . . . . . . 68

C.  Plaintiff Established by a Preponderance of the Credible
    Evidence that Senate Factors 2, 5, and 7 Weigh in Favor
    of Finding a Violation of the Voting Rights Act ("VRA")
    . . . . . . . . . . . . . . . . . . . . . . . 73

    i.  Senate Factor 1: The Extent of Any History of
        Official Discrimination in the State or Political
        Subdivision That Touched the Right of Hispanics to
        Register, Vote, or Otherwise Participate in the
        Democratic Process . . . . . . . . . . . . . 73

    ii.  Senate Factor 2: the Extent to Which Voting in
         Government Elections Is Racially Polarized . . . 76

    iii. Senate Factor 3: the Extent to Which the State or
         Political Subdivision Has Used Voting Practices or
         Procedures That May Enhance the Opportunity for
         Discrimination Against the Minority Group . . . 77

iv.  Senate Factor 4: If There Is a Candidate Slating
     Process, Whether the Members of the Minority Have
     Been Denied Access to That Process . . . . . . . 80

v.   Senate Factor 5: the Extent to Which Members of the
     Minority Group in the State or Political
     Subdivision Bear the Effects of Discrimination in
     Areas Such as Education, Employment, and Health,
     Which Hinder Their Ability to Participate
     Effectively in the Political Process . . . . . . 80

vi.  Senate Factor 6: Whether Political Campaigns Have
     Been Characterized by Overt or Subtle Racial
     Appeals . . . . . . . . . . . . . . . . . . . . 81

vii. Senate Factor 7: The Extent to Which Minorities
     Have Been Elected to Public Office in the
     Jurisdiction . . . . . . . . . . . . . . . . . . 82

D.   The Parties Failed to Establish by a Preponderance of the
     Credible Evidence that Additional Considerations Effect
     Finding a Violation of the VRA . . . . . . . . . . . 84

     i.   Plaintiff Failed to Establish a Significant Lack of
          Responsiveness on the Part of SBISD Elected
          Officials to the Particularized Needs of the
          Hispanic Community . . . . . . . . . . . . . . 84

     ii.  Plaintiff Failed to Establish by a Preponderance of
          the Credible Evidence that the Policy Underlying
          the SBISD's At-Large Election System is Tenuous .
          . . . . . . . . . . . . . . . . . . . . . . . . 88

     iii. Texas Education Code § 11.052 Does Not Offer
          Plaintiff a Viable Means to Change SBISD's Election
          System . . . . . . . . . . . . . . . . . . . . 90

E.   Balancing of the Gingles Preconditions and the Totality
     of Circumstances Leads the Court to Find that Plaintiff
     Has Established a Violation of the VRA . . . . . . . 91

III. Conclusions of Law . . . . . . . . . . . . . . . . . . 92

A.   Jurisdiction . . . . . . . . . . . . . . . . . . . . 92

B.   Responsibility to Make Detailed Findings . . . . . . 92

      C.     **Claim for Violation of § 2 of the Voting Rights Act** . 92

           i.    Section 2 of the Voting Rights Act . . . . . . . 92

          ii.   The Gingles Framework for Analyzing Section 2 Claims . . . . . . . . . . . . . . . . . . . 95

                a.   The First Gingles Precondition . . . . . . 96

                b.   The Second and Third Gingles Preconditions . . . . . . . . . . . . . . . . . . . . . . 99

                    (I)  The Second Gingles Precondition . . . 100

                    (II) The Third Gingles Precondition . . . 104

         iii. Totality of Circumstances . . . . . . . . . . 106

          iv. Balancing of All the Factors . . . . . . . . . 111

**IV.** **Conclusions and Order** . . . . . . . . . . . . . . . . 112

## I.  Introduction

This is an action brought under section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, et seq., challenging the legality of the "at-large" method of electing members of the Spring Branch Independent School District ("SBISD") Board of Trustees.  Plaintiff alleges that the at-large system of electing members to the SBISD Board of Trustees violates the federal voting rights of Hispanic voters because it interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by Hispanic and White, non-Hispanic (i.e., "Anglo") voters,[1] and operates to

---

[1]The parties have used the terms "White" and "Anglo" interchangeably to refer to White non-Hispanics (i.e., English speakers as opposed to Spanish speakers).  For the sake of clarity, in discussing population statistics the court will use the term "Anglo" to refer to this group.

minimize or cancel out Hispanic voters' ability to elect their preferred candidates to the school board.[2]  Defendants contend that SBISD's at-large system for electing school board trustees, which is permissible under Texas law, does not violate the VRA. Defendants deny Plaintiff's allegations that SBISD's election system is not equally open to Hispanic voters.[3]

Section 2 claims challenging at-large voting systems are governed by the framework established in Thornburg v. Gingles, 106 S. Ct. 2752 (1986).  See Allen v. Milligan, 143 S. Ct. 1487, 1503 (2023) (reaffirming the Gingles framework for evaluating § 2 cases challenging at-large voting systems).

> Under Gingles, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

League of United Latin American Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 849 (5th Cir. 1993) (en banc), cert. denied, 114 S. Ct. 878 (1994) (citing Gingles, 106 S. Ct. at 2766). "Satisfaction of these three 'preconditions,' . . . is necessary,

---

[2]See Plaintiff's First Amended Complaint for Declaratory Judgment and Injunctive Relief, Docket Entry No. 3, p. 11 ¶¶ 78-79. See also Plaintiff's Contentions, Exhibit 1 to Joint Pretrial Order, Docket Entry No. 71-1, p. 1 ¶¶ 1-2.  Page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system.

[3]Defendants' Contentions, Exhibit 2 to Joint Pretrial Order, Docket Entry No. 71-2, p. 2.

. . . but not sufficient to establish liability under § 2." Id. (internal citations omitted). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not posses the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." Id. Courts are guided in this second inquiry by factors enumerated in the Senate Judiciary Committee's Report to Section 2 accompanying the 1982 amendment to the VRA, S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. 177. These factors ("the Senate Factors") were adopted by the Court in Gingles, 106 S. Ct. at 2759. The Senate Factors include, but are not limited to:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, . . . or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

     (6)   whether political campaigns have been characterized by overt or subtle racial appeals; and

     (7)   the extent to which members of the minority group have been elected to public office in the jurisdiction.

S. Rep. at 29, 1982 U.S.C.C.A.N. at 206-07. The court may also consider "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29, 1982 U.S.C.C.A.N. at 207.[4]

There is no requirement that all seven Senate Factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is . . . 'minimized or canceled out.'" S. Rep. at 29 n. 118. The Court in <u>Gingles</u> explained that the Senate Factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." <u>Gingles</u>, 106 S. Ct. at 2764, quoting S. Rep. at 30 n. 120.

---

[4]Agreed Conclusion of Law, Docket Entry No. 119, pp. 91-92 ¶ 94.

The court held a five-day bench trial in September of 2024 and heard testimony from seventeen witnesses. Plaintiff presented live testimony from Dr. Duncan Klussmann, SBISD's former superintendent, a parent of children who attended SBISD schools, and an associate clinical professor at the University of Houston's College of Education;[5] James Shaddix, a retired lawyer, SBISD resident, voter, community volunteer, and parent of children who attended SBISD schools;[6] Dr. Andres Tijerina a historian specializing in Texas Latino history;[7] Ricardo Barnes, the Executive Director of the Spring Branch Family Development Center;[8] the Plaintiff, Dr. Virginia Elizondo, a SBISD resident, voter, educator, former candidate for office as a SBISD school board trustee, and parent of a child who attended SBISD schools;[9] Roy Rodney, a lawyer, SBISD resident, voter, community volunteer, and parent of a child who attended SBISD schools;[10] David Lopez, a SBISD resident, voter, community volunteer, former candidate for office as a SBISD school board trustee, and former educator in the SBISD SKY Partnership Program;[11] Noel Lezama, a SBISD resident, voter, community

---

[5] 1 Reporter's Transcript ("RT") 30:6-100:11; 2RT4:6-23:6 (Klussmann).

[6] 2RT23:23-60:6 (Shaddix).

[7] 2RT61:16-124:12 (Tijerina); Plaintiff's Exhibit ("PX") 5, PX 27.

[8] 2RT125:2-155:14; PX 90 (Barnes).

[9] 2RT156:1-220:16; 3RT6:9-12:6 (Elizondo); PX 61.

[10] 3RT61:1-96:25 (Rodney).

[11] 3RT97:23-132:21 (Lopez).

volunteer, former candidate for office as a SBISD school board trustee, parent of children attending SBISD schools, and former student in the SBISD;[12] Patricia Cabrera, a SBISD resident, voter, community volunteer, and former student in the SBISD;[13] and Dr. Robert Stein, a professor of political science, former Dean of the School of Social Sciences and former Chair of the Political Science Department at Rice University.[14] Plaintiff also offered deposition testimony from Dr. Karen Heeth, one of the SBISD's designated corporate representatives.[15]

Defendants presented live testimony from Christine Porter, the SBISD's chief financial officer;[16] Dr. Kristin Craft, the SBISD's former chief academic officer and current superintendent of Boerne Independent School District;[17] Chris Earnest, a SBISD school board trustee, resident, voter, parent of children in SBISD schools, and community volunteer;[18] John Perez, a SBISD school board trustee, resident, voter, parent of children in SBISD schools, and community

---

[12]3RT133:14-161:18 (Lezama); PX 45.

[13]3RT162:18-182:25 (Cabrera).

[14]4RT17:21-102:1 (Stein); PX 1, PX 2, PX 3, PX 4, PX 18, PX 136.

[15]4RT14:11-17:4 (Heeth).

[16]3RT184:10-234:1; 4RT4:7-13:14 (Porter).

[17]3RT13:3-60:7 (Craft).

[18]4RT103:9-142:20 (Earnest).

volunteer;[19] Courtney Anderson, a SBISD school board trustee, resident, voter, parent of children in SBISD schools, and community volunteer;[20] and Dr. John Alford, a professor of political science at Rice University.[21]

After carefully considering the evidence, the relevant authorities, and the parties' arguments, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).

## II.  **Findings of Fact**

**A.    Background**

    i.    Plaintiff

1.    Plaintiff, Dr. Virginia Elizondo, is a United States citizen and registered voter who resides at 9235 Blankenship Drive, Houston, Texas 77080, which is in Harris County, Texas, and within the boundaries of the SBISD.[22]

2.    Dr. Elizondo is Hispanic and is a parent whose child attends an SBISD school.[23]

---

[19]5RT4:21-43:16 (Perez).

[20]5RT44:9-71:23 (Anderson).

[21]5RT72:19-147:14 (Alford); Defendants' Exhibit ("DX") 7, DX 8, DX 73.

[22]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 1.

[23]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 3.

3.    Dr. Elizondo has consistently voted in SBISD elections since moving to the District.  She has masters and doctorate degrees in Education Leadership, with a special focus on bilingual education.  She is a fluent Spanish speaker who has taught thousands of English Language Learners to read and write English.  She has been an active and vocal member of the SBISD volunteer community, serving on several leadership committees, including LEAD SBISD and Visioning for the Future.  Both committees play important roles in developing plans for the future education of SBISD students.[24]

4.    Dr. Elizondo has run for a SBISD school board trustee position twice, unsuccessfully.[25]

5.    Dr. Elizondo has standing to seek relief pursuant to the 5th Circuit's holding in Robinson v. Ardoin, 86 F.4th 574, 587-88 (5th Cir. 2023), because she is a minority District voter who asserts that she has been injured by the dilution of the impact of her vote resulting from the SBISD at-large system for electing members of its Board of Trustees.[26]

ii.    SBISD

6.    Defendant SBISD is a Texas public school district.  It is a political and geographical subdivision of the State of Texas.[27]

---

[24]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 4.

[25]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 5.

[26]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 6.

[27]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 7.

7.   In 1946 SBISD was organized as an independent public school district in western Harris County encompassing what are commonly referred to as the Memorial Villages (_i.e._, the cities of Hunters Creek Village, Piney Point Village, Bunker Hill Village, Hedwig Village, Spring Valley Village, and Hilshire Village).[28]

8.   The Memorial Villages located primarily on the south side of Interstate Highway 10 ("I-10") are subject to zoning ordinances that require large lots and homes; while much of the area located north of I-10 has smaller lots and multi-family apartment buildings.[29]

9.   The larger Spring Branch area _excluding_ the Memorial villages, was annexed by the City of Houston in 1957. By 1973 SBISD's geographic boundaries encompassed the Memorial Villages and part of the City of Houston.[30]

10.  The SBISD reached its peak enrollment of approximately 41,000 in 1976, when it was opening campuses at a rate of nearly one per year. In the 1980's SBISD enrollment declined by 41%. In recent years SBISD's enrollment has increased to a consistent level of more than 35,000 students.[31]

---

[28]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 8.

[29]2RT81:15-17 (Tijerina). _See also_ Docket Entry No. 118 (Plaintiff's Request that Court Take Judicial Notice of Adjudicative Facts regarding land use ordinances of Hunters Creek Village, Bunker Hill Village, Piney Point Village, Hedwig Village and Spring Valley Village).

[30]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 27.

[31]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 9.

11.  Following an economic downturn in the Texas oil economy in the 1980s, the Spring Branch area experienced a major influx of low-income families, many of whom were immigrants from Central America who lived in apartments located north of I-10.[32]  As a result, the SBISD transformed from a district where the majority of the students were Anglo, to a district where the number of Hispanic students is more than twice the number of Anglo students.[33]

12.  SBISD admits that in the past twenty years the racial and ethnic composition of the district has changed significantly, and that the district is now a majority-minority district.[34] A substantial majority of its students are economically disadvantaged, and a greater proportion of its Hispanic students are economically disadvantaged than are its Anglo students.[35]

13.  In the 2010 Census SBISD had a total population of 178,140. The Hispanic population was 78,534 or 44.08% of the total. The Anglo population was 78,588 or 44.1% of the total.  The African American population was 4.3% of the total.[36]

---

[32]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 28.

[33]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 48.  See also PX 6, PX 86, and PX 103.

[34]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 48.

[35]3RT214:10-215:18 (Porter).

[36]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 10.

14.  SBISD population statistics remain similar today.  According to the 2020 Census, SBISD had a total population of 183,364. The Hispanic population was 74,701 or 40.7% of the total.  The Anglo population was 76,444 or 41.7% of the total.  The African American population was 12,190 or 6.6% of the total, and the Asian population was 18,756 or 10.2% of the total.[37]

15.  According to the 2015-2019 American Community Survey, the Citizen Voting Age Population (CVAP) of SBISD was 24.8% Hispanic, 59.7% Anglo, 6.2% African American, and 7.6% Asian.[38]

---

[37]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 12.

[38]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 11.

**Table 1**
**SBISD Population Figures by Numbers and Percentages**[39]

| District | Total | Anglo | Hispanic | Asian | African American | Other | Total Non-Anglo |
|---|---|---|---|---|---|---|---|
| Total Population | 183,364 | 76,444 | 74,701 | 18,756 | 12,190 | 1,273* | 106,920 |
| Voting Age Population | 136,493 | 60,978 | 51,384 | 14,122 | 8,759 | 1,250* | 75,515 |
| Citizen Voting Age Population | 99,280 | 59,270* | 24,664 | 7,545* | 6,155* | 1,646* | 40,010* |
| | | | | | | | |
| District | | % Anglo | % Hispanic | % Asian | % African American | % Other | % Non-Anglo |
| Total Population | | 41.7 | 40.7 | 10.2 | 6.6 | 0.8* | 58.3 |
| Voting Age Population | | 44.7 | 37.6 | 10.3 | 6.4 | 1.0* | 55.3 |
| Citizen Voting Age Population | | 59.7 | 24.8 | 7.6 | 6.2 | 1.7* | 40.3* |

16. Although 40.7% of SBISD's population was Hispanic in the 2020 census, only 24.8% of SBISD's CVAP in the American Community Survey for 2015-2019 was Hispanic. A little more than half of SBISD's Hispanic population are thus unable to vote,

---

[39]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 11-12, and Table 1 at p. 12 between ¶¶ 32-33. See also DX 2 (Stein Data). Population figures are from the 2020 census, and citizen voting age population figures are from the 2015-2019 American Community Survey. Figures followed by asterisk (*) were calculated by the court from the parties' stipulated figures. The absolute numbers and the percentages do not correlate exactly due to apparent rounding errors. The parties' stipulations also state that the Spanish Surname Voter Registration ("SSVR") for SBISD's 2020 election was 17.25%, see Docket Entry No. 99 ¶ 11, but because there was no SBISD election in 2020 due to the pandemic, see 5RT47:5-7 (Anderson), this figure is not used. See also PX 72, unnumbered page between pp. 106-07 (SBISD001841).

presumably because they are either too young to vote or are non-citizens who cannot vote.[40]

17. As of October 2021 the student population of SBISD was approximately 59% Hispanic, 27% Anglo, 7% Asian, 5% African American, and 2% Other.[41]

18. SBISD is a high functioning school district.[42]  But the evidence shows that the District consists of two disparate parts: one located north of I-10, and one located mostly south of I-10.  South of I-10 the students are more likely to be Anglo, affluent, go to college, and more likely to meet or exceed the State's academic standards.  North of I-10 the students are more likely to be Hispanic, economically disadvantaged, dropout, less likely to meet state academic standards,[43] and more likely to be severely disciplined.[44]

19. SBISD has responded to the academic needs of the Hispanic community in a number of ways:

- SBISD offers a successful bilingual program for students whose first language is not English.[45]

---

[40]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 11-12. See also DX 2 (Stein Data).

[41]PX 6 (demographics as of 10-12-21). See also PX 103 (same); PX 86 student demographics as October 2022: Hispanic 58%, Anglo 27%, Asian 7%, African American 5%, Other 3%).

[42]PX28; PX79; PX140.

[43]3RT214:14-215:18 (Porter); 3RT34:12-40:12, 48:12-49:5, 53:10-58:23 (Craft); PX 105, PX 106, PX 107, PX 108, PX 112, PX 113.

[44]PX 112.

[45]3RT13:24-15:15 (Craft).

- SBISD's bilingual program has resulted in measurable improvements in test scores for English Language Learners.[46]

- Because the state mandates that school districts cannot provide a bilingual program beyond fifth grade, SBISD offers a two-way dual language program that exceeds state requirements so that these students can proceed into middle school.[47]

- SBISD offers supports and intervention systems for enrichment of SBISD bilingual students, including the Communities in Schools mentorship program, Boys and Girls Club, parent advisory committees, STEM clubs, FamilyPoint Resources, and parent trainings.[48]

- SBISD takes English Language Learners to Rice University in the summer for STEM camp, and has created a partnership with Texas A&M's engineering department.[49]

- SBISD has a multi-lingual welcome center where students and parents who are coming in new to the country can access services provided by SBISD.[50]

- SBISD's English Language Learner performance exceeds its regional and state peers.[51]

---

[46]3RT15:10-16:7 (Craft).

[47]3RT16:23-17:5 (Craft).

[48]3RT17:6-18:1 (Craft).

[49]3RT18:2-7 (Craft).

[50]3RT18:8-13 (Craft).

[51]3RT19:12-16 (Craft).

- SBISD's schools with large populations of economically disadvantaged Hispanic students have shown marked improvement in state accountability ratings in recent years.[52]

20. Plaintiff contends that notwithstanding SBISD's efforts to address and improve the academic performance of Hispanic students, disparities in student academic achievements persist between predominantly Hispanic and predominately Anglo schools. As evidence of this persistent disparity, Plaintiff cites PX 140, which depicts the Texas Education Agency Student Achievement Accountability Ratings for 2019 and 2022, and Dr. Craft's testimony that the 2022 ratings occurred after SBISD implemented programs to address the needs of the Hispanic community. Dr. Craft also testified that by 2022 the District was starting to see the benefits of what [SBISD] put in place three years earlier.[53]

---

[52] 3RT20:1-31:11 (Craft).

[53] 3RT40:13-41:8 (Craft).



PLAINTIFF'S
EXHIBIT
140
Civil Action No. 4:21-cv-01997

21. There was no credible evidence that SBISD has failed to make good faith efforts and expend necessary resources to address the needs of its Hispanic students.

iii. <u>SBISD's Election System</u>

22. The SBISD Board of Trustees is comprised of seven members elected on an at-large basis, in non-partisan contests, by all voters within the SBISD's geographic boundaries.[54]

23. Elections are held annually on the May uniform election date.[55]

24. SBISD trustees serve staggered three year terms with no term limits.[56]

---

[54] Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 14.

[55] Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 15.

[56] Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 15-16.

25.  Candidates who file for election must choose to run for a particular "position" or seat number and compete with other candidates filing for the same position or seat number.[57]

26.  The positions do not have any geographical significance but serve as a means to stagger terms to prevent a complete turnover of the board in a single election.[58]

27.  Voters may vote in elections for each position, but may only cast one vote per position; the candidate who receives the most votes (a plurality) for a position wins.[59]

28.  To be eligible as a candidate for trustee, a person must be a United States Citizen, 18 years of age or older, not mentally incapacitated, not finally convicted of a felony, a Texas resident continuously for 12 months, resident in the SBISD for 6 months, and registered to vote.[60]

29.  Texas law authorizes school districts to adopt at-large trustee plans in which school board trustees are elected district wide as well as single member district plans in which school board trustees are elected from single-member districts, following a few statutory parameters. See Tex. Educ. Code § 11.052.[61]

---

[57]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 17, 19.

[58]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 18.

[59]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 20.

[60]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 21.

[61]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 22.

30. SBISD has seven election precincts, which are based upon the SBISD middle school enrollment zones:  Precinct 41-Landrum; Precinct 42-Memorial; Precinct 43-Spring Branch; Precinct 44-Spring Woods; Precinct 45-Spring Forest; Precinct 46-Spring Oaks; and Precinct 47-Northbrook.[62]

31. Four of the election precincts and middle school enrollment zones are north of I-10 and, apart from areas that largely fall within the boundaries of heavily segregated Spring Valley Village and Hilshire Village, are overwhelmingly populated by Hispanic students, i.e., Precincts 41-Landrum, 44-Spring Woods, 46-Spring Oaks, and 47-Northbrook.  Three of the precincts and middle school enrollment zones are south of I-10, where the majority of the student population are Anglo, i.e., Precincts 42-Memorial, 43-Spring Branch, and 45-Spring Forest.[63]

---

[62]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 25 and 49 (SBISD adopted its middle school enrollment zones as its election precincts in 2012). The precincts are shown in PX 9, below.

[63]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 48.  See also PX 1, pp. 9-10; PX 105.

21

**Spring Branch ISD Enrollment Zones/Voting Precincts**[64]



Revised 8-15-2017

32.  In 2012 SBISD reduced the number of election day voting
     locations from 25 elementary schools to seven middle schools
     because of difficulties in obtaining the necessary number of
     voting machines and staff to man polling sites.[65]

---

[64]PX 9; PX 104.

[65]1RT78:22-81:11 (Klussman); 3RT196:22-199:1 (Porter).  _See also_ DX 10; DX 70.

33.   SBISD provides eight days of early voting from 7:00 a.m. to 7:00 p.m. on weekdays, and a half a day on Saturday.[66]

34.   Before 2012 SBISD had only one early voting location – the SBISD administration building.   In 2012 SBISD added three additional sites for a total of four early voting locations.[67]

35.   In January of 2022 SBISD added a fifth early voting location in the Spring Oaks Middle School zone north of I-10.[68]

36.   In 2023 SBISD added a sixth early voting location between Northbrook Middle School and Spring Woods Middle School in the northern part of SBISD.[69] The increase in early voting locations coincided with an increase in voter turnout for SBISD elections.[70]

37.   Today, there are three early voting locations south of I-10, and three north of I-10; one of the south-side locations is required by law because SBISD must partner with the City of Piney Point to hold its elections.[71]

38.   SBISD has incorporated into its Board Policy BBB (LEGAL) Tex. Educ. Code §11.052, which authorizes 15 percent of registered voters in a district to petition the school board to put a proposition on the ballot for an election where all district voters can vote to change the manner of electing school board

---

[66]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 50; 3RT204:5-6 (Porter).

[67]3RT201:10-203:6 (Porter).

[68]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 51; 3RT204:9-21 (Porter).

[69]3RT205:3-8 (Porter).

[70]See Tables 3 and 4, below.

[71]3RT206:9-15 (Porter).

trustees.[72]

39. SBISD's Board of Trustees has never been presented a petition pursuant to Tex. Educ. Code §11.052(e) and/or SBISD Policy BBB (LEGAL) and, as a result, SBISD has never placed a proposition requiring that its trustees be elected in single-member districts on an election ballot pursuant to Tex. Educ. Code §11.052(e) and/or Policy BBB (LEGAL).[73]

   iv.   Hispanic Candidates in SBISD Elections

40. Between 2015 and 2021, and before Plaintiff filed this action, SBISD conducted ten trustee elections. Four of the ten contests were uncontested (i.e., only one candidate ran for election). Two of the contested elections had only Anglo candidates. In four contested elections, a Hispanic candidate ran and was defeated by an Anglo candidate: Virginia Elizondo in 2015 and 2021; Noel Lezama ("Lezama") in 2018; and David Lopez ("Lopez") in 2019.[74]

41. Until the May 2022 election, which occurred while this lawsuit was pending, to SBISD's knowledge, no person of color had ever been elected or served as a trustee for SBISD.[75]

42. In 2022 three candidates, John Perez ("Perez"), Laura Mafrige ("Mafrige"), and Ed Kaczenski ("Kaczenski"), ran for SBISD

---

[72]DX 9; 3RT200:7-201:1(Porter).

[73]2RT4:16-19 (Klussmann); 3RT119:12-22 (Lopez); 3RT201:2-8 (Porter).

[74]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 23.

[75]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 24.

Trustee Position 6.[76]  Perez won with 65.6% of the votes cast; Kaczenski finished second with 27.8% of the votes cast; and Mafrige received 6.6% of the votes cast.[77]

43.  In 2023 David Lopez ran a second time and lost to an Anglo candidate.[78]


      v.    The Parties' Expert Witnesses Were Qualified

44.  Plaintiff's experts, Dr. Stein and Dr. Tijerina, and Defendants' expert, Dr. Alford, are all qualified to render their opinions.

45.  Dr. Stein is a Professor of Political Science at Rice University with expertise in the fields of elections and election administration, and a history of serving as an expert witness.[79]

46.  Dr. Tijerina is a retired history professor with expertise in discrimination against Hispanics in Texas.[80]

47.  Dr. Alford is a Professor of Political Science at Rice University with expertise in elections and redistricting, and a history of serving as an expert witness.[81]

---

[76]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 42.

[77]PX 3, p. 3.  See also PX 87, p. 7.

[78]PX 4, p. 2.  See also PX 88, p. 1.

[79]PX 18 (Curriculum Vitae)

[80]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 46; PX 27.

[81]5RT73:21-75:14 (Alford).  See also Alford Curriculum Vitae attached to DX 7, DX 8, and DX 73.

**B.** **Plaintiff Satisfied the <u>Gingles</u> Preconditions by a Preponderance of the Credible Evidence**

    i. <u>Plaintiff Established that the Hispanic Citizen Voting Age Population in SBISD is Sufficiently Large and Geographically Compact to Constitute a Majority in at Least One District of an Illustrative Single Member District Plan</u>

48. Based on the 2020 Census and the 2015-2019 American Community Survey data produced by the United States Census, Plaintiff's expert, Dr. Stein, calculated the share of the Citizen Voting Age Population ("CVAP") and the Hispanic Citizen Voting Age Population ("HCVAP") in each of the SBISD's middle school enrollment zones, expecting that those zones could be potential districts in an illustrative single-member district plan.[82]

49. Dr. Stein used his calculations to create an illustrative plan consisting of seven districts that draw on but are not coterminus with SBISD's seven middle school attendance zones.[83]

---

[82] 4RT36:22-37:10 (Stein).

[83] 4RT77:17-78:25 (Stein).

Demonstrative Spring Branch ISD Single-Member District



8

PLAINTIFF'S
EXHIBIT
24

Civil Action No. 4:21-cv-01997

50. Dr. Stein's illustrative single member district plan is
supported by data in the following Table 2:[84]

---

[84]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 32-33
(continued...)

**Table 2**

| Dist. | Total Population | Voting Age Population | CVAP | % HCVAP | Total HCVAP | Total Non-HCVAP |
|-------|-----------------|---------------------|------|---------|-------------|-----------------|
| 1 | 26,171 | 18,782 | 9,180 | 52.8% | 4,847 | 4,333 |
| 2 | 26,131 | 19,802 | 14,355 | 30.7% | 4,407 | 9,948 |
| 3 | 26,132 | 19,732 | 14,345 | 32.5% | 4,662 | 9,683 |
| 4 | 26,432 | 19,164 | 14,180 | 17.4% | 2,467 | 11,713 |
| 5 | 26,110 | 19,429 | 16,235 | 9.5% | 1,542 | 14,693 |
| 6 | 26,194 | 20,493 | 18,450 | 15.4% | 2,841 | 15,609 |
| 7 | 26,194 | 19,091 | 12,535 | 31.1% | 3,898 | 8,637 |
| Totals | 183,364 | 136,493 | 99,280 | 24.8% | 24,664 | 74,616 |

51. The variances in the total population among the districts in the illustrative plan is less than two and a half percent (2.5%).[85]

52. One of the seven districts in Dr. Stein's illustrative plan, District 1, located in the northeast corner of the SBISD, would have a HCVAP greater than 50%, _i.e._, 52.8% with a margin of error of 5.9% (PX 24).[86]

53. Dr. Stein created illustrative District 1 by combining a portion of Precinct 47, which is the Northbrook Middle School attendance zone that is north of Kempwood Drive and primarily east of Blalock Road, with Precinct 41, which is the Landrum Middle School attendance zone, together with small carve outs from the Spring Branch and Spring Woods attendance zones along

---

[84](...continued)
and Table 1 at p. 12.  See also Stein Data, DX 2, second page.

[85]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 33.

[86]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 32; 4RT37:11-16, and 76:20-23 (Stein).

Bingle Road, to create a district with a majority HCVAP that conforms to the one-person-one-vote rule.[87]

54. Defendant's expert, Dr. Alford, does not dispute Dr. Stein's calculation of the HCVAP of illustrative District 1, but testified that because the American Community Survey data that Dr. Stein used is subject to a margin-of-error of 5.9%, Dr. Stein's illustrative District 1 may not actually be a majority Hispanic district.[88]

55. Because the trial testimony established that even when taking into account potential statistical margins of error, nearly three-quarters of the percentages calculated fall above the fifty percent (50%) mark,[89] the HCVAP for the proposed illustrative district 1 more likely than not exceeds fifty percent (50%). The 52.8% HCVAP estimate in Dr. Stein's proposed illustrative District 1 is therefore an appropriate benchmark that may be relied upon for determining the percentage of the HCVAP in the demonstrative district.

56. Moreover, the parties have stipulated that "Hispanics constitute a 72% majority of the voting age population and a 52.8% majority of the CVAP of District 1 in the illustrative plan."[90] Plaintiff has therefore proved by a preponderance of the evidence that the HCVAP in illustrative District 1 is greater than fifty percent (50%).

---

[87] 4RT83:21-85:7 (Stein).

[88] 5RT106:14-107:10 (Alford).

[89] 4RT38:18-39:17 (Stein).

[90] Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 33. <u>See also</u> 3RT218:10-23 (Porter, agreeing that the geographic concentration of Hispanics in SBISD is large enough to constitute a majority of the voting age population in one or more single member districts under a seven member election plan).

57.  The evidence at trial established that illustrative District 1 represents a community of common interests formed by racial, ethnic, and cultural characteristics (Hispanic); language (over 85% of the population speaks Spanish at home); education (over 60% of the population over 19 have not completed high school and many adults cannot read or write any language); high levels of employment (many people work more than one job); low levels of income (medium family income is $28,000 and employment is often in service industries); and poor health (over 53% of the population have no healthcare).[91]

58.  Although the SBISD contends that illustrative District 1 is not compact because race predominates over traditional districting principles,[92] the court finds that illustrative District 1 is compact because it maintains the integrity of Hispanic population areas, it preserves existing communities of interest, and it is reasonably shaped by relying in part on area streets and in part on SBISD's existing middle school enrollment zones, which serve as SBISD's election precincts.

59.  The HCVAP population of SBISD is sufficiently large and geographically compact to constitute a majority of the voting age population in at least one of the single member districts proposed in Dr. Stein's illustrative seven-district plan.

60.  Dr. Elizondo resides within the boundaries of Dr. Stein's proposed illustrative District 1.[93]

---

[91]PX105; PX106; PX107; 1RT65:20-66:21 (Klussmann); 2RT41:5-42:12 (Shaddix); 2RT129:5-130:21, 134:24-137:14 (Barnes).

[92]Defendants' Memorandum of Law, Docket Entry No. 71-12, pp. 5-7.

[93]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 2.

      ii.   <u>Plaintiff Established that Hispanic Voters in SBISD are Politically Cohesive and that the Anglo Majority Votes Sufficiently as a Bloc to Enable It Usually to Defeat the Hispanic Voters' Preferred Candidate</u>

          a.   Evidence of Racially Polarized Voting

61. As evidence that Hispanic voters in the SBISD are politically cohesive and that the Anglo majority votes sufficiently as a bloc to enable it — in the absence of special circumstances — usually to defeat the Hispanic voters' preferred candidate, Plaintiff presented evidence of racially polarized voting, <u>i.e.</u>, evidence that Hispanic and Anglo voters consistently prefer different candidates, produced by Dr. Stein.

62. Dr. Stein used three analytical techniques to determine if voting in SBISD elections was racially polarized: (a) ordinary least squares ecological regression analysis ("OLS" or "ER");[94] (b) ecological inference analysis ("EI");[95] and (c) a later version of EI analysis called ei.MD.bayes application, also known as "Bayesian" or "EI RxC" analysis.[96]

---

[94]Dr. Stein's first report, analyzed elections between 2015 and 2021 using the OLS or ER method. <u>See</u> PX 1, pp. 4-7; PX19; PX20; PX21; PX22; 4RT29:10-36:21 (Stein).

[95]Dr. Stein's second report, PX 2, analyzed elections between 2015 and 2021 using the EI method; Dr. Stein's third report, PX 3, analyzed the 2022 elections using the EI method; and Dr. Stein's fourth report, PX 4, analyzed the 2023 elections using the EI method. <u>See</u> PX 2, pp. 1-14; PX 3, pp. 2-5; PX 4, pp. 2-3; PX 122; PX 123; PX 124; PX 125; PX 126; PX 127; PX 128; PX 129; PX 130; PX 131; PX 132; PX 133; PX 134; PX 135; PX 137; 4RT25:12-26:3, 48:21-61:8 (Stein).

[96]Dr. Stein's fifth report, PX 136, analyzed the 2024 elections, using the ei.MD.bayes application. 4RT26:6-27:6, 61:22-67:12; 100-102 (Stein). <u>See also</u> PX 136, pp. 4-6; PX 137.

(I)   Ordinary Least Squares Ecological Regression

63.  OLS ER is a mathematical technique that looks at the relationship between two variables: the correlation between election results and the race of the voters voting in the election.  Dr. Stein applied OLS ER analysis to trustee elections held in 2015, 2017, 2018, 2019, and 2021 in each of SBISD's seven election precincts to create scatter plots in which the horizontal axes reflect the percentage of total voters (Anglo or Hispanic) and the vertical axes reflect the percent of the vote received by the candidates (Anglo or Hispanic).  Dr. Stein color-coded the points on the graphs to election year so that the results from all five years could be plotted together.  His analysis presumed that the candidate with the Hispanic surname was the candidate preferred by Hispanic voters.[97]

64.  Racially polarized voting is established when the direction of the relationships between the race or ethnicity of voters and candidates are "signed" in opposite directions.[98]

65.  Dr. Stein found that Anglo and Hispanic voters diverged in their support for each candidate on the ballot, including uncontested contests, where he treated under votes as a second candidate.[99]

66.  Dr. Alford criticized the summary form of Dr. Stein's OLS ER analysis for not providing "election by election details that would allow a conclusion as to whether elections in [SBISD]

_____

[97]PX 1, pp. 4-5 & n. 1.

[98]PX 1, p. 5; PX 19; PX 20; PX 21; PX 22; 4RT35:12-36:1 (Stein).

[99]PX 1, pp. 5-7; PX 19; PX 20; PX 21; PX 22; 4RT29:3-36:21 (Stein).

demonstrate the presence of legally significant racially polarized voting, rather than its mere possibility, in the way that a more traditional analysis could,"[100] but acknowledged that Dr. Stein's "results . . . are suggestive in regard to the degree to which voters vote choices might be linked to their support for Hispanic surnamed candidates."[101]

67. Because in the graphs produced by Dr. Stein, the results do not cluster tightly along prediction lines but, instead, scatter all over the range of possible vote shares, the court is not persuaded that Dr. Stein's OLS ER analysis demonstrates by a preponderance of the credible evidence that Hispanic and Anglo voters consistently preferred different candidates in the 2015, 2017, 2018, 2019, and 2021 SBISD elections.[102]

(II) Ecological Inference Analysis

68. In response to Dr. Alford's criticism of his OLS ER analysis, Dr. Stein performed an election by election analysis of SBISD contested trustee elections held in 2015, 2017, 2018, 2019, 2021, 2022, and 2023 using EI software.[103]

---

[100]DX 7, p. 5.

[101]DX 7, p. 3. See also 5RT126:23-127:2 (Alford) (criticizing Dr. Stein's use of OLS ER analysis as "a novel approach," but acknowledging that OLS ER is a scientifically verifiable way to evaluate racially polarized voting that is generally accepted in the social science community, that Dr. Stein applied the principles and methods of OLS statistical work reliably to the facts of this case, but that in his opinion OLS ER was simply "not the . . . most sophisticated or most reliable analysis to use").

[102]PX 1, pp. 4-7; PX 19; PX 20; PX 21; PX 22; 4RT29:3-36:21 (Stein).

[103]PX 2 (2015, 2017, 2018, 2019, and 2021 elections); PX 3
(continued...)

69.  EI is a statistical technique that uses precinct election data and either voter history files by precinct or census demographic data by precinct to estimate individual voting behavior from aggregate data.  The method accounts for racial variation in voting behavior by precinct, to arrive at the most likely point estimate corresponding to the mean share of the vote received by each candidate from each racial/ethnic group.[104]

70.  When conducting his EI analysis, Dr. Stein calculated EI estimates for five distinct groups (Anglo, Hispanic, Black, Asian, and other).  Because some voters received multiple classifications, his percentages do not always add up to 100.[105]

71.  Dr. Alford criticized Dr. Stein's calculation of EI estimates for five groups instead of two groups (i.e., Hispanic and non-Hispanic), as effectively exaggerating Hispanic support and under reporting non-Hispanic support for individual candidates.[106]  The court finds Dr. Stein's multi-group approach more reliable than Dr. Alford's two-group preference because Dr. Stein credibly testified that there is some

---

[103](...continued)
(2022 elections); and PX 4 (2023 elections).

[104]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 34.

[105]See PX 2, pp. 2, 4, 7, 10, 12; PX 125, PX 127-130, PX 132; 4RT29:17-23, 53:21-55:7, 94:18-95:18 (Stein); 5RT90:3-92:24 (Alford).

[106]DX 8, pp. 5-6 & n. 1; 5RT93:25-94:10 (Alford).

divergence among all five groups.[107] Moreover, Dr. Alford only offered an alternative analysis for the 2023 and 2024 elections,[108] thus making Dr. Stein's analysis the only statistical evidence for the elections held in 2015, 2017, 2018, 2019, 2021, and 2022.

72. Because Dr. Stein's analysis compares minority Hispanic voters to majority Anglo voters, the court finds Dr. Stein's identification of Hispanic preferred candidates, and the mean vote shares attributable to them to be reliable.


(A)   Pre-Suit Elections

73. In 2015 there were two contested trustee elections: a contest for the Position 3 seat between Katherine Dawson ("Dawson") and Craig Adams ("Adams"); and a contest for the Position 4 seat between Dr. Elizondo and Chris Vierra ("Vierra").[109]

74. In the Dawson/Adams contest for Position 3, Dawson received 1,752 votes to Adams' 383 votes, resulting in Dawson winning the election by a margin of 82% to 18%.[110]

75. According to Dr. Stein's EI analysis, Dawson's mean share of the Anglo vote was 88% compared to 12% for Adams, and Adams' mean share of the Hispanic vote was 98% compared to 1% for Dawson.[111]  Based on these mean shares Dr. Stein found Adams to

---

[107]4RT54:8-10 (Stein).

[108]DX 8 (2023); DX 73 (2024); 5RT143:11-144:18 (Alford).

[109]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 35; PX 72, p. 75.

[110]PX 72, p. 75.

[111]PX 2, p. 1; PX 123.  The court has rounded the percentages to the closest whole number.

be the Hispanic preferred candidate, and based on the confidence intervals, he found these mean shares to be statistically significant evidence of racially polarized voting.[112]

76.  In the Vierra/Elizondo contest for Position 4, Vierra received 1,739 votes to Dr. Elizondo's 359 votes, resulting in Vierra winning the election by a margin of 83% to 17%.[113]

77.  Dr. Elizondo testified that she entered the 2015 race and differentiated herself from her opponent by talking about poor academic achievement in north side campuses and the need for a change of leadership on those campuses.[114]  Nevertheless, Dr. Elizondo did not receive more votes than her opponent in any election precinct, including Precincts 41 and 47, which make up Plaintiff's illustrative District 1.[115]

78.  According to Dr. Stein's EI analysis, Vierra's mean share of the Anglo vote was 86% compared to 13% for Dr. Elizondo, and Dr. Elizondo's mean share of the Hispanic vote was 92% compared to 1% for Vierra.[116]  Based on these mean shares, Dr. Stein found Dr. Elizondo to be the Hispanic preferred candidate, and based on the confidence intervals, he concluded that these mean shares were statistically significant evidence of racially polarized voting.[117]

---

[112]PX 2, pp. 1-3.

[113]PX 72, p. 75; 2RT177:23-178:9, 208:11-19 (Elizondo).

[114]2RT175:2-13, 178:10-20 (Elizondo).

[115]DX 20; 2RT208:24-209:7 (Elizondo).

[116]PX 2, p. 1; PX 122.

[117]PX 2, pp. 1-3.

79.  Defendants cite Dr. Elizondo's testimony that she was endorsed by an AFL-CIO union, and that her campaign engaged in phone banking with the help of a teachers' union, i.e., the Spring Branch Federation of Teachers,[118] as evidence that partisan politics, not race, best explains the racial polarity evidenced in this election.

80.  Because there is no evidence that the teachers' union support for Dr. Elizondo was overtly partisan, and because there is no other evidence that partisanship played a role in either Dr. Elizondo's or Vierra's campaign, the court is not persuaded that partisan politics, not race, best explains the racial polarity evidenced in this election.

81.  In 2017 there were two trustee elections: an uncontested election for Position 1; and a contested election for Position 2 between the incumbent, Chris Gonzalez ("Gonzalez") (a non-Hispanic candidate with a Hispanic surname), and Mary Curry Mettenbrink ("Mettenbrink").[119] In the contested election Gonzalez received 810 votes to Mettenbrink's 249 votes, resulting in Gonzalez winning the election by a margin of 76% to 24%.[120]

82.  According to Dr. Stein's EI analysis, Gonzalez's mean share of the Anglo vote was 75% compared to 25% for Mettenbrink, and Gonzalez's mean share of the Hispanic vote was 91% compared

---

[118]2RT206:24-208:7 (Elizondo).

[119]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 36; PX 72, p. 82.

[120]PX 72, p. 82.

to 9% for Mettenbrink.[121]    Based on these mean shares, Dr. Stein found Gonzalez to be the preferred candidate of both Anglo and Hispanic voters, and that this election did not reflect statistically significant evidence of racially polarized voting.[122]

83.  In 2018 there were two trustee elections: a contested election for Position 3 between Minda Caesar ("Caesar") and Noel Lezama ("Lezama"), and an uncontested election in which the incumbent, Vierra, sought reelection to the Position 4 seat.[123]

84.  In the contested election Caesar received 1,914 votes to Lezama's 1,338 votes, resulting in Caesar winning the election by a margin of 59% to 41%.[124]

85.  Lezama testified that before he ran for election to the SBISD Board of Trustees, he had engaged in a number of community activities including serving as president of the Northbrook Middle School Parents Teacher Organization.[125]    He also testified that his family immigrated to this country from Nicaragua to flee the Contras and Sandinista conflicts of the 1980s.[126]  In a letter introducing his campaign, Lezama stated:

> As a Hispanic, bilingual immigrant parent who successfully completed the system, I have firsthand experience in the challenges our students and teachers have.

---

[121] PX 2, pp. 3-5; PX 124.

[122] PX 2, p. 3.

[123] Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 37, PX 72, p. 85.

[124] PX 72, p. 85.

[125] 3RT136:9-21; PX 47.

[126] 3RT143:11-14.

> Every child deserves the individual attention for
> their success. Every child deserves a voice.  We
> need a new look and we need a board member with my
> life experiences in the Spring Branch school system
> and community.[127]

86.   According to Dr. Stein's EI analysis, Caesar's mean share of the
      Anglo vote was 54% compared to 35% for Lezama, and Lezama's
      mean share of the Hispanic vote was 99% compared to 1% for
      Caesar.[128]  Based on these mean shares, Dr. Stein found Lezama
      to be the Hispanic preferred candidate, and based on the
      confidence intervals, he found these mean shares to be
      statistically significant evidence of racially polarized
      voting.[129]

87.   Unlike Dr. Elizondo, who lost every precinct, Lezama received
      more votes than his opponent in all four precincts located
      north of I-10, i.e., Precincts 41, 44, 46, and 47, but still
      lost the election, despite receiving 99% of the Hispanic vote
      and 35% of the Anglo vote.[130]

88.   When asked to explain why he lost the election after receiving
      99% of the Hispanic vote and 35% of the Anglo vote, Lezama
      attributed the loss to low voter turn out in the precincts
      located north of I-10.[131]

89.   Defendants cite Lezama's testimony that he was endorsed by the
      Spring Branch American Federation of Teachers, the same union
      that aided Dr. Elizondo's candidacy in 2015, and that he

---

[127]PX 47.

[128]PX 2, p. 6; PX 125.

[129]PX 2, pp. 5-8; PX 125.

[130]PX 72, p. 86; 3RT137:20-25 (Lezama).

[131]3RT138:1-8 (Lezama).

publicized that endorsement on his campaign website,[132] as evidence that partisan politics, not race, best explains the racial polarity evidenced in this election.

90. Because Lezama testified that he was not a member of any political party at the time of this election,[133] and because there is no evidence that partisanship played a role in Caesar's campaign, the court is not persuaded that partisan politics, not race, best explains the racial polarity seen in this election.

91. In 2019 there were three trustee elections: one contested election for Position 5 between J. Carter Breed ("Breed") and David E. Lopez ("Lopez"); and two uncontested elections in which incumbents Pam Goodson and Karen Peck sought reelection to the Positions 6 and 7, respectively.[134]

92. In the contested election, Breed received 989 votes to Lopez's 476 votes, resulting in Breed winning the election by a margin of 68% to 32%.[135]

93. Lopez testified that he decided to seek a seat on the SBISD Board of Trustees because after working four years as a teacher at Yes Prep Northbrook High School, he "saw that there was no representation economically, racially, and lived-experience-wise for [his] students . . . So [he] was inspired to be that leader for them."[136]

---

[132]3RT155:2-20 (Lezama); DX 66.

[133]3RT155:21-23 (Lezama).

[134]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 38; PX 72, p. 95.

[135]PX 72, p. 95.

[136]3RT103:4-7 (Lopez).

94.  Lopez's election materials emphasized three issues: strong academic programs; protections for the under-represented; and school discipline and safety.[137]

95.  In an email sent to a local media outlet Lopez stated he lived in the most northern part of the SBISD

> where the vast majority of Latinx, economically disadvantaged, and undocumented students live. Currently all 7 board members are white, high net worth individuals with little to no ties to any community North of I-10. There is a representation issue in this district. 75% of the school district student population are students of color and 34% are considered English Language Learners and the all at-large seat structure of the board leads to a highly disenfranchised population in the district.[138]

96.  According to Dr. Stein's EI analysis, Breed's mean share of the Anglo vote was 75% compared to 25% for Lopez, and Lopez's mean share of the Hispanic vote was 98% compared to 2% for Breed.[139]  Based on these mean shares, Dr. Stein found Lopez to be the Hispanic preferred candidate, and based on the confidence intervals, he found these mean shares to be statistically significant evidence of racially-polarized voting.[140]

97.  Like Lezama, Lopez received more votes than his opponent in all four precincts located north of I-10: Precincts 41, 44, 46, and 47,[141] but still lost the election despite receiving 98% of the Hispanic vote and 25% of the Anglo vote.

---

[137]PX 52; PX 58; PX 59; PX 60; 3RT105:2-107:23 (Lopez).

[138]PX 53.  See also 3RT103:8-104:22 (Lopez).

[139]PX 2, p. 9; PX 126.

[140]PX 2, pp. 8-11.

[141]PX 72, p. 96.  See also 3RT108:14-109:19 (Lopez).

98.  Lopez attributed low voter turnout in the election precincts north of I-10 to a number of factors, including unawareness of the election, unfamiliarity with early voting locations, inconvenient times for early voting, lack of transportation to polling locations, and frustration and hopelessness caused by past inability of Hispanic candidates from the north side of I-10 to defeat better resourced Anglo candidates from the south side of I-10.[142]

99.  Defendants cite Lezama's testimony that Breed was a "registered Republican,"[143] and Lopez's testimony that he sought support from a representative of a liberal group called "Swing TX Left" and from a member of the Democratic Party,[144] as well as his campaign strategy to target Democratic primary voters who he thought might be inclined to support him,[145] as evidence that partisan politics, not race, best explains the racial polarity seen in this election.

100. But because Lopez testified that he was not member of any political party at the time of this election,[146] and because there is no evidence that partisanship played a role in Breed's campaign, the court is not persuaded that partisan politics, not race, best explains the racial polarity evidenced in this election.

---

[142]3RT112:8-114:15 (Lopez).

[143]3RT159:2-6 (Lezama).

[144]3RT130:12-131:23 (Lopez); DX 59.

[145]3RT131:24-132:2 (Lopez).

[146]3RT155:21-23 (Lezama).

101. In 2021 there were two trustee elections: an uncontested election in which Caesar sought reelection to Position 3, and a contested election between Christopher Earnest ("Earnest") and Dr. Elizondo for the Position 4 seat.[147]

102. In the contested election, Earnest received 5,307 votes to Dr. Elizondo's 3,484 votes, resulting in Earnest winning the election by a margin of 60% to 40%.[148] Earnest received 54% of the total votes cast from the three precincts located south of I-10, i.e., Precincts 42, 43, and 45.[149]

103. Dr. Elizondo's election materials for the 2021 race included a list of things that a school board could not do, e.g., "change a mask mandate handed down by the state;" "choose a curriculum;" "establish a union;" and "represent only the interests of one sector or segment of the district;"[150] and a list of "facts" intended to dispel a "myth" that "there is too much political influence on the SBISD Board of Trustees" stating that "School Board elections are non-partisan;" "Virginia Elizondo has refused donations and endorsement for any political party," and "Virginia's opponent has accepted an endorsement from both the Harris County and Spring Branch Republican party."[151]

---

[147]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 39, PX 72, p. 107.

[148]PX 72, p. 107.

[149]PX 117; 5RT36:1-5 (Perez).

[150]DX 17.  See also 2RT217:4-219:12 (Elizondo).

[151]DX 18.  See also 2RT219:13-220:13 (Elizondo).

104. According to Dr. Stein's EI analysis, Earnest's mean share of the Anglo vote was 66% compared to 34% for Elizondo, and Elizondo's mean share of the Hispanic vote was 93% compared to 6% for Earnest.[152]  Based on these mean shares, Dr. Stein found Elizondo to be the Hispanic preferred candidate, and based on the confidence intervals, he found the mean shares to be reliable and statistically significant evidence of racially polarized voting.[153]

105. Dr. Elizondo received more votes than her opponent in three of the election precincts located north of I-10, i.e., 44, 46, and 47, and received only five fewer votes than her opponent in Precinct 41,[154] which makes up a large portion of illustrative District 1, but still lost the election despite receiving 93% of the Hispanic vote and 34% of the Anglo vote.

106. Defendants cite Earnest's testimony that he was endorsed by the Republican Party,[155] and Elizondo's testimony that the AFL-CIO union group endorsed her candidacy and made phone calls on her behalf,[156] that she was denied attendance to the Village Republican Women's event in 2021 because some members believed she was a Democrat,[157] and that she was endorsed by a

---

[152]PX 2, p. 9; PX 127.

[153]PX 2, pp. 11-14.

[154]PX 72, p. 109.

[155]4RT108:8-15 (Earnest).

[156]2RT209:11-17, 215:16-216:6 (Elizondo).  See also DX 16.

[157]2RT214:9-23 (Elizondo).

44

Democratic Congressional candidate,[158] as evidence that partisan politics, not race, best explains the racial polarity seen in this election.

107. The evidence at trial showed that partisanship played a larger role in 2021 than in previous SBISD elections, but did not establish that partisan politics, not race, best explains the racial polarity evidenced in this election.

108. The court prepared Table 3 to summarize the results of the contested SBISD trustee elections held between 2015 to 2021. Dr. Stein's EI analyses show that in five of six contested trustee elections held between 2015 and 2021 there is statistically significant evidence that Hispanics and Anglos preferred different candidates, and that in each of those five elections the Anglo-preferred candidate won.[159] The only time a Hispanic-preferred candidate won an election was in 2017 when the Hispanic-preferred candidate, Chris Gonzalez, an Anglo woman with a Hispanic surname, was also the Anglo-preferred candidate.[160]

---

[158]2RT215:3-10 (Elizondo).

[159]PX 2, p. 14.

[160]PX 2, p. 3 ("The contest between Mettenbrink and Gonzalez does not reflect significant evidence of racially-polarized voting).

**Table 3:**

Contested Elections Held Before Suit Was Filed Credibly Analyzed for Cohesion by Dr. Stein (Percentages rounded to closest whole number)

| Year | Position | Candidates (Bold=Election Winner; *=Hispanic Preferred Candidate) | Total Votes Cast | Percentages of Total Votes | Mean Share of Anglo Vote | Mean Share of Hispanic Vote |
|------|----------|---|---|---|---|---|
| 2015 | Total # Voters: Not provided for this election. | | | | | |
| | 3 | **Dawson**/Adams* | 1,752/383 | 82/18 | 88/12 | 1/98 |
| | 4 | **Vierra**/Elizondo* | 1,739/359 | 83/17 | 86/13 | 1/92 |
| 2017 | Total # Voters: Not provided for this election. | | | | | |
| | 2 | **Gonzalez***/Mettenbrink | 810/249 | 76/24 | 75/25 | 91/9 |
| 2018 | Total # Voters: 3,294 of 91,145 Registered Voters = 3.61% | | | | | |
| | 3 | **Caesar**/Lezama* | 1,914/1,338 | 59/41 | 54/35 | 9/99[161] |
| 2019 | Total # Voters: 1,559 of 94,986 Registered Voters = 1.64% | | | | | |
| | 5 | **Breed**/Lopez* | 989/476 | 68/32 | 75/25 | 2/98 |
| 2021 | Total # Voters: 8,802 of 97,556 Registered Voters = 9.02% | | | | | |
| | 4 | **Earnest**/Elizondo* | 5,307/3,484 | 60/40 | 66/34 | 6/93 |

---

[161]Dr. Stein's EI percentages may total above or below 100 because these estimates were calculated for multiple racial/ethnic groups, resulting in more than one possible classification for some voters.  See 4RT53:21-55:7 (Stein). See PX 125 (Caesar/Lezama); PX 127 (Earnest/Elizondo); PX 128 (Alpe/Breed); PX 129 (Perez/Kaczenski/Mafrige); PX 130 (Bennett/Slattery/Morace).  Dr. Alford has acknowledged that the EI analysis used by Dr. Stein produces estimates of vote distribution that can fail to add to 100. See DX 8, pp. 5-6 & n. 1.

(B)   Post-Suit Elections

109. On June 18, 2021, just over a month after she lost the 2021
     election, Dr. Elizondo filed this lawsuit.[162]

110. On October 4, 2021, David Lopez, who unsuccessfully sought
     election to the SBISD Board of Trustees in 2019, along with
     two others, Diana Alexander and Patricia Cabrera, submitted
     an email to the SBISD's Board of Trustees on behalf of an
     organization called "Somos" asking the board "to address
     structural inequities in the electorate process."[163]  The email
     included a number of specific requests, including (1) that
     SBISD transition away from its at-large district plan to a
     seven single member district plan; (2) that the CVAP in three
     of the districts be minority-majority; (3) that the number of
     early voting locations be increased from four to five and that
     they be located in each of SBISD's five zip codes; and
     (4) that the procedures for registering voters at SBISD high
     schools be standardized.[164]

111. On December 6, 2021, the Republican Party of Texas issued a
     Press Release announcing "the creation of a Local Government
     Committee . . . [that would] assist county parties in electing
     conservative candidates in often-overlooked school board and

---

[162]Plaintiff's Original Complaint for Declaratory Judgment and
Injunctive Relief, Docket Entry No. 1.

[163]PX 77, p. 1.

[164]PX 77, pp. 2-4.

municipal elections."[165]

112. In 2022 there were three contested trustee elections: Two candidates, Lisa Alpe ("Alpe") and incumbent Breed vied for Position 5; three candidates, John Perez ("Perez"), Ed Kaczenski ("Kaczenski"), and Laura Mafrige ("Mafrige") vied for Position 6; and three candidates, Caroline Bennett ("Bennett"), David Slattery ("Slattery"), and Jenny Morace ("Morace") vied for Position 7.[166]

113. In the Alpe/Breed contest for Position 5, Alpe received more votes than Breed in all but one election precinct,[167] receiving a total of 9,068 votes to Breed's 4,429 votes, thus winning the election by a margin of 67% to 33%.[168]

114. From the three precincts located south of I-10, Alpe received 7,473 votes, or 54% of the total number of votes cast in this election.[169]

115. According to Dr. Stein's EI analysis, Alpe's mean share of the Anglo vote was 76% compared to 25% for Breed, and Breed's mean

---

[165]DX 6, p. 1.

[166]Agreed Stipulation of Facts, Docket Entry No. 99, ¶¶ 40-42; PX 87, pp. 1-3 and 7.

[167]PX 87, pp. 1 and 7

[168]PX 3, p. 2; PX 87, pp. 1 and 7.

[169]PX 118.

share of the Hispanic vote was 93% compared to 3% for Alpe.[170] Based on these mean shares, Dr. Stein found Breed to be the Hispanic preferred candidate, and based on the confidence intervals, he found the mean shares to be statistically significant evidence of racially-polarized voting.[171]

116. Defendants cite Earnest's testimony that although both Alpe and Breed were Republicans, Breed received — and failed to disavow — endorsement from the Democratic Party,[172] and Perez's testimony that Alpe allied with the most conservative candidates in the other two races, i.e., Earnest and Bennett, all of whom received endorsement from the conservative Spring Branch Families PAC,[173] as evidence that partisan politics, not race, best explains the racial polarity seen in this election. Because both candidates in the Position 5 contest belonged to the same political party, the court is not persuaded that partisan politics, not race, best explains the racial polarity evidenced in this election.

117. In the Perez/Kaczenski/Mafrige contest for Position 6, the winner, Perez, received 8,793 votes representing 66% of the vote, Kaczenski finished second with 3,731 votes representing

---

[170]PX 3, p. 2; PX 128.

[171]PX 3, p. 2.

[172]4RT114:18-115:12 (Earnest).

[173]5RT38:24-39:22 (Perez).

28% of the vote, and Mafrige finished third with 878 votes representing 7% of the vote.[174]

118. From the three precincts located south of I-10, Perez received 7,499 votes, or 54% of the total number of votes cast in this election.[175]

119. Kaczenski received more votes than Perez in three of the four election precincts located north of I-10, i.e., 44, 46, and 47, which makes up a portion of Plaintiff's illustrative District 1.[176]

120. According to Dr. Stein's EI analysis, Perez's mean share of the Anglo vote was 73%, compared to Kaczenski and Mafrige who received 21% and 5%, respectively.[177]  Kaczenski's mean share of the Hispanic vote was 83%, compared to Perez and Mafrige who received 5% and a 30%, respectively.[178]  Based on these mean shares, Dr. Stein found Kaczenski to be the Hispanic preferred candidate, cohesiveness in Hispanic and Anglo voter support for different candidates, and statistically significant evidence of racially-polarized voting.[179]  Dr. Stein also found the cohesiveness of Anglo voter support sufficient to elect Perez, and block the election of the

---

[174]PX 3, p. 3; PX 87, pp. 2 and 7.

[175]PX 119; 5RT36:1-5 (Perez).

[176]PX 87, p. 2.

[177]PX 3, p. 3; PX 129.

[178]PX 3, p. 3; PX 129.

[179]PX 3, p. 3.

Hispanic voters' preferred candidate, Kaczenski.[180]

121. Perez testified that he is a chemical engineer with a degree from Rice University,[181] that he operates a process safety engineering company,[182] and that he has lived in the SBISD since 2001 and his children have attended SBISD schools located south of I-10.[183]

122. Perez testified that in 2021 he voted for Earnest, not Elizondo, and that when he ran for a position on the Board of Trustees in 2022 he supported getting students back into schools and opposed mask mandates,[184] he opposed critical race theory ("CRT") and pornographic materials in school libraries,[185] and he promoted the need to improve the performance of English language learners.[186] He testified that during COVID he awoke to school issues such as this lawsuit, which he opposed,[187] and described as using "lawfare . . . to get a political win . . . under the guise of . . . [the VRA]."[188]

---

[180]PX 3, p. 3.

[181]5RT6:5-11 (Perez).

[182]5RT5:9-10 (Perez).

[183]5RT10:14-25 (Perez).

[184]5RT12:7-15 (Perez).

[185]5RT20:6-17 (Perez).

[186]5RT20:22-24:8 (Perez).

[187]5RT29:12-23 (Perez).

[188]5RT13:3-5 (Perez)

123. Defendants cite Perez's testimony that he is of Hispanic (Mexican-American) heritage,[189] that his father was a migrant worker and the first Hispanic mayor of Carrizo Springs, Texas,[190] and that he was endorsed by the Republican Party and a number of conservative organizations,[191] while Kaczenski was endorsed by the Democratic Party,[192] as evidence that partisan politics, not race, best explains the racial polarity evidenced in this election.

124. The endorsement of Perez by Republicans and Kaczenski by Democrats, although relevant, is insufficient to establish by a preponderance of the evidence that partisan politics, not race, best explains the racial polarity evidenced in this election.

125. Perez's election does not negate the finding that Hispanic and Anglo voters in SBISD consistently prefer different candidates. Although Perez testified that he is of Hispanic heritage, his testimony concerning his education, his occupation, and his children's schools shows that he has more in common with SBISD's Anglo population than with the majority of SBISD's Hispanic population.

---

[189] 5RT6:22-25 (Perez).

[190] 5RT7:22-8:9 (Perez)

[191] 5RT24:16-24 (Perez).

[192] 5RT30:14-23 (Perez).

126. In the Bennett/Slattery/Morace contest for Position 7, the winner, Bennett, received 8,749 votes representing 65% of the vote, Slattery finished second with 4,328 votes representing 32% of the vote, and Morace finished third with 340 votes representing 3.% of the vote.[193]

127. From the three precincts located south of I-10, Bennett received 7,480 votes, or 54% of the total number of votes cast in this election.[194]

128. Slattery received more votes than Bennett in three of the four election precincts located north of I-10, _i.e._, 44, 46, and 47, which makes up a portion of Plaintiff's illustrative District 1.[195]

129. According to Dr. Stein's EI analysis, Bennett's mean share of the Anglo vote was 73%, compared to Slattery and Morace who received 25% and 5%, respectively.[196] Slattery's mean share of the Hispanic vote was 82%, compared to Bennett and Morace who received 11% and a 15%, respectively.[197] Based on these mean shares, Dr. Stein found Slattery to be the Hispanic preferred candidate, cohesiveness in Hispanic and Anglo voter support

---

[193] PX 87, pp. 3 and 7.

[194] PX 87, pp. 3 and 7.

[195] PX 87, p. 3.

[196] PX 3, p. 4; PX 130.

[197] PX 3, p. 4; PX 130.

for different candidates, and statistically significant evidence of racially-polarized voting.[198] Dr. Stein also found the cohesiveness of Anglo voter support sufficient to elect Bennett, and block the election of Hispanic voters' preferred candidate, Slattery.[199]

130. In 2023 there were two contested trustee elections: a contest for Position 1 between Courtney Anderson ("Anderson") and Lopez (who previously ran in 2019); and a contest for Position 2 between Shannon Mahan ("Mahan") and Becky Ardell Downs ("Downs").[200]

131. In the Anderson/Lopez contest for Position 1, Anderson received 7,091 votes to Lopez's 3,498 votes, resulting in Anderson winning the election by a margin of 67% to 33%.[201] Anderson received 5,865 votes, or 55% of the total number of votes cast in this election, from the three precincts located south of I-10, i.e., Precincts 42, 43, and 45.[202]

132. Lopez received more votes than Anderson in two of the four election precincts located north of I-10, i.e., 44 (Spring

---

[198]PX 3, p. 4; PX 130.

[199]PX 3, p. 4.

[200]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 43; PX 88, pp. 1-2.

[201]PX 4, p. 1; PX 88, pp. 1 and 7.

[202]PX 88, p. 1; PX 120.

Woods) and 46 (Spring Oaks),[203] neither of which are included in Plaintiff's illustrative District 1.

133. According to Dr. Stein's EI analysis, Anderson's mean share of the Anglo vote was 81% to 16% for Lopez, and Lopez's mean share of the Hispanic vote was 90% compared to 3% for Anderson.[204] Based on these mean shares, Dr. Stein found Lopez to be the Hispanic preferred candidate, cohesiveness in Hispanic and Anglo voter support for different candidates, and statistically significant evidence of racially-polarized voting.[205] Dr. Stein also found the cohesiveness of Anglo voter support sufficient to elect Anderson, and block the election of the Hispanic voters' preferred candidate, Lopez.[206]

134. Defendants cite Lopez's testimony that he aligned himself with liberal groups and issues, including Democrats,[207] and Anderson's testimony that she aligned herself with traditionally conservative candidates, groups, and issues,[208] as evidence that partisan politics, not race, best explains the racial polarity evidenced in this election.

---

[203]PX 88, p. 1.

[204]PX 4, p. 1; PX 131.

[205]PX 4, p. 1; PX 131.

[206]PX 4, p. 1.

[207]3RT125:7–132:20 (Lopez).

[208]5RT45:17–57:17 (Anderson).

135. The candidates' respective alignment with liberal and conservative groups and issues is insufficient to establish that partisan politics, not race, best explains the racial polarity evidenced in the Anderson/Lopez election.

136. In the Mahan/Downs contest for Position 2, Mahan received more votes than Downs in all but one election precinct,[209] receiving a total of 7,197 votes to Downs' 3,367 votes, resulting in Mahan winning the election by a margin of 68% to 32%.[210]

137. From the three precincts located south of I-10, Mahan received 5,915 votes, or 56% of the total number of votes cast in this election.[211]

138. Downs received more votes than Mahan in one of the four election precincts located north of I-10, i.e., 44 (Spring Woods),[212] which is not included in Plaintiff's illustrative District 1.

139. According to Dr. Stein's EI analysis, Mahan's mean share of the Anglo vote was 85% compared to 17% for Downs; and Downs received 85% of the mean share of the Hispanic vote to 3% for Mahan.[213]  Based on these mean shares, Dr. Stein found Downs to be the Hispanic preferred candidate, cohesiveness in Hispanic

---

[209]PX 88, p. 2.

[210]PX 4, p. 1; PX 88, p. 2.

[211]PX 88, p. 2.

[212]PX 88, p. 2.

[213]PX 4, pp. 1-2; PX 132.

and Anglo voter support for different candidates, and statistically significant evidence of racially-polarized voting.[214]  Dr. Stein also found the cohesiveness of Anglo voter support sufficient to elect Mahan, and block the election of Hispanic voters' preferred candidate, Downs.[215]

140. Defendants cite Lopez's testimony that Downs aligned herself with liberal groups and issues, including Democrats,[216] while Mahan aligned herself with traditionally conservative candidates, groups, and issues, and was endorsed by Republican Senator Ted Cruz,[217] as evidence that partisan politics, not race, best explains the racial polarity seen in this election.

141. The candidates' respective alignment with liberal and conservative groups and issues and Mahan's endorsement by a Republican senator are insufficient to establish that partisan politics, not race, best explains the racial polarity evidenced in the Mahan/Downs election.

142. PX135 visually summarizes the results of Dr. Stein's EI analyses for the SBISD elections held in 2015, 2017, 2018, 2019, 2021, 2022, and 2023, and graphically depicts a pattern of Anglo and Hispanic voter for different candidates in all but one election:

---

[214]PX 4, p. 2.

[215]PX 4, p. 2.

[216]3RT128:5-20 (Lopez).

[217]3RT:128:24-129:8 (Lopez).

| Contest | Candidates | White Vote Percentage | | Hispanic Vote Percentage | |
|---------|-----------|-----------|--|-----------|--|
| 2015 | Vierra / Elizondo | Vierra | | Elizondo | |
| 2015 | Dawson / Adams | Dawson | | Adams | |
| 2017 | Gonzales / Mettenbrink | Gonzales | | Gonzales | |
| 2018 | Caesar / Lezama | Caesar | | Lezama | |
| 2019 | Breed / Lopez | Breed | | Lopez | |
| 2021 | Earnest / Elizondo | Earnest | | Elizondo | |
| 2022 | Alpe / Breed | Alpe | | Breed | |
| 2022 | Perez / Kaczenski / Mafrige | Perez | | Kaczenski | |
| 2022 | Bennett / Slattery / Morace | Bennett | | Slattery | |
| 2023 | Anderson / Lopez (Stein Report) | Anderson | | Lopez | |
| 2023 | Mahan / Downs (Stein Report) | Mahan | | Downs | |

Comparison of White Voter and Hispanic Voter Preferences

PLAINTIFF'S
EXHIBIT
135
Civil Action No. 4:21-cv-01997

143. Defendants' expert, Dr. Alford criticized Dr. Stein's EI analyses for the 2015, 2017, 2018, 2019, 2021, and 2022 elections, but only offered his own analysis of racially polarized voting for the 2023 and 2024 elections using the ei.MD.bayes application (i.e., "Bayesian" or RxC technique), a methodology that Dr. Stein used only for the 2024 election.[218]

---

[218]DX 8, pp. 3-7, esp. n. 1 (2023 election); DX 73, pp. 2-4 (2024 election).

144. According to Dr. Alford's analysis of the 2023 contest for
Position 1 between Anderson and Lopez, Anderson received 69%
of the non-Hispanic vote compared to 31% for Lopez, and Lopez
received 62% of the Hispanic vote compared to 38% for
Anderson.[219] Because his analysis found that neither candidate
received at least 75% of the Hispanic or the non-Hispanic
vote, Dr. Alford found no cohesiveness in the Hispanic vote,
and no evidence of racially polarized voting in this
election.[220]

145. According to Dr. Alford's analysis of the 2023 election for
Position 2 between Mahan and Downs, Mahan received 70% of the
non-Hispanic vote compared to 30% for Downs, and Downs
received 64% of the Hispanic vote compared to 36% for
Anderson. Because his analysis found that neither candidate
received at least 75% of the Hispanic or the non-Hispanic
vote, Dr. Alford found no cohesiveness in the Hispanic vote,
and no evidence of racially polarized voting in this
election.[221]

146. Although Dr. Alford criticizes Dr. Stein's failure to use the
EI RxC analysis for all but the 2024 trustee election, he
acknowledges that the results he obtained by analyzing the two
contested 2023 trustee elections using that method yielded an

---

[219]DX 8, p. 6.

[220]DX 8, pp. 5-7; 5RT75:16-80:7, 5RT83:1-15 (Alford).

[221]DX 8, pp. 5-7; 5RT75:16-80:7, 5RT83:16-20 (Alford).

"overall pattern [that] is very similar to the EI analysis of the estimated support provided by Anglo and Hispanic voters [found] by Dr. Stein in these two contests."[222]

147. In 2024 there were two trustee elections: a contested election between Slattery, Cone, Drews, and Hanson for Position 3; and an uncontested election in which Earnest sought reelection to Position 4.[223] Dr. Stein and Dr. Alford each analyzed the 2024 SBISD election using the ei.MD.bayes, Bayesian, or EI RxC technique. This technique differs from the EI technique that Dr. Stein used for other elections by categorizing voters into two groups: Hispanic and non-Hispanic as a means to improve confidence intervals.[224] The results obtained by Dr. Stein and Dr. Alford for the 2024 election are essentially the same.

148. In the Slattery/Cone/Drews/Hanson contest for Position 3, the winner, Slattery received a majority of the votes cast in every election precinct for a total of 4,470 representing 57% of the vote; Cone finished second with 2,610 votes representing 33% of the vote, Drews finished third with 651 votes representing 8% of the vote, and Hanson finished last with 118 votes representing 1% of the vote.[225]

---

[222]DX 8, p. 6.

[223]PX 136, p. 5; DX 72, pp. 1 and 4.

[224]PX 136, p. 5, 4RT53:23-54:2 (Stein); DX 8, pp. 5-7, 5RT90:3-91:21 (Alford).

[225]DX 72, pp. 1 and 4.

149. According to Dr. Stein's analysis, Slattery's mean share of the non-Hispanic vote was 61% compared to 33% for Cone, 5% for Drews, and less than 1% for Hanson, respectively.[226] Slattery's mean share of the Hispanic vote was 26%, compared to 24% for Cone, 29% for Drews, and 13% for Hanson, respectively.[227]    Based on these vote shares, Dr. Stein acknowledged that no candidate garnered more than 30% of the Hispanic vote.  Nevertheless, Dr. Stein found that these vote shares show racially polarized voting because

> [74%] of Hispanic voters preferred any candidate other than Slattery, the candidate supported by 61% of Non-Hispanic voters.  This shows that any candidate other than Slattery, including Drews, the most preferred candidate among Hispanic voters, was effectively barred from winning the Position 3 SBISD Trustee election by the electoral cohesiveness of the Non-Hispanic voters.[228]

150. Dr. Alford's analysis of the 2024 trustee election yielded results that are essentially the same as those obtained by Dr. Stein.  According to Dr. Alford's analysis, Slattery's mean share of the non-Hispanic vote was 58% compared to 34% for Cone, 7% for Drews, and 1% for Hanson, respectively.[229] Slattery's mean share of the Hispanic vote was 30%, compared to 26% for Cone, 35% for Drews, and 8% for Hanson,

---

[226]PX 136, p. 5.

[227]PX 136, p. 5.

[228]PX 136, p. 6.

[229]PX 136, p. 5.

respectively.[230]  But Dr. Alford found that

> [t]his election is not racially polarized, as
> in the absence of a cohesively supported
> preferred candidate of Hispanic voters, bloc
> voting by non-Hispanic voters cannot be said
> to be responsible for the defeat of the
> candidate preferred by minority voters.[231]

Moreover, as Dr. Alford noted, "according to Dr. Stein's estimates with only 29% of Hispanic voters supporting Drews, over 70% of Hispanic voters supported someone other than Drews."[232]

151.  The 2024 SBISD election showed an absence of cohesive voting, with no candidate receiving a significant enough share of the Hispanic vote to indicate a cohesive preference for any candidate by Hispanic voters.

152.  The court prepared Table 4 to summarize the results of the contested SBISD trustee elections held after this lawsuit was filed, i.e., 2022-2024.

---

[230]DX 73, p. 3; 5RT80:11-82:25 (Alford).

[231]DX 73, p. 3.

[232]DX 73, p. 4.

**Table 4:**

Contested Elections Held After Suit Was Filed Analyzed for Cohesion by Dr. Stein
(Percentages rounded to closest whole number)

| Year | Position | Candidates (Bold=Election Winner; *=Hispanic Preferred Candidate) | Total Votes Cast | Percentages of Total Votes | Mean Share of Anglo or Non-Hispanic Vote | Mean Share of Hispanic Vote |
|---|---|---|---|---|---|---|
| 2022 | Total # Voters: 13,901 of 101,816 Registered Voters = 13.65% | | | | | |
| | 5 | **Alpe**/Breed* | 9,068/4,429 | 67/33 | 76/25 | 3/93 |
| | 6 | **Perez**/Kaczenski*/Mafrige | 8,793/3,731/878 | 66/28/7 | 73/21/5[233] | 5/83/30 |
| | 7 | **Bennett**/Slattery*/Morace | 8,749/4,328/340 | 73/25/5 | 73/25/5 | 11/82/15 |
| 2023 | Total # Voters: 10,635 of 103,338 Registered Voters = 10.29% | | | | | |
| | 1 | **Anderson**/Lopez* | 7.091/3,498 | 67/33 | Stein (Anglo): 81/16 | Stein: 3/90 |
| | | | | | Alford (Non-Hispanic): 69/31 | Alford: 38/62 |
| | 2 | **Mahan**/Downs* | 7,197/3,367 | 68/32 | Stein (Anglo): 85/17 | Stein: 3/85 |
| | | | | | Alford (Non-Hispanic): 70/30 | Alford: 36/64 |
| 2024 | Total # Voters: 7,959 of 106,224 Registered Voters = 7.49% | | | | | |
| | 3 | **Slattery**/Cone/Drews*/Hanson | 4,470/2,610/651/118 | 57/33/8/1 | Stein (Non-Hispanic): 61/33/5/1 | Stein: 26/24/29/14 |
| | | | | | Alford (Non-Hispanic): 58/34/7/1 | Alford: 30/26/35/8 |

---

[233]Dr. Stein's EI percentages may total above or below 100 because these estimates were calculated for multiple racial/ethnic groups, resulting in more than one possible classification for some voters. See 4RT53:21-55:7 (Stein). See also PX 125 (Caesar/Lezama); PX 127 (Earnest/Elizondo); PX 128 (Alpe/Breed); PX 129 (Perez/Kaczenski/Mafrige); PX 130 (Bennett/Slattery/Morace). Dr. Alford has acknowledged that the EI analysis used by Stein produces estimates of vote distribution often fails to sum to 100. See DX 8, pp. 5-6 & n. 1.

            b.    Plaintiff Established by a Preponderance of
                  the Credible Evidence that the Hispanics in
                  SBISD are Politically Cohesive

153. The court prepared Table 5 to summarize the contested
     elections analyzed for evidence of statistically significant
     racially polarized voting.

| Year | Position | Anglo Preferred Candidate | Mean Share of Anglo Vote | Hispanic Preferred Candidate | Mean Share of Hispanic Vote |
|------|----------|---------------------------|--------------------------|------------------------------|-----------------------------|
| 2015 | 3 | Dawson | 88% | Adams | 98% |
| 2015 | 4 | Vierra | 86% | Elizondo | 92% |
| 2017 | 2 | Gonzalez | 75% | Gonzalez | 91% |
| 2018 | 3 | Caesar | 54% | Lezama | 99% |
| 2019 | 5 | Breed | 75% | Lopez | 98% |
| 2021 | 4 | Earnest | 66% | Elizondo | 93% |
| 2022 | 5 | Alpe | 76% | Breed | 93% |
| 2022 | 6 | Perez | 73% | Kaczenski | 83% |
| 2022 | 7 | Bennett | 73% | Slattery | 82% |
| 2023 | 1 | Anderson | 81% Stein 69% Alford | Lopez | 90% Stein 62% Alford |
| 2023 | 2 | Mahan | 85% Stein 70% Alford | Downs | 85% Stein 64% Alford |

154. The only election that did not reflect statistically
     significant evidence of racially polarized voting was the 2017
     election when the Hispanic-preferred candidate, Chris
     Gonzalez, an Anglo woman with a Hispanic surname, was also the
     Anglo-preferred candidate.

155. Although Dr. Alford testified that the margins of error in Dr. Stein's analyses are so large that it is statistically difficult to say which candidate was preferred by Hispanic voters,[234] he also testified that when he conducted his own analysis of SBISD elections held between 2012 and 2021 — an analysis that was neither related to this lawsuit nor presented at trial — he identified as the Hispanic preferred candidates for the 2015 - 2021 elections, the same candidates identified by Dr. Stein, i.e., Dr. Elizondo in 2015, Gonzalez in 2017, Lezama in 2018, Lopez in 2019, and Dr. Elizondo again in 2021.[235]

156. Like Dr. Stein, Dr. Alford identified Lopez and Downs as the Hispanic preferred candidates in SBISD's two contested elections held in 2023.[236]

157. Dr. Alford's results differed from Dr. Stein's results for the 2023 elections only in the value of the mean shares of the Anglo and Hispanic votes that he attributed to each of the Anglo- and Hispanic-preferred candidates.[237]

158. The difference in the values of the mean vote shares attributed to these Anglo- and Hispanic-preferred candidates by Drs. Stein and Alford is attributable to the different

---

[234]5RT82:2-22, 87:2-5 (Alford).

[235]5RT132:21-136:11 (Alford).

[236]DX 8, p. 6; 5RT88:2-89:24 (Alford).

[237]5RT83:1-25 (Alford).

methods that they used for calculating Hispanic votes.
Dr. Alford analyzed the data for two groups (Hispanics and
Non-Hispanics), while Dr. Stein analyzed the data for five
groups (Hispanics, Anglos, Blacks, Asians, and others).[238]

159. Dr. Alford criticized Dr. Stein's analysis of the data for
five groups as having the effect of exaggerating Hispanic
support and under reporting non-Hispanic support,[239] but the
court finds Dr. Stein's approach preferable because it allows
comparison between minority Hispanic voters and majority Anglo
voters and because, as Dr. Stein testified, "there is some
divergence among African Americans, Asians, and other ethnic
groups in the [SBISD]."[240]

160. Dr. Alford also criticized Dr. Stein's analysis for finding
political cohesion at levels of less than 75% of the vote,[241]
but as presented in PX 135 and Table 5, Dr. Stein found the
mean vote shares attributable to the Hispanic preferred
candidates to range from 82% to 99%. All of Dr. Stein's
findings are thus well above the 75% that Dr. Alford opines
is required to find politically cohesive voting.

---

[238]PX 2, pp. 1-12; DX 8, pp. 5-6 & n. 1.

[239]DX 8, p. 5 n. 1; 5RT93:25-94:5 (Alford).

[240]4RT54:8-10 (Stein).

[241]5RT77:13-80:7; 86:22-87:5 (Alford).

161. Dr. Alford testified that if the court accepts Dr. Stein's EI analyses as reliable, the court would see cohesive voting on the part of Hispanics.[242]

162. Because Dr. Stein's method of analysis allows comparison between minority Hispanic voters and majority Anglo voters, the court finds Dr. Stein's analyses and identification of the Hispanic preferred candidates, and the mean vote shares attributable to those candidates, which range from 82% to 99%, to be reliable evidence that SBISD's Hispanic voters are politically cohesive.

163. The evidence at trial also showed that the Hispanic preferred candidates emphasized the same or similar issues in their campaigns, i.e., previous community involvement with the SBISD, and the need to improve academic outcomes for students attending schools located north of I-10 where the academic performance is relatively poor and the majority of students are Hispanic and economically disadvantaged.[243]

164. The court finds that Hispanics in SBISD are politically cohesive and vote as a bloc for Hispanic-preferred candidates that share a single political "platform" of common goals and common means by which to achieve them.

---

[242]5RT131:9-23 (Alford).

[243]PX 62; PX 82; 2RT175:2-176:24, 180:19-181:22 (Elizondo); PX 52; PX 53; PX 58; PX 59; PX 60; 3RT102:11-104:10, 106:10-107:19 (Lopez); PX 47; 3RT135:19-139:21 (Lezama).

   c.  Plaintiff Established by a Preponderance of
       the Credible Evidence that Anglos Vote
       Sufficiently as a Bloc to Enable Them To
       Defeat Hispanic Voters' Preferred Candidates

165. PX 137 summarizes the results of the 2015-2024 SBISD Trustee
     Elections and reflects that the Hispanic-preferred candidate
     lost every election except for one – the 2017 election where
     Chris Gonzalez, a non-Hispanic candidate with a Hispanic-
     surnamed was preferred by both Hispanic and Anglo voters.

| 2015-2024 SBISD Trustee Elections and Hispanic-Preferred Candidate Results | | |
|---|---|---|
| **Election** | **Result** | **Hispanic-Preferred Candidate Win or Lose** |
| 2015 | Vierra v. Elizondo* <br> Dawson v. Adams* | Lose <br> Lose |
| 2017 | Gonzales* v. Mettenbrink | Win |
| 2018 | Caesar v. Lezama* | Lose |
| 2019 | Breed v. Lopez* | Lose |
| 2021 | Earnest v. Elizondo* | Lose |
| 2022 | Alpe v. Breed* <br> Perez v. Kaczenski*/Mafrige <br> Bennett v. Slattery*/Morace | Lose <br> Lose <br> Lose |
| 2023 | Anderson v. Lopez* <br> Mahan v. Downs* | Lose <br> Lose |
| 2024 | Slattery v. Drews*/Cone/Hanson | Lose |
| **Defeat rate for Hispanic-Preferred Candidates 2015-2024** = 11 losses/12 elections = **91.66%** <br> HISPANIC-PREFERRED CANDIDATES MARKED WITH AN ASTERISK (*) | | |

PX137                                                                                                                1

PLAINTIFF'S
EXHIBIT
137
Civil Action No. 4:21-cv-01997

.

166. As presented in PX 135 and Table 5, Dr. Stein calculated the mean vote for the Anglo preferred candidates to range from 54% to 88%. Because as stated in ¶ 162, above, Dr. Stein's method of analysis allows comparison between Anglo and Hispanic voters, the court finds Dr. Stein's analyses and identification of the Anglo preferred candidates, and the mean vote shares attributable to those candidates to be reliable evidence that SBISD's Anglo voters are politically cohesive.

167. The evidence at trial showed that the Anglo preferred candidates have emphasized the same or similar issues in their campaigns, i.e., "conservative values" on issues such as taxes, teacher unions, COVID regulations, "parental choice," "woke" ideology in the classroom, "critical race theory," and sexually explicit books in school libraries.[244]

168. The evidence at trial established that the Anglo vote was sufficient to defeat the combined strength of the Hispanic vote and the crossover vote that Hispanic preferred candidates received from Anglo voters. In 2018 Lezama lost despite receiving 99% of the Hispanic vote and 35% of the Anglo vote. In 2019 Lopez lost despite receiving 98% of the Hispanic vote and 25% of the Anglo vote. In 2021 Dr. Elizondo lost despite receiving 93% of the Hispanic vote and 34% of the Anglo vote.

---

[244] 4RT121:9-123:23 (Earnest); 5RT28:18-31:19 (Perez); 5RT58:23-62:1 (Anderson).

Moreover, in the 2022 and 2023 elections Anglo preferred candidates Alpe, Perez, Bennett, Anderson, and Mahan received over 50% of the total vote from the three majority Anglo precincts located south of I-10: 44, 46, and 47.

169. The court finds that in SBISD Anglos not only vote cohesively, but that they vote sufficiently as a bloc to enable them, in the absence of special circumstances, to defeat the Hispanic voters' preferred candidates.

170. Without disputing that Anglo bloc voting in SBISD is statistically significant, SBISD contends that the Anglo bloc voting is not legally significant because "a general finding regarding the existence of any racially polarized voting, no matter the level, is not enough."[245] Asserting that "courts must look into the root cause of any statistically significant polarized voting to determine if it is also legally significant,"[246] SBISD contends that "the evidence at trial strongly supports a finding that partisan politics, not race, explains the results of the SBISD elections."[247]

171. SBISD trustee elections are non-partisan; no party affiliation is listed on the ballot.[248]

---

[245]Defendants' Post-Trial Brief on Issues Raised by the Court, Docket Entry No. 120, p. 4.

[246]Id. at 5.

[247]Id. at 6.

[248]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 14; 4RT60:14-16 (Stein); 5RT113:16-18, 115:22-116:19 (Alford).

172. While Defendants' expert, Dr. Alford, opined on the role of partisan politics in the outcome of SBISD elections, neither he nor Plaintiff's expert, Dr. Stein, analyzed the role of partisan politics in SBISD elections.[249]

173. There was no evidence that partisans of any political party participated in or influenced SBISD trustee elections before 2021, when the Republican Party of Texas publicly announced an intention to influence local, "non-partisan" elections, including especially, school board elections.[250]

174. The evidence at trial showed that from 2021 through 2024 some, but not all, candidates seeking election to the SBISD board of trustees received partisan endorsements: in 2021 Earnest, the winner of the Position 4 seat received Republican Party endorsement;[251] in 2022 Breed, a Republican incumbent, lost reelection to the Position 5 seat after receiving, but failing to disavow, endorsement from the Democratic Party,[252] and Perez, who won election to the Position 6 seat, was endorsed by the Republican Party while his opponent, Kaczenski, was endorsed by the Democratic Party.[253]   In 2023 Republican

---

[249]See DX 8, p. 7, 5RT113:16-118:10 (Alford); 4RT68:3-70:20 (Stein).

[250]DX 6; 4RT68:23-70:11 (Stein); 5RT113:19-115:25 (Alford).

[251]4RT108:8-15 (Earnest).

[252]4RT114:18-115:12 (Earnest).

[253]5RT30:14-23 (Perez).

Senator Ted Cruz endorsed candidates Anderson and Mahan, who won election for the Position 1 and 2 seats, respectively.[254]

175. The evidence at trial showed that throughout the last decade the Hispanic- and Anglo-preferred candidates have emphasized different issues in their campaigns; Hispanic-preferred candidates have emphasized their previous community involvement with SBISD, and have focused on the need to improve academic outcomes for students, particularly in Hispanic-majority and economically-disadvantaged schools with poorer academic performance, while Anglo-preferred candidates have emphasized "conservative values" on issues such as taxes, teacher unions, COVID regulations, "parental choice," "woke" ideology in the classroom, "critical race theory," and sexually explicit books in school libraries.[255]

176. The court finds that the differences in substantive issues that the Hispanic and Anglo preferred candidates have emphasized are not strictly partisan political issues.

177. The court finds that the racial polarity evidenced in SBISD trustee elections is not primarily attributable to partisan politics.

---

[254] 3RT:128:24-129:19 (Lopez).

[255] Compare PX 62; PX 82; 2RT175:2-176:24, 180:19-181:22 (Elizondo); PX 52; PX 53; PX 58; PX 59; PX 60; 3RT102:11-104:10, 106:10-107:19 (Lopez); and PX 47; 3RT135:19-139:21 (Lezama) with 4RT121:9-123:23 (Earnest); 5RT28:19-31:19 (Perez); 5RT58:23-62:1 (Anderson).

C.  **Plaintiff Established by a Preponderance of the Credible Evidence that Senate Factors 2, 5, and 7 Weigh in Favor of Finding a Violation of the Voting Rights Act**

   i.   <u>Senate Factor 1: the Extent of Any History of Official Discrimination in the State or Political Subdivision That Touched the Right of Hispanics to Register, Vote, or Otherwise Participate in the Democratic Process.</u>

178. Professor Andres Tijerina, a historian and expert witness retained by the Plaintiff who specializes in the history of discrimination against Tejanos and Hispanics in Texas, detailed the extensive history of discrimination against Hispanics in Texas and Harris County, but not in SBISD.  *See* Report of Andres Tijerina, Ph.D., ("Tijerina Report")(PX 5).[256]

179. In the distant past, Texas had segregated school systems in which Anglo and Hispanic children were taught at separate schools,[257] but there is no evidence that SBISD ever had such segregated schools.[258]

180. In the distant past, Texas residents were segregated either by the establishment of Mexican towns where Hispanics lived miles away from their Anglo neighbors, or by the establishment of exclusively Hispanic enclaves or "barrios" created by the use of devices such as zoning ordinances, restrictive covenants, and development standards requiring small lot sizes, low home costs, and size covenants, which led to overcrowding and poor living conditions.[259]

---

[256]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 46.

[257]PX 5, pp. 22-25; 2RT74:14-81:10 (Tijerina).

[258]2RT107:5-108:3 (Tijerina).

[259]PX 5, pp. 16-21; 2RT75:11-81:10 (Tijerina).

181. The Memorial Villages on the south side of I-10 are subject
to strict zoning ordinances requiring large lots and homes
that Hispanics generally could not afford; while north of I-10
are apartments and smaller lots that Hispanics could more
easily afford.[260]

182. SBISD admits that in the four election precincts and middle
school enrollment districts located north of I-10, the student
population is overwhelmingly Hispanic, averaging
approximately 87 percent of the students in those areas. In
the remaining three election and middle school enrollment
districts located primarily south of I-10, the student bodies
are between 42 and 52 percent Anglo.[261] Moreover, a greater
proportion of SBISD's Hispanic students are economically
disadvantaged than are its Anglo students.[262]

183. Plaintiff cites findings from a 2024 report of the American
Bar Association Commission on Hispanic Legal Rights and
Responsibilities, "Latinos in the United States," as evidence
that

> ➤ **Education** — Latino children often face a
> segregated educational system where they
> attend schools with insufficient resources to
> meet their needs.

---

[260]2RT81:15-17 (Tijerina). <u>See also</u> Docket Entry No. 118
(Plaintiff's Request that Court Take Judicial Notice of
Adjudicative Facts regarding land use ordinances of Hunters Creek
Village, Bunker Hill Village, Piney Point Village, Hedwig Village
and Spring Valley Village).

[261]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 48. <u>See
also</u> PX 1, pp. 9-10; PX 105.

[262]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 48.

➤ **Labor and Employment** — Hispanics experience higher unemployment rates, lower wages, harmful working conditions, and persistent workplace discrimination,

➤ **Health and Wellness** — Latinos have limited access to health insurance, which is compounded by language, cultural, technological, and other unique barriers to quality and accessible healthcare.

➤ **Housing and Credit** — Hispanics experience disproportionate rates of homelessness, discriminatory lending, neighborhood segregation and unequal housing opportunities.

➤ **Voting Rights** — Latino voters are subjected to suppression and harassment, purged from registration rolls, and have their vote diluted by redistricting and gerrymandering efforts.

➤ **Criminal Justice** — Hispanics are unfairly profiled by police, subjected to increased rates of incarceration and routine acts of hate, and forced to pay discriminatory fines and fees in the criminal justice system.[263]

But because nothing in this report discusses Houston or SBISD, it is of limited evidentiary value.[264]

184. Although Dr. Tijerina presented evidence of historic discrimination against Hispanics in Texas and Harris County, he presented little evidence of **recent** discrimination against Hispanics, and no evidence of discrimination against Hispanics by the SBISD.[265]

---

[263]PX 138, p. xv; 2RT91:15-93:24 (Tijerina).

[264]2RT122:2-9 (Tijerina).

[265]PX 5; 2RT72:10-94:16 (Tijerina).

185. Plaintiff presented no evidence of recent discrimination in SBISD. All of Plaintiff's evidence of discrimination involves other government entities, and most of these events occurred many years ago, and are not probative of current conditions.

186. There is no evidence that SBISD ever segregated schools or discriminated against students on the basis of race or ethnicity. Apart from the current allegations concerning SBISD's at-large election system, there is no evidence that any history of official discrimination in Texas or in SBISD has touched the right of Hispanics in SBISD to register, to vote, or otherwise to participate in the democratic process.

    ii.  <u>Senate Factor 2: The extent to which voting in government elections is racially polarized.</u>

187. Dr. Stein's analyses and testimony as found in § II.B.ii, above, establishes that throughout the last decade, voting in SBISD trustee elections has evidenced statistically and legally significant racially polarized in all elections except those held in 2017 and 2024.[266]

188. Defendants contend that the reasons for the racial polarity evidenced in SBISD trustee elections is best attributed to "partisan politics, not to race,"[267] but for the reasons stated in ¶¶ 79-80, 89-90, 99-100, 106-07, 116, 123-25, 134-35, 140-41, 170-77, the court finds that the reasons for the racial polarity in SBISD trustee elections is best attributed to race, not to partisan politics.

_____

[266]PX 1; PX 2; PX 3; PX 4; PX 136; PX 122; PX 123; PX 124; PX 125; PX 126; PX 127; PX 128; PX 129; PX 130; PX 131; PX 132; PX 135; PX 137; 4RT17:21-102:1 (Stein).

[267]Defendants' Post-Trial Brief on Issues Raised by the Court, Docket Entry No. 120, p. 6.

iii. <u>Senate Factor 3: The extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group.</u>

189. Plaintiff contends that the SBISD's staggered election system enhances the opportunity for discrimination against Hispanics.

190. Texas law permits staggered elections, and there is no evidence that the SBISD's staggered elections enhance the opportunity for discrimination against Hispanics.  In fact, this practice permits more, rather than less, participation in elections by Hispanic voters.  Under a single-member district system, voters would only be allowed to vote for **one** as opposed to all seven trustee seats, as is allowed under the current system.  Moreover, while voters are currently allowed to vote in SBISD elections every year, under a single-member district system, voters would only be permitted to vote in SBISD elections once every three years, when their particular district representative's term expired.

191. Citing the deposition testimony of Karen Heeth ("Heeth"), and a survey of SBISD high school principals conducted before her deposition,[268] Plaintiff contends that SBISD's failure to fully comply with Texas Election Code § 13.046 enhances the opportunity for discrimination against Hispanics.  Texas Election Code § 13.046 requires high school principals or their designees to act as deputy registrars to facilitate voter registration for students who are 18 or will be 18 years of age or older by distributing materials twice a year.[269]

---

[268] 4RT13:20-17:4 (Heeth); PX 17.

[269] 4RT13:20-17:4 (Heeth); PX 17.

192. Although Heeth testified that responses to a survey about compliance with Texas Election Code § 13.046 taken by SBISD high school principals did not reflect full or uniform compliance on each campus,[270] the testimony of SBISD corporate representative Porter established that SBISD is in substantial compliance with the requirements of Texas Election Code § 13.046,[271] and that in high schools located north of I-10, "there is a very focused intent to ensure that students are aware of the registration possibilities in order to vote."[272]

193. There was no evidence of discriminatory intent or effect from SBISD's failure to fully or uniformly comply with the requirements of Texas Election Code § 13.046, and no evidence that this failure impacted SBISD elections or enhanced the opportunity for discrimination against Hispanics in the SBISD.

194. Plaintiff contends that in 2012 SBISD enhanced the opportunity for discrimination against Hispanics by reducing the number of election day voting locations from 25 elementary schools to seven middle schools, and that the reduction in the number of voting locations required Hispanic voters to travel longer distances to reach voting locations.[273]

195. While the reduction of election day voting locations from 25 to 7 required some voters to travel longer distances to vote, there was no evidence of discriminatory intent or effect from this change, and no evidence that this change enhanced the opportunity for discrimination against Hispanics in the SBISD.

---

[270] 4RT16:21-17:4 (Heeth).

[271] 3RT192:21-196:6 (Porter); PX 17.

[272] 3RT196:4-6 (Porter).

[273] 1RT78:22-81:11 (Klussmann); 2RT143:4-144:2 (Barnes); 2RT186:14-22 (Elizondo); 3RT197:16-199:1 (Porter).

196. Plaintiff contends that SBISD's early voting practices enhanced the opportunity for discrimination against Hispanics by limiting weekend voting hours, by placing early voting locations solely within majority Anglo communities, and by failing to place early voting locations in areas where a majority of Hispanic voters live or have ready access via public transportation.[274]

197. The evidence at trial established that before 2012 voter turnout was very low and SBISD had only one early voting location at the SBISD administration building,[275] but that as voter turnout increased, the SBISD added early voting locations on its own initiative and in response to request from Hispanic voters.[276]

198. There are now three early voting locations on SBISD's south side, and three on the north side; and early voting occurs for an eight day period from 7:00 a.m. to 7:00 p.m. on weekdays and for half a day on Saturday.[277]

199. There was no evidence of discriminatory intent or effect from SBISD's placement of early voting locations or their hours of operation, and no evidence that SBISD's early voting practices enhance the opportunity for discrimination against Hispanics in the SBISD.

---

[274]PX 110; 1RT81:12-83:11 (Klussmann); 2RT139:21-141:3 (Barnes); 2RT184:23-186:22 (Elizondo); 3RT107:24-108:11, 112:20-113:18, 117:12-16 (Lopez); 3RT171:12-14 (Cabrera); 3RT201:9-206:15 (Porter); 4RT125:6-131:19 (Earnest); 5RT35:22-36:22 (Perez); 5RT66:24-68:14 (Anderson).

[275]3RT201:10-20 (Porter).

[276]See § II.A.iii, above, ¶¶ 33-37.

[277]Docket Entry No. 99, ¶ 50; 3RT204:5-6; 206:9-207:15 (Porter).

      iv.   <u>Senate Factor 4: If there is a candidate slating process, whether the members of the minority have been denied access to that process.</u>

200. Plaintiff has not presented any evidence that Hispanics have been denied access to a candidate slating process.

      v.   <u>Senate Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.</u>

201. In SBISD a strong and consistent correlation exists between socioeconomic welfare and race or ethnicity. Hispanic voters, including those in the proposed illustrative District 1, are more likely to be economically disadvantaged than their Anglo peers.[278]

202. A majority of the SBISD's Hispanic population, including the population of proposed illustrative District 1, share common socio-economic characteristics: they are primarily Hispanic; they have relatively high employment rates (primarily in service industries such as restaurants, construction, yardwork, and housekeeping, including in hotels), but limited or depressed incomes (<u>i.e.,</u> a median family income of $28,000 per year), and in some cases they work multiple jobs to make ends meet; 85% of the population primarily speaks Spanish at home; more than 60% of the population older than 19 years of age has not completed high school; more than 53% of the

---

[278]PX 103; PX 105; PX 106; PX 107; 1RT35:13-24, 49:15-52:20, 59:22-61:16 (Klussmann); 2RT41:5-42:12 (Shaddix); 2RT125:15-126:22, 130:17-131:4, 134:3-140:24 (Barnes).

population does not have access to health care; many live in multi-family apartment buildings; and those who rely on public transportation face long bus rides to go anywhere within the Spring Branch area.[279]

203. The schools attended by Hispanic children in SBISD are heavily segregated by ethnicity, economic status, and academic achievement.[280]

204. SBISD does not dispute the existence of racial disparities cited by the Plaintiff, but SBISD did not create, promote, or fail to address those disparities.

   vi.   <u>Senate Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals.</u>

205. There was no evidence that SBISD elections have been characterized by overt or subtle racial appeals. Chris Earnest testified that when he ran against Dr. Elizondo in 2015, he did not hear any overt or subtle racial remarks about Dr. Elizondo.[281] David Lopez did not testify about any racial remarks made to him.[282]

---

[279]2RT130:17-131:4, 134:3-140:24 (Barnes).

[280]PX 1, pp. 9-10; PX 5, pp. 4, 30-39; PX 103; PX 105; PX 106; PX 107.

[281]4RT113:6-11 (Earnest).

[282]Noel Lezama testified that **after** his election was over, he received a crude letter from an unknown person of an unknown race, from an unknown address, for unknown reasons. But this letter does not qualify as a racial "appeal" because it was not made by a candidate for office (such as Lezama's opposing candidate making a "dog whistle" argument). PX 48-49; 3RT153:22-154:7 (Lezama).

206. To the extent there was any evidence of overt racial appeals, those appeals were made by Hispanic candidates such as Lezama, whose election materials emphasized his background as a Hispanic immigrant who had successfully passed through SBISD schools,[283] and Lopez whose election materials emphasized that he lived and worked in the most northern part of the SBISD

> where the vast majority of Latinx, economically disadvantaged, and undocumented students live. Currently all 7 board members are white, high net worth individuals with little to no ties to any community North of I-10. There is a representation issue in this district. 75% of the school district student population are students of color and 34% are considered English Language Learners and the all at-large seat structure of the board leads to a highly disenfranchised population in the district.[284]

vii. <u>Senate Factor 7: The extent to which minorities have been elected to public office in the jurisdiction.</u>

207. Before the May 2022 election, which occurred during the pendency of this litigation, to SBISD's knowledge, no person of color had ever been elected a trustee in SBISD.[285]  The first person of color was elected to the SBISD board in 2022, and that person, John Perez, is an affluent chemical engineer who resides south of I-10, whose children attend south-side schools, who was one of three candidates endorsed by conservative political action committees, and who was not the preferred candidate of the Hispanic voting population.[286]

---

[283]PX 47.

[284]PX 53; 3RT103:8-104:22 (Lopez).

[285]Agreed Stipulation of Facts, Docket Entry No. 99, ¶ 45.

[286]5RT5:9-14, 24:7-8, 28:6-15, 31:20-32:24, 38:19-39:22 (Perez).  <u>See also</u> PX 3, pp.3-4; PX 129; PX 135; PX 137.

208. Perez's election does not negate a history of racially-polarized voting, especially when, as is the case here, he was not the preferred choice of the Hispanic community. As stated in the Senate Report:

> The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the [minority] vote', in violation of this section. If it did, the possibility exists that the majority citizens might evade the section _e.g._, by manipulating the election of a 'safe' minority candidate. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution.

S. Rep. at 29 n. 115. (quoting <u>Zimmer v. McKeithen</u>, 485 F.2d 1297, 1307 (5th Cir. 1973), <u>aff'd sub nom</u> <u>East Carroll Parish School Board v. Marshall</u>, 96 S. Ct. 1083 (1976)).

209. Minority-preferred candidates have never been successful in trustee elections in SBISD, except in a single isolated instance in 2017 when Hispanic and Anglo voters preferred the same candidate, Chris Gonzalez, an Anglo with a Hispanic surname.[287]

---

[287]PX 1;PX 2;PX 3;PX 4;PX 136; PX 122; PX 123; PX 124; PX 125; PX 126; PX 127; PX 128; PX 129; PX 130; PX 131; PX 132; PX 135; PX 137; 4RT17:21-102:1 (Stein).

D.  **The Parties Failed to Establish by a Preponderance of the Credible Evidence that Additional Considerations Weigh For or Against Finding a Violation of the Voting Rights Act**

    i.  <u>Plaintiff Failed to Establish a Significant Lack of Responsiveness on the Part of SBISD Elected Officials to the Particularized Needs of the Hispanic Community</u>

210. Plaintiff points to closures of three elementary schools and the SKY Partnership program at two middle schools and one high school the north of I-10 as evidence of discrimination against Hispanics in SBISD.[288]

211. SBISD's witnesses testified that the schools that were closed were well under capacity, serving far fewer students than possible, and therefore, that consolidating campuses made financial and educational sense in light of a $35,000,000-$40,000,000 budget shortfall.[289]

212. While one of Plaintiff's witnesses testified that closure of the SKY Program took resources away from north side schools that attracted students from across the district,[290] there was no evidence that the school closures adversely impacted and Hispanic students or parents.

213. Plaintiff points to one act of non-race-based vandalism at a north side school to substantiate her contention that the SBISD is not responsive to the needs of Hispanic students.[291] But there was no evidence of who committed this vandalism or

---

[288]PX 139; 1RT75:24-78:15 (Klussmann); 2RT47:24-53:24 (Shaddix); 3RT223:16-233:21 (Porter).

[289]3RT230:10-233:21 (Porter); 5RT25:25-27:16 (Perez).

[290]2RT42:21-45:4 (Shaddix); 3RT145:18-146:17 (Lezama).

[291]PX 46; PX 76; 3RT145:18-146:17 (Lezama).

why, or that the SBISD knew about the vandalism before it was reported.   Nor was there any evidence that SBISD failed to address and abate the vandalism within a reasonable period of time.[292]  Absent evidence that the vandalism was not addressed and abated, or that an unreasonable amount of time passed before SBISD addressed and abated the vandalism, the failure to address an issue as quickly as some would have liked is not evidence of discrimination.

214. As additional evidence that the SBISD has not been responsive to the needs of Hispanic students, Dr. Elizondo pointed to SBISD's failure and refusal to acknowledge, investigate, or take any specific remedial action to redress objective evidence that the SBISD's Alternative Education Program (DAEP) administered disparate discipline to Hispanic and African American children than to Anglo children.[293]

215. In 2019 a parents group identified as the Coalition of Advocates for Restorative Education (CARE) gathered and reported disciplinary statistics from a report titled "Racial Disparity in Harris County Independent School Districts," prepared by the  Center for  Justice Research at Texas Southern University (the "TSU Center"), which showed that the SBISD DAEP program administered disparate discipline to Hispanic and African American children.[294]

---

[292]The only complaint was that SBISD did not respond to the vandalism as quickly as some would have liked.   3RT145:18-146:17 (Lezama).

[293]PX 14; 3RT55:17-58:23 (Craft); 3RT63:3-82:4, 92:15-94:21 (Rodney).

[294]PX 14.

216. Plaintiff's witness Roy Rodney ("Rodney") testified that SBISD received the CARE's report and made changes to its policies as a result of his advocacy.[295]  For example, SBISD responded by taking a number of affirmative actions, including but not limited to developing a system for transferring student assignments to the DAEP, offering additional transition services to DAEP students; extending summer programs to DAEP students; providing hot meals – breakfast and lunch–to DAEP students; focusing on positive behavioral supports; implementing a drug/alcohol abuse prevention program;[296] and, allowing for an early exit from DAEP for good behavior.[297]

217. Plaintiff points to a request that the SBISD Modify its At Large Electoral System made by the Somos advocacy group, as evidence that the District has been unresponsive to citizen requests.[298]  The request was made on October 4, 2021,[299] almost six months after this lawsuit was filed on June 18, 2021,[300] and included requests to add an early voting location and change the cites of two other early voting locations.[301]

---

[295]3RT84:23-85:3 (Rodney).

[296]See PX 14 at p. 29-31; 3RT85:6-86:8 (Rodney).

[297]3RT90:6-91:1 (Rodney).

[298]PX 77, pp. 1-2; 3RT114:16-117:19 (Lopez).

[299]PX 77, p. 1.

[300]See Plaintiff's Original Complaint for Declaratory Judgment and Injunctive Relief, Docket Entry No. 1.

[301]PX 77, pp. 3-4.

218. Before the 2021 election SBISD had received no complaints about early voting locations.[302] Upon receipt of these requests, SBISD added a fifth early voting location north of I-10 in the Spring Oaks Middle School zone.[303] In 2023 the District added a sixth early voting location north of I-10 between Northbrook Middle School and Spring Woods Middle School.[304] Today, there are three early voting locations on SBISD's south side, and three on the north side.[305]

219. SBISD has been responsive to the needs of the Hispanic community in at least the following ways:

- Adopting and implementing a robust bi-lingual program for Spanish speaking students to learn English and succeed in school,[306] that has allowed SBISD's schools with large populations of economically disadvantaged Hispanic students to show marked improvement in state accountability ratings.[307]

- Making changes to disciplinary policies upon request.[308]

- Inviting Hispanic members of the community – including Plaintiff and candidate Noel Lezama - to participate in the LEAD SBISD Program.[309]

---

[302]3RT203:22-204:13 (Porter).

[303]3RT204:14-21 (Porter).

[304]3RT205:3-8 (Porter).

[305]3RT206:9-207:18 (Porter).

[306]3RT13:24-19:16 (Craft).

[307]3RT31:1-11 (Craft).

[308]3RT83:24-85:16 (Rodney); PX 14.

[309]3RT154:8-24 (Lezama); 2RT176:17-24 (Elizondo).

- Using financial bond packages to prioritize improvements to facilities north of I-10.  Of the 13 schools that were replaced, 8 were on the north side.  Plaintiff's witness, Dr. Klussmann, called the 2007 bond the "most equitable bond program probably in the history of [SBISD]."[310]

- Inviting Hispanic community members – including Plaintiff and Noel Lezama - to serve on the SBISD's bond committees.[311]

220. Plaintiff has failed to present evidence that there is a significant lack of responsiveness on the part of SBISD elected officials to the particularized needs of SBISD's Hispanic community.


ii.   Plaintiff Failed to Establish by a Preponderance of the Credible Evidence that the Policy Underlying the SBISD's At-Large Election System is Tenuous

221. The SBISD at-large election system is specifically allowed by Texas law.  The vast majority of school districts in Texas have at-large election systems.[312]

222. Many local governments transitioned from single-member district election systems to at-large election systems around the turn of the 20th century to end corruption and prevent cronyism.[313]  Single member district systems can promote territorial representation as elected officials seek benefits

---

[310]1RT100:1-11 (Klussmann).

[311]2RT205:6-12 (Elizondo); 3RT154:18-24 (Lezama).

[312]3RT199:2-10 (Porter); 5RT99:8-9 (Alford).  See also PX  66.

[313]5RT99:12-25 (Alford).

only for their precinct, while ignoring the good of all constituents.[314] By contrast, at-large systems suppress pork-barrel spending because officials are beholden to all voters, not just those from a small area.[315] Under the present at-large system SBISD trustees are accountable to the voters in every middle school precinct; a single-member district system would change that, even though SBISD is not a large territorial area.[316] The at-large system also allows voters to vote for every SBISD trustee position, every year, while a single-member district system would allow voters to vote for only one trustee place every three years.[317]

223. Plaintiff has advanced policy reasons for adopting a single-member district election system, such as ensuring that members of SBISD's Hispanic minority have an opportunity to be represented as required by law and Texas voters' rights,[318] allowing Hispanic voters' preferences to be better reflected in the election results,[319] and increasing the likelihood that Hispanic-preferred candidates will run for positions on the SBISD Board or Trustees.[320]

---

[314] 5RT99:12-25 (Alford).

[315] 4RT71:15-20 (Stein).

[316] 4RT116:17-117:14 (Earnest).

[317] 5RT52:12-20 (Anderson).

[318] 3RT222:17-22 (Porter).

[319] 3RT222:23-223:2 (Porter).

[320] 3RT223:3-6 (Porter).

224. But Plaintiff has failed to present any evidence that SBISD's use of an at-large electoral system is tenuous, and this court is not charged with determining what would be the "best" electoral system for SBISD.

iii. <u>Texas Education Code § 11.052 Does Not Offer Plaintiff a Viable Means to Change SBISD's Election System</u>

225. SBISD has incorporated into its Board Policy BBB (LEGAL) Texas Education Code § 11.052, which authorizes at least 15 percent or 15,000 registered voters in the school district, whichever is less, to petition the board of trustees to put a proposition on the ballot to change the manner of electing school board trustees.[321]

226. SBISD's Board of Trustees has never received a petition pursuant to Texas Education Code §11.052(e) and/or SBISD Policy BBB (LEGAL) and, as a result, SBISD has never placed on the ballot a proposition to change the manner of electing school board trustees.[322]

227. Plaintiff has no obligation to pursue the petitioning process authorized by Texas Education Code §11.052 as a condition of vindicating her rights under the VRA.

228. Using the petition process provided by Texas Education Code §11.052 would be impractical, if not impossible, for changing the SBISD election system because voter turnout for SBISD trustee elections held between 1988 and 2024 was substantially

---

[321]3RT200:7-201:1 (Porter).  <u>See also</u> DX 9.

[322]2RT4:16-19 (Klussman); 3RT119:12-22 (Lopez); 3RT 201:2-8 (Porter).

less that the 15% or 15,000 registered voters needed to place a proposition on the ballot. For example, to place a single member district proposition on the ballot would require proponents to obtain more signatures than the total number of voters who turned out for any SBISD election for which data was presented at trial.[323]

**E.    Balancing of the <u>Gingles</u> Preconditions and the Totality of Circumstances Leads the Court to Find that Plaintiff Has Established a Violation of the Voting Rights Act**

229. After carefully considering the evidence, when all of the relevant factors are considered, the court finds that race or language minority status better explains Hispanic defeat at the polls than political partisanship, and that Plaintiff has therefore satisfied her burden to show that the SBISD's current at-large election system results in a denial of her opportunity, as a Hispanic voter, to participate in the political process and elect representatives of her choice on account of race or language minority status.

---

[323]PX 88; 4RT7:23-8:12 (Porter (testifying about the 2023 election). <u>See also</u> Tables 3 and 4, above, showing the following turnout rates for recent SBISD trustee elections: 2018 — 3,294 of 91,145 registered voters for a total of 3.61%; 2019 — 1,559 of 94,986 registered voters for a total of 1.64%; 2021 — 8,802 of 97,556 registered voters for a total of 9.02%; 2022 —13,901 of 101,816 registered voters for a total of 13.65%; 2023 — 10,635 or 103,338 registered voters for a total of 10.29%; and 2024 — 7,959 of 106,224 registered voters for a total of 7.49%.

### III. <u>Conclusions of Law</u>

**A.    Jurisdiction**

1.    The court has jurisdiction over this action pursuant to 52 U.S.C. § 10308(f), and 28 U.S.C. §§ 1331, 1343, and 1344.

2.    The court has jurisdiction over the parties.

3.    Venue is proper pursuant to 28 U.S.C. § 1391.

**B.    Responsibility to Make Detailed Findings**

4.    The trial court has two primary obligations in making findings in a vote dilution case.  First, the court must specifically state the evidence found credible and the reasons for its conclusions.  Second, the court must discuss all substantial evidence contrary to its decision, but the court is not required to  expressly mention all the evidence in its opinion.  <u>See</u> <u>League of United Latin American Citizens (LILAC) #4552 v. Roscoe Independent School District</u>, 123 F.3d 843, 846 (5th Cir. 1997) (citing <u>Rollins v. Fort Bend Independent School District</u>, 89 F.3d 1205, 1221 (5th Cir. 1996), and <u>Velasquez v. City of Abilene, Texas</u>, 725 F.2d 1017, 1020 (5th Cir. 1984)).

**C.    Claim for Violation of § 2 of the Voting Rights Act**

i.    <u>Section 2 of the Voting Rights Act</u>

5.    Section 2 of the Voting Rights Act of 1965, as amended ("VRA"), 52 U.S.C. § 10301 <u>et seq.</u>, prohibits any state or political subdivision from imposing or applying a voting

standard, practice, or procedure that results in a denial or abridgment of the right of any citizen of the United States to vote on account of race, color, or language minority status, 52 U.S.C. § 10301(a), and proscribes vote dilution, whereby a class of citizens has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).[324]

---

[324]Section 2, as amended, states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

6.   Congress enacted § 2 to help effectuate the Fifteenth Amendment's guarantee that "[t]he right of citizens of the United States to vote shall not be denied or abridged by . . . any State on account of race, color, or previous condition of servitude." United States Constitute, amendment XV, § 1. See Voinovich v. Quilter, 113 S. Ct. 1149, 1154-55 (1993).

7.   In 1982 Congress substantially revised § 2 of the VRA to make clear that a violation could be proved by showing discriminatory effect alone, and to clarify that proof of discriminatory intent is not required.   Thornburg v. Gingles, 106 S. Ct. 2752, 2758 (1986).

8.   "[E]lectoral devices, such as at-large elections, may not be considered per se violative of § 2.   Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." Gingles, 106 S. Ct. at 2764.   See also 52 U.S.C. § 10301(b).

9.   The issue in this § 2 case is whether as a result of the SBISD's at-large election system, plaintiff, a SBISD Hispanic voter, does not have an equal opportunity to participate in the political process and to elect candidates of her choice on account of her race or language minority status.   52 U.S.C. §§ 10301 and 10303(f)(2).   See also Gingles, 106 S. Ct. at 2763 (quoting S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206).

94

ii.  The Gingles Framework for Analyzing Section 2 Claims

10. Courts evaluate § 2 claims brought by plaintiffs challenging at-large voting systems using the framework articulated in Gingles, 106 S. Ct. at 2764-67.   Under this framework plaintiffs must first prove by a preponderance of the evidence the following three preconditions:

a.  the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district;"

b.  the minority group "is politically cohesive;" and

c.  the "majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as a minority candidate running unopposed — usually to defeat the minority's preferred candidate."

Id. at 2766-67. See Allen v. Milligan, 143 S. Ct. 1487, 1503 (2023) (reaffirming the Gingles framework for evaluating § 2 challenges to voting systems).

11. Failure to establish any one of the Gingles preconditions precludes a finding of vote dilution.  Valdespino v. Alamo Heights Independent School District, 168 F.3d 848, 852 (5th Cir. 1999), cert. denied, 120 S. Ct. 931 (2000).

12. The Supreme Court has explained that

> [e]ach Gingles precondition serves a different purpose.  The first, focused on geographical compactness and numerosity, is "needed to establish that the minority has the potential to elect a

representative of its own choice in some single-
member district. . . The second, concerning the
political cohesiveness of the minority group, shows
that a representative of its choice would in fact
be elected. . . The third precondition, focused on
racially polarized voting, "establish[es] that the
challenged districting thwarts a distinctive
minority vote" at least plausibly on account of
race.

Milligan, 143 S. Ct. at 1503 (quoting Growe v. Emison, 113

S. Ct. 1075, 1084 (1993)). See also Cooper v. Harris, 137 S.

Ct. 1455, 1470 (2017) ("Those three showings, we have

explained, are needed to establish that 'the minority [group]

has the potential to elect a representative of its own choice'

in a possible district, but that racially polarized voting

prevents it from doing so in the district as actually drawn

because [the minority group] is 'submerg[ed] in a larger

[majority] voting population.").


a.   The First Gingles Precondition

13.   To satisfy the first Gingles precondition, i.e., that the

minority group is sufficiently large and geographically

compact to constitute a majority in a single-member district,

plaintiffs generally submit evidence of a hypothetical

redistricting scheme in the form of an illustrative plan.

See Gingles, 106 S. Ct. at 2786 (O'Connor, J., concurring).

See also Fairley v. Hattiesburg, Mississippi, 584 F.3d 660,

669 (5th Cir. 2009) ("[T]o establish the first Gingles

precondition, plaintiffs typically have been required to

96

propose hypothetical redistricting schemes and present them to the district court in the form of illustrative plans.")).

14. Plaintiff must prove by a preponderance of the evidence that the minority citizen voting age population ("CVAP") of at least one of the illustrative districts exceeds 50% of the total CVAP. See Bartlett v. Strickland, 129 S. Ct. 1231, 1245 (2009) ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"). See also League of United Latin American Citizens v. Perry, 126 S. Ct. 2594, 2616 (2006) ("only eligible voters affect a group's opportunity to elect candidates"), and Reyes v. City of Farmers Branch, Texas, 586 F.3d 1019, 1023 (5th Cir. 2009)(holding that only the CVAP is relevant in evaluating the first prong of Gingles).

15. Districts in the illustrative plan will be reasonably configured if they comport with traditional districting criteria, such as being compact, contiguous, and reasonably shaped, and preserve communities of interest and traditional boundaries. See Milligan, 143 S. Ct. at 1503. See also Miller v. Johnson, 115 S. Ct. 2475, 2488 (1995) (identifying traditional districting criteria as including "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests").

97

16. The compactness requirement "refers to the compactness of the minority population, not to the compactness of the . . . district." <u>Perry</u>, 126 S. Ct. at 2618.

17. "[S]hape is a significant factor that courts can and must consider in a <u>Gingles</u> compactness inquiry." <u>Sensley v. Albritton</u>, 385 F.3d 591, 596 (5th Cir. 2004). But "a compactness determination should not <u>hinge</u> on the shape of a district." <u>Id.</u>

18. The Fifth Circuit allows evidence of a proposed plan's compliance with traditional districting principles to come from lay witnesses. <u>See</u> <u>Robinson v. Ardoin</u>, 37 F.4th 208, 219 (5th Cir. 2022)(per curiam) (approving district court's reliance on testimony of resident voters to establish that a proposed illustrative district preserved communities of interest).

19. Citing <u>Abbott v. Perez</u>, 138 S. Ct. 2305 (2018), and <u>Harding v. County of Dallas, Texas</u>, 948 F.3d 302, 315-16 (5th Cir. 2020) (Ho, concurring and dissenting), SBISD argues that Plaintiff must additionally prove that the proposed illustrative district will in fact perform as hoped.[325] SBISD's reliance on <u>Abbott</u> and <u>Harding</u> is misplaced because

---

[325]<u>See</u> Defendants' Memorandum of Law, Docket Entry No. 71-12, pp. 11-12. <u>See also</u> <u>id.</u> at 16 ("[C]onsidering low Hispanic voter turnout, Plaintiff cannot meet 'the overarching demand' that her proposed single-member voting district enhances Hispanics' ability to elect SBISD school board candidates of their choosing.").

neither of those cases added a new requirement to the <u>Gingles</u> framework.  The plan need only be illustrative; "plaintiffs need not demonstrate guaranteed success under a hypothetical redistricting plan to prevail on a claim of vote dilution." <u>Fusilier v. Landry</u>, 963 F.3d 447, 462 (5th Cir. 2020).  <u>See</u> <u>Johnson v. DeGrandy</u>, 114 S. Ct. 2647, 2658 n. 11 (1994) ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.").

20.  The court concludes that Plaintiff satisfied the first <u>Gingles</u> precondition by establishing that the Hispanic minority is sufficiently large and geographically compact to constitute a majority in a proposed single-member district plan.[326]

   b.   The Second and Third <u>Gingles</u> Preconditions

21.  "Usually, plaintiffs in a vote dilution case will attempt to establish both the second and third <u>Gingles</u> factors with statistical evidence of racial polarization of the electorate." <u>Westwego Citizens for Better Government v. City of Westwego</u>, 946 F.2d 1109, 1118 (5th Cir. 1991).

22.  "[R]acial polarization exists where there is a consistent relationship between the race of the voter and the way in which the voter votes or where minority voters and majority voters vote differently." <u>Gingles</u>, 106 S. Ct. at 2768 n. 21.

---

[326]<u>See</u> § II.B.i, above.

23.  "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether [majority voters] vote sufficiently as a bloc usually to defeat the minority's preferred candidates." Gingles, 106 S. Ct. at 2769.  See Westwego, 872 F.2d at 1207 ("Evidence of racially polarized voting 'is the linchpin of a section 2 vote dilution claim,' . . . and is relevant to establishing [the second and third preconditions] set forth in the Gingles decision.") (internal citation omitted).

24.  "[T]he evidence most probative of racially polarized voting must be drawn from elections including both [minority] and [majority] candidates." Westwego, 872 F.2d at 1208 n. 7.

25.  "For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent.  It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." Gingles, 106 S. Ct. at 2772.


(I)  The Second Gingles Precondition

26.  The second Gingles precondition requires plaintiffs to prove by a preponderance of the evidence that the minority group is politically cohesive.  Gingles, 106 S. Ct. at 2766.

27. Political cohesiveness, concerns the voting behavior of minority voters and "implies that the group generally unites behind a single political 'platform' of common goals and common means by which to achieve them." Monroe v. City of Woodville, Mississippi, 881 F.2d 1327, 1331 (5th Cir. 1989) (per curiam), modified, 897 F.2d 763, cert. denied, 111 S. Ct. 71 (1990).

28. Political cohesiveness may be proved a number of ways. One way is to demonstrate that "a significant number of minority group members usually vote for the same candidates." Gingles, 106 S. Ct. at 2769. See also Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 501-02 (5th Cir. 1987), cert. denied, 109 S. Ct. 3213 (1989). "'Statistical proof of political cohesion is likely to be most persuasive form of evidence, although other evidence may also establish this phenomenon,' such as 'lay testimony from members of the community on political cohesion.'" Monroe, 897 F.2d at 764 (quoting Brewer v. Ham, 876 F.2d 448, 453-54 (5th Cir. 1989)). See Westwego, 946 F.2d at 1118 & n. 12 (recognizing that "Gingles allows plaintiffs to prove cohesion even in the absence of statistical evidence of racial polarization").

29. A statistically significant level of cohesion sufficient to satisfy this precondition has been found at a level as low as 54%. See Lopez v. Abbott, 339 F. Supp. 3d 589, 609 (S.D. Tex. 2018) (citing Fabela v. City of Farmers Branch, Texas,

No. 3:10-CV-1425-D, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012) (54.1%, considered to support a finding of minority cohesion in context with a range of elections exhibiting cohesion levels reaching as high as 88.1%)).

30. A statistical analysis preferably covers a sufficient time to display a consistent pattern of racial bloc voting, because "[r]acial polarization should be seen as an attribute not of a single election, but rather of a polity viewed over time." Gingles, 106 S. Ct. at 2769 (internal quotation marks and citation omitted)). But "where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." Id. n. 25.

31. Political cohesiveness may also be proved by establishing four factors identified in Nixon v. Kent County, Michigan, 790 F. Supp. 738, 743-44 (W.D. Mich. 1992):

> (1) whether the members have similar socioeconomic backgrounds resulting in common social disabilities and exclusion; (2) whether members have similar attitudes toward significant issues affecting the challenged entity; (3) whether members have consistently voted for the same candidates; and (4) whether the minorities consider themselves "one" even in situations in which they would benefit independently.

League of United Latin American Citizens v. Clements, 999 F.2d 831, 897 n. 8 (5th Cir. 1993) (en banc) (Jones, J., concurring), cert. denied, 114 S. Ct. 878 (1994) (citing the Nixon factors as persuasive evidence of minority cohesion).

32.   Political cohesion does not mean that minorities vote for the same candidates at all times.

> [T]he fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest.

Gingles, 106 S. Ct. at 2770.

33.   A minority group's preferred candidate need not be a member of the minority group.   See East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 926 F.2d 487, 493 (5th Cir. 1991).

34.   Based on Dr. Stein's analyses of SBISD elections held in 2015, 2018, 2019, 2021, 2022, and 2023, and identification of the Hispanic preferred candidates and the mean vote shares attributable to those candidates, which ranges from 82% to 99%, and on evidence that the Hispanic preferred candidates emphasized the same or similar issues in their campaigns, the court has found that over the last decade Hispanics in SBISD are politically cohesive and vote as a bloc for Hispanic-- preferred candidates that share a single political 'platform' of common goals and common means by which to achieve them.[327]

---

[327]See § II.B.ii.b, above, Finding of Facts ¶¶ 153-64.

(II) The Third <u>Gingles</u> Precondition:

35.  The Third <u>Gingles</u> precondition requires plaintiffs to prove
     by a preponderance of the evidence that "the white majority
     votes sufficiently as a bloc to enable it — in the absence of
     special circumstances . . . usually to defeat the minority's
     preferred candidate." <u>Gingles</u>, 106 S. Ct. at 2767.

36.  "Just as evidence of racial polarity in the electorate can
     satisfy the second <u>Gingles</u> requirement, so can it satisfy the
     third — that the . . . majority votes cohesively enough to
     cause it usually to defeat the candidates preferred by the
     racial or ethnic minority." <u>Westwego</u>, 946 F.2d at 1118.

37.  "The amount of [majority] block voting that can generally
     'minimize or cancel,' . . . [minority] voters' ability to
     elect representatives of their choice . . . will vary from
     district to district according to a number of factors,
     including the nature of the allegedly dilutive electoral
     mechanism." <u>Gingles</u>, 106 S. Ct. at 2769.

38.  "[T]he usual predictability of the majority's success
     distinguishes structural dilution from the mere loss of an
     occasional election." <u>Gingles</u>, 106 S. Ct. at 2767.

39.  "[A] [majority] bloc vote that normally will defeat the
     combined strength of minority support plus [majority]
     'crossover' votes rises to the level of legally significant
     [majority] bloc voting. <u>Gingles</u>, 106 S. Ct. at 2769.

40. "[T]he fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." <u>Gingles</u>, 106 S. Ct. at 2770.

41. Based on Dr. Stein's analyses of SBISD elections held in 2015, 2018, 2019, 2021, 2022, and 2023, and identification of the Anglo preferred candidates, and the mean vote share attributable to those candidates, which ranges from 54% to 88%, on evidence that the Anglo preferred candidates have emphasized the same or similar issues in their campaigns and that those issues differ from issues emphasized by Hispanic preferred candidates, and on evidence that the Anglo vote has been sufficient to defeat the combined strength of the Hispanic vote and the crossover vote that Hispanic preferred candidates received from Anglo voters, the court has found that Anglos in SBISD are politically cohesive and that Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, to defeat the Hispanic voters' preferred candidates.[328]

42. Because Plaintiff has established by a preponderance of the evidence (1) that the Hispanic minority is sufficiently large and geographically compact to constitute a majority in a proposed single-member district plan, (2) that the Hispanic minority is politically cohesive, and (3) that the Anglo

---

[328]<u>See</u> § II.B.ii.c, above, Finding of Facts ¶¶ 165-77.

majority votes sufficiently as a bloc to enable them, in the absence of special circumstances, to defeat the Hispanic voters' preferred candidates, the court concludes that Plaintiff has satisfied the three <u>Gingles</u> preconditions. Once the three <u>Gingles</u> factors have been satisfied,

> it will be only the very unusual case in which the plaintiffs . . . have failed to establish a violation of §2 under the totality of the circumstances. In such cases, the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the [VRA].

<u>Clark v. Calhoun County</u>, 21 F.3d 92, 97 (5th Cir. 1994).


iii. <u>Totality of Circumstances</u>

43. "[A] plaintiff who demonstrates the three [<u>Gingles</u>] preconditions must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." <u>Milligan</u>, 143 S. Ct. at 1503 (quoting <u>Gingles</u>, 106 S. Ct. at 2763-64). <u>See also</u> <u>Abrams v. Johnson</u>, 117 S. Ct. 1925, 1936 (1997) ("Once plaintiffs establish [the three <u>Gingles</u> pre]conditions, the court considers whether, on the totality of circumstances, minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice."

44. "[T]he totality of circumstances inquiry recognizes that application of the <u>Gingles</u> factors is 'peculiarly dependent upon the facts of each case.'" <u>Milligan</u>, 143 S. Ct. at 1503 (citing <u>Gingles</u>, 106 S. Ct. at 2781. "Before courts can find a violation of § 2, therefore, they must conduct 'an intensely local appraisal' of the electoral mechanism at issue, as well as a 'searching practical evaluation of the "past and present reality."'" <u>Id.</u> (quoting <u>Gingles</u>, 106 S. Ct. at 2781).

45. Factors relevant to this showing may include one or more of the seven enumerated factors and two additional considerations identified in S. Rep. No. 97-417 at 28, 1982 U.S.C.C.A.N. at 206-07.[329]  <u>See</u> <u>Gingles</u>, 106 S. Ct. at 2752 and 2759. These factors, however, are "neither comprehensive nor exclusive. . . other factors may also be relevant and may be considered." <u>Gingles</u>, 106 S. Ct. at 2763 (citing S. Rep. No. 97-417, pp. 29-30, 1982 U.S.C.C.A.N. at 207-08).  <u>See also</u> <u>Clements</u>, 999 F.2d at 849 n. 22 (noting that these factors were derived from <u>Zimmer v. McKeithen</u>, 485 F.2d 1297 (5th Cir. 1973), <u>aff'd sub nom East Carroll Parish School Board v. Marshall</u>, 96 S. Ct. 1083 (1976)).

46. The Senate and other factors present issues of fact for the court.  <u>Salas v. Southwest Texas Junior College District</u>, 964 F.2d 1542, 1555 (5th Cir. 1992).

---

[329]<u>See</u> § I, above.

47.  Regarding the first Senate factor - the history of voting-related discrimination in the political subdivision - "'the most relevant "historical" evidence is relatively recent history, not long-past history.'" Rollerson v. Brazos River Harbor Navigation District of Brazoria County, Texas, 6 F.4th 633, 641 (5th Cir. 2021)(quoting Veasey v. Abbott, 830 F.3d 216, 232 (5th Cir. 2016) (en banc), cert. denied, 137 S. CT. 612 (2017)). See also Shelby County, Alabama v. Holder, 133 S. Ct. 2612, 2628-29 (2013) (rejecting the government's argument in a VRA case because it did "not look to 'current political conditions,' but instead relies on a comparison between the States in 1965. . . But history did not end in 1965. . . . It cannot rely simply on the past. . .).

48.  Regarding the fifth Senate factor - the effects of past discrimination - "[t]he effects of past discrimination . . . pertain solely to the 'political access' prong of a §2 claim." Clements, 999 F.2d at 863.  "Absent an indication that [the effects of past discrimination] 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to [SBISD's] political process." National Association for the Advancement of Colored People v. Fordice, 252 F.3d 361, 367 (5th Cir. 2001) (quoting Clements, 999 F.2d at 866).

49. "[T]he most important Senate Report factors bearing on § 2 challenges to multimember districts are [Senate Factor 2,] the 'extent to which minority group members have been elected to public office in the jurisdiction,' and [Senate Factor 7,] the 'extent to which voting in elections of the state or political subdivision is racially polarized.' If present, the other factors, . . . are supportive of, but <u>not essential to</u>, a minority voter's claim." <u>Gingles</u>, 106 S. Ct. at 2765 n. 15 (quoting S. Rep. at 28-29, 1982 U.S.C.C.A.N. at 206).

50. The court has found that Plaintiff established by a preponderance of the credible evidence that Senate Factors 2, 5, and 7 weigh in favor of finding a violation of the VRA,[330] but that Plaintiff failed to establish by a preponderance of the credible evidence that additional considerations identified in the Senate Report weigh in favor of finding a violation of the VRA.[331]

51. A relevant additional factor raised at trial concerns the applicability of Texas Education Code § 11.052, which in pertinent part states that

> (a) . . . the board of trustees of an independent school district, on its own motion, may order that trustees of the district are to be elected from single-member districts or that not fewer than 70 percent of the members of the board of trustees are

---

[330] <u>See</u> § II.C.ii (¶¶ 187-88), v (¶¶ 201-04), and vi (¶¶ 207-09), above.

[331] <u>See</u> § II.D, above, Finding of Facts ¶¶ 210-24.

to be elected from single-member trustee districts
with the remaining trustees to elected from the
district at large. . .

. . .

(e) If at least 15 percent or 15,000 of the
registered voters of the school district, whichever
is less, sign and present to the board of trustees
a petition requesting submission to the voters of
the proposition that trustees of the district be
elected in a specific manner, which must be
generally described on the petition and which must
be a manner of election that the board could have
ordered on its own motion under Subsection (a) or
(b), the board shall order that the appropriate
proposition be placed on the ballot at the first
regular election of trustees held after the 120th
day after the date the petition is submitted to the
board. . . .

(f) If single-member trustee districts are adopted
or approved as provided by this section, the board
shall divide the school district into the
appropriate number of trustee districts, based on
the number of members of the board that are to be
elected from single-member trustee districts, and
shall number each trustee district.  The trustee
districts must be compact and contiguous and must
be as nearly as practicable of equal population.

Tex. Educ. Code §11.052(a), (e) and (f).

52.    The court has found that use of the petition process provided

by Texas Education Code §11.052 would be impractical, if not

impossible, for changing the SBISD election system because

voter turnout for SBISD trustee elections held between 2018

and 2024 was substantially less that the 15% or 15,000

registered voters needed to place a proposition on the

ballot.[332]

---

[332]See § II.D.iii, above, Finding of Facts ¶¶ 225-28.

iv.  Balancing of All the Factors

53.  Plaintiff must present evidence of racial or language minority
bias through the factors used in the Gingles preconditions and
totality of circumstances tests.  Upon doing so, the burden
shifts to SBISD to present evidence of alternative race-
neutral explanations for the racially polarized elections.
SBISD contends that partisan politics and/or low voter turnout
best explain the alleged racially polarized elections.  The
court must determine the weight to be accorded each factor and
issue, and then balance them against each other to determine
whether, on the whole, Plaintiff, as a Hispanic voter, has had
her voting power for electing SBISD board trustees diluted on
account of race or minority language status.  See Monroe, 881
F.2d at 1334.  See also Fusilier, 963 F.3d at 462 (recognizing
a court's need to balance a plaintiff's evidence of vote
dilution against a defendant's evidence that the alleged
dilution is not caused by a plaintiff's protected status);
Lopez, 339 F. Supp.3d at 604 (same).

54.  The court has found that Plaintiff satisfied the three Gingles
preconditions by a preponderance of the evidence, and that
Plaintiff established by a preponderance of the evidence that
Senate Factors 2, 5 and 7 weigh in favor of finding a
violation of the VRA.  The court has not found that partisan
politics best explains the racial polarity evidenced in SBISD

111

elections held over the last decade. For these reasons Plaintiff is entitled to declaratory and injunctive relief precluding the SBISD from maintaining an at-large system for electing school board trustees.

55. Because Plaintiff is the prevailing party, the court concludes that Plaintiff is entitled to court costs and to an award of attorney's fees under Fed. R. Civ. P. 54(d). The Court will defer deciding the amount of attorney's fees to which Plaintiff is entitled until Plaintiff seeks such relief under Fed. R. Civ. P. 54(d).

56. A conclusion of law that should be treated as a finding of fact is adopted as that, and a finding of fact that should be treated as a conclusion of law is hereby adopted as that.

## IV. Conclusions and Order

The court's findings of fact, conclusions of law, and relief ordered are based on its conscientious application of § 2 of the Voting Rights Act and the appellate decisions applying the Act to the facts of this case. As the court's opinion should make clear, there was no evidence that the trustees or administrators of the SBISD failed to provide outstanding educational opportunities for all of SBISD's students or that they failed to act in the best interests of its Hispanic students.

The Court hereby finds and **DECLARES** that the SBISD's current at-large system of electing school board trustees violates the VRA and **ENJOINS** the SBISD from conducting trustee elections under its current electoral system at any time after the election to be held on May 3, 2025.

The Court further orders that within twenty (20) days from the date of this Memorandum Opinion and Order the SBISD shall file with the court a single member district plan providing for the election of school board trustees, with sufficient supporting expert analysis establishing that it complies with Section 2 of the VRA. SBISD's remedial plan may be either a seven district single-member system or a system with five single-member districts and two at-large trustee positions, so long as that system complies with § 2 of the VRA. See Tex. Educ. Code §11.052(a) (allowing for both 7-0 and 5-2 systems). SBISD's remedial plan must (a) contain one or more geographically-compact single member districts in which the HCVAP constitutes a majority; (b) comply with the one person-one vote requirement; and (c) respect existing communities of interest, including but not limited to the integrity of areas of minority population concentrations. Along with these materials, the SBISD may include a memorandum of law of not more than 10 pages.

The Court further orders that within twenty (20) days after SBISD files its remedial plan, Plaintiff may file objections to that plan, and, if desired, an alternative plan with supporting

expert analysis.  Plaintiff's objections shall be no more than 10 pages.  The SBISD may file a reply, not exceeding five (5) pages, within ten (10) days of Plaintiff's response to SBISD's proposed plan.[333]

    **SIGNED** at Houston, Texas, on this 28th day of April, 2025.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

---

[333]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with this case.  As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers, reviewing the trial transcript, and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments.  While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion.  Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.  Given the age and importance of this case, the court will not stay the case or delay the parties' obligations based on motions to reconsider the court's rulings, motions for an interlocutory appeal, or similar motions.